# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1)  JAMES GLITZ and | ) | |
| 2)  RODGER A. THORNBERRY, on | ) | CASE NO. CIV-12-1341-W |
| behalf of Themselves and | ) | |
| 3)  All Others Similarly Situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CLASS ACTION COMPLAINT FOR |
| vs. | ) | VIOLATION OF THE FEDERAL |
| | ) | SECURITIES LAWS |
| | ) | |
| 1)  SANDRIDGE ENERGY, INC., | ) | |
| 2)  TOM L. WARD, | ) | |
| 3)  JAMES D. BENNETT, and | ) | **JURY TRIAL DEMANDED** |
| 4)  MATTHEW K. GRUBB, | ) | |
| | ) | |
| Defendants. | | |

## INTRODUCTION AND SUMMARY OF THE ACTION

1.   This is a securities fraud class action on behalf of all purchasers of the securities of SandRidge Energy, Inc. ("SandRidge" or the "Company") between February 24, 2011 and November 8, 2012 (the "Class Period"), against SandRidge and its top officers, for violations of the federal securities laws arising out of defendants' dissemination of false and misleading statements concerning the Company's business and operational status and FY 2012 financial expectations.

2.   SandRidge, together with its subsidiaries, operates as an independent natural gas and oil company in the United States.  It is headquartered in Oklahoma City.  The Company engages in the exploration, development, and production of oil and gas properties. Its Exploration and Production segment explores for, develops, and produces natural gas and oil reserves with focus on the Mid-Continent (a/k/a "Mississippian formation") and the Permian Basin.   This segment also operates leasehold positions in the West Texas Overthrust, Gulf Coast, and Gulf of Mexico. The Company's Drilling and Oil Field Services segment is involved in the contract drilling of oil and natural gas wells primarily in the west Texas region.  Its Midstream Gas Services segment engages in purchasing, gathering, treating, and selling natural gas in west Texas.

3.   Defendants include Tom L. Ward ("Ward"), Chairman and Chief Executive Officer ("CEO") of SandRidge, who previously co-founded Chesapeake Energy and was the chief operating officer of that company from 1989 until 1996.  Ward founded the modern day SandRidge in June 2006 when he purchased a significant interest in the Company's predecessor, becoming the CEO and Chairman.  According to an April 20, 2012 interview

Defendant Ward gave *Seeking Alpha.com*, "[a]fter leaving Chesapeake Energy (CHK), which he co-founded with CEO Aubrey McClendon, Tom Ward set out in 2006 to build a new exploration and production company based on his 23 years of experience acquiring promising acreage." Beginning in 2008, natural gas prices began to drop, increasing the disparity in its value compared with crude oil.

4.     Seeking to differentiate SandRidge from Chesapeake and its heavily reliance on less profitable natural gas exploration, throughout the Class Period, Defendants maintained that SandRidge had successfully transformed itself from being a primarily low-margin natural gas producing to a primarily high-margin oil producing company. As a result, as relayed by Defendant Ward in the April 2012 interview with *Seeking Alpha.com*, the Company promised much stronger earnings and returns on investor capital:

> ***The important thing to understand is that we have a three-year strategy that no other company in the U.S. has; and that's that we're going to triple EBITDA, we're going to double our oil production, and we are going to increase production. And by the end of 2014, we'll be doing it all within our cash flow. And all the while, we'll be improving our credit metrics.***

5.     Based on Defendants' bullish mantra concerning its successful conversion to being primarily a high-margin oil producer rather than a low-margin natural gas producer throughout the Class Period, and its purported strong business metrics, oil reserves and forward earnings guidance, the Company's stock traded at inflated prices throughout the Class Period, trading above $13 per share in intraday trading by April 1, 2011. Meanwhile, as promised, Defendants' bullish statements allowed them to significantly monetize the Company's Mississippian formation assets, ***raising more than $5 billion*** by:

- ***Selling $2.75 billion in three private placements of SandRidge notes***, promising investors the Company would later register those notes for resale;

- Obtaining $1.5 billion in partially-funded joint venture commitments; and

- ***Raising $928.7 million*** by transferring certain Mississippian formation assets to two trusts and selling common units in those two trusts in two underwritten public offerings.

6.      However, Defendants shocked the market between November 8, 2012, after the close of trading, and November 9, 2012, before the opening of trading, by disclosing that they had been grossly overstating the proportion of oil-producing versus natural gas producing assets in the Company's Mississippian formation throughout the Class Period. Defendants also disclosed that they intended to sell the remaining interest in the Company's Permerian Basin assets, though those assets were the Company's highest-margin oil producing assets. As the market absorbed this and other disclosures made by one of the Company's substantial shareholders concerning compensation paid to and self-dealing by Defendant Ward on November 8th, stock analysts significantly downgraded the Company's stock valuation and SandRidge's stock price was hammered.

7.      In its research report issued that day, Global Hunter Securities noted that "[f]lowing lower-oil volume…through our valuation model substantially reduced our valuation estimate to $5 per share from $9," adding that "[i]n response to this reduction in estimated equity value we are reducing our Buy rating to Neutral." Stifel Nicolaus also reduced its price target to $8.50 from $10, stating the Company's 2013 production guidance of 39.2 million barrels of oil equivalent was disappointing because it indicated more growth in natural gas volumes.

8.     On this news, SandRidge's stock fell precipitously from its November 8, 2012 closing price of $6.10 per share to close at $5.51 per share on November 9, 2012, *or 9%*, on extremely high volume of more than *six times* the average daily trading volume over the prior three month period.

9.     The true facts, which were known by each of the Defendants but concealed from the investing public during the Class Period, were as follows:

(a)     When SandRidge paid Defendant Ward $76 million in connection with terminating the Executive Well Participation Plan, rather than decreasing the Company's focus on natural gas production and focusing it on oil production, the Company had actually acquired significant additional natural gas producing assets from Defendant Ward;

(b)     Defendants had been overstating the value of SandRidge's Mississippian formation assets throughout the Class Period as contrary to their repeated mantra that SandRidge had successfully transformed itself from a primarily natural gas to a primarily oil producing company, in reality its Mississippian formation assets consisted of significantly higher low-margin natural gas deposits and significantly lower high-margin oil deposits than the market had previously been led to believe;

(c)     Due to "problematic" "mechanical" issues with one of three rigs the Company needed to drill in its new Gulf of Mexico assets acquired in the Dynamic Offshore Resources LLC ("Dynamic Offshore") acquisition in early 2012, which had rendered that rig inoperable during the 2Q 2012, Defendants had been required to "ramp down the drilling" in the Gulf of Mexico, which would preclude SandRidge from "drill[ing] as many wells" during FY 2012;

(d)    Contrary to Defendants' Class Period statements, Defendants intended that the $1.3 billion Dynamic Offshore acquisition be utilized as a mere "financing vehicle" for the Company's onshore drilling projects, despite Defendants' earlier promises that the Company did not need to further dilute shareholder interest in SandRidge through equity offerings and lauding the merits of the Dynamic Offshore acquisition; and

(e)    As a result, Defendants knew SandRidge's FY 2012 earnings guidance was not attainable.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

11.    Venue is proper here pursuant to §27 of the 1934 Act. Acts and transactions giving rise to the violations of law complained of occurred here.

## THE PARTIES

12.    Plaintiffs James Glitz and Rodger Thornberry purchased SandRidge common stock as set forth in the attached Certification, which are incorporated herein by reference, and were damaged thereby.

13.    Defendant SandRidge is a Delaware corporation headquartered at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma. During the Class Period, SandRidge had approximately 415 million shares of common stock outstanding which shares traded in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "SD."

14.     Defendant Ward founded SandRidge and is, and was throughout the Class Period, SandRidge's Chairman of the Board and Chief Executive Officer ("CEO").

15.     Defendant James D. Bennett ("Bennett") is, and was throughout the Class Period, SandRidge's Senior Vice President and Chief Financial Officer ("CFO").

16.     Defendant Matthew K. Grubb ("Grubb") is, and was throughout the Class Period, SandRidge's President and Chief Operating Officer.  Grubb was heavily involved in planning the Company's transformation from being a primarily natural gas producer to being a primarily oil producer and relaying the purported success of that transformation to the market during the Class Period.

17.     The defendants identified in ¶¶14-16 are referred to herein as the "Individual Defendants."  The Individual Defendants are liable for the false statements pleaded herein, as those statements are each "group-published" information for which they are responsible.

## BACKGROUND TO THE CLASS PERIOD

18.     A predecessor to SandRidge was founded in 1984 as Riata Energy, Inc.  In 2006, the Company changed its name to SandRidge Energy.  SandRidge's drilling activities are focused on its oil properties in the Mid-Continent and Permian Basin.  The Company also maintains production in West Texas, the Gulf Coast and the Gulf of Mexico.  The Company owns and operates drilling rigs under the brand name Lariat Services, Inc.

19.     The Company made its initial public offering on November 5, 2007, offering 28.7 million shares of its common stock at $26 per share.  SandRidge is traded on the NYSE under the symbol "SD."

20.     Defendant Ward, Chairman and CEO of SandRidge, previously co-founded Chesapeake Energy and was the chief operating officer of that company from 1989 until 1996. SandRidge is also a minority owner of the Oklahoma City Thunder NBA franchise, in which Defendant Ward and another SandRidge director maintain a significant ownership interests. Ward founded the Company in June 2006 when he purchased a significant interest in its predecessor, becoming the CEO and Chairman.  According to an April 20, 2012 interview Defendant Ward gave *Seeking Alpha.com*, "[a]fter leaving Chesapeake Energy (CHK), which he co-founded with CEO Aubrey McClendon, Tom Ward set out in 2006 to build a new exploration and production company based on his 23 years of experience acquiring promising acreage."

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

21.     The Class Period starts on February 24, 2011.  On that day, Defendants released the Company's 4Q and FY 2010 financial results.  Defendants' press release issued that day emphasized that SandRidge's "[o]il reserves increased 140% to 252 MMBbls at year end 2010 from 105 MMBbls at year end 2009."  The press release further quoted Defendant Ward emphasizing the Company's successful transition from a primarily natural gas producing company to a primarily oil producing company:

> ***Tom L. Ward, Chairman and CEO commented, "We are now seeing the
> value of our transformation to oil. The present value of our reserves is $4.5
> billion, nearly three times our year end 2009 present value. Our oil reserves
> have more than doubled from year end 2009.*** Our finding cost of $9.04 per
> Boe reflects the high quality of our drilling program.  We have grown oil
> production from 7,900 barrels per day in fourth quarter 2009 to over 28,400
> barrels per day in fourth quarter 2010 and expect oil sales to generate about
> 80% of our revenues in 2011.

*"We have significantly enhanced our value with the early move to oil in two proven areas.* We control 185,000 net acres in the Central Basin Platform in West Texas *and have now leased 780,000 net acres in the Mississippian oil play in Northern Oklahoma and Southern Kansas.* We expect to ultimately own over 900,000 net acres in the Mississippian as we wind down our leasing efforts in the first quarter.  In both of these plays we develop shallow, permeable, carbonate reservoirs with decades of production history.  *As a result, our costs have remained low and we do not expect to see the type of cost increases the industry is experiencing.*

"We plan to drill over 900 wells in the Central Basin Platform and the Mississippian in 2011 *where our average wellhead return is expected to exceed 90%.*  We intend to fund this program with a combination of cash flow, proceeds from non-core asset sales *and monetizing a portion of Mississippian acreage.*"

[Emphasis added].

22.     Investors were elated and the Company's stock price spiraled on this news, closing up $1.35 per share, *approximately 15%*, on extremely high volume of more than 43 million shares trading.

23.     Thereafter, between March 1, 2011 and March 2, 2011, Defendants announced that the Company planned to commence a private offering of $700 million of Senior Notes due 2021, with proceeds being used to fund a tender offer for up to $650 million in aggregate principal amount of SandRidge's 8.625% Senior Notes due 2015 then outstanding, and with any additional funds being used to repay borrowings outstanding under its senior credit facility.  On March 2, 2011, Defendants announced that the private placement had been so successful that they increased the size of the 2021 Senior Notes offering to $900 million.

24.     Thereafter, on March 29, 2011, Defendants announced they intended to sell a 45% stake in the Company's Mississippian formation assets through the initial public offering ("IPO") of 12.5 million common units of SandRidge Mississippian Trust I, along

with another 1.875 million common units that could be purchased at the option of the underwriters.  Defendants stated the IPO would be priced at between $19 and $21 per common unit and that these common units had been approved for listing on the NYSE under the symbol "SDT."  According to Defendants' press release issued that day, the "Trust [would] own royalty interests conveyed to it by SandRidge which [would] entitle the Trust to a percentage of the proceeds received by SandRidge from the production of hydrocarbons from currently producing wells and development wells to be drilled by SandRidge on approximately 42,600 net acres in the Mississippian formation in northern Oklahoma."

25.     By April 1, 2011, SandRidge's common stock had reached a Class Period high of $13.34 per share in intraday trading based on Defendants' bullish mantra.

26.     On April 6, 2011, Defendants announced the SandRidge Mississippian Trust I IPO had been upsized to 15 million common units priced at $21.00 per common unit, the top end of their previously disclosed range, and that the 15 million common units being sold now represented an approximately 54% beneficial interest in the Trust.  Defendants also disclosed that the underwriters had another 30 days to exercise an option to purchase an additional 2.250 million common units from the Trust to cover over-allotments.

27.     Defendants announced the SandRidge Mississippian Trust I IPO closed April 12, 2011.  Their press release stated that the IPO of 17.250 million common units, including 2.250 common units sold pursuant to the exercise of the underwriters' over-allotment option, resulted in net proceeds to the Trust, before offering expenses, of approximately $338.7 million, "which proceeds were delivered to [SandRidge] as partial consideration for the conveyance of the royalty interests held by the Trust."  The press release also advised that

the 17.250 million common units sold to the public in the IPO now represented an approximately 61.6% beneficial interest in the Trust, and that the Trust also issued to SandRidge 3.750 million common units and 7 million subordinated units convertible into common units, "together representing an approximately 38.4% beneficial interest in the Trust."

28.    On May 5, 2011, Defendants announced SandRidge's 1Q 2011 financial results. Defendants' press release issued that day quoted Defendant Ward emphasizing the success of the Company's efforts to monetize the purportedly oil-rich Mississippian formation assets through the SandRidge Mississippian I Trust IPO:

> Tom L. Ward, Chairman and CEO commented, "We continue to execute our oil-directed plan by focusing efforts in two core areas of development where we are able to realize wellhead rates of return exceeding 100%. We are the most active driller in the Central Basin Platform and the Mississippian horizontal play, capitalizing on our expertise in shallow, conventional carbonate reservoirs to execute our development plan and strategically add to our leasehold positions in these areas. Production growth is matching our expectations in spite of weather-related interruptions. Finally, with the success of our asset monetizations to date, we are now focused on funding our 2012 capital spending program."

29.    On August 4, 2011, Defendants announced that the Company had further monetized their Mississippian formation assets by raising an additional $500 million through a joint development venture with a Korean-based Atinum Partners, Co., Ltd. Defendants' press release issued that day stated in relevant part as follows:

> SandRidge . . . announced today that it has entered into a joint venture ("JV") with an affiliate of Atinum Partners Co., Ltd. ("Atinum"), a leading investment firm located in the Republic of Korea. Pursuant to the agreement, SandRidge will transfer an undivided 13.2% non-operated working interest in approximately 860,000 acres, or approximately 113,000 net acres to Atinum for a total transaction value to SandRidge of $500 million. Atinum will pay

$250 million in cash at closing and the remainder in the form of a drilling carry. The JV area of mutual interest ("AMI") covers substantially all of SandRidge's original Mississippian Play area, located in Northern Oklahoma and Southern Kansas, other than wells and acreage within the associated spacing units spudded prior to the effective date and all wells and acreage associated with SandRidge Mississippian Trust I. The transaction is expected to close in the fourth quarter and is subject to certain closing conditions.

Atinum has committed to a drilling carry obligation to pay 13.2% of SandRidge's share of drilling and completion cost for wells drilled in the AMI up to a total amount of $250 million, which is anticipated to occur over a three year period.

Tom L. Ward, SandRidge's Chairman and CEO, commented, "We are pleased to announce this joint venture with Atinum Partners and look forward to having them as our partner. *This transaction completes another step in our plan to raise the capital needed to accelerate and maximize the value of our assets."*

[Emphasis added].

30. Defendants also issued the Company's 2Q 2011 financial results on August 4, 2011. Further emphasizing the Company's successful transformation to an oil producing company and monetization of its Mississippian formation assets, Defendants' press release issued that day included the following as "financial highlights":

- Added 200,000 net acre position in new Mississippian Play.

- Increasing 2011 capital expenditure guidance by $500 million, from $1.3 billion to $1.8 billion, reflecting an increase in Mississippian drilling activity and continued acreage purchases both in the Mississippian and the Central Basin Platform.

- Increasing 2011 production guidance to 24.1 MMBoe from 23.3 MMBoe.

- Guiding 2012 capital program to $1.8 billion and production to 29.1 MMBoe.

31.     The August 4, 2011 press release also quoted Defendant Ward further emphasizing the value of Company's growing focus on oil production in relevant part as follows:

> Tom L. Ward, Chairman and CEO commented, "We are pleased to announce the joint venture with Atinum Partners on our Mississippian project *where results continue to meet or exceed our expectations*. Our management team has been consistent in discussing several alternatives to fund the drilling of our large Mississippian acreage position within ten years and bring forward the NAV of this asset. With this announcement, we will begin to increase our rig count in Oklahoma and Kansas to average 24 rigs in 2012, which nearly doubles our current rig count. Additionally, we have identified and established an acreage position in a new area that is similar in size, characteristics and cost to our first Mississippian play. In connection with increasing our rig count and acreage position, we are increasing our 2011 capital budget to $1.8 billion and establishing a 2012 capital budget of $1.8 billion.
>
> *"The execution of our 2011 and 2012 plans will move the company significantly toward our 2014 goal of a self-funding capital program, delivering double-digit annual production growth and a debt to EBITDA ratio of less than 2 times."*

[Emphasis added].

32.     The August 4, 2011 press release also provided "2012 Initial Operational Guidance," stating: "The company is introducing certain guidance for 2012. The company expects to incur approximately $1.8 billion in capital expenditures and produce approximately 29.1 MMBoe."

33.     On September 27, 2011, Defendants issued a release entitled "SandRidge Energy, Inc. Signs Agreement to Sell Certain East Texas Properties for $231 Million and Announces Revised Production Guidance." In addition to announcing that SandRidge would sell its East Texas natural gas properties in Gregg, Harrison, Rusk and Panola counties for

$231 million, Defendants' September 27, 2011 further detailed the impact on the Company's

FY 2012 guidance, stating in relevant part as follows:

> SandRidge Chairman and CEO, Tom Ward, commented, "This asset sale is part of the capital plan to execute our 3 Year Strategy of tripling EBITDA, ***doubling oil production,*** and lowering our debt ratio by the end of 2014 by continuing to develop high rate of return oil wells in the Central Basin Platform and the Mississippian play in the Mid-Continent."

> As a result of this asset sale, SandRidge expects production to be 23.9 MMBoe in 2011 and ***27.7 MMBoe in 2012.***

> [Emphasis added].

34.     On November 3, 2011, Defendants issued SandRidge's 3Q 2011 financial

results and revised the Company's FY 2011 and FY 2012 guidance, citing operational

difficulties in the Permerian Basin, but confirming that its Mississippian formation assets

were performing so solidly that production resources were being transferred from Permerian

to Mississippian production, stating in relevant part as follows:

> ***Full Year 2011 and 2012 Production Guidance***

> The company produced 6.18 MMBoe in the third quarter of 2011, compared to 5.64 MMBoe in the second quarter of 2011 and 5.40 MMBoe in the third quarter of 2010. Production from the Permian Basin grew from approximately 23,600 Boe per day in the third quarter of 2010 to approximately 30,200 Boe per day in the third quarter of 2011. This reflects the previously announced sales of non-core Permian assets producing approximately 3,100 Boe per day. ***The company grew its Mississippian horizontal production from approximately 1,600 Boe per day in the third quarter of 2010 to over 12,700 Boe per day in the third quarter of 2011.***

> The company has revised its production guidance for 2011 to 23.4 MMBoe from the previous guidance of 23.9 MMBoe. ***Although production is projected to exceed expectations in the Mid-Continent region due to the success of the Mississippian horizontal drilling program,*** the company is projecting an overall shortfall of approximately 500 MBoe in production, as compared to prior guidance, due to facility constraints in the Central Basin

Platform and underperformance in the Gulf Coast, Gulf of Mexico and the Piñon Field.

As a result of continued drilling success, production has outgrown the existing company-owned and operated low-pressure gathering systems in the Central Basin Platform, causing excessive backpressure on the wells and negative impact to production. While the company is addressing these issues, it is also planning to reduce the rig count from 16 to 12 in the Central Basin Platform *and increase from an average of 24 rigs to 26 rigs in the 2012 Mississippian drilling program*.

While 2011 production is expected to be approximately 2% below the company's prior forecast, the expected year-over-year production growth is approximately 16% and, excluding the impact of asset sales, approximately 25%.

*Production guidance for 2012 remains unchanged at 27.7 MMBoe. Oil and natural gas production is expected to be 16 MMBbls and 70 Bcf, respectively.*

[Emphasis added].

35.    On December 22, 2011, Defendants issued a press release entitled "SandRidge Energy, Inc. Announces $1 Billion Mississippian Joint Venture," further emphasizing Defendants successful efforts to monetize the Company's Mississippian formation assets. The press release stated in relevant part as follows:

SandRidge . . . announced today that it has entered into a Joint Venture ("JV") with a subsidiary of Repsol YPF, S.A., a leading international energy company based in Madrid, Spain. *Under the agreement, SandRidge will sell an approximate 25% non-operated working interest, or 250,000 net acres, in the Extension Mississippian play located in Western Kansas and an approximate 16% non-operated working interest, or 113,636 net acres, in its Original Mississippian play.*

The 363,636 net acres in total will be sold to Repsol for an aggregate transaction value of $1 Billion. Repsol will pay $250 million in cash at closing and the remainder in the form of a drilling carry. In addition to paying for its working interest share of development costs, Repsol will pay an amount equal to 200% of its working interest to fund a portion of SandRidge's cost of development until the additional $750 million drilling carry obligation is

satisfied.  Based on current drilling expectations, SandRidge anticipates the drilling carry obligation to be satisfied within three years.  The JV will exclude all wells and acreage within the associated spacing units spudded prior to January 1, 2012 and all wells and acreage associated with SandRidge Mississippian Trust I.  The transaction is expected to close in the first quarter and is subject to certain closing conditions.

Tom Ward, Chairman and CEO, stated, "We are excited to announce this Joint Venture with Repsol, a global energy leader, and we are pleased that *they share our confidence in the development potential of this vast Mississippian oil play. We compare the scope of this play to the Bakken and believe it will be transformational for the Mid-Continent region of the United States.* SandRidge has led the way in developing the Mississippian Play and has now drilled more than 195 horizontal wells, representing nearly half of all the horizontal wells drilled in the play to date.  As a result of the drilling carry and its lower working interest, SandRidge's 2012 CapEx is expected to decline to $1.6 Billion from a previous budget of $1.8 Billion. *This JV with Repsol puts us on a clear path to bridge the 2012 funding gap with non-debt capital and to execute our three year plan to triple EBITDA and double oil production while lowering our debt to EBITDA ratio.*

[Emphasis added].

36.     On January 5, 2012, Defendants issued a press release announcing the filing of a Registration Statement with the SEC relating to the IPO of approximately $500 million in common units representing beneficial interests in SandRidge Mississippian Trust II, a newly formed Delaware trust.  The underwriters would again have an option to purchase up to approximately $75 million in additional common units within 30 days of closing to cover over allotments and SandRidge Mississippian Trust II would be listed on the NYSE under the symbol "SDR."  Defendants' press release issued that day also explained that in connection with the SandRidge Mississippian Trust II IPO, SandRidge would convey to the trust certain royalty interests in exchange for the net proceeds from the offering and units representing approximately 48% of the beneficial interest in the trust.  Like the SandRidge

Mississippian Trust I had, these royalty interests would entitle the SandRidge Mississippian Trust II to a percentage of the proceeds received by SandRidge from the production of hydrocarbons from currently producing wells and development wells to be drilled by SandRidge on approximately 53,000 net acres in the Mississippian formation in northern Oklahoma and Kansas.

37.    On February 1, 2012, Defendants issued a press release announcing the planned acquisition of Dynamic Offshore, the Company's Year-End 2011 Operations Results and the Company's Year-End Reserve Summary.   As to the Dynamic Offshore acquisition, Defendants' press release issued that day stated in relevant part as follows:

> SandRidge . . . has entered into an agreement to acquire Dynamic Offshore Resources, LLC for aggregate consideration of $1.275 billion consisting of approximately $680 million in cash and approximately 74 million shares of SandRidge common stock valued at $8.02 per share. *These oil rich assets will add reserves, production and cash flow at an attractive valuation that is consistent with the achievement of SandRidge's three year plan to triple EBITDA and double oil production while lowering its debt to EBITDA ratio.* Dynamic Offshore Resources operates primarily in water depths of less than 300 feet and their current production is approximately 25 Mboed. Dynamic's year-end 2011 proved reserves are 62.5 MMboe and are valued at approximately $1.9 billion using SEC net present value discounted at 10 percent (PV-10). Of these reserves, 80% of the value and the quantity are proved developed. *Approximately 50% of Dynamic's current production and proved reserves consists of oil.  The acquisition will be accretive to SandRidge's earnings and cash flow per share as well as improve its leverage metrics.*
>
> Tom L. Ward, Chairman and CEO of SandRidge, commented, *"The value of this acquisition will be evident immediately in our results. We are acquiring these assets for less than PV-10 of the proved developed reserves and at just over $50,000 per flowing barrel. Additionally, we expect these operations to contribute significant free cash flow in excess of the anticipated annual drilling and recompletion capital budget of $200 million."*
>
> [Emphasis added].

- 16 -

38.     Concerning the Company's FY 2011 Year-End Operational Results, Defendants press release issued that day emphasized in relevant part as follows:

- ***Total proved reserves, adjusted for asset sales, increased 11% to 471 MMboe***

- ***Oil reserves, adjusted for asset sales, increased 17% to 245 MMbo***

- ***Reserve replacement of 302%***

- ***PV-10 (Non-GAAP) of total proved reserves increased 52% to $6.9 billion***

- Total production growth of 16% to 23.4 MMboe and ***60% growth in oil production***

[Emphasis added].

39.     Concerning the Company's "Year-End 2011 Reserve Summary," Defendants' press release issued that day stated in relevant part as follows:

> ***SandRidge increased year-end 2011 proved reserves to 471 MMboe, 11% higher than 2010 proved reserves*** of 423 MMboe (which reflects the divestment of 123 MMboe during 2011) ***and represents a reserve replacement ratio of 302%. The Horizontal Mississippian play and the Central Basin Platform contributed reserve growth of 101 MMboe*** offset by 30 MMboe of downward revisions to gas reserves primarily in the Pinon field.

> ***Essentially all of SandRidge's 2011 reserve additions were the result of the company's drilling program.***

> SandRidge's 2011 proved reserves included 2,810 gross (2,438 net) PUD locations.  Approximately 86% of the PUDs are located in the Horizontal Mississippian play and Permian Basin.

> Forty-nine percent of 2011 proved reserves were proved developed, compared with 41% at year-end 2010.

> Approximately 96% of the 2011 PV-10 value is associated with the company's Horizontal Mississippian and Permian core areas.

> ***The company's 2011 proved reserves had a PV-10 of $6.9 billion, a 52% increase from 2010.***  Third party engineers including Netherland Sewell and Lee Keeling evaluated a combined 98% of the total proved PV-10 value.

[Emphasis added].

40.     The "Analysis of Proved Reserves and Replacement Economics" provided in the February 1, 2012 release also expressly stated that the "% Oil Properties to Total PV-10" had increased to "96%" in FY 2011 from "88%" in FY 2010.

41.     On February 23, 2012, Defendants announced the Company's 4Q and FY 2011 financial results.  The press release issued that day emphasized operational highlights in relevant part as follows:

- *Consolidated oil reserves of 245 MMBbls at year end 2011.*

- *Consolidated proved reserves of 471 MMBoe at year end 2011.*

- *Consolidated SEC PV-10 value of $6.9 billion at year end 2011.*

- *Reserve replacement of 303%.*

42.     In addition to providing a year-end reserve summary similar to that provided on February 1, 2012, the February 23, 2012 press release also provided the following update to the Company's FY 2012 guidance attributable to the Dynamic Offshore acquisition:

The company is providing new guidance for 2012, which includes the following anticipated effects of acquiring Dynamic Offshore Resources, LLC ("Dynamic") (assuming the acquisition closes on April 30, 2012):

- *Increased Production by approximately 5.8 MMBoe,* which is risk-adjusted for potential shut-ins during hurricane season;

- *Decreased Oil and Natural Gas Differentials as production from the Dynamic properties is expected to realize higher prices;*

- Increased per unit Lifting Cost due to higher costs associated with the operation of offshore properties, including insurance expenses;

- Decreased per unit Production Taxes as there is a lower overall production tax burden associated with the Dynamic properties;

- Increased per unit DD&A – oil and gas due to a higher depletion rate associated with the Dynamic properties;

- *Decreased per unit DD&A – other, G&A – cash, G&A – stock and Interest Expense due to increased production;*

- *Increased EBITDA from Oilfield Services, Midstream and Other for revenues from production handling agreements associated with the Dynamic properties;*

- Increased Common Stock Shares Outstanding at end of period due to anticipated issuance of shares in conjunction with the Dynamic acquisition;

- Increased Exploration and Production Capital Expenditures by $200 million for anticipated capital expenditures associated with the Dynamic properties.

Additionally, projected Land and Seismic Expenditures have increased to $145 million from $95 million as a result of planned infill leasing around the company's existing Mississippian acreage.

[Emphasis added].

43.     On April 2, 2012, Defendants announced that the Company intended to commence a private offering of $750 million of Senior Notes due 2022. Net proceeds from this offering would be used to finance the cash consideration of approximately $680 million payable in connection with the Company's pending acquisition of Dynamic Offshore and to pay related costs and expenses.

44.     On April 9, 2012, Defendants announced they had commenced the IPO of 26 million common units of SandRidge Mississippian Trust II, representing a 52% beneficial interest in the trust, along with 3.9 million additional common units that could be purchased at the option of the underwriters to cover over-allotments. Defendants also stated that upon completion of the SandRidge Mississippian Trust II IPO, SandRidge, as sponsor of the trust, would own approximately 11.3 million common units, assuming no exercise of the

underwriters' option, and approximately 12.4 million subordinated units convertible into

common units, and the trust would have a total of 49.725 million units outstanding.

Defendants' press release also confirmed that like the SandRidge Mississippian Trust I, the

SandRidge Mississippian Trust II would own royalty interests conveyed to it by SandRidge

that would entitle the trust "to a percentage of the proceeds received by SandRidge from the

production of hydrocarbons from currently producing wells and development wells to be

drilled by SandRidge on approximately 53,000 net acres in the Mississippian formation in

northern Oklahoma and southern Kansas."

45.    In an April 20, 2012 interview Defendant Ward gave to *Seeking Alpha.com*, he
was quoted as stating the following in relevant part:

> So the original premise about building SandRidge was around the natural gas
> story in 2006. And by 2008, our management team believed that the story had
> changed and that we were headed for a period of low prices for natural gas;
> and we decided we had to make a change. So in late 2008, we hedged all of
> our natural gas production for two years, while *we made a conversion to oil*.
> In March of 2009, I went to our Board and recommended buying assets in the
> Permian Basin. And that was at a time when oil was $39.96 and gas was
> $4.13 an Mcf, and we'd hedged our gas at just over $8 an Mcf in late 2008.
>
> So then we moved forward with an acquisition program in the Permian at a
> time when others weren't buying oil. They were still looking for natural gas,
> assuming that there would be a bounce back in natural gas prices, and were
> still chasing the tight-gas formations in the U.S. And we'd chosen not to drill
> in tight gas reservoirs and stayed looking at carbonates for the most part; and
> so then looked for the best places to find oil that other people weren't trying to
> buy, and that was in the Permian Basin.

*       *       *

> ***The important thing to understand is that we have a three-year strategy that***
> ***no other company in the U.S. has; and that's that we're going to triple***
> ***EBITDA, we're going to double our oil production, and we are going to***

*increase production. And by the end of 2014, we'll be doing it all within our
cash flow. And all the while, we'll be improving our credit metrics.*

[Emphasis added].

46.     On April 17, 2012, Defendants announced that as the SandRidge Mississippian
Trust I had, the SandRidge Mississippian Trust II priced 26 million common units at $21, the
top end of the expected price range of $19.00 to $21.00.  The 26 million common units
represented a 52% beneficial interest in the trust and the underwriters had 30 days to exercise
an option to purchase an additional 3.9 million common units from the trust to cover over-
allotments. Following completion of the SandRidge Mississippian Trust II IPO, SandRidge,
as sponsor of the trust, would own approximately 11.3 million common units, assuming no
exercise of the underwriters' option, and approximately 12.4 million subordinated units
convertible into common units, and the trust would have a total of 49.725 million trust units
outstanding

47.     On April 23, 2012, Defendants announced that SandRidge had closed its IPO
of 29.9 common units of SandRidge Mississippian Trust II, including 3.9 million common
units sold pursuant to the exercise of the underwriters' over-allotment option, representing a
60% beneficial interest in the trust.   SandRidge, as sponsor of the trust, retained
approximately 7.4 million common units and approximately 12.4 million subordinated units
convertible into common units.  The Trust had a total of 49.725 trust units outstanding.
Gross proceeds of the transaction, before the underwriting discount, were approximately
$628 million. According to the press release Defendants issued that day, before payment of

offering expenses, SandRidge received approximately $590 million as partial consideration for the conveyance of the royalty interests held by the trust.

48.     On May 3, 2012, Defendants announced SandRidge's 1Q 2012 financial results. Defendants' press release issued that day emphasized as highlights in relevant part as follows:

- ***Mississippian daily average production grew by 23% quarter over quarter***

- ***Record oil production in first quarter 2012 of 3.4 MMBbls***

- ***Recent peak production of 99 MBoe per day on April 29, 2012***

- Current Mississippian acreage position of approximately 1.7 million net acres

- ***Raised $590 million in net proceeds from the IPO of SandRidge Mississippian Trust II in April 2012***

49.     On August 2, 2012, Defendants announced SandRidge's 2Q 2012 financial results. Defendants' press release issued that day emphasized as highlights in relevant part as follows:

- ***Mississippian daily average production grew 31% quarter over quarter and 199% from the comparable period in 2011***

                        *       *       *

- ***Completed IPO of SandRidge Mississippian Trust II and sold units of SandRidge Mississippian Trust I raising $615 million in total net proceeds***

[Emphasis added].

50.     Defendants also "[i]ncreas[ed] 2012 production guidance to 33.0 MMBoe from 32.3 MMBoe," "increase[ed] 2012 capital expenditure guidance to $2.1 billion from $1.85 billion," and "[d]ecreas[ed] the 2012 mid-point Lifting cost guidance by 6%," in the August 2, 2012 press release. The "2012 Guidance Update" also stated in relevant part as follows:

*The production guidance increase reflects current year acquisitions, divestitures, and better than expected performance from the company's core assets.* Lifting cost projections have decreased due to improved efficiencies throughout the company's core operations and the delay of costs relating to $CO_2$ delivery obligations at the Century Plant.   DD&A – *oil and gas projections have increased primarily as a result of changes in the company's depletion rate as a result of the Dynamic acquisition* and the sale of the company's Tertiary assets.  G&A – cash projections have increased to include transaction costs associated with acquisition and divestiture activity and the Mississippian Trust II initial public offering.  *The projection for EBITDA from oilfield services, midstream and other increased to reflect improved drilling profit margins* and higher third party working interests.  Projected P&A cash costs increased due to accelerated P&A activity on offshore properties.  Capital expenditures projections increased to $2.1 billion from $1.85 billion primarily due to accelerated infrastructure activity resulting from drilling success in the Mississippian play.

[Emphasis added].

51.      On August 6, 2012, Defendants announced that SandRidge had priced a private placement of $1.1 billion of Senior Notes, comprised of $825 million of 7.5% Senior Notes due 2023 and $275 million of 7.5% Senior Notes Due 2021, and that net proceeds from the offering would be used to fund the Company's pending tender offer for up to $350 million in aggregate principal amount of its Senior Floating Rate Notes due 2014, and other corporate purposes.

## THE TRUTH BEGINS TO BE REVEALED

52.      On November 8, 2012, the day Defendants were scheduled to publicly release the Company's 3Q 2012 financial results, Dnakar Singh, CEO of New York-based TPG-Axon, which then owned 4.5% of SandRidge's stock, publicly issued a letter addressed to the seven-member SandRidge Board of Directors calling for Defendant Ward's resignation, citing among other things SandRidge's "disastrous performance" and over 76% decline in its

stock price since its IPO in 2007.  Emphasizing that SandRidge had overpaid Ward who it

characterized as an "insatiable spender" with an incoherent strategy, Singh attacked Ward's

"egregious" compensation of $150 million over the prior five years:

> For example, total compensation for 2011 was over $25 million - *representing
> a full 1/2 of the company's earnings.*  In fact, CEO compensation has been
> between $15 and $26 million in every year since the company's IPO.  This is
> simply astonishing, considering 1) the stock has declined 76% over this
> period, 2) the relative stock performance has been in the bottom 1% of all
> major US listed stocks, and dead last among energy companies, and 3) Book
> Value per Share has declined by over 60% over this period.  *In fact, when
> compensation is adjusted for market capitalization of the company, the
> figures become even more appalling – relative to market capitalization, Tom
> Ward has been the single highest compensated CEO among all energy
> companies, and among the highest compensated CEOs in America . . .
> despite destroying more shareholder value than 99% of other companies and
> CEOs.*

> [Emphasis added].

53.     Singh also challenged Ward's unchecked "rife" self-dealing, drawing parallels

between Aubrey McClennon's exploitation of Chesapeake's shareholders:

> The company has been rife with self-dealing, at the expense of shareholders
> and for the benefit of Mr. Ward.  *The most disturbing example has been the
> Executive Well Participation Plan, (similar to the founder well participation
> policy at Chesapeake Energy that caused enormous outrage earlier this
> year).*  When concerns regarding Mr. Ward's ties to Chesapeake Energy arose
> this spring, Mr. Ward repeatedly asserted to us, other shareholders, and the
> media that SandRidge was different, and that over time he and the company
> recognized the inappropriateness of this practice, and eliminated it to avoid
> any appearance of impropriety.   *We investigated his claims, and were
> appalled by what we found.*

> It is true that SandRidge has eliminated their Executive Well Participation
> Plan.  However, they did so *immediately after the market collapse in October
> 2008, by then paying over $67 million to Mr. Ward,* even as 1) markets were
> collapsing, and 2) the company had less than $1 million in cash and was facing
> real risk of bankruptcy.  *Adding insult to injury, the wells that the company
> re-purchased from Ward were natural gas wells, even as Mr. Ward and the*

*company were publicly proclaiming the need to abandon their natural gas focus and shift towards oil exploration and development.* When the company disclosed the purchase, it cited a desire "to retain a greater working interest in future wells, thus increasing proved undeveloped reserves". *This declaration was preposterous, considering their publicly stated desire to abandon the initial natural gas focus of the company and switch to oil.* And, again, it was even more shocking when one considers the environment of that time – with markets collapsing, the company facing collapse, and natural gas facing collapse. When the Executive Well Participation Plan was initially established, the claimed purpose was to "align executives' interests with that of shareholders". It is quite obvious that t*he only purpose was to enrich management at the expense of shareholders.*

What has Mr. Ward done with his wealth, including the $150 million in payments from SandRidge? *He has bought massive holdings of ranchland, and then turned around and leased the land to SandRidge for future exploration. Therefore, some payments to Mr. Ward continue – they have simply changed form.* Cashing out of natural gas wells in October 2008 was a spectacular trade, as was swapping into ranchland in the Midwest . . . unfortunately at the expense of SandRidge shareholders who suffered massive write-downs on the well interests purchased from Mr. Ward. There are also numerous smaller, but equally disturbing, other examples. *Mr. Ward purchased a sizable interest in the Oklahoma City Thunder basketball team…only to yet again turn around and have SandRidge pay him and other owners millions per year in sponsorship and luxury suite payments. Despite its small size, SandRidge is one of the largest corporate supporters of the Oklahoma City Thunder and the company that owns it.*

[Emphasis added].

54.     Then, after the close of trading on November 8, 2012, Defendants issued a press release disclosing the Company's 3Q'12 financial results. Critically, Defendants reported a *loss of $184 million*, or 39 cents per share, in the 3Q 2012, compared with a *profit of $561 million*, or $1.16 per share, in the 3Q 2011. During a conference call held with investors the following morning, Defendant Ward acknowledged that SandRidge had been overstating the value of its Mississippian assets throughout the Class Period, disclosing that in reality, the Company's Mississippian formation assets consisted of far more low-margin

natural gas deposits and far fewer high-margin oil deposits than the market had previously been led to believe:

> *As we continue to grow the Mississippian well count across a larger area, we also are seeing an increase in our natural gas production. And this increase has been offset by a lower amount of oil than we anticipated at the beginning of last year.*

55.     Later during the conference call, in response to an analysts' inquiry, Defendant Ward expressly conceded that the Mississippian formation assets would produce only 40% oil going forward, rather than 45% as Defendants had been using in their projections throughout the Class Period, with the rest of production comprised of lower margin natural gas.

56.     Defendant Grubb explained that as a result, the Company was "revising [its] 2012 production guidance up by 5% on natural gas to 93 Bcfs and down about 2% of oil to 17.8 million barrels of oil." Defendant Grubb further explained that "the revised 2012 production guidance represents slightly lower oil production in Q4 than in Q3," stating that whereas the Company "averaged 53,700 barrels a day of oil in Q3," Defendants were then only "estimating about 53,000 barrels per day in Q4." As a result of this "steeper oil decline," Defendant Grubb stated the Company was now anticipating "flat oil production year-over-year."

57.     In the November 8, 2012 press release and during the November 9, 2012 conference call, Defendants also shocked the market by announcing that SandRidge would be selling off its remaining interest in its high margin, oil-producing Permerian Basin assets. During the conference call, when questioned by analysts why the Company would sell the

higher margin producing Permerian Basin oil assets while retaining the lower-margin primarily natural gas producing Mississippian formation assets, Defendants acknowledged that the Permerian assets were the more valuable that that could command a higher market price.   Questioned on what impact the sale would have on the Company's proportional recoveries of oil and natural gas going forward during the conference call, ***Defendant Grubb admitted that the Company was "looking at going from kind of 51%, 52% [high-margin oil recovery], to about 40%."***

58.    Defendants' admission that the Mississippian assets were of a lower oil producing capacity was not well received by the market.   Global Hunter Securities in particular noted that "[f]lowing lower-oil volume…through our valuation model substantially reduced our valuation estimate to $5 per share from $9," adding that "[i]n response to this reduction in estimated equity value we are reducing our Buy rating to Neutral."   Stifel Nicolaus analyst Amir Arif also reduced his price target to $8.50 from $10 on this news, stating the Company's 2013 production guidance of 39.2 million barrels of oil equivalent was disappointing because it indicated more growth in natural gas volumes.

59.    During the November 9, 2012 earnings conference, Defendant Grubb also disclosed that during the 2Q 2012, "problematic" "mechanical" issues with one of three rigs the Company needed to drill in the new Gulf of Mexico assets acquired in the Dynamic Offshore acquisition rendered that rig inoperable and required the Company to "ultimately go ahead and release that rig."   With only two rather than the three required rigs drilling, Defendants conceded that they had had to "ramp down the drilling" in the Gulf of Mexico and that as a result, SandRidge was "not going to drill as many wells this year."   Defendants

also justified the $1.3 billion Dynamic Offshore acquisition now as a mere "financing vehicle" for their onshore development projects, despite earlier lauding of the acquisition's merits and promises that the Company did not need to further dilute shareholder interest in SandRidge through equity offerings. Moreover, Defendants disclosed that the Company's 3Q 2012 production expenses grew to $14.47/barrel of oil equivalent from $14.01/ barrel of oil equivalent primarily due to additional costs related to SandRidge's acquisition of Dynamic Offshore.

60.     On this news, SandRidge's stock fell precipitously from its November 8, 2012 closing price of $6.10 per share to close at $5.51 per share on November 9, 2012, *or 9%*, on extremely high volume of more than *six times* the average daily trading volume over the prior three month period.

61.     The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were as follows

(a)     When SandRidge paid Defendant Ward $76 million in connection with terminating the Executive Well Participation Plan, rather than decreasing the Company's focus on natural gas production and focusing it on oil production, the Company had actually acquired significant additional natural gas producing assets from Defendant Ward;

(b)     Defendants had been overstating the value of SandRidge's Mississippian formation assets throughout the Class Period as contrary to their repeated mantra that SandRidge had successfully transformed itself from a primarily natural gas to a primarily oil producing company, in reality its Mississippian formation assets consisted of

significantly higher low-margin natural gas deposits and significantly lower high-margin oil deposits than the market had previously been led to believe;

(c)     Due to "problematic" "mechanical" issues with one of three rigs the Company needed to drill in its new Gulf of Mexico assets acquired in the Dynamic Offshore acquisition in early 2012, which had rendered that rig inoperable during the 2Q 2012, Defendants had been required to "ramp down the drilling" in the Gulf of Mexico, which would preclude SandRidge from "drill[ing] as many wells" during FY 2012;

(d)     Contrary to Defendants' Class Period statements, Defendants intended that the $1.3 billion Dynamic Offshore acquisition be utilized as a mere "financing vehicle" for the Company's onshore drilling projects, despite Defendants' earlier promises that the Company did not need to further dilute shareholder interest in SandRidge through equity offerings and lauding the merits of the Dynamic Offshore acquisition; and

(e)     As a result, Defendants knew SandRidge's FY 2012 earnings guidance was not attainable.

### DEFENDANTS' SCIENTER

62.     Defendants are SandRidge and its top officers and directors.   Each ran SandRidge as a manager, dealing with important issues facing SandRidge's business, and controlled the grossly inflated statements concerning SandRidge's Class Period oil (versus natural gas) reserves and operational status, and SandRidge's ability to achieve its target revenues and earnings, in order to inflate the Company's stock price and the market's perception of the value of its Mississippian formation assets so that Defendants could

monetize those assets through the two trust IPO's, the two partially funded joint ventures announced during the Class Period, and through the sale of billions of dollars in notes.

63.     Each of the Individual Defendants, by virtue of their high-level positions with SandRidge, directly participated in the management of SandRidge, was directly involved in the day-to-day operations of SandRidge at the highest levels and was privy to confidential proprietary information concerning SandRidge and its oil reserves, operations, financial statements and financial condition and was aware of or deliberately disregarded that false and misleading statements were being made by and regarding the Company.  Because of their managerial positions with SandRidge, each of the Individual Defendants had access to the adverse undisclosed information about SandRidge's oil reserves, financial condition and prospects and knew (or deliberately disregarded) that the adverse facts alleged herein rendered the positive representations made during the Class Period materially false and misleading.

64.     Each Individual Defendant was personally familiar with the proportion of oil and natural gas available and being produced because they were closely monitoring the performance of SandRidge's operations via reports from SandRidge's Finance Department, which were generated and provided to the Individual Defendants on a regular basis.  As a result of their monitoring, each Individual Defendant was aware that SandRidge would be unable to meet its projected FY 2012 financial results.

65.     Each of the Individual Defendants participated in or failed to prevent the false reports regarding SandRidge's operational and financial condition during the Class Period to maintain the Company's high stock price and to monetize the Mississippian formation assets.

## LOSS CAUSATION/ECONOMIC LOSS

66.     During the Class Period, as detailed herein, Defendants made false and misleading statements, and omitted material information, concerning SandRidge's oil reserves, business fundamentals and engaged in a scheme to deceive the market. Defendants knowingly misstated the extent and value of the Company's oil reserves to improve the market's perception of SandRidge's worth to allow the Company to monetize its interests in the Mississippian formation assets.

67.     By artificially inflating and manipulating SandRidge's stock price, Defendants deceived Plaintiffs and the Class and caused them losses when the truth was revealed.  When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market on November 8, 2012, SandRidge's stock price fell precipitously, as the prior artificial inflation came out of the stock price.  As a result of their purchases of SandRidge securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

68.     This is a class action on behalf of purchasers of SandRidge securities between February 24, 2011 and November 8, 2012, excluding defendants (the "Class").  Excluded from the Class are officers and directors of the Company, as well as their families and the families of the defendants.  Class members are so numerous that joinder of them is impracticable.

69.     Common questions of law and fact predominate and include: (i) whether Defendants violated the 1934 Act; (ii) whether Defendants omitted and/or misrepresented

material facts; (iii) whether Defendants knew or recklessly disregarded that their statements were false; and (iv) whether the prices of SandRidge's publicly traded securities were inflated during the Class Period and the extent of and appropriate measure of damages.

70.    Plaintiffs claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiffs will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violations of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

71.    Plaintiffs incorporate by reference all of the above paragraphs.

72.    Defendants violated §10(b) and Rule 10b-5 by:

(a)    Employing devices, schemes and artifices to defraud;

(b)    Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)    Engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class in connection with their purchases of SandRidge publicly traded securities.

73.    Class members were damaged as they paid artificially inflated prices for SandRidge's publicly traded securities in reliance on the integrity of the market.

## COUNT II

### For Violations of §20(a) of the 1934 Act
### Against All Defendants

74.    Plaintiffs incorporate by reference all of the above paragraphs.

75.    The Individual Defendants acted as controlling persons of the Company within the meaning of §20(a) of the 1934 Act, 15 U.S.C. §78t(a), as alleged herein.  By virtue of their stock ownership, and high-level positions, and participation in and/or awareness of the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiffs contend are false and misleading.   SandRidge controlled the Individual Defendants and all of its employees.

76.    By reason of such wrongful conduct, the defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of the wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    Determining that this action is a proper class action, designating plaintiffs as Lead Plaintiffs and certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiffs and other members of the Class damages together with

interest thereon;

C.     Awarding plaintiffs and other members of the Class costs and expenses of this

litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other

costs and disbursements; and

D.     Awarding plaintiffs and other members of the Class such equitable/injunctive

or other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  December 5, 2012                    Respectfully submitted,


                                            s/  Darren B. Derryberry, OBA No.  14542
                                            Darren B. Derryberry
                                            DERRYBERRY & NAIFEH, LLP
                                            4800 North Lincoln Blvd.
                                            Oklahoma City, Oklahoma  73105
                                            Telephone: 405/708-6784
                                            405/528-6462 (fax)
                                            dderryberry@derryberrylaw.com

                                            ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                            SAMUEL H. RUDMAN
                                            DAVID A. ROSENFELD
                                            MARY K. BLASY
                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone:  631/367-7100
                                            631/367-1173 (fax)

                                            *Attorneys for Plaintiffs*

AMBER L. ECK, PARTNER
ZELDES & HAEGGQUIST, LLP
625 Broadway, Suite 906,
San Diego, CA 92101
Telephone: 619/342-8000
Fax:  619/342-7878

*Additional Counsel for Plaintiffs*

SANDRIDGE ENERGY, INC.

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

James Glitz, ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transactions during the Class Period in the securities that are the subject of this action:

*See* Schedule A

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 4th day of DECEMBER, 2012.

_____
JAMES GLITZ

## SCHEDULE A

| Trade Date | Action (Buy/Sell) | Quantity | Price Per Share | Total Cost |
|---|---|---|---|---|
| 7-9-12 | Buy | 2,000 | $6.4291 | $12,858.20 |
| 5-21-12 | Buy | 3,000 | 6.4291 | 19,287.30 |
| 8-6-12 | Buy | 2,000 | 6.655 | 13,310.— |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

James Glitz - SandRidge Energy

SANDRIDGE ENERGY, INC.

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

Rodger Thornberry ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transactions during the Class Period in the securities that are the subject of this action:

*See* Schedule A

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _30_ day of _November_ , 2012.

_Rodger a. Thornberry_
RODGER THORNBERRY

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 04/12/2011 | 2,000 | $11.42 |
| 04/12/2011 | 2,000 | $11.54 |
| 04/13/2011 | 350 | $11.80 |
| 04/13/2011 | 4,000 | $11.98 |
| 07/12/2011 | 500 | $10.25 |
| 08/09/2011 | 1,000 | $7.26 |
| 08/10/2011 | 200 | $7.12 |
| 08/10/2011 | 800 | $7.08 |
| 08/18/2011 | 200 | $7.27 |
| 10/03/2011 | 200 | $5.36 |
| 10/03/2011 | 300 | $5.32 |
| 10/04/2011 | 1,000 | $5.02 |
| 10/05/2011 | 200 | $5.76 |
| 02/02/2012 | 1,000 | $7.07 |
| 03/26/2012 | 1,000 | $8.21 |
| 04/10/2012 | 500 | $7.09 |
| 04/20/2012 | 750 | $7.06 |
| 04/20/2012 | 1,000 | $7.09 |
| 04/25/2012 | 1,000 | $7.27 |
| 05/03/2012 | 1,000 | $6.92 |
| 05/16/2012 | 150 | $6.47 |
| 06/25/2012 | 200 | $5.93 |
| 06/26/2012 | 200 | $5.99 |
| 08/15/2012 | 100 | $6.50 |
| 10/23/2012 | 1,000 | $6.62 |