**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| IN RE SANDRIDGE ENERGY, INC. SECURITIES LITIGATION | Case No. CIV-12-01341-W<br><br>Relating to All Actions |

**MOTION OF DEFENDANTS SANDRIDGE ENERGY, INC., JAMES D. BENNETT, MATTHEW K. GRUBB, RANDALL D. COOLEY, JIM J. BREWER, EVERETT R. DOBSON, WILLIAM A. GILLILAND, DANIEL W. JORDAN, ROY T. OLIVER, JEFFREY S. SEROTA, AND D. DWIGHT SCOTT TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT; AND BRIEF IN SUPPORT**

COVINGTON & BURLING LLP
Mark P. Gimbel (admitted *pro hac vice*)
C. William Phillips (admitted *pro hac vice*)
Brian B. Alexander (admitted *pro hac vice*)
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000

CROWE & DUNLEVY
Thomas B. Snyder, Esq., OBA #31428
20 North Broadway, Suite 1800
Oklahoma City, OK 73102
(405) 234-3254

*Attorneys for SandRidge Energy, Inc., James D. Bennett, Matthew K. Grubb, Randall D. Cooley, Jim J. Brewer, Everett R. Dobson, William A. Gilliland, Daniel W. Jordan, Roy T. Oliver, Jeffrey S. Serota, and D. Dwight Scott*

## TABLE OF CONTENTS


INTRODUCTION .......... 1

FACTUAL BACKGROUND AND ALLEGATIONS .......... 2

ARGUMENT .......... 13

I. THE SANDRIDGE STOCK PURCHASERS' CLAIMS FAIL. .......... 13

A. The Amended Complaint Alleges No Actionable Misstatements or Omissions. .......... 15

1. SandRidge's Oil and Gas Projections are Protected by the PSLRA Safe Harbor for Forward-Looking Statements. .......... 16

2. The Amended Complaint Fails to Plead the Falsity of Oil and Gas Projections With Particularity. .......... 18

3. SandRidge's Statements About CapEx Are Not Actionable. .......... 20

4. Allegations Regarding the Ward Entities are Not Actionable. .......... 22

B. The SandRidge Stock Purchasers Fail to Plead Scienter. .......... 24

C. The SandRidge Stock Purchasers Fail to Plead Loss Causation. .......... 30

D. The SandRidge Stock Purchasers Do Not State a Section 20(a) Claim. .......... 30

II. THE TRUST PURCHASERS' CLAIMS FAIL. .......... 31

A. Plaintiffs Failed to Comply with the Notice Provisions of the PSLRA. .......... 31

B. The Complaint Fails to State a Claim under Section 11 or Section 12. .......... 33

1. The Trust Purchasers Do Not Plead Any Material Misstatements About Oil and Gas Production. .......... 33

a) The cautionary statements in the prospectuses nullified any potentially misleading effect. .......... 33

b) The statements in the prospectuses were opinions that were neither objectively nor subjectively false. .................. 34

2. The Omission of Information About the Ward Entities and SandRidge's CapEx Was Not Material to Trust Purchasers. .......... 37

3. The Section 12(a)(2) Claim Fails for Additional Reasons. ............. 37

C. The Trust Purchasers Do Not State a Claim Under Section 10(b). ............ 38

D. The Trust Purchasers Do Not State Claims Against Bennett or Grubb Under § 20(a) of the Exchange Act or § 15 of the Securities Act .............. 40

III. OTHER ARGUMENTS FOR DISMISSAL ARE HEREBY INCORPORATED. ........................................................................................ 40

CONCLUSION ........................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ........ *passim*

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544, 570 (2007) ........ 14

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
455 F.3d 195 (3d Cir. 2006) ........ 30

*Caprin v. Simon Transp. Servs., Inc.*,
99 F. App'x 150 (10th Cir. 2004) ........ 15

*City of Philadelphia v. Fleming Cos., Inc.*,
264 F.3d 1245 (10th Cir. 2001) ........ *passim*

*Del Noce v. Delyar Corp.*,
No. 72 Civ. 1819, 1976 WL 813 (S.D.N.Y. July 30, 1976) ........ 35

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ........ 30

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ........ 15, 24

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d. Cir. 2011) ........ 35

*Grossman v. Novell, Inc.*,
120 F.3d 1112 (10th Cir. 1997) ........ 18, 20, 34

*Gustafson v. Alloyd Co.*
513 U.S. 561 (1995) ........ 38

*In re Am. Int'l Grp., Inc., 2008 Sec. Litig.*,
2013 WL 1787567 (S.D.N.Y. Apr. 26, 2013) ........ 37

*In re ChinaCast Educ. Corp. Sec. Litig.*,
No. CV-12-4621, 2012 WL 6136746 (C.D. Cal. Dec. 7, 2012) ........ 29

*In re Gold Resource Corp. Sec. Litig.*,
No. 12-cv-02832, 2013 WL 3724918 (D. Colo. July 15, 2013) ........ 16, 17, 18

*In re Sun Healthcare Grp., Inc. Sec Litig.*,
181 F. Supp. 2d 1283 (D.N.M. 2002)....................29

*In re Thornburg Mortg.*,
695 F. Supp. 2d 1165 (D.N.M. 2010)....................24, 33, 38

*In re VeriFone Sec. Litig.*,
11 F.3d 865 (9th Cir. 1993)....................23

*In re Wachovia Equity Sec. Litig*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011)....................19, 26

*In re Williams Sec. Litig.*,
339 F. Supp. 2d 1206 (N.D. Okla. 2003)....................16

*In re Williams Sec. Litig. WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009)....................30

*J & R Mktg., SEP, v. General Motors Corp.*,
549 F.3d 384 (6th Cir. 2008)....................22

*Joseph v. Wiles*,
223 F.3d 1155 (10th Cir. 2000)....................38

*Kapur v. USANA Health Sciences, Inc.*,
No. 2:07-CV-00177DAK, 2008 WL 2901705 (D. Utah July 23, 2008)....................26

*Kowal v. MCI Commc'ns Corp.*,
16 F.3d 1271 (D.C. Cir. 1994)....................21

*Long v. Brown*,
98 P.2d 28 (Okla. 1939)....................29

*Maher v. Durango Metals, Inc.*,
144 F.3d 1302 (10th Cir. 1998)....................40

*Makor Issues & Rights, Ltd v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008)....................17

*McDonald v. Kinder-Morgan, Inc.*,
287 F.3d 992 (10th Cir. 2002)....................20, 22

*MHC Mut. Conversion Fund, L.P. v. United Western Bancorp*,
913 F. Supp. 2d 1026 (D. Colo. 2012)....................35

*NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*,
No. 1:10-cv-0440-LAK, slip op. at 1 (S.D.N.Y. Mar 16, 2012) ..................................35

*Prissert v. Emcore Corp.*,
894 F. Supp. 2d 1361 (D.N.M. 2012)..................................................................25, 26

*Slater v. A.G. Edwards & Sons, Inc.*,
719 F.3d 1190 (10th Cir. 2013) ..........................................................................33

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
365 F.3d 353 (5th Cir. 2004) ..............................................................................25

*Spiegel v. Tenfold Corp.*,
192 F. Supp. 2d 1261 (D. Utah 2002) .................................................................34

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
531 F.3d 190 (2d. Cir. 2008) ...............................................................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ...........................................................................14, 15, 24, 29

*Thomas v. Metro. Life Ins. Co.*,
No. CIV-07-0121-F, 2008 WL 4619822 (W.D. Okla. Oct. 16, 2008)...........................4

*Truk Int'l Fund LP v. Wehlmann*,
737 F. Supp. 2d 611 (N.D. Tex. 2009)..................................................................34

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
No. CV 11-9495, 2013 WL 2247394 (C.D. Cal. May 9, 2013)...................................31

*Woodmont, Inc. v. Daniels*,
274 F.2d 132 (10th Cir.1959) ..............................................................................25

**Statutes**

68 Okla. Stat. §1010(C) ....................9, 19

15 U.S.C. § 77z-1(a)(3)(B)(iii)(I)(bb)....................32

15 U.S.C. § 78u-4....................14

15 U.S.C. § 78u-4(b)(1) ....................14

15 U.S.C. § 78u-4(b)(2)(A)....................24

15 U.S.C. § 78u-5(i)(1) ....................16

15 U.S.C. § 78u-5(i)(1)(A)....................21

15 U.S.C. § 78u-5(c)(1)....................16

15 U.S.C. § 78u-5(c)(1)(B)(i) ....................17

15 U.S.C. § 78u–4(a)(3)(A)(i) ....................31

15 USC § 77z–1(a)(3)(A)(i)....................31

Securities Act § 11 (15 U.S.C. §77k)....................7, 11, 32

Securities Act § 12(a)(2) (15 U.S.C §77l(a)(2)). ....................*passim*

Securities Act § 15 (15 U.S.C §77o)....................7,11,40

Securities Exchange Act §10(b) (15 U.S.C. §78j(b)) ....................6, 13, 38

Securities Exchange Act § 20(a) (15 U.S.C. §78t(a))....................6, 13, 30, 40

**Other Authorities**

FED. R. CIV. P. 8(a) ....................33

FED. R. CIV. P. 9(b) ....................14

FED. R. CIV. P. 12(b)(6) ....................33

Defendants SandRidge Energy, Inc. ("SandRidge" or "the Company"), James D. Bennett, Matthew K. Grubb, Randall D. Cooley, Jim J. Brewer, Everett R. Dobson, William A. Gilliland, Daniel W. Jordan, Roy T. Oliver, Jr., Jeffrey S. Serota, and D. Dwight Scott (collectively,"SandRidge Defendants") respectfully move to dismiss Plaintiffs' Consolidated Amended Complaint ("Amended Complaint").

## INTRODUCTION

Plaintiffs' Amended Complaint sweeps broadly, indicting nearly every public statement made by Defendants during the class period. Plaintiffs scatter accusations everywhere, but none of these accusations provide the particularity required by the Private Securities Litigation Reform Act ("PSLRA") and basic rules of pleading.

Plaintiffs attack Defendants' statements or omissions concerning SandRidge's oil and gas projections; land acquisitions by entities allegedly related to defendant Tom Ward; and SandRidge's projected capital expenditures ("CapEx"). But they fail to plead facts establishing why and how any statement or omission on these topics was actually false or misleading, much less intentionally so.

For example, the principal factual "support" for Plaintiffs' claim that SandRidge's oil and gas statements were false is an analysis, conducted by an unknown engineering firm commissioned by Plaintiffs' counsel, of unspecified production information about an unidentified and admittedly incomplete group of wells. There is no allegation that any of the Defendants had access to this hindsight analysis or anything similar at the time they allegedly made inconsistent statements, and Plaintiffs' vague representations about the analysis are insufficient to demonstrate falsity or scienter.

Many of the statements that Plaintiffs claim were inaccurate are, moreover, classic forward-looking statements that were accompanied by cautionary language designed to *avoid* misleading investors. Such statements are protected by the PSLRA "safe harbor" and the "bespeaks caution" doctrine and cannot give rise to liability.

If these, and the many other defects detailed below, are not enough, the Amended Complaint also contains new and equally deficient claims by members of a new class of plaintiffs —purchasers of units in two royalty trusts. These claims are not even properly before the Court because they were added without complying with the PSLRA's notice and lead plaintiff provisions.

The new claims expose the hollowness of Plaintiffs' allegations. Despite being brought by new plaintiffs, against new defendants, based on allegations about different securities issued by distinct entities, the new claims rest on virtually identical factual allegations. The allegations ignore significant distinctions between SandRidge and the royalty trusts — distinctions which belie Plaintiffs' apparent and mistaken assumption that every alleged misstatement or omission about SandRidge during the class period would have been material to purchasers of royalty trust units. For these and other reasons set forth below, the Amended Complaint should be dismissed.

## FACTUAL BACKGROUND AND ALLEGATIONS

Defendant SandRidge, headquartered in Oklahoma City, is a producer of oil and natural gas listed on the New York Stock Exchange ("NYSE") under the symbol "SD." From its founding until 2009, SandRidge focused its exploration efforts on natural gas. Compl. ¶¶ 86-87. In 2009, however, SandRidge shifted the focus of the Company to

oil by acquiring interests in the Permian Basin in Texas and the Mississippian Lime formation (the "Mississippian") in Oklahoma and Kansas. *See id.* ¶¶ 3, 86-87. Like SandRidge, many other companies also operate in the Mississippian, including Shell — one of the largest oil companies in the world — and three entities allegedly affiliated with Tom Ward, SandRidge's founder and former CEO: WCT Resources, L.L.C. ("WCT"), 192 Investments, L.L.C. ("192"), and TLW Land & Cattle, L.P. ("TLW") (collectively, the "Ward Entities"). *Id.* ¶¶ 113, 120.

As a publicly-traded oil and natural gas company, the information SandRidge provides to the public — and which is the basis for this lawsuit — includes estimated reserves and CapEx guidance for upcoming years. These projections, while based on information available at the time, are inherently inexact. SandRidge's public filings during the class period contain strong language cautioning investors about its production estimates. SandRidge's 2010 10-K, for example, states that:

> **Our estimated reserves are based on many assumptions that may turn out to be inaccurate. Any significant inaccuracies in these reserve estimates or underlying assumptions could materially affect the quantities and present value of our reserves. Our current estimates of reserves could change, potentially in material amounts, in the future.** The process of estimating oil and natural gas reserves is complex and inherently imprecise. It requires interpretations of available technical data and many assumptions, including assumptions relating to production rates….
>
> **We will not know conclusively prior to drilling whether oil or natural gas will be present in sufficient quantities to be economically viable.** The use of seismic data and other technologies and the study of producing fields in the same area does not enable us to know conclusively prior to drilling whether oil or natural gas will be present or, if present, whether oil or natural gas will be present in sufficient quantities to be economically viable.

Ex. 1, at 33-34 (emphasis in original).[1] SandRidge's 10-K for the year 2011 contains similar warnings. *See* Ex. 2, at 35-36. All of SandRidge's 10-Qs filed during the class period refer to the risk factors in the Company's 10-K filings.[2]

SandRidge's 2010 and 2011 10-Ks also caution investors about SandRidge's CapEx guidance:

> **The development of our proved undeveloped reserves may take longer and may require higher levels of capital expenditures than we currently anticipate.** As of December 31, 2010, 59.2% of our total reserves were proved undeveloped reserves. Development of these reserves may take longer and require higher levels of capital expenditures than we currently anticipate.

Ex. 1, at 35 (emphasis in original); Ex. 2, at 38 (similar). Similar warnings are contained in other contemporaneous public filings and press releases. *See, e.g.,* Ex. 8 (8-K dated Feb. 24, 2011, Ex. 99.1, at 17); Ex. 9 (2009 10-K, at 29-31).

Defendants Mississippian Trust I ("Trust I"), "SDT" on the NYSE, and Mississippian Trust II ("Trust II"), "SDR" on the NYSE, (the "Trusts"), are Delaware statutory trusts formed in December 2010 and December 2011 to own royalty interests in certain specific wells and acreage purchased from SandRidge. *Id.* ¶¶ 41-42. SandRidge conveyed interests in 37 producing wells and 123 development wells over 42,900 net acres in the Mississippian to Trust I and 67 producing wells and 206 development wells

---

[1] All exhibits are attached to the Declaration of Mark P. Gimbel and consist of materials which this Court may consider on a motion to dismiss. *See, e.g., Thomas v. Metro. Life Ins. Co.*, No. CIV-07-0121-F, 2008 WL 4619822, at *5 (W.D. Okla. Oct. 16, 2008) ("Courts routinely consider public filings at the motion to dismiss stage.").

[2] *See* Ex. 3 (10-Q for quarter ended 3/31/11, at 41); Ex. 4 (10-Q for quarter ended 6/30/11, at 67); Ex. 5 (10-Q for quarter ended 9/30/11, at 52); Ex. 6 (10-Q for quarter ended 3/31/12, at 48); Ex. 7 (10-Q for quarter ended 6/30/12, at 64).

over 53,000 net acres to Trust II. Compl. ¶ 41-42; Ex. 10 (Final Prospectus for Trust I, April 6, 2011, at 1); Ex. 11 (Final Prospectus for Trust II, April 17, 2012, at 1). The wells in which the trusts have royalty interests are a small subset of SandRidge's vast holdings in the Mississippian, which grew from 3,400 potential drilling sites across 780,000 acres in 2010 to more than 8,000 potential drilling sites over 1.7 million net acres by 2012. *See* Compl. ¶¶ 89, 163, 288. SandRidge is required to drill the development wells for Trust I and Trust II. Ex. 10, at 1; Ex 11, at 1. The royalty trusts, however, bear no financial responsibility for SandRidge's CapEx. *See* Ex. 10, at 9 ("The trust will not be responsible for any operating or capital costs associated with the Underlying Properties, including the costs to drill the PUD Wells."); Ex. 11, at 9.

Like SandRidge, the Trusts provide information to the public concerning the reserve estimates for wells in which they have an interest. The prospectus for Trust I provides information about reserve estimates and cautions that:

> Reserve estimates for fields that do not have a lengthy production history are less reliable than estimates for fields with lengthy production histories. A lack of production history may contribute to inaccuracy in estimates of proved reserves, future production rates and the timing of development expenditures. Most of the Producing Wells have been operational for less than one year and estimated total reserves vary substantially from well to well…. Although SandRidge and Netherland Sewell analyzed historical production data from vertical wells drilled in the AMI since the 1940s, *there can be no assurance that this data can accurately predict future production from horizontal wells.*

Ex. 10, at 20 (emphasis added). The Prospectus for Trust II contains similar warnings. Ex. 11, at 22-23. Other Trust filings during the class period include similar cautionary language. *See e.g.* Ex. 12 (10-Q for quarter ended March 31, 2011, at 16); Ex. 13 (10-Q

for quarter ended June 30, 2011, at 17); Ex. 14 (10-Q for quarter ended Sept. 30, 2011, at 20); Ex. 15 (2011 10-K, at 20); Ex. 16 (10-Q for quarter ended March 31, 2012, at 16) (referencing risk factors in 2011 10-K); Ex. 17 (10-Q for quarter ended June 30, 2012, at 18) (referencing risk factors in 2011 10-K). Likewise, investors were warned during Trust earnings calls that the calls contained forward-looking statements that are subject to the risk factors identified in its SEC filings. *See* Ex. 18 (Nov. 11, 2011 Earnings Call, at 1-2); Ex. 19 (Feb. 17, 2012 Earnings Call, at 1); Ex. 20 (May 11, 2012 Earnings Call, at 2); Ex. 21 (August 10, 2012 Earnings Call, at 2).

The Lawsuits

In December 2012 and January 2013, two putative securities class actions, *Glitz et al. v. SandRidge Energy, Inc., et al.* (No. 12-cv-1341) and *Carbone v. SandRidge Energy, Inc., et al.* (No. 13-cv-0019), were filed in this Court, each of which brought claims against defendants SandRidge, Ward, Grubb, and Bennett under Sections 10(b) and 20(a) of the Securities Exchange Act on behalf of a putative class of purchasers of SandRidge common stock (the "SandRidge Stock Purchasers").

After the first action was filed, Lead Counsel published a notice of the lawsuit, which asserted that it was being brought on behalf of a class of "persons or entities who purchased the securities of SandRidge Energy, Inc. ('SandRidge' or the 'Company') (NYSE: SD)…." (ECF 32, Ex. 1). Following this notice and a hearing, the Court consolidated the two securities cases, appointed Lead Plaintiffs and Lead Counsel, and granted Plaintiffs' leave to file a Consolidated Amended Complaint. (ECF Doc. 60.) On July 23, 2013, Plaintiffs filed a Consolidated Amended Complaint which added new

claims on behalf of new classes of plaintiffs, the purchasers of units in Trust I and Trust II ("Trust Purchasers"). Since none of the original lead plaintiffs owned units of either Trust, Lead Counsel joined plaintiffs Judith Greenberg, Charles Blackburn, and Ted Odell, to represent the Trust Purchasers. Compl. ¶¶ 20-25 & attached certifications. The additions were made without publishing notice to unit holders in Trust I or Trust II or seeking Court approval for the appointment of any of these individuals as representatives of the Trust Purchasers. The Amended Complaint also added new legal claims under Sections 11, 12(a)(2), and 15 of the Securities Act, and joined fifteen new defendants: the Trusts, eight additional SandRidge officers and directors, and five underwriters for the initial public offerings of the Trusts. In addition to introducing new legal claims on behalf of new classes of securities holders, the Amended Complaint added new allegations of alleged misstatements and omissions relating to SandRidge's CapEx and to acquisitions of land in the Mississippian by the Ward Entities.

Allegations of the SandRidge Stock Purchasers

The SandRidge Stock Purchasers assert claims for fraud based upon statements purportedly made by Defendants concerning three subjects — oil and gas production, land acquisitions by the Ward Entities, and SandRidge's CapEx guidance.

1. *Oil and Gas Production.* The SandRidge Stock Purchasers' principal claim concerns the accuracy of type curves (estimates of how much oil and gas a well will produce) that SandRidge created with the independent petroleum consulting company Netherland Sewell. *See e.g.*, Ex. 22 (Transcript of SandRidge "Analyst Day," at 3) (discussing Netherland Sewell type curve estimate). The Amended Complaint

alleges that SandRidge's 2011 type curve projected that a typical horizontal well in the Mississippian would produce 52% oil and 48% gas. *See* Compl. ¶¶ 151, 160, 180-182, 196, 211, 218, 236. In 2012, Netherland Sewell and SandRidge adjusted the projection to 45% oil and 55% gas based on 2011 data. *See, e.g., id.* ¶¶ 151, 160, 248, 280, 300, 304.

To suggest that these statements concerning SandRidge's type curve were false, Plaintiffs rely on an analysis, conducted by an unknown engineering firm commissioned by Plaintiffs' counsel, of unidentified production reports filed with the Oklahoma Tax Commission ("OTC") for an admittedly incomplete and unidentified subset of SandRidge's wells in the Mississippian. *See* Compl. ¶ 19. Plaintiffs' purported analysis allegedly shows two things: First, that the unidentified wells that Plaintiffs selected to review had an average of less than 40% oil and over 60% gas in 2011 and 35% oil and 65% gas in 2012. *See id.* ¶ 151. Second, that Defendants should have realized in March 2012 that the Mississippian was producing less oil than projected by the type curve that Netherland Sewell and SandRidge prepared. *See id.* ¶ 143.

The analysis Plaintiffs commissioned, however, is admittedly incomplete. As a threshold matter, the underlying data was derived from the OTC (*see id.* ¶ 7), which collects data only for Oklahoma wells. Because part of SandRidge's holdings are in Kansas, the data necessarily excludes a significant portion of SandRidge's wells. Even as to Oklahoma, Plaintiffs admit that the data encompassed only "the most active counties," without specifying the counties in question or those that were omitted. *Id.*¶ 19. Worse yet, it appears that much of the data on which Plaintiffs rely was not even reported by SandRidge, because Oklahoma law permits gross production reports to be filed with the

OTC by either the producer or the first purchaser of gas. *See* 68 Okla. Stat. §1010(C). Plaintiffs themselves claim only that "much" — but not all — of the data they rely upon was provided by SandRidge (Compl. ¶ 19), thus conceding that some of the data they rely on came from unidentified third parties. Because the specific reports Plaintiffs used are not identified, it is impossible to determine who prepared them, the date on which they were submitted, or the wells or production dates at issue — *i.e.*, the basic information necessary to understand the analysis supposedly performed and determine whether the results are, in fact, inconsistent with any public statement of SandRidge.

Plaintiffs also claim that SandRidge's proven reserve estimates (also prepared with Netherland Sewell) were wrong (*see id.* ¶¶ 243-46, 252, 254); that assurances and estimates of the rate of return of Mississippian Wells were false (*see id.* ¶¶ 163-64, 198-99, 260-62, 276-77); and that production data released by SandRidge in 2012 was misleading (*see id.* ¶¶ 274-77, 287, 289-91). The Amended Complaint in addition alleges that the SandRidge Stock Purchasers were misled by statements that Ward knew the Mississippian reservoir because of the long history of vertical well drilling there (*see id.* ¶¶ 163-64, 247, 249), and that SandRidge had shifted its focus to oil (*see id.* ¶¶ 163-64, 176-77, 198-99, 255-56, 260, 262.)

The Amended Complaint does not specifically allege that *any* of the Defendants were aware of allegedly contradictory facts when they made any of these statements about oil and gas production. At most, it alleges that information on SandRidge's reserves is presented to SandRidge's Executive Committee once a quarter by SandRidge's Reservoir Engineering Department and that an independent reserve

estimates are presented annually to the Audit Committee. *See id.* ¶¶ 134-36. The implication — never actually alleged — is that somehow these meetings and reports led Defendants to learn the "truth," which they then misrepresented.

2. *Acquisitions By the Ward Entities.* The Amended Complaint alleges that the Ward Entities usurped SandRidge's corporate opportunities by purchasing land alongside or in advance of SandRidge in the Mississippian in 2011 and 2012. *See id.* ¶ 120. According to Plaintiffs, the SandRidge Defendants misleadingly failed to disclose these transactions when making disclosures about the Mississippian during the class period, including disclosures of related-party transactions involving SandRidge. *See id.* ¶¶ 158, 172-73, 184-85, 206-07, 224-25, 231-32, 257-58, 263-64, 282-83, 295-96. Plaintiffs also claim that Defendants misled investors by stating that SandRidge made an early move to the Mississippian ahead of its competitors, *see id.* ¶¶ 163-64, 167-68, 255-56, without simultaneously disclosing acquisitions by the Ward Entities.

Plaintiffs fail, however, to allege facts establishing that anyone at SandRidge had knowledge of the Ward Entities' acquisitions, which were third-party transactions that did not involve the Company. They rely instead on the speculative claim that other Defendants must have known about the transactions by virtue of their positions at SandRidge and close ties to Tom Ward. *See* Compl. ¶¶ 345-48.

*CapEx Guidance.* The SandRidge Stock Purchasers further allege that SandRidge's CapEx guidance in 2011 and 2012 was inaccurate. *See id.* ¶¶ 159, 165-66, 170-71, 178-79, 188-89, 204-05, 238-39. However, Plaintiffs plead no facts showing that the Defendants knew that any CapEx estimate was wrong at the time it was issued.

Instead, the Amended Complaint alleges only that CapEx estimates increased following the announcement of a new joint venture that contemplated increased drilling. *See id.* ¶¶ 213-215. Plaintiffs' theory appears to be that the Defendants knew or should have known that CapEx would increase, because SandRidge purportedly had an undisclosed motive to engage in reckless "spending and development activities" in the Mississippian in order to benefit the Ward Entities. *See id.* ¶¶ 157-59. But Plaintiffs nowhere plead any facts demonstrating that SandRidge's capital expenditures actually benefitted any Ward Entity.

Allegations of the Trust Purchasers

The Trust Purchasers assert claims under Sections 11, 12(a)(2), and 15 of the Securities Act based on alleged misstatements and omissions in the Trusts' prospectuses. They also assert claims under Sections 10(b) and 20(a) of the Exchange Act based on public statements of SandRidge, the substance of which overlaps with the statements that are the subject of the SandRidge Stock Purchasers' claims.

The Trust Purchasers allege that that Netherland Sewell's reserve estimates in the prospectuses for Trust I and II were inaccurate (*see* Compl. ¶¶ 192-93, 271-73),[3] and that the following statements were likewise misleading:

- The statement in the Trust I prospectus that SandRidge and offset operators "exchanged technical data [that] demonstrate[d] a consistency" in the Mississippian. *See id.* ¶¶ 190-91.
- Statements in both Trust prospectuses that the geology of the Mississippian is well understood because vertical wells have been drilled there in the past. *See id.* ¶¶ 190-91, 269-70.

[3] The estimated percentage of oil from wells in the Trust I prospectus dated April 7, 2011 and Trust II prospectus dated April 17, 2012 was 48% and 46.9% respectively.

- Statements on earnings calls that the oil production of Trust I was meeting estimates and a statement by Grubb that the Trust I wells were producing 42% oil in August 2012. *See id.* ¶¶ 234-35, 250-51, 285-86, 298-99.

The Trust Purchasers base these allegations on the same flawed analysis of unidentified and incomplete OTC data that Plaintiffs' counsel claims applies to all of SandRidge's wells. *See id.* ¶¶ 193, 273. The Amended Complaint does not explain how an analysis that purportedly is representative of SandRidge's broad Mississippian holdings could demonstrate the falsity of statements made about the Trusts' distinct well interests.

Finally, the Trust Purchasers also allege that Defendants made material omissions concerning the land acquisitions of the Ward Entities and SandRidge's CapEx. The Amended Complaint does not explain how those omissions could be relevant to the Trusts. At its inception, each Trust received a royalty interest in specific wells and drilling areas. *See* Ex. 10, at 1; Ex. 11, at 1. Neither trust has any ability to acquire additional well interests, and, as a consequence, any increase in land prices in the Mississippian, as a result of Ward Entity acquisitions or otherwise, would have no effect on the Trusts. The Trusts also bear no financial responsibility for SandRidge's CapEx. *See* Ex. 10, at 9 (Trust not "responsible for any operating or capital costs associated with the Underlying Properties"); Ex. 11, at 9 (same).

<u>Loss Causation Allegations</u>

Plaintiffs allege two instances when the prices for common stock shares in SandRidge and units in the Trusts fell. The prices of SandRidge stock and Trust I's units purportedly dropped in response to an August 4, 2011 press release and August 5, 2011 conference call announcing a joint venture between Atinum Partners and SandRidge. *See*

*id.* ¶¶ 220-21. In addition, SandRidge's stock and the Trust units each allegedly fell on November 9, after SandRidge disclosed that it was planning to adjust its type curve downward and was investigating the sale of its Permian assets, and investor TPG-Axon accused SandRidge of improper related-party transactions. *See id.* ¶¶ 321-27.

The TPG-Axon letter did not, in fact, mention the Ward Entities' acquisitions in the Mississippian. *See* Ex. 23 (Nov. 8, 2012 TPG-Axon Letter, at 6-7). These were identified publicly for the first time when TPG-Axon publicly released a presentation outlining the transactions on January 23, 2013 and then filed the presentation with the SEC on January 24, 2013. *See* Compl. ¶ 334; *see also* Ex. 24 (Jan. 24, 2013 DFAN 14A, Ex. 1, at 5). The Complaint nowhere alleges that SandRidge's stock dropped, meaningfully or otherwise, in response to these disclosures.

## ARGUMENT

### I. THE SANDRIDGE STOCK PURCHASERS' CLAIMS FAIL.

The SandRidge Stock Purchasers assert claims under Section 10(b) and Section 20(a) of the Securities Exchange Act. To state a claim under Section 10(b), a plaintiff must allege that:

> (1) the defendant made an untrue or misleading statement of material fact…
>
> (2)…in connection with the purchase or sale of securities;
>
> (3)…with scienter (that is, with intent to defraud or recklessness);
>
> (4) which caused the plaintiff to rely on the misleading statements; and
>
> (5) thereby suffer damages as a result of his reliance.

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003). In order to state a

claim under Section 20(a), which imposes liability on defendants who control a party responsible for violating the securities laws, a plaintiff must establish each element of the primary Section 10(b) violation, and in addition plead facts establishing "control over the primary violator by the alleged controlling person." *Id.* at 1107.

Under *Bell Atlantic Corp. v. Twombly*, a complaint must not only include factual allegations establishing each essential element of a plaintiff's claim, but plead "enough facts to state a claim to relief that is ***plausible*** on its face." 550 U.S. 544, 570 (2007) (emphasis added). Where, as here, a plaintiff asserts a securities fraud claim, the pleading burden is even higher. Securities fraud claims must meet the "[e]xacting pleading requirements" of the PSLRA, 15 U.S.C. § 78u-4, which exceed even the particularized pleading requirements of Rule 9(b). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 321-22 (2007); *see also Adams*, 340 F.3d at 1095-96.

Congress intended the PSLRA to act "[a]s a check against abusive litigation by private parties." *Tellabs, Inc.*, 551 U.S. at 313. Accordingly, the PSLRA's "exacting" rules require private securities plaintiffs to "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter." *Id.* Under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Adams*, 340 F.3d at 1095 (quoting 15 U.S.C. § 78u-4(b)(1)). To plead that a statement is false, the Complaint must also meet the Rule 9(b) fraud standard by pleading "the who, what, when, where, and how:

the first paragraph of any newspaper story." *Caprin v. Simon Transp. Servs., Inc.*, 99 F. App'x 150, 158 (10th Cir. 2004) (quotation marks and citation omitted).

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). To plead scienter, a plaintiff must set "forth facts raising a strong inference of intentional *or* reckless misconduct." *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1259 (10th Cir. 2001) (emphasis in original). The PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc.*, 551 U.S. at 313. The PSLRA does not permit Plaintiffs to plead scienter generally. *See Adams*, 340 F.3d at 1096.

In *Tellabs*, the Supreme Court explained that for an inference of scienter to be "strong," it must be more than "merely 'reasonable' or 'permissible'"— scienter allegations must be "cogent and compelling." 551 U.S. at 324. "A complaint will survive [a motion to dismiss] only if a reasonable person would deem the inference of scienter cogent and *at least as compelling as* any opposing inference one could draw from the facts alleged, " after taking into account "plausible nonculpable, explanations for the defendant's conduct." *Id*. (emphasis added and footnote omitted).

The Amended Complaint fails to meet these rigorous pleading standards.

### *A. The Amended Complaint Alleges No Actionable Misstatements or Omissions.*

Plaintiffs' Amended Complaint attacks nearly every statement that SandRidge made publicly during the class period, offering a blunderbuss of allegations in

the apparent hope that at least one or two will survive scrutiny. None do. The allegations fall into three broad categories, and none states a viable claim for relief.

1. SandRidge's Oil and Gas Projections are Protected by the PSLRA Safe Harbor for Forward-Looking Statements.

Under the safe harbor provision of the PSLRA, a forward-looking statement is not actionable if

> (A) [it] is (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; *or* (ii) immaterial; *or* (B) the plaintiff fails to prove that the forward-looking statement (i)…was made with actual knowledge…that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1) (emphasis added). The requirements are disjunctive. *See id.* Thus, if there is adequate cautionary language, liability will be precluded without regard to the defendant's state of mind; conversely, if the defendant lacked actual knowledge that a statement was false, liability will be precluded without regard to whether there was adequate cautionary language. *See In re Gold Resource Corp. Sec. Litig.*, No. 12-cv-02832, 2013 WL 3724918, at *8 (D. Colo. July 15, 2013); *accord In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1220 (N.D. Okla. 2003).

SandRidge's statements about its type curve, expected rate of return, and estimated reserves are forward-looking statements that fall squarely within the safe harbor: The statements "contain[] a projection of revenues" and "of future economic performance," 15 U.S.C. § 78u-5(i)(1), were identified as forward-looking in SandRidge filings, and were accompanied by meaningful cautionary language.

Plaintiffs contend that these statements turned out to be wrong—and assume, therefore, that they must have been fraudulent—but the cautionary language in SandRidge's 2010 and 2011 10-Ks warned directly of the risk that the projections might prove inaccurate: "[T]he process of estimating oil and natural gas reserves is complex and inherently imprecise" and the "use of seismic data and other technologies…does not enable us to know conclusively before drilling…whether oil and natural gas will be present in sufficient quantities to be economically viable." Ex. 1, at 33-34; Ex. 2, at 35-36. These cautionary words are more than sufficient to eliminate any claim for fraud here. *See, e.g., Gold Resources Corp. Sec. Litig.*, 2013 WL 3724918, at *12 (warning that "actual results could differ materially from those discussed" and that "there can be no assurance that production will continue at any specific rate" was sufficient).

Even putting aside the ample cautionary language, the safe harbor provision applies because Plaintiffs have failed to allege facts establishing that any of the statements were made with actual knowledge that they were false or misleading. 15 U.S.C. § 78u-5(c)(1)(B)(i). The PLSRA's standard for pleading actual knowledge is even higher than its standard for pleading scienter because Plaintiffs must show "actual knowledge of falsity, not merely indifference to the danger that a statement is false" *Gold Resources Corp.*, 2013 WL 3724918, at *12 (quoting *Makor Issues & Rights, Ltd v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008)).

Plaintiffs do not meet this stringent test because the Amended Complaint alleges only that the Defendants, because of their positions at the Company, received reports with unspecified content from the SandRidge Reservoir Engineer Department.

Compl. ¶¶ 134-36; 344. A plaintiff cannot show actual knowledge by pleading "that defendants, as a natural consequence of their executive positions, had access to adverse information." *Gold Resources Corp.*, 2013 WL 3724918, at *12.

To be sure, Plaintiffs also allege that Plaintiffs' own unidentified consultant performed an analysis of unspecified OTC data for an unidentified and incomplete set of wells which purportedly shows that SandRidge's statements were false, but there is no allegation that this (or any similar) analysis was ever available to any of the Defendants at the time of any alleged misrepresentation. Moreover, some of the data used in the analysis was not even reported by the Company, but appears instead to have been filed by third parties such as oil and gas purchasers. *See infra.* Because Plaintiffs do not allege that anyone at SandRidge contemporaneously aggregated and analyzed the information in these OTC filings in a manner that revealed any inconsistency with the Company's projections — or otherwise had knowledge that any statement was false — the Amended Complaint fails to plead actual knowledge of falsity. *Id.* ¶¶ 7, 19.

2. The Amended Complaint Fails to Plead the Falsity of Oil and Gas Projections With Particularity.

To plead that a statement is misleading, Plaintiffs must set forth "an explanation as to why the disputed statement was untrue or misleading *when made*." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997) (emphasis in original) (quotation marks and citation omitted). Plaintiffs must plead with "a level of factual specificity" that puts "defendants on notice of precisely what they are alleged to have done wrong and permit them to defend against the charge." *Adams*, 340 F.3d at 1102.

Plaintiffs' allegations do not meet this standard. For example, Plaintiffs assert that data extracted from unspecified OTC filings for an admittedly incomplete set of wells belies SandRidge's public statements, but they never identify the specific wells or filings that supposedly support this charge. Compl. ¶¶ 7, 19. Worse yet, it appears that many of the filings were not even prepared by SandRidge. Under Oklahoma law, production reports may be filed with the OTC by either the producer or the first purchaser. *See* 68 Okla. Stat. §1010(C). Plaintiffs tacitly concede that some of the data they relied on was prepared by unknown third parties, by alleging that "*much* of the data" — but not all — "was provided by SandRidge to governmental authorities." Compl. ¶ 19 (emphasis added). Plaintiffs' vague and ambiguous pleading deprives Defendants of the opportunity to review the OTC filings, understand the analysis performed, and respond to its merits. It also falls short of what is necessary to plead falsity under the PSLRA. In the absence of factual allegations identifying particular wells — and the specific production dates for which Plaintiffs claim to have data — there is no basis for the Court to assume that the data is inconsistent with SandRidge's public statements. *Cf. In re Wachovia Equity Sec. Litig*, 753 F. Supp. 2d 326, 351 (S.D.N.Y. 2011) ("[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.") (quotation marks omitted).

The smattering of additional allegations of misrepresentations concerning oil and gas production are no more viable:

- Ward's statement that he knew the Mississippian play well (Compl. ¶¶ 163, 247) is not an actionable misrepresentation; it is merely a "generalized statement[] of optimism that [is] not capable of objective verification."

*Grossman*, 120 F.3d at 1119.

- Plaintiffs allegation that the Company's drilling activity masked the decline of SandRidge's wells (Compl. ¶ 286) is insufficient. The accurate disclosure of results is not actionable simply because the defendant did not "further disclose contingencies that might alter the revenue picture in the future." *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002).
- The Company's statements in its 2010 10-K that it had completed its transformation to an oil-focused company likewise are not misleading. The very 10-K Plaintiff cites shows that 80 percent of SandRidge's revenues in 2010 were generated by oil, *see* Compl. ¶ 176, compared with a little more than 20 percent in 2009, *see* Ex. 9 (2009 10-K), at 46. Plaintiffs do not and cannot contest this proof that the Company had successfully transitioned its focus to oil. Compl. ¶ 176.

Plainly, these allegations do not suffice to state a plausible claim.

3. <u>SandRidge's Statements About CapEx Are Not Actionable.</u>

The Amended Complaint fails to allege any facts—with particularity or otherwise— establishing that Defendants' statements about SandRidge's CapEx were false. The statements are also forward-looking and subject to the PSLRA safe harbor. There is no dispute that, in the first half of 2011, SandRidge's results were consistent with the CapEx guidance it provided to analysts and investors. For example, during a March 25, 2011 conference call, CFO Bennett said that SandRidge would drill 140 wells in the Mississippian in 2011. Ex. 25 (Barclays Conference Transcript, at 3). Consistent with this projection, SandRidge drilled 23 wells in the first quarter and 38 wells in the second quarter. Ex. 26 (8-K dated August 4, 2011, Ex. 99.1, at 2-3).

SandRidge thereafter disclosed that CapEx would increase following the announcement of a joint venture with Atinum to drill in the Mississippian. Compl. ¶ 214. Plaintiffs seek to portray the disclosure of the joint venture as a surprising and sinister

revelation, but the very same documents they rely upon show that SandRidge had publicly disclosed discussions about entering into a joint venture for months. *See e.g.*, Ex. 27 (April 12, 2011 IPAA Oil and Gas Symposium Transcript, at 4) ("We can do a joint venture, and we'll look into possibilities of that."); Compl. ¶ 194. Moreover, on SandRidge's first quarter earnings call, the Company warned that it was actively purchasing property in the Mississippian and would revisit its CapEx guidance around the time of SandRidge's mid-year earnings call. Ex. 28 (May 6, 2011 Earnings Call, at 6).

Defendants' statements about CapEx guidance are classic forward-looking statements. *See* 15 U.S.C. § 78u-5(i)(1)(A) (defining a forward-looking statement as "containing a projection of…capital expenditures"). Because they were accompanied by risk factors in SandRidge's 2010 and 2011 10-Ks that cautioned that the development of unproven reserves could require more capital than expected (*see* Ex. 1, at 35 and Ex. 2, at 38), the statements fall squarely within the PSLRA's safe harbor. The safe harbor also applies because the Amended Complaint nowhere alleges that Defendants had actual knowledge that the statements were false at the time they were made. [4]

[4] Plaintiffs also allege that statements that SandRidge had addressed CapEx funding were misleading since they failed to disclose the Company's reckless spending in the Mississippian Play. However, Plaintiffs nowhere challenge the factual accuracy of those statements; the supposed omission is Plaintiffs' own characterization of such funding as reckless. SandRidge's failure to pejoratively characterize its CapEx is not material. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) (omission of pejorative characterization is not material under 10b–5 when factual matters are disclosed). Similarly, statements about the sale of SandRidge's Permian Basin assets are not actionable; Plaintiffs do not plead particularized facts that they were false when made. *See* Compl. ¶ 306.

4. Allegations Regarding the Ward Entities are Not Actionable.

The SandRidge Stock Purchasers allege that Defendants should have disclosed the Ward Entities' transactions in the Mississippian every time the Company uttered a breath about the area. But a duty to disclose arises only where an "omitted fact" is "material" in that it "alters the meaning of the statement" that was actually made. *McDonald*, 287 F.3d at 998. Plaintiffs point to no statements whose meaning would have been altered by a disclosure of the Ward Entities' Mississippian acquisitions.

Plaintiffs attempt to manufacture a duty of disclosure from Items 303, 404(a), and 503 of SEC Regulation S-K. (Compl. ¶¶ 309, 312, 316.) But a company has a duty to disclose under Item 303 only "where a trend, demand, commitment, event or uncertainty is both presently known to management and *reasonably likely* to have *material effects* on the registrant's *financial condition or results of operation*," SEC Release No. 6835, 1989 WL 1092885, at *4 (emphasis added). The Amended Complaint does not explain how the Ward Entities' acquisitions were reasonably likely to affect SandRidge's financial condition. There is no allegation demonstrating that SandRidge paid more for any acquisition in the Mississippian because of the activity of the Ward Entities, let alone any claim that such an overpayment was reasonably likely to have an impact on SandRidge's financial statements or operational results.[5]

Plaintiff's effort to find a disclosure obligation in Item 404 is equally

[5] Item 303 also only covers trends "known" to the company not "knowable" trends. *J & R Mktg., SEP, v. General Motors Corp.*, 549 F.3d 384, 391 (6th Cir. 2008) and, as explained in Point I.B, *infra*, Plaintiffs have not sufficiently alleged that the acquisitions of the Ward Entities were known to the SandRidge Defendants.

unavailing. In *In re SandRidge Derivative Litigation*, this Court examined virtually identical allegations and found no duty under Item 404 to disclose the transactions of the Ward Entities to which SandRidge was not a party. No. Civ-13-102-W, ECF 134, at 18 (W.D. Okla. Sept. 11, 2013) (dismissing § 14(a) Exchange Act claim). Plaintiff's invocation of Item 503 is even less convincing, as that item requires only the disclosure of "the most significant factors" that make an "offering risky or speculative." Plaintiffs do not and cannot plead any facts suggesting that the Ward Entities' acquisitions in the Mississippian rendered an investment in SandRidge stock risky or speculative.

Even if Plaintiffs could establish a duty to disclose an omitted fact under Regulation S-K, it would not necessarily give rise to a claim under Section10(b). To state a claim, Plaintiffs would still have the burden of demonstrating that any omission was material. *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993) (declining "to hold that a violation of exchange rules governing disclosure may be imported as a surrogate for straight materiality analysis under § 10(b)"). Here, Plaintiffs fail to plead facts establishing that the transactions of the Ward Entities were material to SandRidge investors. Plaintiffs speculate that the transactions somehow effected SandRidge, but there are no facts pleaded showing that the Company was prevented from acquiring well interests, or saw its acquisition costs increase, as a result of any Ward Entity transaction.

The other alleged misstatements and omissions regarding the Ward Entities fail because they are contradicted by the allegations of the Amended Complaint or the documents it incorporates. For example, despite Plaintiffs' assertion that it was misleading for Defendants to state that SandRidge was ahead of the industry in the

Mississippian, the allegations of the Amended Complaint admit that SandRidge began acquiring property in the Mississippian in 2009 — early in the development of the play and before any of the specific Ward Entity acquisitions detailed in the Amended Complaint. *See* Compl. ¶¶ 3, 113-120; 163-64, 167-68, 255-56. Likewise Plaintiffs' allegation that SandRidge failed to disclosed two related-party transactions between the Company and WCT (*see* Compl. ¶¶ 115, 118) fails, because the very presentation on which the claim is based makes clear that SandRidge was not a party to the transactions in question, *see* Ex. 29 (Feb. 8, 2013, DFAN 14A, Ex. 1., at 75-76)

*B. The SandRidge Stock Purchasers Fail to Plead Scienter.*

Scienter is a "'mental state embracing intent to deceive, manipulate, or defraud.'" *Fleming Co., Inc.*, 264 F.3d at 1258 (quoting *Ernst & Ernst*, 425 U.S. at 193 n. 12). To plead scienter, a plaintiff must, for each act or omission alleged, raise a "strong inference of intentional or reckless misconduct" *Id.* at 1259.

> "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible' — it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive [a motion to dismiss] … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."

*Tellabs, Inc.*, 551 U.S. at 324; *see also* 15 U.S.C. § 78u-4(b)(2)(A).

Further, the allegations "must give rise to a strong inference that *each individual defendant* acted with scienter, and not only that the group of defendants, taken together, acted with scienter." *In re Thornburg Mortg.*, 695 F. Supp. 2d 1165, 1199 (D.N.M. 2010) (emphasis added); *see also Adams*, 340 F.3d at 1105-07 (considering

allegations of scienter against each defendant individually). To plead that a corporation acted with scienter, a plaintiff cannot attribute knowledge to the corporation generally or seek to charge it with the collective knowledge of all of its employees. *See Prissert v. Emcore Corp.*, 894 F. Supp. 2d 1361, 1371 (D.N.M. 2012); *see also Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (rejecting collective scienter doctrine). Instead, the complaint must establish scienter on the part of specific officers whose knowledge may be imputed to the corporation. *See id.* (citing, inter alia, *Woodmont, Inc. v. Daniels,* 274 F.2d 132, 137 (10th Cir.1959)).

Here, Plaintiffs' allegations concerning the individual Defendants' knowledge of SandRidge's oil and gas production boil down to nothing more than the generic claim that SandRidge, much like every other US company, prepares and distributes information for the benefit of its officers and directors. Specifically, Plaintiffs attempt to manufacture scienter by alleging that defendants on the Executive Committee received quarterly reports from the SandRidge Reservoir Engineer Department; that the Reservoir Engineer Department reported to Grubb; and that the Audit Committee reviewed estimates that SandRidge intended to make public. Compl. ¶¶ 134-36; 344. None of these allegations demonstrate "a mental state embracing intent to deceive, manipulate, or defraud." *Fleming Co., Inc.*, 264 F.3d at 1258. Indeed, Plaintiffs fail to say anything about the content of the reports SandRidge's officers and directors received, much less enough to manufacture a cogent and compelling inference of fraudulent intent.

Alleging that an officer must have received unspecified information by virtue of his position within the hierarchy of a company is not enough: "Generalized

imputations of knowledge do not suffice, regardless of defendants' positions within the company." *Id.* at 1264. Courts routinely have rejected allegations of scienter similar to those in the Amended Complaint on just this basis. *See Prissert*, 894 F. Supp. 2d at 1371-72 (allegations that executives attended weekly meetings in which they "discussed in detail" the order fulfillment process were not sufficient to show scienter even though alleged fraud concerned order backlog); *Kapur v. USANA Health Sciences, Inc.*, No. 2:07-CV-00177DAK, 2008 WL 2901705, at *17 (D. Utah July 23, 2008) (confidential witness's description of defendants' receipt of internal reports discussing attrition rates not sufficient even though alleged fraud concerned attrition rates); *Wachovia Equity*, 753 F. Supp. 2d at 351 (allegations that management received quarterly reports detailing loan originating standard were not sufficient because the allegations failed to specify which reports revealed widespread lending problems, the information those reports contained, and whether the reports contradicted the public declarations of Defendants).

Nor does the Amended Complaint muster a cogent and compelling inference of scienter by alleging that "the SandRidge Individual Defendants had a strong motive to turn a blind-eye to the fraud alleged herein" because of their "extremely lucrative compensation packages." Compl. ¶ 353. Such allegations are routinely rejected by the courts because similar motives could be ascribed to almost any corporate officer or director. *See Fleming Co., Inc.*, 264 F.3d at 1268 (allegations that defendants were motivated to commit fraud "to protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby" failed to establish scienter since those motives are shared by most executives).

Plaintiffs' remaining scienter allegations are no more convincing. Plaintiffs' after-the-fact analysis of unspecified OTC filings for an unidentified and admittedly incomplete set of wells in the Mississippian shows nothing, particularly since Plaintiffs do not and cannot plead that this analysis — or anything like it — was available to any of the Defendants during the class period. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 196 (2d. Cir. 2008) (showing access to raw data is not sufficient to plead scienter absent allegations that the data "had been collected into reports" that showed inconsistencies with the Defendants statements). Moreover, Plaintiffs concede that some of the data they relied on was not even filed by SandRidge. *See* Comp. ¶ 19 (alleging that "[m]uch," but not all, data was "provided by SandRidge to governmental authorities"). It thus says nothing about what SandRidge or any of its officers and directors knew or should have known.

Simply put, nothing in the Amended Complaint specifies how any Defendants made any alleged misstatement or omission *with the intent to deceive*—or engaged in reckless conduct "which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Fleming Co., Inc.*, 264 F.3d at 1258. To the contrary, the documents incorporated in the Amended Complaint demonstrate the opposite.

For example, during earning calls in 2011 Grubb and Ward disclosed that SandRidge's wells were producing a lower percentage of oil than expected. *See* Ex. 30 (Aug. 5, 2011 Earnings Call Transcript, at 22) (Mississippian producing a "higher gas rate than what we have projected on the type curve"); Ex. 31 (Nov. 4, 2011 Earnings Call

Transcript, at 4) ("A Miss well is now projected [at] 56% natural gas."). Defendants also warned investors that they were relying on the analysis of a third-party reserve engineer, Netherland Sewell; that Netherland Sewell might decide that the type curve (and thus the oil/gas ratio) needed to be revised; and that Defendants "don't really know which direction it'll go." ***See, e.g.*** Ex. 32 (Transcript of Nov. 16, 2011 Global Energy Conf., at 5) (Bennett: "And just to remind you back in second quarter 2010, the Netherland Sewell type curve was 235,000 BOE. So it's 235,000 BOE to 409,000 BOE" and "[w]e're obviously going to update it with our year-end reserve report, don't really know which direction it'll go."); Ex. 31 at 25 (Ward: "we don't anticipate a decline…[b]ut you're right that's up to the third-party engineers."). These disclosures refute any suggestion that Defendants intended to mislead investors with false assurances of a higher ratio.

Plaintiffs' allegations that the Defendants intended to conceal the Ward Entities' acquisitions in the Mississippian are similarly lacking. A large number of companies were operating in the Mississippian by 2011, including Shell, Chesapeake Energy, Atlas Pipeline Partners, Equal Energy Ltd., and Enerjex. *See* Compl. ¶ 120; *see also* Exs. 33-36. Since the Mississippian was well known in the industry, with several large players, it is not clear why the individual Defendants would lie about the fact that the Ward Entities were operating there. What difference could that "fact" make that would incentivize the individual defendants to misrepresent it? The explanation appears nowhere in the Amended Complaint.

Notably, Plaintiffs also do not claim that any individual Defendant acted to enrich himself by selling stock to the supposedly defrauded investing public — indeed,

they acknowledge that no Defendant sold stock during the class period. *See* Compl. ¶ 354. *In re Sun Healthcare Grp., Inc. Sec Litig.*, 181 F. Supp. 2d 1283, 1296 (D.N.M. 2002) (considering absence of insider trading in concluding that scienter allegations were insufficient). For this reason as well, Plaintiffs' allegations of scienter are far from "cogent and compelling." *Tellabs, Inc.*, 551 U.S. at 324.

Nor can Plaintiffs establish scienter on the part of SandRidge through their allegations about Tom Ward. Plaintiffs' allegations that Ward acted with scienter fail for the reasons explained in Point B of Ward's opposition brief, which the SandRidge Defendants hereby incorporate by reference. However, even if the Ward allegations had merit, it would not suffice to establish scienter on the part of SandRidge because Plaintiffs' theory (however misguided) is that Ward was acting for his own benefit, in violation of the Company's Code of Ethics, and against its interests. *See, e.g.*, Compl. ¶¶ 122-24 (alleging Ward was engaged in self-dealing in violation of the SandRidge code of ethics); *see id*, ¶ 351 (alleging Ward was acting to increase the value of the land acquired by the Ward Entities). A corporate principal will not be charged with knowledge of an agent gained "in the performance of acts" done on the agent's "own personal behalf" or "in matters where the agent's interest is adverse to that of his principal." *Long v. Brown*, 98 P.2d 28, 36 (Okla. 1939) (internal quotation marks omitted); *In re ChinaCast Educ. Corp. Sec. Litig.*, No. CV-12-4621, 2012 WL 6136746, at *9 (C.D. Cal. Dec. 7, 2012) (dismissing 10(b) claim and holding that "knowledge and actions of employees acting adversely to the corporate employer cannot be imputed to the corporation").

*C. The SandRidge Stock Purchasers Fail to Plead Loss Causation.*

Loss causation "requires the plaintiff to prove that it was the *very facts* about which the defendant lied which caused its injuries." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006) (emphasis added); *accord In re Williams Sec. Litig. WCG Subclass*, 558 F.3d 1130, 1136-37 (10th Cir. 2009) (Plaintiff must "identify a 'causal connection' between the loss and the misrepresentation."). Plaintiffs do not plead loss causation for any alleged omissions about the transactions of the Ward Entities.

Plaintiffs allege that SandRidge's stock fell on November 9 because TPG-Axon publicly issued a letter accusing Ward of improper related-party transactions with SandRidge, *see* Compl. ¶ 322, but the letter in question did not even mention the adjacent acquisitions of the Ward Entities, *see* Ex. 23, at 6-7. Accusations about the Ward Entities' acquisitions did not surface until TPG-Axon publicly released a presentation and filed it with the SEC on January 24, 2013, and Plaintiffs do not allege that SandRidge's stock declined meaningfully in response to that disclosure. Compl. ¶ 334; Ex. 24, at 5. *See, e.g., Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347-48 (2005) (loss causation not adequately plead where the allegations of the complaint failed to demonstrate that the company's "share price fell significantly after the truth became known").

*D. The SandRidge Stock Purchasers Do Not State a Section 20(a) Claim.*

To state a Section 20(a) claim Plaintiff must "establish (1) a primary violation of the securities laws and (2) control over the primary violator by the alleged controlling person." *Adams*, 340 F.3d at 1107. Here, as explained above, Plaintiffs fail to state a primary Section 10(b) violation. They also fail to establish the requisite

element of control. Plaintiffs' allegation that Bennett was the CFO of SandRidge (Compl. ¶ 28) is not enough, because the alleged fraud does not relate "specifically to official reports of the company's financial performance." *Id.* at 1109. The claim against Grubb similarly fails to establish that he had control over any fraudulent activity.

## II. THE TRUST PURCHASERS' CLAIMS FAIL.

### *A. Plaintiffs Failed to Comply with the Notice Provisions of the PSLRA.*

When an amended pleading "affects a new class of plaintiffs, asserts new legal theories or claims, or is based on new factual allegations," courts "have required plaintiffs to republish notice" under the notice provisions of the PSLRA. *Vanleeuwen v. Keyuan Petrochemicals, Inc.*, No. CV 11-9495, 2013 WL 2247394, at *5 (C.D. Cal. May 9, 2013) (dismissing claims where plaintiffs failed to republish notice after adding (i) new allegations on behalf of individuals who purchased securities in a separate offering and (ii) new allegations of misrepresentations in offering documents).

Notice must be published no later than "20 days after the date on which the complaint is filed . . . ." 15 USC § 77z–1(a)(3)(A)(i); 15 U.S.C. § 78u–4(a)(3)(A)(i). The purpose of the notice requirement is to "encourage the most capable representatives of the plaintiff class to participate in the class action litigation and to exercise supervision and control of the lawyers for the class[.]" *Vanleeuwen*, 2013 WL 2247394, at *6.

Here, Plaintiffs failed to give any notice of the new legal theories, factual allegations, and class of plaintiffs included in the Amended Complaint. The pleading purports to add — without Court approval — a new class of shareholder plaintiffs (the Trust Purchasers); three new named plaintiffs (Greenberg, Blackburn, and Odell); new

causes of action under Sections 11 and 12 of the Securities Act; and new factual allegations regarding the Ward Entities, SandRidge's CapEx, and the public offerings of two royalty trusts that were not at issue in Plaintiffs' original complaint.

Plaintiffs have never given notice to investors of their intention to assert any of these claims. The prior notice given by the SandRidge Investor Group does not suffice, because that notice was directed to holders of SandRidge common stock, not Trust Purchasers. It referred to SandRidge's New York Stock Exchange symbol SD, but not the Trust's symbols: SDT and SDR. ECF 32, Ex. 1. It alleged injuries resulting from drops in SandRidge stock, not Trust units. *Id.* Indeed, the notice contained no references at all to the Trusts or to claims based on the Trusts' offering materials. *Id.*

Plaintiffs' failure to comply with PSLRA notice requirements with respect to these new claims and allegations has resulted in the very problems the PSLRA attempted to remedy. The new plaintiffs, Judith Greenberg (800 shares of Trust I), Charles Blackburn (1,000 shares of Trust II), and Ted Odell (2,000 shares of Trust II), own small amounts of stock . *See* Compl. ¶¶ 23-25 & attached certifications. Because of their modest holdings, they presumptively are not the most effective class representatives. *See* 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I)(bb) (statutory presumption in favor of appointing person with "largest financial interest" lead plaintiff). Moreover, as discussed below, the newly-joined Plaintiffs have problems of standing that might have been avoided had a proper lead plaintiff been selected after compliance with PSLRA notice procedures. Because Lead Counsel failed to comply with the notice provisions of the PSLRA to the detriment of the class, all of the Trust Purchaser claims should be dismissed without

prejudice. To the extent the Court reaches the merits of the claims, however, the allegations should be dismissed for failure to state a claim for the reasons that follow.

B. *The Complaint Fails to State a Claim under Section 11 or Section 12.*

To plead a Section 11 claim, a plaintiff "must identify (1) a misrepresentation or an omission, that is (2) material" in a registration statement. *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013). Similarly, a Section 12(a)(2) claim "must identify a material misrepresentation in or omission from either the prospectus or an oral representation directly concerning the prospectus." *Thornburg Mortg.*, 695 F. Supp. 2d at 1191. The Tenth Circuit does "not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial." *Slater*, 719 F.3d at 1197. Although Section 11 and Section 12 claims are evaluated under the notice pleading standard of Rule 8(a), the standard is "still rather stringent, requiring the Plaintiffs to state non-conclusory facts from which it can plausibly be inferred that they state a valid claim." *Thornburg Mortg.*, 695 F. Supp. 2d at 1221. Here, the Trust Purchasers have not identified any material misrepresentations or omissions, and their claims are otherwise defective.

1. The Trust Purchasers Do Not Plead Any Material Misstatements About Oil and Gas Production.

a) The cautionary statements in the prospectuses nullified any potentially misleading effect.

Under the "bespeaks caution" doctrine, forward-looking statements are "considered immaterial" as a matter of law "when the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements

concerning the subject matter of the statements at issue to nullify any potentially misleading effect." *Grossman*, 120 F.3d at 1120. Known as the "bespeaks caution" doctrine, this is the common law corollary of the PSLRA safe harbor. *See, e.g.*, *Grossman*, 120 F.3d at 1120-21; *Spiegel v. Tenfold Corp.*, 192 F. Supp. 2d 1261, 1268 (D. Utah 2002) (dismissing § 11 claim based on bespeaks caution doctrine).

Here, the Trust prospectuses specifically cautioned investors that reserve estimates were "inherently uncertain" and may not accurately predict the production of future wells; that "[r]eserve estimates for fields that do not have a lengthy production history are less reliable than estimates for fields with lengthy production histories;" and that "[m]ost of the Producing Wells have been operational for less than one year." Ex. 10, at 20; Ex. 11, at 22-23. This language is more than sufficient to bespeak caution and render the forward-looking statements on which Plaintiffs rely immaterial. *See Truk Int'l Fund LP v. Wehlmann*, 737 F. Supp. 2d 611, 623 (N.D. Tex. 2009) (proved reserve estimates immaterial as a matter of law where investors were warned that "[t]he process of estimating oil reserves is complex" and the "estimates are inherently imprecise").[6]

b) The statements in the prospectuses were opinions that were neither objectively nor subjectively false.

The reserve estimates and production projections in the Trust prospectuses

[6] The cautionary language about reserve estimates belies Plaintiffs' allegation that they were misled by statements to the effect that there was a "continuity" or "consistency" of results across the Mississippian. *See* Compl. ¶ 190. Plaintiffs also fail to plead facts negating the limited claim made in the prospectuses — that data from SandRidge and certain operators with whom SandRidge had exchanged information as of April 7, 2011 demonstrated a consistency in the formation. (*See id.*)

are not statements of fact, but opinions because they inherently reflect "judgment regarding multiple factors." *MHC Mut. Conversion Fund, L.P. v. United Western Bancorp*, 913 F. Supp. 2d 1026, 1034 (D. Colo. 2012); *see also Del Noce v. Delyar Corp.*, No. 72 Civ. 1819, 1976 WL 813, at *10 (S.D.N.Y. July 30, 1976) ("valuation of petroleum reserves . . . involves a long and difficult process in which even highly regarded experts are ultimately forced to rely on their subjective judgments"). Opinions are not actionable unless plaintiffs allege not only that they were objectively false, but also that they were *subjectively* false — *i.e.* that the defendant did not believe the opinions at the time they were stated. *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d. Cir. 2011) (where a claim is based on an allegedly false opinion, a "plaintiff must allege that defendant's opinions were both false and not honestly believed when they were made"); *MHC*, 913 F.Supp.2d at 1037 (plaintiffs asserting securities claims "that are based on opinions, must allege that the opinions are objectively *and* subjectively false"). A plaintiff must allege subjective falsity not "because there is a scienter requirement under the Securities Act, but because a statement of opinion is not inherently true or false — it is true or false only to the extent that it misrepresents the speaker's state of mind." *NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*, No. 1:10-cv-0440-LAK, slip op. at 1 (S.D.N.Y. Mar 16, 2012) (attached as Ex. 37).

Here, Plaintiffs' allegations fail to show that the reserve estimates and production projections for the Trusts were objectively false at the time they were made. The unspecified well data that Plaintiffs allegedly reviewed — and which they cite as evidence of falsity — was not representative of the performance of wells in which the

Trusts have an interest. The Amended Complaint alleges that Plaintiffs' counsel reviewed a "selection of data concerning SandRidge wells in [the] most active areas of drilling," Compl. ¶ 19 (emphasis added), but each Trust drills in a specific, geographically limited area that is a small subset of SandRidge's vast Mississippian holdings. Plaintiffs cannot rely on unspecified data regarding SandRidge's broader holdings to establish the falsity of statements made with respect to the Trust's discrete well interests.

Moreover, Plaintiffs have failed to adequately plead subjective falsity — i.e., that Defendants did not believe the reserve estimates or projections at the time they were made. The challenged statements were based on reserve estimates of Netherland Sewell, an independent, third-party reserve engineer. *See, e.g.,* Ex. 10, at 67 ("Netherland Sewell, the independent petroleum engineering consultant, estimated all of the proved reserve information in this registration statement."); Ex. 11, at 69 (same). The Amended Complaint does not even mention Netherland Sewell, much less plead facts suggesting that Netherland Sewell — or any of the Defendants — did not believe in the accuracy of Netherland Sewell's reserve estimates or any related production projections.

Plaintiffs not only fail to plead facts establishing that Defendants did not believe these estimates, they expressly *disclaim* any such allegation for the purposes of their claims under Sections 11, 12(a)(2), and 15: "Plaintiffs do not claim for purposes of this Count that these Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent." Compl. ¶¶ 392, 400, 409. Plaintiffs' disclaimer negates any claim of subjective falsity and is thus fatal to all of Plaintiffs' claims based

on reserve estimates, production projections, and other opinions. *See In re Am. Int'l Grp., Inc., 2008 Sec. Litig.*, 2013 WL 1787567, at *4 (S.D.N.Y. Apr. 26, 2013) ("By repeatedly disclaiming fraud and intentional or reckless misconduct in the Securities Act section of the Complaint, Plaintiffs have disavowed any allegation that the Defendants knowingly misstated any opinions they may have . . . communicated . . . .").[7]

2. The Omission of Information About the Ward Entities and SandRidge's CapEx Was Not Material to Trust Purchasers.

The Amended Complaint fails to allege how the acquisitions of the Ward Entities are *material* to Trust Purchasers. Acquisitions of property in the Mississippian by the Ward Entities were entirely irrelevant to Trust investors, because the Trusts already owned all of the well interests they were formed to exploit by the date of their respective IPOs. *See* Ex. 10, at 1; Ex. 11, at 1. As a result, the Trusts had no interest in acquiring more property in the Mississippian, and Plaintiffs' allegations about prices being driven up by Ward Entity acquisitions are of no moment whatsoever. Similarly, SandRidge's CapEx is not material to Trust investors because the Trusts have no financial responsibility for such expenditures. *See, e.g.*, Ex. 10, at 9; Ex. 11, at 9. Since neither the Ward Entity acquisitions nor SandRidge's CapEx were material to the Trusts, the Trusts were not required to make disclosures on either topic by SEC Regulation S-K.

3. The Section 12(a)(2) Claim Fails for Additional Reasons.

Plaintiffs' Section 12(a)(2) claim fails not only because of the absence of

[7] The statements in the prospectuses of Trust I and II to the effect that "the Mississippian formation's geology is well understood" are likewise opinions.

any material misrepresentation or omission, but because Plaintiffs lack standing. Only one Plaintiff, Judith Greenberg, claims to have purchased units in Trust I, and the certification attached to the Amended Complaint shows that her purchases occurred in October 2012 — nearly 18 months after the Trust I public offering, which occurred on or about April 12, 2011. Because Ms. Greenberg did not purchase "in the offering," she lacks standing to assert a claim under Section 12(a)(2). *See Gustafson v. Alloyd Co.* 513 U.S. 561, 577-78 (1995) ("§ 12(2) liability . . . limited to public offerings."); *see also Joseph v. Wiles*, 223 F.3d 1155, 1160-1161 (10th Cir. 2000).

The claim fails for the additional reason that SandRidge and the Individual Defendants are not statutory "sellers" and therefore may not be held liable under Section 12(a)(2). Both Trusts had a "firm commitment" underwriting pursuant to which the underwriters bought the entire offering from each Trust. *See* Ex. 10, at 113; Ex. 11, at 115. As a result, only the underwriters sold directly to Trust Purchasers, and the other Defendants may not be held liable as sellers under Section 12(a)(2) unless they engaged in direct and active solicitation efforts directed at Plaintiffs — an allegation absent here. *See Thornburg Mortg., Inc.*, 695 F. Supp. 2d at 1220-21 (insufficient to plead that an defendant created the offering documents; "direct and active" solicitation is required).

### C. *The Trust Purchasers Do Not State a Claim Under Section 10(b).*

The Trust Purchasers' Section 10(b) claims are based on statements made during Trust I's earnings calls.. Compl. ¶¶ 234-35, 250-51, 285-86, 298-99. The allegedly misleading statements are virtually identical in substance to those alleged by the SandRidge Stock Purchasers, and fail to state a Section 10(b) claim for the same reason:

The Amended Complaint fails to plead why the statements were misleading when made.

The Trust Purchasers' reliance on Lead Counsel's analysis of unidentified and incomplete OTC filings to demonstrate falsity is even more misplaced than the SandRidge Stock Purchasers' because the data is not representative of the Trust's properties. As explained in Point II.B.1.b, Plaintiffs allege that the OTC filings contained data representative of SandRidge's broad holdings in the Mississippian. *See* Compl. ¶ 19 (stating that they reviewed a "selection of data concerning SandRidge wells in the most active areas of drilling"). The Trusts, however, drill in specific, geographically limited areas that are a small subsection of SandRidge's vast Mississippian holdings.

The Trust Purchasers, like the SandRidge Stock Purchasers, also fail to plead scienter. There are no allegations that any of the Defendants had information about the oil and gas production of the Trusts that contradicted their public statements. Instead, the Trust Purchasers rely on the same conclusory allegations about Defendants' receipt of quarterly reports from the SandRidge Reservoir Engineer Department. Compl. ¶ 344. These allegations are patently inadequate under Tenth Circuit law. *See Fleming*, 264 F.3d at 1264; *see also* Point I.B. Moreover, there was no reason for defendants to believe that "omissions" about the Ward Entities' transactions or SandRidge's CapEx would be misleading, because these activities had no effect on the Trusts, as explained above.

Finally, the allegedly misleading statements identified by the Trust Purchasers fall within the PSLRA's safe harbor. The earnings calls on which Defendants allegedly made misstatements incorporated the strong cautionary language from Trust filings. Ex. 11, at 20 ("Less production history may contribute to less accurate estimates

of reserves, future production rates and the timing of development expenditures. Most of the Drilled Wells have been operational for less than one year…"); *see also* Ex. 18-21, at 1-2 (incorporating cautionary language from Trust I filings).

### *D. The Trust Purchasers Do Not State Claims Against Bennett or Grubb Under § 20(a) of the Exchange Act or § 15 of the Securities Act*

To state a § 15 or § 20(a) claim, a plaintiff must first establish a primary violation of the securities laws. *Adams*, 340 F.3d at 1107. As described in detail above, Plaintiffs have failed to plead a primary violation. Furthermore, under both Section 15 of the Securities Act and Section 20(a) of the Exchange Act, in order to be held liable, a person must "control" the party that commits a primary violation. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 & n. 7 (10th Cir. 1998). Plaintiffs' allegation that the individual Defendants were Trust officers and directors (*see* Compl. ¶¶ 27-37) is insufficient to establish control because it is demonstrably incorrect — the Trusts have no officers or directors. *See* Ex. 15, at 40; Ex. 38 (Trust II's 2012 10-K, at 53). Plaintiffs' additional allegations about Bennett and Grubb, which establish little more than their positions at SandRidge, likewise fall short for the reasons explained in Point I.D.

## III. OTHER ARGUMENTS FOR DISMISSAL ARE HEREBY INCORPORATED.

Finally, the SandRidge Defendants expressly incorporate by reference all applicable arguments for dismissal made by other Defendants.

## CONCLUSION

For the foregoing reasons, this Action should be dismissed.

Dated: October 7, 2013

Respectfully submitted,

CROWE & DUNLEVY

*/s/ Thomas B. Snyder*
Thomas B. Snyder, Esq., 211230CA
20 North Broadway, Suite 1800
Oklahoma City, OK 73102
(405) 234-3254

*Attorneys for SandRidge Energy, Inc., James D. Bennett, Matthew K. Grubb, Randall D. Cooley, Jim J. Brewer, Everett R. Dobson, William A. Gilliland, Daniel W. Jordan, Roy T. Oliver, Jeffrey S. Serota, and D. Dwight Scott*

Of Counsel:

COVINGTON & BURLING LLP

Mark P. Gimbel (admitted *pro hac vice*)
C. William Phillips (admitted *pro hac vice*)
Brian B. Alexander (admitted *pro hac vice*)
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000

# CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2013, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Brian B Alexander balexander@cov.com, cwphillips@cov.com, maony@cov.com, mgimbel@cov.com

C Williams Phillips cphillips@cov.com

Darren B Derryberry dderryberry@derryberrylaw.com, kreynolds@derryberrylaw.com

David A Rosenfeld drosenfeld@rgrdlaw.com, mblasy@rgrdlaw.com

Drew Neville , Jr dneville@hartzoglaw.com, gbrown@hartzoglaw.com

Evan J Kaufman ekaufman@rgrdlaw.com, e_file_sd@rgrdlaw.com

Everett C Johnson , Jr everett.johnson@lw.com

George S Corbyn , Jr gcorbyn@corbynhampton.com, kzellmer@corbynhampton.com

James C Word christian.word@lw.com

Joe M Hampton jhampton@corbynhampton.com, msampson@corbynhampton.com

John E Barbush j.barbush@coxinet.net

John J Clarke , Jr john.clarke@dlapiper.com

Margaret A Tough margaret.tough@lw.com, #sflitigationservices@lw.com, doreen.griffin@lw.com

Mario Alba malba@rgrdlaw.com, e_file_ny@rgrdlaw.com, e_file_sd@rgrdlaw.com

Mark P Gimbel mgimbel@cov.com

Michael C Turpen mturpen@riggsabney.com, swilliams@riggsabney.com

Patrick A Caballero patrick.caballero@bgllp.com, kim.larocca@bgllp.com, steve.benesh@bgllp.com

Richard F Hans richard.hans@dlapiper.com, DocketingNewYork@dlapiper.com

Richard W Gonnello rgonnello@faruqilaw.com

Robert A Nance rnance@riggsabney.com, creimann@riggsabney.com

Ryan S Wilson RWilson@hartzoglaw.com, acox@hartzoglaw.com, dcecrle@hartzoglaw.com

Scott A Graham sgraham@seymourgraham.com, ggroblewski@seymourgraham.com, kathyg@seymourgraham.com

Sean T Masson smasson@rgrdlaw.com, e_file_ny@rgrdlaw.com, e_file_sd@rgrdlaw.com

Steven M Bauer steven.bauer@lw.com, #sflitigationservices@lw.com, doreen.griffin@lw.com

Thomas B Snyder thomas.snyder@crowedunlevy.com, debi.stockwell@crowedunlevy.com, donna.hinkle@crowedunlevy.com, ecf@crowedunlevy.com

William Stephen Benesh sbenesh@bracepatt.com, steve.benesh@bracepatt.com

*s/Thomas B. Snyder*
Thomas B. Snyder