# Exhibit 9

Exhibit 9

Table of Contents

Index to Financial Statements

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 10-K

**(Mark One)**

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2009**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission File Number: 001-33784**

# SANDRIDGE ENERGY, INC.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of incorporation or organization) | **20-8084793**<br>(I.R.S. Employer Identification No.) |
| **123 Robert S. Kerr Avenue**<br>**Oklahoma City, Oklahoma**<br>(Address of principal executive offices) | **73102**<br>(Zip Code) |

**(405) 429-5500**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Common Stock, $0.001 par value** | **New York Stock Exchange** |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☑ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). Yes ☐ No ☑

The aggregate market value of our common stock held by non-affiliates on June 30, 2009 was approximately $1.0 billion based on the closing price as quoted on the New York Stock Exchange. As of February 19, 2010, there were 210,413,896 shares of our common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Company's definitive proxy statement for the 2010 Annual Meeting of Stockholders are incorporated by reference in Part III.

Table of Contents

Index to Financial Statements

**SANDRIDGE ENERGY, INC.**

**2009 ANNUAL REPORT ON FORM 10-K**

**TABLE OF CONTENTS**


| Item | | Page |
|---|---|---|
| | **PART I** | |
| 1. | Business | 1 |
| 1A. | Risk Factors | 27 |
| 1B. | Unresolved Staff Comments | 40 |
| 2. | Properties | 40 |
| 3. | Legal Proceedings | 40 |
| 4. | Reserved | 40 |
| | **PART II** | |
| 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 41 |
| 6. | Selected Financial Data | 41 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 43 |
| 7A. | Quantitative and Qualitative Disclosures about Market Risk | 66 |
| 8. | Financial Statements and Supplementary Data | 69 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 69 |
| 9A. | Controls and Procedures | 69 |
| 9B. | Other Information | 70 |
| | **PART III** | |
| 10. | Directors, Executive Officers and Corporate Governance | 71 |
| 11. | Executive Compensation | 71 |
| 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 71 |
| 13. | Certain Relationships and Related Transactions and Director Independence | 71 |
| 14. | Principal Accountant Fees and Services | 71 |
| | **PART IV** | |
| 15. | Exhibits and Financial Statement Schedules | 72 |

Table of Contents

Index to Financial Statements

# PART I

## Item 1. *Business*

### General

SandRidge Energy, Inc., is an independent natural gas and oil company headquartered in Oklahoma City, Oklahoma concentrating on exploration, development and production activities related to the exploitation of our significant holdings in West Texas. Our primary areas of focus are the West Texas Overthrust (the "WTO") and the Permian Basin. The WTO is a natural gas-prone geological region in Pecos County and Terrell County, Texas where we have operated since 1986 and currently have 562,626 net acres under lease. The WTO includes the Piñon gas field. In the Permian Basin, we control approximately 138,691 net acres in West Texas and New Mexico, including approximately 90,000 net acres acquired in December 2009 as further discussed below. We also operate interests in the Mid-Continent, the Cotton Valley Trend in East Texas, the Gulf Coast area and the Gulf of Mexico.

We have assembled an extensive natural gas and oil property base on which we have identified approximately 12,100 potential drilling locations as of December 31, 2009, including approximately 5,500 locations in the WTO and approximately 2,600 locations in the Permian Basin. As of December 31, 2009, our estimated proved reserves were 1,312.2 Bcfe, of which 52% were natural gas. The reports covering approximately 95% of these estimated proved reserves were prepared by third party engineers. As of December 31, 2009, we had 3,373 gross (2,721.2 net) producing wells, substantially all of which we operate, and had 1,720,909 gross (1,262,115 net) acres under lease. As of December 31, 2009, we had eight rigs drilling in the WTO, four rigs drilling in the Permian Basin, two rigs drilling in East Texas and one rig drilling in the Mid-Continent.

We also operate businesses that are complementary to our primary exploration, development and production activities which provide us with operational flexibility and an advantageous cost structure. We own related gas gathering and treating facilities, a gas marketing business and an oil field services business, including our wholly owned drilling rig business, Lariat Services, Inc. ("Lariat"). As of December 31, 2009, our drilling rig fleet consisted of 31 rigs, 30 of which were operational. We also capture and transport $CO_2$ to the Permian Basin.

Our principal executive offices are located at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma 73102 and our telephone number is (405) 429-5500. We make available free of charge on our website at *www.sandridgeenergy.com* our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports as soon as reasonably practicable after we electronically file such material with, or furnish it to, the Securities and Exchange Commission ("SEC"). Any materials that we have filed with the SEC may be read and copied at the SEC's Public Reference Room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549 or accessed via the SEC's website address at *www.sec.gov*.

References to "SandRidge," "us," "we," "Company" and "our" in this report refer to SandRidge Energy, Inc., together with its subsidiaries. "SandRidge $CO_2$" refers to our wholly owned subsidiary SandRidge $CO_2$, LLC, and "SandRidge Tertiary" refers to our wholly owned subsidiary SandRidge Tertiary, LLC.

### Recent Developments

*Forest Acquisition.* In December 2009, we purchased natural gas and oil properties located in the Permian Basin from Forest Oil Corporation and one of its subsidiaries (collectively, "Forest") for $800.0 million, subject to purchase price and post-closing adjustments (the "Forest Acquisition"). The assets consist primarily of six operated areas in the Central Basin Platform and greater Permian Basin area of western Texas and eastern New Mexico. These properties are characterized by multiple producing horizons including the Spraberry, Wolfcamp, Grayburg, San Andres and Wichita-Albany formations. Additionally, there are significant undeveloped properties in the Clear Fork formation. Approximately 98% of the production is operated and the subject properties cover over 90,000 net acres of which nearly 80% is held by production.

Table of Contents

Index to Financial Statements

*Common Stock Offering.* In December 2009, we completed a registered underwritten public offering of 25,600,000 shares of our common stock, including 3,600,000 shares of common stock acquired by the underwriters from us to cover over-allotments. Net proceeds from the offering were approximately $217.2 million after deducting offering expenses of approximately $9.4 million. The net proceeds were used to fund a portion of the Forest Acquisition purchase price and for general corporate purposes.

*8.75% Senior Notes Due 2020.* In December 2009, we completed the sale of $450.0 million of our unsecured 8.75% Senior Notes due 2020 (the "8.75% Senior Notes") to qualified institutional buyers eligible under Rule 144A of the Securities Act of 1933, as amended (the "Securities Act"). Net proceeds from the offering were approximately $433.1 million after the issuance discount and deducting offering expenses of approximately $9.5 million. We used such proceeds to fund a portion of the Forest Acquisition purchase price.

*Private Placement of 6.0% Convertible Perpetual Preferred Stock.* In December 2009, we completed a private placement of 2,000,000 shares of our 6.0% convertible perpetual preferred stock to an institutional investor in a transaction exempt from registration under Regulation D under the Securities Act. Net proceeds were approximately $199.9 million and were used to fund a portion of the Forest Acquisition purchase price and for general corporate purposes.

Each share of the 6.0% convertible perpetual preferred stock has a liquidation preference of $100.00 and is entitled to an annual dividend of $6.00 payable semi-annually in cash, common stock or any combination thereof, beginning on July 15, 2010. Additionally, each share is initially convertible into 9.21 shares of our common stock, at the holder's option, at any time on or after February 1, 2010 based on an initial conversion price of $10.86 and subject to customary adjustments in certain circumstances. Five years after their issuance, all outstanding shares of the convertible preferred stock will be converted automatically into shares of our common stock at the then-prevailing conversion price as long as all dividends accrued at that time have been paid.

*2010 Capital Expenditure Budget.* On February 25, 2010, we introduced 2010 production guidance of 130 Bcfe based on 2010 capital expenditure guidance of $860.0 million. See Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources" for further discussion of our liquidity and capital expenditures budget.

*Crusader Acquisition Bid Withdrawal.* In September 2009, we entered into a Stock Purchase Agreement (the "Crusader Purchase Agreement") with Crusader Energy Group Inc., and its subsidiaries (collectively, "Crusader") to purchase all of the shares of common stock of Crusader that were to be issued upon the effectiveness of Crusader's reorganization under Chapter 11 of the United States Bankruptcy Code. On November 12, 2009, we announced our withdrawal from the acquisition process of Crusader as permitted under the bidding procedures applicable to Crusader's bankruptcy. On December 14, 2009, we terminated the Crusader Purchase Agreement, and on December 31, 2009, we received the break-up fee of $7.0 million provided for in the Crusader Purchase Agreement.

## Business Strategy

Our primary objective is to achieve long-term growth and maximize stockholder value over multiple business cycles by pursuing the following strategies:

- *Growth Through Development, Drilling and Exploration of Existing Acreage.* We expect to generate long-term reserve and production growth by exploring, drilling and developing our large acreage position. Our primary exploration and development focus will be in the WTO and the Permian Basin. We have identified approximately 5,500 potential drilling locations in the WTO and believe that we will be able to expand the number of drilling locations through exploratory drilling and use of our 3-D seismic data. We intend to complement our program in the WTO through continued development of our oil reserves in the Central Basin Platform of the Permian Basin.
- *Apply Technological Improvements to Our Development and Exploration Program.* We use our 3-D seismic data and our enhanced interpretation technologies to improve drilling and exploration success. We strive to maximize value by continuing to minimize time from spud to first sales with advanced drilling, completion and production methods.

Table of Contents

Index to Financial Statements

- *Reduce Costs, Enhance Returns and Maintain Operating Flexibility by Controlling Operations.* We operate 95% of our production in the WTO, Permian Basin, East Texas, the Gulf Coast area, the Mid-Continent and the Gulf of Mexico, in addition to controlling our fleet of drilling rigs. We believe this allows us to better control overall costs and maintain a high degree of operating flexibility, which permits us to manage our operating costs and control capital expenditures and the timing of development and exploration activities.

## Our Business Segments and Primary Operations

We operate in three business segments: exploration and production, drilling and oil field services and midstream gas services. Financial information regarding each segment is provided in "Management's Discussion and Analysis of Financial Condition and Results of Operations."

### *Exploration and Production*

We explore for, develop and produce natural gas and oil reserves, with a focus on increasing our reserves and production in the WTO and the Permian Basin. We operate substantially all of our wells in these areas. We also have significant operated leasehold positions in the Cotton Valley Trend in East Texas, the Gulf Coast area, the Mid-Continent and the Gulf of Mexico.

The following table identifies certain information concerning our exploration and production business as of December 31, 2009 unless otherwise noted:

| Area | Estimated Net Proved Reserves (Bcfe) | PV-10 (in millions)(1) | Daily Production (MMcfe/d)(2) | Reserves/ Production (Years) | Proved Gross Acreage | Net Acreage | Number of Identified Potential Drilling Locations |
|---|---|---|---|---|---|---|---|
| WTO | 340.0 | $ 224.3 | 123.4 | 7.5 | 682,770 | 562,626 | 5,521 |
| Permian Basin | 574.8 | 885.0 | 67.6 | 23.3 | 204,110 | 138,691 | 2,610 |
| East Texas | 109.3 | 104.8 | 34.6 | 8.7 | 47,087 | 37,849 | 1,505 |
| Gulf Coast | 53.7 | 107.2 | 26.5 | 5.6 | 68,173 | 46,598 | 36 |
| Mid-Continent | 65.1 | 78.0 | 23.6 | 7.6 | 636,653 | 439,802 | 2,333 |
| Gulf of Mexico | 43.3 | 56.2 | 17.8 | 6.7 | 70,470 | 26,230 | 14 |
| Tertiary recovery — West Texas | 125.7 | 105.1 | 2.8 | 123.0 | 9,946 | 8,852 | 84 |
| Other | 0.3 | 0.4 | — | — | 1,700 | 1,467 | — |
| Total | 1,312.2 | $ 1,561.0 | 296.3 | 12.1 | 1,720,909 | 1,262,115 | 12,103 |

(1) PV-10 generally differs from Standardized Measure of Discounted Net Cash Flows ("Standardized Measure") because it does not include the effects of income taxes on future net revenues; however, due to the full valuation allowance on our deferred tax asset at December 31, 2009 that serves to reduce to zero a tax benefit that otherwise would result from the tax effects of PV-10, there was no effect of income taxes on Standardized Measure at December 31, 2009. For a reconciliation of PV-10 to Standardized Measure, see — "Proved Reserves." Our Standardized Measure was $1.6 billion at December 31, 2009.

(2) Average daily net production for the month of December 2009.

Table of Contents

Index to Financial Statements

*West Texas Overthrust ("WTO")*

We have drilled and developed natural gas in the WTO since 1986. This area is located in Pecos County and Terrell County in West Texas and is associated with the Marathon-Ouachita fold and thrust belt that extends east-northeast across the United States into the Appalachian Mountain Region. The WTO was created by the collision of the ancestral North American and South American continents resulting in source rock and reservoir rock, including potential hydrocarbon traps, becoming thrusted upon one another in multiple layers (also known as imbricate stacking) along the leading edge of the WTO. The collision and thrusting resulted in the reservoir rock becoming highly fractured, increasing the likelihood of conventional natural gas and oil accumulations in the reservoir rock and creating a unique geological setting in North America. The primary reservoir rocks in the WTO range in depth from 2,000 to 17,000 feet and range in geologic age from the Permian to the Devonian. The imbricate stacking of these conventional gas-prone reservoirs provides for multi-pay exploration and development opportunities. Despite this, the WTO has historically been under-explored. The high $CO_2$ content of the natural gas, lack of infrastructure in the region, historical limitations of conventional subsurface geological and geophysical methods and commodity prices have combined to discourage exploration of the area. Our access to and control of the necessary infrastructure combined with the application of modern seismic techniques allow us to continue to identify exploration and development opportunities in the WTO.

*3-D Seismic Program.* In 2007, we began a multi-year seismic program to acquire 1,500 square miles of modern 3-D seismic data in the WTO. We believe this enhanced 3-D seismic program will lower exploratory drilling risk and improve completion efficiency by identifying structural detail of potential reservoirs. With the aid of 3-D seismic data and historical well information, we believe we can high-grade our drilling locations in order to achieve low finding costs. As of December 31, 2009, we had acquired 1,300 square miles of 3-D seismic data, all of which has been processed and interpreted.

*Piñon Field.* The Piñon Field lies along the leading edge of the WTO in Pecos County and is our most significant producing field, accounting for 25.8% of our proved reserve base as of December 31, 2009 and approximately 47% of our 2009 exploration and development expenditures (including land and seismic acquisitions). The primary reservoirs are the Tesnus sands (depths ranging from 3,500 to 5,000 feet), the Warwick Caballos chert (depths ranging from 5,000 to 8,000 feet) and the Dugout Creek Caballos chert (depths ranging from 7,000 to 10,000 feet). During 2009, we expanded the Piñon Field utilizing data from our 3-D seismic program and historical well information to identify new reservoirs in the field's three primary thrusts (Dugout Creek, Warwick and Frog Creek). As of December 31, 2009, our estimated proved natural gas and oil reserves in the Piñon Field were 338.2 Bcfe, 4.6% of which were proved undeveloped reserves based on estimates prepared by Netherland, Sewell & Associates, Inc., an independent oil and gas consulting firm. Our interests in the Piñon Field as of December 31, 2009 included 724 gross (690.9 net) producing wells and a 95.3% average working interest in the producing area of the Piñon Field. We were operating eight drilling rigs in the Piñon Field as of December 31, 2009 and we drilled 57 wells in this field during 2009.

The most productive reservoir in the Piñon Field is the Warwick Caballos chert high $CO_2$ reservoir. However, $CO_2$ is a waste product and we cannot produce high $CO_2$ gas without removing the $CO_2$ from the gas stream. Production from this reservoir is currently limited by treating capacity at our legacy natural gas treating plants. Our current expansion of the capacity of our existing plants and the construction of the Century Plant, discussed below, will expand $CO_2$ treating capacity in the area and will allow us to accelerate the development of the Warwick thrust.

*West Texas Overthrust Exploration Update.* Exploration efforts during the fourth quarter of 2009 continued to focus on the integration of 1,300 square miles of 3-D seismic data and evolving sub-surface geologic models. The first two wells of our exploratory program will begin drilling during the first quarter of 2010 and will test structures of greater than 10,000 acres in size.

Table of Contents

Index to Financial Statements

*Century Plant.* In June 2008, we entered into an agreement with a subsidiary of Occidental Petroleum Corporation ("Occidental") to construct a $CO_2$ treating plant (the "Century Plant"), associated $CO_2$ compression pipeline facilities and ancillary equipment for $800.0 million. Occidental will pay a minimum of 100% of the contract price (including any subsequent agreed-on revisions) to us through periodic cost reimbursements based upon the percentage of the project completed. The Century Plant, to be located in Pecos County, Texas, is designed to have treating capacity of 800 MMcf per day of natural gas and is expected to be completed in two phases. The start-up of Phase 1 is anticipated in mid 2010. Century Plant Phase 1 will add approximately 400 MMcf per day of $CO_2$ treating capacity. Century Plant Phase 2 is expected to come online in the second half of 2011.

Upon start-up, the Century Plant will be owned and operated by Occidental. We will deliver high $CO_2$ natural gas to the Century Plant pursuant to a 30-year treating agreement executed simultaneously with the construction agreement, and Occidental will separate and remove the $CO_2$ from the delivered natural gas. Occidental will retain substantially all $CO_2$ removed at the Century Plant and our other existing $CO_2$ treating plants. We will retain all methane from the Century Plant and our other existing plants.

*Permian Basin*

The Forest Acquisition expanded our holdings in the Central Basin Platform ("CBP") of the Permian Basin and added significant Permian Basin production in the Midland and Delaware Basins in Texas as well as the Northwest Shelf in New Mexico.

The primary reservoirs in the CBP are the dolomites and limestones of the San Andres and Clear Fork formations. To date, the San Andres and Clear Fork zones have produced in excess of 2.1 and 1.8 billion barrels of oil, respectively, with typical well depths ranging from 4,500 to 8,000 feet. Our properties in the CBP are positioned for infill and step-out drilling to target these reservoirs in several of the major CBP fields, such as the Goldsmith, Fullerton, Tex-Mex, Martin and Robertson fields.

Our primary target in the Midland Basin is the Spraberry and Wolfcamp formation. The Spraberry is the basinal sandstone equivalent of the Clear Fork platform carbonate and has produced approximately 1.3 billion barrels of oil to date from wells with typical depths ranging from 9,000 to 11,000 feet.

As of December 31, 2009, our estimated net proved reserves in the Permian Basin were 574.8 Bcfe, 54% of which were proved undeveloped reserves based on estimates provided by our independent oil and gas consulting firms, Lee Keeling and Associates, Inc. and Netherland, Sewell & Associates, Inc. Our interests in the Permian Basin as of December 31, 2009 included 1,472 gross (1,386.9 net) producing wells with an average working interest of 94%. We were operating four rigs in the Permian Basin as of December 31, 2009.

*East Texas — Cotton Valley Trend*

We own significant natural gas and oil interests in the natural gas bearing Cotton Valley Trend, which covers parts of East Texas and northern Louisiana. As of December 31, 2009, we held interests in 47,087 gross (37,849 net) acres in East Texas. At that time, our estimated net proved reserves in East Texas were 109.3 Bcfe, with net production of approximately 34.6 MMcfe per day for the month of December 2009. We focus our operations in the Cotton Valley Trend on the tight sand reservoirs of the Pettit and Travis Peak formations with depths ranging from 6,500 to 10,500 feet. These sands are typically distributed over a large area, which has led to a near 100% drilling success rate in this area. Due to the tight nature of the reservoirs, significant hydraulic fracture stimulation is required to obtain commercial production rates and efficiently drain the reservoir. Production in this area is generally characterized as long-lived, with wells having high initial production and decline rates that stabilize at lower levels after several years. Moreover, area operators continue to focus on infill development drilling as many areas have been down spaced to 40 acres per well, with some areas down-spaced to 20 acres per well. We drilled 17 gross (16.3 net) wells in the Cotton Valley Trend in 2009. As of December 31, 2009, we had two rigs running in this region.

Table of Contents

Index to Financial Statements

*Gulf Coast*

As of December 31, 2009, we owned natural gas and oil interests in 68,173 gross (46,598 net) acres in the Gulf Coast area, which encompasses the large coastal plain from the southernmost tip of Texas through the southern portion of Louisiana. As of December 31, 2009, our estimated net proved reserves in the Gulf Coast area were 53.7 Bcfe, with net production of approximately 26.5 MMcfe per day for the month of December 2009.

*Mid-Continent*

We own interests in properties in Oklahoma, Arkansas and southern Kansas that make up our Mid-Continent area. As of December 31, 2009, we held interests in 636,653 gross (439,802 net) leasehold and option acres in these areas. As of December 31, 2009, our estimated proved reserves in the Mid-Continent area were 65.1 Bcfe, based on estimates prepared by our internal engineers. Our average daily net production for the month of December 2009 was approximately 23.6 MMcfe per day.

*Gulf of Mexico*

As of December 31, 2009, we owned natural gas and oil interests in 70,470 gross (26,230 net) acres in state and federal waters off the coast of Texas and Louisiana. As of December 31, 2009, our estimated net proved reserves in the Gulf of Mexico were 43.3 Bcfe, with net production of approximately 17.8 MMcfe per day for the month of December 2009. Our operations in the Gulf of Mexico extend from the coast to more than 100 miles offshore and occur in waters ranging from 30 feet to 1,100 feet.

*Tertiary Oil Recovery*

We currently operate one active $CO_2$ flood and two waterfloods in which $CO_2$ pilot projects are currently under development. All three floods are located in the Permian Basin area of West Texas. The Wellman Unit, located in Terry County, is an active $CO_2$ flood in which $CO_2$ injection was re-initiated in November of 2005. The two prospective $CO_2$ pilot waterfloods are the George Allen Unit and the South Mallet Unit, located in Gaines and Hockley Counties. Both of these pilot projects are expected to begin $CO_2$ injection during 2010.

The three enhanced recovery projects were producing 465 net Boe per day during 2009 and have produced a total of 113.5 MMboe to date. As of December 31, 2009, net proved reserves attributable to the three properties were 20.7 MMboe. Expansion opportunities exist in all three projects. Potential expansion opportunities will be evaluated based on early performance results.

*Proved Reserves*

The following historical estimates of net proved natural gas and oil reserves are based on reserve reports as of December 31, 2009, December 31, 2008 and December 31, 2007, substantially all of which were prepared by independent petroleum engineers. The PV-10 and Standardized Measure shown in the table below are not intended to represent the current market value of our estimated natural gas and oil reserves. The reserve reports as of December 31, 2009 were based on our current drilling schedule and the average price during the 12-month period ended December 31, 2009, using the first-day-of-the-month price for each month. Reserve reports for years prior to 2009 were based on natural gas and oil prices at year-end. We estimate that 97.8% of our current proved undeveloped reserves will be developed by 2012 and all of our current proved undeveloped reserves will be developed by 2015. Refer to “Risk Factors” in Item 1A of this report and “Management’s Discussion and Analysis of Financial Condition and Results of Operations” in Item 7 of this report in evaluating the material presented below.

Our reserve estimation effort is overseen by our Executive Vice President — Reservoir Engineering, a registered Professional Engineer since 1988 with approximately 29 years of industry experience. Internal controls within the reserve estimation process include: confirmation that reserve estimations include all properties owned;

Table of Contents

Index to Financial Statements

confirmation that reserve estimations are based upon proper working and net revenue interests for included properties; review and use in the estimation process of data provided by other departments within the Company such as Accounting; comparison and reconciliation of internally generated reserve estimations to those prepared by third parties; and review and approval of reserve volumes and valuation by appropriate executive-level management. Additionally, our Reservoir Engineering personnel monitor emerging issues and changes in guidance related to reserve estimation on an ongoing basis.

Netherland, Sewell & Associates, Inc., prepared reports of estimated proved reserves of natural gas and oil for our net interest in certain natural gas and oil properties located primarily in the WTO and East Texas, constituting approximately 51.7% of our total proved reserves as of December 31, 2009, approximately 90.2% of our total proved reserves as of December 31, 2008 and approximately 89.0% of our total proved reserves as of December 31, 2007. Lee Keeling and Associates, Inc., prepared reports of estimated proved reserves of natural gas and oil for our net interest in the natural gas and oil properties we acquired in the Forest Acquisition, which constituted approximately 33.7% of our total proved reserves as of December 31, 2009. DeGolyer and MacNaughton prepared the reports of estimated proved reserves for our tertiary oil reserves located in West Texas, which constituted approximately 9.6% of our total proved reserves as of December 31, 2009, approximately 5.4% of our total proved reserves as of December 31, 2008 and approximately 8.0% of our total proved reserves as of December 31, 2007. The remaining 5.0%, 4.4% and 3.0% of our estimated proved reserves as of December 31, 2009, 2008 and 2007, respectively, were based on internally prepared estimates.

A summary of our proved natural gas and oil reserves, all of which are located in the continental United States, is presented below:

| | December 31, | | |
|---|---|---|---|
| | 2009 | 2008 | 2007 |
| **Estimated Proved Reserves(1)** | | | |
| Developed | | | |
| Natural gas (Bcf)(2) | 592.8 | 851.4 | 590.4 |
| Oil (MMBbls) | 38.3 | 15.3 | 12.5 |
| Total proved developed (Bcfe) | 822.8 | 943.4 | 665.6 |
| Undeveloped | | | |
| Natural gas (Bcf)(2) | 87.3 | 1,048.3 | 706.7 |
| Oil (MMBbls) | 67.0 | 27.8 | 24.0 |
| Total proved undeveloped (Bcfe) | 489.4 | 1,215.2 | 850.6 |
| Total Proved | | | |
| Natural gas (Bcf)(2) | 680.1 | 1,899.6 | 1,297.0 |
| Oil (MMBbls) | 105.3 | 43.2 | 36.5 |
| Total proved (Bcfe) | 1,312.2 | 2,158.6 | 1,516.2 |
| PV-10 (in millions)(3) | $1,561.0 | $2,258.5 | $3,550.5 |
| Standardized Measure of Discounted Net Cash Flows (in millions)(4) | $1,561.0 | $ 2,220.6 | $2,718.5 |

(1) Our estimated proved reserves and the future net revenues, PV-10 and Standardized Measure were determined using a 12-month average price for natural gas and oil for the year ended December 31, 2009 and year-end prices for natural gas and oil as of December 31, 2008 and 2007. The prices used in our external and internal reserve reports yield weighted average wellhead prices of $3.41 per Mcf of natural gas and $49.98 per barrel of oil at December 31, 2009, $4.94 per Mcf of natural gas and $39.42 per barrel of oil at December 31, 2008 and $6.46 per Mcf of natural gas and $87.47 per barrel of oil at December 31, 2007 based on index prices used ($3.87 per Mcf of natural gas and $57.65 per barrel of oil at December 31, 2009, $5.71 per Mcf of natural gas and $41.00 per barrel of oil at December 31, 2008 and $6.80 per Mcf of natural gas and $92.50 per barrel of oil at December 31, 2007).

(2) Given the nature of our natural gas reserves, a significant amount of our production, primarily in the WTO, contains natural gas high in $CO_2$ content. These figures are net of volumes of $CO_2$ in excess of pipeline quality specifications.

Table of Contents

Index to Financial Statements

(3) PV-10 is a non-GAAP financial measure and represents the present value of estimated future cash inflows from proved natural gas and oil reserves, less future development and production costs, discounted at 10% per annum to reflect timing of future cash flows and using pricing assumptions in effect at the end of the period for periods prior to December 31, 2009 and 12-month average prices for the year ended December 31, 2009. PV-10 differs from Standardized Measure because it does not include the effects of income taxes on future net revenues; however, due to the full valuation allowance on our deferred tax asset at December 31, 2009 that serves to reduce to zero a tax benefit that otherwise would result from the tax effects of PV-10, there was no effect of income taxes on Standardized Measure at December 31, 2009. Neither PV-10 nor Standardized Measure represents an estimate of fair market value of our natural gas and oil properties. PV-10 is used by the industry and by our management as an arbitrary reserve asset value measure to compare against past reserve bases and the reserve bases of other business entities that are not dependent on the taxpaying status of the entity. The following table provides a reconciliation of our Standardized Measure to PV-10:

| | At December 31, | | |
|---|---|---|---|
| | 2009 | 2008 | 2007 |
| | | (In millions) | |
| Standardized Measure of Discounted Net Cash Flows | $1,561.0 | $ 2,220.6 | $2,718.5 |
| Present value of future income tax expense discounted at 10% | — | 37.9 | 832.0 |
| PV-10 | $1,561.0 | $2,258.5 | $3,550.5 |

(4) Standardized Measure represents the present value of estimated future cash inflows from proved natural gas and oil reserves, less future development and production costs, and income tax expenses, discounted at 10% per annum to reflect timing of future cash flows and using the same pricing assumptions as are used to calculate PV-10. Standardized Measure differs from PV-10 as Standardized Measure includes the effect of future income taxes; however, due to the full valuation allowance on our deferred tax asset at December 31, 2009 that serves to reduce to zero a tax benefit that otherwise would result from the tax effects of PV-10, there was no effect of income taxes on Standardized Measure at December 31, 2009.

Table of Contents

Index to Financial Statements

*Proved Reserves – Sensitivity Analysis*

The table below presents a comparison of our proved reserve quantities and PV-10 when calculated (1) using the 12-month average price (NYMEX price of $3.87 per Mcf of natural gas and West Texas Intermediate posted price of $57.65 per barrel of oil, NYMEX equivalent of $61.14 per barrel) in accordance with the SEC final rule, *Modernization of Oil and Gas Reporting Requirements,* effective December 31, 2009, and (2) the NYMEX spot prices at December 31, 2009 ($5.79 per Mcf of natural gas and $79.34 per barrel of oil). Prices above are before adjustments for field differentials, although field differentials are applied in the computation below. Cost assumptions were held constant for both calculations.

| | Proved Reserves at December 31, 2009 | | | |
|---|---|---|---|---|
| Price Case Scenario | Natural Gas (Bcf) | Oil (MBbls) | Total (Bcfe) | PV-10(1) (in millions) |
| 12-Month Average | 680.1 | 105.3 | 1,312.2 | $ 1,561.0 |
| December 31, 2009 Spot Price | 1,840.3 | 120.9 | 2,565.7 | $ 3,589.5 |

(1) The following table provides a reconciliation of our Standardized Measure to PV-10 calculated under each pricing scenario as of December 31, 2009:

| | 12-Month Average | Spot Price |
|---|---|---|
| | (In millions) | |
| Standardized Measure of Discounted Net Cash Flows | $1,561.0 | $ 1,561.0 |
| Effect of Change in Price on Existing Quantities | — | 1,508.8 |
| Discounted Future Net Values of Quantities Added Under Alternate Price Scenario | — | 519.7 |
| PV-10 | $1,561.0 | $ 3,589.5 |

We believe the estimation of reserve quantities and PV-10 based upon the December 31, 2009 spot price is a useful comparison to our reserve calculation as of December 31, 2008, which also was based on year end spot prices under SEC rules then in effect. The reserves presented under the alternative price assumption are not calculated in accordance with current SEC rules and have not been reviewed by independent petroleum engineers.

Proved oil and gas reserves are those quantities of oil and gas which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations, prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probabilistic methods are used for estimation. To be classified as proved reserves, the project to extract the oil or gas must have commenced or the operator must be reasonably certain that it will commence the project within a reasonable time.

The area of a reservoir considered proved includes (i) the area identified by drilling and limited by fluid contacts, if any, and (ii) adjacent undrilled portions of the reservoir that can, with reasonable certainty, be judged to be continuous with it and to contain economically producible oil or gas on the basis of available geoscience and engineering data. In the absence of data on fluid contacts, proved quantities in a reservoir are limited by the lowest known hydrocarbons as seen in a well penetration unless geoscience, engineering or performance data and reliable technology establish a lower contact with reasonable certainty.

Where direct observation from well penetrations has defined a highest known oil elevation and the potential exists for an associated gas cap, proved oil reserves may be assigned in the structurally higher portions of the reservoir only if geoscience, engineering or performance data and reliable technology establish the higher contact with reasonable certainty.

Table of Contents

Index to Financial Statements

Reserves that can be produced economically through application of improved recovery techniques (such as fluid injection) are included in the proved classification when (i) successful testing by a pilot project in an area of the reservoir with properties no more favorable than in the reservoir as a whole, the operation of an installed program in the reservoir, or an analogous reservoir, or other evidence using reliable technology establishes the reasonable certainty of the engineering analysis on which the project or program was based and (ii) the project has been approved for development by all necessary parties and entities, including governmental entities.

Existing economic conditions include prices and costs at which economic producibility from a reservoir is to be determined. In determining the amount of proved reserves, the price used must be the average price during the 12-month period prior to the ending date of the period covered by the reserve report, determined as an unweighted arithmetic average of the first-day-of-the-month price for each month within such period, unless prices are defined by contractual arrangements, excluding escalations based upon future conditions.

In January 2010, the Financial Accounting Standards Board issued Accounting Standards Update 2010-03 (“ASU 2010-03”) to align the oil and gas reserve estimation and disclosure requirements of Extractive Industries — Oil and Gas Topic of the Accounting Standards Codification with the requirements in the SEC’s final rule, *Modernization of the Oil and Gas Reporting Requirements* . Key items in the new rules include changes to the pricing used to estimate reserves and calculate the full cost ceiling limitation whereby a 12-month average price is used rather than a single day spot price, the use of new technology for determining reserves, the ability to include nontraditional resources in reserves and permitting disclosure of probable and possible reserves. We implemented ASU 2010-03 as of December 31, 2009.

*Proved Undeveloped Reserves.* During 2009, the Company drilled 72 wells and invested approximately $93.1 million dollars in the development of properties that were classified as proved undeveloped at December 31, 2008. At December 31, 2009, 65 of these wells were classified as proved developed producing properties with the remaining wells still in progress.

The 12-month average natural gas index price of $3.87 per Mcf used in the estimation of reserves as of December 31, 2009 resulted in downward revisions of quantities associated with the Company’s proved undeveloped properties as a significant number of properties generated no PV-10 value resulting in the elimination of associated reserve quantities and a shortening of the productive lives of certain proved properties that became uneconomic earlier in their lives with the use of lower natural gas prices compared to prices used in the estimation of reserves in previous periods. There were no downward revisions as a result of the 12-month average oil index price used in the estimation of reserves as of December 31, 2009.

Table of Contents

Index to Financial Statements

*Production and Price History*

The following tables set forth information regarding our net production of natural gas, oil and natural gas liquids and certain price and cost information for each of the periods indicated. Because of the relatively high volumes of $CO_2$ produced with natural gas in certain areas of the WTO, our reported sales and reserves volumes and the related unit prices received for natural gas in these areas are reported net of $CO_2$ volumes stripped at the gas plants. The gas plant fees for removing $CO_2$ for our high $CO_2$ natural gas have been included in our lease operating expenses as treating and gathering fees. All natural gas delivered to sales points with $CO_2$ levels within pipeline specifications is included in sales and reserves volumes.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2009 | 2008 | 2007 |
| **Production Data:** | | | |
| Natural gas (MMcf) | 87,461 | 87,402 | 51,958 |
| Oil (MBbls)(1) | 2,894 | 2,334 | 2,042 |
| Combined equivalent volumes (MMcfe) | 104,823 | 101,405 | 64,211 |
| Average daily combined equivalent volumes (MMcfe/d) | 287.2 | 277.1 | 175.9 |

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2009 | 2008 | 2007 |
| **Average Prices(2):** | | | |
| Natural gas (per Mcf) | $ 3.36 | $ 7.95 | $ 6.51 |
| Oil (per Bbl)(1) | $ 55.62 | $ 91.54 | $ 68.12 |
| Combined equivalent (per Mcfe) | $ 4.34 | $ 8.96 | $ 7.45 |

(1) Includes natural gas liquids.
(2) Reported prices represent actual average prices for the periods presented and do not give effect to derivative contract settlements.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2009 | 2008 | 2007 |
| **Expenses per Mcfe:** | | | |
| Lease operating expenses: | | | |
| Transportation | $ 0.11 | $ 0.11 | $ 0.12 |
| Processing, treating and gathering(1) | 0.36 | 0.33 | 0.28 |
| Other lease operating expenses | 1.14 | 1.13 | 1.25 |
| Total lease operating expenses | $ 1.61 | $ 1.57 | $ 1.65 |
| Production taxes(2) | $ 0.04 | $ 0.30 | $ 0.30 |

(1) Includes costs attributable to gas treatment to remove $CO_2$ and other impurities from our high $CO_2$ natural gas.
(2) Net of severance tax refunds.

Table of Contents

Index to Financial Statements

*Productive Wells*

The following table sets forth the number of productive wells in which we owned a working interest at December 31, 2009. Productive wells consist of producing wells and wells capable of producing, including natural gas wells awaiting pipeline connections to commence deliveries and oil wells awaiting connection to production facilities. Gross wells are the total number of producing wells in which we have an interest and net wells are the sum of our fractional working interests owned in gross wells.

| | Natural Gas | | Oil | | Total | |
|---|---|---|---|---|---|---|
| Area | Gross | Net | Gross | Net | Gross | Net |
| WTO | 722 | 686.4 | 14 | 13.2 | 736 | 699.6 |
| Permian Basin | 75 | 64.1 | 1,397 | 1,322.8 | 1,472 | 1,386.9 |
| East Texas | 255 | 233.0 | 1 | 0.7 | 256 | 233.7 |
| Gulf Coast | 118 | 74.1 | 21 | 10.7 | 139 | 84.8 |
| Mid-Continent | 557 | 217.3 | 72 | 27.7 | 629 | 245.0 |
| Gulf of Mexico | 19 | 7.4 | 26 | 17.0 | 45 | 24.4 |
| Tertiary recovery — West Texas | — | — | 49 | 46.0 | 49 | 46.0 |
| Other | — | — | 47 | 0.8 | 47 | 0.8 |
| Total | 1,746 | 1,282.3 | 1,627 | 1,438.9 | 3,373 | 2,721.2 |

*Developed and Undeveloped Acreage*

The following table sets forth information regarding our developed and undeveloped acreage at December 31, 2009:

| | Developed Acreage(1) | | Undeveloped Acreage(2) | |
|---|---|---|---|---|
| Area | Gross(3) | Net(4) | Gross(3) | Net(4) |
| WTO | 31,743 | 29,501 | 651,027 | 533,125 |
| Permian Basin | 126,535 | 99,804 | 77,575 | 38,887 |
| East Texas | 27,202 | 23,639 | 19,885 | 14,210 |
| Gulf Coast | 61,550 | 43,411 | 6,623 | 3,187 |
| Mid-Continent | 128,368 | 68,472 | 508,285 | 371,330 |
| Gulf of Mexico | 65,039 | 20,799 | 5,431 | 5,431 |
| Tertiary recovery — West Texas | 9,306 | 8,525 | 640 | 327 |
| Other | 180 | 21 | 1,520 | 1,446 |
| Total | 449,923 | 294,172 | 1,270,986 | 967,943 |

(1) Developed acres are acres spaced or assigned to productive wells.

(2) Undeveloped acres are acres on which wells have not been drilled or completed to a point that would permit the production of commercial quantities of oil or natural gas, regardless of whether such acreage contains proved reserves.

(3) A gross acre is an acre in which a working interest is owned. The number of gross acres is the total number of acres in which a working interest is owned.

(4) A net acre is deemed to exist when the sum of the fractional ownership working interests in gross acres equals one. The number of net acres is the sum of the fractional working interests owned in gross acres expressed as whole numbers and fractions thereof.

Many of the leases comprising the acreage set forth in the table above will expire at the end of their respective primary terms unless production from the leasehold acreage has been established prior to such date, in which event the lease will remain in effect until the cessation of production. The following table sets forth as of December 31, 2009 the expiration periods of the gross and net acres that are subject to leases in the acreage summarized in the above table.

Table of Contents

Index to Financial Statements

| Twelve Months Ending | Acres Expiring Gross | Acres Expiring Net |
|---|---|---|
| December 31, 2010 | 263,868 | 205,684 |
| December 31, 2011 | 501,162 | 396,219 |
| December 31, 2012 | 284,042 | 180,371 |
| December 31, 2013 and later | 188,823 | 172,969 |
| Other(1) | 33,091 | 12,700 |
| Total | 1,270,986 | 967,943 |

(1) Leases remaining in effect until the cessation of development efforts or cessation of production on the developed portion of the particular lease.

*Drilling Activity*

The following table sets forth information with respect to wells we completed during the periods indicated. The information presented is not necessarily indicative of future performance, and should not be interpreted to present any correlation between the number of productive wells drilled, quantities of reserves found or economic value. Productive wells are those that produce commercial quantities of hydrocarbons, regardless of whether they produce a reasonable rate of return. Gross wells refer to the total number of wells in which we had a working interest and net wells refer to gross wells multiplied by our weighted average working interest. As of December 31, 2009, we had 27 wells drilling or awaiting completion.

| | 2009 | | | | 2008 | | | | 2007 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Gross | Percent | Net | Percent | Gross | Percent | Net | Percent | Gross | Percent | Net | Percent |
| Development: | | | | | | | | | | | | |
| Productive | 147 | 97.4% | 117.2 | 97.9% | 398 | 98.5% | 372.4 | 98.5% | 281 | 99.3% | 244.4 | 99.5% |
| Dry | 4 | 2.6% | 2.5 | 2.1% | 6 | 1.5% | 5.7 | 1.5% | 2 | 0.7% | 1.3 | 0.5% |
| Total | 151 | 100.0% | 119.7 | 100.0% | 404 | 100.0% | 378.1 | 100.0% | 283 | 100.0% | 245.7 | 100.0% |
| Exploratory: | | | | | | | | | | | | |
| Productive | 9 | 100.0% | 8.6 | 100.0% | 48 | 96.0% | 46.4 | 95.9% | 27 | 81.8% | 24.3 | 83.8% |
| Dry | — | — | — | — | 2 | 4.0% | 2.0 | 4.1% | 6 | 18.2% | 4.7 | 16.2% |
| Total | 9 | 100.0% | 8.6 | 100.0% | 50 | 100.0% | 48.4 | 100.0% | 33 | 100.0% | 29.0 | 100.0% |
| **Total:** | | | | | | | | | | | | |
| Productive | 156 | 97.5% | 125.8 | 98.1% | 446 | 98.2% | 418.8 | 98.2% | 308 | 97.5% | 268.7 | 97.8% |
| Dry | 4 | 2.5% | 2.5 | 1.9% | 8 | 1.8% | 7.7 | 1.8% | 8 | 2.5% | 6.0 | 2.2% |
| | 160 | 100.0% | 128.3 | 100.0% | 454 | 100.0% | 426.5 | 100.0% | 316 | 100.0% | 274.7 | 100.0% |

*Drilling Rigs*

The following table sets forth information with respect to the rigs operating on our acreage as of December 31, 2009.

| Area | Owned | Third-Party |
|---|---|---|
| WTO | 8 | — |
| Permian Basin | 4 | — |
| East Texas | 2 | — |
| Mid-Continent | — | 1 |
| Total | 14 | 1 |

Table of Contents

Index to Financial Statements

*Marketing and Customers*

We sell natural gas, oil and natural gas liquids to a variety of customers, including utilities, natural gas and oil companies and trading and energy marketing companies. One of these customers, Plains Energy, accounted for 20.0%, 10.5% and 11.2% of our total revenue during 2009, 2008 and 2007, respectively. Given the number of readily available purchasers for our products, it is unlikely that the loss of a single customer in the areas in which we sell our products would materially affect our sales.

See Note 23 in the consolidated financial statements included in Item 8 of this report for information regarding our major customers.

*Title to Properties*

As is customary in the oil and gas industry, we initially conduct only a cursory review of the title to our properties for which we do not have proved reserves. Prior to the commencement of drilling operations on those properties, we conduct a thorough title examination and perform curative work with respect to significant defects. To the extent title opinions or other investigations reflect title defects on those properties, we are typically responsible for curing any title defects at our expense. We generally will not commence drilling operations on a property until we have cured any material title defects on such property. In addition, prior to completing an acquisition of producing natural gas and oil leases, we perform title reviews on the most significant leases, and depending on the materiality of properties, we may obtain a title opinion or review previously obtained title opinions. To date, we have obtained title opinions on substantially all of our producing properties and believe that we have satisfactory title to our producing properties in accordance with standards generally accepted in the oil and gas industry. Our natural gas and oil properties are subject to customary royalty and other interests, liens for current taxes and other burdens, which we believe do not materially interfere with the use of or affect our carrying value of the properties.

***Drilling and Oil Field Services***

The drilling and related oil field services that we provide to our exploration and production business and to third parties are described below.

*Drilling Operations*

We drill for our own account primarily in West Texas through our drilling and oil field services subsidiary, Lariat. In addition, we also drill wells for other natural gas and oil companies, primarily located in the West Texas region. We believe that drilling with our own rigs allows us to control costs and maintain operating flexibility. Our rig fleet is designed to drill in our specific areas of operation and has an average of over 800 horsepower and an average depth capacity of greater than 10,500 feet. As of December 31, 2009, our drilling rig fleet consisted of 30 operational rigs. As of December 31, 2009, 14 of our rigs were working on properties that we operated.

The table below identifies certain information concerning our contract drilling operations and our directly-owned rigs:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2009 | 2008 | 2007 |
| Number of operational rigs owned at end of period | 30 | 28 | 25 |
| Average number of operational rigs owned during the period | 30.0 | 27.6 | 26.0 |
| Average drilling revenue per day per rig working for third parties(1)(2) | $11,398 | $14,217 | $21,468 |

(1) Represents revenues from our rigs working for third parties divided by the total number of days our drilling rigs were used by third parties during the period.
(2) Does not include revenues for related rental equipment.

Table of Contents

Index to Financial Statements

The table below identifies certain information concerning our drilling rigs as of December 31, 2009:

| | Operating for | | | |
|---|---|---|---|---|
| | SandRidge | Third Parties | Idle | Operational |
| Lariat | 14 | 2 | 14 | 30 |

*Types of Drilling Contracts*

We obtain our contracts for drilling natural gas and oil wells either through competitive bidding or through direct negotiations with customers. Our drilling contracts generally provide for compensation on a day work basis. The contract terms we offer generally depend on the complexity and risk of operations, the on-site drilling conditions, the type of equipment used, the anticipated duration of the work to be performed and prevailing market rates. For a discussion of these contracts, see "Management's Discussion and Analysis of Financial Condition and Results of Operations — Segment Overview — Drilling and Oil Field Services Segment" in Item 7 of this report.

*Oil Field Services*

Our oil field services business began in 1986 and conducts operations that together with our drilling services compliment our exploration and production business. Oil field services include providing pulling units, trucking, rental tools, location and road construction and roustabout services to us as well as to third parties.

*Our Customers*

We perform approximately 90% of our drilling and oil field services in support of our exploration and production segment and approximately 10% for other operators. For the year ended December 31, 2009, we generated revenues of $23.6 million for drilling and oil field services performed for third parties, with Pioneer Natural Resources USA, Inc., accounting for approximately $8.6 million of those revenues.

*Capital Expenditures*

Our capital expenditures for 2009 related to our drilling and oil field services were $4.1 million. We have budgeted approximately $5.0 million in capital expenditures in 2010 for our drilling and oil field services segment.

***Midstream Gas Services***

We provide gathering, compression, processing and treating services of natural gas in West Texas. Our midstream operations and assets not only serve our exploration and production segment, but also service other natural gas and oil companies. The following tables set forth information regarding our primary midstream assets as of December 31, 2009:

| Gas Treating Plants (West Texas) | Plant Capacity (MMcf/d) | Average Utilization(1) | Third-Party Usage |
|---|---|---|---|
| Pike's Peak | 90 | 93% | <1% |
| Grey Ranch | 220 | 88% | 7% |

(1) Average utilization for the year ended December 31, 2009.

| SandRidge $CO_2$ Compression Facilities (West Texas) | $CO_2$ Compression Capacity (MMcf/d) | Average Utilization(1) |
|---|---|---|
| Pike's Peak | 36 | 82% |
| Mitchell | 26.5 | 83% |
| Grey Ranch | 88 | 47% |
| Terrell | 28 | 82% |

(1) Average utilization for the year ended December 31, 2009.

Table of Contents

Index to Financial Statements

*West Texas*

In Pecos County, we own and operate the Pike's Peak gas treating plant, which has the capacity to treat 90 MMcf per day of natural gas for the removal of $CO_2$ from natural gas produced in the Piñon Field and nearby areas. We also own the Grey Ranch $CO_2$ treatment plant located in Pecos County and have a 50% interest in the partnership that leases the plant from us under a lease expiring in 2020. In October 2009, we took over operations at the Grey Ranch plant pursuant to an agreement with such partnership. The treating capacities for both the Pike's Peak and Grey Ranch plants are dependent upon the quality of natural gas being treated. The data included in the table above for the Pike's Peak and Grey Ranch plants is based on a natural gas stream that averaged 65% $CO_2$.

Our two West Texas gas treating plants remove $CO_2$ from natural gas production and deliver residue gas into the Atmos Lone Star and Enterprise Energy Services pipelines. These assets are operated on fixed fees based upon throughput of natural gas. In addition, we have access for up to 80 MMcf per day of treating capacity at Hoover Energy Partners' Mitchell Plant under a long-term fixed fee arrangement.

We also own or operate approximately 800 miles of natural gas gathering pipelines and numerous dehydration units. Within the Piñon Field, we operate separate gathering systems for sweet natural gas and produced natural gas containing high percentages of $CO_2$. In addition to servicing our exploration and production business, these assets also service other natural gas and oil companies.

The majority of the produced natural gas gathered by our midstream assets in West Texas requires compression from the wellhead to the final sales meter. As of December 31, 2009, we owned or operated approximately 82,000 horsepower of gas compression in West Texas. We anticipate installing an additional 24,000 horsepower in 2010.

In June 2009, we completed the sale of the gathering and compression assets owned by us and located in the Piñon Field at that time. In conjunction with the sale, we entered into a gas gathering agreement and an operations and maintenance agreement. Under the gas gathering agreement, we have dedicated the Piñon Field acreage for priority gathering services for a period of 20 years and we will pay a fee that was negotiated at arms' length for such services.

*Other Areas*

As of December 31, 2009, we owned approximately 116 miles of pipeline gathering systems and operated more than 11,000 horsepower of natural gas compression in East Texas. We anticipate installation of an additional 2,700 horsepower in East Texas in 2010. We also owned approximately 50 miles of pipeline gathering systems and operated over 4,000 horsepower of gas compression in the Gulf Coast area, and owned approximately 44 miles of pipeline in the Mid-Continent area.

*Capital Expenditures*

The growth of our midstream assets is driven by our exploration and development operations. Historically, pipeline and facility expansions are made when warranted by the increase in production or the development of additional acreage. During 2009, we spent approximately $50.0 million in capital expenditures to install pipeline and compression infrastructure to accommodate our growth in production and for increased treating capacity for high $CO_2$ gas, adding approximately 70 MMcf per day in additional treating capacity. With the startup of the Century Plant in mid 2010, we anticipate adding access to approximately 400 MMcf per day in additional treating capacity in 2010. We have budgeted approximately $105.0 million in 2010 capital expenditures for our midstream gas services segment and other general purposes.

*Marketing*

Through Integra Energy LLC, our wholly owned subsidiary, we buy and sell natural gas from SandRidge-operated wells and third-party-operated wells within our West Texas operations. We generally buy and sell

Table of Contents

Index to Financial Statements

natural gas on "back-to-back" contracts using a portfolio of baseload and spot sales agreements. Identical volumes are bought and sold on monthly and daily contracts using a combination of *Inside FERC* and *Gas Daily* pricing indices to eliminate price exposure.

We do not actively seek to buy and sell third-party natural gas due to onerous credit requirements and minimal margin expectations. We conduct thorough credit checks with all potential purchasers and minimize our exposure by contracting with multiple parties each month. We do not engage in any hedging activities with respect to these contracts. We manage several interruptible natural gas transportation agreements in order to take advantage of price differentials or to secure available markets when necessary. We currently have 100,000 MMBtu per day of firm transportation service subscribed on the Oasis Pipeline and 75,000 MMBtu per day on the Mid-Continent Express Pipeline for a portion of our Piñon Field production for 2010.

### *Other Operations*

Our $CO_2$ capturing operations are conducted through SandRidge $CO_2$. As of December 31, 2009, SandRidge $CO_2$ owned 239 miles of $CO_2$ pipelines in West Texas with approximately 63,000 horsepower of owned and leased $CO_2$ compression available and currently operational. The captured $CO_2$ is primarily used and sequestered in tertiary oil recovery operations. As of December 31, 2009, SandRidge $CO_2$ was capturing approximately 140 MMcf per day of $CO_2$. We delivered the majority of this to Occidental Permian Ltd. and Chevron Corp. In December 2009, we captured and sold an average of 104 MMcf of $CO_2$ per day and utilized 11.0 MMcf per day in our enhanced oil recovery projects.

Future regulation of greenhouse gas emissions may provide us an opportunity to create economic benefits in the form of Emissions Reduction Credits ("ERCs"), but such regulation may also impose burdens on the conduct and cost of our operations. Legislative and regulatory efforts may result in legal requirements that create a more active and more valuable market in which to trade ERCs, although the timing and scope of future legal requirements governing greenhouse gases remain uncertain. We currently capture approximately 2.2 million metric tonnes of $CO_2$ per year, all of which is utilized in enhanced oil recovery projects. The captured $CO_2$ may prove beneficial to us if the $CO_2$ capture results in ERCs that can be traded or used by us to meet future regulatory compliance obligations that may otherwise be costly to satisfy. ERCs of just over 1.2 million metric tonnes were sold on the voluntary market during 2009. See "— Environmental Regulations — Future Laws and Regulations."

## Competition

We believe that our leasehold acreage position, drilling and oil field services businesses, midstream assets, $CO_2$ supply and technical and operational capabilities generally enable us to compete effectively. However, the oil and gas industry is intensely competitive, and we face competition in each of our business segments.

We believe our geographic concentration of operations and vertical integration enables us to compete effectively with other exploration and production operations. However, we compete with many companies that have greater financial and personnel resources than we do. These companies may be able to pay more for producing properties and undeveloped acreage. In addition, these companies may have a greater ability to continue exploration activities during periods of low natural gas and oil market prices. Our larger or fully integrated competitors may be able to absorb the burden of any existing and future federal, state and local laws and regulations more easily than we can, which would adversely affect our competitive position. Our ability to acquire additional properties and to discover reserves in the future depends on our ability to evaluate and select suitable properties and to consummate transactions in a highly competitive environment. In addition, because we have fewer financial and human resources than many companies in our industry, we may be at a disadvantage in bidding for exploratory prospects and producing natural gas and oil properties.

With respect to our drilling business, we believe the type, age and condition of our drilling rigs, the quality of our crews and the responsiveness of our management generally enable us to compete effectively. However, to

Table of Contents

Index to Financial Statements

the extent we drill for third parties, we encounter substantial competition from other drilling contractors. Our primary market area is highly competitive. The drilling contracts we compete for are usually awarded on the basis of competitive bids. We may, based on the economic environment at the time, determine that market conditions and profit margins are such that contract drilling for third parties is not a beneficial use of our resources.

We believe pricing and rig availability are the primary factors our potential customers consider in determining which drilling contractor to select. While we must be competitive in our pricing, our competitive strategy generally emphasizes the quality of our equipment and the experience of our rig crews to differentiate us from our competitors. This strategy is less effective when demand for drilling services is weak or there is an oversupply of rigs. These conditions usually result in increased price competition, which makes it more difficult for us to compete on the basis of factors other than price. Many of our competitors have greater financial, technical and other resources than we do. Their greater capabilities in these areas may enable them to better withstand industry downturns and better retain skilled rig personnel.

We believe our geographic concentration of operations enables us to compete effectively in our midstream business segment. Most of our midstream assets are integrated with our production. However, with respect to third-party natural gas and acquisitions, we compete with companies that have greater financial and personnel resources than we do. These companies may be able to pay more for acquisitions. In addition, these companies may have a greater ability to price their services below our prices for similar services.

We believe our supply of $CO_2$ and technical expertise enable us to compete effectively in our $CO_2$ gathering and sales business. However, we face the same competitive pressures in this business that we do in our traditional oil field services segments.

## Seasonal Nature of Business

Generally, the demand for natural gas decreases during the summer months and increases during the winter months. In addition, certain natural gas users utilize natural gas storage facilities and purchase some of their anticipated winter requirements during the summer. This can also lessen seasonal demand fluctuations. Seasonal weather conditions and lease stipulations can limit our drilling and producing activities and other natural gas and oil operations in a portion of our operating areas. These seasonal anomalies can pose challenges for meeting our well drilling objectives and can increase competition for equipment, supplies and personnel during the spring and summer months, which could lead to shortages and increase costs or delay our operations.

## Environmental Regulations

*General*

We are subject to extensive and complex federal, state and local laws and regulations governing the protection of the environment and of the health and safety of our employees. These laws and regulations may, among other things:

- require the acquisition of various permits before drilling or production commences;
- require the installation of expensive pollution control equipment;
- require safety-related procedures and personal protective equipment to be used during operations;
- restrict the types, quantities and concentrations of various substances that can be released into the environment in connection with natural gas and oil drilling production, transportation and treating activities;
- suspend, limit, prohibit or require approval before construction, drilling and other activities; and
- require remedial measures to mitigate pollution from historical and ongoing operations, such as the closure of pits and plugging of abandoned wells.

Table of Contents

Index to Financial Statements

These laws, rules and regulations may also restrict the rate of natural gas and oil production below the rate that would otherwise be possible. The regulatory burden on the oil and gas industry increases the cost of doing business in the industry and consequently affects profitability.

Governmental authorities have the power to enforce compliance with environmental laws, regulations and permits, and violations are subject to injunction, as well as administrative, civil and potentially criminal penalties. The effects of these laws and regulations, as well as other laws or regulations that may be adopted in the future, could have a material adverse impact on our business, financial condition and results of operations. Below is a discussion of environmental laws and regulations that could have a material impact on our business, financial condition and results of operations.

*Comprehensive Environmental Response, Compensation and Liability Act*

The Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") also known as the Superfund law, and analogous state laws impose joint and several liability, without regard to fault or legality of conduct, on specific classes of persons for the release of a hazardous substance into the environment. These persons include the current owner or operator of the site at or to which hazardous substances have been released or disposed, a former owner or operator of such site, and anyone who disposed or arranged for the disposal of a hazardous substance released at the site. Under CERCLA, such persons may be subject to strict joint and several liability for the costs of investigating and cleaning up the hazardous substances that have been released into the environment, for damages to natural resources and for the costs of related environmental and health studies. In addition, it is not uncommon for neighboring landowners and other third parties to file claims for personal injury and property damage allegedly caused by the hazardous substances released into the environment. In the course of our operations, we generate wastes that may fall within CERCLA's definition of hazardous substances. Further, natural gas and oil exploration, production, treating and other activities have been conducted at some of our properties by previous owners and operators, and materials from these operations remain at and could migrate from some of our properties and may warrant or require investigation or remediation or other response action. Therefore, governmental agencies or third parties could seek to hold us responsible under CERCLA or similar state laws for all or part of the costs to clean up a site at or to which hazardous substances may have been released or deposited.

*Waste Handling*

The Resource Conservation and Recovery Act ("RCRA") and comparable state statutes, regulate the generation, transportation, treatment, storage, disposal and cleanup of hazardous and non-hazardous wastes. Under the auspices of the United States Environmental Protection Agency ("EPA") the individual states administer some or all of the provisions of RCRA, sometimes in conjunction with their own more stringent requirements. Drilling fluids, produced waters and most of the other wastes associated with the exploration, development and production of oil or natural gas are currently excluded from regulation as RCRA hazardous wastes but instead are regulated under RCRA's non-hazardous waste provisions. However, it is possible that certain natural gas and oil exploration and production wastes now classified as non-hazardous could be classified as hazardous wastes in the future. Any such change would likely increase our operating expenses, which could have a material adverse effect on our business, financial condition or results of operations as well as on the industry in general.

*Air Emissions*

The federal Clean Air Act and comparable state laws control emissions of potentially harmful air emissions through permitting and monitoring regulations. We are required to obtain various permits to ensure that emissions from our operations remain within permitted levels. To comply with the terms of these permits, and, as part of our ongoing efforts to operate in an environmentally responsible manner, we have installed and maintained complex emission control technologies throughout our systems. Additionally, our midstream operations are developing a compliance agreement with the state agency that will allow us to achieve full compliance with air emission regulations.

Table of Contents

Index to Financial Statements

*Water Discharges*

The federal Water Pollution Control Act, or the Clean Water Act, and analogous state laws, impose restrictions and strict controls with respect to the discharge of pollutants, including spills and leaks of oil and other substances into waters of the United States, including wetlands, as well as state waters. These laws prohibit the discharge of produced waters and sand, drilling fluids, drill cuttings and other substances related to the oil and gas industry into onshore, coastal and offshore waters without appropriate permits. Some of the pollutant limitations have become more restrictive over the years, and additional restrictions and limitations including technology requirements and receiving water limits, may be imposed in the future. The Clean Water Act also regulates storm water discharges from industrial and construction activities. Regulations promulgated by the EPA and state regulatory agencies require industries engaged in certain industrial or construction activities to acquire permits and implement storm water management plans and best management practices, to conduct periodic monitoring and reporting of discharges, and to train employees. Further, federal and state regulations require certain natural gas and oil exploration and production facilities to obtain permits for storm water discharges. There are costs associated with each of these regulatory requirements. In addition, federal and state regulatory agencies can impose administrative, civil and potentially criminal penalties for non-compliance with discharge permits or other requirements of the Clean Water Act and analogous state laws and regulations.

The Oil Pollution Act of 1990 (“OPA”) which amends and augments the Clean Water Act, establishes strict liability for owners and operators of facilities that are the site of a release of oil into waters of the United States. In addition, OPA and regulations that implement OPA impose requirements on responsible parties related to the prevention of oil spills and liability for clean up and natural resource damages resulting from such spills. For example, some of our facilities in the Gulf Coast region must develop, implement and maintain facility response plans, conduct annual spill training for certain employees, conduct annual spill drills and provide varying degrees of financial assurance.

*National Environmental Policy Act*

Natural gas and oil exploration and production activities on federal lands or otherwise requiring federal approval are subject to the National Environmental Policy Act (“NEPA”). NEPA requires federal agencies, including the Department of Interior, to evaluate major agency actions having the potential to significantly impact the environment. In the course of such evaluations, an agency may prepare an Environmental Assessment that assesses the potential direct, indirect and cumulative impacts of a proposed project and, if necessary, will prepare a more detailed Environmental Impact Statement that is made available for public review and comment. All of our current exploration and production activities, as well as proposed exploration and development plans on federal lands, require governmental permits that are subject to the requirements of NEPA. The NEPA process has the potential to delay or even prohibit our development of natural gas and oil projects in covered areas.

*Greenhouse Gases Rule*

In October 2009, the EPA finalized and published the Mandatory Reporting of Greenhouse Gases Rule requiring certain facilities to track and report emissions of $CO_2$, methane and various fluorinated hydrocarbons. The rule applies to significant sources and/or source categories of greenhouse gases and to certain suppliers of $CO_2$ and methane products. Generally, facilities that emit 25,000 tons per year or more of greenhouse gases are subject to this program. Initial greenhouse gas reports must be submitted to the EPA in 2011 and must cover the 2010 calendar year reporting period. The Company has reviewed the final rule and has determined that the Pikes Peak Plant, the Grey Ranch Plant, all $CO_2$ compression sites and several of its natural gas compression locations are subject to these monitoring and reporting requirements. The Company has utilized the services of a third party environmental consulting company to evaluate the applicable requirements and ensure adequate monitoring and recordkeeping programs are in place and that the required information will be available for submittal on or before the applicable submission deadline.

Table of Contents

Index to Financial Statements

*Future Laws and Regulations*

Recent scientific studies have suggested that emissions of certain gases, commonly referred to as greenhouse gases and including carbon dioxide and methane, may contribute to warming the Earth's atmosphere. In response to such studies, the United States Congress is actively considering legislation to restrict or regulate emissions of greenhouse gases. More than one-third of the states, either individually or through multi-state regional initiatives, have begun implementing legal measures to reduce emissions of greenhouse gases, primarily through the planned development of greenhouse gas emissions inventories and regional greenhouse gas cap-and-trade programs. Also, in July 2008, the EPA issued an Advance Notice of Proposed Rulemaking regarding possible future regulation of greenhouse emissions under the Clean Air Act in response to the United States Supreme Court's decision in *Massachusetts, et al. v. EPA*, decided in 2007, which may result in the imposition of restrictions on the emission of greenhouse gases, even if Congress does not adopt new legislation specifically addressing emissions of greenhouse gases. In December 2009, the EPA announced a finding that greenhouse gases threaten the public's health and welfare. Other nations have already agreed to regulate emissions of greenhouse gases pursuant to the Kyoto Protocol, an international treaty pursuant to which participating countries, not including the United States, have agreed to reduce their emissions of greenhouse gases to below 1990 levels by 2012. Passage of climate-related legislation or other regulatory initiatives by Congress or various states of the United States, or the adoption of regulations by the EPA and analogous state agencies that restrict emissions of greenhouse gases in areas in which we conduct business, may have an adverse effect on demand for our services or products and may result in compliance obligations with respect to the release, capture and use of carbon dioxide that could have an adverse effect on our operations.

***Anti-Terrorism Measures***

The federal Department of Homeland Security Appropriations Act of 2007 requires the Department of Homeland Security ("DHS") to issue regulations establishing risk-based performance standards for the security of chemical and industrial facilities, including oil and gas facilities that are deemed to present high levels of security risk. The DHS issued an interim final rule in 2007 regarding risk-based performance standards to be attained pursuant to the act and, on November 20, 2007, further issued an Appendix A to the interim rules establishing chemicals of interest and their respective threshold quantities that will trigger compliance with the interim rules. We have not yet determined the extent to which our facilities are subject to the interim rules or the associated costs to comply, but it is possible that such costs could be substantial.

**Other Regulation of the Oil and Gas Industry**

The oil and gas industry is extensively regulated by numerous federal, state and local authorities, including Native American tribes. Legislation affecting the oil and gas industry is under constant review for amendment or expansion, frequently increasing the regulatory burden. Also, numerous departments and agencies, both federal and state, and Native American tribes are authorized by statute to issue rules and regulations binding on the oil and gas industry and its individual members, some of which carry substantial penalties for noncompliance. Although the regulatory burden on the oil and gas industry increases our cost of doing business and, consequently, affects our profitability, these burdens generally do not affect us any differently or to any greater or lesser extent than they affect other companies in the industry with similar types, quantities and locations of production.

***Drilling and Production***

Our operations are subject to various types of regulation at federal, state, local and Native American tribal levels. These types of regulation include requiring permits for the drilling of wells, drilling bonds and reports concerning operations. Most states, and some counties, municipalities and Native American tribal areas where we operate also regulate one or more of the following activities:

- the location of wells;
- the method of drilling and casing wells;

Table of Contents

Index to Financial Statements

- the timing of construction or drilling activities;
- the rates of production or "allowables";
- the surface use and restoration of properties upon which wells are drilled;
- the plugging and abandoning of wells; and
- the notice to surface owners and other third parties.

State laws regulate the size and shape of drilling and spacing units or proration units governing the pooling of natural gas and oil properties. Some states allow forced pooling or integration of tracts to facilitate exploration while other states rely on voluntary pooling of lands and leases. In some instances, forced pooling or unitization may be implemented by third parties and may reduce our interest in the unitized properties. In addition, state conservation laws establish maximum rates of production from natural gas and oil wells, generally prohibit the venting or flaring of natural gas and impose requirements regarding the ratability of production. These laws and regulations may limit the amount of natural gas and oil we can produce from our wells or limit the number of wells or the locations at which we can drill. Moreover, each state generally imposes a production or severance tax with respect to the production and sale of natural gas, oil and natural gas liquids within its jurisdiction.

Federal, state and local regulations provide detailed requirements for the abandonment of wells, closure or decommissioning of production facilities and pipelines, and for site restoration, in areas where we operate. Regulations of the Minerals Management Service of the United States Department of the Interior ("MMS") require that owners and operators plug and abandon wells and decommission and remove offshore facilities located in federal offshore lease areas in a prescribed manner. The MMS requires federal leaseholders to post performance bonds or otherwise provide necessary financial assurances to provide for such abandonment, decommissioning and removal. The New Mexico Oil Conservation requires the posting of performance bonds to fulfill financial requirements for owners and operators on state land. The Railroad Commission of Texas has financial responsibility requirements for owners and operators of facilities in state waters to provide for similar assurances. The United States Army Corps of Engineers ("ACOE") and many other state and local municipalities have regulations for plugging and abandonment, decommissioning and site restoration. Although the ACOE does not require bonds or other financial assurances, some other state agencies and municipalities do have such requirements.

### *Natural Gas Sales and Transportation*

Historically, federal legislation and regulatory controls have affected the price of the natural gas we produce and the manner in which we market our production. The Federal Energy Regulatory Commission ("FERC") has jurisdiction over the transportation and sale for resale of natural gas in interstate commerce by natural gas companies under the Natural Gas Act of 1938 and the Natural Gas Policy Act of 1978. Various federal laws enacted since 1978 have resulted in the complete removal of all price and non-price controls for sales of domestic natural gas sold in first sales, which include all of our sales of our own production. Under the Energy Policy Act of 2005, FERC has substantial enforcement authority to prohibit the manipulation of natural gas markets and enforce its rules and orders, including the ability to assess civil penalties of $1.0 million per day per violation.

FERC also regulates interstate natural gas transportation rates and service conditions and establishes the terms under which we may use interstate natural gas pipeline capacity, which affects the marketing of natural gas that we produce, as well as the revenues we receive for sales of our natural gas and release of our natural gas pipeline capacity. Commencing in 1985, FERC promulgated a series of orders, regulations and rule makings that significantly fostered competition in the business of transporting and marketing gas. Today, interstate pipeline companies are required to provide nondiscriminatory transportation services to producers, marketers and other shippers, regardless of whether such shippers are affiliated with an interstate pipeline company. FERC's initiatives have led to the development of a competitive, open access market for natural gas purchases and sales that permits all purchasers of natural gas to buy gas directly from third-party sellers other than pipelines.

Table of Contents

Index to Financial Statements

However, the natural gas industry historically has been very heavily regulated; therefore, we cannot guarantee that the less stringent regulatory approach currently pursued by FERC and Congress will continue indefinitely into the future nor can we determine what effect, if any, future regulatory changes might have on our natural gas related activities.

Under FERC's current regulatory regime, transmission services must be provided on an open-access, nondiscriminatory basis at cost-based rates or at market-based rates if the transportation market at issue is sufficiently competitive. Gathering service, which occurs upstream of jurisdictional transmission services, is regulated by the states onshore and in state waters. Although its policy is still in flux, FERC has in the past reclassified certain jurisdictional transmission facilities as non-jurisdictional gathering facilities, which has the tendency to increase our costs of transporting gas to point-of-sale locations.

## Employees

As of December 31, 2009, we had 1,694 full-time employees, including more than 186 geologists, geophysicists, petroleum engineers, technicians, land and regulatory professionals. Of our 1,694 employees, 466 are located at our headquarters in Oklahoma City, Oklahoma, and the remaining employees work in our various field offices and at our drilling sites.

## Glossary of Natural Gas and Oil Terms

The following is a description of the meanings of some of the oil and gas industry terms used in this report.

*2-D seismic or 3-D seismic.* Geophysical data that depict the subsurface strata in two dimensions or three dimensions, respectively. 3-D seismic typically provides a more detailed and accurate interpretation of the subsurface strata than 2-D seismic.

*Bbl.* One stock tank barrel, or 42 U.S. gallons liquid volume, used in this report in reference to oil or other liquid hydrocarbons.

*Bcf.* Billion cubic feet of natural gas.

*Bcfe.* Billion cubic feet equivalent, determined using the ratio of six Mcf of natural gas to one Bbl of oil, condensate or natural gas liquids.

*Boe.* Barrels of oil equivalent, with six thousand cubic feet of natural gas being equivalent to one barrel of oil.

*Btu or British thermal unit.* The quantity of heat required to raise the temperature of one pound of water by one degree Fahrenheit.

*Completion.* The process of treating a drilled well followed by the installation of permanent equipment for the production of natural gas or oil, or in the case of a dry well, the reporting to the appropriate authority that the well has been abandoned.

*Condensate.* A mixture of hydrocarbons that exists in the gaseous phase at original reservoir temperature and pressure, but that, when produced, is in the liquid phase at surface pressure and temperature.

*$CO_2$.* Carbon dioxide.

*Developed acreage.* The number of acres that are assignable to productive wells.

*Developed oil and gas reserves.* Developed oil and gas reserves are reserves of any category that can be expected to be produced (i) through existing wells with existing equipment and operating methods or in which

Table of Contents

Index to Financial Statements

the cost of the required equipment is relatively minor compared to the cost of a new well and (ii) through installed extraction equipment and infrastructure operational at the time of the reserves estimate if the extraction is by means not involving a well.

*Development Costs.* Costs incurred to obtain access to proved reserves and to provide facilities for extracting, treating, gathering and storing the oil and gas. Development costs, including depreciation and applicable operating costs of support equipment and facilities and other costs of development activities, are incurred to (i) gain access to and prepare well locations for drilling, including surveying well locations for the purpose of determining specific development drilling sites, clearing ground, draining, road building and relocating public roads, gas lines and power lines, to the extent necessary in developing the proved reserves, (ii) drill and equip development wells, development-type stratigraphic test wells and service wells, including the costs of platforms and of well equipment such as casing, tubing, pumping equipment, and the wellhead assembly, (iii) acquire, construct and install, production facilities such as leases, flow lines, separators, treaters, heaters, manifolds, measuring devices and production storage tanks, natural gas cycling and processing plants, and central utility and waste disposal systems, and (iv) provide improved recovery systems.

*Development well.* A well drilled within the proved area of a natural gas or oil reservoir to the depth of a stratigraphic horizon known to be productive.

*Dry well.* An exploratory, development or extension well that proves to be incapable of producing either natural gas or oil in sufficient quantities to justify completion as a natural gas or oil well.

*Environmental Assessment ("EA").* A study to determine whether a federal action significantly affects the environment, which federal agencies may be required by the National Environmental Policy Act or similar state statutes to undertake prior to the commencement of activities that would constitute federal actions, such as natural gas and oil exploration and production activities on federal lands.

*Environmental Impact Statement.* A more detailed study of the environmental effects of a federal undertaking and its alternatives than an EA, which may be required by the National Environmental Policy Act or similar state statutes, either after the EA has been prepared and determined that the environmental consequences of a proposed federal undertaking, such as natural gas and oil exploration and production activities on federal lands, may be significant, or without the initial preparation of an EA if a federal agency anticipates that a proposed federal undertaking may significantly impact the environment.

*Exploratory well.* A well drilled to find a new field or to find a new reservoir in a field previously found to be productive of natural gas or oil in another reservoir.

*Field.* An area consisting of a single reservoir or multiple reservoirs all grouped on or related to the same individual geological structural feature and/or stratigraphic condition. The geological terms "structural feature" and "stratigraphic condition" are intended to identify localized geological features as opposed to the broader terms of basins, trends, provinces, plays, areas of interest, etc.

*Gross acres or gross wells.* The total acres or wells, as the case may be, in which a working interest is owned.

*High $CO_2$ gas.* Natural gas that contains more than 10% $CO_2$ by volume.

*Imbricate stacking.* A geological formation characterized by multiple layers lying lapped over each other.

*MBbls.* Thousand barrels of oil or other liquid hydrocarbons.

*Mcf.* Thousand cubic feet of natural gas.

Table of Contents

Index to Financial Statements

*Mcf/d.* Mcf per day.

*Mcfe.* Thousand cubic feet equivalent, determined using the ratio of six Mcf of natural gas to one Bbl of oil, condensate or natural gas liquids.

*MMBbls.* Million barrels of oil or other liquid hydrocarbons.

*MMboe.* Million barrels of oil equivalent.

*MBtu.* Thousand British Thermal Units.

*MMBtu.* Million British Thermal Units.

*MMcf.* Million cubic feet of natural gas.

*MMcf/d.* MMcf per day.

*MMcfe.* Million cubic feet equivalent, determined using the ratio of six Mcf of natural gas to one Bbl of oil, condensate or natural gas liquids.

*MMcfe/d.* MMcfe per day.

*Net acres or net wells.* The sum of the fractional working interest owned in gross acres or gross wells, as the case may be.

*Plugging and abandonment.* Refers to the sealing off of fluids in the strata penetrated by a well so that the fluids from one stratum will not escape into another or to the surface. Regulations of all states require plugging of abandoned wells.

*Present value of future net revenues ("PV-10").* The present value of estimated future revenues to be generated from the production of proved reserves, before income taxes, calculated in accordance with SEC guidelines, net of estimated production and future development costs, using prices and costs as of the date of estimation without future escalation and without giving effect to hedging activities, non-property related expenses such as general and administrative expenses, debt service and depreciation, depletion and amortization. PV-10 is calculated using an annual discount rate of 10%.

*Production costs.* Costs incurred to operate and maintain wells and related equipment and facilities, including depreciation and applicable operating costs of support equipment and facilities and other costs of operating and maintaining those wells and related equipment and facilities.

*Productive well.* A well that is found to be capable of producing natural gas or oil in sufficient quantities to justify completion as a natural gas or oil well.

*Prospect.* A specific geographic area that, based on supporting geological, geophysical or other data and also preliminary economic analysis using reasonably anticipated prices and costs, is deemed to have potential for the discovery of commercial hydrocarbons.

*Proved developed reserves.* Reserves that are both proved and developed.

*Proved reserves.* Has the meaning given to such term in Rule 4-10(a)(22) of Regulation S-X, which defines proved reserves as:

The quantities of oil and gas which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible from a given date forward, from known reservoirs, and under

Table of Contents

Index to Financial Statements

existing economic conditions, operating methods, and government regulations, prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probabilistic methods are used for estimation. The project to extract the hydrocarbons must have commenced or the operator must be reasonably certain that it will commence the project within a reasonable time.

The area of a reservoir considered proved includes (i) the area identified by drilling and limited by fluid contacts, if any, and (ii) adjacent undrilled portions of the reservoir that can, with reasonable certainty, be judged to be continuous with it and to contain economically producible oil or gas on the basis of available geoscience and engineering data. In the absence of data on fluid contacts, proved quantities in a reservoir are limited by the lowest known hydrocarbons as seen in a well penetration unless geoscience, engineering or performance data and reliable technology establish a lower contact with reasonable certainty.

Where direct observation from well penetrations has defined a highest known oil elevation and the potential exists for an associated gas cap, proved oil reserves may be assigned in the structurally higher portions of the reservoir only if geoscience, engineering or performance data and reliable technology establish the higher contact with reasonable certainty.

Reserves that can be produced economically, based on prices used to estimate reserves, through application of improved recovery techniques (including, but not limited to, fluid injection) are included in the proved classification when (i) successful testing by a pilot project in an area of the reservoir with properties no more favorable than in the reservoir as a whole, the operation of an installed program in the reservoir, or an analogous reservoir, or other evidence using reliable technology establishes the reasonable certainty of the engineering analysis on which the project or program was based and (ii) the project has been approved for development by all necessary parties and entities, including governmental entities.

Existing economic conditions include prices and costs at which economic producibility from a reservoir is to be determined. The price shall be the average price during the 12-month period prior to the ending date of the period covered by the report, determined as an unweighted arithmetic average of the first-day-of-the-month price for each month within such period, unless prices are defined by contractual arrangements, excluding escalations based upon future conditions.

*Proved undeveloped reserves.* Reserves that are both proved and undeveloped.

*Pulling Units.* Pulling units are used in connection with completions and workover operations.

*PV-10.* See “Present value of future net revenues.”

*Rental Tools.* A variety of rental tools and equipment, ranging from trash trailers to blow out preventors to sand separators, for use in the oil field.

*Reserves.* Estimated remaining quantities of oil and gas and related substances anticipated to be economically producible, based on prices used to estimate reserves and as of a given date, by application of development projects to known accumulations. In addition, there must exist, or there must be a reasonable expectation that there will exist, the legal right to produce or a revenue interest in the production, installed means of delivering oil and gas or related substances to market, and all permits and financing required to implement the project.

*Reservoir.* A porous and permeable underground formation containing a natural accumulation of producible oil and/or gas that is confined by impermeable rock or water barriers and is individual and separate from other reservoirs.

*Roustabout Services.* The provision of manpower to assist in conducting oil field operations.

Table of Contents

Index to Financial Statements

*Standardized Measure or Standardized Measure of Discounted Future Net Cash Flows.* The present value of estimated future cash inflows from proved natural gas and oil reserves, less future development and production costs and future income tax expenses, discounted at 10% per annum to reflect timing of future cash flows and using the same pricing assumptions as were used to calculate PV-10. Standardized Measure differs from PV-10 because Standardized Measure includes the effect of future income taxes on future net revenues.

*Trucking.* The provision of trucks to move our drilling rigs from one well location to another and to deliver water and equipment to the field.

*Undeveloped acreage.* Lease acreage on which wells have not been drilled or completed to a point that would permit the production of economic quantities of oil or gas regardless of whether such acreage contains proved reserves.

*Undeveloped oil and gas reserves.* Reserves of any category that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. In that regard:

(i) Reserves on undrilled acreage are limited to those directly offsetting development spacing areas that are reasonably certain of production when drilled, unless evidence using reliable technology exists that establishes reasonable certainty of economic producibility, based on pricing used to estimate reserves, at greater distances.

(ii) Undrilled locations are classified as having undeveloped reserves only if a development plan has been adopted indicating that they are scheduled to be drilled within five years, unless the specific circumstances justify a longer time.

(iii) Under no circumstances are estimates for undeveloped reserves attributable to any acreage for which an application of fluid injection or other improved recovery technique is contemplated, unless such techniques have been proved effective by actual projects in the same reservoir or an analogous reservoir or by other evidence using reliable technology establishing reasonable certainty.

*Working interest.* The operating interest that gives the owner the right to drill, produce and conduct operating activities on the property and receive a share of production and requires the owner to pay a share of the costs of drilling and production operations.

## Item 1A. *Risk Factors*

***Natural gas and oil prices are volatile, and a decline in natural gas and oil prices can significantly affect our financial results and impede our growth.***

Our revenues, profitability and cash flow depend upon the prices and demand for natural gas and oil. The markets for these commodities are very volatile. Even relatively modest drops in prices can significantly affect our financial results and impede our growth. Changes in natural gas and oil prices have a significant impact on the value of our reserves and on our cash flow. Prices for natural gas and oil may fluctuate widely in response to relatively minor changes in the supply of and demand for natural gas and oil and a variety of additional factors that are beyond our control, such as:

- the domestic and foreign supply of natural gas and oil;
- the price of foreign imports;
- worldwide economic conditions;
- political and economic conditions in oil producing regions, including the Middle East and South America;
- the ability of members of the Organization of Petroleum Exporting Countries to agree to and maintain oil price and production controls;

Table of Contents

Index to Financial Statements

- the level of consumer product demand;
- weather conditions, including hurricanes and tropical storms in and around the Gulf of Mexico;
- technological advances affecting energy consumption;
- availability of pipeline infrastructure, treating, transportation and refining capacity;
- domestic and foreign governmental regulations and taxes; and
- the price and availability of alternative fuels.

Lower natural gas and oil prices, such as those experienced in recent periods, may not only decrease our revenues on a per share basis, but also may reduce the amount of natural gas and oil that we can produce economically and, therefore, could have a material adverse effect on our financial condition and results of operations. This also may result in our having to make substantial downward adjustments to our estimated proved reserves.

***Volatility in the capital markets could affect the value of certain assets as well as our ability to obtain capital.***

Global financial markets and economic conditions have been, and continue to be, disrupted and volatile due to a variety of factors, including significant write-offs in the financial services sector and current weak economic conditions. In some cases, the markets have produced downward pressure on stock prices and credit capacity for certain issuers without regard to those issuers' underlying financial and/or operating strength. As a result, for many companies, the cost of raising money in the debt and equity capital markets has increased substantially while the availability of funds from those markets has diminished significantly. In particular, as a result of concerns about the stability of financial markets generally and the solvency of lending counterparties specifically, the cost of obtaining money from the credit markets generally has increased as many lenders and institutional investors have increased interest rates, enacted tighter lending standards, refused to refinance existing debt on similar terms or at all and reduced, or in some cases ceased, to provide funding to borrowers. In addition, lending counterparties under existing revolving credit facilities and other debt instruments may be unwilling or unable to meet their funding obligations. These factors may adversely affect the value of certain of our assets and our ability to draw on our senior credit facility. If the current credit conditions of United States and international capital markets persist or deteriorate, we may be required to impair the carrying value of assets associated with derivative contracts to account for non-performance by counterparties to those contracts. Moreover, government responses to the disruptions in the financial markets may not restore consumer confidence, stabilize the markets or increase liquidity and the availability of credit.

On October 3, 2008, Lehman Brothers Commodity Services, Inc. ("Lehman Brothers"), a lender under our senior credit facility, filed for bankruptcy. At the time that its parent, Lehman Brothers Holdings, Inc., declared bankruptcy on September 15, 2008, Lehman Brothers elected not to fund its pro rata share, or 0.29%, of borrowings requested by us under the senior credit facility. Accordingly, we anticipate that Lehman Brothers will not fund its pro rata share of any future borrowing requests. We currently do not expect this reduced availability of amounts under the senior credit facility to impact our liquidity or business operations.

If other financial institutions that have extended credit commitments to us are adversely affected by the current conditions of the United States and international capital markets, they may become unable to fund borrowings under their credit commitments to us, which could have a material adverse effect on our financial condition and our ability to borrow additional funds, if needed, for working capital, capital expenditures and other corporate purposes.

***Future price declines may result in further reductions of the asset carrying values of our natural gas and oil properties.***

We utilize the full cost method of accounting for costs related to our natural gas and oil properties. Under this accounting method, all costs for both productive and nonproductive properties are capitalized and amortized

Table of Contents

Index to Financial Statements

on an aggregate basis over the estimated lives of the properties using the unit-of-production method. However, the amount of these costs that can be carried as capitalized assets is subject to a ceiling, which limits such pooled costs to the aggregate of the present value of future net revenues of proved natural gas and oil reserves attributable to proved properties, discounted at 10%, plus the lower of cost or market value of unproved properties. The full cost ceiling is evaluated at the end of each quarter using the most recent 12-month average prices for natural gas and oil, adjusted for the impact of derivatives accounted for as cash flow hedges. As none of our derivatives are accounted for as cash flow hedges, the impact of our derivative contracts has been excluded from the determination of our full cost ceiling. Our ceiling limitation as of December 31, 2009 resulted in a non-cash impairment charge of $388.9 million. Further declines in natural gas and oil prices, without other mitigating circumstances, could result in additional losses of future net revenues, including losses attributable to quantities that cannot be economically produced at lower prices, which could cause us to make additional write-downs of capitalized costs of our natural gas and oil properties and non-cash charges against future earnings. The amount of such future write-downs and non-cash charges could be substantial.

***We have a substantial amount of indebtedness, which may adversely affect our cash flow and our ability to operate our business.***

As of December 31, 2009, our total indebtedness was $2.6 billion, and we had preferred stock outstanding with an aggregate liquidation preference of $465.0 million. Our substantial level of indebtedness and preferred stock outstanding increases the possibility that we may be unable to generate cash sufficient to pay, when due, the principal of, interest on or other amounts due in respect of our indebtedness. Our substantial indebtedness, combined with our lease and other financial obligations and contractual commitments, could have other important consequences to us. For example, it could:

- make us more vulnerable to adverse changes in general economic, industry and competitive conditions and adverse changes in government regulation;
- require us to dedicate a substantial portion of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of our cash flows to fund working capital, capital expenditures, acquisitions and other general corporate purposes;
- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;
- place us at a disadvantage compared to our competitors that are less leveraged and, therefore, may be able to take advantage of opportunities that our indebtedness prevents us from pursuing; and
- limit our ability to borrow additional amounts for working capital, capital expenditures, acquisitions, debt service requirements, execution of our business strategy or other purposes.

Any of the above listed factors could have a material adverse effect on our business, financial condition and results of operations.

***Our estimated reserves are based on many assumptions that may turn out to be inaccurate. Any significant inaccuracies in these reserve estimates or underlying assumptions could materially affect the quantities and present value of our reserves. Our current estimates of reserves could change, potentially in material amounts, in the future.***

The process of estimating natural gas and oil reserves is complex and inherently imprecise. It requires interpretations of available technical data and many assumptions, including assumptions relating to production rates and economic factors such as natural gas and oil prices, drilling and operating expenses, capital expenditures and availability of funds. Any significant inaccuracies in these interpretations or assumptions could materially affect the estimated quantities and present value of reserves shown in this report. See “Business — Our Businesses and Primary Operations” in Item 1 of this report for information about our natural gas and oil reserves.

Table of Contents

Index to Financial Statements

Actual future production, natural gas and oil prices, revenues, taxes, development expenditures, operating expenses and quantities of recoverable natural gas and oil reserves most likely will vary from our estimates. Any significant variance could materially affect the estimated quantities and present value of reserves shown in this report, which in turn could have a negative effect on the value of our assets. In addition, from time to time in the future, we may adjust estimates of proved reserves, potentially in material amounts, to reflect production history, results of exploration and development, natural gas and oil prices and other factors, many of which are beyond our control.

***The present value of future net cash flows from our proved reserves will not necessarily be the same as the current market value of our estimated natural gas and oil reserves.***

We base the estimated discounted future net cash flows from our proved reserves on 12-month average prices and costs. Actual future net cash flows from our natural gas and oil properties also will be affected by factors such as:

- actual prices we receive for natural gas and oil;
- the accuracy of our reserve estimates;
- actual cost of development and production expenditures;
- the amount and timing of actual production;
- supply of and demand for natural gas and oil; and
- changes in governmental regulations or taxation.

The timing of both our production and our incurrence of expenses in connection with the development and production of natural gas and oil properties will affect the timing of actual future net cash flows from proved reserves, and thus their actual present value. In addition, the 10% discount factor we use when calculating discounted future net cash flows may not be the most appropriate discount factor based on interest rates in effect from time to time and risks associated with us or the oil and gas industry in general.

***Unless we replace our natural gas and oil reserves, our reserves and production will decline, which would adversely affect our business, financial condition and results of operations.***

Our future natural gas and oil reserves and production, and therefore our cash flow and income, are highly dependent on our success in efficiently developing and exploiting our current reserves and economically finding or acquiring additional recoverable reserves. We may not be able to develop, find or acquire additional reserves to replace our current and future production at acceptable costs.

***Our potential drilling location inventories are scheduled over several years, making them susceptible to uncertainties that could materially alter the occurrence or timing of their drilling.***

As of December 31, 2009, only 610 of our approximately 12,100 identified potential future well locations were attributed to proved undeveloped reserves. These potential drilling locations, including those without proved undeveloped reserves, represent a significant part of our growth strategy. Our ability to drill and develop these locations is subject to a number of uncertainties, including the availability of capital, seasonal conditions, regulatory approvals, natural gas and oil prices, costs and drilling results. Because of these uncertainties, we do not know if the numerous potential drilling locations we have will ever be drilled or if we will be able to produce natural gas or oil from these or any other potential drilling locations. As such, our actual drilling activities may materially differ from our current expectations, which could adversely affect our business.

***We will not know conclusively prior to drilling whether natural gas or oil will be present in sufficient quantities to be economically viable.***

We describe some of our current prospects and drilling locations and our plans to explore those prospects and drilling locations in this report. A prospect is a property on which we have identified what our geoscientists

Table of Contents

Index to Financial Statements

believe, based on available seismic and geological information, to be indications of natural gas or oil. Our prospects and drilling locations are in various stages of evaluation, ranging from a prospect that is ready to drill to a prospect that will require substantial additional seismic data processing and interpretation.

The use of seismic data and other technologies and the study of producing fields in the same area will not enable us to know conclusively prior to drilling whether natural gas or oil will be present or, if present, whether natural gas or oil will be present in sufficient quantities to be economically viable. Even if sufficient amounts of natural gas or oil exist, we may damage the potentially productive hydrocarbon bearing formation or experience mechanical difficulties while drilling or completing the well, resulting in a reduction in production from the well or abandonment of the well. During 2009, we participated in drilling a total of 160 gross wells, of which four were identified as dry wells. If we drill additional wells that we identify as dry wells in our current and future prospects, our drilling success rate may decline and materially harm our business. In summary, the cost of drilling, completing and operating any well is often uncertain, and new wells may not be productive.

***Properties that we buy may not produce as projected, and we may be unable to determine reserve potential, identify liabilities associated with the properties or obtain protection from sellers against them.***

Our reviews of properties we acquire are inherently incomplete because an in-depth review of every individual property involved in each acquisition generally is not feasible. Even a detailed review of records and properties may not necessarily reveal existing or potential problems, nor will it permit a buyer to become sufficiently familiar with the properties to assess fully their deficiencies and potential. Inspections may not always be performed on every well, and environmental problems, such as soil or ground water contamination, are not necessarily observable even when an inspection is undertaken. Even when problems are identified, we often assume certain environmental and other risks and liabilities in connection with acquired properties, and such risks and liabilities could have a material adverse effect on our results of operations and financial condition.

***The development of the proved undeveloped reserves in West Texas and other areas of operation may take longer and may require higher levels of capital expenditures than we currently anticipate.***

Approximately 35.5% of the estimated proved reserves that we owned or had under lease in West Texas as of December 31, 2009 were proved undeveloped reserves and 37.3% of our total reserves were proved undeveloped reserves. Development of these reserves may take longer and require higher levels of capital expenditures than we currently anticipate. Therefore, ultimate recoveries from these fields may not match current expectations. Delays in the development of our reserves or increases in costs to drill and develop such reserves will reduce the PV-10 value of our estimated proved undeveloped reserves and future net revenues estimated for such reserves.

***A significant portion of our operations are located in West Texas, making us vulnerable to risks associated with operating in one major geographic area.***

As of December 31, 2009, approximately 69.7% of our proved reserves and approximately 64.5% of our production were located in the WTO and Permian Basin in West Texas. In addition, a substantial portion of our WTO natural gas contains a high concentration of $CO_2$ and requires treating. As a result, we may be disproportionately exposed to the impact of delays or interruptions of production from these wells caused by transportation and treatment capacity constraints, curtailment of production or treatment plant closures for scheduled maintenance or unanticipated occurrences. Such delays or interruptions could have a material adverse effect on our financial condition and results of operations.

***Many of our prospects in the WTO may contain natural gas that is high in $CO_2$ content, which can negatively affect our economics.***

The reservoirs of many of our prospects in the WTO may contain natural gas that is high in $CO_2$ content. The natural gas produced from these reservoirs must be treated for the removal of $CO_2$ prior to marketing. If we

Table of Contents

Index to Financial Statements

cannot obtain sufficient capacity at treatment facilities for our natural gas with a high $CO_2$ concentration, or if the cost to obtain such capacity significantly increases, we could be forced to delay production and development or experience increased production costs. We do not know the amount of $CO_2$ we will encounter in any well until it is drilled. As a result, sometimes we encounter $CO_2$ levels in our wells that are higher than expected. Since the treatment expenses are incurred on a Mcf basis, we will incur a higher effective treating cost per MMBtu of natural gas sold for natural gas with a higher $CO_2$ content. As a result, high $CO_2$ gas wells must produce at much higher rates than low $CO_2$ gas wells to be economic, especially in a low natural gas price environment.

Furthermore, when we treat the gas for the removal of $CO_2$, some of the methane is used to run the treatment plant as fuel gas and other methane and heavier hydrocarbons, such as ethane, propane and butane, cannot be separated from the $CO_2$ and is lost. This is known as plant shrink. Historically our plant shrink has been approximately 14% in the WTO. After giving effect to plant shrink, as many as 4 Mcf of high $CO_2$ natural gas must be produced to sell one MMBtu of natural gas. We report our volumes of natural gas reserves and production net of $CO_2$ volumes that are removed prior to sales.

***All of our consolidated drilling and services revenues are derived from companies in the oil and gas industry.***

Companies to which we provide drilling and related services are affected by the oil and gas industry risks mentioned above. Market prices of natural gas and oil, limited access to capital and reductions in capital expenditures could result in oil and gas companies canceling or curtailing their drilling programs, which could reduce the demand for our drilling and related services. Any prolonged reduction in the overall level of exploration and development activities, whether resulting from changes in natural gas and oil prices or otherwise, could impact our drilling and services segment by negatively affecting:

- revenues, cash flow and profitability;
- our ability to retain skilled rig personnel whom we would need in the event of an upturn in the demand for drilling and related services; and
- the fair value of our rig fleet.

***A significant decrease in natural gas production in our areas of operations, due to the decline in production from existing wells, depressed commodity prices or otherwise, would adversely affect our ability to satisfy certain contractual obligations and revenues and cash flow from our midstream gas services segment.***

In June 2009, we sold an entity, Piñon Gathering Company, LLC (“PGC”), holding our gathering and compression assets located in the Piñon Field to an unaffiliated third party. In conjunction with the sale, we entered into a gas gathering agreement pursuant to which we dedicated our Piñon Field acreage to PGC for gathering services for 20 years. During that period, we have minimum throughput and delivery obligations to PGC. In addition, we continue to construct and acquire our own gathering and compression assets in the Piñon Field. Most of the reserves supporting our contractual obligations to PGC and our own midstream assets are operated by our exploration and production segment. A material decrease in natural gas production in our areas of operation would result in a decline in the volume of natural gas delivered to PGC’s and our pipelines and facilities for gathering, transporting and treating. We have no control over many factors affecting production activity, including prevailing and projected energy prices, demand for hydrocarbons, the level of reserves, geological considerations, governmental regulation and the availability and cost of capital. Our throughput and delivery obligations to PGC may not be satisfied if we do not connect new wells to PGC’s gathering systems or if there is a decline in natural gas that we produce from the Piñon Field; however, we would still be obligated to pay fees under the gas gathering agreement. Failure to connect new wells to our own gathering systems would result in the amount of natural gas we gather, transport and treat being reduced substantially over time and could, upon exhaustion of the current wells, cause us to abandon our gathering systems and, possibly cease gathering, transporting and treating operations.

Table of Contents

Index to Financial Statements

***Our use of 2-D and 3-D seismic data is subject to interpretation and may not accurately identify the presence of natural gas and oil. In addition, the use of such technology requires greater predrilling expenditures, which could adversely affect the results of our drilling operations.***

A significant aspect of our exploration and development plan involves seismic data. Even when properly used and interpreted, 2-D and 3-D seismic data and visualization techniques are only tools used to assist geoscientists in identifying subsurface structures and hydrocarbon indicators and do not enable the interpreter to know whether hydrocarbons are present in those structures. Other geologists and petroleum professionals, when studying the same seismic data, may have significantly different interpretations than our professionals.

In addition, the use of 2-D and 3-D seismic and other advanced technologies requires greater predrilling expenditures than traditional drilling strategies, and we could incur losses due to such expenditures. As a result, our drilling activities may not be geologically successful or economical, and our overall drilling success rate or our drilling success rate for activities in a particular area may not improve.

We often gather 2-D and 3-D seismic data over large areas. Our interpretation of seismic data delineates for us those portions of an area that we believe are desirable for drilling. Therefore, we may choose not to acquire option or lease rights prior to acquiring seismic data, and in many cases, we may identify hydrocarbon indicators before seeking option or lease rights in the location. If we are not able to lease those locations on acceptable terms, we will have made substantial expenditures to acquire and analyze 2-D and 3-D data without having an opportunity to attempt to benefit from those expenditures.

***Drilling for and producing natural gas and oil are high risk activities with many uncertainties that could adversely affect our business, financial condition or results of operations.***

Our drilling and operating activities are subject to many risks, including the risk that we will not discover commercially productive reservoirs. Drilling for natural gas and oil can be unprofitable if dry wells are drilled and if productive wells do not produce sufficient revenues to return a profit. In addition, our drilling and producing operations may be curtailed, delayed or canceled as a result of other factors, including:

- unusual or unexpected geological formations and miscalculations;
- pressures;
- fires;
- blowouts;
- loss of drilling fluid circulation;
- title problems;
- facility or equipment malfunctions;
- unexpected operational events;
- shortages of skilled personnel;
- shortages or delivery delays of equipment and services;
- compliance with environmental and other regulatory requirements; and
- adverse weather conditions.

Any of these risks can cause substantial losses, including personal injury or loss of life, damage to or destruction of property, natural resources and equipment, pollution, environmental contamination or loss of wells and regulatory fines or penalties.

Insurance against all operational risks is not available to us. Additionally, we may elect not to obtain insurance if we believe that the cost of available insurance is excessive relative to the perceived risks presented.

Table of Contents

Index to Financial Statements

We could incur losses for uninsurable or uninsured risks or in amounts in excess of existing insurance coverage. The occurrence of an event that is not covered in full or in part by insurance could have a material adverse impact on our business activities, financial condition and results of operations.

***The high cost or unavailability of drilling rigs, equipment, supplies, personnel and other oil field services could adversely affect our ability to execute our exploration and development plans on a timely basis and within our budget.***

Our industry is cyclical and, from time to time, there is a shortage of drilling rigs, equipment, supplies or qualified personnel. During these periods, the costs of rigs, equipment, supplies and personnel are substantially greater and their availability may be limited. Additionally, these services may not be available on commercially reasonable terms.

***Market conditions or operational impediments may hinder our access to natural gas and oil markets or delay our production.***

Market conditions or a lack of satisfactory natural gas and oil transportation arrangements may hinder our access to natural gas and oil markets or delay our production. The availability of a ready market for our natural gas and oil production depends on a number of factors, including the demand for and supply of natural gas and oil and the proximity of reserves to pipelines and terminal facilities. Our ability to market our production depends, in substantial part, on the availability and capacity of gathering systems, pipelines and treating facilities. For example, we are currently experiencing capacity limitations on high $CO_2$ gas treating in the Piñon Field. Our failure to obtain such services on acceptable terms or expand our midstream assets could have a material adverse effect on our business. We may be required to shut in wells for a lack of a market or because access to natural gas pipelines, gathering system capacity or treating facilities may be limited or unavailable. We would be unable to realize revenue from any shut-in wells until production arrangements were made to deliver the production to market.

***Repercussions from terrorist activities or armed conflict could harm our business.***

Terrorist activities, anti-terrorist efforts or other armed conflict involving the United States or its interests abroad may adversely affect the United States and global economies and could prevent us from meeting our financial and other obligations. If events of this nature occur and persist, the attendant political instability and societal disruption could reduce overall demand for oil and natural gas, potentially putting downward pressure on prevailing oil and natural gas prices and causing a reduction in our revenues. Oil and natural gas production facilities, transportation systems and storage facilities could be direct targets of terrorist attacks, and or operations could be adversely impacted if infrastructure integral to our operations is destroyed by such an attack. Costs for insurance and other security may increase as a result of these threats, and some insurance coverage may become more difficult to obtain, if available at all.

***Our development and exploration operations require substantial capital, and we may be unable to obtain needed capital or financing on satisfactory terms, which could lead to a loss of properties and a decline in our natural gas and oil reserves.***

The natural gas and oil industry is capital intensive. We make and expect to continue to make substantial capital expenditures in our business and operations for the exploration, development, production and acquisition of natural gas and oil reserves. To date, we have financed capital expenditures primarily with proceeds from the sale of equity, debt and cash generated by operations. We intend to finance our future capital expenditures with the sale of equity and debt securities, cash flow from operations, asset sales and current and new financing arrangements. Our cash flow from operations and access to capital are subject to a number of variables, including:

- our proved reserves;
- the level of natural gas and oil we are able to produce from existing wells;

Table of Contents

Index to Financial Statements

- the prices at which natural gas and oil are sold; and
- our ability to acquire, locate and produce new reserves.

If our revenues decrease as a result of lower natural gas and oil prices, operating difficulties, declines in reserves or for any other reason, we may have limited ability to obtain the capital necessary to sustain our operations at current levels. In order to fund our capital expenditures, we may seek additional financing. Our senior credit facility and senior note indentures, however, contain covenants restricting our ability to incur additional indebtedness without the consent of the lenders. Our lenders may withhold this consent at their sole discretion.

Continuing disruptions in the global financial and capital markets also could adversely affect our ability to obtain debt or equity financing on terms favorable to us, or at all. The failure to obtain additional financing could result in a curtailment of our operations relating to exploration and development of our prospects, which in turn could lead to a possible loss of properties and a decline in our natural gas and oil reserves.

***The agreements governing our existing indebtedness have restrictions, financial covenants and borrowing base redeterminations which could adversely affect our operations.***

Our senior credit facility and the indentures governing our senior notes restrict our ability to obtain additional financing, make investments, lease equipment, sell assets and engage in business combinations. We also are required to comply with certain financial covenants and ratios. Our ability to comply with these restrictions and covenants in the future is uncertain and will be affected by the levels of cash flow from our operations and events or circumstances beyond our control. If commodity prices remain at their current level for an extended period or continue to decline, this could adversely affect our ability to meet covenants. Our failure to comply with any of the restrictions and covenants under the senior credit facility, senior notes or other debt financing could result in a default under those instruments, which could cause all of our existing indebtedness to be immediately due and payable.

Our senior credit facility limits the amounts we can borrow to a borrowing base amount. The borrowing base is subject to review semi-annually; however, the lenders reserve the right to have one additional re-determination of the borrowing base per calendar year. Unscheduled re-determinations may be made at our request, but are limited to two requests per year. The borrowing base is determined based upon proved developed producing reserves, proved developed non-producing reserves and proved undeveloped reserves. Outstanding borrowings in excess of the borrowing base must be repaid immediately, or we must pledge other natural gas and oil properties as additional collateral. We do not currently have any substantial unpledged properties, and we may not have the financial resources in the future to make any mandatory principal prepayments under the senior credit facility, which are required, for example, when we exceed our committed line of credit, fail to reinvest proceeds of asset sales in new natural gas and oil properties or incur indebtedness that is not permitted by the terms of the senior credit facility. If the indebtedness under our senior credit facility and senior notes were to be accelerated, our assets may not be sufficient to repay such indebtedness in full.

***Our derivative activities could result in financial losses and could reduce our earnings.***

To achieve a more predictable cash flow and to reduce our exposure to adverse fluctuations in the prices of natural gas and oil, we currently, and may in the future, enter into derivative contracts for a portion of our natural gas and oil production, including collars, basis swaps and fixed-price swaps. As of December 31, 2009, we had natural gas price swaps of 80.3 Bcfe at an average price of $7.70 per Mcfe in place for 2010 and oil price swaps of 4,290 MBbls at an average price of $82.03 per MBbl for 2010, 4,745 MBbls at an average price of $86.52 per MBbl for 2011 and 4,392 MBbls at an average price of $88.26 per MBbl for 2012. The Company also has natural gas basis swaps in place through 2013 for 314.2 Bcf at an average price of $0.57 per Mcf. We have not designated any of our derivative contracts as hedges for accounting purposes and record all derivative contracts

Table of Contents

Index to Financial Statements

on our balance sheet at fair value. Changes in the fair value of our derivative contracts are recognized in current period earnings. Accordingly, our earnings may fluctuate significantly as a result of changes in fair value of our derivative contracts. Derivative contracts also expose us to the risk of financial loss in some circumstances, including when:

- production is less than expected;
- the counterparty to the derivative contract defaults on its contract obligations; or
- there is a change in the expected differential between the underlying price in the derivative contract and actual prices received.

In addition, these types of derivative contracts limit the benefit we would receive from increases in the prices for natural gas and oil.

***Competition in the oil and gas industry is intense, which may adversely affect our ability to succeed.***

The oil and gas industry is intensely competitive, and we compete with companies that have greater resources than we do. Many of these companies not only explore for and produce natural gas and oil, but also carry on refining operations and market petroleum and other products on a regional, national or worldwide basis. These companies may be able to pay more for productive natural gas and oil properties and exploratory prospects or identify, evaluate, bid for and purchase a greater number of properties and prospects than our financial or human resources permit. In addition, these companies may have a greater ability to continue exploration activities during periods of low natural gas and oil market prices. Our larger competitors may be able to absorb the burden of present and future federal, state, local and other laws and regulations more easily than we can, which would adversely affect our competitive position. Our ability to acquire additional properties and to discover reserves in the future will be dependent upon our ability to evaluate and select suitable properties and to consummate transactions in a highly competitive environment. In addition, because we have fewer financial and human resources than many companies in our industry, we may be at a disadvantage in bidding for exploratory prospects and producing natural gas and oil properties. See “Business — Competition” in Item 1 of this report.

Downturns in natural gas and oil prices can result in decreased oil field activity which, in turn, can result in an oversupply of service providers and drilling rigs. This oversupply can result in severe reductions in prices received for oil field services or a complete lack of work for crews and equipment.

***We are subject to complex federal, state, local and other laws and regulations that could adversely affect the cost, manner or feasibility of conducting our operations.***

Our natural gas and oil exploration, production, transportation and treatment operations are subject to complex and stringent laws and regulations. In order to conduct our operations in compliance with these laws and regulations, we must obtain and maintain numerous permits, approvals and certificates from various federal, state and local governmental authorities. We may incur substantial costs in order to maintain compliance with these existing laws and regulations. In addition, our costs of compliance may increase if existing laws and regulations are revised, or if new laws and regulations become applicable to our operations. For instance, we may be unable to obtain all necessary permits, approvals and certificates for proposed projects. Alternatively, we may have to incur substantial expenditures to obtain, maintain or renew authorizations to conduct existing projects. If a project is unable to function as planned due to changing requirements or public opposition, we may suffer expensive delays, extended periods of non-operation or significant loss of value in a project. Such costs may have a negative effect on our business and results of operations.

Our business is subject to federal, state and local laws and regulations as interpreted and enforced by governmental agencies and other bodies vested with authority relating to the exploration for, and the development, production and transportation of, natural gas and oil. Failure to comply with such laws and

Table of Contents

Index to Financial Statements

regulations, as interpreted and enforced, could have a material adverse effect on us. For instance, the MMS may suspend or terminate our operations on federal leases for failure to pay royalties or comply with safety and environmental regulations.

***Our operations expose us to potentially substantial costs and liabilities with respect to environmental, health and safety matters.***

We may incur substantial costs and liabilities as a result of environmental, health and safety requirements applicable to our natural gas and oil exploration, development, production, transportation, treatment, and other activities. These costs and liabilities could arise under a wide range of environmental, health and safety laws that cover, among other things, emissions into the air and water, habitat and endangered species protection, the containment and disposal of hazardous substances, oil field waste and other waste materials, the use of underground injection wells, and wetlands protection. These laws and regulations are complex, change frequently and have tended to become increasingly strict over time. Failure to comply with environmental, health and safety laws or regulations may result in assessment of administrative, civil, and criminal penalties, imposition of cleanup and site restoration costs and liens and the issuance of orders enjoining or limiting our current or future operations. Compliance with these laws and regulations also increases the cost of our operations and may prevent or delay the commencement or continuance of a given operation. Specifically, we may incur increased expenditures in the future in order to maintain compliance with laws and regulations governing emissions of air pollutants from our natural gas treatment plants. See "Business — Environmental Regulations" in Item 1 of this report.

Certain environmental laws impose strict joint and several liability that may require us to pay for or incur the costs to remediate contaminated properties regardless of whether such contamination resulted from the conduct of others or from consequences of our own actions that were or were not in compliance with all applicable laws at the time those actions were taken. In addition, claims for damages to persons, property or natural resources may result from environmental and other impacts of our operations. Moreover, new or modified environmental, health or safety laws, regulations or enforcement policies could be more stringent and impose unforeseen liabilities or significantly increase compliance costs. Therefore, the costs to comply with environmental, health or safety laws or regulations or the liabilities incurred in connection with such compliance could significantly and adversely affect our business, financial condition or results of operations. In addition, many countries as well as several states and regions of the United States have begun implementing legal measures to reduce emissions of greenhouse gases, including carbon dioxide and methane, a primary component of natural gas, in response to scientific studies suggesting that these gases may be contributing to the warming of the Earth's atmosphere. On the United States federal level, Congress is currently considering and President Obama has expressed support for legislation to restrict or regulate emissions of greenhouse gases. The EPA's Final Mandatory Reporting of Greenhouse Gases Rule, which requires reporting of certain greenhouse gas emissions, became effective December 29, 2009. Regulation of greenhouse gases could adversely impact some of our operations and demand for some of our services or products in the future. See "Business — Environmental Regulations" in Item 1 of this report.

***The Century Plant may not be constructed, operate or perform as intended.***

There are significant risks associated with the construction, operation and performance of a project such as the Century Plant. There are a limited number of firms and individuals with the expertise and experience necessary to complete construction projects of this size and nature. There is no assurance that the materials necessary for construction of the plant will be in ready supply when we need them or delivered to us on a timely basis. Accordingly, we may not be able to complete construction of the Century Plant within the time frame currently anticipated, and we could experience cost overruns that will not be covered by Occidental under our contract with Occidental. Finally, there is no guarantee that, once the Century Plant is constructed, we will be able to find, produce and deliver enough high $CO_2$ gas to satisfy our delivery obligations to Occidental or that the Century Plant will operate at its designed capacity or otherwise perform as anticipated.

Table of Contents

Index to Financial Statements

***We may not realize the anticipated benefits of past or future acquisitions, and integration of these acquisitions may disrupt our business and management.***

We have in the past and may in the future acquire other companies or large asset packages. Most recently, we completed the Forest Acquisition in December 2009. We may not realize the anticipated benefits of an acquisition and each acquisition has numerous risks. These risks include:

- difficulty in assimilating the operations and personnel of the acquired company;
- difficulty in maintaining controls, procedures and policies during the transition and integration;
- disruption of our ongoing business and distraction of our management and employees from other opportunities and challenges;
- difficulty integrating the acquired company's accounting, management information, human resources and other administrative systems;
- inability to retain key personnel of the acquired business;
- inability to achieve the financial and strategic goals for the acquired and combined businesses;
- inability to take advantage of anticipated tax benefits;
- potential failure of the due diligence processes to identify significant problems, liabilities or other shortcomings or challenges of an acquired business;
- exposure to litigation or other claims in connection with, or inheritance of claims or litigation risk as a result of, an acquisition, including but not limited to, claims from terminated employees, customers, former stockholders or other third-parties;
- potential inability to assert that internal controls over financial reporting are effective; and
- potential incompatibility of business cultures.

***If we fail to maintain an adequate system of internal control over financial reporting, it could adversely affect our ability to accurately report our results.***

Management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles. A material weakness is a deficiency, or a combination of deficiencies, in our internal control over financial reporting that results in a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. Effective internal controls are necessary for us to provide reliable financial reports and effectively prevent material fraud. If we cannot provide reliable financial reports or prevent fraud, our reputation and operating results would be harmed. Our efforts to develop and maintain our internal controls may not be successful, and we may be unable to maintain adequate controls over our financial processes and reporting in the future, including future compliance with the obligations under Section 404 of the Sarbanes-Oxley Act of 2002. Any failure to develop or maintain effective controls, or difficulties encountered in their implementation, including those related to acquired businesses, or other effective improvement of our internal controls could harm our operating results. Ineffective internal controls could also cause investors to lose confidence in our reported financial information.

***Certain U.S. federal income tax deductions currently available with respect to oil and gas exploration and development may be eliminated as a result of future legislation.***

President Obama's Proposed Fiscal Year 2011 Budget included proposed legislation that would, if enacted into law, make significant changes to United States tax laws, including the elimination of certain key U.S. federal income tax incentives currently available to oil and natural gas exploration and production companies. These changes include, but are not limited to, (i) the repeal of the percentage depletion allowance for oil and natural gas

Table of Contents

Index to Financial Statements

properties, (ii) the elimination of current deductions for intangible drilling and development costs, (iii) the elimination of the deduction for certain domestic production activities, and (iv) an extension of the amortization period for certain geological and geophysical expenditures. It is unclear whether any such changes will be enacted or how soon any such changes could become effective. The passage of any legislation as a result of these proposals or any other similar changes in U.S. federal income tax laws could negatively affect our financial condition and results of operations.

***The adoption of new derivatives legislation or regulation could adversely affect our ability to hedge risks associated with our business.***

Congress is currently considering legislation to impose restrictions on certain transactions involving derivatives, which could affect the use of derivatives in hedging transactions. The Wall Street Reform and Consumer Protection Act of 2009, which was approved by the U.S. House of Representatives on December 11, 2009, would subject over-the-counter ("OTC") derivative dealers and major OTC derivative market participants to substantial supervision and regulation, including by imposing conservative capital and margin requirements and strict business conduct standards. Derivative contracts that are not cleared through central clearinghouses or exchanges may be subject to substantially higher capital and margin requirements. In addition, the American Clean Energy and Security Act of 2009, also known as the Waxman-Markey cap-and-trade legislation or ACESA, which was approved by the U.S. House of Representatives on June 26, 2009, contains provisions that would prohibit private OTC energy commodity derivative and hedging transactions. ACESA would expand the power of the Commodity Futures Trading Commission (the "CFTC") to regulate derivative transactions related to energy commodities, including oil and natural gas, and to mandate clearance of such derivative contracts through registered derivative clearing organizations. Under ACESA, the CFTC's expanded authority over energy derivatives would terminate upon the adoption of general legislation covering derivative regulatory reform. On January 14, 2010, the CFTC proposed rules to establish position limits on derivatives that reference major energy commodities, including natural gas and oil. The proposed all-months-combined position limits would be 10% of the first 25,000 contracts of open interest and 2.5% of open interest beyond 25,000 contracts. The CFTC's proposal includes an exemption for *bona fide* hedges relating to inventory or anticipatory purchases or sales of the commodity. The CFTC also is evaluating whether position limits should be applied consistently across all markets and participants. Although it is not possible at this time to predict the specific content of any derivatives legislation that may ultimately be enacted, any such laws or regulations that are adopted that subject us to additional capital or margin requirements relating to, or to additional restrictions on, our trading and commodity positions could have an adverse effect on our ability to hedge risks associated with our business or on the cost of our hedging activity.

***Federal and state legislation and regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays.***

Congress is currently considering legislation to amend the federal Safe Drinking Water Act to require the disclosure of chemicals used by the oil and gas industry in the hydraulic fracturing process and impose additional regulatory burdens on our industry. Hydraulic fracturing involves the injection of water, sand and chemicals under pressure into rock formations to stimulate natural gas production. Sponsors of bills currently pending before the Senate and House of Representatives have asserted that chemicals used in the fracturing process could adversely affect drinking water supplies. The proposed legislation would require the reporting and public disclosure of chemicals used in the fracturing process, which could make it easier for third parties opposing the hydraulic fracturing process to initiate legal proceedings based on allegations that specific chemicals used in the fracturing process could adversely affect groundwater. In addition, these bills, if adopted, could establish an additional level of regulation at the federal level that could lead to operational delays or increased operating costs and could result in additional regulatory burdens that could make it more difficult to perform hydraulic fracturing and increase our costs of compliance and doing business.

Table of Contents

Index to Financial Statements

***Climate change legislation or regulations restricting emissions of greenhouse gases could result in increased operating costs and reduced demand for the gas and oil that we produce.***

On December 7, 2009, the EPA announced its findings that emissions of carbon dioxide, methane and other greenhouse gases endanger human health and the environment because emissions of such gases, according to the EPA, contribute to warming the Earth's atmosphere and other climate changes. These findings by the EPA allow it to proceed with the adoption and implementation of regulations that would restrict emissions of greenhouse gases under existing provisions of the federal Clean Air Act. In September 2009, the EPA proposed two sets of regulations in anticipation of finalizing its findings. The proposed regulations would require a reduction in emissions of greenhouse gases from motor vehicles and also could require permits for emitting greenhouse gas from certain stationary sources. In addition, on September 22, 2009, the EPA issued a final rule requiring annual reporting of greenhouse gas emissions from specified large greenhouse gas emission sources in the United States, beginning in 2011 for emissions occurring in 2010. The adoption and implementation of any regulations imposing reporting obligations on, or limiting emissions of greenhouse gases from, our equipment and operations could require us to incur costs to reduce emissions of greenhouse gases associated with our operations or could adversely affect demand for the gas and oil we produce.

Also, on June 26, 2009, the U.S. House of Representatives passed the "American Clean Energy and Security Act of 2009," (the "ACESA") which would establish an economy-wide cap-and-trade program to reduce U.S. emissions of greenhouse gases, including carbon dioxide and methane, that may contribute to warming of the Earth's atmosphere and other climate changes. The ACESA would require a 17% reduction in greenhouse gas emissions from 2005 levels by 2020 and just over an 80% reduction of such emissions by 2050. Under this legislation, the EPA would issue a capped and steadily declining number of tradable emissions allowances to certain major sources of greenhouse gas emissions so that such sources could continue to emit greenhouse gases. The net effect of the ACESA would be to impose increasing costs on the combustion of carbon-based fuels such as oil, refined petroleum products and natural gas. The U.S. Senate has begun work on its own legislation for restricting domestic greenhouse gas emissions, and President Obama has indicated his support of legislation to reduce greenhouse gas emissions through an emission allowance system. Although it is not possible at this time to predict whether or when the United States Senate may act on this or other climate change legislation or how any bill passed by the United States Senate would be reconciled with the ACESA, any federal laws or implementing regulations that may be adopted to address greenhouse gas emissions could require us to incur increased operating costs and could adversely affect demand for the gas and oil we produce.

## Item 1B. *Unresolved Staff Comments*

None.

## Item 2. *Properties*

Information regarding our properties is included in Item 1 and in Notes 6 and 25 of the notes to our consolidated financial statements included in Item 8 of this report.

## Item 3. *Legal Proceedings*

SandRidge is a defendant in lawsuits from time to time in the normal course of business. In management's opinion, we are not currently involved in any legal proceedings that, individually or in the aggregate, could have a material effect on our financial condition, operations or cash flows.

## Item 4. *Reserved*

Table of Contents

Index to Financial Statements

## PART II

## Item 5. *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

### Price Range of Common Stock

Our common stock is listed on the New York Stock Exchange ("NYSE") under the symbol "SD." The range of high and low sales prices for our common stock for the periods indicated, as reported by the NYSE, is as follows:

| | High | Low |
|---|---|---|
| **2009** | | |
| Fourth Quarter | $ 14.08 | $ 7.97 |
| Third Quarter | $ 15.00 | $ 7.44 |
| Second Quarter | $ 11.84 | $ 6.31 |
| First Quarter | $ 8.79 | $ 4.49 |
| **2008** | | |
| Fourth Quarter | $19.54 | $ 4.85 |
| Third Quarter | $69.41 | $17.46 |
| Second Quarter | $ 69.00 | $ 37.88 |
| First Quarter | $ 41.05 | $28.50 |

On February 19, 2010, there were 228 record holders of our common stock.

We have neither declared nor paid any cash dividends on our common stock, and we do not anticipate declaring any dividends on our common stock in the foreseeable future. We expect to retain our cash for the operation and expansion of our business, including exploration, development and production activities. In addition, the terms of our indebtedness restrict our ability to pay dividends to holders of our common stock. Accordingly, if our dividend policy were to change in the future, our ability to pay dividends would be subject to these restrictions and our then-existing conditions, including our results of operations, financial condition, contractual obligations, capital requirements, business prospects and other factors deemed relevant by our board of directors.

### Issuer Purchases of Equity Securities

As part of our incentive compensation program, we make required tax payments on behalf of employees as their restricted stock awards vest and then withhold a number of vested shares having a value on the date of vesting equal to the tax obligation. The shares withheld are recorded as treasury stock. During the quarter ended December 31, 2009, the following shares of common stock were withheld in satisfaction of tax withholding obligations arising from the vesting of restricted stock:

| Period | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Number of Shares that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| October 1, 2009 — October 31, 2009 | 29,643 | $ 13.04 | N/A | N/A |
| November 1, 2009 — November 30, 2009 | 1,273 | $ 9.38 | N/A | N/A |
| December 1, 2009 — December 31, 2009 | — | — | N/A | N/A |

## Item 6. *Selected Financial Data*

The following table sets forth, as of the dates and for the periods indicated, our selected financial information. Our financial information is derived from our audited consolidated financial statements for such

Table of Contents

Index to Financial Statements

periods. The financial data includes the results of the Forest Acquisition, effective December 21, 2009, and the acquisition of NEG Oil & Gas, LLC ("NEG"), effective November 21, 2006. The information should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 of this report and our consolidated financial statements and notes thereto contained in Item 8 of this report. The following information is not necessarily indicative of our future results.

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2009 | 2008 | 2007 | 2006 | 2005 |
| | (In thousands, except per share data) | | | | |
| **Statement of Operations Data:** | | | | | |
| Revenues | $ 591,044 | $ 1,181,814 | $ 677,452 | $ 388,242 | $287,693 |
| Expenses: | | | | | |
| Production | 169,285 | 159,004 | 106,192 | 35,149 | 16,195 |
| Production taxes | 4,010 | 30,594 | 19,557 | 4,654 | 3,158 |
| Drilling and services | 30,899 | 26,186 | 44,211 | 98,436 | 52,122 |
| Midstream and marketing | 78,684 | 186,655 | 94,253 | 115,076 | 141,372 |
| Depreciation and depletion — natural gas and oil | 176,027 | 290,917 | 173,568 | 26,321 | 9,313 |
| Depreciation, depletion and amortization — other | 50,865 | 70,448 | 53,541 | 29,305 | 14,893 |
| Impairment | 1,707,150 | 1,867,497 | — | — | — |
| General and administrative | 100,256 | 109,372 | 61,780 | 55,634 | 11,908 |
| (Gain) loss on derivative contracts | (147,527) | (211,439) | (60,732) | (12,291) | 4,132 |
| Loss (gain) on sale of assets | 26,419 | (9,273) | (1,777) | (1,023) | 547 |
| Total operating expenses | 2,196,068 | 2,519,961 | 490,593 | 351,261 | 253,640 |
| (Loss) income from operations | (1,605,024) | (1,338,147) | 186,859 | 36,981 | 34,053 |
| Other income (expense): | | | | | |
| Interest income | 375 | 3,569 | 4,694 | 991 | 206 |
| Interest expense | (185,691) | (147,027) | (117,185) | (16,904) | (5,277) |
| Income (loss) from equity investments | 1,020 | 1,398 | 4,372 | 967 | (384) |
| Other income, net | 7,272 | 1,454 | 729 | 118 | — |
| Total other (expense) income | (177,024) | (140,606) | (107,390) | (14,828) | (5,455) |
| (Loss) income before income taxes | (1,782,048) | (1,478,753) | 79,469 | 22,153 | 28,598 |
| Income tax (benefit) expense | (8,716) | (38,328) | 29,524 | 6,236 | 9,968 |
| (Loss) income from continuing operations | (1,773,332) | (1,440,425) | 49,945 | 15,917 | 18,630 |
| Income from discontinued operations, net of tax | — | — | — | — | 229 |
| Net (loss) income | (1,773,332) | (1,440,425) | 49,945 | 15,917 | 18,859 |
| Less: net income (loss) attributable to noncontrolling interest | 2,258 | 855 | (276) | 296 | 737 |
| Net (loss) income attributable to SandRidge Energy, Inc | (1,775,590) | (1,441,280) | 50,221 | 15,621 | 18,122 |
| Preferred stock dividends and accretion | 8,813 | 16,232 | 39,888 | 3,967 | — |
| (Loss applicable) income available to SandRidge Energy, Inc., common stockholders | $ (1,784,403) | $(1,457,512) | $ 10,333 | $ 11,654 | $ 18,122 |
| **Earnings Per Share Information:** | | | | | |
| **Basic and Diluted** | | | | | |
| Net (loss) income attributable to SandRidge Energy, Inc. | $ (10.15) | $ (9.26) | $ 0.46 | $ 0.21 | $ 0.31 |
| Income from discontinued operations, net of income tax | — | — | — | — | 0.01 |
| Preferred stock dividends | (0.05) | (0.10) | (0.37) | (0.05) | — |
| (Loss) income per share (applicable) available to SandRidge Energy, Inc., common stockholders | $ (10.20) | $ (9.36) | $ 0.09 | $ 0.16 | $ 0.32 |
| Weighted average number of SandRidge Energy, Inc., common shares outstanding(1): | | | | | |
| Basic | 175,005 | 155,619 | 108,828 | 73,727 | 56,559 |
| Diluted | 175,005 | 155,619 | 110,041 | 74,664 | 56,737 |

(1) The number of shares has been adjusted to reflect a 281.562-to-1 stock split in December 2005.

Table of Contents

Index to Financial Statements

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | 2009 | 2008 | 2007 | 2006 | 2005 |
| | | | (In thousands) | | |
| **Balance Sheet Data:** | | | | | |
| Cash and cash equivalents | $ 7,861 | $ 636 | $ 63,135 | $ 38,948 | $ 45,731 |
| Property, plant and equipment, net | $ 2,433,643 | $3,175,559 | $ 3,337,410 | $ 2,134,718 | $ 337,881 |
| Total assets | $ 2,780,317 | $3,655,058 | $3,630,566 | $ 2,388,384 | $ 458,683 |
| Long-term debt | $2,578,938 | $ 2,375,316 | $1,067,649 | $1,066,831 | $ 43,133 |
| Redeemable convertible preferred stock(1) | $ — | $ — | $ 450,715 | $ 439,643 | $ — |
| Total (deficit) equity | $ (195,905) | $ 793,551 | $1,771,563 | $ 654,910 | $297,179 |
| Total liabilities and equity | $ 2,780,317 | $3,655,058 | $3,630,566 | $ 2,388,384 | $ 458,683 |

(1) On May 7, 2008, we converted all of our then outstanding redeemable convertible preferred stock into shares of our common stock.

## Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations*

### Introduction

The following discussion and analysis is intended to help the reader understand our business, financial condition, results of operations, liquidity and capital resources. This discussion and analysis is provided as a supplement to, and should be read in conjunction with, the other sections of this report, including: "Business" in Item 1, "Selected Financial Data" in Item 6 and "Financial Statements and Supplementary Data" in Item 8. The following discussion contains forward-looking statements that reflect our future plans, estimates, beliefs and expected performance. The forward-looking statements are dependent upon events, risks and uncertainties that may be outside our control. Our actual results could differ materially from those discussed in these forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, market prices for natural gas and oil, economic and competitive conditions, regulatory changes, estimates of proved reserves, potential failure to achieve production from development projects, capital expenditures and other uncertainties, as well as those factors discussed below and elsewhere in this report, particularly in "Risk Factors" in Item 1A of this report and "Cautionary Statement Concerning Forward-Looking Statements" below, all of which are difficult to predict. In light of these risks, uncertainties and assumptions, the forward-looking events discussed may not occur.

### Overview of Our Company

We are an independent natural gas and oil company concentrating on exploration, development and production activities related to the exploitation of our significant holdings in West Texas. Our primary areas of focus are the WTO and the Permian Basin. The WTO is a natural gas-prone geological region where we have operated since 1986. The WTO includes the Piñon gas field. We completed numerous acquisitions of additional working interests in the WTO during 2007 and 2008. Additionally, we focus on the exploration, development and production of our properties in the Permian Basin including properties recently acquired from Forest, as discussed below. We also operate interests in the Mid-Continent, the Cotton Valley Trend in East Texas, the Gulf Coast and the Gulf of Mexico.

We currently generate the majority of our consolidated revenues and cash flow from the production and sale of natural gas and oil. Our revenues, profitability and future growth depend substantially on prevailing prices for natural gas and oil and on our ability to find and economically develop and produce natural gas and oil reserves. Prices for natural gas and oil fluctuate widely. In order to reduce our exposure to these fluctuations, we enter into derivative commodity contracts for a portion of our anticipated future natural gas and oil production. Reducing our exposure to price volatility helps ensure that we have adequate funds available for our capital expenditure programs.

Table of Contents

Index to Financial Statements

We operate businesses that are complementary to our exploration, development and production activities. We own related gas gathering and treating facilities, a gas marketing business and an oil field services business. The extent to which each of these supplemental businesses contributes to our consolidated results of operations largely is determined by the amount of work each performs for third parties. Revenues and costs related to work performed by these businesses for our own account are eliminated in consolidation and, therefore, do not contribute to our consolidated results of operations.

**Recent Developments**

*Forest Acquisition.* In December 2009, we purchased natural gas and oil properties located in the Permian Basin from Forest for $800.0 million, subject to purchase price and post-closing adjustments. For more information about the Forest Acquisition, see Item 1, Business — Recent Developments.

*Common Stock Offering.* In December 2009, we completed a registered underwritten public offering of 25,600,000 shares of our common stock, including 3,600,000 shares of common stock acquired by the underwriters from us to cover over-allotments. Net proceeds from the offering were approximately $217.2 million after deducting offering expenses of approximately $9.4 million. The net proceeds were used to fund a portion of the Forest Acquisition purchase price and for general corporate purposes.

*8.75% Senior Notes Due 2020.* In December 2009, we completed the sale of $450.0 million of our unsecured 8.75% Senior Notes to qualified institutional buyers eligible under Rule 144A of the Securities Act. Net proceeds from the offering were approximately $433.1 million after the issuance discount and deducting offering expenses of approximately $9.5 million. We used such proceeds to fund a portion of the Forest Acquisition purchase price.

*Private Placement of 6.0% Convertible Perpetual Preferred Stock.* In December 2009, we completed a private placement of 2,000,000 shares of our 6.0% convertible perpetual preferred stock to an institutional investor in a transaction exempt from registration under Regulation D under the Securities Act. Net proceeds were approximately $199.9 million and were used to fund a portion of the Forest Acquisition purchase price and for general corporate purposes.

Each share of the 6.0% convertible perpetual preferred stock has a liquidation preference of $100.00 and is entitled to an annual dividend of $6.00 payable semi-annually in cash, common stock or any combination thereof, beginning on July 15, 2010. Additionally, each share is initially convertible into 9.21 shares of our common stock, at the holder’s option, at any time on or after February 1, 2010 based on an initial conversion price of $10.86 and subject to customary adjustments in certain circumstances. Five years after their issuance, all outstanding shares of the convertible preferred stock will be converted automatically into shares of our common stock at the then-prevailing conversion price as long as all dividends accrued at that time have been paid.

*2010 Capital Expenditure Budget.* On February 25, 2010, we introduced 2010 production guidance of 130 Bcfe based on 2010 capital expenditure guidance of $860.0 million.

*Crusader Acquisition Bid Withdrawal.* In September 2009, we entered into the Crusader Purchase Agreement to purchase all of the shares of common stock of Crusader that were to be issued upon the effectiveness of Crusader’s reorganization under Chapter 11 of the United States Bankruptcy Code. On November 12, 2009, we announced our withdrawal from the acquisition process of Crusader as permitted under the bidding procedures applicable to Crusader’s bankruptcy. On December 14, 2009, we terminated the Crusader Purchase Agreement and on December 31, 2009, we received the break-up fee of $7.0 million provided for in the Crusader Purchase Agreement.

**Results by Segment**

We operate in three business segments: exploration and production, drilling and oil field services and midstream gas services. The All Other column in the tables below includes items not related to our reportable

Table of Contents

Index to Financial Statements

segments such as our $CO_2$ gathering and sales operations and corporate operations. Management evaluates the performance of our business segments based on operating income (loss), which is defined as segment operating revenues less operating expenses. Results of these measurements provide important information to us about the activity and profitability of our lines of business. Set forth in the table below is financial information regarding each of our business segments for the years ended December 31, 2009, 2008 and 2007 (in thousands).

| | Exploration and Production | Drilling and Oil Field Services | Midstream Gas Services | All Other | Consolidated Total |
|---|---|---|---|---|---|
| **Year Ended December 31, 2009** | | | | | |
| Revenues | $ 457,397 | $ 225,227 | $ 299,580 | $ 30,654 | $ 1,012,858 |
| Inter-segment revenue | (261) | (201,641) | (215,667) | (4,245) | (421,814) |
| Total revenues | $ 457,136 | $ 23,586 | $ 83,913 | $ 26,409 | $ 591,044 |
| Operating loss(1) | $ (1,488,078) | $ (15,166) | $ (36,989) | $ (64,791) | $ (1,605,024) |
| Interest expense, net | (180,856) | (2,074) | (1,246) | (1,140) | (185,316) |
| Other income, net | 4,673 | — | 3,365 | 254 | 8,292 |
| Loss before income taxes | $ (1,664,261) | $ (17,240) | $ (34,870) | $ (65,677) | $ (1,782,048) |
| Capital expenditures(2) | $ 555,809 | $ 4,090 | $ 52,425 | $ 32,818 | $ 645,142 |
| Depreciation, depletion and amortization | $ 178,783 | $ 28,221 | $ 5,496 | $ 14,392 | $ 226,892 |
| **Year Ended December 31, 2008** | | | | | |
| Revenues | $ 912,716 | $ 434,963 | $ 688,071 | $ 22,791 | $ 2,058,541 |
| Inter-segment revenue | (220) | (387,972) | (483,933) | (4,602) | (876,727) |
| Total revenues | $ 912,496 | $ 46,991 | $ 204,138 | $ 18,189 | $ 1,181,814 |
| Operating (loss) income(1) | $ (1,263,249) | $ (5,393) | $ 2,087 | $ (71,592) | $ (1,338,147) |
| Interest expense, net | (139,494) | (2,766) | — | (1,198) | (143,458) |
| Other income, net | 1,171 | 1,015 | 398 | 268 | 2,852 |
| (Loss) income before income taxes | $ (1,401,572) | $ (7,144) | $ 2,485 | $ (72,522) | $ (1,478,753) |
| Capital expenditures(2) | $ 1,909,078 | $ 52,869 | $ 160,460 | $ 55,440 | $ 2,177,847 |
| Depreciation, depletion and amortization | $ 293,625 | $ 42,077 | $ 15,241 | $ 10,422 | $ 361,365 |
| **Year Ended December 31, 2007** | | | | | |
| Revenues | $ 479,321 | $ 261,818 | $ 285,065 | $ 29,286 | $ 1,055,490 |
| Inter-segment revenue | (574) | (188,616) | (177,487) | (11,361) | (378,038) |
| Total revenues | $ 478,747 | $ 73,202 | $ 107,578 | $ 17,925 | $ 677,452 |
| Operating income (loss) | $ 198,913 | $ 10,473 | $ 6,783 | $ (29,310) | $ 186,859 |
| Interest expense, net | (109,458) | (2,762) | (165) | (106) | (112,491) |
| Other income, net | 713 | 2,391 | 1,981 | 16 | 5,101 |
| Income (loss) before income taxes | $ 90,168 | $ 10,102 | $ 8,599 | $ (29,400) | $ 79,469 |
| Capital expenditures(2) | $ 1,046,552 | $ 123,232 | $ 63,828 | $ 47,236 | $ 1,280,848 |
| Depreciation, depletion and amortization | $ 175,565 | $ 37,792 | $ 6,641 | $ 7,111 | $ 227,109 |

(1) The operating loss for the exploration and production segment for the years ended December 31, 2009 and 2008 includes non-cash full cost ceiling impairments of $1,693.3 million and $1,855.0 million, respectively, on our natural gas and oil properties. The operating loss for the midstream gas services segment for the year ended December 31, 2009 includes a $26.1 million loss on the sale of our gathering and compression assets in the Piñon Field.

(2) On an accrual basis.

Table of Contents

Index to Financial Statements

### *Exploration and Production Segment*

The primary factors affecting the financial results of our exploration and production segment are the prices we receive for our natural gas and oil production, the quantity of natural gas and oil we produce and changes in the fair value of commodity derivative contracts we use to reduce the volatility of the prices we receive for our natural gas and oil production. Annual comparisons of production and price data are presented in the following tables.

| | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2009 | 2008 | Amount | Percent |
| Production data: | | | | |
| Natural gas (MMcf) | 87,461 | 87,402 | 59 | 0.1% |
| Oil (MBbls) | 2,894 | 2,334 | 560 | 24.0% |
| Combined equivalent volumes (MMcfe) | 104,823 | 101,405 | 3,418 | 3.4% |
| Average daily combined equivalent volumes (MMcfe/d) | 287.2 | 277.1 | 10.1 | 3.6% |
| Average prices — as reported(1): | | | | |
| Natural gas (per Mcf) | $ 3.36 | $ 7.95 | $ (4.59) | (57.7)% |
| Oil (per Bbl)(2) | $ 55.62 | $ 91.54 | $ (35.92) | (39.2)% |
| Combined equivalent (per Mcfe) | $ 4.34 | $ 8.96 | $ (4.62) | (51.6)% |
| Average prices — including impact of derivative contract settlements: | | | | |
| Natural gas (per Mcf) | $ 7.20 | $ 7.90 | $ (0.70) | (8.9)% |
| Oil (per Bbl)(2) | $ 59.69 | $ 88.09 | $ (28.40) | (32.2)% |
| Combined equivalent (per Mcfe) | $ 7.66 | $ 8.83 | $ (1.17) | (13.3)% |

| | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2008 | 2007 | Amount | Percent |
| Production data: | | | | |
| Natural gas (MMcf) | 87,402 | 51,958 | 35,444 | 68.2% |
| Oil (MBbls) | 2,334 | 2,042 | 292 | 14.3% |
| Combined equivalent volumes (MMcfe) | 101,405 | 64,211 | 37,194 | 57.9% |
| Average daily combined equivalent volumes (MMcfe/d) | 277.1 | 175.9 | 101.2 | 57.5% |
| Average prices — as reported(1): | | | | |
| Natural gas (per Mcf) | $ 7.95 | $ 6.51 | $ 1.44 | 22.1% |
| Oil (per Bbl)(2) | $ 91.54 | $ 68.12 | $ 23.42 | 34.4% |
| Combined equivalent (per Mcfe) | $ 8.96 | $ 7.45 | $ 1.51 | 20.3% |
| Average prices — including impact of derivative contract settlements: | | | | |
| Natural gas (per Mcf) | $ 7.90 | $ 7.18 | $ 0.72 | 10.0% |
| Oil (per Bbl)(2) | $ 88.09 | $ 68.10 | $ 19.99 | 29.4% |
| Combined equivalent (per Mcfe) | $ 8.83 | $ 7.98 | $ 0.85 | 10.7% |

(1) Prices represent actual average prices for the periods presented and do not give effect to derivative transactions.
(2) Includes natural gas liquids.

As of December 31, 2009, we had 1,312.2 Bcfe of estimated net proved reserves with a PV-10 of $1,561.0 million, compared to 2,158.6 Bcfe of estimated net proved reserves with a PV-10 of $2,258.5 million as of December 31, 2008. Our Standardized Measure was $1,561.0 million at December 31, 2009 compared to $2,220.6 million at December 31, 2008 and $2,718.5 million at December 31, 2007. For a discussion of PV-10 and reconciliation to Standardized Measure, see "Business — Our Business and Primary Operations — Proved Reserves" in Item 1 of this report. The decrease in PV-10 in 2009 is primarily attributable to lower commodity prices used in the determination of estimated net proved reserves at December 31, 2009 compared to December 31, 2008. Under SEC rules that became effective December 31, 2009, natural gas and oil reserves are

**Table of Contents**

**Index to Financial Statements**

calculated based on the average price during the 12-month period, using the first-day-of-the-month price for each month in the period instead of the one-day period end pricing method previously used. For the 12-month period ended December 31, 2009, the prices used in our external and internal reserve reports yield weighted average wellhead prices of $3.41 per Mcf of natural gas and $49.98 per barrel of oil based on index prices used ($3.87 per Mcf of natural gas and $57.65 per barrel of oil at December 31, 2009). The SEC requires public companies utilizing the full cost method of accounting for oil and gas properties to perform a ceiling limitation calculation at the end of each quarterly and annual reporting period. As a result of lower natural gas and oil prices during 2009, which were used to determine the future value of our reserves, we were required to record a ceiling impairment of $388.9 million at December 31, 2009, in addition to the $1,304.4 million ceiling impairment recorded at March 31, 2009.

*Exploration and Production Segment — Year Ended December 31, 2009 Compared to Year Ended December 31, 2008*

Exploration and production segment revenues decreased 49.9% to $457.1 million for the year ended December 31, 2009 from $912.5 million in 2008, as a result of a 51.6% decrease in the average price we received for the natural gas and oil we produced, offset slightly by a 3.4% increase in combined production volumes. During 2009, we increased natural gas production slightly by 59 MMcf to 87.5 Bcf and increased oil production by 560 MBbls to 2,894 MBbls. The total combined 3.4 Bcfe increase in production is primarily due to the increased oil production resulting from new wells in West Texas and the Permian Basin.

The average price we received for our natural gas production for the year ended December 31, 2009 decreased $4.59 per Mcf, or 57.7%, to $3.36 per Mcf from $7.95 per Mcf in 2008. The average price received for our oil production decreased to $55.62 per Bbl from $91.54 per Bbl in 2008. The average price we received for our natural gas and oil production was negatively impacted by the continued decline in natural gas and oil prices experienced by the industry during 2009. Including the impact of derivative contract settlements, the effective average price received for natural gas for the year ended December 31, 2009 was $7.20 per Mcf compared to $7.90 per Mcf during 2008. Our oil derivative contract settlements increased our effective price received for oil by $4.07 per Bbl to $59.69 per Bbl for the year ended December 31, 2009. Our oil derivative contract settlements decreased our effective price received for oil by $3.45 per Bbl to $88.09 per Bbl for the year ended December 31, 2008. During 2008 and 2009, we entered into derivative contracts to mitigate the impact of commodity price fluctuations on our production through 2013. Due to the long-term nature of our investment in the development of our properties, we enter into natural gas and oil swaps and natural gas basis swaps for a portion of our production in order to stabilize future cash inflows for planning purposes. Our derivative contracts are not designated as hedges and, as a result, gains or losses on commodity derivative contracts are recorded as a component of operating expenses. Internally, management views the settlement of such derivative contracts as adjustments to the price received for natural gas and oil production to determine "effective prices."

During the year ended December 31, 2009, the exploration and production segment reported a $147.5 million net gain on our commodity derivative contracts ($348.0 million realized gain and $200.5 million unrealized loss) compared to a $211.4 million net gain ($13.0 million realized losses and $224.4 million unrealized gain) in 2008. Unrealized gains or losses on derivative contracts represent the change in fair value of open derivative contracts during the period. The unrealized loss on natural gas and oil derivative contracts recorded during the year ended December 31, 2009 is attributable to an increase in average natural gas and oil prices at December 31, 2009 compared to the average natural gas and oil prices at December 31, 2008 or the contract price for contracts entered into during 2009. The realized gain of $348.0 million for the year ended December 31, 2009 is primarily due to a decline in natural gas prices at the time of settlement compared to the contract price.

For the year ended December 31, 2009, we had an operating loss of $1,488.1 million in our exploration and production segment, compared to an operating loss of $1,263.2 million in 2008. The operating loss for the year ended December 31, 2009 is attributable to the $455.4 million decrease in exploration and production segment

Table of Contents

Index to Financial Statements

revenues and full cost ceiling impairments totaling $1,693.3 million, partially offset by $147.5 million in net gain on our commodity derivative contracts and a $114.9 million decrease in depreciation and depletion on natural gas and oil properties due to the decrease in the average depreciation and depletion per Mcfe. The full cost ceiling impairments are the result of the decline of the future value of our reserves based on the natural gas and oil prices at March 31, 2009 and the 12-month average prices at December 31, 2009.

*Exploration and Production Segment — Year Ended December 31, 2008 Compared to Year Ended December 31, 2007*

For the year ended December 31, 2008, exploration and production segment revenues increased to $912.5 million from $478.7 million in 2007. The increase in 2008 revenues compared to 2007 was attributable to increased production primarily due to successful drilling activity in the WTO and an increase in the average price received for the natural gas and oil we produced. Production volumes increased to 101.4 Bcfe in 2008 from 64.2 Bcfe in 2007, representing an increase of 37.2 Bcfe, or 57.9%. Average combined prices increased $1.51, or 20.3%, to $8.96 per Mcfe in 2008 compared to $7.45 per Mcfe in 2007.

The average price we received for our natural gas production for the year ended December 31, 2008 increased $1.44 per Mcf, or 22.1%, to $7.95 per Mcf from $6.51 per Mcf in 2007. The average price received for our oil production increased to $91.54 per Bbl from $68.12 per Bbl in 2007. The average price we received for our natural gas and oil production was negatively impacted by the significant decline in natural gas and oil prices experienced by the oil and gas industry in the fourth quarter of 2008. The average price received for our natural gas and oil production during the first nine months of 2008 was $9.09 per Mcf and $104.73 per Bbl, respectively, compared to the average price received for our natural gas and oil production during the fourth quarter of 2008 of $5.01 per Mcf and $51.92 per Bbl, respectively. Including the impact of derivative contract settlements, the effective average price received for natural gas for the year ended December 31, 2008 was $7.90 per Mcf compared to $7.18 per Mcf during 2007. Our oil derivative contract settlements decreased our effective price received for oil by $3.45 per Bbl to $88.09 per Bbl for the year ended December 31, 2008. For the year ended December 31, 2007, our oil derivative contract settlements had a minimal impact on our effective price received for oil, which was $68.10 per Bbl.

During the year ended December 31, 2008, the exploration and production segment reported a $211.4 million net gain on our commodity derivative contracts ($13.0 million realized loss and $224.4 million unrealized gain) compared to a $60.7 million net gain ($34.5 million realized gain and $26.2 million unrealized gain) in 2007. Unrealized gains or losses on derivative contracts represent the change in fair value of open derivative contracts during the period. The unrealized gain on natural gas and oil derivative contracts recorded during the year ended December 31, 2008 was attributable to a decrease in average natural gas and oil prices at December 31, 2008 compared to the average natural gas and oil prices at December 31, 2007 or the contract price for contracts entered into during 2008.

For the year ended December 31, 2008, we had an operating loss of $1,263.2 million in our exploration and production segment compared to operating income of $198.9 million in 2007. The $433.8 million increase in exploration and production segment revenues and a $211.4 million net gain on our commodity derivative contracts, of which $224.4 million was unrealized, were offset by a full cost ceiling impairment of $1,855.0 million, a $52.8 million increase in production expenses and a $117.3 million increase in depreciation and depletion on natural gas and oil properties due to the increase in production. The 2008 full cost ceiling impairment was the result of the decline of the future value of our reserves due to the natural gas and oil prices at December 31, 2008 which offset the increase in overall estimated reserve quantities assigned to our properties. There was no ceiling impairment at December 31, 2007. See further discussion of production expense and depreciation and depletion — natural gas and oil properties at “Results of Operations — Consolidated.”

***Drilling and Oil Field Services Segment***

The financial results of our drilling and oil field services segment depend primarily on the demand for and price we can charge for our services. In addition to providing drilling services, our oil field services business also

Table of Contents

Index to Financial Statements

conducts operations that complement our drilling services such as providing pulling units, trucking, rental tools, location and road construction and roustabout services. On a consolidated basis, drilling and oil field service revenues earned and expenses incurred on performing services for third parties, including third party working interests in wells we operate, are included in drilling and services revenues and expenses while drilling and oil field service revenues earned and expenses incurred in performing services for our own account are eliminated in consolidation.

As of December 31, 2009, we owned 31 drilling rigs, through Lariat, of which 14 were idle and one was non-operational. As Lariat's rigs are intended primarily to drill for our account, there is not a significant impact to our consolidated results of operations in having this number of rigs idle.

The table below presents information concerning rigs owned by Lariat:

| | December 31, | |
|---|---|---|
| | 2009 | 2008 |
| Rigs working for SandRidge | 14 | 13 |
| Rigs working for third parties | 2 | 3 |
| Idle rigs | 14 | 12 |
| Total operational | 30 | 28 |
| Non-operational rigs | 1 | 3 |
| Total rigs owned | 31 | 31 |

Until April 15, 2009, we indirectly owned, through Lariat and its partner Clayton Williams Energy, Inc. ("CWEI"), an additional 11 operational rigs through an investment in Larclay L.P. ("Larclay"). Although our ownership in Larclay afforded us access to Larclay's operational rigs, we did not control Larclay, and, therefore, did not consolidate the results of its operations with ours. Only the activities of our wholly owned drilling and oil field services subsidiaries are included in the financial results of our drilling and oil field services segment. On April 15, 2009, Lariat completed an assignment to CWEI of Lariat's 50% equity interest in Larclay pursuant to the terms of an Assignment and Assumption Agreement (the "Larclay Assignment") entered into between Lariat and CWEI. Pursuant to the Larclay Assignment, Lariat assigned all of its right, title and interest in and to Larclay to CWEI effective as of April 15, 2009, and CWEI assumed all of the obligations and liabilities of Lariat relating to Larclay. We fully impaired our investment in and notes receivable due from Larclay at December 31, 2008. There were no additional losses on Larclay during the year ended December 31, 2009 or as a result of the Larclay Assignment.

*Drilling and Oil Field Services Segment — Year Ended December 31, 2009 Compared to Year Ended December 31, 2008*

Drilling and oil field services segment revenues decreased to $23.6 million for the year ended December 31, 2009 from $47.0 million for the year ended December 31, 2008. This resulted in an operating loss of $15.2 million during 2009 compared to an operating loss of $5.4 million during 2008. The decline in revenues and operating income is primarily attributable to a decrease in the number of our rigs operating and decreases in services performed for third parties as well as lower operating margins during 2009 compared to 2008. During 2009, an average of 8.3 of the 30 operational rigs we owned were working compared to an average of 25.5 of the 28 operational rigs working during 2008. Additionally, the average daily rate received per rig working for third parties declined to an average of $11,398 per rig per working day during 2009 from an average of $14,217 per rig per working day during 2008. We received reduced, or stand-by rates, on two of our rigs during 2009 which resulted in a lower average rate per rig per working day for the year ended December 31, 2009 than the comparable period in 2008.

Table of Contents

Index to Financial Statements

*Drilling and Oil Field Services Segment — Year Ended December 31, 2008 Compared to Year Ended December 31, 2007*

During 2008, our drilling and oil field services segment reported $47.0 million in revenues, a decrease of $26.2 million, or 35.8%, from 2007. For the year ended December 31, 2008, we had an operating loss of $5.4 million compared to operating income of $10.5 million in 2007. The decline in revenues and operating income is primarily attributable to an increase in the number of rigs operating on our properties, an increase in our ownership interest in our natural gas and oil properties, resulting in decreases in services performed for third parties, and a decline in revenue earned per day by rigs working for third parties during 2008 compared to 2007. During the year ended December 31, 2008, 89.2% of drilling and oil field service segment revenues were generated by work performed on our own account and eliminated in consolidation compared to 72.0% in 2007.

***Midstream Gas Services Segment***

Midstream gas services segment revenues consist mostly of revenue from gas marketing, which is a very low-margin business. On a consolidated basis, midstream and marketing revenues represent natural gas sold on behalf of third parties and the fees we charge related to gathering, compressing and treating this gas. Gas marketing operating costs represent payments made to third parties for the proceeds from the sale of gas owned by such parties, net of any applicable margin and actual costs to gather, compress and treat the gas that we charge. The primary factors affecting midstream gas services are the quantity of natural gas we gather, treat and market and the prices we pay and receive for natural gas.

In June 2009, we completed the sale of our gathering and compression assets located in the Piñon Field of the WTO. Net proceeds from the sale were approximately $197.5 million, which resulted in a loss on the sale of $26.1 million. The sale of these assets did not and is not expected to have a significant impact on our future consolidated results of operations. In conjunction with the sale, we entered into a gas gathering agreement and an operations and maintenance agreement. Under the gas gathering agreement, we have dedicated our Piñon Field acreage for priority gathering services for a period of 20 years and we will pay a fee for such services that was negotiated at arms' length. Pursuant to the operations and maintenance agreement, we will operate and maintain the gathering system assets sold for a period of 20 years unless we or the buyer of the assets chooses to terminate the agreement.

Grey Ranch, L.P. ("GRLP") is a limited partnership that operates the Grey Ranch Plant located in Pecos County, Texas. We purchased our investment in GRLP during 2003. During October 2009, we executed amendments to certain agreements related to the ownership and operation of GRLP. As a result of these amendments, we became the primary beneficiary of GRLP. Due to this change, we began consolidating the activity of GRLP in our midstream gas services segment prospectively beginning on the effective date of the amendments, October 1, 2009.

*Midstream Gas Services Segment — Year Ended December 31, 2009 Compared to Year Ended December 31, 2008*

Midstream gas services segment revenues for the year ended December 31, 2009 were $83.9 million compared to $204.1 million in 2008. The decrease in midstream gas services revenues is attributable to an overall decrease in natural gas prices in 2009 compared to 2008. Operating costs decreased in proportion to revenue based on the decrease in natural gas prices paid in 2009 compared to 2008. Profit margin for 2009 was 6.2% compared to a profit margin of 8.6% for 2008. The operating loss of $37.0 million for 2009 compared to operating income of $2.1 million in 2008 is primarily attributable to the loss on the sale of our gathering and compression assets. Also contributing to the loss was the impairment of spare parts inventory recorded in 2009.

*Midstream Gas Services Segment — Year Ended December 31, 2008 Compared to Year Ended December 31, 2007*

Midstream gas services segment revenues increased $96.5 million to $204.1 million for the year ended December 31, 2008 from $107.6 million in 2007. The increase in midstream gas services revenues is attributable

Table of Contents

Index to Financial Statements

to larger third-party volumes transported and marketed through our gathering systems during 2008 compared to 2007 as well as an overall increase in natural gas prices in 2008 compared to 2007. Operating income generated by our midstream gas services segment decreased $4.7 million in 2008 to $2.1 million from $6.8 million in 2007 due to an increase in depreciation expense attributable to higher carrying values of midstream gathering and treating assets.

## Consolidated Results of Operations

### *Year Ended December 31, 2009 Compared to the Year Ended December 31, 2008*

*Revenues.* Total revenues decreased 50.0% to $591.0 million for the year ended December 31, 2009 from $1,181.8 million in 2008. This decrease is primarily due to a $454.0 million decrease in natural gas and oil sales and a $121.6 million decrease in midstream and marketing revenues.

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2009 | 2008 | $ Change | % Change |
| | (In thousands) | | | |
| Revenues: | | | | |
| Natural gas and oil | $454,705 | $ 908,689 | $ (453,984) | (50.0)% |
| Drilling and services | 23,902 | 47,199 | (23,297) | (49.4)% |
| Midstream and marketing | 86,028 | 207,602 | (121,574) | (58.6)% |
| Other | 26,409 | 18,324 | 8,085 | 44.1% |
| Total revenues | $591,044 | $1,181,814 | $(590,770) | (50.0)% |

Total natural gas and oil revenues decreased $454.0 million to $454.7 million for the year ended December 31, 2009, compared to $908.7 million in 2008, primarily as a result of the decrease in natural gas and oil prices received on our production. The average price received, excluding the impact of derivative contracts, for our natural gas and oil production decreased 51.6% in 2009 to a combined equivalent price of $4.34 per Mcfe compared to $8.96 per Mcfe in 2008. The average price we received for our natural gas and oil production was negatively impacted by the decline in natural gas and oil prices experienced by the oil and gas industry during 2009. Total natural gas production increased 0.1% to 87.5 Bcf in 2009 compared to 87.4 Bcf in 2008, while oil production increased 24.0% to 2,894 MBbls in 2009 from 2,334 MBbls in 2008.

Drilling and services revenues decreased 49.4% to $23.9 million in 2009 compared to $47.2 million in 2008. The decline in revenues is due to a decrease in rigs operating for and services performed for third parties and the decline in the average daily rate received per rig working for third parties. The average daily rate we received per rig working for third parties declined to an average of $11,398 per rig per working day during 2009 from an average of $14,217 per rig per working day during 2008.

Midstream and marketing revenues decreased $121.6 million, or 58.6%, to $86.0 million for the year ended December 31, 2009, compared to $207.6 million in 2008. The decrease is attributable to the decrease in prices for natural gas that we sold on behalf of third parties in 2009 compared to 2008.

Other revenues increased to $26.4 million for the year ended December 31, 2009 from $18.3 million for 2008. The increase is primarily due to higher $CO_2$ volumes sold to third parties during 2009 than 2008.

Table of Contents

Index to Financial Statements

*Operating Costs and Expenses.* Total operating costs and expenses decreased to $2,196.1 million during 2009, compared to $2,520.0 million in 2008, primarily as a result of decreases in our midstream and marketing expenses, depreciation and depletion and the full cost ceiling impairment.

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2009 | 2008 | $ Change | % Change |
| | (In thousands) | | | |
| Operating costs and expenses: | | | | |
| Production | $ 169,285 | $ 159,004 | $ 10,281 | 6.5% |
| Production taxes | 4,010 | 30,594 | (26,584) | (86.9)% |
| Drilling and services | 30,899 | 26,186 | 4,713 | 18.0% |
| Midstream and marketing | 78,684 | 186,655 | (107,971) | (57.8)% |
| Depreciation and depletion — natural gas and oil | 176,027 | 290,917 | (114,890) | (39.5)% |
| Depreciation, depletion and amortization — other | 50,865 | 70,448 | (19,583) | (27.8)% |
| Impairment | 1,707,150 | 1,867,497 | (160,347) | (8.6)% |
| General and administrative | 100,256 | 109,372 | (9,116) | (8.3)% |
| Gain on derivative contracts | (147,527) | (211,439) | 63,912 | (30.2)% |
| Loss (gain) on sale of assets | 26,419 | (9,273) | 35,692 | (384.9)% |
| Total operating costs and expenses | $2,196,068 | $2,519,961 | $ (323,893) | (12.9)% |

Production expense includes the costs associated with our exploration and production activities, including, but not limited to, lease operating expense and treating costs. Production expenses increased slightly to $169.3 million for the year ended December 31, 2009, compared to $159.0 million in 2008, primarily due to the slight increase in production from our 2009 drilling activity in the Permian Basin and West Texas. Production taxes decreased $26.6 million, or 86.9%, to $4.0 million for the year ended December 31, 2009, compared to $30.6 million in 2008, as a result of severance tax refunds totaling approximately $13.2 million in 2009 and the decreased prices received for production. As a result, production taxes on a unit-of-production basis decreased from $0.30 per Mcfe for 2008 to $0.04 per Mcfe for 2009.

Drilling and services expenses, which include operating expenses attributable to the drilling and oil field services segment and our $CO_2$ services companies, increased $4.7 million, or 18.0%, to $30.9 million in 2009 compared to $26.2 million in 2008. The increase is primarily due to less rig activity and lower profit margins in 2009, which resulted in a lower amount of costs associated with the drilling business being allocated to the full cost pool and an increased amount of such costs being expensed.

Midstream and marketing expenses decreased $108.0 million, or 57.8%, to $78.7 million in 2009 compared to $186.7 million in 2008, due primarily to lower prices paid for natural gas that we sold on behalf of third parties during 2009 than 2008.

Depreciation and depletion for our natural gas and oil properties decreased to $176.0 million during 2009 from $290.9 million in 2008. Our average depreciation and depletion per Mcfe decreased $1.19 to $1.68 from $2.87 in 2008 as a result of the cumulative full cost ceiling impairment, which reduced the carrying value of our natural gas and oil properties. The effect of the decrease in depreciation and depletion per Mcfe was slightly offset by the 3.4% increase in production for the year ended December 31, 2009 compared to 2008.

Depreciation, depletion and amortization ("DD&A") for our other assets consists primarily of depreciation of our drilling rigs, midstream gathering and compression facilities and other equipment. The $19.6 million decrease in DD&A for our other assets is attributable primarily to the change in asset lives of certain of our drilling, oil field service, midstream and other assets to align with industry average lives for similar assets. We calculate depreciation of property and equipment using the straight-line method over the estimated useful lives of the assets, which range from 3 to 39 years.

Table of Contents

Index to Financial Statements

During 2009, we recorded a cumulative non-cash impairment charge of $1,693.3 million on our properties as total capitalized costs of our natural gas and oil properties exceeded our full cost ceiling limitation at both March 31, 2009 and December 31, 2009. Additional impairment expenses of $10.0 million and $3.9 million in 2009 are related to the decline in market value of our spare parts inventory and buildings that we determined will not have use or value in the future, respectively. At December 31, 2008, we recorded a non-cash full cost ceiling limitation impairment charge of $1,855.0 million on our properties. Additional impairment expenses in 2008 related to the impairment of our investment in and notes receivable due from Larclay.

General and administrative expenses decreased 8.3% to $100.3 million in 2009 from $109.4 million in 2008. The decrease is attributable, in part, to lower administrative costs due to the decrease in the number of people we employed for the year. As of December 31, 2009, we had 466 corporate employees compared to 528 at December 31, 2008. Also contributing to the decrease are lower professional services and office costs as a result of focused cost control efforts. General and administrative expenses included non-cash stock compensation expense, net of amounts capitalized, of $20.5 million for the year ended December 31, 2009 compared to $18.8 million in 2008. Corporate salaries and wages were partially offset by capitalized general and administrative expenses of $22.3 million, which included $4.3 million of capitalized stock compensation, for 2009 and $19.1 million for 2008. In accordance with the full cost method of accounting, we capitalize, into the full cost pool, internal costs that can be directly identified with our acquisition, exploration and development activities and do not include any costs related to production, general corporate overhead or similar activities. There was no stock compensation capitalized in 2008.

Due to the continued decline in average natural gas and oil prices during 2009, we recorded a net gain of $147.5 million ($348.0 million realized gain and $200.5 million unrealized loss) on our derivatives contracts for 2009 compared to a $211.4 million net gain ($13.0 million realized loss and $224.4 million unrealized gain) in 2008. The realized gain of $348.0 million for the year ended December 31, 2009 is primarily due to a decline in natural gas prices at the time of settlement compared to the contract price. The unrealized loss recorded in 2009 is attributable to an increase in average natural gas prices at December 31, 2009 compared to December 31, 2008 or the contract date for contracts entered into during 2009.

The loss on sale of assets for the year ended December 31, 2009 is primarily due to the $26.1 million loss on the sale of our gathering and compression assets located in the Piñon Field. For the year ended December 31, 2008, the gain on sale of assets was attributable to the approximately $7.2 million gain on the sale of our assets located in the Piceance Basin of Colorado.

*Other Income (Expense).* Total other expense increased to $177.0 million for the year ended December 31, 2009 from $140.6 million in 2008. The increase is reflected in the table below.

| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | $ Change | % Change |
|---|---|---|---|---|
| | (In thousands) | | | |
| Other income (expense): | | | | |
| Interest income | $ 375 | $ 3,569 | $ (3,194) | (89.5)% |
| Interest expense | (185,691) | (147,027) | (38,664) | 26.3% |
| Income from equity investments | 1,020 | 1,398 | (378) | (27.0)% |
| Other income, net | 7,272 | 1,454 | 5,818 | 400.1% |
| Total other (expense) income | (177,024) | (140,606) | (36,418) | 25.9% |
| Loss before income taxes | (1,782,048) | (1,478,753) | (303,295) | 20.5% |
| Income tax benefit | (8,716) | (38,328) | 29,612 | (77.3)% |
| Net loss | $ (1,773,332) | $ (1,440,425) | $ (332,907) | 23.1% |

Interest income decreased to $0.4 million in 2009 from $3.6 million in 2008. This decrease is generally due to lower excess cash levels during 2009 compared to 2008.

Table of Contents

Index to Financial Statements

Interest expense increased to $185.7 million in 2009, from $147.0 million, net of $0.4 million of capitalized interest, in 2008. The increase in interest expense for 2009 is the result of higher average debt balances outstanding during 2009 compared to 2008.

During the year ended December 31, 2009, we reported income from equity investments of $1.0 million compared to $1.4 million in 2008. The slight decline in income from equity investments is due to the consolidation of GRLP beginning October 1, 2009 and Lariat's assignment of its 50% equity interest in Larclay to CWEI on April 15, 2009.

Other income, net increased to $7.3 million in 2009 from $1.5 million in 2008. The increase is generally due to $4.5 million of the $7.0 million break-up fee provided for in the Crusader Purchase Agreement. Approximately $2.5 million of the break-up fee was recorded in general and administrative expenses to offset Crusader Acquisition related fees and expenses recorded therein.

We reported an income tax benefit of $8.7 million for the year ended December 31, 2009 compared to an income tax benefit of $38.3 million in 2008. The 2009 income tax benefit represented an effective income tax rate of 0.5% compared to an effective income tax rate of 2.6% in 2008. The lower effective income tax rate associated with the net loss attributable to us before income taxes of $1,784.3 million is predominantly due to a valuation allowance on the net deferred tax asset. The valuation allowance serves to reduce the tax benefits recognized from the net deferred tax asset to an amount that is more likely than not to be realized based on the weight of all available evidence. The tax benefit of $8.7 million, net of the valuation allowance, for the year ended December 31, 2009 is due to various federal and state return-to-accrual adjustments.

### *Year Ended December 31, 2008 Compared to the Year Ended December 31, 2007*

*Revenues.* Total revenues increased 74.4% to $1,181.8 million for the year ended December 31, 2008 from $677.5 million in 2007. This increase was due to a $431.1 million increase in natural gas and oil sales and a $99.8 million increase in midstream and marketing revenues, partially offset by lower revenues in our drilling and services operations.

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2008 | 2007 | $ Change | % Change |
| | (In thousands) | | | |
| Revenues: | | | | |
| Natural gas and oil | $ 908,689 | $ 477,612 | $ 431,077 | 90.3% |
| Drilling and services | 47,199 | 73,197 | (25,998) | (35.5)% |
| Midstream and marketing | 207,602 | 107,765 | 99,837 | 92.6% |
| Other | 18,324 | 18,878 | (554) | (2.9)% |
| Total revenues | $ 1,181,814 | $ 677,452 | $ 504,362 | 74.4% |

Total natural gas and oil revenues increased $431.1 million to $908.7 million for the year ended December 31, 2008, compared to $477.6 million in 2007, primarily as a result of the increase in natural gas and oil production volumes and prices received on our production. Total natural gas production increased 68.2% to 87.4 Bcf in 2008 compared to 52.0 Bcf in 2007, while oil production increased 14.3% to 2,334 MBbls in 2008 from 2,042 MBbls in 2007. The average price received, excluding the impact of derivative contracts, for our natural gas and oil production increased 20.3% in 2008 to a combined equivalent price of $8.96 per Mcfe compared to $7.45 per Mcfe in 2007. The average price we received for our natural gas and oil production was negatively impacted by the significant decline in natural gas and oil prices experienced by the oil and gas industry in the fourth quarter of 2008.

Drilling and services revenues decreased 35.5% to $47.2 million in 2008 compared to $73.2 million in 2007. The decline in revenues is primarily attributable to an increase in the average number of our rigs operating on our

Table of Contents

Index to Financial Statements

properties, the increase in our ownership interest in our natural gas and oil properties resulting in decreases in services performed for third parties, and the decline in revenue earned per day by rigs working for third parties. The average daily rate we received per rig working for third parties declined to an average of $14,217 per rig per working day during 2008 from an average of $21,468 per rig per working day during 2007.

Midstream and marketing revenues increased $99.8 million, or 92.6%, to $207.6 million for the year ended December 31, 2008, compared to $107.8 million in 2007. This increase was primarily due to larger production volumes transported and marketed for third parties with ownership in our wells or ownership in other wells connected to our gathering systems during 2008 compared to 2007. Higher natural gas prices prevalent during the first nine months of 2008 compared to 2007 also contributed to the increase.

*Operating Costs and Expenses.* Total operating costs and expenses increased to $2,520.0 million during 2008, compared to $490.6 million in 2007, primarily as a result of our full cost ceiling impairment along with increases in our production-related costs, midstream and marketing expenses, general and administrative expenses and depreciation, depletion and amortization. These increases were partially offset by decreases in costs attributable to our drilling and services operations as well as increased gains on commodity derivative contracts.

| | Year Ended December 31, 2008 | Year Ended December 31, 2007 | $ Change | % Change |
|---|---|---|---|---|
| | (In thousands) | | | |
| Operating costs and expenses: | | | | |
| Production | $ 159,004 | $106,192 | $ 52,812 | 49.7% |
| Production taxes | 30,594 | 19,557 | 11,037 | 56.4% |
| Drilling and services | 26,186 | 44,211 | (18,025) | (40.8)% |
| Midstream and marketing | 186,655 | 94,253 | 92,402 | 98.0% |
| Depreciation and depletion — natural gas and oil | 290,917 | 173,568 | 117,349 | 67.6% |
| Depreciation, depletion and amortization — other | 70,448 | 53,541 | 16,907 | 31.6% |
| Impairment | 1,867,497 | — | 1,867,497 | 100.0% |
| General and administrative | 109,372 | 61,780 | 47,592 | 77.0% |
| Gain on derivative instruments | (211,439) | (60,732) | (150,707) | 248.2% |
| Gain on sale of assets | (9,273) | (1,777) | (7,496) | 421.8% |
| Total operating costs and expenses | $2,519,961 | $ 490,593 | $ 2,029,368 | 413.7% |

Production expenses increased $52.8 million to $159.0 million for the year ended December 31, 2008, compared to $106.2 million in 2007, primarily due to increased production from our 2008 drilling activity and the increase in the number of producing wells in which we have a working interest. Production taxes increased $11.0 million, or 56.4%, to $30.6 million for the year ended December 31, 2008, compared to $19.6 million in 2007, primarily as a result of the increase in production and the increased prices received for production during the year ended December 31, 2008.

Drilling and services expenses decreased $18.0 million, or 40.8%, to $26.2 million in 2008 compared to $44.2 million in 2007, primarily due to the increase in the number and working interest ownership of the wells we drilled for our own account and a decrease in services performed for third parties.

Midstream and marketing expenses increased $92.4 million, or 98.0%, to $186.7 million in 2008 compared to $94.3 million in 2007, due primarily to the larger production volumes transported and marketed during the year ended December 31, 2008 on behalf of third parties compared to 2007.

Depreciation and depletion for our natural gas and oil properties increased to $290.9 million during 2008 from $173.6 million in 2007. Our depreciation and depletion per Mcfe increased $0.17 to $2.87 from $2.70 in 2007. The increase was primarily attributable to the increase in our depreciable properties, higher future development costs and increased production.

Table of Contents

Index to Financial Statements

The $16.9 million increase in DD&A for our other assets was attributable primarily to higher carrying costs of our rigs, due to upgrades and retrofitting during 2007, and our midstream gathering and treating assets, due to upgrades made throughout 2007 and 2008.

At December 31, 2008, we recorded a non-cash impairment charge of $1,855.0 million on our properties as total capitalized costs of our natural gas and oil properties exceeded our full cost ceiling limitation. There was no full cost ceiling impairment as of December 31, 2007. The additional impairment expenses in 2008 related to the impairment of our investment in and notes receivable due from Larclay.

General and administrative expenses increased 77.0% to $109.4 million in 2008 from $61.8 million in 2007. The increase was attributable to an increase in corporate salaries and wages, including non-cash stock compensation expense. The increase in corporate salaries was primarily due to the increase in corporate and support staff added to accommodate our growth. As of December 31, 2008, we had 528 corporate employees compared to 335 at December 31, 2007. Included in corporate salaries and wages was non-cash stock compensation expense of $18.8 million in 2008 and $7.2 million in 2007. Corporate salaries and wages were partially offset by capitalized general and administrative expenses of $19.1 million for 2008 and $4.6 million for 2007.

Due to the decline in average natural gas and oil prices during the second half of 2008, we recorded a net gain of $211.4 million ($13.0 million realized loss and $224.4 million unrealized gain) on our derivatives contracts for 2008 compared to a $60.7 million gain ($34.5 million realized gain and $26.2 million unrealized gain) in 2007. The unrealized gain recorded during 2008 was attributable to a decrease in average natural gas prices at December 31, 2008 compared to the average natural gas prices at December 31, 2007 or the various contract dates for contracts entered into during 2008.

*Other Income (Expense).* Total other expense increased to $140.6 million for the year ended December 31, 2008 from $107.4 million in 2007. The increase is reflected in the table below.

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2008 | 2007 | $ Change | % Change |
| | (In thousands) | | | |
| Other income (expense): | | | | |
| Interest income | $ 3,569 | $ 4,694 | $ (1,125) | (24.0)% |
| Interest expense | (147,027) | (117,185) | (29,842) | 25.5% |
| Income from equity investments | 1,398 | 4,372 | (2,974) | (68.0)% |
| Other income, net | 1,454 | 729 | 725 | 99.5% |
| Total other (expense) income | (140,606) | (107,390) | (33,216) | 30.9% |
| (Loss) income before income taxes | (1,478,753) | 79,469 | (1,558,222) | (1,960.8)% |
| Income tax (benefit) expense | (38,328) | 29,524 | (67,852) | (229.8)% |
| Net (loss) income | $ (1,440,425) | $ 49,945 | $ (1,490,370) | (2,984.0)% |

Interest income decreased to $3.6 million in 2008 from $4.7 million in 2007. This decrease was generally due to lower excess cash levels during 2008 compared to 2007.

Interest expense increased to $147.0 million, net of $0.4 million of capitalized interest, in 2008, from $117.2 million, net of $2.0 million of capitalized interest, in 2007. The increase in interest expense for 2008 was the result of higher average debt balances outstanding during 2008 compared to 2007. An $8.7 million unrealized loss related to our interest rate swap also contributed to the increase in interest expense for 2008. In March 2007, the unamortized debt issuance costs totaling $12.5 million related to our senior bridge facility were expensed resulting in higher interest expense.

Table of Contents

Index to Financial Statements

During the year ended December 31, 2008, we reported income from equity investments of $1.4 million compared to $4.4 million in 2007 due to decreases in profitability experienced by our unconsolidated equity investees, Larclay and GRLP.

We reported an income tax benefit of $38.3 million for the year ended December 31, 2008 compared to income tax expense of $29.5 million in 2007. The 2008 income tax benefit represented an effective income tax rate of 2.6% compared to 37.0% in 2007. The low effective income tax rate associated with the loss before income taxes is predominantly due to a valuation allowance being established against our net deferred tax asset. Our deferred tax position changed from a net deferred tax liability as of December 31, 2007 to a net deferred tax asset as of December 31, 2008 due to the recording of a full cost ceiling impairment of $1,855.0 million. The valuation allowance served to reduce the tax benefits recognized from the net deferred tax asset to an amount that is more likely than not to be realized based on the weight of all available evidence.

## Liquidity and Capital Resources

Our primary sources of liquidity and capital resources are cash flow generated from operations, borrowings under our senior credit facility, the issuance of equity and debt securities, and to a lesser extent, the sale of assets. Our primary uses of capital are expenditures related to our natural gas and oil properties and other fixed assets, the acquisition of natural gas and oil properties and the repayment of amounts outstanding on our senior credit facility and interest payments on our outstanding debt. We maintain access to funds that may be needed to meet capital funding requirements through our senior credit facility.

### *Working Capital*

Our working capital balance fluctuates as a result of the timing and amount of borrowings or repayments under our credit arrangements and changes in the fair value of our outstanding commodity derivative instruments. Absent any significant effects from our commodity derivative instruments, we typically have a working capital deficit or a relatively small amount of positive working capital because our capital spending generally has exceeded our cash flows from operations and we generally use excess cash to pay down borrowings outstanding under our credit arrangements.

At December 31, 2009, we had a working capital surplus of $30.4 million compared to a deficit of $46.7 million at December 31, 2008. Current assets decreased $99.9 million at December 31, 2009, compared to current assets at December 31, 2008, primarily due to a $95.1 million decrease in our current derivative contract assets resulting from the increase in natural gas and oil market prices compared to the contract prices. Current liabilities decreased $177.1 million primarily as a result of a decrease of $162.7 million in accounts payable.

### *Cash Flows*

Our cash flows for the years ended December 31, 2009, 2008 and 2007 are presented in the following table and discussed below:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2009 | 2008 | 2007 |
| | | (In thousands) | |
| Cash flows: | | | |
| Cash flows provided by operating activities | $ 311,559 | $ 579,189 | $ 357,452 |
| Cash flows used in investing activities | (1,247,059) | (1,909,443) | (1,385,581) |
| Cash flows provided by financing activities | 942,725 | 1,267,755 | 1,052,316 |
| Net increase (decrease) in cash and cash equivalents | $ 7,225 | $ (62,499) | $ 24,187 |

Table of Contents

Index to Financial Statements

*Cash Flows from Operating Activities*

Our operating cash flow is mainly influenced by the prices we receive for our natural gas and oil production; the quantity of natural gas we produce and, to a lesser extent, the quantity of oil we produce; the demand for our drilling rigs and oil field services and the rates we are able to charge for these services; and the margins we obtain from our natural gas and $CO_2$ gathering and treating contracts.

Net cash provided by operating activities for the years ended December 31, 2009 and 2008 was $311.6 million and $579.2 million, respectively. The decrease in cash provided by operating activities from 2008 to 2009 is primarily due to our $454.0 million decrease in revenues as a result of our 51.6% decrease in prices received on our production during 2009. These decreases were partially offset by increases in realized gains on our commodity derivative contracts settled during 2009.

Cash flows provided by operating activities increased $221.7 million to $579.2 million in 2008 from $357.5 million in 2007 primarily due to our $504.4 million increase in revenues as a result of our 57.9% increase in production volumes related to our drilling activities during 2008. These increases were partially offset by increases in midstream and marketing expenses and general and administrative costs such as salaries and wages.

*Cash Flows from Investing Activities*

We dedicate and expect to continue to dedicate a substantial portion of our capital expenditure program toward the exploration, development, production and acquisition of natural gas and oil reserves. These capital expenditures are necessary to offset inherent declines in production and proven reserves, which is typical in the capital-intensive natural gas and oil industry.

Cash flows used in investing activities decreased to $1,247.1 million during 2009 from $1,909.4 million in 2008 due to the reduction in our capital expenditure program in 2009. Capital expenditures, excluding acquisitions, decreased $1,532.7 million to $645.1 million for the year ended December 31, 2009 compared to $2,177.8 million for the same period in 2008 primarily due to our decreased drilling activities. The decrease in cash outflows for capital expenditures was partially offset by the Forest Acquisition which resulted in $795.1 million of cash outflows in 2009. Cash outflows from capital expenditures in 2009 were partially offset by approximately $255.0 million in combined net proceeds from the sale of our gathering and compression assets located in the Piñon Field and our deep drilling rights in East Texas. Cash outflows from capital expenditures in 2008 were partially offset by approximately $147.2 million in proceeds from the sale of our assets located in the Piceance Basin of Colorado.

Cash flows used in investing activities increased to $1,909.4 million during 2008 from $1,385.6 million in 2007 due to the expansion of our capital expenditure program in 2008. During 2008, our capital expenditures, excluding capital expenditures accrued at December 31, 2008, were $1,818.7 million in our exploration and production segment, $52.9 million for drilling and oil field services, $131.4 million for midstream gas services and $55.4 million for other capital expenditures.

Table of Contents

Index to Financial Statements

*Capital Expenditures.* Our capital expenditures, on an accrual basis, by segment for the past three years are summarized below:

| | Year Ended December 31, 2009 | 2008 | 2007 |
|---|---|---|---|
| | | (In thousands) | |
| Capital expenditures: | | | |
| Exploration and production | $ 555,809 | $ 1,909,078 | $ 1,046,552 |
| Drilling and oil field services | 4,090 | 52,869 | 123,232 |
| Midstream gas services | 52,425 | 160,460 | 63,828 |
| Other | 32,818 | 55,440 | 47,236 |
| Capital expenditures, excluding acquisitions | 645,142 | 2,177,847 | 1,280,848 |
| Acquisitions | 795,074 | — | 116,650 |
| Total | $ 1,440,216 | $ 2,177,847 | $ 1,397,498 |

*Cash Flows from Financing Activities*

Our financing activities provided $942.7 million in cash for the year ended December 31, 2009 compared to $1,267.8 million for the year ended December 31, 2008. Proceeds from borrowings were $2,619.6 million for the year ended December 31, 2009 compared to $3,252.2 million for 2008, as a result of lower borrowings during 2009 under our senior credit facility. We repaid borrowings of approximately $2,417.0 million during 2009, leaving net borrowings of approximately $202.6 million for the year. During 2009, we completed registered underwritten offerings of an aggregate of 40,080,000 shares of our common stock. Net proceeds from these offerings were approximately $324.8 million. Also in 2009, we completed private placements of an aggregate of 4,650,000 shares of our convertible perpetual preferred stock. Net proceeds were approximately $443.2 million.

Proceeds from borrowings increased to $3,252.2 million for the year ended December 31, 2008 compared to $1,331.5 million for 2007, mainly as a result of our issuance of $750.0 million in 8.0% Senior Notes due 2018 in May 2008 and draw downs on our senior credit facility. We repaid borrowings of approximately $1,944.5 million during 2008, leaving net borrowings of approximately $1,307.7 million for the year. Our financing activities provided $1,267.8 million in cash for the year ended December 31, 2008 compared to $1,052.3 million for the year ended December 31, 2007.

*Indebtedness*

*Senior Credit Facility.* Our senior credit facility limits the amounts we can borrow to a borrowing base amount, currently $850.4 million. The borrowing base is subject to review semi-annually; however, the lenders reserve the right to have one additional re-determination of the borrowing base per calendar year. We may request up to two unscheduled re-determinations per year. The borrowing base is determined based upon proved developed producing reserves, proved developed non-producing reserves, and proved undeveloped reserves. Our borrowing base is redetermined in April and October of each year based on proved reserves. Because the value of our proved reserves is a key factor in determining the amount of the borrowing base, our success in developing reserves, as well as changing commodity prices, may affect the borrowing base of our senior credit facility.

The senior credit facility contains various covenants that limit the ability of us and certain of our subsidiaries to grant certain liens; make certain loans and investments; make distributions; redeem stock; redeem or prepay debt; merge or consolidate with or into a third party; or engage in certain asset dispositions, including a sale of all or substantially all of our assets. Additionally, the senior credit facility limits the ability of us and certain of our subsidiaries to incur additional indebtedness with certain exceptions. The senior credit facility also contains financial covenants, including maintaining agreed levels for the (i) ratio of total funded debt to EBITDAX (as defined in the senior credit facility), which may not exceed 4.5:1.0 at each quarter end calculated using the last four completed fiscal quarters, (ii) ratio of EBITDAX to interest expense plus current maturities of

Table of Contents

Index to Financial Statements

long-term debt, which must be at least 2.5:1.0 at each quarter end calculated using the last four completed fiscal quarters, and (iii) ratio of current assets to current liabilities, which must be at least 1.0:1.0 at each quarter end. In the current ratio calculation (as defined in the senior credit facility) any amounts available to be drawn under the senior credit facility are included in current assets, and unrealized assets and liabilities resulting from mark-to-market adjustments on the Company's derivative contracts are disregarded. As of December 31, 2009, we were in compliance with all of the financial covenants under the senior credit facility.

*Notes Payable.* Long-term obligations under outstanding notes payable consist of the following at December 31, 2009 (in thousands):

| | |
|---|---|
| Other notes payable | $ 35,327 |
| Senior Floating Rate Notes due 2014 | 350,000 |
| 8.625% Senior Notes due 2015 | 650,000 |
| 9.875% Senior Notes due 2016, net of $14,479 discount | 351,021 |
| 8.0% Senior Notes due 2018 | 750,000 |
| 8.75% Senior Notes due 2020, net of $7,410 discount | 442,590 |
| Total debt | $ 2,578,938 |

The indentures governing the senior notes referred to above contain financial covenants similar to those of the senior credit facility and include limitations on the incurrence of indebtedness, payment of dividends, investments, asset sales, certain asset purchases, transactions with related parties and consolidations or mergers.

For more information about the senior credit facility, the senior notes and our other long-term debt obligations, see Note 12 to the consolidated financial statements included in Item 8 of this report.

### *Outlook*

For 2010, we have budgeted $860.0 million for capital expenditures, excluding acquisitions. The majority of our capital expenditures will be discretionary and could be curtailed if our cash flows decline from expected levels or we are unable to obtain capital on attractive terms. We may increase or decrease planned capital expenditures depending on natural gas prices, asset sales and the availability of capital through the issuance of additional long-term debt or equity.

Our revenue, profitability and future growth are substantially dependent upon the prevailing and future prices for natural gas and oil, each of which depend on numerous factors beyond our control such as economic conditions, regulatory developments and competition from other energy sources. The energy markets historically have been volatile and natural gas and oil prices in 2009 were substantially lower than in 2008 and 2007 and may be subject to significant fluctuations in the future. Our derivative arrangements serve to mitigate a portion of the effect of this price volatility on our cash flows, and while derivative contracts for the majority of expected 2010, 2011 and 2012 oil production are in place, there are no fixed price swap derivative contracts in place for our natural gas production beyond 2010. In addition, we will need to incur capital expenditures in 2010 to achieve production targets required to meet our commitments to deliver gas under certain gathering and treating arrangements. We are dependent on availability under the senior credit facility, along with cash flows from operating activities, to fund those capital expenditures. Based on anticipated natural gas and oil prices and availability under the senior credit facility, we expect to be able to fund our planned capital expenditures for 2010. However, a substantial or extended decline in natural gas and oil prices and/or less than anticipated new production could have a material adverse effect on our financial position, results of operations, cash flows and quantities of natural gas and oil reserves that may be economically produced and could impact our ability to comply with the financial covenants under the senior credit facility, which in turn would limit further borrowings to fund capital expenditures. See "Item 7A. Quantitative and Qualitative Disclosures About Market Risk" for additional information regarding our derivative contracts.

Table of Contents

Index to Financial Statements

As of December 31, 2009, our cash and cash equivalents were $7.9 million and we had approximately $2.6 billion in total debt outstanding with no amounts outstanding under our senior credit facility. As of December 31, 2009, we were in compliance with all of the covenants under all of our senior notes and our senior credit facility. As of February 25, 2010, our cash and cash equivalents were approximately $8.7 million, the balance outstanding under our senior credit facility was $59.6 million and we had $25.4 million outstanding in letters of credit.

If future capital expenditures exceed operating cash flow and cash on hand, funds would likely be supplemented as needed by borrowings under our senior credit facility. We may choose to refinance borrowings outstanding under the facility by issuing long-term debt or equity in the public or private markets, or both.

Debt and equity capital markets experienced adverse conditions during the latter part of 2008 and into 2009. Continued volatility in the capital markets may increase costs associated with issuing debt due to increased interest rates, and may affect our ability to access these markets. Currently, we do not believe our liquidity has been, or in the near future will be, materially affected by recent events in the global financial markets. Nevertheless, we continue to monitor events and circumstances surrounding each of the 27 lenders under our senior credit facility. To date, the only disruption in our ability to access the full amounts available under our senior credit facility was the bankruptcy of Lehman Brothers, a lender responsible for 0.29% of the obligations under our senior credit facility. We cannot predict with any certainty the impact to us of any further disruptions in the credit markets.

Based upon the current level of operations and anticipated growth, we believe our cash flow from operations, current cash on hand and availability under our senior credit facility, together with potential access to the credit markets, will be sufficient to meet our capital expenditures budget, debt service requirements and working capital needs for the next 12 months. We have the ability to reduce our capital expenditures budget if cash flows are not available.

### *Contractual Obligations*

A summary of our contractual obligations as of December 31, 2009 is provided in the following table:

| | Payments Due by Year | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | After 2014 | Total |
| | (In thousands) | | | | | | |
| Long-term debt | $ 12,003 | $ 7,295 | $ 1,051 | $ 1,121 | $ 1,191 | $ 2,578,166 | $ 2,600,827 |
| Interest on senior notes(1) | 205,232 | 205,232 | 205,232 | 205,232 | 205,232 | 526,233 | 1,552,393 |
| Firm transportation | 35,307 | 30,391 | 30,612 | 24,725 | 16,483 | 65,979 | 203,497 |
| Gas gathering agreement | 22,226 | 33,780 | 42,814 | 42,634 | 42,360 | 305,390 | 489,204 |
| Asset retirement obligations | 2,553 | 5,801 | 4,344 | 90 | 690 | 97,659 | 111,137 |
| Other | 33,695 | 10,300 | 5,117 | 4,249 | 1,998 | 12,499 | 67,858 |
| Total | $ 311,016 | $ 292,799 | $ 289,170 | $ 278,051 | $ 267,954 | $ 3,585,926 | $ 5,024,916 |

(1) Based on interest rates as of December 31, 2009.

We maintain deposits in bank trust and escrow accounts as required by MMS, surety bond underwriters, purchase agreements or other settlement agreements to satisfy our eventual responsibility to plug and abandon wells and remove structures when certain offshore fields are no longer in use.

## Critical Accounting Policies and Estimates

The discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of our financial statements requires us to make assumptions and

Table of Contents

Index to Financial Statements

prepare estimates that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities and revenues and expenses. We base our estimates on historical experience and various other assumptions that we believe are reasonable; however, actual results may differ. See "Note 1 — Summary of Organization and Significant Accounting Policies" to the consolidated financial statements included in Item 8 of this report for a discussion of our significant accounting policies.

In January 2010, the Financial Accounting Standards Board issued ASU 2010-03 to align the oil and gas reserve estimation and disclosure requirements of Extractive Industries — Oil and Gas Topic of the Accounting Standards Codification with the requirements in the SEC's final rule, *Modernization of the Oil and Gas Reporting Requirements*. We implemented ASU 2010-03 as of December 31, 2009. Key items in the new rules include changes to the pricing used to estimate reserves and calculate the full cost ceiling limitation whereby a 12-month average price is used rather than a single day spot price, the use of new technology for determining reserves, the ability to include nontraditional resources in reserves and permitting disclosure of probable and possible reserves.

*Proved Reserves.* Approximately 95% of our reserves are estimated on an annual basis by independent petroleum engineers. Estimates of proved reserves are based on the quantities of natural gas and oil that geological and engineering data demonstrate, with reasonable certainty, to be recoverable in future years from known reservoirs under existing economic and operating conditions. However, there are numerous uncertainties inherent in estimating quantities of proved reserves and in projecting future revenues, rates of production and timing of development expenditures, including many factors beyond our control. The estimation process is very complex and relies on assumptions and subjective interpretations of available geologic, geophysical, engineering and production data, and the accuracy of reserve estimates is a function of the quality and quantity of available data, engineering and geological interpretation and judgment. In addition, as a result of volatility and changing market conditions, commodity prices and future development costs will change from period to period, causing estimates of proved reserves to change, as well as causing estimates of future net revenues to change. For the years ended December 31, 2009, 2008 and 2007, we revised our proved reserves from prior years' reports by approximately (1,191.9) Bcfe, 452.6 Bcfe and 351.6 Bcfe, respectively, due to market prices during or at the end of the applicable period or production performance indicating more (or less) reserves in place or larger (or smaller) reservoir size than initially estimated or additional proved reserve bookings within the original field boundaries. Estimates of proved reserves are key components of our most significant financial estimates involving our rate for recording depreciation, depletion and amortization and our full cost ceiling limitation. These revisions may be material and could materially affect our future depreciation and depletion expenses.

*Method of accounting for natural gas and oil properties.* The accounting for our business is subject to special accounting rules that are unique to the oil and natural gas industry. There are two allowable methods of accounting for oil and natural gas business activities: the successful efforts method and the full cost method. We follow the full cost method of accounting. All direct costs and certain indirect costs associated with the acquisition, exploration and development of natural gas and oil properties are capitalized. Exploration and development costs include dry well costs, geological and geophysical costs, direct overhead related to exploration and development activities and other costs incurred for the purpose of finding natural gas and oil reserves. Amortization of natural gas and oil properties is provided using the unit-of-production method based on estimated proved natural gas and oil reserves. Sales and abandonments of natural gas and oil properties being amortized are accounted for as adjustments to the full cost pool, with no gain or loss recognized, unless the adjustments would significantly alter the relationship between capitalized costs and proved natural gas and oil reserves. A significant alteration would not ordinarily be expected to occur upon the sale of reserves involving less than 25% of the reserve quantities of a cost center.

Under the successful efforts method, geological and geophysical costs and costs of carrying and retaining undeveloped properties are charged to expense as incurred. Costs of drilling exploratory wells that do not result in proved reserves are charged to expense. Depreciation, depletion and impairment of oil and natural gas properties are generally calculated on a well by well, lease or field basis versus the aggregated "full cost" pool

Table of Contents

Index to Financial Statements

basis. Additionally, gain or loss is generally recognized on all sales of oil and natural gas properties under the successful efforts method. As a result, our financial statements will differ from companies that apply the successful efforts method since we will generally reflect a higher level of capitalized costs as well as a higher oil and natural gas depreciation, depletion and amortization rate, and we will not have exploration expenses that successful efforts companies frequently have.

In accordance with full cost accounting rules, capitalized costs are subject to a limitation. The capitalized cost of natural gas and oil properties, net of accumulated depreciation, depletion, and amortization, less related deferred income taxes, may not exceed an amount equal to the present value of future net revenues from proved natural gas and oil reserves, discounted at 10% per annum, plus the lower of cost or fair value of unproved properties, plus estimated salvage value, less related tax effects (the "ceiling limitation"). Beginning with the December 31, 2009 calculation, our full cost ceiling limitation is calculated using the 12-month average natural gas and oil prices for the most recent 12 months as of the balance sheet date and adjusted for "basis" or location differential, held constant over the life of the reserves. Prior to December 31, 2009, the full cost ceiling limitation calculation required companies to use natural gas and oil prices on the last day of the period. If capitalized costs exceed the ceiling limitation, the excess must be charged to expense. Once incurred, a write-down is not reversible at a later date. During the year ended December 31, 2009, total capitalized costs of our natural gas and oil properties exceeded our ceiling limitation resulting in a non-cash ceiling impairment of $1,693.3 million, $388.9 million of which was incurred in the fourth quarter under the current SEC rule and $1,304.4 million of which was incurred in the first quarter under the rules in effect at the time. For the year ended December 31, 2008, total capitalized costs of our natural gas and oil properties exceeded our ceiling limitation resulting in a non-cash ceiling impairment of $1,855.0 million calculated under the previous rules.

*Unevaluated Properties.* The balance of unevaluated properties consists of capital costs incurred for undeveloped acreage, wells and production facilities in progress and wells pending determination, together with capitalized interest costs for these projects. These costs are initially excluded from our amortization base until the outcome of the project has been determined or, generally, until it is known whether proved reserves will or will not be assigned to the property. We assess all items classified as unevaluated property on a quarterly basis for possible impairment or reduction in value. We assess our properties on an individual basis or as a group if properties are individually insignificant. Our assessment includes consideration of the following factors, among others: intent to drill; remaining lease term; geological and geophysical evaluations; drilling results and activity; the assignment of proved reserves; and the economic viability of development if proved reserves are assigned. During any period in which these factors indicate an impairment, the cumulative drilling costs incurred to date for such property and all or a portion of the associated leasehold costs are transferred to the full cost pool and are then subject to amortization. We estimate that substantially all of our costs classified as unproved as of the balance sheet date will be evaluated and transferred within a six-year period from the date of acquisition, contingent on our capital expenditures and drilling program.

*Asset Retirement Obligations.* Asset retirement obligations represent the estimated future abandonment costs of tangible long-lived assets such as platforms, wells, service assets, pipelines and other facilities. We estimate the fair value of an asset's retirement obligation in the period in which the liability is incurred, if a reasonable estimate can be made. We employ a present value technique to estimate the fair value of an asset retirement obligation, which reflects certain assumptions, including an inflation rate, our credit-adjusted, risk-free interest rate, the estimated settlement date of the liability and the estimated current cost to settle the liability based on third-party quotes and current actual costs. Changes in timing or to the original estimate of cash flows will result in changes to the carrying amount of the liability.

*Revenue Recognition and Gas Balancing.* Natural gas and oil revenues are recorded when title passes to the customer, net of royalties, discounts and allowances, as applicable. We account for natural gas and oil production imbalances using the sales method, whereby we recognize revenue on all natural gas and oil sold to our customers notwithstanding the fact that its ownership may be less than 100% of the natural gas and oil sold. Liabilities are recorded for imbalances greater than our proportionate share of remaining estimated natural gas and oil reserves.

Table of Contents

Index to Financial Statements

We recognize revenues and expenses generated from day work drilling contracts as the services are performed, since we do not bear the risk of completion of the well.

We may receive lump-sum fees for the mobilization of equipment and personnel. Mobilization fees received and costs incurred to mobilize a rig from one market to another are recognized over the term of the related drilling contract. The contract terms typically range from 20 to 90 days.

Midstream gas services segment revenues consist mostly of gas marketing revenue; however, gas marketing is a very low-margin business. Midstream gas services are primarily undertaken to realize incremental margins on gas purchased at the wellhead, and provide value-added services to customers. On a consolidated basis, midstream and marketing revenues represent natural gas sold on behalf of third parties and the fees we charge related to gathering, compressing and treating this gas. Gas marketing operating costs represent payments made to third parties for the proceeds from the sale of gas owned by such parties, net of any applicable margin and actual costs to gather, compress and treat the gas that we charge. In general, natural gas purchased and sold by our midstream gas business is priced at a published daily or monthly index price. Sales to wholesale customers typically incorporate a premium for managing their transmission and balancing requirements. The primary factors affecting midstream gas services are the quantity of natural gas we gather, treat and market and the prices we pay and receive for natural gas.

Revenue from sales of $CO_2$ is recognized when the product is delivered to the customer. We recognize service fees related to the transportation of $CO_2$ as revenue when the related service is provided.

*Property, Plant and Equipment, Net.* Other capitalized costs, including drilling equipment, natural gas gathering and treating equipment, transportation equipment and other property and equipment are carried at cost. Renewals and improvements are capitalized while repairs and maintenance are expensed. Depreciation of drilling equipment is recorded using the straight-line method based on estimated useful lives. Depreciation of other property and equipment is computed using the straight-line method over the estimated useful lives of the assets ranging from 3 to 39 years.

Realization of the carrying value of property and equipment is reviewed for possible impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Assets are determined to be impaired if a forecast of undiscounted estimated future net operating cash flows directly related to the asset including disposal value if any, is less than the carrying amount of the asset. If any asset is determined to be impaired, the loss is measured as the amount by which the carrying amount of the asset exceeds its fair value. An estimate of fair value is based on the best information available, including prices for similar assets. Changes in such estimates could cause us to reduce the carrying value of property and equipment.

When property and equipment components are disposed of, the cost and the related accumulated depreciation are removed from the accounts and any resulting gain or loss is reflected in operations.

*Income Taxes.* Deferred income taxes are recorded for temporary differences between financial statement and income tax basis. Temporary differences are differences between the amounts of assets and liabilities reported for financial statement purposes and their tax basis. Deferred tax assets are recognized for temporary differences that will be deductible in future years' tax returns and for operating loss and tax credit carryforwards. Deferred tax assets are reduced by a valuation allowance if it is deemed more likely than not that some or all of the deferred tax assets will not be realized. Deferred tax liabilities are recognized for temporary differences that will be taxable in future years' tax returns.

As of December 31, 2009, we have a full valuation allowance against our net deferred tax asset. Our deferred tax position changed from a net deferred tax liability as of December 31, 2007 to a net deferred tax asset as of December 31, 2008 due to the recording of a full cost ceiling impairment of $1,855.0 million. The valuation allowance serves to reduce the tax benefits recognized from the net deferred tax asset to an amount that is more

Table of Contents

Index to Financial Statements

likely than not to be realized based on the weight of all available evidence. We increased the valuation allowance for the period ended December 31, 2009 by $641.3 million as a result of not recording a benefit for the current period net loss attributable to us before income taxes of $1,784.3 million.

*Derivative Financial Instruments.* To manage risks related to increases in interest rates and changes in natural gas and oil prices, we enter into interest rate swaps and natural gas and oil futures contracts.

We recognize all of our derivative contracts as either assets or liabilities at fair value. The accounting for changes in the fair value (i.e., gains or losses) of a derivative contract depends on whether it has been designated and qualifies as part of a hedging relationship, and further, on the type of hedging relationship. For those derivative contracts that are designated and qualify as hedging instruments, we designate the hedging instrument, based on the exposure being hedged, as either a fair value hedge or a cash flow hedge. For derivative contracts not designated as hedging instruments, the gain or loss is recognized in current earnings during the period of change. None of our derivatives was designated as hedging instruments during 2009, 2008 and 2007.

**New Accounting Pronouncements**

For a discussion of recently adopted accounting standards, see Note 1 to our consolidated financial statements included in Item 8 of this report.

## CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS

Various statements contained in this report, including those that express a belief, expectation, or intention, as well as those that are not statements of historical fact, are forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These forward-looking statements may include projections and estimates concerning 2010 capital expenditures, our liquidity and capital resources, effects of acquisitions, the timing and success of specific projects, outcomes and effects of litigation, claims and disputes, elements of our business strategy and other statements concerning our operations, economic performance and financial condition. Forward-looking statements are generally accompanied by words such as "estimate," "project," "predict," "believe," "expect," "anticipate," "potential," "could," "may," "foresee," "plan," "goal" or other words that convey the uncertainty of future events or outcomes. We have based these forward-looking statements on our current expectations and assumptions about future events. These statements are based on certain assumptions and analyses made by us in light of our experience and our perception of historical trends, current conditions and expected future developments as well as other factors we believe are appropriate under the circumstances. The forward-looking statements in this report speak only as of the date of this report; we disclaim any obligation to update or revise these statements unless required by securities law, and we caution you not to rely on them unduly. While our management considers these expectations and assumptions to be reasonable, they are inherently subject to significant business, economic, competitive, regulatory and other risks, contingencies and uncertainties relating to, among other matters, the risks discussed in "Risk Factors" in Item 1A of this report including the following:

- the volatility of natural gas and oil prices;
- uncertainties in estimating natural gas and oil reserves;
- the need to replace the natural gas and oil reserves we produce;
- our ability to execute our growth strategy by drilling wells as planned;
- the need to drill productive, economically viable natural gas and oil wells;
- risks and liabilities associated with acquired properties;
- amount, nature and timing of capital expenditures, including future development costs, required to develop the WTO and other undeveloped areas;
- concentration of operations in the WTO;

Table of Contents

Index to Financial Statements

- economic viability of WTO production with high $CO_2$ content;
- availability of natural gas production for our midstream services operations;
- limitations of seismic data;
- risks associated with drilling natural gas and oil wells;
- availability of satisfactory natural gas and oil marketing and transportation;
- availability and terms of capital;
- substantial existing indebtedness;
- limitations on operations resulting from debt restrictions and financial covenants;
- potential financial losses or earnings reductions from commodity derivatives;
- competition in the oil and gas industry;
- general economic conditions, either internationally or domestically or in the jurisdictions in which we operate;
- costs to comply with current and future governmental regulation of the oil and gas industry, including environmental, health and safety laws and regulations; and
- the need to maintain adequate internal control over financial reporting.

## Item 7A. *Quantitative and Qualitative Disclosures about Market Risk*

### General

The discussion in this section provides information about the financial instruments we use to manage commodity prices and interest rate volatility. All contracts are settled in cash and do not require the actual delivery of a commodity at settlement.

*Commodity Price Risk.* Our most significant market risk relates to the prices we receive for our natural gas and oil production. Due to the historical volatility of these commodities, we periodically have entered into, and expect in the future to enter into, derivative arrangements for the purpose of reducing the variability of natural gas and oil prices we receive for our production. From time to time, we enter into commodity pricing derivative contracts for a portion of our anticipated production volumes depending upon management's view of opportunities under the then current market conditions. We do not intend to enter into derivative contracts that would exceed our expected production volumes for the period covered by the derivative arrangement. Our current credit agreement limits our ability to enter into derivative transactions to 85% of expected production volumes from estimated proved reserves. Future credit agreements could require a minimum level of commodity price hedging.

The use of derivative contracts also involves the risk that the counterparties will be unable to meet their obligations under the contracts. Our derivative contracts are with multiple counterparties to minimize our exposure to any individual counterparty. As of December 31, 2009, we had 18 approved derivative counterparties, 17 of which are lenders under our senior credit facility. We currently have derivative contracts outstanding with 11 of these counterparties. We have no derivative contracts in 2010 and beyond with counterparties other than those that are lenders under our senior credit facility.

We use, and may continue to use, a variety of commodity-based derivative contracts, including collars, fixed-price swaps and basis protection swaps. Our fixed price swap transactions are settled based upon New York Mercantile Exchange prices, and our basis protection swap transactions are settled based upon the index price of natural gas at the Waha hub, a West Texas gas marketing and delivery center and the Houston Ship Channel. Settlement for natural gas derivative contracts occurs in the production month.

Table of Contents

Index to Financial Statements

We have not designated any of our derivative contracts as hedges for accounting purposes. We record all derivative contracts on the balance sheet at fair value, which reflects changes in natural gas and oil prices. We establish fair value of our derivative contracts by price quotations obtained from counterparties to the derivative contracts. Changes in fair values of our derivative contracts are recognized as unrealized gains and losses in current period earnings. As a result, our current period earnings may be significantly affected by changes in fair value of our commodity derivative contracts. Changes in fair value are principally measured based on period-end prices compared to the contract price.

At December 31, 2009, our open natural gas and oil commodity derivative contracts consisted of the following:

**Natural Gas**

| Period and Type of Contract | Notional (MMcf)(1) | Weighted Avg. Fixed Price |
|---|---|---|
| January 2010 — March 2010 | | |
| Price swap contracts | 20,475 | $ 7.95 |
| Basis swap contracts | 20,250 | $ (0.74) |
| April 2010 — June 2010 | | |
| Price swap contracts | 19,793 | $ 7.32 |
| Basis swap contracts | 20,475 | $ (0.74) |
| July 2010 — September 2010 | | |
| Price swap contracts | 20,010 | $ 7.55 |
| Basis swap contracts | 20,700 | $ (0.74) |
| October 2010 — December 2010 | | |
| Price swap contracts | 20,010 | $ 7.97 |
| Basis swap contracts | 20,700 | $ (0.74) |
| January 2011 — March 2011 | | |
| Basis swap contracts | 25,650 | $ (0.47) |
| April 2011 — June 2011 | | |
| Basis swap contracts | 25,935 | $ (0.47) |
| July 2011 — September 2011 | | |
| Basis swap contracts | 26,220 | $ (0.47) |
| October 2011 — December 2011 | | |
| Basis swap contracts | 26,220 | $ (0.47) |
| January 2012 — March 2012 | | |
| Basis swap contracts | 28,210 | $ (0.55) |
| April 2012 — June 2012 | | |
| Basis swap contracts | 28,210 | $ (0.55) |
| July 2012 — September 2012 | | |
| Basis swap contracts | 28,520 | $ (0.55) |
| October 2012 — December 2012 | | |
| Basis swap contracts | 28,520 | $ (0.55) |
| January 2013 — March 2013 | | |
| Basis swap contracts | 3,600 | $ (0.46) |
| April 2013 — June 2013 | | |
| Basis swap contracts | 3,640 | $ (0.46) |
| July 2013 — September 2013 | | |
| Basis swap contracts | 3,680 | $ (0.46) |
| October 2013 — December 2013 | | |
| Basis swap contracts | 3,680 | $ (0.46) |

(1) Assumes ratio of 1:1 for Mcf to MMBtu.

Table of Contents

Index to Financial Statements

**Oil**

| Period and Type of Contract | Notional (in MBbls) | Weighted Avg. Fixed Price |
|---|---|---|
| January 2010 — March 2010 | | |
| Price swap contracts | 990 | $ 81.95 |
| April 2010 — June 2010 | | |
| Price swap contracts | 1,092 | $ 82.05 |
| July 2010 — September 2010 | | |
| Price swap contracts | 1,104 | $ 82.05 |
| October 2010 — December 2010 | | |
| Price swap contracts | 1,104 | $ 82.05 |
| January 2011 — March 2011 | | |
| Price swap contracts | 1,170 | $ 86.52 |
| April 2011 — June 2011 | | |
| Price swap contracts | 1,183 | $ 86.52 |
| July 2011 — September 2011 | | |
| Price swap contracts | 1,196 | $ 86.52 |
| October 2011 — December 2011 | | |
| Price swap contracts | 1,196 | $ 86.52 |
| January 2012 — March 2012 | | |
| Price swap contracts | 1,092 | $ 88.26 |
| April 2012 — June 2012 | | |
| Price swap contracts | 1,092 | $ 88.26 |
| July 2012 — September 2012 | | |
| Price swap contracts | 1,104 | $ 88.26 |
| October 2012 — December 2012 | | |
| Price swap contracts | 1,104 | $ 88.26 |

The following table summarizes the cash settlements and valuation gains and losses on our commodity derivative contracts for the years ended December 31, 2009, 2008 and 2007 (in thousands):

| | 2009 | 2008 | 2007 |
|---|---|---|---|
| Realized (gain) loss | $ (348,022) | $ 12,981 | $ (34,494) |
| Unrealized loss (gain) | 200,495 | (224,420) | (26,238) |
| Gain on commodity derivative contracts | $ (147,527) | $ (211,439) | $ (60,732) |

*Credit Risk.* A portion of our liquidity is concentrated in derivative contracts that enable us to mitigate a portion of our exposure to natural gas and oil prices and interest rate volatility. We periodically review the credit quality of each counterparty to our derivative contracts and the level of financial exposure we have to each counterparty to limit our credit risk exposure with respect to these contracts. Additionally, we apply a credit default risk rating factor for our counterparties in determining the fair value of our derivative contracts. The counterparties for all of our hedging transactions have an “investment grade” credit rating. The weighted average credit default swap rate for our counterparties was 0.3% and 2.3% at December 31, 2009 and 2008, respectively.

Our ability to fund our capital expenditure budget is partially dependent upon the availability of funds under our senior credit facility. In order to mitigate the credit risk associated with individual financial institutions committed to participate in our senior credit facility, our bank group consists of 27 financial institutions with commitments ranging from 0.25% to 6.3%. Lehman Brothers, a lender under our senior credit facility, declared bankruptcy on October 3, 2008. As a result of the bankruptcy of Lehman Brothers and its parent company, Lehman Brothers Holdings Inc., on September 15, 2008, Lehman Brothers elected not to fund its pro rata share, or 0.29%, of borrowings requested by us under the facility. Although we do not currently expect this reduced

Table of Contents

Index to Financial Statements

amount available under the senior credit facility to impact our liquidity or business operations, the inability of one or more of our other lenders to fund their obligations under the facility could have a material adverse effect on our financial condition.

*Interest Rate Risk.* We are subject to interest rate risk on our long-term fixed and variable interest rate borrowings. Fixed rate debt, where the interest rate is fixed over the life of the instrument, exposes us to (i) changes in market interest rates reflected in the fair value of the debt and (ii) the risk that we may need to refinance maturing debt with new debt at a higher rate. Variable rate debt, where the interest rate fluctuates, exposes us to short-term changes in market interest rates as our interest obligations on these instruments are periodically redetermined based on prevailing market interest rates, primarily LIBOR and the federal funds rate.

In addition to commodity price derivative arrangements, we may enter into derivative transactions to fix the interest we pay on a portion of the money we borrow under our credit agreement. In January 2008, we entered into a $350.0 million notional amount interest rate swap agreement with a financial institution that effectively fixed the interest rate on our variable rate term loan for the period from April 1, 2008 through April 1, 2011. As a result of the exchange of our variable rate term loan to Senior Floating Rate Notes, the interest rate swap is now used to fix the variable LIBOR interest rate on the Senior Floating Rate Notes at 6.26% through April 2011. In May 2009, we entered into a $350.0 million notional amount interest rate swap agreement with a financial institution that effectively fixed the interest rate on our Senior Floating Rate Notes at 6.69% for the period from April 1, 2011 through April 1, 2013. These swaps have not been designated as hedges.

Our interest rate swaps reduce our market risk on our Senior Floating Rate Notes. We use sensitivity analyses to determine the impact that market risk exposures could have on our variable interest rate borrowings if not for our interest rate swaps. Based on the $350.0 million outstanding balance of our Senior Floating Rate Notes at December 31, 2009, a one percent change in the applicable rates, with all other variables held constant, would have resulted in a change in our interest expense of approximately $3.5 million for the year ended December 31, 2009.

Unrealized gain of $0.4 million and unrealized loss of $8.7 million were recorded in interest expense in the consolidated statements of operations for the change in fair value of the interest rate swaps for the years ended December 31, 2009 and 2008, respectively. Realized loss of $6.2 million and realized gain of $1.3 million were included in interest expense in the consolidated statements of operations for years ended December 31, 2009 and 2008, respectively.

### Item 8. *Financial Statements and Supplementary Data*

Our consolidated financial statements required by this item are included in this report beginning on page F-1.

### Item 9. *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure*

Not applicable.

### Item 9A. Controls and Procedures

*Disclosure Controls and Procedures.* Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we performed an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Exchange Act Rules 13a-15 and 15d-15 as of the end of the period covered by this annual report. Based on that evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 31, 2009 to provide reasonable assurance that the information required to be disclosed by us in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and

Table of Contents

Index to Financial Statements

reported within the time periods specified in the rules and forms of the SEC, and such information is accumulated and communicated to management, as appropriate to allow timely decisions regarding required disclosure.

*Management's Report on Internal Control over Financial Reporting and Report of Independent Registered Public Accounting Firm* . The information required to be furnished pursuant to this item is set forth under the captions "Management's Report on Internal Control over Financial Reporting" and "Report of Independent Registered Public Accounting Firm" in Item 8 of this report.

*Changes in Internal Control over Financial Reporting.* There were no changes in our internal control over financial reporting during the quarter ended December 31, 2009 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### Item 9B. *Other Information*

Not applicable.

Table of Contents

Index to Financial Statements

## PART III

**Item 10.** ***Directors, Executive Officers and Corporate Governance***

The information required by this item is incorporated herein by reference to the following sections of our definitive proxy statement, which will be filed no later than April 30, 2010: "Director Biographical Information," "Executive Officers," "Compliance with Section 16(a) of the Exchange Act" and "Corporate Governance Matters."

**Item 11.** ***Executive Compensation***

The information required by this item is incorporated herein by reference to the following sections of our definitive proxy statement, which will be filed no later than April 30, 2010: "Director Compensation," "Outstanding Equity Awards" and "Executive Officers and Compensation."

**Item 12.** ***Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters***

The information required by this item is incorporated herein by reference to the following sections of our definitive proxy statement, which will be filed no later than April 30, 2010: "Equity Compensation Plan Information" and "Security Ownership of Certain Beneficial Owners and Management."

**Item 13.** ***Certain Relationships and Related Transactions and Director Independence***

The information required by this item is incorporated herein by reference to the following sections of our definitive proxy statement, which will be filed no later than April 30, 2010: "Related Party Transactions" and "Corporate Governance Matters."

**Item 14.** ***Principal Accountant Fees and Services***

The information required by this item is incorporated herein by reference to the section captioned "Ratification of Selection of Independent Registered Public Accounting Firm" in our definitive proxy statement, which will be filed no later than April 30, 2010.

Table of Contents

Index to Financial Statements

## PART IV

**Item 15.** ***Exhibits and Financial Statement Schedules***

The following documents are filed as a part of this report:

(1) *Consolidated Financial Statements*

Reference is made to the Index to Consolidated Financial Statements appearing on page F-1.

(2) *Financial Statement Schedules*

All financial statement schedules have been omitted because they are not applicable or the required information is presented in the consolidated financial statements or notes thereto.

(3) *Exhibits*

See Exhibit Index for a description of the exhibits filed as a part of this report.

[Table of Contents](#)

[Index to Financial Statements](#)

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS


| | Page(s) |
|---|---|
| **Management's Report on Internal Control Over Financial Reporting** | F-2 |
| **Report of Independent Registered Public Accounting Firm** | F-3 |
| Consolidated Balance Sheets at December 31, 2009 and 2008 | F-4 |
| Consolidated Statements of Operations for the Years Ended December 31, 2009, 2008 and 2007 | F-5 |
| Consolidated Statements of Changes in Stockholders' Equity for the Years Ended December 31, 2009, 2008 and 2007 | F-6 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2009, 2008 and 2007 | F-7 |
| Notes to Consolidated Financial Statements | F-8 |

Table of Contents

Index to Financial Statements

### Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

Based on our evaluation on criteria for effective internal control over financial reporting described in *Internal Control — Integrated Framework*, our management concluded, that as of December 31, 2009, our internal control over financial reporting was effective.

The effectiveness of our internal control over financial reporting as of December 31, 2009 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report that follows.

| | |
|---|---|
| /s/ TOM L. WARD | /s/ DIRK M. VAN DOREN |
| Tom L. Ward | Dirk M. Van Doren |
| President and Chief Executive Officer | Executive Vice President and Chief Financial Officer |

Table of Contents

Index to Financial Statements

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders of SandRidge Energy, Inc:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations, changes in stockholders' equity and of cash flows present fairly, in all material respects, the financial position of SandRidge Energy, Inc. and its subsidiaries at December 31, 2009 and 2008, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2009 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying "Management's Report on Internal Control Over Financial Reporting." Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our audits (which were integrated audits in 2009 and 2008). We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

As discussed in Note 1 to the consolidated financial statements, effective December 31, 2009, the Company has changed its reserve estimates and related disclosures as a result of adopting new oil and gas reserve estimation and disclosure requirements.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP

Houston, Texas
March 1, 2010

Table of Contents

Index to Financial Statements

## SandRidge Energy, Inc., and Subsidiaries
## Consolidated Balance Sheets

| | December 31, 2009 | December 31, 2008 |
|---|---|---|
| | (In thousands) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 7,861 | $ 636 |
| Accounts receivable, net: | | |
| Trade | 105,412 | 102,746 |
| Related parties | 64 | 6,327 |
| Derivative contracts | 105,994 | 201,111 |
| Inventories | 3,707 | 3,686 |
| Costs in excess of billings | 12,346 | — |
| Other current assets | 20,580 | 41,407 |
| Total current assets | 255,964 | 355,913 |
| Natural gas and oil properties, using full cost method of accounting | | |
| Proved | 5,913,408 | 4,676,072 |
| Unproved | 281,811 | 215,698 |
| Less: accumulated depreciation, depletion and impairment | (4,223,437) | (2,369,840) |
| | 1,971,782 | 2,521,930 |
| Other property, plant and equipment, net | 461,861 | 653,629 |
| Derivative contracts | — | 45,537 |
| Investments | — | 6,088 |
| Restricted deposits | 32,894 | 32,843 |
| Other assets | 57,816 | 39,118 |
| Total assets | $ 2,780,317 | $ 3,655,058 |
| **LIABILITIES AND EQUITY** | | |
| Current liabilities: | | |
| Current maturities of long-term debt | $ 12,003 | $ 16,532 |
| Accounts payable and accrued expenses: | | |
| Trade | 203,048 | 366,337 |
| Related parties | 860 | 230 |
| Derivative contracts | 7,080 | 5,106 |
| Asset retirement obligation | 2,553 | 275 |
| Billings in excess of costs incurred | — | 14,144 |
| Total current liabilities | 225,544 | 402,624 |
| Long-term debt | 2,566,935 | 2,358,784 |
| Other long-term obligations | 14,099 | 11,963 |
| Derivative contracts | 61,060 | 3,639 |
| Asset retirement obligation | 108,584 | 84,497 |
| Total liabilities | 2,976,222 | 2,861,507 |
| Commitments and contingencies (Note 18) | | |
| Equity: | | |
| SandRidge Energy, Inc., stockholders' equity: | | |
| Preferred stock, $0.001 par value, 50,000 shares authorized: | | |
| 8.5% Convertible perpetual preferred stock; 2,650 shares issued and outstanding at December 31, 2009 and no shares issued and outstanding at December 31, 2008; aggregate liquidation preference of $265,000 at December 31, 2009 | 3 | — |
| 6.0% Convertible perpetual preferred stock; 2,000 shares issued and outstanding at December 31, 2009 and no shares issued and outstanding at December 31, 2008; aggregate liquidation preference of $200,000 at December 31, 2009 | 2 | — |
| Common stock, $0.001 par value, 400,000 shares authorized; 210,581 issued and 208,715 outstanding at December 31, 2009 and 167,372 issued and 166,046 outstanding at December 31, 2008 | 203 | 163 |
| Additional paid-in capital | 2,961,613 | 2,170,986 |
| Treasury stock, at cost | (25,079) | (19,332) |
| Accumulated deficit | (3,142,699) | (1,358,296) |
| Total SandRidge Energy, Inc., stockholders' (deficit) equity | (205,957) | 793,521 |
| Noncontrolling interest | 10,052 | 30 |
| Total (deficit) equity | (195,905) | 793,551 |
| Total liabilities and equity | $ 2,780,317 | $ 3,655,058 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Consolidated Statements of Operations**

| | Years Ended December 31, 2009 | 2008 | 2007 |
|---|---|---|---|
| | (In thousands, except per share amounts) | | |
| Revenues: | | | |
| Natural gas and oil | $ 454,705 | $ 908,689 | $ 477,612 |
| Drilling and services | 23,902 | 47,199 | 73,197 |
| Midstream and marketing | 86,028 | 207,602 | 107,765 |
| Other | 26,409 | 18,324 | 18,878 |
| Total revenues | 591,044 | 1,181,814 | 677,452 |
| Expenses: | | | |
| Production | 169,285 | 159,004 | 106,192 |
| Production taxes | 4,010 | 30,594 | 19,557 |
| Drilling and services | 30,899 | 26,186 | 44,211 |
| Midstream and marketing | 78,684 | 186,655 | 94,253 |
| Depreciation and depletion — natural gas and oil | 176,027 | 290,917 | 173,568 |
| Depreciation, depletion and amortization — other | 50,865 | 70,448 | 53,541 |
| Impairment | 1,707,150 | 1,867,497 | — |
| General and administrative | 100,256 | 109,372 | 61,780 |
| Gain on derivative contracts | (147,527) | (211,439) | (60,732) |
| Loss (gain) on sale of assets | 26,419 | (9,273) | (1,777) |
| Total expenses | 2,196,068 | 2,519,961 | 490,593 |
| (Loss) income from operations | (1,605,024) | (1,338,147) | 186,859 |
| Other income (expense): | | | |
| Interest income | 375 | 3,569 | 4,694 |
| Interest expense | (185,691) | (147,027) | (117,185) |
| Income from equity investments | 1,020 | 1,398 | 4,372 |
| Other income, net | 7,272 | 1,454 | 729 |
| Total other (expense) income | (177,024) | (140,606) | (107,390) |
| (Loss) income before income tax (benefit) expense | (1,782,048) | (1,478,753) | 79,469 |
| Income tax (benefit) expense | (8,716) | (38,328) | 29,524 |
| Net (loss) income | (1,773,332) | (1,440,425) | 49,945 |
| Less: net income (loss) attributable to noncontrolling interest | 2,258 | 855 | (276) |
| Net (loss) income attributable to SandRidge Energy, Inc. | (1,775,590) | (1,441,280) | 50,221 |
| Preferred stock dividends and accretion | 8,813 | 16,232 | 39,888 |
| (Loss applicable) income available to SandRidge Energy, Inc., common stockholders | $ (1,784,403) | $(1,457,512) | $ 10,333 |
| Basic and Diluted Earnings Per Share: | | | |
| Net (loss) income attributable to SandRidge Energy, Inc. | $ (10.15) | $ (9.26) | $ 0.46 |
| Preferred stock dividends | (0.05) | (0.10) | (0.37) |
| Basic and diluted (loss) income per share (applicable) available to SandRidge Energy, Inc., common stockholders | $ (10.20) | $ (9.36) | $ 0.09 |
| Weighted average number of common shares outstanding: | | | |
| Basic | 175,005 | 155,619 | 108,828 |
| Diluted | 175,005 | 155,619 | 110,041 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

Index to Financial Statements

# SandRidge Energy, Inc., and Subsidiaries
## Consolidated Statements of Changes in Stockholders' Equity

| | SandRidge Energy, Inc., Stockholders | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Convertible Perpetual Preferred Stock | | Common Stock | | Additional Paid-In Capital | Treasury Stock | Retained Earnings (Accumulated Deficit) | Noncontrolling Interest | Total |
| | Shares | Amount | Shares | Amount | | | | | |
| | (In thousands) | | | | | | | | |
| Balance, December 31, 2006 | — | $ — | 91,604 | $ 92 | $ 574,868 | $(17,835) | $ 92,693 | $ 5,092 | $ 654,910 |
| Distributions to noncontrolling interest owners | — | — | — | — | — | — | — | (144) | (144) |
| Stock offerings, net of $4.5 million in offering costs | — | — | 50,160 | 50 | 1,113,314 | — | — | — | 1,113,364 |
| Conversion of common stock to redeemable convertible preferred stock | — | — | (526) | (1) | (9,650) | — | — | — | (9,651) |
| Accretion on redeemable convertible preferred stock | — | — | — | — | — | — | (1,421) | — | (1,421) |
| Purchase of treasury stock | — | — | — | (1) | — | (1,660) | — | — | (1,661) |
| Common stock issued under retirement plans | — | — | 32 | — | 379 | 917 | — | — | 1,296 |
| Stock-based compensation | — | — | — | — | 7,202 | — | — | — | 7,202 |
| Issuance of restricted stock awards, net of cancellations | — | — | 573 | — | — | — | — | — | — |
| Net income (loss) | — | — | — | — | — | — | 50,221 | (276) | 49,945 |
| Redeemable convertible preferred stock dividends | — | — | — | — | — | — | (42,277) | — | (42,277) |
| Balance, December 31, 2007 | — | — | 141,843 | 140 | 1,686,113 | (18,578) | 99,216 | 4,672 | 1,771,563 |
| Distributions to noncontrolling interest owners | — | — | — | — | — | — | — | (5,497) | (5,497) |
| Accretion on redeemable convertible preferred stock | — | — | — | — | — | — | (7,636) | — | (7,636) |
| Conversion of redeemable convertible preferred stock | — | — | 22,276 | 23 | 458,328 | — | — | — | 458,351 |
| Purchase of treasury stock | — | — | — | — | — | (3,553) | — | — | (3,553) |
| Common stock issued under retirement plans | — | — | 211 | — | 3,167 | 2,799 | — | — | 5,966 |
| Stock-based compensation | — | — | — | — | 18,784 | — | — | — | 18,784 |
| Stock-based compensation excess tax benefit | — | — | — | — | 4,594 | — | — | — | 4,594 |
| Issuance of restricted stock awards, net of cancellations | — | — | 1,716 | — | — | — | — | — | — |
| Net (loss) income | — | — | — | — | — | — | (1,441,280) | 855 | (1,440,425) |
| Redeemable convertible preferred stock dividends | — | — | — | — | — | — | (8,596) | — | (8,596) |
| Balance, December 31, 2008 | — | — | 166,046 | 163 | 2,170,986 | (19,332) | (1,358,296) | 30 | 793,551 |
| Distributions to noncontrolling interest owners | — | — | — | — | — | — | — | (26) | (26) |
| Consolidation of Grey Ranch L.P. | — | — | — | — | — | — | — | 7,790 | 7,790 |
| Issuance of convertible perpetual preferred stock | 4,650 | 5 | — | — | 443,205 | — | — | — | 443,210 |
| Issuance of common stock | — | — | 40,080 | 40 | 324,790 | — | — | — | 324,830 |
| Purchase of treasury stock | — | — | — | — | — | (1,494) | — | — | (1,494) |
| Stock purchase — retirement plans | — | — | (373) | — | (602) | (4,253) | — | — | (4,855) |
| Stock-based compensation | — | — | — | — | 27,098 | — | — | — | 27,098 |
| Stock-based compensation excess tax benefit | — | — | — | — | (3,864) | — | — | — | (3,864) |
| Issuance of restricted stock awards, net of cancellations | — | — | 2,962 | — | — | — | — | — | — |
| Net (loss) income | — | — | — | — | — | — | (1,775,590) | 2,258 | (1,773,332) |
| Convertible perpetual preferred stock dividends | — | — | — | — | — | — | (8,813) | — | (8,813) |
| Balance, December 31, 2009 | 4,650 | $ 5 | 208,715 | $ 203 | $ 2,961,613 | $(25,079) | $ (3,142,699) | $ 10,052 | $ (195,905) |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

Index to Financial Statements

## SandRidge Energy, Inc., and Subsidiaries
## Consolidated Statements of Cash Flows

| | Years Ended December 31, 2009 | 2008 | 2007 |
|---|---|---|---|
| | | (In thousands) | |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| Net (loss) income | $ (1,773,332) | $ (1,440,425) | $ 49,945 |
| Adjustments to reconcile net (loss) income to net cash provided by operating activities: | | | |
| Provision for doubtful accounts | 214 | 1,748 | — |
| Depreciation, depletion and amortization | 226,892 | 361,365 | 227,109 |
| Impairment | 1,707,150 | 1,867,497 | — |
| Debt issuance costs amortization | 7,477 | 5,623 | 15,998 |
| Discount amortization on long-term debt | 990 | — | — |
| Deferred income taxes | — | (47,530) | 28,923 |
| Provision for inventory obsolescence | — | — | 203 |
| Unrealized loss (gain) on derivative contracts | 200,049 | (215,675) | (26,238) |
| Loss (gain) on sale of assets | 26,419 | (9,273) | (1,777) |
| Interest income — restricted deposits | (51) | (402) | (1,354) |
| Income from equity investments | (1,020) | (1,398) | (4,372) |
| Stock-based compensation | 22,793 | 18,784 | 7,202 |
| Changes in operating assets and liabilities increasing (decreasing) cash: | | | |
| Receivables | 8,760 | 3,735 | (19,061) |
| Inventories | 61 | 307 | (1,730) |
| Other current assets | 20,827 | (20,603) | 12,374 |
| Other assets and liabilities, net | (26,937) | 14,271 | (5,069) |
| Accounts payable and accrued expenses | (108,733) | 41,165 | 75,299 |
| Net cash provided by operating activities | 311,559 | 579,189 | 357,452 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | |
| Capital expenditures for property, plant and equipment | (715,205) | (2,058,415) | (1,280,848) |
| Acquisitions of assets | (795,074) | — | (116,650) |
| Proceeds from sale of assets | 263,220 | 158,781 | 9,034 |
| Contributions on equity investments | — | (1,528) | — |
| Loans to equity investees | — | (7,500) | — |
| Refunds of restricted deposits | — | — | 10,328 |
| Fundings of restricted deposits | — | (781) | (7,445) |
| Net cash used in investing activities | (1,247,059) | (1,909,443) | (1,385,581) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| Proceeds from borrowings | 2,619,607 | 3,252,209 | 1,331,541 |
| Repayments of borrowings | (2,416,975) | (1,944,542) | (1,332,219) |
| Dividends paid-redeemable convertible preferred | — | (17,552) | (33,321) |
| Noncontrolling interest distributions | (26) | (5,497) | (144) |
| Proceeds from issuance of common stock | 324,830 | — | 1,114,660 |
| Proceeds from issuance of convertible perpetual preferred stock | 443,210 | — | — |
| Stock-based compensation excess tax benefit | (3,864) | 4,594 | — |
| Purchase of treasury stock | (5,747) | (3,553) | (1,661) |
| Debt issuance costs | (18,310) | (17,904) | (26,540) |
| Net cash provided by financing activities | 942,725 | 1,267,755 | 1,052,316 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 7,225 | (62,499) | 24,187 |
| CASH AND CASH EQUIVALENTS, beginning of year | 636 | 63,135 | 38,948 |
| CASH AND CASH EQUIVALENTS, end of year | $ 7,861 | $ 636 | $ 63,135 |
| Supplemental Disclosure of Cash Flow Information: | | | |
| Cash paid for interest, net of amounts capitalized | $ 171,994 | $ 131,183 | $ 83,567 |
| Cash paid for income taxes | 2,908 | 2,191 | 2,371 |
| Supplemental Disclosure of Noncash Investing and Financing Activities: | | | |
| Change in accrued capital expenditures | $ (70,063) | $ 119,432 | $ — |
| Convertible perpetual preferred stock dividends payable | 8,813 | — | — |
| Redeemable convertible preferred stock dividends, net of dividends paid | — | — | 8,956 |
| Insurance premium financed | — | — | 1,496 |
| Accretion on redeemable convertible preferred stock | — | 7,636 | 1,421 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements**

**1. Summary of Significant Accounting Policies**

*Nature of Business.* SandRidge Energy, Inc. (including its subsidiaries, collectively, the “Company” or “SandRidge”) is an independent natural gas and oil company concentrating on exploration, development and production activities. The Company also owns and operates natural gas gathering and treating facilities and carbon dioxide (“$CO_2$”) treating and transportation facilities and has marketing and tertiary oil recovery operations. In addition, Lariat Services, Inc. (“Lariat”), a wholly owned subsidiary of the Company, owns and operates drilling rigs and a related oil field services business. The Company’s primary exploration, development and production areas are concentrated in West Texas. The Company also operates interests in the Mid-Continent, the Cotton Valley Trend in East Texas, the Gulf Coast and the Gulf of Mexico.

*Principles of Consolidation.* The consolidated financial statements include the accounts of SandRidge Energy, Inc. and its wholly owned or majority owned subsidiaries and a variable interest entity for which the Company is the primary beneficiary. All significant intercompany accounts and transactions have been eliminated in consolidation.

*Reclassifications.* Certain reclassifications have been made to prior period financial statements to conform to the current period presentation.

*Use of Estimates.* The preparation of the consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Estimates of natural gas and oil reserves and their values, future production rates and future costs and expenses are inherently uncertain for numerous reasons, including many factors beyond the Company’s control. Reservoir engineering is a subjective process of estimating underground accumulations of natural gas and oil that cannot be measured in an exact manner. The accuracy of any reserve estimate is a function of the quality of data available and of engineering and geological interpretation and judgment. In addition, estimates of reserves may be revised based on actual production, results of subsequent exploration and development activities, prevailing commodity prices, operating costs and other factors. These revisions may be material and could materially affect the Company’s future depletion, depreciation and amortization expenses.

*Risks and Uncertainties.* The Company’s revenue, profitability and future growth are substantially dependent upon the prevailing and future prices for natural gas and oil, each of which depend on numerous factors beyond the Company’s control such as economic conditions, regulatory developments and competition from other energy sources. The energy markets historically have been volatile and natural gas and oil prices in 2009 were substantially lower than in 2008 and 2007, and may be subject to significant fluctuations in the future. The Company’s derivative arrangements serve to mitigate a portion of the effect of this price volatility on the Company’s cash flows, and while derivative contracts for the majority of expected 2010, 2011 and 2012 oil production are in place, there are no fixed price swap contracts in place for the Company’s natural gas production beyond 2010. See Note 14 for the Company’s open natural gas and oil commodity derivative contracts. In addition, the Company will need to incur capital expenditures in 2010 in order to achieve production targets required to meet its commitments to deliver gas under certain gathering and treating arrangements. The Company is dependent on availability under its senior credit facility, along with cash flows from operating activities, to fund those capital expenditures. Based on anticipated natural gas and oil prices and availability under its senior credit facility, the Company expects to be able to fund its planned capital expenditures for 2010. However, a substantial or extended decline in natural gas and oil prices could have a material adverse effect on the

Table of Contents

Index to Financial Statements



Company's financial position, results of operations, cash flows and quantities of natural gas and oil reserves that may be economically produced, and could impact the Company's ability to comply with the financial covenants under the senior credit facility, which in turn would limit further borrowings to fund capital expenditures. See Note 12 for discussion of the financial covenants.

*Cash and Cash Equivalents.* The Company considers all highly-liquid instruments with a maturity of three months or less when purchased to be cash equivalents as these instruments are readily convertible to known amounts of cash and bear insignificant risk of changes in value due to their short maturity period.

*Accounts Receivable, Net.* The Company has receivables for sales of natural gas, oil and natural gas liquids, as well as receivables related to the exploration and treating services for natural gas, oil and natural gas liquids. Management has established an allowance for doubtful accounts. The allowance is evaluated by management and is based on management's review of the collectability of the receivables in light of historical experience, the nature and volume of the receivables and other subjective factors.

*Inventories.* Inventories consist of oil field services supplies and are stated at the lower of cost or market with cost determined on an average cost basis.

*Investments.* Investments in affiliated companies are accounted for under the equity method in circumstances where the Company is deemed to exercise significant influence over the operating and investing policies of the investee but does not have control. Under the equity method, the Company recognizes its share of the investee's earnings in its consolidated statements of operations. Investments in affiliated companies not accounted for under the equity method are accounted for under the cost method. See Note 7. Investments in marketable equity securities have been designated as available for sale and measured at fair value pursuant to the fair value option which requires unrealized gains and losses be reported in earnings.

*Debt Issuance Costs.* The Company amortizes debt issuance costs related to its long-term debt as interest expense over the scheduled maturity period of the debt. Unamortized debt issuance costs were $49.1 million as of December 31, 2009 and $38.2 million as of December 31, 2008. The Company includes these unamortized costs in other assets in its consolidated balance sheets.

*Revenue Recognition and Gas Balancing.* Natural gas and oil revenues are recorded when title passes to the customer, net of royalties, discounts and allowances, as applicable. The Company accounts for natural gas and oil production imbalances using the sales method, whereby the Company recognizes revenue on all natural gas and oil sold to its customers notwithstanding the fact that its ownership may be less than 100% of the natural gas and oil sold. Liabilities are recorded by the Company for imbalances greater than the Company's proportionate share of remaining estimated natural gas and oil reserves. The Company has recorded a liability for gas imbalance positions related to natural gas properties with insufficient proved reserves of $1.9 million and $1.7 million at December 31, 2009 and 2008, respectively. The Company includes the gas imbalance positions in other long-term obligations in its consolidated balance sheets.

The Company recognizes revenues and expenses generated from day work drilling contracts as the services are performed as the Company does not bear the risk of completion of the well. The Company may receive lump-sum fees for the mobilization of equipment and personnel. Mobilization fees received and costs incurred to mobilize a rig from one market to another are recognized over the term of the related drilling contract. The contract terms typically range from 20 to 90 days.

Midstream gas services are primarily undertaken to realize incremental margins on gas purchased at the wellhead, and provide value-added services to customers. Consolidated midstream and marketing revenues represent natural gas sold on behalf of third parties and the fees the Company charges related to gathering,

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

compressing and treating this gas. In general, natural gas purchased and sold by the midstream gas business is priced at a published daily or monthly index price. Sales to wholesale customers typically incorporate a premium for managing their transmission and balancing requirements. Revenues are recognized upon delivery of natural gas to customers and/or when services are rendered, pricing is determined and collectability is reasonably assured.

Revenue from sales of $CO_2$ is recognized when the product is delivered to the customer. The Company recognizes service fees related to the transportation of $CO_2$ as revenue when the related service is provided.

*Environmental Costs.* Environmental expenditures are expensed or capitalized, as appropriate, depending on future economic benefit. Expenditures that relate to an existing condition caused by past operations and that have no future economic benefit are expensed. Liabilities related to future costs are recorded on an undiscounted basis when environmental assessments and/or remediation activities are probable and costs can be reasonably estimated. Environmental costs accrued at December 31, 2009 and 2008 were not material.

*Natural Gas and Oil Operations.* The Company uses the full cost method to account for its natural gas and oil properties. Under full cost accounting, all costs directly associated with the acquisition, exploration and development of natural gas and oil reserves are capitalized into a full cost pool. These capitalized costs include costs of all unproved properties, internal costs directly related to the Company's acquisition, exploration and development activities and capitalized interest. During 2009, the Company capitalized internal costs of $22.3 million to the full cost pool, including $4.3 million of stock compensation. During 2008, the Company capitalized internal costs of $19.1 million to the full cost pool. The Company did not capitalize any interest expense to the full cost pool in 2009 or 2008. During 2007, the Company capitalized internal costs and interest expense of $4.6 million and $0.3 million, respectively, to the full cost pool. There was no stock compensation capitalized in 2008 or 2007.

Capitalized costs are amortized using a unit-of-production method. Under this method, the provision for depreciation, depletion and amortization is computed at the end of each quarter by multiplying total production for the quarter by a depletion rate. The depletion rate is determined by dividing the total unamortized cost base plus future development costs by net equivalent proved reserves at the beginning of the quarter.

Costs associated with unproved properties are excluded from the amortizable cost base until a determination has been made as to the existence of proved reserves. Unproved properties are reviewed at the end of each quarter to determine whether the costs incurred should be reclassified to the full cost pool and, thereby, subjected to amortization. Sales and abandonments of natural gas and oil properties being amortized are accounted for as adjustments to the full cost pool, with no gain or loss recognized, unless the adjustments would significantly alter the relationship between capitalized costs and proved natural gas and oil reserves. A significant alteration would not ordinarily be expected to occur upon the sale of reserves involving less than 25% of the reserve quantities of a cost center.

Under the full cost method of accounting, total capitalized costs of natural gas and oil properties, net of accumulated depreciation, depletion and amortization, less related deferred income taxes may not exceed an amount equal to the present value of future net revenues from proved reserves, discounted at 10% per annum, plus the lower of cost or fair value of unevaluated properties, plus estimated salvage value, less the related tax effects (the "ceiling limitation"). A ceiling limitation calculation is performed at the end of each quarter. If total capitalized costs, net of accumulated depreciation, depletion and amortization, less related deferred taxes are greater than the ceiling limitation, a write-down or impairment of the full cost pool is required. A write-down of the carrying value of the full cost pool is a non-cash charge that reduces earnings and impacts stockholders' equity in the period of occurrence and typically results in lower depreciation, depletion and amortization expense in future periods. Once incurred, a write-down is not reversible at a later date. See Note 8.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

For year end December 31, 2009, the ceiling limitation calculation used a 12-month natural gas and oil average, as adjusted for basis or location differentials using a 12-month average, and held constant over the life of the reserves ("net wellhead prices"). For prior periods, the ceiling limitation calculation used natural gas and oil prices in effect as of the balance sheet date, as adjusted for basis or location differentials as of the balance sheet date, and held constant over the life of the reserves. If applicable, these net wellhead prices would be further adjusted to include the effects of any fixed price arrangements for the sale of natural gas and oil. The Company may, from time-to-time, use derivative financial instruments to hedge against the volatility of natural gas and oil prices. Derivative contracts that qualify and are designated as cash flow hedges are included in estimated future cash flows. Historically, the Company has not designated any of its derivative contracts as cash flow hedges and has therefore not included its derivative contracts in estimating future cash flows. The future cash outflows associated with future development or abandonment of wells are included in the computation of the discounted present value of future net revenues for purposes of the ceiling limitation calculation.

The costs associated with unproved properties, initially excluded from the amortization base, relate to unproved leasehold acreage, wells and production facilities in progress and wells pending determination of the existence of proved reserves, together with capitalized interest costs for these projects. Unproved leasehold costs are transferred to the amortization base with the costs of drilling the related well once a determination of the existence of proved reserves has been made or upon impairment of a lease. Costs of seismic data are allocated to various unproved leaseholds and transferred to the amortization base with the associated leasehold costs on a specific project basis. Costs associated with wells in progress and completed wells that have yet to be evaluated are transferred to the amortization base once a determination is made whether or not proved reserves can be assigned to the property. Costs of dry wells are transferred to the amortization base immediately upon determination that the well is unsuccessful.

All items classified as unproved property are assessed on a quarterly basis for possible impairment or reduction in value. Properties are assessed on an individual basis or as a group if properties are individually insignificant. The assessment includes consideration of various factors, including, but not limited to, the following: intent to drill; remaining lease term; geological and geophysical evaluations; drilling results and activity; assignment of proved reserves; and economic viability of development if proved reserves are assigned. During any period in which these factors indicate an impairment, the cumulative drilling costs incurred to date for such property and all or a portion of the associated leasehold costs are transferred to the full cost pool and become subject to amortization.

*Property, Plant and Equipment, Net.* Other capitalized costs, including drilling equipment, natural gas gathering and treating equipment, transportation equipment and other property and equipment are carried at cost. Renewals and improvements are capitalized while repairs and maintenance are expensed. Depreciation of such property and equipment is computed using the straight-line method over the estimated useful lives of the assets ranging from 3 to 39 years.

Realization of the carrying value of property and equipment is reviewed for possible impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Assets are considered to be impaired if a forecast of undiscounted estimated future net operating cash flows directly related to the asset including disposal value, if any, is less than the carrying amount of the asset. If any asset is considered impaired, the loss is measured as the amount by which the carrying amount of the asset exceeds its fair value.

When property and equipment components are disposed of, the cost and the related accumulated depreciation are removed and any resulting gain or loss is reflected in the consolidated statements of operations.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

*Asset Retirement Obligation.* The Company owns natural gas and oil properties that require expenditures to plug and abandon the wells when the natural gas and oil reserves in the wells are depleted. These expenditures are recorded in the period in which the liability is incurred (at the time the wells are drilled or acquired). Asset retirement obligations are recorded as a liability at their estimated present value at the asset's inception, with the offsetting increase to property cost. Periodic accretion expense of the estimated liability is recorded in the consolidated statements of operations.

Asset retirement obligations primarily represent the Company's estimate of fair value to plug, abandon and remediate the natural gas and oil properties at the end of their productive lives, in accordance with applicable state laws. The Company determines its asset retirement obligations by calculating the present value of estimated expenses related to the liability. Estimating the future asset retirement obligations requires management to make estimates and judgments regarding timing, existence of a liability and what constitutes adequate restoration. Inherent in the present value calculation rates are the timing of settlement and changes in the legal, regulatory, environmental and political environments. The following shows the activity of the asset retirement obligation for the years ended December 31 (in thousands).

| | 2009 | 2008 | 2007 |
|---|---|---|---|
| Asset retirement obligation, January 1 | $ 84,772 | $ 58,580 | $ 45,216 |
| Liability incurred upon acquiring and drilling wells | 14,537 | 5,707 | 3,265 |
| Revisions in estimated cash flows | 10,831 | 15,976 | 5,971 |
| Liability settled in current period | (6,111) | (764) | (9) |
| Accretion of discount expense | 7,108 | 5,273 | 4,137 |
| Asset retirement obligation, December 31 | 111,137 | 84,772 | 58,580 |
| Less: current portion | 2,553 | 275 | 864 |
| Asset retirement obligation, net of current | $108,584 | $ 84,497 | $57,716 |

The revisions in estimated cash flows for 2009 and 2008 are primarily due to changes in reserve lives based on lower natural gas and oil prices used to determine reserves at December 31, 2009 and 2008. Due to hurricane damage, certain non-operated offshore platforms were plugged and abandoned during 2009 in advance of anticipated timelines.

*Income Taxes.* Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax reporting. Deferred tax assets are reduced by a valuation allowance if a determination is made that it is more likely than not that some or all of the deferred assets will not be realized based on the weight of all available evidence.

The Company has elected an accounting policy in which interest and penalties on income taxes are presented as a component of the income tax provision, rather than as a component of interest expense. Interest and penalties resulting from the underpayment of or the late payment of income taxes due to a taxing authority and interest and penalties accrued relating to income tax contingencies, if any, are presented, on a net of tax basis, as a component of the income tax provision.

*Noncontrolling Interest.* Effective January 1, 2009, the Company implemented the guidance in ASC Topic 810, Consolidation, which resulted in changes to the presentation for noncontrolling interests. Noncontrolling interest in the Company's subsidiaries represents ownership interests in the consolidated entity and is included as a component of equity in the consolidated balance sheets and consolidated statement of changes in equity as required by ASC Topic 810, Consolidation. All historical periods presented in the accompanying consolidated financial statements reflect these changes to the presentation for noncontrolling interests.

Table of Contents

Index to Financial Statements



During October 2009, the Company executed amendments to certain agreements related to the ownership and operation of Grey Ranch Plant, LP (“GRLP”), the limited partnership that operates the Grey Ranch Plant located in Pecos County, Texas. As a result of these amendments, the Company became the primary beneficiary of GRLP. The Company began consolidating the activity of GRLP in its consolidated financial statements prospectively on the effective date of the amendments, or October 1, 2009. The 50% ownership interest not held by the Company is presented as noncontrolling interest on the consolidated financial statements at December 31, 2009.

At December 31, 2009, 2008 and 2007, noncontrolling interest in the Company’s consolidated subsidiaries included a 1.29% interest in Cholla Pipeline, LP. At December 31, 2007, noncontrolling interest in the Company’s consolidated subsidiaries also included a 26.19% interest in Sagebrush Pipeline, LLC (“Sagebrush”). As a result of the sale of Sagebrush’s assets in May 2008, the noncontrolling interest in Sagebrush was distributed. See Note 2.

*Concentration of Risk.* The Company maintains cash balances at several financial institutions. Accounts at each institution are insured by the Federal Deposit Insurance Corporation up to $250,000. From time to time, the Company may have balances in these accounts that exceed the federally insured limit. The Company does not anticipate any loss associated with balances in excess of the federally insured limit.

All of the Company’s hedging transactions have been carried out in the over-the-counter market. The use of hedging transactions involves the risk that the counterparties may be unable to meet the financial terms of the transactions. The counterparties for all of the Company’s hedging transactions have an “investment grade” credit rating. The Company monitors on an ongoing basis the credit ratings of its hedging counterparties and considers its counterparties’ credit default risk rating in determining the fair value of its derivative contracts. The weighted average credit default swap rate for our counterparties was 0.3% and 2.3% at December 31, 2009 and 2008, respectively.

The purchasers of the Company’s natural gas and oil production consist primarily of independent marketers, major oil and natural gas companies and gas pipeline companies. The Company has not experienced any significant losses from uncollectible accounts. In 2009, 2008 and 2007, the Company had one individual purchaser accounting for 20.0%, 10.5% and 11.2%, respectively, of its total sales. The Company believes other purchasers are available in its areas of operations and does not believe the loss of any one of its purchasers would materially affect the Company’s ability to sell the natural gas and oil it produces.

*Fair Value of Financial Instruments.* The Company’s financial instruments, not otherwise recorded at fair value, consist primarily of cash, trade receivables, trade payables and long-term debt. The carrying value of cash, trade receivables and trade payables are considered to be representative of their respective fair values due to the short-term maturity of these instruments. See Note 3 for discussion of the Company’s derivative contracts and long-term debt.

*Derivative Financial Instruments.* To manage risks related to increases in interest rates and changes in natural gas and oil prices, the Company enters into interest rate swaps and natural gas and oil derivative contracts.

The Company recognizes all of its derivative instruments as either assets or liabilities at fair value. The accounting for changes in the fair value (i.e., gains or losses) of a derivative instrument depends on whether it has been designated and qualifies as part of a hedging relationship, and further, on the type of hedging relationship. For those derivative instruments that are designated and qualify as hedging instruments, the Company designates the hedging instrument, based on the exposure being hedged, as either a fair value hedge or a cash flow hedge.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

For derivative instruments not designated as hedging instruments, the gain or loss is recognized in current earnings during the period of change. None of the Company's derivatives was designated as hedging instruments during 2009, 2008 and 2007.

*Stock-Based Compensation.* ASC Topic 718, Compensation — Stock Compensation, establishes the accounting for equity instruments exchanged for employee services. Under ASC Topic 718, stock-based compensation cost is measured based on the calculated fair value of the award on the grant date. The expense is recognized on a straight-line basis over the employee's requisite service period, generally the vesting period of the award. The related excess tax benefit received upon exercise of stock options or vesting of restricted stock, if any, is reflected in the statement of cash flows as a financing activity. The related excess tax expense due upon exercise of stock options or vesting of restricted stock, if any, is reflected in the statement of cash flows as an operating activity.

*Recently Adopted Accounting Pronouncements.* In December 2007, the FASB issued new guidance establishing accounting and reporting standards for ownership interests in subsidiaries held by parties other than the parent, the amount of consolidated net income attributable to the parent and to the noncontrolling interest, changes in a parent's ownership interest and the valuation of retained noncontrolling equity investments when a subsidiary is deconsolidated. This new guidance, included in ASC Topic 810, Consolidation, also establishes disclosure requirements to clearly identify and distinguish between the interests of the parent and the interests of the noncontrolling owners. Effective January 1, 2009, the Company implemented the new guidance, which resulted in changes to the presentation for noncontrolling interests. This implementation did not have a material impact on the Company's financial position or results of operations. All historical periods presented in the accompanying consolidated financial statements reflect these changes to the presentation for noncontrolling interests. See Note 20.

In February 2008, the FASB issued guidance that delayed the effective date of certain requirements under ASC Topic 820, Fair Value Measurements and Disclosures, to fiscal years beginning after November 15, 2008 for all nonfinancial assets and liabilities except those recognized or disclosed at fair value in the financial statements on a recurring basis, at least annually. Effective January 1, 2009, the Company began following ASC Topic 820 for all nonfinancial assets and liabilities. This implementation did not have a material impact on the Company's financial position or results of operations.

In March 2008, the FASB issued new guidance regarding disclosures in ASC Topic 815, Derivatives and Hedging, which requires expanded disclosures to provide greater transparency about (i) how and why an entity uses derivative instruments, (ii) how derivative instruments and related hedge items are accounted for under ASC Topic 815, and (iii) how derivative instruments and related hedged items affect an entity's financial position, results of operations and cash flows. ASC Topic 815 requires qualitative disclosures about objectives and strategies for using derivatives, quantitative disclosures about fair value amounts of gains and losses on derivative instruments and disclosures about credit risk-related contingent features in derivative agreements. The new guidance regarding disclosures in ASC Topic 815 became effective for the Company on January 1, 2009 and did not have a material impact on its financial position or results of operations. See Note 14.

In April 2009, the FASB amended ASC Topic 825, Financial Instruments, to require publicly traded companies to provide disclosures about fair value of financial instruments in interim financial information as well as in annual financial statements. Under ASC Topic 825, entities must disclose, in the body or in the accompanying notes of its summarized financial information for interim reporting periods and in its financial statements for annual reporting periods, the fair value of all financial instruments for which it is practicable to estimate the value, whether or not recognized in the statement of financial position. The amendment to ASC Topic 825 became effective for the Company in the quarter ended June 30, 2009 and had no impact on the Company's financial position or results of operations. See Note 3.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

In May 2009, the FASB issued guidance in ASC Topic 855, Subsequent Events, to establish general standards of accounting for, and disclosure of, events that occur after the balance sheet date but before financial statements are issued or available to be issued. In particular, ASC Topic 855 sets forth the period after the balance sheet date during which management of a reporting entity should evaluate events or transactions that may occur for potential recognition or disclosure in the financial statements for both interim and annual financial statements. The Company has applied the provisions of ASC Topic 855 to its consolidated interim and annual financial statements for periods ended after June 15, 2009. See Note 22.

In June 2009, the FASB issued Accounting Standards Update 2009-01, “The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles — a replacement of FASB Statement No. 162” (“ASU 2009-01”). The FASB ASC is intended to be the source of authoritative GAAP and reporting standards as issued by the FASB. The primary purpose of the FASB ASC is to improve clarity and use of existing standards by grouping authoritative literature under common topics. ASU 2009-01 is effective for financial statements issued for interim and annual periods ending after September 15, 2009. The Codification does not change or alter existing GAAP. The implementation of ASU 2009-01 had no impact to the Company’s financial position or results of operations.

In January 2010, the FASB issued Accounting Standards Update 2010-03 (“ASU 2010-03”) to align the oil and gas reserve estimation and disclosure requirements of ASC Topic 932, Extractive Industries — Oil and Gas, with the requirements in the Securities and Exchange Commission’s final rule, *Modernization of the Oil and Gas Reporting Requirements,* which was issued on December 31, 2008 and was effective for the year ended December 31, 2009. The *Modernization of the Oil and Gas Reporting Requirements* was designed to modernize and update the oil and gas disclosure requirements to align with current practices and changes in technology. Key provisions of ASU 2010-03 are as follows:

The new rules require reserve estimates to be calculated using a 12-month average price. The 12-month average price is also required to be used for purposes of calculating the full cost ceiling limitations. Price changes can still be incorporated to the extent defined by contractual arrangements. The use of a 12-month average price rather than a single-day price is intended to reduce the impact on reserve estimates and the full cost ceiling limitations due to short-term volatility and seasonality of prices.

The new rules amend the definition of lowest known hydrocarbon to permit the use of new reliable technologies to establish the reasonable certainty of proved reserves. Also included in the new rules are provisions for establishing levels of lowest known hydrocarbons and highest known oil through reliable technology other than well penetrations.

The new rules also amend the definition of proved oil and gas reserves to include reserves located beyond development spacing areas that are immediately adjacent to developed spacing areas if economic producibility can be established with reasonable certainty. This is designed to permit the use of alternative technologies to establish proved reserves in lieu of requiring companies to use specific tests. In addition, a uniform standard of reasonable certainty that applies to all proved reserves, regardless of location or distance from producing wells, was established.

The new rules permit disclosure of probable and possible reserves and provide definitions of probable reserves and possible reserves. Disclosure of probable and possible reserves is optional. However, such disclosure must meet specific requirements. Disclosures of probable and possible reserves must provide the same level of geographical detail as proved reserves and must state whether the reserves are developed or undeveloped. Probable and possible reserve disclosures must also provide the relative uncertainty associated with these classifications of reserves estimations.

Table of Contents

Index to Financial Statements



The new rules require disclosure of additional details on proved undeveloped reserves, including the total quantity of proved undeveloped reserves at year end, any material changes to proved undeveloped reserves that occurred during the year, investments and progress made to convert proved undeveloped reserves to developed oil and gas reserves and an explanation of the reasons why concentrations of proved undeveloped reserves in individual fields or countries have remained undeveloped for five years or more after disclosure as proved undeveloped reserves.

The new rules require the qualifications and measures taken to assure the independence and objectivity of any business entity or employee primarily responsible for preparing or auditing the reserve estimates be reported.

The Company implemented ASU 2010-03 prospectively as a change in accounting principle inseparable from a change in accounting estimate at December 31, 2009. The Company has not determined reserve levels at December 31, 2009 under the previous accounting rules due to the operational and technical challenges of preparing reserve reports under two sets of rules and therefore it is not practicable to determine the impact of adopting this accounting principle.

*Recently Issued Accounting Principles Not Yet Adopted.* In December 2009, the FASB issued Accounting Standards Update 2009-16, "Transfers and Servicing — Accounting for Transfers of Financial Assets," ("ASU 2009-16") which codifies FASB Statement No. 166, "Accounting for Transfers of Financial Assets, an amendment of FASB Statement No. 140". ASU 2009-16, among other things, eliminates the concept of a "qualifying special-purpose entity," changes the requirements for derecognizing financial assets, and requires additional disclosures about transfers of financial assets. ASU 2009-16 is effective for annual reporting periods beginning after November 15, 2009. ASU 2009-16 is not anticipated to impact the Company's financial position or results of operations.

In December 2009, the FASB issued Accounting Standards Update 2009-17, "Consolidations — Improvements to Financial Reporting by Enterprises Involved with Variable Interest Entities" ("ASU 2009-17"), which codifies FASB Statement No. 167, "Amendments to FASB Interpretation No. 46(R)". ASU 2009-17 represents a revision to former FASB Interpretation No. 46(R), "Consolidation of Variable Interest Entities," ("FIN 46(R)") and changes how a reporting entity determines when an entity that is insufficiently capitalized or is not controlled through voting or similar rights should be consolidated. ASU 2009-17 also requires enhanced disclosures about a reporting entity's involvement with variable interest entities. ASU 2009-17 is effective for annual reporting periods beginning after November 15, 2009. The implementation of ASU 2009-17 is not anticipated to impact the Company's financial position or results of operations.

In January 2010, the FASB issued Accounting Standards Update 2010-06, "Fair Value Measurements and Disclosures: Improving Disclosures about Fair Value Measurements" ("ASU 2010-06"). ASU 2010-06 requires additional disclosures and clarifies existing disclosure requirements about fair value measurement as set forth in ASC Topic 820. ASU 2010-06 is effective for interim and annual reporting periods beginning after December 15, 2009, except for certain disclosure requirements regarding activity in Level 3 fair value measurements which is effective for fiscal years beginning after December 15, 2010. The implementation of ASU 2010-06 is expected to have no impact on the Company's results of operations or financial condition, but will require additional disclosure.

## 2. Acquisitions and Dispositions

### *2007 Acquisitions*

The Company closed the following acquisitions in 2007:

- In October 2007, the Company purchased developed and undeveloped properties located in West Texas from an oil and gas company. The purchase price was approximately $73.8 million, comprised of

Table of Contents

Index to Financial Statements



$25.0 million in cash and a $48.8 million note payable. The $25.0 million cash consideration paid was funded through a draw on the Company's senior credit facility. All principal and accrued interest (accruing at 7% annually) due on the note payable were repaid in November 2007 with proceeds from the Company's initial public offering of its common stock. For additional discussion of the Company's initial public offering, refer to Note 20 herein.

- In November 2007, the Company purchased a gas treatment plant and related gathering system located in Pecos County, Texas. The purchase price of approximately $10.0 million was paid in cash.
- In November 2007, the Company purchased leasehold acreage and producing well interests located predominantly in the West Texas Overthrust ("WTO") from a group of entities controlled by a significant shareholder. The purchase price of approximately $32.0 million was paid in cash.

***2008 Acquisitions and Dispositions***

The Company closed the following acquisitions and dispositions in 2008:

- In May 2008, the Company sold all of its assets located in the Piceance Basin of Colorado. Assets sold included undeveloped acreage, working interests in wells, gathering and compression systems and other facilities related to the wells. Net proceeds to the Company were approximately $147.2 million after closing adjustments. The portion of the Company's net proceeds attributable to the disposed gathering and compression systems and facilities exceeded the book basis of those assets resulting in a gain on sale of approximately $7.2 million after closing adjustments. The sale of the acreage and working interests in wells was accounted for as an adjustment to the full cost pool with no gain or loss recognized.
- In July 2008, the Company purchased land, minerals, developed and undeveloped leasehold and interests in producing properties through various transactions for an aggregate purchase price of $67.6 million, which was paid in cash.
- In October 2008, the Company purchased certain working interests and related reserves in Company wells owned by the Company's Chairman and Chief Executive Officer and certain of his affiliates. The purchase price of approximately $67.3 million, after closing adjustments, was paid in cash.

***2009 Acquisitions and Dispositions***

The Company closed the following acquisitions and dispositions in 2009:

- In June 2009, the Company completed the sale of its gathering and compression assets located in the Piñon Field, part of the WTO located in Pecos and Terrell counties, Texas. Net proceeds to the Company were approximately $197.5 million, resulting in a loss of $26.1 million. In conjunction with the sale, the Company entered into a gas gathering agreement and an operations and maintenance agreement. Under the gas gathering agreement, the Company has dedicated its Piñon Field acreage for priority gathering services for a period of 20 years and the Company will pay a fee that was negotiated at arms' length for such services. Pursuant to the operations and maintenance agreement, the Company will operate and maintain the gathering system assets sold for a period of 20 years unless the Company or the buyer of the assets chooses to terminate the agreement.
- In June 2009, the Company completed the sale of its drilling rights in East Texas below the depth of the Cotton Valley formation for net proceeds of $57.2 million, after certain post-closing adjustments. In October 2009, the Company received an additional $1.3 million in proceeds as a result of the post-closing adjustments. The sale of the drilling rights was accounted for as an adjustment to the full cost pool with no gain or loss recognized by the Company.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

- In December 2009, the Company purchased developed and undeveloped natural gas and oil properties located in the Permian Basin from Forest Oil Corporation and one of its subsidiaries (collectively, "Forest"). The purchase price was $800.0 million, subject to purchase price and post-closing adjustments. The acquisition was financed with proceeds from the issuance of $450.0 million of 8.75% Senior Notes due 2020, the placement of $200.0 million of new shares of 6.0% convertible perpetual preferred stock, and a public offering of the Company's common stock for $226.6 million. See further discussion at Note 12 and Note 20.

The acquisition qualifies as a business combination and, as such, the Company estimated the fair value of this property as of the December 21, 2009 acquisition date, the date on which the acquirer obtained control of the properties. The fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date (exit price). Fair value measurements also utilize assumptions of market participants. The Company used a discounted cash flow model and made market assumptions as to future commodity prices, projections of estimated quantities of oil and natural gas reserves, expectations for timing and amount of future development and operating costs, projections of future rates of production, expected recovery rates and risk adjusted discount rates. These assumptions represent Level 3 inputs.

The Company estimates the fair value of these properties approximates the consideration paid to Forest, which the Company concludes approximates the fair value that would be paid by a typical market participant. This measurement resulted in no goodwill being recognized. The acquisition-related costs totaling $0.3 million have been expensed as incurred in general and administrative expense on the consolidated income statement. Revenues of $3.6 million and earnings of $2.8 million generated by the acquired properties from December 21, 2009 to December 31, 2009 have been included in the accompanying consolidated statements of operations.

The following table summarizes the consideration paid to Forest and the amounts of the assets acquired and liabilities assumed as of December 21, 2009. The purchase price allocation is preliminary and subject to adjustment as the final closing settlement will be completed during mid 2010.

| | (In thousands) |
|---|---|
| Consideration paid to Forest: | |
| Cash, net of accrued purchase price adjustment | $ 795,074 |
| Recognized amounts of identifiable assets acquired and liabilities assumed: | |
| Proved developed and undeveloped properties | 754,185 |
| Unproved leasehold properties | 52,246 |
| Asset retirement obligation | (11,357) |
| Total identifiable net assets | $ 795,074 |

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

*Pro Forma Information — Forest Acquisition*

The unaudited financial information in the table below summarizes the combined results of the Company's operations and the properties acquired from Forest, on a pro forma basis, as though the purchase had taken place at the beginning of each period presented. The pro forma information is based on the Company's consolidated results of operations for the years ended December 31, 2009 and 2008, on historical results of the properties acquired, and on estimates of the effect of the transactions to the combined results. The pro forma information is not necessarily indicative of results that actually would have occurred had the transaction been in effect for the periods indicated, or of results that may occur in the future.

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2009 | | 2008 | |
| | Actual | Pro Forma | Actual | Pro Forma |
| | (in thousands, except per share data) | | | |
| | | (Unaudited) | | (Unaudited) |
| Revenues | $ 591,044 | $ 682,593 | $ 1,181,814 | $ 1,373,834 |
| Net loss applicable to SandRidge Energy, Inc., common stockholders | $(1,784,403) | $(1,949,567) | $(1,457,512) | $(1,699,728) |
| Basic and diluted earnings per share available to SandRidge Energy, Inc., common stockholders: | | | | |
| Net loss applicable to SandRidge Energy, Inc., common stockholders | $ (10.20) | $ (9.72) | $ (9.36) | $ (9.38) |

***Crusader Acquisition***

In September 2009, the Company entered into a Stock Purchase Agreement (the "Crusader Purchase Agreement") with Crusader Energy Group Inc., and its subsidiaries (collectively, "Crusader") to purchase all of the shares of common stock of Crusader that were to be issued upon the effectiveness of Crusader's reorganization under Chapter 11 of the United States Bankruptcy Code. On November 12, 2009, the Company announced its withdrawal from the acquisition process of Crusader as permitted under the bidding procedures applicable to Crusader's bankruptcy. On December 14, 2009, the Company terminated the Crusader Purchase Agreement, and on December 31, 2009, the Company received the break-up fee of $7.0 million provided for in the Crusader Purchase Agreement.

## 3. Fair Value Measurements

The Company applies the guidance provided under ASC Topic 820, Fair Value Measurements and Disclosures, to its financial assets and liabilities and nonfinancial liabilities that are measured and reported on a fair value basis. Pursuant to this guidance, the Company has classified and disclosed its fair value measurements using the following levels of the fair value hierarchy:

Level 1: Unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities.

Level 2: Quoted prices in markets that are not active, or inputs which are observable, either directly or indirectly, for substantially the full term of the asset or liability.

Level 3: Measurement based on prices or valuation models that require inputs that are both significant to the fair value measurement and less observable for objective sources (i.e., supported by little or no market activity).

Assets and liabilities that are measured at fair value are classified based on the lowest level of input that is significant to the fair value measurement. The Company's assessment of the significance of a particular input to

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

the fair value measurement requires judgment, which may affect the valuation of the fair value of assets and liabilities and their placement within the fair value hierarchy levels as described in ASC Topic 820. The determination of the fair values, stated below, takes into account the market for the Company's financial assets and liabilities, the associated credit risk and other factors as required by ASC Topic 820. The Company considers active markets as those in which transactions for the assets or liabilities occur in sufficient frequency and volume to provide pricing information on an ongoing basis.

***Level 1 Fair Value Measurements***

*Other long-term assets.* The fair value of other long-term assets, consisting of assets attributable to the Company's deferred compensation plan, is based on quoted market prices.

***Level 3 Fair Value Measurements***

*Derivative Contracts* The fair values of the Company's natural gas, oil and interest rate swaps are based upon quotes obtained from counterparties to the derivative contracts. The Company reviews other readily available market prices for its derivative contracts as there is an active market for these contracts. However, the Company does not have access to the specific valuation models used by its counterparties or other market participants. Included in these models are discount factors that the Company must estimate in its calculation. Additionally, the Company applies a value weighted average credit default risk rating factor for its counterparties in determining the fair value of its derivative contracts. Based on the inputs for the fair value measurement, the Company classified its derivative contract assets and liabilities as Level 3.

The following table summarizes the Company's financial assets and liabilities measured at fair value on a recurring basis by the fair value hierarchy as of December 31, 2009 (in thousands):

| | Fair Value Measurements | | | Assets / Liabilities at |
|---|---|---|---|---|
| Description | Level 1 | Level 2 | Level 3 | Fair Value |
| Derivative contracts — assets | $ — | $ — | $105,994 | $105,994 |
| Derivative contracts — liabilities | — | — | (68,140) | (68,140) |
| Other long-term assets | 6,251 | — | — | 6,251 |
| | $6,251 | $ — | $ 37,854 | $ 44,105 |

The table below sets forth a reconciliation of the Company's financial assets and liabilities measured at fair value on a recurring basis using significant unobservable inputs (Level 3) during the year ended December 31, 2009 (in thousands):

| | Derivatives |
|---|---|
| Balance of Level 3, December 31, 2008 | $ 237,903 |
| Total gains or losses (realized/unrealized) | 141,744 |
| Purchases, issuances and settlements | (341,793) |
| Transfers in and out of Level 3 | — |
| Balance of Level 3, December 31, 2009 | $ 37,854 |
| Changes in unrealized gains (losses) on derivative contracts held as of December 31, 2009 | $ (200,049) |

See Note 14 for further discussion of the Company's derivative contracts.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

***Fair Value of Debt***

The Company measures fair value of its long-term debt based on quoted market prices and with consideration given to the effect of the Company's credit risk. The estimated fair value of the Company's senior notes and the carrying value at December 31, 2009 were as follows (in thousands):

| | Fair Value | Carrying Value |
|---|---|---|
| Senior Floating Rate Notes due 2014 | $316,859 | $ 350,000 |
| 8.625% Senior Notes due 2015 | 655,470 | 650,000 |
| 9.875% Senior Notes due 2016(1) | 390,692 | 351,021 |
| 8.0% Senior Notes due 2018 | 739,778 | 750,000 |
| 8.75% Senior Notes due 2020(2) | 451,890 | 442,590 |

(1) Carrying value is net of a $14,479 discount.
(2) Carrying value is net of a $7,410 discount.

The carrying value for the Company's senior credit facility and remaining fixed rate debt instruments approximate fair value based on current rates applicable to similar instruments. See Note 12 for further discussion of the Company's long-term debt.

**4. Accounts Receivable**

A summary of trade accounts receivable is as follows (in thousands):

| | December 31, | |
|---|---|---|
| | 2009 | 2008 |
| Natural gas and oil sales | $ 82,472 | $ 72,266 |
| Natural gas and oil services | 10,484 | 20,476 |
| Joint interest billing | 10,101 | 13,816 |
| Other | 5,945 | 62 |
| | 109,002 | 106,620 |
| Less allowance for doubtful accounts | (3,590) | (3,874) |
| Total trade accounts receivable, net | $105,412 | $ 102,746 |

The following table shows the balance in the allowance for doubtful accounts and activity for the years ended December 31, 2009, 2008 and 2007 (in thousands):

| | 2009 | 2008 | 2007 |
|---|---|---|---|
| Allowance for doubtful accounts, January 1 | $ 3,874 | $2,238 | $3,025 |
| Additions charged to costs and expenses | 214 | 1,748 | — |
| Deductions(1) | (498) | (112) | (787) |
| Allowance for doubtful accounts, December 31 | $3,590 | $ 3,874 | $2,238 |

(1) Deductions represent write-off of receivables.

The Company's customer, SemGroup, L.P. and certain of its subsidiaries (collectively, "SemGroup"), filed for bankruptcy on July 22, 2008. During 2008, the Company established an allowance in the amount of $1.5 million for all amounts due from SemGroup.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

## 5. Other Current Assets

Other current assets consist of the following (in thousands):

| | December 31, 2009 | December 31, 2008 |
|---|---|---|
| Prepaid insurance | $ 7,627 | $ 9,374 |
| Deposits | 7,499 | 26,806 |
| Prepaid drilling | 1,804 | 2,657 |
| Other | 3,650 | 2,570 |
| Total other current assets | $20,580 | $ 41,407 |

## 6. Property, Plant and Equipment

Property, plant and equipment consist of the following (in thousands):

| | December 31, 2009 | December 31, 2008 |
|---|---|---|
| Natural gas and oil properties: | | |
| Proved | $ 5,913,408 | $ 4,676,072 |
| Unproved | 281,811 | 215,698 |
| Total natural gas and oil properties | 6,195,219 | 4,891,770 |
| Less accumulated depreciation, depletion and impairment(1) | (4,223,437) | (2,369,840) |
| Net natural gas and oil properties capitalized costs | 1,971,782 | 2,521,930 |
| Land | 13,937 | 11,250 |
| Non natural gas and oil equipment(2) | 594,132 | 764,792 |
| Buildings and structures | 78,584 | 71,859 |
| Total | 686,653 | 847,901 |
| Less accumulated depreciation, depletion and amortization | (224,792) | (194,272) |
| Net capitalized costs | 461,861 | 653,629 |
| Total property, plant and equipment | $ 2,433,643 | $3,175,559 |

(1) Includes cumulative full cost ceiling limitation impairment charges of $3,548.3 million and $1,855.0 million at December 31, 2009 and 2008, respectively. See Note 8.
(2) Includes capitalized interest of approximately $3.8 million at both December 31, 2009 and 2008.

In June 2009, the Company completed the sale of its gathering and compression assets located in the Piñon Field and the sale of its deep drilling rights in East Texas. In May 2008, the Company completed the sale of all its assets located in the Piceance Basin of Colorado. See Note 2.

The average rates used for depreciation and depletion of natural gas and oil properties were $1.68 per Mcfe in 2009 and $2.87 per Mcfe in 2008.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

***Costs Excluded from Amortization***

Costs associated with unproved properties of $281.8 million as of December 31, 2009 were excluded from amounts subject to amortization. The following table summarizes the costs related to unproved properties which have been excluded from natural gas and oil properties being amortized at December 31, 2009 and the year in which they were incurred (in thousands):

| | Year Cost Incurred | | | | Excluded Costs at December 31, |
|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2009 |
| Property acquisition | $175,369 | $— | $34,714 | $65,125 | $275,208 |
| Exploration | — | — | — | 6,603 | 6,603 |
| Development | — | — | — | — | — |
| Capitalized interest | — | — | — | — | — |
| Total costs incurred | $175,369 | $— | $34,714 | $ 71,728 | $281,811 |

The Company expects to complete the majority of the evaluation activities within six years from the applicable date of acquisition, contingent on the Company's capital expenditures and drilling program. In addition, the Company's internal engineers evaluate all properties on at least an annual basis.

## 7. Investments

During 2009, the Company had the following investments it accounted for under the equity method.

*Grey Ranch, L.P.* GRLP is a limited partnership that operates the Grey Ranch Plant located in Pecos County, Texas. The Company has long-term operating and gathering agreements with GRLP. The Company purchased its 50% ownership in GRLP during 2003. Income or losses of GRLP are allocated to the partners based on their ownership percentage. Any operating or cash shortfalls for GRLP require contributions from the partners. During October 2009, the Company executed amendments to certain agreements related to the ownership and operation of GRLP. As a result of these amendments, the Company became the primary beneficiary of GRLP. The Company previously accounted for its ownership interest in GRLP using the equity method of accounting; however, due to this change, the Company began consolidating the activity of GRLP in its consolidated financial statements prospectively beginning on the effective date of the amendments, October 1, 2009. The change from equity method accounting to the consolidation of GRLP activity had no effect on the Company's net income. The ownership interest not held by the Company is presented as noncontrolling interest in the consolidated financial statements. As of December 31, 2009, the Company's consolidated balance sheet included $16.0 million of net property, plant and equipment and $10.0 million of noncontrolling interest related to GRLP. Although GRLP is included in the Company's consolidated financial statements, the Company's interest in GRLP's assets is limited to its 50% ownership. GRLP's creditors have no recourse to the general credit of the Company.

At December 31, 2008, the Company's investment in GRLP was accounted for under the equity method. The Company's 50% ownership in GRLP totaled approximately $6.1 million and was classified as an investment in the accompanying consolidated balance sheets at December 31, 2008.

*Larclay, L.P.* Until April 15, 2009, Lariat and its partner Clayton Williams Energy, Inc. ("CWEI"), each owned a 50% interest in Larclay L.P. ("Larclay"), a limited partnership formed in 2006 to acquire drilling rigs and provide land drilling services, and, until such time, Lariat operated the rigs owned by Larclay. On April 15, 2009, Lariat completed an assignment to CWEI of Lariat's 50% equity interest in Larclay pursuant to the terms

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

of an Assignment and Assumption Agreement (the "Larclay Assignment") entered into between Lariat and CWEI on March 13, 2009. Pursuant to the Larclay Assignment, Lariat assigned all of its right, title and interest in and to Larclay to CWEI effective April 15, 2009 and CWEI assumed all of the obligations and liabilities of Lariat relating to Larclay. The Company fully impaired both the investment in and notes receivable due from Larclay at December 31, 2008. See Note 8 for discussion of this impairment. There were no additional losses on Larclay during the year ended December 31, 2009 or as a result of the Larclay Assignment.

## 8. Impairment

*Full Cost Ceiling Limitation.* Under the full cost method of accounting, the net book value of natural gas and oil properties, less related deferred income taxes, may not exceed a calculated "ceiling." The ceiling limitation is the discounted estimated after-tax future net revenue from proved natural gas and oil properties, excluding future cash outflows associated with settling asset retirement obligations included in the net book value of natural gas and oil properties, plus the cost of properties not subject to amortization. In calculating future net revenues for the year ended December 31, 2009, prices and costs used are based on the most recent 12-month average. Prior to December 31, 2009, prices and costs used to calculate future net revenues were based on prices on the last day of the period. These prices are not changed except where different prices are fixed and determinable from applicable contracts for the remaining term of those contracts. The Company has entered into various commodity derivative contracts; however, these derivative contracts are not accounted for as cash flow hedges. Accordingly, the effect of these derivative contracts has not been considered in calculating the full cost ceiling limitation.

The net book value, less related deferred tax liabilities, is compared to the ceiling limitation on both a quarterly and annual basis. Any excess of the net book value, less related deferred taxes, is written off as an expense. An expense recorded in one period may not be reversed in a subsequent period even though higher natural gas and oil prices may have increased the ceiling limitation in the subsequent period. During the first quarter and the fourth quarter of 2009, the Company reduced the carrying value of its natural gas and oil properties by $1,304.4 million and $388.9 million, respectively, due to a full cost ceiling limitation. Due to the Company's full valuation allowance, there was no tax effect on the full cost ceiling impairments taken in 2009. During the fourth quarter of 2008, the Company reduced the carrying value of its oil and gas properties by $1,855.0 million due to a full cost ceiling limitation. The after-tax effect of this reduction in 2008 was $1,677.5 million.

*Other Property, Plant and Equipment.* The Company recorded a $10.0 million impairment in the fourth quarter of 2009 on its spare parts inventory due to a decline in market value. The inventory was classified as fixed assets due to the Company's intent to place the parts into service in the future. Also in the fourth quarter of 2009, the Company recorded a $3.9 million impairment on three buildings located on its downtown Oklahoma City campus. The Company has determined these buildings will not have use or value in the future.

*Larclay, L.P.* During 2008, Larclay experienced cash shortfalls as a result of its principal payments due pursuant to its rig loan agreement. As permitted under the Larclay partnership agreement, Lariat provided loans to Larclay to offset the cash shortfalls. At December 31, 2008, the notes outstanding to Larclay and related interest receivable were $7.5 million and $0.2 million, respectively. With the significant decline in natural gas and oil prices in the fourth quarter of 2008, the demand for Larclay's drilling rigs and land drilling services has decreased. Due to economic conditions, natural gas and oil prices and the continued cash shortfalls for Larclay, Lariat fully impaired its $4.8 million investment in Larclay, as well as notes and accrued interest receivable due from Larclay totaling $7.7 million, as of December 31, 2008. This resulted in an impairment expense of approximately $12.5 million included in the consolidated statement of operations for the year ended December 31, 2008.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

### 9. Restricted Deposits

Restricted deposits represent bank trust and escrow accounts required by the Minerals Management Service of the United States Department of the Interior, surety bond underwriters, purchase agreements or other settlement agreements to satisfy the Company's eventual responsibility to plug and abandon wells and remove structures when certain offshore fields are no longer in use. During 2008, the Company deposited $0.8 million in escrow accounts. There were no deposits to the escrow accounts in 2009.

### 10. Accounts Payable and Accrued Expenses

Trade accounts payable and accrued expenses consist of the following (in thousands):

| | December 31, | |
|---|---|---|
| | 2009 | 2008 |
| Accounts payable | $ 134,212 | $ 302,407 |
| Convertible perpetual preferred stock dividends | 8,813 | — |
| Payroll and benefits | 18,270 | 20,703 |
| Drilling advances | 4,985 | 4,074 |
| Settlement agreement — current (See Note 13) | 5,000 | 5,000 |
| Accrued interest | 31,382 | 26,790 |
| Other | 386 | 7,363 |
| Total trade accounts payable and accrued expenses | $ 203,048 | $ 366,337 |

### 11. Costs in Excess of Billings (Billings in Excess of Costs Incurred)

In June 2008, the Company entered into an agreement with a subsidiary of Occidental Petroleum Corporation ("Occidental") to construct and sell a $CO_2$ treating plant in Pecos County, Texas (the "Century Plant") and associated compression and pipeline facilities for $800.0 million. Under this agreement, the Company will construct the Century Plant and Occidental will pay a minimum of 100% of the contract price, plus any subsequent agreed-upon revisions, to the Company through periodic cost reimbursements based upon the percentage of the project completed by the Company. The Century Plant is expected to be completed in two phases with the start-up of Phase I expected in mid 2010. Upon start-up, the Century Plant will be owned and operated by Occidental for the purpose of separating and removing $CO_2$ from natural gas delivered by the Company. Pursuant to a 30-year treating agreement executed simultaneously with the construction agreement, Occidental will remove $CO_2$ from the Company's delivered production volumes. See Note 18 for discussion of gas volume requirements. The Company will retain all methane gas from the Century Plant.

The Company accounts for construction of the Century Plant using the completed-contract method, under which contract revenues and costs are recognized when work under the contract is completed or substantially completed. In the interim, costs incurred on and billings related to contracts in process are accumulated on the balance sheet. Contract gains or losses will be recorded, as development costs within the Company's natural gas and oil properties as part of the full cost pool, when it is determined that a gain or loss will be incurred. At December 31, 2009 and 2008, no amounts had been recorded to the full cost pool in anticipation of probable and estimable gains or losses. Costs in excess of billings were $12.3 million and were reported as a current asset in the accompanying consolidated balance sheet at December 31, 2009. Billings in excess of costs incurred were $14.1 million and were reported as a current liability in the accompanying consolidated balance sheet at December 31, 2008.

Table of Contents

Index to Financial Statements



## 12. Long-Term Debt

Long-term obligations consist of the following (in thousands):

| | December 31, 2009 | December 31, 2008 |
|---|---|---|
| Senior credit facility | $ — | $ 573,457 |
| Other notes payable: | | |
| Drilling rig fleet and related oil field services equipment | 17,375 | 33,030 |
| Mortgage | 17,952 | 18,829 |
| Senior Floating Rate Notes due 2014 | 350,000 | 350,000 |
| 8.625% Senior Notes due 2015 | 650,000 | 650,000 |
| 9.875% Senior Notes due 2016, net of $14,479 discount | 351,021 | — |
| 8.0% Senior Notes due 2018 | 750,000 | 750,000 |
| 8.75% Senior Notes due 2020, net of $7,410 discount | 442,590 | — |
| Total debt | 2,578,938 | 2,375,316 |
| Less: Current maturities of long-term debt | 12,003 | 16,532 |
| Long-term debt | $2,566,935 | $ 2,358,784 |

*Senior Credit Facility.* The amount the Company can borrow under its senior secured revolving credit facility (the “senior credit facility”) is limited to a borrowing base, which was $850.4 million at December 31, 2009. The senior credit facility matures on November 21, 2011 and is available to be drawn on subject to limitations based on its terms and certain financial covenants, as described below.

The senior credit facility contains various covenants that limit the ability of the Company and certain of its subsidiaries to grant certain liens; make certain loans and investments; make distributions; redeem stock; redeem or prepay debt; merge or consolidate with or into a third party; or engage in certain asset dispositions, including a sale of all or substantially all of the Company’s assets. Additionally, the senior credit facility limits the ability of the Company and certain of its subsidiaries to incur additional indebtedness with certain exceptions, including under the series of senior notes discussed below.

The senior credit facility contains financial covenants, including maintaining agreed levels for the (i) ratio of total funded debt to EBITDAX (as defined in the senior credit facility), which may not exceed 4.5:1.0 at each quarter end calculated using the last four completed fiscal quarters, (ii) ratio of EBITDAX to interest expense plus current maturities of long-term debt, which must be at least 2.5:1.0 at each quarter end calculated using the last four completed fiscal quarters, and (iii) ratio of current assets to current liabilities, which must be at least 1.0:1.0 at each quarter end. In the current ratio calculation (as defined in the senior credit facility) any amounts available to be drawn under the senior credit facility are included in current assets, and unrealized assets and liabilities resulting from mark-to-market adjustments on the Company’s derivative contracts are disregarded. As of and during the year ended December 31, 2009, the Company was in compliance with all of the financial covenants under the senior credit facility.

The obligations under the senior credit facility are guaranteed by certain Company subsidiaries and are secured by first priority liens on all shares of capital stock of each of the Company’s material present and future subsidiaries; all intercompany debt of the Company; and substantially all of the Company’s assets, including proved natural gas and oil reserves representing at least 80% of the discounted present value (as defined in the senior credit facility) of proved natural gas and oil reserves reviewed in determining the borrowing base for the senior credit facility.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

At the Company's election, interest under the senior credit facility is determined by reference to (a) the London Interbank Offered Rate ("LIBOR") plus an applicable margin between 2.00% and 3.00% per annum or (b) the 'base rate,' which is the higher of (i) the federal funds rate plus 0.5%, (ii) the prime rate published by Bank of America or (iii) the Eurodollar rate (as defined in the senior credit facility) plus 1.00% per annum, plus, in each case under scenario (b), an applicable margin between 1.00% and 2.00% per annum. Interest is payable quarterly for prime rate loans and at the applicable maturity date for LIBOR loans, except that if the interest period for a LIBOR loan is six months, interest is paid at the end of each three-month period. The average annual interest rate paid on amounts outstanding under the senior credit facility was 2.33% for the year ended December 31, 2009.

Borrowings under the senior credit facility may not exceed the lower of the borrowing base or the committed amount. Private placements of senior notes totaling $365.5 million in May 2009 and $450.0 million in December 2009, discussed below, reduced the borrowing base to $850.4 million at December 31, 2009. The Company's borrowing base is redetermined in April and October of each year. With respect to each redetermination, the administrative agent and the lenders under the senior credit facility consider several factors, including the Company's proved reserves and projected cash requirements, and make assumptions regarding, among other things, natural gas and oil prices and production. Accordingly, the Company's ability to develop its properties and changes in commodity prices impact the borrowing base. No changes were made to the borrowing base during 2009 as a result of redeterminations. The Company has, at times, incurred additional costs related to the senior credit facility as a result of changes to the borrowing base. During 2009, additional costs of approximately $0.9 million were incurred. These costs have been deferred and are included in other assets in the accompanying consolidated balance sheets. At December 31, 2009, the Company had no amounts outstanding under the senior credit facility and $47.0 million in outstanding letters of credit, which affect the availability under the senior credit facility on a dollar-for-dollar basis.

On October 3, 2008, Lehman Brothers Commodity Services, Inc. ("Lehman Brothers"), a lender under the Company's senior credit facility, filed for bankruptcy. At the time that its parent, Lehman Brothers Holdings Inc., declared bankruptcy on September 15, 2008, Lehman Brothers elected not to fund its pro rata share, or 0.29%, of borrowings requested by the Company under the senior credit facility. Accordingly, the Company anticipates that Lehman Brothers will not fund its pro rata share of any future borrowing requests. The Company currently does not expect this reduced availability of amounts under the senior credit facility to impact its liquidity or business operations.

*Other Notes Payable.* The Company has financed a portion of its drilling rig fleet and related oil field services equipment through the issuance of notes secured by such equipment. At December 31, 2009, the aggregate outstanding balance of these notes was $17.4 million, with annual fixed interest rates ranging from 7.64% to 8.67%. The notes have a final maturity date of December 1, 2011 and require aggregate monthly installments of principal and interest in the amount of $0.8 million. The notes have a prepayment penalty (currently ranging from 0.50% to 1.00%) that is triggered if the Company repays the notes prior to maturity.

The debt incurred to purchase the downtown Oklahoma City property that serves as the Company's corporate headquarters is fully secured by a mortgage on one of the buildings and a parking garage located on the property. The note underlying the mortgage bears interest at 6.08% annually and matures on November 15, 2022. Payments of principal and interest in the amount of approximately $0.5 million are due on a quarterly basis through the maturity date. During 2009, the Company made payments of principal and interest on this note totaling $0.9 million and $1.1 million, respectively.

*Senior Floating Rate Notes Due 2014 and 8.625% Senior Notes Due 2015.* In May 2008, the Company exchanged senior term loans for senior unsecured notes with registration rights which were subsequently exchanged for substantially identical notes pursuant to a registered exchange offer. The effect of the exchange

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

offers resulted in the Company issuing $350.0 million of Senior Floating Rate Notes due 2014 (the "Senior Floating Rate Notes") in exchange for the total outstanding principal amount of its senior floating rate term loan and $650.0 million of 8.625% Senior Notes due 2015 (the "8.625% Senior Notes") in exchange for the total outstanding principal amount of its 8.625% senior term loan. Terms of these senior notes are substantially identical to those of the exchanged senior term loans and the terms of the unregistered notes for which the senior term loans were exchanged. These senior notes are jointly and severally, unconditionally guaranteed on an unsecured basis by all of the Company's wholly owned subsidiaries, except certain minor subsidiaries. See Note 24 for condensed consolidating financial information of the subsidiary guarantors.

The Senior Floating Rate Notes bear interest at LIBOR plus 3.625% (3.91% at December 31, 2009), except for the period from April 1, 2008 to June 30, 2008, for which the interest rate was 6.323%. Interest is payable quarterly with principal due on April 1, 2014. The average interest rate paid on outstanding Senior Floating Rate Notes for the year ended December 31, 2009 was 4.57% without consideration of the interest rate swap discussed below. The 8.625% Senior Notes bear interest at a fixed rate of 8.625% per annum with the principal due on April 1, 2015. Under the terms of the 8.625% Senior Notes, interest is payable semi-annually and, through the interest payment due on April 1, 2011, interest may be paid, at the Company's option, either entirely in cash or entirely with additional fixed rate senior notes. If the Company elects to pay the interest due during any period in additional fixed rate senior notes, the interest rate will increase to 9.375% during that period. All interest payments made to date on the 8.625% Senior Notes have been paid in cash.

In January 2008, the Company entered into a $350.0 million notional interest rate swap agreement to fix the variable LIBOR interest rate on the floating rate senior term loan for the period from April 1, 2008 to April 1, 2011. As a result of the exchange of the floating rate senior term loan to Senior Floating Rate Notes, the interest rate swap is now used to fix the variable LIBOR interest rate on the Senior Floating Rate Notes at an annual rate of 6.26% through April 1, 2011. In May 2009, the Company entered into a $350.0 million notional interest rate swap agreement to fix the variable LIBOR interest rate on the Senior Floating Rate Notes at an annual rate of 6.69% for the period from April 1, 2011 to April 1, 2013. The two interest rate swaps effectively serve to fix the Company's variable interest rate on its Senior Floating Rate Notes for the majority of the term of these notes. These swaps have not been designated as hedges.

The Company may redeem, at specified redemption prices, some or all of the Senior Floating Rate Notes at any time and some or all of the 8.625% Senior Notes on or after April 1, 2011.

The Company incurred $26.1 million of debt issuance costs in connection with the senior term loans. As the senior term loans were exchanged for unsecured senior notes with substantially identical terms, the remaining unamortized debt issuance costs on the senior term loans are being amortized over the terms of the Senior Floating Rate Notes and the 8.625% Senior Notes. These costs are included in other assets in the consolidated balance sheets.

*9.875% Senior Notes Due 2016.* In May 2009, the Company completed a private placement of $365.5 million of unsecured 9.875% Senior Notes due 2016 (the "9.875% Senior Notes") to qualified institutional investors eligible under Rule 144A of the Securities Act of 1933, as amended (the "Securities Act"). These notes were issued at a discount which will be amortized into interest expense over the term of the notes. Net proceeds from the offering were approximately $342.1 million after deducting offering expenses. The Company used the net proceeds from the offering to repay outstanding borrowings under the senior credit facility and for general corporate purposes. The notes bear interest at a fixed rate of 9.875% per annum, payable semi-annually, with the principal due on May 15, 2016. The 9.875% Senior Notes are redeemable, in whole or in part, prior to their maturity at specified redemption prices. The notes are jointly and severally, unconditionally guaranteed on an unsecured basis by all of the Company's wholly owned subsidiaries, except certain minor subsidiaries.

Table of Contents

Index to Financial Statements



In conjunction with the issuance of the 9.875% Senior Notes, the Company entered into a Registration Rights Agreement requiring the Company to register these notes by May 16, 2010 if they are not already freely tradable at that time. The Company is required to pay additional interest if it fails to fulfill its obligations under the agreement within the specified time periods.

Debt issuance costs of $7.9 million incurred in connection with the offering of the 9.875% Senior Notes are included in other assets in the consolidated balance sheet and are being amortized over the term of the notes.

*8.0% Senior Notes Due 2018.* In May 2008, the Company issued $750.0 million of unsecured 8.0% Senior Notes due 2018 (the "8.0% Senior Notes") to qualified institutional investors eligible under Rule 144A of the Securities Act. Net proceeds from the offering of approximately $734.0 million, after deducting offering expenses, were used to repay amounts outstanding under the senior credit facility and to fund a portion of the 2008 capital expenditure program. The notes bear interest at a fixed rate of 8.0% per annum, payable semi-annually, with the principal due on June 1, 2018. The notes are redeemable, in whole or in part, prior to their maturity at specified redemption prices. The 8.0% Senior Notes are jointly and severally, unconditionally guaranteed on an unsecured basis, by all of the Company's wholly owned subsidiaries, except certain minor subsidiaries. The notes are freely tradable.

The Company incurred $16.0 million of debt issuance costs in connection with the offering of the 8.0% Senior Notes. These costs are included in other assets in the consolidated balance sheet and are being amortized over the term of the notes.

*8.75% Senior Notes Due 2020.* In December 2009, the Company completed the sale of $450.0 million of unsecured 8.75% Senior Notes due 2020 (the "8.75% Senior Notes") to qualified institutional buyers eligible under Rule 144A of the Securities Act. These notes were issued at a discount which will be amortized into interest expense over the term of the notes. Net proceeds from the offering were approximately $433.1 million after the issuance discount and deducting offering expenses. The Company used such proceeds to fund a portion of the purchase of natural gas and oil properties from Forest during December 2009. The notes bear interest at a fixed rate of 8.75% per annum, payable semi-annually, with the principal due on January 15, 2020. The 8.75% Senior Notes are redeemable, in whole or in part, prior to their maturity at specified redemption prices. The notes are jointly and severally, unconditionally guaranteed on an unsecured basis by all of the Company's wholly owned subsidiaries, except certain minor subsidiaries.

In conjunction with the issuance of the 8.75% Senior Notes, the Company entered into a Registration Rights Agreement requiring the Company to register these notes by December 16, 2010. The Company is required to pay additional interest if it fails to fulfill its obligations under the agreement within the specified time periods.

Debt issuance costs of $9.5 million incurred in connection with the offering of the 8.75% Senior Notes are included in other assets in the consolidated balance sheet and are being amortized over the term of the notes.

The indentures governing all of the senior notes contain financial covenants similar to those of the senior credit facility and include limitations on the incurrence of indebtedness, payment of dividends, investments, asset sales, certain asset purchases, transactions with related parties and consolidations or mergers. As of and for the year ended December 31, 2009, the Company was in compliance with all of the covenants contained in the indentures governing the senior notes.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

*Maturities of Long-Term Debt.* Aggregate maturities of long-term debt, excluding discounts, during the next five years are as follows (in thousands):

| | |
|---|---|
| Years ending December 31: | |
| 2010 | $ 12,003 |
| 2011 | 7,295 |
| 2012 | 1,051 |
| 2013 | 1,121 |
| 2014 | 1,191 |
| Thereafter | 2,578,166 |
| Total debt | $ 2,600,827 |

## 13. Other Long-Term Obligations

Pursuant to a settlement agreement with Conoco, Inc., entered into in January 2007, the Company agreed to pay approximately $25.0 million plus interest, payable in $5.0 million principal increments. The current portion of the unpaid settlement of $5.0 million was included in accounts payable-trade in the accompanying consolidated balance sheets at December 31, 2009 and December 31, 2008. The non-current unpaid settlement amounts of $5.0 million and $10.0 million have been included in other long-term obligations in the accompanying consolidated balance sheets at December 31, 2009 and December 31, 2008, respectively.

## 14. Derivatives

The Company's derivative contracts have not been designated as hedges. The Company records all derivative contracts, which include commodity derivatives and interest rate swaps, at fair value. Changes in derivative contract fair values are recognized in earnings. Cash settlements and valuation gains and losses are included in loss (gain) on derivative contracts for the commodity derivative contracts and in interest expense for the interest rate swaps in the consolidated statements of operations. Commodity derivative contracts are settled on a monthly basis. Settlements on the interest rate swaps occur quarterly. Derivative assets and liabilities arising from the Company's derivative contracts with the same counterparty that provide for net settlement are reported on a net basis in the consolidated balance sheet.

*Commodity Derivatives.* The Company is exposed to commodity price risk, which impacts the predictability of its cash flows related to the sale of natural gas and oil. This risk is managed by the Company's use of commodity derivative contracts. These derivative contracts allow the Company to limit its exposure to a portion of its projected natural gas and oil sales. None of the Company's derivative contracts may be terminated early as a result of a party having its credit rating downgraded. At December 31, 2009 and December 31, 2008, the Company's commodity derivative contracts consisted of fixed price swaps and basis swaps, which are described below:

*Fixed price swaps:* The Company receives a fixed price for the contract and pays a floating market price to the counterparty over a specified period for a contracted volume.

*Basis swaps:* The Company receives a payment from the counterparty if the settled price differential is greater than the stated terms of the contract and pays the counterparty if the settled price differential is less than the stated terms of the contract, which guarantees the Company a price differential for natural gas from a specified delivery point.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

*Interest Rate Swaps.* The Company is exposed to interest rate risk on its long-term fixed and variable interest rate borrowings. Fixed rate debt, where the interest rate is fixed over the life of the instrument, exposes the Company to (i) changes in market interest rates reflected in the fair value of the debt and (ii) the risk that the Company may need to refinance maturing debt with new debt at a higher rate. Variable rate debt, where the interest rate fluctuates, exposes the Company to short-term changes in market interest rates as the Company's interest obligations on these instruments are periodically redetermined based on prevailing market interest rates, primarily LIBOR and the federal funds rate.

The Company has entered into two interest rate swap agreements to manage the interest rate risk on a portion of its floating rate debt by effectively fixing the variable interest rate on its Senior Floating Rate Notes. See Note 12 for further discussion of the Company's interest rate swaps.

*Fair Value of Derivatives.* In accordance with ASC Topic 815, the following table presents the fair value of the Company's derivative contracts as of December 31, 2009 and on a gross basis without regard to same-counterparty netting (in thousands):

| Type of Contract | Balance Sheet Classification | December 31, 2009 | December 31, 2008 |
|---|---|---|---|
| Derivative assets | | | |
| Natural gas swaps | Derivative contracts-current | $ 152,986 | $ 188,045 |
| Oil price swaps | Derivative contracts-current | 2,849 | 13,066 |
| Natural gas swaps | Derivative contracts-noncurrent | — | 45,537 |
| Oil price swaps | Derivative contracts-noncurrent | 5,362 | — |
| Derivative liabilities | | | |
| Natural gas swaps | Derivative contracts-current | (45,714) | — |
| Oil price swaps | Derivative contracts-current | (4,127) | — |
| Interest rate swaps | Derivative contracts-current | (7,080) | (5,106) |
| Natural gas swaps | Derivative contracts-noncurrent | (62,941) | (3,639) |
| Oil price swaps | Derivative contracts-noncurrent | (2,262) | — |
| Interest rate swaps | Derivative contracts-noncurrent | (1,219) | — |
| Total net derivative contracts | | $ 37,854 | $ 237,903 |

A counterparty to one of the Company's derivative contracts, Lehman Brothers, declared bankruptcy on October 3, 2008. Due to Lehman Brothers' bankruptcy, the declaration of bankruptcy by its parent, Lehman Brothers Holdings Inc., on September 15, 2008, and the asset position of the contract, the Company did not assign any value to this derivative contract from September 30, 2008 until September 30, 2009. During August 2009, the Company entered into an agreement with Lehman Brothers to settle all unsettled positions under this derivative contract through September 30, 2009. As of October 1, 2009, Lehman Brothers assigned this contract to a third-party to serve as the counterparty for the remaining three months of the contract.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

The following table summarizes the effect of the Company's derivative contracts on the consolidated statements of operations for the years ended December 31, 2009, 2008 and 2007 (in thousands):

| Type of Contract | Location of (Gain) Loss Recognized in Income | Amount of (Gain) Loss Recognized in Income 2009 | 2008 | 2007 |
|---|---|---|---|---|
| Interest rate swap | Interest expense | $ 5,783 | $ 7,441 | $ — |
| Natural gas and oil swaps | Gain on derivative contracts | (147,527) | (211,439) | (60,732) |
| Total | | $ (141,744) | $ (203,998) | $ (60,732) |

The following table summarizes the cash settlements and valuation gains and losses on commodity derivative contracts for the years ended December 31, 2009, 2008 and 2007 (in thousands):

| | Year Ended December 31, 2009 | 2008 | 2007 |
|---|---|---|---|
| Realized (gain) loss | $ (348,022) | $ 12,981 | $ (34,494) |
| Unrealized loss (gain) | 200,495 | (224,420) | (26,238) |
| Gain on commodity derivative contracts | $(147,527) | $(211,439) | $ (60,732) |

Net losses of $5.8 million ($0.4 million unrealized gain and $6.2 million realized loss) and net losses of $7.4 million ($8.7 million unrealized loss and $1.3 million realized gain) related to the interest rate swaps discussed above were included in interest expense in the accompanying consolidated statement of operations for the year ended December 31, 2009 and December 31, 2008, respectively.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

At December 31, 2009, the Company's open natural gas and oil commodity derivative contracts consisted of the following:

### Natural Gas

| Period and Type of Contract | Notional (MMcf)(1) | Weighted Avg. Fixed Price |
|---|---|---|
| January 2010 — March 2010 | | |
| Price swap contracts | 20,475 | $ 7.95 |
| Basis swap contracts | 20,250 | $ (0.74) |
| April 2010 — June 2010 | | |
| Price swap contracts | 19,793 | $ 7.32 |
| Basis swap contracts | 20,475 | $ (0.74) |
| July 2010 — September 2010 | | |
| Price swap contracts | 20,010 | $ 7.55 |
| Basis swap contracts | 20,700 | $ (0.74) |
| October 2010 — December 2010 | | |
| Price swap contracts | 20,010 | $ 7.97 |
| Basis swap contracts | 20,700 | $ (0.74) |
| January 2011 — March 2011 | | |
| Basis swap contracts | 25,650 | $ (0.47) |
| April 2011 — June 2011 | | |
| Basis swap contracts | 25,935 | $ (0.47) |
| July 2011 — September 2011 | | |
| Basis swap contracts | 26,220 | $ (0.47) |
| October 2011 — December 2011 | | |
| Basis swap contracts | 26,220 | $ (0.47) |
| January 2012 — March 2012 | | |
| Basis swap contracts | 28,210 | $ (0.55) |
| April 2012 — June 2012 | | |
| Basis swap contracts | 28,210 | $ (0.55) |
| July 2012 — September 2012 | | |
| Basis swap contracts | 28,520 | $ (0.55) |
| October 2012 — December 2012 | | |
| Basis swap contracts | 28,520 | $ (0.55) |
| January 2013 — March 2013 | | |
| Basis swap contracts | 3,600 | $ (0.46) |
| April 2013 — June 2013 | | |
| Basis swap contracts | 3,640 | $ (0.46) |
| July 2013 — September 2013 | | |
| Basis swap contracts | 3,680 | $ (0.46) |
| October 2013 — December 2013 | | |
| Basis swap contracts | 3,680 | $ (0.46) |

(1) Assumes ratio of 1:1 for Mcf to MMBtu.

Table of Contents

Index to Financial Statements



**Oil**

| Period and Type of Contract | Notional (in MBbls) | Weighted Avg. Fixed Price |
|---|---|---|
| January 2010 — March 2010 | | |
| Price swap contracts | 990 | $ 81.95 |
| April 2010 — June 2010 | | |
| Price swap contracts | 1,092 | $ 82.05 |
| July 2010 — September 2010 | | |
| Price swap contracts | 1,104 | $ 82.05 |
| October 2010 — December 2010 | | |
| Price swap contracts | 1,104 | $ 82.05 |
| January 2011 — March 2011 | | |
| Price swap contracts | 1,170 | $ 86.52 |
| April 2011 — June 2011 | | |
| Price swap contracts | 1,183 | $ 86.52 |
| July 2011 — September 2011 | | |
| Price swap contracts | 1,196 | $ 86.52 |
| October 2011 — December 2011 | | |
| Price swap contracts | 1,196 | $ 86.52 |
| January 2012 — March 2012 | | |
| Price swap contracts | 1,092 | $ 88.26 |
| April 2012 — June 2012 | | |
| Price swap contracts | 1,092 | $ 88.26 |
| July 2012 — September 2012 | | |
| Price swap contracts | 1,104 | $ 88.26 |
| October 2012 — December 2012 | | |
| Price swap contracts | 1,104 | $ 88.26 |

## 15. Retirement and Deferred Compensation Plans

*Retirement Plan.* The Company maintains a 401(k) retirement plan for its employees. Under the plan, eligible employees may elect to defer a portion of their earnings up to the maximum allowed by regulations promulgated by the Internal Revenue Service. The 2009 annual 401(k) deferral limit for employees under age 50 was $16,500. Employees turning age 50 or over in 2009 could defer up to $22,000 in 2009. The Company makes matching contributions to the plan equal to 100% on the first 15% of employee deferred wages. All matching contributions are made with Company stock. In 2008 and 2007, the Company satisfied its matching obligations related to employee contributions from the respective previous year through transfers of treasury stock. See Note 20. For 2009 and 2008, the Company satisfied its matching obligations related to employee contributions with cash purchases of Company stock. For 2009, 2008 and 2007, retirement plan expense was approximately $7.4 million, $7.8 million and $4.9 million, respectively.

*Deferred Compensation Plan.* Effective February 1, 2007 the Company established a non-qualified deferred compensation plan that allows eligible highly compensated employees to elect to defer income in excess of the IRA annual limitations on qualified 401(k) retirement plans. The Company makes matching contributions on non-qualified contributions up to a maximum of 15% of employee gross earnings. For 2009 and 2008, employer contributions were approximately $2.5 million and $1.6 million, respectively. There were no contributions made in 2007.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

Any assets placed in trust by the Company to fund future obligations of the Company's non-qualified deferred compensation plan are subject to the claims of creditors in the event of insolvency or bankruptcy, and participants are general creditors of the Company as to their deferred compensation in the plan.

## 16. Income Taxes

Deferred income taxes are provided to reflect the future tax consequences of temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements. Deferred tax assets are reduced by a valuation allowance as necessary when a determination is made that it is more likely than not that some or all of the deferred assets will not be realized based on the weight of all available evidence. As of December 31, 2008, the Company determined it was appropriate to record a full valuation allowance against its net deferred tax asset. For the year ended December 31, 2009, the Company recorded a $641.3 million increase to the previously established valuation allowance. The increase is primarily a result of not recording a tax benefit for the current period net loss attributable to the Company before income taxes of $1,784.3 million.

Significant components of the Company's deferred tax assets and liabilities are as follows (in thousands):

| | December 31, 2009 | December 31, 2008 |
|---|---|---|
| Deferred tax liabilities: | | |
| Derivative contracts | $ 13,627 | $ 85,645 |
| Investment in partnerships | 3,770 | — |
| Total deferred tax liabilities | 17,397 | 85,645 |
| Deferred tax assets: | | |
| Property, plant and equipment | 873,096 | 555,660 |
| Allowance for doubtful accounts | 787 | 1,414 |
| Net operating loss carryforwards | 220,195 | 2,064 |
| Investment in and notes receivable from partnerships | — | 1,880 |
| Compensation and benefits | 9,823 | 6,911 |
| Alternative minimum tax credits and other carryforwards | 3,070 | 2,524 |
| Asset retirement obligation liability | 39,681 | 4,287 |
| Other | 2,570 | 1,422 |
| Total deferred tax assets | 1,149,222 | 576,162 |
| Valuation allowance | (1,131,825) | (490,517) |
| Net deferred tax liability | $ — | $ — |

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

The (benefits) provisions for income taxes consisted of the following components for the years ended December 31 (in thousands):

| | 2009 | 2008 | 2007 |
|---|---|---|---|
| Current: | | | |
| Federal | $ (4,413) | $ 4,537 | $ — |
| State | (4,303) | 4,665 | 601 |
| | (8,716) | 9,202 | 601 |
| Deferred: | | | |
| Federal | — | (46,180) | 28,121 |
| State | — | (1,350) | 802 |
| | — | (47,530) | 28,923 |
| Total (benefit) provision for income taxes | $(8,716) | $ (38,328) | $29,524 |

A reconciliation of the (benefits) provisions for income taxes at the statutory federal tax rate to the Company's actual (benefit) provision for income taxes is as follows for the years ended December 31 (in thousands):

| | 2009 | 2008 | 2007 |
|---|---|---|---|
| Computed at federal statutory rate | $(624,507) | $(517,863) | $27,911 |
| State taxes, net of federal benefit | (14,265) | (12,153) | 912 |
| Non-deductible expenses | 1,905 | 967 | 312 |
| Stock-based compensation | 5,941 | — | — |
| Other | (19,098) | 204 | 389 |
| Change in valuation allowance | 641,308 | 490,517 | — |
| Total (benefit) provision for income taxes | $ (8,716) | $ (38,328) | $29,524 |

As of December 31, 2009, the Company has approximately $1.3 million of alternative minimum tax credits available that do not expire. In addition, the Company has approximately $639.3 million of federal net operating loss carryovers that expire during the years 2023 through 2029. Excess tax benefits of $11.5 million associated with the vesting of restricted stock awards are included in the federal net operating loss carryovers, but will not be recognized as a tax benefit recorded to additional paid-in capital until realized.

Internal Revenue Code ("IRC") Section 382 addresses company ownership changes and specifically limits the utilization of certain deductions and other tax attributes on an annual basis following an ownership change. The Company experienced an ownership change within the meaning of IRC Section 382 on December 31, 2008. As of December 31, 2009, $305.0 million of federal net operating loss carryforwards are subject to the IRC Section 382 limitation which could result in a material amount of these carryforwards expiring unused. The limitation does not result in a current federal tax liability for the period ending December 31, 2009.

No reserves for uncertain income tax positions have been recorded pursuant to the guidance for uncertainty in income taxes under ASC Topic 740, Income Taxes. Tax years 1999 to present remain open for the majority of taxing authorities due to net operating loss carryforwards from those years. The Company's accounting policy is to recognize interest and penalties, if any, related to unrecognized tax benefits as income tax expense. The Company does not have an accrued liability for interest and penalties at December 31, 2009.

Table of Contents

Index to Financial Statements



## 17. Earnings (Loss) Per Share

Basic earnings per share are computed using the weighted average number of common shares outstanding during the period. Diluted earnings per share are computed using the weighted average shares outstanding during the period, but also include the dilutive effect of awards of restricted stock and outstanding convertible preferred stock. The following table summarizes the calculation of weighted average common shares outstanding used in the computation of diluted earnings per share, for the years ended December 31 (in thousands):

| | 2009 | 2008 | 2007 |
|---|---|---|---|
| Weighted average basic common shares outstanding | 175,005 | 155,619 | 108,828 |
| Effect of dilutive securities: | | | |
| Restricted stock | — | — | 1,213 |
| Convertible preferred stock | — | — | — |
| Weighted average diluted common and potential common shares outstanding | 175,005 | 155,619 | 110,041 |

For the years ended December 31, 2009 and 2008, restricted stock awards covering approximately 2.8 million and 1.5 million shares, respectively, were excluded from the computation of net loss per share because their effect would have been antidilutive.

In computing diluted earnings per share, the Company evaluated the if-converted method with respect to its outstanding 8.5% convertible perpetual preferred stock and 6.0% convertible perpetual preferred stock (see Note 20) for the year ended December 31, 2009 and with respect to its then outstanding redeemable convertible preferred stock for the years ended December 31, 2008 and 2007. Under this method, the Company assumes the conversion of the preferred stock to common stock and determines if this is more dilutive than including the preferred stock dividends (paid and unpaid) in the computation of income available to common stockholders. The Company determined the if-converted method was not more dilutive and included preferred stock dividends in the determination of income available to common stockholders for the years ended December 31, 2009, 2008 and 2007.

## 18. Commitments and Contingencies

*Operating Leases.* The Company has obligations under noncancelable operating leases, primarily for the use of office space. Total rental expense under operating leases for the years ended December 31, 2009, 2008 and 2007 was approximately $3.2 million, $2.4 million and $2.3 million, respectively.

Future minimum lease payments under noncancelable operating leases (with initial lease terms in excess of one year) as of December 31, 2009 were as follows (in thousands):

| | |
|---|---|
| Years ending December 31: | |
| 2010 | $ 2,043 |
| 2011 | 827 |
| 2012 | 292 |
| 2013 | 158 |
| 2014 | 48 |
| | $3,368 |

*Rig Commitments.* The Company has contracts with third-party drilling rig operators for the use of their rigs at specified day rates. These commitments are not recorded in the consolidated balance sheets. Minimum future commitments as of December 31, 2009 were $1.2 million for 2010.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

*Purchase Commitment.* The Company has a contract to purchase pipe for use in its drilling and production activities. This commitment is not recorded in the consolidated balance sheet. Minimum future commitments as of December 31, 2009 were $21.6 million for 2010.

*Firm Transportation.* The Company has subscribed firm gas transportation service under two Transportation Service Agreements ("TSA"). The TSA terms run through 2012 on the Oasis Pipeline and through 2018 on the Midcontinent Express Pipeline. These commitments are not recorded in the consolidated balance sheets. Under the terms of the TSAs, the Company is obligated to pay a demand charge and in exchange, obtains the right to flow natural gas production through these pipelines to more competitive marketing areas. The amounts of the required payments for firm transportation as of December 31, 2009 were as follows (in thousands):

| | |
|---|---|
| Years ending December 31: | |
| 2010 | $ 35,307 |
| 2011 | 30,391 |
| 2012 | 30,612 |
| 2013 | 24,725 |
| 2014 | 16,483 |
| Thereafter | 65,979 |
| | $ 203,497 |

*Gas Gathering Agreement.* In conjunction with the sale of the gathering and compression assets located in the Piñon Field of the WTO, the Company entered into a gas gathering agreement. Under the gas gathering agreement, the Company has dedicated its Piñon Field acreage for priority gathering services over a period of 20 years and the Company will pay a fee that was negotiated at arms' length for such services. Pursuant to the gas gathering agreement, the base fee can be reduced if certain criteria are met. The table below presents the base fee contractual obligations under this agreement as of December 31, 2009 (in thousands).

| | |
|---|---|
| Years ending December 31: | |
| 2010 | $ 22,226 |
| 2011 | 33,780 |
| 2012 | 42,814 |
| 2013 | 42,634 |
| 2014 | 42,360 |
| Thereafter | 305,390 |
| | $ 489,204 |

*Litigation.* The Company is a defendant in lawsuits from time to time in the normal course of business. In management's opinion, the Company is not currently involved in any legal proceedings which, individually or in the aggregate, could have a material effect on the financial condition, operations or cash flows of the Company.

**19. Redeemable Convertible Preferred Stock**

In November 2006, the Company sold 2,136,667 shares of redeemable convertible preferred stock to finance a portion of the NEG acquisition and received net proceeds of approximately $439.5 million after deducting offering expenses of approximately $9.3 million. Each holder of redeemable convertible preferred stock was entitled to quarterly cash dividends at the annual rate of 7.75% of the accreted value, or $210 per share, of their redeemable convertible preferred stock. Each share of redeemable convertible preferred stock was initially

Table of Contents

Index to Financial Statements



convertible into 10.0 shares, and ultimately convertible into 10.2 shares, of common stock at the option of the holder, subject to certain anti-dilution adjustments. A summary of dividends declared and paid on the redeemable convertible preferred stock is as follows (in thousands, except per share data):

| Declared | Dividend Period | Dividends per Share | Total | Payment Date |
|---|---|---|---|---|
| January 31, 2007 | November 21, 2006 — February 1, 2007 | $ 3.21 | $6,859 | February 15, 2007 |
| May 8, 2007 | February 2, 2007 — May 1, 2007 | 3.97 | 8,550 | May 15, 2007 |
| June 8, 2007 | May 2, 2007 — August 1, 2007 | 4.10 | 8,956 | August 15, 2007 |
| September 24, 2007 | August 2, 2007 — November 1, 2007 | 4.10 | 8,956 | November 15, 2007 |
| December 16, 2007 | November 2, 2007 — February 1, 2008 | 4.10 | 8,956 | February 15, 2008 |
| March 7, 2008 | February 2, 2008 — May 1, 2008 | 4.01 | 8,095 | (1) |
| May 7, 2008 | May 2, 2008 — May 7, 2008 | 4.01 | 501 | May 7, 2008 |

(1) Includes $0.6 million of prorated dividends paid to holders of redeemable convertible preferred shares at the time their shares converted to common stock in March 2008. The remaining dividends of $7.5 million were paid during May 2008.

On March 30, 2007, certain holders of the Company’s common units (consisting of shares of common stock and a warrant to purchase redeemable convertible preferred stock upon the surrender of common stock) exercised warrants to purchase redeemable convertible preferred stock. The holders converted 526,316 shares of common stock into 47,619 shares of redeemable convertible preferred stock.

During March 2008, holders of 339,823 shares of the Company’s redeemable convertible preferred stock elected to convert those shares into 3,465,593 shares of the Company’s common stock. Additionally, during May 2008, the Company converted the remaining outstanding 1,844,464 shares of its redeemable convertible preferred stock into 18,810,260 shares of its common stock as permitted under the terms of the redeemable convertible preferred stock. These conversions resulted in increases to additional paid-in capital totaling $452.2 million, which represents the difference between the par value of the common stock issued and the carrying value of the redeemable convertible shares converted. The Company also recorded charges to retained earnings totaling $7.2 million in accelerated accretion expense related to the converted redeemable convertible preferred shares. Prorated dividends totaling $0.5 million for the period from May 2, 2008 to the date of conversion (May 7, 2008) were paid to the holders of the converted shares on May 7, 2008. On and after the conversion date, dividends ceased to accrue and the rights of common unit holders to exercise outstanding warrants to purchase redeemable convertible preferred shares terminated.

Approximately $8.6 million in paid and unpaid dividends on the redeemable convertible preferred stock has been included in the Company’s earnings per share calculations for the year ended December 31, 2008, as presented in the accompanying consolidated statement of operations. No shares of redeemable convertible preferred stock were outstanding during the year ended December 31, 2009.

## 20. Equity

### *Preferred Stock*

The following table presents information regarding the Company’s preferred stock (in thousands):

| | December 31, 2009 | December 31, 2008 |
|---|---|---|
| Shares authorized | 50,000 | 50,000 |
| Shares outstanding at end of period: | | |
| 8.5% Convertible perpetual preferred stock | 2,650 | — |
| 6.0% Convertible perpetual preferred stock | 2,000 | — |

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

The Company is authorized to issue 50,000,000 shares of preferred stock, $0.001 par value, of which 4,650,000 shares are designated as convertible perpetual preferred stock at December 31, 2009. There were no shares of preferred stock outstanding as of December 31, 2008. See Note 19 for discussion of conversion of redeemable preferred stock during 2008.

*8.5% Convertible perpetual preferred stock.* In January 2009, the Company completed a private placement of 2,650,000 shares of 8.5% convertible perpetual preferred stock to qualified institutional investors eligible under Rule 144A under the Securities Act. The offering included 400,000 shares of convertible perpetual preferred stock issued upon the full exercise of the initial purchaser's option to cover over-allotments. Net proceeds from the offering were approximately $243.3 million after deducting offering expenses of approximately $8.6 million. The Company used the net proceeds from the offering to repay outstanding borrowings under the senior credit facility and for general corporate purposes.

Each share of 8.5% convertible perpetual preferred stock has a liquidation preference of $100 and is convertible at the holder's option at any time initially into approximately 12.4805 shares of the Company's common stock based on an initial conversion price of $8.01, subject to adjustments upon the occurrence of certain events. Each holder of the convertible perpetual preferred stock is entitled to an annual dividend of $8.50 per share to be paid semi-annually in cash, common stock or a combination thereof, at the Company's election, with the first dividend payment due in February 2010. Approximately $8.4 million in unpaid dividends on the 8.5% convertible perpetual preferred stock has been included in the Company's earnings per share calculations for the year ended December 31, 2009 as presented in the accompanying consolidated statements of operations. The 8.5% convertible perpetual preferred stock is not redeemable by the Company at any time. After February 20, 2014, the Company may cause all outstanding shares of the convertible perpetual preferred stock to automatically convert into common stock at the then-prevailing conversion rate if certain conditions are met.

*6.0% Convertible perpetual preferred stock.* In December 2009, the Company completed a private placement of 2,000,000 shares of 6.0% convertible perpetual preferred stock to an institutional investor in a transaction exempt from registration under Regulation D under the Securities Act. Net proceeds were approximately $199.9 million and were used to fund a portion of the purchase of natural gas and oil properties from Forest during December 2009 and for general corporate purposes.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

Each share of the 6.0% convertible perpetual preferred stock has a liquidation preference of $100.00 and is entitled to an annual dividend of $6.00 payable semi-annually in cash, common stock or any combination thereof, at the Company's election, beginning on July 15, 2010. Approximately $0.4 million in unpaid dividends on the 6.0% convertible perpetual preferred stock has been included in the Company's earnings per share calculations for the year ended December 31, 2009 as presented in the accompanying consolidated statements of operations. The 6.0% convertible perpetual preferred stock in not redeemable by the Company at any time. Each share is initially convertible into 9.21 shares of the Company's common stock, at the holder's option, at any time on or after February 1, 2010 based on an initial conversion price of $10.86 and subject to customary adjustments in certain circumstances. Five years after their issuance, all outstanding shares of the convertible preferred stock will be converted automatically into shares of the Company's common stock at the then-prevailing conversion price as long as all dividends accrued at that time have been paid.

***Common Stock***

The following table presents information regarding the Company's common stock (in thousands):

| | December 31, | |
|---|---|---|
| | 2009 | 2008 |
| Shares authorized | 400,000 | 400,000 |
| Shares outstanding at end of period | 208,715 | 166,046 |
| Shares held in treasury | 1,866 | 1,326 |

In March 2007, the Company sold approximately 17.8 million shares of common stock for net proceeds of $318.7 million after deducting offering expenses of approximately $1.4 million. The stock was sold in private sales to various investors including the Company's Chairman and Chief Executive Officer, who invested $61.4 million in exchange for approximately 3.4 million shares of common stock.

On November 9, 2007, the Company completed the initial public offering of its common stock. The Company sold 32,379,500 shares of its common stock, including 4,710,000 shares sold directly to an entity controlled by the Company's Chairman and Chief Executive Officer, at a price of $26.00 per share. After deducting underwriting discounts of approximately $44.0 million and offering expenses of approximately $3.1 million, the Company received net proceeds of approximately $794.7 million. The Company used the net proceeds from the offering as follows (in millions):

| | |
|---|---|
| Repayment of outstanding balance and accrued interest on senior credit facility | $515.9 |
| Repayment of note payable and accrued interest incurred in connection with recent acquisition | 49.1 |
| Excess cash to fund future capital expenditures | 229.7 |
| Total | $ 794.7 |

During March 2008, the Company issued 3,465,593 shares of common stock upon the conversion of 339,823 shares of its redeemable convertible preferred stock. In May 2008, the Company converted the remaining 1,844,464 outstanding shares of its redeemable convertible preferred stock into 18,810,260 shares of its common stock as permitted under the terms of the redeemable convertible preferred stock. See additional discussion at Note 19.

In April 2009, the Company completed a registered underwritten offering of 14,480,000 shares of its common stock, including 2,280,000 shares of common stock acquired by the underwriters from the Company to cover over-allotments. Net proceeds to the Company from the offering were approximately $107.6 million, after deducting offering expenses of approximately $2.4 million, and were used to repay a portion of the amount outstanding under the senior credit facility and for general corporate purposes.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

In December 2009, the Company completed a registered underwritten public offering of 25,600,000 shares of its common stock, including 3,600,000 shares of common stock acquired by the underwriters from the Company to cover over-allotments. Net proceeds from the offering were approximately $217.2 million after deducting offering expenses of approximately $9.4 million. The net proceeds were used to fund the purchase of natural gas and oil properties from Forest and for general corporate purposes.

***Treasury Stock***

The Company makes required tax payments on behalf of employees when their restricted stock awards vest and then withholds a number of vested shares of common stock having a value on the date of vesting equal to the tax obligation. As a result of such transactions, the Company withheld 167,009 shares having a total value of $1.5 million, 80,724 shares having a total value of $3.6 million, and 44,649 shares having a total value of $0.8 million during the years ended December 31, 2009, 2008 and 2007, respectively. These shares were accounted for as treasury stock.

In June 2007, the Company purchased 39,844 shares of its common stock into treasury through an open market repurchase transaction in order to fund a portion of its 401(k) matching obligation as described below. Cash consideration for these shares of approximately $0.8 million was paid in July 2007.

In June 2007, the Company transferred 72,044 shares of its treasury stock to an account established for the benefit of the Company's 401(k) Plan. The transfer was made in order to satisfy the Company's $1.3 million accrued payable to match employee contributions made to the plan during 2006. Historical cost of the shares transferred totaled approximately $0.9 million, resulting in an increase to the Company's additional paid-in capital of approximately $0.4 million.

In February 2008, the Company transferred 184,484 shares of its treasury stock into an account established for the benefit of the Company's 401(k) Plan. The transfer was made in order to satisfy the Company's $5.0 million accrued payable to match employee contributions made to the plan during 2007. The historical cost of the shares transferred totaled approximately $2.4 million and resulted in an increase to the Company's additional paid-in capital of approximately $2.6 million.

***Equity Compensation***

The Company awards restricted common stock under incentive compensation plans that vest over specified periods of time, subject to certain conditions. Awards issued prior to 2006 had vesting periods of one, four or seven years. All awards issued during and after 2006 have four year vesting periods. Shares of restricted common stock are subject to restriction on transfer. Unvested restricted stock awards are included in the Company's outstanding shares of common stock.

Equity compensation provided to employees directly involved in natural gas and oil exploration and development activities is capitalized to the Company's natural gas and oil properties. Equity compensation not capitalized is reflected in general and administrative expenses, production expenses, midstream and marketing expenses and drilling and services expenses in the consolidated statements of operations. For the year ended December 31, 2009, the Company recognized equity compensation expense of $22.8 million, net of $4.3 million capitalized, related to restricted common stock. For the years ended December 31, 2008 and 2007, the Company recognized equity compensation expense of $18.8 million and $7.2 million, respectively, related to restricted common stock. There was no equity compensation capitalized in 2008 or 2007.

Effective June 5, 2009, the Company adopted the SandRidge Energy, Inc. 2009 Incentive Plan (the "2009 Incentive Plan"). Under the terms of the 2009 Incentive Plan, the Company may grant stock options, stock

Table of Contents

Index to Financial Statements



appreciation rights, shares of restricted stock, restricted stock units and other forms of awards based on the value (or increase in the value) of shares of the common stock of the Company for up to 12,000,000 shares of common stock. The 2009 Incentive Plan also permits cash incentive awards. Consistent with its other incentive plans, the Company intends for shares of restricted stock to be the primary form of awards granted under the 2009 Incentive Plan.

Restricted stock activity for the year ended December 31, 2009 was as follows (shares in thousands):

| | Number of Shares | Weighted-Average Grant Date Fair Value |
|---|---|---|
| Unvested restricted shares outstanding at December 31, 2008 | 2,993 | $ 30.71 |
| Granted | 3,531 | $ 8.34 |
| Vested | (800) | $ 29.43 |
| Canceled | (402) | $ 20.97 |
| Unvested restricted shares outstanding at December 31, 2009 | 5,322 | $ 16.80 |

As of December 31, 2009, there was approximately $69.4 million of unrecognized compensation cost related to unvested restricted stock awards, which is expected to be recognized over a weighted average period of 2.9 years.

### *Noncontrolling Interest*

Noncontrolling interests in certain of the Company's subsidiaries represents ownership interests in the consolidated entity and are included as a component of equity in the consolidated balance sheets and consolidated statement of changes in equity as required by the Consolidation Topic of the ASC.

## 21. Related Party Transactions

The Company enters into transactions in the ordinary course of business with certain of its stockholders and other related parties. These transactions primarily consist of purchases of gas treating services and drilling equipment and sales of oil field services and natural gas. Following is a summary of all significant transactions with such related parties for years ended December 31 (in thousands):

| | 2009 | 2008 | 2007 |
|---|---|---|---|
| Sales to and reimbursements from related parties | $ 7,304 | $ 90,170 | $118,631 |
| Purchases of services from related parties | $21,745 | $59,951 | $ 77,555 |

In 2007, the Company purchased leasehold acreage from a partnership controlled by a director. The purchase price was approximately $8.3 million, which was paid in cash. Also in 2007, the Company purchased certain producing well interests from a director. The purchase price was approximately $3.5 million, which was paid in cash.

In 2008, the Company purchased certain working interests and related reserves in Company wells owned by its Chairman and Chief Executive Officer and certain of his affiliates. The purchase price was $67.3 million. See Note 2.

*Oklahoma City Thunder Agreements*. The Company's Chairman and Chief Executive Officer owns a minority interest in a limited liability company which owns and operates the Oklahoma City Thunder, a National

Table of Contents

Index to Financial Statements



Basketball Association team playing in Oklahoma City, where the Company is headquartered. The Company is party to a five-year sponsorship agreement whereby it pays approximately $3.3 million per year for advertising and promotional activities related to the Oklahoma City Thunder. Additionally, the Company entered into an agreement to license a suite at the arena where the Oklahoma City Thunder plays its home games. Under this four-year agreement, the Company will pay an annual license fee of $0.2 million.

*Larclay, L.P.* As previously discussed in Note 8, Lariat owned a 50% interest in Larclay until April 15, 2009. At that time, Lariat assigned its interest in Larclay to CWEI. The following table summarizes the Company's transactions with Larclay for the period from January 1, 2009 through April 15, 2009 and for the years ended December 31, 2008 and 2007 (in thousands):

| | 2009 | 2008 | 2007 |
|---|---|---|---|
| Sales to and reimbursements from Larclay | $3,125 | $42,757 | $53,256 |
| Purchases of services from Larclay | $1,762 | $ 34,747 | $ 33,297 |

## 22. Subsequent Events

Events occurring after December 31, 2009 were evaluated to ensure that any subsequent events that met the criteria for recognition and/or disclosure in this report have been included.

## 23. Business Segment Information

The Company has three business segments: exploration and production, drilling and oil field services and midstream gas services. These segments represent the Company's three main business units, each offering different products and services. The exploration and production segment is engaged in the acquisition, development and production of natural gas and oil properties. The drilling and oil field services segment is engaged in the land contract drilling of natural gas and oil wells. The midstream gas services segment is engaged in the purchasing, gathering, processing, treating and selling of natural gas. The All Other column in the tables below includes items not related to the Company's reportable segments, including the Company's $CO_2$ gathering and sales operations and corporate operations.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

Management evaluates the performance of the Company’s business segments based on operating income, which is defined as segment operating revenues less operating expenses and depreciation, depletion and amortization. Summarized financial information concerning the Company’s segments is shown in the following table (in thousands):

| | Exploration and Production | Drilling and Oil Field Services | Midstream Gas Services | All Other | Consolidated Total |
|---|---|---|---|---|---|
| **Year Ended December 31, 2009** | | | | | |
| Revenues | $ 457,397 | $ 225,227 | $ 299,580 | $ 30,654 | $ 1,012,858 |
| Inter-segment revenue | (261) | (201,641) | (215,667) | (4,245) | (421,814) |
| Total revenues | $ 457,136 | $ 23,586 | $ 83,913 | $ 26,409 | $ 591,044 |
| Operating loss(1) | $ (1,488,078) | $ (15,166) | $ (36,989) | $ (64,791) | $ (1,605,024) |
| Interest expense, net | (180,856) | (2,074) | (1,246) | (1,140) | (185,316) |
| Other income, net | 4,673 | — | 3,365 | 254 | 8,292 |
| Loss before income taxes | $ (1,664,261) | $ (17,240) | $ (34,870) | $ (65,677) | $ (1,782,048) |
| Capital expenditures(2) | $ 555,809 | $ 4,090 | $ 52,425 | $ 32,818 | $ 645,142 |
| Depreciation, depletion and amortization | $ 178,783 | $ 28,221 | $ 5,496 | $ 14,392 | $ 226,892 |
| **At December 31, 2009** | | | | | |
| Total assets | $ 2,313,582 | $ 229,507 | $ 110,757 | $ 126,471 | $ 2,780,317 |
| **Year Ended December 31, 2008** | | | | | |
| Revenues | $ 912,716 | $ 434,963 | $ 688,071 | $ 22,791 | $ 2,058,541 |
| Inter-segment revenue | (220) | (387,972) | (483,933) | (4,602) | (876,727) |
| Total revenues | $ 912,496 | $ 46,991 | $ 204,138 | $ 18,189 | $ 1,181,814 |
| Operating (loss) income(1) | $ (1,263,249) | $ (5,393) | $ 2,087 | $ (71,592) | $ (1,338,147) |
| Interest expense, net | (139,494) | (2,766) | — | (1,198) | (143,458) |
| Other income, net | 1,171 | 1,015 | 398 | 268 | 2,852 |
| (Loss) income before income taxes | $ (1,401,572) | $ (7,144) | $ 2,485 | $ (72,522) | $ (1,478,753) |
| Capital expenditures(2) | $ 1,909,078 | $ 52,869 | $ 160,460 | $ 55,440 | $ 2,177,847 |
| Depreciation, depletion and amortization | $ 293,625 | $ 42,077 | $ 15,241 | $ 10,422 | $ 361,365 |
| **At December 31, 2008** | | | | | |
| Total assets | $ 2,986,070 | $ 275,164 | $ 284,281 | $ 109,543 | $ 3,655,058 |
| **Year Ended December 31, 2007** | | | | | |
| Revenues | $ 479,321 | $ 261,818 | $ 285,065 | $ 29,286 | $ 1,055,490 |
| Inter-segment revenue | (574) | (188,616) | (177,487) | (11,361) | (378,038) |
| Total revenues | $ 478,747 | $ 73,202 | $ 107,578 | $ 17,925 | $ 677,452 |
| Operating income (loss) | $ 198,913 | $ 10,473 | $ 6,783 | $ (29,310) | $ 186,859 |
| Interest expense, net | (109,458) | (2,762) | (165) | (106) | (112,491) |
| Other income, net | 713 | 2,391 | 1,981 | 16 | 5,101 |
| Income (loss) before income taxes | $ 90,168 | $ 10,102 | $ 8,599 | $ (29,400) | $ 79,469 |
| Capital expenditures(2) | $ 1,046,552 | $ 123,232 | $ 63,828 | $ 47,236 | $ 1,280,848 |
| Depreciation, depletion and amortization | $ 175,565 | $ 37,792 | $ 6,641 | $ 7,111 | $ 227,109 |
| **At December 31, 2007** | | | | | |
| Total assets | $ 3,143,137 | $ 271,563 | $ 127,822 | $ 88,044 | $ 3,630,566 |

(1) The operating loss for the exploration and production segment for the years ended December 31, 2009 and 2008 includes non-cash full cost ceiling impairments of $1,693.3 million and $1,855.0 million, respectively, on the Company’s natural gas and oil properties. The operating loss for the midstream gas services segment for the year ended December 31, 2009 includes a $26.1 million loss on the sale of its gathering and compression assets in the Piñon Field.

(2) On an accrual basis.

Table of Contents

Index to Financial Statements



*Major Customer*. During 2009, 2008 and 2007, the Company had sales in excess of 10% of total revenues to a natural gas and oil purchaser ($120.1 million or 20.0% of total revenues, $124.6 million or 10.5% of total revenues, and $76.1 million or 11.2% of total revenues, respectively).

**24. Condensed Consolidating Financial Information**

The Company provides condensed consolidating financial information for its subsidiaries that are guarantors of its registered debt. The subsidiary guarantors are wholly owned and have, jointly and severally, unconditionally guaranteed on an unsecured basis the Company's 8.625% Senior Notes and Senior Floating Rate Notes. The subsidiary guarantees (i) rank equally in right of payment with all of the existing and future senior debt of the subsidiary guarantors; (ii) rank senior to all of the existing and future subordinated debt of the subsidiary guarantors; (iii) are effectively subordinated in right of payment to any existing or future secured obligations of the subsidiary guarantors to the extent of the value of the assets securing such obligations; and (iv) are structurally subordinated to all debt and other obligations of the subsidiaries of the guarantors who are not themselves guarantors. The Company has not presented separate financial and narrative information for each of the subsidiary guarantors because it believes that such financial and narrative information would not provide any additional information that would be material in evaluating the sufficiency of the guarantees.

Effective May 1, 2009, SandRidge Energy, Inc., the parent, contributed all of its rights, title and interest in its natural gas and oil related assets and accompanying liabilities to one of its wholly owned guarantor subsidiaries, leaving it with no natural gas or oil related assets or operations.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

The following condensed consolidating financial information represents the financial information of SandRidge Energy, Inc., and its wholly owned subsidiary guarantors, prepared on the equity basis of accounting. The non-guarantor subsidiaries are minor and, therefore, not presented separately. The financial information may not necessarily be indicative of the financial position, results of operations, or cash flows had the subsidiary guarantors operated as independent entities.

**Condensed Consolidating Balance Sheets**

| | December 31, 2009 | | | |
|---|---|---|---|---|
| | Parent Company | Guarantor Subsidiaries | Eliminations | Consolidated |
| | (In thousands) | | | |
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ 339 | $ 7,522 | $ — | $ 7,861 |
| Accounts receivable, net | 642,317 | 239,719 | (776,560) | 105,476 |
| Derivative contracts | — | 105,994 | — | 105,994 |
| Other current assets | — | 36,633 | — | 36,633 |
| Total current assets | 642,656 | 389,868 | (776,560) | 255,964 |
| Property, plant and equipment, net | — | 2,433,643 | — | 2,433,643 |
| Investment in subsidiaries | 1,813,887 | — | (1,813,887) | — |
| Other assets | 49,103 | 41,607 | — | 90,710 |
| Total assets | $2,505,646 | $2,865,118 | $(2,590,447) | $ 2,780,317 |
| **LIABILITIES AND EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued expenses | $ 159,693 | $ 820,775 | $ (776,560) | $ 203,908 |
| Other current liabilities | 7,080 | 14,556 | — | 21,636 |
| Total current liabilities | 166,773 | 835,331 | (776,560) | 225,544 |
| Long-term debt | 2,543,611 | 23,324 | — | 2,566,935 |
| Asset retirement obligation | — | 108,584 | — | 108,584 |
| Other liabilities | 1,219 | 73,940 | — | 75,159 |
| Total liabilities | 2,711,603 | 1,041,179 | (776,560) | 2,976,222 |
| (Deficit) equity | (205,957) | 1,823,939 | (1,813,887) | (195,905) |
| Total liabilities and equity | $2,505,646 | $2,865,118 | $(2,590,447) | $ 2,780,317 |

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

| | December 31, 2008 | | | |
|---|---|---|---|---|
| | Parent Company | Guarantor Subsidiaries | Eliminations | Consolidated |
| | (In thousands) | | | |
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ 18 | $ 618 | $ — | $ 636 |
| Accounts receivable, net | 863,129 | 66,463 | (820,519) | 109,073 |
| Derivative contracts | 201,111 | — | — | 201,111 |
| Other current assets | 3,194 | 41,899 | — | 45,093 |
| Total current assets | 1,067,452 | 108,980 | (820,519) | 355,913 |
| Property, plant and equipment, net | 1,106,623 | 2,068,936 | — | 3,175,559 |
| Investment in subsidiaries | 1,002,336 | — | (1,002,336) | — |
| Other assets | 135,161 | 39,809 | (51,384) | 123,586 |
| Total assets | $ 3,311,572 | $ 2,217,725 | $ (1,874,239) | $ 3,655,058 |
| **LIABILITIES AND EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued expenses | $ 163,068 | $ 1,024,018 | $ (820,519) | $ 366,567 |
| Other current liabilities | 5,106 | 30,951 | — | 36,057 |
| Total current liabilities | 168,174 | 1,054,969 | (820,519) | 402,624 |
| Long-term debt | 2,323,458 | 86,710 | (51,384) | 2,358,784 |
| Asset retirement obligation | 12,759 | 71,738 | — | 84,497 |
| Other liabilities | 13,660 | 1,942 | — | 15,602 |
| Total liabilities | 2,518,051 | 1,215,359 | (871,903) | 2,861,507 |
| Equity | 793,521 | 1,002,366 | (1,002,336) | 793,551 |
| Total liabilities and equity | $ 3,311,572 | $ 2,217,725 | $ (1,874,239) | $ 3,655,058 |

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

**Condensed Consolidating Statements of Operations**

| | Parent Company | Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|
| | | (In thousands) | | |
| **Year Ended December 31, 2009** | | | | |
| Total revenues | $ 58,273 | $ 534,876 | $ (2,105) | $ 591,044 |
| Expenses: | | | | |
| Direct operating expenses | 27,737 | 283,665 | (2,105) | 309,297 |
| General and administrative | 15,645 | 84,611 | — | 100,256 |
| Depreciation, depletion, amortization and impairment | 627,478 | 1,306,564 | — | 1,934,042 |
| (Gain) loss on derivative contracts | (237,351) | 89,824 | — | (147,527) |
| Total expenses | 433,509 | 1,764,664 | (2,105) | 2,196,068 |
| Loss from operations | (375,236) | (1,229,788) | — | (1,605,024) |
| Equity earnings from subsidiaries | (1,227,164) | — | 1,227,164 | — |
| Interest expense, net | (182,009) | (3,307) | — | (185,316) |
| Other income, net | 103 | 8,189 | — | 8,292 |
| Loss before income tax benefit | (1,784,306) | (1,224,906) | 1,227,164 | (1,782,048) |
| Income tax benefit | (8,716) | — | — | (8,716) |
| Net loss | (1,775,590) | (1,224,906) | 1,227,164 | (1,773,332) |
| Less: net income attributable to noncontrolling interest | — | 2,258 | — | 2,258 |
| Net loss attributable to SandRidge Energy, Inc. | $(1,775,590) | $(1,227,164) | $1,227,164 | $(1,775,590) |
| **Year Ended December 31, 2008** | | | | |
| Total revenues | $ 329,109 | $ 855,184 | $ (2,479) | $ 1,181,814 |
| Expenses: | | | | |
| Direct operating expenses | 72,473 | 323,172 | (2,479) | 393,166 |
| General and administrative | 40,638 | 68,734 | — | 109,372 |
| Depreciation, depletion, amortization and impairment | 957,509 | 1,271,353 | — | 2,228,862 |
| Gain on derivative contracts | (211,439) | — | — | (211,439) |
| Total expenses | 859,181 | 1,663,259 | (2,479) | 2,519,961 |
| Loss from operations | (530,072) | (808,075) | — | (1,338,147) |
| Equity earnings from subsidiaries | (809,594) | — | 809,594 | — |
| Interest expense, net | (140,022) | (3,436) | — | (143,458) |
| Other income, net | 36 | 2,816 | — | 2,852 |
| Loss before income tax (benefit) expense | (1,479,652) | (808,695) | 809,594 | (1,478,753) |
| Income tax (benefit) expense | (38,372) | 44 | — | (38,328) |
| Net loss | (1,441,280) | (808,739) | 809,594 | (1,440,425) |
| Less: net income attributable to noncontrolling interest | — | 855 | — | 855 |
| Net loss attributable to SandRidge Energy, Inc. | $ (1,441,280) | $ (809,594) | $ 809,594 | $ (1,441,280) |

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

| | Parent Company | Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|
| | | (In thousands) | | |
| **Year Ended December 31, 2007** | | | | |
| Total revenues | $ 139,281 | $ 538,171 | $ — | $ 677,452 |
| Expenses: | | | | |
| Direct operating expenses | 33,643 | 228,793 | — | 262,436 |
| General and administrative | 32,446 | 29,334 | — | 61,780 |
| Depreciation, depletion and amortization | 43,257 | 183,852 | — | 227,109 |
| Gain on derivative contracts | (26,183) | (34,549) | — | (60,732) |
| Total expenses | 83,163 | 407,430 | — | 490,593 |
| Income from operations | 56,118 | 130,741 | — | 186,859 |
| Equity earnings from subsidiaries | 137,515 | — | (137,515) | — |
| Interest (expense) income, net | (113,838) | 1,347 | — | (112,491) |
| Other (expense) income, net | (81) | 5,182 | — | 5,101 |
| Income before income tax expense | 79,714 | 137,270 | (137,515) | 79,469 |
| Income tax expense | 29,493 | 31 | — | 29,524 |
| Net income | 50,221 | 137,239 | (137,515) | 49,945 |
| Less: net loss attributable to noncontrolling interest | — | (276) | — | (276) |
| Net income attributable to SandRidge Energy, Inc. | $ 50,221 | $137,515 | $(137,515) | $ 50,221 |

**Condensed Consolidating Statements of Cash Flows**

| | Parent Company | Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|
| | | (In thousands) | | |
| **Year Ended December 31, 2009** | | | | |
| Net cash (used in) provided by operating activities | $ (717,969) | $ 1,029,528 | $ — | $ 311,559 |
| Net cash used in investing activities | (240,992) | (1,006,067) | — | (1,247,059) |
| Net cash provided by (used in) financing activities | 959,282 | (16,557) | — | 942,725 |
| Net increase in cash and cash equivalents | 321 | 6,904 | — | 7,225 |
| Cash and cash equivalents at beginning of year | 18 | 618 | — | 636 |
| Cash and cash equivalents at end of year | $ 339 | $ 7,522 | $ — | $ 7,861 |
| **Year Ended December 31, 2008** | | | | |
| Net cash (used in) provided by operating activities | $ (309,359) | $ 888,548 | $ — | $ 579,189 |
| Net cash used in investing activities | (1,042,633) | (866,810) | — | (1,909,443) |
| Net cash provided by (used in) financing activities | 1,289,043 | (21,288) | — | 1,267,755 |
| Net (decrease) increase in cash and cash equivalents | (62,949) | 450 | — | (62,499) |
| Cash and cash equivalents at beginning of year | 62,967 | 168 | — | 63,135 |
| Cash and cash equivalents at end of year | $ 18 | $ 618 | $ — | $ 636 |
| **Year Ended December 31, 2007** | | | | |
| Net cash (used in) provided by operating activities | $ (301,288) | $ 667,724 | $ (8,984) | $ 357,452 |
| Net cash used in investing activities | (728,697) | (656,884) | — | (1,385,581) |
| Net cash provided by (used in) financing activities | 1,061,505 | (18,173) | 8,984 | 1,052,316 |
| Net increase (decrease) in cash and cash equivalents | 31,520 | (7,333) | — | 24,187 |
| Cash and cash equivalents at beginning of year | 31,447 | 7,501 | — | 38,948 |
| Cash and cash equivalents at end of year | $ 62,967 | $ 168 | $ — | $ 63,135 |

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

**25. Supplemental Information on Oil and Gas Producing Activities**

The Supplementary Information on Oil and Gas Producing Activities is presented as required by ASC Topic 932, Extractive Activities — Oil and Gas. The supplemental information includes capitalized costs related to oil and gas producing activities; costs incurred in oil and gas property acquisition, exploration and development; and the results of operations for oil and gas producing activities. Supplemental information is also provided for oil and gas production and average sales prices; the estimated quantities of proved oil and gas reserves; the standardized measure of discounted future net cash flows associated with proved oil and gas reserves; and a summary of the changes in the standardized measure of discounted future net cash flows associated with proved oil and gas reserves.

*Capitalized Costs Related to Oil and Gas Producing Activities*

The Company's capitalized costs consisted of the following (in thousands):

| | December 31, | | |
|---|---|---|---|
| | 2009 | 2008 | 2007 |
| Natural gas and oil properties: | | | |
| Proved | $ 5,913,408 | $ 4,676,072 | $ 2,848,531 |
| Unproved | 281,811 | 215,698 | 259,610 |
| Total natural gas and oil properties | 6,195,219 | 4,891,770 | 3,108,141 |
| Less accumulated depreciation, depletion and impairment | (4,223,437) | (2,369,840) | (230,974) |
| Net natural gas and oil properties capitalized costs | $ 1,971,782 | $ 2,521,930 | $2,877,167 |

*Costs Incurred in Oil and Gas Property Acquisition, Exploration and Development*

Costs incurred in oil and gas property acquisition, exploration and development activities which have been capitalized are summarized as follows (in thousands):

| | 2009 | 2008 | 2007 |
|---|---|---|---|
| Acquisitions of properties: | | | |
| Proved | $ 749,070 | $ 366,275 | $ 303,282 |
| Unproved | 67,731 | 16,982 | — |
| Exploration(1) | 126,345 | 391,672 | 361,973 |
| Development | 407,409 | 1,132,078 | 485,348 |
| Total cost incurred | $ 1,350,555 | $ 1,907,007 | $ 1,150,603 |

(1) Includes seismic costs of $6.8 million, $68.8 million and $38.6 million for 2009, 2008 and 2007, respectively. 2009 and 2008 amounts also include pipe inventory costs of $77.7 million and $47.2 million, respectively.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

*Results of Operations for Oil and Gas Producing Activities (Unaudited)*

The Company's results of operations from oil and gas producing activities for each of the years 2007, 2008 and 2009 are shown in the following table (in thousands):

| | |
|---|---|
| **For the Year Ended December 31, 2007** | |
| Revenues | $ 477,612 |
| Expenses: | |
| Production costs | 125,749 |
| Depreciation, depletion and amortization expenses | 169,392 |
| Total expenses | 295,141 |
| Income before income taxes | 182,471 |
| Provision for income taxes | 65,690 |
| Results of operations for oil and gas producing activities (excluding corporate overhead and interest costs) | $ 116,781 |
| **For the Year Ended December 31, 2008** | |
| Revenues | $ 908,689 |
| Expenses: | |
| Production costs | 189,598 |
| Depreciation, depletion, amortization and impairment expenses | 2,140,685 |
| Total expenses | 2,330,283 |
| Loss before income taxes | (1,421,594) |
| Benefit of income taxes | (36,819) |
| Results of operations for oil and gas producing activities (excluding corporate overhead and interest costs) | $ (1,384,775) |
| **For the Year Ended December 31, 2009** | |
| Revenues | $ 454,705 |
| Expenses: | |
| Production costs | 173,295 |
| Depreciation, depletion, amortization and impairment expenses | 1,869,314 |
| Total expenses | 2,042,609 |
| Loss before income taxes | (1,587,904) |
| Benefit of income taxes | (7,940) |
| Results of operations for oil and gas producing activities (excluding corporate overhead and interest costs) | $(1,579,964) |

*Oil and Gas Reserve Quantities (Unaudited)*

Proved oil and gas reserves are those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible, based on prices used to estimate reserves, from a given date forward from known reservoirs, and under existing economic conditions, operating methods, and government regulation before the time of which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain. Proved developed reserves are proved reserves expected to be recovered through existing wells with existing equipment and operating methods or in

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

which the cost of the required equipment is relatively minor compared with the cost of a new well. Proved undeveloped reserves are reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively large major expenditure is required for recompletion.

The table below represents the Company's estimate of proved natural gas and oil reserves attributable to the Company's net interest in oil and gas properties, all of which are located in the continental United States, based upon the evaluation by the Company and its independent petroleum engineers of pertinent geoscience and engineering data in accordance with the Securities and Exchange Commission's regulations. Estimates of substantially all of the Company's proved reserves have been prepared by independent reservoir engineers and geoscience professionals and are reviewed by members of the Company's senior management with professional training in petroleum engineering to ensure that the Company consistently applies rigorous professional standards and the reserve definitions prescribed by the SEC.

Netherland, Sewell & Associates, Inc., DeGolyer and MacNaughton and Lee Keeling and Associates, Inc., independent oil and gas consultants, prepared the estimates of proved reserves of natural gas and oil attributable to substantially all of the Company's net interest in natural gas and oil properties as of the end of one or more of 2009, 2008 and 2007. Netherland, Sewell & Associates, Inc., DeGolyer and MacNaughton and Lee Keeling and Associates, Inc., are independent petroleum engineers, geologists, geophysicists and petrophysicists and do not own an interest in the Company or its properties and are not employed on a contingent basis. Netherland, Sewell & Associates, Inc. and Lee Keeling and Associates, Inc., prepared the estimates of proved reserves for a majority of the Company's properties other than those held by SandRidge Tertiary, LLC (formerly PetroSource Production Co), which constitute approximately 85.4% of the Company's total proved reserves as of December 31, 2009. DeGolyer and MacNaughton prepared the estimates of proved reserves for SandRidge Tertiary, LLC, which constitute approximately 9.6% of our total proved reserves as of December 31, 2009. The small remaining portion of estimates of proved reserves were based on Company estimates.

The Company believes the geoscience and engineering data examined provides reasonable assurance that the proved reserves are economically producible in future years from known reservoirs, and under existing economic conditions, operating methods and governmental regulations. Estimates of proved reserves are subject to change, either positively or negatively, as additional information is available and contractual and economic conditions change.

During 2008 and 2007, the Company recognized additional reserves attributable to extensions and discoveries as a result of successful drilling in the Piñon Field. Drilling expenditures of $129.8 million and $97.1 million resulted in the addition of 57.8 Bcfe and 44.7 Bcfe, respectively, of net proved developed reserves by extending the field boundaries as well as proving the producing capabilities of formations not previously captured as proved reserves. The remaining 136.5 Bcfe and 55.1 Bcfe of net proved reserve extensions in the Piñon Field for 2008 and 2007, respectively, are proved undeveloped reserves associated with direct offsets to the drilling program extending the boundaries of the Piñon Field and zone identification. Changes in reserves associated with the development drilling have been accounted for in revisions of previous reserve estimates.

During 2009, the Company recognized downward revisions of 1,123.8 Bcf in its natural gas reserve quantities as lower natural gas prices used in the estimation of reserves as of December 31, 2009 caused (1) a significant number of proved undeveloped reserve locations to generate no discounted future net cash flows resulting in the elimination of associated reserve quantities and (2) a shortening of the productive lives of certain proved properties that became uneconomic earlier in their lives with the use of lower gas prices compared to prices used in the estimation of reserves in the previous periods. The natural gas price used in the estimation as of December 31, 2009, which is a 12-month average price in accordance with SEC rules, was $3.87 per Mcf compared to the index price at December 31, 2008 of $5.71 per Mcf used in the estimation of year end 2008 reserves. The remaining 121.1 Bcf of negative revisions are performance related.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

The summary below presents changes in the Company's estimated reserves for 2007, 2008 and 2009.

| | Oil (MBbls) | Nat. Gas (MMcf)(1) |
|---|---|---|
| **Proved developed and undeveloped reserves:** | | |
| As of December 31, 2006 | 25,175 | 850,708 |
| Revisions of previous estimates | 5,492 | 318,639 |
| Acquisitions of new reserves | 53 | 75,139 |
| Extensions and discoveries | 7,849 | 104,501 |
| Production | (2,042) | (51,958) |
| As of December 31, 2007 | 36,527 | 1,297,029 |
| Revisions of previous estimates | 6,738 | 412,155 |
| Acquisitions of new reserves | 513 | 38,008 |
| Extensions and discoveries | 1,728 | 241,596 |
| Sales of reserves in place | (8) | (1,750) |
| Production | (2,334) | (87,402) |
| As of December 31, 2008 | 43,164 | 1,899,636 |
| Revisions of previous estimates | 8,826 | (1,244,873) |
| Acquisitions of new reserves | 56,342 | 104,046 |
| Extensions and discoveries | 8 | 8,890 |
| Sales of reserves in place | (97) | (163) |
| Production | (2,894) | (87,461) |
| As of December 31, 2009 | 105,349 | 680,075 |
| **Proved developed reserves(2):** | | |
| As of December 31, 2006 | 10,994 | 308,296 |
| As of December 31, 2007 | 12,532 | 590,358 |
| As of December 31, 2008 | 15,342 | 851,357 |
| As of December 31, 2009 | 38,327 | 592,777 |
| **Proved undeveloped reserves(2):** | | |
| As of December 31, 2006 | 14,181 | 542,412 |
| As of December 31, 2007 | 23,995 | 706,671 |
| As of December 31, 2008 | 27,822 | 1,048,279 |
| As of December 31, 2009 | 67,022 | 87,298 |

(1) Natural gas reserves are computed at 14.65 pounds per square inch absolute and 60 degrees Fahrenheit.
(2) Our estimated proved reserves were determined using a 12-month average price for natural gas and oil for the year ended December 31, 2009 and year-end prices for natural gas and oil as of December 31, 2008, 2007 and 2006.

*Standardized Measure of Discounted Future Net Cash Flows (Unaudited)*

The standardized measure of discounted cash flows and summary of the changes in the standardized measure computation from year to year are prepared in accordance with ASC Topic 932. The assumptions that underlie the computation of the standardized measure of discounted cash flows may be summarized as follows:

- the standardized measure includes the Company's estimate of proved oil, natural gas and natural gas liquids reserves and projected future production volumes based upon economic conditions;

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

- pricing is applied based upon 12-month average market prices at December 31, 2009 and year end prices for December 31, 2008 and December 31, 2007 adjusted for fixed or determinable contracts that are in existence at year-end. The calculated weighted average per unit prices for the Company's proved reserves and future net revenues were as follows:

| | At December 31, | | |
|---|---|---|---|
| | 2009 | 2008 | 2007 |
| Natural gas (per Mcf) | $ 3.41 | $ 4.94 | $ 6.46 |
| Oil (per barrel) | $49.98 | $39.42 | $87.47 |

- future development and production costs are determined based upon actual cost at year-end;
- the standardized measure includes projections of future abandonment costs based upon actual costs at year-end; and
- a discount factor of 10% per year is applied annually to the future net cash flows.

The summary below presents the Company's future net cash flows relating to proved oil and gas reserves based on the standardized measure in ASC Topic 932.

| | (In thousands) |
|---|---|
| **As of December 31, 2007** | |
| Future cash inflows from production | $11,578,381 |
| Future production costs | (2,706,208) |
| Future development costs(a) | (1,640,500) |
| Future income tax expenses | (1,782,909) |
| Undiscounted future net cash flows | 5,448,764 |
| 10% annual discount | (2,730,227) |
| Standardized measure of discounted future net cash flows | $ 2,718,537 |
| **As of December 31, 2008** | |
| Future cash inflows from production | $11,092,154 |
| Future production costs | (3,887,553) |
| Future development costs(a) | (2,153,506) |
| Future income tax expenses | (399,014) |
| Undiscounted future net cash flows | 4,652,081 |
| 10% annual discount | (2,431,505) |
| Standardized measure of discounted future net cash flows | $ 2,220,576 |
| **As of December 31, 2009** | |
| Future cash inflows from production | $ 7,582,670 |
| Future production costs | (3,028,888) |
| Future development costs(a) | (938,272) |
| Future income tax expenses | — |
| Undiscounted future net cash flows | 3,615,510 |
| 10% annual discount | (2,054,532) |
| Standardized measure of discounted future net cash flows | $ 1,560,978 |

(a) Includes abandonment costs.

Table of Contents

Index to Financial Statements

**SandRidge Energy, Inc., and Subsidiaries**
**Notes to Consolidated Financial Statements—(continued)**

The following table represents the Company's estimate of changes in the standardized measure of discounted future net cash flows from proved reserves (in thousands):

**Changes in the Standardized Measure of Discounted Future Net Cash Flows**
**Associated with Proved Oil and Gas Reserves**

| | |
|---|---|
| **Present value as of December 31, 2006** | $ 1,440,146 |
| Changes during the year: | |
| Revenues less production and other costs | (351,863) |
| Net changes in prices, production and other costs | 800,630 |
| Development costs incurred | 485,348 |
| Net changes in future development costs | (723,943) |
| Extensions and discoveries | 328,094 |
| Revisions of previous quantity estimates | 998,729 |
| Accretion of discount | 88,596 |
| Net change in income taxes | (537,835) |
| Purchases of reserves in-place | 155,051 |
| Timing differences and other(a) | 35,584 |
| Net change for the year | 1,278,391 |
| **Present value as of December 31, 2007** | 2,718,537 |
| Changes during the year: | |
| Revenues less production and other costs | (719,091) |
| Net changes in prices, production and other costs | (1,747,962) |
| Development costs incurred | 1,132,078 |
| Net changes in future development costs | (1,152,018) |
| Extensions and discoveries | 227,874 |
| Revisions of previous quantity estimates | 757,939 |
| Accretion of discount | 168,811 |
| Net change in income taxes | 794,001 |
| Purchases of reserves in-place | 47,767 |
| Sales of reserves in-place | (2,076) |
| Timing differences and other(a) | (5,284) |
| Net change for the year | (497,961) |
| **Present value as of December 31, 2008** | 2,220,576 |
| Changes during the year: | |
| Revenues less production and other costs | (281,410) |
| Net changes in prices, production and other costs | (1,841,292) |
| Development costs incurred | 201,467 |
| Net changes in future development costs | 1,075,246 |
| Extensions and discoveries | 8,671 |
| Revisions of previous quantity estimates | (553,469) |
| Accretion of discount | 109,512 |
| Net change in income taxes | 37,936 |
| Purchases of reserves in-place | 565,457 |
| Sales of reserves in-place | (131) |
| Timing differences and other(a) | 18,415 |
| Net change for the year | (659,598) |
| **Present value as of December 31, 2009** | $ 1,560,978 |

(a) The change in timing differences and other are related to revisions in the Company's estimated time of production and development.

Table of Contents

Index to Financial Statements



**26. Quarterly Financial Results (Unaudited)**

The Company's operating results for each quarter of 2009 and 2008 are summarized below (in thousands, except per share data).

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| **2009:** | | | | |
| Total revenues | $ 159,013 | $ 134,099 | $ 134,855 | $ 163,077 |
| Loss from operations(2) | $ (1,116,280) | $ (49,987) | $ (50,229) | $ (388,528) |
| Net loss(2) | $ (1,154,854) | $ (91,170) | $ (101,312) | $ (425,996) |
| Loss applicable to SandRidge Energy, Inc., common stockholders(2) | $ (1,154,857) | $ (91,174) | $ (104,132) | $ (434,240) |
| Net loss per share applicable to SandRidge Energy, Inc., common stockholders(1): | | | | |
| Basic | $ (7.07) | $ (0.52) | $ (0.58) | $ (2.36) |
| Diluted | $ (7.07) | $ (0.52) | $ (0.58) | $ (2.36) |
| **2008:** | | | | |
| Total revenues | $ 269,086 | $ 378,050 | $ 334,023 | $ 200,655 |
| (Loss) income from operations(2) | $ (62,811) | $ (11,795) | $ 401,287 | $ (1,664,828) |
| Net (loss) income(2) | $ (55,790) | $ (20,327) | $ 230,348 | $ (1,594,656) |
| (Loss) income (applicable) available to SandRidge Energy, Inc., common stockholders(2) | $ (66,207) | $ (26,993) | $ 230,346 | $ (1,594,658) |
| Net (loss) income per share (applicable) available to SandRidge Energy, Inc., common stockholders(1): | | | | |
| Basic | $ (0.47) | $ (0.17) | $ 1.41 | $ (9.78) |
| Diluted | $ (0.47) | $ (0.17) | $ 1.40 | $ (9.78) |

(1) Income (loss) per share available (applicable) to common stockholders for each quarter is computed using the weighted-average number of shares outstanding during the quarter, while earnings per share for the fiscal year is computed using the weighted-average number of shares outstanding during the year. Thus, the sum of income (loss) per share available (applicable) to common stockholders for each of the four quarters may not equal the fiscal year amount.

(2) Includes a full cost ceiling impairment of $388.9 million, $1,304.4 million and $1,855.0 million for the fourth quarter of 2009, first quarter of 2009 and fourth quarter of 2008, respectively.

Table of Contents

Index to Financial Statements

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**SANDRIDGE ENERGY, INC.**

/S/ TOM L. WARD

**Tom L. Ward,**
**Chairman of the Board and Chief Executive Officer**

March 1, 2010

KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Tom L. Ward, Richard J. Gognat and Justin P. Byrne, and each of them severally, his true and lawful attorney or attorneys-in-fact and agents, with full power to act with or without the others and with full power of substitution and resubstitution, to execute in his name, place and stead, in any and all capacities, any or all amendments to this report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents and each of them, full power and authority to do and perform in the name of on behalf of the undersigned, in any and all capacities, each and every act and thing necessary or desirable to be done in and about the premises, to all intents and purposes and as fully as they might or could do in person, hereby ratifying, approving and confirming all that said attorneys-in-fact and agents or their substitutes may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /S/ TOM L. WARD<br>**Tom L. Ward** | President, Chief Executive Officer and Chairman of the Board (Principal Executive Officer) | March 1, 2010 |
| /S/ DIRK M. VAN DOREN<br>**Dirk M. Van Doren** | Chief Financial Officer and Executive Vice President (Principal Financial Officer) | March 1, 2010 |
| /S/ RANDALL D. COOLEY<br>**Randall D. Cooley** | Senior Vice President — Accounting (Principal Accounting Officer) | March 1, 2010 |
| /S/ DAN JORDAN<br>**Dan Jordan** | Director | March 1, 2010 |
| /S/ BILL GILLILAND<br>**Bill Gilliland** | Director | March 1, 2010 |
| /S/ ROY T. OLIVER, JR.<br>**Roy T. Oliver, Jr.** | Director | March 1, 2010 |
| /S/ EVERETT R. DOBSON<br>**Everett R. Dobson** | Director | March 1, 2010 |
| /S/ D. DWIGHT SCOTT<br>**D. Dwight Scott** | Director | March 1, 2010 |
| /S/ JEFF SEROTA<br>**Jeff Serota** | Director | March 1, 2010 |

Table of Contents

Index to Financial Statements

## EXHIBIT INDEX

| Exhibit No. | Exhibit Description | Incorporated by Reference Form | SEC File No. | Exhibit | Filing Date | Filed Herewith |
|---|---|---|---|---|---|---|
| 1.1 | Underwriting Agreement, dated April 23, 2009, among SandRidge Energy, Inc., Tom L. Ward and Morgan Stanley & Co. Incorporated, as representative of the underwriters named therein | 8-K | 001-33784 | 1.1 | 04/28/2009 | |
| 1.2 | Underwriting Agreement, dated December 1, 2009, among SandRidge Energy, Inc., Tom L. Ward and Barclays Capital Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and RBC Capital Markets Corporation, as representatives of the several underwriters set forth in Schedule 1 thereto | 8-K | 001-33784 | 1.1 | 12/02/2009 | |
| 2.1 | Stock Purchase Agreement, dated September 22, 2009, among SandRidge Energy, Inc., SandRidge Exploration, LLC, Crusader Energy Group Inc., Crusader Energy Group, LLC, Hawk Energy Fund I, LLC, Knight Energy Group, LLC, Knight Energy Group II, LLC, Knight Energy Management, LLC and RCH Upland Acquisition, LLC | 10-Q | 001-33784 | 2.1 | 11/05/2009 | |
| 3.1 | Certificate of Incorporation of SandRidge Energy, Inc. | S-1 | 333-148956 | 3.1 | 01/30/2008 | |
| 3.2 | Certificate of Designation of 8.5% Convertible Perpetual Preferred Stock of SandRidge Energy, Inc. | 8-K | 001-33784 | 3.1 | 01/21/2009 | |
| 3.3 | Certificate of Designation of 6.0% Convertible Perpetual Preferred Stock of SandRidge Energy, Inc. | 8-K | 001-33784 | 3.1 | 12/22/2009 | |
| 3.4 | Amended and Restated Bylaws of SandRidge Energy, Inc. | 8-K | 001-33784 | 3.1 | 03/09/2009 | |
| 4.1 | Specimen Stock Certificate representing common stock of SandRidge Energy, Inc. | S-1 | 333-148956 | 4.1 | 01/30/2008 | |
| 4.3 | Registration Rights Agreement, dated November 21, 2006, by and among SandRidge Energy, Inc. (as successor by merger to Riata Energy, Inc.) and the Purchasers party thereto | S-1 | 333-148956 | 4.3 | 01/30/2008 | |
| 4.7 | Amended and Restated Shareholders Agreement, dated April 4, 2007, among SandRidge Energy, Inc. (as successor by merger to Riata Energy, Inc.) and certain shareholders | S-1 | 333-148956 | 4.7 | 01/30/2008 | |
| 4.8 | Registration Rights Agreement, dated March 20, 2007, by and among SandRidge Energy, Inc. and the several purchasers party thereto | S-1 | 333-148956 | 4.8 | 01/30/2008 | |

Table of Contents

Index to Financial Statements

| Exhibit No. | Exhibit Description | Incorporated by Reference Form | SEC File No. | Exhibit | Filing Date | Filed Herewith |
|---|---|---|---|---|---|---|
| 4.10 | Shareholders Agreement, dated March 20, 2007, by and among SandRidge Energy, Inc. and certain common shareholders | S-1 | 333-148956 | 4.10 | 01/30/2008 | |
| 4.11 | Indenture, dated May 1, 2008, by and among SandRidge Energy, Inc., certain subsidiary guarantors named therein and Wells Fargo Bank, National Association, as trustee | 8-K | 001-33784 | 4.1 | 05/02/2008 | |
| 4.12 | Registration Rights Agreement, dated May 1, 2008, by and among SandRidge Energy, Inc. and certain guarantors named therein for the benefit of noteholders | 8-K | 001-33784 | 4.2 | 05/02/2008 | |
| 4.14 | Indenture, dated May 20, 2008, by and among SandRidge Energy, Inc., certain subsidiary guarantors named therein and Wells Fargo Bank, National Association, as trustee | 8-K | 001-33784 | 4.1 | 05/21/2008 | |
| 4.15 | Registration Rights Agreement, dated May 20, 2008 by and among SandRidge Energy, Inc., certain subsidiary guarantors named therein, Banc of America Securities LLC, Barclays Capital, Inc. and J.P. Morgan Securities Inc., as representatives of the purchasers | 8-K | 001-33784 | 4.2 | 05/21/2008 | |
| 4.16 | Registration Rights Agreement, dated February 16, 2009, among SandRidge Energy, Inc., George B. Kaiser and Pooled CIT Investments, O.K. | 10-K | 001-33784 | 4.16 | 02/26/2009 | |
| 4.17 | Amendment to Registration Rights Agreement, dated April 23, 2009, by and among SandRidge Energy, Inc. and certain common shareholders | 8-K | 001-33784 | 4.2 | 04/28/2009 | |
| 4.18 | Indenture, dated May 14, 2009, by and among SandRidge Energy, Inc., certain subsidiary guarantors named therein and Wells Fargo Bank, National Association, as trustee | 8-K | 001-33784 | 4.1 | 05/15/2009 | |
| 4.19 | Registration Rights Agreement, dated May 14, 2009 by and among SandRidge Energy, Inc., certain subsidiary guarantors named therein, Barclays Capital Inc., Banc of America Securities LLC, J.P. Morgan Securities Inc., RBC Capital Markets Corporation and RBS Securities Inc., as representatives of the purchasers | 8-K | 001-33784 | 4.2 | 05/15/2009 | |
| 4.20 | Indenture, dated December 16, 2009, by and among SandRidge Energy, Inc., certain subsidiary guarantors named therein and Wells Fargo Bank, National Association, as trustee | 8-K | 001-33784 | 4.1 | 12/22/2009 | |

Table of Contents

Index to Financial Statements

| Exhibit No. | Exhibit Description | Incorporated by Reference Form | SEC File No. | Exhibit | Filing Date | Filed Herewith |
|---|---|---|---|---|---|---|
| 4.21 | Registration Rights Agreement, dated December 16, 2009, by and among SandRidge Energy, Inc., certain subsidiary guarantors named therein, Banc of America Securities LLC, Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Mitsubishi UFJ Securities (USA), Inc. and RBC Capital Markets Corporation, as representatives of the purchasers | 8-K | 001-33784 | 4.2 | 12/22/2009 | |
| 10.1† | Executive Nonqualified Excess Plan | 8-K | 001-33784 | 10.1 | 07/15/2008 | |
| 10.2† | Riata 2005 Stock Plan | S-1 | 333-148956 | 10.2 | 01/30/2008 | |
| 10.2.1† | Form of Restricted Stock Award Agreement under 2005 Stock Plan | 10-K | 001-33784 | 10.2.1 | 03/07/2008 | |
| 10.3† | SandRidge Energy, Inc. 2009 Incentive Plan | 8-K | 001-33784 | 10.1 | 06/09/2009 | |
| 10.5.1† | Employment Agreement of Tom L. Ward, dated June 8, 2006 | S-1 | 333-148956 | 10.11 | 01/30/2008 | |
| 10.5.2† | Employment Agreement of Dirk M. Van Doren, dated effective as of January 1, 2008 | 10-Q | 001-33784 | 10.5.2 | 05/08/2008 | |
| 10.5.3† | Employment Agreement of Matthew K. Grubb, dated effective as of January 1, 2008 | 10-Q | 001-33784 | 10.5.3 | 05/08/2008 | |
| 10.5.4† | Employment Agreement of Todd N. Tipton, dated effective as of January 1, 2008 | 10-Q | 001-33784 | 10.5.4 | 05/08/2008 | |
| 10.5.5† | Employment Agreement of Larry K. Coshow, dated effective as of January 1, 2008 | 10-Q | 001-33784 | 10.5.5 | 05/08/2008 | |
| 10.5.6† | Form of Employment Agreement for Senior Vice Presidents | 10-Q | 001-33784 | 10.5.6 | 05/08/2008 | |
| 10.5.7† | Employment Separation Agreement of Larry K. Coshow, dated April 14, 2008 | 10-Q | 001-33784 | 10.5.7 | 05/08/2008 | |
| 10.5.8† | Employment Agreement of Rodney E. Johnson, dated effective as of January 1, 2009 | 10-K | 001-33784 | 10.5.8 | 02/26/2009 | |
| 10.6† | Form of Indemnification Agreement for directors and officers | S-1 | 333-148956 | 10.5 | 01/30/2008 | |
| 10.7 | Senior Credit Facility, dated November 21, 2006, by and among SandRidge Energy, Inc. (as successor by merger to Riata Energy, Inc.) and Bank of America, N.A., as Administrative Agent and Banc of America Securities LLC as Lead Arranger and Book Running Manager | S-1 | 333-148956 | 10.6 | 01/30/2008 | |
| 10.7.1 | Amendment No. 1 to Senior Credit Facility, dated November 21, 2006 by and among SandRidge Energy, Inc. | S-1 | 333-148956 | 10.6 | 01/30/2008 | |
| 10.7.2 | Amendment No. 2 to Senior Credit Facility, dated November 21, 2006 | S-1 | 333-148956 | 10.10 | 01/30/2008 | |

Table of Contents

Index to Financial Statements

| Exhibit No. | Exhibit Description | Incorporated by Reference Form | SEC File No. | Exhibit | Filing Date | Filed Herewith |
|---|---|---|---|---|---|---|
| 10.7.3 | Amendment No. 3 to Senior Credit Facility, dated September 14, 2007 | 10-Q | 001-33784 | 10.7.3 | 05/08/2008 | |
| 10.7.4 | Amendment No. 4 to Senior Credit Facility, dated April 4, 2008 | 10-Q | 001-33784 | 10.4 | 08/07/2008 | |
| 10.7.5 | Amendment No. 5 to Senior Credit Facility, dated September 18, 2008 | 10-K | 001-33784 | 10.7.5 | 02/26/2009 | |
| 10.7.6 | Amendment No. 6 to Senior Credit Facility, dated April 17, 2009 | 8-K | 001-33784 | 10.1 | 08/06/2007 | |
| 10.7.7 | Amendment No. 7 to Senior Credit Facility, dated October 15, 2009 | | | | | * |
| 10.7.8 | Amendment No. 8 to Senior Credit Facility, dated December 14, 2009 | 8-K | 001-33784 | 10.2 | 12/15/2009 | |
| 10.8 | Credit Agreement, dated March 22, 2007 by and among SandRidge Energy, Inc. and Bank of America, N.A., as Administrative Agent and Banc of America Securities LLC as Lead Arranger | S-1 | 333-148956 | 10.8 | 01/30/2008 | |
| 10.9 | Purchase and Sale Agreement, dated June 7, 2007 by and between Wallace Jordan, LLC and SandRidge Energy, Inc. | S-1 | 333-148956 | 10.17 | 01/30/2008 | |
| 10.10 | Office Lease Agreement, dated March 6, 2006 by and between 1601 Tower Properties, L.L.C. and Riata Energy, Inc. | S-1 | 333-148956 | 10.18 | 01/30/2008 | |
| 10.10.1 | First Amendment, dated October 19, 2006 to Office Lease Agreement, dated March 6, 2006 | S-1 | 333-148956 | 10.19 | 01/30/2008 | |
| 10.10.2 | Second Amendment, dated January 26, 2007 to Office Lease Agreement | S-1 | 333-148956 | 10.20 | 01/30/2008 | |
| 10.11 | Letter Agreement for Acquisition of Properties, dated September 21, 2007 by and between SandRidge Energy, Inc., Longfellow Energy, LP, Dalea Partners, LP and N. Malone Mitchell, 3 rd | S-1 | 333-148956 | 10.21 | 01/30/2008 | |
| 10.12 | Construction Management Agreement, dated June 29, 2008, by and between Oxy USA Inc. and SandRidge Energy Exploration and Production, LLC | 10-Q | 001-33784 | 10.1 | 08/07/2008 | |
| 10.13 | Gas Treating and $CO_2$ Delivery Agreement, dated June 29, 2008, by and between Oxy USA Inc. and SandRidge Energy Exploration and Production, LLC | 10-Q | 001-33784 | 10.2 | 08/07/2008 | |
| 10.14 | Purchase and Sale Agreement, dated October 9, 2008, by and among SandRidge Energy, Inc., Tom L. Ward, TLW Investments, L.L.C. and TLW Investments, Inc. | 8-K | 001-33784 | 10.1 | 10/16/2008 | |

[Table of Contents](#)

[Index to Financial Statements](#)

| Exhibit No. | Exhibit Description | Incorporated by Reference Form | SEC File No. | Exhibit | Filing Date | Filed Herewith |
|---|---|---|---|---|---|---|
| 10.15 | Purchase Agreement, dated January 14, 2009, by and between SandRidge Energy, Inc. and Deutsche Bank Securities Inc., as representative of the initial purchasers | | | | | * |
| 10.16 | Purchase Agreement, dated May 11, 2009, by and among SandRidge Energy, Inc., certain subsidiary guarantors named therein, and Barclays Capital Inc., Banc of America Securities LLC, J.P. Morgan Securities Inc., RBC Capital Markets Corporation and RBS Securities Inc., as representatives of the several initial purchasers | | | | | * |
| 10.17 | Membership Interest Purchase Agreement, dated June 30, 2009, by and between SandRidge Midstream, Inc. and TCW Pecos Midstream, L.L.C. | 10-Q | 001-33784 | 10.4 | 08/06/2009 | |
| 10.18 | Gas Gathering Agreement, dated June 30, 2009, by and between Piñon Gathering Company, LLC and SandRidge Exploration and Production, LLC | 10-Q | 001-33784 | 10.5 | 08/06/2009 | |
| 10.19 | Operations and Maintenance Agreement, dated June 30, 2009, by and between Piñon Gathering Company, LLC and SandRidge Midstream, Inc. | 10-Q | 001-33784 | 10.6 | 08/06/2009 | |
| 10.20 | Agreement for Purchase and Sale of Assets, dated November 25, 2009, by and among Forest Oil Corporation, Forest Oil Permian Corporation and SandRidge Exploration and Production, LLC | 8-K | 001-33784 | 10.1 | 11/30/2009 | |
| 10.21 | Purchase Agreement, dated November 30, 2009, by and between SandRidge Energy, Inc. and Fairfax Financial Holdings, Ltd. | | | | | * |
| 10.22 | Purchase Agreement, dated December 9, 2009, by and among SandRidge Energy, Inc., certain subsidiary guarantors named therein, and Banc of America Securities LLC, Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Mitsubishi UFJ Securities (USA), Inc. and RBC Capital Markets Corporation, as representatives of the several initial purchasers | 8-K | 001-33784 | 10.1 | 12/15/2009 | |
| 21.1 | Subsidiaries of SandRidge Energy, Inc. | S-1 | 333-148956 | 21.1 | 01/30/2008 | |
| 23.1 | Consent of PricewaterhouseCoopers LLP | | | | | * |
| 23.2 | Consent of DeGolyer and MacNaughton | | | | | * |
| 23.3 | Consent of Netherland, Sewell & Associates, Inc. | | | | | * |
| 23.4 | Consent of Lee Keeling and Associates, Inc. | | | | | * |
| 24.1 | Power of Attorney (included on signature page) | | | | | * |

Table of Contents

Index to Financial Statements

| Exhibit No. | Exhibit Description | Incorporated by Reference Form | SEC File No. | Exhibit | Filing Date | Filed Herewith |
|---|---|---|---|---|---|---|
| 31.1 | Section 302 Certification — Chief Executive Officer | | | | | * |
| 31.2 | Section 302 Certification — Chief Financial Officer | | | | | * |
| 32.1 | Section 906 Certifications of Chief Executive Officer and Chief Financial Officer | | | | | * |
| 99.1 | Report of DeGolyer and MacNaughton | | | | | * |
| 99.2 | Report of Netherland, Sewell & Associates, Inc. | | | | | * |
| 99.3 | Report of Lee Keeling and Associates, Inc. | | | | | * |
| 101.INS | XBRL Instance Document | | | | | * |
| 101.SCH | XBRL Taxonomy Extension Schema Document | | | | | * |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | | | | | * |
| 101.DEF | XBRL Taxonomy Extension Definition Document | | | | | * |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | | | | | * |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | | | | | * |

† Management contract or compensatory plan or arrangement

Note: Debt instruments of the Company defining the rights of long-term debt holders in principal amounts not exceeding 10 percent of its consolidated assets have been omitted and will be provided to the Commission upon request.

**Exhibit 10.7.7**

*Execution Version*

**AMENDMENT NO. 7**

**and**

**SCHEDULED DETERMINATION**
**OF THE BORROWING BASE**

dated as of October 15, 2009

to the **CREDIT AGREEMENT**

dated as of November 21, 2006

among

**SANDRIDGE ENERGY, INC.**
as the Borrower,

**BANK OF AMERICA, N.A.,**
as Administrative Agent, Swing Line Lender and L/C Issuer

and

The Other Lenders Party Thereto

**BANC OF AMERICA SECURITIES LLC,**
Sole Lead Arranger and Sole Book Manager

AMENDMENT NO. 7 AND
SCHEDULED DETERMINATION OF THE BORROWING BASE

AMENDMENT AND SCHEDULED DETERMINATION (this "**Amendment**") dated as of October 15, 2009 under the Credit Agreement dated as of November 21, 2006 (as amended, restated, supplemented, or otherwise modified from time to time, the " **Credit Agreement**") among SANDRIDGE ENERGY, INC., a Delaware corporation (f/k/a Riata Energy, Inc.) (the "**Borrower**"), each LENDER from time to time party thereto and BANK OF AMERICA, N.A., as Administrative Agent (the "**Administrative Agent**"), Swing Line Lender and L/C Issuer.

WHEREAS, the parties hereto desire to amend the Credit Agreement as set forth herein; and

WHEREAS, the Administrative Agent proposes to continue the current Borrowing Base amount in accordance with the Scheduled Determination procedure set forth in Section 2.05 of the Credit Agreement;

NOW, THEREFORE, the parties hereto agree as follows:

**SECTION 1**. *Defined Terms*. Unless otherwise specifically defined herein, each term used herein that is defined in the Credit Agreement has the meaning assigned to such term in the Credit Agreement. Each reference to "hereof", "hereunder", "herein" and "hereby" and each other similar reference and each reference to "this Agreement" and each other similar reference contained in the Credit Agreement shall, after this Amendment becomes effective, refer to the Credit Agreement as amended hereby.

**SECTION 2**. *Amendments to the Credit Agreement*. The Credit Agreement is hereby amended as follows:

(a) The following definition is hereby added where alphabetically appropriate to read:

"**Convertible Preferred Stock**" means the Borrower's 8.5% Convertible Perpetual Preferred Stock issued on January 21, 2009, par value $0.001 per share, liquidation preference of $100 per share and with the terms set forth in the Certificate of Designation of the 8.5% Convertible Perpetual Preferred Stock.

(b) The definition of "Consolidated EBITDAX" in Section 1.01 of the Credit Agreement is amended by (i) deleting the word "and" at the end of clause (d) thereof, (ii) by adding the word "and" at the end of clause (e) thereof and (iii) by adding the new clause (f) that reads in its entirety as follows:

> "cash expenses and restructuring charges (whether cash or non-cash) incurred in connection with the acquisition of any entity or line of business permitted hereunder, including, solely in connection with the acquisition of Crusader Energy Group Inc., bankruptcy expenses;"

(c) Section 7.06(d) of the Credit Agreement is amended by deleting the word "and" after the end of clause (ii) thereof and inserting the following new clause "(iv)" immediately following clause (iii) thereof:

> "so long as no Default, Event of Default or Borrowing Base Deficiency exists at the time of such payment, the Borrower may pay regular semi-annual cash dividends on shares of its Convertible Preferred Stock issued prior to October 1, 2009 in an amount not exceeding $8.50 per share per annum; and"

(d) Schedule 3 to the form of Compliance Certificate (Exhibit D of the Credit Agreement) is amended by adding the following line item after "+ other non-cash expenses":

"+ acquisition-related cash expenses and restructuring charges (cash or non-cash)"

**SECTION 3**. *Proposal to Continue the Current Borrowing Base.* Based on the Engineering Report and other information concerning the businesses and properties of the Borrower and its Subsidiaries (including their Oil and Gas Properties and the reserves and production relating thereto) received pursuant to Sections 2.05(b)(i) and 6.01(d) of the Credit Agreement by the Administrative Agent from the Borrower, the Administrative Agent, pursuant to Sections 2.05(b)(i) and 2.05(b)(iii) of the Credit Agreement, hereby proposes to the Lenders for their approval to continue the current amount of the Borrowing Base, which is $985,350,000 (having previously been reduced from $1,095,000,000 by operation of Section 7.03(n) of the Credit Agreement).

**SECTION 4.** *Approval by Lenders*. In accordance with Section 2.05(b)(iii) of the Credit Agreement, the undersigned Lenders hereby approve the continuation of the current amount of the Borrowing Base as proposed by the Administrative Agent under Section 3 above.

**SECTION 5**. *Representations of the Borrower*. The Borrower represents and warrants that, both before and immediately after giving effect to this Amendment pursuant to Section 8 hereof, (i) the representations and warranties set forth in Article V of the Credit Agreement will be true and correct and (ii) no Default or Event of Default will have occurred and be continuing.

**SECTION 6.** *Governing Law.* This Amendment shall be governed by and construed in accordance with the laws of the State of New York.

**SECTION 7.** *Counterparts.* This Amendment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Delivery of an executed counterpart of a signature page of this Amendment by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

**SECTION 8.** *Effectiveness*. This Amendment shall become effective on and as of the date hereof provided that the Administrative Agent shall have received counterparts hereof signed by each of the Required Lenders and the Borrower.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed as of the date first above written.

Proposed, Consented to and Accepted by:

**ADMINISTRATIVE AGENT**

BANK OF AMERICA, N.A., as Administrative Agent, L/C Issuer and Swing Line Lender

By: /s/ Jeffrey H. Rathkamp
Name: Jeffrey H. Rathkamp
Title: Managing Director

Approved by:

**BORROWER**

SANDRIDGE ENERGY, INC.

By: /s/ Dirk M. Van Doren
Name: Dirk M. Van Doren
Title: Chief Financial Officer

**LENDERS**

BANK OF AMERICA, N.A., as Lender

By: /s/ Jeffrey H. Rathkamp
Name: Jeffrey H. Rathkamp
Title: Managing Director

ALLIED IRISH BANKS P.L.C.

By: /s/ Edward M. Fenk
Name: Edward Fenk
Title: Vice President

By: /s/ James P. Giordano
Name: James Giordano
Title: Assistant Vice President

BARCLAYS BANK PLC

By: /s/ Sam Yoo
Name: Sam Yoo
Title: Assistant Vice President

Signature Page to Amendment No. 7 and Scheduled Determination of the Borrowing Base

THE BANK OF NOVA SCOTIA

By: /s/ W. Keith Buchanan
Name: W. Keith Buchanan
Title: Managing Director

BANK OF OKLAHOMA, N.A.

By: ______________________________________

Name:

Title:

BANK OF SCOTLAND PLC

By: /s/ Julia R. Franklin
Name: Julia R. Franklin
Title: Assistant Vice President

Signature Page to Amendment No. 7 and Scheduled Determination of the Borrowing Base

BMO CAPITAL MARKETS FINANCING, INC.

By: /s/ Gumaro Tijerina
Name: Gumaro Tijerina
Title: Director

Signature Page to Amendment No. 7 and Scheduled Determination of the Borrowing Base

BNP PARIBAS

By: /s/ Polly Schott
Name: Polly Schott
Title: Director

By: /s/ Betsy Jocher
Name: Betsy Jocher
Title: Director

Signature Page to Amendment No. 7 and Scheduled Determination of the Borrowing Base

CALYON NEW YORK BRANCH

By: /s/ Sharada Manne
Name: Sharada Manne
Title: Director

By: /s/ Mark Roche
Name: Mark Roche
Title: Managing Director

Signature Page to Amendment No. 7 and Scheduled Determination of the Borrowing Base

COMERICA BANK

By: /s/ Peter L. Sefzik
Name: Peter L. Sefzik
Title: Senior Vice President

Signature Page to Amendment No. 7 and Scheduled Determination of the Borrowing Base

COMPASS BANK

By: ______________________________

Name:

Title:

Signature Page to Amendment No. 7 and Scheduled Determination of the Borrowing Base

CREDIT SUISSE, CAYMAN ISLANDS BRANCH

By: /s/ Nupur Kumar
Name: Nupur Kumar
Title: Vice President

By: /s/ Kevin Buddhdew
Name: Kevin Buddhdew
Title: Associate

DEUTSCHE BANK TRUST COMPANY AMERICAS

By: /s/ Marcus M. Tarkington
Name: Marcus M. Tarkington
Title: Director

By: /s/ Enrique Landaeta
Name: Enrique Landaeta
Title: Vice President

FORTIS CAPITAL CORP.

By: /s/ Ilene Fowler
Name: Ilene Fowler
Title: Director

By: /s/ Stephen R. Staples
Name: Stephen R. Staples
Title: Director

GOLDMAN SACHS BANK USA

By: /s/ Andrew Caditz
Name: Andrew Caditz
Title: Authorized Signatory

Signature Page to Amendment No. 7 and Scheduled Determination of the Borrowing Base

JPMORGAN CHASE BANK, N.A.

By: /s/ Michael A. Kamauf
Name: Michael A. Kamauf
Title: Vice President

Signature Page to Amendment No. 7 and Scheduled Determination of the Borrowing Base

MIDFIRST BANK

By: /s/ Shawn D. Brewer
Name: Shawn D. Brewer
Title: Vice President

Signature Page to Amendment No. 7 and Scheduled Determination of the Borrowing Base

MORGAN STANLEY BANK, N.A.

By: ______________________________

Name:

Title:

Signature Page to Amendment No. 7 and Scheduled Determination of the Borrowing Base

ROYAL BANK OF CANADA

By: /s/ Don J. McKinnerney
Name: Don J. McKinnerney
Title: Authorized Signatory

Signature Page to Amendment No. 7 and Scheduled Determination of the Borrowing Base

THE ROYAL BANK OF SCOTLAND PLC

By: /s/ David Slye
Name: David Slye
Title: Senior Vice President

STERLING BANK

By: ______________________________

Name:

Title:

SUMITOMO MITSUI BANKING CORPORATION

By: /s/ Masakazu Hasegawa

Name: Masakazu Hasegawa

Title: General Manager

SUN TRUST BANK

By: /s/ Peter Panos
Name: Peter Panos
Title: Director

UNION BANK, N.A. (f/k/a Union Bank of California, N.A.)

By: /s/ Randall Osterberg
Name: Randall Osterberg
Title: Senior Vice President

Signature Page to Amendment No. 7 and Scheduled Determination of the Borrowing Base

U.S. BANK NATIONAL ASSOCIATION

By: /s/ Bruce E. Hernandez
Name: Bruce E. Hernandez
Title: Vice President

Signature Page to Amendment No. 7 and Scheduled Determination of the Borrowing Base

WELLS FARGO BANK, NA

By: /s/ Dustin S. Hansen
Name: Dustin S. Hansen
Title: Vice President

Signature Page to Amendment No. 7 and Scheduled Determination of the Borrowing Base

**Exhibit 10.15**

**EXECUTION COPY**

**SANDRIDGE ENERGY, INC.**

**8.5% Convertible Perpetual Preferred Stock**

**PURCHASE AGREEMENT**

January 14, 2009

DEUTSCHE BANK SECURITIES INC.
As Representative of the Initial Purchasers
set forth on Schedule A hereto
c/o Deutsche Bank Securities Inc.
60 Wall Street
New York, New York 10005

Ladies and Gentlemen:

*Introductory*. SandRidge Energy, Inc., a Delaware corporation (the "Company"), proposes to issue and sell to the several Initial Purchasers named in Schedule A (the "Initial Purchasers"), acting severally and not jointly, 2,250,000 shares of the Company's 8.5% Convertible Perpetual Preferred Stock, par value $0.001 per share and liquidation preference $100 per share, which shall have the rights, powers and preferences set forth in the Certificate of Designation (the "Certificate of Designation") of 8.5% Convertible Perpetual Preferred Stock (the "Firm Securities"). The Company also proposes to issue and sell at the option of Deutsche Bank Securities Inc. an additional 400,000 shares of its 8.5% Convertible Perpetual Preferred Stock (the "Option Securities" and together with the Firm Securities, the "Securities") solely to cover over-allotments, if any, as set forth below. Deutsche Bank Securities Inc. has agreed to act as the representative of the Initial Purchasers (the "Representative") in connection with the offering and sale of the Securities.

The Securities will be convertible into shares of common stock of the Company, par value $0.001 per share ("Common Stock"), in the manner described in the Certificate of Designation. The shares of Common Stock into which the Securities may be converted are referred to herein as the "Underlying Securities."

The Company understands that the Initial Purchasers propose to make an offering of the Securities on the terms and in the manner set forth herein and in the Pricing Disclosure Package (as defined below) and agrees that the Initial Purchasers may resell, subject to the conditions set forth herein, all or a portion of the Securities to purchasers (the "Subsequent Purchasers") on the terms set forth in the Pricing Disclosure Package (the first time when sales of the Securities are made by the Initial Purchasers is referred to as the "Time of Sale"). The Securities are to be offered and sold to or through the Initial Purchasers without being registered with the Securities and Exchange Commission (the "Commission") under the Securities Act of 1933 (as amended, the "Securities Act," which

term, as used herein, includes the rules and regulations of the Commission promulgated thereunder), in reliance upon exemptions therefrom. Pursuant to the terms of the Securities and the Certificate of Designation, investors who acquire Securities shall be deemed to have agreed that Securities may only be resold or otherwise transferred, after the date hereof, if such Securities are registered for sale under the Securities Act or if an exemption from the registration requirements of the Securities Act is available (including the exemptions afforded by Rule 144A under the Securities Act ("Rule 144A")).

The Company has prepared and delivered to each Initial Purchaser copies of a Preliminary Offering Memorandum, dated January 14, 2009, including documents incorporated by reference therein (the "Preliminary Offering Memorandum"), and has prepared and delivered to each Initial Purchaser copies of a Pricing Supplement, dated January 14, 2009, in the form attached hereto as Exhibit B (the "Pricing Supplement"), describing the terms of the Securities, each for use by such Initial Purchaser in connection with its solicitation of offers to purchase the Securities. The Preliminary Offering Memorandum and the Pricing Supplement are herein referred to as the "Pricing Disclosure Package." Promptly after this Agreement is executed and delivered, the Company will prepare and deliver to each Initial Purchaser a final offering memorandum dated the date hereof including documents incorporated by reference therein (the "Final Offering Memorandum").

All references herein to the terms "Pricing Disclosure Package" and "Final Offering Memorandum" shall be deemed to mean and include all information filed under the Securities Exchange Act of 1934 (as amended, the "Exchange Act," which term, as used herein, includes the rules and regulations of the Commission promulgated thereunder) prior to the Time of Sale and incorporated by reference in the Pricing Disclosure Package (including the Preliminary Offering Memorandum) or the Final Offering Memorandum (as the case may be), and all references herein to the terms "amend", "amendment" or "supplement" with respect to the Final Offering Memorandum shall be deemed to mean and include all information filed under the Exchange Act after the Time of Sale and incorporated by reference in the Final Offering Memorandum.

The Company hereby confirms its agreements with the Initial Purchasers as follows:

SECTION 1. *Representations and Warranties.* The Company hereby represents, warrants and covenants to each Initial Purchaser that, as of the date hereof and as of the Closing Date (references in this Section 1 to the "Offering Memorandum" are to (x) the Pricing Disclosure Package in the case of representations and warranties made as of the date hereof and (y) the Final Offering Memorandum in the case of representations and warranties made as of the Closing Date):

(a) *No Registration Required.* Subject to compliance by the Initial Purchasers with the representations and warranties set forth in Section 2 hereof and with the procedures set forth in Section 7 hereof, it is not necessary in connection with the offer, sale and delivery of the Securities to the Initial Purchasers and to each Subsequent Purchaser in the manner contemplated by this Agreement and the Offering Memorandum to register the Securities under the Securities Act.

(b) *No Integration of Offerings or General Solicitation.* None of the Company, its affiliates (as such term is defined in Rule 501 under the Securities Act) (each, an "Affiliate"), or any person acting on its or any of their behalf (other than the Initial Purchasers, as to whom the Company makes no representation or warranty) has, directly or indirectly, solicited any offer to buy or offered to sell, or will, directly or indirectly, solicit any offer to buy or offer to sell, in the United States or to any United States citizen or resident, any security which is or would be integrated with the sale of the Securities in a manner that would require the Securities to be registered under the Securities Act. None of the Company, its Affiliates, or any person acting on its or any of their behalf (other than the Initial Purchasers, as to whom the Company makes no representation or warranty) has engaged or will engage, in connection with the offering of the Securities, in any form of general solicitation or general advertising within the meaning of Rule 502 under the Securities Act.

(c) *Eligibility for Resale under Rule 144A.* The Securities are eligible for resale pursuant to Rule 144A and will not be, at the Closing Date, of the same class as securities listed on a national securities exchange registered under Section 6 of the Exchange Act or quoted in a U.S. automated interdealer quotation system.

(d) *The Pricing Disclosure Package and Offering Memorandum.* Neither the Pricing Disclosure Package, as of the Time of Sale, nor the Final Offering Memorandum, as of its date or (as amended or supplemented in accordance with Section 3(a), as applicable) as of the Closing Date, contains or represents an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that this representation, warranty and agreement shall not apply to statements in or omissions from the Pricing Disclosure Package, the Final Offering Memorandum or any amendment or supplement thereto made in reliance upon and in conformity with information furnished to the Company in writing by any Initial Purchaser through Deutsche Bank Securities Inc. expressly for use in the Pricing Disclosure Package, the Final Offering Memorandum or any amendment or supplement thereto, as the case may be.

(e) *Company Additional Written Communications*. The Company has not prepared, made, used, authorized, approved or distributed and will not prepare, make, use, authorize, approve or distribute any written communication that constitutes an offer to sell or solicitation of an offer to buy the Securities (each such communication by the Company or its agents and representatives (other than a communication referred to in clauses (i) and (ii) below) a "Company Additional Written Communication") other than (i) the Pricing Disclosure Package, (ii) the Final Offering Memorandum, and (iii) any electronic road show or other written communications, in each case used in accordance with Section 3(a). Each such Company Additional Written Communication, when taken together with the Pricing Disclosure Package, did not, and at the Closing Date will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that this representation, warranty and agreement shall not apply to statements in or omissions from each such Company Additional Written Communication made in reliance upon and in conformity with information furnished to the Company in writing by any Initial Purchaser through Deutsche Bank Securities Inc. expressly for use in any Company Additional Written Communication.

(f) *Incorporated Documents.* The documents incorporated or deemed to be incorporated by reference in the Offering Memorandum at the time they were or hereafter are filed with the Commission (collectively, the "Incorporated Documents") complied and will comply in all material respects with the requirements of the Exchange Act.

(g) *The Purchase Agreement.* This Agreement has been duly authorized, executed and delivered by the Company.

(h) *The Securities.* The Securities have been duly and validly authorized by all necessary corporate action on the part of the Company and, when issued and delivered against payment therefor in accordance with the terms of this Agreement and the Certificate of Designation, the Securities will be validly issued, fully paid and non-assessable, will not be subject to any preemptive or similar rights, and will be convertible at the option of the holders thereof into the Underlying Securities in accordance with the Certificate of Designation.

(i) *Outstanding Capital Stock.* The outstanding shares of capital stock of the Company have been duly authorized and validly issued and are fully paid and non-assessable; none of the outstanding shares of capital stock of the Company was issued in violation of any preemptive or similar rights of any stockholder of the Company.

(j) *The Underlying Securities.* The Underlying Securities have been duly authorized and reserved, and when issued and delivered upon conversion of the Securities will be validly issued, fully paid and non-assessable; and no preemptive or similar rights of stockholders exist with respect to any of the Underlying Securities.

(k) *The Certificate of Designation.* The Certificate of Designation has been duly authorized by the Company and conforms in all material respects to the description thereof contained in the Offering Memorandum.

(l) *No Convertible Stock*. There are no outstanding securities of the Company convertible into, exchangeable for or evidencing the right to purchase or subscribe for any shares of capital stock of the Company and there are no outstanding or authorized options, warrants or rights of any character obligating the Company to issue any shares of its capital stock or any securities convertible or exchangeable into or evidencing the right to purchase or subscribe for any shares of such stock.

(m) *No Material Adverse Change*. Except as otherwise disclosed in the Offering Memorandum, subsequent to the respective dates as of which information is given in the Offering Memorandum: (i) there has been no material adverse change, or any development that could reasonably be expected to result in a material adverse change, in the condition, financial or otherwise, or in the earnings, business, properties, operations or prospects (other than as a result of developments affecting the oil and gas industry generally), whether or not arising from transactions in the ordinary course of business, of the Company and its subsidiaries, considered as one entity (a "Material Adverse Change"); (ii) the Company and its subsidiaries, considered as one entity, have not incurred any material liability or obligation, indirect, direct or contingent, nor entered into any material transaction or agreement; and (iii) there has been no cash dividend or distribution of any kind declared, paid or made by the Company or, except for dividends paid to the Company or other subsidiaries, any of its subsidiaries on any class of capital stock or repurchase or redemption by the Company or any of its subsidiaries of any class of capital stock.

(n) *Independent Accountants*. PricewaterhouseCoopers LLP, who have expressed their opinion with respect to certain of the financial statements (which term as used in this Agreement includes the related notes thereto) and supporting schedules included in the Offering Memorandum, are independent registered public accountants with respect to the Company as required by the Securities Act and the Exchange Act.

Grant Thornton LLP, who have expressed their opinion with respect to certain of the financial statements and supporting schedules included in the Offering Memorandum, are independent registered public accountants with respect to NEG Oil & Gas LLC as required by the Securities Act and the Exchange Act.

(o) *Preparation of the Financial Statements*. The consolidated financial statements of the Company included in the Offering Memorandum present fairly the consolidated financial position of the entities to which they relate as of and at the dates indicated and the results of their operations and cash flows for the periods specified. Such financial statements comply as to form with the applicable accounting requirements of Regulation S-X and have been prepared in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods involved, except as may be expressly stated in the related notes thereto. The financial data set forth in the Offering Memorandum under the caption "Summary Consolidated Historical Financial Data" and the "Actual" column under the caption "Capitalization" fairly present the information set forth therein on a basis consistent with that of the audited financial statements contained in the Offering Memorandum.

(p) *Incorporation and Good Standing of the Company.* The Company has been duly incorporated and is validly existing and in good standing under the laws of the jurisdiction of its incorporation and has power and authority (corporate or otherwise) to own or lease, as the case may be, and operate its properties and to conduct its business as described in the Offering Memorandum and, in the case of the Company, to enter into and perform its obligations under each of this Agreement, the Certificate of Designation and the Securities. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except for such jurisdictions where the failure to so qualify or to be in good standing would not, individually or in the aggregate, result in a material adverse effect on the condition, financial or otherwise, or on the earnings, business, properties or operations, whether or not arising from transactions in the ordinary course of business, of the Company and its subsidiaries, considered as one entity (a "Material Adverse Effect"). All of the issued and outstanding shares of capital stock, or similar equity interest, of each subsidiary have been duly authorized and validly issued, are fully paid and nonassessable and are owned by the Company, directly or through subsidiaries, free and clear of any security interest, mortgage, pledge, lien, encumbrance or claim, except that the Senior Credit Facility, dated November 21, 2006, by and among SandRidge Energy, Inc. (as successor by merger to Riata Energy, Inc.) and Bank of America, N.A., as Administrative Agent and Banc of America Securities LLC as Lead Arranger and Book Running Manager, as amended, (the "Credit Facility") is secured by a negative pledge on any of the Company's non-mortgage properties.

(q) *Capitalization and Other Capital Stock Matters* . The authorized, issued and outstanding capital stock of the Company is as set forth in the Offering Memorandum under the caption "Capitalization" (other than for subsequent issuances, if any, pursuant to employee benefit plans described in the Offering Memorandum or upon exercise of outstanding options described in the Offering Memorandum).

(r) *Non-Contravention of Existing Instruments; No Further Authorizations or Approvals Required* . Neither the Company nor any of its subsidiaries is (i) in violation of its charter or by laws (or other applicable organizational document), (ii) is (or, with the giving of notice or lapse of time, would be) in default ("Default") under any indenture, mortgage, loan or credit agreement, note, contract, franchise, lease or other instrument to which the Company or any of its subsidiaries is a party or by which it or any of them may be bound (including, without limitation, the Credit Facility), or to which any of the property or assets of the Company or any of its subsidiaries is subject (each, an "Existing Instrument"), or (iii) is in violation of any statute, law, rule, regulation, judgment, order or decree of any court, regulatory body, administrative agency, governmental body, arbitrator or other authority having jurisdiction over the Company or such subsidiary or any of its properties, as applicable, except with respect to clause (ii) and (iii), for such Defaults or violations as would not, individually or in the aggregate, have a Material Adverse Effect.

The Company's execution, delivery and performance of this Agreement, the issuance and delivery of the Securities or the Underlying Securities, the Company's compliance with the Certificate of Designation and the consummation of the transactions contemplated hereby and thereby and by the Offering Memorandum (i) have been duly authorized by all necessary action (corporate or otherwise) and will not result in any violation of the charter or by laws (or other applicable organizational document) of the Company or any subsidiary, (ii) will not conflict with or constitute a breach of, or Default or a Debt Repayment Triggering Event (as defined below) under, or result in the creation or imposition of any lien, charge or encumbrance upon any property or assets of the Company or any of its subsidiaries pursuant to, or require the consent of any other party to, any Existing Instrument and (iii) will not result in any violation of any statute, law, rule, regulation, judgment, order or decree applicable to the Company or any of its subsidiaries of any court, regulatory body, administrative agency, governmental body, arbitrator or other authority having jurisdiction over the Company or any of its subsidiaries or any of its or their properties. As used herein, a "Debt Repayment Triggering Event" means any event or condition which gives, or with the giving of notice or lapse of time would give, the holder of any note, debenture or other evidence of indebtedness (or any person acting on such holder's behalf) the right to require the repurchase, redemption or repayment of all or a portion of such indebtedness by the Company or any of its subsidiaries.

No consent, approval, authorization or other order of, or registration or filing with, any court or other governmental or regulatory authority or agency is required for the Company's execution, delivery and performance of this Agreement or the issuance and delivery of the Securities or the Underlying Securities or the Company's compliance with the Certificate of Designation, or the consummation of the transactions contemplated hereby and thereby and by the Offering Memorandum, except for such as have been obtained or made by the Company and are in full force and effect under the Securities Act, and applicable state securities or blue sky laws.

(s) *No Material Actions or Proceedings*. Except as otherwise disclosed in the Offering Memorandum, there are no legal or governmental actions, suits or proceedings pending or, to the Company's knowledge, threatened (i) against or affecting the Company or any of its subsidiaries, (ii) which has as the subject thereof any officer or director of, or property owned or leased by, the Company or any of its subsidiaries or (iii) relating to environmental or discrimination matters, where in any such case (A) there is a reasonable possibility that such action, suit or proceeding might be determined adversely to the Company or such subsidiary and (B) any such action, suit or proceeding, if so determined adversely, would reasonably be expected to have a Material Adverse Effect or adversely affect the consummation of the transactions contemplated by this Agreement.

(t) *Labor Matters*. No labor problem or dispute with the employees of the Company or any of its subsidiaries exists or is threatened or imminent that would reasonably be expected to have a Material Adverse Effect.

(u) *Intellectual Property Rights*. The Company and its subsidiaries own, possess, license or have other rights to use, on reasonable terms, all patents, patent applications, trade and service marks, trade and service mark registrations, trade names, copyrights, licenses, inventions, trade secrets, technology, know-how and other intellectual property (collectively, the "Intellectual Property Rights") necessary for the conduct of the Company's business as now conducted or as proposed in the Offering Memorandum to be conducted except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. Except as set forth in the Offering Memorandum, (a) no party has been granted an exclusive license to use any portion of such Intellectual Property Rights owned by the Company; (b) to the Company's knowledge there is no material infringement by third parties of any such Intellectual Property Rights owned by or exclusively licensed to the Company; (c) there is no pending or, to the Company's knowledge, threatened action, suit, proceeding or claim by others challenging the Company's rights in or to any material Intellectual Property Rights; and (d) there is no pending or, to the Company's knowledge, threatened action, suit, proceeding or claim by others that the Company's business as now conducted infringes or otherwise violates any material patent, trademark, copyright, trade secret or other proprietary rights of others, and the Company is unaware of any other fact which would form a reasonable basis for any such claim.

(v) *All Necessary Permits, etc*. The Company possesses such valid and current licenses, certificates, authorizations or permits issued by the appropriate state, federal or foreign regulatory agencies or bodies necessary to conduct its business except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, and the Company has not received any notice of proceedings relating to the revocation or modification of, or non-compliance with, any such certificate, authorization or permit which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would reasonably be expected to have a Material Adverse Effect.

(w) *Title to Properties*. Each of the Company and its subsidiaries has (i) generally satisfactory title to its oil and gas properties, title investigations having been carried out by the Company or its subsidiaries in accordance with the practice in the oil and gas industry in the areas in which the Company and its subsidiaries operate, (ii) good and marketable title to all other real property owned by it (including pipeline easement rights) to the extent necessary to carry on its business, and (iii) good and marketable title to all personal property owned by it, in each case free and clear of all liens, encumbrances and defects except such as are described in the Offering Memorandum or such as do not materially affect the value of the properties of the Company and its subsidiaries, considered as one enterprise, and do not interfere in any material respect with the use made and proposed to be made of such properties, by the Company and its subsidiaries, considered as one enterprise; and all of the easements, leases and subleases material to the business of the Company and its subsidiaries, considered as one enterprise, and under which the Company or any of its subsidiaries holds or uses properties described in the Offering Memorandum, are in full force and effect, and neither the Company nor any of its subsidiaries has any notice of any material claim of any sort that has been asserted by anyone adverse to the rights of the Company or its subsidiaries under any of the easements, leases or subleases mentioned above, or affecting or questioning the rights of the Company or any subsidiary thereof to the continued possession or use of the easement or leased or subleased premises.

(x) *Condition of Properties*. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Company, the plants, buildings, structures and equipment owned by the Company are in good operating condition and repair and have been reasonably maintained consistent with standards generally followed in the industry (giving due account to the age and length of use of same, ordinary wear and tear excepted), are adequate and suitable for their present uses and, in the case of plants, buildings and other structures, are structurally sound.

(y) *Tax Law Compliance*. The Company and its consolidated subsidiaries have filed all necessary federal, state, local and foreign income and franchise tax returns in a timely manner and have paid all taxes required to be paid by any of them and, if due and payable, any related or similar assessment, fine or penalty levied against any of them, except for any taxes, assessments, fines or penalties as may be being contested in good faith and by appropriate proceedings or where the failure to do so would not reasonably be expected to have a Material Adverse Effect. The Company has made appropriate provisions in the financial statements included in the Offering Memorandum in respect of all federal, state and foreign income and franchise taxes for all current or prior periods as to which the tax liability of the Company or any of its consolidated subsidiaries has not been finally determined except to the extent it would not have a Material Adverse Effect.

(z) *Company Not an "Investment Company"*. The Company is not, and, after receipt of payment for the Securities and application of the proceeds as described under "Use of Proceeds" in the Offering Memorandum will not be, required to register as an "investment company" within the meaning of the Investment Company Act and will conduct its business in a manner so that it will not become subject to the Investment Company Act.

(aa) *Insurance*. Each of the Company and its subsidiaries are insured by recognized, and to the knowledge of the Company, financially sound and reputable institutions with policies in such amounts and with such deductibles and covering such risks as are generally deemed adequate and customary for their businesses including, but not limited to, policies covering real and personal

property owned or leased by the Company and its subsidiaries against theft, damage, destruction, acts of terrorism or vandalism and earthquakes. All policies of insurance and fidelity or surety bonds insuring the Company or any of its subsidiaries or their respective businesses, assets, employees, officers and directors are in full force and effect; the Company and its subsidiaries are in compliance, in all material respects, with the terms of such policies and instruments; and there are no material claims by the Company or any of its subsidiaries under any such policy or instrument as to which any insurance company is denying liability or defending under a reservation of rights clause; and neither the Company nor any such subsidiary has, in the past three years, been refused any insurance coverage sought or applied for.

(bb) *No Price Stabilization or Manipulation*. The Company has not taken and will not take, directly or indirectly, any action designed to or that might be reasonably expected to cause or result in stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of the Securities. The Company acknowledges that the Initial Purchasers may engage in stabilization transactions as described in the Offering Memorandum.

(cc) *Compliance with Sarbanes-Oxley*. The Company and its subsidiaries and their respective officers and directors are in compliance with the applicable provisions of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act," which term, as used herein, includes the rules and regulations of the Commission promulgated thereunder).

(dd) *Internal Controls.* The Company maintains effective internal control over financial reporting as defined in Rule 13a-15 under the Exchange Act and a system of internal accounting control sufficient to provide reasonable assurance that (A) transactions are executed in accordance with management's general or specific authorization, (B) transactions are recorded as necessary to permit preparation of the Company's financial statements in conformity with accounting principles generally accepted in the United States and to maintain accountability for its assets, (C) access to the Company's assets is permitted only in accordance with management's general or specific authorization and (D) the recorded accountability for the Company's assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

(ee) *Disclosure Controls and Procedures*. The Company has established and maintains disclosure controls and procedures (as such term is defined in Rules 13a-15 and 15d-14 under the Exchange Act); such disclosure controls and procedures are designed to ensure that material information relating to the Company and its subsidiaries is made known to the chief executive officer and chief financial officer of the Company by others within the Company or any of its subsidiaries, and such disclosure controls and procedures are reasonably effective to perform the functions for which they were established subject to the limitations of any such control system; the Company's auditors and the Audit Committee of the Board of Directors of the Company have been advised of: (i) any significant deficiencies or material weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data; and (ii) any fraud, whether or not material, that involves management or other employees who have a role in the Company's internal controls; and since the date of the most recent evaluation of such disclosure controls and procedures, there have been no significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses.

(ff) *Compliance with Environmental Laws*. Except as otherwise disclosed in the Offering Memorandum: (i) neither the Company nor any of its subsidiaries is in violation of any federal, state, local or foreign law, regulation, order, permit or other requirement relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata) or wildlife, including without limitation, laws and regulations relating to emissions, discharges, releases or threatened releases of chemicals, pollutants, contaminants, wastes, toxic substances, hazardous substances, petroleum and petroleum products (collectively, "Materials of Environmental Concern"), or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Materials of Environmental Concern (collectively, "Environmental Laws"), which violation includes, but is not limited to, noncompliance with any permits or other governmental authorizations required for the operation of the business of the Company or its subsidiaries under applicable Environmental Laws, or noncompliance with the terms and conditions thereof, nor has the Company or any of its subsidiaries received any written communication, whether from a governmental authority, citizens group, employee or otherwise, that alleges that the Company or any of its subsidiaries is in violation of any Environmental Law, except, in each case, as would not, individually or in the aggregate, have a Material Adverse Effect; (ii) there is no claim, action or cause of action filed with a court or governmental authority, no investigation with respect to which the Company has received written notice, and no written notice by any person or entity alleging potential liability for investigatory costs, cleanup costs, governmental responses costs, natural resources damages, property damages, personal injuries, attorneys' fees or penalties arising out of, based on or resulting from the presence, or release into the environment, of any Material of Environmental Concern at any location owned, leased or operated by the Company or any of its subsidiaries, now or in the past (collectively, "Environmental Claims"), pending or, to the Company's knowledge, threatened against the Company or any of its subsidiaries or any person or entity whose liability for any Environmental Claim the Company or any of its subsidiaries has retained or assumed either contractually or by operation of law, except as would not, individually or in the aggregate, have a Material Adverse Effect; and (iii) to the Company's knowledge, there are no past, present or anticipated future actions, activities, circumstances, conditions, events or incidents, including, without limitation, the release, emission, discharge, presence or disposal of any Material of Environmental Concern, that reasonably could result in a violation of any Environmental Law, require expenditures to be incurred pursuant to Environmental Law, except as would not, individually or in the aggregate, have a Material Adverse Effect.

(gg) *Independent Petroleum Engineers*. DeGolyer and MacNaughton, whose reports as of December 31, 2005 and 2006, are referenced in the Offering Memorandum, was, as of the date of such reports, and is, as of the date hereof, an independent petroleum engineer with respect to the Company (with respect to the report as of December 31, 2005) and SandRidge CO2, LLC (f/k/a PetroSource Energy Company, L.P.) (with respect to the reports as of December 31, 2005, 2006 and 2007). Netherland, Sewell & Associates Inc., whose reports as of December 31, 2005, 2006 and 2007, are referenced in the Offering Memorandum, was, as of December 31, 2005, an independent petroleum engineer with respect to NEG Oil & Gas LLC, and was, as of December 31, 2006 and 2007, and is, as of the date hereof, an independent petroleum engineer with respect to NEG Oil & Gas LLC (with respect to the

reports as of December 31, 2005) and the Company (excluding SandRidge CO2 f/k/a PetroSource Energy Company, L.P.). Harper & Associates, Inc., whose report as of December 31, 2005, is referenced in the Offering Memorandum, was, as of the date of such report, and is, as of the date hereof, an independent petroleum engineer with respect to the Company. The information underlying the estimates of reserves of the Company and its subsidiaries, which was supplied by the Company to DeGolyer and MacNaughton, Netherland, Sewell & Associates Inc. and Harper & Associates, Inc. for purposes of reviewing the reserve reports and estimates of the Company and preparing the letters (the "Reserve Report Letters") of DeGolyer and MacNaughton, Netherland, Sewell & Associates Inc. and Harper & Associates, Inc., including, without limitation, production, costs of operation and development, current prices for production, agreements relating to current and future operations and sales of production, was true and correct in all material respects on the dates such estimates were made and such information was supplied and was prepared in accordance with customary industry practices; estimates of such reserves and present values as described in the Offering Memorandum and reflected in the Reserve Report Letters comply in all material respects with the applicable requirements of Regulation S-X and Industry Guide 2 under the Act.

(hh) *Related Party Transactions*. No relationship, direct or indirect, exists between or among any of the Company or any affiliate of the Company, on the one hand, and any director, officer, member, stockholder, customer or supplier of the Company or any affiliate of the Company, on the other hand, which is required by the Securities Act to be disclosed in a registration statement on Form S-1 which is not so disclosed in the Offering Memorandum. There are no outstanding loans, advances (except advances for business expenses in the ordinary course of business) or guarantees of indebtedness by the Company or any affiliate of the Company to or for the benefit of any of the officers or directors of the Company or any affiliate of the Company or any of their respective family members.

(ii) *Lending Relationship*. Except as disclosed in the Offering Memorandum, to its knowledge, the Company (i) does not have any material lending or other relationship with any bank or lending affiliate of any Initial Purchaser and (ii) does not intend to use any of the proceeds from the sale of the Securities hereunder to repay any outstanding debt owed to any affiliate of any Initial Purchaser.

(jj) *Solvency.* The Company is, and immediately after the Closing Date will be, Solvent. As used herein, the term "Solvent" means, with respect to any person on a particular date, that on such date (i) the fair market value of the assets of such person is greater than the total amount of liabilities (including contingent liabilities) of such person, (ii) the present fair salable value of the assets of such person is greater than the amount that will be required to pay the probable liabilities of such person on its debts as they become absolute and matured, (iii) such person is able to realize upon its assets and pay its debts and other liabilities, including contingent obligations, as they mature and (iv) such person does not have unreasonably small capital.

(kk) *No Default in Senior Indebtedness.* No event of default exists under the Credit Facility.

(ll) *Exclusive Agreement.* The Company has not paid or agreed to pay to any person any compensation for soliciting another person to purchase any securities of the Company (expect as contemplated in this Agreement).

(mm) *Brokers.* Except for certain fees payable to the Representative in connection with the offering, there is no broker, finder or other party that is entitled to receive from the Company any brokerage or finder's fee or other fee or commission as a result of any transactions contemplated by this Agreement.

Any certificate signed by an officer of the Company and delivered to the Initial Purchasers or to counsel for the Initial Purchasers shall be deemed to be a representation and warranty by the Company to each Initial Purchaser as to the matters set forth therein.

SECTION 2. *Purchase, Sale and Delivery of the Securities*.

(a) *The Securities.* The Company agrees to issue and sell to the Initial Purchasers, severally and not jointly, all of the Securities, and the Initial Purchasers agree, severally and not jointly, to purchase from the Company the number of Firm Securities set forth opposite their names on Schedule A, at a purchase price of $92.04 per share (the "Purchase Price") payable on the Closing Date, in each case, on the basis of the representations, warranties and agreements herein contained, and upon the terms, subject to the conditions thereto, herein set forth. Each Security will be convertible into shares of Common Stock in the manner provided in the Certificate of Designation and at the conversion rate set forth in the Certificate of Designation (the "Conversion Rate"), which Conversion Rate is subject to adjustment in certain events as provided in the Certificate of Designation.

(b) *The Closing Date.* Delivery of the Firm Securities to be purchased by the Initial Purchasers and payment therefor shall be made at the offices of Davis Polk & Wardwell, 450 Lexington, Avenue, New York, New York 10017 (or such other place as may be agreed to by the Company and Deutsche Bank Securities Inc.) at 9:00 a.m. New York City time, on January 21, 2009 or such other time and date as Deutsche Bank Securities Inc. shall designate by notice to the Company (the time and date of such closing are called the "Closing Date"). The Company hereby acknowledges that circumstances under which Deutsche Bank Securities Inc. may provide notice to postpone the Closing Date as originally scheduled include, but are in no way limited to, any determination by the Company or the Initial Purchasers to recirculate to investors copies of an amended or supplemented Offering Memorandum or a delay as contemplated by the provisions of Section 16 hereof.

(c) *The Option Securities and the Optional Closing Date.* In addition, on the basis of the representations and warranties herein contained and subject to the terms and conditions herein set forth, the Company hereby grants an option to the Representative to purchase the Option Securities at the Purchase Price solely for the purpose of covering over-allotments, if any, which may be made in connection with the offering. The option granted hereby may be exercised in whole or in part by giving written notice (i) at any time before the Closing Date and (ii) at any time and from time to time within 30 days after the date of this Agreement by the Representative to the Company, setting forth the number of Option Securities as to which the Representative is exercising the option and the time and date for delivery of and payment for such Option Securities. The time and date for delivery of and payment for such

Option Securities shall be determined by the Representative but shall not be later than ten full business days after the exercise of such option, nor in any event prior to the Closing Date (such time and date being herein referred to as the "Optional Closing Date"). If the date of exercise of the option is two or more days before the Closing Date, the notice of exercise shall set the Closing Date as the Optional Closing Date. The Representative may cancel such option at any time prior to its expiration by giving written notice of such cancellation to the Company. If any Option Securities are to be purchased, each Initial Purchasers agrees, severally and not jointly, to purchase the principal amount of Option Securities that bears the same proportion to the total principal amount of Firm Securities set forth opposite the name of such Initial Purchaser on Schedule A bears to the total principal amount of Firm Securities.

(d) *Initial Purchasers as Qualified Institutional Buyers.* Each Initial Purchaser severally and not jointly represents and warrants to, and agrees with, the Company that it is a "qualified institutional buyer" within the meaning of Rule 144A (a "Qualified Institutional Buyer").

SECTION 3. *Additional Covenants.* The Company further covenants and agrees with each Initial Purchaser as follows:

(a) *Preparation of Final Offering Memorandum; Initial Purchasers' Review of Proposed Amendments and Supplements and Company Additional Written Communications.* As promptly as practicable following the Time of Sale and in any event not later than the second business day following the date hereof, the Company will prepare and deliver to the Initial Purchasers the Final Offering Memorandum, which shall consist of the Preliminary Offering Memorandum as modified only by the information contained in the Pricing Supplement. The Company will not amend or supplement the Preliminary Offering Memorandum or the Pricing Supplement. The Company will not amend or supplement the Final Offering Memorandum prior to the Closing Date unless Deutsche Bank Securities Inc. shall previously have been furnished a copy of the proposed amendment or supplement prior to the proposed use or filing, and shall not have objected to such amendment or supplement. Before making, preparing, using, authorizing, approving or distributing any Company Additional Written Communication, the Company will furnish to the Initial Purchasers a copy of such written communication for review and will not make, prepare, use, authorize, approve or distribute any such written communication to which Deutsche Bank Securities Inc. reasonably objects

(b) *Amendments and Supplements to the Final Offering Memorandum and Other Securities Act Matters.* If, prior to the later of (x) the Closing Date and (y) the completion of the placement of the Securities by the Initial Purchasers with the Subsequent Purchasers, any event shall occur or condition exist as a result of which it is necessary to amend or supplement the Final Offering Memorandum, as then amended or supplemented, in order to make the statements therein, in the light of the circumstances when the Final Offering Memorandum is delivered to a Subsequent Purchaser, not misleading, or if in the judgment of the Initial Purchasers or counsel for the Initial Purchasers it is otherwise necessary to amend or supplement the Final Offering Memorandum to comply with law, the Company agrees to promptly prepare (subject to Section 3 hereof) and furnish at its own expense to the Initial Purchasers, amendments or supplements to the Final Offering Memorandum so that the statements in the Final Offering Memorandum as so amended or supplemented will not, in the light of the circumstances at the Closing Date and at the time of sale of Securities, be misleading or so that the Final Offering Memorandum, as amended or supplemented, will comply with all applicable law.

(c) *Copies of the Offering Memorandum.* The Company agrees to furnish the Initial Purchasers, without charge, as many copies of the Pricing Disclosure Package and the Final Offering Memorandum and any amendments and supplements thereto as they shall have reasonably requested.

(d) *Blue Sky Compliance.* The Company shall cooperate with the Initial Purchasers and counsel for the Initial Purchasers to qualify or register (or to obtain exemptions from qualifying or registering) all or any part of the Securities for offer and sale under the securities laws of the several states of the United States, the provinces of Canada or any other jurisdictions designated by the Initial Purchasers, shall comply with such laws and shall continue such qualifications, registrations and exemptions in effect so long as required for the distribution of the Securities. The Company shall not be required to qualify as a foreign corporation or to take any action that would subject it to general service of process in any such jurisdiction where it is not presently qualified or where it would be subject to taxation as a foreign corporation. The Company will advise the Initial Purchasers promptly of the suspension of the qualification or registration of (or any such exemption relating to) the Securities for offering, sale or trading in any jurisdiction or any initiation or threat of any proceeding for any such purpose, and in the event of the issuance of any order suspending such qualification, registration or exemption, the Company shall use its best efforts to obtain the withdrawal thereof at the earliest possible moment.

(e) *Use of Proceeds.* The Company shall apply the net proceeds from the sale of the Securities sold by it in the manner described under the caption "Use of Proceeds" in the Pricing Disclosure Package.

(f) *Additional Issuer Information.* Prior to the completion of the placement of the Securities by the Initial Purchasers with the Subsequent Purchasers, the Company shall file, on a timely basis, with the Commission and the NYSE all reports and documents required to be filed under Section 13 or 15 of the Exchange Act. Additionally, at any time when the Company is not subject to Section 13 or 15 of the Exchange Act, for the benefit of holders and beneficial owners from time to time of the Securities, the Company shall furnish, at its expense, upon request, to holders and beneficial owners of Securities and prospective purchasers of Securities information ("Additional Issuer Information") satisfying the requirements of Rule 144A(d).

(g) *Agreement Not To Offer or Sell Additional Securities.* For a period commencing on the date hereof and ending on the 60th day after the date of the Offering Memorandum, the Company agrees not to, without the prior written consent of Deutsche Bank Securities Inc., on behalf of the several Initial Purchasers (which consent may be withheld in its sole discretion), directly or indirectly, sell, offer, contract or grant any option to sell (including without limitation any short sale), pledge, transfer, establish an open "put equivalent position" or liquidate or decrease a "call equivalent position" within the meaning of Rule 16a-1 (h) under the Exchange Act, or otherwise dispose of or transfer (or enter into any transaction or device that is designed to, or could be expected to, result in the disposition by the Company at any time in the future of), including the filing (or participation in the filing of) of a registration statement with the Commission in respect of, any shares of Common Stock, options or warrants to acquire shares of Common Stock,

or securities exchangeable or exercisable for or convertible into shares of Common Stock currently or hereafter owned either of record or beneficially (as defined in Rule 13d-3 under the Exchange Act) by the Company or publicly disclose the intention to do any of the foregoing.

(h) *No Integration.* The Company agrees that it will not and will cause its Affiliates not to make any offer or sale of securities of the Company of any class if, as a result of the doctrine of "integration" referred to in Rule 502 under the Securities Act, such offer or sale would render invalid (for the purpose of (i) the sale of the Securities by the Company to the Initial Purchasers, (ii) the resale of the Securities by the Initial Purchasers to Subsequent Purchasers or (iii) the resale of the Securities by such Subsequent Purchasers to others) the exemption from the registration requirements of the Securities Act provided by Section 4(2) thereof or by Rule 144A or otherwise.

(i) *Underlying Securities*. The Company will use its commercially reasonable efforts to cause the Underlying Securities to be approved for supplemental listing on the New York Stock Exchange on or prior to the Closing Date and to ensure that the Underlying Securities remain authorized for listing following the Closing Date.

(j) *Transfer Agent.* The Company shall engage and maintain, at its expense, a registrar and transfer agent for the Securities and the Common Stock.

(k) *Available Conversion Shares*. The Company will reserve and keep available at all times, free of preemptive rights, the full number of Underlying Securities.

(l) *Conversion Price*. Between the date hereof and the Closing Date or any Optional Closing Date, the Company will not do or authorize any act that would result in an adjustment of the conversion price.

(m) *No Restricted Resales*. During the period of one year after the Closing Date, the Company will not, and will not permit any of its affiliates (as defined in Rule 144 under the Securities Act) to resell any of the Securities which constitute "restricted securities" under Rule 144 that have been reacquired by any of them.

(n) *Legended Securities.* Each certificate for a Security will bear the legend contained in "Transfer Restrictions" in the Preliminary Offering Memorandum for the time period and upon the other terms stated in the Preliminary Offering Memorandum.

(o) *PORTAL.* The Company will use its reasonable best efforts to cause such Securities to be eligible for the PORTAL market.

Deutsche Bank Securities Inc., on behalf of the several Initial Purchasers, may, in its sole discretion, waive in writing the performance by the Company of any one or more of the foregoing covenants or extend the time for their performance.

SECTION 4. *Payment of Expenses.* The Company agrees to pay all costs, fees and expenses incurred in connection with the performance of its obligations hereunder and in connection with the transactions contemplated hereby, including, without limitation, (i) all expenses incident to the issuance and delivery of the Securities (including all printing and engraving costs), (ii) all necessary issue, transfer and other stamp taxes in connection with the issuance and sale of the Securities to the Initial Purchasers, (iii) all fees and expenses of the Company's counsel, independent public or certified public accountants and other advisors, (iv) all costs and expenses incurred in connection with the preparation, printing, filing, shipping and distribution of the Pricing Disclosure Package and the Final Offering Memorandum (including financial statements and exhibits), and all amendments and supplements thereto, this Agreement and the Securities, (v) all filing fees, attorneys' fees and expenses incurred by the Company or the Initial Purchasers in connection with qualifying or registering (or obtaining exemptions from the qualification or registration of) all or any part of the Securities for offer and sale under the securities laws of the several states of the United States, the provinces of Canada or other jurisdictions designated by the Initial Purchasers (including, without limitation, the cost of preparing, printing and mailing preliminary and final blue sky or legal investment memoranda and any related supplements to the Pricing Disclosure Package or the Final Offering Memorandum, (vi) any fees payable in connection with the listing of the Securities with the PORTAL market, (vii) any filing fees incident to, and any reasonable fees and disbursements of counsel to the Initial Purchasers in connection with the review by the FINRA, if any, of the terms of the sale of the Securities or the Underlying Securities, (viii) all fees and expenses (including reasonable fees and expenses of counsel) of the Company in connection with the performance by the Company of any other obligations under this Agreement and (ix) the expenses incident to the "road show" for the offering of the Securities, including the travel and lodging expenses of representatives and officers of the Company and one-half (1/2) of the cost of any chartered airplane chartered in connection with the road show. Except as provided in this Section 4 and Sections 6, 8 and 9 hereof, the Initial Purchasers shall pay their own expenses, including the fees and disbursements of their counsel, and one-half (1/2) of the cost of any chartered airplane chartered in connection with the road show.

SECTION 5. *Conditions of the Obligations of the Initial Purchasers.* The obligations of the several Initial Purchasers to purchase and pay for the Firm Securities as provided herein on the Closing Date and for the Option Securities, if any, as provided herein on the Optional Closing Date shall be subject to the accuracy of the representations and warranties on the part of the Company set forth in Section 1 hereof as of the date hereof and as of the Closing Date or the Optional Closing Date, as the case may be, as though then made and to the timely performance by the Company of its covenants and other obligations hereunder, and to each of the following additional conditions:

(a) *Accountants' Comfort Letter and Accountants' Bring-Down Comfort Letter.* On the date hereof, the Initial Purchasers shall have received from PricewaterhouseCoopers LLP, independent public accountants for the Company, a "comfort letter" dated the date hereof addressed to the Initial Purchasers, in form and substance satisfactory to the Initial Purchasers, covering the financial information in the Preliminary Offering Memorandum and the Pricing Supplement and other customary matters. In addition, on the Closing Date and the Optional Closing Date, as the case may be, the Initial Purchasers shall have received from such accountants, "bring-down comfort letter" dated the Closing Date or the Optional Closing Date, as the case may be, addressed to the Initial Purchasers, in form and substance satisfactory to the Initial Purchasers, in the form of the "comfort letter" delivered on the date hereof, except that (i) it shall cover the financial information in the Final Offering Memorandum and any amendment or supplement thereto and (ii) procedures shall be brought down to a date no more than 5 days prior to the Closing Date or the Optional Closing Date, as the case may be.

(b) *No Material Adverse Change or Ratings Agency Change.* For the period from and after the date of this Agreement and prior to the Closing Date or the Optional Closing Date, as the case may be:

(i) in the judgment of the Representative there shall not have occurred any Material Adverse Change; and

(ii) there shall not have occurred any downgrading, nor shall any notice have been given of any intended or potential downgrading or of any review for a possible change that does not indicate the direction of the possible change, in the rating accorded any securities or indebtedness of the Company or any of its subsidiaries by any "nationally recognized statistical rating organization" as such term is defined for purposes of Rule 436 under the Securities Act; and

(iii) there shall not have been any change or decrease specified in the letter or letters referred to in paragraph (a) of this Section 5 which is, in the sole judgment of the Representative, so material and adverse as to make it impractical or inadvisable to proceed with the offering or delivery of the Securities as contemplated by the Preliminary Offering Memorandum and the Pricing Supplement.

(c) *Opinion of Counsel for the Company.* On the Closing Date or the Optional Closing Date, as the case may be, the Initial Purchasers shall have received the favorable opinion of (i) Vinson & Elkins LLP, counsel for the Company, dated as of such Closing Date or Optional Closing Date, as the case may be, the form of which is attached as Exhibit A-1 and (ii) appropriate counsel of the Company, dated as of such Closing Date or Optional Closing Date, as the case may be, the form of which is attached as Exhibit A-2.

(d) *Opinion of Counsel for the Initial Purchasers.* On the Closing Date or the Optional Closing Date, as the case may be, the Initial Purchasers shall have received the favorable opinion of Davis Polk & Wardwell, counsel for the Initial Purchasers, dated as of such Closing Date or Optional Closing Date, as the case may be, with respect to such matters as may be reasonably requested by the Initial Purchasers.

(e) *Officers' Certificate.* On the Closing Date or the Optional Closing Date, as the case may be, the Initial Purchasers shall have received a written certificate executed by the Chairman of the Board, Chief Executive Officer or President of the Company and the Chief Financial Officer or Chief Accounting Officer of the Company, dated as of the Closing Date or the Optional Closing Date, as the case may be, to the effect set forth in Section 5(b)(ii) hereof, and further to the effect that:

(i) for the period from and after the date of this Agreement and prior to the Closing Date or the Optional Closing Date, as the case may be, there has not occurred any Material Adverse Change;

(ii) the representations, warranties and covenants of the Company set forth in Section 1 and Section 3 hereof, respectively, were true and correct as of the date hereof and are true and correct as of the Closing Date or the Optional Closing Date, as the case may be, with the same force and effect as though expressly made on and as of the Closing Date or the Optional Closing Date, as the case may be;

(iii) no event of default exists under the Credit Facility;

(iv) the Company has complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied at or prior to the Closing Date or the Optional Closing Date, as the case may be.

(f) *PORTAL Listing.* At the Closing Date the Securities shall have been designated for trading on the PORTAL Market.

(g) *Underlying Securities*. The Underlying Securities shall have been approved for supplemental listing, subject to official notice of issuance, on the New York Stock Exchange.

(h) *Engineers' Comfort Letters*. On the date hereof, the Initial Purchasers shall have received from DeGolyer and MacNaughton, Netherland, Sewell & Associates Inc. and Harper & Associates, Inc., independent petroleum engineers, a letter dated the date hereof addressed to the Initial Purchasers, the form of which is attached as Exhibits B-1, B-2 and B-3, respectively.

(i) *Certificate of Designation*. The Certificate of Designation shall have been filed with the Secretary of State of the State of Delaware on or before the Closing Date.

(j) *Lock-Up Agreements from Certain Securityholders of the Company.* On or prior to the date hereof, the Company shall have furnished to the Initial Purchasers agreements in the form of Exhibit C hereto from each of the officers and directors of the Company listed in Schedule B hereto, and such agreements shall be in full force and effect on each of the Closing Date and the Optional Closing Date, as the case may be.

(k) *Additional Documents.* On or before the Closing Date or the Optional Closing Date, as the case may be, the Initial Purchasers and counsel for the Initial Purchasers shall have received such information, documents and opinions as they may reasonably require for the purposes of enabling them to pass upon the issuance and sale of the Securities as contemplated herein, or in order to evidence the accuracy of any of the representations and warranties, or the satisfaction of any of the conditions or agreements, herein contained.

If any condition specified in this Section 5 is not satisfied when and as required to be satisfied, this Agreement may be terminated by the Initial Purchasers by notice to the Company at any time on or prior to the Closing Date or the Optional Closing Date, as the case may be, which termination shall be without liability on the part of any party to any other party, except that Sections 4, 6, 8 and 9 hereof shall at all times be effective and shall survive such termination.

SECTION 6. *Reimbursement of Initial Purchasers' Expenses.* If this Agreement is terminated by the Initial Purchasers pursuant to Section 5 hereof, including if the sale to the Initial Purchasers of the Securities on the Closing Date or the Optional Closing Date, as the case may be, is not consummated because of any refusal, inability or failure on the part of the Company to perform any agreement herein or to comply with any provision hereof, the Company agrees to reimburse the Initial Purchasers, severally, upon demand for all reasonable out-of-pocket expenses that shall have been reasonably incurred by the Initial Purchasers in connection with the proposed purchase and the offering and sale of the Securities, including, without limitation, fees and disbursements of counsel, printing expenses, travel expenses, postage, facsimile and telephone charges. If this Agreement is terminated pursuant to Section 16 by reason of the default of one or more Initial Purchasers, the Company shall not be obligated to reimburse any defaulting Initial Purchaser on account of those expenses.

SECTION 7. *Offer, Sale and Resale Procedures.* Each of the Initial Purchasers, on the one hand, and the Company, on the other hand, hereby agree to observe the following procedures in connection with the offer and sale of the Securities:

(A) Offers and sales of the Securities will be made only by the Initial Purchasers or Affiliates thereof qualified to do so in the jurisdictions in which such offers or sales are made. Each such offer or sale shall only be made to persons whom the offeror or seller reasonably believes to be Qualified Institutional Buyers.

(B) The Securities will be offered by approaching prospective Subsequent Purchasers on an individual basis. No general solicitation or general advertising (within the meaning of Rule 502 under the Securities Act) will be used in the United States in connection with the offering of the Securities.

Following the sale of the Securities by the Initial Purchasers to Subsequent Purchasers pursuant to the terms hereof, the Initial Purchasers shall not be liable or responsible to the Company for any losses, damages or liabilities suffered or incurred by the Company, including any losses, damages or liabilities under the Securities Act, arising from or relating to any resale or transfer of any Security.

SECTION 8. *Indemnification*.

(a) *Indemnification of the Initial Purchasers.* The Company agrees to indemnify and hold harmless each Initial Purchaser, its directors, officers and employees, and each person, if any, who controls any Initial Purchaser within the meaning of the Securities Act and the Exchange Act against any loss, claim, damage, liability or expense, as incurred, to which such Initial Purchaser, director, officer, employee or controlling person may become subject, under the Securities Act, the Exchange Act or other federal or state statutory law or regulation, or at common law or otherwise (including in settlement of any litigation, if such settlement is effected with the written consent of the Company), insofar as such loss, claim, damage, liability or expense (or actions in respect thereof as contemplated below) arises out of or is based upon any untrue statement or alleged untrue statement of a material fact contained in the Pricing Disclosure Package, any Company Additional Written Information or the Final Offering Memorandum (or any amendment or supplement thereto), or the omission or alleged omission therefrom of a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; and to reimburse each Initial Purchaser and

each such director, officer, employee or controlling person for any and all expenses (including the fees and disbursements of counsel chosen by Deutsche Bank Securities Inc.) as such expenses are reasonably incurred by such Initial Purchaser or such director, officer, employee or controlling person in connection with investigating, defending, settling, compromising or paying any such loss, claim, damage, liability, expense or action; provided, however, that the foregoing indemnity agreement shall not apply to any loss, claim, damage, liability or expense to the extent, but only to the extent, arising out of or based upon any untrue statement or alleged untrue statement or omission or alleged omission made in reliance upon and in conformity with written information furnished to the Company by the Initial Purchasers expressly for use in the Pricing Disclosure Package, any Company Additional Written Information or the Final Offering Memorandum (or any amendment or supplement thereto). The indemnity agreement set forth in this Section 8(a) shall be in addition to any liabilities that the Company may otherwise have.

(b) *Indemnification of the Company.* Each Initial Purchaser agrees, severally and not jointly, to indemnify and hold harmless the Company, its directors and each person, if any, who controls the Company within the meaning of the Securities Act or the Exchange Act, against any loss, claim, damage, liability or expense, as incurred, to which the Company or any such director or controlling person may become subject, under the Securities Act, the Exchange Act, or other federal or state statutory law or regulation, or at common law or otherwise (including in settlement of any litigation, if such settlement is effected with the written consent of such Initial Purchaser), insofar as such loss, claim, damage, liability or expense (or actions in respect thereof as contemplated below) arises out of or is based upon any untrue statement or alleged untrue statement of a material fact contained in the Pricing Disclosure Package, any Company Additional Written Information or the Final Offering Memorandum (or any amendment or supplement thereto), or the omission or alleged omission therefrom of a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in the Pricing Disclosure Package, any Company Additional Written Information or the Final Offering Memorandum (or any amendment or supplement thereto), in reliance upon and in conformity with written information furnished to the Company by the Initial Purchasers expressly for use therein; and to reimburse the Company and each such director or controlling person for any and all expenses (including the fees and disbursements of counsel) as such expenses are reasonably incurred by the Company or such director or controlling person in connection with investigating, defending, settling, compromising or paying any such loss, claim, damage, liability, expense or action. The Company hereby acknowledges that the only information that the Initial Purchasers have furnished to the Company expressly for use in the Pricing Disclosure Package, any Company Additional Written Information or the Final Offering Memorandum (or any amendment or supplement thereto) are the statements set forth in the 8th, 9th and 14th paragraphs under the caption “Plan of Distribution” in the Preliminary Offering Memorandum and the Final Offering Memorandum. The indemnity agreement set forth in this Section 8(b) shall be in addition to any liabilities that each Initial Purchaser may otherwise have.

(c) *Notifications and Other Indemnification Procedures.* Promptly after receipt by an indemnified party under this Section 8 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against an indemnifying party under this Section 8, notify the indemnifying party in writing of the commencement thereof, but the omission so

to notify the indemnifying party will not relieve it from any liability which it may have to any indemnified party for contribution or otherwise than under the indemnity agreement contained in this Section 8 or to the extent it is not prejudiced as a proximate result of such failure. In case any such action is brought against any indemnified party and such indemnified party seeks or intends to seek indemnity from an indemnifying party, the indemnifying party will be entitled to participate in and, to the extent that it shall elect, jointly with all other indemnifying parties similarly notified, by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that a conflict may arise between the positions of the indemnifying party and the indemnified party in conducting the defense of any such action the indemnified party or parties shall have the right to select separate counsel to assume such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties. Upon receipt of notice from the indemnifying party to such indemnified party of such indemnifying party's election so to assume the defense of such action and approval by the indemnified party of counsel, the indemnifying party will not be liable to such indemnified party under this Section 8 for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof unless the indemnified party shall have employed separate counsel in accordance with the proviso to the next preceding sentence (it being understood, however, that the indemnifying party shall not be liable for the expenses of more than one separate counsel (together with local counsel), approved by the indemnifying party (Deutsche Bank Securities Inc. in the case of Sections 8(b) and 9 hereof), representing the indemnified parties who are parties to such action).

(d) *Settlements.* The indemnifying party under this Section 8 shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify the indemnified party against any loss, claim, damage, liability or expense by reason of such settlement or judgment. No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement, compromise or consent to the entry of judgment in any pending or threatened action, suit or proceeding in respect of which any indemnified party is or could have been a party and indemnity was or could have been sought hereunder by such indemnified party, unless such settlement, compromise or consent (i) includes an unconditional release of such indemnified party from all liability on claims that are the subject matter of such action, suit or proceeding and (ii) does not include any statements as to or any findings of fault, culpability or failure to act by or on behalf of any indemnified party.

SECTION 9. *Contribution.* If the indemnification provided for in Section 8 hereof is for any reason held to be unavailable to or otherwise insufficient to hold harmless an indemnified party in respect of any losses, claims, damages, liabilities or expenses referred to therein, then each indemnifying party shall contribute to the aggregate amount paid or payable by such indemnified party, as incurred, as a result of any losses, claims, damages, liabilities or expenses referred to therein (i) in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and the Initial Purchasers, on the other hand, from the offering of the Securities pursuant to this Agreement or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in

such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the Company, on the one hand, and the Initial Purchasers, on the other hand, in connection with the statements or omissions which resulted in such losses, claims, damages, liabilities or expenses, as well as any other relevant equitable considerations. The relative benefits received by the Company, on the one hand, and the Initial Purchasers, on the other hand, in connection with the offering of the Securities pursuant to this Agreement shall be deemed to be in the same respective proportions as the total net proceeds from the offering of the Securities pursuant to this Agreement (before deducting expenses) received by the Company, and the total discount received by the Initial Purchasers bear to the aggregate initial offering price of the Securities. The relative fault of the Company, on the one hand, and the Initial Purchasers, on the other hand, shall be determined by reference to, among other things, whether any such untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact or any such inaccurate or alleged inaccurate representation or warranty relates to information supplied by the Company, on the one hand, or the Initial Purchasers, on the other hand, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission or inaccuracy.

The amount paid or payable by a party as a result of the losses, claims, damages, liabilities and expenses referred to above shall be deemed to include, subject to the limitations set forth in Section 8 hereof, any legal or other fees or expenses reasonably incurred by such party in connection with investigating or defending any action or claim. The provisions set forth in Section 8 hereof with respect to notice of commencement of any action shall apply if a claim for contribution is to be made under this Section 9; provided, however, that no additional notice shall be required with respect to any action for which notice has been given under Section 8 hereof for purposes of indemnification.

The Company and the Initial Purchasers agree that it would not be just and equitable if contribution pursuant to this Section 9 were determined by pro rata allocation (even if the Initial Purchasers were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in this Section 9.

Notwithstanding the provisions of this Section 9, no Initial Purchaser shall be required to contribute any amount in excess of the discount received by such Initial Purchaser in connection with the Securities distributed by it. No person guilty of fraudulent misrepresentation (within the meaning of Section 11 of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Initial Purchasers' obligations to contribute pursuant to this Section 9 are several, and not joint, in proportion to their respective commitments as set forth opposite their names in Schedule A. For purposes of this Section 9, each director, officer and employee of an Initial Purchaser and each person, if any, who controls an Initial Purchaser within the meaning of the Securities Act and the Exchange Act shall have the same rights to contribution as such Initial Purchaser, and each director of the Company, and each person, if any, who controls the Company within the meaning of the Securities Act and the Exchange Act shall have the same rights to contribution as the Company.

SECTION 10. *Termination of this Agreement.* Prior to the Closing Date, this Agreement may be terminated by the Representative by notice given to the Company if at any time (i) trading in securities generally on either the New York Stock Exchange shall have been suspended or materially limited, or minimum or maximum prices shall have been generally established on

any of such stock exchanges by the Commission or the FINRA; (ii) a general banking moratorium shall have been declared by any federal or New York authority or a material disruption in commercial banking or securities settlement or clearance services in the United States has occurred; or (iii) there shall have occurred any outbreak or escalation of national or international hostilities or any crisis or calamity, or any change in the United States or international financial markets, or any substantial change or development involving a prospective substantial change in United States' or international political, financial or economic conditions, as in the judgment of the Representative is material and adverse and makes it impracticable or inadvisable to market the Securities in the manner and on the terms described in the Offering Memorandum or to enforce contracts for the sale of securities.

SECTION 11. *Representations and Indemnities to Survive Delivery.* The respective indemnities, agreements, representations, warranties and other statements of the Company, its officers and the several Initial Purchasers set forth in or made pursuant to this Agreement will remain in full force and effect, regardless of any investigation made by or on behalf of any Initial Purchaser, the Company, or any of their partners, officers or directors or any controlling person, as the case may be, and will survive delivery of and payment for the Securities sold hereunder and any termination of this Agreement.

SECTION 12. *Notices.* All communications hereunder shall be in writing and shall be mailed, hand delivered, couriered or facsimiled and confirmed to the parties hereto as follows:

If to the Initial Purchasers:

Deutsche Bank Securities Inc.
60 Wall Street
New York, New York 10005
Facsimile: 212-797-9344
Attention: ECM Syndicate

with a copy to:

Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
Facsimile: 212-450-3674
Attention: Richard D. Truesdell, Jr.

If to the Company:

SandRidge Energy, Inc.
1601 NW Expressway, Suite 1600
Oklahoma City, Oklahoma
Facsimile: 405-753-5988
Attention: General Counsel

with a copy to:

Vinson & Elkins L.L.P.
First City Tower
1001 Fannin Street, Suite 2500
Houston, Texas 77002
Facsimile: 713-615-5531
Attention: T. Mark Kelly

Any party hereto may change the address or facsimile number for receipt of communications by giving written notice to the others.

SECTION 13. *Successors.* This Agreement will inure to the benefit of and be binding upon the parties hereto, including any substitute Initial Purchasers pursuant to Section 16 hereof, and to the benefit of the indemnified parties referred to in Sections 8 and 9 hereof, and in each case their respective successors, and no other person will have any right or obligation hereunder. The term “successors” shall not include any Subsequent Purchaser of other purchaser of the Securities as such from any of the Initial Purchasers merely by reason of such purchase.

SECTION 14. *Partial Unenforceability.* The invalidity or unenforceability of any section, paragraph or provision of this Agreement shall not affect the validity or enforceability of any other section, paragraph or provision hereof. If any section, paragraph or provision of this Agreement is for any reason determined to be invalid or unenforceable, there shall be deemed to be made such minor changes (and only such minor changes) as are necessary to make it valid and enforceable.

SECTION 15. *Governing Law Provisions.* THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN SUCH STATE WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THEREOF.

SECTION 16. *Default of One or More of the Several Initial Purchasers.* If any one or more of the several Initial Purchasers shall fail or refuse to purchase Securities that it or they have agreed to purchase hereunder on the Closing Date, and the aggregate number of Securities which such defaulting Initial Purchaser or Initial Purchasers agreed but failed or refused to purchase does not exceed 10% of the aggregate number of the Securities to be purchased on such date, the other Initial Purchasers shall be obligated, severally, in the proportions that the number of Securities set forth opposite their respective names on Schedule A bears to the aggregate number of Securities set forth opposite the names of all such non-defaulting Initial Purchasers, or in such other proportions as may be specified by the Initial Purchasers with the consent of the non-defaulting Initial Purchasers, to purchase the Securities which such defaulting Initial Purchaser or Initial Purchasers agreed but failed or refused to purchase on the Closing Date. If any one or more of the Initial Purchasers shall fail or refuse to purchase Securities and the aggregate number of Securities with respect to which such default occurs exceeds 10% of the aggregate number of Securities to be purchased on the Closing Date, and arrangements

satisfactory to the Initial Purchasers and the Company for the purchase of such Securities are not made within 48 hours after such default, this Agreement shall terminate without liability of any party to any other party except that the provisions of Sections 4, 6, 8 and 9 hereof shall at all times be effective and shall survive such termination. In any such case either the Initial Purchasers or the Company shall have the right to postpone the Closing Date, as the case may be, but in no event for longer than seven days in order that the required changes, if any, to the Final Offering Memorandum or any other documents or arrangements may be effected.

As used in this Agreement, the term “Initial Purchaser” shall be deemed to include any person substituted for a defaulting Initial Purchaser under this Section 16. Any action taken under this Section 16 shall not relieve any defaulting Initial Purchaser from liability in respect of any default of such Initial Purchaser under this Agreement.

SECTION 17. *No Advisory or Fiduciary Responsibility.* The Company acknowledges and agrees that: (i) the purchase and sale of the Securities pursuant to this Agreement, including the determination of the offering price of the Securities and any related discounts and commissions, is an arm’s-length commercial transaction between the Company, on the one hand, and the several Initial Purchasers, on the other hand, and the Company is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated by this Agreement; (ii) in connection with each transaction contemplated hereby and the process leading to such transaction each Initial Purchaser is and has been acting solely as a principal and is not the agent or fiduciary of the Company or its affiliates, stockholders, creditors or employees or any other party; (iii) no Initial Purchaser has assumed or will assume an advisory or fiduciary responsibility in favor of the Company with respect to any of the transactions contemplated hereby or the process leading thereto (irrespective of whether such Initial Purchaser has advised or is currently advising the Company on other matters) or any other obligation of the Company except the obligations expressly set forth in this Agreement; (iv) the several Initial Purchasers and their respective affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Company and that the several Initial Purchasers have no obligation to disclose any of such interests by virtue of any fiduciary or advisory relationship; and (v) the Initial Purchasers have not provided any legal, accounting, regulatory or tax advice with respect to the offering contemplated hereby and the Company has consulted its own legal, accounting, regulatory and tax advisors to the extent it deemed appropriate.

This Agreement supersedes all prior agreements and understandings (whether written or oral) between the Company and the several Initial Purchasers, or any of them, with respect to the subject matter hereof. The Company hereby waives and releases, to the fullest extent permitted by law, any claims that the Company may have against the several Initial Purchasers with respect to any breach or alleged breach of fiduciary duty.

SECTION 18. *General Provisions.* This Agreement constitutes the entire agreement of the parties to this Agreement and supersedes all prior written or oral and all contemporaneous oral agreements, understandings and negotiations with respect to the subject matter hereof. This Agreement may be executed in two or more counterparts, each one of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement may not be amended or modified unless in writing by all of the parties hereto, and no condition herein (express or implied) may be waived unless waived in writing by each party whom the condition is meant to benefit. The section headings herein are for the convenience of the parties only and shall not affect the construction or interpretation of this Agreement.

If the foregoing is in accordance with your understanding of our agreement, kindly sign and return to the Company the enclosed copies hereof, whereupon this instrument, along with all counterparts hereof, shall become a binding agreement in accordance with its terms.

Very truly yours,

SANDRIDGE ENERGY, INC.

By: /s/ Tom L. Ward
Tom L. Ward
CEO, President and Chairman of the Board

The foregoing Purchase Agreement is hereby confirmed and accepted by the Initial Purchasers as of the date first above written.

DEUTSCHE BANK SECURITIES INC.

By: /s/ W. Brooks Harris
Name: Brooks Harris
Title: Managing Director

By: /s/ Michael V. Johnson
Name: Michael V. Johnson
Title: Managing Director

**SCHEDULE A**

| Initial Purchasers | Number of Firm Securities |
|---|---|
| Deutsche Bank Securities Inc. | 1,350,000 |
| Barclays Capital Inc. | 150,000 |
| J.P. Morgan Securities Inc. | 150,000 |
| RBC Capital Markets Corporation | 150,000 |
| ABN AMRO Incorporated | 56,250 |
| BBVA Securities, Inc. | 56,250 |
| BNP Paribas Securities Corp. | 56,250 |
| Comerica Securities, Inc. | 56,250 |
| Scotia Capital (USA) Inc. | 56,250 |
| SunTrust Robinson Humphrey, Inc. | 56,250 |
| U.S. Bancorp Investments, Inc. | 56,250 |
| Wells Fargo Securities, LLC | 56,250 |
| Total | 2,250,000 |

**SCHEDULE B**

**PERSONS DELIVERING LOCK-UP AGREEMENTS**

- Tom L. Ward
- Dirk M. Van Doren
- Matthew K. Grubb
- Todd N. Tipton
- Rodney E. Johnson
- William A. Gilliland
- Daniel W. Jordan
- Roy T. Oliver, Jr.
- Stuart W. Ray
- D. Dwight Scott
- Jeffrey S. Serota

**EXHIBIT A-1**

Opinion of outside counsel to the Company to be delivered pursuant to Section 5 of the Purchase Agreement.

(i) The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of Delaware.

(ii) Each of the Purchase Agreement and the Certificate of Designation has been duly authorized, executed and delivered by the Company.

(iii) The shares of Common Stock into which the Securities are convertible at the initial conversion price provided in the Certificate of Designation have been duly authorized by all necessary corporate action of the Company and reserved for issuance upon such conversion and, upon issuance of such shares of Common Stock on conversion of the Securities in accordance with the terms of the Certificate of Designation at conversion prices at or in excess of the par value of such shares of Common Stock, will be validly issued, fully paid and nonassessable. There are no preemptive rights to acquire any such shares of Common Stock set forth in the Company's Certificate of Incorporation or in the Delaware General Corporation Law.

(iv) The Securities conform in all material respects to the descriptions thereof contained in the Pricing Disclosure Package and the Final Offering Memorandum.

(v) The documents incorporated by reference in the Pricing Disclosure Package and the Final Offering Memorandum (other than the financial statements, financial schedules and other financial or accounting information and oil and gas reserve data included therein or omitted therefrom, as to which no opinion need be rendered), when they were filed with the Commission, appeared on their face to comply as to form in all material respects with the requirements of the Exchange Act.

(vi) The statements in the Offering Memorandum under the caption "Certain United States Federal Income Tax Considerations" insofar as such statements summarize legal matters, legal agreements or legal conclusions discussed therein, fairly present in all material respects such legal matters or legal conclusions.

(vii) The execution and delivery of the Purchase Agreement and the Securities by the Company and the performance by the Company of its obligations thereunder (other than performance by the Company of its obligations under the indemnification and contribution sections of the Purchase Agreement, as to which no opinion need be rendered) (i) will not result in any violation of the provisions of the Articles of Incorporation or Bylaws (or other applicable organizational document) of the Company or any subsidiary; (ii) will not constitute a breach of, or Default or a Debt Repayment Triggering Event under, the Senior Credit Facility, dated November 21, 2006, by and among SandRidge Energy, Inc. (as successor by merger to Riata Energy, Inc.) and Bank of America, N.A., as Administrative Agent and Banc of America Securities LLC as Lead Arranger and Book Running Manager, as amended; or (iii) to the best knowledge of such counsel, will not result in any violation of any statute, law, rule, judgment, regulation,

order or decree applicable to the Company or any of its subsidiaries of any court, regulatory body, administrative agency, governmental body, arbitrator or other authority having jurisdiction over the Company or any of its subsidiaries or any of its or their properties; except in the case of clause (ii) and (iii), such breaches, defaults and violations that would not reasonably be expected to have a Material Adverse Effect; provided however, we express no opinion in this paragraph (ix) with respect to federal or state securities laws or blue sky laws, rules or regulations or any state or federal anti-fraud statute, rule or regulation.

(viii) The Company is not, and after receipt of payment for the Securities will not be, an “investment company” within the meaning of Investment Company Act.

(ix) Assuming the accuracy of the representations, warranties and covenants of the Company and the Initial Purchasers contained herein, no registration of the Securities under the Securities Act is required in connection with the purchase of the Securities by the Initial Purchasers or the initial resale of the Securities by the Initial Purchasers to Qualified Institutional Buyers in the manner contemplated by this Agreement and the Pricing Disclosure Package and the Final Offering Memorandum. Such counsel need express no opinion, however, as to when or under what circumstances any Securities initially sold by the Initial Purchasers may be reoffered or resold.

In addition, such counsel shall state that they have participated in conferences with officers and other representatives of the Company, representatives of the independent public or certified public accountants for the Company and with representatives of the Initial Purchasers and their counsel at which the contents of the Pricing Disclosure Package and the Final Offering Memorandum and related matters were discussed and, although such counsel is not passing upon and does not assume any responsibility for the accuracy, completeness or fairness of the statements contained in the Pricing Disclosure Package or the Final Offering Memorandum (other than as specified above), on the basis of the foregoing, nothing has come to their attention which would lead them to believe that the Pricing Disclosure Package, as of the Time of Sale, or that the Final Offering Memorandum, as of its date or at the Closing Date, contained or contains an untrue statement of a material fact or omitted or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (it being understood that such counsel need express no belief as to the financial statements or other financial or accounting or oil and gas reserve data, included in or omitted from the Pricing Disclosure Package or the Final Offering Memorandum).

In rendering such opinion, such counsel may rely as to matters involving the application of laws of any jurisdiction other than the General Corporation Law of the State of Delaware, the laws of the State of Texas, the contract laws of the State of New York or the federal law of the United States, to the extent they deem proper and specified in such opinion, upon the opinion (which shall be dated the Closing Date shall be satisfactory in form and substance to the Initial Purchasers, shall expressly state that the Initial Purchasers may rely on such opinion as if it were addressed to them and shall be furnished to the Initial Purchasers) of other counsel of good standing whom they believe to be reliable and who are satisfactory to counsel for the Initial Purchasers.

**EXHIBIT A-2**

Opinion of counsel for the Company to be delivered pursuant to Section 5 of the Purchase Agreement.

(i) The Company has corporate power and authority to own, lease and operate its properties and to conduct its business as described in the Pricing Disclosure Package and the Final Offering Memorandum and to enter into and perform its obligations under the Purchase Agreement, the Certificate of Designation and the Securities.

(ii) The Company is duly qualified as a foreign corporation to transact business and is in good standing in each other jurisdiction in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except for such jurisdictions where the failure to so qualify or to be in good standing would not, individually or in the aggregate, have a Material Adverse Effect.

(iii) The Company and each subsidiary possess such valid and current certificates, authorizations or permits issued by the appropriate state, federal or foreign regulatory agencies or bodies necessary to conduct their respective businesses, and, to such counsel's knowledge, neither the Company nor any subsidiary has received any notice of proceedings relating to the revocation or modification of, or non-compliance with, any such certificate, authorization or permit which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, could have a Material Adverse Effect.

(iv) After due inquiry, such counsel does not know of any legal or governmental actions, suits or proceedings pending or, to the best of such counsel's knowledge, threatened (i) against or affecting the Company or any of its subsidiaries, (ii) which has as the subject thereof any officer or director of, or property owned or leased by, the Company or any of its subsidiaries or (iii) relating to environmental or discrimination matters, where in any such case (A) there is a reasonable possibility that such action, suit or proceeding might be determined adversely to the Company or such subsidiary and (B) any such action, suit or proceeding, if so determined adversely, would reasonably be expected to, singly or in the aggregate, have a Material Adverse Effect or adversely affect the consummation of the transactions contemplated by this Agreement. After due inquiry, such counsel does not know of any existing or, to the best of such counsel's knowledge, threatened or pending, material labor dispute with the employees of the Company or any of its subsidiaries, or with the employees of any principal supplier of the Company.

(v) To the best knowledge of such counsel, neither the Company nor any subsidiary is in violation of its charter, by-laws or other organizational document, as the case may be.

In rendering such opinion, such counsel may rely as to matters involving the application of laws of any jurisdiction other than the General Corporation Law of the State of Delaware, the laws of the State of Texas, or the federal law of the United States, to the extent they deem proper and specified in such opinion, upon the opinion (which shall be dated the Closing Date shall be satisfactory in form and substance to the Initial Purchasers, shall expressly state that the Initial Purchasers may rely on such opinion as if it were addressed to them and shall be furnished to the Initial Purchasers) of other counsel of good standing whom they believe to be reliable and who are satisfactory to counsel for the Initial Purchasers.

**EXHIBIT B**

Pricing term sheet dated January 14, 2009
to Preliminary Offering Memorandum dated January 14, 2009
(the "Preliminary Offering Memorandum")

**SandRidge Energy, Inc.**
**2,250,000 Shares**
**8.5% Convertible Perpetual Preferred Stock**
**(Liquidation Preference $100 per Share)**

| | |
|---|---|
| Issuer: | SandRidge Energy, Inc., a Delaware corporation ("SD"). |
| Ticker / Exchange: | SD / The New York Stock Exchange. |
| Title of Securities: | 8.5% Convertible Perpetual Preferred Stock (the "Convertible Preferred Stock"). |
| Number of Shares of Convertible Preferred Stock Offered: | 2,250,000 shares of Convertible Preferred Stock (excluding the initial purchasers' option to purchase a maximum of 400,000 additional shares of Convertible Preferred Stock solely to cover over-allotments, if any). |
| Issue Price: | $95.04 per share. |
| Proceeds, After Deducting the Initial Purchasers' Discounts and the Estimated Expenses of the Offering Payable by SD: | Approximately $206,540,000 (without giving effect to any exercise of the initial purchasers' option to purchase a maximum of 400,000 additional shares of Convertible Preferred Stock solely to cover over-allotments, if any). |
| Annual Dividend Rate: | No dividends shall accrue or accumulate on the Convertible Preferred Stock prior to August 15, 2009. Thereafter, holders of shares of Convertible Preferred Stock will be entitled to receive, when, as and if declared by SD's board of directors out of funds legally available for payment, cumulative dividends of $8.50 per annum per share (equivalent to a per annum rate of 8.5% per share). |

| | |
|---|---|
| Dividend Payment Dates: | Dividends on the Convertible Preferred Stock will be payable semi-annually on February 15 and August 15 of each year (each, a "Dividend Payment Date"), commencing on February 15, 2010, and shall accrue and accumulate from the most recent date to which dividends have been paid, or if no dividends have been paid, from August 15, 2009, and may be paid in cash or, where freely transferable by any non-affiliate recipient thereof, in common stock as provided in the Preliminary Offering Memorandum. |
| Dividend Record Dates: | Dividends will be payable to holders of record as they appear on SD's stock register on the February 1 and August 1 immediately preceding each Dividend Payment Date. |
| Closing Stock Price: | $6.41 as of January 14, 2009. |
| Conversion Rights: | Each share of Convertible Preferred Stock will be convertible at any time on or after April 15, 2009 at the option of the holder thereof into a number of shares of SD common stock equal to $100 divided by the Conversion Price, which is initially approximately 12.4805 shares of SD common stock. |
| Initial Conversion Price: | $8.0125 per share, subject to specified adjustments. |
| Conversion Premium: | 125% of the Closing Stock Price. |
| Sole Book-Running Manager: | Deutsche Bank Securities. |
| Trade Date: | January 15, 2009. |
| Settlement Date: | January 21, 2009. |
| CUSIP Number: | 80007P 406 |
| Special Rights Upon a Fundamental Change: | If a holder converts its Convertible Preferred Stock at any time beginning at the opening of business on the Trading Day immediately following the effective date of a fundamental change and ending at the close of business on the 30th Trading Day immediately following such effective date, the holder will automatically receive a number of shares of SD common stock equal to the greater of: |

- (i) a number of shares of SD common stock, as described under "Description of Preferred Stock—Conversion Rights" in the Preliminary Offering Memorandum and subject to adjustment as described under "Description of Preferred Stock—Conversion Price Adjustment" in the Preliminary Offering Memorandum (with such adjustment or cash payment for fractional shares as SD may elect) and (ii) the make-whole premium, if any, described under "Description of Preferred Stock—Determination of Make-Whole Premium" in the Preliminary Offering Memorandum; and

- a number of shares of SD common stock calculated by reference to an adjusted Conversion Price equal to the greater of (i) the Market Value as of the effective date and (ii) $6.41.

In lieu of issuing the number of shares of common stock issuable upon conversion pursuant to the foregoing provisions, SD, at its option, may elect to make a cash payment equal to the Market Value for such shares.

| | |
|---|---|
| Mandatory Conversion: | At any time on or after February 20, 2014, SD may at its option cause all outstanding shares of the Convertible Preferred Stock to be automatically converted into that number of shares of SD common stock for each share of Convertible Preferred Stock equal to $100 divided by the then-prevailing Conversion Price, if the Closing Sale Price of the SD common stock equals or exceeds 130% of the then-prevailing Conversion Price for at least 20 Trading Days in a period of 30 consecutive Trading Days, including the last Trading Day of such 30-day period, ending on the Trading Day prior to SD's issuance of a press release announcing the mandatory conversion as described under "Description of Preferred Stock—Mandatory Conversion" in the Preliminary Offering Memorandum.<br><br>In addition to the mandatory conversion provision described above, if there are fewer than 250,000 shares of Convertible Preferred Stock outstanding, SD may, at any time on or after February 20, 2014, at its option, cause all such outstanding shares of the Convertible Preferred Stock to be automatically converted into that number of shares of common stock equal to $100 divided by the lesser of the then-prevailing Conversion Price and the Market Value as determined on the second Trading Day immediately prior to the Mandatory Conversion Date. |
| Determination of the Make-Whole Premium: | If you elect to convert your shares of Convertible Preferred Stock upon the occurrence of a fundamental change that occurs prior to February 20, 2014, in certain circumstances, you will be entitled to receive, in addition to a number of shares of common stock equal to the applicable conversion rate, an additional number of shares of common stock (the "additional shares" or the "make-whole premium") upon conversion as described under "Description of Preferred Stock—Determination of the Make-Whole Premium" in the Preliminary Offering Memorandum. |

The following table sets forth the stock price paid, or deemed paid, per share of SD common stock in a transaction that constitutes the fundamental change, the effective date and the make-whole premium (expressed as a number of additional shares) to be paid upon a conversion in connection with a fundamental change:

| | Stock Price[1] | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Effective Date** | **$6.41** | **$7.00** | **$8.00** | **$10.00** | **$12.00** | **$14.00** | **$16.00** | **$18.00** | **$20.00** | **$25.00** | **$30.00** | **$35.00** | **$40.00** | **$45.00** | **$50.00** |
| January 21, 2009 | 3.1201 | 2.8140 | 2.3184 | 1.6520 | 1.2294 | 0.9410 | 0.7338 | 0.5794 | 0.4612 | 0.2644 | 0.1496 | 0.0796 | 0.0359 | 0.0091 | 0.0000 |
| February 15, 2010 | 2.9776 | 2.6157 | 2.1404 | 1.5113 | 1.1190 | 0.8542 | 0.6654 | 0.5253 | 0.4181 | 0.2398 | 0.1356 | 0.0720 | 0.0326 | 0.0088 | 0.0000 |
| February 15, 2011 | 2.7103 | 2.3571 | 1.9006 | 1.3127 | 0.9586 | 0.7258 | 0.5627 | 0.4430 | 0.3521 | 0.2012 | 0.1128 | 0.0587 | 0.0249 | 0.0046 | 0.0000 |
| February 15, 2012 | 2.3859 | 2.0300 | 1.5795 | 1.0280 | 0.7203 | 0.5314 | 0.4061 | 0.3174 | 0.2515 | 0.1432 | 0.0793 | 0.0394 | 0.0140 | 0.0007 | 0.0000 |
| February 15, 2013 | 2.0529 | 1.6594 | 1.1691 | 0.6115 | 0.3533 | 0.2291 | 0.1639 | 0.1254 | 0.0995 | 0.0586 | 0.0329 | 0.0147 | 0.0019 | 0.0000 | 0.0000 |
| February 20, 2014 | 1.9434 | 1.4991 | 0.9089 | 0.1798 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |

(1) The stock prices set forth in the table will be adjusted as of any date on which the Conversion Price of the Convertible Preferred Stock is adjusted in the same proportion as the Conversion Price is so adjusted and in such event, the number of additional shares of common stock shall be adjusted in inverse proportion to the adjustment to the Conversion Price.

The exact stock prices and effective dates may not be set forth in the table above, in which case:

- if the stock price is between two stock prices in the table or the effective date is between two effective dates in the table, the make-whole premium will be determined by straight-line interpolation between make-whole premium amounts set forth for the higher and lower stock prices and the two effective dates, as applicable, based on a 365-day year;
- if the stock price is in excess of $50.00 per share (subject to adjustment in the same manner as the stock price), no make-whole premium will be paid; and
- if the stock price is less than or equal to $6.41 per share (subject to adjustment in the same manner as the stock price), no make-whole premium will be paid.

---

This communication is intended for the sole use of the person to whom it is provided by the sender.

This communication shall not constitute an offer to sell or the solicitation of an offer to buy securities nor shall there be any sale of these securities in any state in which such solicitation or sale would be unlawful prior to registration or qualification of these securities under the laws of any such state.

**The Convertible Preferred Stock, the common stock issuable upon conversion thereof and the common stock issuable as a dividend on the Convertible Preferred Stock, if any, have not been registered under the Securities Act of 1933, as amended (the "Securities Act"). The Convertible Preferred Stock may not be offered or sold within the United States or to U.S. persons, except to qualified institutional buyers in reliance on the exemption from registration provided by Rule 144A. You are hereby notified that sellers of the Convertible Preferred Stock may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. For further details about eligible offers and resale restrictions, see "Notice to Investors" and "Transfer Restrictions" in the Preliminary Offering Memorandum. Hedging transactions involving the Convertible Preferred Stock may not be conducted unless in compliance with the Securities Act.**

The information in this term sheet supplements the Preliminary Offering Memorandum and supersedes the information in the Preliminary Offering Memorandum to the extent inconsistent with the information in the Preliminary Offering Memorandum. This term sheet is qualified in its entirety by reference to the Preliminary Offering Memorandum. Terms used herein but not defined herein shall have the respective meanings as set forth in the Preliminary Offering Memorandum.

ANY DISCLAIMER OR OTHER NOTICES THAT MAY APPEAR BELOW ARE NOT APPLICABLE TO THIS COMMUNICATION AND SHOULD BE DISREGARDED. SUCH DISCLAIMERS OR OTHER NOTICES WERE AUTOMATICALLY GENERATED AS A RESULT OF THIS COMMUNICATION BEING SENT VIA BLOOMBERG OR ANOTHER EMAIL SYSTEM.

**EXHIBIT C**

**LOCK-UP LETTER AGREEMENT**

Deutsche Bank Securities Inc.
60 Wall Street
New York, New York 10005
As Representative of the several
Initial Purchasers named in Schedule A
of the Purchase Agreement referred to below

Ladies and Gentlemen:

The undersigned understands that you and certain other firms (the " **Initial Purchasers**") propose to enter into a Purchase Agreement (the " **Purchase Agreement**") providing for the purchase by the Initial Purchasers of shares (the " **Preferred Shares**") of Convertible Preferred Stock, par value $0.001 per share, of SandRidge Energy, Inc., a Delaware corporation (the "**Company**"), and that the Initial Purchasers propose to reoffer the Preferred Shares to certain investors (the "**Offering**"). The Preferred Shares are convertible into shares of Common Stock, par value $0.001 per share, of the Company (the " **Common Stock**").

The undersigned is an owner of record or beneficially of certain shares of Common Stock or securities convertible into or exchangeable or exercisable for Common Stock. The undersigned recognizes that the Offering will be of benefit to the undersigned and will benefit the Company. The undersigned acknowledges that you and the other Initial Purchasers are relying on the representations and agreements of the undersigned contained in this letter in carrying out the Offering and entering into the Purchase Agreement.

In consideration of the foregoing, the undersigned hereby irrevocably agrees that, without the prior written consent of Deutsche Bank Securities Inc., on behalf of the Initial Purchasers (which consent may be withheld in its sole discretion), the undersigned will not (and will cause any spouse or immediate family member of the spouse or the undersigned living in the undersigned household not to), directly or indirectly, sell, offer, contract or grant any option to sell (including without limitation any short sale), pledge, transfer, establish an open "put equivalent position" or liquidate or decrease a "call equivalent position" within the meaning of Rule 16a-1 (h) under the Securities Exchange Act of 1934, as amended (the " **Exchange Act**"), or otherwise dispose of or transfer (or enter into any transaction or device that is designed to, or could be expected to, result in the disposition by any person at any time in the future of), including the filing (or participation in the filing of) of a registration statement with the Securities and Exchange Commission in respect of, any shares of Common Stock, options or warrants to acquire shares of Common Stock, or securities exchangeable or exercisable for or convertible into shares of Common Stock currently or hereafter owned either of record or beneficially (as defined in Rule 13d-3 under the Exchange Act) by the undersigned (or such spouse and family member) or publicly disclose the intention to do any of the foregoing, for a period commencing on the date hereof and continuing through the close of trading on the date 60 days after the date of the final offering memorandum relating to the Offering.

The foregoing shall not apply to transfers or sales of Common Stock pursuant to any contract, instruction or plan, including a contract, instruction or plan complying with Rule 10b5-1 of the Exchange Act, that has been entered into by the undersigned prior to the date of this Lock-Up Letter Agreement.

In furtherance of the foregoing, the Company and its transfer agent are hereby authorized to decline to make any transfer of securities if such transfer would constitute a violation or breach of this Lock-Up Letter Agreement.

It is understood that, if the Company notifies the Initial Purchasers that it does not intend to proceed with the Offering, if the Purchase Agreement does not become effective, if the Offering shall not have commenced by March 1, 2009, or if the Purchase Agreement (other than the provisions thereof which survive termination) shall terminate or be terminated prior to payment for and delivery of the Preferred Shares, the undersigned will be released from its obligations under this Lock-Up Letter Agreement.

Whether or not the Offering actually occurs depends on a number of factors, including market conditions. Any Offering will only be made pursuant to a Purchase Agreement, the terms of which are subject to negotiation between the Company and the Initial Purchasers.

*{Signature page follows}*

The undersigned hereby represents and warrants that the undersigned has full power and authority to enter into this Lock-Up Letter Agreement and that, upon request, the undersigned will execute any additional documents necessary in connection with the enforcement hereof. Any obligations of the undersigned shall be binding upon the heirs, personal representatives, successors and assigns of the undersigned.

Very truly yours,

By: ______________________________
Name:

**Exhibit 10.16**

**SANDRIDGE ENERGY, INC.**

**SANDRIDGE ONSHORE, LLC,**
**LARIAT SERVICES, INC.,**
**SANDRIDGE OPERATING COMPANY,**
**INTEGRA ENERGY, L.L.C.,**
**SANDRIDGE EXPLORATION AND PRODUCTION, LLC,**
**SANDRIDGE TERTIARY, LLC,**
**SANDRIDGE MIDSTREAM, INC,**
**SANDRIDGE OFFSHORE, LLC**
**AND**
**SANDRIDGE HOLDINGS, INC.**

$365,500,000

9.875% Senior Notes due 2016

**PURCHASE AGREEMENT**

dated May 11, 2009

**Barclays Capital Inc.**
**Banc of America Securities LLC**
**J.P. Morgan Securities Inc.**
**RBC Capital Markets Corporation**
**RBS Securities Inc.**

**PURCHASE AGREEMENT**

May 11, 2009

BARCLAYS CAPITAL INC.
BANC OF AMERICA SECURITIES LLC
J.P. MORGAN SECURITIES INC.
RBC CAPITAL MARKETS CORPORATION
RBS SECURITIES INC.

As Representatives of the Initial Purchasers
set forth on Schedule A hereto
c/o Barclays Capital Inc.
745 Seventh Avenue
New York, NY 10019

Ladies and Gentlemen:

*Introductory*. SandRidge Energy, Inc., a Delaware corporation (the "Company"), proposes to issue and sell to the several Initial Purchasers named in Schedule A (the "Initial Purchasers"), acting severally and not jointly, the respective amounts set forth in such Schedule A of $365,500,000 in aggregate principal amount of the Company's 9.875% Senior Notes due 2016 (the "Notes"). Barclays Capital Inc., Banc of America Securities LLC, J.P. Morgan Securities Inc., RBC Capital Markets Corporation and RBS Securities Inc. have agreed to act as the representatives of the Initial Purchasers (the "Representatives") in connection with the offering and sale of the Notes.

The Notes will be issued pursuant to an indenture, dated as of May 14, 2009 (the "Indenture"), among the Company, the Guarantors (as defined below) and Wells Fargo Bank, National Association, as trustee (the "Trustee"). Notes will be issued only in book-entry form in the name of Cede & Co., as nominee of The Depository Trust Company (the "Depositary") pursuant to a letter of representations, to be dated on or before the Closing Date (as defined in Section 2 hereof) (the "DTC Agreement"), among the Company, the Guarantors, the Trustee and the Depositary.

The holders of the Notes will be entitled to the benefits of a registration rights agreement, dated as of the Closing Date (as defined below) (the "Registration Rights Agreement"), among the Company, the Guarantors and the Initial Purchasers, pursuant to which the Company and the Guarantors will agree to file with the Commission (as defined below), under the circumstances set forth therein, (i) a registration statement under the Securities Act (as defined below) relating to another series of debt securities of the Company with terms substantially identical to the Notes (the "Exchange Notes") to be offered in exchange for the Notes (the "Exchange Offer") and (ii) to the extent required by the Registration Rights Agreement, a shelf registration statement pursuant to Rule 415 of the Securities Act relating to the resale by certain holders of the Notes, and in each case, to use its commercially reasonable best efforts to cause such registration statements to be declared effective.

The payment of principal of, premium and Liquidated Damages (as defined in the Indenture), if any, and interest on the Notes and the Exchange Notes will be fully and unconditionally guaranteed on a senior unsecured basis, jointly and severally by (i) SandRidge Onshore, LLC, Lariat Services, Inc., SandRidge Operating Company, Integra Energy, L.L.C., SandRidge Exploration and Production, LLC, SandRidge Tertiary, LLC, SandRidge Midstream, Inc, SandRidge Offshore, LLC and SandRidge Holdings, Inc. and (ii) any subsidiary of the Company formed or acquired after the Closing Date that executes an additional guarantee in accordance with the terms of the Indenture, and their respective successors and assigns (collectively, the "Guarantors"), pursuant to their guarantees (the "Guarantees"). The Notes and the Guarantees related thereto are herein collectively referred to as the "Securities"; and the Exchange Notes and the Guarantees related thereto are herein collectively referred to as the "Exchange Securities."

The Company understands that the Initial Purchasers propose to make an offering of the Securities on the terms and in the manner set forth herein and in the Pricing Disclosure Package (as defined below) and agrees that the Initial Purchasers may resell, subject to the conditions set forth herein, all or a portion of the Securities to purchasers (the "Subsequent Purchasers") on the terms set forth in the Pricing Disclosure Package (the first time when sales of the Securities are made by the Initial Purchasers is referred to as the "Time of Sale"). The Securities are to be offered and sold to or through the Initial Purchasers without being registered with the Securities and Exchange Commission (the "Commission") under the Securities Act of 1933 (as amended, the "Securities Act," which term, as used herein, includes the rules and regulations of the Commission promulgated thereunder), in reliance upon exemptions therefrom. Pursuant to the terms of the Securities and the Indenture, investors who acquire Securities shall be deemed to have agreed that Securities may only be resold or otherwise transferred, after the date hereof, if such Securities are registered for sale under the Securities Act or if an exemption from the registration requirements of the Securities Act is available (including the exemptions afforded by Rule 144A under the Securities Act ("Rule 144A") or Regulation S under the Securities Act ("Regulation S")).

The Company has prepared and delivered to each Initial Purchaser copies of a Preliminary Offering Memorandum, dated May 11, 2009, including documents incorporated by reference therein (the "Preliminary Offering Memorandum"), and has prepared and delivered to each Initial Purchaser copies of a Pricing Supplement, dated May 11, 2009, in the form attached hereto as Exhibit B (the "Pricing Supplement"), describing the terms of the Securities, each for use by such Initial Purchaser in connection with its solicitation of offers to purchase the Securities. The Preliminary Offering Memorandum and the Pricing Supplement are herein referred to as the "Pricing Disclosure Package." Promptly after this Agreement is executed and delivered, the Company will prepare and deliver to each Initial Purchaser a final offering memorandum dated the date hereof including documents incorporated by reference therein (the "Final Offering Memorandum").

All references herein to the terms "Pricing Disclosure Package" and "Final Offering Memorandum" shall be deemed to mean and include all information filed under the Securities Exchange Act of 1934 (as amended, the "Exchange Act," which term, as used herein, includes the rules and regulations of the Commission promulgated thereunder) prior to the Time of Sale and incorporated by reference in the Pricing Disclosure Package (including the Preliminary Offering Memorandum) or the Final Offering Memorandum (as the case may be), and all references herein to the terms "amend," "amendment" or "supplement" with respect to the Final Offering Memorandum shall be deemed to mean and include all information filed under the Exchange Act after the Time of Sale and incorporated by reference in the Final Offering Memorandum.

The Company hereby confirms its agreements with the Initial Purchasers as follows:

SECTION 1. *Representations and Warranties.* Each of the Company and the Guarantors, jointly and severally, hereby represents, warrants and covenants to each Initial Purchaser that, as of the date hereof and as of the Closing Date (references in this Section 1 to the "Offering Memorandum" are to (x) the Pricing Disclosure Package in the case of representations and warranties made as of the date hereof and (y) the Pricing Disclosure Package and the Final Offering Memorandum in the case of representations and warranties made as of the Closing Date):

(a) *No Registration Required.* Subject to compliance by the Initial Purchasers with the representations and warranties set forth in Section 2 hereof and with the procedures set forth in Section 7 hereof, it is not necessary in connection with the offer, sale and delivery of the Securities to the Initial Purchasers and to each Subsequent Purchaser in the manner contemplated by this Agreement and the Offering Memorandum to register the Securities under the Securities Act or, until such time as the Exchange Securities are issued pursuant to an effective registration statement, to qualify the Indenture under the Trust Indenture Act of 1939 (the "Trust Indenture Act," which term, as used herein, includes the rules and regulations of the Commission promulgated thereunder).

(b) *No Integration of Offerings or General Solicitation.* None of the Company, its affiliates (as such term is defined in Rule 501 under the Securities Act) (each, an "Affiliate"), or any person acting on its or any of their behalf (other than the Initial Purchasers, as to whom the Company makes no representation or warranty) has, directly or indirectly, solicited any offer to buy or offered to sell, or will, directly or indirectly, solicit any offer to buy or offer to sell, in the United States or to any United States citizen or resident, any security which is or would be integrated with the sale of the Securities in a manner that would require the Securities to be registered under the Securities Act. None of the Company, its Affiliates, or any person acting on its or any of their behalf (other than the Initial Purchasers, as to whom the Company makes no representation or warranty) has engaged or will engage, in connection with the offering of the Securities, in any form of general solicitation or general advertising within the meaning of Rule 502 under the Securities Act. With respect to those Securities sold in reliance upon Regulation S, (i) none of the Company, its Affiliates or any person acting on its or their behalf (other than the Initial Purchasers, as to whom the Company makes no representation or warranty) has engaged or will engage in any directed selling efforts within the meaning of Regulation S and (ii) each of the Company and its Affiliates and any person acting on its or their behalf (other than the Initial Purchasers, as to whom the Company makes no representation or warranty) has complied and will comply with the offering restrictions set forth in Regulation S.

(c) *Eligibility for Resale under Rule 144A.* The Securities are eligible for resale pursuant to Rule 144A and will not be, at the Closing Date, of the same class as securities listed on a national securities exchange registered under Section 6 of the Exchange Act or quoted in a U.S. automated interdealer quotation system.

(d) *The Pricing Disclosure Package and Offering Memorandum.* Neither the Pricing Disclosure Package, as of the Time of Sale, nor the Final Offering Memorandum, as of its date or (as amended or supplemented in accordance with Section 3(a), as applicable) as of the Closing Date, contains or represents an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that this representation, warranty and agreement shall not apply to statements in or omissions from the Pricing Disclosure Package, the Final Offering Memorandum or any amendment or supplement thereto made in reliance upon and in conformity with information furnished to the Company in writing by any Initial Purchaser through Barclays Capital Inc. expressly for use in the Pricing Disclosure Package, the Final Offering Memorandum or amendment or supplement thereto, as the case may be.

(e) *Company Additional Written Communications*. The Company has not prepared, made, used, authorized, approved or distributed and will not prepare, make, use, authorize, approve or distribute any written communication that constitutes an offer to sell or solicitation of an offer to buy the Securities (each such communication by the Company or its agents and representatives (other than a communication referred to in clauses (i) and (ii) below) a "Company Additional Written Communication") other than (i) the Pricing Disclosure Package, (ii) the Final Offering Memorandum, and (iii) any electronic road show or other written communications, in each case used in accordance with Section 3(a). Each such Company Additional Written Communication, when taken together with the Pricing Disclosure Package, did not, and at the Closing Date will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that this representation, warranty and agreement shall not apply to statements in or omissions from each such Company Additional Written Communication made in reliance upon and in conformity with information furnished to the Company in writing by any Initial Purchaser through Barclays Capital Inc. expressly for use in any Company Additional Written Communication.

(f) *Incorporated Documents.* The documents incorporated or deemed to be incorporated by reference in the Offering Memorandum at the time they were or hereafter are filed with the Commission (collectively, the "Incorporated Documents") complied and will comply in all material respects with the requirements of the Exchange Act.

(g) *The Purchase Agreement.* This Agreement has been duly authorized, executed and delivered by the Company and each Guarantor.

(h) *The Registration Rights Agreement.* The Registration Rights Agreement has been duly authorized and, on the Closing Date, will have been duly executed and delivered by, and will constitute a valid and binding agreement of, the Company and the Guarantors, enforceable in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws relating to or affecting the rights and remedies of creditors or by general equitable principles and except as rights to indemnification and contribution under the Registration Rights Agreement may be limited by applicable law.

(i) *Authorization of the Notes, the Guarantees and the Exchange Notes.* The Notes to be purchased by the Initial Purchasers from the Company are in the form contemplated by the Indenture, have been duly authorized for issuance and sale pursuant to this Agreement and the Indenture and, at the Closing Date, will have been duly executed by the Company and, when authenticated in the manner provided for in the Indenture and delivered against payment of the purchase price therefor, will constitute valid and binding agreements of the Company, enforceable in accordance with their terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws relating to or affecting the rights and remedies of creditors or by general equitable principles and will be entitled to the benefits of the Indenture. The Exchange Notes have been duly and validly authorized for issuance by the Company, and when issued and authenticated in accordance with the terms of the Indenture, the Registration Rights Agreement and the Exchange Offer, will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or similar laws relating to or affecting enforcement of the rights and remedies of creditors or by general principles of equity and will be entitled to the benefits of the Indenture. The Guarantees of the Notes and the Exchange Notes are in the respective forms contemplated by the Indenture, have been duly authorized for issuance and sale pursuant to this Agreement and the Indenture and, at the Closing Date, will have been duly executed by each of the Guarantors and, when the Notes and the Exchange Notes have been authenticated in the manner provided for in the Indenture and delivered against payment of the purchase price therefor, will constitute valid and binding agreements of the Guarantors, enforceable in accordance with their terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws relating to or affecting the rights and remedies of creditors or by general equitable principles and will be entitled to the benefits of the Indenture.

(j) *Authorization of the Indenture.* The Indenture has been duly authorized by the Company and, at the Closing Date, will have been duly executed and delivered by the Company and will constitute a valid and binding agreement of the Company, enforceable against the Company in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws relating to or affecting the rights and remedies of creditors or by general equitable principles.

(k) *Description of the Securities and the Indenture.* The Securities, the Exchange Securities and the Indenture will conform in all material respects to the respective statements relating thereto contained in the Offering Memorandum.

(l) *No Material Adverse Change*. Except as otherwise disclosed in the Offering Memorandum, subsequent to the respective dates as of which information is given in the Offering Memorandum (exclusive of any amendment or supplement thereto): (i) there has been no material adverse change, or any development that could reasonably be expected to result in a material adverse change, in the condition, financial or otherwise, or in the earnings, business, properties, operations or prospects (other than as a result of developments affecting the oil and gas industry generally), whether or not arising from transactions in the ordinary course of business, of the Company and its subsidiaries, considered as one entity (a "Material Adverse Change"); (ii) the Company and its subsidiaries, considered as one entity, have not incurred any material liability or obligation, indirect, direct or contingent, nor entered into any

material transaction or agreement; and (iii) there has been no cash dividend or distribution of any kind declared, paid or made by the Company or, except for dividends paid to the Company or other subsidiaries, any of its subsidiaries on any class of capital stock or repurchase or redemption by the Company or any of its subsidiaries of any class of capital stock.

(m) *Independent Accountants*. PricewaterhouseCoopers LLP, who have expressed their opinion with respect to the financial statements (which term as used in this Agreement includes the related notes thereto) and supporting schedules included in the Offering Memorandum, are independent registered public accountants with respect to the Company as required by the Securities Act and the Exchange Act.

(n) *Preparation of the Financial Statements*. The consolidated financial statements of the Company included in the Offering Memorandum present fairly the consolidated financial position of the entities to which they relate as of and at the dates indicated and the results of their operations and cash flows for the periods specified. Such financial statements comply as to form with the applicable accounting requirements of Regulation S-X and have been prepared in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods involved, except as may be expressly stated in the related notes thereto. The financial data set forth in the Offering Memorandum under the caption “Summary Consolidated Historical Financial Data” and the “Actual” column under the caption “Capitalization” fairly present the information set forth therein on a basis consistent with that of the audited financial statements contained in the Offering Memorandum.

(o) *Incorporation and Good Standing of the Company and the Guarantors.* Each of the Company and each Guarantor has been duly incorporated or otherwise formed and is validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, as the case may be, and has power and authority (corporate or otherwise) to own or lease, as the case may be, and operate its properties and to conduct its business as described in the Offering Memorandum and, in the case of the Company and the Guarantors, to enter into and perform its obligations under each of this Agreement, the Registration Rights Agreement, the Securities, the Exchange Securities and the Indenture. Each of the Company and each Guarantor is duly qualified to transact business and is in good standing in each jurisdiction in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except for such jurisdictions where the failure to so qualify or to be in good standing would not, individually or in the aggregate, result in a material adverse effect on the condition, financial or otherwise, or on the earnings, business, properties or operations, whether or not arising from transactions in the ordinary course of business, of the Company and its subsidiaries, considered as one entity (a “Material Adverse Effect”). All of the issued and outstanding shares of capital stock, or similar equity interest, of each subsidiary have been duly authorized and validly issued, are fully paid and nonassessable and are owned by the Company, directly or through subsidiaries, free and clear of any security interest, mortgage, pledge, lien, encumbrance or claim, other than those granted pursuant to the Senior Credit Facility, dated November 21, 2006, by and among SandRidge Energy, Inc. (as successor by merger to Riata Energy, Inc.) and Bank of America, N.A., as Administrative Agent and Banc of America Securities LLC as Lead Arranger and Book Running Manager, as amended, (the “Credit Facility”).

(p) *Capitalization and Other Capital Stock Matters* . The authorized, issued and outstanding capital stock of the Company is as set forth in the Offering Memorandum under the caption “Capitalization” (other than for subsequent issuances, if any, pursuant to employee benefit plans described in the Offering Memorandum or upon exercise of outstanding options described in the Offering Memorandum).

(q) *Non-Contravention of Existing Instruments; No Further Authorizations or Approvals Required* . Neither the Company nor any of its subsidiaries is (i) in violation of its charter or by laws (or other applicable organizational document), (ii) is (or, with the giving of notice or lapse of time, would be) in default (“Default”) under any indenture, mortgage, loan or credit agreement, note, contract, franchise, lease or other instrument to which the Company or any of its subsidiaries is a party or by which it or any of them may be bound (including, without limitation, the Credit Facility, or to which any of the property or assets of the Company or any of its subsidiaries is subject (each, an “Existing Instrument”), or (iii) is in violation of any statute, law, rule, regulation, judgment, order or decree of any court, regulatory body, administrative agency, governmental body, arbitrator or other authority having jurisdiction over the Company or such subsidiary or any of its properties, as applicable, except with respect to clause (ii) and (iii), for such Defaults or violations as would not, individually or in the aggregate, have a Material Adverse Effect.

The Company’s execution, delivery and performance of this Agreement, the Registration Rights Agreement and the Indenture, and the issuance and delivery of the Securities or the Exchange Securities, and consummation of the transactions contemplated hereby and thereby and by the Offering Memorandum (i) have been duly authorized by all necessary action (corporate or otherwise) and will not result in any violation of the charter or by laws (or other applicable organizational document) of the Company or any subsidiary, (ii) will not conflict with or constitute a breach of, or Default or a Debt Repayment Triggering Event (as defined below) under, or result in the creation or imposition of any lien, charge or encumbrance upon any property or assets of the Company or any of its subsidiaries pursuant to, or require the consent of any other party to, any Existing Instrument and (iii) will not result in any violation of any statute, law, rule, regulation, judgment, order or decree applicable to the Company or any of its subsidiaries of any court, regulatory body, administrative agency, governmental body, arbitrator or other authority having jurisdiction over the Company or any of its subsidiaries or any of its or their properties. As used herein, a “Debt Repayment Triggering Event” means any event or condition which gives, or with the giving of notice or lapse of time would give, the holder of any note, debenture or other evidence of indebtedness (or any person acting on such holder’s behalf) the right to require the repurchase, redemption or repayment of all or a portion of such indebtedness by the Company or any of its subsidiaries.

No consent, approval, authorization or other order of, or registration or filing with, any court or other governmental or regulatory authority or agency is required for the Company’s execution, delivery and performance of this Agreement, the Registration Rights Agreement, or the Indenture, or the issuance and delivery of the Securities or the Exchange Securities, or consummation of the transactions contemplated hereby and thereby and by the Offering Memorandum, except for such as have been obtained or made by the Company and are in full force and effect under the Securities Act, and applicable state securities or blue sky laws.

(r) *No Material Actions or Proceedings*. Except as otherwise disclosed in the Offering Memorandum, there are no legal or governmental actions, suits or proceedings pending or, to the Company's knowledge, threatened (i) against or affecting the Company or any of its subsidiaries, (ii) which has as the subject thereof any officer or director of, or property owned or leased by, the Company or any of its subsidiaries or (iii) relating to environmental or discrimination matters, where in any such case (A) there is a reasonable possibility that such action, suit or proceeding might be determined adversely to the Company or such subsidiary and (B) any such action, suit or proceeding, if so determined adversely, would reasonably be expected to have a Material Adverse Effect or adversely affect the consummation of the transactions contemplated by this Agreement.

(s) *Labor Matters*. No labor problem or dispute with the employees of the Company or any of its subsidiaries exists or is threatened or imminent that would reasonably be expected to have a Material Adverse Effect.

(t) *Intellectual Property Rights*. The Company and its subsidiaries own, possess, license or have other rights to use, on reasonable terms, all patents, patent applications, trade and service marks, trade and service mark registrations, trade names, copyrights, licenses, inventions, trade secrets, technology, know-how and other intellectual property (collectively, the "Intellectual Property Rights") necessary for the conduct of the Company's business as now conducted or as proposed in the Offering Memorandum to be conducted except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. Except as set forth in the Offering Memorandum, (a) no party has been granted an exclusive license to use any portion of such Intellectual Property Rights owned by the Company; (b) to the Company's knowledge there is no material infringement by third parties of any such Intellectual Property Rights owned by or exclusively licensed to the Company; (c) there is no pending or, to the Company's knowledge, threatened action, suit, proceeding or claim by others challenging the Company's rights in or to any material Intellectual Property Rights; and (d) there is no pending or, to the Company's knowledge, threatened action, suit, proceeding or claim by others that the Company's business as now conducted infringes or otherwise violates any material patent, trademark, copyright, trade secret or other proprietary rights of others, and the Company is unaware of any other fact which would form a reasonable basis for any such claim.

(u) *All Necessary Permits, etc*. The Company and each Guarantor possess such valid and current licenses, certificates, authorizations or permits issued by the appropriate state, federal or foreign regulatory agencies or bodies necessary to conduct their respective businesses except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, and neither the Company nor any Guarantor has received any notice of proceedings relating to the revocation or modification of, or non-compliance with, any such certificate, authorization or permit which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would reasonably be expected to have a Material Adverse Effect.

(v) *Title to Properties*. Each of the Company and its subsidiaries has (i) generally satisfactory title to its oil and gas properties, title investigations having been carried out by the Company or its subsidiaries in accordance with the practice in the oil and gas industry in the areas in which the Company and its subsidiaries operate, (ii) good and marketable title to all other real property owned by it (including pipeline easement rights) to the extent necessary to carry on its business, and (iii) good and marketable title to all personal property owned by it, in each case free and clear of all liens, encumbrances and defects except such as are described in the Offering Memorandum or such as do not materially affect the value of the properties of the Company and its subsidiaries, considered as one enterprise, and do not interfere in any material respect with the use made and proposed to be made of such properties, by the Company and its subsidiaries, considered as one enterprise; and all of the easements, leases and subleases material to the business of the Company and its subsidiaries, considered as one enterprise, and under which the Company or any of its subsidiaries holds or uses properties described in the Offering Memorandum, are in full force and effect, and neither the Company nor any of its subsidiaries has any notice of any material claim of any sort that has been asserted by anyone adverse to the rights of the Company or its subsidiaries under any of the easements, leases or subleases mentioned above, or affecting or questioning the rights of the Company or any subsidiary thereof to the continued possession or use of the easement or leased or subleased premises.

(w) *Condition of Properties*. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Company, the plants, buildings, structures and equipment owned by the Company are in good operating condition and repair and have been reasonably maintained consistent with standards generally followed in the industry (giving due account to the age and length of use of same, ordinary wear and tear excepted), are adequate and suitable for their present uses and, in the case of plants, buildings and other structures, are structurally sound.

(x) *Tax Law Compliance*. The Company and its consolidated subsidiaries have filed all necessary federal, state, local and foreign income and franchise tax returns in a timely manner and have paid all taxes required to be paid by any of them and, if due and payable, any related or similar assessment, fine or penalty levied against any of them, except for any taxes, assessments, fines or penalties as may be being contested in good faith and by appropriate proceedings or where the failure to do so would not reasonably be expected to have a Material Adverse Effect. The Company has made appropriate provisions in the financial statements included in the Offering Memorandum in respect of all federal, state and foreign income and franchise taxes for all current or prior periods as to which the tax liability of the Company or any of its consolidated subsidiaries has not been finally determined except to the extent it would not have a Material Adverse Effect.

(y) *Company Not an "Investment Company"*. The Company is not, and, after receipt of payment for the Securities and application of the proceeds as described under "Use of Proceeds" in the Offering Memorandum will not be, required to register as an "investment company" within the meaning of the Investment Company Act and will conduct its business in a manner so that it will not become subject to the Investment Company Act.

(z) *Insurance*. Each of the Company and its subsidiaries are insured by recognized, and to the knowledge of the Company, financially sound and reputable institutions with policies in such amounts and with such deductibles and covering such risks as are generally deemed adequate and customary for their businesses including, but not limited to, policies covering real and personal

property owned or leased by the Company and its subsidiaries against theft, damage, destruction, acts of terrorism or vandalism and earthquakes. All policies of insurance and fidelity or surety bonds insuring the Company or any of its subsidiaries or their respective businesses, assets, employees, officers and directors are in full force and effect; the Company and its subsidiaries are in compliance, in all material respects, with the terms of such policies and instruments; and there are no material claims by the Company or any of its subsidiaries under any such policy or instrument as to which any insurance company is denying liability or defending under a reservation of rights clause; and neither the Company nor any such subsidiary has, in the past three years, been refused any insurance coverage sought or applied for.

(aa) *No Price Stabilization or Manipulation*. The Company has not taken and will not take, directly or indirectly, any action designed to or that might be reasonably expected to cause or result in stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of the Securities. The Company acknowledges that the Initial Purchasers may engage in stabilization transactions as described in the Offering Memorandum.

(bb) *Compliance with Sarbanes-Oxley*. The Company and its subsidiaries and their respective officers and directors are in compliance with the applicable provisions of the Sarbanes-Oxley Act of 2002 (the “Sarbanes-Oxley Act,” which term, as used herein, includes the rules and regulations of the Commission promulgated thereunder).

(cc) *Internal Controls.* The Company maintains effective internal control over financial reporting as defined in Rule 13a-15 under the Exchange Act and a system of internal accounting control sufficient to provide reasonable assurance that (A) transactions are executed in accordance with management’s general or specific authorization, (B) transactions are recorded as necessary to permit preparation of the Company’s financial statements in conformity with accounting principles generally accepted in the United States and to maintain accountability for its assets, (C) access to the Company’s assets is permitted only in accordance with management’s general or specific authorization and (D) the recorded accountability for the Company’s assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

(dd) *Disclosure Controls and Procedures*. The Company has established and maintains disclosure controls and procedures (as such term is defined in Rules 13a-15 and 15d-14 under the Exchange Act); such disclosure controls and procedures are designed to ensure that material information relating to the Company and its subsidiaries is made known to the chief executive officer and chief financial officer of the Company by others within the Company or any of its subsidiaries, and such disclosure controls and procedures are reasonably effective to perform the functions for which they were established subject to the limitations of any such control system; the Company’s auditors and the Audit Committee of the Board of Directors of the Company have been advised of: (i) any significant deficiencies or material weaknesses in the design or operation of internal controls which could adversely affect the Company’s ability to record, process, summarize, and report financial data; and (ii) any fraud, whether or not material, that involves management or other employees who have a role in the Company’s internal controls; and since the date of the most recent evaluation of such disclosure controls and procedures, there have been no significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses.

(ee) *Compliance with Environmental Laws*. Except as otherwise disclosed in the Offering Memorandum: (i) neither the Company nor any of its subsidiaries is in violation of any federal, state, local or foreign law, regulation, order, permit or other requirement relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata) or wildlife, including without limitation, laws and regulations relating to emissions, discharges, releases or threatened releases of chemicals, pollutants, contaminants, wastes, toxic substances, hazardous substances, petroleum and petroleum products (collectively, “Materials of Environmental Concern”), or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Materials of Environmental Concern (collectively, “Environmental Laws”), which violation includes, but is not limited to, noncompliance with any permits or other governmental authorizations required for the operation of the business of the Company or its subsidiaries under applicable Environmental Laws, or noncompliance with the terms and conditions thereof, nor has the Company or any of its subsidiaries received any written communication, whether from a governmental authority, citizens group, employee or otherwise, that alleges that the Company or any of its subsidiaries is in violation of any Environmental Law, except, in each case, as would not, individually or in the aggregate, have a Material Adverse Effect; (ii) there is no claim, action or cause of action filed with a court or governmental authority, no investigation with respect to which the Company has received written notice, and no written notice by any person or entity alleging potential liability for investigatory costs, cleanup costs, governmental responses costs, natural resources damages, property damages, personal injuries, attorneys’ fees or penalties arising out of, based on or resulting from the presence, or release into the environment, of any Material of Environmental Concern at any location owned, leased or operated by the Company or any of its subsidiaries, now or in the past (collectively, “Environmental Claims”), pending or, to the Company’s knowledge, threatened against the Company or any of its subsidiaries or any person or entity whose liability for any Environmental Claim the Company or any of its subsidiaries has retained or assumed either contractually or by operation of law, except as would not, individually or in the aggregate, have a Material Adverse Effect; and (iii) to the Company’s knowledge, there are no past, present or anticipated future actions, activities, circumstances, conditions, events or incidents, including, without limitation, the release, emission, discharge, presence or disposal of any Material of Environmental Concern, that reasonably could result in a violation of any Environmental Law, require expenditures to be incurred pursuant to Environmental Law, except as would not, individually or in the aggregate, have a Material Adverse Effect.

(ff) *Independent Petroleum Engineers*. DeGolyer and MacNaughton, whose reports as of December 31, 2006, 2007 and 2008 are referenced in the Offering Memorandum, was, as of the date of such reports, and is, as of the date hereof, an independent petroleum engineer with respect to SandRidge CO2, LLC (f/k/a PetroSource Energy Company, L.P.). Netherland, Sewell & Associates Inc., whose reports as of December 31, 2006, 2007 and 2008, are referenced in the Offering Memorandum, was, as of December 31, 2006, 2007 and 2008, and is, as of the date hereof, an independent petroleum engineer with respect to the Company (excluding SandRidge CO2 f/k/a PetroSource Energy Company, L.P.). The information underlying the estimates of reserves of the Company and its subsidiaries, which was supplied by the Company to DeGolyer and MacNaughton and Netherland, Sewell &

Associates Inc. for purposes of reviewing the reserve reports and estimates of the Company and preparing the letters (the "Reserve Report Letters") of DeGolyer and MacNaughton and Netherland, Sewell & Associates Inc., including, without limitation, production, costs of operation and development, current prices for production, agreements relating to current and future operations and sales of production, was true and correct in all material respects on the dates such estimates were made and such information was supplied and was prepared in accordance with customary industry practices; estimates of such reserves and present values as described in the Offering Memorandum and reflected in the Reserve Report Letters comply in all material respects with the applicable requirements of Regulation S-X and Industry Guide 2 under the Act.

(gg) *Related Party Transactions*. No relationship, direct or indirect, exists between or among any of the Company or any affiliate of the Company, on the one hand, and any director, officer, member, stockholder, customer or supplier of the Company or any affiliate of the Company, on the other hand, which is required by the Securities Act to be disclosed in a registration statement on Form S-1 which is not so disclosed in the Offering Memorandum. There are no outstanding loans, advances (except advances for business expenses in the ordinary course of business) or guarantees of indebtedness by the Company or any affiliate of the Company to or for the benefit of any of the officers or directors of the Company or any affiliate of the Company or any of their respective family members.

(hh) *Lending Relationship*. Except as disclosed in the Offering Memorandum, to its knowledge, the Company (i) does not have any material lending or other relationship with any bank or lending affiliate of any Initial Purchaser and (ii) does not intend to use any of the proceeds from the sale of the Securities hereunder to repay any outstanding debt owed to any affiliate of any Initial Purchaser.

(ii) *Solvency.* Each of the Company and the Guarantors is, and immediately after the Closing Date will be, Solvent. As used herein, the term "Solvent" means, with respect to any person on a particular date, that on such date (i) the fair market value of the assets of such person is greater than the total amount of liabilities (including contingent liabilities) of such person, (ii) the present fair salable value of the assets of such person is greater than the amount that will be required to pay the probable liabilities of such person on its debts as they become absolute and matured, (iii) such person is able to realize upon its assets and pay its debts and other liabilities, including contingent obligations, as they mature and (iv) such person does not have unreasonably small capital.

(jj) *No Default in Senior Indebtedness.* No event of default exists under the Credit Facility.

(kk) *Regulation S.* The Company, the Guarantors and their respective affiliates and all persons acting on their behalf (other than the Initial Purchasers, as to whom the Company and the Guarantors make no representation) have complied with and will comply with the offering restrictions requirements of Regulation S in connection with the offering of the Securities outside the United States and, in connection therewith, the Offering Memorandum will contain the disclosure required by Rule 902. The Company is a "reporting issuer", as defined in Rule 902 under the Securities Act.

(ll) *No Unlawful Payments; Compliance with Anti-Corruption Law.* Neither the Company nor any of its subsidiaries or affiliates, nor any director, officer, or employee, nor, to the Company's knowledge, any agent or representative of the Company or of any of its subsidiaries or affiliates, has taken or will take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage; and the Company and its subsidiaries and affiliates have conducted their businesses in compliance with applicable anti-corruption laws and have instituted and maintain and will continue to maintain policies and procedures designed to promote and achieve compliance with such laws and with the representation and warranty contained herein.

(mm) *Compliance with USA PATRIOT Act and Money Laundering Laws.* The operations of the Company and its subsidiaries are and have been conducted at all times in material compliance with all applicable financial recordkeeping and reporting requirements, including those of the Bank Secrecy Act, as amended by Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), and the applicable anti-money laundering statutes of jurisdictions where the Company and its subsidiaries conduct business, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "Anti-Money Laundering Laws"), and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its subsidiaries with respect to the Anti-Money Laundering Laws is pending or, to the best knowledge of the Company, threatened.

(nn) Compliance with OFAC.

(A) The Company represents that neither the Company nor any of its subsidiaries (collectively, the "Entity") or, to the knowledge of the Entity, any director, officer, employee, agent, affiliate or representative of the Entity, is an individual or entity ("Person") that is, or is owned or controlled by a Person that is:

(1) the subject of any sanctions administered or enforced by the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC"), the United Nations Security Council ("UNSC"), the European Union ("EU"), Her Majesty's Treasury ("HMT"), or other relevant sanctions authority (collectively, "Sanctions"), nor

(2) located, organized or resident in a country or territory that is the subject of Sanctions (including, without limitation, Burma/Myanmar, Cuba, Iran, North Korea, Sudan and Syria).

(B) The Company represents and covenants that it will not, directly or indirectly, use the proceeds of the offering, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person:

(1) to fund or facilitate any activities or business of or with any Person or in any country or territory that, at the time of such funding or facilitation, is the subject of Sanctions; or

(2) in any other manner that will result in a violation of Sanctions by any Person (including any Person participating in the offering, whether as underwriter, advisor, investor or otherwise).

(C) The Entity represents and covenants that for the past 5 years, it has not knowingly engaged in, is not now knowingly engaged in, and will not engage in, any dealings or transactions with any Person, or in any country or territory, that at the time of the dealing or transaction is or was the subject of Sanctions.

Any certificate signed by an officer of the Company or any Guarantor and delivered to the Initial Purchasers or to counsel for the Initial Purchasers shall be deemed to be a representation and warranty by the Company or such Guarantor to each Initial Purchaser as to the matters set forth therein.

SECTION 2. *Purchase, Sale and Delivery of the Securities*.

(a) *The Securities.* Each of the Company and the Guarantors agrees to issue and sell to the Initial Purchasers, severally and not jointly, all of the Securities, and the Initial Purchasers agree, severally and not jointly, to purchase from the Company and the Guarantors the aggregate principal amount of Securities set forth opposite their names on Schedule A, at a purchase price of 93.773% of the principal amount thereof payable on the Closing Date, in each case, on the basis of the representations, warranties and agreements herein contained, and upon the terms, subject to the conditions thereto, herein set forth.

(b) *The Closing Date.* Delivery of certificates for the Notes in definitive form to be purchased by the Initial Purchasers and payment therefor shall be made at the offices of Davis Polk & Wardwell, 450 Lexington, Avenue, New York, New York 10017 (or such other place as may be agreed to by the Company and Barclays Capital Inc.) at 9:00 a.m. New York City time, on May 14, 2009 or such other time and date as Barclays Capital Inc. shall designate by notice to the Company (the time and date of such closing are called the "Closing Date"). The Company hereby acknowledges that circumstances under which Barclays Capital Inc. may provide notice to postpone the Closing Date as originally scheduled include, but are in no way limited to, any determination by the Company or the Initial Purchasers to recirculate to investors copies of an amended or supplemented Offering Memorandum or a delay as contemplated by the provisions of Section 16 hereof.

(c) *Delivery of the Securities.* The Company shall deliver, or cause to be delivered, to Barclays Capital Inc. for the accounts of the several Initial Purchasers certificates for the Notes at the Closing Date against the irrevocable release of a wire transfer of immediately available funds for the amount of the purchase price therefor. The certificates for the Notes shall be in such denominations and registered in the name of Cede & Co., as nominee of the Depositary, pursuant to the DTC Agreement, and shall be made available for inspection on the business day preceding the Closing Date at a location in New York City, as Barclays Capital Inc. may designate. Time shall be of the essence, and delivery at the time and place specified in this Agreement is a further condition to the obligations of the Initial Purchasers.

(d) *Initial Purchasers as Qualified Institutional Buyers.* Each Initial Purchaser severally and not jointly represents and warrants to, and agrees with, the Company that it is a "qualified institutional buyer" within the meaning of Rule 144A (a "Qualified Institutional Buyer").

SECTION 3. *Additional Covenants.* Each of the Company and the Guarantors further covenants and agrees with each Initial Purchaser as follows:

(a) *Preparation of Final Offering Memorandum; Initial Purchasers' Review of Proposed Amendments and Supplements and Company Additional Written Communications.* As promptly as practicable following the Time of Sale and in any event not later than the second business day following the date hereof, the Company will prepare and deliver to the Initial Purchasers the Final Offering Memorandum, which shall consist of the Preliminary Offering Memorandum as modified only by the information contained in the Pricing Supplement. The Company will not amend or supplement the Preliminary Offering Memorandum or the Pricing Supplement. The Company will not amend or supplement the Final Offering Memorandum prior to the Closing Date unless Barclays Capital Inc. shall previously have been furnished a copy of the proposed amendment or supplement prior to the proposed use or filing, and shall not have objected to such amendment or supplement. Before making, preparing, using, authorizing, approving or distributing any Company Additional Written Communication, the Company will furnish to the Initial Purchasers a copy of such written communication for review and will not make, prepare, use, authorize, approve or distribute any such written communication to which Barclays Capital Inc. reasonably objects

(b) *Amendments and Supplements to the Final Offering Memorandum and Other Securities Act Matters.* If, prior to the later of (x) the Closing Date and (y) the completion of the placement of the Securities by the Initial Purchasers with the Subsequent Purchasers, any event shall occur or condition exist as a result of which it is necessary to amend or supplement the Final Offering Memorandum, as then amended or supplemented, in order to make the statements therein, in the light of the circumstances when the Final Offering Memorandum is delivered to a Subsequent Purchaser, not misleading, or if in the judgment of the Initial Purchasers or counsel for the Initial Purchasers it is otherwise necessary to amend or supplement the Pricing Disclosure Package or the Final Offering Memorandum to comply with law, the Company agrees to promptly prepare (subject to Section 3 hereof) and furnish at its own expense to the Initial Purchasers, amendments or supplements to the Pricing Disclosure Package and the Final Offering Memorandum so that the statements in the Pricing Disclosure Package and the Final Offering Memorandum as so amended or supplemented will not, in the light of the circumstances at the Closing Date and at the time of sale of Securities, be misleading or so that the Pricing Disclosure Package and the Final Offering Memorandum, as amended or supplemented, will comply with all applicable law.

(c) *Copies of the Offering Memorandum.* The Company agrees to furnish the Initial Purchasers, without charge, as many copies of the Pricing Disclosure Package and the Final Offering Memorandum and any amendments and supplements thereto as they shall have reasonably requested.

(d) *Blue Sky Compliance.* Each of the Company and the Guarantors shall cooperate with the Initial Purchasers and counsel for the Initial Purchasers to qualify or register (or to obtain exemptions from qualifying or registering) all or any part of the Securities for offer and sale under the securities laws of the several states of the United States, the provinces of Canada or any other jurisdictions designated by the Initial Purchasers, shall comply with such laws and shall continue such qualifications, registrations and exemptions in effect so long as required for the distribution of the Securities. None of the Company or any of the Guarantors shall be required to qualify as a foreign corporation or to take any action that would subject it to general service of process in any such jurisdiction where it is not presently qualified or where it would be subject to taxation as a foreign corporation. The Company will advise the Initial Purchasers promptly of the suspension of the qualification or registration of (or any such exemption relating to) the Securities for offering, sale or trading in any jurisdiction or any initiation or threat of any proceeding for any such purpose, and in the event of the issuance of any order suspending such qualification, registration or exemption, each of the Company and the Guarantors shall use its best efforts to obtain the withdrawal thereof at the earliest possible moment.

(e) *Use of Proceeds.* The Company shall apply the net proceeds from the sale of the Securities sold by it in the manner described under the caption "Use of Proceeds" in the Pricing Disclosure Package.

(f) *The Depositary.* The Company will cooperate with the Initial Purchasers and use its best efforts to permit the Securities to be eligible for clearance and settlement through the facilities of the Depositary.

(g) *Additional Issuer Information.* Prior to the completion of the placement of the Securities by the Initial Purchasers with the Subsequent Purchasers, the Company shall file, on a timely basis, with the Commission and the NYSE all reports and documents required to be filed under Section 13 or 15 of the Exchange Act. Additionally, at any time when the Company is not subject to Section 13 or 15 of the Exchange Act, for the benefit of holders and beneficial owners from time to time of the Securities, the Company shall furnish, at its expense, upon request, to holders and beneficial owners of Securities and prospective purchasers of Securities information ("Additional Issuer Information") satisfying the requirements of Rule 144A(d).

(h) *Agreement Not To Offer or Sell Additional Securities.* During the period of 60 days following the date hereof, the Company will not, without the prior written consent of Barclays Capital Inc. (which consent may be withheld at the sole discretion of Barclays Capital Inc.), directly or indirectly, sell, offer, contract or grant any option to sell, pledge, transfer or establish an open "put equivalent position" within the meaning of Rule 16a-1 under the Exchange Act, or otherwise dispose of or transfer, or announce the offering of, or file any registration statement under the Securities Act in respect of, any debt securities of the Company or securities exchangeable for or convertible into debt securities of the Company (other than as contemplated by this Agreement and to register the Exchange Securities).

(i) *Future Reports to the Initial Purchasers.* At any time when the Company is not subject to Section 13 or 15 of the Exchange Act and any Securities or Exchange Securities remain outstanding, the Company will furnish to Barclays Capital Inc.: (i) as soon as practicable after the end of each fiscal year, copies of the Annual Report of the Company containing the balance sheet of the

Company as of the close of such fiscal year and statements of income, stockholders' equity and cash flows for the year then ended and the opinion thereon of the Company's independent public or certified public accountants; (ii) as soon as practicable after the filing thereof, copies of each proxy statement, Annual Report on Form 10-K, Quarterly Report on Form 10-Q, Current Report on Form 8-K or other report filed by the Company with the Commission, the Financial Industry Regulatory Authority (the "FINRA") or any securities exchange; and (iii) as soon as available, copies of any report or communication of the Company mailed generally to holders of its capital stock or debt securities (including the holders of the Securities), if, in each case, such documents are not filed with the Commission within the time periods specified by the Commission's rules and regulations under Section 13 or 15 of the Exchange Act.

(j) *No Integration.* The Company agrees that it will not and will cause its Affiliates not to make any offer or sale of securities of the Company of any class if, as a result of the doctrine of "integration" referred to in Rule 502 under the Securities Act, such offer or sale would render invalid (for the purpose of (i) the sale of the Securities by the Company to the Initial Purchasers, (ii) the resale of the Securities by the Initial Purchasers to Subsequent Purchasers or (iii) the resale of the Securities by such Subsequent Purchasers to others) the exemption from the registration requirements of the Securities Act provided by Section 4(2) thereof or by Rule 144A or by Regulation S thereunder or otherwise.

(k) *No Restricted Resales*. During the period of one year after the Closing Date, the Company will not, and will not permit any of its affiliates (as defined in Rule 144 under the Securities Act) to resell any of the Notes which constitute "restricted securities" under Rule 144 that have been reacquired by any of them.

(l) *Legended Securities.* Each certificate for a Note will bear the legend contained in "Transfer Restrictions" in the Preliminary Offering Memorandum for the time period and upon the other terms stated in the Preliminary Offering Memorandum.

Barclays Capital Inc., on behalf of the several Initial Purchasers, may, in its sole discretion, waive in writing the performance by the Company or any Guarantor of any one or more of the foregoing covenants or extend the time for their performance.

SECTION 4. *Payment of Expenses.* Each of the Company and the Guarantors agrees to pay all costs, fees and expenses incurred in connection with the performance of its obligations hereunder and in connection with the transactions contemplated hereby, including, without limitation, (i) all expenses incident to the issuance and delivery of the Securities (including all printing and engraving costs), (ii) all necessary issue, transfer and other stamp taxes in connection with the issuance and sale of the Securities to the Initial Purchasers, (iii) all fees and expenses of the Company's and the Guarantors' counsel, independent public or certified public accountants and other advisors, (iv) all costs and expenses incurred in connection with the preparation, printing, filing, shipping and distribution of the Pricing Disclosure Package and the Final Offering Memorandum (including financial statements and exhibits), and all amendments and supplements thereto, this Agreement, the Registration Rights Agreement, the Indenture, the DTC Agreement and the Notes and Guarantees, (v) all filing fees, attorneys' fees and expenses incurred by the Company, the Guarantors or the Initial Purchasers in connection with qualifying or registering (or obtaining exemptions from the qualification or registration of) all or any

part of the Securities for offer and sale under the securities laws of the several states of the United States, the provinces of Canada or other jurisdictions designated by the Initial Purchasers (including, without limitation, the cost of preparing, printing and mailing preliminary and final blue sky or legal investment memoranda and any related supplements to the Pricing Disclosure Package or the Final Offering Memorandum, (vi) the fees and expenses of the Trustee, including the fees and disbursements of counsel for the Trustee in connection with the Indenture, the Securities and the Exchange Securities, (vii) any fees payable in connection with the rating of the Securities or the Exchange Securities with the ratings agencies and the listing of the Securities with the PORTAL Market, (viii) any filing fees incident to, and any reasonable fees and disbursements of counsel to the Initial Purchasers in connection with the review by the FINRA, if any, of the terms of the sale of the Securities or the Exchange Securities, and (ix) all fees and expenses (including reasonable fees and expenses of counsel) of the Company and the Guarantors in connection with approval of the Securities by the Depositary for “book-entry” transfer, and the performance by the Company and the Guarantors of their respective other obligations under this Agreement and (x) the expenses incident to the “road show” for the offering of the Securities, including the travel and lodging expenses of representatives and officers of the Company. Except as provided in this Section 4 and Sections 6, 8 and 9 hereof, the Initial Purchasers shall pay their own expenses, including the fees and disbursements of their counsel.

SECTION 5. *Conditions of the Obligations of the Initial Purchasers.* The obligations of the several Initial Purchasers to purchase and pay for the Securities as provided herein on the Closing Date shall be subject to the accuracy of the representations and warranties on the part of the Company and the Guarantors set forth in Section 1 hereof as of the date hereof and as of the Closing Date as though then made and to the timely performance by the Company of its covenants and other obligations hereunder, and to each of the following additional conditions:

(a) *Accountants’ Comfort Letter.* On the date hereof, the Initial Purchasers shall have received from PricewaterhouseCoopers LLP, independent public accountants for the Company, a “comfort letter” dated the date hereof addressed to the Initial Purchasers, in form and substance satisfactory to the Initial Purchasers, covering the financial information in the Preliminary Offering Memorandum and the Pricing Supplement and other customary matters. In addition, on the Closing Date, the Initial Purchasers shall have received from such accountants, “bring-down comfort letter” dated the Closing Date addressed to the Initial Purchasers, in form and substance satisfactory to the Initial Purchasers, in the form of the “comfort letter” delivered on the date hereof, except that (i) it shall cover the financial information in the Final Offering Memorandum and any amendment or supplement thereto and (ii) procedures shall be brought down to a date no more than 5 days prior to the Closing Date.

(b) *No Material Adverse Change or Ratings Agency Change.* For the period from and after the date of this Agreement and prior to the Closing Date:

(i) in the judgment of the Representatives there shall not have occurred any Material Adverse Change; and

(ii) there shall not have occurred any downgrading, nor shall any notice have been given of any intended or potential downgrading or of any review for a possible change that does not indicate the direction of the possible change, in the rating accorded any securities or indebtedness of the Company or any of its subsidiaries by any “nationally recognized statistical rating organization” as such term is defined for purposes of Rule 436 under the Securities Act; and

(iii) there shall not have been any change or decrease specified in the letter or letters referred to in paragraph (a) of this Section 5 which is, in the sole judgment of the Representatives, so material and adverse as to make it impractical or inadvisable to proceed with the offering or delivery of the Notes as contemplated by the Preliminary Offering Memorandum and the Pricing Supplement.

(c) *Opinion of Counsel for the Company.* On the Closing Date the Initial Purchasers shall have received the favorable opinion of (i) Vinson & Elkins LLP, counsel for the Company, dated as of such Closing Date, the form of which is attached as Exhibit A-1 and (ii) Richard J. Gognat, Senior Vice President - Legal and General Counsel of the Company, dated as of such Closing Date, the form of which is attached as Exhibit A-2.

(d) *Opinion of Counsel for the Initial Purchasers.* On the Closing Date the Initial Purchasers shall have received the favorable opinion of Davis Polk & Wardwell, counsel for the Initial Purchasers, dated as of such Closing Date, with respect to such matters as may be reasonably requested by the Initial Purchasers.

(e) *Officers' Certificate.* On the Closing Date the Initial Purchasers shall have received a written certificate executed by the Chairman of the Board, Chief Executive Officer or President of the Company and each Guarantor and the Chief Financial Officer or Chief Accounting Officer of the Company and each Guarantor, dated as of the Closing Date, to the effect set forth in Section 5(b)(ii) hereof, and further to the effect that:

(i) for the period from and after the date of this Agreement and prior to the Closing Date there has not occurred any Material Adverse Change;

(ii) the representations, warranties and covenants of the Company set forth in Section 1 hereof were true and correct as of the date hereof and are true and correct as of the Closing Date with the same force and effect as though expressly made on and as of the Closing Date;

(iii) no event of default exists under the Credit Facility;

(iv) the Company has complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied at or prior to the Closing Date.

(f) *Registration Rights Agreement.* The Company and the Guarantors shall have entered into the Registration Rights Agreement and the Initial Purchasers shall have received executed counterparts thereof.

(g) *Engineers' Comfort Letters*. On the date hereof, the Initial Purchasers shall have received from each of DeGolyer and MacNaughton and Netherland, Sewell & Associates Inc., independent petroleum engineers, a letter dated the date hereof addressed to the Initial Purchasers, in form and substance that is satisfactory to the Representatives.

(h) *Additional Documents.* On or before the Closing Date, the Initial Purchasers and counsel for the Initial Purchasers shall have received such information, documents and opinions as they may reasonably require for the purposes of enabling them to pass upon the issuance and sale of the Securities as contemplated herein, or in order to evidence the accuracy of any of the representations and warranties, or the satisfaction of any of the conditions or agreements, herein contained.

If any condition specified in this Section 5 is not satisfied when and as required to be satisfied, this Agreement may be terminated by the Initial Purchasers by notice to the Company at any time on or prior to the Closing Date, which termination shall be without liability on the part of any party to any other party, except that Sections 4, 6, 8 and 9 hereof shall at all times be effective and shall survive such termination.

SECTION 6. *Reimbursement of Initial Purchasers' Expenses.* If this Agreement is terminated by the Initial Purchasers pursuant to Section 5 hereof, including if the sale to the Initial Purchasers of the Securities on the Closing Date is not consummated because of any refusal, inability or failure on the part of the Company to perform any agreement herein or to comply with any provision hereof, the Company agrees to reimburse the Initial Purchasers, severally, upon demand for all reasonable out-of-pocket expenses that shall have been reasonably incurred by the Initial Purchasers in connection with the proposed purchase and the offering and sale of the Securities, including, without limitation, fees and disbursements of counsel, printing expenses, travel expenses, postage, facsimile and telephone charges. If this Agreement is terminated pursuant to Section 10 or Section 16 by reason of the default of one or more Initial Purchasers, the Company shall not be obligated to reimburse any defaulting Initial Purchaser on account of those expenses.

SECTION 7. *Offer, Sale and Resale Procedures.* Each of the Initial Purchasers, on the one hand, and the Company and each of the Guarantors, on the other hand, hereby agree to observe the following procedures in connection with the offer and sale of the Securities:

(A) Offers and sales of the Securities will be made only by the Initial Purchasers or Affiliates thereof qualified to do so in the jurisdictions in which such offers or sales are made. Each such offer or sale shall only be made to persons whom the offeror or seller reasonably believes to be Qualified Institutional Buyers or non-U.S. persons outside the United States to whom the offeror or seller reasonably believes offers and sales of the Securities may be made in reliance upon Regulation S upon the terms and conditions set forth in Annex I hereto, which Annex I is hereby expressly made a part hereof.

(B) The Securities will be offered by approaching prospective Subsequent Purchasers on an individual basis. No general solicitation or general advertising (within the meaning of Rule 502 under the Securities Act) will be used in the United States in connection with the offering of the Securities.

(C) Upon original issuance by the Company, and until such time as the same is no longer required under the applicable requirements of the Securities Act, the Notes (and all securities issued in exchange therefor or in substitution thereof, other than the Exchange Notes) shall bear the legend specified in Exhibit C to the Indenture:

Following the sale of the Securities by the Initial Purchasers to Subsequent Purchasers pursuant to the terms hereof, the Initial Purchasers shall not be liable or responsible to the Company for any losses, damages or liabilities suffered or incurred by the Company, including any losses, damages or liabilities under the Securities Act, arising from or relating to any resale or transfer of any Security.

SECTION 8. *Indemnification*.

(a) *Indemnification of the Initial Purchasers.* Each of the Company and the Guarantors, jointly and severally, agrees to indemnify and hold harmless each Initial Purchaser, its directors, officers and employees, and each person, if any, who controls any Initial Purchaser within the meaning of the Securities Act and the Exchange Act against any loss, claim, damage, liability or expense, as incurred, to which such Initial Purchaser, director, officer, employee or controlling person may become subject, under the Securities Act, the Exchange Act or other federal or state statutory law or regulation, or at common law or otherwise (including in settlement of any litigation, if such settlement is effected with the written consent of the Company), insofar as such loss, claim, damage, liability or expense (or actions in respect thereof as contemplated below) arises out of or is based upon any untrue statement or alleged untrue statement of a material fact contained in the Pricing Disclosure Package, any Company Additional Written Information or the Final Offering Memorandum (or any amendment or supplement thereto), or the omission or alleged omission therefrom of a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; and to reimburse each Initial Purchaser and each such director, officer, employee or controlling person for any and all expenses (including the fees and disbursements of counsel chosen by Barclays Capital Inc.) as such expenses are reasonably incurred by such Initial Purchaser or such director, officer, employee or controlling person in connection with investigating, defending, settling, compromising or paying any such loss, claim, damage, liability, expense or action; provided, however, that the foregoing indemnity agreement shall not apply to any loss, claim, damage, liability or expense to the extent, but only to the extent, arising out of or based upon any untrue statement or alleged untrue statement or omission or alleged omission made in reliance upon and in conformity with written information furnished to the Company by the Initial Purchasers expressly for use in the Pricing Disclosure Package, any Company Additional Written Information or the Final Offering Memorandum (or any amendment or supplement thereto). The indemnity agreement set forth in this Section 8(a) shall be in addition to any liabilities that the Company may otherwise have.

(b) *Indemnification of the Company and the Guarantors.* Each Initial Purchaser agrees, severally and not jointly, to indemnify and hold harmless the Company, each Guarantor, each of their respective directors and each person, if any, who controls the Company or any Guarantor within the meaning of the Securities Act or the Exchange Act, against any loss, claim, damage, liability or expense, as incurred, to which the Company, any Guarantor or any such director or controlling person may become subject, under the Securities Act, the Exchange Act, or other federal or state statutory law or regulation, or at common law or otherwise (including in

settlement of any litigation, if such settlement is effected with the written consent of such Initial Purchaser), insofar as such loss, claim, damage, liability or expense (or actions in respect thereof as contemplated below) arises out of or is based upon any untrue statement or alleged untrue statement of a material fact contained in the Pricing Disclosure Package, any Company Additional Written Information or the Final Offering Memorandum (or any amendment or supplement thereto), or the omission or alleged omission therefrom of a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in the Pricing Disclosure Package, any Company Additional Written Information or the Final Offering Memorandum (or any amendment or supplement thereto), in reliance upon and in conformity with written information furnished to the Company by such Initial Purchaser expressly for use therein; and to reimburse the Company, any Guarantor and each such director or controlling person for any and all expenses (including the fees and disbursements of counsel) as such expenses are reasonably incurred by the Company, any Guarantor or such director or controlling person in connection with investigating, defending, settling, compromising or paying any such loss, claim, damage, liability, expense or action. Each of the Company and the Guarantors hereby acknowledges that the only information that the Initial Purchasers have furnished to the Company expressly for use in the Pricing Disclosure Package, any Company Additional Written Information or the Final Offering Memorandum (or any amendment or supplement thereto) are the statements set forth in the second and third sentences of the 6th paragraph and the entire 11th paragraph under the caption “Plan of Distribution” in the Preliminary Offering Memorandum and the Final Offering Memorandum. The indemnity agreement set forth in this Section 8(b) shall be in addition to any liabilities that each Initial Purchaser may otherwise have.

(c) *Notifications and Other Indemnification Procedures.* Promptly after receipt by an indemnified party under this Section 8 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against an indemnifying party under this Section 8, notify the indemnifying party in writing of the commencement thereof, but the omission so to notify the indemnifying party will not relieve it from any liability which it may have to any indemnified party for contribution or otherwise than under the indemnity agreement contained in this Section 8 or to the extent it is not materially prejudiced as a proximate result of such failure. In case any such action is brought against any indemnified party and such indemnified party seeks or intends to seek indemnity from an indemnifying party, the indemnifying party will be entitled to participate in and, to the extent that it shall elect, jointly with all other indemnifying parties similarly notified, by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that a conflict may arise between the positions of the indemnifying party and the indemnified party in conducting the defense of any such action the indemnified party or parties shall have the right to select separate counsel to assume such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties. Upon receipt of notice from the indemnifying party to such indemnified party of such indemnifying party’s election so to assume the defense of such action and approval by the indemnified party of counsel, the indemnifying party will not be liable to such indemnified party under this

Section 8 for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof unless the indemnified party shall have employed separate counsel in accordance with the proviso to the next preceding sentence (it being understood, however, that the indemnifying party shall not be liable for the expenses of more than one separate counsel (together with local counsel), approved by the indemnifying party (Barclays Capital Inc. in the case of Sections 8(b) and 9 hereof), representing the indemnified parties who are parties to such action).

(d) *Settlements.* The indemnifying party under this Section 8 shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify the indemnified party against any loss, claim, damage, liability or expense by reason of such settlement or judgment. No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement, compromise or consent to the entry of judgment in any pending or threatened action, suit or proceeding in respect of which any indemnified party is or could have been a party and indemnity was or could have been sought hereunder by such indemnified party, unless such settlement, compromise or consent (i) includes an unconditional release of such indemnified party from all liability on claims that are the subject matter of such action, suit or proceeding and (ii) does not include any statements as to or any findings of fault, culpability or failure to act by or on behalf of any indemnified party.

SECTION 9. *Contribution.* If the indemnification provided for in Section 8 hereof is for any reason held to be unavailable to or otherwise insufficient to hold harmless an indemnified party in respect of any losses, claims, damages, liabilities or expenses referred to therein, then each indemnifying party shall contribute to the aggregate amount paid or payable by such indemnified party, as incurred, as a result of any losses, claims, damages, liabilities or expenses referred to therein (i) in such proportion as is appropriate to reflect the relative benefits received by the Company and the Guarantors, on the one hand, and the Initial Purchasers, on the other hand, from the offering of the Securities pursuant to this Agreement or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the Company and the Guarantors, on the one hand, and the Initial Purchasers, on the other hand, in connection with the statements or omissions which resulted in such losses, claims, damages, liabilities or expenses, as well as any other relevant equitable considerations. The relative benefits received by the Company and the Guarantors, on the one hand, and the Initial Purchasers, on the other hand, in connection with the offering of the Securities pursuant to this Agreement shall be deemed to be in the same respective proportions as the total net proceeds from the offering of the Securities pursuant to this Agreement (before deducting expenses) received by the Company, and the total discount received by the Initial Purchasers bear to the aggregate initial offering price of the Securities. The relative fault of the Company and the Guarantors, on the one hand, and the Initial Purchasers, on the other hand, shall be determined by reference to, among other things, whether any such untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact or any such inaccurate or alleged inaccurate representation or warranty relates to information supplied by the Company and the Guarantors, on the one hand, or the Initial Purchasers, on the other hand, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission or inaccuracy.

The amount paid or payable by a party as a result of the losses, claims, damages, liabilities and expenses referred to above shall be deemed to include, subject to the limitations set forth in Section 8 hereof, any legal or other fees or expenses reasonably incurred by such party in connection with investigating or defending any action or claim. The provisions set forth in Section 8 hereof with respect to notice of commencement of any action shall apply if a claim for contribution is to be made under this Section 9; provided, however, that no additional notice shall be required with respect to any action for which notice has been given under Section 8 hereof for purposes of indemnification.

The Company, the Guarantors and the Initial Purchasers agree that it would not be just and equitable if contribution pursuant to this Section 9 were determined by pro rata allocation (even if the Initial Purchasers were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in this Section 9.

Notwithstanding the provisions of this Section 9, no Initial Purchaser shall be required to contribute any amount in excess of the discount received by such Initial Purchaser in connection with the Securities distributed by it. No person guilty of fraudulent misrepresentation (within the meaning of Section 11 of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Initial Purchasers' obligations to contribute pursuant to this Section 9 are several, and not joint, in proportion to their respective commitments as set forth opposite their names in Schedule A. For purposes of this Section 9, each director, officer and employee of an Initial Purchaser and each person, if any, who controls an Initial Purchaser within the meaning of the Securities Act and the Exchange Act shall have the same rights to contribution as such Initial Purchaser, and each director of the Company or any Guarantor, and each person, if any, who controls the Company or any Guarantor with the meaning of the Securities Act and the Exchange Act shall have the same rights to contribution as the Company and the Guarantors.

SECTION 10. *Termination of this Agreement.* Prior to the Closing Date, this Agreement may be terminated by the Representatives by notice given to the Company if at any time (i) trading in securities generally on either the New York Stock Exchange shall have been suspended or materially limited, or minimum or maximum prices shall have been generally established on any of such stock exchanges by the Commission or the FINRA; (ii) a general banking moratorium shall have been declared by any federal or New York authority or a material disruption in commercial banking or securities settlement or clearance services in the United States has occurred; or (iii) there shall have occurred any outbreak or escalation of national or international hostilities or any crisis or calamity, or any change in the United States or international financial markets, or any substantial change or development involving a prospective substantial change in United States' or international political, financial or economic conditions, as in the judgment of the Representatives is material and adverse and makes it impracticable or inadvisable to market the Notes in the manner and on the terms described in the Offering Memorandum or to enforce contracts for the sale of securities.

SECTION 11. *Representations and Indemnities to Survive Delivery.* The respective indemnities, agreements, representations, warranties and other statements of the Company, the Guarantors, their respective officers and the several Initial Purchasers set forth in or made pursuant to this Agreement will remain in full force and effect, regardless of any investigation made by or on behalf of any Initial Purchaser, the Company, any Guarantor or any of their partners, officers or directors or any controlling person, as the case may be, and will survive delivery of and payment for the Securities sold hereunder and any termination of this Agreement.

SECTION 12. *Notices.* All communications hereunder shall be in writing and shall be mailed, hand delivered, couriered or facsimiled and confirmed to the parties hereto as follows:

If to the Initial Purchasers:

Barclays Capital Inc.
745 Seventh Avenue
New York, New York 10019
Facsimile: 212-519-1921
Attention: Victoria Hale / Syndicate Registration

with a copy to:

Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
Facsimile: 212-450-3674
Attention: Richard D. Truesdell, Jr.

If to the Company or the Guarantors:

SandRidge Energy, Inc.
123 Robert S. Kerr Avenue
Oklahoma City, Oklahoma
Facsimile: 405-429-5983
Attention: General Counsel

with a copy to:

Vinson & Elkins L.L.P.
First City Tower
1001 Fannin Street, Suite 2500
Houston, Texas 77002
Facsimile: 713-615-5962
Attention: James M. Prince

Any party hereto may change the address or facsimile number for receipt of communications by giving written notice to the others.

SECTION 13. *Successors.* This Agreement will inure to the benefit of and be binding upon the parties hereto, including any substitute Initial Purchasers pursuant to Section 16 hereof, and to the benefit of the indemnified parties referred to in Sections 8 and 9 hereof, and in each case their respective successors, and no other person will have any right or obligation hereunder. The term “successors” shall not include any Subsequent Purchaser of other purchaser of the Securities as such from any of the Initial Purchasers merely by reason of such purchase.

SECTION 14. *Partial Unenforceability.* The invalidity or unenforceability of any section, paragraph or provision of this Agreement shall not affect the validity or enforceability of any other section, paragraph or provision hereof. If any section, paragraph or provision of this Agreement is for any reason determined to be invalid or unenforceable, there shall be deemed to be made such minor changes (and only such minor changes) as are necessary to make it valid and enforceable.

SECTION 15. *Governing Law Provisions.* THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN SUCH STATE WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THEREOF.

SECTION 16. *Default of One or More of the Several Initial Purchasers.* If any one or more of the several Initial Purchasers shall fail or refuse to purchase Securities that it or they have agreed to purchase hereunder on the Closing Date, and the aggregate number of Securities which such defaulting Initial Purchaser or Initial Purchasers agreed but failed or refused to purchase does not exceed 10% of the aggregate number of the Securities to be purchased on such date, the other Initial Purchasers shall be obligated, severally, in the proportions that the number of Securities set forth opposite their respective names on Schedule A bears to the aggregate number of Securities set forth opposite the names of all such non-defaulting Initial Purchasers, or in such other proportions as may be specified by the Initial Purchasers with the consent of the non-defaulting Initial Purchasers, to purchase the Securities which such defaulting Initial Purchaser or Initial Purchasers agreed but failed or refused to purchase on the Closing Date. If any one or more of the Initial Purchasers shall fail or refuse to purchase Securities and the aggregate number of Securities with respect to which such default occurs exceeds 10% of the aggregate number of Securities to be purchased on the Closing Date, and arrangements satisfactory to the Initial Purchasers and the Company for the purchase of such Securities are not made within 48 hours after such default, this Agreement shall terminate without liability of any party to any other party except that the provisions of Sections 4, 6, 8 and 9 hereof shall at all times be effective and shall survive such termination. In any such case either the Initial Purchasers or the Company shall have the right to postpone the Closing Date, as the case may be, but in no event for longer than seven days in order that the required changes, if any, to the Final Offering Memorandum or any other documents or arrangements may be effected.

As used in this Agreement, the term “Initial Purchaser” shall be deemed to include any person substituted for a defaulting Initial Purchaser under this Section 16. Any action taken under this Section 16 shall not relieve any defaulting Initial Purchaser from liability in respect of any default of such Initial Purchaser under this Agreement.

SECTION 17. *No Advisory or Fiduciary Responsibility.* Each of the Company and the Guarantors acknowledges and agrees that: (i) the purchase and sale of the Securities pursuant to this Agreement, including the determination of the offering price of the Securities and any related discounts and commissions, is an arm’s-length commercial transaction between the Company and the Guarantors, on the one hand, and the several Initial Purchasers, on the other hand, and the Company and the Guarantors are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the transactions contemplated by this Agreement; (ii) in connection with each transaction contemplated hereby and the process leading to such transaction each Initial Purchaser is and has been acting solely as a principal and is not the agent or fiduciary of the Company, Guarantors or their respective affiliates, stockholders, creditors or employees or any other party; (iii) no Initial Purchaser has assumed or will assume an advisory or fiduciary responsibility in favor of the Company or Guarantors with respect to any of the transactions contemplated hereby or the process leading thereto (irrespective of whether such Initial Purchaser has advised or is currently advising the Company Guarantors on other matters) or any other obligation to the Company and the Guarantors except the obligations expressly set forth in this Agreement; (iv) the several Initial Purchasers and their respective affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Company and the Guarantors and that the several Initial Purchasers have no obligation to disclose any of such interests by virtue of any fiduciary or advisory relationship; and (v) the Initial Purchasers have not provided any legal, accounting, regulatory or tax advice with respect to the offering contemplated hereby and the Company and the Guarantors have consulted their own legal, accounting, regulatory and tax advisors to the extent they deemed appropriate.

This Agreement supersedes all prior agreements and understandings (whether written or oral) between the Company, the Guarantors and the several Initial Purchasers, or any of them, with respect to the subject matter hereof. The Company and the Guarantors hereby waive and release, to the fullest extent permitted by law, any claims that the Company and the Guarantors may have against the several Initial Purchasers with respect to any breach or alleged breach of fiduciary duty.

SECTION 18. *General Provisions.* This Agreement constitutes the entire agreement of the parties to this Agreement and supersedes all prior written or oral and all contemporaneous oral agreements, understandings and negotiations with respect to the subject matter hereof. This Agreement may be executed in two or more counterparts, each one of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement may not be amended or modified unless in writing by all of the parties hereto, and no condition herein (express or implied) may be waived unless waived in writing by each party whom the condition is meant to benefit. The section headings herein are for the convenience of the parties only and shall not affect the construction or interpretation of this Agreement.

If the foregoing is in accordance with your understanding of our agreement, kindly sign and return to the Company the enclosed copies hereof, whereupon this instrument, along with all counterparts hereof, shall become a binding agreement in accordance with its terms.

Very truly yours,

SANDRIDGE ENERGY, INC.

By: /s/ Tom L. Ward
Name: Tom L. Ward
Title: Chief Executive Officer

SANDRIDGE ONSHORE, LLC

By: /s/ Tom L. Ward
Name: Tom L. Ward
Title: Chief Executive Officer

LARIAT SERVICES, INC.

By: /s/ Tom L. Ward
Name: Tom L. Ward
Title: Chief Executive Officer

SANDRIDGE OPERATING COMPANY

By: /s/ Tom L. Ward
Name: Tom L. Ward
Title: Chief Executive Officer

INTEGRA ENERGY, L.L.C.

By: /s/ Tom L. Ward
Name: Tom L. Ward
Title: Chief Executive Officer

SANDRIDGE EXPLORATION AND PRODUCTION, LLC

By: /s/ Tom L. Ward
Name: Tom L. Ward
Title: Chief Executive Officer

SANDRIDGE TERTIARY, LLC

By: /s/ Tom L. Ward
Name: Tom L. Ward
Title: Chief Executive Officer

SANDRIDGE MIDSTREAM, INC

By: /s/ Tom L. Ward
Name: Tom L. Ward
Title: Chief Executive Officer

SANDRIDGE OFFSHORE, LLC

By: /s/ Tom L. Ward
Name: Tom L. Ward
Title: Chief Executive Officer

SANDRIDGE HOLDINGS, INC

By: /s/ Tom L. Ward
Name: Tom L. Ward
Title: Chief Executive Officer

The foregoing Purchase Agreement is hereby confirmed and accepted by the Initial Purchasers as of the date first above written.

BARCLAYS CAPITAL INC.

By: /s/ Paul Cugno
Name: Paul Cugno
Title: Managing Director

BANC OF AMERICA SECURITIES LLC

By: /s/ Lex Maultsby
Name: Lex Maultsby
Title: Managing Director

J.P. MORGAN SECURITIES INC.

By: /s/ Jack D. Smith
Name: Jack D. Smith
Title: Executive Director

RBC CAPITAL MARKETS CORPORATION

By: /s/ David B. Capaldi
Name: David B. Capaldi
Title: Managing Director

RBS SECURITIES INC.

By: /s/ Michael F. Newcomb II
Name: Michael F. Newcomb II
Title: Managing Director

**SCHEDULE A**

| Initial Purchasers | Aggregate Principal Amount of Notes to be Purchased |
|---|---|
| Barclays Capital Inc. | $ 91,375,000 |
| Banc of America Securities LLC | 42,946,250 |
| J.P. Morgan Securities Inc. | 42,946,250 |
| RBC Capital Markets Corporation | 42,946,250 |
| RBS Securities Inc. | 42,946,250 |
| BNP Paribas Securities Corp. | 14,620,000 |
| Calyon Securities (USA) Inc. | 14,620,000 |
| Credit Suisse Securities (USA) LLC | 14,620,000 |
| SunTrust Robinson Humphrey, Inc. | 14,620,000 |
| Wachovia Capital Markets, LLC | 14,620,000 |
| BBVA Securities, Inc. | 7,310,000 |
| BMO Capital Markets Corp. | 7,310,000 |
| Scotia Capital (USA) Inc. | 7,310,000 |
| U.S. Bancorp Investments, Inc. | 7,310,000 |
| Total | $ 365,500,000 |

**EXHIBIT A-1**

Opinion of outside counsel to the Company to be delivered pursuant to Section 5 of the Purchase Agreement.

(i) The Company is validly existing as a corporation in good standing under the laws of the State of Delaware.

(ii) The Purchase Agreement has been duly authorized, executed and delivered by, the Company and each Guarantor.

(iii) The Registration Rights Agreement has been duly authorized, executed and delivered by, and is a valid and binding agreement of, the Company and each Guarantor, enforceable in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws relating to or affecting the rights and remedies of creditors or by general equitable principles and except as rights to indemnification and contribution under the Registration Rights Agreement may be limited by applicable law and except that provisions relating to liquidated damages may not be enforceable under general principles of contract law.

(iv) The Indenture has been duly authorized, executed and delivered by the Company and each Guarantor and (assuming the due authorization, execution and delivery thereof by the Trustee) constitutes a valid and binding agreement of the Company and each Guarantor, enforceable against the Company and each Guarantor in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws relating to or affecting the rights and remedies of creditors or by general principles of equity.

(v) The Notes are in the form contemplated by the Indenture, have been duly authorized by the Company for issuance and sale pursuant to this Agreement and the Indenture and, when executed by the Company and authenticated by the Trustee in the manner provided in the Indenture (assuming the due authorization, execution and delivery of the Indenture by the Trustee) and delivered against payment of the purchase price therefor, will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or similar laws relating to or affecting enforcement of the rights and remedies of creditors or by general principles of equity and will be entitled to the benefits of the Indenture.

(vi) The Guarantees of the Notes are in the respective forms contemplated by the Indenture, have been duly authorized for issuance and sale pursuant to this Agreement and the Indenture and have been duly executed by each of the Guarantors and, when the Notes have been authenticated in the manner provided for in the Indenture and delivered against payment of the purchase price therefor, will constitute valid and binding agreements of the Guarantors, enforceable in accordance with their terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws relating to or affecting the rights and remedies of creditors or by general equitable principles and will be entitled to the benefits of the Indenture.

(vii) The Securities and the Indenture conform in all material respects to the descriptions thereof contained in the Pricing Disclosure Package and the Final Offering Memorandum.

(viii) The documents incorporated by reference in the Pricing Disclosure Package and the Final Offering Memorandum (other than the financial statements, financial schedules and other financial or accounting information and oil and gas reserve data included therein or omitted therefrom, as to which no opinion need be rendered), when they were filed with the Commission, appeared on their face to comply as to form in all material respects with the requirements of the Exchange Act.

(ix) The statements in the Pricing Disclosure Package and the Final Offering Memorandum under the caption "Certain United States Federal Income Tax Considerations" insofar as such statements summarize legal matters, legal agreements or legal conclusions discussed therein, fairly present in all material respects such legal matters or legal conclusions.

(x) The execution and delivery of the Purchase Agreement, the Registration Rights Agreement, the Securities, and the Indenture by the Company and each Guarantor and the performance by the Company and each Guarantor of their respective obligations thereunder (other than performance by the Company of its obligations under the indemnification and contribution sections of the Purchase Agreement and the Registration Rights Agreement, as to which no opinion need be rendered) (i) will not result in any violation of the provisions of the Certificate of Incorporation or Bylaws (or other applicable organizational document) of the Company or any Guarantor; (ii) will not constitute a breach of, or Default or a Debt Repayment Triggering Event under (a) the Senior Credit Facility, dated November 21, 2006, by and among SandRidge Energy, Inc. (as successor by merger to Riata Energy, Inc.) and Bank of America, N.A., as Administrative Agent and Banc of America Securities LLC as Lead Arranger and Book Running Manager, as amended, (b) the Indenture, dated May 1, 2008, by and among SandRidge Energy, Inc., certain subsidiary guarantors named therein and Wells Fargo Bank, National Association, as trustee or (c) the Indenture, dated May 20, 2008, by and among SandRidge Energy, Inc., certain subsidiary guarantors named therein and Wells Fargo Bank, National Association, as trustee; or (iii) to the best knowledge of such counsel, will not result in any violation of any statute, law, rule, judgment, regulation, order or decree applicable to the Company or any of its subsidiaries of any court, regulatory body, administrative agency, governmental body, arbitrator or other authority having jurisdiction over the Company or any of its subsidiaries or any of its or their properties; except in the case of clause (ii) and (iii), such breaches, defaults and violations that would not reasonably be expected to have a Material Adverse Effect; provided however, we express no opinion in this paragraph (x) with respect to federal or state securities laws or blue sky laws, rules or regulations or any state or federal anti-fraud statute, rule or regulation.

(xi) The Company is not, and after receipt of payment for the Securities and the application of the proceeds as contemplated under the caption "Use of Proceeds" in the Final Offering Memorandum will not be, an "investment company" within the meaning of Investment Company Act.

(xii) Assuming the accuracy of the representations, warranties and covenants of the Company, the Guarantors and the Initial Purchasers contained in the Purchase Agreement, no registration of the Notes or the Guarantees under the Securities Act, and no qualification of an indenture under the Trust Indenture Act with respect thereto, is required in connection with the purchase of the Securities by the Initial Purchasers or the initial resale of the Securities by the Initial Purchasers to Qualified Institutional Buyers in the manner contemplated by this Agreement and the Pricing Disclosure Package and the Final Offering Memorandum other than any registration or qualification that may be required in connection with the Exchange Offer contemplated by the Pricing Disclosure Package and the Final Offering Memorandum or in connection with the Registration Rights Agreement. Such counsel need express no opinion, however, as to when or under what circumstances any Initial Notes initially sold by the Initial Purchasers may be reoffered or resold.

In addition, such counsel shall state that they have participated in conferences with officers and other representatives of the Company, representatives of the independent public or certified public accountants for the Company and with representatives of the Initial Purchasers at which the contents of the Pricing Disclosure Package and the Final Offering Memorandum, and any supplements or amendments thereto, and related matters were discussed. Although such counsel has made certain additional inquiries and investigations in connection with the preparation of the Pricing Disclosure Package and the Final Offering Memorandum, it is not passing on and does not assume any responsibility for the accuracy, completeness or fairness of the statements contained in the Pricing Disclosure Package or the Final Offering Memorandum (other than as specified in paragraphs (vii) and (ix) above). On the basis of the foregoing, no information has come to their attention which would lead them to believe:

(a) the Preliminary Offering Memorandum, as of the Time of Sale, together with the Pricing Supplement included in Exhibit B of the Purchase Agreement, contained any untrue statement of a material fact or omitted to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading; or

(b) the Final Offering Memorandum, as of its date and as of the Closing Date, contained or contains any untrue statement of a material fact or omitted or omits to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading,

except that in each case such counsel need express no opinion with respect to the financial statements and schedules and other financial or accounting data derived therefrom and the oil and gas reserve data contained in or omitted from the Pricing Disclosure Package or the Final Offering Memorandum.

In rendering such opinion, such counsel may rely (A) as to matters involving the application of laws of any jurisdiction other than the General Corporation Law of the State of Delaware, the laws of the State of Texas, the contract laws of the State of New York or the federal law of the United States, to the extent they deem proper and specified in such opinion, upon the opinion (which shall be dated the Closing Date, shall be satisfactory in form and substance to the Initial Purchasers, shall expressly state that the Initial Purchasers may rely on such opinion as if it were addressed to them and shall be furnished to the Initial Purchasers) of other counsel of good standing whom they believe to be reliable and who are satisfactory to counsel for the Initial Purchasers; and (B) as to matters of fact, to the extent they deem proper, on certificates of responsible officers of the Company and public officials.

**EXHIBIT A-2**

Opinion of counsel for the Company to be delivered pursuant to Section 5 of the Purchase Agreement.

(i) The Company has corporate power and authority to own, lease and operate its properties and to conduct its business as described in the Pricing Disclosure Package and the Final Offering Memorandum and to enter into and perform its obligations under the Purchase Agreement, the Registration Rights Agreement, the Indenture and the Securities.

(ii) The Company is duly qualified as a foreign corporation to transact business and is in good standing in each jurisdiction in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except for such jurisdictions where the failure to so qualify or to be in good standing would not, singly or in the aggregate, have a Material Adverse Effect.

(iii) Each Guarantor has been duly incorporated and is validly existing as a corporation in good standing under the laws of the jurisdiction of its incorporation, has corporate power and authority to own, lease and operate its properties and to conduct its business as described in the Pricing Disclosure Package and the Final Offering Memorandum and, to the best knowledge of such counsel, is duly qualified as a foreign corporation to transact business and is in good standing in each jurisdiction in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except for such jurisdictions where the failure to so qualify or to be in good standing would not, individually or in the aggregate, have a Material Adverse Effect.

(iv) The Company and each subsidiary possess such valid and current certificates, authorizations or permits issued by the appropriate state, federal or foreign regulatory agencies or bodies necessary to conduct their respective businesses, and, to such counsel's knowledge, neither the Company nor any subsidiary has received any notice of proceedings relating to the revocation or modification of, or non-compliance with, any such certificate, authorization or permit which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, could have a Material Adverse Effect.

(v) After due inquiry, such counsel does not know of any legal or governmental actions, suits or proceedings pending or, to the best of such counsel's knowledge, threatened (i) against or affecting the Company or any of its subsidiaries, (ii) which has as the subject thereof any officer or director of, or property owned or leased by, the Company or any of its subsidiaries or (iii) relating to environmental or discrimination matters, where in any such case (A) there is a reasonable possibility that such action, suit or proceeding might be determined adversely to the Company or such subsidiary and (B) any such action, suit or proceeding, if so determined adversely, would reasonably be expected to, singly or in the aggregate, have a Material Adverse Effect or adversely affect the consummation of the transactions contemplated by this Agreement. After due inquiry, such counsel does not know of any existing or, to the best of such counsel's knowledge, threatened or pending, material labor dispute with the employees of the Company or any of its subsidiaries, or with the employees of any principal supplier of the Company.

(vi) To the best knowledge of such counsel, neither the Company nor any subsidiary is in violation of its charter, by-laws or other organizational document, as the case may be.

In rendering such opinion, such counsel may rely (A) as to matters involving the application of laws of any jurisdiction other than the General Corporation Law of the State of Delaware or the federal law of the United States, to the extent they deem proper and specified in such opinion, upon the opinion (which shall be dated the Closing Date, shall be satisfactory in form and substance to the Initial Purchasers, shall expressly state that the Initial Purchasers may rely on such opinion as if it were addressed to them and shall be furnished to the Initial Purchasers) of other counsel of good standing whom they believe to be reliable and who are satisfactory to counsel for the Initial Purchasers; and (B) as to matters of fact, to the extent they deem proper, on certificates of responsible officers of the Company and public officials.

**EXHIBIT B**

Pricing Supplement

**ANNEX I**

*Resale Pursuant to Regulation S or Rule 144A* . Each Initial Purchaser understands that:

Such Initial Purchaser agrees that it has not offered or sold and will not offer or sell the Securities in the United States or to, or for the benefit or account of, a U.S. Person (other than a distributor), in each case, as defined in Rule 902 of Regulation S (i) as part of its distribution at any time and (ii) otherwise until 40 days after the later of the commencement of the offering of the Securities pursuant hereto and the Closing Date, other than in accordance with Regulation S or another exemption from the registration requirements of the Securities Act. Such Initial Purchaser agrees that, during such 40-day restricted period, it will not cause any advertisement with respect to the Securities (including any "tombstone" advertisement) to be published in any newspaper or periodical or posted in any public place and will not issue any circular relating to the Securities, except such advertisements as are permitted by and include the statements required by Regulation S.

Such Initial Purchaser agrees that, at or prior to confirmation of a sale of Securities by it to any distributor, dealer or person receiving a selling concession, fee or other remuneration during the 40-day restricted period referred to in Rule 903 of Regulation S , it will send to such distributor, dealer or person receiving a selling concession, fee or other remuneration a confirmation or notice to substantially the following effect:

> "The Securities covered hereby have not been registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), and may not be offered and sold within the United States or to, or for the account or benefit of, U.S. persons (i) as part of your distribution at any time or (ii) otherwise until 40 days after the later of the date the Securities were first offered to persons other than distributors in reliance upon Regulation S and the Closing Date, except in either case in accordance with Regulation S under the Securities Act (or in accordance with Rule 144A under the Securities Act or to accredited investors in transactions that are exempt from the registration requirements of the Securities Act), and in connection with any subsequent sale by you of the Securities covered hereby in reliance on Regulation S under the Securities Act during the period referred to above to any distributor, dealer or person receiving a selling concession, fee or other remuneration, you must deliver a notice to substantially the foregoing effect. Terms used above have the meanings assigned to them in Regulation S under the Securities Act."

**Exhibit 10.21**

# 6.0% CONVERTIBLE PERPETUAL PREFERRED STOCK PURCHASE AGREEMENT

**dated as of**

**November 30, 2009**

**between**

**SandRidge Energy, Inc.**

**and**

**Fairfax Financial Holdings Limited**

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE 1 | DEFINITIONS AND INTERPRETATION | 1 |
| 1.1 | Defined Terms | 1 |
| 1.2 | Interpretation | 2 |
| ARTICLE 2 | SUMMARY OF TRANSACTIONS | 3 |
| 2.1 | Sale and Purchase of Shares | 3 |
| 2.2 | Purchase Price | 3 |
| 2.3 | Underlying Securities | 3 |
| ARTICLE 3 | CLOSING AND CLOSING CONDITIONS | 4 |
| 3.1 | Time and Place of the Closing | 4 |
| 3.2 | Actions at the Closing | 4 |
| | 3.2.1 Delivery of Shares | 4 |
| | 3.2.2 Payment of Purchase Price | 4 |
| | 3.2.3. Opinions | 4 |
| | 3.2.4 Officers Certificate | 4 |
| | 3.2.5 NYSE Supplemental Listing of Underlying Securities | 5 |
| | 3.2.6 Filing of Certificate of Designation | 5 |
| | 3.2.7 Additional Actions | 5 |
| 3.3 | Conditions Precedent to Obligations of the Purchaser | 5 |
| | 3.3.1 Performance of Closing Actions | 5 |
| | 3.3.2 No Material Adverse Change | 5 |
| | 3.3.3 NYSE Supplemental Listing of Underlying Securities | 6 |
| | 3.3.4 Filing of Certificate of Designation | 6 |
| | 3.3.5 Opinions of Counsel | 6 |
| | 3.3.6 Officer's Certificates | 6 |
| 3.4 | Conditions Precedent to Obligations of the Company | 6 |
| | 3.4.1 Securities Laws | 6 |
| | 3.4.2 Performance of Closing Actions | 6 |
| | 3.4.3 Withholding Certificates | 6 |
| ARTICLE 4 | REPRESENTATIONS AND WARRANTIES OF THE COMPANY | 7 |
| 4.1 | No Registration Required | 7 |
| 4.2 | No Integration of Offerings or General Solicitation | 7 |
| 4.3 | Public Filings | 7 |
| 4.4 | The Purchase Agreement | 7 |
| 4.5 | The Shares | 7 |
| 4.6 | Outstanding Capital Stock | 7 |
| 4.7 | The Underlying Securities | 7 |
| 4.8 | The Certificate of Designation | 8 |
| 4.9 | No Convertible Stock | 8 |
| 4.10 | No Material Adverse Change | 8 |
| 4.11 | Independent Accountants | 8 |

| | | |
|---|---|---|
| 4.12 | Preparation of the Financial Statements | 8 |
| 4.13 | Incorporation and Good Standing of the Company | 8 |
| 4.14 | Non-Contravention of Existing Instruments; No Further Authorizations or Approvals Required | 9 |
| 4.15 | No Material Actions or Proceedings | 10 |
| 4.16 | Labor Matters | 10 |
| 4.17 | Intellectual Property Rights | 10 |
| 4.18 | All Necessary Permits, etc. | 10 |
| 4.19 | Title to Properties | 11 |
| 4.20 | Condition of Properties | 11 |
| 4.21 | Tax Law Compliance | 11 |
| 4.22 | Company Not an “Investment Company” | 11 |
| 4.23 | Insurance | 12 |
| 4.24 | Compliance with Sarbanes-Oxley | 12 |
| 4.25 | Internal Controls | 12 |
| 4.26 | Disclosure Controls and Procedures | 12 |
| 4.27 | Compliance with Environmental Laws | 13 |
| 4.28 | Independent Petroleum Engineers | 13 |
| 4.29 | Related Party Transactions | 14 |
| 4.30 | Solvency | 14 |
| 4.31 | No Default in Senior Indebtedness | 14 |
| 4.32 | Brokers | 14 |
| ARTICLE 5 | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 14 |
| 5.1 | Representations and Warranties of Purchaser | 14 |
| | 5.1.1 Organization | 14 |
| | 5.1.2 Authority and Power | 15 |
| | 5.1.3 Valid and Binding Obligations | 15 |
| | 5.1.4 Securities Law Matters | 15 |
| | 5.1.5 Legends | 15 |
| | 5.1.6 Restricted Securities | 16 |
| | 5.1.7 No Public Market | 16 |
| | 5.1.8 Access to Information | 16 |
| | 5.1.9 Reliance Upon Purchaser’s Representations | 16 |
| | 5.1.10 Foreign Purchasers | 17 |
| | 5.1.11 Exculpation | 17 |
| | 5.1.12 Certain ERISA Matters | 17 |
| 5.2 | No Further Representations | 17 |
| ARTICLE 6 | ADDITIONAL COVENANTS | 17 |
| 6.1 | No Integration | 17 |
| 6.2 | Underlying Securities | 18 |
| 6.3 | Transfer Agent | 18 |
| 6.4 | Available Shares of Common Stock | 18 |
| 6.5 | No Restricted Resales | 18 |
| 6.6 | Use of Proceeds | 18 |
| 6.7 | Regulatory Filings | 18 |

| | | |
|---|---|---|
| ARTICLE 7 | TERMINATION | 18 |
| 7.1 | Termination | 18 |
| | | |
| ARTICLE 8 | MISCELLANEOUS | 19 |
| 8.1 | Notices | 19 |
| 8.2 | Entire Agreement; Amendment | 20 |
| 8.3 | Successors and Assigns | 20 |
| 8.4 | Governing Law | 21 |
| 8.5 | Expenses, Etc. | 21 |
| 8.6 | Captions | 21 |
| 8.7 | Severability | 21 |
| 8.8 | Counterparts | 21 |
| 8.9 | No Waiver | 21 |

# 6.0% CONVERTIBLE PERPETUAL PREFERRED STOCK PURCHASE AGREEMENT

THIS 6.0% CONVERTIBLE PERPETUAL PREFERRED STOCK PURCHASE AGREEMENT (this " **Agreement**"), dated as of November 30, 2009, is entered into by and between SandRidge Energy, Inc., a Delaware corporation (the " **Company**"), and Fairfax Financial Holdings Limited, a corporation organized under the laws of Canada (the " **Purchaser**") (the Company and the Purchaser being sometimes hereinafter referred to individually as a "**Party**" and collectively as the "**Parties**"), with reference to the following:

## RECITALS

The Company desires to sell, and the Purchaser desires to purchase, 2,000,000 shares of the Company's 6.0% Convertible Perpetual Preferred Stock, par value $0.001 per share and liquidation preference $100 per share (the " **Shares**"), which shall have the rights, powers and preferences set forth in the Certificate of Designation (as defined below), upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## ARTICLE 1

## DEFINITIONS AND INTERPRETATION

**1.1 Defined Terms.** Capitalized terms used in this Agreement (including in the Preamble and the Recitals hereto) without other definition shall have the following meanings, unless the context clearly requires otherwise:

"**Affiliate**" has the meaning ascribed to such term in Rule 501 under the Securities Act.

"**Agreement**" means this 6.0% Convertible Perpetual Preferred Stock Purchase Agreement, including all Exhibits and other attachments hereto.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are required or authorized by law to close.

"**Certificate of Designation**" means the Certificate of Designation of 6.0% Convertible Perpetual Preferred Stock in the form set forth as Exhibit A to this Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning given in the Preamble to this Agreement.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Existing Preferred Stock**" means the 8.5% Convertible Perpetual Preferred Stock of the Company issued on January 21, 2009.

"**Forest Acquisition**" means the Company's acquisition of the Permian Basin oil field assets from Forest Oil Corporation, pursuant to an asset purchase agreement publicly announced on November 30, 2009.

"**Material Adverse Change**" has the meaning ascribed to such term in Section 4.10 hereof.

"**Material Adverse Effect**" has the meaning ascribed to such term in Section 4.13 hereof.

"**Party**" or "**Parties**" has the meaning given in the Preamble to this Agreement.

"**Public Filings**" means, with respect to the Company, collectively, (i) the annual report on Form 10-K for the year ended December 31, 2008, as amended, (ii) the proxy statement in respect of the 2009 annual meeting of the Company's shareholders, (iii) the quarterly reports on Form 10-Q for the quarters ended March 31, 2009, June 30, 2009, and September 30, 2009, and (iv) the current reports on Form 8-K filed by the Company since January 1, 2009.

"**Purchase Price**" has the meaning given in Section 2.3.

"**Purchaser**" has the meaning given in the Preamble to this Agreement.

"**SEC**" means the U.S. Securities and Exchange SEC, or any other Federal agency at the time administering the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC thereunder.

**1.2 Interpretation.** Except where otherwise expressly provided or unless the context otherwise necessarily requires, in this Agreement (including in the Recitals hereto):

(a) Reference to a given Article, Section, Subsection, clause, or Exhibit is a reference to an Article, Section, Subsection, clause, or Exhibit of this Agreement.

(b) The terms "hereof", "herein", "hereto", "hereunder" and "herewith" refer to this Agreement as a whole.

(c) Reference to a given agreement, instrument, document or law is a reference to that agreement, instrument, document or Law as modified, amended, supplemented and restated through the date as of which such reference is made, and, as to any law, any successor law.

(d) Reference to a person includes its predecessors, successors and permitted assigns.

(e) The singular includes the plural and the masculine includes the feminine, and vice versa.

(f) “Includes” or “including” means “including, for example and without limitation.”

(g) References to “days” means calendar days.

(h) Any item disclosed by a Party on any schedule to this Agreement shall be deemed to be disclosed and incorporated by reference into each other schedule or representation or warranty delivered or made by such Party in this Agreement, as though fully set forth therein.

## ARTICLE 2

## SUMMARY OF TRANSACTIONS

**2.1 Sale and Purchase of Shares.** Subject to the terms and conditions hereof, at the Closing, (a) the Company agrees to issue and sell to the Purchaser, the Shares at a purchase price of $100.00 per Share, and the Purchaser agrees to purchase and acquire such Shares, and (b) the Parties shall take or cause to be taken the other actions described in Section 3.2.

**2.2 Purchase Price.** The aggregate amount payable for the Shares to be purchased by the Purchaser is Two Hundred Million Dollars ($200,000,000.00) (the “**Purchase Price**”). The Purchase Price shall be paid in immediately available funds at the Closing in accordance with Section 3.2.2, subject to the satisfaction or waiver of the conditions to closing contained herein.

**2.3 Underlying Securities.** The Shares will be convertible into shares of common stock of the Company, par value $0.001 per share (“ **Common Stock**”), in the manner described in the Certificate of Designation, and dividends on the Shares may be paid in shares of Common Stock at the Company’s election, in accordance with the Certificate of Designations. The shares of Common Stock into which the Shares may be converted, and the shares of Common Stock that may be issued in payment of dividends on the Shares, are referred to collectively herein as the “ **Underlying Securities**.”

## ARTICLE 3

## CLOSING AND CLOSING CONDITIONS

**3.1 Time and Place of the Closing.** Subject to the terms and conditions hereof, the closing of the transactions contemplated by Article 2 (the "**Closing**") shall take place at the offices of Covington & Burling LLP, at 1201 Pennsylvania Avenue, N.W., Washington DC 20004, on the date of consummation of the Forest Acquisition at 10:00 A.M., Washington, D.C. time; *provided*, *however*, that (i) if all of the closing conditions set forth in this Article 3 have not been satisfied or waived on or prior to such date or (ii) if the Forest Acquisition shall be consummated on a date during the period from and including December 29, 2009 through and including January 4, 2010, then the Closing shall take place at such other place and on such other date as the Company and Purchaser mutually agree (the actual date of the Closing is referred to herein as the " **Closing Date**").

**3.2 Actions at the Closing.** At the Closing, the Company and the Purchaser (as applicable) shall take or cause to be taken the following actions (the "**Closing Actions**"):

**3.2.1 Delivery of Shares.** In exchange for the payment referenced in Section 3.2.2 below, the Company shall deliver to the Purchaser the Shares being purchased by the Purchaser from the Company through the facilities of the Depository Trust Company.

**3.2.2 Payment of Purchase Price.** The Purchaser shall pay to the Company by wire transfer in immediately available funds an amount equal to the Purchase Price.

**3.2.3 Opinions.** The Company shall cause to be delivered to the Purchaser opinions of (i) Covington & Burling LLP, counsel for the Company, dated as of such Closing Date, the form of which is attached as Exhibit B and (ii) the general counsel of the Company, dated as of such Closing Date, the form of which is attached as Exhibit C.

**3.2.4 Officers Certificate.** The Chief Executive Officer or President of the Company and the Chief Financial Officer or Chief Accounting Officer of the Company shall deliver to the Purchaser a written certificate executed by such officers, dated as of the Closing Date, to the effect that:

(a) there shall not have occurred any downgrading, nor shall any notice have been given of any intended or potential downgrading or of any review for a possible change that does not indicate the direction of the possible change, in the rating accorded any securities or indebtedness of the Company or any of its subsidiaries by any "nationally recognized statistical rating organization" as such term is defined for purposes of Rule 436 under the Securities Act;

(b) for the period from and after the date of this Agreement and prior to the Closing Date, there has not occurred any Material Adverse Change;

(c) the representations and warranties of the Company set forth in Article 4 were true and correct as of the date hereof and are true and correct as of the Closing Date, with the same force and effect as though expressly made on and as of the Closing Date;

(d) no event of default exists under the Credit Facility; and

(e) the Company has complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied at or prior to the Closing Date.

**3.2.5 NYSE Supplemental Listing of Underlying Securities.** The Company shall deliver evidence satisfactory to the Purchaser that the Underlying Securities have been approved for supplemental listing, subject to official notice of issuance, on the New York Stock Exchange.

**3.2.6 Filing of Certificate of Designation.** The Company shall cause the Certificate of Designation to be filed with the Secretary of State of the State of Delaware on or before the Closing Date.

**3.2.7 Additional Actions.** The Parties shall execute and deliver, or cause to be executed and delivered, all other documents, and take such other actions, in each case as shall be necessary or appropriate, to consummate the transactions contemplated hereby, all in accordance with the provisions of this Agreement.

**3.3 Conditions Precedent to Obligations of the Purchaser.** The obligation of the Purchaser to consummate the purchase of its Shares at Closing shall be subject to the accuracy of the representations and warranties on the part of the Company set forth in Article 4 hereof as of the date hereof and as of the Closing Date, as though then made and to the timely performance by the Company of its covenants and other obligations hereunder, and to each of the following additional conditions, any of which may be waived by the Purchaser in its sole discretion:

**3.3.1 Performance of Closing Actions.** The Company shall have performed and complied with all agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before Closing, including its Closing Actions.

**3.3.2 No Material Adverse Change.** For the period from and after the date of this Agreement and prior to the Closing Date:

(a) there shall not have occurred any Material Adverse Change; and

(b) there shall not have occurred any downgrading, nor shall any notice have been given of any intended or potential downgrading or of any review for a possible change that does not indicate the direction of the possible change, in the rating accorded any securities or indebtedness of the Company or any of its subsidiaries by any “nationally recognized statistical rating organization” as such term is defined for purposes of Rule 436 under the Securities Act.

**3.3.3 NYSE Supplemental Listing of Underlying Securities.** The Underlying Securities shall have been approved for supplemental listing, subject to official notice of issuance, on the New York Stock Exchange.

**3.3.4 Filing of Certificate of Designation.** The Certificate of Designation shall have been filed with the Secretary of State of the State of Delaware on or before the Closing Date.

**3.3.5 Opinions of Counsel.** The Purchaser shall have received the opinions of counsel listed in Section 3.2.3.

**3.3.6 Officer's Certificates.** The Purchaser shall have received the officers certificate listed in Section 3.2.4.

If any of the conditions set forth in this Section 3.3 are not satisfied or waived at or prior to the Closing Date, the Parties hereto shall be released and discharged from their respective obligations hereunder. The Purchaser may at its discretion and for itself, however, waive compliance with the whole or any part of this Section 3.3.

**3.4 Conditions Precedent to Obligations of the Company.** The obligation of the Company to consummate the sale of the Shares at the Closing shall be subject to the accuracy of the representations and warranties on the part of the Purchaser set forth in Article 5 hereof as of the date hereof and as of the Closing Date, as though then made and to the timely performance by the Purchaser of its covenants and other obligations hereunder, and to each of the following additional conditions, any of which may be waived by the Company in its sole discretion:

**3.4.1 Securities Laws.** The Company shall have obtained all required authorizations, approvals, permits and qualifications (if any) or secured an exemption therefrom under all applicable federal and state securities laws prior to the offer and sale of the Shares, and such authorizations, approvals, permits, qualifications or exemptions shall be effective as of the Closing.

**3.4.2 Performance of Closing Actions.** The Purchaser shall have performed and complied with all agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before Closing, including its Closing Actions.

**3.4.3 Withholding Certificates.** The Purchaser shall at the Closing, and subsequently as requested by the Company, provide to the Company a duly completed and valid IRS Form W-8 (of the type applicable to the Purchaser) or W-9, as applicable, executed in its name or, if the Purchaser is a single-member entity that is disregarded for U.S. federal income tax purposes, the name of its single owner. Purchasers providing a Form W-8 (other than Form W-8ECI) are hereby notified that the Company intends to withhold federal income tax from payments to them at the rate required under applicable law (including any applicable income tax treaty).

**ARTICLE 4**

**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

The Company hereby represents and warrants to the Purchaser that:

**4.1 No Registration Required.** Subject to compliance by the Purchaser with the representations and warranties set forth in Article 5 hereof, it is not necessary in connection with the offer, sale and delivery of the Shares to the Purchaser in the manner contemplated by this Agreement to register the Shares under the Securities Act.

**4.2 No Integration of Offerings or General Solicitation.** None of the Company, its Affiliates or any person acting on its or any of their behalf has, directly or indirectly, solicited any offer to buy or offered to sell, or will, directly or indirectly, solicit any offer to buy or offer to sell, in the United States or to any United States citizen or resident, any security which is or would be integrated with the sale of the Shares in a manner that would require the Shares to be registered under the Securities Act. None of the Company, its Affiliates, or any person acting on its or any of their behalf has engaged or will engage, in connection with the offering of the Shares, in any form of general solicitation or general advertising within the meaning of Rule 502 under the Securities Act.

**4.3 Public Filings.** The Public Filings, taken as a whole, do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein not misleading, in light of the circumstances under which they were made. The Public Filings, at the time they were filed with the SEC, complied in all material respects with the requirements of the Exchange Act.

**4.4 The Purchase Agreement.** This Agreement has been duly authorized, executed and delivered by the Company.

**4.5 The Shares.** The Shares have been duly and validly authorized by all necessary corporate action on the part of the Company and, when issued and delivered against payment therefor in accordance with the terms of this Agreement and the Certificate of Designation, the Shares will be validly issued, fully paid and non-assessable, will not be subject to any preemptive or similar rights, and will be convertible at the option of the holders thereof into the Underlying Securities in accordance with the Certificate of Designation.

**4.6 Outstanding Capital Stock.** The outstanding shares of capital stock of the Company have been duly authorized and validly issued and are fully paid and non-assessable; none of the outstanding shares of capital stock of the Company was issued in violation of any preemptive or similar rights of any stockholder of the Company.

**4.7 The Underlying Securities.** The Underlying Securities have been duly authorized and reserved, and when issued and delivered upon conversion of the Shares or in payment of dividends on the Shares, in the manner contemplated by the Certificate of Designation, will be validly issued, fully paid and non-assessable; and no preemptive or similar rights of stockholders exist with respect to any of the Underlying Securities.

**4.8 The Certificate of Designation.** The Certificate of Designation has been duly authorized by the Company.

**4.9 No Convertible Stock.** Other than the Existing Preferred Stock or as disclosed in the Public Filings, there are no outstanding securities of the Company convertible into, exchangeable for or evidencing the right to purchase or subscribe for any shares of capital stock of the Company and there are no outstanding or authorized options, warrants or rights of any character obligating the Company to issue any shares of its capital stock or any securities convertible or exchangeable into or evidencing the right to purchase or subscribe for any shares of such stock.

**4.10 No Material Adverse Change.** Except as otherwise disclosed in the Public Filings, subsequent to the filing of the Company's quarterly report on Form 10-Q for the quarter ended September 30, 2009, there has been no material adverse change, or any development that could reasonably be expected to result in a material adverse change, in the condition, financial or otherwise, or in the earnings, business, properties, operations or prospects (other than as a result of developments affecting the oil and gas industry generally), whether or not arising from transactions in the ordinary course of business, of the Company and its subsidiaries, considered as one entity (a "**Material Adverse Change**"); (ii) the Company and its subsidiaries, considered as one entity, have not incurred any material liability or obligation, indirect, direct or contingent, nor entered into any material transaction or agreement; and (iii) except for dividends on the Existing Preferred Stock, there has been no cash dividend or distribution of any kind declared, paid or made by the Company or, except for dividends paid to the Company or other subsidiaries, any of its subsidiaries on any class of capital stock or repurchase or redemption by the Company or any of its subsidiaries of any class of capital stock.

**4.11 Independent Accountants.** PricewaterhouseCoopers LLP, who have expressed their opinion with respect to certain of the financial statements included in the Public Filings, are independent registered public accountants with respect to the Company as required by the Securities Act and the Exchange Act.

**4.12 Preparation of the Financial Statements.** The consolidated financial statements of the Company included in the Public Filings present fairly the consolidated financial position of the entities to which they relate as of and at the dates indicated and the results of their operations and cash flows for the periods specified. Such financial statements comply as to form with the applicable accounting requirements of Regulation S-X and have been prepared in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods involved, except as may be expressly stated in the related notes thereto.

**4.13 Incorporation and Good Standing of the Company.** The Company has been duly incorporated and is validly existing and in good standing under the laws of the jurisdiction of its incorporation and has power and authority (corporate or otherwise) to own or lease, as the case may be, and operate its properties and to conduct its business as described in the Public Filings and, in the case of the Company, to enter into and perform its obligations under each of this Agreement, the Certificate of Designation and the Shares. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except for such jurisdictions where the failure

to so qualify or to be in good standing would not, individually or in the aggregate, result in a material adverse effect on the condition, financial or otherwise, or on the earnings, business, properties or operations, whether or not arising from transactions in the ordinary course of business, of the Company and its subsidiaries, considered as one entity (a **"Material Adverse Effect"**). All of the issued and outstanding shares of capital stock, or similar equity interest, of each subsidiary have been duly authorized and validly issued, are fully paid and nonassessable and are owned by the Company, directly or through subsidiaries, free and clear of any security interest, mortgage, pledge, lien, encumbrance or claim, except that the Credit Agreement, dated November 21, 2006, by and among SandRidge Energy, Inc. (as successor by merger to Riata Energy, Inc.) and Bank of America, N.A., as Administrative Agent and Banc of America Securities LLC as Lead Arranger and Book Running Manager, as amended, (the **"Credit Facility"**) is secured by a negative pledge on any of the Company's non-mortgage properties.

**4.14 Non-Contravention of Existing Instruments; No Further Authorizations or Approvals Required.** Neither the Company nor any of its subsidiaries is (i) in violation of its charter or bylaws (or other applicable organizational document), (ii) is (or, with the giving of notice or lapse of time, would be) in default (**"Default"**) under any indenture, mortgage, loan or credit agreement, note, contract, franchise, lease or other instrument to which the Company or any of its subsidiaries is a party or by which it or any of them may be bound (including, without limitation, the Credit Facility), or to which any of the property or assets of the Company or any of its subsidiaries is subject (each, an **"Existing Instrument"**), or (iii) is in violation of any statute, law, rule, regulation, judgment, order or decree of any court, regulatory body, administrative agency, governmental body, arbitrator or other authority having jurisdiction over the Company or such subsidiary or any of its properties, as applicable, except with respect to clause (ii) and (iii), for such Defaults or violations as would not, individually or in the aggregate, have a Material Adverse Effect.

The Company's execution, delivery and performance of this Agreement, the issuance and delivery of the Shares or the Underlying Securities, the Company's compliance with the Certificate of Designation and the consummation of the transactions contemplated hereby and thereby (i) have been duly authorized by all necessary action (corporate or otherwise) and will not result in any violation of the charter or by laws (or other applicable organizational document) of the Company or any subsidiary, (ii) will not conflict with or constitute a breach of, or Default or a Debt Repayment Triggering Event (as defined below) under, or result in the creation or imposition of any lien, charge or encumbrance upon any property or assets of the Company or any of its subsidiaries pursuant to, or require the consent of any other party to, any Existing Instrument and (iii) will not result in any violation of any statute, law, rule, regulation, judgment, order or decree applicable to the Company or any of its subsidiaries of any court, regulatory body, administrative agency, governmental body, arbitrator or other authority having jurisdiction over the Company or any of its subsidiaries or any of its or their properties. As used herein, a **"Debt Repayment Triggering Event"** means any event or condition which gives, or with the giving of notice or lapse of time would give, the holder of any note, debenture or other evidence of indebtedness (or any person acting on such holder's behalf) the right to require the repurchase, redemption or repayment of all or a portion of such indebtedness by the Company or any of its subsidiaries.

No consent, approval, authorization or other order of, or registration or filing with, any court or other governmental or regulatory authority or agency is required for the Company's execution, delivery and performance of this Agreement or the issuance and delivery of the Shares or the Underlying Securities or the Company's compliance with the Certificate of Designation, or the consummation of the transactions contemplated hereby and thereby, except for such as have been obtained or made by the Company and are in full force and effect under the Securities Act, and applicable state securities or blue sky laws.

**4.15 No Material Actions or Proceedings.** Except as otherwise disclosed in the Public Filings, there are no legal or governmental actions, suits or proceedings pending or, to the Company's knowledge, threatened (i) against or affecting the Company or any of its subsidiaries, (ii) which has as the subject thereof any officer or director of, or property owned or leased by, the Company or any of its subsidiaries or (iii) relating to environmental or discrimination matters, where in any such case (A) there is a reasonable possibility that such action, suit or proceeding might be determined adversely to the Company or such subsidiary and (B) any such action, suit or proceeding, if so determined adversely, would reasonably be expected to have a Material Adverse Effect or adversely affect the consummation of the transactions contemplated by this Agreement.

**4.16 Labor Matters.** No labor problem or dispute with the employees of the Company or any of its subsidiaries exists or is threatened or imminent that would reasonably be expected to have a Material Adverse Effect.

**4.17 Intellectual Property Rights.** The Company and its subsidiaries own, possess, license or have other rights to use, on reasonable terms, all patents, patent applications, trade and service marks, trade and service mark registrations, trade names, copyrights, licenses, inventions, trade secrets, technology, know-how and other intellectual property (collectively, the **"Intellectual Property Rights"**) necessary for the conduct of the Company's business as now conducted or as proposed in the Public Filings to be conducted except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. Except as set forth in the Public Filings, (a) no party has been granted an exclusive license to use any portion of such Intellectual Property Rights owned by the Company; (b) to the Company's knowledge there is no material infringement by third parties of any such Intellectual Property Rights owned by or exclusively licensed to the Company; (c) there is no pending or, to the Company's knowledge, threatened action, suit, proceeding or claim by others challenging the Company's rights in or to any material Intellectual Property Rights; and (d) there is no pending or, to the Company's knowledge, threatened action, suit, proceeding or claim by others that the Company's business as now conducted infringes or otherwise violates any material patent, trademark, copyright, trade secret or other proprietary rights of others, and the Company is unaware of any other fact which would form a reasonable basis for any such claim.

**4.18 All Necessary Permits, etc.** The Company possesses such valid and current licenses, certificates, authorizations or permits issued by the appropriate state, federal or foreign regulatory agencies or bodies necessary to conduct its business except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, and the Company has not received any notice of proceedings relating to the revocation or modification of, or non-compliance with, any such certificate, authorization or permit which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would reasonably be expected to have a Material Adverse Effect.

**4.19 Title to Properties**. Each of the Company and its subsidiaries has (i) generally satisfactory title to its oil and gas properties, title investigations having been carried out by the Company or its subsidiaries in accordance with the practice in the oil and gas industry in the areas in which the Company and its subsidiaries operate, (ii) good and marketable title to all other real property owned by it (including pipeline easement rights) to the extent necessary to carry on its business, and (iii) good and marketable title to all personal property owned by it, in each case free and clear of all liens, encumbrances and defects except such as are described in the Public Filings or such as do not materially affect the value of the properties of the Company and its subsidiaries, considered as one enterprise, and do not interfere in any material respect with the use made and proposed to be made of such properties, by the Company and its subsidiaries, considered as one enterprise; and all of the easements, leases and subleases material to the business of the Company and its subsidiaries, considered as one enterprise, and under which the Company or any of its subsidiaries holds or uses properties described in the Public Filings, are in full force and effect, and neither the Company nor any of its subsidiaries has any notice of any material claim of any sort that has been asserted by anyone adverse to the rights of the Company or its subsidiaries under any of the easements, leases or subleases mentioned above, or affecting or questioning the rights of the Company or any subsidiary thereof to the continued possession or use of the easement or leased or subleased premises.

**4.20 Condition of Properties.** Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Company, the plants, buildings, structures and equipment owned by the Company are in good operating condition and repair and have been reasonably maintained consistent with standards generally followed in the industry (giving due account to the age and length of use of same, ordinary wear and tear excepted), are adequate and suitable for their present uses and, in the case of plants, buildings and other structures, are structurally sound.

**4.21 Tax Law Compliance.** The Company and its consolidated subsidiaries have filed all necessary federal, state, local and foreign income and franchise tax returns in a timely manner and have paid all taxes required to be paid by any of them and, if due and payable, any related or similar assessment, fine or penalty levied against any of them, except for any taxes, assessments, fines or penalties as may be being contested in good faith and by appropriate proceedings or where the failure to do so would not reasonably be expected to have a Material Adverse Effect. The Company has made appropriate provisions in the financial statements included in the Public Filings in respect of all federal, state and foreign income and franchise taxes for all current or prior periods as to which the tax liability of the Company or any of its consolidated subsidiaries has not been finally determined except to the extent it would not have a Material Adverse Effect.

**4.22 Company Not an "Investment Company".** The Company is not, and, after receipt of payment for the Shares and application of the proceeds will not be, required to register as an "investment company" within the meaning of the Investment Company Act and will conduct its business in a manner so that it will not become subject to the Investment Company Act.

**4.23 Insurance.** Each of the Company and its subsidiaries are insured by recognized, and to the knowledge of the Company, financially sound and reputable institutions with policies in such amounts and with such deductibles and covering such risks as are generally deemed adequate and customary for their businesses including, but not limited to, policies covering real and personal property owned or leased by the Company and its subsidiaries against theft, damage, destruction, acts of terrorism or vandalism and earthquakes. All policies of insurance and fidelity or surety bonds insuring the Company or any of its subsidiaries or their respective businesses, assets, employees, officers and directors are in full force and effect; the Company and its subsidiaries are in compliance, in all material respects, with the terms of such policies and instruments; and there are no material claims by the Company or any of its subsidiaries under any such policy or instrument as to which any insurance company is denying liability or defending under a reservation of rights clause; and neither the Company nor any such subsidiary has, in the past three years, been refused any insurance coverage sought or applied for.

**4.24 Compliance with Sarbanes-Oxley.** The Company and its subsidiaries and their respective officers and directors are in compliance with the applicable provisions of the Sarbanes-Oxley Act of 2002 (the **"Sarbanes-Oxley Act**," which term, as used herein, includes the rules and regulations of the SEC promulgated thereunder).

**4.25 Internal Controls.** The Company maintains effective internal control over financial reporting as defined in Rule 13a-15 under the Exchange Act and a system of internal accounting control sufficient to provide reasonable assurance that (A) transactions are executed in accordance with management's general or specific authorization, (B) transactions are recorded as necessary to permit preparation of the Company's financial statements in conformity with accounting principles generally accepted in the United States and to maintain accountability for its assets, (C) access to the Company's assets is permitted only in accordance with management's general or specific authorization and (D) the recorded accountability for the Company's assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

**4.26 Disclosure Controls and Procedures.** The Company has established and maintains disclosure controls and procedures (as such term is defined in Rules 13a-15 and 15d-14 under the Exchange Act); such disclosure controls and procedures are designed to ensure that material information relating to the Company and its subsidiaries is made known to the chief executive officer and chief financial officer of the Company by others within the Company or any of its subsidiaries, and such disclosure controls and procedures are reasonably effective to perform the functions for which they were established subject to the limitations of any such control system; the Company's auditors and the Audit Committee of the Board of Directors of the Company have been advised of: (i) any significant deficiencies or material weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data; and (ii) any fraud, whether or not material, that involves management or other employees who have a role in the Company's internal controls; and since the date of the most recent evaluation of such disclosure controls and procedures, there have been no significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses.

**4.27 Compliance with Environmental Laws.** Except as otherwise disclosed in the Public Filings: (i) neither the Company nor any of its subsidiaries is in violation of any federal, state, local or foreign law, regulation, order, permit or other requirement relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata) or wildlife, including without limitation, laws and regulations relating to emissions, discharges, releases or threatened releases of chemicals, pollutants, contaminants, wastes, toxic substances, hazardous substances, petroleum and petroleum products (collectively, " **Materials of Environmental Concern** "), or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Materials of Environmental Concern (collectively, "**Environmental Laws**"), which violation includes, but is not limited to, noncompliance with any permits or other governmental authorizations required for the operation of the business of the Company or its subsidiaries under applicable Environmental Laws, or noncompliance with the terms and conditions thereof, nor has the Company or any of its subsidiaries received any written communication, whether from a governmental authority, citizens group, employee or otherwise, that alleges that the Company or any of its subsidiaries is in violation of any Environmental Law, except, in each case, as would not, individually or in the aggregate, have a Material Adverse Effect; (ii) there is no claim, action or cause of action filed with a court or governmental authority, no investigation with respect to which the Company has received written notice, and no written notice by any person or entity alleging potential liability for investigatory costs, cleanup costs, governmental responses costs, natural resources damages, property damages, personal injuries, attorneys' fees or penalties arising out of, based on or resulting from the presence, or release into the environment, of any Material of Environmental Concern at any location owned, leased or operated by the Company or any of its subsidiaries, now or in the past (collectively, " **Environmental Claims**"), pending or, to the Company's knowledge, threatened against the Company or any of its subsidiaries or any person or entity whose liability for any Environmental Claim the Company or any of its subsidiaries has retained or assumed either contractually or by operation of law, except as would not, individually or in the aggregate, have a Material Adverse Effect; and (iii) to the Company's knowledge, there are no past, present or anticipated future actions, activities, circumstances, conditions, events or incidents, including, without limitation, the release, emission, discharge, presence or disposal of any Material of Environmental Concern, that reasonably could result in a violation of any Environmental Law, require expenditures to be incurred pursuant to Environmental Law, except as would not, individually or in the aggregate, have a Material Adverse Effect.

**4.28 Independent Petroleum Engineers.** DeGolyer and MacNaughton, whose reports as of December 31, 2006, 2007 and 2008, are referenced in the Public Filings, was, as of the date of such reports, and is, as of the date hereof, an independent petroleum engineer with respect to SandRidge CO2, LLC (f/k/a PetroSource Energy Company, L.P.) (with respect to the reports as of December 31, 2006 and 2007) and with respect to SandRidge Tertiary, LLC (with respect to the report as of December 31, 2008). Netherland, Sewell & Associates Inc., whose reports as of December 31, 2006, 2007 and 2008, are referenced in the Public Filings, was, as of December 31, 2006, 2007 and 2008, and is, as of the date hereof, an independent petroleum engineer with respect to the Company (excluding SandRidge CO2, LLC f/k/a PetroSource Energy Company, L.P. with respect to the reports as of December 31, 2006 and 2007 and excluding SandRidge Tertiary, LLC with respect to the report as of December 31, 2008). The information underlying the estimates of reserves of the Company and its subsidiaries, which was supplied by the Company to DeGolyer and

MacNaughton and Netherland, Sewell & Associates Inc. for purposes of reviewing the reserve reports and estimates of the Company and preparing the letters (the **"Reserve Report Letters**") of DeGolyer and MacNaughton and Netherland, Sewell & Associates Inc., including, without limitation, production, costs of operation and development, current prices for production, agreements relating to current and future operations and sales of production, was true and correct in all material respects on the dates such estimates were made and such information was supplied and was prepared in accordance with customary industry practices; estimates of such reserves and present values as described in the Public Filings and reflected in the Reserve Report Letters comply in all material respects with the applicable requirements of Regulation S-X and Industry Guide 2 under the Securities Act.

**4.29 Related Party Transactions.** No relationship, direct or indirect, exists between or among any of the Company or any affiliate of the Company, on the one hand, and any director, officer, member, stockholder, customer or supplier of the Company or any affiliate of the Company, on the other hand, which is required by the Exchange Act to be disclosed in reports filed under the Exchange Act which is not so disclosed in the Public Filings. There are no outstanding loans, advances (except advances for business expenses in the ordinary course of business) or guarantees of indebtedness by the Company or any affiliate of the Company to or for the benefit of any of the officers or directors of the Company or any affiliate of the Company or any of their respective family members.

**4.30 Solvency.** The Company is, and immediately after the Closing Date will be, Solvent. As used herein, the term " **Solvent**" means, with respect to any person on a particular date, that on such date (i) the fair market value of the assets of such person is greater than the total amount of liabilities (including contingent liabilities) of such person, (ii) the present fair salable value of the assets of such person is greater than the amount that will be required to pay the probable liabilities of such person on its debts as they become absolute and matured, (iii) such person is able to realize upon its assets and pay its debts and other liabilities, including contingent obligations, as they mature and (iv) such person does not have unreasonably small capital.

**4.31 No Default in Senior Indebtedness.** No event of default exists under the Credit Facility.

**4.32 Brokers.** There is no broker, finder or other party that is entitled to receive from the Company any brokerage or finder's fee or other fee or commission as a result of any transactions contemplated by this Agreement.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

**5.1 Representations and Warranties of Purchaser.** The Purchaser hereby represents and warrants to the Company that:

**5.1.1 Organization.** The Purchaser is duly organized, validly existing and in good standing under the laws of the state or jurisdiction in which it was formed. The Purchaser is qualified to do business in all jurisdictions where it does business, where the failure to qualify would materially and adversely affect its ability to execute or deliver, or perform its obligations under, this Agreement.

**5.1.2 Authority and Power.** The Purchaser has the requisite power and authority to enter into this Agreement, to consummate each of the transactions and undertakings contemplated hereby, and to perform all the terms and conditions thereof to be performed by it. The execution, delivery and performance of this Agreement and consummation of each of the transactions and undertakings contemplated hereby have been duly authorized by all requisite action on its part under the Purchaser's constituent or governing documents and applicable law.

**5.1.3 Valid and Binding Obligations.** This Agreement has been duly and validly executed and delivered, and is enforceable against the Purchaser in accordance with the terms thereof.

**5.1.4 Securities Law Matters.** The offer and sale of the Shares and the Underlying Securities to the Purchaser is being made as a private placement pursuant to Section 4(2) of the Securities Act and/or Regulation D thereunder, and is not being registered under the Securities Act. The Purchaser hereby acknowledges that neither the Shares nor the Underlying Securities have been registered under the Securities Act, or registered or qualified for sale under any state securities laws, and cannot be resold without registration thereunder or exemption therefrom. The Purchaser is a "**Qualified Institutional Buyer**", as such term is defined in Rule 144A of the Securities Act, or an institutional "accredited investor," as such term is defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D of the Securities Act, and will acquire the Shares and Underlying Securities for its own account and not with a view to a sale or distribution thereof in violation of the Securities Act, and the rules and regulations thereunder, any applicable state "blue sky" laws or any other applicable securities laws. The Purchaser has sufficient knowledge and experience in financial and business matters to enable it to evaluate the risks of investment in the Shares and Underlying Securities, is purchasing the Shares with a full understanding of all of the terms, conditions and risks thereof, and at the Closing will bear and have the ability to bear the economic risk of this investment for an indefinite period of time. The Purchaser acknowledges that it has been afforded an opportunity to request and to review all information considered by the Purchaser to be necessary to make the investment decision to enter into this Agreement and to consummate the transactions contemplated hereby. The Purchaser understands and agrees to the terms and conditions under which the Shares are being offered.

**5.1.5 Legends.** The Purchaser acknowledges that, to the extent applicable, each certificate evidencing the Shares shall be endorsed with a legend substantially in the form set forth below, as well as any additional legend imposed or required by applicable securities laws:

"THIS SECURITY (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES

ACT") OR THE SECURITIES LAWS OF ANY U.S. STATE, NOR IS ANY SUCH REGISTRATION CONTEMPLATED. THIS SECURITY AND ANY SECURITY ISSUABLE UPON CONVERSION HEREOF MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM.

THE HOLDER OF THIS SECURITY AGREES FOR THE BENEFIT OF THE COMPANY THAT (A) THIS SECURITY AND ANY SECURITY ISSUABLE UPON CONVERSION HEREOF MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (I) TO SANDRIDGE ENERGY, INC., OR ITS SUCCESSOR, (II) IN THE UNITED STATES TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (III) OUTSIDE OF THE UNITED STATES IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 904 UNDER THE SECURITIES ACT, (IV) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF AVAILABLE), OR (V) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT, IN EACH OF CASES (I) THROUGH (V) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THIS SECURITY FROM IT OF THE RESALE RESTRICTIONS REFERRED TO ABOVE. IN ANY CASE, THE HOLDER HEREOF WILL NOT, DIRECTLY OR INDIRECTLY, ENGAGE IN ANY HEDGING TRANSACTION WITH REGARD TO THE SECURITIES EXCEPT AS PERMITTED UNDER THE SECURITIES ACT."

**5.1.6 Restricted Securities.** The Purchaser acknowledges that the Shares are "restricted securities" (as such term is defined in Rule 144 under the Securities Act) and must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available.

**5.1.7 No Public Market.** The Purchaser understands that no public market now exists for the Shares, and that it is unlikely that a public market will ever exist for the Shares.

**5.1.8 Access to Information.** The Purchaser acknowledges that it has been afforded an opportunity to request and to review all information considered by the Purchaser to be necessary to make an investment decision with respect to the Shares. The Purchaser has received and reviewed information about the Company and has had an opportunity to discuss the Company's business, management and financial affairs with its management.

**5.1.9 Reliance Upon Purchaser's Representations.** The Purchaser understands and acknowledges that: (a) neither the Shares nor the Underlying Securities have been registered under the Securities Act; (b) its representations and warranties contained herein are being relied upon by the Company as a basis for exemption of the sale of the Shares under the Securities

Act; (c) the offering of the Shares pursuant to this Agreement will not be registered under the Securities Act on the ground that the sale provided for in this Agreement and the issuance of securities hereunder is exempt from the registration requirements of the Securities Act; and (d) no state or federal agency has made any finding or determination as to the fairness of the terms of the sale of the Shares or any recommendation or endorsement thereof. If any of the representations made by the Purchaser in connection with its purchase of Shares are no longer accurate, the Purchaser will promptly notify the Company.

**5.1.10 Foreign Purchasers.** If the Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Code), the Purchaser hereby represents and warrants that it has satisfied itself as to the full observances of the laws of its jurisdiction in connection with any invitation to subscribe for, offer and purchase of the Shares, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares. The Purchaser's purchase of and continued ownership of Shares, will not violate any applicable securities or other laws of the Purchaser's jurisdiction.

**5.1.11 Exculpation.** The Purchaser acknowledges that it is not relying upon any person, firm or corporation, including, without limitation, the Company, in making its investment or decision to invest in the Company, other than the representations and warranties of the Company contained in this Agreement.

**5.1.12 Certain ERISA Matters.** The Purchaser represents that the assets used to purchase the Shares will either (a) not constitute the assets of any plan subject to Part 4 of Title I of ERISA, Section 4975 of the Code or substantially similar law; or (b) will constitute the assets of such a plan, but the acquiring, holding and disposition of Shares will not constitute a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code, or a violation under any applicable substantially similar law.

**5.2 No Further Representations.** Except for the representations and warranties expressly set forth in Article 4 of this Agreement, the Company expressly disclaims any representations or warranties of any kind, express or implied, relating to the Shares, the Company or the transactions contemplated hereby.

## ARTICLE 6

## ADDITIONAL COVENANTS

**6.1 No Integration.** The Company agrees that it will not and will cause its Affiliates not to make any offer or sale of securities of the Company of any class if, as a result of the doctrine of "integration" referred to in Rule 502 under the Securities Act, such offer or sale would render invalid (for the purpose of the sale of the Shares by the Company to the Purchaser) the exemption from the registration requirements of the Securities Act provided by Section 4(2) thereof or otherwise.

**6.2 Underlying Securities.** The Company will use its commercially reasonable efforts to cause the Underlying Securities to be approved for supplemental listing on the New York Stock Exchange on or prior to the Closing Date and to ensure that the Underlying Securities remain authorized for listing following the Closing Date.

**6.3 Transfer Agent.** The Company shall engage and maintain, at its expense, a registrar and transfer agent for the Shares and the Common Stock.

**6.4 Available Shares of Common Stock.** The Company will reserve and keep available at all times, free of preemptive rights, the full number of Underlying Securities.

**6.5 No Restricted Resales.** During the period of one year after the Closing Date, the Company will not, and will not permit any of its affiliates (as defined in Rule 144 under the Securities Act) to resell any of the Shares which constitute "restricted securities" under Rule 144 that have been reacquired by any of them.

**6.6 Use of Proceeds.** The Company shall use the net proceeds of the sale of the Shares to fund the Forest Acquisition.

**6.7 Regulatory Filings.** Following the Closing, in connection with the conversion of the Shares to the extent required by applicable law, the Company and the Purchaser shall, as promptly as reasonably practicable following the Company's receipt of a request from the Purchaser, (i) make any required filing with the U.S. Federal Trade Commission ("**FTC**"), Department of Justice ("**DOJ**") and any other governmental entity required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), or any other applicable law with respect to such conversion of the Shares, (ii) as promptly as practicable make or cause their Affiliates to make any filing or notice required under any other antitrust or competition law or other law or regulation agreed by the parties to be applicable to such conversion of the Shares and (iii) provide any supplemental information requested in connection with the HSR Act or such other antitrust, competition or other laws or regulations as promptly as practicable after such request is made. Each of the Company and the Purchaser shall, and shall cause its Affiliates to, furnish to the other such information and assistance as the other may reasonably request in connection with its preparation of any filing or submission which is necessary under the HSR Act or such other applicable law or which is otherwise requested by the FTC or DOJ or other governmental entity and shall keep each other apprised of the status of any communications with, and inquiries or requests for additional information from, the FTC and DOJ or other governmental entity.

## ARTICLE 7

## TERMINATION

**7.1 Termination.** This Agreement may be terminated at any time prior to the Closing, only in the following manner:

(a) By mutual written agreement of the Company and the Purchaser;

(b) By the Purchaser upon written notice to the other Parties hereto if the Closing shall not have occurred within 30 days of the date of this Agreement; *provided* that such date may be extended by the Purchaser by written notice to the Company for a period not to exceed an additional 30 days, if the reason for such extension is the failure to satisfy one or more conditions to the Closing and the Purchaser reasonably believes that condition(s) to the Closing can be satisfied by the new termination deadline. Notwithstanding the foregoing, termination under this provision shall not be available to the Purchaser if the Closing has not occurred solely by reason of any breach by the Purchaser under this Agreement;

(c) By any Party upon written notice to the other Parties hereto, if, prior to the Closing, (i) trading in securities generally on either the New York Stock Exchange shall have been suspended or materially limited, or minimum or maximum prices shall have been generally established on any of such stock exchanges by the SEC or the FINRA; (ii) a general banking moratorium shall have been declared by any federal or New York authority or a material disruption in commercial banking or securities settlement or clearance services in the United States has occurred; or (iii) there shall have occurred any outbreak or escalation of national or international hostilities or any crisis or calamity, or any change in the United States or international financial markets, or any substantial change or development involving a prospective substantial change in United States' or international political, financial or economic conditions, as in the judgment of the Party giving notice is material and adverse and makes it impracticable or inadvisable to proceed with the Closing or to enforce contracts for the sale of securities.

## ARTICLE 8

## MISCELLANEOUS

**8.1 Notices.** Any notice, statement, demand, claim, offer or other written instrument required or permitted to be given pursuant to this Agreement shall be in writing signed by the Party giving such notice and shall be sent by facsimile, hand messenger delivery, overnight courier service, or certified mail (receipt requested) to the other Party at the address set forth below:

(a) If to the Company, to it at:

SandRidge Energy, Inc.
123 Robert S. Kerr Avenue
Oklahoma City, OK 73102-6406
Facsimile: 405-429-5983
Attention: General Counsel

with a copy to:

Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004
Facsimile: 202-778-5000
Attention: David H. Engvall

(b) If to the Purchaser, to it at:

Fairfax Financial Holdings Limited
95 Wellington Street West
Suite 800
Toronto, ON
Canada M5J 2N7
Facsimile: 416-360-4946
Attention: Paul Rivett

with a copy to:

Shearman & Sterling LLP
Commerce Court West
Suite 4405
Toronto, ON
Canada M5L 1E8
Facsimile: 416-360-2958
Attention: Stephen Centa

Each Party shall have the right to change the place to which notices shall be sent or delivered or to specify one additional address to which copies of notices may be sent, in either case by similar notice sent or delivered in like manner to the other Party.

**8.2 Entire Agreement; Amendments.** This Agreement constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, of the Parties with respect to the subject matter hereof. Any oral representations or modifications concerning this instrument shall be of no force or effect unless contained in a subsequent written modification signed by the party to be charged. This Agreement may be amended, waived or modified only by a written instrument executed by the Parties.

**8.3 Successors and Assigns.** This Agreement shall be binding upon, and shall inure to the benefit of, and shall be enforceable by, the Parties and their respective successors and permitted assigns. Neither this Agreement, nor any right hereunder, may be assigned by any Party without the prior written consent of the other Party; except that consent shall not be required for an assignment by Purchaser to any direct or indirect subsidiary of Purchaser, provided that Purchaser shall provide written notice to the Company of any such assignment.

**8.4 Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN SUCH STATE WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THEREOF.

**8.5 Expenses, Etc.** The Company and the Purchaser shall bear their own expenses and legal fees incurred on their behalf with respect to this Agreement and the transactions contemplated hereby; provided, that the Company shall pay the reasonable, documented fees and expenses of legal counsel to the Purchaser with respect to this Agreement and the transactions contemplated hereby.

**8.6 Captions.** The captions contained in this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision contained herein.

**8.7 Severability.** The invalidity or unenforceability of any section, paragraph or provision of this Agreement shall not affect the validity or enforceability of any other section, paragraph or provision hereof. If any section, paragraph or provision of this Agreement is for any reason determined to be invalid or unenforceable, there shall be deemed to be made such minor changes (and only such minor changes) as are necessary to make it valid and enforceable.

**8.8 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall constitute an original but all of which, taken together, shall constitute but one agreement.

**8.9 No Waiver.** Any failure of a Party to enforce any of the provisions of this Agreement or to require compliance with any of its terms at any time during the pendency of this Agreement shall in no way affect the validity of this Agreement, or any part hereof, and shall not be deemed a waiver of the right of such Party thereafter to enforce any and each such provision.

IN WITNESS WHEREOF, the Purchaser and the Company have caused this Agreement to be duly executed and delivered.

SANDRIDGE ENERGY, INC.

By: /s/ Tom L. Ward
Name: Tom L. Ward
Title: Chief Executive Officer

PURCHASER:

FAIRFAX FINANCIAL HOLDINGS LIMITED

By: /s/ Paul Rivett
Name: Paul Rivett
Title: Vice President and Chief Legal Officer

EXHIBIT A

FORM OF CERTIFICATE OF DESIGNATION FOR 6.0% CONVERTIBLE PERPETUAL PREFERRED STOCK

EXHIBIT B

FORM OF OPINION OF COVINGTON & BURLING LLP

The following opinion is subject to customary assumptions and qualifications.

(i) The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.

(ii) The Company has duly authorized, executed and delivered each of the Purchase Agreement and the Certificate of Designation.

(iii) The shares of Common Stock (the "*Conversion Shares*") initially issuable upon conversion of the Shares have been duly authorized and reserved for issuance upon such conversion. Upon issuance, sale and delivery of any Conversion Shares in accordance with the terms of the Certificate of Designation and receipt by the Company of the consideration specified therein, such Conversion Shares will be validly issued, fully paid and non-assessable and will be free of any preemptive rights or, to our knowledge, any similar rights set forth in the Company's Amended and Restated Certificate of Incorporation or in the General Corporation Law of the State of Delaware (the " *DGCL*").

(iv) The issuance of the Shares and the execution and delivery of the Purchase Agreement by the Company and the consummation by the Company of the transactions contemplated thereby in accordance with the terms thereof do not (i) breach the provisions of the Company's Amended and Restated Certificate of Incorporation or Amended and Restated Bylaws; (ii) breach the provisions of, or cause a default or a Debt Repayment Triggering Event under, the Credit Agreement, dated November 21, 2006, by and among the Company (as successor by merger to Riata Energy, Inc.) and Bank of America, N.A., as Administrative Agent and Banc of America Securities LLC as Lead Arranger and Book Running Manager, as amended; or (iii) violate the DGCL or any New York or Federal statute , law, rule or regulation known to such counsel to which the Company is subject; provided however, such counsel need not express any opinion in this paragraph (iv) with respect to state securities laws or blue sky laws, rules or regulations or any state or Federal anti-fraud statute, rule or regulation.

(v) The Company is not and, after giving effect to the offering and sale of the Shares and the application of the proceeds thereof, will not be an "investment company" as defined in the Investment Company Act of 1940, as amended.

(vi) Based upon and assuming the accuracy of the representations and warranties, and compliance with the covenants, set forth in the Purchase Agreement, it is not necessary in connection with the issuance and sale to the Purchaser of the Shares pursuant to the Purchase Agreement to register the Shares under the Securities Act of 1933. Such counsel need express no opinion as to when or under what circumstances any Shares initially sold by the Company may be reoffered or resold.

EXHIBIT C

FORM OF OPINION OF IN-HOUSE COMPANY COUNSEL

The following opinion is subject to customary assumptions and qualifications.

(i) The Company has corporate power and authority to perform its obligations under the Purchase Agreement and the Certificate of Designation.

(ii) The Company is duly qualified as a foreign corporation to transact business and is in good standing in each other jurisdiction in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except for such jurisdictions where the failure to so qualify or to be in good standing would not, individually or in the aggregate, have a Material Adverse Effect.

(iii) The Company and each subsidiary possesses such valid and current certificates, authorizations or permits issued by the appropriate state, Federal or foreign regulatory agencies or bodies necessary to conduct their respective businesses, and, to such counsel's knowledge, neither the Company nor any subsidiary has received any notice of proceedings relating to the revocation or modification of, or non-compliance with, any such certificate, authorization or permit which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, could have a Material Adverse Effect.

(iv) After due inquiry, such counsel does not know of any legal or governmental actions, suits or proceedings pending or, to the best of such counsel's knowledge, threatened (i) against or affecting the Company or any of its subsidiaries, (ii) which has as the subject thereof any officer or director of, or property owned or leased by, the Company or any of its subsidiaries or (iii) relating to environmental or discrimination matters, where in any such case (A) there is a reasonable possibility that such action, suit or proceeding might be determined adversely to the Company or such subsidiary and (B) any such action, suit or proceeding, if so determined adversely, would reasonably be expected to, singly or in the aggregate, have a Material Adverse Effect or adversely affect the consummation of the transactions contemplated by this Agreement. After due inquiry, such counsel does not know of any existing or, to the best of such counsel's knowledge, threatened or pending, material labor dispute with the employees of the Company or any of its subsidiaries.

(v) To the best knowledge of such counsel, neither the Company nor any subsidiary is in violation of its charter, by-laws or other organizational document, as the case may be.

In rendering such opinion, such counsel may rely as to matters involving the application of laws of any jurisdiction other than the General Corporation Law of the State of Delaware, the laws of the State of Texas, or the Federal law of the United States, to the extent they deem proper and specified in such opinion, upon the opinion (which shall be dated the Closing Date shall be satisfactory in form and substance to the Purchaser, shall expressly state that the Purchaser may rely on such opinion as if it were addressed to them and shall be furnished to the Purchaser) of other counsel of good standing whom they believe to be reliable and who are satisfactory to counsel for the Purchaser.

**Exhibit 23.1**

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statements on Form S-3 (Nos. 333-158556 and 333-158554) and Registration Statements on Form S-8 (Nos. 333-160527, 333-155441 and 333-148299) of SandRidge Energy, Inc., of our report dated March 1, 2010 relating to the consolidated financial statements and the effectiveness of internal control over financial reporting, which appears in this Form 10-K .

PricewaterhouseCoopers LLP

Houston, Texas
March 1, 2010

**Exhibit 23.2**

DEGOLYER AND MACNAUGHTON
500 | SPRING VALLEY ROAD
SUITE 800 EAST
Dallas, Texas 75244

February 26, 2010

SandRidge Energy, Inc.
123 Robert S. Kerr Avenue
Oklahoma City, OK 73102

Ladies and Gentlemen:

We hereby consent to the use by SandRidge Energy, Inc. (SandRidge), in its Annual Report on Form 10-K for the year ended December 31, 2009, filed with the U.S. Securities and Exchange Commission on or about March 1, 2010, including any amendments thereto, of the name DeGolyer and MacNaughton and to the inclusion therein of references in "Part I, Item 1 Business" and "Notes to Consolidated Financial Statements" to our "Appraisal Report as of December 31, 2007 on Certain Properties owned by PetroSource, Energy Company" and "Appraisal Report as of December 31, 2008 on Certain Properties owned by SandRidge Tertiary, LLC," and to the inclusion of our third party letter report dated February 5, 2010, containing our opinion on the proved reserves attributable to certain properties owned by SandRidge, and to the incorporation by reference thereof into Sandridge's Registration Statements on Form S-3 (File Nos. 333-158556 and 333-158554) and Registration Statements on Form S-8 (File Nos. 333-160527, 333-155441 and 333-148299).

Very truly yours,

/s/ DeGOLYER and MacNAUGHTON

DeGOLYER and MacNAUGHTON

Exhibit 23.3

NETHERLAND, SEWELL & ASSOCIATES, INC.

CONSENT OF INDEPENDENT PETROLEUM ENGINEERS AND GEOLOGISTS

We hereby consent to the use by SandRidge Energy, Inc. (the "Company"), of our name and to the inclusion of information taken from the reports listed below in the Company's Annual Report on Form 10-K for the year ended December 31, 2009, filed with the U.S. Securities and Exchange Commission on March 1, 2010, including any amendments thereto, as well as to the incorporation by reference thereof into the Company's Registration Statements on Form S-3 (File Nos. 333-158556 and 333-158554) and Registration Statements on Form S-8 (File Nos. 333-160527, 333-155441 and 333-148299):

December 31, 2009, SandRidge Energy, Inc. Interest in Certain Properties located in the United States - SEC Price Case

December 31, 2008, SandRidge Energy, Inc. Interest in Certain Properties located in the United States - SEC Price Case

December 31, 2007, SandRidge Energy, Inc. Interest in Certain Properties located in the United States - SEC Price Case

**NETHERLAND, SEWELL & ASSOCIATES, INC.**

By: /s/ C. H. (Scott) Rees III, P.E.
C. H. (Scott) Rees III, P.E.
Chairman and Chief Executive Officer

Dallas, Texas
February 22, 2010

Please be advised that the digital document you are viewing is provided by Netherland, Sewell & Associates, Inc. (NSAI) as a convenience to our clients. The digital document is intended to be substantively the same as the original signed document maintained by NSAI. The digital document is subject to the parameters, limitations, and conditions stated in the original document. In the event of any differences between the digital document and the original document, the original document shall control and supersede the digital document.

**Exhibit 23.4**

# LEE KEELING AND ASSOCIATES, INC.

## PETROLEUM CONSULTANTS

**TULSA OFFICE**
First Place Tower
15 East Fifth Street • Suite 3500
Tulsa, Oklahoma 74103-4350
(918) 587-5521 • Fax: (918) 587-2881

**HOUSTON OFFICE**
Kellog Brown and Root Tower
601 Jefferson Ave. • Suite 3790
Houston, Texas 77002-7912
(713) 651-8006 • Fax: (281) 754-4934

February 26, 2010

SandRidge Energy, Inc.
123 Robert S. Kerr Avenue
Oklahoma City, OK 73102

Ladies and Gentlemen:

We hereby consent to the use by SandRidge Energy, Inc. (the "Company") in its Annual Report on Form 10-K for the year ended December 31, 2009, filed with the U.S. Securities and Exchange Commission on or about March 1, 2010, including any amendments thereto, of our name and to the inclusion therein of references to our "Estimated Proved Reserves and Future Net Flow of SandRidge Energy, Inc. Effective December 31, 2009" and to the incorporation by reference thereof into the Company's Registration Statements on Form S-3 (File Nos. 333-158556 and 333-158554) and Registration Statements on Form S-8 (File Nos. 333-160527, 333-155441 and 333-148299).

**LEE KEELING AND ASSOCIATES, INC.**

By: Lee Keeling and Associates, Inc.

**WWW.LKAENGINEERS.COM**

**Exhibit 31.1**

**Certification of the Company's Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 7241)**

I, Tom L. Ward, certify that:

1. I have reviewed this annual report on Form 10-K of SandRidge Energy, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Ace Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Tom L. Ward

Tom L. Ward
President, Chief Executive Officer and
Chairman of the Board

Date: March 1, 2010

**Exhibit 31.2**

**Certification of the Company's Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 7241)**

I, Dirk M. Van Doren, certify that:

1. I have reviewed this annual report on Form 10-K of SandRidge Energy, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Dirk M. Van Doren

Dirk M. Van Doren
Executive Vice President and Chief Financial Officer

Date: March 1, 2010

**Exhibit 32.1**

**Certification of the Company's Chief Executive Officer and Chief Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350)**

Pursuant to 18 U.S.C. § 1350, the undersigned officers of SandRidge Energy, Inc. (the "Company"), hereby certify that the Company's Annual Report on Form 10-K for the year ended December 31, 2009 (the "Report"), fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Tom L. Ward

Tom L. Ward
President, Chief Executive Officer and
Chairman of the Board

March 1, 2010

/s/ Dirk M. Van Doren

Dirk M. Van Doren
Executive Vice President and Chief Financial Officer

March 1, 2010

**Exhibit 99.1**

**DeGolyer and MacNaughton**
5001 Spring Valley Road
Suite 800 East
Dallas, Texas 75244

February 5, 2010

SandRidge Tertiary, LLC
6 Desta Drive
Midland, TX 79705

Gentlemen:

Pursuant to your request, we have prepared estimates of the extent and value of the net proved crude oil, condensate, natural gas liquids (NGL), and natural gas reserves, as of December 31, 2009, of certain properties owned by SandRidge Tertiary, LLC (SandRidge). The properties appraised are located in Gaines, Hockley, and Terry Counties, Texas. SandRidge is a wholly owned subsidiary of SandRidge Energy, Inc. SandRidge has represented that these properties account for 100 percent of SandRidge and 9.6 percent of SandRidge Energy, Inc.'s net proved reserves as of December 31, 2009.

Estimates of proved reserves presented in this report have been prepared in compliance with the regulations promulgated by the United States Securities and Exchange Commission (SEC). These reserves definitions are discussed in detail in the Definition of Reserves section of this report.

Reserves included herein are expressed as net reserves. Gross reserves are defined as the total estimated petroleum to be produced from these properties after December 31, 2009. Net reserves are defined as that portion of the gross reserves attributable to the interests owned by SandRidge after deducting all interests owned by others. Gas quantities estimated herein are expressed as sales gas. Sales gas is defined as that portion of the total gas to be delivered into a gas pipeline for sale after separation, processing, fuel use, and flare. Gas reserves are expressed at a temperature base of 60 degrees Fahrenheit (°F) and at a pressure base of 14.65 pounds per square inch absolute (psia). Condensate reserves estimated herein are those to be recovered by conventional lease separation.

Values of proved reserves shown herein are expressed in terms of estimated future gross revenue, future net revenue, and present worth. Future gross revenue is that revenue which will accrue to the appraised interests from the production and sale of the estimated net reserves. Future net revenue is calculated by deducting estimated severance taxes, ad valorem taxes, operating expenses, and capital costs from the future gross revenue. Operating expenses include field operating expenses, transportation expenses, compression charges, and an allocation of overhead that directly relates to production activities. Future income tax expenses were not taken into account in the preparation of these estimates. Present worth is defined as future net revenue discounted at a specified arbitrary discount rate compounded monthly over the expected period of realization.

Estimates of oil, condensate, NGL, and natural gas should be regarded only as estimates that may change as further production history and additional information become available. Not only are such reserves estimates based on that information which is currently available, but such estimates are also subject to the uncertainties inherent in the application of judgmental factors in interpreting such information.

Data used in this audit were obtained from reviews with SandRidge personnel, SandRidge files, from records on file with the appropriate regulatory agencies, and from public sources. Additionally, this information includes data supplied by Petroleum Information/Dwights LLC; Copyright 2009 Petroleum Information/Dwights LLC. In the preparation of this report we have relied, without independent verification, upon such information furnished by SandRidge with respect to property interests, production from such properties, current costs of operation and development, current prices for production, agreements relating to current and future operations and sale of production, and various other information and data that were accepted as represented. A field examination of the properties was not considered necessary for the purposes of this report.

**Methodology and Procedures**

Estimates of reserves were prepared by the use of standard geological and engineering methods generally accepted by the petroleum industry. The method or combination of methods used in the analysis of each reservoir was tempered by experience with similar reservoirs, stage of development, quality and completeness of basic data, and production history.

When applicable, the volumetric method was used to estimate the original oil in place (OOIP) and the original gas in place (OGIP). Structure and isopach maps were constructed to estimate reservoir volume. Electrical logs, radioactivity logs, core analyses, and other available data were used to prepare these maps as well as to estimate representative values for porosity and

water saturation. When adequate data were available and when circumstances justified, material balance and other engineering methods were used to estimate OOIP or OGIP.

Estimates of ultimate recovery were obtained after applying recovery factors to OOIP or OGIP. These recovery factors were based on consideration of the type of energy inherent in the reservoirs, analyses of the petroleum, the structural positions of the properties, and the production histories. When applicable, material balance and other engineering methods were used to estimate recovery factors. An analysis of reservoir performance, including production rate, reservoir pressure, and gas-oil ratio behavior, was used in the estimation of reserves.

For depletion-type reservoirs or those whose performance disclosed a reliable decline in producing-rate trends or other diagnostic characteristics, reserves were estimated by the application of appropriate decline curves or other performance relationships. In the analyses of production-decline curves, reserves were estimated only to the limits of economic production or to the limit of the production licenses as appropriate.

**Definition of Reserves**

Petroleum reserves included in this report are classified as proved. Only proved reserves have been evaluated for this report. Reserves classifications used in this report are in accordance with the reserves definitions of Rules 4–10(a) (1)–(32) of Regulation S–X of the SEC. Reserves are judged to be economically producible in future years from known reservoirs under existing economic and operating conditions and assuming continuation of current regulatory practices using conventional production methods and equipment. In the analyses of production-decline curves, reserves were estimated only to the limit of economic rates of production under existing economic and operating conditions using prices and costs consistent with the effective date of this report, including consideration of changes in existing prices provided only by contractual arrangements but not including escalations based upon future conditions. The petroleum reserves are classified as follows:

*Proved oil and gas reserves* – Proved oil and gas reserves are those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible—from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations—prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probabilistic methods are used for the estimation. The project to extract the hydrocarbons must have commenced or the operator must be reasonably certain that it will commence the project within a reasonable time.

(i) The area of the reservoir considered as proved includes:

(A) The area identified by drilling and limited by fluid contacts, if any, and (B) Adjacent undrilled portions of the reservoir that can, with reasonable certainty, be judged to be continuous with it and to contain economically producible oil or gas on the basis of available geoscience and engineering data.

(ii) In the absence of data on fluid contacts, proved quantities in a reservoir are limited by the lowest known hydrocarbons (LKH) as seen in a well penetration unless geoscience, engineering, or performance data and reliable technology establishes a lower contact with reasonable certainty.

(iii) Where direct observation from well penetrations has defined a highest known oil (HKO) elevation and the potential exists for an associated gas cap, proved oil reserves may be assigned in the structurally higher portions of the reservoir only if geoscience, engineering, or performance data and reliable technology establish the higher contact with reasonable certainty.

(iv) Reserves which can be produced economically through application of improved recovery techniques (including, but not limited to, fluid injection) are included in the proved classification when:

(A) Successful testing by a pilot project in an area of the reservoir with properties no more favorable than in the reservoir as a whole, the operation of an installed program in the reservoir or an analogous reservoir, or other evidence using reliable technology establishes the reasonable certainty of the engineering analysis on which the project or

program was based; and (B) The project has been approved for development by all necessary parties and entities, including governmental entities.

(v) Existing economic conditions include prices and costs at which economic producibility from a reservoir is to be determined. The price shall be the average price during the 12-month period prior to the ending date of the period covered by the report, determined as an unweighted arithmetic average of the first-day-of-the-month price for each month within such period, unless prices are defined by contractual arrangements, excluding escalations based upon future conditions.

*Developed oil and gas reserves* – Developed oil and gas reserves are reserves of any category that can be expected to be recovered:

(i) Through existing wells with existing equipment and operating methods or in which the cost of the required equipment is relatively minor compared to the cost of a new well; and

(ii) Through installed extraction equipment and infrastructure operational at the time of the reserves estimate if the extraction is by means not involving a well.

*Undeveloped oil and gas reserves* – Undeveloped oil and gas reserves are reserves of any category that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion.

(i) Reserves on undrilled acreage shall be limited to those directly offsetting development spacing areas that are reasonably certain of production when drilled, unless evidence using reliable technology exists that establishes reasonable certainty of economic producibility at greater distances.

(ii) Undrilled locations can be classified as having undeveloped reserves only if a development plan has been adopted indicating that they are scheduled to be drilled within five years, unless the specific circumstances, justify a longer time.

(iii) Under no circumstances shall estimates for undeveloped reserves be attributable to any acreage for which an application of fluid injection or other improved recovery technique is contemplated, unless such techniques have been proved effective by actual projects in the same reservoir or an analogous reservoir, as defined in [section 210.4–10 (a) Definitions], or by other evidence using reliable technology establishing reasonable certainty.

**Primary Economic Assumptions**

The following economic assumptions were used for estimating existing and future prices and costs:

*Oil Prices*

Prices used in this evaluation were based on local differentials to a West Texas Intermediate (WTI) price of $61.04 per barrel. The WTI base price is the average price for WTI crude on the first of each month during 2009. Local differentials are based on the difference between the actual price received and the WTI price on the first day of each month during 2009. The weighted average price over the lives of the properties was $54.56 per barrel.

*Natural Gas Prices*

Prices used in this evaluation were based on local differentials to a Henry Hub gas price of $3.87 per million British thermal units (MMBtu). The Henry Hub base price is the average price for Henry Hub gas on the first of each month during 2009. Local differentials are based on the difference between the actual price received and the Henry Hub price on the first day of each month during 2009. The weighted average price over the lives of the properties was $3.109 per thousand cubic feet (Mcf).

*NGL Prices*

Prices used in this evaluation were based on local differentials to a WTI price of $61.04 per barrel. The WTI base price is the average price for WTI crude on the first of each month during 2009. Local differentials are

based on the difference between the actual price received for NGL and the WTI price on the first day of each month during 2009. The weighted average price over the lives of the properties was $28.25 per barrel.

*Operating Expenses and Capital Costs*

Current operating expenses and capital costs, based on information provided by SandRidge were used in estimating future expenses and costs required to operate the properties. In certain cases, future expenses, either higher or lower than current expenses, may have been used because of anticipated changes in operating conditions. Initial operating expenses were held constant for the lives of the properties and not escalated for inflation. Future capital costs were estimated using 2009 values and were not escalated for inflation.

While the oil and gas industry may be subject to regulatory changes from time to time that could affect an industry participant's ability to recover its oil and gas reserves, we are not aware of any such governmental actions which would restrict the recovery of the December 31, 2009, estimated oil and gas volumes. The reserves estimated in this report can be produced under current regulatory guidelines.

**Summary of Oil and Gas Reserves and Revenue**

The estimates of net proved reserves attributable to the properties appraised, as of December 31, 2009, are as follows, expressed in thousands of barrels (Mbbl) or millions of cubic feet (MMcf):

| | Oil and Condensate (Mbbl) | Natural Gas Liquids (Mbbl) | Sales Gas (MMcf) |
|---|---|---|---|
| Proved Developed Producing | 1,112 | 159 | 39 |
| Proved Developed Nonproducing | 48 | 0 | 31 |
| **Total Proved Developed** | **1,160** | **159** | **70** |
| Proved Undeveloped | 16,731 | 2,405 | 2,851 |
| **Total Proved** | **17,891** | **2,564** | **2,921** |

The estimated revenue and expenditures attributable to SandRidge's interests in the proved reserves, as of December 31, 2009, of the properties appraised under the aforementioned

assumptions concerning future prices and costs are summarized as follows, expressed in thousands of dollars (M$):

| | Proved | | | |
|---|---|---|---|---|
| | Developed Producing (M$) | Developed Nonproducing (M$) | Undeveloped (M$) | Total Proved (M$) |
| Future Gross Revenue | 66,183 | 2,672 | 988,802 | 1,057,657 |
| Production and Ad Valorem Taxes | 4,763 | 190 | 66,599 | 71,552 |
| Operating Expenses | 18,474 | 317 | 452,289 | 471,080 |
| Capital Costs | 24 | 162 | 108,128 | 108,314 |
| Future Net Revenue* | 42,922 | 2,003 | 361,786 | 406,711 |
| Present Worth at 10 Percent* | 25,570 | 1,049 | 78,433 | 105,052 |

* Future income taxes have not been taken into account in the preparation of these estimates.
Note: Numbers in tables may not add due to rounding.

In our opinion, the information relating to estimated proved reserves, estimated future net revenue from proved reserves, and present worth of estimated future net revenue from proved reserves of oil, condensate, natural gas liquids, and gas contained in this report has been prepared in accordance with Paragraphs 932-235-50-4, 932-235-50-6, 932-235-50-7, 932-235-50-9, 932-235-50-30, and 932-235-50-31(a), (b), and (e) of the Accounting Standards Update 932-235-50, *Extractive Industries – Oil and Gas (Topic 932): Oil and Gas Reserve Estimation and Disclosures* (January 2010) of the Financial Accounting Standards Board and Rules

4–10(a) (1)–(32) of Regulation S–X and Rules 302(b), 1201, 1202(a) (1), (2), (3), (4), (8), and 1203(a) of Regulation S–K of the Securities and Exchange Commission; provided, however, future income tax expenses have not been taken into account in estimating the future net revenue and present worth values set forth herein.

DeGolyer and MacNaughton is an independent petroleum engineering consulting firm that has been providing petroleum consulting services throughout the world for over 70 years. DeGolyer and MacNaughton does not have any financial interest, including stock ownership, in SandRidge. Our fees were not contingent on the results of our evaluation. This letter report has been prepared at the request of SandRidge and should not be used for purposes other than those for which it is intended. DeGolyer and MacNaughton has used all procedures and methods that it considers necessary to prepare this report.

Submitted,

/s/ DeGolyer and MacNaughton

DeGOLYER and MacNAUGHTON
Texas Registered Engineering Firm F-716

/s/ Paul J. Szatkowski, P.E.

Paul J. Szatkowski, P.E.
Senior Vice President
DeGolyer and MacNaughton

**CERTIFICATE of QUALIFICATION**

I, Paul J. Szatkowski, Petroleum Engineer with DeGolyer and MacNaughton, 5001 Spring Valley Road, Suite 800 East, Dallas, Texas, 75244 U.S.A., hereby certify:

1. That I am a Senior Vice President with DeGolyer and MacNaughton, which company did prepare the letter report addressed to SandRidge dated February 5, 2010, and that I, as Senior Vice President, was responsible for the preparation of this report.
2. That I attended Texas A&M University, and that I graduated with a Bachelor of Science degree in Petroleum Engineering in the year 1974; that I am a Registered Professional Engineer in the State of Texas; that I am a member of the International Society of Petroleum Engineers and the American Association of Petroleum Geologists; and that I have in excess of 35 years of experience in the oil and gas reservoir studies and reserves evaluations.

SIGNED: February 5, 2010

/s/ Paul J. Szatkowski, P.E.
Paul J. Szatkowski, P.E.
Senior Vice President
DeGolyer and MacNaughton

**Exhibit 99.2**

NETHERLAND, SEWELL & ASSOCIATES, INC.
**WORLDWIDE PETROLEUM CONSULTANTS**
ENGINEERING • GEOLOGY • GEOPHYSICS • PETROPHYSICS

**CHAIRMAN & CEO**
C. H. (SCOTT) REES III
**PRESIDENT & COO**
DANNY D. SIMMONS
**EXECUTIVE VP**
G. LANCE BINDER

**EXECUTIVE COMMITTEE**
P. SCOTT FROST - DALLAS
J. CARTER HENSON, JR. - HOUSTON
DAN PAUL SMITH - DALLAS
JOSEPH J. SPELLMAN - DALLAS
THOMAS J. TELLA II - DALLAS

February 11, 2010

Mr. Matthew K. Grubb
SandRidge Energy, Inc.
1601 Northwest Expressway, Suite 1600
Oklahoma City, Oklahoma 73118

Dear Mr. Grubb:

In accordance with your request, we have estimated the proved reserves and future revenue, as of December 31, 2009, to the SandRidge Energy, Inc. (SandRidge) interest in certain oil and gas properties located in the United States. It is our understanding that the proved reserves estimated in this report constitute approximately 50 percent of all proved reserves owned by SandRidge. The estimates in this report have been prepared in accordance with the definitions and guidelines of the U.S. Securities and Exchange Commission (SEC) and, with the exception of the exclusion of future income taxes, conform to the FASB Accounting Standards Codification Topic 932, Extractive Activities—Oil and Gas. Definitions are presented immediately following this letter. This report has been prepared for SandRidge's use in filing with the SEC.

We estimate the net reserves and future net revenue to the SandRidge interest in these properties, as of December 31, 2009, to be:

| | Net Reserves | | Future Net Revenue (M$) | |
|---|---|---|---|---|
| Category | Oil (MBBL) | Gas (MMCF) | Total | Present Worth at 10% |
| Proved Developed Producing | 12,950.9 | 419,834.8 | 866,913.1 | 584,480.9 |
| Proved Developed Non-Producing | 1,001.0 | 59,397.2 | 106,644.4 | 48,066.3 |
| Proved Undeveloped | 11,703.7 | 45,271.1 | 372,037.9 | 178,362.4 |
| Total Proved | 25,655.7 | 524,503.0 | 1,345,595.4 | 810,909.6 |

*Totals may not add because of rounding.*

The oil reserves shown include crude oil, condensate, and natural gas liquids. Oil volumes are expressed in thousands of barrels (MBBL); a barrel is equivalent to 42 United States gallons. Gas volumes are expressed in millions of cubic feet (MMCF) at standard temperature and pressure bases.

The estimates shown in this report are for proved reserves. No study was made to determine whether probable or possible reserves might be established for these properties. This report does not include any value that could be attributed to interests in undeveloped acreage beyond those tracts for which undeveloped reserves have been estimated. Reserves categorization conveys the relative degree of certainty; reserves subcategorization is based on development and production status. The estimates of reserves and future revenue included herein have not been adjusted for risk.

Future gross revenue to the SandRidge interest is prior to deducting state production taxes and ad valorem taxes. Future net revenue is after deductions for these taxes, future capital costs, operating expenses, and abandonment costs but before consideration of federal income taxes. The future net revenue has been discounted at an annual rate of 10 percent to determine its present worth. The present worth is shown to indicate the effect of time on the value of money and should not be construed as being the fair market value of the properties.

4500 THANKSGIVING TOWER • 1601 ELM STREET • DALLAS, TEXAS 75201-4754 • PH: 214-969-5401 • FAX: 214-969-5411
1221 LAMAR STREET, SUITE 1200 • HOUSTON, TEXAS 77010-3072 • PH: 713-654-4950 • FAX: 713-654-4951
nsai@nsai-petro.com
netherlandsewell.com

NETHERLAND, SEWELL & ASSOCIATES, INC.

For the purposes of this report, we did not perform any field inspection of the properties, nor did we examine the mechanical operation or condition of the wells and facilities. We have not investigated possible environmental liability related to the properties; therefore, our estimates do not include any costs due to such possible liability. Our estimates do not include any salvage value for the lease and well equipment or the cost of abandoning the properties, except for the West Texas Overthrust (WTO) Fields and the Gulf of Mexico properties. Future revenue estimates for these properties do include SandRidge's estimates of the costs to abandon the wells, platforms, and production facilities. Abandonment costs are included as capital costs.

Prices used in this report are based on the 12-month unweighted arithmetic average of the first-day-of-the-month price for the period January through December 2009. For oil volumes, the average West Texas Intermediate posted price of $57.65 per barrel is adjusted by lease for quality, transportation fees, and regional price differentials. For gas volumes, the average Henry Hub spot price of $3,866 per MMBTU is adjusted by lease for energy content, transportation fees, and regional price differentials. All prices are held constant throughout the lives of the properties.

Lease and well operating costs used in this report are based on operating expense records of SandRidge. These costs include the per-well overhead expenses allowed under joint operating agreements along with estimates of costs to be incurred at and below the district and field levels. Headquarters general and administrative overhead expenses of SandRidge are included to the extent that they are covered under joint operating agreements for the operated properties. Lease and well operating costs are held constant throughout the lives of the properties. Capital costs are included as required for workovers, new development wells, and production equipment. The future capital costs are held constant to the date of expenditure.

We have made no investigation of potential gas volume and value imbalances resulting from overdelivery or underdelivery to the SandRidge interest. Therefore, our estimates of reserves and future revenue do not include adjustments for the settlement of any such imbalances; our projections are based on SandRidge receiving its net revenue interest share of estimated future gross gas production.

The reserves shown in this report are estimates only and should not be construed as exact quantities. Proved reserves are those quantities of oil and gas which, by analysis of engineering and geoscience data, can be estimated with reasonable certainty to be economically producible. If the reserves are recovered, the revenues therefrom and the costs related thereto could be more or less than the estimated amounts. Because of governmental policies and uncertainties of supply and demand, the sales rates, prices received for the reserves, and costs incurred in recovering such reserves may vary from assumptions made while preparing this report. Estimates of reserves may increase or decrease as a result of future operations, market conditions, or changes in regulations.

For the purposes of this report, we used technical and economic data including, but not limited to, well logs, geologic maps, well test data, production data, historical price and cost information, and property ownership interests. The reserves in this report have been estimated using deterministic methods; these estimates have been prepared in accordance with generally accepted petroleum engineering and evaluation principles. We used standard engineering and geoscience methods, or a combination of methods, such as performance analysis, volumetric analysis, analogy, and reservoir modeling, that we considered to be appropriate and necessary to establish reserves quantities and reserves categorization that conform to SEC definitions and guidelines. In evaluating the information at our disposal concerning this report, we have excluded from our consideration all matters as to which the controlling interpretation may be legal or accounting, rather than engineering and geoscience. As in all aspects of oil and gas evaluation, there are uncertainties inherent in the interpretation of engineering and geoscience data; therefore, our conclusions necessarily represent only informed professional judgment.

NETHERLAND, SEWELL & ASSOCIATES, INC.

The titles to the properties have not been examined by Netherland, Sewell & Associates, Inc. (NSAI), nor has the actual degree or type of interest owned been independently confirmed. The data used in our estimates were obtained from SandRidge and the nonconfidential files of NSAI and were accepted as accurate. Supporting geoscience, field performance, and work data are on file in our office. The technical persons responsible for preparing the reserves estimates presented herein meet the requirements regarding qualifications, independence, objectivity, and confidentiality set forth in the Standards Pertaining to the Estimating and Auditing of Oil and Gas Reserves Information promulgated by the Society of Petroleum Engineers. We are independent petroleum engineers, geologists, geophysicists, and petrophysicists; we do not own an interest in these properties and are not employed on a contingent basis.

Sincerely,

**NETHERLAND, SEWELL & ASSOCIATES, INC.**
Texas Registered Engineering Firm F-002699

By: /s/ C. H. (Scott) Rees III
C.H. (Scott) Rees III, P. E.
Chairman and Chief Executive Officer

By: /s/ David T. Miller
David T. Miller, P. E. 96134
Vice President

Date Signed: February 11, 2010

By: /s/ Jay P. Mitchell
Jay P. Mitchell, P. G. 1649
Vice President

Date Signed: February 11, 2010

DTM:CLM

Please be advised that the digital document you are viewing is provided by Netherland, Sewell & Associates, Inc. (NSAI) as a convenience to our clients. The digital document is intended to be substantively the same as the original signed document maintained by NSAI. The digital document is subject to the parameters, limitations, and conditions stated in the original document. In the event of any differences between the digital document and the original document, the original document shall control and supersede the digital document.

NETHERLAND, SEWELL & ASSOCIATES, INC.

**DEFINITIONS OF OIL AND GAS RESERVES**

Adapted from U.S. Securities and Exchange Commission Regulation S-X Section 210.4-10(a)

The following definitions are set forth in U.S. Securities and Exchange Commission (SEC) Regulation S-X Section 210.4-10(a). Also included is supplemental information from (1) the 2007 Petroleum Resources Management System approved by the Society of Petroleum Engineers, (2) the FASB Accounting Standards Codification Topic 932, Extractive Activities—Oil and Gas, and (3) the SEC's Compliance and Disclosure Interpretations.

(1) *Acquisition of properties.* Costs incurred to purchase, lease or otherwise acquire a property, including costs of lease bonuses and options to purchase or lease properties, the portion of costs applicable to minerals when land including mineral rights is purchased in fee, brokers' fees, recording fees, legal costs, and other costs incurred in acquiring properties.

(2) *Analogous reservoir.* Analogous reservoirs, as used in resources assessments, have similar rock and fluid properties, reservoir conditions (depth, temperature, and pressure) and drive mechanisms, but are typically at a more advanced stage of development than the reservoir of interest and thus may provide concepts to assist in the interpretation of more limited data and estimation of recovery. When used to support proved reserves, an "analogous reservoir" refers to a reservoir that shares the following characteristics with the reservoir of interest:

(i) Same geological formation (but not necessarily in pressure communication with the reservoir of interest);

(ii) Same environment of deposition;

(iii) Similar geological structure; and

(iv) Same drive mechanism.

*Instruction to paragraph (a)(2):* Reservoir properties must, in the aggregate, be no more favorable in the analog than in the reservoir of interest.

(3) *Bitumen.* Bitumen, sometimes referred to as natural bitumen, is petroleum in a solid or semi-solid state in natural deposits with a viscosity greater than 10,000 centipoise measured at original temperature in the deposit and atmospheric pressure, on a gas free basis. In its natural state it usually contains sulfur, metals, and other non-hydrocarbons.

(4) *Condensate.* Condensate is a mixture of hydrocarbons that exists in the gaseous phase at original reservoir temperature and pressure, but that, when produced, is in the liquid phase at surface pressure and temperature.

(5) *Deterministic estimate.* The method of estimating reserves or resources is called deterministic when a single value for each parameter (from the geoscience, engineering, or economic data) in the reserves calculation is used in the reserves estimation procedure.

(6) *Developed oil and gas reserves.* Developed oil and gas reserves are reserves of any category that can be expected to be recovered:

(i) Through existing wells with existing equipment and operating methods or in which the cost of the required equipment is relatively minor compared to the cost of a new well; and

(ii) Through installed extraction equipment and infrastructure operational at the time of the reserves estimate if the extraction is by means not involving a well.

*Supplemental definitions from the 2007 Petroleum Resources Management System:*

*Developed Producing Reserves – Developed Producing Reserves are expected to be recovered from completion intervals that are open and producing at the time of the estimate. Improved recovery reserves are considered producing only after the improved recovery project is in operation.*

*Developed Non-Producing Reserves – Developed Non-Producing Reserves include shut-in and behind-pipe Reserves. Shut-in Reserves are expected to be recovered from (1) completion intervals which are open at the time of the estimate but which have not yet started producing, (2) wells which were shut-in for market conditions or pipeline connections, or (3) wells not capable of production for mechanical reasons. Behind-pipe Reserves are expected to be recovered from zones in existing wells which will require additional completion work or future recompletion prior to start of production. In all cases, production can be initiated or restored with relatively low expenditure compared to the cost of drilling a new well.*

(7) *Development costs.* Costs incurred to obtain access to proved reserves and to provide facilities for extracting, treating, gathering and storing the oil and gas. More specifically, development costs, including depreciation and applicable operating costs of support equipment and facilities and other costs of development activities, are costs incurred to:

(i) Gain access to and prepare well locations for drilling, including surveying well locations for the purpose of determining specific development drilling sites, clearing ground, draining, road building, and relocating public roads, gas lines, and power lines, to the extent necessary in developing the proved reserves.

(ii) Drill and equip development wells, development-type stratigraphic test wells, and service wells, including the costs of platforms and of well equipment such as casing, tubing, pumping equipment, and the wellhead assembly.

**DEFINITIONS OF OIL AND GAS RESERVES**
Adapted from U.S. Securities and Exchange Commission Regulation S-X Section 210.4-10(a)

(iii) Acquire, construct, and install production facilities such as lease flow lines, separators, treaters, heaters, manifolds, measuring devices, and production storage tanks, natural gas cycling and processing plants, and central utility and waste disposal systems.

(iv) Provide improved recovery systems.

(8) *Development project.* A development project is the means by which petroleum resources are brought to the status of economically producible. As examples, the development of a single reservoir or field, an incremental development in a producing field, or the integrated development of a group of several fields and associated facilities with a common ownership may constitute a development project.

(9) *Development well.* A well drilled within the proved area of an oil or gas reservoir to the depth of a stratigraphic horizon known to be productive.

(10) *Economically producible.* The term economically producible, as it relates to a resource, means a resource which generates revenue that exceeds, or is reasonably expected to exceed, the costs of the operation. The value of the products that generate revenue shall be determined at the terminal point of oil and gas producing activities as defined in paragraph (a)(16) of this section.

(11) *Estimated ultimate recovery (EUR).* Estimated ultimate recovery is the sum of reserves remaining as of a given date and cumulative production as of that date.

(12) *Exploration costs.* Costs incurred in identifying areas that may warrant examination and in examining specific areas that are considered to have prospects of containing oil and gas reserves, including costs of drilling exploratory wells and exploratory-type stratigraphic test wells. Exploration costs may be incurred both before acquiring the related property (sometimes referred to in part as prospecting costs) and after acquiring the property. Principal types of exploration costs, which include depreciation and applicable operating costs of support equipment and facilities and other costs of exploration activities, are:

(i) Costs of topographical, geographical and geophysical studies, rights of access to properties to conduct those studies, and salaries and other expenses of geologists, geophysical crews, and others conducting those studies. Collectively, these are sometimes referred to as geological and geophysical or “G&G” costs.

(ii) Costs of carrying and retaining undeveloped properties, such as delay rentals, ad valorem taxes on properties, legal costs for title defense, and the maintenance of land and lease records.

(iii) Dry hole contributions and bottom hole contributions.

(iv) Costs of drilling and equipping exploratory wells.

(v) Costs of drilling exploratory-type stratigraphic test wells.

(13) *Exploratory well.* An exploratory well is a well drilled to find a new field or to find a new reservoir in a field previously found to be productive of oil or gas in another reservoir. Generally, an exploratory well is any well that is not a development well, an extension well, a service well, or a stratigraphic test well as those items are defined in this section.

(14) *Extension well.* An extension well is a well drilled to extend the limits of a known reservoir.

(15) *Field.* An area consisting of a single reservoir or multiple reservoirs all grouped on or related to the same individual geological structural feature and/or stratigraphic condition. There may be two or more reservoirs in a field which are separated vertically by intervening impervious strata, or laterally by local geologic barriers, or by both. Reservoirs that are associated by being in overlapping or adjacent fields may be treated as a single or common operational field. The geological terms “structural feature” and “stratigraphic condition” are intended to identify localized geological features as opposed to the broader terms of basins, trends, provinces, plays, areas-of-interest, etc.

(16) *Oil and gas producing activities*.

(i) Oil and gas producing activities include:

(A) The search for crude oil, including condensate and natural gas liquids, or natural gas (“oil and gas”) in their natural states and original locations;

(B) The acquisition of property rights or properties for the purpose of further exploration or for the purpose of removing the oil or gas from such properties;

(C) The construction, drilling, and production activities necessary to retrieve oil and gas from their natural reservoirs, including the acquisition, construction, installation, and maintenance of field gathering and storage systems, such as:

*(1)* Lifting the oil and gas to the surface; and

*(2)* Gathering, treating, and field processing (as in the case of processing gas to extract liquid hydrocarbons); and

**DEFINITIONS OF OIL AND GAS RESERVES**
Adapted from U.S. Securities and Exchange Commission Regulation S-X Section 210.4-10(a)

(D) Extraction of saleable hydrocarbons, in the solid, liquid, or gaseous state, from oil sands, shale, coalbeds, or other nonrenewable natural resources which are intended to be upgraded into synthetic oil or gas, and activities undertaken with a view to such extraction.

*Instruction 1 to paragraph (a)(16)(i):* The oil and gas production function shall be regarded as ending at a "terminal point", which is the outlet valve on the lease or field storage tank. If unusual physical or operational circumstances exist, it may be appropriate to regard the terminal point for the production function as:

a. The first point at which oil, gas, or gas liquids, natural or synthetic, are delivered to a main pipeline, a common carrier, a refinery, or a marine terminal; and

b. In the case of natural resources that are intended to be upgraded into synthetic oil or gas, if those natural resources are delivered to a purchaser prior to upgrading, the first point at which the natural resources are delivered to a main pipeline, a common carrier, a refinery, a marine terminal, or a facility which upgrades such natural resources into synthetic oil or gas.

*Instruction 2 to paragraph (a)(16)(i):* For purposes of this paragraph (a)(16), the term *saleable hydrocarbons* means hydrocarbons that are saleable in the state in which the hydrocarbons are delivered.

(ii) Oil and gas producing activities do not include:

(A) Transporting, refining, or marketing oil and gas;

(B) Processing of produced oil, gas, or natural resources that can be upgraded into synthetic oil or gas by a registrant that does not have the legal right to produce or a revenue interest in such production;

(C) Activities relating to the production of natural resources other than oil, gas, or natural resources from which synthetic oil and gas can be extracted; or

(D) Production of geothermal steam.

(17) *Possible reserves.* Possible reserves are those additional reserves that are less certain to be recovered than probable reserves.

(i) When deterministic methods are used, the total quantities ultimately recovered from a project have a low probability of exceeding proved plus probable plus possible reserves. When probabilistic methods are used, there should be at least a 10% probability that the total quantities ultimately recovered will equal or exceed the proved plus probable plus possible reserves estimates.

(ii) Possible reserves may be assigned to areas of a reservoir adjacent to probable reserves where data control and interpretations of available data are progressively less certain. Frequently, this will be in areas where geoscience and engineering data are unable to define clearly the area and vertical limits of commercial production from the reservoir by a defined project.

(iii) Possible reserves also include incremental quantities associated with a greater percentage recovery of the hydrocarbons in place than the recovery quantities assumed for probable reserves.

(iv) The proved plus probable and proved plus probable plus possible reserves estimates must be based on reasonable alternative technical and commercial interpretations within the reservoir or subject project that are clearly documented, including comparisons to results in successful similar projects.

(v) Possible reserves may be assigned where geoscience and engineering data identify directly adjacent portions of a reservoir within the same accumulation that may be separated from proved areas by faults with displacement less than formation thickness or other geological discontinuities and that have not been penetrated by a wellbore, and the registrant believes that such adjacent portions are in communication with the known (proved) reservoir. Possible reserves may be assigned to areas that are structurally higher or lower than the proved area if these areas are in communication with the proved reservoir.

(vi) Pursuant to paragraph (a)(22)(iii) of this section, where direct observation has defined a highest known oil (HKO) elevation and the potential exists for an associated gas cap, proved oil reserves should be assigned in the structurally higher portions of the reservoir above the HKO only if the higher contact can be established with reasonable certainty through reliable technology. Portions of the reservoir that do not meet this reasonable certainty criterion may be assigned as probable and possible oil or gas based on reservoir fluid properties and pressure gradient interpretations.

(18) *Probable reserves.* Probable reserves are those additional reserves that are less certain to be recovered than proved reserves but which, together with proved reserves, are as likely as not to be recovered.

(i) When deterministic methods are used, it is as likely as not that actual remaining quantities recovered will exceed the sum of estimated proved plus probable reserves. When probabilistic methods are used, there should be at least a 50% probability that the actual quantities recovered will equal or exceed the proved plus probable reserves estimates.

NETHERLAND, SEWELL & ASSOCIATES, INC.

**DEFINITIONS OF OIL AND GAS RESERVES**
Adapted from U.S. Securities and Exchange Commission Regulation S-X Section 210.4-10(a)

(ii) Probable reserves may be assigned to areas of a reservoir adjacent to proved reserves where data control or interpretations of available data are less certain, even if the interpreted reservoir continuity of structure or productivity does not meet the reasonable certainty criterion. Probable reserves may be assigned to areas that are structurally higher than the proved area if these areas are in communication with the proved reservoir.

(iii) Probable reserves estimates also include potential incremental quantities associated with a greater percentage recovery of the hydrocarbons in place than assumed for proved reserves.

(iv) See also guidelines in paragraphs (a)(17)(iv) and (a)(17)(vi) of this section.

(19) *Probabilistic estimate.* The method of estimation of reserves or resources is called probabilistic when the full range of values that could reasonably occur for each unknown parameter (from the geoscience and engineering data) is used to generate a full range of possible outcomes and their associated probabilities of occurrence.

(20) *Production costs.*

(i) Costs incurred to operate and maintain wells and related equipment and facilities, including depreciation and applicable operating costs of support equipment and facilities and other costs of operating and maintaining those wells and related equipment and facilities. They become part of the cost of oil and gas produced. Examples of production costs (sometimes called lifting costs) are:

(A) Costs of labor to operate the wells and related equipment and facilities.

(B) Repairs and maintenance.

(C) Materials, supplies, and fuel consumed and supplies utilized in operating the wells and related equipment and facilities.

(D) Property taxes and insurance applicable to proved properties and wells and related equipment and facilities.

(E) Severance taxes.

(ii) Some support equipment or facilities may serve two or more oil and gas producing activities and may also serve transportation, refining, and marketing activities. To the extent that the support equipment and facilities are used in oil and gas producing activities, their depreciation and applicable operating costs become exploration, development or production costs, as appropriate. Depreciation, depletion, and amortization of capitalized acquisition, exploration, and development costs are not production costs but also become part of the cost of oil and gas produced along with production (lifting) costs identified above.

(21) *Proved area.* The part of a property to which proved reserves have been specifically attributed.

(22) *Proved oil and gas reserves.* Proved oil and gas reserves are those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible—from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations—prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probabilistic methods are used for the estimation. The project to extract the hydrocarbons must have commenced or the operator must be reasonably certain that it will commence the project within a reasonable time.

(i) The area of the reservoir considered as proved includes:

(A) The area identified by drilling and limited by fluid contacts, if any, and

(B) Adjacent undrilled portions of the reservoir that can, with reasonable certainty, be judged to be continuous with it and to contain economically producible oil or gas on the basis of available geoscience and engineering data.

(ii) In the absence of data on fluid contacts, proved quantities in a reservoir are limited by the lowest known hydrocarbons (LKH) as seen in a well penetration unless geoscience, engineering, or performance data and reliable technology establishes a lower contact with reasonable certainty.

(iii) Where direct observation from well penetrations has defined a highest known oil (HKO) elevation and the potential exists for an associated gas cap, proved oil reserves may be assigned in the structurally higher portions of the reservoir only if geoscience, engineering, or performance data and reliable technology establish the higher contact with reasonable certainty.

(iv) Reserves which can be produced economically through application of improved recovery techniques (including, but not limited to, fluid injection) are included in the proved classification when:

(A) Successful testing by a pilot project in an area of the reservoir with properties no more favorable than in the reservoir as a whole, the operation of an installed program in the reservoir or an analogous reservoir, or other evidence using reliable technology establishes the reasonable certainty of the engineering analysis on which the project or program was based; and

**DEFINITIONS OF OIL AND GAS RESERVES**

Adapted from U.S. Securities and Exchange Commission Regulation S-X Section 210.4-10(a)

(B) The project has been approved for development by all necessary parties and entities, including governmental entities.

(v) Existing economic conditions include prices and costs at which economic producibility from a reservoir is to be determined. The price shall be the average price during the 12-month period prior to the ending date of the period covered by the report, determined as an unweighted arithmetic average of the first-day-of-the-month price for each month within such period, unless prices are defined by contractual arrangements, excluding escalations based upon future conditions.

(23) *Proved properties.* Properties with proved reserves.

(24) *Reasonable certainty.* If deterministic methods are used, reasonable certainty means a high degree of confidence that the quantities will be recovered. If probabilistic methods are used, there should be at least a 90% probability that the quantities actually recovered will equal or exceed the estimate. A high degree of confidence exists if the quantity is much more likely to be achieved than not, and, as changes due to increased availability of geoscience (geological, geophysical, and geochemical), engineering, and economic data are made to estimated ultimate recovery (EUR) with time, reasonably certain EUR is much more likely to increase or remain constant than to decrease.

(25) *Reliable technology.* Reliable technology is a grouping of one or more technologies (including computational methods) that has been field tested and has been demonstrated to provide reasonably certain results with consistency and repeatability in the formation being evaluated or in an analogous formation.

(26) *Reserves.* Reserves are estimated remaining quantities of oil and gas and related substances anticipated to be economically producible, as of a given date, by application of development projects to known accumulations. In addition, there must exist, or there must be a reasonable expectation that there will exist, the legal right to produce or a revenue interest in the production, installed means of delivering oil and gas or related substances to market, and all permits and financing required to implement the project.

*Note to paragraph (a)(26):* Reserves should not be assigned to adjacent reservoirs isolated by major, potentially sealing, faults until those reservoirs are penetrated and evaluated as economically producible. Reserves should not be assigned to areas that are clearly separated from a known accumulation by a non-productive reservoir (i.e., absence of reservoir, structurally low reservoir, or negative test results). Such areas may contain prospective resources (i.e., potentially recoverable resources from undiscovered accumulations).

*Excerpted from the FASB Accounting Standards Codification Topic 932, Extractive Activities—Oil and Gas:*

*932-235-50-30 A standardized measure of discounted future net cash flows relating to an entity's interests in both of the following shall be disclosed as of the end of the year:*

*a. Proved oil and gas reserves (see paragraphs 932-235-50-3 through 50-11B)*

*b. Oil and gas subject to purchase under long-term supply, purchase, or similar agreements and contracts in which the entity participates in the operation of the properties on which the oil or gas is located or otherwise serves as the producer of those reserves (see paragraph 932-235-50-7).*

*The standardized measure of discounted future net cash flows relating to those two types of interests in reserves may be combined for reporting purposes.*

*932-235-50-31 All of the following information shall be disclosed in the aggregate and for each geographic area for which reserve quantities are disclosed in accordance with paragraphs 932-235-50-3 through 50-11B:*

*a. Future cash inflows. These shall be computed by applying prices used in estimating the entity's proved oil and gas reserves to the year-end quantities of those reserves. Future price changes shall be considered only to the extent provided by contractual arrangements in existence at year-end.*

*b. Future development and production costs. These costs shall be computed by estimating the expenditures to be incurred in developing and producing the proved oil and gas reserves at the end of the year, based on year-end costs and assuming continuation of existing economic conditions. If estimated development expenditures are significant, they shall be presented separately from estimated production costs.*

*c. Future income tax expenses. These expenses shall be computed by applying the appropriate year-end statutory tax rates, with consideration of future tax rates already legislated, to the future pretax net cash flows relating to the entity's proved oil and gas reserves, less the tax basis of the properties involved. The future income tax expenses shall give effect to tax deductions and tax credits and allowances relating to the entity's proved oil and gas reserves.*

*d. Future net cash flows. These amounts are the result of subtracting future development and production costs and future income tax expenses from future cash inflows.*

**DEFINITIONS OF OIL AND GAS RESERVES**
Adapted from U.S. Securities and Exchange Commission Regulation S-X Section 210.4-10(a)

e. *Discount. This amount shall be derived from using a discount rate of 10 percent a year to reflect the timing of the future net cash flows relating to proved oil and gas reserves.*

f. *Standardized measure of discounted future net cash flows. This amount is the future net cash flows less the computed discount.*

(27) *Reservoir.* A porous and permeable underground formation containing a natural accumulation of producible oil and/or gas that is confined by impermeable rock or water barriers and is individual and separate from other reservoirs.

(28) *Resources.* Resources are quantities of oil and gas estimated to exist in naturally occurring accumulations. A portion of the resources may be estimated to be recoverable, and another portion may be considered to be unrecoverable. Resources include both discovered and undiscovered accumulations.

(29) *Service well.* A well drilled or completed for the purpose of supporting production in an existing field. Specific purposes of service wells include gas injection, water injection, steam injection, air injection, salt-water disposal, water supply for injection, observation, or injection for in-situ combustion.

(30) *Stratigraphic test well.* A stratigraphic test well is a drilling effort, geologically directed, to obtain information pertaining to a specific geologic condition. Such wells customarily are drilled without the intent of being completed for hydrocarbon production. The classification also includes tests identified as core tests and all types of expendable holes related to hydrocarbon exploration. Stratigraphic tests are classified as “exploratory type” if not drilled in a known area or “development type” if drilled in a known area.

(31) *Undeveloped oil and gas reserves.* Undeveloped oil and gas reserves are reserves of any category that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion.

(i) Reserves on undrilled acreage shall be limited to those directly offsetting development spacing areas that are reasonably certain of production when drilled, unless evidence using reliable technology exists that establishes reasonable certainty of economic producibility at greater distances.

(ii) Undrilled locations can be classified as having undeveloped reserves only if a development plan has been adopted indicating that they are scheduled to be drilled within five years, unless the specific circumstances, justify a longer time.

*From the SEC’s Compliance and Disclosure Interpretations (October 26, 2009):*

*Although several types of projects — such as constructing offshore platforms and development in urban areas, remote locations or environmentally sensitive locations — by their nature customarily take a longer time to develop and therefore often do justify longer time periods, this determination must always take into consideration all of the facts and circumstances. No particular type of project per se justifies a longer time period, and any extension beyond five years should be the exception, and not the rule.*

*Factors that a company should consider in determining whether or not circumstances justify recognizing reserves even though development may extend past five years include, but are not limited to, the following:*

- *The company’s level of ongoing significant development activities in the area to be developed (for example, drilling only the minimum number of wells necessary to maintain the lease generally would not constitute significant development activities);*
- *The company’s historical record at completing development of comparable long-term projects;*
- *The amount of time in which the company has maintained the leases, or booked the reserves, without significant development activities;*
- *The extent to which the company has followed a previously adopted development plan (for example, if a company has changed its development plan several times without taking significant steps to implement any of those plans, recognizing proved undeveloped reserves typically would not be appropriate); and*
- *The extent to which delays in development are caused by external factors related to the physical operating environment (for example, restrictions on development on Federal lands, but not obtaining government permits), rather than by internal factors (for example, shifting resources to develop properties with higher priority).*

(iii) Under no circumstances shall estimates for undeveloped reserves be attributable to any acreage for which an application of fluid injection or other improved recovery technique is contemplated, unless such techniques have been proved effective by actual projects in the same reservoir or an analogous reservoir, as defined in paragraph (a)(2) of this section, or by other evidence using reliable technology establishing reasonable certainty.

(32) *Unproved properties.* Properties with no proved reserves.

**Exhibit 99.3**

# LEE KEELING AND ASSOCIATES, INC.

## PETROLEUM CONSULTANTS

**TULSA OFFICE**
First Place Tower
15 East Fifth Street • Suite 3500
Tulsa, Oklahoma 74103-4350
(918) 587-5521 • Fax: (918) 587-2881

**HOUSTON OFFICE**
Kellog Brown and Root Tower
601 Jefferson Ave. • Suite 3790
Houston, Texas 77002-7912
(713) 651-8006 • Fax: (281) 754-4934

January 26, 2010

SandRidge Energy, Inc.
123 Robert S. Kerr Avenue
Oklahoma City, Oklahoma 73102-6406

Attention: Mr. Rodney Johnson

Re: Estimated Proved Reserves and
Future Net Cash Flow
Constant Pricing

Gentlemen:

In accordance with your request, we have prepared an estimate of the proved reserves and future net cash flow attributable to the interests owned by SandRidge Energy, Inc. (SandRidge) located in the states of New Mexico and Texas. This report was prepared according to the Securities and Exchange Commission (SEC) guidelines as published in the Federal Register January 14, 2009. The effective date of our estimate is December 31, 2009, and the results are summarized as follows:

| | ESTIMATED REMAINING NET RESERVES | | | | FUTURE NET CASH FLOW | |
|---|---|---|---|---|---|---|
| **RESERVE CLASSIFICATION** | **Oil (MBBL)** | **Gas (MMCF)** | **NGL (MBBL)** | **Net Equiv. (MMCFE) (1)** | **Total (M$)** | **Present Worth Disc. @ 10% (M$)** |
| Proved Developed | | | | | | |
| Producing | 12,486 | 58,024 | 4,225 | 158,287 | 605,004 | 307,376 |
| Non-Producing | 237 | 835 | 86 | 2,769 | 8,797 | 4,351 |
| Behind-Pipe | 3,743 | 16,798 | 1,024 | 45,400 | 162,890 | 59,364 |
| Sub-Total | 16,466 | 75,657 | 5,335 | 206,456 | 776,691 | 371,091 |
| Proved Undeveloped | 28,418 | 28,389 | 6,124 | 235,640 | 951,744 | 194,366 |
| TOTAL PROVED RESERVES | 44,884 | 104,046 | 11,459 | 442,096 | 1,728,435 | 565,457 |

(1) MMCFE-one million cubic feet equivalent, calculated by converting one barrel of oil to six MCF of natural gas.

Note: Totals may differ from schedules due to roundoff.

Future net cash flow is the amount, exclusive of federal and state income taxes, which will accrue to the subject interests from continued operation of the properties to depletion. It should not be construed as a fair market or trading value. No provision has been made for the cost of plugging and abandoning the properties.

No attempt has been made to quantify or otherwise account for any accumulative gas production imbalances that may exist. Likewise, no attempt has been made to determine whether the wells and facilities are in compliance with various governmental regulations. Accordingly, no costs have been included in the event the wells and facilities are not in compliance.

Summary forecasts of annual gross and net production, operating income, and future net cash flow by reserve type are included as Schedule No. 1. A sequential listing of the individual properties based on discounted future net cash flow by reserve type is included as Schedule No. 2. An alphabetical one-line summary by property is reflected on Schedule No. 3.

## CLASSIFICATION OF RESERVES

Reserves assigned to the various leases and/or wells have been classified as either “proved developed” or “proved undeveloped” in accordance with the definitions of the proved reserves as promulgated by the Securities and Exchange Commission. These are as follows:

Proved Developed Oil and Gas Reserves are reserves that can be expected to be recovered through existing wells with existing equipment and operating methods. Additional oil and gas expected to be obtained through the application of fluid injection or other improved recovery techniques for supplementing the natural forces and mechanisms of primary recovery should be included as “proved developed reserves” only after testing by a pilot project or after the operation of an installed program has confirmed through production response that increased recovery will be achieved.

Proved Undeveloped Oil and Gas Reserves are reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. Reserves on undrilled acreage shall be limited to those directly offsetting development spacing areas that are reasonably certain of production when drilled, unless evidence using reliable technology exists that establishes reasonable certainty of economic producibility at greater distances. Under no circumstances should estimates for proved undeveloped reserves be attributable to any acreage for which an application of fluid injection or other improved recovery technique is contemplated, unless such techniques have been proved effective by actual tests in the area and in the same reservoir.

Proved Developed Oil and Gas Reserves attributed to the subject leases have been further classified as “proved developed producing,” “proved developed non-producing” and “proved developed behind-pipe.”

Proved Developed Producing Reserves are those reserves expected to be recovered from currently producing zones under continuation of present operating methods.

Proved Developed Non-Producing Reserves are those reserves expected to be recovered from zones that have been completed and tested but are not yet producing due to situations including, but not limited to, lack of market, minor completion problems that are expected to be corrected, or reserves expected from future stimulation treatments based on analogy to nearby wells.

Proved Developed Behind-Pipe Reserves are those reserves currently behind the pipe in existing wells that are considered proved by virtue of successful testing or production in offsetting wells.

ESTIMATION OF RESERVES

The majority of the subject properties have been producing for a considerable length of time. The estimation of reserves for these wells has been based on the extrapolation of the existing historic production decline curves and/or pressure decline trends to economic limits or abandonment pressures.

Reserves anticipated from recently completed or new wells were based upon volumetric calculations or analogy with similar properties, which are producing from the same horizons in the respective areas. Structural position, net pay thickness, well productivity, gas-oil ratios, water production, pressures, and other pertinent factors were considered in the estimations of these reserves.

Reserves assigned to behind-pipe zones have been estimated based on volumetric calculations and/or analogy with other wells in the area producing from the same horizon.

FUTURE NET CASH FLOW

Oil Income

Income from the sale of oil was estimated using the average price for West Texas Intermediate posted price on the first of each month during 2009 as provided by the staff of SandRidge. That price was $57.65 per barrel. This price was held constant throughout the life of each lease. Adjustments were made for state severance and ad valorem taxes and historical differentials between posted prices and actual field prices.

Gas Income

Income from the sale of gas was based upon the average price for gas sold at Henry Hub the first of each month during 2009 as provided by the staff of SandRidge. This price was $3,866 per MMBTU which was held constant throughout the life of each lease. Adjustments were made for BTU, basis differential, marketing, and transportation costs. Additional adjustments were made for state severance and ad valorem taxes.

NGL Income

Income from the recovery and sale of natural gas liquids (NGL) was based on a price that was forty-nine (49) per cent of the oil price. Adjustments were made for historical price differentials.

Operating Expenses

Operating expenses were based upon actual operating costs charged by SandRidge or the respective operators, as supplied by the staff of SandRidge. All expenses were held constant throughout the life of each lease.

Future Expenses

Provisions have been made for future expenses required for recompletion and drilling. These costs are forecast based upon current estimates, regardless of the time they are incurred.

GENERAL

Information upon which this estimate has been based was furnished by the staff of SandRidge or was obtained by us from outside sources we consider to be reliable. This information is assumed correct. No attempt has been made to verify title or ownership of the subject properties.

Leases were not inspected by a representative of this firm, nor were the wells tested under our supervision; however, the performance of the majority of the wells was discussed with employees of SandRidge.

This report has been prepared utilizing methods and procedures regularly used by petroleum engineers to estimate oil and gas reserves for properties of this type and character. The recovery of oil and gas reserves and projection of producing rates are dependent upon many variable factors including prudent operation, compression of gas when needed, market demand, installation of lifting equipment, and remedial work when required. The reserves included in this report have been based upon the assumption that the wells will continue to be operated in a prudent manner under the same conditions existing at the present time. Actual production results and future well data may yield additional facts, not presently available to us, which will require an adjustment to our estimates.

The reserves included in this report are estimates only and should not be construed as being exact quantities. They may or may not be actually recovered, and, if recovered, the revenues therefrom and the actual costs related thereto could be more or less than the estimated amounts. As in all aspects of oil and gas estimation, there are uncertainties inherent in the interpretation of engineering data and, therefore, our conclusions necessarily represent only informed professional judgments.

It should be pointed out that regulatory authorities could, in the future, change the allocation of reserves allowed to be produced from a particular well in any reservoir, thereby altering the material premise upon which our reserve estimates may be based.

The projection of cash flow has been made assuming constant prices. There is no assurance that prices will not vary. For this reason and those listed in the previous paragraph, the future net cash from the sale of production from the subject properties may vary from the estimates contained in this report.

It is our opinion that based upon our knowledge of current facts and conditions, the reserves presented in this report are a reasonable measure of SandRidge's reserves considered by us.

The information developed during the course of this investigation, basic data, maps and worksheets showing recovery determinations can be made available for inspection in our office.

This report is to be used only in its entirety.

We appreciate this opportunity to be of service to you.

Very truly yours,

Lee Keeling and Associates, Inc.

LEE KEELING AND ASSOCIATES, INC.

LKA6956