IN THE UNITED STATES DISTRICT COURT FOR

THE WESTERN DISTRICT OF OKLAHOMA

IN RE SANDRIDGE ENERGY, INC. )   No. CIV-12-1341-W
SECURITIES LITIGATION    )

Relating to All Securities Actions

## ORDER

This matter comes before the Court on the Motion to Dismiss Corrected

Consolidated Amended Complaint filed by defendants SandRidge Mississippian Trust I

("Miss Trust I") and SandRidge Mississippian Trust II ("Miss Trust II")(collectively "Trusts")

pursuant to Rules 12(b)(6) and 9(b), F.R.Civ.P. Lead plaintiffs Laborers Pension Trust

Fund for Northern Nevada ("Laborers"), Construction Laborers Pension Trust of Greater

St. Louis ("Construction Laborers") and Vladimir and Angelica Galkin (collectively

"Galkins")(collectively "Lead Plaintiffs") and plaintiffs Judith Greenberg, Charles Blackburn

and Ted Odell (collectively "Trust Plaintiffs") have responded in opposition, and Miss Trusts

I and II have filed a reply. Based upon the allegations in the corrected consolidated

amended complaint ("Amended Complaint"), the Court makes its determination.

James Glitz and Roger Thornberry on December 5, 2012, and Louis Carbone on

January 4, 2013, filed lawsuits "on behalf of all purchasers of the securities of SandRidge

Energy, Inc. ("SandRidge") between February 24, 2011, and November 8, 2012," Glitz v.

SandRidge Energy, Inc., No. CIV-12-1341-W, Doc. 1 at 2, ¶ 2 ("Glitz"); Carbone v.

SandRidge Energy, Inc., No. CIV-13-19-W, Doc. 1 at 2, ¶ 2 ("Carbone"), for alleged

violations of federal securities laws arising out of the dissemination of allegedly false and

misleading statements concerning SandRidge's business and operational status and

financial projections. Named as defendants in those lawsuits were SandRidge and three

individuals:  Tom L. Ward, then SandRidge Chairman and Chief Executive Officer,

Matthew K. Grubb, then SandRidge President and Chief Operating Officer, and James D.

Bennett, then SandRidge Senior Vice President and Chief Financial Officer.

Pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15

U.S.C. § 78u-4, which provides in pertinent part that no

> later than 20 days after the date on which the [first] complaint is filed, the
> plaintiff or plaintiffs shall cause to be published, in a widely circulated
> national business-oriented publication or wire service, a notice advising
> members of the purported plaintiff class . . . of the pendency of the action,
> the claims asserted therein, and the purported class period . . . [,]

15 U.S.C. § 78u-4(a)(3)(A)(i)(I), notice of the Glitz action was published on December 5,

2012, in Business Wire, Inc. ("Business Wire"), a national business-oriented wire service.

See Glitz, Doc. 29-3; Carbone, Doc. 16-3.  The Notice

> announced that a class action ha[d] been commenced . . . on behalf of all
> persons or entities who purchased the securities of SandRidge[, referred to
> by its New York Stock Exchange symbol, SD,] . . . between February 24,
> 2011 and November 8, 2012 . . . ,

Glitz, Doc. 29-3 at 1, which the Notice defined as the "Class Period."  Id.

The Notice further advised that the lawsuit

> charge[d] SandRidge and certain of its officers and directors with violations
> of the Securities Exchange Act of 1934[,]

id., because SandRidge and these officers and directors had

> issued materially false and misleading statements regarding . . .
> [SandRidge's] operational status and financial projections . . . [by]
> misrepresent[ing] and/or fail[ing] to disclose . . . (a) that they had been
> overstating the value of SandRidge's Mississippian formation assets[1]

---

[1]The Mississippian Play is described in the Amended Complaint as "a geological formation
that extends hundreds of miles across northern Oklahoma and south-central Kansas."  Doc. 75 at
26, ¶ 74.  It is alleged that the Mississippian formation "ranges from a few hundred feet to as much

throughout the Class Period as contrary to their repeated mantra that SandRidge had successfully transformed itself from a primarily natural gas to a primarily oil producing company, when in reality its Mississippian formation assets consisted of significantly higher low-margin natural gas deposits and significantly lower high-margin oil deposits than the market had previously been led to believe; (b) [that] mechanical issues with one of three rigs . . . [SandRidge] needed to drill in its new Gulf of Mexico assets acquired in the Dynamic Offshore Resources LLC acquisition in early 2012 rendered that rig inoperable during the second quarter of 2012, requiring that [SandRidge] . . . ramp down drilling in the Gulf of Mexico; (c) that contrary to their Class Period statements, defendants intended that the $1.3 billion Dynamic Offshore acquisition be utilized as a "financing vehicle" for . . . [SandRidge's] onshore drilling projects; and (d) that as a result, defendants knew SandRidge's fiscal year 2012 earnings guidance was not attainable.

Id. at 1-2.

Thereafter, Glitz and Carbone came before the Court on various motions and, by agreement, the Court, on March 6, 2013, consolidated the two matters for all pretrial proceedings and for trial.  The Court found inter alia that the cases

involve[d] claims on behalf of purchasers of SandRidge securities for alleged violations of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j, 78t, and Securities and Exchange Commission ("SEC") Rule 10b-5 and . . . [were] grounded on the same factual and legal issues: whether the plaintiffs purchased SandRidge securities at artificially inflated prices as a result of [SandRidge, Ward, Grubb and Bennett's] . . . allegedly false and misleading statements and whether the[ir] . . . conduct violated sections 10(b) and 20(a), e.g., 15 U.S.C. § 78j(b); id. § 78t(a), and SEC Rule 10b-5.

Glitz, Doc. 60 at 3 n.4 (citing Glitz, Doc. 1; Carbone, Doc. 1).

On that same date, the Court, pursuant to the PSLRA, appointed as "Lead Plaintiffs" in the consolidated action Laborers, Construction Laborers and the Galkins.  E.g., Glitz,

---

as 1000 feet thick, and is composed of layers of limestone, chert and limey mudstones that were deposited in a shallow sea during the Mississippian geological period over 300 million years ago. Oil has been produced from the formation since the 1940's from conventional vertical wells. Beginning in 2007, horizontal well and hydraulic fracturing technology has been applied to extract oil from reservoirs within the . . . formation." Id.

Doc. 60 at 4. In doing so, the Court followed the procedure set forth in the PSLRA, which

provides that no

> later than 90 days after the date on which a notice is published . . . , the court shall . . . appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members . . . .

Id. § 78u-4(a)(3)(B)(i).

> In making its determination, the Court was statutorily mandated to

adopt a presumption that the most adequate plaintiff . . . [was] the person or group of persons that–

>> (aa) ha[d] either filed the complaint or made a motion in response to [the] . . . notice . . . ;

>> (bb) . . . ha[d] the largest financial interest in the relief sought by the class; and

>> (cc) otherwise satisfie[d] the requirements of Rule 23 of the Federal Rules of Civil Procedure.

Id. § 78u-4(a)(3)(B)(iii)(I). Mindful that this presumption could

> be rebutted . . . upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff

>> . . . w[ould] not fairly and adequately protect the interests of the class . . . [,]

id. § 78u-4(a)(3)(B)(iii)(II)(aa), the Court determined that the presumption had not been

rebutted in this instance and that Laborers, Construction Laborers and the Galkins satisfied

all statutory and Rule 23 requirements: they not only had filed a timely request for

appointment as lead plaintiff and had shown that they had the largest financial interest in

the relief sought by the defined class, e.g., Glitz, Doc. 29-4; Carbone, Doc. 16-4, but also

4



had claims that were typical of those of the proposed class and would fairly and adequately protect the interests of that class.

On July 30, 2013, Laborers, Construction Laborers and the Galkins as Lead Plaintiffs filed the Amended Complaint. See Doc. 75. The amended pleading named additional plaintiffs–Greenberg, Blackburn and Odell, as well as additional defendants. Included in the latter group[2] were the movants, Miss Trust I and Miss Trust II.

The Trust Plaintiffs have alleged in the Amended Complaint that "[w]hen natural gas prices began to drop in 2008, [SandRidge] . . . made a shift in strategy to transform itself from being primarily low-margin natural gas producing to a high margin oil producing company," id. at 30, ¶ 86, and that "[i]n connection with its transformation strategy, beginning in early 2011, SandRidge represented that it would 'monetize' certain of its

---

[2]Renamed as defendants in the Amended Complaint were (a) Ward as SandRidge Chief Executive Officer and Chairman of SandRidge's Board of Directors ("Board") and as President, Chief Executive Officer and Chairman of the Boards of Directors for Miss Trust I ("Miss Trust I Board") and Miss Trust II ("Miss Trust II Board"), (b) Bennett as SandRidge Senior Vice President and Chief Financial Officer and as Executive Vice President and Chief Financial Officer of Miss Trust II, and Grubb as Sandridge President and Chief Operating Officer.

Also named as defendants were

(a) Randall D. Cooley as SandRidge Senior Accounting Officer and Senior Vice President, Divisional, and as Senior Vice President of Accounting of Miss Trust I and Miss Trust II;

(b) D. Dwight Scott as a Miss Trust I Board member;

(c) Jim J. Brewer, Jr., and Jeffrey S. Serota as Miss Trust II Board members;

(d) Everett R. Dobson, William A. Gilliland, Daniel W. Jordan and Roy T. Oliver as Miss Trust I and Miss Trust II Board members;

(e) Morgan Stanley & Co. Incorporated ("Morgan Stanley), a global financial services firm, and Raymond James & Associates, Inc. ("Raymond James"), operating as an investment bank, which had acted as co-lead underwriters and served as representatives for the Miss Trust I and Miss Trust II Offerings and helped draft and disseminate prospectuses for the same; and

(f) Citigroup Global Markets, Inc. ("Citigroup"), a brokerage firm and the securities arm of Citigroup Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), a global financial services firm, and RBC Capital Markets, LLC ("RBC Capital"), a brokerage firm and the securities arm of RBC Capital Markets, which had acted as co-lead underwriters and served as representatives for the Miss Trust II Offering and helped draft and disseminate the prospectus for this offering.

assets in order to create cash-flow to fund [its] . . . ongoing lease acquisitions and drilling activities in its core assets in the Mid-Continent ['(a/k/a "Mississippian formation" or "Mississippian [P]lay"),' id. at 29-30, ¶ 85,] and the Permian Basin." Id. at 32-33, ¶ 92. The Trust Plaintiffs have contended that these efforts included the creation of two "royalty trusts to fund [the] . . . ongoing drilling operations." Id. at 33, ¶ 92.

Miss Trust I is described in the Amended Complaint as "a Delaware statutory trust formed in December 2010 to own overriding royalty interests to be conveyed to th[at] [T]rust by SandRidge in 37 horizontal wells producing from the Mississippian formation in Oklahoma and royalty interests in 123 horizontal development wells to be drilled in th[at] . . . formation." Doc. 75 at 17, ¶ 41;[3] e.g., Doc. 130-1 at 6.

As the record establishes, on January 5, 2011, Miss Trust I and SandRidge, as co-registrants, filed a registration statement with the SEC. See Doc. 132-1. The prospectus with respect to the Miss Trust I Offering, which together with certain SEC filings and other papers, formed the Miss Trust I Registration Statement, became effective on April 7, 2011, and 15,000,000 common units representing beneficial interests in the trust were sold at

--------

[3]As stated in the prospectus, Miss Trust I

will own term and perpetual royalty interests in oil and natural gas properties leased by SandRidge in the Mississippian formation in Alfalfa, Garfield, Grant, Major and Wood counties in Oklahoma. These royalty interests will entitle the trust to receive (a) 90% of the proceeds attributable to SandRidge's net revenue interest in the sale of production from 37 horizontal producing wells and (b) 50% of the proceeds attributable to SandRidge's net revenue interest in the sale of production from 123 horizontal development wells to be drilled on drilling locations within an Area of Mutual Interest consisting of approximately 64,200 gross acres (42,900 net acres) held by SandRidge. The number of wells required to be drilled may increase or decrease in proportion to SandRidge's actual net revenue interest in each well.

Doc. 130-1 at 2.

$21.00 per unit.  An over-allotment option was also granted to certain underwriters[4] to purchase up to an additional 2,250,000 common units.  On April 12, 2011, this option was exercised, and in accordance with its Registration Statement and prospectus, Miss Trust I completed its initial public offering of 17,250,000 common units.  See Doc. 75 at 50, ¶ 133.  The Trust Plaintiffs have asserted that the net proceeds from this offering totaled $339,900,000.00.  See id.

Miss Trust II is described in the Amended Complaint as "a Delaware statutory trust formed in December 2011 to own overriding royalty interests to be conveyed to th[at] [T]rust by . . . SandRidge in 67 producing horizontal wells in the Mississippian formation in Oklahoma and Kansas, and overriding royalty interests in 206 horizontal development wells to be drilled in th[at] . . . formation."  Id. at 17, ¶ 42;[5] e.g., Doc. 130-2 at 8.

On January 5, 2012, Miss Trust II and SandRidge, as co-registrants, filed a registration statement with the SEC for the Miss Trust II Offering.  The prospectus with

---

[4]Miss Trust I underwriters, which helped draft and disseminate the prospectus, included not only Raymond James and Morgan Stanley, see n.2 supra, but also Wells Fargo Securities LLC, RBC Capital Markets, LLC, Oppenheimer & Co. Inc. ("Oppenheimer"), Madison Williams & Co. LLC, Morgan Keenan & Co., Inc., Robert W. Baird & Co. Inc. and Wunderlich Securities, Inc. ("Wunderlich").  See Doc. 75 at 19, ¶ 49; Doc. 130-1 at 117.  The Trust Plaintiffs have contended that these entities "were paid over $23.5 million in connection with the Miss Trust I Offering . . . ." Doc. 75 at 19, ¶ 50 (emphasis deleted).

[5]As stated in its prospectus, Miss Trust II

will own overriding royalty interests in certain of SandRidge's properties in the Mississippian formation in northern Oklahoma and southern Kansas.  These royalty interests will entitle the Trust to receive, after deduction of certain costs, (a) 80% of the proceeds attributable to SandRidge's net revenue interest in the sale of production from 67 producing wells and (b) 70% of the proceeds attributable to SandRidge's net revenue interest in the sale of production from 206 development wells to be drilled within an area of mutual interest consisting of approximately 81,200 gross acres (53,00 net acres) held by SandRidge.

Doc. 130-2 at 2.

respect to the Miss Trust II Offering, which together with certain SEC filings and other papers, formed the Miss Trust II Registration Statement, became effective on April 18, 2012, and 26,000,000 common units representing beneficial interests in Miss Trust II were sold at $21.00 per unit.   An over-allotment option was again granted to certain underwriters[6] to purchase up to an additional 3,900,000 common units, and on April 17, 2012, the underwriters exercised this option.  See Doc. 75 at 34, ¶ 100.  In accordance with the prospectus, Miss Trust II completed its initial public offering of 29,900,000 common units.  See id. at 50, ¶ 133.  According to the Trust Plaintiffs, the net proceeds totaled $587,100,000.00.  See id.

Greenberg had acquired common units of the Miss Trust I and Blackburn and Odell had acquired common units of the Miss Trust II, that they claimed, respectively, were "pursuant or traceable to the Miss Trust I Offering[,]" id. at 14, ¶ 23, or "pursuant or traceable to the Miss Trust II Offering . . . ."  Id. ¶ 24; e.g., id. at 15, ¶ 25.

The Trusts are named in three causes of action in the Amended Complaint, Counts I, III and IV.  Relief is sought in Count I under Section 10(b) of the Exchange Act and SEC Rule 10-5 and the Trusts are charged therein with disseminating and/or approving materially false and misleading statements.

In Counts III and IV of the Amended Complaint, relief is sought under Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2),

---

[6]Miss Trust II underwriters that helped draft and disseminate the prospectus included Raymond James, Merrill Lynch, Citigroup, RBC Capital and Morgan Stanley, see n.2 supra, as well as UBS Securities LLC, Oppenheimer, Wunderlich, Sanders Morris Harris Inc., and Johnson Rice & Company L.L.C.  See Doc. 75 at 19, ¶ 49; Doc. 130-2 at 144.  The Trust Plaintiffs have alleged that these entities "were paid over $37.6 million in connection with the Miss Trust II Offering."  Doc. at 19, ¶ 50 (emphasis deleted).

respectively, based upon the Trust Plaintiffs'[7] contention that the Trusts are "liable for the materially inaccurate statements . . . in the Registration Statements and [for] the failure of the[se] . . . Statements to be complete and accurate."  Doc. 75 at 160, ¶ 394.

In addition to challenging the plausibility of the allegations advanced in support of Counts I, III and IV under Rule 12(b)(6), supra, the Trusts, by adoption of certain co-defendants' motions,[8] have argued that these counts should be dismissed because there was no suggestion in the Notice published on December 5, 2012, see Doc. 29-3, that any lawsuit had been commenced on behalf of purchasers of common units issued by Miss Trust I and Miss Trust II, the New York Stock Exchange symbols for which are SDT and SDR, respectively, or that any claims were being asserted in Glitz with respect to the Miss Trust I and the Miss Trust II Offerings.  The Trusts, by adopting their co-defendants' motions, have contended that because no "plaintiff" has ever published notice of a putative class action on behalf of investors in Miss Trust I or Miss Trust II, dismissal of Counts I, III and IV is warranted for failure to comply with the notice requirement of the PSLRA.

Resolution of this issue requires comparison of the allegations in the complaint filed in Glitz[9] and the statements in the Notice advising of that lawsuit and the allegations in the Amended Complaint.  See Kaplan v. S.A.C. Capital Advisors, L.P., 947 F. Supp.2d 366, 367 (S.D.N.Y. 2013)(quoting Waldman v. Wachovia Corp., 2009 WL 2950362 *1 (S.D.N.Y. 2009)("Although courts typically disfavor republication when a complaint is amended,

---

[7]Despite the use of the collective term "plaintiffs" in the Amended Complaint, neither Laborers, Construction Laborers nor the Galkins purchased common units issued by Miss Trust I or Miss Trust II.

[8]See Doc. 131 at 46-47.

[9]In his complaint, Carbone repeated the allegations set forth in Glitz.

courts have required new notice where the amended complaint substantially alters the claims or class members."); In re Thornberg Mortgage, Inc. Securities Litigation, 629 F. Supp.2d 1233, 1242 (D.N.M. 2009)(where new claims are closely related to initial claims expressly covered in the notice, requiring further notice for the amendments would serve only to delay case).

Accordingly, the Court has reviewed the allegations in the Amended Complaint asserted by the Trust Plaintiffs on behalf of Miss Trust I and Miss Trust II investors and the complaint filed in Glitz, which purported to assert claims solely on behalf of a putative class of purchasers of SandRidge common stock, to determine whether the Trusts are entitled to the relief they have requested.

In Count I of the Amended Complaint, the Trust Plaintiffs have alleged

(1) that during the relevant period, the Trusts,[10] which are sued as primary participants in the wrongful and illegal conduct, disseminated or approved certain materially false and misleading statements in the Registration Statements regarding production in the Mississippian formation, see Doc. 75 at 76-79, ¶¶ 190-193, which the Trusts knew or deliberately disregarded were misleading;

(2) that the Trusts, "individually and in concert [with other defendants], directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of . . . [SandRidge] and the . . . Trusts[,]" id. at 153, ¶ 369;

---

[10]The Trust Plaintiffs have used the term "defendants" in this count without attributing particular conduct to any one defendant. The Court has substituted the term "Trusts."

(3) that the Trusts "(a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/ or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of . . . SandRidge securities during the [relevant] . . . [p]eriod in an effort to maintain artificially high market prices for the[se] . . . securities[,]" id. ¶ 370;

(4) that the Trusts "had actual knowledge of the misrepresentations and omissions of material facts set forth [in the Amended Complaint] . . . , or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them[,]" id. at 154, ¶ 372;

(5) that the Trusts' "material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public the significant problems with SandRidge's cash flows, capital expenditures, the overstated reserves, and the extent of . . . related party transactions, and supporting the artificially inflated price of SandRidge securities[,] id. at 154-55, ¶ 372;

(6) that "[a]s demonstrated by [the Trusts'] . . . misstatements of . . . [SandRidge's] and the . . . Trusts' business, operations, oil and gas reserves, and transactions during the Class Period, . . . [the Trusts], if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading[,]" id. at 155, ¶ 372;

(7) that "[a]s a result of the dissemination of the materially false and misleading information and failure to disclose material facts, . . . the market prices of SandRidge's securities were artificially inflated during the Class Period[,]" id. ¶ 373;

(8) that "[i]n ignorance of the fact that market prices of SandRidge's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by [the Trusts] . . . , or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by . . . [the Trusts,] but not disclosed in public statements . . . , [the Trust] Plaintiffs . . . acquired SandRidge securities . . . at artificially high prices and were damaged as a result[,]" id.;

(9) that the Trust Plaintiffs "were ignorant of the[ ] falsity [of the misrepresentations and of the omissions], and . . . [h]ad [they] . . . known the truth . . . [they] would not have purchased or otherwise acquired their SandRidge securities, or, if they had purchased such securities . . . , they would not have done so at the artificially inflated prices which they paid." Id. at 155-56, ¶ 374.

In Counts III and IV of the Amended Complaint, the Trust Plaintiffs have sought relief, as stated, under Section 11 and 12(a) of the Securities Act, respectively, on the grounds that the Registration Statements for the Miss Trust I and Miss Trust II Offerings not only contained untrue statements of material fact, but also omitted material information. In particular, the Trust Plaintiffs have alleged in Count III

(1) that the Registration Statements for these Offerings "were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make

the statements made therein not misleading, and omitted to state material facts required to be stated therein[,]" Doc. 75 at 159-60, ¶ 393;

(2) that the "Trusts were co-registrants for the Trust Offerings[, and] [a]s issuers of the trust units, . . . the . . . Trusts are strictly liable for the materially inaccurate statements contained in the Registration Statements and the failure of the Registration Statements to be complete and accurate[,]" id. at 160, ¶ 394;

(3) that the Trust Plaintiffs "acquired units in the . . . Trust I Offering and the . . . Trust II Offering, . . . rel[ying] on[ ] the Registration Statements and without knowledge of the [alleged] untruths and/or omissions . . . ," id. at 161, ¶ 398; and

(4) that the Trust Plaintiffs "sustained damages when the price of the . . . Trust I and the . . . Trust II securities declined substantially subsequent to and due to [the Trusts' misconduct] . . . ." Id.

In Count IV, wherein relief is sought under Section 12(a)(2) of the Securities Act, the Trust Plaintiffs have alleged

(1) that the Trusts issued; caused to be issued and/or signed the Registration Statements, which contained prospectuses that were used to induce investors to purchase common units of Miss Trust I and Miss Trust II;

(2) that these Registration Statements contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein;

(3) that the Trusts, acting through their employees, agents and others, solicited investors' purchases for the Trusts' benefit;

(4) that they (Greenberg, Blackburn and Odell) did not know and could not have known of the untruths or omissions contained in the Registration Statements; and

(5) that the Trusts, although obligated to make a reasonable and diligent investigation of the statements contained in the Registration Statements to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading, failed to make a reasonable investigation or possessed no reasonable grounds for the belief that the statements contained in the Registration Statements were accurate and complete in all material respects.

In support of her particular claims for relief, Greenberg has alleged in the Amended Complaint

(1) that the Miss Trust I Registration Statement's report with regard to SandRidge's "understanding" of the Mississippian formation and the "consistency" of that region[11] were materially false and misleading when made because they failed to disclose certain adverse facts about SandRidge's understanding of the geological-makeup of the Mississippian formation: namely, that "the geology of the Mississippian is highly variable and there was very limited horizontal well production history from which reliable reserve forecasts could be made," Doc. 75 at 65, ¶ 162(a), and that "[t]here was a risk that areas where SandRidge was drilling horizontal wells may have had partially depleted reservoirs as a result of the vertical wells drilled in the Mississippian since the 1940s[,]" id. ¶ 162(b);

---

[11]See Doc. 75 at 76, ¶ 190.

(2) that contrary to the representations in the Miss Trust I Registration Statement, "there was no 'continuity' or 'consistency' across the [areas of mutual interest ('AMI'),]" id. at 77, ¶ 191, because "the formation geology and individual well productivity across the AMI was highly variable[,] . . . [and] there was limited production history from Mississippian horizontal wells such that [estimated ultimate recovery per well ('EUR')] projections were not firmly established[,]" id.;

(3) that the Registration Statement emphasized that the reserves associated with Miss Trust I's underlying properties[12] consisted of 48-49% oil and provided certain other reserve information,[13] and that such statements were materially false "because the liquid fraction for typical Mississippian wells at that time was only 40% oil and 60% gas as opposed to the 48% oil and 52% gas that [SandRidge] . . . represented[,]" id. at 79, ¶ 193; and

(4) that the Miss Trust I Registration Statement was materially false and misleading because it failed to account for the involvement of the Ward-related entities[14] in the

---

[12]The Miss Trust I Registration Statement identified the "Underlying Properties" as

consist[ing] of the working interest owned by SandRidge in the Mississippian formation in Alfalfa, Garfield, Grant, Major and Woods counties in Oklahoma arising under leases and farmout agreements related to properties from which the [proved developed producing] Royalty Interest and the [probable undeveloped] Royalty Interest will be conveyed.  The Underlying Properties consist of approximately 64,200 gross acres (42,900 net acres).

Id. ¶ 190.

[13]See id. at 77, ¶ 192.

[14]The Amended Complaint alleges that "[d]efendant Ward is affiliated with several entities that operate in the same business and location as SandRidge," id. at 35, ¶ 104, and that "some of these entities are direct competitors of SandRidge." Id. Identified as "Ward-related entities" are WCT Resources, L.L.C., 192 Investments, L.L.C., and TLW Land & Cattle, L.P.  See id.

Mississippian formation[15] and for the amount of natural gas relative to oil in that formation.[16]

As to Blackburn and Odell's claims in the Amended Complaint with regard to Miss Trust II, these Trust Plaintiffs have alleged

(1) that the Trusts knew or recklessly disregarded the fact that the Miss Trust II Registration Statement's description of SandRidge's "understanding"[17] of the Mississippian

---

[15]Greenberg has contended that the Trusts knew or recklessly disregarded that the Ward-related entities (a) had "acquired huge amounts of land and mineral rights in the Mississippian play ('in advance of or alongside of SandRidge's holdings', id. at 62, ¶ 158(a),) that benefitted from SandRidge's spending and development activities in the area[,]" id., (b) had "inappropriately moved ahead of . . . [SandRidge] to acquire mineral rights from third-parties, and then flipped th[ose] . . . [rights] to SandRidge . . . ," id. at 62-63, ¶ 158(b), and (c) had "stood to gain financially even if production in the Mississippian [formation] was lower than represented by SandRidge or if SandRidge's Mississippian wells did not generate attractive rates of return to SandRidge." Id. at 63, ¶ 158(c); e.g., id. at 35-36, ¶ 104.

[16]In particular, Greenberg has alleged the Trusts knew or recklessly disregarded the following facts about the amount of gas relative to oil:

> (a) The Mississippian was much gassier than represented . . . . Production data that SandRidge reported to the Oklahoma Tax Commission showed that SandRidge understated the gas to oil ratio for its typical horizontal well in its Mississippian play and that the oil production relative to gas production as reported was approximately half of that represented . . . . In addition, the oil to gas ratio was contrary to . . . representations that SandRidge had completed its transformation from a gas to an oil company. With the large price premium commanded by the market for oil versus natural gas, SandRidge's overstatement of the oil percentage misrepresents and greatly overstates the value of their wells in the Mississippian play; and

> (b) Contrary to [the] . . . statements during 2011 that [the] . . . Mississippian wells on average produced 52% oil and 48% gas, production data reported by SandRidge reveals that its wells produced less than 40% oil and more than 60% gas during 2011[.]

Id. at 63-64, ¶ 160(a)-(b).

[17]As alleged in the Amended Complaint, that "understanding" is as follows:

The Underlying Properties are located in northern Oklahoma and southern Kansas in the Mississippian formation, which is an expansive carbonate hydrocarbon system located on the Anadarko Shelf. The top of the formation is encountered



region was materially false and misleading because it failed to disclose certain alleged adverse facts about SandRidge's "understanding of the geology of the Mississippian [formation]," Doc. 75 at 106, ¶ 270,[18] and the involvement of the Ward-related entities in that region;

(2) that contrary to the Miss Trust II Registration Statement, "there was no 'continuity' or 'consistency' across the AMI," id. at 106-07, ¶ 270;

(3) that instead, "the formation geology and individual well productivity across the AMI was highly variable," Id. at 107, ¶ 270, and "there was limited production history from Mississippian horizontal wells such that EUR projections were not firmly established[,]" id.;

---

between 4,000 feet and 7,000 feet and lies stratigraphically between the Pennsylvanian-aged Morrow formation and the Devonian-aged Woodford Shale formation. The Mississippian formation can reach 1,000 feet in gross thickness and the targeted porosity zone is between 50 and 100 feet in thickness. The formation's geology is well understood as a result of the thousands of vertical wells drilled and produced there since the 1940s, including approximately 73 vertical wells drilled on the Underlying Properties, and over 400 horizontal wells drilled in the region in the Mississippian formation.

Id. at 106, ¶ 269.

[18]The alleged "adverse facts" about which the Trusts knew or which they recklessly disregarded include the following:

(a) the geology of the Mississippian is highly variable and there was very limited horizontal well production history from which reliable reserve forecasts could be made. Contrary to [the Trusts'] . . . statements, there was not a single type curve across their entire leasehold extending for hundreds of miles. Indeed, after the Class Period, SandRidge provided multiple type well curves based on geographical region instead of relying on just a single type well decline curve as [SandRidge] . . . had done during the Class Period; and

(b) [t]here was a risk that areas where SandRidge was drilling horizontal wells may have had partially depleted reservoirs as a result of the vertical wells drilled in the Mississippian since the 1940s.

Id. at 65, ¶ 162.

(4) that the Registration Statement, and, in particular, the "Summary" and "Calculation of Target Distributions" sections of the Miss Trust II Prospectus were materially false and misleading to the extent they, respectively, "stressed that the proved reserves in the properties associated with the Miss Trust II consisted of 46.8% oil and 53.2% natural gas," id. ¶ 271, and "show[ed] the estimated % of oil volumes ranging from 47% in the first quarter of 2012 to 51% projected for the fourth quarter of 2012 for the assets associated with the Miss Trust II[,]" id. ¶ 272, because they failed to disclose "adverse facts about . . . the amount of natural gas relative to oil[,]"[19] id. at 108, ¶ 273, and "the steep drop in production experienced by SandRidge horizontal Mississippian wells[,]"[20] id.; and

(5) that "the statements that '[t]he proved reserves consist of 46.8% oil and 53.2% natural gas' and '[t]he probable reserves consist of 46.9% oil and 53.1% natural gas' were materially false and misleading when made because the liquid fraction for typical Mississippian wells at that time was only 35% oil and 65% gas[.]" Id. at 109, ¶ 273.

In the Glitz complaint, which was the subject of the Notice issued in Business Wire, Glitz and Thornberry contended, inter alia, as their allegations relate to the Trusts,

(1) that SandRidge and the three individual defendants, Ward, Grubb and Bennett, had "maintained that SandRidge had successfully transformed itself from being a primarily low-margin natural gas producing [company] to a primarily high-margin oil producing company[,]" Glitz, Doc. 1 at 3, ¶ 4;

---

[19]See Doc. 75 at 63-64, ¶ 160.

[20]See id. at 64-65, ¶ 161.

18

(2) that based on this "bullish mantra concerning [SandRidge's] . . . successful conversion[,]" id. ¶ 40, SandRidge's "stock traded at inflated prices . . . ," id., and allowed SandRidge "to significantly monetize [its] . . . Mississippian formation assets, . . . by [inter alia] . . . [r]aising $928.7 million by transferring certain Mississippian formation assets to two trusts and selling common units in those two trusts in two underwritten public offerings[,]" id. at 3-4, ¶ 5;

(3) that "on March 29, 2011, [SandRidge and the three individual] [d]efendants] announced they intended to sell a 45% stake in [SandRidge's] . . . Mississippian formation assets through the initial public offering of 12.5 million common units of . . . Miss[ ] Trust I . . . ," id. at 9, ¶ 24;

(4) that according to a "press release issued that day, the '[Miss] Trust [I] [would] own royalty interests conveyed to it by SandRidge which [would] entitle the Trust to a percentage of the proceeds received by SandRidge from the production of hydrocarbons from currently producing wells and development wells to be drilled by SandRidge on approximately 42,600 net acres in the Mississippian formation in northern Oklahoma[,]'" id. at 10, ¶ 24;

(5) that "[o]n April 6, 2011, [SandRidge] . . . announced the . . . Miss[ ] Trust I IPO had been upsized to 15 million common units priced at $21.00 per common unit[,]" id. ¶ 26, and "closed April 12, 2011," id. ¶ 27, "result[ing] in net proceeds to the Trust . . . of approximately $338.7 million," id.;

(6) that a second press release "emphasiz[ed] the success of [SandRidge's] . . . efforts to monetize the purportedly oil-rich Mississippian formation assets through the . . . Miss[ ] Trust I IPO," id. at 11, ¶ 28; but

19

(7) that "[t]he true facts, which were known by [SandRidge and the three individual] . . . [d]efendants but concealed from the investing public . . . were . . . [that SandRidge, Ward, Grubb and Bennett] had been overstating the value of SandRidge's Mississippian formation assets . . . as contrary to their repeated mantra that SandRidge had successfully transformed itself[,] . . . [when] in reality its Mississippian formation assets consisted of significantly higher low-margin natural gas deposits and significantly lower high-margin oil deposits . . . , [that] [d]ue to 'problematic' 'mechanical' issues with one of three rigs . . . [SandRidge] needed to drill in its new Gulf of Mexico assets acquired in . . . early 2012, [SandRidge] . . . had been required to 'ramp down the drilling in the Gulf of Mexico . . . , [that] [c]ontrary to the[ ] Class Period statements, [SandRidge, Ward, Grubb and Bennett] . . . . intended that [an] . . . [o]ffshore acquisition be utilized as a 'financing vehicle' for . . . [SandRidge's] onshore drilling projects . . . , and . . . [t]hat as a result, [SandRidge, Ward, Grubb and Bennett] . . . knew SandRidge's [fiscal year] 2012 earnings guidance was not attainable." Id. at 29-30, ¶ 61.[21]

In response to the Trusts' request for dismissal for failure to comply with the PSLRA, Greenberg, Blackburn and Odell have argued that the complaint filed in Glitz, as clearly indicated in the Business Wire Notice, was brought on behalf of "all purchasers of the securities of SandRidge[,]" Glitz, Doc. 1 at 2, ¶ 2 (emphasis added); Carbone, Doc. 1 at 2, ¶ 2; Doc. 29-3 at 1, and that their claims under Sections 11 and 12(a)(2) of the Securities Act and the claims of Laborers, Construction Laborers and the Galkins under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 share a common

---

[21]These same allegations form the basis of the Notice. See Doc. 29-3 at 1-2.

nucleus of fact: "whether . . . SandRidge securities [were purchased] at artificially inflated prices as a result of the defendants' allegedly false and misleading statements[.]" Doc. 141 at 42 n.18 (quoting Glitz, Doc. 60 at 3 n.4).

Admittedly, as shown by the foregoing allegations, there are commonalities between the complaint in Glitz and the Notice and the Amended Complaint. The Class Period first defined in Glitz (and repeated in the Notice) did not change. See Glitz, Doc. 1 at 2, ¶ 1; Doc. 29-3 at 1; Doc. 75 at 6, ¶ 1. Glitz refers to the Trusts and the reasons they were created. See Glitz, Doc. 1 at 3-4, ¶ 5.

The differences, however, overshadow these commonalities. The Glitz complaint and the Notice focus solely on buyers of SandRidge securities; while the Amended Complaint repeats these claims (and the allegations giving rise to them), it includes as potential plaintiffs investors in Miss Trust I and Miss Trust II.[22] The Glitz complaint

---

[22]The Lead Plaintiffs and the Trust Plaintiffs have argued that "both the original and amended complaints assert claims on behalf of the same class of SandRidge securities purchasers." Doc. 141 at 45, n.20. That may be true, but only as to the Lead Plaintiffs. The complaint in Glitz identified the proposed class as "purchasers of SandRidge securities between February 24, 2011 and November 8, 2012, excluding defendants." Glitz, Doc. 1 at 32, ¶ 68. The Amended Complaint has defined the proposed class as

all purchasers of SandRidge securities . . . , consisting of the following:

(a) purchasers of the common stock of SandRidge . . . ;

(b) purchasers of the common units of the Miss Trust I in or traceable to the Miss Trust I Offering . . . ;

(c) purchasers of the common units of the Miss Trust II in or traceable to the Miss Trust II Offering . . . .

Doc. 75 at 20, ¶ 54.

21

identified misrepresentations and omissions in SEC filings other than offering documents;[23] the Amended Complaint, as in pertains to the Trusts, identifies alleged misstatements and omissions in the Trusts' offering materials.

Glitz and the Notice rely on the fact that "SandRidge's stock fell precipitously from its November 8, 2012 closing price of $6.10 per share to . . . $5.51 per share on November 9, 2012, or 9%." Glitz, Doc. 1 at 5, ¶ 8; e.g., Doc. 29-3 at 2. Such statement does not, however, reflect the price per share of the Trusts' common units,[24] and neither the allegations in the Glitz complaint nor the statements in the Business Wire Notice would have alerted Miss Trust I or Miss Trust II investors of the pendency of an action involving securities issued by either Trust.[25]

Because the transactions giving rise to the claims against the Trusts are grounded on new factual and legal allegations, e.g., Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc., 2005 WL 1322721 (S.D.N.Y. 2005), the Court finds that "the [A]mended [C]omplaint . . . [has] dramatically alter[ed] the contours of the lawsuit," In re

[23]See, e.g., Glitz, Doc. 1 at 6, ¶ 9; id. at 8, ¶ 21; id. at 11, ¶ 28; id. at 12, ¶ 30; id. at 14, ¶ 34; id. at 19, ¶ 41; id. at 23, ¶ 48; id. ¶ 49.

[24]As the Amended Complaint indicates, the price per share of a common unit of Miss Trust I fell from $18.95 on November 8, 2012, to $17.54 on November 9, 2012–a decline of 7.4%. See Doc. 75 at 11, ¶ 11. The price per share of a common unit of Miss Trust II fell more than 8.5% from $19.36 on November 8, 2012, to $17.70 on November 9, 2012. See id.

[25]The Amended Complaint very clearly distinguishes between SandRidge's common securities and the Trusts' common units. See, e.g., Doc. 75 at 147, ¶ 355. And while SandRidge and the Trusts may be, as the Lead Plaintiffs and the Trust Plaintiffs have argued, "inextricably linked," Doc. 141 at 43, they are "separate legal entities." Id. at 15. See Doc. 130-1 at 2 (Miss Trust I units "represent undivided beneficial interests in the property of the trust. They do not represent any interest in Sandridge."); id. at 13 ("trust units do not represent interests in or obligations of SandRidge"); id. at 47 (same); Doc. 130-2 at 2 (Miss Trust II "represent undivided beneficial interests in the property of the trust. They do not represent any interest in SandRidge."); id. at 18 ("trust units do not represent interests in or obligations of SandRidge"); id. at 58 (same).

Leapfrog Enterprises, Inc. Securities Litigation, 2005 WL 5327775 *3 (N.D. Cal. 2005), and that the Trusts are entitled to the dismissal they have requested.

Such finding[26] is bolstered by the Trusts' argument that Greenberg, Odell and Blackburn are not presumptively the most effective class representatives and do not adequately represent the interests of purchasers of common units issued by Miss Trust I and/or Miss Trust II "given their relatively inconsequential transactions," Doc. 129 at 24: Greenberg "acquired" 800 common units of Miss Trust I on October 2, 2012, some eighteen (18) months after the Miss Trust I Offering, at a price per unit of $23.21, see Doc. 75 at 168; Odell purchased 2,000 common units of Miss Trust II on April 18, 2012, at a price per unit of $21.25, see id. at 170; and Blackburn purchased 1,000 common units of Miss Trust II on May 2, 2012, at a price per unit of $23.00. See id. at 171.

While "courts have required plaintiffs to republish notice when the amended pleading affects a new class of plaintiffs, asserts new legal theories or claims, or is based on new factual allegations," Vanleeuwen v. Keyuan Petrochemicals, Inc., 2013 WL 2247394 * 5 (C.D. Cal. 2013)(citations omitted), the Trusts have requested dismissal rather than republication; likewise, neither the Lead Plaintiffs nor the Trust Plaintiffs have suggested the latter in case the Court finds the Trusts' arguments to be meritorious.

Accordingly, having found that the Trust Plaintiffs may not proceed on their claims against the Trusts in the absence of compliance with the PSLRA,[27] the Court DISMISSES

---

[26]Having found the Lead Plaintiffs and the Trust Plaintiffs' failure to comply with the PSLRA to be dispositive, the Court has not considered the Trusts' arguments regarding standing or their challenges to the plausibility or sufficiency of the allegations advanced in support of Counts I, III and IV.

[27]E.g., Vanleeuwen *6 (permitting plaintiffs to proceed on their claims without providing notice to members of new class of plaintiffs contrary to letter and intent of notice requirements

without prejudice the claims asserted by Greenberg, Blackburn and Odell against the Trusts in Counts I, III and IV and GRANTS the Trusts' Motion to Dismiss Corrected Consolidated Amended Complaint [Doc. 131].

ENTERED this  11th  day of May, 2015.

LEE R. WEST
UNITED STATES DISTRICT JUDGE

_____

provided by section 78u–4(a)(3)).