IN THE UNITED STATES DISTRICT COURT FOR

THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| IN RE SANDRIDGE ENERGY, INC. | ) | No. CIV-12-1341-W |
| SECURITIES LITIGATION | ) | |
| | | Relating to All Securities Actions |

## ORDER

This matter comes before the Court on the Motion to Dismiss Plaintiffs' Consolidated Amended Complaint filed by defendants SandRidge Energy, Inc. ("SandRidge"), James D. Bennett, Matthew K. Grubb, Randall D. Cooley, Jim J. Brewer, Everett R. Dobson, William A. Gilliland, Daniel W. Jordan, Roy T. Oliver, Jeffrey S. Serota and D. Dwight Scott pursuant to Rules 12(b)(6) and 9(b), F.R.Civ.P. Lead plaintiffs Laborers Pension Trust Fund for Northern Nevada, Construction Laborers Pension Trust of Greater St. Louis and Vladimir and Angelica Galkin (collectively "Lead Plaintiffs") and plaintiffs Judith Greenberg, Charles Blackburn and Ted Odell (collectively "Trust Plaintiffs") have responded in opposition, and SandRidge and the movants have filed a reply. Based upon the record and after review of the allegations in the corrected consolidated amended complaint ("Amended Complaint"), see Doc. 75, the Court makes its decision with regard to these defendants' request for dismissal.

In doing so, the Court finds that dismissal of the claims asserted in Counts III, IV and V against any movant by the Trust Plaintiffs is warranted because the Court has determined in prior Orders, see Docs. 179, 180, that the Trust Plaintiffs failed to comply with the notice requirement of the Private Securities Litigation Reform Act ("PSLRA"), 15

U.S.C. § 78u-4.[1] Likewise, to the extent, if any, Counts I and II were brought on behalf of the Trust Plaintiffs against any movant herein, such allegations are dismissed.

As to the remaining claims, the Court is first guided by Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), wherein the United States Supreme Court set forth the standards that this Court must use in determining whether dismissal, as these defendants have requested, is warranted under Rule 12(b)(6), supra. The Supreme Court held in accordance with Rule 8, F.R.Civ.P., that a complaint need not contain "heightened fact pleading of specifics," 550 U.S. at 570, or "detailed factual allegations," id. at 555 (citations omitted), but that it must contain "enough facts to state a claim to relief that is plausible on its face." Id. at 570.

The United States Court of Appeals for the Tenth Circuit has stated that Twombly imposes a "burden . . . on the plaintiff[s] to frame a 'complaint with enough factual matter (taken as true) to suggest' that [they are] . . . entitled to relief." Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Twombly, 550 U.S. at 556). Thus, "[t]he allegations [in the Amended Complaint] must be enough that, if assumed to be true, . . . [the Lead Plaintiffs] plausibly (not just speculatively) ha[ve] a claim for relief [against these defendants]." Id. (footnote omitted).

The Court's task at this stage is to determine whether "there are well-pleaded factual allegations," Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), in the challenged pleading;[2] if so,

---

[1] For that reason, the Court has disregarded those allegations in the Amended Complaint giving rise to those claims and the arguments of the parties concerning the same.

[2] "The [C]ourt's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." Swoboda v. Dubach, 992 F.2d 286, 290 (10th Cir. 1993)(quotation omitted)(emphasis deleted). That is to say, "the sufficiency of a

the "[C]ourt should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citations omitted).

In this connection, a complaint "'must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'" Bryson v. Gonzales, 534 F.3d 1282, 1286 (10th Cir. 2008)(quotation and further citation omitted). While "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context," Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215 (10th Cir. 2011)(citations omitted), neither "'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), nor "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory allegations, . . . suffice." Id. (citation omitted). "[T]he Twombly/Iqbal standard recognizes a plaintiff should have at least some relevant information to make the claims plausible on their face." Khalik v. United Air Lines, 671 F.3d 1188, 1193 (10th Cir. 2012).

---

complaint must rest on its contents alone." Gee v. Pacheco, 627 F.3d 1178, 1186 (10th Cir. 2010) (citation omitted).

Exceptions to this rule occur when a complaint incorporates documents by reference, e.g., id. (citations omitted), when submitted documents referred to in that paper are central to a plaintiff's claims and the authenticity of those documents is not in dispute, e.g., id. (citation omitted), and when matters exist of which a court should take judicial notice. E.g., id. (citation omitted). In those limited instances, the Court is not required to restrict itself to examination of the allegations in the challenged pleading.

Accordingly, because the Lead Plaintiffs have referred to various documents in their Amended Complaint and because these documents are central to their claims and their authenticity is not in dispute, the Court is permitted to consider and has examined the same. The Court has likewise reviewed certain public documents submitted by the parties. E.g., In re Gold Resource Corporation Securities Litigation, 776 F.3d 1103, 1108 (10th Cir. 2015); Slater v. A.G. Edwards & Sons, Inc., 719 F.3d 1190, 1196 (10th Cir. 2013).

"[I]t demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," Iqbal, 556 U.S. at 678 (citations omitted), and more than "mere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' . . . ." Kansas Penn Gaming, 656 F.3d at 1214 (quoting Twombly, 550 U.S. at 555). If the Lead Plaintiffs' factual allegations "are 'merely consistent with' a defendant's liability," Iqbal, 556 U.S. at 678 (quotation omitted), or "do not permit the [C]ourt to infer more than the mere possibility of misconduct," id. at 679, these claimants have "not 'show[n]' . . . 'that . . . [they are] entitled to relief.'" Id. (quotation omitted).

Rule 9(b), supra, on which the defendants have also relied, requires a plaintiff, "[i]n alleging fraud . . . , [to] . . . state with particularity the circumstances constituting [the] fraud . . . ." Id. "Thus, 'a complaint alleging fraud [must] set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" Tal v. Hogan, 453 F.3d 1244, 1263 (10th Cir. 2006)(quoting Koch v. Koch Industries, 203 F.3d 1202, 1236 (10th Cir. 2000)(other citation omitted)).

In determining whether the Amended Complaint meets these heightened pleading requirements, to the extent, if any,[3] Rule 9(b) is applicable in this instance, the Court's analysis is again confined to the text of that pleading, e.g., United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 726 (10th Cir. 2006)(citation omitted), and any exhibits attached thereto and incorporated by reference therein. As with Rule 12(b)(6), supra, the Court must "accept as true all well-pleaded facts, as distinguished

---

[3]See In re Gold Resource, 776 F.3d at 1108-09.

4

from conclusory allegations, and [must] view those facts in the light most favorable to the
. . . [the complainants]." Id.(citation omitted).

The Lead Plaintiffs brought this action on behalf of all purchasers, other than the
named defendants, of certain SandRidge securities between February 24, 2011, and
November 8, 2012–which period is defined as "the 'Class Period.'" Doc. 75 at 6, ¶ 1.
SandRidge is an oil and gas exploration company, see id. at 7, ¶ 2,[4] which has as "one of
. . . [its] core holdings . . . the Mississippian play,"[5] id., "a geological formation that extends
hundreds of miles across northern Oklahoma and south-central Kansas." Id. at 26, ¶ 74.

The Lead Plaintiffs have contended that "[w]hen natural gas prices began to drop
in 2008, [SandRidge] . . . made a shift in strategy to transform itself from being primarily
low-margin natural gas producing to a high margin oil producing company," id. at 30, ¶ 86,
and that SandRidge founder, Tom L. Ward, "equated increased oil production with an
increase in shareholder value," id. at 32, ¶ 90, and emphasized to investors that

> [w]hen considering the current valuation ratio of oil to natural gas, . . .
> [SandRidge's] ability to substantially grow [its] . . . oil production clearly
> enables SandRidge to generate higher revenues and deliver increased value
> to . . . shareholders. When combined with [its] . . . ability to quickly capture
> value on [its] . . . natural gas assets should prices improve, [SandRidge's] .
> . . successful transformation to oil has put [it] . . . in an extremely positive
> position for the future.

Id.

---

[4]SandRidge is organized under the laws of the State of Delaware, see Doc. 76 at 15, ¶ 26,
and has its principal place of business in Oklahoma City, Oklahoma. See id.

[5]The Mississippian formation "ranges from a few hundred feet to as much as 1000 feet
thick, and is composed of layers of limestone, chert and limey mudstones that were deposited in
a shallow sea during the Mississippian geological period over 300 million years ago. Oil has been
produced from the formation since the 1940's from conventional vertical wells. Beginning in 2007,
horizontal well and hydraulic fracturing technology has been applied to extract oil from reservoirs
within the . . . formation." Id. at 26, ¶ 74.

The Lead Plaintiffs have contended that the three remaining movants–SandRidge, Grubb and Bennett–were in fact misrepresenting the value of SandRidge's Mississippian play properties and they have sought relief in Count I[6] under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), as amended by the PSLRA, 15 U.S.C. § 78u-4, and under Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and against Grubb and Bennett in Count II under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as amended by the PSLRA.  Grubb served as SandRidge's President and Chief Operating Officer during the Class Period, See Doc. 75 at 15, ¶ 29; Bennett served as SandRidge's Senior Vice President and Chief Financial Officer during that same time. See id. ¶ 28.

> Section 10(b) makes it
>
> unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission ("SEC") may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5, its implementing regulation,

> "mak[es] it unlawful to, among other things, 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'"

Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317 (2011)(quoting 17 C.F.R. § 240.10b–5(b)); e.g., Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552

---

[6]See id. at 153, ¶ 367 ("This Count is asserted against SandRidge[ ] [and] the Individual SandRidge Defendants . . . for violations of Section 10(b) of the Exchange Act and Rule 10b-5."). The phrase "Individual SandRidge Defendants" refers to Ward, Bennett and Grubb.  See id. at 17, ¶ 38; id. at 15, ¶¶ 27-29.

U.S. 148, 157 (2008)(Rule 10b–5 encompasses only conduct already prohibited by section 10(b)).

"A plaintiff suing under Section 10(b) . . . bears a heavy burden at the pleading stage[,]" In re Level 3 Communications, Inc. Securities Litigation, 667 F.3d 1331, 1333 (10th Cir. 2012), and in determining whether the Amended Complaint sets forth sufficient direct or inferential allegations to sustain a recovery under Section 10(b) and Rule 10b-5, the Court has considered, as case law requires,[7] whether the Amended Complaint contains allegations addressing the following material elements:

> "(1) a material misrepresentation or omission by the defendant;[8] (2) scienter;[9] (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

Matrixx, 131 S. Ct. at 1317 (quoting Stoneridge Investment, 552 U.S. at 157).

---

[7]To determine whether the Lead Plaintiffs have met their "obligation to provide the 'grounds' of . . . [their] 'entitle[ment] to relief,'" Twombly, 550 U.S. at 555 (citation omitted), the Court has applied Twombly/Iqbal to the Amended Complaint and accepted as true any well-pleaded factual allegations asserted therein. In doing so, the Court is mindful that while Rule 12(b)(6) "does not require . . . [the Lead Plaintiffs to] establish a prima facie case in [their Amended] . . . [C]omplaint," Khalik, 671 F.3d at 1192, an examination of the essential "elements of [the] . . . alleged cause of action [is] help[ful] to determine whether [they have] . . . set forth a plausible claim." Id. (citations omitted). Accordingly, the Court has first considered what elements the Lead Plaintiffs must ultimately establish to prevail on a Section 10(b) claim, e.g., Burnett v. Mortgage Electronic Registration Systems, Inc., 706 F.3d 1231, 1236 (10th Cir. 2013)(Iqbal's contextual approach means comparing pleading with elements of cause of action), and then "draw[ing] on its judicial experience and common sense,'" id. (quoting Iqbal, 556 U.S. at 679), the Court has "compar[ed] . . . [the Lead Plaintiffs' allegations] . . . with the elements of th[at] cause[ ] of action." Id.; e.g., id. (pleadings that do not allow for at least "reasonable inference" of legally relevant facts are insufficient).

[8]E.g., Nakkhumpun v. Taylor, 782 F.3d 1142, 1147 (10th Cir. 2015)(as to first element (falsity), plaintiff must plead the fraud with particularity under Rule 9(b)).

[9]E.g., In re Gold Resource, 776 F.3d at 1109 (with respect to each statement or omission alleged, plaintiff must state with particularity facts giving rise to a strong inference that defendant acted with required state of mind).

To meet their burden, the Lead Plaintiffs have alleged in Count I that the "defendants," collectively and without attributing particular conduct to any one defendant,

(1) disseminated or approved certain "materially false and misleading statements . . . , which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary . . . to make the statements . . . , in light of the circumstances under which they were made, not misleading[,]" Doc. 75 at 153, ¶ 368;

(2) "by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of . . . [SandRidge,]" id. ¶ 369;

(3) "(a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of . . . SandRidge securities during the Class Period in an effort to maintain artificially high market prices for the[se] . . . securities[,]" id. ¶ 370;

(4) are liable because "(i) [they] . . . were high-level [SandRidge] executives and/or directors . . . and members of [SandRidge's] . . . . management team or had control thereof; (ii) . . . by virtue of [their] . . . responsibilities and activities as a [SandRidge] senior officer and/or director . . . [they were] privy to and participated in the creation, development and reporting of [SandRidge's] . . . internal budgets, plans, and/or projections; (iii) . . . [they] enjoyed significant personal contact and familiarity with the other defendants and [were]

. . . advised of and had access to other members of [SandRidge's] . . . management team, internal reports and other data and information about [SandRidge's] . . . reserves, production, finances, operations, and liabilities at all relevant times; and (iv) [they were each] . . . aware of [SandRidge's] . . . dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading[,]" id. at 154, ¶ 371;

(5) "had actual knowledge of the misrepresentations and omissions of material facts set forth [in the Amended Complaint] . . . , or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them[,]" id. ¶ 372;

(6) acted "knowingly or recklessly and for the purpose and effect of concealing from the investing public the significant problems with SandRidge's cash flows, capital expenditures, [and] . . . overstated reserves, and the extent of the [Ward-]related party[10] transactions, and . . . the artificially inflated price of SandRidge securities[,]" id. at 154-55, ¶ 372; and

(7) "[a]s demonstrated by [their] . . . misstatements of . . . [SandRidge's] . . . business, operations, oil and gas reserves, and transactions[,] . . . if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading." Id. at 155, ¶ 372.

---

[10]The Lead Plaintiffs have used the phrase–"Ward-related entities"–in the Amended Complaint to refer collectively to three entities with which Ward is alleged to be affiliated: WCT Resources, L.L.C., 192 Investments, L.L.C. and TLW Land & Cattle, L.P. See Doc. 75 at 35, ¶ 104.

The Lead Plaintiffs have further alleged in support of Count I

(1) that "[a]s a result of the dissemination of the materially false and misleading information and failure to disclose material facts, . . . the market prices of SandRidge's securities were artificially inflated[,]" id. ¶ 373;

(2) that "[i]n ignorance of the fact that market prices of SandRidge's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by [d]efendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by [d]efendants but not disclosed in public statements . . . , [the Lead] Plaintiffs . . . acquired SandRidge securities . . . at artificially high prices and were damaged as a result[,]" id.; and

(3) that the Lead Plaintiffs "were ignorant of the[ ] falsity [of the misrepresentations and of the omissions], and . . . [h]ad [they] . . . known the truth . . . [they] would not have purchased or otherwise acquired their SandRidge securities, or, if they had purchased such securities . . . , they would not have done so at the artificially inflated prices which they paid." Id. at 155-56, ¶ 374.

The movants have argued that the Amended Complaint sets forth no actionable misstatements or omissions, describing that pleading as "offering [only] a blunderbuss of allegations in the apparent hope that at least one or two will survive scrutiny." Doc. 133 at 22-23. The purported misstatements and/or omissions, according to the movants, concern three subjects: SandRidge's projected capital expenditures ("CapEx"), acreage acquisitions by the Ward-related entities and oil and gas production. See Doc. 75 at 154-55, ¶ 372.

10

In connection with the first subject–the CapEx allegations, SandRidge, Bennett and Grubb have argued inter alia that any statements or representations about the same fall within PSLRA's "safe harbor" provision, which protects individuals and corporations from liability for certain statements that prove false. The "safe harbor" provision renders statements not actionable

> if and to the extent that–
>
> (A) [such] . . . statement[s] . . . [are]
>
>> (i) identified as . . . forward-looking statement[s], <u>and</u> [are] . . . accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]; <u>or</u>
>>
>> (ii) immaterial; <u>or</u>
>
> (B) the plaintiff fails to prove that the forward-looking statement[s]–
>
>> (i) . . . w[ere] made with actual knowledge . . . that the statement[s] w[ere] false or misleading[.]"

15 U.S.C. § 78u-5(c)(1)(emphasis added).

The statute is phrased in the disjunctive. In those instances where there are "meaningful cautionary statements," liability is precluded despite a defendant's state of mind; if a defendant lacked "actual knowledge" about the falsity or misleading nature of the statement, liability is precluded without regard to whether there was adequate cautionary language. See In re Gold Resource Corp. Securities Litigation, 957 F. Supp.2d 1284, 1293-94 (D. Colo. 2013).

In determining whether the safe harbor provision provides protection to SandRidge, Bennett and Grubb in this instance, the Court has considered the following allegations as set forth in the Amended Complaint:

(1) the "[d]efendants repeatedly noted that by 2014, [SandRidge] . . . would have a 'self-funding capital program,' which would be operating 'all within [SandRidge's] cash flow,' and all while 'improving [its] credit metrics[,]'" Doc. 75 at 46, ¶ 125;

(2) "[c]ontrary to their [positive statements and] repeated assurances during the Class Period, instead of focusing on cash flow and maintaining financial discipline, [the] [d]efendants continued to spend more and more money and exceed capital expenditure targets in large part to continue acquisition, drilling, and development activities in the Mississippian[,]" id.;[11]

(3) "[o]n February 24, 2011, [SandRidge] . . . provided capital expenditures guidance for 2011 of $1.3 billion[,]" id. ¶ 126,[12] and "[t]hereafter, . . . expressed confidence in the budget several times[,]" id., as evidenced by Ward's statements[13]

_____

[11]See id. at 63, ¶ 159 ("Defendants knew, or recklessly disregarded, that contrary to their statements about financial discipline and meeting their capital expenditures, . . . [they] sought to pour more and more money into the Mississippian regardless of the cost to SandRidge").

[12]See id. at 67, ¶ 165 (quoting February 24, 2011, press release that announced financial and operational results for the fourth quarter and full year 2010 and contained SandRidge's 2011 Operational Guidance [Doc. 133-8 at 9]: "Total planned capital expenditures have increased to $1.3 billion from $1.1 billion, primarily due to planned increases in drilling activity in the Mid-Continent, workovers and recompletions in the Permian Basin, land acquisitions in the Mid-Continent area, and anticipated midstream and other expenditures."); Doc. 75 at 68, ¶ 170 (quoting Form 10-K for fiscal year ending December 31, 2010, filed on February 28, 2011 [Doc. 133-1 at 72]: "For 2011, [SandRidge has] . . . budgeted $1.3 billion for capital expenditures. The majority of [its] . . . capital expenditures are discretionary and could be curtailed if . . . cash flows decline from expected levels or [SandRidge is] . . . unable to obtain capital on attractive terms. [SandRidge] . . . may increase or decrease planned capital expenditures depending on oil and natural gas prices, asset sales and the availability of capital through the issuance of additional equity or long-term debt.").

[13]See Doc. 75 at 72, ¶ 178 (quoting from a transcript of an investor and analyst meeting on March 1, 2011 [Doc. 133-22 at 3], wherein Ward explained SandRidge's "history of buying property in the Central Basin Platform of the Permian" and "discuss[ed] the future development of that area: "'So while [SandRidge] . . . continue[s] to look at the platform as a place that [SandRidge] . . . like[s] and want[s] to add acreage, it's not really in the scale that['s] . . . already [been] talked about. So the Central Basin Platform will be—the majority of [SandRidge's] . . . CapEx will be spent there this

(a) "in an April 12, 2011 conference call with investors . . . : '[W]e've addressed the CapEx funding gap for this year and are already starting to work on 2012[,]'" id.;[14]

(b) "[i]n a May 6, 2011 conference call with investors,[15] . . . : '[H]aving [almost] fully funded our 2011 CapEx plan, we'll continue our capital raising efforts and are now focused on funding our 2012 program, which we will also accomplish through additional asset monetization[,]'" id. at 46-47, ¶ 126 (emphasis deleted);[16] and

(c) "[i]n a May 24, 2011 conference call with investors, . . . : '[W]e have addressed our CapEx funding gap for this year and are working diligently on our 2012 projected gap as I think we'll be discussing throughout this year.  In fact, we anticipate having that concluded before 2011[,]'" id. at 47, ¶ 126;

(4) the defendants in August 2011 however "announced [in a press release] that SandRidge was increasing 2011 capital expenditure guidance by a shocking $500 million,

---

year[.]'"); Doc. 75 at 75, ¶ 188 (quoting from a transcript of the Barclays Capital High Yield Bond and Syndicated Loan Conference on March 25, 2011 [Doc. 133-25 at 3], wherein Bennett opined about the amount of capital expenditures that were allocated for the Permian Basin:  "'Talking about the Permian Basin, two-thirds of [SandRidge's] . . . capital this year will be on the Permian Basin. . . . [I]t's been producing oil for over 80 years [and is] . . . the third most prolific oil producing basin in the United States.'").

[14]See Doc. 133-27 at 6 (Transcript of the Independent Petroleum Association of America Oil & Gas Investment Symposium (April 12, 2011)).

[15]See Doc. 133-28 at 8 (Transcript of 1Q11 Earnings Call (May 6, 2011)).

[16]See Doc. 75 at 82, ¶ 204 (Form 10-Q for 1Q11 filed on May 9, 2011 [Doc. 133-3 at 43]: "For 2011, [SandRidge has] . . . budgeted $1.3 billion for capital expenditures . . . , excluding acquisitions. The majority of . . . capital expenditures are discretionary and could be curtailed if . . . cash flows decline from expected levels or if [SandRidge is] . . . unable to obtain capital on attractive terms.  [SandRidge] . . . may increase or decrease planned capital expenditures depending on oil and natural gas prices, the availability of capital through asset sales and the issuance of additional equity or long-term debt.").

from $1.3 billion to $1.8 billion," id. at ¶ 127,[17] an increase "[t]he press release attributed

primarily to 'increased leasing activity, well count and well costs in the Mississippian play[,]'"

id. (emphasis deleted),[18] and which increase Ward stated "[d]uring an August 5, 2011

earnings conference call with analysts and investors, . . . [was due] in part because

[SandRidge] . . . was looking to acquire additional acreage in the Mississippian." Id. ¶ 128.[19]

The Lead Plaintiffs have further complained in connection with this category of

allegations that "[t]he rise in capital expenditures did not end there," id. ¶ 129, and that "the

guidance [was raised] three more times[,]" id.:

(1) "[d]uring the first and second quarters of 2012, [SandRidge] . . . estimated that

capital expenditures for 2012 would increase slightly, topping off at $1.85 billion[,]" id.;

(2) however, in a press released dated August 2, 2012, SandRidge "again increased

the 2012 capital expenditures by $250 million . . . to $2.1 billion[,]" id.; and

(3) on November 8, 2012, SandRidge "raised the capital expenditure budget yet

again to $2.15 billion." Id.

_____

[17]See id. at 85, ¶ 214 (quoting from press release (August 4, 2011), SandRidge announced its financial and operational results for 2Q11 and first six months of 2011 [Doc. 133-26]: "'Increasing 2011 capital expenditure guidance by $500 million, from $1.3 billion to $1.8 billion, reflecting an increase in Mississippian drilling activity and continued acreage purchases both in the Mississippian and the Central Basin Platform.'").

[18]See Doc. 133-26 at 12 (2011 Guidance Update).  The increased activity was the result of "a $500 million joint venture [between SandRidge and] . . . Atinum [Partners Co., Ltd. ('Atinum')], [which] . . . allow[ed] SandRidge [to] accelerate its drilling and development activity in the Mississippian."  Doc. 75 at 47, ¶ 127; e.g., id. at 85-86, ¶ 213 (Atinum agreed to pay SandRidge $250 million in cash and committed to a drilling carry obligation up to a total amount of $250 million); id. at 86, ¶ 215.

[19]See Doc. 133-30 at 8 (transcript of 2Q11 Earnings Call).

The phrase "forward-looking statements" is statutorily defined to include "projection[s] of . . . capital expenditures." 15 U.S.C. § 78u-5(i)(1)(A).[20] Therefore, to fall within PSLRA's safe harbor, the Court must determine whether SandRidge's predictive CapEx statements were accompanied by meaningful cautionary language.

"'"[C]autionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs [have] challenge[d].'"'" In re Molycorp, Inc. Securities Litigation, 2015 WL 1540523 *25 (D. Colo. 2015)(quotation and further citation omitted). Not "'"all factors" that may present a risk [must be listed], nor "must the cautionary language explicitly mention the factor that ultimately belies a forward-looking statement. . . .'"'" Id. (quotation omitted)(emphasis deleted). "'Rather, "when an investor has been warned of risks of a significance similar to that actually realized, [the investor] . . . is

---

[20]For purposes of PSLRA's safe harbor provision, the term "forward-looking statement" includes only

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations . . . ;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management . . . ;
>
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
>
> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
>
> (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the [SEC].

15 U.S.C. § 78u-5(i)(1)(A)-(F).

sufficiently on notice of the danger of the investment to make an intelligent decision about it according to [the investor's] . . . own preferences for risk and reward.'"" Id. (quotation omitted)(emphasis deleted).

Upon review, the Court finds that SandRidge's representations about its projected capital expenditures about which the Lead Plaintiffs have complained were accompanied by adequate cautionary statements that "identif[ied] important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." 15 U.S.C. § 78u-5(c)(1)(A)(i). Admittedly, SandRidge's statements in SEC filings that "[t]he oil and natural gas industry is capital intensive," Doc. 133-1 at 41; e.g., Doc. 133-2 at 44, and that "capital expenditures are necessary to offset inherent declines in production and proven reserves, which is typical in the capital-intensive oil and natural gas industry," Doc. 1 at 69; e.g., Doc. 133-2 at 76, are arguably too general and mere boilerplate.

SandRidge, however, sufficiently alerted investors of the dangers of their investments by also providing substantive and company-specific warnings about certain circumstances, for example:  that the development of its proved undeveloped reserves, which constituted a large percentage of its total reserves,[21] could "require higher levels of capital expenditures than . . . anticipate[d,]" id. at 40, and that SandRidge's "ultimate recoveries . . . may not match current expectations," Doc. 133-1 at 40, due to "[d]elays in . . . development or increases in costs to drill . . . [which] will reduce [the present value of estimated future net

---

[21]See, e.g., Doc. 133-1 at 40 ("[a]s of December 31, 2010, 59.2% of our total reserves were proved undeveloped reserves").

revenues[,]" id.;[22] e.g., id. at 53; Doc. 133-2 at 44;[23] id. at 5; Doc. 133-8 at 15;[24] Doc. 133-9

at 35.[25]  Accordingly, the Court finds that SandRidge's projected CapEx estimates[26] fall

within PSLRA's safe harbor provision[27] and are therefore not actionable.[28]

_____

[22]See Doc. 75 at 68, ¶ 170 (Form 10-K (February 28, 2011) reiterated SandRidge's financial results contained in its February 24, 2011, press release); Doc. 133-1 at 40 (Form 10-K for fiscal year ending December 31, 2010)("As of December 31, 2010, 59.2% of our total reserves were proved undeveloped reserves.  Development of these reserves may take longer and require higher levels of capital expenditures than [SandRidge] . . . currently anticipate[s].  Therefore, ultimate recoveries from these fields may not match current expectations.  Delays in the development of our reserves or increases in costs to drill and develop such reserves will reduce the [present value of estimated future net revenues ('PV-10')] . . . of our estimated proved undeveloped reserves . . . .").

[23]See Doc. 133-2 at 44 (Form 10-K for fiscal year ending December 31, 2011)("As of December 31, 2011, 51% of . . . [SandRidge's] total reserves were proved undeveloped reserves. Development of these reserves may take longer and require higher levels of capital expenditures than [SandRidge] . . . currently anticipates.  Therefore, ultimate recoveries from these fields may not match current expectations.  Delays in the development of . . . [SandRidge's] reserves or increases in costs to drill and develop such reserves will reduce the PV-10 value of its estimated proved undeveloped reserves and future net revenues estimated for such reserves.").  See also id. at 44-45 ("[SandRidge's] . . . development and exploration operations require substantial capital").

[24]See Doc. 133-8 at 15 (Form 8-K, Ex. 99.1 (February 24, 2011)("Total planned capital expenditures have increased to $1.3 billion from $1.1 billion, primarily due to planned increases in drilling activity in the Mid-Continent, workovers and recompletions in the Permian Basin, land acquisitions in the Mid-Continent area, and anticipated midstream and other expenditures").

[25]See Doc. 133-9 at 35-36 (explaining inter alia why development of proved undeveloped reserves in West Texas and other areas of operation may take longer and may require higher levels of capital expenditures than SandRidge currently expects).

[26]The Lead Plaintiffs have contended that "[t]he purported risk disclosure that the development of unproven reserves could require more capital than expected did not warn of the risk that CapEx could be increased to benefit the Ward-related entities or in order to mask disappointing production results[.]"  Doc. 138 at 30.  As stated, the safe harbor provision ""does not require a listing of all factors" that may present a risk, nor "must the cautionary language explicitly mention the factor that ultimately belies a forward-looking statement[.]""  In re Molycorp, 2015 WL 1540523 *25 (quotation omitted)(emphasis deleted).

[27]The Lead Plaintiffs have argued without citation of authority that certain CapEx representations about which they have complained contain "statements of current or historical fact[,]" Doc. 138 at 29, and thus, are not protected by PSLRA's safe harbor.  Although the Lead Plaintiffs had the opportunity to identify those representations, they have referred to only alleged

Relying on the material element of "loss causation," which is also required to state a cause of action under Section 10(b) and Rule 10b-5, e.g., Matrixx, 131 S. Ct. at 1317; Stoneridge Investment, 552 U.S. at 157, SandRidge, Bennett and Grubb have next challenged the Lead Plaintiffs' allegations about the transactions of the Ward-related entities in the Mississippian formation.[29] The Lead Plaintiffs have contended that Ward, who is named as a defendant in his individual capacity as chief executive officer and chairman of SandRidge's Board of Directors ("Board"), "through various affiliated entities was materially benefitting from [SandRidge's] . . . investment activities in the Mississippian[,]" id. ¶ 3, and was "acquiring massive amounts of land and mineral rights throughout the Mississippian." Id. The three affiliated entities identified in the Amended Complaint are WCT Resources, L.L.C. ("WCT"),[30] 192 Investments, L.L.C. ("192

---

statement of current or historical fact: "'[H]aving fully funded our 2011 CapEx plan, we'll continue our capital raising efforts and are now focused on funding our 2012 program, which we will also accomplish through additional asset monetization.'" Id. (quoting Doc. 75 at 47, ¶ 126). The Court finds that it need not determine in the case of this alleged mixed statement whether the non-forward-looking portion of such statement is actionable since taken as a whole the challenged statement relates to projected capital expenditures.

[28]Having so determined, the Court has not considered the movants' remaining challenges to these allegations.

[29]Because the Court has found dispositive the movants' arguments regarding the Lead Plaintiffs' failure to sufficiently allege facts plausibly suggesting "loss causation" as to these allegations, the Court has disregarded the movants' remaining challenges to the Lead Plaintiffs' allegations regarding the Ward-related entities.

[30]WCT is described in the Amended Complaint as a limited liability company organized under Oklahoma law, which once shared its headquarters with SandRidge in Oklahoma City. See Doc. 75 at 36, ¶ 105. The Lead Plaintiffs have asserted that WCT is owned by trusts established by Ward and his wife, Sch'ree Ward, for the benefit of Ward's children and that the trustee of these trusts is Scott C. Hartman, who has worked at SandRidge since April 2006 and has served as SandRidge's executive business director. See id. ¶ 106. The Lead Plaintiffs have further contended that Ward's son, Trent Ward ("T Ward"), is WCT's registered agent and chief executive officer and that Scott White, who was employed by SandRidge as a land manager until 2011, is WCT's current chief operating officer. See id.

Investments"),[31] and TLW Land & Cattle, L.P. ("TLW"),[32] see id. at 35, ¶ 104, and they allegedly not only operated in the same locations as SandRidge, but also were direct competitors of SandRidge. See id.

The element of "loss causation" recognized in Matrixx, 131 S. Ct. at 1317, and Stoneridge Investment, 552 U.S. at 157, "requires a plaintiff to show that a misrepresentation (or omission) that affected the integrity of the market price also caused a subsequent economic loss." Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179, 2186 (2011)(emphasis deleted). Loss causation "'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" In re Williams Securities Litigation-WCG Subclass, 558 F.3d 1130, 1136 (10th Cir. 2009)(quoting Emergent Capital Investment Management, LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2nd Cir. 2003)); e.g., Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005).

---

The Lead Plaintiffs have asserted that "SandRidge had leased the mineral rights for at least 223 sections in northwest Kansas, within the counties of Sherman, Thomas, Sheridan, Wallace, Logan, and Gove," id. ¶ 107, and that WCT, "[i]n the[se] same counties, and often adjoining or adjacent to SandRidge's sections, . . . leased the mineral rights to at least 403 sections . . . ." Id. They have further asserted that "on many occasions WCT[, 'the fifth largest acreage holder in the Mississippian formation,' id. at 37, ¶ 108,] . . . acquired [its] . . . lease holdings in advance of or alongside of SandRidge's holdings. Id. ¶ 107.

[31]192 Investments is described in the Amended Complaint as a limited liability company organized under Oklahoma law, which has its headquarters, like SandRidge, at 123 Robert S. Kerr Avenue in Oklahoma City. See id. at 37, ¶ 109. T Ward is 192 Investments' registered agent and its manager. See id.
The Lead Plaintiffs have contended that 192 Investments "acquired mineral rights on thousands of acres in late 2011 in the Mississippian play in Kansas," id. ¶ 110, and that it "bought those mineral rights just months before SandRidge leased property in adjacent plots." Id.

[32]TLW is described in the Amended Complaint as a limited partnership organized under Oklahoma law, which together with SandRidge and 192 Investments has its headquarters at the same address in Oklahoma City. See id. at 38, ¶ 111. Ward is TLW's registered agent, see id., and in papers filed with the SEC, TLW is identified as an "'entity in which . . . Ward has an ownership interest.'" Id.

In the Amended Complaint, the Lead Plaintiffs have contended that "[a]fter the close of trading on November 8, 2012, [SandRidge] . . . issued a press release disclosing [its] . . . financial results for the third quarter 2012 . . . , and reported a 'net loss applicable to common stockholders of $184 million, or $0.39 per diluted share, for third quarter 2012 . . . .'" Doc. 75 at 133, ¶ 321; e.g., id. at 149, ¶ 360. They have further complained that on that same date, Dnakar Singh, TPG-Axon Capital ("TPG-Axon") chief executive officer and owner of 4.5% of SandRidge's stock, had "publicly issued a letter to . . . SandRidge's Board . . . calling for . . . Ward's resignation," id. at 133-34, ¶ 322, and accusing Ward of "self-dealing, at the expense of shareholders . . . ," id. at 134, ¶ 322; e.g., id. at 149, ¶ 360; Doc. 133-23 at 7, and buying "massive holdings of ranchland and then turn[ing] around and leas[ing] th[at] land to SandRidge for future exploration . . . ." Doc. 75 at 134, ¶ 322; e.g., Doc. 133-23 at 7.

SandRidge common stock "declined from a closing price of $6.10 per share to close at $5.51 per share on November 9[ ] . . . ," Doc. 75 at 138, ¶ 330; e.g., id. at 150, ¶ 361, and the Lead Plaintiffs have alleged that this "drop[ ] removed the inflation from the price of SandRidge common stock, causing real economic loss to investors who had purchased [that] . . . stock during the Class Period." Id. at 138, ¶ 330; e.g., id. at 150, ¶ 361. The Lead Plaintiffs have claimed that this

> decline[ ] in the price of SandRidge securities after the disclosures on . . . November 8 and 9, 2012, came to light w[as] a direct result of the nature and extent of [d]efendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline[ ] in SandRidge's securities negates any inference that the loss suffered by [the Lead] Plaintiffs . . . was caused by changed market conditions, macroeconomic or industry factors or [SandRidge]-specific facts unrelated to [d]efendants' fraudulent conduct. The economic loss, i.e., damages, suffered by [the Lead] Plaintiffs . . . was a direct result of [d]efendants' fraudulent scheme to artificially inflate

the price of SandRidge's common stock and the subsequent significant decline in the value of SandRidge's common stock when [d]efendants' prior misrepresentations and other fraudulent conduct were revealed.

Id. at 150-51, ¶ 362.[33]

According to the movants, neither SandRidge's press release nor Singh's letter–the alleged corrective disclosures[34]–contained disclosures or accusations about the acquisitions of adjacent acreage by the Ward-related entities.   The disclosures and accusations "detailing the scope of certain related-party land transactions of SandRidge," Doc. 133-24 at 4; e.g., id. at 41, came in a presentation that was released by TPG-Axon on January 23, 2013, and attached as an exhibit to a Consent Statement filed with the SEC on January 24, 2013.  See Doc. 133-24 at 5.  SandRidge, Bennett and Grubb have argued that since the presentation and SEC filing came after the decline in the value of SandRidge's common stock on November 9, 2012, there can be (and are no) allegations in the Amended Complaint that support the inference that SandRidge stock declined in response to, or was

---

[33]A plaintiff may plead loss causation by alleging either a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price or the materialization of a connected risk that causes the price to drop.  E.g., In re Williams Securities Litigation, 558 F.3d at 1138 (truth may be revealed by actual materialization of concealed risk rather than by public disclosure that risk exists).  See Doc. 75 at 137, ¶ 329 ("As a direct result of [d]efendants' disclosures . . . and a materialization of the undisclosed risk of investing in SandRidge . . . , the price of SandRidge common stock . . . fell precipitously."); id. at 148, ¶ 357.

[34]As the Lead Plaintiffs have contended, they "need not identify a corrective disclosure at all."  Doc. 138 at 43.  Although "[l]oss causation is easiest to show when a corrective disclosure reveals the fraud to the public and the price subsequently drops[,]" In re Williams Securities Litigation, 558 F.3d at 1137 (citation omitted), as stated, it is not "the only or even the preferred method of showing loss causation[.]"  Id.  Regardless of which method is employed, see n.33 supra, a plaintiff must establish "how the truth was revealed."  In re Williams Securities Litigation, 558 F.3d at 1138; e.g., id. (any theory of loss causation would still have to identify when materialization occurred and link it to corresponding loss).  The allegations on which the Lead Plaintiffs have relied to "connect[ ] th[e] disclosures [that occurred on November 8 and 9, 2012,] to [the movants'] . . . misrepresentations and omissions," Doc. 138 at 42, and to "the resulting loss in the value of shares," id., do not pertain to the Ward-related entities or to these entities' acquisition of adjacent acreage.

negatively affected by, either the subsequent presentation or TPG-Axon's disclosure about the Ward-related entities and their transactions and purchases of adjacent acreage. <u>See</u> Doc. 75 at 140, ¶ 334;[35] <u>Dura Pharmaceuticals</u>, 544 U.S. at 347 (2005)(to sufficiently plead loss causation, plaintiff must allege disclosure or revelation of truth about defendant's prior misstatement or omission is in some way connected with drop in stock price); <u>In re Williams Securities Litigation</u>, 558 F.3d at 1136 (alleging price has been inflated as result of misrepresentation is not enough, even if plaintiff has suffered loss, unless plaintiff identifies "causal connection" between loss and misrepresentation). Accordingly, the Lead Plaintiffs' Section 10(b) and Rule 10b-5 claim grounded on these allegations fails.

Finally, in connection with the third category of allegations in the Amended Complaint, the Lead Plaintiffs have asserted that SandRidge, Grubb and Bennett "made representations about the production of SandRidge's wells in the Mississippian," Doc. 75 at 53, ¶ 140, but in doing so, they

(1) "grossly overstated the [estimated ultimate recovery ('EUR')] for SandRidge's . . . horizontal type well," <u>id.</u>;[36] <u>e.g.</u>, <u>id.</u> at 64, ¶ 161;

---

[35]<u>See</u> Doc. 75 at 140, ¶ 334 ("The First TPG-Axon Presentation discussed related-party transactions between . . . [SandRidge] . . . and the Ward-related entities during the Class Period. For example, the First TPG-Axon Presentation noted several instances of improper flipping of land and mineral rights. It also commented on the improper front running that had been occurring with the Ward-related entities, whereby the Ward-related entities would purchase acreage mere weeks before SandRidge purchased acreage in adjacent plots, and then either sell its holdings or hold on to them and realize tremendous gains from appreciation.")

[36]The Lead Plaintiffs have alleged that "[d]uring the Class Period, SandRidge made it appear that the EUR per well of its typical horizontal well in the Mississippian play was higher than it actually was," Doc. 75 at 53, ¶ 141, and have cited as examples: "at the beginning of 2011, SandRidge represented an EUR per well of [its] . . . typical horizontal well . . . as 409 MBoe, consisting of 211 Mbbl of oil and 1,186 MMscf of gas[,]" <u>id.</u> at 53-54, ¶ 141, and "at the beginning of 2012, SandRidge represented an increased EUR per well of [its] . . . typical horizontal well . . . as 456 MBoe, consisting of 204 Mbbl of oil and 1,512 MMscf of gas." <u>Id.</u> at 54, ¶ 142. They have

(2) "overstated the oil to gas ratios of the wells," id. at 53, ¶ 140;[37] e.g., id. at 63, ¶ 160;

(3) "minimized the oil decline rates for the wells," id. at 53, ¶ 140; e.g., id. at 64, ¶ 161;

(4) "overstated the economic value of SandRidge's Mississippian wells," id. at 53, ¶ 140;[38] and

---

contended that in fact the "total EUR per well averaged only 32.5 Mbbls for oil (84% lower than represented by SandRidge); 686 MMscf for gas (55% lower than represented by SandRidge); [and] 147 EUR, Boe (68% lower than represented by SandRidge)[.]" Id. at 56, ¶ 144.

The Lead Plaintiffs have claimed that SandRidge nevertheless "maintained throughout 2012 (until the end of the Class Period) that well performance continued to support an average 456 MBoe type well[,]" id. at 56-57, ¶ 147, as evidenced by Grubb's remarks on May 4, 2012: "[R]ight now everything looks to be on track with what we have modeled to the 456,000 barrels EUR." Id. at 57, ¶ 147. The Lead Plaintiffs have further claimed that "[a]t the end of the Class Period, SandRidge admitted that the EUR for SandRidge's Mississippian wells was lower than represented," id. ¶ 148, as shown during SandRidge's third quarter 2012 earnings conference call on November 9, 2012, during which "SandRidge disclosed that it had lowered the type well oil EUR by 24% from 204 Mbbl to 155 Mbbl." Id.

[37]The Lead Plaintiffs have alleged inter alia that "[d]uring the Class Period, SandRidge often stated well test results and well EUR estimates in terms of barrel oil equivalents (Boe) as a way to disguise the fact that it was drilling highly 'gassy' wells[,]" id. at 58, ¶ 149; that "[t]hroughout 2011, SandRidge consistently represented that its horizontal Mississippian wells produced 52% oil and 48% natural gas[,]" id. ¶ 150, and that "[t]hroughout 2012, SandRidge consistently represented that the Mississippian play had a mean oil ultimate recovery of 204 Mbbls and total oil and gas of 456 MBoe, yielding a liquid fraction oil of 45% and gas of 55%." Id.

The Lead Plaintiffs have contended that SandRidge, however, "produced a much lower percentage of oil than represented[, and that] . . . according to production data reported by SandRidge to the Oklahoma Tax Commission, throughout 2011, SandRidge produced on average less than 40% oil and more than 60% gas compared with representations of 52% oil and 48% gas[, and] [s]imilarly, according to reported production data throughout 2012, SandRidge produced on average 35% oil and 65% gas compared to [SandRidge's] . . . representations of 45% oil and 55% gas." Id. at 59, ¶ 151.

[38]The Lead Plaintiffs have alleged that "[s]ince the [estimated ultimate recovery from] . . . SandRidge's Mississippian wells w[as] much lower than represented, the wells were less valuable from an economic perspective." Id. at 60, ¶ 154.

(5) "misrepresented that well performance was consistent as represented by a single type curve across the[ ] entire leasehold, which extended for hundreds of miles." Id.[39]

SandRidge, Grubb and Bennett have challenged these allegations on multiple grounds, including, that even if the foregoing representations or omissions about the production of SandRidge's wells in the Mississippian are assumed to be false or misleading, which they dispute, that the Lead Plaintiffs have failed to establish the essential element of scienter, which is required to state a cause of action under Section 10(b) and Rule 10b-5. E.g., Matrixx, 131 S. Ct. at 1317; Stoneridge Investment, 552 U.S. at 157.

"[T]he PSLRA created a heightened pleading standard applicable to th[is] . . . element[ ]," In re Gold Resource, 776 F.3d at 1109 (citation omitted), and to satisfy "the scienter requirement—'a mental state embracing intent to deceive, manipulate, or defraud,'" id. (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)), in this case, "it is not sufficient 'for [the Lead] [P]laintiff[s] to allege generally that the defendant[s] acted with scienter, as permitted under [Rule] 9(b)[, supra].'" Id. (quoting Level 3, 667 F.3d at 1333) (other citation omitted). They must instead, "'with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that [each] . . . defendant acted with the required state of mind.'" 15 U.S.C. § 78u-4(b)(2)(A).

"'The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation,

---

[39]The Lead Plaintiffs have contended that "[c]ontrary to [the] [d]efendants' statements, there was not a single type curve across the[ ] entire leasehold extending for hundreds of miles[,]" id. at 65, ¶ 162(a), and that "[a]fter the Class Period, SandRidge provided multiple type well curves based on geographical region instead of relying on just a single type well decline curve as [it] . . . had done during the Class Period[.]" Id.

meets that standard.'" In re Gold Resource, 776 F.3d at 1109 (quoting Tellabs, Inc. v.

Makor Issues & Rights, Ltd., 551 U.S. 308, 322-23 (2007)(emphasis deleted)).  A "strong

inference" is one that is "cogent and compelling," Tellabs, 551 U.S. at 324, not "merely

'reasonable' or 'permissible[.]'" Id.  "A complaint will survive [a request for dismissal] . . .

only if a reasonable person would deem the inference of scienter cogent and at least as

compelling as any opposing inference one could draw from the facts alleged.'" Id.  (footnote

omitted).

> In this circuit, a

> [p]laintiff must allege facts sufficient to raise a strong inference that
> defendants' representations were intentionally false[40] or at least recklessly
> made. "Recklessness" under [Section] 10(b) is "conduct that is an extreme
> departure from the standards of ordinary care, and which presents a danger
> of misleading buyers or sellers that is either known to the defendant or is so
> obvious that the actor must have been aware of it."

In re Gold Resource, 776 F.3d at 1113 (quoting City of Philadelphia v. Fleming Companies,

Inc., 264 F.3d 1245, 1258 (10th Cir. 2001)); e.g., Nakkhumpun v. Taylor, 782 F.3d 1142,

1147 (10th Cir. 2015).  "Negligence, even gross negligence, is not sufficient; something

similar to 'conscious disregard' is required." In re Gold Resource, 776 F.3d at 1113 (citing

Level 3, 667 F.3d at 1343 n.12); e.g., Fleming, 264 F.3d at 1258.

The Tenth Circuit recognizes that "[c]ourts have been cautious about imposing

liability for securities fraud based on reckless conduct[.]" Id. at 1260 (citation omitted).  A

"'[p]laintiff[ ] should not be allowed to proceed with allegations of "fraud by hindsight,"'" id.;

defendants "should be liable for failing to reveal only 'those material facts reasonably

---

[40]"'Intentional misconduct . . . encompasses deliberate illegal behavior.'" City of Phila-
delphia v. Fleming Companies, Inc., 264 F.3d 1245, 1258 (10th Cir. 2001)(quotation omitted).

available to them.'"  Id. (citation omitted).  "'Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.'"  Id. (citation omitted).   Moreover, "'allegations that the defendant[s] possessed knowledge of facts that are later determined by a court to have been material, without more, [are] not sufficient to demonstrate that the defendant[s] intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate, or defraud."  Id.

The Lead Plaintiffs have contended that the Amended Complaint "raises a strong inference that [the] [d]efendants knew, or recklessly disregarded, that the economics of the typical SandRidge Mississippian horizontal well were overstated." Doc. 138 at 36 (citations omitted).   They have argued in their response that the "[d]efendants were apprised of SandRidge's true production performance because SandRidge closely and actively monitored the production from its wells." Id. (citations omitted). According to the Amended Complaint, that "close[ ] and regular[ ]," Doc. 75 at 51, ¶ 134, monitoring was performed by SandRidge's Reservoir Engineering Department, which in 2011 had "'[eighteen] full-time employees, comprised of seven degreed engineers and [eleven] engineering analysts/ technicians,'" id. (quotation omitted),[41] "to ensure [that] the most current reservoir information [was] . . . reflected in reserves estimates." Id. The Lead Plaintiffs have alleged that this department "'work[ed] closely with independent petroleum consultants . . . to ensure the integrity, accuracy and timeliness of an annually developed independent

---

[41]In 2012, the number of degreed engineers increased to eight. See Doc. 75 at 51, ¶ 135.

reserves estimate[,]'" id. at 52, ¶ 136 (quotation omitted), that "[t]hese . . . reserves estimates [were] . . . adopted as SandRidge's corporate reserves," id. (quotation omitted), and that these reserves estimates were presented to SandRidge's Executive Committee, on which Grubb and Bennett served.  See id. ¶ 137.

The Lead Plaintiffs have further alleged

(1) that the Reservoir Engineering Department reported "the true facts about the production and economics in the Mississippian . . . to SandRidge's management[,]" id. at 143, ¶ 344, including Grubb, as SandRidge's president, see id. at 144, ¶ 344;

(2) that the "[r]eserve reports were reviewed by . . . Bennett[, as chief financial officer]," id. at 143-44, ¶ 344; and

(3) that "each quarter, the Executive Vice President of Reservoir Engineering presented the status of SandRidge's reserves . . . to the Executive Committee[.]" Id. at 144, ¶ 344.

"[G]eneralized, conclusory allegations regarding scienter without specific corroborating details," Weinstein v. McClendon, 2013 WL 1457718 *4 (W.D. Okla. 2013), are insufficient.  Likewise inadequate is any "attempt to allege scienter based on [the] defendants' management positions and involvement in the operations of . . . [the company]." Id.  "[T]he mere fact that the individual [d]efendants occupied senior positions . . . is not sufficient to imply knowledge of the specific fact of [falsity or] materiality.'" Id. (quoting Fleming, 264 F.3d at 1264).  Particularized factual allegations must show that a defendant received and reviewed a report or other information and that that specific defendant therefore knew the truth about the facts that were purportedly misstated and further knew that his misrepresentation about, or nondisclosure of, that truth would likely mislead

investors.   That Bennett and Grubb may have received reports from the Reservoir Engineering Department does not alone demonstrate "'a mental state embracing intent to deceive, manipulate, or defraud.'"   <u>Fleming</u>, 264 F.3d at 1258 (quotation omitted); <u>e.g.</u>, <u>Wolfe v. AspenBio Pharma, Inc.</u>, 587 Fed. Appx. 493, 497 (10th Cir. 2014)(inference that defendant's knowledge came from fact of his position and importance of project not sufficient; notion that knowledge may be imputed solely from individual's position within company rejected).

Like the United States Court of Appeals for the Tenth Circuit stated in <u>Weinstein v. McClendon</u>, 757 F.3d 1110 (10th Cir. 2014), "there is little in the [Amended] [C]omplaint to support the conclusory allegation that the[ ] allegedly misleading omissions and statements were motivated by the intent to defraud or by a reckless disregard of a known 'fact that was so obviously material that [the movants] . . . must have been aware both of its materiality and that its nondisclosure would likely mislead investors.'"   <u>Id</u>. at 1114.   Absent allegations that give rise to a strong inference that Grubb and Bennett "knew about the '"danger of misleading buyers and sellers,"'"   <u>Nakkhumpun</u>, 782 F.3d at 1149 (quoting <u>Dronsejko v. Thornton</u>, 632 F.3d 658, 665 (10th Cir. 2011)(further quotation omitted), or that "the danger [of misleading investors] was 'so obvious that [Grubb and Bennett] must have been aware of it[,]'"   <u>id</u>. (quotations omitted), this theory of relief fails.   The allegations in the Amended Complaint taken as a whole together with the exhibits submitted by the parties,[42] fail to create the necessary inference[43] that any representations made by, or any nondisclosures

---

[42]<u>See</u> n. 2 <u>supra</u>.

[43]The Court must assess the Lead Plaintiffs' Amended Complaint "holistically, setting out the alleged material misrepresentations and omissions and evaluating [the Lead] [P]laintiff[s']

of, Grubb or Bennett regarding the production of SandRidge's wells in the Mississippian formation were made with the primary purpose of misleading shareholders or that either defendant recklessly disregarded the likelihood that his representations or nondisclosures regarding production would mislead SandRidge investors.[44]

Finally, the Lead Plaintiffs have argued their "scienter allegations are also strongly supported by compelling motive allegations." Doc. 138 at 40 (citations omitted). They have argued that Grubb and Bennett "were motivated to misstate SandRidge's production data and investment strategy in order to inflate the value of [SandRidge] . . . stock and [to] . . . mask problems in the Mississippian[.]" Id. In this circuit, while "[a]llegations of motive and opportunity may be important [when 'look[ing] to the totality of the pleadings to determine whether the plaintiffs' allegations permit a strong inference of fraudulent intent[,]' Fleming, 264 F.3d at 1262,] . . . [such allegations] are . . . not sufficient in themselves to establish a 'strong inference' of scienter." Id. The conclusory allegation that these two "[d]efendants possessed substantial motives for misrepresenting SandRidge's financial status, operations, and acquisition . . . throughout the Class Period," Doc. 75 at 146, ¶ 350, fails to raise an inference of scienter that is either cogent or compelling. See Fleming, 264 F.3d at 1269 (business motive is insufficient). Likewise, that Grubb was "among the highest paid executives of any of SandRidge's peer companies, all of which outperformed SandRidge,"

---

of scienter more cogent or compelling than an opposing inference of nonfraudulent intent with respect to the misrepresentations," id., about which the Lead Plaintiffs have complained.

[44]As the defendants have argued, statements by Grubb and Bennett during the Class Period about oil and gas production appear inconsistent with a scheme to deceive, manipulate or defraud investors. See, e.g., Doc. 133-30 at 23 (SandRidge Q2 2011 Earnings Call (August 5, 2011))(Grubb advised that SandRidge was "seeing . . . in the Mississippi drilling . . . a higher gas rate than what [SandRidge] . . . ha[d] projected").

Doc. 75 at 147, ¶ 353, and thereby "had a strong motive to turn a blind-eye to the [alleged] fraud," id., is not sufficient. E.g., Fleming, 264 F.3d at 1268-69 (rejecting as insufficient the motive "to 'protect and enhance . . . [defendants'] executive positions and the substantial compensation and prestige they obtained thereby'" since such is a "generalized motive[ ] shared by all companies and . . . . [is] not specifically and uniquely related to" corporate defendant); id. at 1269 (defendant's desire to protect own position with company and value of own stock insufficient since motive shared by all company executives).

In Count II of the Amended Complaint, the Lead Plaintiffs have sought relief under Section 20(a) of the Exchange Act on the grounds that Grubb and Bennett each acted as a controlling person of SandRidge and

(1) that "[b]y virtue of [his] . . . high-level position[ ], and . . . [his] ownership and contractual rights, participation in and/or awareness of [SandRidge's] . . . operations and/or intimate knowledge of the false and misleading statements filed by . . . [SandRidge] with the SEC and disseminated to the investing public, [he] . . . had the power to influence and control and did influence and control, directly or indirectly, the decision-making of . . . [SandRidge] . . . , including the content and dissemination of the [allegedly false and misleading] . . . statements," Doc. 75 at 156-57, ¶ 379; and

(2) that Grubb and Bennett were each "provided with or had unlimited access to copies of . . . [SandRidge's] . . . [allegedly misleading] reports, press releases, public filings and other statements . . . . prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected." Id. at 157, ¶ 379.

Liability under Section 20(a) attaches to "[e]very person who, directly or indirectly, controls any person liable" for violations of the federal securities laws. E.g., 15 U.S.C. § 78t(a). "'[T]o state a prima facie case of control person liability, the [Lead] [P]laintiff[s] must establish (1) a primary violation of the securities laws and (2) "control" over the primary violator by [Grubb or Bennett,] the alleged controlling person.'" In re Gold Resource, 776 F.3d at 1118 (quoting Fleming, 264 F.3d at 1270 (further quotation omitted)).

Because the Court has determined that the Lead Plaintiffs have not successfully pled a viable claim against SandRidge under Section 10(b) and Rule 10b-5 at this stage of the proceedings grounded on the three categories of allegations addressed by the parties, the Lead Plaintiffs have not satisfied the first prong and their Section 20(a) claim necessarily fails. E.g., id.

Based upon the foregoing, the Court

(1) GRANTS the Motion to Dismiss Plaintiffs' Consolidated Amended Complaint [Doc. 133] filed by SandRidge, Bennett, Grubb, Cooley, Brewer, Dobson, Gilliland, Jordan, Oliver, Serota and Scott to the extent that the Court hereby DISMISSES without prejudice Counts III, IV and V in the Amended Complaint;

(2) GRANTS said motion as to Counts I and II to the extent the Court DISMISSES without prejudice the Trust Plaintiffs' claims in those counts as to all movants;

(3) likewise GRANTS said motion as to the Lead Plaintiffs' allegations in Counts I and II and DISMISSES these counts without prejudice, but FINDS that the Lead Plaintiffs should be given the opportunity to amend their Amended Complaint as to their claims under Section 10(b) and Rule 10b-5 against SandRidge, Bennett and Grubb subject to Rule 11, F.R.Civ.P., and in accordance with extant case law and the PSLRA;

31

(4) DIRECTS the Lead Plaintiffs, should they intend to pursue their claims against these three defendants, to file their amended pleading within twenty-eight (28) days of this date; and

(5) in light of this dismissal, deems MOOT the Lead Plaintiffs' Motion to Partially Lift PSLRA Discovery Stay [Doc. 150], as supplemented.[45]

ENTERED this 27th day of August, 2015.

LEE R. WEST
UNITED STATES DISTRICT JUDGE

---

[45]The PSLRA provides that "all discovery and other proceedings [in a securities fraud action] shall be stayed during the pendency of any motion to dismiss[.]" 15 U.S.C. § 78u-4(b)(3)(B). In enacting the PSLRA, "Congress recognized that although private securities-fraud litigation furthers important public-policy interests, prime among them, deterring wrongdoing and providing restitution to defrauded investors, such lawsuits have also been subject to abuse, including the 'extract[ion]' of 'extortionate "settlements"' of frivolous claims." Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 133 S. Ct. 1184, 1200 (2013)(quoting H.R. Conf. Rep. No. 104-369 at 31-32 (1995)). "The PSLRA's response to the[se] perceived abuses was, inter alia, to '. . . authorize a stay of discovery pending resolution of any motion to dismiss.'" Id. (quoting Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 81 (2006))(further citation omitted).

"Although automatic, the PSLRA's discovery stay is not [however] absolute." Golden Palm Investments Ltd. Partnership v. Azouri, 2015 WL 3485019 *2 (D. Nev. 2015). If "the [C]ourt finds upon the motion of any party that particularized discovery is necessary to preserve evidence or prevent undue prejudice to that party," 15 U.S.C. § 78u-4(b)(3)(B); the stay may be vacated. In this case, the Lead Plaintiffs had not sought discovery to preserve evidence; rather, they had relied on the second prong—undue prejudice, and consequently, they had the burden of demonstrating not only that the discovery they sought was particularized, but also that the continued stay would cause undue prejudice.

Because "Congress clearly intended that complaints in . . . securities actions should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed," Medhekar v. United States District Court, 99 F.3d 325, 328 (9th Cir. 1996)(citation omitted), "[t]he prejudice of having to postpone discovery until after the resolution of [a] . . . pending motion[ ] to dismiss is not 'undue.' Rather, such delay is an inherent part of the process in a PSLRA case." Herrley v. Frozen Food Express Industries, Inc., 2013 WL 4417699 *3 (N.D. Tex. 2013)(citation omitted).

32