IN THE UNITED STATES DISTRICT COURT FOR

THE WESTERN DISTRICT OF OKLAHOMA

IN RE SANDRIDGE ENERGY, INC.    )        No. CIV-12-1341-W
SECURITIES LITIGATION          )

Relating to All Securities Actions

## ORDER

This matter comes before the Court on the Motion to Dismiss filed by defendant Tom L. Ward pursuant to Rules 12(b)(6) and 9(b), F.R.Civ.P. Lead plaintiffs Laborers Pension Trust Fund for Northern Nevada, Construction Laborers Pension Trust of Greater St. Louis and Vladimir and Angelica Galkin (collectively "Lead Plaintiffs") and plaintiffs Judith Greenberg, Charles Blackburn and Ted Odell (collectively "Trust Plaintiffs") have responded in opposition, and Ward has filed a reply. Based upon the record and after review of the allegations in the corrected consolidated amended complaint ("Amended Complaint"), see Doc. 75, the Court makes its decision with regard to Ward's request for dismissal.

In doing so, the Court finds that dismissal of the claims asserted in Counts III, IV and V against Ward by the Trust Plaintiffs is warranted because the Court has determined in prior Orders, see Docs. 179, 180, that the Trust Plaintiffs failed to comply with the notice requirement of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.[1] Likewise, to the extent, if any, Counts I and II were brought on behalf of the Trust Plaintiffs against Ward, such allegations are dismissed.

As to the remaining claims asserted against Ward by the Lead Plaintiffs in Counts I and II, the Court is first guided by Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007),

---

[1] For that reason, the Court has disregarded those allegations in the Amended Complaint giving rise to those claims and the arguments of the parties concerning the same.

wherein the United States Supreme Court set forth the standards that this Court must use in determining whether dismissal, as Ward has requested, is warranted under Rule 12(b)(6), supra. The Supreme Court held in accordance with Rule 8, F.R.Civ.P., that a complaint need not contain "heightened fact pleading of specifics," 550 U.S. at 570, or "detailed factual allegations," id. at 555 (citations omitted), but that it must contain "enough facts to state a claim to relief that is plausible on its face." Id. at 570.

The United States Court of Appeals for the Tenth Circuit has stated that Twombly imposes a "burden . . . on the plaintiff[s] to frame a 'complaint with enough factual matter (taken as true) to suggest' that [they are] . . . entitled to relief." Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Twombly, 550 U.S. at 556). The allegations in the Amended Complaint must therefore "be enough that, if assumed to be true, . . . [the Lead Plaintiffs] plausibly (not just speculatively) ha[ve] a claim for relief [against Ward]." Id. (footnote omitted).

The Court's task at this stage is to determine whether "there are well-pleaded factual allegations," Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), in the challenged pleading; if so, the "[C]ourt should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id.[2] "A claim has facial plausibility when the

_____

[2]"'The [C]ourt's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.'" Swoboda v. Dubach, 992 F.2d 286, 290 (10th Cir. 1993)(quotation omitted)(emphasis deleted). That is to say, "the sufficiency of a complaint must rest on its contents alone." Gee v. Pacheco, 627 F.3d 1178, 1186 (10th Cir. 2010) (citation omitted).

Exceptions to this rule occur when a complaint incorporates documents by reference, e.g., id. (citations omitted), when submitted documents referred to in that paper are central to a plaintiff's claims and the authenticity of those documents is not in dispute, e.g., id. (citation omitted), and when matters exist of which a court should take judicial notice. E.g., id. (citation omitted). In those limited instances, the Court is not required to restrict itself to examination of the allegations in the

plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citations omitted).

In this connection, a complaint "'must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'" Bryson v. Gonzales, 534 F.3d 1282, 1286 (10th Cir. 2008)(quotation and further citation omitted). While "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context," Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215 (10th Cir. 2011)(citations omitted), neither "'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), nor "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory allegations, . . . suffice." Id. (citation omitted). "[T]he Twombly/Iqbal standard recognizes a plaintiff should have at least some relevant information to make the claims plausible on their face." Khalik v. United Air Lines, 671 F.3d 1188, 1193 (10th Cir. 2012). "[I]t demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," Iqbal, 556 U.S. at 678 (citations omitted), and more than "mere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' . . . ." Kansas Penn Gaming, 656 F.3d at 1214 (quoting Twombly, 550 U.S. at 555). If the Lead Plaintiffs' factual allegations "are 'merely consistent with' a defendant's liability," Iqbal, 556

---

challenged pleading.

Accordingly, because the Lead Plaintiffs have referred to various documents in their Amended Complaint and because these documents are central to their claims and their authenticity is not in dispute, the Court is permitted to consider and has examined the same. The Court has likewise reviewed certain public documents submitted by the parties. E.g., In re Gold Resource Corporation Securities Litigation, 776 F.3d 1103, 1108 (10th Cir. 2015); Slater v. A.G. Edwards & Sons, Inc., 719 F.3d 1190, 1196 (10th Cir. 2013).

U.S. at 678 (quotation omitted), or "do not permit the [C]ourt to infer more than the mere possibility of misconduct," id. at 679, these claimants have "not 'show[n]' . . . 'that . . . [they are] entitled to relief.'" Id. (quotation omitted).

Rule 9(b), supra, on which Ward has also relied, requires a plaintiff, "[i]n alleging fraud . . . , [to] . . . state with particularity the circumstances constituting [the] fraud . . . ." Id. "Thus, 'a complaint alleging fraud [must] set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" Tal v. Hogan, 453 F.3d 1244, 1263 (10th Cir. 2006)(quoting Koch v. Koch Industries, 203 F.3d 1202, 1236 (10th Cir. 2000)(other citation omitted)).

In determining whether the Amended Complaint meets these heightened pleading requirements, to the extent, if any,[3] Rule 9(b) is applicable in this instance, the Court's analysis is again confined to the text of that pleading, e.g., United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 726 (10th Cir. 2006)(citation omitted), and any exhibits attached thereto and incorporated by reference therein. As with Rule 12(b)(6), supra, the Court must "accept as true all well-pleaded facts, as distinguished from conclusory allegations, and [must] view those facts in the light most favorable to the . . . [the complainants]." Id.(citation omitted).

The Lead Plaintiffs brought this action on behalf of all purchasers, other than the named defendants, of certain SandRidge Energy, Inc. ("SandRidge")[4] securities between February 24, 2011, and November 8, 2012–which period is defined as "the 'Class Period.'"

---

[3]See In re Gold Resource, 776 F.3d at 1108-09.

[4]SandRidge is organized under the laws of the State of Delaware, see Doc. 75 at 15, ¶ 26, and has its principal place of business in Oklahoma City, Oklahoma. See id.

Doc. 75 at 6, ¶ 1. SandRidge is an oil and gas exploration company, see Doc. 75 at 7, ¶ 2, which has as "one of . . . [its] core holdings . . . the Mississippian play,"[5] id., "a geological formation that extends hundreds of miles across northern Oklahoma and south-central Kansas." Id. at 26, ¶ 74.

The Lead Plaintiffs have contended that "[w]hen natural gas prices began to drop in 2008, [SandRidge] . . . made a shift in strategy to transform itself from being primarily low-margin natural gas producing to a high margin oil producing company," id. at 30, ¶ 86, and that Ward, SandRidge's founder, who is sued in his individual capacity as chief executive officer and chairman of SandRidge's Board of Directors ("Board"), "equated increased oil production with an increase in shareholder value," id. at 32, ¶ 90, and emphasized to investors that

> [w]hen considering the current valuation ratio of oil to natural gas, . . . [SandRidge's] ability to substantially grow [its] . . . oil production clearly enables SandRidge to generate higher revenues and deliver increased value to . . . shareholders. When combined with [its] . . . ability to quickly capture value on [its] . . . natural gas assets should prices improve, [SandRidge's] . . . successful transformation to oil has put [it] . . . in an extremely positive position for the future.

Id.

The Lead Plaintiffs have complained that Ward was in fact misrepresenting the value of SandRidge's Mississippian play properties, and they have sought relief against

---

[5]The Mississippian formation "ranges from a few hundred feet to as much as 1000 feet thick, and is composed of layers of limestone, chert and limey mudstones that were deposited in a shallow sea during the Mississippian geological period over 300 million years ago. Oil has been produced from the formation since the 1940's from conventional vertical wells. Beginning in 2007, horizontal well and hydraulic fracturing technology has been applied to extract oil from reservoirs within the . . . formation." Id. at 26, ¶ 74.

Ward in Count I[6] of the Amended Complaint under Section 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), as amended by the PSLRA,

15 U.S.C. § 78u-4, and under Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5,

and in Count II of that pleading under Section 20(a) of the Exchange Act, 15 U.S.C. §

78t(a), as amended by the PSLRA.

> Section 10(b) makes it
>
>> unlawful for any person, directly or indirectly, . . . [t]o use or employ, in
>> connection with the purchase or sale of any security . . . any manipulative
>> or deceptive device or contrivance in contravention of such rules and
>> regulations as the [Securities and Exchange] Commission ("SEC") may
>> prescribe as necessary or appropriate in the public interest or for the
>> protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5, its implementing regulation,

> "mak[es] it unlawful to, among other things, 'make any untrue statement of
> a material fact or to omit to state a material fact necessary in order to make
> the statements made, in the light of the circumstances under which they
> were made, not misleading.'"

Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317 (2011)(quoting 17 C.F.R. §

240.10b–5(b)); e.g., Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552

U.S. 148, 157 (2008)(Rule 10b–5 encompasses only conduct already prohibited by

section 10(b)).

> "A plaintiff suing under Section 10(b) . . . bears a heavy burden at the pleading

stage[,]" In re Level 3 Communications, Inc. Securities Litigation, 667 F.3d 1331, 1333

(10th Cir. 2012), and in determining whether the Amended Complaint sets forth sufficient

---

[6]See id. at 153, ¶ 367 ("This Count is asserted against SandRidge[ ] [and] the Individual SandRidge Defendants . . . for violations of Section 10(b) of the Exchange Act and Rule 10b-5"). The phrase "Individual SandRidge Defendants" refers to Ward, James D. Bennett and Matthew K. Grubb.  See id. at 17, ¶ 38; id. at 15, ¶¶ 27-29.

direct or inferential allegations to sustain a recovery under Section 10(b) and Rule 10b-5,

the Court has considered, as case law requires,[7] whether the Amended Complaint

contains allegations addressing the following material elements:

> "(1) a material misrepresentation or omission by the defendant;[8] (2) scienter;[9] (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

Matrixx, 131 S. Ct. at 1317 (quoting Stoneridge Investment, 552 U.S. at 157).

To meet this burden, the Lead Plaintiffs have alleged in Count I

(1) that Ward[10] disseminated or approved certain "materially false and misleading

statements . . . , which . . . [he] knew or deliberately disregarded were misleading in that

---

[7]To determine whether the Lead Plaintiffs have met their "obligation to provide the 'grounds' of . . . [their] 'entitle[ment] to relief,'" Twombly, 550 U.S. at 555 (citation omitted), the Court has applied Twombly/Iqbal to the Amended Complaint and accepted as true any well-pleaded factual allegations asserted therein. In doing so, the Court is mindful that while Rule 12(b)(6) "does not require . . . [the Lead Plaintiffs to] establish a prima facie case in [their Amended] . . . [C]omplaint," Khalik, 671 F.3d at 1192, an examination of the essential "elements of [the] . . . alleged cause of action [is] help[ful] to determine whether [they have] . . . set forth a plausible claim." Id. (citations omitted). Accordingly, the Court has first considered what elements the Lead Plaintiffs must ultimately establish to prevail on a Section 10(b) claim, e.g., Burnett v. Mortgage Electronic Registration Systems, Inc., 706 F.3d 1231, 1236 (10th Cir. 2013)(Iqbal's contextual approach means comparing pleading with elements of cause of action), and then "draw[ing] on its judicial experience and common sense,'" id. (quoting Iqbal, 556 U.S. at 679), the Court has "compar[ed] . . . [the Lead Plaintiffs' allegations] . . . with the elements of th[at] cause[ ] of action." Id.; e.g., id. (pleadings that do not allow for at least "reasonable inference" of legally relevant facts are insufficient).

[8]E.g., Nakkhumpun v. Taylor, 782 F.3d 1142, 1147 (10th Cir. 2015)(as to first element (falsity), plaintiff must plead the fraud with particularity under Rule 9(b)).

[9]E.g., In re Gold Resource, 776 F.3d at 1109 (with respect to each statement or omission alleged, plaintiff must state with particularity facts giving rise to a strong inference that defendant acted with required state of mind).

[10]The plaintiffs have used the term "defendants" in this count collectively without attributing particular conduct to any one defendant. The Court has substituted Ward's name to determine whether the plaintiffs have set forth a plausible claim against him.

they contained misrepresentations and failed to disclose material facts necessary . . . to make the statements . . . , in light of the circumstances under which they were made, not misleading[,]" Doc. 75 at 153, ¶ 368;

(2) that Ward, "individually and in concert [with other defendants], directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of . . . [SandRidge,]" id. ¶ 369;

(3) that he "(a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of . . . SandRidge securities during the Class Period in an effort to maintain artificially high market prices for the[se] . . . securities[,]" id. ¶ 370;

(4) that his primary liability arises from the following facts:  "(i) [he was a] . . . high-level [SandRidge] executive[ ] and/or director[ ] . . . and [a] member[ ] of the . . . management team or had control thereof; (ii) . . . , by virtue of his responsibilities and activities as a [SandRidge] senior officer and/or director . . . [he] was privy to and participated in the creation, development and reporting of [SandRidge's] . . . internal budgets, plans, and/or projections; (iii) [he] . . . enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of [SandRidge's] . . . management team, internal reports and other data and information about [SandRidge's] . . . reserves, production, finances, operations, and

8

liabilities at all relevant times; and (iv) [he] . . . was aware of [SandRidge's] . . . dissemination of information to the investing public which [he] . . . knew or recklessly disregarded was materially false and misleading[,]" id. at 154, ¶ 371;

(5) that Ward "had actual knowledge of the misrepresentations and omissions of material facts set forth [in the Amended Complaint] . . . , or acted with reckless disregard for the truth in that [he] . . . failed to ascertain and to disclose such facts, even though such facts were available to . . . [him,]" id. ¶ 372;

(6) that he acted "knowingly or recklessly and for the purpose and effect of concealing from the investing public the significant problems with SandRidge's cash flows, capital expenditures, [and] . . . overstated reserves, and the extent of the [Ward-]related party[11] transactions, and . . . the artificially inflated price of SandRidge securities[,]" id. at

---

[11]The Lead Plaintiffs have used the phrase–"Ward-related entities"–in the Amended Complaint to refer collectively to three entities with which Ward is alleged to be affiliated: WCT Resources, L.L.C. ("WCT"),192 Investments, L.L.C. ("192 Investments") and TLW Land & Cattle, L.P. ("TLW"). See Doc. 75 at 35, ¶ 104.

WCT is described as a limited liability company organized under Oklahoma law, which, until recently, shared its headquarters with SandRidge in Oklahoma City. See Id. at 36, ¶ 105. The Lead Plaintiffs have asserted that WCT is owned by trusts established by Ward and his wife, Sch'ree Ward, for the benefit of Ward's children, that the trustee of these trusts is Scott C. Hartman, who has worked at SandRidge since April 2006 and who has served as SandRidge's executive business director. See id. ¶ 106. The Lead Plaintiffs have contended that Ward's son, Trent Ward ("T Ward"), is WCT's registered agent and chief executive officer and that Scott White, who was employed by SandRidge as a land manager until 2011, is WCT's current chief operating officer. See id. WCT is alleged to have had approximately seven (7) employees. See id.

The Lead Plaintiffs have further asserted that "SandRidge had leased the mineral rights for at least 223 sections in northwest Kansas, within the counties of Sherman, Thomas, Sheridan, Wallace, Logan, and Gove," id. ¶ 107, that WCT "[i]n the[se] same counties, and often adjoining or adjacent to SandRidge's sections, . . . leased the mineral rights to at least 403 sections . . . ," id., and that "on many occasions WCT[, 'the fifth largest acreage holder in the Mississippian formation,' id. at 37, ¶ 108,] . . . acquired [its] . . . lease holdings in advance of or alongside of SandRidge's holdings. Id. ¶ 107.

192 Investments is described as a limited liability company organized under Oklahoma law, which has its headquarters at the same address as SandRidge in Oklahoma City. See id. at 37, ¶ 109. T Ward is 192 Investments' registered agent and its manager. See id.

The Lead Plaintiffs have contended that 192 Investments "acquired mineral rights on

154-55, ¶ 372; and

(7) that "[a]s demonstrated by [his] . . . misstatements of . . . [SandRidge's] . . . business, operations, oil and gas reserves, and transactions[,] . . . if [Ward] . . . did not have actual knowledge of the misrepresentations and omissions alleged, [he] w[as] reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading." Id. at 155, ¶ 372.

The Lead Plaintiffs have further alleged in support of Count I

(1) that "[a]s a result of the dissemination of the materially false and misleading information and failure to disclose material facts, . . . the market prices of SandRidge's securities were artificially inflated[,]" id. ¶ 373;

(2) that "[i]n ignorance of the fact that market prices of SandRidge's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by [Ward] . . . , or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by . . . [Ward] but not disclosed in public statements . . . , [the Lead] Plaintiffs . . . acquired SandRidge securities . . . at artificially high prices and were damaged as a result[,]" id.; and

(3) that the Lead Plaintiffs "were ignorant of the[ ] falsity [of the misrepresentations

---

thousands of acres in late 2011 in the Mississippian play in Kansas," id. ¶ 110, and that it "bought those mineral rights just months before SandRidge leased property in adjacent plots." Id.

TLW is described in the Amended Complaint as a limited partnership organized under Oklahoma law, which shares its headquarters with SandRidge and 192 Investments. See id. at 38, ¶ 111. Ward is TLW's registered agent, see id., and in papers filed with the SEC, TLW is identified as an "'entity in which . . . Ward has an ownership interest.'" Id

and of the omissions], and . . . [h]ad [they] . . . known the truth . . . [they] would not have purchased or otherwise acquired their SandRidge securities, or, if they had purchased such securities . . . , they would not have done so at the artificially inflated prices which they paid." Id. at 155-56, ¶ 374.

The Court this date has granted the Motion to Dismiss Plaintiffs' Consolidated Amended Complaint filed by SandRidge and defendants Matthew K. Grubb and James D. Bennett. To the extent Ward has adopted by reference, see Doc. 134 at 6 n.1, 30, the arguments contained in that motion as they pertain to alleged misstatements or omissions concerning SandRidge's projected capital expenditures and acreage acquisitions by the Ward-related entities, see Doc. 75 at 154-55, ¶ 372, the Court finds its Order is equally dispositive as to Ward. The Court therefore has addressed only the purported misstatements and/or omissions that concern the third subject of allegations in the Amended Complaint and Ward's challenges thereto. See id.

In this connection, the Lead Plaintiffs have asserted that Ward "made representations about the production of SandRidge's wells in the Mississippian," Doc. 75 at 53, ¶ 140, but when doing so

(1) "grossly overstated the [estimated ultimate recovery ('EUR')] for SandRidge's . . . horizontal type well," id.;[12] e.g., id. at 64, ¶ 161;

_____

[12]The Lead Plaintiffs have alleged that "[d]uring the Class Period, SandRidge made it appear that the EUR per well of its typical horizontal well in the Mississippian play was higher than it actually was," Doc. 75 at 53, ¶ 141, and have cited as examples: "at the beginning of 2011, SandRidge represented an EUR per well of [its] . . . typical horizontal well . . . as 409 MBoe, consisting of 211 Mbbl of oil and 1,186 MMscf of gas[,]" id. at 53-54, ¶ 141, and "at the beginning of 2012, SandRidge represented an increased EUR per well of [its] . . . typical horizontal well . . . as 456 MBoe, consisting of 204 Mbbl of oil and 1,512 MMscf of gas." Id. at 54, ¶ 142. They have contended that in fact the "total EUR per well averaged only 32.5 Mbbls for oil (84% lower than represented by SandRidge); 686 MMscf for gas (55% lower than represented by SandRidge); 147

and of the omissions], and . . . [h]ad [they] . . . known the truth . . . [they] would not have purchased or otherwise acquired their SandRidge securities, or, if they had purchased such securities . . . , they would not have done so at the artificially inflated prices which they paid." Id. at 155-56, ¶ 374.

The Court this date has granted the Motion to Dismiss Plaintiffs' Consolidated Amended Complaint filed by SandRidge and defendants Matthew K. Grubb and James D. Bennett. To the extent Ward has adopted by reference, see Doc. 134 at 6 n.1, 30, the arguments contained in that motion as they pertain to alleged misstatements or omissions concerning SandRidge's projected capital expenditures and acreage acquisitions by the Ward-related entities, see Doc. 75 at 154-55, ¶ 372, the Court finds its Order is equally dispositive as to Ward. The Court therefore has addressed only the purported misstatements and/or omissions that concern the third subject of allegations in the Amended Complaint and Ward's challenges thereto. See id.

In this connection, the Lead Plaintiffs have asserted that Ward "made representations about the production of SandRidge's wells in the Mississippian," Doc. 75 at 53, ¶ 140, but when doing so

(1) "grossly overstated the [estimated ultimate recovery ('EUR')] for SandRidge's . . . horizontal type well," id.;[12] e.g., id. at 64, ¶ 161;

---

[12]The Lead Plaintiffs have alleged that "[d]uring the Class Period, SandRidge made it appear that the EUR per well of its typical horizontal well in the Mississippian play was higher than it actually was," Doc. 75 at 53, ¶ 141, and have cited as examples: "at the beginning of 2011, SandRidge represented an EUR per well of [its] . . . typical horizontal well . . . as 409 MBoe, consisting of 211 Mbbl of oil and 1,186 MMscf of gas[,]" id. at 53-54, ¶ 141, and "at the beginning of 2012, SandRidge represented an increased EUR per well of [its] . . . typical horizontal well . . . as 456 MBoe, consisting of 204 Mbbl of oil and 1,512 MMscf of gas." Id. at 54, ¶ 142. They have contended that in fact the "total EUR per well averaged only 32.5 Mbbls for oil (84% lower than represented by SandRidge); 686 MMscf for gas (55% lower than represented by SandRidge); 147

(2) "overstated the oil to gas ratios of the wells," id. at 53, ¶ 140;[13] e.g., id. at 63,

¶ 160;

(3) "minimized the oil decline rates for the wells," id. at 53, ¶ 140; e.g., id. at 64, ¶

161;

(4) "overstated the economic value of SandRidge's Mississippian wells," id. at 53,

¶ 140;[14] and

(5) "misrepresented that well performance was consistent as represented by a

single type curve across the[ ] entire leasehold, which extended for hundreds of miles."

---

EUR, Boe (68% lower than represented by SandRidge)[.]" Id. at 56, ¶ 144.
    The Lead Plaintiffs have claimed that SandRidge nevertheless "maintained throughout 2012 (until the end of the Class Period) that well performance continued to support an average 456 MBoe type well." Id. at 56-57, ¶ 147.  The Lead Plaintiffs have further claimed that "[a]t the end of the Class Period, SandRidge admitted that the EUR for SandRidge's Mississippian wells was lower than represented," id. ¶ 148, as shown during SandRidge's third quarter 2012 earnings conference call on November 9, 2012, during which "SandRidge disclosed that it had lowered the type well oil EUR by 24% from 204 Mbbl to 155 Mbbl." Id.

[13]The Lead Plaintiffs have alleged inter alia that "[d]uring the Class Period, SandRidge often stated well test results and well EUR estimates in terms of barrel oil equivalents (Boe) as a way to disguise the fact that it was drilling highly 'gassy' wells[,]" id. at 58, ¶ 149; that "[t]hroughout 2011, SandRidge consistently represented that its horizontal Mississippian wells produced 52% oil and 48% natural gas[,]" id. ¶ 150, and that "[t]hroughout 2012, SandRidge consistently represented that the Mississippian play had a mean oil ultimate recovery of 204 Mbbls and total oil and gas of 456 MBoe, yielding a liquid fraction oil of 45% and gas of 55%." Id.
    The Lead Plaintiffs have contended that SandRidge, however, "produced a much lower percentage of oil than represented[, and that] . . . according to production data reported by SandRidge to the Oklahoma Tax Commission, throughout 2011, SandRidge produced on average less than 40% oil and more than 60% gas compared with representations of 52% oil and 48% gas[, and] [s]imilarly, according to reported production data throughout 2012, SandRidge produced on average 35% oil and 65% gas compared to [SandRidge's] . . . representations of 45% oil and 55% gas." Id. at 59, ¶ 151.

[14]The Lead Plaintiffs have alleged that "[s]ince the [estimated ultimate recovery from] . . . SandRidge's Mississippian wells w[as] much lower than represented, the wells were less valuable from an economic perspective." Id. at 60, ¶ 154.

Id.[15]

Ward, based on his own arguments and/or through adoption of the arguments advanced by SandRidge, Grubb and Bennett, has challenged these allegations on multiple grounds, including, that even if the foregoing representations or omissions about the production of SandRidge's wells in the Mississippian play are assumed to be false or misleading, which he disputes, that the Lead Plaintiffs have failed to establish the essential element of scienter, which is required to state a cause of action under Section 10(b) and Rule 10b-5. E.g., Matrixx, 131 S. Ct. at 1317; Stoneridge Investment, 552 U.S. at 157.

"[T]he PSLRA created a heightened pleading standard applicable to th[is] . . . element[ ]," In re Gold Resource, 776 F.3d at 1109 (citation omitted), and to satisfy "the scienter requirement--'a mental state embracing intent to deceive, manipulate, or defraud,'" id. (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)), in this case, "it is not sufficient 'for [the Lead] [P]laintiff[s] to allege generally that [a] . . . defendant acted with scienter, as permitted under [Rule] 9(b)[, supra].'" Id. (quoting Level 3, 667 F.3d at 1333)(other citation omitted). They must instead, "'with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" 15 U.S.C. § 78u-4(b)(2)(A).

---

[15]The Lead Plaintiffs have contended that "[c]ontrary to [the] [d]efendants' (yet again referred to collectively) statements, there was not a single type curve across the[ ] entire leasehold extending for hundreds of miles[,]" id. at 65, ¶ 162(a), and that "[a]fter the Class Period, SandRidge provided multiple type well curves based on geographical region instead of relying on just a single type well decline curve as [it] . . . had done during the Class Period[.]" Id.

"'The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" In re Gold Resource, 776 F.3d at 1109 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322-23 (2007)(emphasis deleted)). A "strong inference" is one that is "cogent and compelling," Tellabs, 551 U.S. at 324, not "merely 'reasonable' or 'permissible[.]'" Id. "A complaint will survive [a request for dismissal] . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" Id. (footnote omitted).

In this circuit,[16] a

> [p]laintiff must allege facts sufficient to raise a strong inference that [a] defendant['s] representations were intentionally false[17] or at least recklessly made. "Recklessness" under [Section] 10(b) is "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

In re Gold Resource, 776 F.3d at 1113 (quoting City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245, 1258 (10th Cir. 2001)); e.g., Nakkhumpun v. Taylor, 782 F.3d 1142, 1147 (10th Cir. 2015). "Negligence, even gross negligence, is not sufficient; something similar to 'conscious disregard' is required." In re Gold Resource, 776 F.3d at 1113 (citing Level 3, 667 F.3d at 1343 n.12); e.g., In re Zagg, Inc. Securities Litigation,

---

[16]See In re Zagg, Inc. Securities Litigation, 2015 WL 4901893 *4 n.3 (10th Cir. 2015)(United States Supreme Court has reserved question of "whether recklessness suffices to fulfill the scienter requirement," but Tenth Circuit has held that it may)(quoting Matrixx, 131 S. Ct. at 132)(citing Level 3, 667 F.3d at 1343 n.12).

[17]"'Intentional misconduct . . . encompasses deliberate illegal behavior.'" City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245, 1258 (10th Cir. 2001)(quotation omitted).

2015 WL 4901893 *9 (10th Cir. 2015)(recklessness "is a particularly high standard," something closer to "a state of mind approximating actual intent")(quoting Dronsejko v. Thornton, 632 F.3d 658, 668 (10th Cir. 2011)(further quotation omitted); Fleming, 264 F.3d at 1258.

The Tenth Circuit recognizes that "[c]ourts have been cautious about imposing liability for securities fraud based on reckless conduct[.]" Id. at 1260 (citation omitted). A "'[p]laintiff[ ] should not be allowed to proceed with allegations of "fraud by hindsight,"'" id.; a defendant "should be liable for failing to reveal only 'those material facts reasonably available to . . . [him].'" Id. (citation omitted). "'Thus, allegations that [a] defendant[ ] should have anticipated future events and made certain disclosures earlier than . . . [he] actually did do not suffice to make out a claim of securities fraud.'" Id. (citation omitted). Moreover, "'allegations that [a] . . . defendant possessed knowledge of facts that are later determined by a court to have been material, without more, [are] not sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate, or defraud." Id.

The Lead Plaintiffs have argued that because "Ward had access to information showing that . . . [SandRidge's] wells were gassier than represented, that there was a steep decline in production rates of SandRidge's older horizontal Mississippian wells by March 2012, that the decline continued thereafter, and that the EUR for the typical SandRidge horizontal well in the Mississippian was overstated and should have been reduced," id. at 22-23 (citations omitted), "Ward knew, or recklessly disregarded, the falsity of his statements regarding the production of SandRidge's Mississippian horizontal

type well and that its economics were overstated." Doc. 140 at 22 (citations omitted).

The Lead Plaintiffs have contended that "[a] strong inference of Ward's scienter is raised by the fact that [SandRidge] . . . had a comprehensive production monitoring system in place." Id. at 23. According to the Amended Complaint, "SandRidge continually reassured investors throughout the Class Period that it closely and regularly monitored the production results of its wells," Doc. 75 at 51, ¶ 134, and that this "close[ ] and regular[ ]," id., monitoring was performed by SandRidge's Reservoir Engineering Department, which in 2011 had "'[eighteen] full-time employees, comprised of seven degreed engineers and [eleven] engineering analysts/ technicians,'" id. (quotation omitted),[18] "to ensure [that] the most current reservoir information [was] . . . reflected in reserves estimates." Id. The Lead Plaintiffs have alleged that this department "'work[ed] closely with independent petroleum consultants . . . to ensure the integrity, accuracy and timeliness of an annually developed independent reserves estimate[,]'" id. at 52, ¶ 136 (quotation omitted), that "[t]hese . . . reserves estimates [were] . . . adopted as SandRidge's corporate reserves," id. (quotation omitted), and that these reserves estimates were presented to SandRidge's Executive Committee, on which Ward served. See id. ¶ 137.

The Lead Plaintiffs have further alleged

(1) that the Reservoir Engineering Department reported "the true facts about the production and economics in the Mississippian . . . to SandRidge's management[,]" id. at 143, ¶ 344; and

(2) that "each quarter, the Executive Vice President of Reservoir Engineering

---

[18]In 2012, the number of degreed engineers increased to eight. See Doc. 75 at 51, ¶ 135.

presented the status of SandRidge's reserves . . . to the Executive Committee[.]" Id. at 144, ¶ 344.

"[G]eneralized, conclusory allegations regarding scienter without specific corroborating details," Weinstein v. McClendon, 2013 WL 1457718 *4 (W.D. Okla. 2013), are insufficient. Likewise inadequate is any "attempt to allege scienter based on [a] defendant['s] management position[ ] and involvement in the operations of [the corporate defendant] . . . ." Id. "[T]he mere fact that [an] . . . individual [d]efendant[ ] occupied [a] senior position[ ] in the company . . . is not sufficient to imply knowledge of the specific fact of [falsity or] materiality.'" Id. (quoting Fleming, 264 F.3d at 1264). Particularized factual allegations must show that the defendant received and reviewed a report or other information and that that specific defendant therefore knew the truth about the facts that were purportedly misstated and further knew that his misrepresentation about, or nondisclosure of, that truth would likely mislead investors. E.g., Zagg *8 (position in company insufficient basis from which to impute knowledge). That Ward may have received reports from the Reservoir Engineering Department does not alone demonstrate "'a mental state embracing intent to deceive, manipulate, or defraud.'" Fleming, 264 F.3d at 1258 (quotation omitted); e.g., Wolfe v. AspenBio Pharma, Inc., 587 Fed. Appx. 493, 497 (10th Cir. 2014)(inference that defendant's knowledge came from fact of his position and importance of project not sufficient; notion that knowledge may be imputed solely from individual's position within company rejected).

The Lead Plaintiffs have also argued that their "scienter allegations are strongly supported by compelling motive allegations." Doc. 140 at 28. They have first asserted that "SandRidge's heavy investment in the Mississippian play benefitted Ward because

of the exceedingly lucrative flipping and adjacent-land transactions by the Ward-related entities," id. (citation omitted), and because "[t]he success of the transactions by the Ward-related entities was intertwined with SandRidge's massive amount of spending in the Mississippian," id. (citation omitted), "Ward was motivated to misrepresent SandRidge's production data in the Mississippian and . . . [its] financial condition and stability . . . to maintain SandRidge's spending . . . to benefit the Ward-related entities." Id. (citation omitted).[19]

As stated, particularized facts are required to "giv[e] rise to a strong inference that the defendant acted with the required state of mind.'" 15 U.S.C. § 78u-4(b)(2)(A). While the Amended Complaint has alleged in two instances compensation received by WCT and TLW during the Class Period, as disclosed in SEC filings, see Doc. 75 at 39, ¶¶ 116, 263, it has only speculated about any profits Ward might have received. See Campo v. Sears Holdings Corp., 371 Fed. Appx. 212, 215 (2nd Cir. 2010)(sufficient motive allegations entail concrete benefits that could be realized by false statements and nondisclosures).

In this circuit, while "[a]llegations of motive and opportunity [and even personal financial gain] may be important [when 'look[ing] to the totality of the pleadings to

---

[19]The Lead Plaintiffs have contended that

[a]t the same time that . . . [Ward was] misrepresenting the value of SandRidge's Mississippian play properties, unbeknownst to investors, [he was] . . . , through various affiliated entities[, WCT, 192 Investments and TLW,] . . . materially benefitting from [SandRidge's] . . . investment activities in Mississippian . . . [by] acquiring massive amounts of land and mineral rights throughout th[at] . . . [formation].

Doc. 75 at 7, ¶ 3.  The Lead Plaintiffs have contended that "Ward and his affiliated entities were engaged in . . . classic form[s] of front-running," id. at 8, ¶ 3; e.g., id. at 40-43, ¶¶ 40-43, and flipping.  See id. at 7, ¶ 3; id. at 38-40, ¶¶ 112-118.

determine whether the plaintiffs' allegations permit a strong inference of fraudulent intent[,]' Fleming, 264 F.3d at 1262,] . . . [such allegations] are . . . not sufficient in themselves to establish a 'strong inference' of scienter." Id.; e.g., Zagg *9. Thus, the conclusory allegation that Ward "possessed substantial motives for misrepresenting SandRidge's financial status, operations, and acquisition . . . throughout the Class Period," Doc. 75 at 146, ¶ 350, fails to raise an inference of scienter that is either cogent or compelling. See Fleming, 264 F.3d at 1269 (business motive is insufficient).

Likewise, that Ward, according to the Lead Plaintiffs, "earned [an] extremely lucrative compensation package[] regardless of [SandRidge's] . . . financial performance," Doc. 75 at 146, ¶ 353,[20] and was "among the highest paid in the[ ] industry, even though . . . [SandRidge's] revenue of $1.4 billion ranked it in the bottom half of publicly traded exploration and production companies[,]" id., that Ward's "compensation increased 16% in 2011, up from $21.7 million in 2010," id., and "[h]is pay increased 58% the year before, up from $13.7 million in 2009[,]" id., or that in 2012, Ward "made an additional $21 million, despite the fact that SandRidge stock declined 22%[,]" id., and thereby "had a strong motive to turn a blind-eye to the [alleged] fraud," id., is not sufficient. E.g., Fleming, 264 F.3d at 1268-69 (rejecting as insufficient motive "to 'protect and enhance . . . [defendants'] executive positions and the substantial compensation and prestige they obtained thereby'" since such is a "generalized motive[ ] shared by all companies and . . . . [is] not specifically and uniquely related to" corporate defendant); id. at 1269 (defendant's desire to protect

---

[20]See Doc. 135-1 at 22 (compensation package consisted of inter alia salary, bonus and stock awards; stock awards equaled $20,771,971.00 and $16,250,004.00 in 2011 and 2012, respectively, arguably undercutting any contention that Ward's compensation was not tied to performance).

own position with company and value of own stock insufficient since motive shared by all company executives).

The Lead Plaintiffs' allegations that Ward was financially motivated to engage in fraudulent conduct may however be arguably undercut by the record in this case: by the end of the Class Period, Ward had significantly increased his SandRidge stock holdings[21] to approximately 25.3 million shares, thereby, as he has argued, "aligning his interests with those of other [SandRidge] . . . shareholders." Doc. 134 at 14. Thus, when SandRidge stock declined on November 9, 2012, to a closing price of $5.51 per share, see Doc. 75 at 11, ¶ 11; id. at 150, ¶ 362, Ward like the Lead Plaintiffs suffered the same stock price decline.

Finally, according to the Amended Complaint, because "[t]he fraud . . . relate[d] to the core business and operations of SandRidge," id. at 145, ¶ 348, and in light of the "magnitude of the misrepresentations of SandRidge's oil and gas production[,]" Doc. 140 at 25, "knowledge of the fraud may be imputed to [Ward] . . . ." Doc. 75 at 145, ¶ 348. "'[G]eneralized imputations of knowledge' . . . are not sufficient to establish scienter." Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1107 (10th Cir. 2003)(quotation omitted). Cf. Zagg *8 (allegation that defendant "must have known" statement was false or misleading inadequate). Allegations based on the "core operations" doctrine, which was recognized pre-PSLRA, and allegations based on the magnitude of the fraud alone are not enough to create a strong inference of scienter; rather, these allegations are just relevant factors to the Court's holistic inquiry mandated by Tellabs.

---

[21]See Doc. 135-4; Doc. 135-5.

Based upon its review, the Court, like the United States Court of Appeals for the Tenth Circuit stated in <u>Weinstein v. McClendon</u>, 757 F.3d 1110 (10th Cir. 2014), finds "there is little in the [instant Amended] [C]omplaint to support the conclusory allegation that the[ ] allegedly misleading omissions and statements were motivated by the intent to defraud or by a reckless disregard of a known 'fact that was so obviously material that [Ward] . . . must have been aware both of its materiality and that its nondisclosure would likely mislead investors.'" <u>Id.</u> at 1114. The pleaded facts taken collectively do not give rise to a strong inference of scienter that Ward acted with the required state of mind: either with an "intent to deceive" or with "conscious disregard."

In Count II of the Amended Complaint, the Lead Plaintiffs have sought relief under Section 20(a) of the Exchange Act on the grounds that Ward acted as a controlling person of SandRidge and

(1) that "[b]y virtue of [his] . . . high-level position[ ], and . . . [his] ownership and contractual rights, participation in and/or awareness of [SandRidge's] . . . operations and/or intimate knowledge of the false and misleading statements filed by . . . [SandRidge] with the SEC and disseminated to the investing public, [he] . . . had the power to influence and control and did influence and control, directly or indirectly, the decision-making of . . . [SandRidge] . . . , including the content and dissemination of the [allegedly false and misleading] . . . statements," Doc. 75 at 156-57, ¶ 379; and

(2) that he was "provided with or had unlimited access to copies of . . . [SandRidge's] . . . [allegedly misleading] reports, press releases, public filings and other statements . . . . prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected."

Id. at 157, ¶ 379.

Liability under Section 20(a) attaches to "[e]very person who, directly or indirectly, controls any person liable" for violations of the federal securities laws. E.g., 15 U.S.C. § 78t(a). "'[T]o state a prima facie case of control person liability, the [Lead] [P]laintiff[s] must establish (1) a primary violation of the securities laws and (2) "control" over the primary violator by [Ward,] the alleged controlling person.'" In re Gold Resource, 776 F.3d at 1118 (quoting Fleming, 264 F.3d at 1270 (further quotation omitted)).

Because the Court has determined in an Order issued this date that the Lead Plaintiffs have not successfully pled a viable claim against SandRidge under Section 10(b) and Rule 10b-5 at this stage of the proceedings, the Lead Plaintiffs have not satisfied the first prong and their Section 20(a) claim necessarily fails. E.g., id.

Based upon the foregoing, the Court

(1) GRANTS Ward's Motion to Dismiss [Doc. 134] and hereby DISMISSES without prejudice Counts III, IV and V in the Amended Complaint;

(2) GRANTS said motion as to Counts I and II to the extent the Court DISMISSES without prejudice the Trust Plaintiffs' claims in those counts as to Ward;

(3) likewise GRANTS said motion as to the Lead Plaintiffs' allegations in Counts I and II and DISMISSES these counts without prejudice, but FINDS that the Lead Plaintiffs, as they have requested, see Doc. 140 at 35 n.17, should be given the opportunity to amend their Amended Complaint as to their claims under Section 10(b) and Rule 10b-5 against Ward subject to Rule 11, F.R.Civ.P., and in accordance with extant case law and the PSLRA; and

(4) DIRECTS the Lead Plaintiffs, should they intend to pursue their claims against

22

Ward, to file their amended pleading within twenty-eight (28) days of this date.

ENTERED this 27th day of August, 2015.

LEE R. WEST
UNITED STATES DISTRICT JUDGE