UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

| In re SANDRIDGE ENERGY, INC. SECURITIES LITIGATION | ) ) ) | No. 5:12-cv-01341-LRW<br><br>**CLASS ACTION** |
|---|---|---|
| This Document Relates To:<br><br>ALL ACTIONS. | ) ) ) ) ) | SECOND CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ........................................................................... 1

JURISDICTION AND VENUE ....................................................................... 6

BASIS OF ALLEGATIONS ............................................................................ 7

FORMER EMPLOYEES .................................................................................. 8

PARTIES ............................................................................................................ 9

    Plaintiffs ...................................................................................................... 9

    Defendants ................................................................................................. 10

CLASS ACTION ALLEGATIONS .............................................................. 11

KEY TECHNICAL TERMS IN THE OIL AND GAS EXPLORATION
    INDUSTRY ............................................................................................... 13

SUBSTANTIVE ALLEGATIONS ............................................................... 19

    The Company and Its Business .............................................................. 19

    The Trust Offerings ................................................................................ 23

    The Ward-Related Entities .................................................................... 25

    WCT Resources ....................................................................................... 26

    192 Investments ...................................................................................... 27

    TLW Land & Cattle ................................................................................ 28

    The Ward-Related Entities Engaged in Improper Flipping ................... 28

    The Ward-Related Entities Engaged in  Improper Front Running for
    Adjacent Land Transactions .................................................................... 30

    Ward's Self-Dealing Violated SandRidge's Code of Ethics .................. 33

    SandRidge Poured Huge Amounts of Money into the Mississippian  Which
    Harmed the Financial Condition of the Company But Benefitted the Ward-
    Related Entities ....................................................................................... 36

**Page**

SandRidge's Overinvestment in the Mississippian Forced the Company to Raise Large Amounts of Capital ............................................................................. 39

SandRidge Closely Monitored the Production of Its Wells ................................... 41

The Individual Defendants and Other SandRidge Senior Executives Were Kept Fully Informed of the Mississippian's Poor Production ................................ 43

Defendants Misrepresented SandRidge's Understanding of the Mississippian Play .................................................................................................. 45

The Performance of SandRidge's Mississippian Play Was Worse than Represented ........................................................................................................... 45

SandRidge Overstated the Average EUR of SandRidge's Horizontal Wells in the Mississippian Play ....................................................................................... 46

SandRidge Overstated the Gas to Oil Ratios in Its Mississippian Wells .............. 50

The Economics of SandRidge's Mississippian Wells Was Much Worse than Represented .................................................................................................. 52

MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ................................................................................................... 54

First Quarter 2011 Statements ............................................................................... 58

The Miss Trust I Offering ...................................................................................... 66

Second Quarter 2011 Statements ........................................................................... 69

Third Quarter 2011 Statements ............................................................................. 76

Fourth Quarter 2011 Statements ............................................................................ 79

First Quarter 2012 Statements ............................................................................... 84

Miss Trust II Offering ........................................................................................... 94

Second Quarter 2012 Statements ........................................................................... 97

Third Quarter 2012 Statements ........................................................................... 103

**Page**

Fourth Quarter 2012 Statements .......................................................................... 108

Defendants Were Required to Disclose the Self-Dealing  Transactions of the Ward-Related Entities in the Mississippian .................................................. 109

The SEC filings of SandRidge and the SandRidge Trusts and  the Registration Statements for the SandRidge Trusts Omitted  Known Trends, Events and Uncertainties that Were Impacting,  and Would Impact, the Company's Financial Results ................................................................................ 111

The 10-Ks for SandRidge and the SandRidge Trusts and  The Registration Statements for the SandRidge Trusts Omitted  Significant Risk Factors Required to be Disclosed Therein ....................................................... 114

Any Purported Risk Warnings Were Inadequate  or Materially False and Misleading ............................................................................................... 116

END OF CLASS PERIOD DISCLOSURES ............................................................... 118

ADDITIONAL SCIENTER ALLEGATIONS ............................................................ 127

LOSS CAUSATION/ECONOMIC LOSS .................................................................. 135

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ..................................................................................... 138

NO SAFE HARBOR ................................................................................................. 139

COUNT I .................................................................................................................. 141

Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder  Against SandRidge, Ward, Grubb, and Bennett ......... 141

COUNT II ................................................................................................................. 144

Violations of Section 20(a) of the Exchange Act Against Defendants Ward, Grubb, and Bennett ............................................................................................. 144

PRAYER FOR RELIEF ............................................................................................ 145

JURY DEMAND ....................................................................................................... 146

Lead Plaintiffs Laborers Pension Trust Fund for Northern Nevada, Construction Laborers Pension Trust of Greater St. Louis, Vladimir and Angelica Galkin (collectively, "Plaintiffs"), by their undersigned attorneys, on behalf of themselves and the class they seek to represent, for their Second Consolidated Amended Complaint for Violations of the Federal Securities Laws (the "Complaint"), allege the following upon knowledge as to their own acts, and upon the investigation conducted by Plaintiffs' counsel as detailed below.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all purchasers, other than Defendants (defined below), of SandRidge Energy, Inc. ("SandRidge" or the "Company") common stock between February 24, 2011 and November 8, 2012, inclusive, (the "Class Period") seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended, and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.     Defendant SandRidge is an oil and gas exploration company.  This case is about one of SandRidge's core holdings referred to as the Mississippian play (also referred to herein as the "Mississippian" and the "Mid-Continent"), which is located in Oklahoma and Kansas.  As detailed further herein, throughout the Class Period, Defendants materially overstated the amount of oil being produced in the Mississippian play for its typical horizontal Mississippian well, the amount of oil relative to gas, and the economics for horizontal Mississippian wells, and misrepresented the geology of the Company's leasehold across the Mississippian.

3.     At the same time that Defendants were misrepresenting the value of SandRidge's Mississippian play properties, unbeknownst to investors, SandRidge's founder

and chief executive officer ("CEO"), Defendant Tom Ward ("Ward"), through various affiliated entities, was materially benefitting from the Company's investment activities in the Mississippian. Beginning in 2009, SandRidge started acquiring and developing properties in the Mississippian. By 2012, the Company had acquired 1.7 million acres and spent over $2.2 billion developing those properties. As SandRidge was purchasing and developing properties in the Mississippian, Defendant Ward and his affiliated entities were acquiring massive amounts of land and mineral rights[1] throughout the Mississippian. These Ward-related entities (defined more specifically below) often acquired land just prior to SandRidge's acquisitions of neighboring properties and the Ward-related entities either flipped those properties to SandRidge or other companies or held on to the properties and benefitted from their appreciation in value due to SandRidge's development activities in the area. The Ward-related entities also stood to benefit from royalties earned from drilling activities on its areas. In other words, Defendant Ward and his affiliated entities were engaged in a classic form of front-running – Ward got out in front of SandRidge, purchased lands around where SandRidge would be developing wells and then benefitted from SandRidge's investments through the appreciation in the value of the land and royalty interests.

4.      Throughout the Class Period, Defendants told investors that SandRidge was investing in the Mississippian due to the large amounts of oil reserves and the favorable amount of oil relative to gas in the area. Aside from the fact that these statements misrepresented the nature of the Mississippian properties, as detailed herein, investors were

---

[1]      As used herein, "mineral rights" includes the rights associated with hydrocarbon resources such as oil and natural gas.

not told the other side of that coin – that irrespective of how the wells ultimately performed, SandRidge's investments directly benefitted Ward.  SandRidge's Mississippian-related spending caused the Company to drastically exceed its capital expenditures allotment and required SandRidge to take on debt and obtain funding from other sources in order to keep funneling money into the Mississippian, which further negatively impacted the financial condition of the Company.  By April 4, 2011, Defendants were telling investors that the Company would be increasing its capital expenditures in the region to $1.8 billion – and that figure would be revised upwards on several occasions.

5.    SandRidge's heavy investment in the Mississippian, however, did not equate to positive financial gains for the Company.  Defendants' stated purpose for investing so heavily in the Mississippian was the purported large amounts of oil reserves relative to gas and the total economic value of the typical SandRidge well in the area.  The gas to oil ratio and the estimated ultimate recovery per well (commonly referred to as the "EUR") are key metrics used in the oil and gas exploration industry to value a particular play such as the Mississippian.  During the Class Period, however, Defendants grossly overstated the amount of oil relative to gas and the EUR of the typical SandRidge horizontal Mississippian well. The overstatement of the oil relative to gas and the EUR of the typical SandRidge horizontal Mississippian well resulted in an overstatement of the economic value of SandRidge's Mississippian play.

6.    For example, during 2011, SandRidge represented that its average horizontal Mississippian well produced 52% oil and just 48% gas.  During 2012, SandRidge represented that its average horizontal Mississippian well produced 45% oil and 55% gas.

Based on production data that SandRidge reported to the Oklahoma Tax Commission, however, SandRidge produced on average less than 40% oil and more than 60% gas during 2011 and produced on average 35% oil and 65% gas during 2012. The overstatement of oil to gas during the Class Period resulted in an overstatement of the reserves and economic value of SandRidge's Mississippian wells.

7.      Furthermore, by early 2012, based on production data reported by SandRidge to the Oklahoma Tax Commission, there was a substantial drop-off in the amount of total production in SandRidge's typical horizontal Mississippian wells. Thus, even though SandRidge consistently reported to investors during 2012 that the typical horizontal Mississippian well would yield an EUR of oil of 204 Mbo, an EUR of gas of 1512 MMscf, and a combined oil and gas EUR of 456 Mboe, a decline curve analysis of reported production data for SandRidge's initial horizontal Mississippian wells indicated that these wells were expected to yield an EUR of oil of no more than 32.5 Mbo (84% less than reported), an EUR of gas of no more than 686 MMscf (55% less than reported), and a combined oil and gas EUR of no more than 147 Mboe (68% less than reported). Accordingly, SandRidge grossly overstated the reserves and economic value of the life of its horizontal wells in the Mississippian.

8.      Yet, SandRidge continued to spend heavily in the Mississippian to the financial detriment of the Company and raised nearly $1 billion from public investors to do so through the issuance of common units in the SandRidge Mississippian Trust I during April 2011 and the Mississippian Trust II during April 2012. These funds enabled SandRidge to continue spending in the Mississippian to the benefit of Ward.

9.     SandRidge's continued investment in the area increased the value of acreage in the Mississippian.  The Company admitted in March 2012 that its Mississippian land appreciated by 21 times its value ($200 per acre purchase price) – implying a value of $4,236 per acre.  Given that the Ward-related entities held interests in 475,000 acres in the Mississippian, this implied value suggested that the Ward-related entities' interests were valued at $2 billion (475,000 acres x $4,236 [rate at which SandRidge monetized its assets] = $2,012,100,100).

10.     Defendants' overstatement of the value of SandRidge's Mississippian play and failure to disclose the transactions and holdings in the Mississippian by the Ward-related entities caused the price of SandRidge common stock to be artificially inflated throughout the Class Period.

11.     Defendant Ward's rampant front-running and SandRidge's ever-growing investments in the Mississippian ultimately cost the Company hundreds of millions of dollars, left SandRidge with wells and properties far less valuable than represented, and saw Ward ousted from his positions at the Company.  After the close of trading on November 8, 2012, SandRidge announced its financial results for the third quarter of 2012 and reported a loss of $184 million.  During a conference call with investors the following morning, SandRidge finally acknowledged that the EUR for its typical Mississippian horizontal well was lower than represented and that there was more low-margin natural gas and less high-margin oil recoverable than represented during the Class Period.  SandRidge also announced that it was selling its valuable Permian Basin holdings in order to raise capital.  Finally, also on November 8th, a large activist SandRidge shareholder, TPG-Axon Capital ("TPG-

Axon"), publicly issued a letter to the Company's board of directors challenging Defendant Ward's self-dealing and calling for his resignation.

12.     As a result of the disclosures on November 8th and 9th, 2012, the shares of SandRidge common stock declined from a closing price of $6.10 per share to close at $5.51 per share on November 9th (a 9.7% decline and a 57.6% decline from the Class Period high of $12.97 per share reached on April 4, 2011), on heavy trading volume.

13.     By the end of 2012, SandRidge lowered the EUR for its typical Mississippian horizontal well even further.  TPG-Axon continued revealing additional details about the self-dealing raised in its November 8th letter, forcing the Company's board to retain outside counsel and perform an internal investigation into Ward and the Ward-related entities.  On June 19, 2013, the Company announced that the board had completed its investigation and that Defendant Ward was terminated as Chairman and CEO of the Company.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Section 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

15.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78a], and 28 U.S.C. §§1331 and 1337.

16.     Venue is properly laid in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  The acts and conduct complained of herein occurred in substantial part in this District and the Company maintains executive offices in this District.

17.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including

the mails and telephonic communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## BASIS OF ALLEGATIONS

18.     The allegations herein are based upon the investigation conducted by and under the supervision of Plaintiffs' counsel, which included interviewing former SandRidge employees and reviewing and analyzing information from numerous public and proprietary sources (such as LexisNexis, Dow Jones and Bloomberg, Inc.), including, *inter alia*, SEC filings, other regulatory filings and reports, publicly available annual reports, press releases, published interviews, news articles and other media reports, reports of securities analysts and investor advisory services, and public data related to SandRidge's well production performance, including production data provided to the Oklahoma Tax Commission by SandRidge, and data accessed through the Drillinginfo, Inc. database (a commercial petroleum data service), in order to obtain the information necessary to plead Plaintiffs' claims with particularity where necessary.

19.     Additionally, Plaintiffs' counsel reviewed various SEC filings and presentations prepared by TPG-Axon, a large SandRidge shareholder, relating to, among other things, transactions engaged in throughout the Mississippian by entities affiliated and associated with Defendant Ward ("TPG-Axon Presentations").   Plaintiffs' counsel independently reviewed oil and gas lease records filed in Oklahoma county courthouses and other documents related to the sale and/or transfer of mineral rights to SandRidge, Defendant Ward, and entities associated or affiliated with Defendant Ward and members of his immediate family.   Plaintiffs' counsel verified a significant portion of the information contained in the presentations prepared by TPG-Axon.

20.     Finally, Plaintiffs' counsel, with the assistance of an independent petroleum engineering consulting firm, analyzed the production data of SandRidge's wells available at the time of Defendants' statements about those wells during the Class Period and obtained and reviewed a statistically significant and unbiased selection of data concerning SandRidge wells in its most active areas of drilling.  Data was obtained for individual wells producing in the most active counties for SandRidge in the Mississippian play.  Much of the data was provided by SandRidge to governmental authorities.  The underlying data and analysis of that data performed by Plaintiffs were not readily available to public.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### FORMER EMPLOYEES

21.     As part of their investigation into the facts underlying this action, counsel for Plaintiffs interviewed numerous former employees of SandRidge.  The allegations made herein are based, in part, upon information and belief and are supported by the knowledge of three former employees ("FEs").  These FEs have direct first-hand knowledge about SandRidge's business and operations and the facts alleged herein.

22.     Former Employee No. 1 ("FE1") was a Senior Geologist at SandRidge until November 2010 and worked at SandRidge for approximately 3 years.  FE1 was one of only three or four Senior Geologists working on the Mississippian.  Throughout his/her tenure at SandRidge, FE1 worked as a geologist throughout the regions in Oklahoma where SandRidge held leases to drill the Mississippian lime.  In addition, throughout his/her employment at SandRidge, FE1 attended weekly management meetings in SandRidge's

headquarters which were attended by SandRidge senior management, including Defendants Ward and Grubb.

23.     Former Employee No. 2 ("FE2") was a Geologist at SandRidge throughout the Class Period.  During his/her tenure at SandRidge, FE2 worked on both the Permian Basin and the Mississippian.  As a geologist, FE2 determined where to drill and pin-pointed hazards like faults or fractures.  In connection with his/her employment at SandRidge, FE2 attended meetings which were attended by SandRidge senior management, including Defendants Ward and Grubb.

24.     Former Employee No. 3 ("FE3") was an Associate Geologist at SandRidge during the Class Period.  FE3 worked as a geologist on the Mississippian play in Kansas from May 2012 through May 2013.  As an Associate Geologist, FE3 determined where to drill by reviewing the past performance of wells in the same area and trying to estimate whether a new well would have similar production results.

## PARTIES

**Plaintiffs**

25.     Lead Plaintiff Laborers Pension Trust Fund for Northern Nevada acquired the common stock of SandRidge as set forth in the certification previously filed with the Court and incorporated by reference herein during the Class Period and was damaged thereby.

26.     Lead Plaintiff Construction Laborers Pension Trust of Greater St. Louis acquired the common stock of SandRidge as set forth in the certification previously filed with the Court and incorporated by reference herein during the Class Period and was damaged thereby.

27.     Lead Plaintiffs Vladimir and Angelica Galkin acquired the common stock of SandRidge as set forth in the certification previously filed with the Court and incorporated by reference herein during the Class Period and were damaged thereby.

**Defendants**

28.     Defendant SandRidge is a Delaware corporation headquartered at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma.

29.     Defendant Ward founded SandRidge and served as SandRidge's Chairman of the Board and CEO during the Class Period.  Defendant Ward signed the Registration Statements for the Trust Offerings.  The Company terminated Defendant Ward in June 2013. Ward is a professional landman with a Bachelor of Business Administration degree in Petroleum Land Management from the University of Oklahoma, and he is highly experienced in all facets of the business of petroleum exploration and production and, at all relevant times, was positioned to fully understand the Company's production reports on a technical level.

30.     Defendant James D. Bennett ("Bennett") served as SandRidge's Senior Vice President and Chief Financial Officer ("CFO").  Defendant Bennett signed or authorized the signing of the Registration Statement for the Miss Trust II Offering.

31.     Defendant Matthew K. Grubb ("Grubb") served as SandRidge's President and Chief Operating Officer ("COO") during the Class Period.

32.     Defendants SandRidge, Ward, Bennett, and Grubb are collectively referenced herein as the "Defendants."   Defendants Ward, Bennett, and Grubb are collectively referenced herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

33.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of consisting of all purchasers of SandRidge common stock during the Class Period (the "Class").

34.     Excluded from the Class are Defendants, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

35.     The members of the Class are so numerous that joinder of all members is impracticable.  SandRidge common stock is actively traded on the NYSE.  There were approximately 415.4 million shares of SandRidge common stock outstanding as of February 17, 2012.  The precise number of Class members is unknown to Plaintiffs at this time but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of SandRidge or its transfer agent.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

36.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

37.     Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs' and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

38.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

39.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business and operations of the Company;

(c)     whether the price of SandRidge common stock was artificially inflated during the Class Period; and

(d)     the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## KEY TECHNICAL TERMS IN THE
## OIL AND GAS EXPLORATION INDUSTRY

40.     The oil and gas industry uses a set of terms specific to that industry.  Below are explanations of terms that are referenced herein.

41.     **Area of Mutual Interest ("AMI")**.  A geographic location in which more than one oil legal entity – such as an oil and/or natural gas company, partnership, or trust – has a stake.

42.     **Barrel Oil Equivalent ("Boe")**.  When a well produces both crude oil and natural gas, the production of the oil and gas is often expressed as "barrels oil equivalent" or "Boe".  Converting gas volumes to the oil equivalent is customarily done on the basis of the heating content or calorific value of the fuel.  Before aggregating, the gas volumes first must be converted to the same temperature and pressure.  Common industry gas conversion factors usually range between 1.0 barrel of oil equivalent (boe) = 5.6 thousand standard cubic feet of gas (mscf) to 1.0 boe = 6.0 mscf.  For the purpose of the Amended Complaint, the conversion is 1.0 boe = 6.0 mscf.  Although an equivalent barrel of condensate or natural gas may be equivalent to a barrel of oil on an energy basis, it is not equivalent on a dollar value basis as there may be a large difference in value between an equivalent barrel of lower priced gas or condensate and a barrel of higher priced oil.  "Crude Oil Equivalent" is the same as "Barrel Oil Equivalent".

43.     **Cash and Cash Equivalents**.  An item on the balance sheet that reports the value of a company's assets that are cash or can be converted into cash immediately (*e.g.* bank accounts, marketable securities and Treasury bills).

44.     **Crude Oil**.  Crude Oil is the portion of petroleum that exists in the liquid phase in natural underground reservoirs and remains liquid at atmospheric conditions of pressure and temperature.

45.     **Developed oil and gas reserves**.  Developed oil and gas reserves are reserves of any category that can be expected to be recovered:

(a)     Through existing wells with existing equipment and operating methods or in which the cost of the required equipment is relatively minor compared to the cost of a new well; and

(b)     Through installed extraction equipment and infrastructure operational at the time of the reserves estimate if the extraction is by means not involving a well.

46.     **Development well**.  A well drilled within the proved area of an oil or gas reservoir to the depth of a horizon known to be productive.

47.     **Estimated ultimate recovery (EUR)**.  Estimated ultimate recovery is the sum of reserves remaining as of a given date and cumulative production as of that date.  EUR's are determined for the Mississippian based on analysis of the production decline curve.  A petroleum engineer plots daily, weekly or monthly oil and gas production versus time, and from the production data, and taking into consideration historic analog production, projections are made of future production volumes and rates of decline to arrive at an ultimate production figure, at the point when the well reaches its economic limit (*i.e.* projected expenses equal projected well revenues).

48. **Exploratory well**.  An exploratory well is a well drilled to find a new field or to find a new reservoir in a field previously found to be productive of oil or gas in another reservoir.

49. **Free Cash Flow**.  A measure of financial performance calculated as operating cash flow minus capital expenditures.  Free cash flow represents the cash that a company is able to generate after laying out the money required to maintain or expand its asset base.

50. **Funding Gap**.  The amount of money needed to fund the ongoing operations or future development of a business or project that is not currently provided by cash, equity or debt.  Funding gaps can be covered by investment from venture capital or angel investors, equity sales or through debt offerings and bank loans.

51. **GOR**.  A ratio of gas/oil produced from one barrel of crude oil at reservoir temperature and pressure, and expressed in the units standard cubic feet per barrel of oil ("scf/bbl").

52. Below are acronyms that refer to the quantity of oil, gas and other types of liquids:

(a) **MBbls**.  Thousand barrels of oil or other liquid hydrocarbons;

(b) **MBbls/d**.  Thousand barrels of oil or other liquid hydrocarbons per day;

(c) **MBoe**.  Thousand barrels of oil equivalent;

(d) **Mcf**.  Thousand cubic feet of natural gas;

(e) **MMBbls**.  Million barrels of oil or other liquid hydrocarbons;

(f) **MMBoe**.  Million barrels of oil equivalent;

(g) **MMBtu**.  Million British Thermal Units; and

(h)    **MMcf**.  Million cubic feet of natural gas.

53.    **Mississippian Formation**.  The Mississippian is a geological formation that extends hundreds of miles across northern Oklahoma and south-central Kansas.  It ranges from a few hundred feet to as much as 1000 feet thick, and is composed of layers of limestone, chert and limey mudstones that were deposited in a shallow sea during the Mississippian geological period over 300 million years ago.  Oil has been produced from the formation since the 1940s from conventional vertical wells.  Beginning in 2007, horizontal well and hydraulic fracturing technology has been applied to extract oil from reservoirs within the Mississippian formation.  This formation is also referred to the "Mississippian" or the "Mississippian play."

54.    **Natural Gas**.  Natural Gas is the portion of petroleum that exists either in the gaseous phase or is in solution in crude oil in natural underground reservoirs, and which is gaseous at atmospheric conditions of pressure and temperature.

55.    **Probable reserves**.  Probable reserves are those additional reserves that are less certain to be recovered than proved reserves but which, together with proved reserves, are as likely as not to be recovered.

(a)    When deterministic methods are used, it is as likely as not that actual remaining quantities recovered will exceed the sum of estimated proved plus probable reserves.  When probabilistic methods are used, there should be at least a 50% probability that the actual quantities recovered will equal or exceed the proved plus probable reserves estimates.

(b)     Probable reserves may be assigned to areas of a reservoir adjacent to proved reserves where data control or interpretations of available data are less certain, even if the interpreted reservoir continuity of structure or productivity does not meet the reasonable certainty criterion.  Probable reserves may be assigned to areas that are structurally higher than the proved area if these areas are in communication with the proved reservoir.

(c)     Probable reserves estimates also include potential incremental quantities associated with a greater percentage recovery of the hydrocarbons in place than assumed for proved reserves.

56.     **Proved oil and gas reserves**.  Proved oil and gas reserves are those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probabilistic methods are used for the estimation.  The project to extract the hydrocarbons must have commenced or the operator must be reasonably certain that it will commence the project within a reasonable time.

57.     **PUDs**.  Proven undeveloped reserves.

58.     **Reasonable certainty**.  If deterministic methods are used (to estimate reserves), reasonable certainty means a high degree of confidence that the quantities will be recovered.  If probabilistic methods are used, there should be at least a 90% probability that the quantities actually recovered will equal or exceed the estimate.  A high degree of

confidence exists if the quantity is much more likely to be achieved than not, and, as changes due to increased availability of geoscience (geological, geophysical, and geochemical), engineering, and economic data are made to estimated ultimate recovery (EUR) with time, reasonably certain EUR is much more likely to increase or remain constant than to decrease.

59.   **Reserves**.  Reserves are estimated remaining quantities of oil and gas and related substances anticipated to be economically producible, as of a given date, by application of development projects to known accumulations.  In addition, there must exist, or there must be a reasonable expectation that there will exist, the legal right to produce or a revenue interest in the production, installed means of delivering oil and gas or related substances to market, and all permits and financing required to implement the project.

60.   **Reservoir**.  A porous and permeable underground formation, or horizon within a formation, containing a natural accumulation of producible oil and/or gas that is confined by impermeable rock or water barriers and is individual and separate from other reservoirs.

61.   **Resources**.  Resources are quantities of oil and gas estimated to exist in naturally occurring accumulations.  A portion of the resources may be estimated to be recoverable, and another portion may be considered to be unrecoverable.  Resources include both discovered and undiscovered accumulations, and do not included proven reserves.

62.   **Undeveloped oil and gas reserves**.  Undeveloped oil and gas reserves are reserves of any category that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion.

(a)     Reserves on undrilled acreage shall be limited to those directly offsetting development spacing areas that are reasonably certain of production when drilled, unless evidence using reliable technology exists that establishes reasonable certainty of economic producibility at greater distances.

(b)     Undrilled locations can be classified as having undeveloped reserves only if a development plan has been adopted indicating that they are scheduled to be drilled within five years, unless the specific circumstances, justify a longer time.

63.     **Decline Curve**.  A decline curve is a standard tool commonly used by petroleum engineers to determine remaining reserves and EUR for wells with production history.  Oil and gas production rates typically decline as a function of time due to loss of reservoir pressure or the changing relative volumes of the produced fluids.  Fitting a trend through the through the performance history and assuming this same trend continues into the future forms the basis for the decline curve analysis concept.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

64.     Defendant SandRidge, which is headquartered in Oklahoma City, described itself during the Class Period as an independent natural gas and oil company in the United States that engages in the exploration, development, and production of oil and gas properties. Its Exploration and Production ("E&P") segment explored for, developed, and produced natural gas and oil reserves with a focus on the Mid-Continent and the Permian Basin, a sedimentary basin largely contained in the western part of Texas and the southeastern part of New Mexico.  The E&P segment also operated leasehold positions in the West Texas Overthrust, Gulf Coast, and Gulf of Mexico.  The Company's Drilling and Oil Field Services

segment was involved in the contract drilling of oil and natural gas wells primarily in the west Texas region. Its Midstream Gas Services segment engages in purchasing, gathering, treating, and selling natural gas in west Texas.

65.     When Defendant Ward first founded SandRidge, it was primarily a natural gas company. When natural gas prices began to drop in 2008, the Company made a shift in strategy to transform itself from being primarily a low-margin natural gas producing to a high-margin oil producing company. The Company made several large acquisitions in connection with this transformation.

66.     A critical piece of this strategy was the Company's acquisition of oil and gas production interests in the Permian Basin. The Permian Basin was a core SandRidge area during the Class Period in which the Company controlled approximately 244,700 net acres in West Texas and New Mexico. The Company's oil properties in the Permian Basin included properties acquired in December 2009 from Forest Oil Corporation in conjunction with SandRidge's strategic shift in focus from gas to oil development and production, and properties formerly owned by Arena Resources, Inc., which SandRidge acquired in July 2010.

67.     According to SandRidge's 2010 Annual Report, the Permian Basin "provided SandRidge with 149 million barrels of oil equivalent (MMboe) of proved reserves and 16,100 barrels of oil equivalent per day (Boepd) of production—75 percent of which is oil. Our total investment of less than $1.9 billion is now worth approximately $3.8 billion clearly illustrating our ability to execute and enhance value in our core areas." The 2010 Annual Report emphasized that the "largest portion of [its] 2011 drilling budget will be dedicated to

the Central Basin Platform where [it] expects to drill more than 800 wells using 16 rigs, making SandRidge the most active driller in this oil rich region."   SandRidge also stressed that the Permian Basin wells were expected to provide a high rate of return:  "The average well costs approximately $760,000 and takes four to eight days to drill, depending on the formation being targeted.  These wells are expected to produce an average of about 83,000 Boe per well and achieve a 90 percent rate of return."

68.     In its 2010 Annual Report, SandRidge described the horizontal Mississippian play in northern Oklahoma and southern Kansas as a "core area" of the Company. SandRidge emphasized that: "early and aggressive entry in this play enabled [it] to keep [its] lease costs under $200 per acre, which is in stark contrast to the entry cost of many of the recent, more high-profile plays now prominent in our industry, where acreage costs have been 10 to 100 times higher."   The Annual Report further described the importance of the Mississippian play to SandRidge as follows:

> Horizontal wells drilled in the Mississippian formation reach a total vertical depth of about 6,000 feet and are then drilled another 4,000 feet horizontally, at a cost of $2.7 million per well.  With more than 17,000 vertical wells drilled in this area over the last 30 years, *we believe the Mississippian has significant scale*.  *Accordingly, we expect to reach 900,000 to 1 million acres of leasehold, which represents the largest land position of any operator*.  We have identified more than 3,400 potential drilling locations in the Mississippian formation and expect to drill approximately 135 horizontal wells this year using 12 rigs.  *We expect ultimate recovery to range from 300,000 to 500,000 Boe per well and, based on current commodity prices, these wells to provide a 120 percent rate of return*.[2]

69.     Defendant Ward equated increased oil production with an increase in shareholder value, stating, in pertinent part, as follows:

---

[2]     All emphasis is added unless otherwise indicated.

The changes we have implemented over the last two years have made this an exciting time for SandRidge. With the transformation to oil essentially complete, we now have an exceptional platform of conventional assets with predictable production curves that we are able to drill at a low cost, resulting in high rates of return. Our two sizable oil plays in the Central Basin Platform and the horizontal Mississippian formation provide a large inventory of high return oil drilling opportunities with decades of known production history.

At a time when oil is in high demand worldwide and is progressively becoming more difficult to find and produce, SandRidge increased oil production last year by 155 percent over 2009. In 2011, we expect to further increase our oil production by another 66 percent over 2010. When considering the current valuation ratio of oil to natural gas, our ability to substantially grow our oil production clearly enables SandRidge to generate higher revenues and deliver increased value to our shareholders. ***When combined with our ability to quickly capture value on our natural gas assets should prices improve, our successful transformation to oil has put SandRidge in an extremely positive position for the future***.

(Emphasis added.)

70.    According to SandRidge's Annual Report, "as natural gas prices hover around $4.00 per Mcf and oil remains in the $100 per barrel range, the current valuation ratio between natural gas and oil is approximately 25:1. One barrel of oil is now worth the same as 25 Mcf of gas, ***making oil a significantly more valuable commodity***." And this significant difference between the relative values of oil and natural gas served as the theme of the Company's 2010 Annual Report to shareholders, which featured on its cover an illustration of a holding tank with "25:1" prominently written on the side of the tank in colorful numerals.[3]

---

[3]    *See*  http://investors.sandridgeenergy.com/files/doc_financials/annual/2010Annual Report.pdf.  *See also id* at insider cover ("Based on the increasing divergence between the relative values of oil and natural gas – currently approximately 25:1 – the decision by SandRidge to shift our focus to oil seemed only natural.").

## The Trust Offerings

71.     In connection with its transformation strategy, beginning in early 2011, SandRidge represented that it would "monetize" certain of its assets in order to create cash-flow to fund their ongoing lease acquisitions and drilling activities in its core assets in the Mid-Continent and the Permian Basin.  Accordingly, among other monetization efforts, SandRidge created royalty trusts to fund their ongoing drilling operations.

72.     **SandRidge Miss Trust I Offering**:  On January 5, 2011, the SandRidge Miss Trust I filed a Registration Statement on Form S-1 and SandRidge filed a Registration Statement on Form S-3 with the SEC as co-registrants, and each filed several amendments on Form S-1/A and Form S-3/A thereafter for the SandRidge Miss Trust I Offering (the "SandRidge Miss Trust I Registration Statement").

73.     On April 7, 2011, the Prospectus with respect to the Miss Trust I Offering (the "SandRidge Miss Trust I Prospectus"), which forms part of the SandRidge Miss Trust I Registration Statement, became effective and 15 million common units – representing an approximately 54% beneficial interest in the SandRidge Miss Trust I – at $21 per unit were sold to the public, thereby raising $315 million.

74.     In addition to the above-referenced 15 million common units, the SandRidge Miss Trust I Registration Statement included an overallotment option granted to the Underwriters to purchase up to an additional 2.25 million common units, and on or about April 12, 2011 the Underwriters exercised this option.  In total, 17.25 million common units were sold in the Miss Trust I Offering at $21 per share, thereby raising approximately $338.7 million.

75.     The 17.25 million common units sold in the offering now represented an approximately 61.6% beneficial interest in the SandRidge Miss Trust I.  In addition, the SandRidge Miss Trust I issued the Company 3.750 million common units and 7 million subordinated units convertible into common units, together representing an approximate 38.4% beneficial interest in the Trust.

76.     **The SandRidge Miss Trust II Offering**: On January 5, 2012, the SandRidge Miss Trust II filed on a Form S-1 and SandRidge filed on a Form S-3 a Registration Statement with the SEC as co-registrants and each filed several amendments on Form S-1/A and Form S-3/A thereafter for the SandRidge Miss Trust II Offering (the "Miss Trust II Registration Statement").

77.     On April 18, 2012, the Prospectus with respect to the Miss Trust II Offering (the "SandRidge Miss Trust II Prospectus"), which forms part of the Miss Trust II Registration Statement, became effective and 26 million common units at $21 per unit were sold to the public, thereby raising $546 million.

78.     In addition to the above-referenced 26 million common units, the SandRidge Miss Trust II Registration Statement included an overallotment option granted to the Underwriters to purchase up to an additional 3.9 million common units, and on or about April 17, 2012 the Underwriters exercised this option.  In total, 29.9 million common units were sold in the Miss Trust II Offering at $21 per share, thereby raising approximately $590 million.

79.     The 29.9 million common units sold in the offering to the public in the Miss Trust II Offering now represented an approximately 60% beneficial interest in the SandRidge

Miss Trust II.  In addition, the SandRidge Miss Trust II issued the Company 7.4 million common units and 12.4 million subordinated units convertible into common units, together representing an approximate 40% beneficial interest in the Trust.

80.     In total, the Miss Trust I raised $338.7 million from investors as the Miss Trust II raised $590 million from investors.

### The Ward-Related Entities

81.     Defendant Ward is affiliated with several entities that operate in the same business and location as SandRidge.  In fact, some of these entities are direct competitors of SandRidge.   These entities include, among others, WCT Resources, L.L.C. ("WCT Resources"), 192 Investments, L.L.C. ("192 Investments"), and TLW Land & Cattle, L.P. ("TLW Land & Cattle") (collectively, the "Ward-related entities").  Throughout the Class Period, Defendants represented that it was necessary to spend heavily on SandRidge's development activities in the Mississippian in order to reap lucrative financial gains from the large reserves of oil and natural gas.

82.     Unbeknownst to investors, however, Defendant Ward had the undisclosed ulterior motive for SandRidge's Mississippian activities to enrich Ward and his family members, at the expense of the Company and its shareholders.  Defendants failed to disclose to investors during the Class Period that the Ward-related entities bought huge amounts of land and mineral rights in the Mississippian and stood to benefit from SandRidge's spending and development activities in the area.  The Ward-related entities benefited as a result of: (1) the resale of rights acquired in the Mississippian to SandRidge and SandRidge's competitors; (2) the appreciation of its holdings caused by SandRidge's acquisition and development of adjacent land; and (3) the payment of production royalties to the Ward family.

83.     Defendant Ward, through the Ward-related entities, had a different profit model than SandRidge in operating in the Mississippian.  While SandRidge was required to spend heavily in the Mississippian to make the property productive in hopes of profiting from its investment, the Ward-related entities – by passively benefitting from SandRidge's significant expenditures – were virtually guaranteed to profit from their interests in the Mississippian.  The Ward-related entities purchased interests in the Mississippian knowing that the areas would benefit from SandRidge's investment.  These interests would appreciate in value *because of SandRidge's investment*, then the Ward-related entities would sell or lease such interests to SandRidge or other third parties, thus benefitting without investing their own capital or taking any meaningful risk.  Thus, the Mississippian was much more profitable for the Ward-related entities than SandRidge and would provide substantial rewards to the Ward-related entities even with less reserves than represented.

**WCT Resources**

84.     WCT Resources is a limited liability company organized under Oklahoma law, located at 428 Dean A. McGee Avenue, Oklahoma City, Oklahoma 73102.  Until recently, WCT Resources shared its headquarters with SandRidge at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma 73102.

85.     WCT Resources is owned by trusts established by Defendant Ward and his wife, Sch'ree Ward, for the benefit of Defendant Ward's children ("Ward Children's Trusts").  The trustee of the Ward Children's Trusts, Scott C. Hartman, has worked at SandRidge since April 2006 and served as Executive Business Director at SandRidge at all times relevant herein.  Defendant Ward's son, Trent Ward, is WCT Resources' registered agent and CEO.  The current COO of WCT Resources, Scott White, was a land manager at

SandRidge until 2011.  WCT Resources had approximately seven employees at the times relevant herein, as opposed to the approximately 2,500 full-time employees at SandRidge.

86.     In all, SandRidge had leased the mineral rights for at least 223 sections in northwest Kansas, within the counties of Sherman, Thomas, Sheridan, Wallace, Logan, and Gove.  In the same counties, and often adjoining or adjacent to SandRidge's sections, WCT Resources leased the mineral rights to at least 403 sections, ***almost twice the number as SandRidge***.  In these counties, SandRidge had leased 142,720 acres while WCT Resources has leased 257,920.  As described below, many of WCT Resources' sections were directly contiguous to SandRidge's sections, and some WCT Resources sections were completely surrounded by SandRidge's sections.  According to deed records in these counties, on many occasions WCT Resources acquired their lease holdings in advance of or alongside of SandRidge's holdings.

87.     According to the TPG-Axon Presentations, WCT Resources has acquired approximately 475,000 acres of mineral rights in the Mississippian play, ***making it the fifth largest acreage holder in the Mississippian formation*** (behind only SandRidge, Chesapeake, Shell, and Devon).

**192 Investments**

88.     192 Investments is a limited liability company organized under Oklahoma law. Trent Ward, Defendant Ward's son, is 192 Investment's registered agent and the manager of 192 Investments.  And like SandRidge, 192 Investments has its headquarters at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma 73102.

89.     According to Kansas land records, 192 Investments acquired mineral rights on thousands of acres in late 2011 in the Mississippian play in Kansas.  Notably, 192

Investments bought those mineral rights just months before SandRidge leased property in adjacent plots.

**TLW Land & Cattle**

90.     TLW Land & Cattle is a limited partnership organized under Oklahoma law. As with SandRidge and 192 Investments, TLW Land & Cattle's headquarters is at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma 73102.  Defendant Ward is TLW Land & Cattle's registered agent.   According to the Company's SEC disclosures, TLW Land & Cattle is an "entity in which [Defendant] Ward has an ownership interest."

**The Ward-Related Entities Engaged in Improper Flipping**

91.     The Ward-related entities inappropriately moved ahead of the Company to acquire mineral rights from third parties, and then flipped them to SandRidge shortly thereafter.

92.     Defendants have acknowledged that certain transactions with the Ward-related entities qualified as related-party transactions.  Indeed, in its Form 10-K/A for the fiscal year 2010, which was filed with the SEC on March 23, 2011, in a section titled "Other Transactions with Mr. Ward," the Company stated:

> We lease rights to minerals under certain areas of land in northwest Oklahoma from TLW Land & Cattle LP ("TLW LC"), an entity in which Mr. Ward has an ownership interest.  In 2010, we developed some of the surface lands associated with these mineral interests and paid $33,046 to TLW-LC pursuant to the development.  We also paid royalties totaling $302,554 to TLW-LC in connection with the production of oil and natural gas from these properties.
>
> In September 2010, we purchased a portion of the working interest in leases covering acreage in northeast Oklahoma from WCT Resources, L.L.C., a limited liability company formed in 2002 and owned by trusts established in 1989 for the benefit of Mr. Ward's children ("WCT"), for $1,791,120, and in January 2011, we acquired a working interest in additional acreage in the area for $391,955.  Our Board approved the transactions in accordance with its

- 28 -

Related Party Transactions Policy.   WCT also participates as a working interest owner in wells we operate in northwest Oklahoma, and during 2010, we paid revenue of $242,363 to WCT as a working interest owner.

93.     This same so-called "disclosure" was repeated in the Company's Proxy statement filed with the SEC on April 25, 2011 on Schedule 14A in advance of its annual meeting of stockholders to be held on June 3, 2011 (the "2011 Proxy Statement").

94.     However, the representations contained in the 2010 Form 10-K/A and the 2011 Proxy Statement omit material information.  In particular, those filings fail to disclose that, on April 6, 2010, June 15, 2010 and September 28, 2010, WCT Resources acquired various mineral rights in Pawnee County, Oklahoma and then only *three weeks later*, on October 15, 2010, WCT Resources flipped certain of those mineral rights to SandRidge.   The transactions are depicted in the below chart from a February 2013 TPG-Axon Presentation:



95.     Similarly, on its form 10-K/A for the fiscal year 2011, which was filed with the SEC on March 20, 2012, in the section titled "Other Transactions with Mr. Ward," the Company states in pertinent part:

We own wells on certain areas of land in northwest Oklahoma under which TLW Land & Cattle LP ("TLW LC"), an entity in which Mr. Ward has an ownership interest, owns a royalty interest.  In 2011, we paid royalties totaling $925,735 to TLW-LC in connection with the production of oil and natural gas from these properties.

*In January 2011, we purchased a portion of the working interest in leases covering acreage in northeast Oklahoma from WCT Resources, L.L.C.*, a

limited liability company formed in 2002 and owned by trusts established in 1989 for the benefit of Mr. Ward's children ("WCT"), for $391,955.  WCT also participates as a working interest owner in wells we operate in northwest Oklahoma, and during 2011, we paid revenue of $168,196 to WCT as a working interest owner.

96.     This purported "disclosure" was repeated in the Company's Proxy statement filed with the SEC on April 26, 2012 on Schedule 14A in advance of its annual meeting of stockholders to be held on June 1, 2012 (the "2012 Proxy Statement").

97.     But the representations contained in the 2011 Form 10-K/A and the 2012 Proxy Statement omit material information.  Specifically, these SEC filings fail to disclose that on November 30, 2010, WCT Resources leased mineral rights in Pawnee County, Oklahoma and less than two months later, on January 20, 2011, WCT Resources flipped those specific leases to SandRidge.

98.     This front-running continued in 2013.  FE3 attended a meeting in 2013 during which Defendant Ward instructed a landman named Zach Graham to lease a portion of land in Kansas and he instructed him how much to offer.  According to FE3, the people at the meeting were hesitant to lease this property because it was known that the property produced natural gas rather than oil.  Mr. Graham determined later that that land was owned by Defendant Ward.  FE3 recalled that this self-dealing upset Aaron Reyna, Senior Vice President-Operations, enough that he slammed his hands on a table and pulled Defendant Ward out of the meeting to ask him why the land was being leased.

### The Ward-Related Entities Engaged in
### Improper Front Running for Adjacent Land Transactions

99.     The Company's public filings also omit material information with respect to the Ward-related acquisitions of land.  The Ward-related entities acquired huge amounts of

land and mineral rights alongside or even in advance of SandRidge.  These vast acquisitions extended across a significant portion of SandRidge's most active counties in the Mississippian.  Once SandRidge bought next to the Ward-related entities, the Ward-related entities either sold its holdings or held on to them and realized gains from appreciation.  In some instances, the Ward-related entities assigned the mineral rights to one of SandRidge's competitors, Shell.

100.    Below are several examples of front running for adjacent land transactions by the Ward-related entities:

1)      On January 13, 2011, Sam B. Rose Oil & Gas assigned mineral rights to WCT Resources in Cowley County, Kansas (Cowley County: 35-32-6). Nine months later, on September 28, 2011, SandRidge was assigned mineral rights in adjacent acreage.  WCT Resources still retains its acreage.

2)      Sometime between June 6, 2011 and July 5, 2011, Bent Tree Properties assigned mineral rights to WCT Resources and 192 Investments in Barber County, Kansas (Barber County: 08-31S-10W).  Shortly thereafter, SandRidge was assigned mineral rights in adjacent acreage on July 25, 2011.  Just three months after that, on October 26, 2011, WCT Resources assigned its mineral rights to Shell.   The below chart from a February 2013 TPG-Axon Presentation depicts this transaction:



3)      In a similar transaction, Ben Tree Properties assigned mineral rights to WCT Resources in Barber County, Kansas on June 20, 2011 (Barber County: 12-30S-11W).  Once again, on July 25, 2011, SandRidge was assigned mineral rights in adjacent acreage and on October 26, 2011, WCT Resources assigned its mineral rights to Shell.

4)      On November 21, 2011, Bent Tree Properties assigned mineral rights to WCT Resources and 192  Investments in Thomas County, Kansas (Thomas County: 17-08S-35W).  SandRidge was assigned mineral rights in adjacent acreage five months later, on April 3, 2012.  WCT Resources still retains its acreage.

5)      On December 12, 2011, Bent Tree Properties assigned mineral rights to WCT Resources and 192  Investments in Thomas County, Kansas (Thomas County: 29-06S-33W).  Four months later, on April 3, 2012, SandRidge was assigned mineral rights in adjacent acreage.  WCT Resources still retains its acreage.

6)      Also on December 12, 2011, Bent Tree Properties assigned mineral rights to WCT Resources and 192  Investments on a different plot of land in Thomas  County,  Kansas  (Thomas  County:  21-07S-33W).    Once  again, SandRidge was assigned mineral rights in adjacent acreage on April 3, 2012. WCT Resources still retains its acreage.

7)      On December 19, 2011, Bent Tree Properties assigned mineral rights to WCT Resources and 192 Investments on land in Thomas County, Kansas (Thomas  County:  05-09S-35W).    On  April  3,  2012  and  July  1,  2012, SandRidge was assigned mineral rights in adjacent acreage.  WCT Resources still retains this acreage.

8)      That very same day, two nearly identical transactions occurred: Bent Tree  Properties  assigned  mineral  rights  to  WCT  Resources  and  192 Investments in two different plots of land in Thomas County, Kansas (Thomas County:  34-08S-35W;  Thomas  County:  34-07S-34W).    Then four  months later,  SandRidge  was  assigned  mineral  rights  in  adjacent  acreage.    WCT Resources still retains this acreage.

9)      On January 4, 2012 and February 29, 2012, Bent Tree Properties assigned  mineral  rights  to  WCT  Resources  and  192 Investments in Thomas County,  Kansas  (Thomas  County:  26-07S-34W).    On  April  3,  2012, SandRidge was assigned mineral rights in adjacent acreage.  WCT Resources still retains this acreage.  The below chart from a February 2013 TPG-Axon Presentation depicts this transaction:

|  |  | (1) January 2012:<br>WCT acquires acreage |  | (2) April 2012:<br>SandRidge acquires adjacent acreage |  |  | (3) Today:<br>WCT still retains acreage |  |  |
|---|---|---|---|---|---|---|---|---|---|
| | | WCT / 192 | WCT / 192 | SD | SD | WCT / 192 | SD | SD | WCT / 192 | WCT / 192 |

101.   Because SandRidge has spent massive amounts of capital on the development and infrastructure of the Mississippian play, SandRidge's activity caused the adjacent or contiguous holdings of WCT Resources and 192 Investments to increase substantially to their historical value.  Indeed, SandRidge itself has acknowledged that the prices of acreage costs increase exponentially once they become more high profile and as more investment is made in the area, such as what SandRidge's investments had begun to do with the Mississippian.  In fact, according to the TPG-Axon Presentations, the land acquired by the Ward-related entities could be worth billions of dollars once SandRidge builds out the infrastructure in the region.

### Ward's Self-Dealing Violated SandRidge's Code of Ethics

102.   The Company's Code of Business Conduct and Ethics on the Company's website states in pertinent part:

Conflicts of Interest

A conflict of interest occurs when an officer, director or employee's private interest interferes in any way – or appears to interfere – with the interests of the Company.   Conflicts of interest include, but are not limited to, the following:

- Ownership in an enterprise that does business with, seeks to do business with, or is a competitor of the Company;

\*        \*        \*

- • Participation in any outside activity that competes with the Company or that interferes with the performance of an employee, officer or director's duties to the Company.

No officer, director or employee shall hold a position of material interest in an entity that conflicts with or appears to conflict with, proper performance of Company duties and responsibilities or the ability to make independent judgments regarding transactions between SandRidge and the entity. *Employees, officers and directors may not use their positions, Company assets, or confidential information gained in connection with their employment or involvement with the Company for personal gain or for the benefit of a family member or any outside party*. All potential conflicts of interest must be disclosed in writing to the Senior Vice President of Human Resources. Determination will be made in consultation with the General Counsel whether such conflict or potential conflict is incompatible with the officer, director or employee's duties.

Corporate Opportunities

*SandRidge officers, directors and employees are prohibited from (a) personally taking advantage of investment opportunities that are discovered through the use of Company property, information or position; (b) using Company property, information or position for personal gain; and (c) competing with the Company*. Officers, directors and employees owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

Confidentiality

Officers, directors and employees should maintain the confidentiality of all information entrusted to them by the Company, its suppliers, owners or customers, except when disclosure is authorized or legally mandated. Confidential information includes all nonpublic information that might be of use to competitors or harmful to the Company or its customers, if disclosed. *Confidential information should not be shared with the media, competitors or any other third parties*.

Fair dealing

All officers, directors and employees shall deal fairly, honestly and ethically with the Company's working interest owners, royalty owners, lessors, customers, contractors, competitors, suppliers, regulators, business partners, shareholders, employees and others. *No officer, director or employee shall take unfair advantage of anyone through* manipulation, concealment, *abuse of privileged or confidential information*, misrepresentation, fraudulent behavior or any other unfair dealing practice.

Fraudulent behavior includes, but is not limited to:

- Forgery or alteration of Company documents, including negotiable instruments;

- Misappropriation of Company, customer, partner or supplier assets;

- Unauthorized handling or reporting of Company transactions; and/or

- Falsification of Company records or financial statements.

Protection and Proper Use of Company Assets

***All Company assets should be used for legitimate purposes*** and protected against theft, waste or loss.  Company assets include, but are not limited to, cash, land, buildings, equipment, inventory, vehicles, appliances (*i.e.* telephones, computers, copiers, etc.) and intangible items such as ***business plans, prospects*** and Company records, name, logo and tag line.

103.    The Company's Financial Code of Ethics, which applies to the CEO, the CFO, the Controller, and other senior financial officers states:

I.      Ethical Principals

In carrying out his or her duties to and responsibilities for the Company, each Senior Officer should:

- Act ethically with honesty and integrity, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Provide full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the United States Securities and Exchange Commission ("SEC") and in other public communications that the Company makes;

- Comply with applicable laws, rules and regulations of national, state, provincial and local governments and private and public regulatory agencies having jurisdiction over the Company;

- Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing his or her independent judgment on behalf of the Company to be subordinated to other interests;

- Promote honest and ethical behavior by others in the work environment;

- Respect the confidentiality of information acquired in the course of his or her work except when authorized or otherwise legally obligated to disclose such information. Such confidential information must not be used for the personal advantage of any Senior Officer or parties related to such Senior Officer;

- Responsibly use and maintain all assets and resources employed or entrusted to such Senior Officer;

- Promptly report violations of this Financial Code to the Chairman of the Audit Committee of the Board of Directors ("Audit Committee"); and

- Accept accountability for adherence to this Financial Code.

104. Unbeknownst to shareholders, contrary to Defendants' representations regarding compliance with the corporate governance guidelines, Defendant Ward and other related parties were engaging in self-dealing transactions in direct contravention to SandRidge's Code of Business Conduct and Ethics and Financial Code of Ethics.

**SandRidge Poured Huge Amounts of Money into the Mississippian
Which Harmed the Financial Condition of the Company
But Benefitted the Ward-Related Entities**

105. Defendants repeatedly noted that by 2014, the Company would have a "self-funding capital program," which would be operating "all within [SandRidge's] cash flow," and all while "improving [its] credit metrics." According to Defendants' positive statements, SandRidge appeared to be on a clear path to success. Contrary to their repeated assurances during the Class Period, instead of focusing on cash flow and maintaining financial discipline, Defendants continued to spend more and more money and exceed capital expenditure targets in large part to continue acquisition, drilling, and development activities in the Mississippian.

106. On February 24, 2011, the Company provided capital expenditures guidance for 2011 of $1.3 billion. Thereafter, Defendants expressed confidence in the budget several

times.  For example, in an April 12, 2011 conference call with investors, Defendant Ward noted: "we've addressed the CapEx funding gap for this year and are already starting to work on 2012."  In a May 24, 2011 conference call with investors, Defendant Ward stated: "we have addressed our CapEx funding gap for this year and are working diligently on our 2012 projected gap as I think we'll be discussing throughout this year.  In fact, we anticipate having that concluded before the end of 2011."

107.    However, on August 4, 2011, Defendants announced that SandRidge had entered into a $500 million joint venture with Atinum, thereby allowing SandRidge accelerate its drilling and development activity in the Mississippian.  Defendants also announced that SandRidge was increasing 2011 capital expenditure guidance by a shocking $500 million, from $1.3 billion to $1.8 billion.  The press release attributed the increase primarily to "increased leasing activity, well count and well costs in the ***Mississippian play***."

108.    During an August 5, 2011 earnings conference call with analysts and investors, Defendant Ward conceded that the capital expenditures were being increased in part because the Company was looking to acquire additional acreage in the Mississippian.

109.    The rise in capital expenditures did not end there and SandRidge raised the guidance three more times.  During the first and second quarters of 2012, Defendants estimated that capital expenditures for 2012 would increase slightly, topping off at $1.85 billion.  However, in an August 2, 2012 press release, Defendants again increased the 2012 capital expenditures by $250 million, from $1.85 billion to $2.1 billion.  On November 8, 2012, Defendants raised the capital expenditure budget yet again to $2.15 billion.  The graph

below shows how the Company's 2012 capital expenditure guidance was repeatedly increased:



110.    At the same time SandRidge was increasing capital expenditures – in large part to acquire and develop land in the Mississippian – the Ward-related entities were front-running SandRidge's acquisitions in the same areas.    SandRidge's acquisitions and development in the Mississippian play increased the value of the properties and mineral rights acquired by the Ward-related entities.

111.    Defendants, however, were increasing capital expenditures at a significant multiple to the Company's cash flow from operations, which resulted in the Company having an insufficient amount of cash to fund expenditures, requiring the Company to raise capital through the issuance of debt, sale of new securities, and sale of valuable assets.

112.    As capital expenditures were increasing, year-end (YE) cash and cash equivalents were not increasing by the same levels.    The Company's capital expenditures were 9 times cash and cash equivalents in 2011 and 7 times cash and cash equivalents in 2012.    The growth in cash and cash equivalents from 2011 to 2012 was only $102 million, a paltry 4.7% return on the 2012 capital expenditures of $2.174 billion.    The graph below

shows the disproportionate growth of capital expenditures compared with net income from operations and cash and cash equivalents growth at SandRidge during 2011 and 2012:



**SandRidge's Overinvestment in the Mississippian Forced the Company to Raise Large Amounts of Capital**

113.   Since SandRidge's cash flow from operations was not increasing at a proportionate level to capital expenditures during the Class Period, the Company was forced to take on additional debt and raise funds from external sources in order to keep funding its acquisitions and development in the Mississippian.   Much of this activity negatively impacted the financial stability of the Company.   For example:

- On March 15, 2011, the Company completed the private placement of $900 million of unsecured 7.5% Senior Notes due 2021.

- On April 12, 2011, SandRidge Miss Trust I completed its initial public offering of 17,250,000 common units – representing approximately 61.6% of the beneficial interest in the Mississippian Trust I.   The net proceeds were $336.9 million.   Concurrent with the closing of the offering, the Company

conveyed certain royalty interests to the Miss Trust I in exchange for the net proceeds of the offering and 10,750,000 units, giving the Company a 38.4% beneficial interest in the Miss Trust I.

- In July 2011, the Company sold its Wolfberry assets in the Permian Basin for approximately $155 million.

- On August 16, 2011, SandRidge Permian Trust completed its initial public offering of 34,500,000 common units representing approximately 65.7% of the beneficial interest in the Permian Trust.  Net proceeds to the Permian Trust, after certain offering expenses, were $580.6 million.  Concurrent with the closing, the Company conveyed certain royalty interests to the Permian Trust in exchange for the net proceeds of the offering and 18,000,000 units, representing approximately 34.3% of the beneficial interest in the Permian Trust.

- In August 2011, the Company sold certain oil and natural gas properties in New Mexico for $199 million.

- On September 28, 2011, the Company sold to Atinum MidCon I, LLC a 13.2% non-operated working interest – roughly 113,000 net acres – in the Mississippian formation for approximately $250 million.  In addition, the Company will receive an additional $ 250 million in the form of a drilling carry.

- On November 14, 2011, the Company sold producing properties located on over 23,000 net acres in East Texas for $231 million.

- On January 5, 2012, SandRidge sold to Repsol E&P USA Inc. an undivided 16% non-operated working interest in SandRidge's original Mississippian play and an undivided 25% non-operated working interest in SandRidge's extension Mississippian play for approximately $272.5 million.  In addition, the Company will receive an additional $750 million in the form of a drilling carry over a period of approximately three to five years.

- On April 23, 2012, SandRidge Miss Trust II completed its initial public offering of 29,900,000 common units – representing approximately 60.1% of the beneficial interests in the Miss Trust II. Net proceeds were approximately $587.1 million.  Concurrent with the closing of the offering, the Company conveyed certain royalty interests to the Miss Trust II in exchange for the net proceeds of the offering and 19,825,000 units, representing approximately 39.9% of the beneficial interest in the Miss Trust II.

- On April 17, 2012, the Company completed the private placement of $750 million of unsecured 8.125% Senior Notes due 2022.

- On June 4, 2012, the Company closed the sale of its non-core Tertiary assets in the Permian Basin to a private party for $130 million.

### SandRidge Closely Monitored the Production of Its Wells

114.    SandRidge continually reassured investors throughout the Class Period that it closely and regularly monitored the production results of its wells, including its wells located in the Mississippian.  For example, SandRidge's Form 10-K for the year ended 2010 filed with the SEC on February 28, 2011, stated in pertinent part as follows:

> **SandRidge's Reservoir Engineering Department continually monitors asset performance and makes reserves estimate adjustments, as necessary, to ensure the most current reservoir information is reflected in reserves estimates**.  Reserve information includes production histories as well as other geologic, economic, ownership and engineering data.

115.    The Company also positively described the size and breadth of its Reservoir Engineering Department, stating, in pertinent part, as follows:

> The department currently has a total of 18 full time employees, comprised of seven degreed engineers and 11 engineering analysts/technicians with a minimum of a four-year degree in mathematics, economics, finance or other business or science field.

116.    By early 2012, SandRidge had increased the number of degreed engineers in their Reservoir Engineering Department to eight.

117.    The Reservoir Engineering Department was headed by Rodney E. Johnson ("Rodney Johnson"), SandRidge's Executive Vice President-Reservoir Engineering, and one of only four Executive Vice Presidents at the Company.  (After Defendants Ward and Grubb, the Company's 2011 10-K lists four Executive Vice Presidents:  Rodney Johnson, Defendant James D. Bennett, Todd N. Tipton, and David C. Lawler.)

118.    According to SandRidge, Rodney Johnson "[was] the technical person primarily responsible for overseeing the preparation of the company's reserve estimates, [and

was] the primary contact with Netherland Sewell and received the reserve report from Netherland Sewell."

119.    Additionally, the Company also admitted that "[t]he Reservoir Engineering Department report[ed] directly to . . . [Defendant Grubb], independently from all of our operating divisions."

120.    The status of SandRidge's reserves was formally presented at least once per quarter by Rodney Johnson to the other senior SandRidge officials.  For example, the SandRidge Miss Trust I Registration Statement states in pertinent part as follows:

> *Each quarter, the Executive Vice President Reservoir Engineering [Rodney Johnson] presents the status of SandRidge's reserves, including the reserves associated with the Underlying Properties, to the Executive Committee, which subsequently approves all changes*.  In the event the quarterly updated reserves estimates are disclosed, the aforementioned review process is evidenced by signatures from the Executive Vice President Reservoir Engineering and the Chief Financial Officer.

121.    During the Class Period, the Executive Committee that was presented with the reports described above consisted of the Individual Defendants.

122.    The reserve estimates were reviewed by members of the Board of Directors and various senior executives.  The SandRidge Miss Trust I Registration Statement states in pertinent part as follows:

> SandRidge's Reservoir Engineering Department works closely with its independent petroleum consultants at each fiscal year end to ensure the integrity, accuracy and timeliness of an annually developed independent reserves estimate.  *These independently developed reserves estimates* are adopted as SandRidge's corporate reserves and *are reviewed by the Audit Committee, as well as the Chief Financial Officer [Defendant Bennett], Senior Vice President of Accounting, Vice President of Internal Audit, Vice President of Financial Reporting, Treasurer and General Counsel*.  In addition to reviewing the independently developed reserve reports, the Audit Committee interviews the third-party engineer at Netherland Sewell primarily responsible for the reserve report.

- 42 -

**The Individual Defendants and Other SandRidge Senior Executives
Were Kept Fully Informed of the Mississippian's Poor Production**

123.    Throughout the Class Period, the Individual Defendants and other senior executives within SandRidge were kept apprised on – at least – a weekly basis of the production performance throughout SandRidge's assets, including the Mississippian play. FE1 and FE2 attended weekly management meetings on the 28th floor of SandRidge's Oklahoma City headquarters ("Management Meetings").  These meetings, which lasted approximately one to two hours, were run by Defendants Ward and Grubb and attended by numerous SandRidge geologists and senior executives, including, but not limited to, Todd Lipton, Vice President of Exploration, and Rodney Johnson, Executive Vice President-Reservoir Engineering (two of the Company's four Executive Vice Presidents).

124.    During these meetings, according to FE1 and FE2, management and senior geologists would discuss the status of drilling and production levels.  Production data was provided by county or township, and individual wells that were either performing well or that needed improvement were also discussed.

125.    FE2 also attended weekly team meetings that were attended by employees that worked on the Mississippi lime ("Team Meetings").  These Team Meetings were led by either Craig Johnson, Senior Vice President of Development for Oklahoma, or Paul Stark, Reservoir Engineering Manager.  At these Team Meetings, the team would discuss production levels in depth. They would also determine the information that would be reported to Ward.

126.    According to FE3, oil production in the Mississippian play was lower than had been anticipated, and this caused frustration within SandRidge.  FE3 believed that it was common knowledge at SandRidge that the Mississippian was underperforming.

127.    FE3 also attended weekly "Exploration Meetings," throughout 2012, which were attended by landmen, reservoir engineers, geologists, vice presidents, and Defendants Ward and Grubb.  Those in attendance at the Exploration Meetings discussed drill schedules, wells that were going to be drilled, prospective drilling areas, and production at existing wells.  The poor performance of the Mississippian was discussed during these meetings.

128.    According to FE2, the number of underperforming wells in the Mississippian was larger than expected, and that overall, since at least early 2012, the Mississippian was not performing as well as expected.

129.    According to FE1, production data for the Mississippian play was also reported in daily emails – referred to internally as "Drilling and Completions Reports" – that were sent to recipients Company-wide.  According to FE1, the information contained in these reports was the same type of information that was discussed during the weekly Management Meetings.  It is FE1's understanding that Ward and other senior executives received the Drilling and Completions Reports.  According to FE2, Drilling and Completions Reports were also sent to the heads of the departments, including, but not limited to, George Davis, Dean Fratarcangeli, Doug Johnson, Paul Stark, Craig Johnson, Ross Giblet, and Barack Robison.  FE3 believes that other senior executives also received these emails, including, for example, David Lawler, Executive Vice President of Operations.

**Defendants Misrepresented SandRidge's**
**Understanding of the Mississippian Play**

130.   Defendants portrayed the Mississippian play as an extremely attractive area for the Company in connection with its shift to a company whose production is primarily oil rather than natural gas.  At the beginning of the Class Period, Defendants spoke positively about the rate of returns from drilling activity and the large amounts of oil reserves that SandRidge would be able to tap into.  In the SandRidge Mississippian Trust I Registration Statement, Defendants characterized the "Mississippian formation's geology" as "well understood as a result of the thousands of vertical wells drilled and produced there since the 1940s" and further stated in pertinent part as follows:

> SandRidge and other operators in the region have gained a thorough understanding of how to best identify the location of productive reservoirs and potential horizontal well bore paths, the permeability and porosity of the underlying rock properties and the amount and percentage mix of recoverable oil and gas.  With this and other data derived from the vertical history, operators have been able to apply modern drilling technologies to determine more efficient ways to drill, complete and generate production from wells in the formation.

131.   Contrary to their statements, however, Defendants did not have a strong understanding of the Mississippian production and reserves associated with horizontal wells. In fact, unbeknownst to investors, there was a substantial risk that the numerous vertical wells in existence created a serious risk of depletion of oil and natural gas from reservoirs that SandRidge was now drilling horizontally.

**The Performance of SandRidge's Mississippian Play Was Worse than Represented**

132.   Throughout the Class Period, Defendants made representations about the production of SandRidge's wells in the Mississippian.  Defendants represented the EUR of SandRidge's wells, the oil to gas ratio of the wells, the decline rates of the wells and the

- 45 -

economic value of the wells.  The reported production of those wells at the time of Defendants' statements, however, was much worse than represented.  In fact, SandRidge (i) grossly overstated the EUR for SandRidge's Mississippian horizontal type well, (ii) overstated the oil to gas ratios of the wells, (iii) minimized the oil decline rates for the wells, (iv) overstated the economic value of SandRidge's Mississippian wells, and (v) misrepresented that well performance was consistent as represented by a single type curve across their entire leasehold, which extended for hundreds of miles.

### SandRidge Overstated the Average EUR of SandRidge's Horizontal Wells in the Mississippian Play

133.    During the Class Period, SandRidge made it appear that the EUR per well of its typical horizontal well in the Mississippian play was higher than it actually was.  For example, at the beginning of 2011, SandRidge represented an EUR per well of their typical horizontal well in the Mississippian play as 409 MBOE, consisting of 211 Mbbl of oil and 1,186 MMscf of gas.  The graph below summarizes the characteristics of their type well as presented by Defendants at the beginning of 2011:



134.   Then, at the beginning of 2012, SandRidge represented an increased EUR per well of their typical horizontal well in the Mississippian play as 456 MBOE, consisting of 204 Mbbl of oil and 1,512 MMscf of gas.  The graph below summarizes the characteristics of their type well as presented by Defendants at the beginning of 2012:



135.   It had become apparent by March 2012, however, that there was a steep drop in oil production rates in SandRidge's older wells in the Mississippian and rates were declining much faster than the type well presented by SandRidge.  An analysis of information provided by SandRidge to the Oklahoma Tax Commission for a statistically significant group of SandRidge's initial producing wells in their most active counties in the Mississippian play shows that for the six-month period from October 2011 to March 2012, the average oil rate for SandRidge's wells in the data set analyzed was 37 barrels of oil per day ("BOPD").  In the following six month period, from April 2012 to September 2012, the oil rate for these same wells dropped to an average of 6 BOPD, an 85% decrease from the previous six-month period.  The following chart shows the average oil rate by calendar month for this group of initial SandRidge wells analyzed by Plaintiffs:



136.   An analysis of the EUR for SandRidge's initial Mississippian wells discussed in the preceding paragraph indicated that total EUR per well averaged only 32.5 Mbbls for oil (84% lower than represented by SandRidge); 686 MMscf for gas (55% lower than represented by SandRidge); 147 EUR, BOE (68% lower than represented by SandRidge); and a gas to oil ratio of 21,108 scf/bbl (A gas to oil ratio of three times that represented by SandRidge).

137.   Additionally, a decline analysis of production data reported to the Oklahoma Tax Commission on 114 SandRidge wells in SandRidge's core operating area that had more than one year production history as of October 2012 indicated the following:  (1) average total EUR/well of 112 MBOE; (2) average EUR for oil of 24 MBO; (3) average EUR for gas of 526 MMscf; and (4) gas to oil ratio of 21,917 scf/bbl.  The below chart depicts the EUR and GOR of SandRidge's Mississippian wells based upon the two analyses performed by Plaintiffs from data reported by SandRidge to the Oklahoma Tax Commission:

| | Decline Curve Analysis, SandRidge's Initial Wells | | Decline Curve Analysis, 114 Wells | | Type Well, As Provided by SandRidge (Throughout 2012) | |
|---|---|---|---|---|---|---|
| EUR, Oil | 32.5 | MBO | 24 | MBO | 204 | MBO |
| EUR, Gas | 686 | MMscf | 526 | MMscf | 1512 | MMscf |
| EUR, BOE | 147 | MBOE 6:1 | 112 | MBOE 6:1 | 456 | MBOE 6:1 |
| Liquid Fraction, % | 22% | | 21% | | 45% | |
| GOR | 21,108 | scf/bbl | 21,917 | scf/bbl | 7,412 | scf/bbl |

138.    Thus, as set forth above, SandRidge grossly misrepresented the estimated ultimate recovery from its wells in the Mississippian.

139.    Despite this precipitous drop in oil rates for SandRidge's Mississippian wells, which began no later than March 2012 and continued to drop further between April and June 2012, SandRidge maintained throughout 2012 (until the end of the Class Period) that well performance continued to support an average 456 MBOE type well.  For example, during the first quarter 2012 earnings conference call held on May 4, 2012, the following exchange occurred:

**Craig Shere –** *Tuohy Brothers – Analyst*

Okay, and one last question, I don't know if Matt wants to take it, but there is some talk of potential eventual decline in the B factor given more results over time?  I was just wondering given some of the well results you've announced and more time under your belt, if there's any thought about adjusting the type curves?

**Matt Grubb –** *SandRidge Energy, Inc. – President and COO*

Really, we're not looking at adjusting type curve now.  We'll probably do it here at the end of the year.  But right now everything looks to be on track with what we have modeled to the 456,000 barrels EUR.  We'll look at it again at the end of the year and see how everything's declining and then make a decision at that time.

140.    At the end of the Class Period, SandRidge admitted that the EUR for SandRidge's Mississippian wells was lower than represented.  On November 9, 2012, during the Company's third quarter 2012 earnings conference call, SandRidge disclosed that it had lowered the type well oil EUR by 24% from 204 Mbbl to 155 Mbbl.  SandRidge, however,

- 49 -

should have lowered the type well oil EUR by approximately 80% instead of 24% and the Defendants knew, or recklessly disregarded that the type well oil EUR was significantly overstated and should have been lowered.  In the 2012 year end guidance, as set forth in SandRidge's investor analyst meeting presentation on March 5, 2013, the EUR had been further reduced from 456 Mboe to 338 Mboe as of year end 2012 – a reduction of 26% – and the oil EUR had been reduced from 204 Mbbl to 107 Mbbl as of the year end 2012 – a reduction of 48%.

**SandRidge Overstated the Gas to Oil Ratios in Its Mississippian Wells**

141.   Oil commands a significantly higher commodity price compared with natural gas in the current market – on an equal Btu heating basis, wells that produce more oil and minimal gas generate more revenues than wells that produce mostly gas and low volumes of oil.  Contrary to Defendants' statements during the Class Period, many of the SandRidge wells in the Mississippian have high GOR's, which classify them as gas wells rather than oil wells.  During the Class Period, SandRidge often stated well test results and well EUR estimates in terms of barrel oil equivalents (Boe) as a way to disguise the fact that it was drilling highly "gassy" wells.  The high GOR in the Mississippian was contrary to the Company's stated plans to transition to a predominantly oil production company.

142.   During the Class Period oil rates were declining faster than gas rates and SandRidge overstated the oil to gas ratio for its wells in the Mississippian.  The oil and gas percentages are derived from dividing the oil amount by the total oil equivalent (Mboe), which includes the contribution of gas.  In a February 7, 2011 SandRidge presentation at the Credit Suisse 2011 Energy Summit, SandRidge represented that production from its horizontal Mississippian type well results in oil of 211 Mbbl (100% Crude) and total

production of 409 total Mboe; resulting in a liquid fraction of 52% oil and 48% gas (211 Mbbl ÷ 409 Total Mboe = 52% oil). Throughout 2011, SandRidge consistently represented that its horizontal Mississippian wells produced 52% oil and 48% natural gas. Throughout 2012, SandRidge consistently represented that the Mississippian play had a mean oil ultimate recovery of 204 Mbbls and total oil and gas of 456 Mboe, yielding a liquid fraction oil of 45% and gas of 55%. In fact, Defendant Ward represented that the oil percentage would remain over 50% for at least 13 years. Specifically, at a RBC Global Energy & Power Conference, on June 4, 2012, Defendant Ward stated, in pertinent part, as follows:

> The first year production, 53% oil. The life of the well is primarily natural gas, about 55% natural gas, but the cross over isn't until after year 13, so it is – the PV value is on the oil side of the reservoir.

143. Throughout 2011 and 2012, however, SandRidge produced a much lower percentage of oil than represented. Indeed, according to production data reported by SandRidge to the Oklahoma Tax Commission, throughout 2011, SandRidge produced on average less than 40% oil and more than 60% gas compared with representations of 52% oil and 48% gas. Similarly, according to reported production data throughout 2012, SandRidge produced on average 35% oil and 65% gas compared to Defendants' representations of 45% oil and 55% gas.

144. By overstating the oil and understating the gas percentage, and due to the large price premium commanded by the market for oil versus natural gas, SandRidge misrepresented the performance of the wells and greatly overstated their economic value. In fact, during the Class Period, as shown in the table at ¶137, the oil fractions are less than one-half of what was represented by SandRidge. In addition, the oil to gas ratio based on

reported data was contrary to the Defendants' representations that SandRidge had completed is transformation from a gas to an oil company.

145.   The below chart depicts the average oil percentage for SandRidge's Mississippian type wells on a quarterly basis as represented by SandRidge in data submitted to the Oklahoma Tax Commission:



**The Economics of SandRidge's Mississippian
Wells Was Much Worse than Represented**

146.   Since the EUR of SandRidge's Mississippian wells were much lower than represented, the wells were less valuable from an economic perspective.  At a presentation on June 4 2012, as depicted in the chart below, SandRidge represented very favorable

economics for the Mississippian – with an IRR between 30% and 130% – over a range of NYMEX oil and gas prices:



147.     SandRidge has misrepresented the true economics of the Mississippian because the EUR for oil and total oil and gas were overstated.  If Plaintiffs' EUR estimates are used in the economic analysis using the same cost and commodity price assumptions as SandRidge for a typical Mississippian well, the result is a negative economic return.

148.     Furthermore, the Company's large amounts of spending on drilling new wells in the Mississippian enabled SandRidge to report increasing total production numbers in that area even though older wells with more production history experienced steep declines.  Thus,

the increased drilling activity masked the rapid decline and depletion in SandRidge's horizontal Mississippian wells.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

149.   Throughout the Class Period, Defendants issued materially false and misleading statements and failed to disclose material information about the Company's business and its Mississippian play.  Defendants failed to disclose numerous acquisitions of land and mineral rights by the Ward-related entities, that SandRidge's massive spending on acquisitions, production, and development in the Mississippian would financially benefit the Ward-related entities, and that the Company was being run in a way to benefit the Ward-related entities to the detriment of the Company's shareholders.  As alleged herein, Defendants caused the Company to increase its capital expenditures and spend massive amounts of money in the Mississippian even though the spending negatively impacted SandRidge's financial position, and even though the oil reserves were worth much less than SandRidge represented to investors.

150.   Defendants knew, or recklessly disregarded, the following facts regarding SandRidge and the Ward-related entities:

(a)   The Ward-related entities acquired huge amounts of land and mineral rights in the Mississippian play that benefitted from SandRidge's spending and development activities in the area.  The Ward-related entities acquired properties and lease holdings in advance of or alongside of SandRidge's holdings;

(b)   The Ward-related entities inappropriately moved ahead of the Company to acquire mineral rights from third-parties, and then flipped them to SandRidge shortly

thereafter.  In fact, there were instances where SandRidge acquired mineral rights from Ward-related entities only weeks after they were acquired by the Ward-related entities; and

(c)     The land and mineral rights owned by the Ward-related entities stood to gain financially even if production and reserves in the Mississippian were lower than represented by SandRidge or if SandRidge's Mississippian wells did not generate attractive rates of return to SandRidge.

151.    Defendants knew, or recklessly disregarded, that contrary to their statements about financial discipline and meeting their capital expenditures guidance, Defendants sought to pour more and more money into the Mississippian regardless of the cost to SandRidge, which benefitted the Mississippian holdings of the Ward-related entities. Further, Defendants knew, or recklessly disregarded, that capital expenditures were not based solely on what was in SandRidge's interests but were also based in part on the interests of the Ward-related entities.  As such, Defendants knew, or recklessly disregarded, there was a risk that capital expenditures could be increased to benefit the Ward-related entities to the detriment of SandRidge.

152.    Defendants knew, or recklessly disregarded, the following facts about the amount of gas relative to oil in the Mississippian:

(a)     The Mississippian was much gassier than represented by Defendants. Production data that SandRidge reported to the Oklahoma Tax Commission showed that SandRidge understated the gas to oil ratio for its typical horizontal well in its Mississippian play and that the oil production relative to gas production as reported was approximately half of that represented by Defendants.  In addition, the oil to gas ratio was contrary to the

Defendants' representations that SandRidge had completed its transformation from a gas to an oil company.  With the large price premium commanded by the market for oil versus natural gas, SandRidge's overstatement of the oil percentage misrepresents and greatly overstates the value of their wells in the Mississippian play;

(b)     Contrary to Defendants' statements during 2011 that its Mississippian wells on average produced 52% oil and 48% gas, production data reported by SandRidge reveals that its wells produced less than 40% oil and more than 60% gas during 2011; and

(c)     Contrary to Defendant's statements during 2012 that its Mississippian wells on average produced 45% oil and 55% gas, production data reported by SandRidge reveals that its wells produced on average 35% oil and 65% gas during 2012.

153.    Defendants knew, or recklessly disregarded, the following facts about a steep drop off in production rates of its horizontal Mississippian wells and the EUR for those wells:

(a)     Based on production data that SandRidge reported to the Oklahoma Tax Commission, there was a steep drop in oil production rates in SandRidge's older wells by March 2012 and rates were declining much faster than the type well presented by SandRidge;

(b)     The Company's large amounts of spending on drilling new wells in the Mississippian enabled SandRidge to report increasing total production numbers in that area even though older wells with more production history experienced steep declines.  Thus, the increased drilling activity masked the rapid decline and depletion in SandRidge's horizontal Mississippian wells;

(c)     Despite a precipitous drop in oil rates for SandRidge's Mississippian wells, which began no later than March 2012 and continued to drop further between April to June 2012, SandRidge maintained throughout 2012 (until the end of the Class Period) that well performance continued to support an average 456 MBOE type well.  SandRidge should have updated its decline curve and EUR for its typical horizontal Mississippian play well based on the steep production decline revealed by reported well production data; and

(d)     SandRidge grossly overstated the EUR for its typical Mississippian play horizontal well. Indeed, contrary to Defendants' characterizations during 2012 of the EUR of the typical horizontal Mississippian well, production data provided by SandRidge shows that the EUR for oil was between 84-88% lower, the EUR for gas was between 55-65% lower, and the combined gas/oil equivalent of total production was 68-75% lower than represented by SandRidge throughout 2012.

154.   Defendants knew, or recklessly disregarded, the following facts about the geological make-up of the Mississippian:

(a)     The geology of the Mississippian is highly variable and there was very limited horizontal well production history from which reliable reserve forecasts could be made.  Contrary to Defendants' statements, there was not a single type curve across their entire leasehold extending for hundreds of miles.  Indeed, after the Class Period, SandRidge provided multiple type well curves based on geographical region instead of relying on just a single type well decline curve as the Company had done during the Class Period; and

(b)     There was a risk that areas where SandRidge was drilling horizontal

wells may have had partially depleted reservoirs as a result of the vertical wells drilled in the

Mississippian since the 1940s.

**First Quarter 2011 Statements**

155.    On February 24, 2011, the start of the Class Period, the Company announced

its financial and operational results for the fourth quarter 2010 and fiscal year ending

December 31, 2010 ("4Q10") in a press release (the "2/24/11 Press Release"), which it filed

with the SEC on Form 8-K.  In the 2/24/11 Press Release, Defendant Ward emphasized the

Company's successful transition from a primarily natural gas producing company to a

primarily oil producing company: "We are now seeing the value of our transformation to

oil. . . .  Our oil reserves have more than doubled from year end 2009. . . .  We have grown

oil production from 7,900 barrels per day in fourth quarter 2009 to over 28,400 barrels per

day in fourth quarter 2010 and ***expect oil sales to generate about 80% of our revenues in***

***2011***."  Defendant Ward went on to state in pertinent part as follows:

> We have significantly enhanced our value with the ***early move to oil in two***
> ***proven areas***.  We control 185,000 net acres in the Central Basin Platform in
> West Texas and have now leased 780,000 net acres in the Mississippian oil
> play in Northern Oklahoma and Southern Kansas.  We expect to ultimately
> own over 900,000 net acres in the Mississippian as we wind down our leasing
> efforts in the first quarter.  In both of these plays we develop shallow,
> permeable, carbonate reservoirs with ***decades of production history***.  As a
> result, our costs have remained low and we do not expect to see the type of
> cost increases the industry is experiencing.  ***We plan to drill over 900 wells in***
> ***the Central Basin Platform and the Mississippian in 2011 where our average***
> ***wellhead return is expected to exceed 90%***.  We intend to fund this program
> with a combination of cash flow, proceeds from non-core asset sales and
> monetizing a portion of Mississippian acreage.

156.    The statements referenced above in ¶155 were materially false and misleading

when made because they failed to disclose the adverse facts about (i) the involvement of the

Ward-related entities in the Mississippian as set forth in ¶150, and (ii) the amount of natural gas relative to oil set forth in ¶152(a)–(b) above, which were known to Defendants or recklessly disregarded by them.  Additionally, the statement that SandRidge made an "early move to oil" was materially false and misleading when made because Defendants failed to disclose that the move to the Mississippian should not have been characterized as a "move to oil" because of the significantly higher amounts of natural gas being produced relative to oil in that area.

157.    In response to the announcements set forth above, the Company's stock price increased from its February 24, 2011 closing price of $9.12 per share to close at $10.53 per share (approximately 15%) on February 25, 2011, on extremely high volume.

158.    On February 28, 2011, SandRidge filed its annual report on Form 10-K with the SEC for fiscal year ended December 31, 2010 (the "2010 10-K") and reiterated the Company's financial results that were contained in the 2/24/11 Press Release, including for capital expenditures, stating, in pertinent part, as follows:

> For 2011, *we have budgeted $1.3 billion for capital expenditures*.  The majority of our capital expenditures are discretionary and could be curtailed if our cash flows decline from expected levels or we are unable to obtain capital on attractive terms.  We may increase or decrease planned capital expenditures depending on oil and natural gas prices, asset sales and the availability of capital through the issuance of additional equity or long-term debt.

159.    The statements referenced in ¶158 above were materially false and misleading when made because they failed to disclose the adverse facts about the Company's reckless spending in the Mississippian as set forth in ¶151 above, which were known to Defendants or recklessly disregarded by them.

160.    Attached as an exhibit to the 2010 10-K were the Notes to the Company's Financial Statements, which discussed certain of the Company's related-party transactions, stating, in pertinent part, as follows:

> In 2008, the Company purchased certain working interests and related reserves in Company wells owned by its Chairman and Chief Executive Officer and certain of his affiliates.  The purchase price was $67.3 million.

161.    The statements referenced above in ¶160 were materially false and misleading when made because they failed to disclose the adverse facts about the involvement of the Ward-related entities in the Mississippian set forth in ¶150.

162.    The false and misleading statements referenced above in ¶¶158, 160, which were known, or should have been known, to the Defendants to be materially false and misleading, were then falsely certified by Defendants Ward and Bennett and included in the 2010 10-K:

CERTIFICATION

I, . . . certify that:

1.    I have reviewed this annual report on Form 10-K of SandRidge Energy, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over

financial reporting (as defined in Exchange Ace Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

163.     The statements referenced above in ¶162 were repeated in all material respects in the Forms 10-K and 10-Q SandRidge later filed with the SEC during the Class Period.

164.     On or about February 28, 2011, the Company provided investors with its "2010 Annual Report," to which the 2010 10-K was attached.  As an introduction to the 2010 Annual Report, Defendant Ward wrote a letter to SandRidge shareholders ("2011 Shareholder Letter") and discussed the Company's successful completion of its transformation to a primarily oil company, stating, in pertinent part, as follows:

> In 2010, SandRidge Energy **successfully completed its transformation** from a company that was focused primarily on natural gas two years ago to one that will derive approximately 80 percent of its 2011 revenues from oil and **dedicate essentially all of its 2011 drilling budget to oil**.
>
> *          *          *
>
> **With the transformation to oil essentially complete**, we now have an exceptional platform of conventional assets with predictable production curves that we are able to drill at a low cost, resulting in high rates of return.

165.     The statements referenced above in ¶164 were each materially false and misleading when made because they failed to disclose the adverse facts about the amount of natural gas relative to oil set forth in ¶152(a)–(b) above, which were known to Defendants or recklessly disregarded by them.  Additionally, the statements that SandRidge "successfully completed its transformation," that "the transformation to oil [was] essentially complete," and that SandRidge would "dedicate essentially all of its 2011 drilling budget to oil" were materially false and misleading when made because the production from the Mississippian was much gassier than represented and SandRidge – at that time – was producing more gas than oil in the Mississippian.  Contrary to Defendants' statements, the transformation to oil was not essentially complete.

166.     As part of the 3/1/11 Conference, Defendants gave a power point presentation ("3/1/11 Investor Presentation"), which promoted the "high rate of return" for horizontal

Mississippian wells.  In particular, the 3/1/11 Investor Presentation indicated that production from the Company's horizontal Mississippian type well results in oil of "211 Mbbl (100% Crude)" and total production of "409 Total Mboe," equating to a liquid fraction of 52% oil and 48% gas.  It also claimed that the Mississippian play would provide a 120% rate of return.

167.   The statements referenced above in ¶166 were materially false and misleading when made because they failed to disclose the adverse facts about the amount of natural gas relative to oil set forth in ¶152(a)–(b) above, which were known to Defendants or recklessly disregarded by them.  Moreover, the statement that the Company's horizontal Mississippian type well results in oil of "211 Mbbl" and total production of "409 Total Mboe" were materially false and misleading when made because the liquid fraction for typical Mississippian wells at that time was only 40% oil and 60% gas as opposed to the 52% oil and 48% gas that the Company represented.

168.   On March 7, 2011, during the Raymond James Institutional Investors Conference, Defendant Grubb discussed, among other things, the Mississippian play and its "high rate of return."  Defendant Grubb discussed the metrics for that area, stating, in pertinent part, as follows:

> The metric on the Mississippi is we have 3,400 potential locations, that was at the 780,000-acre range.  So, it's quite a bit more now.  If you're looking at 409,000 barrels of oil equivalent, this is a third-party reserves consultant estimate, of which about **half of it is crude oil and half of it is gas**.  I've already talked about the well cost, $2.7 million, that does include allocation for water handling facilities.  And what we look for here is a 30-day IP of about 245 barrels equivalent per day.  And what we're seeing our drilling program is we're doing a little bit better than that, we're about 307 barrels of oil equivalent.  So, we're exceeding the IP a little bit.  At the current strip is about 120% rate of return.  And again, what we've shown here is a sensitivity

to commodity price from $60 oil and $4 gas to $100 oil and $6 gas that ranges from about 50% to well over 150% rate of return.

169.   The statements referenced above in ¶168 were materially false and misleading when made because they failed to disclose the adverse facts about the amount of natural gas relative to oil set forth in ¶152(a)–(b) above, which were known to Defendants or recklessly disregarded by them.  Further, the statement that "half of it is crude oil and half of it is gas" was materially false and misleading when made because SandRidge's own production data showed that much more gas was being produced than oil.

170.   On March 23, 2011, the Company filed its Form 10-K/A with the SEC for the fiscal year 2010 (the "2010 10-K/A").  In a section titled "Other Transactions with Mr. Ward," the Company stated, in pertinent part, as follows:

> We lease rights to minerals under certain areas of land in northwest Oklahoma from TLW Land & Cattle LP ("TLW LC"), an entity in which Mr. Ward has an ownership interest.  In 2010, we developed some of the surface lands associated with these mineral interests and paid $33,046 to TLW-LC pursuant to the development.  We also paid royalties totaling $302,554 to TLW-LC in connection with the production of oil and natural gas from these properties.
>
> In September 2010, we purchased a portion of the working interest in leases covering acreage in northeast Oklahoma from WCT Resources, L.L.C., a limited liability company formed in 2002 and owned by trusts established in 1989 for the benefit of Mr. Ward's children ("WCT"), for $1,791,120, and in January 2011, we acquired a working interest in additional acreage in the area for $391,955.  Our Board approved the transactions in accordance with its Related Party Transactions Policy.  WCT also participates as a working interest owner in wells we operate in northwest Oklahoma, and during 2010, we paid revenue of $242,363 to WCT as a working interest owner.

171.   The statements referenced in ¶170 above were materially false and misleading when made because they failed to disclose the adverse facts about the involvement of the Ward-related entities in the Mississippian set forth in ¶150 above, which were known to Defendants or recklessly disregarded by them.  Furthermore, these statements were

materially false and misleading when made because they failed to disclose other transactions between the Company and the Ward-related entities.

172.    On March 25, 2011, Defendant Bennett, at the Barclays High Yield Bond and Syndicated Loan Conference, presented on behalf of the Company about, among other things, the amount of capital expenditures that were allocated for the Permian play, stating, in pertinent part: "Talking about the Permian Basin, two-thirds of our capital this year will be on the Permian Basin. . . . [W]hy we like the basin, it's been producing oil for over 80 years. It's . . . the third most prolific oil producing basin in the United States."

173.    The statements referenced above in ¶172 were materially false and misleading when made because they failed to disclose the adverse facts about: (i) the involvement of the Ward-related entities in the Mississippian set forth in ¶150; and (ii) the Company's reckless spending in the Mississippian as set forth in ¶151 above, which were known to Defendants or recklessly disregarded by them.  Further, the statement that "two-thirds of our capital this year will be on the Permian Basin" was materially false and misleading when made because Defendants knew, or recklessly disregarded, that the Company was focusing more heavily on the Mississippian than represented.

174.    Additionally, to the extent that any statements referenced in ¶172 were forward looking statements, such oral forward-looking statements were not accompanied by a cautionary statement that the particular oral statement is a forward-looking statement and that the actual results might differ materially from those projected in the forward-looking statement.  Additionally, such oral forward-looking statements were not accompanied by an oral statement that additional information concerning factors that could cause actual results

to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof ("Oral Statement About Additional Information").

**The Miss Trust I Offering**

175.    On April 7, 2011, the Prospectus for the initial public offering of the SandRidge Mississippian Trust I became effective.   The Miss I Registration Statement described the Company's "thorough understanding" of the Mississippian region and the "consistency" of the region, stating, in pertinent part, as follows:

> *Well control and vertical drilling and production history significantly reduce drilling, reserve recovery and production decline risk.  **The Mississippian formation's geology is well understood as a result of the thousands of vertical wells drilled and produced there since the 1940s, including 123 vertical wells drilled on the Underlying Properties**.*  With data from the vertical wells that have been drilled, SandRidge and other operators in the region ***have gained a thorough understanding*** of how to best identify the location of productive reservoirs and potential horizontal well bore paths, the permeability and porosity of the underlying rock properties and the amount and percentage mix of recoverable oil and gas.  With this and other data derived from the vertical history, operators have been able to apply modern drilling technologies to determine more efficient ways to drill, complete and generate production from wells in the formation.
>
> *        *        *
>
> The reserves attributable to the Producing Wells, which cover a wide area of the AMI, and the continuity of the formation over the AMI area classification further supports proved undeveloped classification within close proximity to the Producing Wells.  ***Data from both SandRidge and offset operators with which SandRidge has exchanged technical data demonstrate a consistency in this formation over an area much larger than the AMI***.  In addition, direct measurement from other producing wells has also been used to confirm consistency in reservoir properties such as porosity, thickness and stratigraphic conformity.

176.    The statements referenced in ¶175 above were materially false and misleading when made because they failed to disclose the adverse facts about the Company's

understanding of the geology of the Mississippian as set forth in ¶154 above, which were known to Defendants or recklessly disregarded by them.  Additionally, contrary to the statements set forth above, there was no "continuity" or "consistency" across the AMI. Rather, the formation geology and individual well productivity across the AMI was highly variable.  Further, there was limited production history from Mississippian horizontal wells such that EUR projections were not firmly established.

177.   The Miss Trust I Registration Statement also emphasized that the reserves associated with the Miss Trust I's underlying properties consisted of 48-49% oil and provided other reserve information, stating, in pertinent part, as follows:

THE UNDERLYING PROPERTIES

The Underlying Properties consist of the working interest owned by SandRidge in the Mississippian formation in Alfalfa, Garfield, Grant, Major and Woods counties in Oklahoma arising under leases and farmout agreements related to properties from which the PDP Royalty Interest and the PUD Royalty Interest will be conveyed.  The Underlying Properties consist of approximately 64,200 gross acres (42,900 net acres).  There are more than 250 potential drilling locations within the AMI [areas of mutual interest].  As of December 31, 2010 and after giving effect to the conveyance of the PDP Royalty Interest and the PUD Royalty Interest to the trust, ***the total reserves estimated to be attributable to the trust were 19,276 MBoe (48% oil).  This amount includes 6,860 MBoe attributable to the PDP Royalty Interest and 12,416 MBoe attributable to the PUD Royalty Interest, respectively***. SandRidge is currently the operator of 73% of the wells subject to the PDP Royalty Interest.  SandRidge owns an average 56.3% net revenue interest in the wells subject to the PDP Royalty Interest.  The reserves attributable to the trust's royalty interests include the reserves that are expected to be produced from the Mississippian formation during the 20-year period in which the trust owns the royalty interests as well as the residual interest in the reserves that the trust will sell on or shortly following the Termination Date.

\*       \*       \*

- 67 -

| Period | June 30, 2011(1) | | September 30, 2011 | | December 31, 2011 | | March 31, 2012 |
|---|---|---|---|---|---|---|---|
| | *(In thousands, except volumetric and per unit data)* | | | | | | |
| *Estimated production from trust properties* | | | | | | | |
| Oil sales volumes (MBbl) | 257 | | 154 | | 146 | | 149 |
| Natural gas sales volumes (MMcf) | 1,624 | | 959 | | 910 | | 921 |
| Total sales volumes (MBoe) | 527 | | 314 | | 298 | | 302 |
| % PDP sales volumes | 86 % | | 69% | | 63% | | 56% |
| % PUD sales volumes | 14 % | | 31% | | 37% | | 44% |
| % Oil volumes | 49 % | | 49% | | 49% | | 49% |
| % Natural gas volumes | 51 % | | 51% | | 51% | | 51% |
| *Commodity price and derivative contract positions* | | | | | | | |
| NYMEX futures price(2) | | | | | | | |
| Oil ($/Bbl) | $ 94.78 | $ | 102.88 | $ | 103.59 | $ | 103.58 |
| Natural gas ($/MMBtu) | $ 4.17 | $ | 4.37 | $ | 4.53 | $ | 5.00 |
| Assumed realized weighted unhedged price(3) | | | | | | | |
| Oil ($/Bbl) | $ 89.78 | $ | 97.88 | $ | 98.59 | $ | 98.58 |
| Natural gas ($/Mcf) | $ 3.79 | $ | 4.00 | $ | 4.15 | $ | 4.58 |
| Assumed realized weighted hedged price | | | | | | | |
| Oil ($/Bbl) | $ 92.02 | $ | 98.44 | $ | 98.60 | $ | 99.01 |
| Natural gas ($/Mcf) | $ 4.16 | $ | 4.27 | $ | 4.24 | $ | 4.46 |
| Percent of oil volumes hedged(4) | 78 % | | 79% | | 84% | | 74% |
| Oil hedged price ($/Bbl) | $ 103.60 | $ | 103.60 | $ | 103.60 | $ | 104.15 |
| Percent of natural gas volumes hedged(4) | 100 % | | 100% | | 100% | | 100% |
| Natural gas hedged price ($/MMBtu) | $ 4.61 | $ | 4.61 | $ | 4.61 | $ | 4.90 |
| *Estimated cash available for distribution* | | | | | | | |
| Oil sales revenues | $ 23,040 | $ | 15,042 | $ | 14,405 | $ | 14,678 |
| Natural gas sales revenues | 6,162 | | 3,841 | | 3,774 | | 4,217 |
| Realized gains (losses) from derivative contracts | 1,164 | | 339 | | 82 | | (44) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Operating revenues and realized gains (losses) from derivative contracts | $ | 30,366 | $ | 19,222 | $ | 18,260 | $  18,850 |
| Production taxes | | 359 | | 222 | | 210 | 215 |
| Ad valorem taxes | | 144 | | 93 | | 90 | 93 |
| Trust administrative expenses | | 1,460(5) | | 225 | | 225 | 226 |
| Total trust expenses | | 1,963 | | 540 | | 525 | 534 |
| Cash available for distribution | $ | 28,403 | $ | 18,682 | $ | 17,735 | $  18,316 |
| Trust units outstanding | | 28,000 | | 28,000 | | 28,000 | 28,000 |
| Target distribution per trust unit | $ | 1.01 | $ | 0.67 | $ | 0.63 | $   0.65 |
| Subordination threshold per trust unit | $ | 0.81 | $ | 0.53 | $ | 0.51 | $   0.52 |
| Incentive threshold per trust unit | $ | 1.22 | $ | 0.80 | $ | 0.76 | $   0.78 |

178.    The statements referenced above in ¶177 were materially false and misleading when made because they failed to disclose the adverse facts about the amount of natural gas relative to oil set forth in ¶152(a)–(b) above, which were known to Defendants or recklessly disregarded by them.  Moreover, the statement that the "total reserves [in the Mississippian] estimated to be attributable to the trust were 19,276 Mboe (48% oil)" was materially false and misleading when made because the liquid fraction for typical Mississippian wells at that time was only 40% oil and 60% gas as opposed to the 48% oil and 52% gas that the Company represented.

**Second Quarter 2011 Statements**

179.    On April 12, 2011, Defendants participated in the IPAA 2011 Oil & Gas Investment Symposium ("4/12/11 Conference"), during which Defendant Ward confirmed

that capital expenditures for 2011 would be $1.3 billion: "we've *addressed* the CapEx funding gap for this year and are already starting to work on 2012."

180.     The statements referenced above in ¶179 – which are not forward-looking because they concern action taken in the past – were materially false and misleading when made because they failed to disclose the adverse facts about the Company's reckless spending in the Mississippian as set forth in ¶151 above, which were known to Defendants or recklessly disregarded by them.  The statement "we've *addressed* the CapEx funding gap for this year" was materially false and misleading because Defendant Ward failed to disclose that SandRidge was prepared to increase CapEx in order to spend more funds in the Mississippian to enrich the Ward-related entities.

181.     As part of the 4/12/11 Conference, Defendants gave a power point presentation ("4/12/11 Presentation") which discussed the "high rate of return" for the Mississippian play and that production from SandRidge's horizontal Mississippian type well results in oil of "211 Mbbl (100% Crude)" and total production of "409 Total Mboe," resulting in a liquid fraction of 52% oil and 48% gas.

182.     The statements referenced above in ¶181 were materially false and misleading when made because they failed to disclose the adverse facts about the amount of natural gas relative to oil set forth in ¶152(a)–(b) above, which were known to Defendants or recklessly disregarded by them.  Moreover, the statement that the Company's horizontal Mississippian type well results in oil of "211 Mbbl" and total production of "409 Total Mboe" were materially false and misleading when made because the liquid fraction for typical

Mississippian wells at that time was only 40% oil and 60% gas as opposed to the 52% oil and 48% gas that the Company represented.

183.    On May 5, 2011 the Company announced its financial and operational results for the first quarter 2011 ("1Q11") in a press release (the "5/5/11 Press Release") which it filed with the SEC on Form 8-K.  In the 5/5/11 Press Release, Defendant Ward discussed the Company's drilling activities in the Permian and Mississippian, stating, in pertinent part, as follows:

> We **continue to execute our oil-directed plan** by focusing efforts in two core areas of development where we are **able to realize wellhead rates of return exceeding 100%**.  We are the most active driller in the Central Basin Platform and the Mississippian horizontal play, capitalizing on our expertise in shallow, conventional carbonate reservoirs to execute our development plan and strategically add to our leasehold positions in these areas.  **Production growth is matching our expectations in spite of weather-related interruptions. Finally, with the success of our asset monetizations to date, we are now focused on funding our 2012 capital spending program**.

184.    The statements referenced above in ¶183 were materially false and misleading when made because they failed to disclose the adverse facts about the amount of natural gas relative to oil set forth in ¶152(a)–(b) above, which were known to Defendants or recklessly disregarded by them.  Further, the statements "continue to execute our oil-directed plan" and "wellhead rates of return exceeding 100%" were materially false and misleading when made because reported production data at that time showed that SandRidge's horizontal Mississippian wells were producing more gas than oil.  The statement "[p]roduction growth is matching our expectations" was materially false and misleading because production results in the Mississippian were below expectations.  Additionally, contrary to Defendant Ward's statement that "we are now focused on [2012 capital spending]" (which implies that 2011 CapEx spending was set), there was a risk that SandRidge could increase 2011 capital

expenditures to spend more in the Mississippian to benefit Ward and the Ward-related entities.

185.    The 5/5/11 Press Release also described the Mississippian Horizontal Play, stating, in pertinent part, as follows:

> The Mississippian horizontal oil play in the Mid-Continent area of Oklahoma and Kansas is an expansive, shallow carbonate hydrocarbon system.  During the first quarter of 2011, SandRidge drilled 23 horizontal wells in the Mississippian play bringing the total number of operated wells drilled in the Mississippian to 67.  Industry-wide, over 170 horizontal wells have been drilled in the Mississippian across a 130-mile area.  The company organically grew its Mississippian production from approximately 250 Boe per day in first quarter 2010 to over 5,300 Boe per day in first quarter 2011.  SandRidge has approximately 924,000 net acres leased in the play on which it has currently identified over 4,000 additional drilling locations.  The company presently operates 12 rigs in the play, of which 11 are drilling horizontal producer wells with one drilling saltwater disposal wells.  SandRidge plans to drill over 130 horizontal wells in the Mississippian play in 2011.

186.    The statements referenced above in ¶185 were materially false and misleading when made because they failed to disclose the adverse facts about: (i) the involvement of the Ward-related entities in the Mississippian set forth in ¶150 above; and (ii) the Company's reckless spending in the Mississippian as set forth in ¶151 above, which were known to Defendants or recklessly disregarded by them.

187.    On May 6, 2011, the Company held an earnings conference call for analysts and investors ("5/6/11 Conf Call"), to discuss the financial and operational results and other information set forth in the 5/5/11 Press Release.  During the call, Defendant Bennett stated that the Company's "2011 CapEx plan" of $1.3 billion had been "***almost fully funded***," and he stated that the Company will "continue our capital raising efforts and are now focused on funding our 2012 program, which we will also accomplish through additional asset monetization."

188.   The statements referenced above in ¶187 – which are not forward-looking because they concern action taken in the past – were materially false and misleading when made because they failed to disclose the adverse facts about: (i) the involvement of the Ward-related entities in the Mississippian set forth in ¶150 above; and (ii) the Company's reckless spending in the Mississippian as set forth in ¶151 above, which were known to Defendants or recklessly disregarded by them.   Further, contrary to Defendant Bennett's statement that the "2011 CapEx plan" of $1.3 billion had been "almost fully funded," there was an undisclosed risk that SandRidge could increase 2011 capital expenditures to spend more in the Mississippian to benefit Ward and the Ward-related entities.

189.   On May 9, 2011, the Company filed its quarterly report on Form 10-Q with the SEC for 1Q11 (the "1Q11 10-Q") and reiterated the Company's financial results contained in the 5/5/11 Press Release and 5/6/11 Conf Call.   In the 1Q11 10-Q, the Company repeated the Company's "Outlook" on capital expenditures for 2011, stating, in pertinent part: "For 2011, we have budgeted $1.3 billion for capital expenditures, including expenditures related to our drilling obligation under the development agreement with the Trust, excluding acquisitions."

190.   The statements referenced above in ¶189 were materially false and misleading when made because they failed to disclose the adverse facts about: (i) the involvement of the Ward-related entities in the Mississippian set forth in ¶150 above; and (ii) the Company's reckless spending in the Mississippian as set forth in ¶151 above, which were known to Defendants or recklessly disregarded by them.   Further, contrary to Defendants' statement that SandRidge "budgeted $1.3 billion for capital expenditures," the Company was spending heavily in the Mississippian resulting in the Company being forced to significantly increase

its capital expenditures and there was an undisclosed risk that capital expenditures would be increased to benefit the Ward-related entities.

191.    The 1Q11 10-Q also discussed "Related Party Transactions," noting that the Company "enters into transactions in the ordinary course of business with certain related parties.  These transactions primarily consist of purchases related to drilling and completion activities, gas treating services and drilling equipment and sales of oil field services, equipment and natural gas."

192.    The statements referenced above in ¶191 were materially false and misleading when made because they failed to disclose the adverse facts about the involvement of the Ward-related entities in the Mississippian set forth in ¶150, which were known to Defendants or recklessly disregarded by them.

193.    The false and misleading statements referenced above in ¶¶189, 191, which were known, or should have been known, to Defendants to be materially false and misleading, were then falsely certified by Defendants Ward and Bennett in the 1Q11 10-Q.

194.    On May 24, 2011, Defendant Ward participated in the UBS Global Oil and Gas Conference.  Defendant Ward presented at the Conference and stated, in pertinent part, as follows: "we have addressed our CapEx funding gap for this year and are working diligently on our 2012 projected gap as I think we'll be discussing throughout this year.  In fact, we anticipate having that concluded before 2011."

195.    The statements referenced in ¶194 above were materially false and misleading when made because they failed to disclose the adverse facts about the Company's reckless spending in the Mississippian as set forth in ¶151 above, which were known to Defendants or

recklessly disregarded by them.  Further, contrary to Defendant Ward's statement that "we have addressed our CapEx funding gap for this year," there was an undisclosed risk that SandRidge could increase 2011 capital expenditures to spend more in the Mississippian to benefit Ward and the Ward-related entities.

196.    In June 2011, Defendants continued to represent that the Mississippian type wells were producing more oil than gas.  For example, on June 3, 2011, SandRidge held its 2011 Annual Shareholders Meeting.  During a power point presentation at that meeting, Defendants represented that production from its horizontal Mississippian type well results in oil of "211 Mbbl (100% Crude)" and total production of "409 Total Mboe", which equates to 52% oil and 48% gas.  Defendants made the same representations concerning the Mississippian wells' gas-to-oil ratio in power point presentations during a June 6, 2011 RBC Capital Markets 2011 Energy and Power Conference and a SandRidge June 14, 2011 Investor Presentation.

197.    The statements referenced above in ¶196 were materially false and misleading when made because they failed to disclose the adverse facts about the amount of natural gas relative to oil set forth in ¶152(a)–(b) above, which were known to Defendants or recklessly disregarded by them.  Moreover, the statement that the Company's horizontal Mississippian type well results in oil of "211 Mbbl" and total production of "409 Total Mboe" were materially false and misleading when made because the liquid fraction for typical Mississippian wells at that time was only 40% oil and 60% gas as opposed to the 52% oil and 48% gas that the Company represented.

**Third Quarter 2011 Statements**

198.   On August 4, 2011, the Company announced that it had entered into a $500 million joint venture with Atinum Partners Co., Ltd. in the Mississippian play in a press release (the "Atinum Press Release") which it filed with the SEC on Form 8-K.  The Atinum Press Release indicated that Atinum agreed to pay SandRidge $250 million in cash and had committed to a drilling carry obligation up to a total amount of $250 million, thereby allowing SandRidge accelerate its drilling and development activity in the Mississippian.

199.   On August 4, 2011 the Company announced its financial and operational results for the second quarter 2011 ("2Q11") and first six months of 2011 in a press release (the "8/4/11 Press Release"), which it filed with the SEC on Form 8-K.  Defendant Ward commented in the 8/4/11 Press Release, stating, in pertinent part, as follows:

> We are pleased to announce the joint venture with Atinum Partners *on our Mississippian project where results continue to meet or exceed our expectations*.  Our management team has been consistent in discussing several alternatives to fund the drilling of our large Mississippian acreage position within ten years and bring forward the NAV of this asset.  *With this announcement, we will begin to increase our rig count in Oklahoma and Kansas to average 24 rigs in 2012, which nearly doubles our current rig count.  Additionally, we have identified and established an acreage position in a new area that is similar in size, characteristics and cost to our first Mississippian play*.  In connection with increasing our rig count and acreage position, we are *increasing our 2011 capital budget to $1.8 billion and establishing a 2012 capital budget of $1.8 billion*.
>
> The execution of our 2011 and 2012 plans will move the company significantly toward our 2014 goal of a self-funding capital program, delivering double-digit annual production growth and a debt to EBITDA ratio of less than 2 times.

200.   The statements referenced above in ¶¶198-199 were materially false and misleading when made because they failed to disclose the adverse facts about: (i) the involvement of the Ward-related entities in the Mississippian set forth in ¶150; (ii) the

amount of natural gas relative to oil set forth in ¶152(a)–(b); and (iii) the Company's reckless spending in the Mississippian as set forth in ¶151 above, which were known to Defendants or recklessly disregarded by them.  The statements omitted the material fact that the increased spending in the Mississippian benefited Ward and the Ward-related entities to the detriment of SandRidge.  In addition, the statement that the "results" from the Mississippian "continue to meet or exceed our expectations" was materially false and misleading when made because the gas to oil ratio in the Mississippian was significantly higher than the Company's stated expectations.

201.    On August 5, 2011, the Company held a conference call for analysts and investors (the "8/5/11 Conf Call") to discuss the financial results and other information set forth in the 8/4/11 Press Release.  On the call, Defendant Grubb, stated in pertinent part as follows:

> As you have seen, we've increased our 2011 budget by $500 million to $1.8 billion total.  The allocation for the increase is as follows.  $150 million for drilling more wells in the Permian and the Miss wells, including saltwater disposal wells.  And also that includes the adjustment of the well cost in the Miss from $2.5 million to $3 million.  There are also $50 million of non-op drilling in the Mississippian, and increased work-overs and re-completions in the Company.
>
> ***The biggest part of the increase is in land, $275 million in additional land spending for acquisition of new acreage in the Central Basin platform and the new Mississippian play, and $25 million for oil field services in Midstream***.

202.    During the 8/5/11 Conf Call, Defendants provided a power point presentation (the "8/5/11 Presentation"), which continued to report "409 Total Mboe," "211 Mbbl," and 52% crude oil.  The 8/5/11 Presentation further reported a rate of return of 94% in the Mississippian play.

203.    The statements referenced above in ¶¶201-202 were materially false and misleading when made because they failed to disclose the adverse facts about: (i) the involvement of the Ward-related entities in the Mississippian set forth in ¶150; (ii) the amount of natural gas relative to oil set forth in ¶152(a)–(b); and (iii) the Company's reckless spending in the Mississippian as set forth in ¶151 above, which were known to Defendants or recklessly disregarded by them.  Furthermore, the statement that "[t]he biggest part of the increase is in land, $275 million in additional land spending for acquisition of new acreage in the Central Basin platform and the new Mississippian play results" was materially false and misleading when made because it failed to disclose that Ward and the Ward-related entities stood to reap tremendous gains from additional spending in the Mississippian.

204.    In response to the Company's announcements on August 4th and 5th that capital expenditures would be increased by $500 million, in large part for land acquisition and development in the Mississippian (benefitting the land and mineral rights owned by the Ward-related entities), SandRidge's common stock declined $1.41 per share, or 13.7%, from a close of $11.17 per share on August 3, 2011 to close at $9.76 per share on August 4, 2011 on extremely heavy volume.  In the following days, the price of the stock continued to decline, reaching $7.79 on August 5, 2011, on massive volume of 69.7 million shares, and then continued to decline and closed at $6.55 on August 8, 2011.  In total, SandRidge's common stock fell 44.1% between August 4 and 8, 2011.  This decline in SandRidge common stock was caused in part from a materialization of the risk of SandRidge's reckless spending to benefit the Ward-related entities.

205.    SandRidge common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions made by Defendants during the Class Period.

206.    On August 8, 2011, SandRidge filed its quarterly report on Form 10-Q with the SEC for 2Q11 (the "2Q11 10-Q") and reiterated the Company's financial results contained in the 8/4/11 Press Release and the 8/5/11 Conf Call.  Defendants Ward and Bennett falsely certified the Company's internal controls and procedures in the 2Q11 10-Q, stating that "the Company's management," had "performed an evaluation of the effectiveness of the design and operation of its disclosure controls and procedures . . . concluded that the Company's disclosure controls and procedures were effective."

207.    The 2Q11 10-Q also discussed "Related Party Transactions," repeating, in pertinent part, the same statements regarding the Company's transactions with related parties set forth in the 2010 10-K, referenced above in ¶160.

208.    The statements referenced above in ¶¶206-207 were materially false and misleading when made for the reasons set forth in ¶150.

**Fourth Quarter 2011 Statements**

209.    On November 3, 2011, the Company announced its financial and operational results for the third quarter 2011 ("3Q11") and first nine months of 2011 in a press release (the "11/3/11 Press Release") which it filed with the SEC on Form 8-K.  As part of its key highlights, the 11/3/11 Press Release noted that oil production in 3Q11 was 3.19 MMBbls compared to 2.77 MMBbls in 2Q11 and 2.22 MMBbls in 3Q10.  The 11/3/11 Press Release also stated, in pertinent part, as follows:

- Drilled 255 wells during third quarter 2011 and 716 wells during first nine months of 2011.

- Current daily production of 70 MBoe per day.

- ***Increased position in new Mississippian play to approximately 700,000 net acres***.

- Closed $621 million SandRidge Permian Trust IPO, received approximately $250 million in initial proceeds upon closing of Mississippian joint venture and announced sale of East Texas properties for $231 million.

- Projected funding surplus of approximately $500 million in 2011 with multiple options available to fund 2012 capital budget.

- Cash balance of approximately $225 million and current liquidity of approximately $1 billion

210.   The 11/3/11 Press Release also revised the Company's Fiscal Year 2011 and Fiscal Year 2012 guidance, citing operational difficulties in the Permian Basin, but confirming that its Mississippian formation assets were performing so solidly that production resources were being transferred from Permian to Mississippian production.  The 11/3/11 Press Release stated in pertinent part as follows:

> The company has revised its production guidance for 2011 to 23.4 MMBoe from the previous guidance of 23.9 MMBoe.  ***Although production is projected to exceed expectations in the Mid-Continent region due to the success of the Mississippian horizontal drilling program***, the company is projecting an overall shortfall of approximately 500 MBoe in production, as compared to prior guidance, due to facility constraints in the Central Basin Platform and underperformance in the Gulf Coast, Gulf of Mexico and the Piñon Field.

211.   The statements referenced above in ¶¶209-210 were materially false and misleading when made because they failed to disclose the adverse facts about: (i) the involvement of the Ward-related entities in the Mississippian set forth in ¶150; (ii) the amount of natural gas relative to oil set forth in ¶152(a)–(b); and (iii) the Company's reckless spending in the Mississippian as set forth in ¶151 above, which were known to Defendants or

recklessly disregarded by them.  Moreover, the statement that the Company's "production is projected to exceed expectations in the Mid-Continent region due to the success of the Mississippian horizontal drilling program" was materially false and misleading when made because the gas to oil ratio in the Mississippian at that time was significantly higher than the Company's stated expectations.

212.   On November 4, 2011, Defendants held an earnings conference call for analysts and investors (the "11/4/11 Conf Call"), to discuss the financial and operational results and other information set forth in the 11/3/11 Press Release.  During the 11/4/11 Conf Call, Defendant Grubb discussed the Company's production, stating, in pertinent part, as follows:

> Partially making up for the slower growth rate in the Permian over the last few months is the performance in the Mid-Continent region.  Driven by the success of our Mississippian drilling program, we project to exceed our year-end production target for the Mid-Continent region by about 260,000 barrels of oil equivalent.
>
> ***The Mississippian program has performed beyond our expectations***, and 30-day IPs have come in better than the type curve that was generated at year-end 2010.

213.   The statements referenced above in ¶212 were materially false and misleading when made because they failed to disclose the adverse facts about the amount of natural gas relative to oil set forth in ¶152(a) – (b) above, which were known to Defendants or recklessly disregarded by them.  Further, the statement that "[t]he Mississippian program has performed beyond our expectations," was materially false and misleading when made because the gas to oil ratio in the Mississippian at that time was significantly higher than the Company's stated expectations.

214.    On November 7, 2011, SandRidge filed its quarterly report on Form 10-Q with the SEC for 3Q11 (the "3Q11 10-Q") and reiterated the Company's financial results contained in the 11/3/11 Press Release and the 11/4/11 Conf Call.  The 3Q11 10-Q repeated in substance the statements regarding the Company's internal controls set forth in the 2Q11 10-Q, referenced above in ¶206.   The 3Q11 10-Q also discussed "Related Party Transactions," repeating, in pertinent part, the same statements regarding the Company's transactions with related parties set forth in the 2010 10-K, referenced above in ¶160.

215.    The statements referenced above in ¶214 were materially false and misleading when made because they failed to disclose the adverse facts about the involvement of the Ward-related entities in the Mississippian set forth in ¶150 which were known to Defendants or recklessly disregarded by them.

216.    The false and misleading statements referenced above in ¶214, which were known, or should have been known, to the Defendants to be materially false and misleading, were then falsely certified by Defendants Ward and Bennett in the 3Q11 10-Q.

217.    On November 11, 2011, an earnings conference call was held for analysts and investors to discuss the financial and operational results and other information for the Miss Trust I for the third quarter 2011.   In the question and answer portion of the call, the following exchange occurred with respect to the Company's increasing gas production and stable oil production:

**Mario Barazza -** *Tuohy Brothers Investment Research, Inc. - Analyst*

Okay.  All right, and then I wanted to confirm with the gas production being higher than anticipated that liquids as a percent of total has remained the same.

**Matt Grubb -** *SandRidge Mississippian Trust I - President, COO*

Yes. That's correct. Gas did out produce our forecast for gas production and our liquids is -- *we produced more liquids because overall the well performed better* and we drilled higher net revenue interest wells in addition to more wells. However, *on a type curve basis the liquids were roughly on trend*.

218.   The statements referenced above in ¶217 were materially false and misleading when made because they failed to disclose the adverse facts about the amount of natural gas relative to oil set forth in ¶152(a)–(b) above, which were known to Defendants or recklessly disregarded by them. In addition, the statement that the Company "produced more liquids because overall the well performed better and we drilled higher net revenue interest wells in addition to more wells" was materially false and misleading when made because the Mississippian wells did not perform better than expected as a higher rate of gas than oil was being produced. The statement that the "type curve" for the Mississippian was "roughly on trend" was false and misleading because the metrics the Company used for its type curve did not reflect the true gas to oil ratio for wells in the Mississippian.

219.   On November 16, 2011, as part of the Bank of America-Merrill Lynch – Global Energy Conference, Defendants gave a power point presentation, which continued to represent that oil production from the Company's horizontal Mississippian type well was "211 Mbbl" and total production of "409 Total Mboe," resulting in a GOR of 52% oil and 48% gas.

220.   The statements referenced above in ¶219 were materially false and misleading when made because they failed to disclose the adverse facts about the amount of natural gas relative to oil set forth in ¶152(a)–(b) above, which were known to Defendants or recklessly disregarded by them. Moreover, the statements that the Company's horizontal Mississippian type well results in oil of "211 Mbbl" and total production of "409 Total Mboe" were

materially false and misleading when made because the liquid fraction for typical Mississippian wells at that time was only 40% oil and 60% gas as opposed to the 52% oil and 48% gas that the Company represented.

**First Quarter 2012 Statements**

221.    Starting in January 2012, SandRidge's management began representing the average EUR per well of their typical horizontal well in the Mississippian play as 456 MBOE, consisting of 204 Mbbl of oil and 1,512 MMscf of gas.

222.    For example, on January 10, 2012, during a presentation at the Goldman Sachs Global Energy Conference, Defendants provided the following graph, which summarizes the characteristics of their type well in the Mississippian:

223.    The statements referenced above in ¶¶221-222 were materially false and misleading when made because they failed to disclose the adverse facts about the amount of natural gas relative to oil set forth in ¶152(a)–(c) above, which were known to Defendants or recklessly disregarded by them.  Moreover, the statements that the Company's horizontal Mississippian type well results in oil of "204 Mbbl" and total production of "456 Total Mboe" were materially false and misleading when made because the liquid fraction for typical Mississippian wells at that time was only 35% oil and 65% gas as opposed to the 46% oil and 54% gas that the Company represented.

224.    On February 1, 2012, Defendants issued a press release announcing the planned acquisition of Dynamic Offshore Resources, LLC, the Company's Year-End 2011 Operations Results and the Company's Year-End Reserve Summary (the "2/1/12 Press Release").  The 2/1/12 Press Release discussed the Company's Fiscal Year 2011 Year-End Operational Results, stating, in pertinent part, as follows:

- Total proved reserves, adjusted for asset sales, increased 11% to 471 MMboe

- Oil reserves; adjusted for asset sales, increased 17% to 245 MMboe

- Reserve replacement of 302%

- PV-10 (Non-GAAP) of total proved reserves increased 52% to $6.9 billion

- Total production growth of 16% to 23.4 MMboe and 60% growth in oil production

225.    In addition, the 2/1/12 Press Release discussed the Company's "Year-End 2011

Reserve Summary," stating, in pertinent part, as follows:

> ***SandRidge increased year-end 2011 proved reserves to 471 MMboe, 11%
> higher than 2010 proved reserves*** of 423 MMboe (which reflects the
> divestment of 123 MMboe during 2011***) and represents a reserve
> replacement ratio of 302%.  The Horizontal Mississippian play and the
> Central Basin Platform contributed reserve growth of 101 MMboe*** offset by
> 30 MMboe of downward revisions to gas reserves primarily in the Piñon field.

> Essentially all of SandRidge's 2011 reserve additions were the result of the
> company's drilling program.

> SandRidge's 2011 proved reserves included 2,810 gross (2,438 net) PUD
> [proved undeveloped] locations.  Approximately 86% of the PUDs are located
> in the Horizontal Mississippian play and Permian Basin.

> Forty-nine percent of 2011 proved reserves were proved developed, compared
> with 41% at year-end 2010.

> Approximately 96% of the 2011 PV-10 value is associated with the company's
> Horizontal Mississippian and Permian core areas.

> ***The company's 2011 proved reserves had a PV-10 of $6.9 billion, a 52%
> increase from 2010***.  Third party engineers including Netherland Sewell and
> Lee Keeling evaluated a combined 98% of the total proved PV-10 value.

226.    The "Analysis of Proved Reserves and Replacement Economics" provided in

the 2/1/12 Press Release also stated that the "% Oil Properties to Total PV-10" had increased

to "96%" in Fiscal Year 2011 from "88%" in Fiscal Year 2010.

227.    The statements referenced above in ¶¶224-226 were materially false and misleading when made because they failed to disclose, the adverse facts about: (i) the involvement of the Ward-related entities in the Mississippian set forth in ¶150; (ii) the amount of natural gas relative to oil set forth in ¶152(a)–(c); and (iii) the Company's reckless spending in the Mississippian as set forth in ¶151 above, which were known to Defendants or recklessly disregarded by them.

228.    On February 7, 2012, Defendant Ward participated in the Credit Suisse Energy Summit (the "2/7/12 Summit"), and he discussed, among other things, the success of the Mississippian play.  For example, Defendant Ward stated in pertinent part as follows:

> Our performance in the ***Mississippian has continued to improve***.  So in the -- when we first started in 2010, we anticipated a well making about 250,000 barrels of oil equivalent.  In 2010, then -- at year-end 2010, we had 37 wells drilled and we had a type curve of 409,000 barrels per well equivalent and that averaged first 30-day IP of 244 barrels equivalent a day.  In 2000 -- at the ***end of 2011, we've now moved up to 456 Mboe and that has a 275 barrel a day equivalent first 30-day production***.

> *           *           *

> And you can see on the next page, we go through and just lay out all the wells we've drilled, there is some very, very good wells and some poor wells.  We see that all the way across the play.  So we have not identified one particular area that is tremendously better than other areas.  We might see that over time, we just don't know, in a very large play like this***.  But what we do know is that we can consistently make very high rates of return***.

> ***Also, you notice that the companies who post their wells, there are very few companies that post every well that they drill.  So it's usually a sign that things are going right***.  And with us, the last 30 wells, again, were 318 barrels of oil equivalent, our type curve is 275.  If you add in the last 43 wells that we've drilled, we are up over 400 barrels a day and how much on an equivalent basis.

> *           *           *

*So what makes Mississippian a great play?  It is scale, very high internal rates of return, but one of the keys to everything we do is to know the reservoir*.  So whether it's in the Mississippian, in the Permian or in the Gulf of Mexico, we are drilling from reservoirs that have been drilled for decades and we understand those reservoirs and we have teams of people that understand those reservoirs and we believe there is much less risk in dealing in traditional zones that have nanodarcies to darcies of permeability or excuse me -- millidarcies to darcies of permeability rather than nanodarcies.

229.   During the 2/7/12 Summit, Defendant Ward gave a power point presentation and represented that production from the Company's horizontal Mississippian type well results in oil of "204 Mbbl (100% Crude)" and total production of "456 Total Mboe" – a liquid fraction of 45% oil and 55% gas.

230.   The statements referenced above in ¶¶228-229 were materially false and misleading when made because they failed to disclose, the adverse facts about: (i) the involvement of the Ward-related entities in the Mississippian set forth in ¶150; (ii) the amount of natural gas relative to oil set forth in ¶152(a)–(c); (iii) the Company's reckless spending in the Mississippian as set forth in ¶151; and (iv) the Company's understanding of the geology of the Mississippian as set forth in ¶154 above, which were known to Defendants or recklessly disregarded by them.  In addition, the statement that the Company's performance in the Mississippian "has continued to improve" was materially false and misleading when made because the percentage of oil being produced as compared to gas in the Mississippian was continuing to decrease.  The statements that the Company had a "type curve of 409,000 barrels" for the Mississippian in 2010 and that it "know[s] the reservoir" were materially false and misleading when made because, as the Company later disclosed, the geology of the Mississippian is highly variable and there was not a single type curve across their entire leasehold in the Mississippian.  The statements that the Company

horizontal Mississippian type well produced "456 Mboe" was materially false and misleading when made because the liquid fraction for the typical Mississippian well at that time was only 35% oil and 65% gas as opposed to the 46% oil and 54% gas that the Company represented.

231.   On February 17, 2012, an earning conference call was held for analysts and investors to discuss the financial and operational results of the Miss Trust I for the fourth quarter 2011.  In the question and answer portion of the call, the following exchange occurred with respect to the Company's increasing gas production and stable oil production:

**Kevin Smith -** *Raymond James & Associates – Analyst*

Okay, great.  And the other thing, it seems like your recent wells have had a higher gas waiting than I think 55% is what you're kind of forecast. Are you -- do you agree with that?  Is that what you're seeing?  Or are you just then maybe drilling in a gassier weighted part of the field?  Or how should I think about that?

**Tom Ward -** *SandRidge Energy - Chairman, CEO*

No, you know, we do agree with that.  I think the wells overall in the play appears to be gassier than what we initially projected**.  *The important thing is to know that that's not the – at the expense of oil.  The oil is coming in on target. And they're just making more gas***.

232.   The statements referenced above in ¶231 were materially false and misleading when made because they failed to disclose the adverse facts about the amount of natural gas relative to oil set forth in ¶152(a)–(c) above, which were known to Defendants or recklessly disregarded by them.  In addition, the statement that "[t]he oil is coming in on target.  And they're just making more gas" was materially false and misleading when made because the higher percentage of gas being produced was in part the result of a lower amount of oil being produced, not a simple increase in gas.

233.    On February 23, 2012, the Company announced its financial and operational results for the fourth quarter 2011 ("4Q11") and fiscal year 2011 in a press release (the "2/23/12 Press Release") which it filed with the SEC on Form 8-K.  The 2/23/12 Press Release emphasized operational highlights, stating, in pertinent part, as follows:

- Record oil production in fourth quarter and full year 2011 of 3.29 MMBbls and 11.83 MMBbls, respectfully.

- Consolidated oil reserves of 245 MMBbls at year end 2011.

- Consolidated proved reserves of 471 MMBoe at year end 2011.

- Consolidated SEC PV-10 value of $6.9 billion at year end 2011.

- Reserve replacement of 303%.

234.    The 2/23/12 Press Release reported that during 4Q11, oil production had increased 26% "mainly due to continued development of the company's oil properties in the Mississippian play and Permian Basin."  It also noted that, for fiscal year 2011, oil production had increased 60% "mainly due to oil production added as a result of the company's drilling programs in the Mississippian play and Permian Basin."

235.    The statements referenced above in ¶¶233-234 were materially false and misleading when made because they failed to disclose the adverse facts about the amount of natural gas relative to oil set forth in ¶152(a)–(c) above, which were known to Defendants or recklessly disregarded by them.

236.    On February 24, 2012, Defendants held an earnings conference call for analysts and investors (the "2/24/12 Conf Call"), to discuss the financial and operational results and other information set forth in the 2/23/12 Press Release.  On the call, Defendant Ward explained that "[d]uring 2010, it became clear to us that we knew something that no

one else had focused on, which is drilling for shallow conventional oil on shore US is very profitable and scalable.  The key is to stay away from competition and be a first mover into acreage once you have determined your play."

237.    The statements referenced above in ¶236 were materially false and misleading when made because they failed to disclose, the adverse facts about: (i) the involvement of the Ward-related entities in the Mississippian set forth in ¶150; and (ii) the amount of natural gas relative to oil set forth in ¶152(a)–(c).  Further, the statement that "during 2010, it became clear to us that we knew something that no one else had focused on" was materially false and misleading when made because other entities, including the Ward-related entities had focused on the Mississippian.  The statement that the "key is to stay away from competition" was materially false and misleading because the Company did not seek to stay away from competition as evidenced by the active participation by the Ward-related entities in that area.  The statement that the Company strived to be the "first mover into acreage once you have determined your play" was materially false and misleading when made because it actually allowed the Ward-related entities to be the first mover in numerous areas throughout the Mississippian play.

238.    On February 27, 2012, SandRidge filed its annual report on Form 10-K with the SEC for the year ended 2011 (the "2011 10-K").  The 2011 10-K discussed, among other things, "Certain Relationships and Related Transactions and Director Independence," declaring that the "information required by this item is incorporated herein by reference to the following sections of the Company's definitive proxy statement, which will be filed no later than April 30, 2012: Related Party Transactions and Corporate Governance Matters."

Attached as an exhibit to the 2011 10-K were the Notes to the Company's financial statements, which further discussed the Company's related-party transactions, stating, in pertinent part, as follows:

> The Company enters into transactions in the ordinary course of business with certain related parties. These transactions primarily consist of purchases related to drilling and completion activities, gas treating services and drilling equipment and sales of oil field services, equipment and natural gas. . . .

239.    The statements referenced above in ¶238 were materially false and misleading when made because they failed to disclose the adverse facts about the involvement of the Ward-related entities in the Mississippian set forth in ¶150 above, which were known to Defendants or recklessly disregarded by them.

240.    The false and misleading statements referenced above in ¶238, which were known, or should have been known, to the Defendants to be materially false and misleading, were then falsely certified by Defendants Ward and Bennett in the 2011 10-K.

241.    On or about March 12, 2012, the Company provided investors with its 2011 Annual Report to investors, which attached the 2011 10-K. As an introduction to the 2011 Annual Report, Defendant Ward wrote a letter to SandRidge shareholders ("2012 Shareholder Letter"), which stated in pertinent part:

> ***Upon completing our transformation from natural gas to oil in 2010***, we took additional bold measures in 2011 to further ensure our ability to deliver increased shareholder value in 2012 and beyond. ***We have purchased $400 million of leases in the Mississippian Oil Play, which stretches from northern Oklahoma to western Kansas, securing two million acres(1) in an area we believe generates the highest rate of return for horizontal drilling in the U.S. today and will be the primary driver of growth for the company going forward***.

242.    The 2012 Shareholder letter also addressed oil production in Mississippian play, stating, in pertinent part, as follows: "An average horizontal well costs $3.2 million to

drill, produces 456 thousand barrels of oil equivalent (Mboe) and provides and internal rate of return of approximately 98 percent. . . .   Because of its exception economics, our Mississippian acreage has been a remarkable source of value creation for the company."

243.   The statements referenced above in ¶¶241-242 were materially false and misleading when made because they failed to disclose, the adverse facts about: (i) the involvement of the Ward-related entities in the Mississippian set forth in ¶150; (ii) the amount of natural gas relative to oil set forth in ¶152(a)–(c); (iii) the steep drop in production experienced by SandRidge horizontal Mississippian wells as set forth in ¶153 above; and (iv) the Company's reckless spending in the Mississippian as set forth in ¶151 above, which were known to Defendants or recklessly disregarded by them.   Moreover, the statement the Company had "complet[ed] our transformation from natural gas to oil in 2010" was materially false and misleading when made because the Company continued to produce more gas than oil throughout the Class Period.   The statement that the Company's horizontal Mississippian type well results in oil of "456 thousand barrels of oil equivalent (Mboe)" was materially false and misleading when made because the liquid fraction for typical Mississippian wells at that time was only 35% oil and 65% gas as opposed to the 46% oil and 54% gas that the Company represented.

244.   On March 20, 2012, SandRidge filed its Form 10-K/A with the SEC for the year ended 2011 (the "2011 10-K/A"), which reported "Other Transactions with Mr. Ward." In particular, it stated:

> We own wells on certain areas of land in northwest Oklahoma under which TLW Land & Cattle LP (TLW LC), an entity in which Mr. Ward has an ownership interest, owns a royalty interest.   In 2011, we paid royalties totaling

$925,735 to TLW-LC in connection with the production of oil and natural gas from these properties.

In January 2011, we purchased a portion of the working interest in leases covering acreage in northeast Oklahoma from WCT Resources, L.L.C., a limited liability company formed in 2002 and owned by trusts established in 1989 for the benefit of Mr. Ward's children (WCT), for $391,955. WCT also participates as a working interest owner in wells we operate in northwest Oklahoma, and during 2011, we paid revenue of $168,196 to WCT as working interest owner.

245.    The statements referenced above in ¶244 were materially false and misleading when made because they failed to disclose the adverse facts about the involvement of the Ward-related entities in the Mississippian set forth in ¶150 above, which were known to Defendants or recklessly disregarded by them.

246.    Similar to the statements in the 2010 10-K/A, the 2011 10-K/A also highlighted the Company's ethical practices:

Our Board of Directors has adopted corporate governance guidelines that define those governance practices of the Board that are not included in our Bylaws. **Our Board of Directors has also adopted a Code of Business Conduct and Ethics**, which contains general guidelines for conducting our business and **applies to all of our officers, directors and employees**, and **a Financial Code of Ethics that applies to our Chief Executive Officer, Chief Financial Officer and Senior Vice President Accounting**. Our corporate governance guidelines and codes can be found in the corporate governance section of our website at http://www.sandridgeenergy.com.

247.    The statements referenced above in ¶246 were materially false and misleading when made because they failed to disclose the adverse facts about the involvement of the Ward-related entities in the Mississippian set forth in ¶150 above, and that transactions by the Ward-related entities violated the Company's Code of Business Conduct and Ethics, which were known to Defendants or recklessly disregarded by them.

248.   On March 26, 2012, Defendant Ward participated in the Barclays High Yield Bond and Syndicated Loan Conference (the "3/26/12 Conference") and stated in pertinent part: "we have said in the past that we think this is a statistical pay but will average between 300,000 and 500,000 barrels of oil equivalent per well and we are seeing that across [t]he play with the type curve right now being at 456." This 456 Total Mboe figure was reiterated in an accompanying power point presentation shown during the 3/26/12 Conference.

249.   The statements referenced above in ¶248 were materially false and misleading when made because they failed to disclose, the adverse facts about: (i) the amount of natural gas relative to oil set forth in ¶152 (a)–(c); and (ii) the steep drop in production experienced by SandRidge horizontal Mississippian wells as set forth in ¶153 above. Additionally, the statements that the Company's horizontal Mississippian type well results in oil of "204 Mbbl" and total production of "456 Total Mboe" were materially false and misleading when made because the liquid fraction for typical Mississippian wells at that time was only 35% oil and 65% gas as opposed to the 46% oil and 54% gas that the Company represented.

**Miss Trust II Offering**

250.   On April 17, 2012, the Prospectus for the initial public offering of the SandRidge Mississippian Trust II became effective. The Miss II Registration Statement described the Company's "understanding" of the Mississippian region:

> The Underlying Properties are located in northern Oklahoma and southern Kansas in the Mississippian formation, which is an expansive carbonate hydrocarbon system located on the Anadarko Shelf. The top of the formation is encountered between 4,000 feet and 7,000 feet and lies stratigraphically between the Pennsylvanian-aged Morrow formation and the Devonian-aged Woodford Shale formation. The Mississippian formation can reach 1,000 feet in gross thickness and the targeted porosity zone is between 50 and 100 feet in thickness. The formation's geology is well understood as a result of the thousands of vertical wells drilled and produced there since the 1940s,

including approximately 73 vertical wells drilled on the Underlying Properties, and over 400 horizontal wells drilled in the region in the Mississippian formation.

251.    The statements referenced in ¶250 above were materially false and misleading when made because they failed to disclose the adverse facts about: (i) the Company's understanding of the geology of the Mississippian as set forth in ¶154; and (ii) the involvement of the Ward-related entities in the Mississippian set forth in ¶150 above, which were known to Defendants or recklessly disregarded by them.  Additionally, contrary to the statements set forth above, there was no "continuity" or "consistency" across the AMI. Rather, the formation geology and individual well productivity across the AMI was highly variable.  Further, there was limited production history from Mississippian horizontal wells such that EUR projections were not firmly established.

252.    The Miss Trust II Registration Statement stressed that the proved reserves in the properties associated with the Miss Trust II consisted of 46.8% oil and 53.2% natural gas. Specifically, in the "Summary" Section, the Prospectus states, in pertinent part:

> As of December 31, 2011, the total proved reserves estimated to be attributable to the trust were 26.1 million barrels of oil equivalent ("MMBoe"). This amount includes 10.2 MMBoe attributable to the PDP Royalty Interest and 15.9 MMBoe attributable to the Development Royalty Interest.  ***The proved reserves consist of 46.8% oil and 53.2% natural gas.  In addition, as of December 31, 2011, there were 9.8 MMBoe of probable reserves estimated to be attributable to the trust, all of which were attributable to*** the Development Royalty Interest.  ***The probable reserves consist of 46.9% oil and 53.1% natural gas***.  Please see "The Underlying Properties Oil and Natural Gas Reserves" and "The Underlying Properties The Reserve Report" for information about the estimated reserves attributable to the trust.

253.    In addition, in the "Calculation of Target Distributions" section, the Miss II Trust Prospectus includes the following chart showing the estimated % of oil volumes

ranging from 47% in the first quarter of 2012 to 51% projected for the fourth quarter of 2012

for the assets associated with the Miss Trust II:

| | March 31, 2012[1] | June 30, 2012 | September 30, 2012 | December 31, 2012 |
|---|---|---|---|---|
| | **(In thousands, except volumetric and per unit data)** | | | |
| *Estimated production from trust properties* | | | | |
| Oil sales volumes (MBbl) | 132 | 206 | 249 | 261 |
| Natural gas sales volumes (MMcf) | 885 | 1,324 | 1,430 | 1,490 |
| Total sales volumes (MBoe) | 279 | 427 | 488 | 509 |
| % Proved developed producing (PDP) sales volumes | 100 % | 72% | 71% | 59% |
| % Proved undeveloped (Development) sales volumes | 0 % | 28% | 26% | 39% |
| % Probable undeveloped (Development) sales volumes | 0 % | 0% | 4% | 3% |
| % Oil volumes | 47 % | 48% | 51% | 51% |
| % Natural gas volumes | 53 % | 52% | 49% | 49% |
| *Commodity price and derivative contract positions* | | | | |
| NYMEX futures price[2] | | | | |
| Oil ($/Bbl) | $98.85 | $103.03 | $103.99 | $104.86 |
| Natural gas ($/MMBtu) | 3.08 | 2.25 | 2.37 | 2.63 |
| Assumed realized weighted unhedged price[3] | | | | |
| Oil ($/Bbl) | $93.82 | $98.00 | $98.96 | $99.83 |
| Natural gas ($/Mcf) | 3.08 | 2.25 | 2.37 | 2.63 |
| Assumed realized weighted hedged price | | | | |
| Oil ($/Bbl) | $93.82 | $100.01 | $101.74 | $101.70 |
| Percent of oil volumes hedged | 0 % | 74% | 92% | 87% |
| Oil hedged price ($/Bbl) | — | $107.00 | $107.00 | $107.00 |
| *Estimated cash available for distribution* | | | | |
| Oil sales revenues | $ 12,341 | $ 20,208 | $ 24,673 | $ 26,043 |
| Natural gas sales revenues | 2,725 | 2,982 | 3,390 | 3,913 |
| Realized gains (losses) from derivative contracts | — | 414 | 693 | 489 |
| Operating revenues and realized gains (losses) from derivative contracts | 15,066 | 23,604 | 28,756 | 30,445 |
| Production taxes | (151 ) | (232 ) | (250 ) | (323) |
| Ad valorem taxes | — | — | (154 ) | (202) |
| Trust administrative expenses | (1,750)[4] | (325 ) | (325 ) | (325) |
| Total trust expenses | (1,901 ) | (557 ) | (729 ) | (850) |

| | | | | |
|---|---|---|---|---|
| Cash available for distribution | $   13,165 | $ 23,047 | $      28,027 | $      29,595 |
| Trust units outstanding | 49,725 | 49,725 | 49,725 | 49,725 |
| Target distribution per trust unit | $.26 | $.46 | $.56 | $.60 |
| Subordination threshold per trust unit | $.21 | $.37 | $.45 | $.48 |
| Incentive threshold per trust unit | $.32 | $.56 | $.68 | $.71 |

254.   The statements referenced above in ¶¶252-253 were materially false and misleading when made because they failed to disclose, the adverse facts about: (i) the amount of natural gas relative to oil set forth in ¶152(a)–(c); and (ii) the steep drop in production experienced by SandRidge horizontal Mississippian wells as set forth in ¶153 above.  Moreover, the statements that "[t]he proved reserves consist of 46.8% oil and 53.2% natural gas" and "[t]he probable reserves consist of 46.9% oil and 53.1% natural gas" were materially false and misleading when made because the liquid fraction for typical Mississippian wells at that time was only 35% oil and 65% gas as opposed to the 47% oil and 53% gas that the Company represented.

**Second Quarter 2012 Statements**

255.   On May 3, 2012, the Company announced its financial and operational results for the first quarter 2012 ("1Q12") in a press release (the "5/3/12 Press Release") which it filed with the SEC on Form 8-K.  In the 5/3/12 Press Release, the Company highlighted "Mississippian daily average production grew by 23% quarter over quarter" and "Record oil production in first quarter of 3.4 MMBbls."

256.   The statements referenced above in ¶255 were materially false and misleading when made because they failed to disclose, the adverse facts about: (i) the amount of natural

gas relative to oil set forth in ¶152(a)–(c); and (ii) the steep drop in production experienced by SandRidge horizontal Mississippian wells as set forth in ¶153 above.  Moreover, the statements that "Mississippian daily average production grew by 23% quarter over quarter" and the "Record oil production in first quarter of 3.4 MMBbls" in the Mississippian were materially false and misleading when made because the Company's massive spending on drilling new wells in the Mississippian enabled SandRidge to report increasing total production numbers in that area even though older wells with more production history experienced steep declines.  This heightened drilling activity masked the rapid decline and depletion in SandRidge's horizontal Mississippian wells.

257.   On May 4, 2012, the Company held an earnings conference call for analysts and investors (the "5/4/12 Conf Call") to discuss the financial and operational results and other information set forth in the 11/3/11 Press Release, and Defendant Ward stated, in pertinent part, as follows:

> During the next two years, we leased 2.2 million acres for about $415 million and created one of the largest oil resource plays in the world.  Now, it is widely known that the Mississippian is among the very best places to drill and in our opinion, it is the very best place to drill in the United States.  It is important to note that SandRidge is focused on only two drilling plays and one resource play to lease land in the last three years.

> Our Company standard is to be the most efficient operator of each area we choose to develop.  We are efficient because of our relentless focus on the single plays. In the Mississippian, this allows us to prepare lead time to install electricity and disposal before we drill and to watch our drilling costs very closely.  We see a lot of companies talk about how much a well might make in a particular play, on a particular day, ***but not many discuss what really matters, which is how much you spend, how you prepare, and how much you find after drilling several hundred wells on your way to several thousand***.

*       *       *

*Our type curve, EUR, of 456,000 barrels equivalent has an average peak 30-day rate of 275 barrels of oil equivalent per day.* However, we do have prolific success stories. One well we recently completed in Alfalfa County, Oklahoma averaged more than 2,200 barrels of oil equivalent per day at 92% oil and is calculated to be the third highest, 30-day rate oil well drilled in the United States in the last three years.

*   *   *

However, we have chosen to not only discuss our best wells, but the nearly 300 wells we drilled across the more than 150 miles from Comanche County, Kansas to Noble County, Oklahoma. A well that averages only 244 barrels of oil equivalent per day, which is what our type curve was at the end of 2010, would have a rate of return of more than 80%. A well that averages 310 barrels of oil equivalent per day during a 30-day peak rate will have a rate of return of over 125%. We are very happy with both of these outcomes or really any in between, because even at the low end of the range, we can meet our three-year goal of tripling EBITDA, doubling oil production, and improving our credit metrics.

*   *   *

Our production in the Mississippian averaged 19,300 barrels of oil equivalent per day for the first quarter, but is currently over 26,000 barrels of oil equivalent per day. *Our Miss production has grown from a standing start in 2010 to the 26,000 barrels of oil equivalent per day, level with only an average of 14 rigs. You can imagine the growth we plan to have with 45 rigs running by the end of 2013.*

*   *   *

We have started our first two wells in the extension portion of our Mississippian Play. Like the original Mississippian, we expect to have a statistical combination of good and not as good wells. However, *this is still a play that, in the long-term, will provide excellent returns for the Company and our investors.* Just a reminder that we had over 7,000 vertical wells to tell us where to buy acreage and it's the same formation with the same trapping mechanism that we're drilling in the original play. Therefore, we believe the risk is low, but we'll know much more by the end of the year as we drill our first 50 wells in western Kansas.

258.    The statements referenced above in ¶257 were materially false and misleading when made because they failed to disclose, the adverse facts about: (i) the involvement of the Ward-related entities in the Mississippian set forth in ¶150; (ii) the amount of natural gas

relative to oil set forth in ¶152(a)–(c); (iii) the steep drop in production experienced by SandRidge horizontal Mississippian wells as set forth in ¶153 above; and (iv) the Company's reckless spending in the Mississippian as set forth in ¶151 above, which were known to Defendants or recklessly disregarded by them.  Also, the statement that the Company's horizontal Mississippian type curve EUR was based on "456,000 barrels equivalent" was materially false and misleading when made because the liquid fraction for typical Mississippian wells at that time was only 35% oil and 65% gas as opposed to the 46% oil and 54% gas that the Company represented.  The statement that the Company's "Miss production has grown from a standing start in 2010 to the 26,000 barrels of oil equivalent per day" was materially false and misleading when made because the Company's massive spending on drilling new wells in the Mississippian enabled SandRidge to report increasing total production numbers in that area even though older wells with more production history experienced steep declines.  This heightened drilling activity masked the rapid decline and depletion in SandRidge's horizontal Mississippian wells.

259.   Despite oil rates dropping precipitously since March 2012 for the initial SandRidge wells that were producing prior to November 2010, SandRidge continued to make representations that their monitoring of well performance indicated that it was continuing to support the 456 MBOE type well.

260.   For example, during the 5/4/12 Conf Call, Defendant Grubb responded to a question about whether the type curve SandRidge was using should be adjusted for potential eventual decline in the B factor, stating, in pertinent part, as follows:

**Craig Shere –** *Tuohy Brothers – Analyst*

Okay, and one last question, I don't know if Matt wants to take it, but there is some kind of potential eventual decline in the B factor given more results over time? I was just wondering given some of the well results you've announced and more time under your belt, if there's any thought about adjusting the type curves?

**Matt Grubb –** *SandRidge Energy, Inc. – President and COO*

Really, we're not looking at adjusting type curve now. We'll probably do it here at the end of the year. But right now everything looks to be on track with what we have modeled to the 456,000 barrels EUR. We'll look at it again at the end of the year and see how everything's declining and then make a decision at that time.

261. As part of the 5/4/12 Conf Call, Defendants also provided a power point presentation to investors, which maintained that production from its horizontal Mississippian type well remained steady at "204 Mbbl (100% Crude)" and total production of "456 Total Mboe" – a liquid fraction of 45% oil and 55% gas.

262. The statements referenced above in ¶¶259-261 were materially false and misleading when made because they failed to disclose, the adverse facts about: (i) the amount of natural gas relative to oil set forth in ¶152(a)–(c); and (ii) the steep drop in production experienced by SandRidge horizontal Mississippian wells as set forth in ¶153 above. Moreover, the statement that the Company's horizontal Mississippian type well results in oil of "204 Mbbl" and total production of "456 Total Mboe" was materially false and misleading when made because the liquid fraction for typical Mississippian wells at that time was only 35% oil and 65% gas as opposed to the 46% oil and 54% gas that the Company represented.

263. On May 7, 2012, SandRidge filed its quarterly report on Form 10-Q with the SEC for 1Q12 (the "1Q12 10-Q") and reiterated the Company's financial results contained in the 5/3/12 Press Release and the 5/4/12 Conf Call. The 1Q12 10-Q discussed, among other

things, the Company's related-party transactions.  In particular, the 1Q12 10-Q stated in pertinent part:

> The Company enters into transactions in the ordinary course of business with certain related parties.  These transactions primarily consist of purchases related to drilling and completion activities, gas treating services and drilling equipment and sales of oil field services, equipment and natural gas.  During the three-month periods ended March 31, 2012 and 2011, the Company had sales to related parties of $3.7 million and $4.8 million, respectively.  At March 31, 2012 and December 31, 2011, the Company had accounts receivable due from related parties of $1.9 million and $1.6 million, respectively.  These amounts primarily relate to sales of natural gas to Southern Union, the Company's partner in GRLP.

264.   The statements referenced above in ¶263 were materially false and misleading when made because they failed to disclose, the adverse facts about the involvement of the Ward-related entities in the Mississippian set forth in ¶150, which were known to Defendants or recklessly disregarded by them.

265.   The false and misleading statements referenced above in ¶263, which were known, or should have been known, to the Defendants to be materially false and misleading, were then falsely certified by Defendants Ward and Bennett in the 1Q12 10-Q.

266.   On May 11, 2012, an earnings conference call was held for analysts and investors to discuss the financial and operational results of the Miss Trust I for 1Q12.  On the call, Defendant Ward stated, in pertinent part, as follows:

> Thank you, James, and welcome to the SandRidge Mississippian Trust I conference call.  SDT's fourth period results once again surpassed expectations, and in addition to beating the target distribution, we exceeded the incentive threshold for the period.  The successful performance for the period resulted in a distribution slightly under $0.79 per unit which is approximately 20% higher than the $0.65 per unit target distribution.  We continue to be very pleased with the Trust performance and ***the performance of the Mississippian play which in our opinion continues to have the highest rate of return drilling in the United States***.  Now I will turn the call over to

Matt Grubb for a review of SDT's production and drilling results during the period.

267.   The statements referenced above in ¶266 were materially false and misleading when made because they failed to disclose the adverse facts about: (i) the amount of natural gas relative to oil set forth in ¶152(a)–(c); and (ii) the steep drop in production experienced by SandRidge horizontal Mississippian wells as set forth in ¶153 above.   Further, the statement that "the performance of the Mississippian . . . continues to have the highest rate of return drilling in the United States" was materially false and misleading because the Mississippian performed much worse than represented.

**Third Quarter 2012 Statements**

268.   On August 2, 2012, Defendants announced SandRidge's financial results for the second quarter 2012 ("2Q12") and first six months of 2012 in a press release (the "8/2/12 Press Release"), which was filed with the SEC on Form 8-K.   The 8/2/12 Press Release highlighted certain items, including a statement that the "Mississippian daily average production grew 31% quarter over quarter and 199% from the comparable period in 2011." Defendants also "[i]ncreas[ed] 2012 production guidance to 33.0 MMBoe from 32.3 MMBoe," "increase[ed] 2012 capital expenditure guidance to $2.1 billion from $1.85 billion," and "[c]ompleted IPO of SandRidge Mississippian Trust II and sold units of SandRidge Mississippian Trust I raising $615 million in total net proceeds."

269.   With respect to the Company's drilling activities, the 8/2/12 Press Release discussed the Mississippian Play, stating, in pertinent part, as follows:

> During the second quarter of 2012, SandRidge drilled 91 horizontal wells: 71 in Oklahoma and 20 in Kansas.   This brings the total horizontal wells drilled during the first half of the year to 159 wells.   Additionally, SandRidge drilled 20 disposal wells during the second quarter for a total of 37 disposal wells in

the first half of 2012.  To date, 872 horizontal wells have been drilled in the Mississippian play, including 392 drilled by SandRidge.  SandRidge has an inventory of approximately 8,000 drilling locations on approximately 1.7 million net acres.  The company presently has 33 rigs operating in the play: 19 drilling horizontal wells in Oklahoma, 10 drilling horizontal wells in Kansas and four drilling disposal wells.  The company plans to drill approximately 380 horizontal wells in the Mississippian play during 2012 and exit the year with 33 rigs drilling horizontal wells

270.   The 8/2/12 Press Release also discussed the 2Q12 financial results, stating, in

pertinent part:

Oil and natural gas revenue increased 38% to $430 million in second quarter 2012 from $312 million in the same period of 2011 as a result of increased oil production.  ***Oil production increased 65% to 4.6 MMBbls from second quarter 2011 production of 2.8 MMBbls mainly due to continued development of the company's properties in the Mississippian play and Permian Basin and production contributed by the acquisition of Dynamic Offshore Resources, LLC ("Dynamic") in April 2012***.  Second quarter 2012 total production increased 45% to 8.2 MMBoe from 5.6 MMBoe in second quarter 2011.  Realized reported prices, which exclude the impact of derivative settlements, were $85.35 per barrel and $1.87 per Mcf during second quarter 2012. Realized reported prices in the same period of 2011 were $89.09 per barrel and $3.81 per Mcf.

271.   The 8/2/12 Press Release further provided the following "2012 Guidance

Update":

***The production guidance increase reflects current year acquisitions, divestitures, and better than expected performance from the company's core assets***.  Lifting cost projections have decreased due to improved efficiencies throughout the company's core operations and the delay of costs relating to C02 delivery obligations at the Century Plant.   DD&A – ***oil and gas projections have increased primarily as a result of changes in the company's depletion rate as a result of the Dynamic acquisition and the sale of the company's Tertiary assets***.  G&A – cash projections have increased to include transaction costs associated with acquisition and divestiture activity and the Mississippian Trust II initial public offering.  ***The projection for EBITDA from oilfield services, midstream and other increased to reflect improved drilling profit margins*** and higher third party working interests.  Projected P&A cash costs increased due to accelerated P&A activity on offshore properties.

272.    The statements referenced above in ¶¶268-271 were materially false and misleading when made because they failed to disclose the adverse facts about: (i) the involvement of the Ward-related entities in the Mississippian set forth in ¶150; (ii) the amount of natural gas relative to oil set forth in ¶152(a)–(c); (iii) the steep drop in production experienced by SandRidge horizontal Mississippian wells as set forth in ¶153 above; and (iv) the Company's reckless spending in the Mississippian as set forth in ¶151 above, which were known to Defendants or recklessly disregarded by them.    Also, the statement that "Mississippian daily average production grew 31% quarter over quarter and 199% from the comparable period in 2011" was materially false and misleading when made because the Company's massive spending on drilling new wells in the Mississippian play enabled SandRidge to report increasing total oil production numbers in that area even though older wells with more production history experienced steep declines.    This heightened drilling activity masked the rapid decline and depletion in SandRidge's horizontal Mississippian wells.

273.    On August 3, 2012, Defendants held an earnings conference call for analysts and investors (the "8/3/12 Conf Call"), to discuss the financial and operational results and other information set forth in the 8/2/12 Press Release.    During the 8/3/12 Conf Call Defendant Bennett, stated, in pertinent part, as follows:

> CapEx for the quarter was $562 million, down slightly from $570 million in the first quarter. ***80% of the quarter's CapEx was on drilling and production for our E&P operations, concentrated in the Mississippian and Permian.*** We've slowed our land purchases since the first quarter and anticipate spending little on new leaseholds in the remainder of year.  Regarding 2012 CapEx guidance, we're increasing our estimate for full-year's CapEx to $2.1 billion, up from $1.85 billion, primarily due to increased facility cost in the Mississippian and Permian and leasehold acquisition costs.

- 105 -

274.   The statements referenced above in ¶273 – which are not forward-looking because they concern action taken in the past – were materially false and misleading when made because they failed to disclose the adverse facts about: (i) the involvement of the Ward-related entities in the Mississippian set forth in ¶150; (ii) the amount of natural gas relative to oil set forth in ¶152(a)–(c); (iii) the steep drop in production experienced by SandRidge horizontal Mississippian wells as set forth in ¶153 above; and (iv) the Company's reckless spending in the Mississippian as set forth in ¶151 above, which were known to Defendants or recklessly disregarded by them.

275.   On August 8, 2012, SandRidge filed its quarterly report on Form 10-Q with the SEC for 2Q12 (the "2Q12 10-Q") and reiterated the Company's financial results contained in the 8/2/12 Press Release and the 8/3/12 Conf Call.  The 2Q12 10-Q contained substantially the same statements regarding the Company's internal controls as did the 2Q11 10-Q, referenced above in ¶206 and were materially false and misleading for the reasons set forth in ¶150.

276.   The 2Q12 10-Q also discussed the Company's related-party transactions, stating, in pertinent part:

> The Company enters into transactions in the ordinary course of business with certain related parties.  These transactions primarily consist of purchases related to drilling and completion activities, gas treating services and drilling equipment and sales of oil field services, equipment and natural gas.  During the three-month periods ended June 30, 2012 and 2011, sales by the Company to related parties were $3.2 million and $6.9 million, respectively.  During the six-month periods ended June 30, 2012 and 2011, sales by the Company to related parties were $7.0 million and $11.7 million, respectively.  Accounts receivable due from related parties totaled $1.2 million and $1.6 million at June 30, 2012 and December 31, 2011, respectively.  These amounts primarily relate to sales of natural gas to Southern Union, the Company's partner in GRLP.

277.    The statements referenced above in ¶276 were materially false and misleading when made because they failed to disclose the adverse facts about the involvement of the Ward-related entities in the Mississippian set forth in ¶150 which were known to Defendants or recklessly disregarded by them.

278.    The false and misleading statements referenced above in ¶¶275-276, which were known, or should have been known, to the Defendants to be materially false and misleading, were then falsely certified by Defendants Ward and Bennett in the 2Q 2012 10-Q.

279.    On August 14, 2012, Defendant Ward participated in the EnerCom Inc. Oil & Gas Conference (the "8/14/12 Conference"), and he discussed, among other things, the Permian Basin's continued importance for SandRidge: "I mentioned the Central Basin Platform. ***It is still a critical piece of the SandRidge production***. At over 30,000 barrels of oil equivalent per day, we are one of the few operators that can operate in scale on the Central Basin Platform."  As part of his presentation at the 8/14/12 Conference, Defendant Ward provided power point slides, which continued to claim that the liquid fraction for the Mississippian type curve was 45% oil and 55% gas as a result of production numbers of "204 Mbbl (100% Crude)" and "456 Total Mboe."

280.    The statements referenced above in ¶279 were materially false and misleading when made because they failed to disclose the adverse facts about: (i) the amount of natural gas relative to oil set forth in ¶152(a)–(c); and (ii) the steep drop in production experienced by SandRidge horizontal Mississippian wells as set forth in ¶153 above.  In addition, the statements that the Company's horizontal Mississippian type well results in oil of "204

Mbbl" and total production of "456 Total Mboe" were materially false and misleading when made because the liquid fraction for typical Mississippian wells at that time was only 35% oil and 65% gas as opposed to the 46% oil and 54% gas that the Company represented.

281.   On September 5, 2012, Defendant Ward, on behalf of the Company, participated in the Barclays CEO Energy/Power Conference (the "9/5/12 Conference"). During the 9/5/12 Conference, Defendant Ward gave a power point presentation, which, once again, maintained that production from the Mississippian type  well was 45% oil and 55% gas as a result of production numbers of "204 Mbbl (100% Crude)" and "456 Total Mboe."

282.   The statements referenced above in ¶281 were materially false and misleading when made because they failed to disclose the adverse facts about: (i) the amount of natural gas relative to oil set forth in ¶152(a)–(c); and (ii) the steep drop in production experienced by SandRidge horizontal Mississippian wells as set forth in ¶153 above.  Further, the statements that the Company's horizontal Mississippian type well results in oil of "204 Mbbl" and total production of "456 Total Mboe" were materially false and misleading when made because the liquid fraction for typical Mississippian wells at that time was only 35% oil and 65% gas as opposed to the 46% oil and 54% gas that the Company represented.

**Fourth Quarter 2012 Statements**

283.   On October 2, 2012, Defendant Ward gave a presentation at the Johnson Rice & Co LLC Energy Conference.  At that outset, Defendant Ward explained that he is "asked a lot" when the Company is "going to plan to sell our Permian and focus on the Mississippian."  Defendant Ward stated that his response to such a question is that, "[w]hile the Mississippian is our growth asset, *the Permian is core to the Company, and we do not*

*have plans to be selling there.*   We will continue to drill in the Permian because of the high rates of return for oil drilling in the Central Basin Platform of the Permian."

284.   The statement referenced above in ¶283 that "the Permian is core to the Company, and we do not have plans to be selling there" was materially false and misleading when made because the Company was considering selling its Permian assets, as the Company announced shortly thereafter.

### Defendants Were Required to Disclose the Self-Dealing Transactions of the Ward-Related Entities in the Mississippian

285.   Pursuant to Item 13 of Form 10-K, and Item 11 of Form S-1, the Form 10-K's filed by SandRidge and the SandRidge Trusts during the Class Period, and the Registration Statements filed in connection with the SandRidge Trust Offerings, were required to furnish the information required under Item 404 of Regulation S-K [17 C.F.R. §229.407(a)], including a description of transactions in which the registrant was a participant and in which any related person had or will have a direct or indirect material interest.

286.   Item 404(a) of SEC Regulation S-K requires registrants to "[d]escribe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."   Among other things, a registrant is required to disclose the following information:

> The related person's interest in the transaction with the registrant, including the related person's position(s) or relationship(s) with, or ownership in, a firm, corporation, or other entity that is a party to, or has an interest in, the transaction. . . .

*       *       *

Any other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the circumstances of the particular transaction.

287. Additionally, the Instructions to Item 404(a) defines the term "related person" to mean any director of the registrant or ***"[a]ny immediate family member of a director or executive officer of the registrant . . . which means any child* . . ."**

288. Accordingly, Defendants were required to disclose information about the numerous transactions by the Ward-related entities in the Mississippian, including the following:

(a)  that the Ward-related entities acquired huge amounts of land and mineral rights in the Mississippian play that benefitted from SandRidge's spending and development activities in the area.  The Ward-related entities acquired properties and lease holdings in advance of or alongside of SandRidge's holdings;

(b)  the Ward-related entities inappropriately moved ahead of the Company to acquire mineral rights from third-parties, and then flipped them to SandRidge shortly thereafter.  In fact, there were instances where SandRidge acquired mineral rights from Ward-related entities only weeks after they were acquired by the Ward-related entities; and

(c)  the land and mineral rights owned by the Ward-related entities stood to gain financially even if production in the Mississippian was lower than represented by SandRidge or if SandRidge's Mississippian wells did not generate attractive rates of return to SandRidge.

**The SEC filings of SandRidge and the SandRidge Trusts and
the Registration Statements for the SandRidge Trusts Omitted
Known Trends, Events and Uncertainties that Were Impacting,
and Would Impact, the Company's Financial Results**

289.    Pursuant to Item 2 of Form 10-Q, Item 7 of Form 10-K, and Item 11 of Form

S-1, the Form 10-K's and 10-Q's filed by SandRidge and the SandRidge Trusts during the

Class Period, and the Registration Statements filed in connection with the SandRidge Trust

Offerings, were required to furnish the information required under Item 303 of Regulation S-

K [17 C.F.R. §229.303], including any known trends, events or uncertainties that have

caused or are reasonably likely to cause the registrant's financial information not to be

indicative of future operating results.

290.    In 1989, the SEC issued an interpretive release on Item 303 and the disclosure

required under the regulation.  *See* Management's Discussion and Analysis of Financial

Condition and Results of Operations ("MD&A"), SEC Release No. 6835, 1989 WL

1092885, at *1 (May 18, 1989) (hereinafter referred to as "1989 Interpretive Release").  In

the 1989 Interpretive Release, the SEC stated that:

> Required disclosure is based on currently known trends, events and
> uncertainties that are reasonably expected to have material effects, such as: A
> reduction in the registrant's product prices; erosion in the registrant's market
> share; changes in insurance coverage; or the likely non-renewal of a material
> contract. . . .   A disclosure duty exists where a trend, demand, commitment,
> event or uncertainty is both presently known to management and reasonably
> likely to have material effects on the registrant's financial condition or results
> of operation.

*Id*. at *4.

291.    Furthermore, the 1989 Interpretive Release provided the following test to

determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1)  Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.

(2)  If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

*Id*. at *6.

292.   The following were known trends, events, or uncertainties that were having and were reasonably likely to have an impact on the Company's continuing operations and therefore were required to be disclosed by Defendants, but were not:

(a)   The Ward-related entities acquired huge amounts of land and mineral rights in the Mississippian play that benefitted from SandRidge's spending and development activities in the area and even acquired properties and lease holdings in advance of or alongside of SandRidge's holdings.  The land and mineral rights owned by the Ward-related entities stood to gain financially even if production in the Mississippian was lower than represented by SandRidge or if SandRidge's Mississippian wells did not generate attractive rates of return to SandRidge;

(b)   Contrary to their statements about financial discipline and meeting their capital expenditures guidance, Defendants sought to pour more and more money into the Mississippian regardless of the cost to SandRidge, which benefitted the Mississippian holdings of the Ward-related entities;

(c)     The Mississippian was much gassier than represented by Defendants. Production data that SandRidge reported to the Oklahoma Tax Commission showed that SandRidge understated the gas to oil ratio for its typical horizontal well in its Mississippian play and that the oil production relative to gas production as reported was approximately half of that represented by Defendants.  With the large price premium commanded by the market for oil versus natural gas, SandRidge's overstatement of the oil percentage misrepresents and greatly overstates the value of their wells in the Mississippian play;

(d)     Contrary to Defendants' statements during 2011 that SandRidge's Mississippian wells on average produced 52% oil and 48% gas, production data reported by SandRidge reveals that its wells produced less than 40% oil and more than 60% gas during 2011.  Contrary to Defendant's statements during 2012 that its Mississippian wells on average produced 45% oil and 55% gas, production data reported by SandRidge reveals that its wells produced on average 35% oil and 65% gas during 2012;

(e)     Based on production data that SandRidge reported to the Oklahoma Tax Commission, there was a steep drop in oil production rates in SandRidge's older wells by March 2012 and rates were declining much faster than the type well presented by SandRidge;

(f)     The Company's large amounts of spending on drilling new wells in the Mississippian enabled SandRidge to report increasing total production numbers in that area even though older wells with more production history experienced steep declines.  Thus, the increased drilling activity masked the rapid decline and depletion in SandRidge's horizontal Mississippian wells;

(g)     Despite a precipitous drop in oil rates for SandRidge's Mississippian wells, which began no later than March 2012 and continued to drop further between April and June 2012, SandRidge maintained throughout 2012 (until the end of the Class Period) that well performance continued to support an average 456 MBOE type well.  SandRidge should have updated its decline curve and EUR for its typical horizontal Mississippian Play well based on the steep production decline revealed by reported well production data;

(h)     SandRidge grossly overstated the EUR for its typical Mississippian play horizontal well.  Indeed, contrary to Defendants' characterizations during 2012 of the EUR of the typical horizontal Mississippian well, production data provided by SandRidge shows that the EUR for oil was between 84-88% lower, the EUR for gas was between 55-65% lower, and the combined gas/oil equivalent of total production was 68-75% lower than represented by SandRidge throughout 2012; and

(i)     Contrary to Defendants' statements, there was not a single type curve across their entire leasehold extending for hundreds of miles.

### The 10-Ks for SandRidge and the SandRidge Trusts and The Registration Statements for the SandRidge Trusts Omitted Significant Risk Factors Required to be Disclosed Therein

293.    Pursuant to Item 1A of Form 10-K, and Item 3 of Form S-1, the Form 10-K's filed by SandRidge and the SandRidge Trusts during the Class Period, and the Registration Statements filed in connection with the SandRidge Trust Offerings, were required to furnish the information pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.303], including, among other things, a "discussion of the most significant factors that make the offering risky or speculative."  Defendants, however, failed to disclose the following as required under Item 503:

(a)     The land and mineral rights owned by the Ward-related entities stood to gain financially even if production in the Mississippian was lower than represented by SandRidge or if SandRidge's Mississippian wells did not generate attractive rates of return to SandRidge.   There was a significant risk that SandRidge would spend heavily in the Mississippian due to the property and mineral rights holdings of the Ward-related entities regardless of whether it was in the best interest of SandRidge;

(b)     The Mississippian was much gassier than represented by Defendants and SandRidge understated the gas to oil ratio for its typical horizontal well in its Mississippian play.  With the large price premium commanded by the market for oil versus natural gas, SandRidge's overstatement of the oil percentage misrepresents and greatly overstates the value of their wells in the Mississippian play;

(c)     Based on production data that SandRidge reported to the Oklahoma Tax Commission, there was a steep drop in oil production rates in SandRidge's older wells by March 2012 and rates were declining much faster than the type well presented by SandRidge;

(d)     The Company's large amounts of spending on drilling new wells in the Mississippian enabled SandRidge to report increasing total production numbers in that area even though older wells with more production history experienced steep declines.  Thus, the increased drilling activity masked the rapid decline and depletion in SandRidge's horizontal Mississippian wells;

(e)     Despite a precipitous drop in oil rates for SandRidge's Mississippian wells, which began no later than March 2012 and continued to drop further between April to

June 2012, SandRidge maintained throughout 2012 (until the end of the Class Period) that well performance continued to support an average 456 MBOE type well. SandRidge should have updated its decline curve and EUR for its typical horizontal Mississippian Play well based on the steep production decline revealed by reported well production data;

(f)     SandRidge grossly overstated the EUR for its typical Mississippian play horizontal well. Indeed, contrary to Defendants' characterizations during 2012 of the EUR of the typical horizontal Mississippian well, production data provided by SandRidge shows that the EUR for oil was between 84-88% lower, the EUR for gas was between 55-65% lower, and the combined gas/oil equivalent of total production was 68-75% lower than represented by SandRidge throughout 2012;

(g)     Contrary to Defendants' statements, there was not a single type curve across their entire leasehold extending for hundreds of miles; and

(h)     There was a substantial risk that areas where SandRidge was drilling horizontal wells may have had partially depleted reservoirs as a result of the vertical wells drilled in the Mississippian since the 1940s.

## Any Purported Risk Warnings Were Inadequate or Materially False and Misleading

294.     Even though the Company's earnings press releases, conference calls and other Class Period statements may have been accompanied by purported risk warnings or warnings that certain statements may be forward-looking, they did not adequately warn investors about the materially false and misleading statements alleged herein. These risk warnings: (i) were false or misleading as a matter of current or historical fact; and/or (ii) were not meaningful

because, among other things, they were vague, boilerplate and did not adequately warn of the

true risks of investing in SandRidge or the SandRidge Trusts.

295.   For example, the Company's earnings releases stated, in pertinent part, as

follows:

> [W]hether actual results and developments will conform with our expectations
> and predictions is subject to a number of risks and uncertainties, including the
> volatility of oil and natural gas prices, our success in discovering, estimating,
> developing and replacing oil and natural gas reserves, actual decline curves
> and the actual effect of adding compression to gas wells, the availability and
> terms of capital, the ability of counterparties to transactions with us to meet
> their obligations, our timely execution of hedge transactions, credit conditions
> of global capital markets, changes in economic conditions, the amount and
> timing of future development costs, the availability and demand for alternative
> energy sources, regulatory changes, including those related to carbon dioxide
> and greenhouse gas emissions, and other factors, many of which are beyond
> our control. . . .

296.   Likewise, the Registration Statements for the SandRidge Trusts, as well as the

SandRidge Trusts' annual reports filed with the SEC on Form 10-K stated, in pertinent part,

as follows:

> It is not possible to measure underground accumulations of oil and natural gas
> in an exact way, and estimating reserves is inherently uncertain.  Ultimately,
> actual production and revenues for the Underlying Properties could be
> materially less than estimated amounts.  Petroleum engineers are required to
> make subjective estimates of underground accumulations of oil and natural gas
> based on factors and assumptions that include:
>
> *       *       *
>
> Reserve estimates for fields that do not have a lengthy production history are
> less reliable than estimates for fields with lengthy production histories.  A lack
> of production history may contribute to inaccuracy in estimates of proved
> reserves, future production rates and the timing of development expenditures.
> Most of the Producing Wells have been operational for less than one year and
> estimated total reserves vary substantially from well to well and are not
> directly correlated to perforated lateral length or completion technique.
> Although SandRidge and Netherland Sewell analyzed historical production
> data from vertical wells drilled in the AMI since the 1940s, there can be no

assurance that this data can accurately predict future production from horizontal wells. The lack of operational history for horizontal wells in the Mississippian formation may also contribute to the inaccuracy of estimates of proved reserves. A material and adverse variance of actual production, revenues and expenditures from those underlying reserve estimates, would have a material adverse effect on the financial condition, results of operations and cash flows of the trust and would reduce cash distributions to trust unitholders.

297. The statements referenced above in ¶¶295-296 were false or misleading as a matter of current or historical fact and/or were not meaningful because Defendants should have warned that the gas to oil ratio for SandRidge's Mississippian horizontal wells was higher than represented throughout the entire Class Period, that its older wells in the Mississippian wells had begun to experience steep drilling declines in March 2012, and that the EUR for its typical horizontal Mississippian well was grossly overstated and should have been reduced as a result of the steep drop in production. Additionally, the purported warnings do not disclose that data that existed at the time of the statements revealed that the economics of SandRidge's horizontal Mississippian type wells was much worse than portrayed by Defendants.

## END OF CLASS PERIOD DISCLOSURES

298. After the close of trading on November 8, 2012, Defendants issued a press release disclosing the Company's financial results for the third quarter 2012 (the "11/8/12 Press Release"), and reported a "net loss applicable to common stockholders of $184 million, or $0.39 per diluted share, for third quarter 2012 compared to net income available to common stockholders of $561 million, or $1.16 per diluted share, in third quarter 2011." Furthermore, the 11/8/12 Press Release stated that SandRidge was "exploring the sale of its assets in the Permian Basin, other than those associated with the SandRidge Permian Trust."

299.    Also on November 8, 2012, Dnakar Singh ("Singh"), CEO of New York-based TPG-Axon, which then owned 4.5% of SandRidge's stock, publicly issued a letter addressed to the SandRidge Board of Directors calling for Defendant Ward's resignation, citing among other things SandRidge's "disastrous performance" and over 76% decline in its stock price since its IPO in 2007.    Emphasizing that SandRidge had overpaid Ward who he characterized as an "insatiable spender" with an incoherent strategy, Singh attacked Ward's "egregious" compensation of $150 million over the prior five years and challenged Ward's unchecked "rife" self-dealing, stating, in pertinent part, as follows:

> Tom Ward has been the single highest compensated CEO among all energy companies, and among the highest compensated CEOs in America . . . despite destroying more shareholder value than 99% of other companies and CEOs.
>
> **The company has been rife with self-dealing, at the expense of shareholders and for the benefit of Mr. Ward**.
>
> \*        \*        \*
>
> What has Mr. Ward done with his wealth, including the $150 million in payments from SandRidge? **He has bought massive holdings of ranchland, and then turned around and leased the land to SandRidge for future exploration**.    Therefore, some payments to Mr. Ward continue – they have simply changed form. . . .

300.    On November 9, 2012, before the opening of the market, Defendants held a conference call for analysts and investors to discuss the financial results and other information set forth in the 11/8/12 Press Release (the "11/9/12 Conf Call").    On the call, Defendant Ward acknowledged that SandRidge had been overstating the value of its Mississippian assets throughout the Class Period, disclosing that in reality, the Company's Mississippian formation assets consisted of far more low-margin natural gas deposits and far fewer high-margin oil deposits than the market had previously been led to believe:

- 119 -

As we continue to grow the Mississippian well count across a larger area, we also are seeing an increase in our natural gas production. ***And this increase has been offset by a lower amount of oil than we anticipated at the beginning of last year***.

301.    During the 11/9/12 Conf Call, an analyst expressed concern over the drop in oil production in the Mississippian and Defendant Ward conceded that the Mississippian formation assets would produce only 40% oil going forward, rather than 45% as Defendants had been using in their projections throughout the Class Period, with the rest of production comprised of lower margin natural gas:

**Charles Meade –** *Johnson Rice & Co. – Analyst*

…You know, Tom, I recognize that you guys have a lot more -- well, you guys have all the data, or almost -- you know, you guys have half of the whole industry data on the Mississippian.  So you have a lot more you can look at and, I guess, draw comfort from, than we will have here.

***But I think from our perspective, and a lot of people, you're looking at this from the outside and you see 25% of the per well EUR oil go -- you know, kind of disappear in the Mississippian.  It kind of makes you sit up in your chair.  And you, you know, you kind of wonder -- is this the right time to be, you know, increasing concentration in the Mississippian play, when the play kind of just shifted on you***?  And so, can you kind of tell your, you know, your thought process there?  Or maybe kind of give some detail on why you have -- you know, what your comfort level is?

**Tom Ward –** *SandRidge Energy, Inc. – Chairman and CEO*

Sure.  ***We're looking at a well now that has about 40% projected oil in it instead of 45%***.  But the key is the rate of return, whether we're producing oil, water, or anything else, is that we focus on a rate of return.  And even at depressed gas prices, we can see 50% rates of return.  And I don't know any other plays where you can consistently drill -- 1,100 wells that have been drilled, there are 500 wells -- and have these types of rates of return over such a large area.  And so in my opinion, it's a very low-risk area that has very high-rates of return.  Whether it's producing oil or natural gas.

302.    During the 11/9/12 Conf Call, Defendant Grubb explained, in pertinent part, that, as a result of the decline in oil production, the Company was "revising [its] 2012

production guidance up by 5% on natural gas to 93 Bcfs and down about 2% of oil to 17.8 million barrels of oil."

303.   Defendant Bennett also acknowledged that the Company was seeking to sell the valuable Permian Basis assets in order to focus even more on the Mississippian, stating, in pertinent part:

> Today, as we look forward to, and plan for, beyond 2013, we believe it's a favorable time to look at monetizing our Permian assets.  Mature, cash flowing, conventional oil assets such as these are earning attractive valuations in the market.  ***By monetizing our Permian assets and using the proceeds to reduce debt and improve liquidity, we can focus our capital on the higher-growth and much larger-scale Mississippian***, and have a business plan that is fully funded through 2014.

304.   In addition to being surprised by the oil production decline in the Mississippian, analysts were concerned and confused about the Company's sale of its valuable Permian Basin assets.  During the 11/9/12 Conf Call, analysts questioned Defendant Ward about why the Company would sell the higher-margin producing Permian Basin oil assets while retaining the lower-margin primarily natural gas producing Mississippian formation assets.  Defendant Ward responded, in pertinent part, as follows:

> **Brian Liveley** - *Tudor, Pickering, Holt & Co. - Analyst*
>
> Okay.  I guess, really where I'm going with the question is -- I imagine you guys have a number of options in terms of helping the liquidity.  And just -- **I'm just kind of curious on what other opportunities you guys looked at. You know, versus doing the Permian sale, given that these are pretty high-margin barrels.**
>
> **Tom Ward** - *SandRidge Energy Inc - Chairman and CEO*
>
> Sure.  The other option is that you just keep the Permian and continue to -- and cut back CapEx, and drill in just the Mississippian, but have the production in the Permian.  That's the way we modeled the Company. So that is our other option.  Depending on what the sale price comes in on the Permian.

**Brian Liveley** - *Tudor, Pickering, Holt & Co. - Analyst*

***Tom, I'm just confused on why is the existing plan not the best option***?

**Tom Ward** - *SandRidge Energy Inc - Chairman and CEO*

Well, because we think the Permian assets will bring a premium and -- in the market.  Because of other sales that have happened in the Permian.  And if it does, then it would be a better asset in someone else's hands that has maybe a lower cost of capital, or has the ability to focus just on the Permian.  Where we have two very large assets to try to grow.

**Brian Liveley** - *Tudor, Pickering, Holt & Co. - Analyst*

***That's understandable, but it just seems like it's probably some of the higher-margin barrels you have within the organization***.

**Tom Ward** - *SandRidge Energy Inc - Chairman and CEO*

Well, I don't think you're taking into context how much we might receive from it.  So there's nothing that makes us sell the Permian.

305.    Analysts were disappointed with the lower oil volumes and higher gas to oil ratio.  On November 9, 2012, Global Hunter Securities noted in a research report on the Company that "[f]lowing lower-oil volume . . . through our valuation model substantially reduced our valuation estimate to $5 per share from $9," and added that "[i]n response to this reduction in estimated equity value we are reducing our Buy rating to Neutral."  Stifel Nicolaus also reduced its price target to $8.50 from $10, stating the Company's 2013 production guidance of 39.2 million barrels of oil equivalent was disappointing because it indicated more growth in natural gas volumes.

306.    As a direct result of Defendants' disclosures set forth above, and a materialization of the undisclosed risk of investing in SandRidge, the price of SandRidge common stock fell precipitously.

307.   On November 8th and 9th, 2012, the shares of SandRidge common stock declined from a closing price of $6.10 per share to close at $5.51 per share on November 9th (a 9.7% decline and a 57.6% decline from the Class Period high of $12.97 per share reached on April 4, 2011), on heavy trading volume.  This drop removed the inflation from the price of SandRidge common stock, causing real economic loss to investors who had purchased SandRidge's common stock during the Class Period.

308.   A November 14, 2012 analyst report on the SandRidge Trusts by RBC Capital Markets stated, in pertinent part, as follows:

> Parental Guidance: Royalty Trust Performance
> Following in Parent's Footsteps
> Revising estimates for SandRidge Trusts on
> Mississippian Type-Curve Revisions
>
> **SDR:**
> **Mississippian Gas Cut Concerns Drive Type Curve Revision**.  On its 3Q12 conference call, SandRidge Energy (SD) noted that its assumed average type curve for the horizontal Mississippian was to be revised downward, and included a higher gas cut than previously thought.  Management has lowered its type-curve model by 10% to around 415 MMboe based on its larger set of information of ~400 wells with production history greater than 30 days.  ***The average well is now around 38% oil, which is much lower than +50% expectation from a year ago***.  While still economic at an estimated IRR of 10.4%, the decrease in royalty income negatively impacts our estimates for SDR, we note that our assumed production split for SDT previously reflected the increased gas cut based on the recent production results which we view as a variation in the play.
>
> **Reducing SDR PT to $19 from $22; Adjusting Estimates**.  Based on our revised type-curve and changes to our production estimates, we are reducing SDR's price target by 14% to $19.  We are decreasing FY 2012 production 3.3% to 5.2 Mboe/d and DPU 9.2% to $1.87.  We are decreasing FY 2013 production 9.0% to 6.9 Mboe/d and DPU 15.1% to $2.66.  We are decreasing FY 2014 production 6.8% to 7.7 Mboe/d and DPU 13.4% to $2.99.
>
> **Updating Type Curve Estimate**.  Our revised Mississippian type curve includes a 422 Mboe EUR, IP rate of 287 boe/d (unchanged) and a year-one

decline of 65%. These new inputs result in an average IRR per well of 30% and B.E. of $30.02/boe.

309. A November 19, 2012 analyst report on the Miss Trust I by Wells Fargo on November 19, 2012 stated, in pertinent part, as follows:

SDT: Lowering Estimates And Valuation On Updated Type Curve

- **Summary**. Following comments from management of SandRidge Energy, the sponsor of SDT, regarding horizontal Mississippian well performance we are lowering our EPU estimates and valuation range as a result of an updated type curve. *SD management indicated that horizontal Miss wells are experiencing a greater than anticipated decline in oil volumes. As such, SD has reduced per well EURs to 421,000 Boe (37% oil) from 456,000 (45% oil)*. We are updating our type curve and production model to reflect the revised economic assumptions and as a result *we are lowering our EPU estimates for 2012/2013 to $2.97/$2.82 from $3.07/$3.29 previously. In addition, we are lowering our valuation range to $15-$18 from $18-$22 previously to reflect our revised fair value estimate of $17.26*.

- **Horizontal Miss EURs More Gassy**. On its quarterly conference call, management from SandRidge Energy, the sponsor of SDT, indicated that with over 500 wells now on production, representing nearly half of the wells drilled to date in the play, *the data indicates that oil production rates are declining at a faster than previously anticipated rate*. As a result, the company is reducing EURs due to the steeper decline rate for oil and we are now updating our model to reflect these assumptions. *For the horizontal Miss, we are now modeling EURs of 421,000 Boe comprised of 1.6 Bcf of gas (63% of projected EUR) and 155,000 bbls of oil (37%). Previously, our economic assumptions were based on an EUR of 456,000 Boe comprised of 1.5 Bcf of gas (55%) and 204,000 Bbls of oil (45%)*. Further details on our economic assumptions are included in exhibit 1.

310. In December 2012, TPG-Axon commenced a formal consent solicitation to declassify the seven-member board of SandRidge and replace all of its incumbent directors. In response, SandRidge initiated its own consent revocation solicitation to defeat TPG-Axon.

311. On January 24, 2013, attached to the Company's Form DFAN14A, which was filed with the SEC, was a presentation from TPG-Axon (the "First TPG-Axon Presentation"). The First TPG-Axon Presentation discussed related-party transactions

between the Company and the Ward-related entities during the Class Period.  For example, the First TPG-Axon Presentation noted several instances of improper flipping of land and mineral rights.  It also commented on the improper front running that had been occurring with the Ward-related entities, whereby the Ward-related entities would purchase acreage mere weeks before SandRidge purchased acreage in adjacent plots, and then either sell its holdings or hold on to them and realize tremendous gains from appreciation.  This presentation provided additional detail concerning Ward's self-dealing, which was first revealed in TPG-Axon's letter on November 8, 2012.

312.   On February 8, 2013, attached to the Company's Form DFAN14A, which was filed with the SEC, was a second presentation from TPG-Axon (the "Second TPG-Axon Presentation"), which discussed, among other things, the related-party transactions the Company had engaged in with the Ward-related entities.  On February 20, 2013, attached to the Company's Form DFAN14A, which was filed with the SEC, was a third presentation from TPG-Axon (the "Third TPG-Axon Presentation"), which further discussed the breadth of related-party transactions between the Company and the Ward-related entities.  For example, the Third TPG-Axon Presentation noted that there was extensive overlap between the areas that the Ward-related entities had acquired and the areas that SandRidge was either operating in or had an interest in.  Moreover, the Third TPG-Axon Presentation discussed the massive amounts of capital that the Company was spending on development and critical infrastructure in areas adjacent to the Ward-related entities' holdings.  In particular, the Third TPG-Axon Presentation commented that this investment by the Company could cause the adjacent holdings to be worth billions of dollars.  This presentation provided additional detail

concerning Ward's self-dealing, which was first revealed in TPG-Axon's letter on November 8, 2012.

313.   During a March 5, 2013 "2013 Investor/Analyst Meeting," Defendants revealed that SandRidge's combined oil and gas EUR in the Mississippian for year end 2012 was actually only 338 Mboe – a *25% decrease* from the 456 Mboe Defendants reported during the same time.

314.   On March 13, 2013, the Company announced that in response to issues raised by TPG-Axon, the Company's board will perform an investigation and review many of the self-dealing transactions engaged in by the Ward-related entities and that are described herein.  The Company announced that it expected the results of that review to be completed no later than June 15, 2013 and that the "Board of Directors will decide by June 30, 2013, whether or not to terminate Mr. Ward's employment" as a result of the findings of the investigation.

315.   On or about April 1, 2013, the Company gave a presentation to investors ("4/1/13 Investor Presentation") and discussed, among other things, the performance in specific counties within the Mississippian.  Notably, instead of providing a single type curve for its entire Mississippian plan, the Company now provided fifteen different decline curves for the various counties in the Mississippian, each with a different EUR.  Thus, Defendants acknowledged that there was not a single type curve for SandRidge's Mississippian play.

316.   On April 8, 2013, the Company announced that it had retained a law firm to review Defendant Ward's allegedly wrongful self-dealing transactions.

317.   On June 19, 2013, the Company announced that the board had completed its investigation and that Defendant Ward was terminated as Chairman and CEO of the Company.

## ADDITIONAL SCIENTER ALLEGATIONS

318.   As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company or the SandRidge Trusts (or in their own name) were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding SandRidge, their control over, and/or receipt and/or modification of SandRidge's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

319.   Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company.

320.   As alleged above in great detail, Defendants knew, or recklessly disregarded, that the economics of the typical SandRidge Mississippian horizontal well was misrepresented and the economic value was overstated.  Throughout the Class Period, Defendants knew, or recklessly disregarded, that the Mississippian was much gassier than

represented by Defendants and that the gas to oil ratio was much higher than represented. Defendants knew, or recklessly disregarded, that there was a steep drop off in production rates of SandRidge's older horizontal Mississippian wells by March 2012 and that the decline continued thereafter.  As such, Defendants knew, or recklessly disregarded, that the EUR for the typical SandRidge horizontal well in the Mississippian was overstated and should have been reduced.

321.   Defendants knew, or had reason to know, of these facts during the Class Period because they are based on production data that SandRidge reported to the Oklahoma Tax Commission and throughout the Class Period, the Company repeatedly insisted that it "continually monitored" its reserves.

322.   The Reservoir Engineering Department was headed by Rodney Johnson, Executive Vice President-Reservoir Engineering, who was one of the most senior executives within the Company.   Because SandRidge claimed that its "Reservoir Engineering Department continually monitors asset performance and makes reserves estimate adjustments, as necessary, to ensure the most current reservoir information is reflected in reserves estimates," Rodney Johnson would have had actual knowledge of the Mississippians' underperformance.  SandRidge, through Rodney Johnson, had knowledge of the underperformance of the Mississippian.

323.   Furthermore, the true facts about the production and economics of the Mississippian, among others, were reported to SandRidge's senior management by the Company's Reservoir Engineering Department.  Reserve reports were reviewed by, among others, "the Audit Committee, the CFO (*i.e.* Defendant Bennett), Senior Vice President of

Accounting, Vice President of Internal Audit, Vice President of Financial Reporting, Treasurer and General Counsel."  Indeed, the Reservoir Engineering Department reported directly to the Company's President, Defendant Grubb, independently from all of SandRidge's operating divisions.  Moreover, each quarter, the Executive Vice President of Reservoir Engineering presented the status of SandRidge's reserves, including the reserves associated with the SandRidge Trusts, to the Executive Committee, of which the SandRidge Individual Defendants were members.

324.    According to the FEs, SandRidge senior executives – including the Individual Defendants – were kept apprised of the performance within the Mississippian on, at least, a weekly basis.  Defendants Ward and Grubb attended weekly Management Meetings at which management and senior geologists discussed the status of drilling and production levels. Defendants Ward and Grubb also attended Exploration Meetings at which landmen, reservoir engineers, geologists, and executives discussed drill schedules, wells that were going to be drilled, prospective drilling areas, and production at existing wells, including the poor performance of the Mississippian.  Additionally, at weekly Team Meetings, which were led by Rodney Johnson or Paul Stark, the team discussed production and then reported information to Defendant Ward.  In addition to learning about the poor performance of the Mississippian at weekly meetings, SandRidge senior executives, including Ward, were emailed Drilling and Completion Reports that discussed the performance of the Company's wells.

325.    Additionally, at the time of the statements alleged herein made during the Class Period, each of the Individual Defendants was aware of the nature of the transactions

engaged in by the Ward-related entities.  Defendants knew or recklessly disregarded, that the Ward-related entities had acquired, and were continuing to acquire, massive amounts of land and mineral rights in the Mississippian.  Defendants also knew, or recklessly disregarded, that the land and mineral rights owned by the Ward-related entities stood to gain financially even if production in the Mississippian was lower than represented by SandRidge or if SandRidge's Mississippian wells did not generate attractive rates of return to SandRidge.

326.   Defendant Ward knew about these facts because they were engaged in by him or for the benefit of his immediate family.  The other Individual Defendants knew about these transactions because the Company had engaged in numerous transactions with the Ward-related entities and due to their longstanding and close relationship with Defendant Ward.

327.   Defendants possessed knowledge of facts or had access to information contradicting their public statements.  Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs of fraud.  Furthermore, Defendants turned a blind eye as the Ward-related entities continued front-running SandRidge by acquiring land ahead of the Company, then flipping it back to SandRidge, or realizing large gains through appreciation.  As Defendants were aware or recklessly disregarded, Ward continuously used the Company's resources to misappropriate and acquire intelligence to acquire acreage to benefit himself and the Ward-related entities.

328.   The fraud alleged herein relates to the core business and operations of SandRidge so knowledge of the fraud may be imputed to Defendants.  Given Defendants' knowledge of the truth concerning Defendant Ward's self-dealing, related-party transactions,

the fact that SandRidge overstated its oil reserves, oil to gas ratio, and economics of its typical horizontal well in the Mississippian, and the dismal increases in cash and cash equivalents as compared to the exorbitant increases in the Company's capital expenditures, the positive statements detailed above, made contemporaneously with that knowledge, were false and/or misleading.  Furthermore, these facts were known by SandRidge employees in senior positions at SandRidge and their knowledge can be imputed to SandRidge itself.

329.   Defendants' materially false and misleading statements and material omissions caused SandRidge's common stock to be artificially inflated.

330.   Additionally, the magnitude of the misrepresentations of SandRidge's oil and gas production (overstatement of oil EUR by **84%** and an overstatement of gas EUR by **55%**) further supports Defendants' knowledge that the Company was radically overstating its production in the Mississippian.  As alleged above, the oil production rate for SandRidge's older Mississippian wells – with longer, more reliable production histories – dropped from an average of 34 barrels of oil per day in February 2012 to an average of 16 barrels of oil per day in March 2012.  Likewise, from April 2012 to September 2012, well production dropped by an additional alarming **84%** from the preceding six-month period.  Significant declines such as these would have been readily identified by the Company's well performance monitoring program and discussed during internal meetings, and the drop along with the impact on EUR would have been reported to Ward, Bennett, Grubb, and other senior executives within the Company.  Indeed, in its 2012 year-end reserve report, Netherland Sewell revised Trust I oil reserves downward by 52% and revised Trust II oil reserves down by 53%.

331.    Finally, Ward's knowledge of SandRidge's production in the Mississippian is supported by his personal interest in the region through the Ward-related entities.  Even if Ward had been derelict in his duties as CEO of SandRidge and a member of the Executive Committee, and had not been actively monitoring the Company's core oil production holdings, he would have been aware of the Mississippian's production reports by virtue of his vast personal interests in the area.

332.    Additionally, Defendants possessed substantial motives for misrepresenting SandRidge's financial status, operations, and acquisition and monetization prospects throughout the Class Period.

333.    Defendant Ward had a significant motive for engaging in the fraud alleged herein.  The Ward-related entities acquired massive amounts of land and mineral rights in the Mississippian and reaped huge financial rewards as a result of SandRidge's spending and development in that area.  As Defendant Ward admitted, the Company was able to acquire acreage for an average price of less than $175 per acre, and by August 2012, the value skyrocketed to about $15,000 per acre.

334.    SandRidge's heavy investment in the Mississippian play benefitted Ward in connection with the exceedingly lucrative flipping and adjacent-land transactions by the Ward-related entities.  The Ward-related entities earned millions of dollars through the sale of assets to SandRidge through flipping transactions.  SandRidge's acquisition, drilling and development activities caused the holdings of the Ward-related entities to increase substantially in value.

335.    As acknowledged by SandRidge, the value of acreage in the Mississippian increased exponentially once they become more high profile and as more investment was made in the area.  In fact, on March 26, 2012, SandRidge stated, during a presentation at the Barclays High Yield Conference, that its Mississippian land appreciated by 21 times its value ($200 per acre purchase price), implying a value of $4,236 per acre.

336.    The Ward-related entities held interests of 475,000 acres in the Mississippian. Applying the same value to the Ward-related entities, ($4,236 per acre), ***the value of the Ward-related entities' 475,000 acres in the Mississippian was approximately $2 billion at that time*** (475,000 acres x $4,236 [rate at which SandRidge monetized its assets] = $2,012,100,100).[4]  This is consistent with TPG-Axon's conclusion that the land acquired by the Ward-related entities could be worth billions of dollars.

337.    The success of the transactions by the Ward-related entities was intertwined with SandRidge's massive amount of spending in the Mississippian.  Toward that end, Ward was motivated to misrepresent SandRidge's production in the Mississippian and the financial condition and stability of the Company in order to maintain SandRidge's spending in the Mississippian to benefit the Ward-related entities.  These misrepresentations also enabled SandRidge to fund its Mississippian program by raising capital through a series of lucrative offerings and asset sales, including almost $1 billion through the Trusts.

338.    Furthermore, Defendant Ward and his management team earned extremely lucrative compensation packages regardless of the financial performance of the Company.

---

[4]    Further, SandRidge stated that the current implied value of its holdings in the Mississippian was $15,000 per acre, which would value the Ward-related entities' holdings at approximately $7.125 billion.

Indeed, they were among the highest paid in their industry, even though the Company's revenue of $1.4 billion ranked it in the bottom half of publicly traded exploration and production companies. Specifically, Defendant Ward's compensation increased 16% in 2011, up from $21.7 million in 2010. His pay increased 58% the year before, up from $13.7 million in 2009. In 2012, Ward made an additional $21 million, despite the fact that SandRidge stock declined 22%. Defendants Ward and Grubb were among the highest paid executives of any of SandRidge's peer companies, all of which outperformed SandRidge. In addition, SandRidge directors made approximately $360,000 per year, which is about $80k to $90k more than received by directors of Exxon-Mobil, a company of over 130 times SandRidge's market capitalization. Thus, the SandRidge Individual Defendants had strong motive to turn a blind-eye to the fraud alleged herein.

339. Further, Executive Vice Presidents Rodney Johnson and Todd N. Tipton, other insiders, and a large shareholder of the Company sold shares of SandRidge stock when it was artificially inflated during the Class Period, as depicted in the below chart:

**SandRidge Energy Inc (SD-N)**
Summary of Insider Stock Sales

| Filer Name | Title | Transaction Date | Ownership Direct Indirect | Shares Sold | Price | Proceeds |
|---|---|---|---|---|---|---|
| CHANG WAYNE C | Officer | 01-Mar-2011 | D | 11,591 | $10.83 | $125,531 |
| | | 01-Mar-2011 | I | 7,956 | $11.00 | $87,516 |
| | | | | 19,547 | | $213,047 |
| | | | | | | |
| FAIRFAX FINANCIAL | Beneficial Owner of More | | I | | | $1,176,904 |
| HOLDINGS LTD | than 10% Class | 18-Jul-2011 | | 104,800 | $11.23 | |
| | | 18-Jul-2011 | I | 1,395,200 | $11.16 | $15,570,432 |
| | | 19-Jul-2011 | I | 6,870,000 | $11.38 | $78,180,600 |
| | | 20-Jul-2011 | I | 5,000,000 | $11.35 | $56,750,000 |
| | | 21-Jul-2011 | I | 2,000,000 | $11.26 | $22,520,000 |
| | | 22-Jul-2011 | I | 1,590,600 | $11.59 | $18,435,054 |
| | | | | 16,960,600 | | $192,632,990 |
| | | | | | | |
| Johnson (Rodney E) | Officer | 15-Mar-2012 | D | 28,000 | $8.37 | $234,360 |
| Johnson (Rodney E) | Officer | 16-Mar-2012 | I | 11,053 | $8.48 | $93,729 |
| | | | | 39,053 | | $328,089 |
| | | | | | | |
| Tipton (Todd N) | Officer | 10-May-2011 | D | 4,000 | $11.00 | $44,000 |
| | | 20-May-2011 | D | 3,375 | $10.60 | $35,775 |
| | | 20-May-2011 | D | 4,254 | $10.59 | $45,050 |
| | | 27-May-2011 | D | 17,790 | $12.07 | $214,725 |
| | | 23-Mar-2012 | D | 14,601 | $8.04 | $117,392 |
| | | 23-Mar-2012 | D | 11,074 | $8.10 | $89,699 |
| | | 03-Apr-2012 | D | 4,000 | $8.03 | $32,120 |
| | | | | 59,094 | | $578,762 |
| | | | | | | |
| | | Totals: | | 17,078,294 | | $193,752,888 |

## LOSS CAUSATION/ECONOMIC LOSS

340.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of SandRidge's common stock and operated as a fraud or deceit on Class Period purchasers of SandRidge's common stock.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of SandRidge common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of SandRidge's common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

341.   Defendants' false and misleading statements had the intended effect and caused SandRidge's common stock to trade at artificially inflated levels throughout the Class Period.

342.   As a direct result of Defendants' disclosures set forth above, and a materialization of the undisclosed risk of investing in SandRidge common stock, the prices of SandRidge's common stock fell precipitously.  These drops removed the inflation from the price of SandRidge common stock, causing real economic loss to investors who had purchased SandRidge common stock during the Class Period.

343.   On August 4, 2011, among other things, Defendants announced that the Company was accelerating activities in the Mississippian and that the Company's capital expenditures were being increased by $500 million, from $1.3 billion to $1.8 billion due in large part to increased spending in the Mississippian, which benefitted the Ward-related entities, as set forth in ¶¶198-200 above.  In response to the Company's announcements on August 4, 2011 and related Conference Call on August 5, 2011, the price of SandRidge

common stock fell.  It declined $1.41 per share, or 12.6%, from a close of $11.17 per share before the announcements, to close at $9.76 on August 4, 2011, on extremely heavy volume of 34.3 million shares.  In the following days, the price of SandRidge common stock continued to decline, reaching $7.79 on August 5, 2011, on heavy volume of 69.7 million shares, and then $6.55 only four days later on August 8, 2011, again on heavy volume of 42.3 million shares, dropping over 44% between August 4th and 8th, 2011.

344.   On November 8, 2012, Defendants issued a press release disclosing the Company's financial results for the third quarter 2012 (the "11/8/12 Press Release"), reporting a loss of $184 million, or 39 cents per share, in the 3Q12, compared with a profit of $561 million, or $1.16 per share, in the 3Q11.

345.   That same day, as described more fully above in ¶299, TPG-Axon issued a public letter to the Company's board of directors questioning Defendant Ward's conduct as CEO, including his self-dealing.  The letter, among other things, disclosed that Defendant Ward was paid approximately $150 million over the past five years and with that money, "*he has bought massive holdings of ranchland, and then turned around and leased the land to SandRidge for future exploration*."  Thus, the letter suggested that Defendant Ward had been moving ahead of SandRidge in identifying and purchasing attractive land and mineral rights, and then profiting at the expense of SandRidge's investors.  In other words, the letter discussed Defendant Ward's front-running activities.  Defendants' misstatements and omissions concealed the risk of, among other things, capital expenditures being increased to benefit the Ward-related entities to the detriment of SandRidge.  They also concealed the risk

of Ward and the Ward-related entities competing against and profiting from SandRidge in the Mississippian.

346.   During a conference call held with investors before the market opened the following day, November 9, 2012 ("11/9/2012 Call"), Defendant Ward acknowledged that SandRidge had been overstating the value of its Mississippian assets throughout the Class Period, disclosing that the Company's Mississippian formation assets consisted of far more low-margin natural gas deposits and far fewer high-margin oil deposits than the market had previously been led to believe.

347.   During the 11/9/2012 Call, Defendants also disclosed that SandRidge would be selling its valuable Permian Basin assets to focus more on the Mississippian.

348.   On November 8th and 9th, 2012, the shares of SandRidge common stock declined from a closing price of $6.10 per share to close at $5.51 per share on November 9th (a 9.7% decline and a 57.6% decline from the Class Period high of $12.97 per share reached on April 4, 2011), on heavy trading volume.  This drop removed the inflation from the price of SandRidge common stock, causing real economic loss to investors who had purchased SandRidge's common stock during the Class Period.

349.   The declines in the price of SandRidge common stock after the disclosures on August 4th and 5th, 2011 and November 8th and 9th, 2012, came to light were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market and as the risk of Defendants' fraud materialized.

350. The risks that were within the zone of risk concealed by Defendants' misstatements and omissions caused Plaintiffs' and the Class's losses when the risks materialized.

351. The timing and magnitude of the price declines in SandRidge's common stock negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of SandRidge's common stock and the subsequent significant decline in the value of SandRidge's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

352. At all relevant times, the market for SandRidge common stock was an efficient market for the following reasons, among others:

(a)    SandRidge common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, SandRidge filed periodic public reports with the SEC and the NYSE;

(c)    SandRidge regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services; and

(d)     SandRidge was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

353.   As a result of the foregoing, the market for SandRidge common stock promptly digested current information regarding SandRidge from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of SandRidge's common stock during the Class Period suffered similar injury through their purchase of SandRidge common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

354.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

(a)     None of the false and misleading statements pleaded herein are "forward looking statements" as the term is defined in Section 21E(h)(i)(1) of the Exchange Act [15 U.S.C. §78u-5(h)(i)(1)].  For example, the alleged false and misleading statements concerning capital expenditures are not "forward-looking statements" because they do not "contain[] a projection of . . . capital expenditures. . . ." 15 U.S.C. §78u-5(h)(i)(1)(A).

(b)     Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.

(c)     To the extent there were any forward-looking statements identified as such, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

(d)     To the extent there were any forward-looking statements identified as such, (i) the statements made by a natural person were made with actual knowledge by that person that the statement was false or misleading and (ii) the statements made by a business entity were made by or with the approval of an executive officer of that entity; and made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

355.    Any oral forward-looking statements made by Defendants also do not satisfy the requirements of 15 U.S.C. §78u-5(c)(1)(A) because:

(a)     The oral forward-looking statements were not accompanied by a cautionary statement that the particular oral statement is a forward-looking statement and that the actual results might differ materially from those projected in the forward-looking statement;

(b)     The oral forward-looking statements were not accompanied by an Oral Statement About Additional Information (defined *supra* ¶174);

(c)     Regardless, any accompanying Oral Statement About Additional Information did not identify the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement ("Document With Additional Information"); and

(d)     Regardless, the information contained in the Document With Additional Information was not a cautionary statement that satisfies the standard established in 15 U.S.C. §78u-5(c)(1)(A).

## COUNT I

### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against SandRidge, Ward, Grubb, and Bennett

356.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

357.     This Count is asserted against Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

358.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

359.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

360.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/ or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the SandRidge common stock

during the Class Period in an effort to maintain artificially high market prices for SandRidge

common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

Defendants are sued either as primary participants in the wrongful and illegal conduct

charged herein or as controlling persons as alleged below.

361.   Each of the Individual Defendants' primary liability, and controlling person

liability, arises from the following facts: (i) the Individual Defendants were high-level

executives and/or directors at the Company during the Class Period and members of the

Company's management team or had control thereof; (ii) each of the Individual Defendants,

by virtue of his responsibilities and activities as a senior officer and/or director of the

Company was privy to and participated in the creation, development and reporting of the

Company's internal budgets, plans, and/or projections; (iii) each of the Individual

Defendants enjoyed significant personal contact and familiarity with the other Defendants

and was advised of and had access to other members of the Company's management team,

internal reports and other data and information about the Company's reserves, production,

finances, operations, and liabilities at all relevant times; and (iv) each of the Individual

Defendants was aware of the Company's dissemination of information to the investing

public which they knew or recklessly disregarded was materially false and misleading.

362.   Defendants had actual knowledge of the misrepresentations and omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed

to ascertain and to disclose such facts, even though such facts were available to them.  Such

Defendants' material misrepresentations and/or omissions were done knowingly or

recklessly and for the purpose and effect of concealing from the investing public the

significant problems with SandRidge's cash flows, capital expenditures, the overstated

reserves, and the extent of the related party transactions, and supporting the artificially

inflated price of SandRidge common stock.  As demonstrated by Defendants' misstatements

of the Company's business, operations, oil and gas reserves, and transactions during the

Class Period, Defendants, if they did not have actual knowledge of the misrepresentations

and omissions alleged, were reckless in failing to obtain such knowledge by deliberately

refraining from taking those steps necessary to discover whether those statements were false

or misleading.

363.   As a result of the dissemination of the materially false and misleading

information and failure to disclose material facts, as set forth above, the market prices of

SandRidge's common stock were artificially inflated during the Class Period.  In ignorance

of the fact that market prices of SandRidge's publicly traded securities were artificially

inflated, and relying directly or indirectly on the false and misleading statements made by

Defendants, or upon the integrity of the market in which the securities trade, and/or on the

absence of material adverse information that was known to or recklessly disregarded by

Defendants but not disclosed in public statements by Defendants during the Class Period,

Plaintiffs and the other members of the Class acquired SandRidge common stock during the

Class Period at artificially high prices and were damaged as a result of the securities law

violations alleged herein.

364.   At the time of said misrepresentations and omissions, the Plaintiffs and the

other members of the Class were ignorant of their falsity, and believed them to be true.  Had

Plaintiffs and the other members of the Class and the marketplace known the truth regarding

the significant problems alleged herein, which were not disclosed by Defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their SandRidge common stock, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

365.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

366.    As a direct and proximate result of Defendants' wrongful conduct, the Plaintiffs and the other members of the Class suffered damages in connection with their purchases of SandRidge's common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against Defendants Ward, Grubb, and Bennett

367.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is asserted against Defendants Ward, Grubb, and Bennett for violation of Section 20(a) of the Exchange Act.

368.    Defendants Ward, Grubb and Bennett acted as controlling persons of SandRidge within the meaning of Section 20(a) of the Exchange Act.

369.    By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, Defendants Ward, Grubb, and Bennett had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements

which  Plaintiffs contend are false and misleading.  Defendants Ward, Grubb, and Bennett were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by the Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

370.    As set forth above, the Defendants, each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Defendants Ward, Grubb, and Bennett are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of SandRidge common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.    Awarding Plaintiffs and other members of the Class damages together with interest thereon;

C.    Awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.    Awarding Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:  October 23, 2015

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
CHRISTOPHER M. BARRETT


*/s/ Evan J. Kaufman*
EVAN J. KAUFMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
cbarrett@rgrdlaw.com

*Lead Counsel for Plaintiffs*

DERRYBERRY & NAIFEH, LLP
DARREN B. DERRYBERRY
(OBA No. 14542)
4800 North Lincoln Blvd.
Oklahoma City, OK  73105
Telephone:  405/708-6784
405/528-6462 (fax)
dderryberry@derryberrylaw.com

*Liaison Counsel*

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK
225 Broadway, Suite 2050
San Diego, CA 92101
Telephone:  619/342-8000
619/342-7878 (fax)
ambere@zhlaw.com

*Additional Plaintiffs' Counsel*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 23, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel registered for ECF, and I hereby certify that I will cause personal service of the annexed document to be made on all additional parties.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 23, 2015.

*/s/ Evan J. Kaufman*
EVAN J. KAUFMAN