UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re SANDRIDGE ENERGY, INC. SECURITIES LITIGATION | ) ) ) | No. 5:12-cv-01341-LRW |
| | ) | <u>CLASS ACTION</u> |
| | ) | |
| This Document Relates To: | ) ) | PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE |
| ALL ACTIONS. | ) ) | SANDRIDGE DEFENDANTS' MOTION TO DISMISS THE SECOND |
| | ) | CONSOLIDATED AMENDED COMPLAINT |

## TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ............................................................................ 1

II.  ARGUMENT ............................................................................................... 4

    A.  The SAC Adequately Alleges Scienter ........................................................ 4

        1.  The SAC Adequately Alleges Scienter Concerning
            Production and Reserves in the Mississippian ................................... 4

        2.  Additional Allegations Supporting Scienter ..................................... 9

        3.  Scienter Is Properly Imputed to the Corporation ............................ 10

        4.  Motive Allegations Add to the Inference of Scienter ...................... 11

    B.  The SAC Adequately Alleges Loss Causation with Respect to the
        Ward-Related Entities ............................................................................ 12

    C.  The SAC Alleges Actionable Statements Concerning Financial
        Discipline and CapEx .............................................................................. 16

    D.  Responses to Defendants' Arguments Incorporated by Reference ............. 21

III.  CONCLUSION .......................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abell v. Sothern*,
214 F. App'x 743 (10th Cir. 2007) ............................................................... 12

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ............................................................*passim*

*Better v. YRC Worldwide Inc.*,
2012 U.S. Dist. LEXIS 136749
(D. Kan. Sept. 25, 2012) ............................................................................. 8

*Brumbaugh v. Wave Systems Corp.*,
416 F. Supp. 2d 239 (D. Mass. 2006) ....................................................... 11

*City of Phila. v. Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) ................................................................. 11

*Connett v. Justus Enter. of Kansas, Inc.*,
68 F.3d 382 (10th Cir. 1995) ..................................................................... 21

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................................... 12

*FindWhat Investor Grp. v FindWhat.com*,
658 F.3d 1282 (11thCir. 2011) ................................................................. 15

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................... 3

*Gilbreath v. Cleveland Cnty. Bd. of Cnty. Comm'rs*,
2012 U.S. Dist. LEXIS 93544
(W.D. Okla. July 6, 2012)........................................................................ 25

*Harris v. Ivax Corp.*,
182 F.3d 799 (11th Cir. 1999) ................................................................. 18

*In re Genworth Fin. Inc. Sec. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015) ....................................................... 23

*In re Gold Res. Corp. Sec. Litig.*,
957 F. Supp. 2d 1284 (D. Colo. 2013)................................................. 17, 18

*In re Molycorp, Inc. Sec. Litig.*,
  2016 WL 233402
  (D. Colo. Jan. 20, 2016) ............................................................................. 9

*In re Omnicare Inc. Sec. Litig.*,
  769 F.3d 455 (6th Cir. 2014) ..................................................................... 11

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010).......................................................................... 13

*In re Parmalat Securities Litig.*,
  684 F. Supp. 2d 453 (S.D.N.Y. 2010)......................................................... 10

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368, 382 (S.D.N.Y. 2015)................................................. 21

*In re Smith Barney Transfer Agent Litig.*,
  884 F. Supp. 2d 152 (S.D.N.Y. 2012)........................................................... 4

*In re Stat-Tech Securities Litigation*,
  905 F. Supp. 1416 (D. Colo. 1995)............................................................. 21

*In re Stillwater Capital Partners Inc. Litig.*,
  858 F. Supp. 2d 277 (S.D.N.Y. 2012)........................................................... 4

*In re Stone & Webster, Inc. Sec. Litig.*,
  414 F.3d 187 (1st Cir.2005) ................................................................. 17, 18

*In re Thornburg Mortg. Sec. Litig.*,
  695 F. Supp. 2d 1165 (D.N.M. 2010) ......................................................... 11

*In re Weinstein*,
  757 F.3d 1110 (10th Cir. 2014) .................................................................... 3

*In re Williams Sec. Litig.–WCG Subclass*,
  558 F.3d 1130 (10th Cir. 2009) .................................................................. 13

*In re Williams Sec. Litig.*,
  339 F. Supp. 2d 1206 (N.D. Okla. 2003)................................................. 4, 18

*In re Williams Sec. Litig.*,
  496 F. Supp. 2d 1195 (N.D. Okla. 2007).................................................... 9

*Institutional Investors Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)....................................................................... 18

*Long v. Brown*,
    98 P.2d 28 (Okla. 1939) ...................................................................... 20, 21

*Makor Issues and Rights, Ltd., v .Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ...................................................................... 18

*Maryland Cas. Co. v. Tulsa Indus. Loan & Inv. Co.*,
    83 F.2d 14 (10th Cir. 1936) ...................................................................... 10

*Miller v. Champion Enterprises Inc.*,
    346 F.3d 660 (6th Cir. 2003) ...................................................................... 18

*Nakkhumpun v. Taylor*,
    782 F.3d 1142 (10th Cir. 2015) ...................................................... 4, 11, 15

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) ...................................................................... 23

*Sawyer v. Mid-Continent Petroleum Corp.*,
    236 F.2d 518 (10th Cir. 1956) ...................................................................... 10

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974) ...................................................................... 12

*Sekuk Global Enter. v. KVH Indus., Inc.*,
    2005 U.S. Dist. LEXIS 16628
    (D.R.I. Aug. 11, 2005) ...................................................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................... 4, 12

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
    2008 U.S. Dist. LEXIS 47748
    (D. Colo. Mar. 28, 2008) ...................................................................... 7, 11

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78j(b) ...................................................................... 10
    §78t(a) ...................................................................... 25

17 C.F.R.
    §240.10b-5 ...................................................................... 10

Private Securities Litigation Refore Act of 1995 ...................................... 2, 17

## TABLE OF ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| **¶__ :** | Citations to Second Consolidated Amended Complaint |
| **192 Investments:** | 192 Investments, L.L.C., a limited liability company owned by three trusts established for the benefit of Ward's children |
| **Class Period:** | February 24, 2011 through November 8, 2012 |
| **Decline Curve:** | A standard tool commonly used by petroleum engineers to determine remaining reserves and EUR for wells with production history. |
| **Defendants:** | SandRidge Energy, Inc., Tom L. Ward, James D. Bennett, and Matthew K. Grubb. |
| **Drilling and Completion Reports:** | Reports emailed to recipients Company-wide that contained production data. |
| **EUR:** | Estimated ultimate recovery, the sum of reserves remaining as of a given date and cumulative production as of that date. |
| **Exploration Meetings:** | Weekly meetings attended by landmen, reservoir engineers, geologists, vice presidents, and Ward and Grubb. Those in attendance at the Exploration Meetings discussed drill schedules, wells that were going to be drilled, prospective drilling areas, and production at existing wells. The poor performance of the Mississippian was also discussed during these meetings. |
| **FAC:** | Corrected Consolidated Amended Complaint (ECF No. 75) |
| **FE:** | Former Employees, which refers to the former geologists interviewed by Plaintiffs in connection with their investigation of the conduct alleged in the Second Consolidated Amended Complaint |
| **GOR:** | Gas-to-oil ratio, a ratio of gas/oil produced from one barrel of crude oil at reservoir temperature and pressure, and expressed in the units standard cubic feet per barrel of oil. |
| **Individual Defendants:** | Tom L. Ward, James D. Bennett, and Matthew K. Grubb |

| | |
|---|---|
| **IPO:** | Initial public offering |
| **Johnson:** | Rodney Johnson, one of SandRidge's most-senior executives and the head of the Company's Reservoir Engineering Department |
| **Kaufman Decl.:** | Declaration of Evan J. Kaufman in Opposition to the SandRidge Defendants' Motion to Dismiss the Second Consolidated Amended Complaint |
| **Management Meetings:** | Weekly management meetings on the 28th floor of SandRidge's Oklahoma City headquarters, which lasted approximately one to two hours, run by Ward and Grubb and attended by numerous SandRidge geologists and senior executives. During these meetings, management and senior geologists would discuss the status of drilling and production levels. |
| **Mbbl:** | One thousand barrels of oil or other liquid hydrocarbons |
| **MBOE:** | One thousand barrels of oil equivalent |
| **Mississippian or the Mississippian play:** | SandRidge's core oil and gas holdings in Oklahoma and Kansas |
| **MMscf:** | One million standard cubic feet |
| **MTD:** | Motion to dismiss |
| **MTDs the FAC:** | Refers to the four motions to dismiss the First Consolidated Amended Complaint (ECF Nos. 138, 140-142) |
| **Opposition to the SandRidge Defs.' MTD the SAC:** | Plaintiffs' Memorandum of Law in Opposition to the SandRidge Defendants' Motion to Dismiss the Second Consolidated Amended Complaint |
| **Opposition to Ward's MTD the SAC:** | Plaintiffs' Memorandum of Law in Opposition to Tom L. Ward's Motion to Dismiss the Second Consolidated Amended Complaint |
| **OTC:** | Oklahoma Tax Commission |
| **PSLRA:** | Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 |

| | |
|---|---|
| **RED:** | Reservoir Engineering Department, which SandRidge represented continually monitored asset performance and made reserves estimate adjustments, as necessary, to ensure the most current reservoir information was reflected in reserves estimates. According to the Company, during the Class Period, the RED had a total of 18 full time employees, comprised of seven degreed engineers and 11 engineering analysts/technicians with a minimum of a four-year degree in mathematics, economics, finance or other business or science field. |
| **S. Opp at __.:** | Citations to Plaintiffs' Memorandum of Law in Opposition to the SandRidge Defendants' Motion to Dismiss the Second Amended Consolidated Complaint |
| **S. Order:** | Court's order entered on August 27, 2015 dismissing claims against the SandRidge Defendants (ECF No. 184) |
| **SAC:** | Second Consolidated Amended Complaint (ECF No. 188) |
| **SandRidge Defendants:** | SandRidge Energy, Inc., James D. Bennett, and Matthew K. Grubb |
| **SandRidge or the Company:** | SandRidge Energy, Inc. |
| **SM:** | Opening Brief in Support of SandRidge Defendants' Motion to Dismiss the Second Consolidated Amended Complaint (ECF No. 189) |
| **Team Meetings:** | Weekly team meetings attended by employees that worked on the Mississippian, at which the team would discuss production levels in depth and determine the information that would be reported to Ward. |
| **TLW Land & Cattle:** | TLW Land & Cattle, L.P. |
| **TPG-Axon:** | TPG-Axon Capital, one of the largest shareholders of SandRidge common stock during the Class Period |
| **Trust I:** | Mississippi Trust I |
| **Trust II:** | Mississippi Trust II |

| | |
|---|---|
| **Trusts:** | Mississippi Trust I and Mississippi Trust II |
| **W. Opp. at__:** | Citations to Plaintiffs' Memorandum of Law in Opposition to Ward's Motion to Dismiss the Second Amended Consolidated Complaint |
| **W. Order:** | Court's order entered on August 27, 2015 dismissing claims against Ward (ECF No. 185) |
| **Ward-Related Entities:** | Several entities affiliated with defendant Ward that operate in the same business and location as SandRidge, including, among others, WCT Resources, 192 Investments, and TLW Land & Cattle |
| **WCT Resources:** | WCT Resources, L.L.C., a limited liability company owned by three trusts established for the benefit of Ward's children |
| **WM:** | Opening Brief in Support of Tom L. Ward's Motion to Dismiss the Second Consolidated Amended Complaint (ECF No. 190) |

Plaintiffs respectfully submit this memorandum of law in opposition to the SandRidge Defendants' motion to dismiss the Second Consolidated Amended Complaint (the "SAC"; cited herein as "¶_").

## I.      PRELIMINARY STATEMENT[1]

Plaintiffs' first amended complaint ("FAC") alleged that SandRidge and the Individual Defendants substantially overstated the economic value of SandRidge's core oil and gas holdings in Oklahoma and Kansas referred to as the Mississippian play.  Plaintiffs alleged that as SandRidge was spending billions of dollars in the Mississippian, Defendant Ward and the Ward-Related Entities were front-running the Company's acquisitions and benefitting from SandRidge's investments.  Furthermore, Defendants falsely portrayed SandRidge as financially disciplined, even though the Company spent recklessly in the Mississippian to the benefit of Ward and his children.

The Court issued an order on August 27, 2015 dismissing the FAC on three grounds ("S. Order").  The Court held that Plaintiffs did not adequately plead scienter with respect to Defendants' misrepresentations of the economic value of the Mississippian.  S. Order at 22-30.  The Court found that Plaintiffs did not adequately plead loss causation with respect to the transactions by the Ward-Related Entities.  *Id.* at 21-22.  According to the Court, the "disclosures and accusations" detailing the scope of the transactions by the Ward-Related Entities were first discussed in a post-Class Period January 2013 presentation by TPG-Axon,

---

[1]  Plaintiffs incorporate by reference the Statement of Facts and all arguments from the Opposition to Wards' MTD the SAC, submitted herewith, and the oppositions to Defendants' MTDs the FAC.  ECF Nos. 138, 140-142.  Citations, footnotes, and internal quotation marks omitted and all emphasis added unless otherwise noted.

and that the November 8, 2012 letter by TPG-Axon (attached as Ex. A to the Kaufman Decl.) discussing Ward's self-dealing did not disclose the transactions by the Ward-Related Entities.  S. Order at 21.  Finally, the Court found that Defendants' statements about financial discipline and the Company's capital expenditures ("CapEx") were forward-looking and protected by the "safe harbor" provision of the PSLRA.  *Id.* at 17.

Plaintiffs' filed the SAC on October 23, 2015.  The SandRidge Defendants' motion to dismiss the SAC focuses primarily on the Court's three grounds for dismissal of the FAC.[2] Contrary to Defendants' characterization of the SAC as a repackaging of the FAC, the SAC substantially builds upon the FAC and addresses the Court's concerns.  First, the SAC greatly strengthens Plaintiffs' allegations that Defendants materially misrepresented the production and reserves in the Mississippian with scienter.  The SAC alleges, among other things, based on interviews with three former SandRidge geologists, each of the Defendants closely monitored SandRidge's production and reserves in the Mississippian.  ¶¶123-129. The Individual Defendants participated in regular weekly meetings to discuss production and reserves in the Mississippian in detail.  ¶¶123-128.  According to the former employees, the poor performance of the Mississippian was discussed during these meetings.  *Id*. SandRidge's senior executives received detailed information about SandRidge's production by email on a daily basis.  ¶129.  The SAC also alleges, based on an analysis of SandRidge production data provided to the OTC, that SandRidge overstated the estimated ultimate recovery ("EUR") of oil in the Mississippian by more than 600%.  ¶¶136-137.

---

[2]   This memorandum responds only to the arguments raised by the SandRidge Defendants in their memorandum.

The new allegations in the SAC detailing Defendants' close monitoring of production in the Mississippian, along with the other allegations in the SAC, raise a strong inference that Defendants knew that SandRidge materially overstated the production and reserves in the Mississippian, or at a minimum, "had access to information suggesting that their public statements were not accurate." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010). And, because SandRidge's actual Mississippian production information "was so obviously material," Defendants "must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *In re Weinstein*, 757 F.3d 1110, 1113 (10th Cir. 2014).

Second, the SAC makes clear that Ward's front-running transactions – publicly disclosed in the November 8, 2012 TPG-Axon letter – related to the same subject-matter and conduct as the transactions engaged in by the Ward-Related Entities. The SAC alleges that the post-Class Period TPG-Axon reports provided additional details about the front-running first raised in the November 8th letter. Thus, the SAC adequately alleges loss causation with respect to the transactions by the Ward-Related Entities.

Finally, the SAC eliminated certain objectionable statements alleged to be false which were related to SandRidge's CapEx and modified allegations to clarify that certain statements concerning SandRidge's CapEx are not "forward-looking" because they concern past or present statements of fact. Additionally, with respect to the CapEx statements that are forward looking, the SAC alleges those statements were knowingly misleading because Defendants failed to warn investors that SandRidge spent recklessly in the Mississippian to benefit the Ward-Related Entities and to mask the poor performance of older wells.

Plaintiffs respectfully request that Defendants' motion to dismiss the SAC be denied in its entirety and that Plaintiffs be permitted to proceed with discovery.

## II.    ARGUMENT

### A.    The SAC Adequately Alleges Scienter

When evaluating scienter, the court must undertake a holistic analysis and assess how all of the scienter allegations stand together.  *S. Order* at 28 n.43.  Scienter "includes (1) intentional misconduct, defined as deliberate illegal behavior, and (2) recklessness, defined as conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that he must have been aware of it."  *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1218 (N.D. Okla. 2003).  As the Supreme Court explained in *Tellabs*, "[t]he inference that the defendant acted with scienter need not be irrefutable . . . or even the most plausible of competing inferences," but merely "at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  In other words, a tie goes to the plaintiff.  *See id.*; *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1147 (10th Cir. 2015).  As discussed below, the SAC meets this standard.

### 1.    The SAC Adequately Alleges Scienter Concerning Production and Reserves in the Mississippian

The SandRidge Defendants materially misrepresented[3] the economic value of the

---

[3]    The Individual Defendants are also considered "makers" of the statements contained in the Company's Forms 10-K and 10-Q and the Trusts' registration statements because they signed or certified them.  *See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 163–65 (S.D.N.Y. 2012); *In re Stillwater Capital Partners Inc. Litig.*, 858 F. Supp. 2d 277, 287–88 (S.D.N.Y. 2012).

Mississippian to investors by, among other things, overstating the amount of oil reserves as well as the amount of oil relative to natural gas. ¶¶7, 133-37. For example, based on a decline curve analysis of SandRidge's production data as reported to the OTC,[4] SandRidge overstated the EUR of oil by *626%* and represented during 2012 that its wells produced 45% oil and 55% gas when those wells produced only 35% oil and 55% gas. ¶¶135-37, 143.

The SAC contains numerous allegations supporting a strong inference that the SandRidge Defendants knew, or recklessly disregarded, that they made materially false or misleading statements and omitted material information about the economics of the Mississippian. The SAC, like the FAC, alleges that SandRidge had a robust "Reservoir Engineering Department," ("RED") which reported directly to Grubb, comprised of 18 highly skilled full-time employees devoted to monitoring and reviewing its oil production. ¶¶114-16. The Company assured investors that this department "continually monitors asset performance and *makes reserves estimate adjustments, as necessary* to ensure the most current reservoir information is reflected in reserves estimates." ¶114.

Even though the FAC contained these and other allegations supporting scienter, the Court held that it was not enough. S. Order at 28-9. The Court reasoned, allegations "that Bennett and Grubb *may have* received reports from the [RED] does not alone demonstrate" scienter. *Id.* at 27-28. The Court added that to be sufficient, the SAC needs to allege a strong inference that Grubb and Bennett "knew about the danger of misleading buyers and

---

[4]    A decline curve analysis, which was used by both SandRidge and Plaintiffs, is a traditional means of identifying well production and predicting well performance and life based on measures of oil and gas rates. ¶63. SandRidge's proved reserves were also calculated through decline curve analysis. *See* SandRidge 2011 Form 10-K, attached as Ex. 2 to the Gimbel Decl. (ECF No. 133).

sellers or that the [danger of misleading investors] was so obvious that Grubb and Bennett must have been aware of it." S. Order at 28.

The SAC alleges important new facts which strengthen Plaintiffs' scienter allegations and satisfy the Court's standard. These facts, based in part on interviews with former SandRidge geologists, demonstrate that Defendants closely monitored SandRidge's oil and gas production and reserves in the Mississippian. It is clear, based on the allegations in the SAC, that each of the Individual Defendants *did receive* reports and attend meetings about SandRidge's production and reserves in the Mississippian on a regular basis.

SandRidge's wells were continually monitored by RED, which was headed by one of SandRidge's most-senior officers, Rodney Johnson. ¶¶114-18. According to SandRidge, Johnson "[was] the technical person primarily responsible for overseeing the preparation of the company's reserve estimates." ¶118. Moreover, each quarter, Johnson presented the status of SandRidge's reserves to the Executive Committee, of which each of the Individual Defendants were members. ¶323

Information collected by the RED was regularly communicated to the SandRidge Defendants during meetings and in writing. ¶¶123-29. Ward[5] and Grubb ran weekly "Management Meetings" that lasted between one to two hours during which the production performance of the Mississippian was discussed. ¶123. Numerous SandRidge geologists and senior executives, including, Todd Lipton and Rodney Johnson (two of the Company's

---

[5] Ward is, by training and education, a professional landman highly experienced in all facets of the business of oil exploration and production and, for this reason, was able to fully understand the significance of the production reports he regularly received. ¶¶29, 331.

four Executive Vice Presidents) attended these meetings. ¶¶123-24.[6] During these meetings,

production data was provided by county or township, and the performance of individual

wells was discussed. ¶124. *See W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,

2008 U.S. Dist. LEXIS 47748, at *47 (D. Colo. Mar. 28, 2008) (strong inference of scienter

where defendant "was in charge of meetings regarding how to replace the cancelled or

delayed Verizon order, and thus he was aware of the issue regarding this lost revenue and yet

no disclosure was made").

SandRidge also held weekly "Team Meetings" with employees who worked in the

Mississippian, which were run by either Craig Johnson, Senior Vice President, or Paul Stark,

Reservoir Engineering Manager. ¶125. The production level of the Mississippian was

discussed in depth during these meetings and then information from the meetings was

reported directly to Ward. *Id.* Defendant Grubb also received information about the

Mississippian through his attendance at weekly "Exploration Meetings" during which the

poor performance of production at the Mississippian was discussed. ¶127.

In addition to learning about SandRidge's actual production during meetings, the

Individual Defendants were apprised of the actual production in the Mississippian through

daily emails sent to recipients Company-wide, including Ward and other senior executives of

the Company. ¶129. These emails included "Drilling and Completion Reports," which

---

[6] Defendants incorrectly suggest that the allegations concerning their positions are inappropriate and not relevant to the Court's determination of whether they acted with scienter. SM at 18. While the Tenth Circuit has noted that "***standing alone***, the fact that a defendant was a senior executive in a company cannot give rise to a strong inference of scienter," it held that a defendant's position "is a fact relevant in our weighing of the totality of the allegations." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003).

contained the same type of information that was discussed during the weekly Management Meetings. ¶¶129, 324. *See Better v. YRC Worldwide Inc.*, 2012 U.S. Dist. LEXIS 136749, at *31 (D. Kan. Sept. 25, 2012) (finding scienter in part based on allegations that defendants were provided with reports on a "regular basis").

Based on the foregoing, the Court should reject the SandRidge Defendants' attempt to portray the SAC as simply relying upon Defendants' managerial positions or their placement in SandRidge's formalized reporting structure to support scienter. SM at 18-21. Similarly, the Court should reject the SandRidge Defendants' attempt to criticize Plaintiffs' level of detail and characterization of Plaintiffs' new allegations as simply "repackage[d] allegations" from the FAC. SM at 21.

Since the analysis of SandRidge's production as set forth in the SAC is based on SandRidge's own production data as reported to the OTC, the Court should accept as true the SAC's well pleaded allegations that SandRidge materially overstated its EUR and misrepresented the GOR in the Mississippian and view these allegations in the light most favorable to Plaintiffs. S. Order at 4-5. Additionally, the Court should draw the reasonable inference that the production and reserve information discussed during the meetings attended by the Individual Defendants and contained in emails was consistent with SandRidge's production data as reported to the OTC, and inconsistent with Defendants' public statements.

Accordingly, Plaintiffs adequately plead that Defendants knew that SandRidge's actual production and reserves in the Mississippian were inconsistent with SandRidge's publicly reported data. At a minimum, however, the Court should draw an inference that each of these Defendants "had access to information suggesting that their public statements"

concerning the production and reserves in the Mississippian "were materially inaccurate." *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1282 (N.D. Okla. 2007).

Additional information provided by the Former Employees referenced in the SAC support that Defendants knew, or recklessly disregarded, that they misrepresented the Mississippian's performance. FE3 believed it was common knowledge at SandRidge that the Mississippian was underperforming. ¶126. According to FE2, the number of underperforming wells in the Mississippian was larger than expected, and since at least early 2012, the Mississippian was not performing as well as expected. ¶128. This information is consistent with the analysis by Plaintiffs' consultant that there was a steep drop-off in production in older wells by March 2012. ¶¶137-39. *See In re Molycorp, Inc. Sec. Litig.*, 2016 WL 233402, at *12-13 (D. Colo. Jan. 20, 2016) (in concluding that details provided by confidential witness were "well pled," held when evaluating allegations' sufficiency, the court should evaluate, *inter alia*, "the corroborative nature of other facts alleged").

### 2. Additional Allegations Supporting Scienter

A discussed in Plaintiffs' Opposition to Ward's MTD, and incorporated here by reference, the SAC contains other allegations contributing to a strong inference of scienter. Key high-level officers, such as Grubb and Bennett, are charged with knowledge because the misstatements in question concern key parts of SandRidge's business. *See Adams*, 340 F.3d at 1106 (finding that a "substantial contribution" to earnings would have been known by the president and CEO); W. Opp. at 11-12.

Furthermore, the magnitude of the discrepancies between SandRidge's internal production data, as reported to the OTC, and its publicly reported production and reserves,

such as the 626% overstatement in oil EUR, supports an inference of scienter.  *See Adams*, 340 F.3d at 1106 ("Strengthening the inference that [defendant] knew of the statements was the magnitude of the alleged falsity."); W. Opp. at 12.

### 3.    Scienter Is Properly Imputed to the Corporation

In the Tenth Circuit, "[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of §10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority."  *Adams*, 340 F.3d at 1106.  As discussed above, and in the opposition to Ward's motion to dismiss, the SAC adequately alleges the Individual Defendants' scienter, and their scienter may be imputed to SandRidge.

At the very least, Johnson's scienter, as SandRidge's Executive Vice President of Reservoir Engineering, may be imputed to SandRidge.  ¶118.  It cannot seriously be disputed that Johnson was fully aware of SandRidge's actual production in the Mississippian and its implication on the decline curve and EUR for that area.  At a minimum, he had access to information showing that SandRidge's reserves and production were overstated.  *See In re Parmalat Securities Litig.*, 684 F. Supp. 2d 453, 471 n.116 (S.D.N.Y. 2010) ("a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority").[7]

---

[7]    *Maryland Cas. Co. v. Tulsa Indus. Loan & Inv. Co.*, 83 F.2d 14, 16 (10th Cir. 1936); *Sawyer v. Mid-Continent Petroleum Corp.*, 236 F.2d 518, 520 (10th Cir. 1956) ("Since a corporation can act only through its officers, agents and employees, it is necessarily chargeable with the composite knowledge of its officers and agents acting within the scope

### 4.  Motive Allegations Add to the Inference of Scienter

Because the allegations discussed in the previous sections, taken collectively, plead a strong inference of scienter, Plaintiffs need allege nothing more. *See Nakkhumpun*, 782 F.3d at 1152 ("scienter allegations may suffice even without a motive."). Nonetheless, Plaintiffs have also alleged compelling motive allegations, which although unnecessary, provide additional support for scienter. ¶¶104, 350-54. *See City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1262 (10th Cir. 2001) ("courts must look to the totality of the pleadings to determine whether the plaintiffs' allegations permit a strong inference of fraudulent intent," and "*[a]llegations of motive and opportunity may be important to that totality. . .*"). The SandRidge Defendants were motivated to misstate SandRidge's production data to inflate the value of the Company's stock, mask production problems in the Mississippian, and enable SandRidge to conduct lucrative offerings to continue investing in the Mississippian.[8]

Also adding to the inference of scienter is Johnson's sale of nearly $328,000 of artificially inflated SandRidge common stock during the Class Period. ¶339. *See Startek, Inc.*, 2008 U.S. Dist. LEXIS 44748, at *31-37 (finding stock sales added to inference of

---

of their authority."); *In re Omnicare Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014) (holding that the state of mind of an individual agent who (i) "furnished information for . . . statement in which the misrepresentation was made before its utterance or issuance" or (ii) is a "high managerial agent . . . who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance" is "probative for purposes of determining whether a misrepresentation made by a corporation was made by it with the requisite scienter under . . . [Section] 10(b)").

[8]  *See, e.g.*, *In re Thornburg Mortg. Sec. Litig.*, 695 F. Supp. 2d 1165, 1202 (D.N.M. 2010) ("the desire to raise capital through public securities offering," along with other allegations supports scienter); *Sekuk Global Enter. v. KVH Indus., Inc.*, 2005 U.S. Dist. LEXIS 16628, at *46 (D.R.I. Aug. 11, 2005) (scienter requirement satisfied, in part, because successful secondary offering was alleged); *Brumbaugh v. Wave Systems Corp.*, 416 F. Supp. 2d 239, 252 (D. Mass. 2006) (private placement offering demonstrated motive and opportunity).

scienter).  Finally, as discussed in Plaintiffs' opposition to Ward's motion, Ward possessed

substantial motives to misrepresent the economics of the Mississippian to investors.  W.

Opp. at 14-18.

Accepting all well-pleaded facts as true (S. Order at 4-5), it would be difficult to

imagine a scenario in which the Defendants were unaware they misrepresented SandRidge's

production and reserves to investors.  And one would be hard-pressed to conclude that such

an inference is more compelling than the inference of scienter.  *Tellabs*, 551 U.S. at 324.

Under these circumstances, Plaintiffs have pleaded a strong inference of scienter and are

"entitled to offer evidence to support the claims.'"  *Abell v. Sothern*, 214 F. App'x 743, 750

(10th Cir. 2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974))*.* [9]

## B.    The SAC Adequately Alleges Loss Causation with Respect to the Ward-Related Entities

To establish loss causation at the pleading stage, a plaintiff must simply "provide a

defendant with ***some indication*** of the loss and the causal connection that the plaintiff had in

mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  The Supreme Court

recognized that this standard is "not meant to impose a great burden up on a plaintiff," and

that a securities fraud complaint is sufficient so long as it sets forth what the alleged loss and

causal connection to the fraud "might be."  *Id*.  The SAC satisfies this standard and

---

[9]    In the S. Order, the Court found statements by Grubb and Bennett about oil and gas
production to appear inconsistent with a scheme to deceive.  S. Order at 29, n. 44, quoting
August 5, 2011 Grubb statement.  The full sentence states: "But what we are seeing is more
gas in the Mississippi drilling, ***not the expense of oil***, but certainly a higher gas rate than
what we have projected on the type curve."  See Ex. H to Kaufman Decl.  Thus, Grubb
falsely represented that oil production was still strong, when the opposite was true.
Defendants continued to represent that the GOR was 52:48 that day (¶202) and later that year
(¶219), which also indicates that oil was strong as well.

adequately alleges loss causation concerning the Ward-Related Entities.

According to the Court's prior opinion, "neither SandRidge's press release nor Singh's [TPG-Axon] letter – the alleged corrective disclosures – contained disclosures or accusations about the acquisitions of adjacent acreage by the Ward-Related Entities." S. Order at 21. Defendants cite the Court's prior ruling in support of their argument that the SAC does not adequately allege loss causation. Defendants, however, ignore that Plaintiffs supplemented and clarified their loss causation allegations concerning the Ward-Related Entities. *See, e.g.*, ¶¶345, 350.

The SAC alleges loss causation under both a "corrective disclosure" and "materialization of risk" theory. "Establishing either theory as applicable would suffice to show loss causation." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010); *see also In re Williams Sec. Litig.–WCG Subclass*, 558 F.3d 1130, 1137-38 (10th Cir. 2009). According to the Court, under both theories, a plaintiff must establish "how the truth was revealed." S. Order at 21. The SAC alleges that the truth about the Ward-Related Entities was partially revealed on November 8 and 9, 2012, in the TPG-Axon letter, and when SandRidge released its financial results for the third quarter of 2012. ¶298. In response to these disclosures, on November 9, 2012, SandRidge stock declined 9.7%. ¶307.

On November 8th, Dnakar Singh, the CEO of TPG-Axon, issued a public letter to the SandRidge Board of Directors (attached as Ex. A to the Kaufman Decl.) calling for Ward's resignation and revealing that Ward had engaged in self-dealing at the expense of shareholders. ¶299. The TPG-Axon letter disclosed that Ward "bought massive holdings of ranchland, and then turned around and leased the land to SandRidge for future exploration."

- 13 -

*Id*. at 7.   Thus, as clarified by new allegations in the SAC, "the letter suggested that Defendant Ward had been moving ahead of SandRidge in identifying and purchasing attractive land and mineral rights, and then profiting at the expense of SandRidge's investors. In other words, the letter discussed Defendant Ward's front-running activities."  ¶345.  Since the SAC alleges that SandRidge stock was artificially inflated as a result of material omissions relating to Ward's front-running, and since the SAC alleges that SandRidge stock declined as a result of the market learning that Ward engaged in front-running through the TPG-Axon letter, Plaintiffs have adequately pled loss causation.  ¶¶341, 345, 348.

Defendants, citing the Court's prior opinion, argue that loss causation has not been alleged since the TPG-Axon letter did not specifically reference the adjacent land transactions engaged in by the Ward-Related Entities.  SD Mem. at 15.  According to Defendants, since the details of the transactions engaged in by the Ward-Related Entities were not revealed until TPG-Axon released a presentation on January 23, 2013, the SAC cannot support the inference that SandRidge stock declined in response to the TPG-Axon presentation or the facts contained therein.  SM at 15.

Defendants, however, miss the point.  The self-dealing revealed in the November 8th letter concerned the same subject-matter and was directly related to the transactions by the Ward-Related Entities.  The TPG-Axon presentations about the flipping and adjacent land transactions were the culmination of TPG-Axon's investigation of the precise self-dealing and front-running by Ward as was first revealed in November 8th letter.  As clarified in the SAC, the TPG-Axon presentations released on January 24, 2013 and February 8, 2013 "provided additional detail concerning Ward's self-dealing, which was first revealed in TPG-

Axon's letter on November 8, 2012." ¶311. Because the disclosures in the TPG-Axon Letter "share the same subject matter" as the prior misstatements, it serves as an adequate corrective disclosure for the purposes of pleading loss causation. *FindWhat Investor Grp. v FindWhat.com*, 658 F.3d 1282, 1311 n.28 (11thCir. 2011).

Separately, the SAC alleges losses as the result of a materialization of the risk of the front-running by the Ward-Related Entities. In the Tenth Circuit, to allege a materialization of a concealed risk, "a plaintiff alleges loss causation by showing that the defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized." *Nakkhumpun*, 782 F.3d at 1154. Under this theory, Plaintiffs must allege that (1) the risk that materialized was within the zone of risk concealed by Defendants' false and misleading statements and material omissions regarding the Ward-Related Entities (foreseeability) and that (2) the materialization of the risk caused a negative impact in the value of SandRidge common stock (causal link). *See id.*

Here, Plaintiffs allege that undisclosed risks of the improper transactions by the Ward-Related Entities included heavy and reckless spending in the Mississippian, misrepresentations of SandRidge's production and reserves, and other acts to benefit Ward to the detriment of the Company, such as the sale of the valuable Permian Basin. ¶¶345, 347, 350. When SandRidge revealed that it overstated its reserves and was selling its valuable Permian asset on November 8-9, 2012, SandRidge common stock declined. ¶¶347-48. Thus, the decline in SandRidge stock in response to these disclosures was a materialization of the risk of the improper transactions by the Ward-Related Entities.

C.     **The SAC Alleges Actionable Statements Concerning Financial Discipline and CapEx**

Plaintiffs have alleged actionable statements concerning SandRidge's reckless spending in the Mississippian and statements about CapEx.[10]  During the Class Period, Defendants portrayed SandRidge as financially disciplined, which by 2014 would have a "self-funding capital program" operating "all within [SandRidge's] cash flow" while "improving [its] credit metrics."  ¶105.  An important part of this story was the Company's ability to manage capital expenditures within its cash flow to prevent burdening the Company with too much debt.  On February 28, 2011, the Company provided CapEx guidance for [2011] of $1.3 billion.  ¶158.  Thereafter, on April 12, 2011, Defendant Ward reiterated that CapEx would be $1.3 billion for 2011 and stated, "we've addressed the CapEx funding gap for 2011 and are already starting to work on 2012."  ¶179.  Defendant Ward made clear that the CapEx figure was set, funding issues for 2011 were resolved, and that no changes were anticipated for 2011 CapEx since SandRidge was focusing on CapEx for 2012. ¶179.  On May 5, 2011, Defendant Ward again informed investors that SandRidge is "now focused on funding our 2012 capital spending program" (¶183), and on May 6, 2011, Bennett stated that the Company's "2011 CapEx plan" of $1.3 billion had been "almost fully funded" thereby conveying that they did not anticipate any changes to plans that would impact 2011 CapEx. ¶187; *see also* ¶¶189, 194.

Investors were unaware that SandRidge's CapEx was not based on a plan grounded in sound financial discipline.  Rather, throughout the Class Period, SandRidge spent massive

---

[10]   *See* ¶¶158, 172, 179, 183, 185, 187, 189, 194, 198-99, 201-02, 209-10, 226, 228-29, 241-42, 257, 268.

amounts of money in the Mississippian in a reckless and haphazard manner to the benefit of the Ward-Related Entities and to mask poor production results in the Mississippian.  ¶¶151, 153(b).  Thus, Defendants lacked a reasonable basis to represent the Company's CapEx was set for 2011 and failed to disclose there was a material risk SandRidge would increase Mississippian spending.[11]

Defendants argue their statements concerning CapEx are not actionable pursuant to the PSLRA's safe harbor because they are forward-looking, Plaintiffs do not plead the SandRidge Defendants had actual knowledge those statements were misleading, and they contend the challenged statements were accompanied by cautionary language.  SM at 8-13. As a preliminary matter, not all of the challenged statements, or every part of the statements, were forward-looking, so the PSLRA safe harbor does not apply.  Even though the phrase "forward-looking statements" may be defined to include "projection[s] of . . . capital expenditures" (SM at 9), simply because a statement relates to the topic of CapEx projections does not mean the entire statement is necessarily forward-looking or that the safe harbor applies.  *See In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1294-96 (D. Colo. 2013) (holding that parts of mixed present/future statements that refer to present are not entitled to safe harbor);  *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005) ("The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of

---

[11]  Defendants continued to mislead investors thereafter about the Company's financial discipline.  For example, Defendants represented to the market throughout most of 2012, without reasonable basis, that CapEx was set, only to increase capital expenditures in August 2012 from $1.85 billion to $2.1 billion.  ¶268.

falsehood relates to non-forward-looking aspects of the statement.").[12]

Here, (i) Ward's statement "we are now focused on funding our 2012 capital spending program" ¶183; (ii) Bennett's statement that the Company's "2011 CapEx plan" of $1.3 billion had been "almost fully funded" ¶187; (iii) Ward's statement "we have addressed our CapEx funding gap for [2011]" ¶194; and (iv) Bennett's statement that "we're increasing our estimate" for 2012 CapEx "primarily due to . . ." ¶273, were statements of present or past events and not subject to safe harbor protection.[13]

Furthermore, with respect to statements that may be considered "forward looking," such as the actual $1.3 billion CapEx figure for 2011 itself, they were not accompanied by adequate cautionary language.  Although "cautionary language need not mention the factor that ultimately belies the forward-looking statement," the cautionary language must "warn[] investors of risks of a significance similar to that actually realized."  *Williams*, 339 F. Supp.

---

[12]   *See*, *also Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009) ("'a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.'"); *Harris v. Ivax Corp.*, 182 F.3d 799, 806 (11th Cir. 1999) ("Forward-looking conclusions often rest both on historical observations and assumptions about future events.").

[13]   These statements are distinguishable from the statements at issue in the cases cited by Defendants.  In *Avaya*, 564 F.3d at 246, the statement at issue was that the company "was 'on track' to achieve its goals or projections" and in *Miller v. Champion Enterprises Inc.*, 346 F.3d 660 (6th Cir. 2003), the court concluded that the phrase at issue, although implying present circumstances, was nevertheless protected because it was an "assumption underlying" a "forward-looking statement."  *Id.* at 677.  Here, by contrast, the present portion of the mixed statements are not assumptions underlying the CapEx projections and are therefore "not entitled to the safe harbor with respect to the part of the statement[s] that refers to the present."  *Makor Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008); *accord In re Gold Resource Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1295 (D. Colo. 2013) ("The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement.").

2d at 1220.  Here, the cautionary language warned of business risks and uncertainties, such as the volatility of oil prices and success in discovery, estimating, and developing oil reserves.  *See, e.g.*, SM at 11.  This language, however, did not warn investors that Defendants lacked a reasonable basis to represent a figure for 2011 CapEx because SandRidge spent money in the Mississippian in a haphazard and reckless manner to benefit the Ward-Related Entities and increased CapEx related to drilling in order to mask the poor performance of older wells.  The SAC alleges seven oral statements concerning capital spending,[14] yet Defendants only cite to cautionary language for four of them, leaving three without any related cautionary language.[15]

Additionally, Plaintiffs have alleged sufficient facts demonstrating the CapEx statements were made with actual knowledge that they were misleading.  Defendants miss the point by arguing that Plaintiffs must allege the SandRidge Defendants were aware of an "undisclosed plan to increase CapEx for the benefit of the Ward-Related Entities."  SM at 11.  Plaintiffs do not allege a plan to increase CapEx.  Rather, the SAC alleges that "SandRidge was prepared to increase CapEx in order to spend more funds in the Mississippian to enrich the Ward-Related Entities."  ¶180.  The SandRidge Defendants lacked a reasonable basis to make statements about CapEx because they knew SandRidge was recklessly spending in the Mississippian to the benefit of the Ward-Related Entities and

---

[14]   *See* ¶¶172 (Mar. 25, 2011 conference), 179 (April 12, 2011 conference), 187 (May 6, 2011 call), 194 (May 24, 2011 conference), 201 (Aug. 5, 2011 call), 228 (Feb. 7, 2012 conference), 257 (May 4, 2012 call).

[15]   *See* Gimbel Decl. Exs. 1-4 (March 25, 2011 presentation, April 12, 2011 presentation, May 6, 2011 transcript, May 24, 2011 presentation) (Dkt. No. 189-1).

to mask poor production.

As discussed in the Opposition to Ward's MTD, Ward knowingly made CapEx statements without a reasonable basis (W. Opp. at 13-14) and Ward's knowledge can be imputed to SandRidge. *See Adams*, 340 F.3d at 1107 ("[k]nowledge of a corporate officer or agent acting within the scope of authority is attributable to the corporation.")). *See* Part II.A. The court should reject the SandRidge Defendants' attempt to distinguish between the knowledge of Ward and SandRidge.

Furthermore, the success of Ward's scheme was facilitated by the complicity of SandRidge and its senior officers, including Grubb and Bennett. It cannot be disputed that the SandRidge Defendants were aware of the transactions by the Ward-Related Entities which were disclosed in SandRidge's SEC filings. A reasonable inference can be drawn that they were aware of others as well.[16] In fact, FE3 attended a meeting in 2013 during which Ward instructed a landman to lease land owned by Ward even though it produced natural gas instead of oil. ¶98.

Defendants argue that under the "adverse inference" exception, a corporate principal will not be charged with knowledge of an agent gained "in performance of acts" done on the agent's "own personal behalf" or "in matters where the agent's interest is adverse to that of his principal." SM at 12 (quoting *Long v. Brown*, 98 P.2d 28, 36 (Okla. 1939)). This

---

[16]  Ward is reportedly under criminal investigation for violations of federal antitrust laws, and is the unnamed co-conspirator described in a recently filed federal indictment alleging a conspiracy to violate antitrust laws. *See* Exs. B and C to the Kaufman Decl. Ward was also named as a defendant in a civil antitrust action. *See* Ex. D to Kaufman Decl. Plaintiffs request the ability to amend their pleading if new pertinent facts come to light as a result of these developments.

exception, however, only applies where "an officer acts *entirely* in his own interests and adversely to the interests of the corporation." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 382 (S.D.N.Y. 2015). Here, the adverse inference exception does not apply because SandRidge benefitted from the false and misleading CapEx statements. Hiding the Company's reckless spending from investors made SandRidge appear financially disciplined, and artificially inflated SandRidge stock. This, in turn, enabled SandRidge to raise capital to continue spending in the Mississippian.[17]

Finally, Defendants argue that omissions concerning the Ward-Related Entities' transactions were not material and did not lead SandRidge to increase its CapEx. Contrary to their argument, a reasonable investor would have found it material that Ward engaged in self-dealing front-running activities. The disclosure of these facts would have altered the total mix of information related to SandRidge's active involvement in the Mississippian.[18]

### D.   Responses to Defendants' Arguments Incorporated by Reference

Rather than include their arguments within the twenty five allowable pages, the

---

[17]   The cases cited by Defendants are distinguishable. In *Long v. Brown*, 98 P.2d 28, 36 (Okla. 1939), the court held that Company *A* could not be charged with knowledge of agent obtained while working for Company *B*. *Id.* Moreover, in that case, the principal is not alleged to have obtained a benefit. *Id.* Likewise, in *In re Stat-Tech Securities Litigation*, 905 F. Supp. 1416, 1422 (D. Colo. 1995), the principal was not alleged to have obtained any benefit. *See id.* Lastly, the issue of "[w]hether a principal has retained a benefit is at least in part a question of fact," and is therefore not suitable for resolution on a motion to dismiss. *See* Restatement (Third) of Agency §5.04 (comment d).

[18]   Because "[m]ateriality is a mixed question of law and fact," a complaint may not be dismissed on the basis of materiality unless the alleged facts are "so obviously important [or unimportant] to an investor, that reasonable minds cannot differ on the question of materiality." *Connett v. Justus Enter. of Kansas, Inc.*, 68 F.3d 382, 384 (10th Cir. 1995). Here, Defendants cannot prove that reasonable minds could not differ as to the importance of the Ward-related transactions.

SandRidge Defendants incorporate by reference all applicable arguments made in their and Ward's motions to dismiss the FAC and Ward's motion to dismiss the SAC. In response to Defendants' incorporated arguments, Plaintiffs incorporate by reference all applicable arguments made in their memoranda of law in opposition to the Defendants' motions to dismiss the FAC. *See* ECF Nos. 138, 140-142. These include, without limitation:

> *The SAC Adequately Pleads the Falsity of Production and Reserves.* Defendants argue the SAC does not plead the falsity of oil and gas projections with particularity. SM at 23. As explained in Plaintiffs' Opposition to the SandRidge Defendants' MTD the FAC, the SAC provides coherent and plausible facts when looked at as a whole. *See* ECF No. 138 at 11-16. The sources of Plaintiffs' facts are disclosed, such as SandRidge production data provided to the OTC for a statistically significant group of wells in the most active counties and the decline curve methodology. *See id.* And, it cannot seriously be disputed that the sources of the production data analyzed by Plaintiffs, SandRidge and the OTC, are reliable. *See id.* Finally, the stark contrast between SandRidge's production as shown in OTC filings and SandRidge's public disclosures, strongly "support[s] the conclusion that a reasonable person would believe that the defendants' statements were misleading." *See id.* (quoting *Adams*, 340 F.3d at 1099). At the appropriate time, Plaintiffs intend to provide evidence supporting the analysis. In the event the Court deems Plaintiffs' disclosures of the data and analysis incomplete for pleading purposes, Plaintiffs respectfully request the opportunity to provide additional details to the Court or amend the complaint.

> *Oil and Gas Reserves Are Not Inactionable Opinions.* Contrary to Defendants' argument, statements about SandRidge's type curve, and other production estimates and

projections, are not inactionable statements of opinion. As explained in the Opposition to Underwriters' MTD the FAC (ECF No. 141, at III.A.4) and the Response to Defendants' Supp. Brief in Support of MTD the FAC (ECF No. 182), the challenged statements about reserves and the gas to oil ratio are not opinions. SandRidge's proved reserve figures are calculated based on an objective standard using historical data using established engineering principles and methodologies, and by definition are "estimated with reasonable certainty." *See In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 778-79 (E.D. Va. 2015) (applying Omnicare and stating, "[a]s an initial matter, Defendants' statements regarding the adequacy of reserves in the instant case are not necessarily statements of opinion.").

Even if these statements were opinions, they are actionable. Under *Omnicare* an opinion can be "misleadingly incomplete" regardless of the Defendants' sincerity. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1328 (2015) (explaining that "a reasonable investor may . . . understand an opinion statement to convey facts about how the speaker has formed the opinion" or "about the speaker's basis for holding that view."). The reserve information, if deemed opinions, would be misleading because Defendants failed to disclose that reserves were not updated to account for the most recent production data showing steep drops in production inconsistent with the reserves.

*The Oil and Gas Reserves Are Not Entitled to Safe Harbor.* Defendants' argue that the PSLRA's safe harbor provision protects SandRidge's statements about its type curve, expected rate of return, and reserves. SM at 24. As explained in Plaintiffs' Oppositions to the SandRidge Defendants' and the Underwriters' MTDs the FAC, Defendants are wrong. *See* ECF No. 138, at Part II.A.2; ECF No. 142, at Part III.B.3. Many of the statements are

not forward-looking or are "mixed" statements of present and future events and not entitled to protection.  Even if some are forward-looking, the purportedly cautionary language was not meaningful and Plaintiffs have alleged sufficient facts demonstrating the statements were made with actual knowledge of their falsity.

*Statements Concerning CapEx Were Misleading When Made.*  As discussed above, Defendants' argument that the SAC does not sufficiently allege that SandRidge's CapEx statements were false when made (SM at 24-25) misses the point.  Plaintiffs do not allege that the figures themselves were false.  Plaintiffs allege Defendants did not have a reasonable basis to represent CapEx was set due to the failure to disclose that SandRidge spent recklessly in the Mississippian to the benefit of Ward.  *See* Opp. to SandRidge Defs.' MTD the FAC, ECF No. 138, at 20.

*SandRidge was Under a Duty to Disclose Ward's Self-Dealing Transactions, Which Are Material.*  Contrary to Defendants' argument (SM at 25), the misrepresentations concerning the transactions by the Ward-Related Entities were material and Defendants were under a duty to disclose facts about those transactions.  *See* Opp. to SandRidge Defs.' MTD the FAC, ECF No. 138, at 21-22.  *First*, Defendants were under a duty to fully disclose the self-dealing transactions.  Even though certain information about the sale of interests by the Ward-Related Entities to SandRidge may have been disclosed, the short amount of time between the acquisitions by the Ward-Related Entities and their sale to SandRidge, or its competitors, was material.  Additionally, the Ward-Related Entities benefitted from SandRidge's acquisitions in and development of the Mississippian.  Thus, the Ward-Related Entities were "related person[s]" that "had a direct or indirect material interest" in

SandRidge's acquisitions and development in the Mississippian, requiring disclosure under Item 404(a).

*Second*, the acquisitions by the Ward-Related Entities in the Mississippian in advance of SandRidge's acquisitions in those same areas were material because they would have altered the total mix of information for investors when evaluating SandRidge's business and spending in the Mississippian, since Ward and his family stood to gain as a result of increased spending and development by SandRidge.[19]  *See id.* at 21-22.[20]

## III.    CONCLUSION

Plaintiffs respectfully request that the SandRidge Defendants' motion be denied in its entirety.[21]

---

[19]    Additionally, Defendants were under a duty to disclose the transactions by the Ward-related entities under SEC Regulation S-K.  *See, e.g.*, ¶¶285-88, 292, 293.

[20]    Lastly, the SAC adequately pleads that Bennett and Grubb are liable under §20(a) of the Exchange Act, in that it alleges a primary violation against SandRidge and alleges that Bennett as CFO, and Grubb as President and COO, had the power to influence and control the decision making of the Company, and had direct involvement in the management of the Company.

[21]    In the event that any portion of the Complaint is found deficient, Plaintiffs respectfully request leave to amend the pleading to address such deficiencies.  *See Gilbreath v. Cleveland Cnty. Bd. of Cnty. Comm'rs*, 2012 U.S. Dist. LEXIS 93544, at *31 (W.D. Okla. July 6, 2012) ("[I]f it is at all possible that the party against whom the dismissal is directed can correct the defect in the pleading or state a claim for relief, the court should dismiss with leave to amend.").  Plaintiffs are able to add facts which were learned subsequent to the filing of the SAC.  Such allegations include, but are not limited to, (i) during the weekly production meetings attended by Ward and Grubb, GOR and decline curves of the Mississippian were specifically discussed, (ii) Bennett frequently attended the weekly management meetings and (iii) Ward and Grubb were described by a geologist as being extremely hands-on with respect to production and reserves.  Furthermore, Plaintiffs can add substantial detail concerning the analysis of SandRidge's production data in the event it is deemed necessary.

DATED:  March 11, 2016

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
CHRISTOPHER M. BARRETT

*s/ Evan J. Kaufman*
EVAN J. KAUFMAN
NY Bar Number: 2753614

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
cbarrett@rgrdlaw.com

*Lead Counsel for Plaintiffs*

DERRYBERRY & NAIFEH, LLP
DARREN B. DERRYBERRY
(OBA No. 14542)
4800 North Lincoln Blvd.
Oklahoma City, OK  73105
Telephone:  405/708-6784
405/528-6462 (fax)
dderryberry@derryberrylaw.com

*Liaison Counsel*

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK
225 Broadway, Suite 2050
San Diego, CA 92101
Telephone:  619/342-8000
619/342-7878 (fax)
ambere@zhlaw.com

*Additional Plaintiffs' Counsel*

<u>CERTIFICATE OF SERVICE</u>

I, Evan J. Kaufman, certify that on March 11, 2016, I caused a true and correct copy of the foregoing document to be served electronically on all counsel of record registered for electronic service for this case and by first-class mail on all other counsel of record.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 11th day of March 2016 at Melville, New York.

*s/ Evan J. Kaufman*
EVAN J. KAUFMAN
NY Bar Number: 2753614

ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
ekaufman@rgrdlaw.com

*Lead Counsel*
