UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re SANDRIDGE ENERGY, INC. SECURITIES LITIGATION | ) ) ) ) | No. 5:12-cv-01341-LRW<br><br>CLASS ACTION |
| This Document Relates To:<br><br>ALL ACTIONS. | ) ) ) ) ) ) | PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO TOM L. WARD'S MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED COMPLAINT |

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ............................................................... 1

II.  STATEMENT OF FACTS ...................................................................... 3

    A.   The Mississippian Play Performed Worse than Represented ...................... 3

    B.   SandRidge Spent Recklessly in the Mississippian ...................................... 5

    C.   Ward Benefitted from SandRidge's Reckless Spending .............................. 6

    D.   SandRidge's Stock Declines, the Fraud Is Partially Revealed, and
         Ward Is Terminated ........................................................................................ 6

III. ARGUMENT .......................................................................................... 7

    A.   The SAC Creates a Strong Inference of Scienter ........................................ 7

         1.   The SAC Adequately Alleges Ward's Scienter for Statements
              Concerning the Mississippian's Performance ................................... 8

         2.   Additional Allegations Supporting Scienter ................................... 11

         3.   Ward's Statements Concerning Financial Discipline and
              CapEx Were Knowingly False or Misleading ................................. 12

         4.   Ward's Motive Bolsters the Strong Inference of Scienter .............. 13

         5.   Ward's Other Arguments Do Not Defeat a Strong Inference
              of Scienter ....................................................................................... 17

    B.   The SAC Adequately Alleges Violations of §20(a) ................................... 22

IV.  CONCLUSION ..................................................................................... 23

# TABLE OF AUTHORITIES

Page

## CASES

*Abell v. Sothen*,
214 F. App'x 743 (10th Cir. 2007) .......................................................................... 7, 16

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ............................................................................. *passim*

*Arocho v. Nafziger*,
367 F. App'x 942 (10th Cir. 2010) ............................................................................. 19

*Better v. YRC Worldwide Inc.*,
2012 U.S. Dist. LEXIS 136749
(D. Kan. Sept. 25, 2012) ...................................................................................... 10, 21

*Brumbaugh v. Wave Systems Corp.*,
416 F. Supp. 2d 239 (D. Mass. 2006) ....................................................................... 14

*California Public Emps.' Ret. Sys. v. The Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) ....................................................................................... 20

*City of Phila v. Fleming Cos.*,
264 F.3d 1262 (10th Cir. 2001) ................................................................................. 13

*Crowell v. Ionics, Inc.*,
343 F. Supp. 2d 1 (D. Mass. 2004) ........................................................................... 20

*Dep't of the Treasury of N.J. v. Cliffs Nat. Res.*,
2015 U.S. Dist. LEXIS 151359
(N.D. Ohio Nov. 6, 2015) .......................................................................................... 21

*Gilbreath v. Cleveland Cnty. Bd. of Cnty. Comm'rs*,
2012 U.S. Dist. LEXIS 93544
(W.D. Okla. July 6, 2012) ......................................................................................... 23

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ..................................................................................... 20

*In re Ashanti Goldfields Sec. Litig.*,
2004 WL 626810
(E.D.N.Y. Mar. 30, 2004) .......................................................................................... 20

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) ........................................................................ 20

*In re Daou Sys., Inc. Sec. Litig.*,
  411 F.3d 1006 (9th Cir. 2005) ................................................................... 20

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)........................................................ 19

*In re Molycorp, Inc. Sec. Litig.*,
  2016 WL 233402
  (D. Colo. Jan. 20, 2016) ................................................................ 11, 21, 22

*In re Smith Barney Transfer Agent Litig.*,
  884 F. Supp. 2d 152 (S.D.N.Y. 2012)........................................................... 8

*In re Stillwater Capital Partners Inc. Litig.*,
  858 F. Supp. 2d 277 (S.D.N.Y. 2012)........................................................... 8

*In re Thornburg Mortg. Sec. Litig.*,
  695 F. Supp. 2d 1165 (D.N.M. 2010) ......................................................... 14

*In re Wachovia Equity Sec. Litig.*
  753 F. Supp. 2d 326 (S.D.N.Y. 2011)......................................................... 20

*In re Weinstein*,
  757 F.3d 1110 (10th Cir. 2014) ............................................................. 2, 13

*In re Williams Sec. Litig.*,
  339 F. Supp. 2d 1206 (N.D. Okla. 2003)................................................. 8, 20

*Ley v. Visteon Corp.*,
  543 F.3d 801 (6th Cir. 2008) ..................................................................... 21

*Loritz v. Exide Techs.*,
  2014 U.S. Dist. LEXIS 111491
  (C.D. Cal. Aug. 7, 2014) ............................................................................ 21

*Marcus v. Frome*,
  329 F. Supp. 2d 464 (S.D.N.Y. 2004)........................................... 14, 16, 17

*Mishkin v. Zynex, Inc.*,
  2011 U.S. Dist. LEXIS 34467
  (D. Colo. Mar. 30, 2011)...................................................................... 12, 21

*Nakkhumpun v. Taylor*,
  782 F.3d 1142 (10th Cir. 2015) .............................................................. 8, 13

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
   455 F. Appx. 10 (2d Cir. 2011) .................................................................. 11

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ...................................................................... 20

*S.E.C. v. Cavanagh*,
   155 F.3d 129 (2d Cir. 1998) ................................................................ 16, 17

*S.E.C. v. China Ne. Petroleum Holdings Ltd.*,
   27 F. Supp. 3d 379 (S.D.N.Y. 2014) ................................................... *passim*

*Scheuer v. Rhodes*,
   416 U.S. 232 (1974) .............................................................................. 7, 15

*Sekuk Global Enter. v. KVH Indus., Inc.*,
   2005 U.S. Dist. LEXIS 16628
   (D.R.I. Aug. 11, 2005) ............................................................................ 14

*Simon v. Abiomed, Inc.*,
   37 F. Supp. 3d 499 (D. Mass. 2014) .......................................................... 22

*Tal v. Hogan*,
   453 F.3d 1244 (10th Cir. 2006) ................................................................ 19

*Teachers' Ret. Sys. of La. v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) .................................................................... 20

*Tellabs, Inc. v Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................ 8, 15, 20

*Touchtone Grp., LLC v. Rink*,
   913 F. Supp. 2d 1063 (D. Colo. 2012) .................................................. 12, 14

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
   2008 U.S. Dist. LEXIS 47748
   (D. Colo. Mar. 28, 2008) ..................................................................... 11, 21

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) .................................................................... 21

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §78t(a) ...................................................................................................................... 23

Private Securities Litigation Reform Act ........................................................................ 12

**SECONDARY AUTHORITIES**

Richard Finger, *SandRidge CEO Tom Ward Fired But Gets $90.9 Million?*
  *What The...?* ............................................................................................................. 7

## TABLE OF ABBREVIATIONS AND DEFINED TERMS

¶__ :                         Citations to Second Consolidated Amended Complaint

**192 Investments:**          192 Investments, L.L.C., a limited liability company owned by three trusts established for the benefit of Ward's children

**Class Period:**             February 24, 2011 through November 8, 2012

**Decline Curve:**            A standard tool commonly used by petroleum engineers to determine remaining reserves and EUR for wells with production history.

**Defendants:**               SandRidge Energy, Inc., Tom L. Ward, James D. Bennett, and Matthew K. Grubb

**Drilling and Completion Reports:**    Reports emailed to recipients Company-wide that contained production data.

**EUR:**                      Estimated ultimate recovery, the sum of reserves remaining as of a given date and cumulative production as of that date.

**Exploration Meetings:**     Weekly meetings attended by landmen, reservoir engineers, geologists, vice presidents, and Ward and Grubb. Those in attendance at the Exploration Meetings discussed drill schedules, wells that were going to be drilled, prospective drilling areas, and production at existing wells. The poor performance of the Mississippian was also discussed during these meetings.

**FAC:**                      Corrected Consolidated Amended Complaint (ECF No. 75)

**FE:**                       Former Employees, which refers to the former geologists interviewed by Plaintiffs in connection with their investigation of the conduct alleged in the Second Consolidated Amended Complaint

**GOR:**                      Gas-to-oil ratio, a ratio of gas/oil produced from one barrel of crude oil at reservoir temperature and pressure, and expressed in the units standard cubic feet per barrel of oil.

**Individual Defendants:**    Tom L. Ward, James D. Bennett, and Matthew K. Grubb

**IPO:**                      Initial public offering

| | |
|---|---|
| **Johnson:** | Rodney Johnson, one of SandRidge's most-senior executives and the head of the Company's Reservoir Engineering Department |
| **Kaufman Decl.:** | Declaration of Evan J. Kaufman in Opposition to the SandRidge Defendants' Motion to Dismiss the Second Consolidated Amended Complaint |
| **Management Meetings:** | Weekly management meetings on the 28th floor of SandRidge's Oklahoma City headquarters, which lasted approximately one to two hours, run by Ward and Grubb and attended by numerous SandRidge geologists and senior executives. During these meetings, management and senior geologists would discuss the status of drilling and production levels. |
| **Mbbl:** | One thousand barrels of oil or other liquid hydrocarbons |
| **MBOE:** | One thousand barrels of oil equivalent |
| **Mississippian or the Mississippian play:** | SandRidge's core oil and gas holdings in Oklahoma and Kansas |
| **MMscf:** | One million standard cubic feet |
| **MTD:** | Motion to dismiss |
| **MTDs the FAC:** | Refers to the four motions to dismiss the First Consolidated Amended Complaint (ECF Nos. 138, 140-42) |
| **Opposition to the SandRidge Defs.' MTD the SAC:** | Plaintiffs' Memorandum of Law in Opposition to the SandRidge Defendants' Motion to Dismiss the Second Consolidated Amended Complaint |
| **Opposition to Ward's MTD the SAC:** | Plaintiffs' Memorandum of Law in Opposition to Tom L. Ward's Motion to Dismiss the Second Consolidated Amended Complaint |
| **OTC:** | Oklahoma Tax Commission |
| **PSLRA:** | Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 |

| | |
|---|---|
| **RED:** | Reservoir Engineering Department, which SandRidge represented continually monitored asset performance and made reserves estimate adjustments, as necessary, to ensure the most current reservoir information was reflected in reserves estimates.  According to the Company, during the Class Period, the RED had a total of 18 full time employees, comprised of seven degreed engineers and 11 engineering analysts/technicians with a minimum of a four-year degree in mathematics, economics, finance or other business or science field. |
| **S. Opp at __.:** | Citations to Plaintiffs' Memorandum of Law in Opposition to the SandRidge Defendants' Motion to Dismiss the Second Amended Consolidated Complaint |
| **S. Order:** | Court's order entered on August 27, 2015 dismissing claims against the SandRidge Defendants (ECF No. 184) |
| **SAC:** | Second Consolidated Amended Complaint (ECF No. 188) |
| **SandRidge Defendants:** | SandRidge Energy, Inc., James D. Bennett, and Matthew K. Grubb |
| **SandRidge or the Company:** | SandRidge Energy, Inc. |
| **SM:** | Opening Brief in Support of SandRidge Defendants' Motion to Dismiss the Second Consolidated Amended Complaint (ECF No. 189) |
| **Team Meetings:** | Weekly team meetings attended by employees that worked on the Mississippian, at which the team would discuss production levels in depth and determine the information that would be reported to Ward. |
| **TLW Land & Cattle:** | TLW Land & Cattle, L.P. |
| **TPG-Axon:** | TPG-Axon Capital, one of the largest shareholders of SandRidge common stock during the Class Period |
| **Trust I:** | Mississippi Trust I |
| **Trust II:** | Mississippi Trust II |
| **Trusts:** | Mississippi Trust I and Mississippi Trust II |

**W. Opp. at__:**            Citations to Plaintiffs' Memorandum of Law in Opposition to Ward's Motion to Dismiss the Second Amended Consolidated Complaint

**W. Order:**                Court's order entered on August 27, 2015 dismissing claims against Ward (ECF No. 185)

**Ward-Related Entities:**   Several entities affiliated with defendant Ward that operate in the same business and location as SandRidge, including, among others, WCT Resources, 192 Investments, and TLW Land & Cattle

**WCT Resources:**          WCT Resources, L.L.C., a limited liability company owned by three trusts established for the benefit of Ward's children

**WM:**                    Opening Brief in Support of Tom L. Ward's Motion to Dismiss the Second Consolidated Amended Complaint (ECF No. 190)

Lead Plaintiffs Laborers Pension Trust Fund for Northern Nevada, Construction Laborers Pension Trust of Greater St. Louis, and Vladimir and Angelica Galkin (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to the motion to dismiss the Second Consolidated Amended Complaint (the "SAC"; cited herein as "¶_") filed by defendant Tom L. Ward.[1]

## I.    PRELIMINARY STATEMENT[2]

Committing fraud apparently pays if your name is Tom Ward.  Despite failing to deliver any meaningful value to SandRidge shareholders,[3] despite using SandRidge to benefit himself and his children to the detriment of SandRidge, despite making numerous false and misleading statements during the Class Period, and despite being fired from the Company, Mr. Ward earned tens of millions of dollars while employed by SandRidge and walked away from SandRidge with severance payments exceeding ***$90 million***.[4]

The First Consolidated Amended Complaint ("FAC") was dismissed, in large part, on scienter grounds (*see* Aug. 27, 2015 Order, ECF No. 185 (the "*W. Order*")).  The SAC

---

[1]   "SandRidge Defendants" refer to SandRidge Energy, Inc., James D. Bennett, and Matthew K. Grubb.  "Defendants" refers to the SandRidge Defendants and Ward.

[2]   Plaintiffs incorporate by reference all arguments from the Opposition to the SandRidge Defs.' MTD the SAC, submitted herewith, and the oppositions to defendants' MTDs the FAC. ECF Nos. 138, 140-42.  Citations, footnotes, and internal quotation marks omitted and all emphasis added unless otherwise noted.

[3]   As of March 11, 2016, shares of SandRidge common stock were trading around $0.10 per share – a 99.9% decline from their Class Period high of $12.97.

[4]   Ward is reportedly now under criminal investigation for violations of federal antitrust laws, and is the unnamed co-conspirator described in a recently filed federal indictment alleging a conspiracy to violate antitrust laws.  *See* Exs. B and C to the Kaufman Decl.  Ward was also named as a defendant in a civil antitrust action.  *See* Ex. D to Kaufman Decl. Plaintiffs request the ability to amend their pleading if new pertinent facts come to light as a result of these developments.

contains numerous additional allegations based in part on the first-hand knowledge of former SandRidge geologists ("Former Employees" or "FEs") and cures any perceived deficiencies. These Former Employees attended the same meetings as defendant Ward where the performance of the Company's Mississippian play was discussed ***every week***.

When dismissing the FAC, the Court stated that allegations showing that "Ward ***may have*** received reports from the Reservoir Engineering Department [did] not alone demonstrate a mental statement embracing intent to deceive, manipulate, or defraud." *W. Order* at 17.  The SAC cures any perceived defects since it alleges that Ward attended weekly meetings at which the actual production of SandRidge's wells was discussed (¶¶123, 127), and Ward was sent reports of the Mississippian's actual production data on at least a daily basis (¶¶125, 129).  In other words, the SAC alleges that Ward made statements and had access to information contrary to his statements, supporting a strong inference of scienter.  Moreover, because the actual production data contradicted Ward's public statements, the actual production data "was so obviously material" Ward "must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *In re Weinstein*, 757 F.3d 1110, 1113 (10th Cir. 2014); *see also W. Order* at 21.

Although these allegations alone create a strong inference of scienter, Ward's scienter is also supported by the following:

- Ward can be charged with knowledge because the misstatements in question concern key parts of SandRidge's business.

- The large overstatement (***over 600%***) of SandRidge's stated oil EUR compared with the EUR revealed through an analysis of SandRidge's production data reported to the OTC supports an inference of scienter.

- Ward's knowledge of SandRidge's production in the Mississippian is supported by his and his children's personal interests in the region through the Ward-Related Entities.

- The SAC's strong inference of scienter is bolstered by compelling motive allegations.  ¶¶82, 332-39.  For example, Ward was motivated to misstate SandRidge's production and to omit material facts in order to benefit his children, who stood to gain financially from the transactions of the Ward-Related Entities within the Mississippian.

- Ward was motivated to misstate SandRidge's production data and financial discipline in order mask declining production in older wells with longer production histories (¶¶156, 161, 275, 286), and to enable SandRidge to conduct lucrative offerings (including almost $1 billion from the Trusts) to continue investing in the Mississippian.

Because the SAC's allegations – when considered collectively – are susceptible to an inference of scienter that is "at least as compelling as" any competing inference, Plaintiffs request that Ward's motion to dismiss the SAC be denied in its entirety.[5]

## II.  STATEMENT OF FACTS

### A.  The Mississippian Play Performed Worse than Represented

Throughout the Class Period, Defendants misrepresented the performance of SandRidge's core Mississippian play, including the estimated ultimate recovery ("EUR"), the gas-to-oil ratio ("GOR"), the decline rates, and the economic value of SandRidge's wells. ¶132.  Plaintiffs demonstrated the falsity and misleading nature of the statements by analyzing, with the assistance of an independent engineering consulting firm, a statistically

---

[5]  Ward limits his arguments in his motion to the issue of scienter. As such, Plaintiffs only address these arguments herein.  As discussed in Plaintiffs' Opposition to the SandRidge Defendants' MTD the SAC and Plaintiffs' oppositions to Defendants' MTDs the FAC (which are incorporated herein by reference) Plaintiffs have adequately alleged each of the other elements of Plaintiffs' claims. *See* ECF Nos. 138, 140-42.

significant and unbiased selection of production data from SandRidge's most active wells in the Mississippian as reported to the Oklahoma Tax Commission ("OTC").  ¶¶19-20.

For example, SandRidge misrepresented the GOR of its wells when it represented that the GOR of the average horizontal Mississippian well was 52% gas and 48% oil during 2011, and 45% gas and 55% oil during 2012.  *E.g*, ¶6.  According to SandRidge's own production data, however, SandRidge produced on average less than ***40% oil*** and ***more than 60% gas*** during 2011 and 35% oil and 65% gas during 2012.  *Id*., ¶¶6, 143.

Relatedly, Defendants failed to disclose that the Company's initial wells in the Mississippian were experiencing a significant drop in production.  ¶135.  At the start of 2011, SandRidge represented the EUR per well of the Company's typical horizontal well in the Mississippian play as 409 MBOE, and then, at the beginning of 2012, SandRidge claimed the EUR had ***increased*** to 456 MBOE.  ¶¶133-35.  But, according to an analysis of the Company's production data available to Defendants at the time of their statements, by March 2012, production had dropped sharply in SandRidge's Mississippian wells with longer production histories, and rates were declining much faster than the average well presented by SandRidge.  ¶135.  In fact, a decline curve analysis of SandRidge data reported to the OTC showed that SandRidge's initial horizontal Mississippian wells with longer production histories were expected to yield an EUR of oil of no more than 32.5 MBOE – 84% less than reported.  ¶¶134, 136.  In other words, Defendants ***overstated the EUR of oil by over 600%*** (*i.e*., reporting 204 MBOE when it was actually 32.5 MBOE).

### B.    SandRidge Spent Recklessly in the Mississippian

When SandRidge began developing the Mississippian in early 2011, the Company assured investors it was focused on cash flow and maintaining financial discipline, and as a result, by 2014, that the Company would have a "self-funding capital program" which would be operating "all within [SandRidge's] cash flow," and would "improv[e] [its] credit metrics."  ¶105.  On February 24, 2011, SandRidge announced CapEx guidance of $1.3 billion for fiscal year 2011.  ¶106.  In the months following that announcement, the Company repeatedly expressed confidence in that guidance.  ¶¶158, 179.

Nevertheless, throughout the Class Period, SandRidge blew through CapEx budgets to spend more in the Mississippian and raise more and more capital to fund its spending. ¶¶105-13.  On April 7, 2011, the Company raised approximately $338.7 million through the Mississippi Trust I ("Trust I") IPO.  ¶¶73-74.  On August 4, 2011, SandRidge increased the 2011 CapEx guidance from $1.3 billion to $1.8 billion.  ¶¶107, 199.  Ward attributed the increase primarily to "increased leasing activity, well count and well costs in the Mississippian play" (*id.*), and also noted that CapEx was being increased in part because SandRidge was looking to acquire additional acreage in the Mississippian.  ¶¶108-09, 199, 201.

On April 18, 2012, SandRidge raised approximately $590 million through the SandRidge Mississippian Trust II ("Trust II") IPO.  ¶¶77-78.  SandRidge raised its CapEx $250 million in August 2012, from $1.85 billion to $2.1 billion, and then again on November 8, 2012, to $2.15 billion.  ¶¶109, 268, 271.

### C.    Ward Benefitted from SandRidge's Reckless Spending

During the Class Period, Ward engaged in front-running transactions in the Mississippian through affiliated entities including several that were owned for the benefit of his children (the "Ward-Related Entities").  Specifically, the Ward-Related Entities purchased interests and then sold them to SandRidge at a profit, and they purchased land adjacent to areas SandRidge would acquire, benefitting from SandRidge's drilling and eventual development in the area.  ¶¶91-101.[6]

In March 2012, the Company represented that its Mississippian land appreciated by 21 times its value ($200 per acre purchase price) – implying a value of $4,236 per acre. Using the same value per acre, the Ward-Related Entities' 475,000 acres were valued at $2 billion.  ¶¶335-36.  Further, SandRidge stated that the implied value of its Mississippian holdings was $15,000 per acre, resulting in a $7.125 billion valuation for the Ward-Related Entities' interests.  *Id.*  These estimates are corroborated by TPG-Axon's conclusion that the land acquired by the Ward-Related Entities could be worth billions of dollars.  *Id.*

### D.    SandRidge's Stock Declines, the Fraud Is Partially Revealed, and Ward Is Terminated

After the close of trading on November 8, 2012, SandRidge announced its financial results for the third quarter of 2012, reporting a loss of $184 million.  ¶298.  SandRidge acknowledged that the EUR for its typical Mississippian horizontal well was lower than

---

[6]    Although SandRidge made certain purported disclosures regarding Ward's transactions, these disclosures did not reveal the short amount of time between the Ward-Related Entities' acquisitions and sales of holdings.  ¶¶93-94.  For example, the Company did not disclose that, during 2010, WCT Resources acquired various mineral rights in Oklahoma and then, ***only three weeks later***, flipped certain of those mineral rights to SandRidge.  ¶94; *see also* ¶97.

represented and that there was more natural gas and less oil recoverable than it stated during the Class Period.  ¶¶300-01.  Also on November 8, 2012, a large SandRidge shareholder, TPG-Axon, publicly issued a letter to the Company's Board challenging Ward's self-dealing and calling for his resignation.  ¶299.  This letter disclosed, among other things, Ward's improper front-running, explaining that Ward had been purchasing massive holdings of ranchland and then turning around and leasing the land back to SandRidge.  *Id*.

Thereafter, the Board investigated Ward's conduct as first revealed in the TPG-Axon letter.  On June 19, 2013, the Board completed its investigation and Ward was terminated as Chairman and CEO of the Company.  ¶¶13, 317.  Ward received a severance payment of at least $90.9 million in connection with his termination.[7]

## III.    ARGUMENT

At the motion to dismiss stage, a court must accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.  *W. Order*, at *4.  The issue is "'not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims.'"  *Abell v. Sothen*, 214 F. App'x 743, 750 (10th Cir. 2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

### A.      The SAC Creates a Strong Inference of Scienter

When evaluating scienter, the court must undertake a holistic analysis and assess how all of the scienter allegations stand together.  *See W. Order* at 14. Scienter "includes (1)

---

[7]    *See* Richard Finger, *SandRidge CEO Tom Ward Fired But Gets $90.9 Million? What The...?*, attached as Ex. E to the Kaufman Decl.

intentional misconduct, defined as deliberate illegal behavior, and (2) recklessness, defined as conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that he must have been aware of it." *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1218 (N.D. Okla. 2003). As the Supreme Court explained in *Tellabs, Inc. v Makor Issues & Rights, Ltd.*, "[t]he inference that the defendant acted with scienter need not be irrefutable . . . or even the most plausible of competing inferences," but merely "at least as compelling as any opposing inference one could draw from the facts alleged." 551 U.S. 308, 324 (2007). In other words, a tie goes to the plaintiff. *See Id.*; *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1147 (10th Cir. 2015). As discussed below, the TAC meets this standard.

## 1.    The SAC Adequately Alleges Ward's Scienter for Statements Concerning the Mississippian's Performance

During the Class Period, Defendant Ward[8] misrepresented and omitted material information concerning the performance of the Company's wells in the Mississippian, including statements concerning the amount of natural gas relative to oil, the steep drop-off in production experienced by SandRidge's initial wells, and the EUR for the wells.[9] The SAC contains numerous allegations supporting a strong inference that Ward knew, or recklessly disregarded, that he made materially false or misleading statements and omitted material information. *See, e.g.*, ¶¶123-29. The SAC, like the FAC, alleges that SandRidge

---

[8]    Ward is also considered a "maker" of the statements contained in the Company's Forms 10-K and 10-Q and the Trusts' registration statements because he signed or certified them. *See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 163–65 (S.D.N.Y. 2012); *In re Stillwater Capital Partners Inc. Litig.*, 858 F. Supp. 2d 277, 287–88 (S.D.N.Y. 2012).

[9]    *See respectively* ¶¶155, 164, 177, 183, 199, 226, 228-229, 231, 236, 241-242, 248, 252, 257, 266, 279, 281; and ¶¶248, 252, 257, 266, 279, 281.

had a robust internal "Reservoir Engineering Department" ("RED"), which reported directly to Grubb, comprised of 18 highly skilled full-time employees devoted to monitoring and reviewing its oil production.  ¶¶114-22.  The Company assured investors this department "continually monitors asset performance and *makes reserves estimate adjustments, as necessary* to ensure the most current reservoir information is reflected in reserve estimates." ¶114.

Furthermore, SandRidge stated it worked closely with independent consultants to "ensure the integrity, accuracy and timeliness of an annually developed independent reserves estimate," and the results of these efforts were reported to the Executive Committee, on which Ward served.  Similarly, the SAC, like the FAC, alleges that Ward knew the true state of SandRidge's production through quarterly updates about the status of, and approved all changes to, SandRidge's reserves.  ¶120.

Even though the FAC contained these and other allegations supporting scienter, the Court held this was not enough.  *W. Order* at 17.  The Court reasoned, allegations that "Ward *may have* received reports from the [RED]" alone "[did] not . . . demonstrate a mental statement embracing intent to deceive, manipulate, or defraud."  *Id.*

The SAC alleges important new facts strengthening Plaintiffs' scienter allegations and satisfying the Court's standard.  These facts, based in part on interviews with former SandRidge geologists, demonstrate that Ward closely monitored SandRidge's oil and gas production and reserves in the Mississippian.  It is clear, based on the allegations in the SAC, that Ward *did receive reports and attend meetings* about SandRidge's production and reserves in the Mississippian on a regular basis.

SandRidge's wells were continually monitored by RED, which presented the status of SandRidge's reserves to the Executive Committee, of which Ward was a member.  ¶323. Ward, however, reviewed SandRidge's Mississippian production data much more frequently than on a quarterly basis.  Information collected by the RED was regularly communicated to Ward during meetings and in writing.[10]  ¶¶123-29.  Ward with Grubb ran weekly "Management Meetings" which lasted between one to two hours during which the production performance of the Mississippian was routinely discussed.  ¶123.  Numerous SandRidge geologists and senior executives, including Todd Lipton and Rodney Johnson (two of the Company's four Executive Vice Presidents), attended these meetings.  ¶123-24. During these meetings, production data was provided by county or township, and the performance of individual wells was discussed.  ¶124.

SandRidge also held weekly "Team Meetings," at which the production level of the Mississippian was discussed in depth and then information from the meetings was reported directly to Ward.  ¶123.  Defendant Ward also received information about the Mississippian through his attendance at weekly "Exploration Meetings" during which the poor performance of production at the Mississippian was discussed.  ¶127.

In addition to learning about SandRidge's actual production in the Mississippian during meetings, Ward was apprised of the actual production in the Mississippian through daily emails, referred to as "Drilling and Completion Reports," sent to recipients Company-wide, including Ward and other senior executives of the Company.  ¶129.  *See Better v. YRC*

---

[10]  Ward is, by training and education, a professional landman highly experienced in all facets of the business of oil exploration and production and, for this reason, was able to fully understand the significance of the production reports he received on a regular basis.  ¶29.

*Worldwide Inc.*, 2012 U.S. Dist. LEXIS 136749, at *7 (D. Kan. Sept. 25, 2012) (strong inference of scienter where "defendants had first-hand knowledge (through written reports, meetings, email, etc.) of the company's poor financial state"); *W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, 2008 U.S. Dist. LEXIS 47748, at *47 (D. Colo. Mar. 28, 2008) (strong inference of scienter where defendant "was in charge of meetings regarding how to replace the cancelled or delayed Verizon order, and thus he was aware of the issue regarding this lost revenue and yet no disclosure was made").

### 2.   Additional Allegations Supporting Scienter

The SAC contains other allegations contributing to a strong inference of scienter.  It cannot be seriously disputed that production in the Mississippian was a core part of SandRidge's business.  Key high-level officers, such as Ward, are charged with knowledge because the misstatements in question concern key parts of SandRidge's business.  *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003) (finding that a "substantial contribution" to earnings would have been known by the president and CEO); *In re Molycorp, Inc. Sec. Litig.*, 2016 WL 233402, at *15 (D. Colo. Jan. 20, 2016) ("Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis."); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. Appx. 10, 14 n.3 (2d Cir. 2011) (core operations doctrine "can provide supplemental support for allegations of scienter").

Furthermore, the magnitude of the discrepancies between SandRidge's internal production data, as reported to the OTC, and its publicly reported production and reserves, such as the 626% overstatement in oil EUR, supports an inference of scienter.  *See Adams*,

340 F.3d at 1106 ("Strengthening the inference that [defendant] knew of the statements was the magnitude of the alleged falsity."); *Mishkin v. Zynex, Inc.*, 2011 U.S. Dist. LEXIS 34467, at *20 (D. Colo. Mar. 30, 2011) ("the magnitude of the corrections to Zynex's financial statements once Zynex recognized publicly that it could not collect anything close to the amounts routinely billed to insurers" was indicative of scienter); *Touchtone Grp., LLC v. Rink*, 913 F. Supp. 2d 1063, 1080 (D. Colo. 2012) ("The Tenth Circuit has found 'the magnitude of the alleged falsity' to be a significant factor in assessing whether a plaintiff has sufficiently alleged scienter.").

Moreover, Ward likely would have learned details of SandRidge's production through his communication with Grubb, SandRidge's President, who directly supervised the RED.[11] Finally, Ward's knowledge of SandRidge's production in the Mississippian is supported by his personal interest in the region through the Ward-Related Entities.

### 3. Ward's Statements Concerning Financial Discipline and CapEx Were Knowingly False or Misleading

During the Class Period, Ward misstated and omitted material information concerning the Company's purported financial discipline, the improper transactions of the Ward-Related Entities in the Mississippian, and the Company's reckless spending in the Mississippian that harmed the Company but benefited the Ward-Related Entities.[12]

---

[11]   *See Adams*, 340 F.3d at 1106 (imputing scienter from one senior company officer to another reasoning that "[b]ecause McKenzie was Hall's chief financial officer, the fact that McKenzie was aware that the financial statements were false reduces the likelihood that Hall was ignorant of that fact").

[12]   *See respectively* ¶¶155, 160, 170, 185, 189, 191, 199, 206-07, 214, 228-29, 236, 238, 241-42, 244, 246, 250, 257, 263, 275-76; and ¶¶158, 179, 183, 189, 194, 199, 228-29, 241-42, 257.

These statements were also made with scienter. Ward understood, however, that: (i) SandRidge's CapEx was increasing at a significant multiple to the Company's cash flow from operations, thereby requiring the Company to raise capital through the issuance of debt, the sale of new securities, and the sale of valuable assets; and (ii) as a result of the Company's overstated oil fraction and steep decline in oil production rates (during 2012), the Company would need to substantially increase investment and drilling in order to report improved production results. ¶¶131, 150-51. Due to SandRidge's strained cash position and the Company's drastic understatement of its GOR, Ward had no reasonable basis to maintain that the Company had the intention or ability to meet its CapEx guidelines. *Id.* Additionally, Ward knew that SandRidge's massive spending in the Mississippian benefitted the Ward-Related Entities. Given that Ward, as CEO, was entrusted to look after the interests of the shareholders, the fact that he was engaged in transactions to benefit himself and his family is a fact "so obviously material" that he "must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *Weinstein*, 757 F.3d at 1113.

### 4. Ward's Motive Bolsters the Strong Inference of Scienter

Because the allegations discussed in the previous sections, taken collectively, plead a strong inference of scienter, Plaintiffs need not allege Ward's motive. *See Nakkhumpun*, 782 F.3d at 1152 ("scienter allegations may suffice even without a motive"). Nonetheless, Plaintiffs also allege compelling motive allegations, which although unnecessary, provide additional support for scienter. ¶¶104, 350-54. *City of Phila v. Fleming Cos.*, 264 F.3d 1262, 1262 (10th Cir. 2001) ("courts must look to the totality of the pleadings to determine

whether the plaintiffs' allegations permit a strong inference of fraudulent intent," and "[a]llegations of motive and opportunity may be important to that totality. . . .").

"To succeed in establishing scienter with a motive and opportunity pleading, plaintiffs had to allege 'that defendants benefitted in some concrete and personal way from the purported fraud'. . . ." *Id.* at1261. Moreover, the requirement that the benefit be "concrete" does not require that the benefits accrue directly to the defendant. *See S.E.C. v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 389 (S.D.N.Y. 2014). A benefit to a family member "constitutes a sufficiently concrete and personal benefit to infer motive." *Id.* (citing *Marcus v. Frome*, 329 F. Supp. 2d 464, 473 (S.D.N.Y. 2004)).

Here, Plaintiffs' motive allegations strongly support Plaintiffs' already compelling scienter allegations. Ward was motivated to misstate SandRidge's production, reserves, financial discipline, and to omit material information concerning the Ward-Related Entities' front-running, in order to benefit himself and his children by increasing the value of the Ward-Related Entities' interests, inflate the value of the Company's stock, hide lower-than-reported reserves in the Mississippian, and enable SandRidge to conduct lucrative offerings (including almost $1 billion from the Trusts) to continue investing in the Mississippian.[13] This increased spending in the Mississippian enabled SandRidge to report increased total production volumes that masked declining production in older wells with longer production

---

[13] *See, e.g.*, *In re Thornburg Mortg. Sec. Litig.*, 695 F. Supp. 2d 1165, 1202 (D.N.M. 2010) ("the desire to raise capital through public securities offering," along with other allegations supports scienter); *Sekuk Global Enter. v. KVH Indus., Inc.*, 2005 U.S. Dist. LEXIS 16628, at *46 (D.R.I. Aug. 11, 2005) (scienter requirement satisfied, in part, because successful secondary offering was alleged); *Brumbaugh v. Wave Systems Corp.*, 416 F. Supp. 2d 239, 252 (D. Mass. 2006) (private placement offering demonstrated motive and opportunity).

histories.  *See e.g.*, ¶148.  Importantly, the longer Ward kept the scheme going, the more front-running he could accomplish in the Mississippian.

Accepting as true all well-pleaded facts (*S. Order* at 4-5), it would be difficult to imagine a scenario in which Ward was unaware that he misrepresented SandRidge's production and reserves to investors.  And one would be hard-pressed to conclude that such an inference is more compelling than the inference of scienter.  *See Tellabs*, 551 U.S. at 324. SandRidge's business and profitability is dependent upon oil and gas production and reserves.  It is not plausible that Ward did not keep a watch on the performance of SandRidge's Mississippian wells very closely.  Under these circumstances, Plaintiffs have pleaded a strong inference of scienter and are "'entitled to offer evidence to support the claims.'"  *Abell*, 214 F. App'x at 750 (quoting *Scheuer*, 416 U.S. 232, 236 (1974)).

In rejecting the FAC's motive allegations, the Court reasoned that the FAC only "alleged two instances" where Ward-Related Entities received compensation, and only "speculated about any profits Ward might have received."  *W. Order* at 18.  The SAC addresses these concerns by alleging additional facts showing the benefits of the scheme to Ward and his family.  The SAC alleges that the Ward-Related Entities held interests in 475,000 acres in the Mississippian, and because of SandRidge's investments in the same areas, the value of these interests increased exponentially, making them worth billions of dollars.  ¶336.  This multi-billion dollar estimate was corroborated by one of SandRidge's largest shareholders.  *Id.*  Additionally, because Ward directed the actions of the Ward-Related Entities and because these entities were owned for the benefit of Ward's children, the SAC adequately alleges that Ward received concrete benefits.  *See China Ne. Petroleum*,

27 F. Supp. 3d at 389 (holding that family member's receipt of funds "constitutes a sufficiently concrete and personal benefit to infer motive"); *Marcus*, 329 F. Supp. 2d at 473 (discussing a family's alleged receipt of stock as a concrete and personal benefit for scienter purposes); *cf. S.E.C. v. Cavanagh*, 155 F.3d 129, 137 (2d Cir. 1998) (recognizing that a defendant should not be able to evade penalty "by the simple procedure of giving [property] to friends and relatives").

Specifically, WCT Resources[14] and 192 Investments[15] are both owned by trusts created for the benefit of Ward's three children, and therefore, the profits gained by the Ward-Related Entities directly benefit Ward's children.  *See* ¶¶85-89; 92-97.  The SAC alleges the Ward-Related Entities purchased interests in the Mississippian knowing that the areas would benefit from SandRidge's investment.  *See, e.g.*, ¶83.  As planned, the Company purchased adjacent interests and invested heavily in these areas, directly increasing the value of the Ward-Related Entities' interests, benefitting Ward and his children.[16]

---

[14]  WCT Resources is owned for the benefit of Ward's children.  ¶85.  *See* Disclosure Statement, attached as Ex. F to the Kaufman Decl.  WCT Resources leased the mineral rights to at least 403 sections in the same counties, and often adjoining or adjacent to SandRidge's sections.  ¶86.  SandRidge had leased 142,720 acres while WCT Resources has leased 257,920 – often before SandRidge.  *Id.*

[15]  192 Investments is owned for the benefit of Ward's three children.  *See* Disclosure Statement, attached as Ex. G to the Kaufman Decl.  192 Investments is named in Ward's 2011 employment contract as a firm through which he is permitted to drill wells with, and earn royalties from, SandRidge.  Defendant Ward's son is 192 Investment's registered agent and manager.  ¶88.  According to land records, 192 Investments acquired mineral rights on thousands of acres in the Mississippian in Kansas in late 2011, just months before SandRidge leased property in adjacent plots.  ¶89.  *See also* ¶¶92-97.

[16]  *See, e.g.*, ¶100 (specifying nine examples of land interests purchased by the Ward-Related Entities – from November 2011 through February 2012 – ahead of SandRidge's purchase of adjacent land interests).

Ward argues the SAC provides no facts connecting any appreciation of the Ward-Related Entities' interests directly to Ward.  WM at 16.  The inference that Ward's children benefitted, however, "constitutes a sufficiently concrete and personal benefit to infer motive."  *China Ne. Petro.*, 27 F. Supp. 3d at 389; *see also Marcus*, 329 F. Supp. 2d at 473.  Indeed, courts have rejected the argument, advanced by Ward, that benefits cannot accrue to family members for scienter purposes.  To hold otherwise would allow "[e]ven the least clever fraudster [to] escape liability under [Defendants'] proposed interpretation of our securities laws."  *China Ne. Petro.*, 27 F. Supp. 3d at 389.

"Such a formalistic interpretation of the concrete and personal benefit standard is completely untenable."  *Id.*  "To endorse this approach would allow any defendant to avoid consequences – *at the pleadings stage, no less* – by simply transferring proceeds into family members' accounts rather than into his own."  *Id.*; *cf. Cavanagh*, 155 F.3d at 137.

### 5.    Ward's Other Arguments Do Not Defeat a Strong Inference of Scienter

Defendant Ward makes a variety of other arguments against the sufficiency of Plaintiffs' scienter allegations, none of which defeat the strong inference of scienter raised by the SAC's allegations.

<u>Ward Ignores Key Allegations</u>.  Defendant Ward argues that "not even one of [the FEs] describes any information at any of the meetings that indicated any Company statement was false or that Mr. Ward knew it."  WM at 12.  Not so.  The SAC alleges that Ward

attended several weekly meetings at which the Mississippian's performance was discussed, and that Ward received Drilling and Completion Reports *every day*. ¶¶123-24, 127, 129.[17]

Despite Ward's assertion that it is "unremarkable" that Ward was present at meetings where the Mississippian was discussed (WM at 13), his attendance at those meetings supports the compelling inference that Ward was well aware of the actual performance of the Company's Mississippian wells, which contradicted his public statements.

<u>Ward's Financial Interests Do Not "Defeat" Scienter</u>. Ward incorrectly claims that his financial interest in SandRidge is "scienter-defeating." WM at 16. In support of this claim, Ward misleadingly states that he "actually increased his stock holding" by approximately 2 million shares "during the Class Period," and that he "lost almost $15 million" as a result of the drop in SandRidge's stock price. WM at 16-17.

Each of these arguments lacks merit. *First*, Ward was careful not to state that he ***"purchased"*** additional shares during the Class Period because he did not purchase ***any***. The increase to Ward's holdings was exclusively the result of stock awards, and he did not use his own money to buy SandRidge common stock.

*Second*, Ward's holdings during the Class Period only increased by approximately 25,264 shares (0.1% of Ward's then 25,298,493 shares) and not by 2 million shares as he claims (WM at 17). The Forms 4 provided by Ward – which should be rejected because they

---

[17] Ward also incorrectly claims that the SAC does "not plead *any facts* that identify what specific information Mr. Ward knew was false or what information he withheld." WM at 14. The SAC compellingly alleges that Ward was provided with information that contradicted his material misstatements. *See, e.g.*, ¶¶177, 252.

are unauthenticated and offered for the truth of the information cited therein[18] – clearly show that the grant of 1.6 million shares occurred before the Class Period.[19]  *Third*, Ward's claim that he "lost almost $15 million" is unsupported, and in any event, is an issue of fact not appropriate at this time.  *See W. Order* at 4 (holding that Court's analysis is confined to the text of the SAC).  Additionally, without knowing Ward's cost basis, his losses cannot be estimated.  Regardless, this alleged loss is miniscule compared with the hundreds of millions of dollars he received in compensation from SandRidge.  Indeed, this alleged $15 million loss is less than Ward's compensation in a *single* year (for example, he earned $25.3 million in 2011 and earned more than $60 million between 2009 through 2011), and is much less than the $90 million in severance he received when he was fired.  And, this amount is certainly less than the billions of dollars earned by the Ward-Related Entities.

In finding that the FAC did not adequately allege motive, the Court reasoned, because Ward increased his holdings, he "suffered the same stock price decline" as Plaintiffs.  *W. Order* at 20.  But, even if Ward had purchased shares during the Class Period (he did not), such purchases "alone cannot counteract the circumstantial evidence of fraudulent intent described above" because "such a rule would create incentive for corporate officers to insulate themselves from liability by purchasing stock merely to negate an inference of fraud."  *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013);

---

[18]   Although a court may "take judicial notice of its own files and records, as well as facts which are a matter of public record . . . [t]he documents may only be considered to show their contents, not to prove the truth of matters asserted therein."  *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006); *accord Arocho v. Nafziger*, 367 F. App'x 942, 952 n.12 (10th Cir. 2010).

[19]   Ward made the same misrepresentation in his motion to dismiss the FAC.

*see also In re Ashanti Goldfields Sec. Litig.*, 2004 WL 626810, at *5 (E.D.N.Y. Mar. 30, 2004) ("net purchases of stock by defendants do not necessarily negate an inference of scienter on a motion to dismiss.").

Lastly, contrary to Ward's suggestion, the lack of allegations that Ward sold shares during the Class Period does not defeat scienter. WM at 16. *See Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 15 (D. Mass. 2004) ("[T]he absence of stock trading profit does not establish the absence of a scheme to profit through insider trading. It only establishes the absence of a successful scheme."); *Williams*, 339 F. Supp. 2d at 1233 ("Just as we cannot countenance pleading fraud by hindsight, neither can we infer innocence by hindsight because the alleged misdeeds did not pay off").

The FEs Support Scienter. It is well-established as a matter of law that plaintiffs may rely upon confidential witnesses ("CWs") in pleading scienter. *Adams*, 340 F.3d at 1099-100.[20] Ward argues the Court should be skeptical of attempts to plead scienter using CWs. *See* WM at 13 n.8.[21] Contrary to Ward's argument, "[t]he identity of a [CW] is not crucial,

---

[20] *See also In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1015-18 (9th Cir. 2005) (and cases cited therein); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 28-30 (1st Cir. 2002); *California Public Emps.' Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004); *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000); *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 179-80 (4th Cir. 2007).

[21] The cases cited by Ward are distinguishable: *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007) is contrary to 10th Circuit precedent, and to the Supreme Court *Tellabs* decision. *Baxter* misreads *Tellabs* to create a "steep" "discount" for allegations from CWs, yet critically ignores that the complaint in *Tellabs* was premised on "27 confidential sources" (*Tellabs*, 551 U.S. at 316), and that *Tellabs* held that courts must "accept all factual allegations in the complaint as true" (*id.* at 322). *In re Wachovia Equity Sec. Litig.* is distinguishable because here, unlike there, the FEs here did in fact attend meetings with Defendants. *See* 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (holding that, because CWs did not meet with the defendants, the inference of scienter was undermined). Contrary to

at the pleading stage, if the 'facts alleged in the plaintiffs' complaint are detailed enough to support a reasonable belief that the defendant's statements identified by the plaintiffs were false or misleading.'" *Mishkin*, 2011 WL 1158715, at *6 (quoting *Adams*, 340 F.3d at 1102).

Here, the allegations are entitled to "significant weight" because the SAC describes "the bases" for the FEs' knowledge, "the positions they held," "their exposure to the relevant conduct," and "the relevant time frame." *See* ¶¶ 21-24, 123-29. *Mishkin*, 2011 WL 1158715, at *7 (D. Colo. Mar. 30, 2011) (in concluding that scienter was adequately alleged, held that "the allegations based on the statements of the CWs are entitled to significant weight because the complaint describes the bases of the CWs' knowledge, the positions they held, their exposure to the relevant conduct, and the relevant time frame");, 2012 U.S. Dist. LEXIS 136749, at *31-32 (holding that plaintiffs had adequately alleged scienter where "[CWs] tell how the individual defendants had first-hand knowledge (through written reports, meetings, email, etc.) of the company's poor financial state").[22]

---

Defendants' assertion, the Sixth Circuit did not hold in *Ley* that CW allegations should be steeply discounted. *See Dep't of the Treasury of N.J. v. Cliffs Nat. Res.*, 2015 U.S. Dist. LEXIS 151359, at *7 n.4 (N.D. Ohio Nov. 6, 2015) (interpreting *Ley v. Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008)).

[22]   *See also Molycorp*, 2016 WL 233402, at *13 (finding the details provided by the witness, the basis of witness's knowledge, and the reliability of witness well pled); *W. Palm Beach Firefighters' Pension Fund*, 2008 WL 879023, at *16 (finding that CW statements raised a strong inference of scienter when "[CW] states that Meade was in charge of meetings . . . and thus he was aware of the issue regarding this lost revenue and yet no disclosure was made"). Moreover, "at the pleading stage," because the witnesses "were in a position to have personal knowledge of the facts which they allege . . . , [the Court] must take the statements as true for the purposes of ruling on a motion to dismiss." *Loritz v. Exide Techs.*, 2014 U.S. Dist. LEXIS 111491, at *30 (C.D. Cal. Aug. 7, 2014) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009)).

Additionally, Ward's complaint that FE1 did not work at SandRidge during the Class Period misses the point. WM at 5, 9, 12. "A witness need not have been at the company for [the] entire, or indeed any, of an asserted class period to have probative information." *Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 515 (D. Mass. 2014). FE1 provided information concerning meetings headed by Ward and Grubb, and because FE1 stopped working at SandRidge only three months before the beginning of the Class Period, it is reasonable to infer that the same meetings headed by Ward continued to take place during the Class Period. Inferences, however, are not necessary because the information from FE1 is corroborated by information from FE2 (and vice versa), and FE2 worked as a geologist at SandRidge throughout the entire Class Period. ¶23. *See In re Molycorp*, 2016 WL 233402, at *12-13 (in concluding that details provided by CW were "well pled," held that when evaluating allegations' sufficiency, the court should evaluate, inter alia, "the corroborative nature of the other facts alleged").[23]

## B.    The SAC Adequately Alleges Violations of §20(a)

To allege a claim under §20(a) of the Exchange Act, a plaintiff must plead: (i) a primary violation by the controlled person; and (ii) control of the primary violator by the defendant. *See Adams*, 340 F.3d at 1107. The SAC adequately pleads that Ward is liable under §20(a) of the Exchange Act, in that it alleges a primary violation by SandRidge and

---

[23]    Ward incorrectly asserts that FE2 "alleges only that he attended weekly meetings at which they 'would also determine the information that would be reported to Ward.'" WM at 12. As alleged in the SAC, FE2 attended weekly Management Meetings, which lasted approximately one to two hours, and were ***attended by Ward***. ¶123.

that Ward as CEO had the power to influence and control the decision making of the Company, and had direct involvement in the management of the Company.

## IV.     CONCLUSION

Plaintiffs respectfully request that Ward's motion be denied in its entirety.[24]

DATED:  March 11, 2016          ROBBINS GELLER RUDMAN
                                   & DOWD LLP
                                SAMUEL H. RUDMAN
                                EVAN J. KAUFMAN
                                CHRISTOPHER M. BARRETT


                                        *s/ Evan J. Kaufman*
                                ─────────────────────────────
                                    EVAN J. KAUFMAN
                                   NY Bar Number: 2753614

                                58 South Service Road, Suite 200
                                Melville, NY  11747
                                Telephone:  631/367-7100
                                631/367-1173 (fax)
                                srudman@rgrdlaw.com
                                ekaufman@rgrdlaw.com
                                cbarrett@rgrdlaw.com

                                *Lead Counsel for Plaintiffs*

───────────────────────

[24]  In the event that any portion of the Complaint is found deficient, Plaintiffs respectfully request leave to amend the pleading to address such deficiencies. *See Gilbreath v. Cleveland Cnty. Bd. of Cnty. Comm'rs*, 2012 U.S. Dist. LEXIS 93544, at *31 (W.D. Okla. July 6, 2012) ("[I]f it is at all possible that the party against whom the dismissal is directed can correct the defect in the pleading or state a claim for relief, the court should dismiss with leave to amend."). Plaintiffs are able to add facts which were learned subsequent to the filing of the SAC. Such allegations include, but are not limited to, (i) during the weekly production meetings attended by Ward and Grubb, GOR and decline curves of the Mississippian were specifically discussed, and (ii) Ward and Grubb were described by a geologist as being extremely hands-on with respect to production and reserves. Furthermore, Plaintiffs can add substantial detail concerning the analysis of SandRidge's production data in the event it is deemed necessary.

DERRYBERRY & NAIFEH, LLP
DARREN B. DERRYBERRY
(OBA No. 14542)
4800 North Lincoln Blvd.
Oklahoma City, OK  73105
Telephone:  405/708-6784
405/528-6462 (fax)
dderryberry@derryberrylaw.com

*Liaison Counsel*

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK
225 Broadway, Suite 2050
San Diego, CA 92101
Telephone:  619/342-8000
619/342-7878 (fax)
ambere@zhlaw.com

*Additional Plaintiffs' Counsel*

<u>CERTIFICATE OF SERVICE</u>

I, Evan J. Kaufman, certify that on March 11, 2016, I caused a true and correct copy of the foregoing document to be served electronically on all counsel of record registered for electronic service for this case and by first-class mail on all other counsel of record.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 11th day of March 2016 at Melville, New York.

<div style="text-align:center;margin-left:50%">

*s/ Evan J. Kaufman*

EVAN J. KAUFMAN
NY Bar Number: 2753614

</div>

ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
ekaufman@rgrdlaw.com

*Lead Counsel*