IN THE UNITED STATES DISTRICT COURT FOR

THE WESTERN DISTRICT OF OKLAHOMA

IN RE SANDRIDGE ENERGY, INC.      )          No. CIV-12-1341-W
SECURITIES LITIGATION             )          Relating to All Securities Actions

## ORDER

This matter comes before the Court on the Motion to Dismiss filed by defendants

SandRidge Energy, Inc. ("SandRidge"), James D. Bennett and Matthew K. Grubb

pursuant to Rules 12(b)(6) and 9(b), F.R.Civ.P.  Lead plaintiffs Laborers Pension Trust

Fund for Northern Nevada, Construction Laborers Pension Trust of Greater St. Louis and

Vladimir and Angelica Galkin (collectively "Lead Plaintiffs") have responded in opposition,

and the defendants have filed a reply in support of their challenges to the factual

sufficiency of the allegations in the Lead Plaintiffs' third consolidated amended complaint

("Third Amended Complaint").  See Doc. 225.

In determining whether the defendants' challenges under Rule 12(b)(6), supra,

have merit, the Court is guided by the decision of the United States Supreme Court in

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).  In Twombly, the Supreme Court

held in accordance with Rule 8, F.R.Civ.P., that a complaint need not contain "heightened

fact pleading of specifics," 550 U.S. at 570, or "detailed factual allegations," id. at 555

(citations omitted), but it must contain "enough facts to state a claim to relief that is

plausible on its face."  Id. at 570.

The United States Court of Appeals for the Tenth Circuit has stated that Twombly

imposes a "burden . . . on the plaintiff[s] to frame a 'complaint with enough factual matter

(taken as true) to suggest' that . . . [they are] entitled to relief."  Robbins v. Oklahoma,

519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Twombly, 550 U.S. at 556).   The

allegations in the Third Amended Complaint must therefore "be enough that, if assumed to be true, the [Lead] [P]laintiff[s] plausibly (not just speculatively) ha[ve] a claim for relief [against SandRidge,[1] Bennett and Grubb]." Id. (footnote omitted).

The Court's task at this stage is to determine whether "there are well-pleaded factual allegations," Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), in the challenged pleading; if so, the "[C]ourt should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id.[2]  "A claim has facial plausibility when the plaintiff pleads factual content[3] that allows the [C]ourt to draw the reasonable

---

[1]On May 16, 2016, SandRidge filed a Voluntary Petition for Bankruptcy in the United States Bankruptcy Court for the Southern District of Texas.  See In re SandRidge Energy, Inc., No. 16-32488.  On September 20, 2016, the Bankruptcy Court entered its amended order confirming SandRidge and its debtor affiliates' amended Plan of Reorganization ("Plan").  See Doc. 217-1.  In accordance with the Plan's terms, see Doc. 225 at 14-15, ¶ 28 (citation omitted), SandRidge is a defendant in this action only to the extent necessary to recover from available remaining coverage under applicable insurance policies.  See id. at 15; id. at 5 n.1.

[2]"The [C]ourt's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.'"  Swoboda v. Dubach, 992 F.2d 286, 290 (10th Cir. 1993)(quotation omitted)(emphasis deleted).  That is to say, "the sufficiency of a complaint must rest on its contents alone."  Gee v. Pacheco, 627 F.3d 1178, 1186 (10th Cir. 2010)(citation omitted).
    Exceptions to this rule, however, exist.  When a complaint incorporates documents by reference, e.g., id. (citations omitted), when submitted documents referred to in that pleading are central to the plaintiffs' claims and the authenticity of those documents is not in dispute, e.g., id. (citation omitted), and when matters exist of which a court should take judicial notice, e.g., id. (citation omitted), the Court in those limited instances is not required to restrict itself to examination of the allegations in the challenged pleading.
    Accordingly, to the extent the Third Amended Complaint cites to certain documents that are central to the Lead Plaintiffs' claims and the authenticity of those documents is not in dispute, the Court has considered the same.  The Court has likewise reviewed certain public filings to which the parties have referred.  E.g., In re Gold Resource Corporation Securities Litigation, 776 F.3d 1103, 1108 (10th Cir. 2015); Slater v. A.G. Edwards & Sons, Inc., 719 F.3d 1190, 1196 (10th Cir. 2013).

[3]"'Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only "fair notice" of the nature of the claim, but also "grounds" on which the claim rests.'"  Robbins, 519 F.3d at 1248 (quoting Twombly, 550 U.S. at

inference that the defendant is liable for the misconduct alleged." Id. at 678 (citations

omitted).   As the Tenth Circuit has recognized, Twombly and Iqbal neither change Rule

8's notice requirement, nor alter Rule 12(b)(6)'s requirement that a complaint state a

legally recognized claim for relief; these decisions only add the "requirement of plausibility

[that] serves . . . to weed out claims that do not (in the absence of additional allegations)

have a reasonable prospect of success[.]"   Robbins, 519 F.3d at 1248.

This "requirement of plausibility" obligates the Lead Plaintiffs to set forth in the

Third Amended Complaint "'either direct or inferential allegations respecting all the

material elements necessary to sustain a recovery under some viable legal theory.'"

Bryson v. Gonzales, 534 F.3d 1282, 1286 (10th Cir. 2008)(quotation and citation omitted).

And, while "[t]he nature and specificity of the allegations required to state a plausible claim

will vary based on context," Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215

(10th Cir. 2011)(citations omitted), neither "'naked assertion[s]' devoid of 'further factual

enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), nor

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

allegations, [will] . . . suffice." Id. (citation omitted).

"[T]he Twombly/Iqbal standard recognizes a plaintiff should have at least some

relevant information to make the claims plausible on their face." Khalik v. United Air

Lines, 671 F.3d 1188, 1193 (10th Cir. 2012).   The Federal Rules of Civil Procedure

"demand[ ] more than an unadorned, the-defendant-unlawfully-harmed-me accusation[,]"

Iqbal, 556 U.S. at 678 (citations omitted), and more than "mere 'labels and conclusions,'

_____

555 n.3)(further citation omitted).

and 'a formulaic recitation of the elements of a cause of action' . . . ." <u>Kansas Penn Gaming</u>, 656 F.3d at 1214 (quoting <u>Twombly</u>, 550 U.S. at 555).   If the Lead Plaintiffs' factual allegations "are 'merely consistent with' [the] . . . defendant[s'] . . . liability," <u>Iqbal</u>, 556 U.S. at 678 (quotation omitted), or "do not permit the [C]ourt to infer more than the mere possibility of misconduct," <u>id</u>. at 679, the Lead Plaintiffs "ha[ve] not 'show[n]' . . . 'that . . . [they are] entitled to relief.'"   <u>Id</u>. (quotation omitted).

Rule 9(b), <u>supra</u>, which the defendants have also cited, requires a plaintiff, "[i]n alleging fraud . . . , [to] . . . state with particularity the circumstances constituting [the] fraud . . . ."   <u>Id</u>.   In such instances, the complaint must "'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'"   <u>Koch v. Koch Industries, Inc.</u>, 203 F.3d 1202, 1236 (10th Cir. 2000)(quotation omitted).   In deciding whether the Third Amended Complaint meets this heightened pleading requirement, to the extent, if any,[4] Rule 9(b) is applicable in this instance, the Court's analysis is again confined to the text of that pleading, <u>e.g.</u>, <u>United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah</u>, 472 F.3d 702, 726 (10th Cir. 2006), and any exhibits attached thereto and incorporated by reference therein.

Applying these standards to the Third Amended Complaint, the Court has examined the following allegations, and to the extent they are well pleaded, the Court has construed them in the Lead Plaintiffs' favor and accepted them as true, <u>e.g.</u>, <u>id</u>. (under both Rule 12(b)(6) and Rule 9(b), court must accept as true all well-pleaded facts, as

---

[4]<u>See</u> <u>In re Gold Resource</u>, 776 F.3d at 1108-09.

distinguished from conclusory allegations, and view those facts in the light most favorable to the complainants), to determine whether the Lead Plaintiffs have met their "obligation to provide the 'grounds' of . . . [their] 'entitle[ment] to relief[.]'" Twombly, 550 U.S. at 555 (citation omitted).

The Lead Plaintiffs brought this action on behalf of all purchasers, other than the named defendants, of certain SandRidge common stock between February 24, 2011, and November 8, 2012–which period is defined in the Third Amended Complaint as "the 'Class Period.'"  Doc. 225 at 5, ¶ 1.  SandRidge is an oil and gas exploration company, see id. ¶ 2, and this lawsuit focuses on "one of SandRidge's core holdings referred to as the Mississippian play,"[5] id., "a geological formation that extends hundreds of miles across northern Oklahoma and south-central Kansas."  Id. at 21, ¶ 53.

The Lead Plaintiffs have contended that during the Class Period, co-defendant Tom L. Ward, SandRidge's founder and then chief executive officer and Chairman of its Board of Directors ("Board"), see id. at 15, ¶ 29, together with Bennett, then SandRidge's chief financial officer and a senior vice president, see id. at 16, ¶ 30, and Grubb, then SandRidge's president and chief operating officer, see id. ¶ 31, made certain materially

---

[5]The Mississippian formation

ranges from a few hundred feet to as much as 1000 feet thick, and is composed of layers of limestone, chert and limey mudstones that were deposited in a shallow sea during the Mississippian geological period over 300 million years ago.  Oil has been produced from the formation since the 1940s from conventional vertical wells. Beginning in 2007, horizontal well and hydraulic fracturing technology has been applied to extract oil from reservoirs within the . . . formation.

Doc. 225 at 21, ¶ 53.

false and misleading statements and failed to disclose certain material information about SandRidge's business and its activities in the Mississippian formation.

The Lead Plaintiffs have complained

(1) that "[a]t the same time that [Ward, Grubb and Bennett] . . . were misrepresenting the value of SandRidge's Mississippian play properties," id. at 6, ¶ 3, Ward, "unbeknownst to investors, . . . through various affiliated entities, [including, among others, WCT Resources, L.L.C. ("WCT"),[6] 192 Investments, L.L.C. ("192 Investments")[7] and TLW Land & Cattle, L.P. ("TLW")[8](collectively "Ward-related entities"), see id. at 31,

---

[6]WCT is described as a limited liability company organized under Oklahoma law, which at one time, shared its headquarters with SandRidge in Oklahoma City, Oklahoma. See id. at 32, ¶ 84. The Lead Plaintiffs have asserted that WCT is owned by, and its members are, trusts established by Ward and his wife, Sch'ree Ward, for the benefit of Ward's children, see Doc. 205-5 at 2, and that the trustee of these trusts is Scott C. Hartman, who began working at SandRidge in April 2006 and who has served as SandRidge's executive business director. See Doc. 225 at 32, ¶ 85. The Lead Plaintiffs have contended that Ward's son, Trent Ward ("T Ward"), is WCT's registered agent and chief executive officer, and that Scott White, who was employed by SandRidge as a land manager until 2011, was WCT's chief operating officer. See id. WCT is alleged to have had approximately seven (7) employees during the Class Period. See id.

The Lead Plaintiffs have further asserted that "SandRidge had leased the mineral rights for at least 223 sections in northwest Kansas, within the counties of Sherman, Thomas, Sheridan, Wallace, Logan, and Gove[,]" id. ¶ 86, that WCT "[i]n the[se] same counties, and often adjoining or adjacent to SandRidge's sections, . . . leased the mineral rights to at least 403 sections, almost twice the number as SandRidge[,]" id. at 32-33, ¶ 86, and that "on many occasions WCT[, then 'the fifth largest acreage holder in the Mississippian formation,' id. at 33, ¶ 87,] . . . acquired . . . [its] lease holdings in advance of or alongside of SandRidge's holdings." Id. ¶ 86.

[7]192 Investments is described as a limited liability company organized under Oklahoma law, which had its headquarters at the same address as SandRidge in Oklahoma City. See id. ¶ 88. 192 Investments' registered agent and manager is T Ward, see id., and its members are the Trent Lee Ward Trust, the Romi Nirel Ward Trust and the James Davis Ward Trust. See Doc. 205-6 at 2.

The Lead Plaintiffs have contended that 192 Investments "acquired mineral rights on thousands of acres in late 2011 in the Mississippian play in Kansas," Doc. 225 at 33, ¶ 89, and that it "bought those mineral rights just months before SandRidge leased property in adjacent plots." Id.

[8]TLW is described in the Third Amended Complaint as a limited partnership organized under Oklahoma law, which shared its headquarters with SandRidge and 192 Investments. See

6

¶ 81,] was materially benefitting from [SandRidge's] . . . investment activities in the Mississippian[,]" id. at 6, ¶ 3; e.g., id. at 61, ¶ 150;[9]

(2) that although Ward, Grubb and Bennett "told investors that SandRidge was investing in the Mississippian due to the large amounts of oil reserves and the favorable amount of oil relative to gas in the area[,]" id. at 7, ¶ 4; e.g., id. at 62, ¶ 152, these "statements misrepresented the nature of the Mississippian properties," id. at 7, ¶ 4;[10] and

---

id. at 33-34, ¶ 90.   Ward is TLW's registered agent, see id. at 34, ¶ 90, and in publicly-filed papers, TLW is identified as "an 'entity in which . . . Ward has an ownership interest.'"   Id.

[9]The Lead Plaintiffs have alleged that "[b]eginning in 2009, SandRidge started acquiring and developing properties in the Mississippian[, and] [b]y 2012, . . . had acquired 1.7 million acres and spent over $2.2 billion developing those properties[,]" id. at 6, ¶ 3, and that at the same time, Ward and the Ward-related entities "were acquiring massive amounts of land and mineral rights[, 'includ[ing] the rights associated with hydro-carbon resources such as oil and natural gas[,]' id. n.2], throughout the Mississippian."   Id. at 6, ¶ 3.
   In describing the manner in which these acquisitions occurred, the Lead Plaintiffs have alleged that Ward and the Ward-related entities "often acquired land just prior to SandRidge's acquisitions of neighboring properties and [that] the Ward-related entities either flipped those properties to SandRidge or other companies or held on to the properties and benefitted from their appreciation in value due to SandRidge's development activities in the area."   Id.   The Lead Plaintiffs have further asserted:

   The Ward-related entities also stood to benefit from royalties earned from drilling activities on its areas.   In other words, . . . Ward and his affiliated entities were engaged in a classic form of front-running—Ward got out in front of SandRidge, purchased lands around where SandRidge would be developing wells and then benefitted from SandRidge's investments through the appreciation in the value of the land and royalty interests.

id. at 6-7, ¶ 3.

[10]The Lead Plaintiffs have alleged that Ward, Grubb and Bennett

knew, or recklessly disregarded, the following facts about the amount of gas relative to oil in the Mississippian:

(a) The Mississippian was much gassier than represented . . . .   Production data that SandRidge reported to the Oklahoma Tax Commission showed that

SandRidge understated the gas to oil ratio for its typical horizontal well in its Mississippian play and that the oil production relative to gas production as reported was approximately half of that represented by [Ward, Grubb and Bennett] . . . .   In addition, the oil to gas ratio was contrary to the[ir] . . . representations that SandRidge had completed its transformation from a gas to an oil company[;]

(b) Contrary to [their] . . . statements during 2011 that [SandRidge's] . . . Mississippian wells on average produced 52% oil and 48% gas, production data . . . reveal[ed] that [SandRidge's] . . . wells produced less than 40% oil and more than 60% gas during 2011; and

(c) Contrary to [their] . . . statements during 2012 that [the] . . . Mississippian wells on average produced 45% oil and 55% gas, production data reported by SandRidge reveal[ed] that its wells produced on average 35% oil and 65% gas during 2012.

Id. at 62-63, ¶ 152; e.g., id. at 52, ¶ 132 (defendants "overstated the oil to gas ratios of the wells"); id. at 56-57, ¶¶ 141-145.

The Lead Plaintiffs have further alleged that Ward, Grubb and Bennett

knew, or recklessly disregarded, the following facts about a steep drop off in production rates of [SandRidge's] . . . horizontal Mississippian wells and the [estimated ultimate recovery ("EUR")] for those wells:

(a) Based on production data that SandRidge reported to the Oklahoma Tax Commission, there was a steep drop in oil production rates in SandRidge's older wells by March 2012 and rates were declining much faster than the type well presented by SandRidge;

(b) [SandRidge's] . . . large amounts of spending on drilling new wells in the Mississippian enabled SandRidge to report increasing total production numbers in that area even though older wells with more production history experienced steep declines. . . . [T]he increased drilling activity masked the rapid decline and depletion in SandRidge's horizontal Mississippian wells;

(c) Despite a precipitous drop in oil rates for SandRidge's Mississippian wells, which began no later than March 2012 and continued . . . to June 2012, SandRidge maintained throughout 2012 (until the end of the Class Period) that well performance continued to support an average 456 MBOE type well[;] and

(d) SandRidge grossly overstated the EUR for its typical Mississippian play horizontal well.   Indeed, contrary to [Ward, Grubb and Bennett's] . . . characterizations during 2012 of the EUR of the typical horizontal Mississippian well, production data provided by SandRidge shows that the EUR for oil was between 84-88% lower, the EUR for gas was between 55-65% lower, and the combined gas/oil equivalent of total production was 68-75% lower than represented by SandRidge throughout 2012.

8

(3) that "SandRidge's Mississippian-related spending caused [SandRidge] . . . to drastically exceed its capital expenditures allotment and required [it] . . . to take on debt and obtain funding from other sources . . . to keep funneling money into the Mississippian, which further negatively impacted [SandRidge's] . . . financial condition[,]" id., and that "[b]y April 4, 2011, [Ward, Grubb and Bennett] . . . were telling investors that [SandRidge] . . . would be increasing its capital expenditures in the region to $1.8 billion . . . ." Id.; e.g., id. at 62, ¶ 151.

The Lead Plaintiffs have asserted two claims for relief in the Third Amended Complaint. Count I seeks damages under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, and the Securities and

---

Id. at 63-64, ¶ 153; e.g., id. at 52, ¶ 132 (defendants "grossly overstated the EUR for SandRidge's . . . horizontal type well"); id. (defendants "minimized the oil decline rates for the wells"); id. (defendants "overstated the economic value of SandRidge's Mississippian wells"); id. at 52-56, ¶¶ 133-140; id. at 59-60, ¶¶ 146-148.
The Lead Plaintiffs have also contended that Ward, Grubb and Bennett

knew, or recklessly disregarded, the following facts about the geological make up of the Mississippian:

(a) . . . . Contrary to [their] . . . statements, there was not a single type curve across the[ ] entire leasehold extending for hundreds of miles. Indeed, after the Class Period, SandRidge provided multiple type well curves based on geographical region instead of relying on just a single type well decline curve as [SandRidge] . . . had done during the Class Period; and

(b) There was a risk that areas where SandRidge was drilling horizontal wells may have had partially depleted reservoirs as a result of the vertical wells drilled in the Mississippian since the 1940s.

Id. at 64-65, ¶ 154; e.g., id. at 52, ¶ 132 (defendants "misrepresented that well performance was consistent as represented by a single type curve across the[ ] entire leasehold, which extended for hundreds of miles").

Exchange Commission's ("SEC") Rule 10b-5 promulgated thereunder.   See 17 C.F.R. §

240.10b-5.   Count II seeks damages under Section 20(a) of the Exchange Act, 15 U.S.C.

§ 78t(a), as amended by the PSLRA.

> Section 10(b) makes it

> unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] . . . may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

> SEC Rule 10b-5 implements . . . [Section 10(b))] by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37 (2011)(quoting 17 C.F.R. §

240.10b-5(b)); e.g., Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552

U.S. 148, 157 (2008)(Rule 10b–5 encompasses only conduct already prohibited by

Section 10(b)).

"A plaintiff suing under Section 10(b) [and Rule 10b-5] . . . bears a heavy burden

at the pleading stage."   In re Level 3 Communications, Inc. Securities Litigation, 667 F.3d

1331, 1333 (10th Cir. 2012).   In determining whether the Lead Plaintiffs have met their

burden in this case by setting forth in the Third Amended Complaint enough direct or

inferential allegations to sustain a recovery under Section 10(b) and Rule 10b-5, the Court

has considered, as case law requires,[11] whether that pleading contains allegations that

support the following material elements:

---

[11]While Rule 12(b)(6), supra, "does not require that [the Lead] Plaintiff[s] establish a prima

"(1) a material misrepresentation or omission by the defendant;[12] (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

Matrixx, 563 U.S. at 37-38 (quoting Stoneridge Investment, 552 U.S. at 157); e.g.,

Nakkhumpun v. Taylor, 782 F.3d 1142, 1146-47 (10th Cir. 2015); Sanchez v. Crocs, Inc.,

667 Fed. Appx. 710, 718 (10th Cir. 2016)(cited pursuant to Tenth Cir. R. 32.1).

Count I itself contains only the following "conclusory and formulaic recitations,"

Khalik, 671 F.3d at 1193, of the essential elements:

(1) "[d]uring the Class Period, [Bennett and Grubb][13] . . . disseminated or approved

[certain] . . . materially false and misleading statements . . . , which they knew or

deliberately disregarded were misleading in that they contained misrepresentations and

failed to disclose material facts necessary . . . to make the[se] statements . . . , in light of

the circumstances under which they were made, not misleading[,]" Doc. 225 at 151, ¶

358;

---

facie case in [their Third Amended] . . . [C]omplaint," Khalik, 671 F.3d at 1192, an examination of the essential "elements of [their] . . . alleged cause of action [is] help[ful] to determine whether [they have] . . . set forth a plausible claim." Id. (citations omitted). Accordingly, the Court has first considered what elements the Lead Plaintiffs must ultimately establish to prevail on a Section 10(b) and Rule 10b-5 claim, e.g., Burnett v. Mortgage Electronic Registration Systems, Inc., 706 F.3d 1231, 1236 (10th Cir. 2013)(Iqbal's contextual approach means comparing pleading with elements of cause of action), and has then "compar[ed] the . . . [Lead Plaintiffs' allegations] with the elements of th[at] cause[ ] of action." Id.; e.g., id. (pleadings that do not allow for at least "reasonable inference" of legally relevant facts are insufficient).

[12]E.g., Nakkhumpun v. Taylor, 782 F.3d 1142, 1147 (10th Cir. 2015)(as to first element (falsity), plaintiff must plead fraud with particularity under Rule 9(b)).

[13]The Lead Plaintiffs have used the term "defendants" in this count collectively without attributing particular conduct to any one defendant. The Court has substituted each individual defendant's name to determine whether the Lead Plaintiffs have set forth a plausible claim against him.

(2) Bennett and Grubb, "individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about [SandRidge's] . . . business, operations and future prospects[,]" id. ¶ 359; and

(3) Bennett and Grubb, together with Ward, "(a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of . . . SandRidge common stock during the Class Period in an effort to maintain artificially high market prices for [that] . . . stock[.]"  Id. ¶ 360.

The Lead Plaintiffs have claimed that Bennett and Grubb are both primarily liable and that their

> liability[ ] arises from the following facts:  (i) [each was a] . . . high-level [SandRidge] executive[ ] and/or director[ ] . . . and member[ ] of the . . . management team or had control thereof; (ii) each . . . , by virtue of [the] . . . responsibilities and activities [of] . . . a senior officer and/or director[,] . . . was privy to and participated in the creation, development and reporting of [SandRidge's] . . . internal budgets, plans, and/or projections; (iii) each . . . enjoyed significant personal contact and familiarity with . . . [one] [an]other [and with Ward] . . . and was advised of and had access to other members of [SandRidge's] . . . management team, internal reports and other data and information about [SandRidge's] . . . reserves, production, finances, operations, and liabilities at all relevant times; and (iv) each . . . was aware of [SandRidge's] . . . dissemination of information to the investing public which . . . was materially false and misleading.

Id. at 151-52, ¶ 361.

The Lead Plaintiffs have claimed

(1) that both Bennett and Grubb "had actual knowledge of the misrepresentations and omissions of material facts set forth [in the Third Amended Complaint] . . . , or acted

with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them[,]" id. at 152, ¶ 362;

(2) that their "material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public the significant problems with SandRidge's cash flows, capital expenditures, [and] . . . overstated reserves, and the extent of the . . . transactions [of the Ward-related entities], and supporting the artificially inflated price of SandRidge common stock[,]" id.; and

(3) "[a]s demonstrated by [their] . . . misstatements of . . . [SandRidge's] . . . business, operations, oil and gas reserves, and transactions[,] . . . if they did not have actual knowledge of the misrepresentations and omissions alleged, [that they] were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading." Id. at 152-53, ¶ 362.

The Lead Plaintiffs have further alleged in support of Count I

(1) that "[a]s a result of the dissemination of the materially false and misleading information and failure to disclose material facts, . . . the market prices of SandRidge's common stock were artificially inflated during the Class Period[,]" id. at 153, ¶ 363;

(2) that "[i]n ignorance of th[at] fact . . . , and relying directly or indirectly on [Bennett's and Grubb's] . . . false and misleading statements . . . , or upon the integrity of the market in which the[se] securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by [these two] [d]efendants but not disclosed in public statements . . . , [the Lead] Plaintiffs . . . acquired SandRidge common stock . . . at artificially high prices and were damaged as a result[,]" id.; and

13

(3) that the Lead Plaintiffs "were ignorant of the[ ] falsity [of Bennett's and Grubb's representations], and . . . [h]ad [they] . . . known the truth . . . , [they] would not have purchased or otherwise acquired their SandRidge common stock, or, if they had purchased such securities . . . , they would not have done so at the artificially inflated prices which they paid."  Id. ¶ 364.

The defendants' alleged misstatements or omissions that are the subject of Count I fall into three categories:  those that pertain to SandRidge's capital expenditures ("CapEx"), those that pertain to oil and gas production in the Mississippian formation and those that pertain to the activities of the Ward-related entities.  See id. at 61-65, ¶¶ 149-154.

SandRidge, Bennett and Grubb have first argued[14] that any alleged representations about capital expenditures are not actionable because such representations fall within PSLRA's "safe harbor."  Individuals and corporations are statutorily protected from liability for certain statements, written or oral, that prove false

if and to the extent . . .

(A) [such] . . . statement[s] . . . [are]

    (i) identified as . . . forward-looking statement[s], and [are] . . . accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]; or

    (ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement[s]–

---

[14]Ward has joined in this argument and has likewise moved for dismissal on this ground. See Doc. 190 at 5 n.1.

> (i) . . . w[ere] made with actual knowledge . . . that the
> statement[s] w[ere] false or misleading[.]"

15 U.S.C. § 78u-5(c)(1)(emphasis added).

The statute is phrased in the disjunctive.  In those instances where there are "meaningful cautionary statements," liability is precluded despite a defendant's state of mind; if a defendant lacked "actual knowledge" about the falsity or misleading nature of the statement, liability is precluded without regard to whether there was adequate cautionary language.  See In re Gold Resource Corporation Securities Litigation, 957 F. Supp.2d 1284, 1293-94 (D. Colo. 2013), aff'd, 776 F.3d 1103 (10th Cir. 2015).

In determining whether the statutory safe harbor provides protection in this instance, the Court has considered the following allegations as set forth in the Third Amended Complaint:

(1) the "[d]efendants repeatedly noted that by 2014, [SandRidge] . . . would have a 'self-funding capital program,' which would be operating 'all within [SandRidge's] cash flow,' and all while 'improving [its] credit metrics[,]'" Doc. 225 at 42, ¶ 105; and

(2) "[c]ontrary to their [positive statements and] repeated assurances during the Class Period, instead of focusing on cash flow and maintaining financial discipline, [the] [d]efendants continued to spend more and more money and exceed capital expenditure targets in large part to continue acquisition, drilling, and development activities in the Mississippian."  Id.[15]

---

[15]The Lead Plaintiffs have alleged that the defendants "knew, or recklessly disregarded, that contrary to their statements about financial discipline and meeting their capital expenditures guidance, [they] . . . sought to pour more and more money into the Mississippian regardless of the cost to SandRidge, which benefitted the Mississippian holdings of the Ward- related entities[,]" Doc. 225 at 62, ¶ 151, and that they "knew, or recklessly disregarded, that capital expenditures

The Lead Plaintiffs have contended that "[o]n February 24, 2011[, the beginning of the Class Period], [SandRidge] . . . provided capital expenditures guidance for 2011 of $1.3 billion[,]" id. ¶ 106,[16] and "[t]hereafter, . . . [orally] expressed confidence in the budget several times[,]" id., as evidenced by the following:

(1) "[o]n March 25, 2011, . . . Bennett, at the Barclays [Capital 2011] High Yield Bond and Syndicated Loan Conference, presented . . . the amount of capital expenditures that were allocated for the Permian play," id. at 72, ¶ 172, and stated:  "'Talking about the Permian Basin, two-thirds of [SandRidge's] . . . capital this year will be on the Permian Basin. . . .  [I]t's been producing oil for over 80 years[ ] [and is] . . . the third most prolific oil producing basin in the United States[,]'"[17] id.;

(2) "in an April 12, 2011 conference call with investors, . . . Ward noted: '[W]e've addressed the CapEx funding gap for this year and are already starting to work on 2012[,]'" id. at 42-43, ¶ 106; e.g., id. at 77, ¶ 179 ("Ward confirmed that capital expenditures for 2011 would be $1.3 billion");[18]

---

were not based solely on what was in SandRidge's interests but were also based in part on the interests of the Ward-related entities."  Id.

[16]See id. at 66, ¶ 158 ("On February 28, 2011, SandRidge filed its annual report on Form 10-K with the SEC for fiscal year ended December 31, 2010 and reiterated . . . [its] financial results that were contained in the 2/24/11 Press Release, including [the following] for capital expenditures[:]  'For 2011, [SandRidge has] . . . budgeted $1.3 billion for capital expenditures. The majority of [its] . . . capital expenditures are discretionary and could be curtailed if . . . cash flows decline from expected levels or [SandRidge is] . . . unable to obtain capital on attractive terms.  [SandRidge] . . . may increase or decrease planned capital expenditures depending on oil and natural gas prices, asset sales and the availability of capital through the issuance of additional equity or long-term debt.")(emphasis deleted).

[17]See Doc. 189-2 (Presentation at Barclays Capital 2011 High Yield Conference (March 25, 2011).

[18]See Doc. 189-3 at 6 (Presentation at Independent Petroleum Association of America Oil

(3) on May 6, 2011, SandRidge held an earnings conference call, and "[d]uring the call, . . . Bennett stated that [SandRidge's] . . . '2011 CapEx plan' of $1.3 billion had been 'almost fully funded,'[19] and . . . that . . . [SandRidge] will 'continue [its] . . . capital raising efforts and [is] . . . now focused on funding [its] . . . 2012 program, which . . . will also [be] accomplish[ed] through additional asset monetization[,]'" id. at 80, ¶ 187 (emphasis deleted);[20] e.g., Doc. 133-28 at 8;

(4) "[i]n a May 24, 2011 conference call with investors, . . . Ward stated:   '[W]e have addressed our CapEx funding gap for this year and are working diligently on our 2012 projected gap as I think we'll be discussing throughout this year.   In fact, we anticipate having that concluded before 2011[,]'" Doc. 225 at 43, ¶ 106;[21] e.g., id. at 82, ¶ 194; and

(5) "[o]n August 5, 2011, [SandRidge] . . . held a conference call for analysts and investors to discuss the financial results and other information [that had been the subject of a press release issued on August 4, 2011,] . . . and [o]n th[at] call, . . . Grubb[ ] stated[:]

> 'As you have seen, [SandRidge] . . . increased [its] . . . 2011 budget by $500 million to $1.8 billion total.  The allocation for the increase is as follows. $150 million for drilling more wells in the Permian and the Miss[issippian] wells, including saltwater disposal wells.   And also that includes the adjustment of the well cost in the Miss[issippian] from $2.5 million to $3 million.   There are also $50 million of non-op drilling in the Mississippian, and increased work-overs and re-completions . . . .

---

& Gas Investment Symposium (April 12, 2011)).

[19]See Doc. 189-4 at 7 (Corrected Transcript of Q1 2011 SandRidge Earnings Conference Call (May 6, 2011)).

[20]See Doc. 225 at 80, ¶ 189 ("On May 9, 2011, . . . [SandRidge] filed its quarterly report on Form 10-Q with the SEC of 1Q11 and reiterated . . . [its] financial results in the 5/5/11 Press Release and 5/6/11 Conf[erence] Call[ and] . . . repeated [its] . . . outlook on capital expenditures for 2011[.]").

[21]See Doc. 189-5 (Presentation at UBS Global Oil & Gas Conference (May 24, 2011)).

> The biggest part of the increase is in land, $275 million in additional land spending for acquisition of new acreage in the Central Basin platform and the new Mississippian play, and $25 million for oil field services in Midstream."'

Id. at 84-85, ¶ 201 (emphasis deleted); e.g., id. at 43, ¶ 108 (during the call, "Ward conceded that the capital expenditures were being increased in part because . . . [SandRidge] was looking to acquire additional acreage in the Mississippian"); e.g., Doc. 133-30 at 7.

The Lead Plaintiffs have also relied on the following written statements that they have claimed are misleading:

(1) on February 28, 2011, SandRidge filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2010, and repeated therein SandRidge's financial results that were contained in the press release dated February 24, 2011:

> For 2011, we have budgeted $1.3 billion for capital expenditures. The majority of our capital expenditures are discretionary and could be curtailed if our cash flows decline from expected levels or we are unable to obtain capital on attractive terms. We may increase or decrease planned capital expenditures depending on oil and natural gas prices, asset sales and the availability of capital through the issuance of additional equity or long-term debt.

Doc. 225 at 66, ¶ 158 (emphasis deleted); e.g., Doc. 133-1 at 72; Doc. 133-8;[22]

(2) on May 5, 2011, SandRidge announced its financial and operational results for the first quarter 2011 in a press release, which was filed with the SEC and which read in

---

[22] See Doc. 133-8 at 15 (SandRidge Form 8-K, Ex. 99.1 (February 24, 2011)("Total planned capital expenditures have increased to $1.3 billion from $1.1 billion, primarily due to planned increases in drilling activity in the Mid-Continent, workovers and recompletions in the Permian Basin, land acquisitions in the Mid-Continent area, and anticipated midstream and other expenditures")).

part that "with the success of [its] . . . asset monetizations to date, [it is] . . . now focused on funding [its] . . . 2012 capital spending program[,]" id. at 78, ¶ 183 (emphasis deleted); and

(3) in the press release issued on August 4, 2011, SandRidge announced it "had entered into a $500 million joint venture with Atinum [Partners Co., Ltd. ('Atinum')], [which] . . . allow[ed] SandRidge [to] accelerate its drilling and development activity in the Mississippian." Id. at 43, ¶ 107;[23] e.g., Doc. 133-26 at 7.[24]

The Lead Plaintiffs have further complained that "[t]he rise in capital expenditures did not end there[,]" Doc. 225 at 43, ¶ 109: "SandRidge raised the guidance three more times." Id. They have alleged

(1) that "[d]uring the first and second quarters of 2012, [SandRidge] . . . estimated that capital expenditures for 2012 would increase slightly, topping off at $1.85 billion[;] [h]owever, in an August 2, 2012 press release, [SandRidge] . . . again increased the 2012 capital expenditures by $250 million, from $1.85 billion to $2.1 billion[;]" id.; and

(2) that "[o]n November 8, 2012, [the date the Class Period ended, SandRidge] . . . raised the capital expenditure budget yet again to $2.15 billion." Id.

---

[23]See Doc. 225 at 83, ¶ 198 (the press release revealed that Atinum agreed to pay SandRidge $250 million in cash and committed to a drilling carry obligation up to a total amount of $250 million); id. ¶ 199 (in the release, which was filed with the SEC on Form 8-K (see Doc. 133-26), SandRidge announced its financial and operational results for the second quarter 2011 and the first six months of 2011).

[24]According to the Lead Plaintiffs, SandRidge "was increasing 2011 capital expenditure guidance by a shocking $500 million, from $1.3 billion to $1.8 billion," Doc. 225 at 43, ¶ 107; e.g., Doc. 133-26 at 7, an increase "[t]he press release attributed . . . primarily to 'increased leasing activity, well count and well costs in the Mississippian play.'" Doc. 225 at 43, ¶ 107 (emphasis deleted); e.g., Doc. 133-26 at 6, 12.

The phrase "forward-looking statements" is statutorily defined to include "projection[s] of . . . capital expenditures." 15 U.S.C. § 78u-5(i)(1)(A).[25] Therefore, to fall within PSLRA's safe harbor, the Court must determine whether SandRidge's predictive CapEx statements[26] were accompanied by "meaningful cautionary" language.

Blanket statements and boilerplate disclaimers during conference calls, in press releases or in SEC filings about the capital intensive and risky nature of the oil and gas

---

[25] For purposes of the PSLRA's "safe harbor," the term "forward-looking statement" includes

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations . . . ;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management . . . ;
>
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
>
> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
>
> (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the [SEC].

15 U.S.C. § 78u-5(i)(1)(A)-(F). See In re Fusion-io, Inc. Securities Litigation, 2015 WL 661869 *10 (N.D. Cal. February 12, 2015)(forward-looking statements include "'any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions "underlying or related to" any of these issues'") (quoting No. 84 Employer-Teamster Joint Council Pension Trust Fund v. American West Holding Corp., 320 F.3d 920, 936 (9th Cir. 2003)(citing 15 U.S.C. § 78u5 (i))).

[26] See id. *11 (where corporate representatives make statements regarding company's "guidance" for future revenues, statements are forward-looking); id. (challenged statements that explicitly refer to company's "opportunity" or "opportunities" for future operations, or assumptions underlying those opportunities for future operations, qualify as forward-looking statements).

20

industry are not sufficient to immunize a defendant. See, e.g., Doc. 133-1 at 41; Doc. 133-2 at 44; Doc. 189-4 at 1. Rather, "''cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which . . . [are] challenge[d].'''" In re Molycorp, Inc. Securities Litigation, 2015 WL 1540523 *25 (D. Colo. 2015)(quotation and further citation omitted). They "must warn of 'important factors that could cause actual results to differ[.]'" Bumgarner v. Williams Companies, Inc., 2016 WL 1717206 *3 (N.D. Okla. 2016)(quoting In re Harman International Industries, Inc. Securities Litigation, 791 F.3d 90, 103 (D.C. Cir. 2015)); e.g., 15 U.S.C. § 78u-5(c)(1)(A)(i). "However, the cautionary language need not mention all factors that could alter anticipated results, or even the specific factor that 'ultimately belies a forward-looking statement.'" Id. (quotation omitted). Rather, "'[w]hen an investor has been warned of risks of a significance similar to that actually realized, [the investor] . . . is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to [the investor's] . . . own preferences for risk and reward.'" In re Gold Resource, 957 F. Supp.2d at 1297 (quotation omitted).

The Court finds that the defendants' representations in the written papers regarding projected capital expenditures about which the Lead Plaintiffs have complained were accompanied by adequate cautionary statements that "identif[ied] important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." 15 U.S.C. § 78u-5(c)(1)(A)(i). As the Court has already determined, the defendants in those papers sufficiently alerted investors of the dangers of their

investments by providing substantive and company-specific warnings. <u>See</u>, <u>e.g.</u>, Doc. 133-1 at 5, 40, 72;[27] Doc. 133-2 at 44; Doc. 133-9 at 35.

As to the oral announcements on which the Lead Plaintiffs have relied, the Court likewise finds these statements were accompanied by sufficient cautionary language that was delivered either orally or in the written presentations that accompanied the statements. <u>E.g.</u>, Doc. 189-2; Doc. 189-3; Doc. 189-4; Doc. 189-5; Doc. 133-30. <u>See In re Fusion-io, Inc. Securities Litigation</u>, 2015 WL 661869 *13 (N.D. Cal. February 12, 2015)(company began each call with nearly identical statement that some statements would constitute forward-looking statements and cautioned listeners that forward-looking statements were predictions based on current expectations and assumptions and that expectations and assumptions involved risks and uncertainties and referred listeners to company's registration statements and reports filed with SEC).[28]

---

[27]<u>See</u> <u>Grobler v. Neovasc Inc.</u>, 2016 WL 6897760 *6 (D. Mass. November 22, 2016)(press releases contained warnings about forward-looking statements and specifically referred to company's public filings).

[28]<u>See</u> <u>In re Cutera Securities Litigation</u>, 610 F.3d 1103, 1112 (9th Cir. 2010)(defendant began conference call with notice that prepared remarks contained forward-looking statements concerning future financial performance and guidance, that management may make additional forward-looking statements in response to questions and that factors like defendant's ability to continue increasing sale performance could cause variance in results); <u>Bodri v. GoPro, Inc.</u>, 2017 WL 1732022 (N.D. Cal. May 1, 2017)(defendant reminded callers that statements including, but not limited to, those about company's projected future and financial results including revenue and expenses, economic and marketing trends, future plans, prospects and growth opportunities, anticipated benefits of long-term strategy, customers' competitive position, market share and leadership position in various markets constituted forward-looking statements and were subject to risks and uncertainties that may cause actual results to differ materially and referred callers to company's annual SEC report). <u>See also</u> <u>Grobler</u> *5 (oral statements need not be repetitively hedged by cautionary language: courts have routinely considered warning at beginning of investor call to be sufficient to satisfy safe harbor requirements).

Finally, as the Lead Plaintiffs have argued, a "distinction must be made between statements of future projections and statements of current or historical fact, as the latter are not protected by the safe harbor." In re Gold Resource, 957 F. Supp.2d at 1294 (citations omitted). They have contended that certain statements concerning SandRidge's CapEx are not 'forward-looking' because they concern past or present statements of fact[,]" Doc. 204 at 12, as demonstrated by the following:

(1) Ward's statements on May 5, 2011, and May 24, 2011, respectively, that "with the success of . . . [the] asset monetizations to date, [SandRidge is] . . . now focused on funding [its] . . . 2012 capital spending program[,]" Doc. 225 at 78, ¶ 183 (emphasis deleted), and that SandRidge has "addressed [its] . . . CapEx funding gap for this year[, 2011,]" id. at 82, ¶ 194; and

(2) Bennett's statements on May 6, 2011, and August 3, 2012, respectively, that SandRidge's "'2011 CapEx plan' of $1.3 billion had been 'almost fully funded,'" id. at 80, ¶ 187 (emphasis deleted), and that "[r]egarding 2012 CapEx guidance, . . . [SandRidge is] "increasing [its] . . . estimate[,]" id. at 114, ¶ 273, "primarily due to increased facility cost in the Mississippian and Permian and leasehold acquisition costs." Id.

"'Forward-looking conclusions often rest both on historical observations and assumptions about future events.'" In re Gold Resource, 957 F. Supp.2d at 1295 (quoting Harris v. Ivax Corp., 182 F.3d 799, 806 (11th Cir. 1999)). "'[T]hat a statement contains some reference to a projection of future events cannot . . . bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement.'" Id. (quoting In re Stone & Webster, Inc. Securities Litigation, 414 F.3d 187, 213 (1st Cir. 2005)). That is to say, "'a mixed present/future statement is

not entitled to the safe harbor with respect to the part of the statement that refers to the present.'" Id. (quoting Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 256 (3d Cir. 2009)(further quotation omitted)); e.g., Institutional Investors Group, 564 F.3d at 255 (if statements justify financial projections in terms of company's current situation and affirm that situation, statements not forward-looking).

However, if the non-forwarding looking parts of a statement, "when read in context, cannot meaningfully be distinguished from the future projection of which they are a part[,]" id., the statements such as the statements on which the Lead Plaintiffs have relied, fall within the safe harbor and are not actionable.   See id. (phrases "on track" and "position us" do not make statements of current fact).   In determining whether a statement qualifies as forwarding-looking, the Court must "'look to the facts and circumstances of the language used[,]'" In re Molycorp *25 (quotation omitted), as those facts and circumstances are alleged in the pleading under review, and the Court finds in this case that the CapEx statements[29] fall within PSLRA's safe harbor and therefore are not actionable.[30]

---

[29]The Lead Plaintiffs have conceded that "the cautionary language warned of business risks and uncertainties, such as the volatility of oil prices and success in discovery, estimating, and developing oil reserves[,]" Doc. 204 at 28, but have argued that such "language, however, did not warn investors that [the] [d]efendants lacked a reasonable basis to represent a figure for 2011 CapEx because SandRidge spent money in the Mississippian in a haphazard and reckless manner to benefit Ward-[r]elated [e]ntities and increased CapEx related to drilling in order to mask the poor performance of older wells."  Id.   As stated, the safe harbor provision '"'does not require a listing of all factors" that may present a risk, nor "must the cautionary language explicitly mention the factor that ultimately belies a forward-looking statement[.]"'" In re Molycorp *25 (quotations omitted)(emphasis deleted).   The language need only "put an investor sufficiently 'on notice of the danger of the investment to make an intelligent decision about it according to [his or] her own preferences for risk and reward.'"  Bumgarner *3 (quotation omitted).

[30]Having so determined, the Court has not considered the movants' remaining challenges

As stated, one element of the Lead Plaintiffs' claim under Section 10(b) and Rule 10b-5 is "loss causation."  See Matrixx, 563 U.S. at 37-38; Stoneridge Investment, 552 U.S. at 157.  SandRidge, Bennett and Grubb[31] have argued that the allegations in the Third Amended Complaint that pertain to the activities of the Ward-related entities, see, e.g., Doc. 225 at 6, ¶ 3; id. at 61, ¶ 150, are not actionable because the Lead Plaintiffs have failed to sufficiently allege facts that plausibly suggest this essential element.

The PSLRA requires the Lead Plaintiffs to allege and prove that these defendants' "act or omission . . . caused the loss for which the [Lead] [P]laintiffs seek[ ] to recover damages."  15 U.S.C. § 78u–4(b)(4); e.g., Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 345-46 (2005).  That is to say, the Lead Plaintiffs must show a "causal link between the alleged misconduct [about which they have complained] and the economic harm [they] ultimately suffered . . . ."  Emergent Capital Investment Management, LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2nd Cir. 2003)(citation omitted); e.g., In re Williams Securities Litigation—WCG Subclass, 558 F.3d 1130, 1136 (10th Cir. 2009).  Accordingly, the Lead Plaintiffs are obligated to set forth enough facts that show that their "losses were attributable to the revelation of the fraud and not the myriad other factors that affect[ed] . . . [SandRidge's] stock price."  Id.; e.g., Dura Pharmaceuticals, 544 U.S. at 343 (plaintiff required to show revelation caused loss and not one of the "tangle of factors"); Nakkhumpun, 782 F.3d at 1154 (plaintiff must allege facts showing causal connection between revelation of truth to the marketplace and losses).  "Without showing

---

to these allegations.

[31]Ward has joined in this argument and has likewise moved for dismissal on this ground. See Doc. 190 at 5 n.1.

a causal connection that specifically links [their] losses to [the defendants'] misrepresentations, [they] . . . cannot succeed." In re Williams Securities, 558 F.3d at 1136.

Relying on the following allegations, the Lead Plaintiffs have argued that the Third Amended Complaint satisfies the pleading standard set forth in Dura Pharmaceuticals: "a plaintiff must simply 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'"   Doc. 204 at 21 (quoting Dura Pharmaceuticals, 544 U.S. at 347)(emphasis deleted).   Those allegations are:

(1) "[o]n November 8, 2012, [the] [d]efendants issued a press release disclosing [SandRidge's] . . . financial results for the third quarter 2012, reporting a loss of $184 million, or 39 cents per share[,]" Doc. 225 at 145-46, ¶ 344; e.g., id. at 127-28, ¶ 298;

(2) that same day, Dinakar Singh, chief executive officer of TPG-Axon Capital ("TPG-Axon") and then-owner of 4.5% of SandRidge's stock, publicly issued a letter addressed to SandRidge's Board demanding Ward's resignation due to SandRidge's "'disastrous performance,'" id. at 128, ¶ 299; see Doc. 133-23 at 3, and a decline in its stock price in excess of 76% since 2007; and

(3) in his letter, Singh, inter alia, "challenged Ward's unchecked 'rife' self-dealing, stating, in pertinent part . . . . [that] Ward . . . has bought massive holdings of ranchland, and then turned around and leased the land to SandRidge for future exploration.'"   Doc. 225 at 128, ¶ 299 (emphasis deleted); see Doc. 133-23 at 7-8.

In the Lead Plaintiffs' opinion,

(1) Singh's letter not only "discussed . . . Ward's front-running activities[,]" Doc. 225 at 146, ¶ 345, by "suggest[ing] that . . . Ward had been moving ahead of SandRidge in

26

identifying and purchasing attractive land and mineral rights, and then profiting at the expense of SandRidge's investors[,]" id.; but also

(5) questioned whether the defendants' "misstatements and omissions concealed the risk of . . . capital expenditures being increased to benefit the Ward-related entities to the detriment of SandRidge[ and] . . . also concealed the risk of Ward and the Ward-related entities competing against and profiting from SandRidge in the Mississippian." Id.

According to the Lead Plaintiffs,

(1) "[o]n November 8 and 9, 2012, the shares of SandRidge common stock declined from a closing price of $6.10 per share to close at $5.51 per share on November 9 (a 9.7% decline and a 57.6% decline from the Class Period high of $12.97 per share reached on April 4, 2011), on heavy trading volume[,]" id. at 147, ¶ 348; and

(2) "[t]his drop removed the inflation from the price of SandRidge common stock, causing real economic loss to investors who had purchased . . . [the] stock during the Class Period." Id.

The Lead Plaintiffs have contended that they have met their pleading burden the essential element of "loss causation" under two theories:  "corrective disclosure" and "materialization of a concealed risk."  Under the first, the corrective disclosure of a previously undisclosed truth causes a decline in the stock price, and a plaintiff shows the necessary "loss causation" by setting forth enough facts that show that the corrective disclosure reveals the alleged fraud to the public and that this revelation caused the resulting decline in price.  E.g., Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 649 (7th Cir. 1997)(loss causation can be proved by showing defendant made fraudulent

misstatement and that misstatement was responsible for damage).   This theory "does not require . . . that the [Lead] [P]laintiff[s] plead that all of [their] . . . loss can be attributed to the false statement . . . ."  Id.

In connection with the second theory—materialization of a concealed risk—"a plaintiff alleges loss causation by showing that the defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized." Nakkhumpun, 782 F.3d at 1154 (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2nd Cir. 2005)).  A plaintiff must establish "not only concealment of the risk but also negative impact on the share price based on materialization of the risk."  Id. at 1156 (citing Lentell, 396 F.3d at 173); e.g., In re Williams, 558 F.3d at 1138 (truth can be revealed by actual materialization of concealed risk, rather than by public disclosure that risk exists).

Regardless of which method the Lead Plaintiffs have employed, they must establish "how [and when] the truth was revealed[,]" id. at 1137 (citation omitted); e.g., id. at 1138, and "link [the revelation of that truth] . . . to a corresponding loss."  Id.   The press release issued on November 8, 2012, and TPG-Axon's letter published that same date, see Doc. 133-23, pertain to Ward; neither discusses nor discloses the activities of the Ward-related entities about which the Lead Plaintiffs have complained.[32]

As the Court has determined, "the scope of certain related-party land transactions of SandRidge[,]" Doc. 133-24 at 4; e.g., id. at 41, was revealed by TPG-Axon on January

---

[32]The letter does not disclose Ward's relationship with the Ward-related entities, but rather complains about the Executive Well Participation Plan and Ward's "unconscionable" compensation that permitted him to purchase "massive holdings of ranchland," Doc. 133-23 at 8, and then "lease[ ] th[at] land to SandRidge for future exploration."  Id.

23, 2013, and outlined in an exhibit attached to a Consent Statement filed with the SEC on January 24, 2013.   See id. at 2, 5.[33]   Because that Consent Statement was filed after the decline in the value of SandRidge's common stock on November 9, 2012, the Court finds the allegations in the Third Amended Complaint do not support the inference that SandRidge stock declined in response to, or was negatively affected by "SandRidge's related-party transactions[,]" Doc. 133-24 at 41, since those transactions and the activities of the Ward-related entities were not disclosed until January 2013.   See In re Williams, 558 F.3d at 1133 (any theory of loss causation must identify when materialization occurred and link it to corresponding loss).   Accordingly, the Lead Plaintiffs' Section 10(b) and Rule 10b-5 claim grounded on these allegations fails.

A second essential element of the Lead Plaintiffs' claim under Section 10(b) and Rule 10b-5 is "scienter," see Matrixx, 563 U.S. at 37, and "the PSLRA [has] created a heightened pleading standard applicable to th[is] . . . element." In re Gold Resource, 776 F.3d at 1109 (citation omitted); e.g., Sanchez, 667 Fed. Appx. at 719.   To satisfy "the scienter requirement–'a mental state embracing intent to deceive, manipulate, or defraud,'" In re Gold Resource, 776 F.3d at 1109 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)), "it is not sufficient 'for a plaintiff to allege generally that the defendant acted with scienter, as permitted under [Rule] 9(b)[, supra].'" Id. (quoting Level 3, 667 F.3d at 1333)(further citation omitted).   The plaintiff must instead, "'with

---

[33]See Doc. 133-24 at 41 ("Th[is] presentation outlines numerous instances where entities affiliated with . . . Ward's family, such as TLW . . . , WCT . . . and 192 Investments, have been active in acquiring acreage and mineral rights ahead of . . . [SandRidge], and in many instances 'flipping' the rights to SandRidge just weeks or months later.   More worryingly, it appears that those affiliated entities have also acquired acreage in advance of purchasers by SandRidge in the same areas, and then either sold it to third parties or kept it.").

respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"   Id. (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

In this connection, "'[t]he [Court's] inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'"   In re Gold Resource, 776 F.3d at 1109 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322-23 (2007) (emphasis deleted)).   A "strong inference" is one that is "cogent and compelling," Tellabs, 551 U.S. at 324, not "merely 'reasonable' or 'permissible[.]'"   Id.   Thus, "[a] complaint will survive [a request for dismissal] . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"   Id. (footnote omitted); e.g., MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P., 761 F.3d 1109, 1121 (10th Cir. 2014).

In this circuit,[34] a

> [p]laintiff must allege facts sufficient to raise a strong inference that [the] defendant['s] representations were intentionally false[35] or at least reck-lessly made.   "Recklessness" under [Section] 10(b) is "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

---

[34] See In re Zagg, Inc. Securities Litigation, 797 F.3d 1194, 1201 n.3 (10th Cir. 2015) (United States Supreme Court has reserved question of "whether recklessness suffices to fulfill the scienter requirement," but Tenth Circuit has held that it may)(quoting Matrixx, 563 U.S. at 48) (citing Level 3, 667 F.3d at 1343 n.12).

[35] "'Intentional misconduct . . . encompasses deliberate illegal behavior.'"   City of Phila-delphia v. Fleming Companies, Inc., 264 F.3d 1245, 1258 (10th Cir. 2001)(quotation omitted).

In re Gold Resource, 776 F.3d at 1113 (quoting City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245, 1258 (10th Cir. 2001)); e.g., Nakkhumpun, 782 F.3d at 1147 (plaintiff must allege facts that create strong inference that defendants acted with intent to deceive shareholders or in reckless disregard of a risk that shareholders would be deceived). "Negligence, even gross negligence, is not sufficient; something similar to 'conscious disregard' is required." In re Gold Resource, 776 F.3d at 1113 (citing Level 3, 667 F.3d at 1343 n.12); e.g., In re Zagg, Inc. Securities Litigation, 797 F.3d 1194, 1206 (10th Cir. 2015)(recklessness "'is a particularly high standard,' something closer to 'a state of mind approximating actual intent'")(quoting Dronsejko v. Thornton, 632 F.3d 658, 668 (10th Cir. 2011)(further quotation omitted); Fleming, 264 F.3d at 1259.

The Tenth Circuit recognizes that "[c]ourts have been cautious about imposing liability for securities fraud based on reckless conduct[.]" Id. at 1260 (citation omitted). A "'[p]laintiff[ ] should not be allowed to proceed with allegations of "fraud by hindsight,"'" id.; a defendant "should be liable for failing to reveal only 'those material facts reasonably available to . . . [him].'" Id. (citation omitted). "'Thus, allegations that [a] defendant[ ] should have anticipated future events and made certain disclosures earlier than . . . [he] actually did do not suffice to make out a claim of securities fraud.'" Id. (quotation omitted). Moreover, "'allegations that [a] . . . defendant possessed knowledge of facts that are later determined by a court to have been material, without more, are not sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate, or defraud." Id.

31

The Court must determine whether the Lead Plaintiffs have stated specific facts that give rise to a strong inference that Bennett and/or Grubb acted with the required state of mind with respect to each misstatement or omission alleged regarding the remaining category of allegations:   the economic value of the Mississippian formation to investors (because the amount of oil reserves and the amount of oil relative to natural gas had been overstated).   See Doc. 225 at 7, ¶ 4.[36]   In doing so, the Court must focus on the factual allegations in the Third Amended Complaint that attempt to show that Bennett and Grubb, each through his receipt of information and data and in light of his control over SandRidge, "knew, or recklessly disregarded, that the public documents and statements issued or disseminated in . . . [SandRidge's] name . . . were materially false and misleading[,]" id. at 136, ¶ 318, and that Bennett and Grubb each "knew[,] or recklessly disregarded[,] that such [materially false and misleading] statements or documents would be issued or disseminated to the investing public."   Id.   That is to say, the Court must consider whether such allegations show that both Bennett and Grubb either acted with an intent to deceive or defraud SandRidge investors or acted recklessly.

The Lead Plaintiffs have contended that the Third Amended Complaint sufficiently pleads scienter because the allegations show that the performance of SandRidge wells in the Mississippian formation and the oil and gas production and reserves in that formation were closely monitored by SandRidge's Reservoir Engineering Department, that the information gleaned from that monitoring was regularly provided Bennett and Grubb and thus, that the "material facts [about the performance of SandRidge wells in the

---

[36]See, e.g., Doc. 225 at 52-60, ¶¶ 132-148; id. at 62-65, ¶¶ 152-154.

Mississippian formation and the oil and gas production and reserves were] reasonably available to . . . [them]." Fleming, 264 F.3d at 1260 (citation omitted).

According to the Third Amended Complaint, "SandRidge continually reassured investors throughout the Class Period that it closely and regularly monitored the production results of its wells," Doc. 225 at 47, ¶ 114,—reassurances that were repeated in SandRidge's SEC Form 10-K for the fiscal year ended December 31, 2010, filed on February 28, 2011.  E.g., id.; Doc. 133-1 at 12.   This "close[ ] and regular[ ] monitor[ing,]" Doc. 225 at 47, ¶ 114, was performed by the Reservoir Engineering Department, which in 2011 had "'[eighteen] full-time employees, comprised of seven degreed engineers and [eleven] engineering analysts/technicians[,]'" id. ¶ 115 (quotation omitted); e.g., Doc. 133-1 at 12,[37] "'to ensure the most current reservoir information [was] . . . reflected in reserves estimates.'"  Doc. 225 at 47, ¶ 114 (quotation omitted)(emphasis deleted).

The Lead Plaintiffs have alleged that this department "was headed by Rodney E. Johnson, SandRidge's Executive Vice President-Reservoir Engineering," id. ¶ 117, and that "Johnson '[was] the technical person primarily responsible for overseeing the preparation of . . . [SandRidge's] reserve estimates[.]"  Id. ¶ 118.  According to the Third Amended Complaint, Johnson "formally presented [SandRidge's reserve estimates] at least once per quarter . . . to . . . senior SandRidge officials[,]" id. at 48, ¶ 120, and that these "estimates were reviewed by . . . various senior executives."  Id. ¶ 122.

---

[37]In 2012, the number of degreed engineers increased to eight.  See Doc. 225 at 47, ¶ 116.

To support their allegations of scienter and their contention that Bennett and Grubb were "kept fully informed of the Mississippian's poor production[,]" id. at 49 (capitalization and emphasis deleted), the Lead Plaintiffs have relied on three former SandRidge employees:   a senior geologist identified as "FE1," id. at 13, ¶ 22,[38] a geologist identified as "FE2," id. ¶ 23,[39] and an associate geologist identified as "FE3," id. ¶ 24,[40] and have described the circumstances when that information regarding poor performance was allegedly disclosed to Bennett and Grubb:   "weekly management meetings[,]" id. at 49, ¶ 123, "weekly team meetings[,]" id. ¶ 125, and "weekly '[e]xploration [m]eetings[.]'"   Id. at 50, ¶ 127.

Because FE1 was not employed by SandRidge during the Class Period, the Court has disregarded any contentions based on his or her "information and belief[,]" id. at 13, ¶ 21, about, and his or her "direct first-hand knowledge[,]" id., of, events that occurred during that period.   The Court has instead examined the "information [provided by] and

---

[38]The Lead Plaintiffs have alleged that FE1 worked at SandRidge for approximately three years, that his/her employment ended in November 2010, that "[t]hroughout his/her tenure at SandRidge, [he/she] . . . worked . . . throughout the regions in Oklahoma where SandRidge held leases to drill the Mississippian lime[,]" id. at 13, ¶ 22, and that he/she during "his/her employment at SandRidge, . . . attended weekly management meetings in SandRidge's headquarters which were attended by SandRidge senior management, including . . . Grubb." Id.   The Lead Plaintiffs have alleged that "[a]ccording to FE1, production data for the Mississippian play was also reported in daily emails—referred to internally as 'Drilling and Completions Reports'—[and] . . . that . . . senior executives received the[se] . . . Reports." Id. at 50, ¶ 129.

[39]FE2 is alleged to have "worked on both the Permian Basin and the Mississippian[,]" id. ¶ 23, and "determined where to drill and pin-pointed hazards like faults or fractures." Id.   During his/her employment, he/she "attended meetings which were attended by SandRidge senior management, including . . . Grubb." Id.

[40]FE3 is alleged to have worked as an associate geologist in the Mississippian formation in Kansas from May 2012 to May 2013, e.g., id. at 13-14, ¶ 24; in that position, he/she "determined where to drill by reviewing the past performance of wells in the same area and trying to estimate whether a new well would have similar production results." Id.

[the] belief and . . . knowledge of," id., FE2 and FE3, "about SandRidge's business and operations . . . ."   Id.

According to FE2, Grubb conducted weekly management meetings that were "attended by numerous SandRidge geologists[, including FE2,] and senior executives[.]" Id. at 49, ¶ 123.   Grubb was therefore "kept apprised on—at least—a weekly basis of the production performance throughout SandRidge's assets, including the Mississippian play[,]" id., since "the status of drilling and production levels[,]" id. ¶ 124, and "individual wells that were either performing well or that needed improvement were . . . discussed." Id.

FE2 also participated in "weekly team meetings that were attended by employees that worked on the Mississippi lime . . . [and] led by either Craig Johnson, Senior Vice President of Development for Oklahoma, or Paul Stark, Reservoir Engineering Manager[,]" id. ¶ 125, and that production levels were likewise discussed at these meetings.   According to FE2, "the number of under-performing wells in the Mississippian was larger than expected, and that overall, since at least early 2012, the Mississippian was not performing as well as expected."   Id. at 50, ¶ 128.

The third former employee, FE3, was present in 2012 during the "weekly '[e]xploration [m]eetings,' . . . , which were attended by . . . Grubb[, among others,]" id. ¶ 127; attendees "discussed drill schedules, wells that were going to be drilled, prospective drilling areas, and production at existing wells[ ] [and] [t]he poor performance of the Mississippian . . . ."   Id.; e.g., id. at 138-39, ¶ 324.   "According to FE3, oil production in the Mississippian play was lower than had been anticipated, and this caused frustration within SandRidge."   Id. at 50, ¶ 126.

"[G]eneralized, conclusory allegations regarding scienter without specific corroborating details," Weinstein v. McClendon, 2013 WL 1457718 *4 (W.D. Okla. 2013), are insufficient.  Likewise inadequate is any "attempt to allege scienter based on [a] defendant['s] management position[ ] and involvement in the operations of [the corporate defendant] . . . ."  Id.  "'[T]he mere fact that [an] . . . individual [d]efendant[ ] occupied [a] senior position[ ] in the company . . . is not sufficient to imply knowledge of the specific fact of [falsity or] materiality.'"  Id. (quoting Fleming, 264 F.3d at 1264); e.g., Anderson v. Spirit Aerosystems Holdings, Inc., 827 F.3d 1229, 1245 (10th Cir. 2016)(court cannot infer scienter based on defendant's position in company or involvement with particular project); In re Zagg, 797 F.3d at 1205 (while defendant's position within company is relevant, knowledge of violation may not be imputed solely from this circumstance); Wolfe v. AspenBio Pharma, Inc., 587 Fed. Appx. 493, 497 (10th Cir. 2014)(inference that defendant's knowledge came from fact of his position and importance of project not enough); id. (notion that knowledge may be imputed solely from individual's position within company rejected).

Rather, particularized factual allegations must show that Bennett and Grubb each received and reviewed a report or was provided other information and that each defendant either knew the truth about the facts that were purportedly misstated and that his misrepresentation about, or nondisclosure of, that truth would likely mislead investors or "acted with 'a reckless disregard of a known fact that so obviously material that [he] must have been aware of both its materiality and that its non-disclosure would likely mislead investors.'"  In re Zagg, 797 F.3d at 1202 (quoting Weinstein v. McClendon, 757 F.3d 1110, 1114 (10th Cir. 2014)(further quotation marks omitted))(footnote omitted).

When "'all of the facts alleged, taken collectively,'"[41] In re Gold Resource, 776 F.3d at 1109 (quoting Tellabs, Inc., 551 U.S. at 322)(emphasis deleted), and accepted as true, are considered as to Grubb, the Court finds that these facts "'giv[e] rise to a strong inference that . . . [Grubb] acted with the required state of mind[,]'" id. (quoting 15 U.S.C. § 78u-4(b)(2)(A)), and engaged in either knowing or reckless conduct by materially misrepresenting the economic value of the Mississippian formation to investors.   Under the circumstances, the Court finds the inference of scienter is "more than merely 'reasonable' or 'permissible[,]'" Tellabs, Inc., 551 U.S. at 324; it is, as case law requires, "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."   Id. (footnote omitted).

It is a closer question, however, whether these same "facts . . . , taken collectively," In re Gold Resource, 776 F.3d at 1109 (quoting Tellabs, Inc., 551 U.S. at 322)(emphasis deleted), and accepted as true, when considered as to Bennett, "'giv[e] rise to a strong inference that . . . [he] acted with the required state of mind.'"   Id. (quoting 15 U.S.C. § 78u-4(b)(2)(A)).   While FE2 and FE3 have specifically identified Grubb as an attendee at the "weekly management meetings[,]" Doc. 225 at 49, ¶ 123, "weekly team meetings[,]" id. ¶ 125, and/or "weekly '[e]xploration [m]eetings[,]'" id. at 50, ¶ 127, at which was discussed SandRidge's production and reserves in the Mississippian formation, there are no specific allegations in the Third Amended Complaint that identify Bennett as participating in these meetings or receiving specific reports.   Rather, the Lead Plaintiffs

---

[41]According to the Third Amended Complaint, "'[t]he Reservoir Engineering Department report[ed] directly to . . . [. . . Grubb], independently from all of . . . [SandRidge's] operating divisions.'"   Id. at 48, ¶ 119.

have alleged in conclusory fashion that "the true facts about the production and economics of the Mississippian . . . were reported to SandRidge's senior management by the . . . Reservoir Engineering Department[,]" id. at 138, ¶ 323, and that these "[r]eserve reports were reviewed by, among others, . . . Bennett[,]" id.; they have further suggested that "[s]ignificant declines [in well production] . . . would have been readily identified by . . . [SandRidge's] well performance monitoring program and . . . the drop along with the impact on EUR would have been reported to . . . Bennett[ ] . . . and other senior executives[.]" Id. at 141, ¶ 330.

The Lead Plaintiffs' allegations with respect to Bennett "are nothing more than 'generalized imputations of knowledge' and are not sufficient to establish scienter." Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1107 (10th Cir. 2003)(quotation omitted); e.g., id. (conclusory allegation about involvement of "senior management" does not amount to particularized claim that defendant knew about false statements). See Anderson, 827 F.3d at 1239 (generalized descriptions of internal meetings, cost reports and mismanagement do not contribute to cogent, compelling inference of scienter); MHC Mutual Conversion Fund, 761 F.3d at 1122 (allegation that, as part of their jobs, defendants attended regular meetings at which market conditions and disclosures about them were discussed deemed insufficient since routine attendance at meetings does not suggest cogent and compelling inference of scienter).

The Lead Plaintiffs have argued that Bennett was a "[k]ey high-level officer[,]" Doc. 204 at 18, who is "charged with knowledge because the misstatements . . . concern key parts of SandRidge's business[,]" id., and who "possessed substantial motives for

misrepresenting SandRidge's . . . operations . . . throughout the Class Period."[42]  Doc.

225 at 141, ¶ 331.  Admittedly, Bennett's position "is . . . relevant in [the Court's] . . .

weighing of the totality of the allegations."  Adams, 340 F.3d at 1106.  Also relevant to

the Court's decision is "the "magnitude of the alleged falsity[,]" id., of the statements

regarding SandRidge's Mississippian's performance and of the amount of oil reserves

and the amount of oil relative to natural gas.

However, as stated, "[f]or scienter, the [PSLRA] . . . creates a heightened duty for

the [Lead] [P]laintiffs to 'state with particularity facts giving rise to a strong inference that

. . . [Bennett] acted with the required state of mind.'"  Anderson, 827 F.3d at 1237

(quotation and further citation omitted).  Additional particularized facts as to Bennett

himself are therefore necessary to infer scienter, and absent those facts in the Third

Amended Complaint, the Court finds, under the circumstances, that the Lead Plaintiffs'

---

[42]While the Lead Plaintiffs "need not show that [a] . . . defendant[ ] acted with a particular motive[,]" Anderson, 827 F.3d at 1238 (citing Nakkhumpun, 782 F.3d at 1152 (scienter allegations may suffice even without motive), to the extent the Lead Plaintiffs have relied on the same, the conclusory allegations regarding motive found in the Third Amended Complaint as they relate to Bennett do not contribute to a cogent and compelling inference of scienter.

As stated in the Lead Plaintiffs' response, the motives:  "to inflate the value of [SandRidge's] . . . stock, mask production problems in the Mississippian, and enable SandRidge to conduct lucrative offerings to continue investing in the Mississippian[,]" Doc. 204 at 20, are more akin to "generalized motives shared by all companies[,]"  Fleming, 264 F.3d at 1269.  See id. (quoting San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Co., 75 F.3d 801, 814 (2d Cir.1996)("a company's desire to maintain a high bond or credit rating [does not] qualif[y] as a sufficient motive for fraud in these circumstances, because if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."); id. (citing Novak v. Kasaks, 997 F. Supp. 425, 430 n.5 (S.D.N.Y. 1998)(alleged motive to raise capital insufficient as a matter of law to allege scienter).

Even if the Lead Plaintiffs had successfully alleged that Bennett "possessed a motive," MHC Mutual Conversion Fund, 761 F.3d at 1121, "motive and opportunity to mislead . . . 'are typically not sufficient in themselves to establish a "strong inference" of scienter.'"  Id. (quoting Fleming, 264 F.3d at 1263).

allegations do not create a cogent, compelling inference of scienter.   E.g., Weinstein, 757 F.3d at 1114.

In Count II of the Third Amended Complaint, the Lead Plaintiffs have sought relief under Section 20(a) of the Exchange Act on the grounds that Bennett and Grubb each acted as a controlling person of SandRidge.   They have contended

(1) that each defendant, "[b]y virtue of [his] . . . high-level position[ ], and . . . [his] ownership and contractual rights, participation in and/or awareness of [SandRidge's] . . . operations and/or intimate knowledge of the false and misleading statements filed by . . . [SandRidge] with the SEC and disseminated to the investing public, . . . had the power to influence and control and did influence and control, directly or indirectly, . . . [SandRidge's] decision-making of . . . , including the content and dissemination of the [allegedly false and misleading] . . . statements[,]" Doc. 225 at 154, ¶ 369; and

(2) that each was "provided with or had unlimited access to copies of . . . [SandRidge's] . . . [allegedly misleading] reports, press releases, public filings and other statements . . . . prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected." Id.

Liability under Section 20(a) attaches to "[e]very person who, directly or indirectly, controls any person liable," 15 U.S.C. § 78t(a), for violations of the federal securities laws. ""The statue is remedial and is to be construed liberally.""   Maher v. Durango Metals, Inc., 144 F.3d 1302, 1305 (10th Cir. 1998)(quoting Richardson v. MacArthur, 451 F.2d 35, 41 (10th Cir. 1971)(further quotation omitted)).   Section 20(a) ""has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to

hold a 'controlling person' liable." Id. (quoting Richardson, 451 F.2d at 41-41 (further quotation omitted).

Therefore, "'to state a prima facie case of control person liability, the [Lead] [P]laintiff[s] must establish (1) a primary violation of the securities laws and (2) control over the primary violator by [Bennett and Grubb,] the alleged controlling person[s].'" In re Gold Resource, 776 F.3d at 1118 (quoting Fleming, 264 F.3d at 1270 (further quotation omitted)). In this connection, the latter element requires that the Lead Plaintiffs "point to facts which indicate that [Bennett and Grubb] . . . had 'possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" Adams, 340 F.3d at 1108 (quoting Maher, 144 F.3d at 1305).

Upon review of the Third Amended Complaint, the Court finds that the Lead Plaintiffs have sufficiently alleged that Grubb as SandRidge's president and chief operating officer during the Class Period, see Doc. 225 at 16, ¶ 31, and Bennett, as SandRidge's chief financial officer and a senior vice president during that period, see id. ¶ 30, exerted control over, and influenced, SandRidge's day-to-day operations. See Adams, 340 F.3d at 1108 (as president and chief executive officer, defendant would have possessed ultimate corporate management authority on daily basis). And, because the Court likewise finds that the Lead Plaintiffs have successfully pled a viable claim against SandRidge[43] under Section 10(b) and Rule 10b-5 at this stage of the proceedings, the

---

[43]Because the Court has determined that the Third Amended Complaint has adequately alleged that Grubb, SandRidge's president and chief operating officer during the Class Period, see Doc. 225 at 16, ¶ 31, acted with scienter, the Court further finds that the pleading also sufficiently alleges scienter on behalf of SandRidge to the extent permitted. See n.1, supra.

Lead Plaintiffs have satisfied both prongs of their Section 20(a) claim as to Bennett[44] and Grubb and that this claim may therefore be maintained against them.

Based upon the foregoing, the Court

(1) GRANTS the Motion to Dismiss Plaintiffs' Third Amended Complaint [Doc. 227] to the extent SandRidge, Grubb and Bennett have sought dismissal of the Lead Plaintiffs' claims in Count I as to all defendants that are grounded on allegations regarding CapEx and the Ward-related entities and DISMISSES those claims and allegations with prejudice as to all defendants;

(2) further GRANTS the motion to the extent Bennett has sought dismissal of the Lead Plaintiffs' claim in Count I against him based upon SandRidge's performance in the Mississippian formation and DISMISSES that claim and those allegations against him with prejudice; and

(3) DENIES said motion in all other respects; and

(4) DECLINES the Lead Plaintiffs' request to further amend their Third Amended Complaint.

ENTERED this _1st_ day of August, 2017.

LEE R. WEST
UNITED STATES DISTRICT JUDGE

---

"The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of [Section] 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority." Adams, 340 F.3d at 1106-07 (citations omitted).

[44]See id. at 1109 (while some courts require evidence that control person participated in fraudulent activity, Tenth Circuit has expressly rejected those decisions that require plaintiff to show defendant actually or culpably participated in the primary violation); Maher, 144 F.3d at 1305.