IN THE UNITED STATES DISTRICT COURT FOR

THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| IN RE SANDRIDGE ENERGY, INC. | ) | No. CIV-12-1341-W |
| SECURITIES LITIGATION | ) | Relating to All Securities Actions |

## ORDER

This matter comes before the Court on the Motion to Dismiss filed by defendant Tom L. Ward pursuant to Rules 12(b)(6) and 9(b), F.R.Civ.P.   Lead plaintiffs Laborers Pension Trust Fund for Northern Nevada, Construction Laborers Pension Trust of Greater St. Louis and Vladimir and Angelica Galkin (collectively "Lead Plaintiffs") have responded in opposition, and Ward has filed a reply in support of his challenges to the factual sufficiency of the allegations in the Lead Plaintiffs' third consolidated amended complaint ("Third Amended Complaint").   See Doc. 225.

In determining whether Ward's challenges under Rule 12(b)(6), supra, have merit, the Court is guided by the decision of the United States Supreme Court in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).   In Twombly, the Supreme Court held in accordance with Rule 8, F.R.Civ.P., that a complaint need not contain "heightened fact pleading of specifics," 550 U.S. at 570, or "detailed factual allegations," id. at 555 (citations omitted), but it must contain "enough facts to state a claim to relief that is plausible on its face."   Id. at 570.

The United States Court of Appeals for the Tenth Circuit has stated that Twombly imposes a "burden . . . on the plaintiff[s] to frame a 'complaint with enough factual matter (taken as true) to suggest' that . . . [they are] entitled to relief."   Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Twombly, 550 U.S. at 556).   The allegations in the Third Amended Complaint must therefore "be enough that, if assumed

to be true, the [Lead] [P]laintiff[s] plausibly (not just speculatively) ha[ve] a claim for relief [against Ward]." Id. (footnote omitted).

The Court's task at this stage is to determine whether "there are well-pleaded factual allegations," Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), in the challenged pleading; if so, the "[C]ourt should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id.[1] "A claim has facial plausibility when the plaintiff pleads factual content[2] that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citations omitted). As the Tenth Circuit has recognized, Twombly and Iqbal neither change Rule 8's notice requirement, nor alter Rule 12(b)(6)'s requirement that a complaint state a legally recognized claim for relief; these decisions only add the "requirement of plausibility

---

[1]"The [C]ourt's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.'" Swoboda v. Dubach, 992 F.2d 286, 290 (10th Cir. 1993)(quotation omitted)(emphasis deleted). That is to say, "the sufficiency of a complaint must rest on its contents alone." Gee v. Pacheco, 627 F.3d 1178, 1186 (10th Cir. 2010)(citation omitted).

Exceptions to this rule occur when a complaint incorporates documents by reference, e.g., id. (citations omitted), when submitted documents referred to in that pleading are central to the plaintiffs' claims and the authenticity of those documents is not in dispute, e.g., id. (citation omitted), and when matters exist of which a court should take judicial notice. E.g., id. (citation omitted). In those limited instances, the Court is not required to restrict itself to examination of the allegations in the challenged pleading.

Accordingly, to the extent the Third Amended Complaint cites to certain documents that are central to the Lead Plaintiffs' claims and the authenticity of those documents is not in dispute, the Court has examined the same. The Court has likewise reviewed certain public filings to which the parties have referred. E.g., In re Gold Resource Corporation Securities Litigation, 776 F.3d 1103, 1108 (10th Cir. 2015); Slater v. A.G. Edwards & Sons, Inc., 719 F.3d 1190, 1196 (10th Cir. 2013).

[2]"Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only "fair notice" of the nature of the claim, but also "grounds" on which the claim rests.'" Robbins, 519 F.3d at 1248 (quoting Twombly, 550 U.S. at 555 n.3)(further citation omitted).

[that] serves . . . to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success[.]"   Robbins, 519 F.3d at 1248.

This "requirement of plausibility" obligates the Lead Plaintiffs to set forth in the Third Amended Complaint "'either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'" Bryson v. Gonzales, 534 F.3d 1282, 1286 (10th Cir. 2008)(quotation and further citation omitted).  And, while "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context," Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215 (10th Cir. 2011)(citations omitted), neither "'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), nor "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory allegations, [will] . . . suffice."   Id. (citation omitted).

"[T]he Twombly/Iqbal standard recognizes a plaintiff should have at least some relevant information to make the claims plausible on their face."   Khalik v. United Air Lines, 671 F.3d 1188, 1193 (10th Cir. 2012).   The Federal Rules of Civil Procedure "demand[ ] more than an unadorned, the-defendant-unlawfully-harmed-me accusation[,]" Iqbal, 556 U.S. at 678 (citations omitted), and more than "mere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' . . . ."   Kansas Penn Gaming, 656 F.3d at 1214 (quoting Twombly, 550 U.S. at 555).   If the Lead Plaintiffs' factual allegations "are 'merely consistent with' [Ward's] . . . liability," Iqbal, 556 U.S. at 678 (quotation omitted), or "do not permit the [C]ourt to infer more than the mere possibility of misconduct," id. at 679, the Lead Plaintiffs "ha[ve] not 'show[n]' . . . 'that . . . [they are] entitled to relief.'"   Id. (quotation omitted).

Rule 9(b), supra, on which Ward has also relied, requires a plaintiff, "[i]n alleging fraud . . . , [to] . . . state with particularity the circumstances constituting [the] fraud . . . ." Id. In such instances, the complaint must "'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" Koch v. Koch Industries, Inc., 203 F.3d 1202, 1236 (10th Cir. 2000)(quotation omitted). In deciding whether the Third Amended Complaint meets this heightened pleading requirement, to the extent, if any,[3] Rule 9(b) is applicable in this instance, the Court's analysis is again confined to the text of that pleading, e.g., United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 726 (10th Cir. 2006), and any exhibits attached thereto and incorporated by reference therein.

Applying these standards to the Third Amended Complaint, the Court has examined the following allegations, and to the extent they are well pleaded, the Court has construed them in the Lead Plaintiffs' favor and accepted them as true, e.g., id. (under both Rule 12(b)(6) and Rule 9(b), court must accept as true all well-pleaded facts, as distinguished from conclusory allegations, and view those facts in the light most favorable to the complainants), to determine whether the Lead Plaintiffs have met their "obligation to provide the 'grounds' of . . . [their] 'entitle[ment] to relief[.]'" Twombly, 550 U.S. at 555 (citation omitted).

The Lead Plaintiffs brought this action on behalf of all purchasers, other than the named defendants, of certain SandRidge Energy, Inc. ("SandRidge")[4] common stock

---

[3] See In re Gold Resource, 776 F.3d at 1108-09.

[4] SandRidge, which is organized under the laws of the State of Delaware, see Doc. 225 at 14, ¶ 28, and has its principal place of business in Oklahoma City, Oklahoma, see id., filed a

4

between February 24, 2011, and November 8, 2012–which period is defined in the Third Amended Complaint as "the 'Class Period.'"  Doc. 225 at 5, ¶ 1.  SandRidge is an oil and gas exploration company, see id. ¶ 2, and this lawsuit focuses on "one of SandRidge's core holdings referred to as the Mississippian play,"[5] id., "a geological formation that extends hundreds of miles across northern Oklahoma and south-central Kansas."  Id. at 21, ¶ 53.

The Lead Plaintiffs have contended that during the Class Period, Ward, SandRidge's founder and then chief executive officer and Chairman of its Board of Directors ("Board"), see id. at 15, ¶ 29, together with co-defendants James D. Bennett, then SandRidge's chief financial officer and a senior vice president, see id. at 16, ¶ 30, and Matthew K. Grubb, then SandRidge's president and chief operating officer, see id. ¶ 31, made certain materially false and misleading statements and failed to disclose certain

---

Voluntary Petition for Bankruptcy in the United States Bankruptcy Court for the Southern District of Texas on May 16, 2016.  See In re SandRidge Energy, Inc., No. 16-32488.  On September 20, 2016, the Bankruptcy Court entered its amended order confirming SandRidge and its debtor affiliates' amended Plan of Reorganization ("Plan").  See Doc. 217-1.  In accordance with the Plan's terms, see Doc. 225 at 14-15, ¶ 28 (citation omitted), SandRidge is a defendant in this action only to the extent necessary to recover from available remaining coverage under applicable insurance policies.  See id. at 15; id. at 5 n.1.

[5]The Mississippian formation

ranges from a few hundred feet to as much as 1000 feet thick, and is composed of layers of limestone, chert and limey mudstones that were deposited in a shallow sea during the Mississippian geological period over 300 million years ago.  Oil has been produced from the formation since the 1940s from conventional vertical wells.  Beginning in 2007, horizontal well and hydraulic fracturing technology has been applied to extract oil from reservoirs within the . . . formation.

Id. at 21, ¶ 53.

material information about SandRidge's business and its activities in the Mississippian formation.

The Lead Plaintiffs have complained

(1) that "[a]t the same time that [SandRidge was] . . . misrepresenting the value of [its] . . . Mississippian play properties," id. at 6, ¶ 3, Ward, "unbeknownst to investors, . . . through various affiliated entities, [including, among others, WCT Resources, L.L.C. ("WCT"),[6] 192 Investments, L.L.C. ("192 Investments")[7] and TLW Land & Cattle, L.P. ("TLW")[8] (collectively "Ward-related entities"), see id. at 31, ¶ 81,] was materially

_____

[6]WCT is described as a limited liability company organized under Oklahoma law, which at one time, shared its headquarters with SandRidge in Oklahoma City, Oklahoma. See id. at 32, ¶ 84. The Lead Plaintiffs have asserted that WCT is owned by, and its members are, trusts established by Ward and his wife, Sch'ree Ward, for the benefit of Ward's children, see Doc. 205-5 at 2, and that the trustee of these trusts is Scott C. Hartman, who began working at SandRidge in April 2006 and who has served as SandRidge's executive business director. See Doc. 225 at 32, ¶ 85. The Lead Plaintiffs have contended that Ward's son, Trent Ward ("T Ward"), is WCT's registered agent and chief executive officer, and that Scott White, who was employed by SandRidge as a land manager until 2011, was WCT's chief operating officer. See id. WCT is alleged to have had approximately seven (7) employees during the Class Period. See id.
The Lead Plaintiffs have further asserted that "SandRidge had leased the mineral rights for at least 223 sections in northwest Kansas, within the counties of Sherman, Thomas, Sheridan, Wallace, Logan, and Gove[,]" id. ¶ 86, that WCT "[i]n the[se] same counties, and often adjoining or adjacent to SandRidge's sections, . . . leased the mineral rights to at least 403 sections, almost twice the number as SandRidge[,]" id. at 32-33, ¶ 86, and that "on many occasions WCT[, then 'the fifth largest acreage holder in the Mississippian formation,' id. at 33, ¶ 87,] . . . acquired . . . [its] lease holdings in advance of or alongside of SandRidge's holdings." Id. ¶ 86.

[7]192 Investments is described as a limited liability company organized under Oklahoma law, which had its headquarters at the same address as SandRidge in Oklahoma City. See id. ¶ 88. 192 Investments' registered agent and its manager is T Ward, see id., and its members are the Trent Lee Ward Trust, the Romi Nirel Ward Trust and the James Davis Ward Trust. See Doc. 205-6 at 2.
The Lead Plaintiffs have contended that 192 Investments "acquired mineral rights on thousands of acres in late 2011 in the Mississippian play in Kansas," Doc. 225 at 33, ¶ 89, and that it "bought those mineral rights just months before SandRidge leased property in adjacent plots." Id.

[8]TLW is described in the Third Amended Complaint as a limited partnership organized under Oklahoma law, which shared its headquarters with SandRidge and 192 Investments. See

benefitting from [SandRidge's] . . . investment activities in the Mississippian[,]" id. at 6, ¶ 3; e.g., id. at 61, ¶ 150;[9]

(2) that although the Ward, Grubb and Bennett "told investors that SandRidge was investing in the Mississippian due to the large amounts of oil reserves and the favorable amount of oil relative to gas in the area[,]" id. at 7, ¶ 4; e.g., id. at 62, ¶ 152, these "statements misrepresented the nature of the Mississippian properties," id. at 7, ¶ 4;[10] and

---

id. at 33-34, ¶ 90.   Ward is TLW's registered agent, see id. at 34, ¶ 90, and in publicly-filed papers, TLW is identified as "an 'entity in which . . . Ward has an ownership interest.'"   Id.

[9]The Lead Plaintiffs have alleged that "[b]eginning in 2009, SandRidge started acquiring and developing properties in the Mississippian[, and] [b]y 2012, . . . had acquired 1.7 million acres and spent over $2.2 billion developing those properties[,]" id. at 6, ¶ 3, and that at the same time, Ward and the Ward-related entities "were acquiring massive amounts of land and mineral rights[, 'includ[ing] the rights associated with hydro-carbon resources such as oil and natural gas[,]' id. n.2], throughout the Mississippian."   Id. at 6, ¶ 3.
In describing the manner in which these acquisitions occurred, the Lead Plaintiffs have alleged that Ward and the Ward-related entities "often acquired land just prior to SandRidge's acquisitions of neighboring properties and [that] the Ward-related entities either flipped those properties to SandRidge or other companies or held on to the properties and benefitted from their appreciation in value due to SandRidge's development activities in the area."   Id.   The Lead Plaintiffs have further asserted:

> The Ward-related entities also stood to benefit from royalties earned from drilling activities on its areas.   In other words, . . . Ward and his affiliated entities were engaged in a classic form of front-running—Ward got out in front of SandRidge, purchased lands around where SandRidge would be developing wells and then benefitted from SandRidge's investments through the appreciation in the value of the land and royalty interests.

Id. at 6-7, ¶ 3.

[10]The Lead Plaintiffs have alleged that Ward, Grubb and Bennett

knew, or recklessly disregarded, the following facts about the amount of gas relative to oil in the Mississippian:

(a) The Mississippian was much gassier than represented . . . .   Production data that SandRidge reported to the Oklahoma Tax Commission showed that

SandRidge understated the gas to oil ratio for its typical horizontal well in its Mississippian play and that the oil production relative to gas production as reported was approximately half of that represented by [Ward, Grubb and Bennett] . . . .   In addition, the oil to gas ratio was contrary to the[ir] . . . representations that SandRidge had completed its transformation from a gas to an oil company[;]

(b) Contrary to [their] . . . statements during 2011 that [SandRidge's] . . . Mississippian wells on average produced 52% oil and 48% gas, production data . . . reveal[ed] that [SandRidge's] . . . wells produced less than 40% oil and more than 60% gas during 2011; and

(c) Contrary to [their] . . . statements during 2012 that [the] . . . Mississippian wells on average produced 45% oil and 55% gas, production data reported by SandRidge reveal[ed] that its wells produced on average 35% oil and 65% gas during 2012.

Id. at 62-63, ¶ 152; e.g., id. at 52, ¶ 132 (defendants "overstated the oil to gas ratios of the wells"); id. at 56-57, ¶¶ 141-145.

The Lead Plaintiffs have further alleged that Ward, Grubb and Bennett

knew, or recklessly disregarded, the following facts about a steep drop off in production rates of [SandRidge's] . . . horizontal Mississippian wells and the [estimated ultimate recovery ("EUR")] for those wells:

(a) Based on production data that SandRidge reported to the Oklahoma Tax Commission, there was a steep drop in oil production rates in SandRidge's older wells by March 2012 and rates were declining much faster than the type well presented by SandRidge;

(b) [SandRidge's] . . . large amounts of spending on drilling new wells in the Mississippian enabled SandRidge to report increasing total production numbers in that area even though older wells with more production history experienced steep declines. . . . [T]he increased drilling activity masked the rapid decline and depletion in SandRidge's horizontal Mississippian wells;

(c) Despite a precipitous drop in oil rates for SandRidge's Mississippian wells, which began no later than March 2012 and continued . . . to June 2012, SandRidge maintained throughout 2012 (until the end of the Class Period) that well performance continued to support an average 456 MBOE type well[;] and

(d) SandRidge grossly overstated the EUR for its typical Mississippian play horizontal well.   Indeed, contrary to [Ward, Grubb and Bennett's] . . . characterizations during 2012 of the EUR of the typical horizontal Mississippian well, production data provided by SandRidge shows that the EUR for oil was between 84-88% lower, the EUR for gas was between 55-65% lower, and the combined gas/oil equivalent of total production was 68-75% lower than represented by SandRidge throughout 2012.

(3) that "SandRidge's Mississippian-related spending caused [SandRidge] . . . to drastically exceed its capital expenditures allotment and required [it] . . . to take on debt and obtain funding from other sources . . . to keep funneling money into the Mississippian, which further negatively impacted [SandRidge's] . . . financial condition[,]" id., and that "[b]y April 4, 2011, [Ward, Grubb and Bennett] . . . were telling investors that [SandRidge] . . . would be increasing its capital expenditures in the region to $1.8 billion . . . ." Id.; e.g., id. at 62, ¶ 151.[11]

---

Id. at 63-64, ¶ 153; e.g., id. at 52, ¶ 132 (defendants "grossly overstated the EUR for SandRidge's . . . horizontal type well"); id. (defendants "minimized the oil decline rates for the wells"); id. (defendants "overstated the economic value of SandRidge's Mississippian wells"); id. at 52-56, ¶¶ 133-140; id. at 59-60, ¶¶ 146-148.
    The Lead Plaintiffs have also contended that Ward, Grubb and Bennett

    knew, or recklessly disregarded, the following facts about the geological make up
    of the Mississippian:

    (a) . . . .  Contrary to [their] . . . statements, there was not a single type curve
    across the[ ] entire leasehold extending for hundreds of miles.   Indeed, after the
    Class Period, SandRidge provided multiple type well curves based on
    geographical region instead of relying on just a single type well decline curve as
    [SandRidge] . . . had done during the Class Period; and

    (b) There was a risk that areas where SandRidge was drilling horizontal wells may
    have had partially depleted reservoirs as a result of the vertical wells drilled in the
    Mississippian since the 1940s.

Id. at 65-65, ¶ 154; e.g., id. at 52, ¶ 132 (defendants "misrepresented that well performance was consistent as represented by a single type curve across the[ ] entire leasehold, which extended for hundreds of miles").

    [11]The Lead Plaintiffs have alleged that Ward, Grubb and Bennett "knew, or recklessly disregarded, that contrary to their statements about financial discipline and meeting their capital expenditures guidance, [they] . . . sought to pour more and more money into the Mississippian regardless of the cost to SandRidge, which benefitted the Mississippian holdings of the Ward-related entities[,]" id. at 62, ¶ 151, and that they "knew, or recklessly disregarded, that capital expenditures were not based solely on what was in SandRidge's interests but were also based in part on the interests of the Ward-related entities."  Id.

The Lead Plaintiffs have asserted two claims for relief against Ward in the Third Amended Complaint.   Count I seeks damages under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, and the Securities and Exchange Commission's ("SEC") Rule 10b-5 promulgated thereunder.   See 17 C.F.R. § 240.10b-5.   Count II seeks damages under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as amended by the PSLRA.

Section 10(b) makes it

unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] . . . may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

SEC Rule 10b-5 implements . . . [Section 10(b))] by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37 (2011)(quoting 17 C.F.R. § 240.10b-5(b)); e.g., Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)(Rule 10b–5 encompasses only conduct already prohibited by Section 10(b)).

"A plaintiff suing under Section 10(b) [and Rule 10b-5] . . . bears a heavy burden at the pleading stage."   In re Level 3 Communications, Inc. Securities Litigation, 667 F.3d 1331, 1333 (10th Cir. 2012).   In determining whether the Lead Plaintiffs have met their burden by setting forth in the Third Amended Complaint enough direct or inferential

allegations to sustain a recovery under Section 10(b) and Rule 10b-5, the Court has

considered, as case law requires,[12] whether that pleading contains allegations that

support the following material elements:

> "(1) a material misrepresentation or omission by the defendant;[13] (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

Matrixx, 563 U.S. at 37-38 (quoting Stoneridge Investment, 552 U.S. at 157); e.g.,

Nakkhumpun v. Taylor, 782 F.3d 1142, 1146-47 (10th Cir. 2015); Sanchez v. Crocs, Inc.,

667 Fed. Appx. 710, 718 (10th Cir. 2016)(cited pursuant to Tenth Cir. R. 32.1).

Count I itself contains only the following "conclusory and formulaic recitations,"

Khalik, 671 F.3d at 1193, of the essential elements:

(1) "[d]uring the Class Period, [Ward][14] . . . disseminated or approved . . . [certain]

materially false and misleading statements . . . , which . . . [he] knew or deliberately

---

[12]Although Rule 12(b)(6), supra, "does not require that [the Lead] Plaintiff[s] establish a prima facie case in [their Third Amended] . . . [C]omplaint," Khalik, 671 F.3d at 1192, an examination of the essential "elements of [their] . . . alleged cause of action [is] help[ful] to determine whether [they have] . . . set forth a plausible claim." Id. (citations omitted). Accordingly, the Court has first considered what elements the Lead Plaintiffs must ultimately establish to prevail on a Section 10(b) and Rule 10b-5 claim, e.g., Burnett v. Mortgage Electronic Registration Systems, Inc., 706 F.3d 1231, 1236 (10th Cir. 2013)(Iqbal's contextual approach means comparing pleading with elements of cause of action), and has then "compar[ed] the . . . [Lead Plaintiffs' allegations] . . . with the elements of th[at] cause[ ] of action." Id.; e.g., id. (pleadings that do not allow for at least "reasonable inference" of legally relevant facts are insufficient).

[13]E.g., Nakkhumpun v. Taylor, 782 F.3d 1142, 1147 (10th Cir. 2015)(as to first element (falsity), plaintiff must plead fraud with particularity under Rule 9(b)).

[14]The Lead Plaintiffs have used the term "defendants" in this count collectively without attributing particular conduct to any one defendant. The Court has substituted Ward's name to determine whether the Lead Plaintiffs have set forth a plausible claim against him.

disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary . . . to make the[se] statements . . . , in light of the circumstances under which they were made, not misleading[,]" Doc. 225 at 151, ¶ 358;

(2) Ward, "individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about [SandRidge's] . . . business, operations and future prospects[,]" id. ¶ 359; and

(3) Ward, together with his co-defendants, "(a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of . . . SandRidge common stock during the Class Period in an effort to maintain artificially high market prices for [that] . . . stock[.]"   Id. ¶ 360.

> The Lead Plaintiffs have contended that Ward is primarily liable and that his
>
> liability[ ] arises from the following facts:  (i) [he was a] . . . high-level [SandRidge] executive[ ] and/or director[ ] . . . and member[ ] of the . . . management team or had control thereof; (ii) . . . by virtue of his responsibilities and activities as a senior officer and/or director[,] . . . [he] was privy to and participated in the creation, development and reporting of [SandRidge's] . . . internal budgets, plans, and/or projections; (iii) [he] . . . enjoyed significant personal contact and familiarity with . . . [Bennett and Grubb] and was advised of and had access to other members of [SandRidge's] . . . management team, internal reports and other data and information about [SandRidge's] . . . reserves, production, finances, operations, and liabilities at all relevant times; and (iv) [he] . . . was aware of [SandRidge's] . . . dissemination of information to the investing public which [he] . . . knew or recklessly disregarded was materially false and misleading.

Id. at 151-52, ¶ 361.

The Lead Plaintiffs have claimed

(1) that Ward "had actual knowledge of the misrepresentations and omissions of material facts set forth [in the Third Amended Complaint] . . . , or acted with reckless disregard for the truth in that [he] . . . failed to ascertain and to disclose such facts, even though such facts were available to . . . [him,]" id. at 152, ¶ 362;

(2) that his "material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public the significant problems with SandRidge's cash flows, capital expenditures, [and] . . . overstated reserves, and the extent of the . . . transactions [of the Ward-related entities], and supporting the artificially inflated price of SandRidge common stock[,]" id.; and

(3) "[a]s demonstrated by [his] . . . misstatements of . . . [SandRidge's] . . . business, operations, oil and gas reserves, and transactions[,] . . . if [Ward] . . . did not have actual knowledge of the misrepresentations and omissions alleged, [that he] w[as] reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading." Id. at 152-53, ¶ 362.

The Lead Plaintiffs have further alleged in support of Count I

(1) that "[a]s a result of the dissemination of the materially false and misleading information and failure to disclose material facts, . . . the market prices of SandRidge's common stock were artificially inflated during the Class Period[,]" id. at 153, ¶ 363;

(2) that "[i]n ignorance of th[at] fact . . . , and relying directly or indirectly on [Ward's] . . . false and misleading statements . . . , or upon the integrity of the market in which the[se] securities trade, and/or on the absence of material adverse information that was

known to or recklessly disregarded by . . . [Ward,] but not disclosed in public statements . . . , [the Lead] Plaintiffs . . . acquired SandRidge common stock . . . at artificially high prices and were damaged as a result[,]" id.; and

(3) that the Lead Plaintiffs "were ignorant of the[ ] falsity [of Ward's representations], and . . . [h]ad [they] . . . known the truth . . . , [they] would not have purchased or otherwise acquired their SandRidge common stock, or, if they had purchased such securities . . . , they would not have done so at the artificially inflated prices which they paid."   Id. ¶ 364.

Ward's alleged misstatements or omissions that are the subject of Count I fall into three categories:  those that pertain to SandRidge's capital expenditures ("CapEx"),[15] those that pertain to oil and gas production in the Mississippian formation and those that pertain to the activities of the Ward-related entities.[16]   See id. at 61-65, ¶¶ 149-154.

As stated, one essential element of the Lead Plaintiffs' claim under Section 10(b) and Rule 10b-5 is "scienter[,]"[17] see Matrixx, 563 U.S. at 37, and "the PSLRA [has] created a heightened pleading standard applicable to th[is] . . . element."  In re Gold Resource, 776 F.3d at 1109 (citation omitted); e.g., Sanchez, 667 Fed. Appx. at 719.   To

---

[15]The Court has addressed and dismissed against all defendants the Lead Plaintiffs' allegations regarding SandRidge's capital expenditures in an Order issued this date.

[16]The Court has also addressed and dismissed against all defendants the Lead Plaintiffs' allegations regarding the activities of the Ward-related entities in that same Order.

[17]On August 27, 2015, the Court dismissed this action against Ward because the Lead Plaintiffs inter alia had failed to plead specific facts supporting a strong inference that Ward had acted with the required state of mind.  See Doc. 185.  In the instant motion, Ward has again challenged the Lead Plaintiffs' allegations of scienter and has again argued that the allegations fail to establish this necessary element.

satisfy "the scienter requirement–'a mental state embracing intent to deceive, manipulate,

or defraud,'" In re Gold Resource, 776 F.3d at 1109 (quoting Ernst & Ernst v. Hochfelder,

425 U.S. 185, 193 n.12 (1976)), "it is not sufficient 'for a plaintiff to allege generally that

the defendant acted with scienter, as permitted under [Rule] 9(b)[, supra].'" Id. (quoting

Level 3, 667 F.3d at 1333)(further citation omitted). The plaintiff must instead, "'with

respect to each act or omission alleged . . . , state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind.'" Id. (quoting

15 U.S.C. § 78u-4(b)(2)(A)).

In this connection, "'[t]he [Court's] inquiry . . . is whether all of the facts alleged,

taken collectively, give rise to a strong inference of scienter, not whether any individual

allegation, scrutinized in isolation, meets that standard.'" In re Gold Resource, 776 F.3d

at 1109 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322-23 (2007)

(emphasis deleted)). A "strong inference" is one that is "cogent and compelling,"

Tellabs, 551 U.S. at 324, not "merely 'reasonable' or 'permissible[.]'" Id. Thus, "[a]

complaint will survive [a request for dismissal] . . . only if a reasonable person would deem

the inference of scienter cogent and at least as compelling as any opposing inference

one could draw from the facts alleged.'" Id. (footnote omitted).

In this circuit,[18] a

> [p]laintiff must allege facts sufficient to raise a strong inference that [the]
> defendant['s] representations were intentionally false or at least reck-lessly
> made. "Recklessness" under [Section] 10(b) is "conduct that is an extreme

---

[18]See In re Zagg, Inc. Securities Litigation, 797 F.3d 1194, 1201 n.3 (10th Cir. 2015) (United States Supreme Court has reserved question of "whether recklessness suffices to fulfill the scienter requirement," but Tenth Circuit has held that it may)(quoting Matrixx, 563 U.S. at 48) (citing Level 3, 667 F.3d at 1343 n.12).

departure from the standards of ordinary care, and which presents a danger
of misleading buyers or sellers that is either known to the defendant or is so
obvious that the actor must have been aware of it."

In re Gold Resource, 776 F.3d at 1113 (quoting City of Philadelphia v. Fleming

Companies, Inc., 264 F.3d 1245, 1258 (10th Cir. 2001)); e.g., Nakkhumpun, 782 F.3d at

1147 (plaintiff must allege facts that create strong inference that defendants acted with

intent to deceive shareholders or in reckless disregard of a risk that shareholders would

be misled). "Negligence, even gross negligence, is not sufficient; something similar to

'conscious disregard' is required." In re Gold Resource, 776 F.3d at 1113 (citing Level

3, 667 F.3d at 1343 n.12); e.g., In re Zagg, Inc. Securities Litigation, 797 F.3d 1194, 1206

(10th Cir. 2015)(recklessness "'is a particularly high standard,' something closer to 'a state

of mind approximating actual intent'")(quoting Dronsejko v. Thornton, 632 F.3d 658, 668

(10th Cir. 2011)(further quotation omitted); Fleming, 264 F.3d at 1259.

The Tenth Circuit recognizes that "[c]ourts have been cautious about imposing

liability for securities fraud based on reckless conduct[.]" Id. at 1260 (citation omitted).

A "'[p]laintiff[ ] should not be allowed to proceed with allegations of "fraud by hindsight,"'"

id.; a defendant "should be liable for failing to reveal only 'those material facts reasonably

available to . . . [him].'" Id. (citation omitted). "'Thus, allegations that [a] defendant[ ]

should have anticipated future events and made certain disclosures earlier than . . . [he]

actually did do not suffice to make out a claim of securities fraud.'" Id. (quotation

omitted). Moreover, "'allegations that [a] . . . defendant possessed knowledge of facts

that are later determined by a court to have been material, without more, are not sufficient

to demonstrate that the defendant intentionally withheld those facts from, or recklessly

disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate, or defraud." Id.

The Court must determine whether the Lead Plaintiffs have stated specific facts that give rise to a strong inference that Ward acted with the required state of mind with respect to each misstatement or omission regarding the remaining category of allegations:  the economic value of the Mississippian formation to investors (because the amount of oil reserves and the amount of oil relative to natural gas had been overstated). See Doc. 225 at 7, ¶ 4.[19]  In doing so, the Court must focus on the allegations in the Third Amended Complaint that attempt to show that Ward, through his receipt of information and data and in light of his control over SandRidge, "knew, or recklessly disregarded, that the public documents and statements issued or disseminated in . . . [SandRidge's] name . . . were materially false and misleading[,]" id. at 136, ¶ 318, and that he "knew[,] or recklessly disregarded[,] that such [materially false and misleading] statements or documents would be issued or disseminated to the investing public." Id. That is to say, the Court must consider whether such allegations show that Ward either acted with an intent to deceive or defraud SandRidge investors or acted recklessly.

The Lead Plaintiffs have contended that the Third Amended Complaint sufficiently pleads scienter because the allegations show that the performance of SandRidge wells in the Mississippian formation and the oil and gas production and reserves in that formation not only were closely monitored by Ward himself, but also were monitored by

---

[19]See, e.g., Doc. 225 at 52-60, ¶¶ 132-148; id. at 62-65, ¶¶ 152-154.

SandRidge's Reservoir Engineering Department, which in turn regularly provided Ward information about the same.

According to the Third Amended Complaint, "SandRidge continually reassured investors throughout the Class Period that it closely and regularly monitored the production results of its wells," Doc. 225 at 47, ¶ 114,—reassurances that were repeated in SandRidge's SEC Form 10-K for the fiscal year ended December 31, 2010, filed on February 28, 2011.  E.g., id; Doc. 133-1 at 12.  This "close[ ] and regular[ ] monitor[ing,]" Doc. 225 at 47, ¶ 114, was performed by the Reservoir Engineering Department, which in 2011 had "'[eighteen] full-time employees, comprised of seven degreed engineers and [eleven] engineering analysts/technicians[,]'" id. ¶ 115 (quotation omitted); e.g., Doc. 133-1 at 12,[20] "'to ensure the most current reservoir information [was] . . . reflected in reserves estimates.'"  Doc. 225 at 47, ¶ 114 (quotation omitted)(emphasis deleted).

The Lead Plaintiffs have alleged that this department "was headed by Rodney E. Johnson, SandRidge's Executive Vice President-Reservoir Engineering," id. ¶ 117, and that "Johnson '[was] the technical person primarily responsible for overseeing the preparation of . . . [SandRidge's] reserve estimates[.]"  Id. ¶ 118.  According to the Third Amended Complaint, Johnson "formally presented [the status of SandRidge's reserves] at least once per quarter . . . to . . . senior SandRidge officials[,]" id. at 48, ¶ 120, and that these "estimates were reviewed by . . . various senior executives."  Id. ¶ 122.

---

[20]In 2012, the number of degreed engineers increased to eight.  See Doc. 225 at 47, ¶ 116.

To support their allegations of scienter and their contention that Ward was "kept fully informed of the Mississippian's poor production[,]" id. at 49 (capitalization and emphasis deleted), the Lead Plaintiffs have relied on three former SandRidge employees: a senior geologist identified as "FE1," id. at 13, ¶ 22,[21] a geologist identified as "FE2," id. ¶ 23,[22] and an associate geologist identified as "FE3," id. ¶ 24,[23] and have described the circumstances when that information regarding poor production was allegedly disclosed to Ward: "weekly management meetings[,]" id. at 49, ¶ 123, "weekly team meetings[,]" id. ¶ 125, and "weekly '[e]xploration [m]eetings[.]'" Id. at 50, ¶ 127.

Because FE1 was not employed by SandRidge during the Class Period, the Court has disregarded any contentions based on his or her "information and belief[,]" id. at 13, ¶ 21, about, and his or her "direct first-hand knowledge[,]" id., of, events that occurred during this period. The Court has instead examined the "information [provided by] and

---

[21]The Lead Plaintiffs have alleged that FE1 worked at SandRidge for approximately three years, that his/her employment ended in November 2010, that "[t]hroughout his/her tenure at SandRidge, [he/she] . . . worked . . . throughout the regions in Oklahoma where SandRidge held leases to drill the Mississippian lime[,]" id. at 13, ¶ 22, and that he/she during "his/her employment at SandRidge, . . . attended weekly management meetings in SandRidge's headquarters which were attended by SandRidge senior management, including . . . Ward . . . ." Id. The Lead Plaintiffs have alleged that "[a]ccording to FE1, production data for the Mississippian play was also reported in daily emails—referred to internally as 'Drilling and Completions Reports'—[and] . . . that Ward . . . received the[se] . . . Reports." Id. at 50, ¶ 129.

[22]FE2 is alleged to have "worked on both the Permian Basin and the Mississippian[,]" id. ¶ 23, and "determined where to drill and pin-pointed hazards like faults or fractures." Id. During his/her employment, he/she "attended meetings which were attended by SandRidge senior management, including . . . Ward . . . ." Id.

[23]FE3 is alleged to have worked as an associate geologist in the Mississippian formation in Kansas from May 2012 to May 2013, e.g., id. at 13-14, ¶ 24; in that position, he/she "determined where to drill by reviewing the past performance of wells in the same area and trying to estimate whether a new well would have similar production results." Id.

[the] belief and . . . knowledge of," id., FE2 and FE3, "about SandRidge's business and operations . . . ."  Id.

According to FE2, Ward conducted weekly management meetings that were "attended by numerous SandRidge geologists[, including FE2,] and senior executives[.]" Id. at 49, ¶ 123.   Ward was therefore "kept apprised on—at least—a weekly basis of the production performance throughout SandRidge's assets, including the Mississippian play[,]" id., since "the status of drilling and production levels[,]" Id. ¶ 124, and "individual wells that were either performing well or that needed improvement were . . . discussed." Id. ¶ 124; e.g., id. at 138, ¶ 324.

FE2 also participated in "weekly team meetings that were attended by employees that worked on the Mississippi lime . . . [and] led by either Craig Johnson, Senior Vice President of Development for Oklahoma, or Paul Stark, Reservoir Engineering Manager." Id. at 49, ¶ 125.   Attendees not only discussed production levels, but also determined what "information . . . would be reported to Ward."   Id.; e.g., id. at 139, ¶ 324.   According to FE2, "the number of under-performing wells in the Mississippian was larger than expected, and that overall, since at least early 2012, the Mississippian was not performing as well as expected."   Id. at 50, ¶ 128.

The third former employee, FE3, was present in 2012 during the "weekly '[e]xploration [m]eetings,' . . . , which were attended by . . . Ward[, among others,]" id. ¶ 127; attendees "discussed drill schedules, wells that were going to be drilled, prospective drilling areas, and production at existing wells[ ] [and] [t]he poor performance of the Mississippian . . . ."   Id.; e.g., id. at 138-39, ¶ 324.   "According to FE3, oil production in

the Mississippian play was lower than had been anticipated, and this caused frustration within SandRidge."  Id. at 50, ¶ 126.

"[G]eneralized, conclusory allegations regarding scienter without specific corroborating details," Weinstein v. McClendon, 2013 WL 1457718 *4 (W.D. Okla. 2013), are insufficient.  Likewise inadequate is any "attempt to allege scienter based on [a] defendant['s] management position[ ] and involvement in the operations of [the corporate defendant] . . . ."  Id.  "'[T]he mere fact that [an] . . . individual [d]efendant[ ] occupied [a] senior position[ ] in the company . . . is not sufficient to imply knowledge of the specific fact of [falsity or] materiality.'"  Id. (quoting Fleming, 264 F.3d at 1264); e.g., Anderson v. Spirit Aerosystems Holdings, Inc., 827 F.3d 1229, 1245 (10th Cir. 2016)(court cannot infer scienter based on defendant's position in company or involvement in particular project); In re Zagg, 797 F.3d at 1205 (while defendant's position within company is relevant, knowledge may not be imputed solely from that circumstance); Wolfe v. AspenBio Pharma, Inc., 587 Fed. Appx. 493, 497 (10th Cir. 2014)(inference that defendant's knowledge came from fact of his position and importance of project not enough); id. (notion that knowledge may be imputed solely from individual's position within company rejected).

Rather, particularized factual allegations must show that Ward received and reviewed a report or was provided other information and that he therefore either knew the truth about the facts that were purportedly misstated and that his misrepresentation about, or nondisclosure of, that truth would likely mislead investors or "acted with 'a reckless disregard of a known fact that so obviously material that [he] must have been aware of both its materiality and that its non-disclosure would likely mislead investors.'"  In re

Zagg, 797 F.3d at 1202 (quoting Weinstein v. McClendon, 757 F.3d 1110, 1114 (10th Cir. 2014)(further quotation marks omitted))(footnote omitted).

When "'all of the facts alleged, taken collectively," In re Gold Resource, 776 F.3d at 1109 (quoting Tellabs, Inc., 551 U.S. at 322)(emphasis deleted), are considered and accepted as true, the Court finds that these facts "'giv[e] rise to a strong inference that . . . [Ward] acted with the required state of mind[,]'" id. (quoting 15 U.S.C. § 78u-4(b)(2)(A)), and engaged in either knowing or reckless conduct by materially misrepresenting the economic value of the Mississippian formation to investors. Under the circumstances, the Court finds the inference of scienter is "more than merely 'reasonable' or 'permissible[,]'" Tellabs, Inc., 551 U.S. at 324; it is, as case law requires, "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." [24] Id. (footnote omitted).[25]

In Count II of the Third Amended Complaint, the Lead Plaintiffs have sought relief under Section 20(a) of the Exchange Act on the grounds that Ward acted as a controlling person of SandRidge.   They have contended

---

[24]"Twombly does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true."   Iqbal, 556 U.S. at 696.   Rather, "the relevant question is whether, assuming the factual allegations are true, the plaintiff has stated a ground for relief that is plausible."   Id.

[25]While the Lead Plaintiffs "need not show that [Ward] . . . acted with a particular motive[,]" Anderson, 827 F.3d at 1238 (citing Nakkhumpun, 782 F.3d at 1152 (scienter allegations may suffice even without motive), they have argued that they have "allege[d] compelling motive allegations, which . . . provide additional support for scienter."   Doc. 206 at 23.   See Doc. 225 at 141-43, ¶¶ 33-338.   Although "[a]llegations of motive and opportunity [and even personal financial gain] may be important[,]" Fleming, 264 F.3d at 1262, the Court, when looking to the totality of the pleadings, finds in this instance that it need not consider motive since it has determined that the Lead Plaintiffs' have met their burden of pleading scienter.

(1) that "[b]y virtue of [his] . . . high-level position[ ], and . . . [his] ownership and contractual rights, participation in and/or awareness of [SandRidge's] . . . operations and/or intimate knowledge of the false and misleading statements filed by . . . [SandRidge] with the SEC and disseminated to the investing public, [Ward] . . . had the power to influence and control and did influence and control, directly or indirectly, . . . [SandRidge's] decision-making of . . . , including the content and dissemination of the [allegedly false and misleading] . . . statements[,]" Doc. 225 at 154, ¶ 369; and

(2) that he was "provided with or had unlimited access to copies of . . . [SandRidge's] . . . [allegedly misleading] reports, press releases, public filings and other statements . . . . prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected." Id.

Liability under Section 20(a) attaches to "[e]very person who, directly or indirectly, controls any person liable," 15 U.S.C. § 78t(a), for violations of the federal securities laws. "'"The statue is remedial and is to be construed liberally."'"   Maher v. Durango Metals, Inc., 144 F.3d 1302, 1305 (10th Cir. 1998)(quoting Richardson v. MacArthur, 451 F.2d 35, 41 (10th Cir. 1971)(further quotation omitted)).   Section 20(a) "'"has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." Id. (quoting Richardson, 451 F.2d at 41-41 (further quotation omitted).

Therefore, "'to state a prima facie case of control person liability, the [Lead] [P]laintiff[s] must establish (1) a primary violation of the securities laws and (2) control over the primary violator by [Ward,] the alleged controlling person.'"   In re Gold

Resource, 776 F.3d at 1118 (quoting Fleming, 264 F.3d at 1270 (further quotation omitted)). In this connection, the latter element requires that the Lead Plaintiffs "point to facts which indicate that [Ward] . . . had 'possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" Adams, 340 F.3d at 1108 (quoting Maher, 144 F.3d at 1305).

Upon review of the Third Amended Complaint, the Court finds that the Lead Plaintiffs have sufficiently alleged that Ward, as SandRidge's chief executive officer and Board Chairman during the Class Period, see id. at 15, ¶ 29, exerted control over, and influenced, the day-to-day operations of SandRidge. See Adams, 340 F.3d at 1108 (as president and chief executive officer, defendant would have possessed ultimate corporate management authority on daily basis). And, because the Court likewise finds that the Lead Plaintiffs have successfully pled a viable claim against SandRidge[26] under Section 10(b) and Rule 10b-5 at this stage of the proceedings, the Lead Plaintiffs have satisfied both prongs of their Section 20(a) claim against Ward.

---

[26]Because the Court has determined that the Third Amended Complaint has adequately alleged that both Grubb, SandRidge's president and chief operating officer, see Doc. 225 at 16, ¶ 31, and Ward, SandRidge's chief executive officer and Board Chairman, see id. at 15, ¶ 29, acted with scienter during the Class Period, the Court further finds that the pleading also sufficiently alleges scienter on behalf of SandRidge to the extent permitted. See n.4, supra. "The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of [Section] 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority." Adams, 340 F.3d at 1106-07 (citations omitted).

Accordingly, the Court, based on the foregoing,

(1) DENIES to the extent stated herein[27] Ward's Motion to Dismiss Plaintiffs' Third Amended Complaint [Doc. 226]; and

(2) in so doing, deems MOOT the Lead Plaintiffs' Motion to Partially Lift PSLRA Discovery Stay [Doc. 222] and Supplemental Motion and Notice of Cease and Desist Order [Doc. 231].[28]

ENTERED this _1st_ day of August, 2017.

LEE R. WEST
UNITED STATES DISTRICT JUDGE

---

[27]See nn. 15, 16, supra.

[28]The PSLRA provides that "all discovery and other proceedings [in a securities fraud action] shall be stayed during the pendency of any motion to dismiss[.]"  15 U.S.C. § 78u-4(b)(3)(B).  "In enacting the [PSLRA], Congress recognized that although private securities fraud litigation furthers important public policy interests, prime among them, deterring wrongdoing and providing restitution to defrauded investors, such lawsuits have also been subject to abuse, including the 'extract[ion]' of 'extortionate "settlements"' of frivolous claims."  Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 568 U.S. 455, 475 (2013)(quoting H.R. Conf. Rep. No. 104-369 at 31-32 (1995)).  "The PSLRA's response to the[se] perceived abuses was, inter alia, to '. . . authorize a stay of discovery pending resolution of any motion to dismiss.'"  Id. (quoting Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 81 (2006))(further citation omitted).  Because the Court has now resolved the pending motions, the Lead Plaintiffs' request to vacate the stay and permit certain discovery is moot.