# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

IN RE SANDRIDGE ENERGY,
INC. SECURITIES LITIGATION

Case No. 5:12-cv-01341-W

Relating to All Actions

# DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Dated: June 1, 2018

# TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Background.................................................................................................................... 4

I.      Procedural History........................................................................................ 4

II.     The Lead Plaintiffs and Proposed Class Representatives. ........................... 8

       A.      Northern Nevada ................................................................... 8

       B.      St. Louis Trust ..................................................................... 11

       C.      Vladimir and Angelica Galkin ............................................ 12

Argument .................................................................................................................... 15

I.      Class Certification Should be Denied Because the Proposed Class Period is Overbroad. .................................................................................................. 15

       A.      Plaintiffs Have No Basis for Seeking A Class Period That Begins in 2011, Because Their Allegations — Even If Credited — Cannot Establish Scienter Before May 2012. ............................................ 15

       B.      The Court Should Reject Plaintiffs' Effort to Revive Dismissed Claims by Proposing An Overbroad Class Period. .................... 18

II.     Lead Plaintiffs Should Not Be Appointed Class Representatives, And The Class Should Not Be Certified. .............................................................. 19

       A.      Plaintiffs Have Failed to Demonstrate That They Will Be Adequate Representatives of The Proposed Class. ..................................... 20

       B.      Plaintiffs Are Not Typical of the Class. ..................................... 25

             1.      Northern Nevada and Vladimir Galkin are Not Members of the Well Performance Class. ........................................... 25

             2.      The Galkins' Investment Practices Render them Atypical ............. 27

             3.      St. Louis Trust Has An Unusually Extensive History of Similar Securities Litigation with The Same Firm. ........................ 29

       C.      Individual Issues Predominate Over Classwide Issues. .............................. 30

1.   The Named Plaintiffs Have Proposed No Method Capable of Calculating Damages on A Classwide Basis. ...................................31

2.   Plaintiffs' Allegations About Data Filed with State Authorities Raise Individualized Questions of Investor Knowledge. ....................................................................................34

Conclusion ............................................................................................................35

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Albertson's, Inc. v. Amalgamated Sugar Co.*,
   503 F.2d 459 (10th Cir. 1974) ............................................................. 20, 24

*Berger v. Compaq Computer Corp.*,
   257 F.3d 475 (5th Cir. 2001) .................................................................. 21

*Better v. YRC Worldwide Inc.*,
   No. 11-2072-KHV, 2016 WL 1056972 (D. Kan. Mar. 14, 2016) ............................... 21

*CE Design Ltd. v. King Architectural Metals, Inc.*,
   637 F.3d 721 (7th Cir. 2011) .................................................................. 25

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ......................................................................... 30, 31

*Davidson v. Belcor, Inc.*,
   933 F.2d 603 (7th Cir. 1991) .................................................................. 27

*E.E.O.C. v. Unit Drilling Co.*,
   No. 13-CV-147-TCK-PJC, 2014 WL 3548845
   (N.D. Okla. July 17, 2014) .................................................................... 22

*Falcon v. Philips Elecs. N. Am. Corp.*,
   No. 06 Civ. 6090(JSR), 2007 WL 959374 (S.D.N.Y. Mar. 30, 2007),
   *aff'd*, 304 F. App'x 896 (2d Cir. 2008) ...................................................... 26, 29

*Fry v. UAL Corp.*,
   136 F.R.D. 626 (N.D. Ill. 1991) ............................................................... 28

*Gary Plastic Packaging Corp.*, 903 F.2d at 176 (2d Cir. 1990) ................................. 28

*George v. China Auto. Sys. Inc.*,
   No. 11 Civ. 7533(KBF), 2013 WL 3357170 (S.D.N.Y. July 3, 2013) .......................... 28

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) .............................................................. 25, 29, 30

*Hockenbury v. Hanover Ins. Co.*,
   No. CIV-15-1003, 2016 WL 552967 (W.D. Okla. Feb. 10, 2016) ............................. 15

*Hoexter v. Simmons*,
   140 F.R.D. 416 (D. Ariz. 1991) ............................................................... 30

*In re BP p.l.c. Sec. Litig.*,
  MDL No. 10-md-2185, 2014 WL 2112823 (S.D. Tex. May 20, 2014),
  *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015) .......................... 33

*In re Caremark Int'l, Inc. Sec. Litig.*,
  No.94 C 4751, 1996 WL 351182 (N.D. Ill. June 24, 1996) ....................................... 28

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)................................................................................. 15, 17

*Joffee v. Lehman Bros., Inc.*,
  410 F. Supp. 2d 187 (S.D.N.Y. 2006)......................................................................... 34

*Katz v. Comdisco, Inc.*
  117 F.R.D 403 (N.D. Ill. 1987) .................................................................................. 17

*Kelley v. Mid-America Racing Stables, Inc.*,
  139 F.R.D. 405 (W.D. Okla. 1990)................................................................. 20, 21, 24

*Kovaleff v. Piano*,
  142 F.R.D. 406 (S.D.N.Y. 1992) ................................................................................ 28

*Metzger v. Am. Fid. Assur. Co.*,
  249 F.R.D. 375 (W.D. Okla. 2007)............................................................................. 25

*Mud Operations, Inc. v. SJL Well Serv., LLC*,
  No. CIV-14-321-W, 2015 WL 11237651 (W.D. Okla. Sept. 25, 2015) ..................... 29

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
  272 F.R.D. 160 (S.D.N.Y. 2011) ............................................................................... 35

*Petrie v. Elec. Game Card, Inc.*,
  308 F.R.D. 336 (C.D. Cal. 2015) ............................................................................... 27

*In re Quarterdeck Office Sys., Inc. Sec. Litig.*,
  No. CV 92-3970-DWW(GHKx), 1993 WL 623310
  (C.D. Cal. Sept. 30, 1993).......................................................................................... 29

*Reed v. Bowen*,
  849 F.2d 1307 (10th Cir. 1988) ................................................................................. 20

*Regions Morgan Keegan Closed-End Fund Litig.*, Nos. 07-02830, MDL
  2009, 2010 WL 5713851 at *11 (W.D. Tenn. Dec. 15, 2010) .................................... 27

*Rocco v. Nam Tai Elecs, Inc.*,
  245 F.R.D. 131 (S.D.N.Y. 2007) ............................................................................... 27

*Shiring v. Tier Techs., Inc.*,
  244 F.R.D. 307 (E.D. Va. 2007) .................................................................. 25

*W.R. Huff Asset Mgmt. Co., v. Deloitte & Touche LLP*,
  549 F.3d 100 (2d Cir. 2008)...................................................................... 27

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)....................................................................... 19, 20, 30

*Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*,
  725 F.3d 1213 (10th Cir. 2013) .................................................................. 30

*Welling v. Alexy*,
  155 F.R.D. 654 (N.D. Cal. 1994)................................................................ 30

*Zimmerman v. Bell*,
  800 F.2d 386 (4th Cir. 1986) ...................................................................... 35

**Statutes and Rules**

Private Securities Litigation Reform Act ....................................................*passim*

Fed. R. Civ. P. 23............................................................................... 1, 3, 19

Fed. R. Civ. P. 23(a)(3) ............................................................................ 25

Fed. R. Civ. P. 23(a)(4) ............................................................................ 20

Fed. R. Civ. P. 23(b) ............................................................................. 3, 19

Fed. R. Civ. P. 23(b)(3) ................................................................. 19, 33, 35

Fed. R. Civ. P. 30(b)(6) ..................................................................... 10, 22

H.R. Conf. Rep. 104-369 (1995) ............................................................... 21

S. Rep. No. 104-98 (1995)......................................................................... 3

Defendants James Bennett, Matthew Grubb, and Tom Ward, and nominal defendant SandRidge Energy, Inc. ("SandRidge" or "the Company") respectfully submit this opposition to the Motion for Class Certification by Lead Plaintiffs Laborers Pension Fund for Northern Nevada ("Northern Nevada"), Construction Laborers Pension Trust of Greater St. Louis ("St. Louis Trust"), and Vladimir and Angelica Galkin.

## INTRODUCTION

Plaintiffs' motion for class certification focuses principally on arguments about the efficiency of the market for SandRidge common stock, but the obstacles to class certification in this case are far more basic.  Certification must be denied because Plaintiffs have proposed a grossly overbroad class period that ignores this Court's prior rulings; because Plaintiffs are inadequate class representatives who have allowed their counsel to take actions adverse to the proposed class; and because a variety of unique defenses and individual issues makes clear that Plaintiffs cannot satisfy the typicality and predominance requirements of Rule 23.

*First*, the proposed class period begins more than a year too early.  When this litigation commenced, Plaintiffs asserted a broad variety of claims, including (i) allegations that the Defendants made misrepresentations about projected capital expenditures that resulted in a stock drop in August of 2011, *e.g.*, Third Amended Complaint (the "Complaint" or "Compl.") ¶¶ 151, 204, Dkt. 225;[1] (ii) allegations that the Defendants failed to disclose related party transactions by entities affiliated with Tom

---

[1] Unless noted otherwise, all docket citations are to No. 5:12-cv-01341-W.

Ward, *e.g., id.* ¶ 150; and (iii) allegations that Defendants concealed a decline in

Mississippian well performance that became evident in "early 2012," *id.* ¶ 128, leading to

a stock drop when the truth was purportedly revealed in November of 2012, *e.g.*, *id.*

¶¶ 300–02, 307.  In a series of decisions, however, the Court substantially narrowed the

case, dismissing Plaintiffs' claims based on alleged misrepresentations about capital

expenditures and related party transactions.  As a result, the only claims that remain in

the case focus on alleged misrepresentations about well performance in the Mississippian.

Any proposed class period must therefore run from no earlier than May 2012 — when the

Complaint first pleads scienter with respect to well performance statements — through

November 8, 2012 (the "Well Performance Class Period").  By proposing an overbroad

class period that would begin in February 2011 (the "Proposed Class Period"), Plaintiffs'

motion seeks to restore purported damages from an August 2011 stock drop that

Plaintiffs' own allegations attribute to a dismissed claim.

    *Second*, even if the Proposed Class Period were tailored to the claims that remain

in the case, certification would be inappropriate because each of the Lead Plaintiffs has

proven to be an inadequate representative.  Class representatives have a fiduciary

obligation to protect the interests of the class on whose behalf they are litigating.  Lead

Plaintiffs have demonstrated that they are incapable of fulfilling this basic obligation by

displaying stunning inattention to the litigation.  Despite having submitted identical,

boilerplate declarations averring they were committed to "vigorously prosecuting" and

"overseeing" this litigation, the Lead Plaintiffs admitted in their depositions that they had

failed to review critical pleadings; did not know who they were suing; had little or no

knowledge of the Court's rulings; were unaware of settlement efforts including the recent court-ordered mediation; and/or had otherwise ignored critical aspects of the litigation. Most alarmingly, Lead Plaintiffs allowed their counsel to pursue claims on behalf of *a different class of investors* — royalty trust unitholders who are competing for the same limited pool of funds. *See* Dkt. 265. Adequate class representatives would have prevented their counsel from making such a motion, which served class counsel's interest in pursuing attorneys' fees *but was directly adverse to the interests of the putative class*. Indeed, one of Congress's goals in enacting the Private Securities Litigation Reform Act ("PSLRA") was to eliminate just this kind of lawyer-driven litigation, in which the plaintiffs "have great difficulty exercising any meaningful direction over the case brought on their behalf." *See* S. Rep. No. 104-98 at 6 (1995).

*Third*, a variety of other problems discussed in greater detail below demonstrate that Plaintiffs cannot fulfill other requirements of Rule 23. Two of the Lead Plaintiffs, for example, did not purchase SandRidge shares during the Well Performance Class Period — which renders them atypical and inadequate representatives. Three are subject to unique defenses arising from post-class period purchases of SandRidge stock, lack of knowledge of their own investment activity, spoliation of evidence, and/or litigation history. All have failed to show that common issues will predominate over individual issues, as Rule 23(b) requires, because this litigation promises to raise individualized questions about damages and the particular knowledge investors had when purchasing SandRidge stock. For these and other reasons set forth in detail below, class certification should be denied.

## BACKGROUND

### I.   PROCEDURAL HISTORY

In December of 2012 and January of 2013, two lawsuits were filed on behalf of common stockholders of SandRidge Energy, Inc.  *See Glitz v. SandRidge Energy, Inc.*, No. 12-cv-1341, Dkt. 1; *Carbone v. SandRidge Energy Inc.*, No. 13-cv-19, Dkt. 1.  By order dated March 6, 2013, Dkt. 60, the Court consolidated the two actions; appointed Northern Nevada, the St. Louis Trust, and the Galkins as Lead Plaintiffs; appointed Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as class counsel; and directed Robbins Geller to file a consolidated complaint on behalf of Lead Plaintiffs.

On July 30, 2013, Robbins Geller filed a consolidated complaint, asserting claims on behalf of Lead Plaintiffs and a putative class of purchasers of SandRidge common stock.  *See* Dkt. 75.  The consolidated complaint also named as additional plaintiffs three individuals — Judith Greenberg, Charles Blackburn, and Ted Odell (the "Trust Plaintiffs") — who sought to assert different claims, including claims arising under the Securities Act of 1933 ("Securities Act"), on behalf of a different class of investors: unitholders (the "Trust Unitholders") in two royalty trusts established to hold interests in certain Mississippian wells conveyed by SandRidge.  The Court dismissed the Trust Plaintiffs' claims without prejudice, reasoning, inter alia, that Robbins Geller had improperly attempted to join claims of a different class of investors without complying with the notice provisions of the PSLRA.  *See* Dkt. 179, 180, 184, 185.

Lead Plaintiffs thereafter amended their complaint twice more.  As filed, the operative Complaint asserts three categories of claims under Sections 10(b) and 20(a) of

the Securities Exchange Act.  The first two arise from alleged misrepresentations or omissions in 2011 concerning (1) the Company's capital expenditure guidance (the "CapEx Claims") and (2) certain related party transactions by three entities purportedly affiliated with Mr. Ward (the "Related Party Transaction Claims").  A third category of claims (the "Well Performance Claims") is based on allegations that, by early 2012, the Defendants knew that SandRidge's oil and gas wells in the Mississippian formation were performing poorly but concealed this fact from investors by making statements that inflated the ratios of oil and gas produced in the wells and/or remaining well reserves.  *See, e.g.*, Compl. ¶¶ 135, 297 (decline in oil production did not begin until March 2012); ¶¶ 24, 127–29 (alleging Defendants had knowledge of declining production based on allegations of a confidential witness who started at SandRidge in May of 2012).

The Complaint further alleges that these misrepresentations caused Plaintiffs to suffer losses from two distinct stock drops separated by more than a year: in August 2011 and November 2012.  Plaintiffs asserted that the first stock drop, on August 5, 2011, was caused by SandRidge's disclosure of previously concealed facts regarding the first two categories of claims — the CapEx Claims and the Related Party Transaction Claims.  *See, e.g., id.* ¶ 204 ("In response to the Company's announcements on August 4th and 5th that capital expenditures would be increased by $500 million, in large part for land acquisition and development in the Mississippian (benefitting the land and mineral rights owned by the Ward-related entities), SandRidge's common stock declined $1.41 per

share.").[2]  The second stock drop — a drop of 59 cents on November 9, 2012 —

allegedly was caused by negative disclosures concerning the performance of

Mississippian wells (as well as certain other news not at issue in the case).  *See, e.g.*, *id.*

¶¶ 11, 12, 298–307, 344–48.

In August 2017, the Court granted Defendants' motions to dismiss in part,

dismissing the CapEx Claims and the Related Party Transaction Claims.  *See* Dkt. 239 &

240.  It largely denied the motions, however, to the extent that they sought to dismiss the

Well Performance Claims.[3]  Although all Defendants argued that the Complaint's

allegations were insufficient to plead scienter, the Court held that "all of the facts alleged,

"*taken collectively*," supported an inference of scienter as to Ward and Grubb.  Dkt. 239,

at 37 (emphasis added, citation omitted); Dkt. 240, at 22 (emphasis added, citation

omitted).  In particular, the Court cited allegations based on two confidential witnesses:

"FE2," a former SandRidge employee who allegedly reported that "since at least early

2012, the Mississippian was not performing as well as expected," Dkt. 239, at 34–35,

Dkt. 240, at 19–20, and "FE3," another former SandRidge employee who joined the

Company in May of 2012 and allegedly reported that Mississippian oil production was

lower than anticipated, Dkt. 239, at 35, Dkt. 240, at 19, 20-21.  As a result of the Court's

---

[2]   The Court later ruled that Plaintiffs could not establish loss causation with respect to the Related Party Transaction Claims, because the relevant transactions were not revealed to the market until January 2013, after the proposed class period and after any stock drop alleged to have produced a loss.  *See, e.g.,* Dkt. 239, at 29.

[3]   The Court dismissed Plaintiffs' Well Performance Claim under Section 10(b) against James Bennett for failure to adequately plead scienter.  Dkt. 239 at ¶ 42.

rulings, the only remaining claims are Well Performance Claims, and the only stock drop at issue is the November 2012 stock drop. *See* Dkt. 239, at 42, Dkt. 240, at 25.

On February 7, 2018, Robbins Geller filed a motion for reconsideration of the Court's orders dismissing the Trust Plaintiffs' claims, arguing that the Court should revisit those decisions because they had the unintended effect of extinguishing Securities Act claims of all Trust Unitholders under an intervening decision of the United States Supreme Court.  Dkt. 265.  The motion acknowledged that the Trust Plaintiffs, should they be reinstated, would be competing for the same "limited insurance proceeds available to fund any recovery" in this action.  *Id.* at 12 n.3.  A few weeks later, an alternate group of trust unitholders, represented by the Rosen Law Firm, sought to intervene on behalf of the class of Trust Unitholders, on the ground that it would be a conflict of interest for Robbins Geller to represent both the common stockholder class and the Trust Class "due to the inherent conflict that is caused by the competition for the same limited funds for recovery."  *See* Dkt. 273 at 14 (quoting *Friedman v. Quest Energy Partners LP*, 261 F.R.D. 607, 610 (W.D. Okla. 2009)).  The Court denied the motion for reconsideration, reasoning that the relevant law that had led the Court to dismiss the Trust Plaintiffs' claims (the notice provisions of the PSLRA) had not changed and that the Trust Plaintiffs had advanced "no reason that justifies relief."  Dkt. 323, at 18.

While Robbins Geller's motion for reconsideration was pending, Plaintiffs filed the instant motion for class certification.  They ask the Court to certify a class consisting of "all purchasers of SandRidge common stock between February 24, 2011 and November 8, 2012 inclusive"; to appoint Lead Plaintiffs as representatives of the Class;

and to appoint Robbins Geller as Class Counsel.  Dkt. 268, at 1.  The parties then

conducted discovery on class certification issues, including depositions of Lead Plaintiffs.

## II.  THE LEAD PLAINTIFFS AND PROPOSED CLASS REPRESENTATIVES.

The four Lead Plaintiffs each submitted virtually identical, boilerplate declarations

in support of their motion to be appointed as class representatives.  Each declaration

asserted that the applicable Lead Plaintiff had "received and reviewed periodic updates

and correspondence from counsel regarding important aspects of the case"; had

"participated in discussions with counsel regarding significant developments"; and was

committed to "vigorously prosecuting this litigation" as a fiduciary by, among other

things, "overseeing critical junctures" in the litigation and "directing the efforts of

Robbins Geller."  Dkt. 269-7.  The reality revealed in depositions was quite different.

### A.  Northern Nevada

Northern Nevada is a defined benefit pension plan for various unions.  *See* Ex. 1,[4]

Mace Dep. Tr. 70:8–20; Dkt. 269-7, at 3 ¶ 2.  It acquired 20,525 shares of SandRidge

stock in an account managed by a third party investment manager.  *See also* Ex. 1, Mace

Dep. Tr. 115:25–116:9, 118:12–121:5, 121:14–23.  All of its shares were acquired in

2011, *before* the Well Performance Class Period.  *See id.* 120:20–121:9.  Its total claimed

losses amount to less than one tenth of one percent of its assets.  *See id.* at 94:15–18.

Northern Nevada has "outsourced" the function of identifying potential litigation

---

[4]   Citations to Exhibits (e.g., "Ex. 1") refer to the exhibits to the Declaration of Mark Gimbel filed with this Opposition.

claims to outside counsel under a series of "portfolio monitoring" agreements. *Id.* at 37:4–38:3.  The first such agreement was with Millberg Weiss Bershad Hynes & Lerach LLP ("Millberg Weiss"), a firm that was later indicted for engaging in a bribery scheme under which millions of dollars in kickbacks were paid to investors in exchange for their agreement to serve as lead plaintiffs in securities litigation. *See* Ex. 2, Millberg Weiss Agreement; Ex. 1, Mace Dep. Tr. 41:7–14.  ██████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████  *See* Ex. 2, Millberg Weiss Agreement, at 3; Ex. 1, Mace Dep. Tr. 39:3–6, 42:15–44:2.  Although the indictment and guilty plea occurred while its portfolio monitoring agreement with Millberg Weiss was in place, Northern Nevada had no knowledge of its counsel's felony conviction. *See* Ex. 1, Mace Dep. Tr. 44:10–15.

Northern Nevada currently has a "portfolio monitoring agreement" with Robbins Geller. *See id.* at 49:20–50:2.  It never occurred to Northern Nevada that it might have a claim against the Defendants before being approached under this portfolio monitoring agreement. *See id.* at 56:3–7.  After being approached, however, it decided to file suit based on the recommendations of Robbins Geller and its other outside legal counsel, Nathan Jenkins. *See id.* at 54:14–56:2.  Mr. Jenkins is an attorney who has previously served as co-counsel to Robbins Geller in securities litigation. *See id.* at 35:10–14.

Northern Nevada could not identify any steps it had taken to direct the efforts of Robbins Geller in the litigation. *See id.* at 82:14–20.  It could not remember any significant pleadings that it had reviewed. *See id.* at 84:13–17.  It could not recall any

court orders it had reviewed. *See id.* at 84:21–24. It could not describe any decisions issued by the Court, apart from having a vague recollection that "there was a bankruptcy decision or a motion where the assets were protected." *See id.* 77:21–78:9. It did not know whether it had any pending claims against Tom Ward, James Bennett, or Matthew Grubb and could not even name a single individual defendant. *See id.* at 86:21–87:3, 89:7–90:16. It did almost nothing to prepare for its deposition pursuant to Rule 30(b)(6); indeed, it had not even reviewed the deposition notice or the list of 22 topics for the deposition. *See id.* at 11:13–13:5. It was completely unaware of the recent court-ordered mediation conducted in February of this year; its only knowledge of settlement efforts was a vague recollection of a settlement proposal made years ago. *See id.* at 78:15–79:4.

Northern Nevada also did not know that Robbins Geller had asserted claims in the litigation on behalf of Trust Unitholders. *See id.* at 167:24–168:4. It had never seen Robbins Geller's motion asking the Court to reconsider its decision dismissing those claims. *See id.* 167:5–14. It had never considered whether it was in the interests of common stockholders for those claims to be revived. *See id.* at 168:10–17. It had never given any thought or consideration to the question of whether it was in the interest of common stockholders for a different class of security holders to seek to recovery from the same "pot of money." *See id.* at 169:21–171:3.[5]

---

[5] Northern Nevada Trust's approach to its role as a fiduciary in this case is consistent with its conduct in the past. In 2004, Northern Nevada and its trustees entered into consent orders under which the trustees agreed to pay over $1.7 million and accept restrictions on Northern Nevada's investment activities in order to settle claims that

### B.    St. Louis Trust

St. Louis Trust is a pension fund for labor unions in the St. Louis area.  *See* Ex. 3,
Willey Dep. Tr. 16:6–10.  Since 2004, St. Louis Trust has had a portfolio monitoring
agreement with Robbins Geller or a predecessor firm.  *See id.* at 62:22–63:23; Exs. 4–5
(monitoring agreements).  Like Northern Nevada, its contact under the first portfolio
monitoring agreement was William Lerach, the attorney who pleaded guilty in the lead
plaintiff bribery scheme.  *See* Ex. 3, Willey Dep. Tr. 70:17–21.  Like Northern Nevada, it
was oblivious to its counsel's conviction for bribery; it had no recollection of learning
about the charges until the day before its deposition in this action, when its representative
met with counsel to prepare to be deposed.  *See id.* at 70:22–71:6.

Pursuant to portfolio monitoring agreements, Robbins Geller or its predecessor has
filed ten securities actions, including this one, on behalf of St. Louis Trust.  *See* Ex. 6,
Interrogatory Responses, at 18–19.  Of those 10 actions, five were dismissed on the
pleadings.  *See* Ex. 3, Willey Dep. Tr. 50:12–51:15, 52:4–24, 52:25–54:11, 54:12–55:10,
74:16–75:13; *see also* Exs. 7–11 (dismissal orders).  St. Louis Trust had no recollection
of most of the lawsuits, dismissed or otherwise.  *See* Ex. 3, Willey Dep. Tr. 50:15–23,
51:16–20, 52:25–53:8, 54:12–17, 55:11–19, 55:22–25, 56:7–14, 57:2–11.

St. Louis Trust's representative did not know whether anyone at the trust had
reviewed the complaint in this action before it was filed.  *See id.* at 81:15–20.  It did no

---

they breached their fiduciary obligations under ERISA.  *See* Ex. 1, Mace Dep. Tr.
103:17–106:18.  The consent orders were in place for over a decade before being
lifted approximately two years ago.  *See id.* at 106:14–18.

factual investigation of any kind into any of the allegations.  *See id.* at 82:13–18.  It was

unable to remember any significant pleadings filed in the case.  *See id.* at 43:16–24.  It

had no knowledge of the recent court-ordered mediation.  *See id.* at 42:3–17.  It had no

recollection of *any* court orders.  *See id.* at 44:2–8.  It was not even aware that the Court

had dismissed any claims in the case — let alone two out of three of the core claims

asserted on behalf of common stockholders.  *See id.* at 32:3–8.

Like Northern Nevada, St. Louis Trust had no knowledge that Robbins Geller was

seeking to assert competing claims on behalf of a class of Trust Unitholders, asking

"What do you mean by a unit?  What's a unit?" when the topic was introduced.  *Id.* at

36:3–13.  It had given no consideration to whether the interests of common stockholders

would be served by permitting Robbins Geller to assert claims on behalf of different

investors "competing for the same pot of settlement funds."  *See id.* at 38:1–39:21.

Instead of managing its counsel's conflicts, it stated that it would "defer" to Robbins

Geller on whether a conflict existed and that it did not "have a say in that matter" of

whether it was in the best interests of common stockholders for Robbins Geller to pursue

the claims.  *See id.* at 39:15–40:20, 41:13–21.

## C.      Vladimir and Angelica Galkin

The Galkins are ███████████████████████████  *See* Ex. 12, V.

Galkin Dep. Tr. 34:23–35:6. ████████████████████████████████



███████████████████████████████████████████

███████████████████████████████████████  *Id.* at 73:5–

77:21; *compare also* Ex. 21, Account Statements, at pp. 1–8 (statement for April 2011



██████████████████████████████████████) *with id.*, at pp. 9–193 (statements for May

2011 to March 2013 ████████████████████████████████████████). As a

result, Mr. Galkin did not acquire or own any SandRidge stock.  *See id.* at 36:11–38:22,

39:13–40:6.  All of the SandRidge shares at issue in this case were purchased and sold

from ████████████████████████████████████  *See id.* at 62:6–

63:16, *see also* Ex. 21, Account Statements, at pp. 21–158 (reflecting purchases of

SandRidge common stock starting in June 2011).  Mr. Galkin conceded at his deposition

that ██████████████████████████████████  *See* Ex. 12, V.

Galkin Dep. Tr. 62:6–63:16.

      Mr. Galkin █████████████████████████████████████████

*See id.* at 38:2–5.  Mrs. Galkin did not even recall knowing, during the Proposed Class

Period, that █████████████████████████████████████

████.  *See* Ex. 13, A. Galkin Dep. Tr. 167:3–8, 168:20–25.  Mr. Galkin had only a vague

recollection of why ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████  *See* Ex. 12, V.

Galkin Dep. Tr. 133:5–9, 186:6–188:15, 258:4–21.  Mr. Galkin continued to ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████  *See id.* at 55:24–60:6; Ex. 21, Account Statements, at pp. 151–

193.

      Mr. Galkin had a vague recollection of ████████████████████████

█████, *see* Ex. 12, V. Galkin Dep. Tr. 110:21–111:17, but knew little about the

progress of the case since then.  He was completely unaware, for example, that █

█████████████████████████████████████████████████████████

█████.  *See id.* at 243:11–244:23.  He was unable to describe any ████████████

█████, *see id.* at 118:11–17, or ██████████████████████, *see id.* 125:13–

126:8.  He was unaware that ███████████████████████████████████████

███████████████████████████████.  *See id.* at 118:18–119:24.  He

also was not aware of █████████████████████████████████████

██████████████████████████████.  *See id.* at 122:10–

123:9.

   Mrs. Galkin likewise knew little about ██████████████████████

████████████████████████.  The first date on which she could

specifically recall █████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████.  *See* Ex. 13, A. Galkin Dep. Tr. 130:17–131:3.  Despite acknowledging that

███████████████████████████ Mrs. Galkin had not done anything to

████████████████████████████████████████████████

█████.  *See id.* at 132:20–134:18.  She was not even sure whether ███████████

████████████████████████████████████████████████████

███████████████████████  *See id.* at 127:11–21, 129:7–12.

## ARGUMENT

## I.   CLASS CERTIFICATION SHOULD BE DENIED BECAUSE THE PROPOSED CLASS PERIOD IS OVERBROAD.

Courts have wide discretion in matters of class certification and routinely reject proposed class definitions that are overbroad.  *See Hockenbury v. Hanover Ins. Co.*, No. CIV-15-1003, 2016 WL 552967, at *3–4 (W.D. Okla. Feb. 10, 2016) (rejecting proposed class definition that "is overbroad and unworkable").  In a securities fraud case such as this one, a proposed class period is overbroad when it encompasses a time period during which defendants are not alleged to have had the requisite scienter.  *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 280 (3d Cir. 2009) ("Because the Complaint has not adequately pleaded fraud for any statements made before March 2, 2005, the class period can begin to run no earlier than that date.").

Here, the only claims remaining in the case concern statements about Mississippian well performance.  Plaintiff's allegations fail to establish that any Defendant had scienter with respect to such statements before May 2012.  As a result, no legitimate class period could begin before that date.

### A.   Plaintiffs Have No Basis for Seeking A Class Period That Begins in 2011, Because Their Allegations — Even If Credited — Cannot Establish Scienter Before May 2012.

A plaintiff asserting a claim for securities fraud must allege particular facts from which it is possible to draw a "cogent and compelling" inference of scienter.  Dkt. 239 at 30 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*. 551 U.S. 308, 324 (2007)).  In its rulings on the Defendants' motions to dismiss, the Court found this burden satisfied

based on allegations that, "taken collectively," allowed the Court to draw the inference that Defendants Ward and Grubb may have had knowledge of the declining performance of certain Mississippian Wells by May of 2012.  Dkt. 239 at 37–38 (citations omitted).

Specifically, the Court relied on allegations attributed to two former SandRidge employees who claimed that Mr. Ward and Mr. Grubb attended meetings at which well performance was discussed.  *See* Dkt. 239 at 35; Dkt. 240 at 20–21.  The Court had dismissed the previous complaint for failure to plead scienter, and Plaintiffs' allegations about former employees were the only factual allegations relevant to scienter that Plaintiffs added in amending their pleading.  *See, e.g.*, Dkt. 184 at 24–29.  The Court concluded that FE2's and FE3's statements, when "taken collectively," give rise to an inference that Mr. Grubb and Mr. Ward acted with the requisite scienter.  Dkt. 239 at 37 (citation omitted); Dkt. 240 at 22 (citation omitted).  Because FE3 did not commence his employment at SandRidge before May of 2012, Compl. ¶ 24 — and FE2's claims about well performance likewise pertained to "early 2012," *id.* ¶ 128 — scienter could not have been adequately alleged for any earlier period.

In pleading scienter, Plaintiffs' Complaint also relied heavily on a hindsight analysis of publicly available well data by a consultant retained by Plaintiffs' counsel. *See, e.g.*, *id.* ¶¶ 135–37.  The Court properly did not cite this analysis in holding that scienter was adequately pleaded, because there was no allegation that anyone at SandRidge was aware of Plaintiffs' data or analysis during the relevant period. Moreover, as Plaintiffs' own expert conceded, ███████████████████████ ████████████████████████████████████████████████████

█████ *See* Ex. 14, Steinholt Dep. Tr. 89:2–90:7.  As a result, the information was not concealed from the market and cannot support a claim of fraud.  Even if it had any bearing on scienter, however, it would point to the same conclusion because Plaintiffs do not allege that any decline in Mississippian performance was apparent from this data before March 2012.  *See, e.g.*, Compl. ¶ 139 (alleging the "drop in oil rates . . . began no later than March 2012"); *id.* ¶ 259 (alleging that "oil rates" had been "dropping precipitously since March 2012"); *see also id.* ¶¶ 135, 153(a), 153(c), 292(e), 292(g), 293(c), 293(e), 297, 320, 330.  Having pleaded that their own analysis of well data showed a decline in Mississippian well performance as of March 2012, Plaintiffs have no basis for asserting that any Defendant understood the decline — and had the requisite scienter — any earlier.

Plaintiffs' failure to establish scienter before 2012 makes clear that their Proposed Class Period is overbroad and must be rejected.  The Third Circuit's decision in *Avaya* is directly on point.  *See* 564 F.3d at 280.  In that case, the court held that the plaintiffs had adequately pleaded scienter with respect to certain "March pricing statements" but not earlier statements.  *See id.* at 280.  As a result, it concluded that the proposed class period was inappropriate: "Our disposition entails a shorter class period than Shareholders propose.  Because the Complaint has not adequately pleaded fraud for any statements made before March 2, 2005, the class period can begin to run no earlier than that date." *Id.*  The same is true here: because Plaintiffs have failed to plead scienter for periods before May 2012, the class period can begin to run no earlier.

Similarly, in *Katz v. Comdisco, Inc.*, the plaintiffs alleged that the defendants had

misled investors about a potential tax liability. *See* 117 F.R.D. 403, 405–06 (N.D. Ill. 1987). Because the defendants did not allegedly become aware of that liability before receiving a letter from the IRS on July 2, 1984, the Court modified the class period to begin on that date, and excluded persons who purchased the stock earlier, at a time when the defendants did not know of the potential tax liability. *See id.* at 405-06, 411. The same logic applies with equal force here: there is no basis for certifying a class of purchasers who acquired stock during Plaintiffs' Overbroad Class Period, which starts over a year before the alleged events which the Court found sufficient to plead scienter.

**B.    The Court Should Reject Plaintiffs' Effort to Revive Dismissed Claims by Proposing An Overbroad Class Period.**

Plaintiffs' overbroad Proposed Class Period is all the more improper because it amounts to a disguised effort to restore Plaintiffs' dismissed CapEx and Related Party Transaction Claims, which sought to recover for losses allegedly sustained when SandRidge's stock dropped in August of 2011.

The Complaint asserts that the August 2011 stock drop was caused by SandRidge's announcement that it "was accelerating activities in the Mississippian" and that its "capital expenditures were being increased by $500 million . . . due in large part to increased spending in the Mississippian, which benefitted the Ward-related entities." Compl. ¶ 343; *see also id.* ¶¶ 107–08, 204 (alleging similarly). These disclosures pertain exclusively to the now-dismissed CapEx and Related Party Transaction claims. Nowhere in the Complaint do Plaintiffs allege that the August 2011 stock drop was the result of adverse disclosures about oil-to-gas ratios or oil reserves. To the contrary, Plaintiffs

assert that, in August 2011, SandRidge announced that oil production had *increased* and allegedly "*failed* to disclose the adverse facts about . . . the amount of natural gas relative to oil." *Id.* ¶¶ 200, 203 (emphasis added); *see also* Dkt. 296-1, at 7 (disclosing increased production of oil and gas).

By arguing for the first time here that the August 4, 2011 stock drop resulted in part from purported announcements about an "unfavorable gas to oil mix," Dkt. 268, at 3 — and by seeking the Court's approval of an overbroad Proposed Class Period that would encompass the August 2011 stock drop — Plaintiffs are attempting to reinvent the Complaint and drag losses back into the case that their own allegations attribute to dismissed claims. The Court should not condone this effort to circumvent its rulings.

## II. LEAD PLAINTIFFS SHOULD NOT BE APPOINTED CLASS REPRESENTATIVES, AND THE CLASS SHOULD NOT BE CERTIFIED.

Plaintiffs' motion should be denied for the additional reason that they have not demonstrated that they and the proposed class meet the requirements of Rule 23 of the Federal Rules of Civil Procedure. A party seeking certification of a class under Rule 23 must satisfy each of the four requirements of Rule 23(a) — numerosity, commonality, typicality, and adequacy — and one of the three requirements of Rule 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). Plaintiffs here seek certification under Rule 23(b)(3), which requires them to prove "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

This test is not a "mere pleading standard." *Wal-Mart*, 564 U.S. at 350. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule — that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* "It is neither practical nor prudential to engage the powerful machinery of a class action on the basis of a hypothetical." *Reed v. Bowen*, 849 F.2d 1307, 1311 (10th Cir. 1988).

Plaintiffs' motion falls short of the requirements of Rule 23 in three ways: it does not demonstrate that Plaintiffs will adequately represent the interests of absent class members, it does not show that Plaintiffs are typical of the class (two Plaintiffs are not even members of the Well Performance Class), and it does not prove that common issues will predominate.

### A.    Plaintiffs Have Failed to Demonstrate That They Will Be Adequate Representatives of The Proposed Class.

A party moving for class certification must prove that it "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[T]his requirement of adequate representation must be stringently applied because members of the class are bound unless they affirmatively exercise their option to be excluded, even though they may not be actually aware of the proceedings." *Albertson's, Inc. v. Amalgamated Sugar Co.*, 503 F.2d 459, 463–64 (10th Cir. 1974). Adequacy must be proven "*in fact*" — not pleaded, not alleged, not asserted. *Wal-Mart*, 564 U.S. at 350 (emphasis in original); *see also Kelley v. Mid-America Racing Stables, Inc.*, 139 F.R.D. 405, 410 (W.D. Okla. 1990). There is no presumption of adequate representation, and a

proposed class representative may not rely on the presence of competent counsel alone to meet the test of adequacy.  *See Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482–83 & n.18 (5th Cir. 2001).

To demonstrate their adequacy, proposed class representatives must have "sufficient knowledge and understanding concerning the subject matter of the suit, so that they can take an active role in the litigation."  *Better v. YRC Worldwide Inc.*, No. 11-2072-KHV, 2016 WL 1056972, at *8 (D. Kan. Mar. 14, 2016).  They must be both informed and willing and able to direct and control the litigation.  *See, e.g.*, *Berger*, 257 F.3d at 483.  "The upshot of this requirement is that the class's attorney may not become a *de facto* plaintiff."  *Kelley*, 139 F.R.D. at 409; *see also* H.R. Conf. Rep. 104-369, at 31 (1995) (PSLRA was intended to stem "the manipulation by class action lawyers of the clients whom they purportedly represent.").  Here, Lead Plaintiffs cannot meet their burden of proving adequacy because they have repeatedly abdicated all responsibility for litigation to their counsel — no matter the consequences for the proposed class.

For Northern Nevada and St. Louis Trust, this abdication began with the decision to bring litigation in the first place.  Each operates under a so-called "portfolio monitoring agreement" and has essentially "outsourced the function of identifying potential litigation claims."  Ex. 1, Mace Dep. Tr. 37:22–38:3.  Northern Nevada has sought appointment as lead plaintiff in four securities litigations pursuant to these monitoring arrangements, and its representative was completely unfamiliar with two of them.  *Id.* at 25:5–18, 29:9–17.  St. Louis Trust has participated in eleven securities class actions since 2005, including ten in which it was represented by Robbins Geller or a

predecessor.  *See* Ex. 6, Interrogatory Responses, at 18–19.  Its Chairman and Rule

30(b)(6) designee had essentially no knowledge of eight of these actions — five of which

were dismissed for failure to state a claim.  *See supra* at 11–12.  He testified that he was

unconcerned that half of the securities litigations filed by Robbins Geller on the St. Louis

Trust's behalf were dismissed on the pleadings, *see* Ex. 3, Willey Dep. Tr. 59:4–13,

adding that, if counsel advised it to file a complaint, the St. Louis Trust would follow that

advice without doing any of its own diligence or investigation, *id*. at 82:13–18.

     Northern Nevada and St. Louis Trust have followed their practice of complete

delegation to Robbins Geller in this action as well.  Northern Nevada believes its

principal fiduciary obligation in "directing the efforts of Robbins Geller" is to follow

Robbins Geller's recommendations, *see* Ex. 1, Mace Dep. Tr. 79:22–80:14, and it could

not identify any steps it had taken to direct the efforts of Robbins Geller in the litigation,

*see id.* at 82:14–20.  It completely failed to prepare for a Rule 30(b)(6) deposition in

violation of its obligations under that rule[6] and displayed near-total ignorance of the

Court's decisions, significant pleadings and motions, a Court-ordered mediation, and

even the identity of the individuals it has sued for fraud.  *See supra* at 8–10.  St. Louis

Trust has behaved much the same way.  Its representative could not identify any

significant pleadings; had no knowledge of the recent court-ordered mediation; and was

---

[6]   *See, e.g.*, *E.E.O.C. v. Unit Drilling Co.,* No. 13-CV-147-TCK-PJC, 2014 WL
3548845, at *1 (N.D. Okla. July 17, 2014) ("The deponent has the duty of being
knowledgeable on the subject matter identified as the area of inquiry." (citation
omitted)).

not even aware that several of its claims in this case have been dismissed.  *See supra* at 11–12.

Like Northern Nevada and St. Louis Trust, Vladimir and Angelica Galkin have only ████████████████████████████████████████████████████████████ ████████████████████████  *See, e.g.*, Ex. 12, V. Galkin Dep. Tr. 50:2–5; 109:20– 111:15, 174:12–15; Ex. 13, A. Galkin Dep. Tr. 177:13–23.  At his deposition, Mr. Galkin conveniently remembered only ████████████████████████████████████ ████████████████████████████████████████████████  *See* Ex. 12, V. Galkin Dep. Tr. 80:4–24, 145:17–25, 183:3–10.  He also was unable to describe ████████████████████████████████████████████████████  *See supra* at 13–14.  And even though Mrs. Galkin████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████  *See* Ex. 13, A. Galkin Dep. Tr. 56:14–20.

The consequences of Lead Plaintiffs' abdication of any responsibility for overseeing this litigation have been concrete, not theoretical.  It has led them to be completely ignorant of a conflict of interest between themselves, their counsel, the common stockholders they seek to represent, and the Trust Unitholders.  As the Rosen Law Firm, counsel for the Lanier Trust, explained in its motion to intervene, the putative class of SandRidge common stockholders in this action is "competing" with a putative class of Trust Unitholders "to recover from a common source of funds which has already been depleted by the release granted to SandRidge in its bankruptcy case."  Dkt. 273 at

14.  Despite the clear conflict this creates, Robbins Geller repeatedly has sought to advance the competing interests of the putative class of Trust Unitholders, by first joining their claims in this action in violation of the notice requirements of the PSLRA and then seeking to revive their claims following dismissal.

Robbins Geller's incentives are clear: to maximize its opportunity to recover attorney fees by litigating claims on behalf of two different classes of investors.  But its actions have not been in the interest of common stockholders, and Lead Plaintiffs have failed even to notice.  They have allowed Robbins Geller to advance the interests of a competing class of investors with no thought as to how this might affect the common stockholders they seek to represent.  A plaintiff who believes — as Northern Nevada, the St. Louis Trust, and the Galkins apparently do — that its duty as a class representative is to blindly follow outside counsel's recommendations cannot be trusted to defend the rights of a class, particularly when its counsel is actively representing clients with conflicting interests.  *See, e.g.*, *Albertson's*, 503 F.2d at 463–64 (class certification was improper due to potential conflicts of interest).

This Court confronted a similar group of plaintiffs in *Kelley*.  In that case, also a putative securities class action, the plaintiffs offered similarly empty assurances of their adequacy; gave no reasons or explanations for their lawsuit; and appeared to understand little about the litigation beyond than what their attorneys had told them.  *See* 139 F.R.D. at 409–10.  The Court concluded that the plaintiffs had "abdicated their role to their attorneys, who now have become the *de facto* plaintiffs." *Id.* at 410.  No class was certified.  *See id.*  The Court should reach the same conclusion here.

24

### B.      Plaintiffs Are Not Typical of the Class.

A class representative must demonstrate that its claims and defenses are typical of the class. *See* Fed. R. Civ. P. 23(a)(3). A class thus cannot be certified if its putative representatives face unique defenses "which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted) (collecting authority). "[I]t is not necessary that the [unique] defense asserted against the putative class representative ultimately succeed." *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 313 (E.D. Va. 2007) (alterations in original) (quoting *McNichols v. Loeb Rhoades & Co.,* 97 F.R.D. 331, 334 (N.D. Ill. 1982)). The presence of such a defense alone "may destroy the required typicality of the class as well as bring the adequacy of the named plaintiff's representation" into questions. *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) (quoting *J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980)). Here, each Plaintiff faces such unique defenses.

#### 1.      Northern Nevada and Vladimir Galkin are Not Members of the Well Performance Class.

"[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Metzger v. Am. Fid. Assur. Co.*, 249 F.R.D. 375, 377 (W.D. Okla. 2007) (quoting *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 405 (1977)). Two of the Lead Plaintiffs, Northern Nevada and Mr. Galkin, are not part of any properly defined class and are thus disqualified from serving as class representatives.

Northern Nevada did not purchase any SandRidge stock during the Well Performance Class Period.  *See* Dkt. 269-6 at 2–4.  As a result, it cannot claim to have suffered any injury as a result of any of the well performance statements at issue in the case.  *See* Ex. 1, Mace Dep. Tr. 129:12–131:23 (agreeing that Northern Nevada's last purchase occurred before events which allegedly establish Defendants' scienter).

Mr. Galkin likewise did not purchase any SandRidge stock during the class period. All of the transactions in SandRidge stock referenced in his Lead Plaintiff certification were ███████████████████████████████████████████████████ *See* Ex. 12, V. Galkin Dep. Tr. 37:3–21, 55:24–60:6, 62:6–63:16, 73:5–17, 197:23–198:7, 200:13–22; *see also* Ex. 21, Account Statements, at pp. 21–158.  Although he ████████████████████████████████████████████, *see* Ex. 12, V. Galkin Dep. Tr. 39:10–12, 63:13–66:12, Mr. Galkin conceded that ██████████████████ ███████████████████████████████████████, *see id.* at 39:13–40:6, 68:18–69:5 — ████████████████████████████████████████ ████████████████████████████, *see id.* at 74:17–77:21.  Given this admission, and the undisputed account documentation establishing that Mrs. Galkin is the sole account owner, Mr. Galkin cannot claim ownership of any SandRidge shares or serve as a class representative.  *See Falcon v. Philips Elecs. N. Am. Corp.*, No. 06 Civ. 6090(JSR), 2007 WL 959374 (S.D.N.Y. Mar. 30, 2007), *aff'd*, 304 F. App'x 896 (2d Cir. 2008) (denying appointment as class representative where plaintiff's spouse, rather than plaintiff, made purchase at issue).

Whatever rights Mr. Galkin may have in Mrs. Galkin's SandRidge shares through

26

marriage, they do not confer standing on Mr. Galkin to pursue the claims at issue. *See Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 346 (C.D. Cal. 2015) (putative lead plaintiff "has not shown that he has suffered an injury in fact" because, "even though he made investment decisions regarding [the security in question], those shares were held in his wife['s] name only."); *see also, e.g.*, *Davidson v. Belcor, Inc.*, 933 F.2d 603, 607–08 (7th Cir. 1991) (ex-wife lacked standing to pursue a securities fraud claim for shares obtained in separation agreement with ex-husband); *Regions Morgan Keegan Closed-End Fund Litig.*, Nos. 07-02830, MDL 2009, 2010 WL 5173851, at *11–12 (W.D. Tenn. Dec. 15, 2010) (putative lead plaintiff was inadequate because he had not "clarified his interest in his wife's and daughter's accounts," making "litigation about his standing . . . certain"). Nor does Mrs. Galkin's permission confer standing. *See W.R. Huff Asset Mgmt. Co., v. Deloitte & Touche LLP*, 549 F.3d 100, 108–10 (2d Cir. 2008) (investment advisor lacked standing to pursue securities fraud claims on behalf of its clients even though the advisor had a power of attorney and was authorized to make investment decisions on its clients' behalf).

### 2.    The Galkins' Investment Practices Render them Atypical

The Galkins are also atypical in that Mrs. Galkin purchased *over two million shares* of SandRidge stock *after the fraud allegedly was revealed*. Courts repeatedly have held that a plaintiff who makes "numerous post-class purchases" after the "revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative." *Rocco v. Nam Tai Elecs, Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (quoting *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D.

65, 69 (S.D.N.Y. 2000)); *see also, e.g.*, *Gary Plastic Packaging Corp.*, 903 F.2d 176, 179–80(2d Cir. 1990) (affirming district court's denial of class certification where plaintiff continued purchasing the securities despite having received notice of the alleged fraud); *Kovaleff v. Piano*, 142 F.R.D. 406, 408 (S.D.N.Y. 1992) (denying certification based on unique defense where class representative purchased stock both before and after alleged fraud was disclosed). This is because "[a] named plaintiff who has engaged in a post-disclosure purchase is subject to the defense that the alleged misstatements or omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision." *George v. China Auto. Sys. Inc.*, No. 11 Civ. 7533(KBF), 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013) (denying class certification on various grounds, including lack of typicality).

Here, moreover, Mrs. Galkin is in the unusual position of having ceded all authority over investment decisions to her husband — an additional factor that renders her atypical. *See In re Caremark Int'l, Inc. Sec. Litig.*, No.94 C 4751, 1996 WL 351182, at *6 (N.D. Ill. June 24, 1996) ("Plaintiffs have not been permitted to act as class representatives in securities litigation where they did not participate in the investment decision at issue.")*; see also Fry v. UAL Corp.*, 136 F.R.D. 626, 636 (N.D. Ill. 1991) (finding that a plaintiff could not adequately represent the class because she "abdicated complete authority" over her "relevant financial affairs" to another).

Compounding this problem, Mr. Galkin did not receive 

*See* Ex. 12, V. Galkin Dep. Tr.

186:6–188:15, 254:3–257:3 (testifying that ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████).  Because

Defendants consequently were deprived of evidence regarding the reasons for Mrs.

Galkin's investments in SandRidge, the Galkins are vulnerable to sanctions for spoliation

— another unique defense that renders them atypical.  *See Mud Operations, Inc. v. SJL

Well Serv., LLC,* No. CIV-14-321-W, 2015 WL 11237651, at *2–4 (W.D. Okla. Sept. 25,

2015) (granting judgment of no damages as a matter of law as a sanction for

misplacement of evidence); *see also Falcon*, 2007 WL 959374, at *2 (denying

certification because the named plaintiff had discarded evidence).

### 3.  St. Louis Trust Has An Unusually Extensive History of Similar Securities Litigation with The Same Firm.

A named plaintiff's typicality and adequacy as a class representative is subject to

dispute if the plaintiff has "extensive experience in prior securities litigation" and a

longstanding "relationship with [its] lawyers."  *Hanon*, 976 F.2d at 508.  Courts have thus

held that a plaintiff's prior involvement in similar lawsuits with the same counsel creates

unique defenses that render the plaintiff inadequate.  *See, e.g.*, *id.* at 506–07, 508–09

(upholding the district court's decision not to certify a class because, among other

reasons, the plaintiff had previously brought four similar suits while represented by same

counsel); *In re Quarterdeck Office Sys., Inc. Sec. Litig.*, No. CV 92-3970-DWW(GHKx),

1993 WL 623310, at *5 (C.D. Cal. Sept. 30, 1993) (finding plaintiffs atypical because of

their atypical investing experience and status as named plaintiffs in other securities

lawsuits); *Hoexter v. Simmons*, 140 F.R.D. 416, 422–23 (D. Ariz. 1991) (finding

plaintiffs atypical because their extensive involvement in prior litigation).

Here, St. Louis Trust has participated in eleven securities class actions since 2005

(including this action).  It was represented by Robbins Geller or a predecessor in all but

one of those actions, and it sought to be appointed lead plaintiff in each.  St. Louis Trust's

history of cookie-cutter securities litigation, its longstanding relationship with its counsel,

and its unfamiliarity with this action will require it "to meet defenses that are not typical

of the defenses which may be raised against other members of the proposed class."

*Hanon*, 976 F.2d at 508; *see also Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994)

("[The plaintiff's] demonstrated level of disinterest in this lawsuit coupled with his vast

experience as a securities class action plaintiff renders him subject to unique defenses

and, consequently, inadequate to serve as class representative.").

## C.    Individual Issues Predominate Over Classwide Issues.

Certification should be denied for the additional reason that Plaintiffs have failed

to meet their burden of demonstrating that issues and questions common to the class will

predominate over individual issues, as required by Rule 23(b)(3).  In response to a motion

for class certification, "the district court has a 'duty to take a close look at whether

common questions predominate over individual ones.'"  *Wallace B. Roderick Revocable

Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1219 (10th Cir. 2013) (quoting *Comcast

Corp. v. Behrend*, 569 U.S. 27, 33 (2013)).  Only if the Court is "satisfied, after a

rigorous analysis," that Plaintiffs have carried their burden can a class be certified.  *Wal-

Mart*, 563 U.S. at 350–51 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161

(1982)).  Here, the predominance requirement cannot be satisfied because individualized

questions of damages and investor knowledge will predominate over common questions.

### 1.  The Named Plaintiffs Have Proposed No Method Capable of Calculating Damages on A Classwide Basis.

In *Comcast Corp. v. Behrend*, the Supreme Court made clear that the "rigorous

analysis" of predominance required by Rule 23(b)(3) necessarily includes an examination

of whether "damages are capable of measurement on a classwide basis" using a method

consistent with the Plaintiffs' theory of liability.  569 U.S. at 35.  While the failure to

present a viable classwide damages model will not necessarily foreclose class

certification, it is an important factor that must be considered when determining whether

common questions predominate.  *See Roderick*, 725 F.3d at 1220 (district court abused its

discretion by failing to consider "the extent to which material differences in damages

determinations will require individualized inquiries").  Here, this factor weighs strongly

against a finding of predominance, because Plaintiffs have failed to present a coherent,

classwide damages model consistent with their liability case.

Although Plaintiffs' expert has opined without elaboration that some version of an

"event study framework" can be used to calculate damages by reference to the drop in

SandRidge's stock price at the end of the class period, *see* Dkt. 268 at 22, this proposed

damages model suffers from fundamental problems that render it inadequate as a

classwide damages model.  *First*, the proposed damages model cannot separate any

damages from the alleged misrepresentations and omissions at issue in the case (e.g.,

alleged misstatements about Mississippian well performance) from losses attributable to

31

other negative developments unrelated to Plaintiffs' claims.  Specifically, calculating

damages by reference to the November 2012 stock drop would not separate losses

attributable to alleged misrepresentations regarding oil and gas production from losses

attributable to other negative announcements that the Complaint concedes were made

simultaneously and contributed to the fall in SandRidge's stock price, including: (1)

SandRidge's announcement that earnings had declined in the third quarter 2012, *see*

Compl. ¶ 298; (2) SandRidge's announcement that it was selling its assets in the Permian

Basin, *see id.* ¶¶ 298, 303–04; (3) the open letter from a large activist shareholder to the

company's Board making allegations of misconduct against then-CEO Tom Ward and

calling for a change in management, *see id.* ¶ 299; (4) the Company's announcement of

problems with drilling operations in the Gulf of Mexico, *see* Orig. Compl., Dkt. 1, ¶ 59;

and (5) the recharacterization of the $1.3 billion acquisition of Dynamic Offshore as a

"mere financing vehicle . . . , despite earlier lauding of the acquisition's merits," *id.*

*Second*, Plaintiffs' damages model would inaccurately assume that any purported

inflation in SandRidge's share price remained constant throughout the proposed class

period despite numerous changes that would have impacted the amount of price inflation

under Plaintiffs' theory of liability.  For example, Plaintiffs contend that Defendants'

statements about the ratio of oil to gas in the Mississippian inflated SandRidge's stock

price by over-estimating the amount of high-margin oil and underestimating the amount

of low-margin gas.  If this were true, however, inflation should have varied with changes

in the relative values of oil and gas.  A review of oil and gas prices between March and

November 2012 demonstrates the problem.  By March 2012, the ratio of WTI oil spot

prices to Henry Hub natural gas spot prices was approximately than 46 to 1.  By November 2012, that ratio had declined to approximately 25 to 1.  *See* Ex. 15, Table of Prices and Ratio.  Despite this dramatic change in the price of oil relative to gas and other relevant changes,[7] Plaintiffs propose to hold inflation constant.

Because Plaintiffs have proposed no method to account for these problems, they have failed to propose a viable classwide damages methodology that would measure damages for all members of the putative class in a manner consistent with their theory of liability.  Plaintiffs do not satisfy the predominance requirement of Rule 23(b)(3) by offering a "conclusory assertion that damages will be calculated on a classwide basis" and "asking the Court simply to trust them," without providing any "information about how the . . . calculation would be performed."  *In re BP p.l.c. Sec. Litig.*, MDL No. 10-md-2185, 2014 WL 2112823, at *12 (S.D. Tex. May 20, 2014), *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015).  In the absence of a concrete, viable classwide damages model, the Court must assume that damages will require individual calculation.

---

[7]   Among other changes, SandRidge made different projections of well performance at different points in the proposed overbroad Proposed Class Period. *See* Compl. ¶ 143 (SandRidge projected 52% oil in 2011 but only 45% oil in 2012); *id.* ¶¶ 133–34 (SandRidge projected in 2011 that Mississippian wells would yield 409 thousand barrels of oil equivalents; in 2012 it raised its projection to 456 thousand barrels of oil equivalents).  Its holdings in the Mississippian also increased significantly over time. *Compare, e.g.*, Ex. 16, SandRidge Energy, Inc. 2011 Form 10-K, at 1 (21 rigs drilling and approximately 1.3 million acres under lease in the Mid-Continent) *with, e.g.*, Ex. 17, SandRidge Energy, Inc. 2012 Form 10-K, at 1 (33 rigs drilling and approximately 1.9 million acres under lease in the Mid-Continent ).  Plaintiffs' proposed damages model does not account for these changes, even though they would have impacted the alleged inflation in SandRidge's shares under Plaintiffs' theory of liability.

### 2.    Plaintiffs' Allegations About Data Filed with State Authorities Raise Individualized Questions of Investor Knowledge.

Plaintiff's Complaint also raises individualized questions of knowledge by alleging that the truth about SandRidge's production in the Mississippian was discernible from "data . . . provided by SandRidge to government authorities," Compl. ¶ 20; *see also id.* at ¶¶ 135–37, and yet somehow neither "readily available to the public," *id.* ¶ 20, nor reflected in the market price of SandRidge stock, *see id.* ¶¶ 302, 306.

Plaintiffs' assertion that publicly available well data revealed the truth about SandRidge's oil and gas production is fatal to their claims, because any such publicly available information should, in an efficient market, have been quickly reflected in the price of SandRidge's common stock, precluding any claim that the market was misled. *See, e.g., Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187, 194 (S.D.N.Y. 2006) (plaintiffs could not establish loss causation where allegedly omitted information was publicly disclosed and already reflected in the stock price).  Plaintiffs' own expert ████████████████████████.  *See* Ex. 14, Steinholt Dep. Tr. 89:2–90:7.

If, however, this information somehow was not reflected in SandRidge's stock price, as the Complaint suggests, then an individualized inquiry of each class member would be required to determine the extent to which that investor had analyzed the information and was aware of the allegedly omitted "truth."  The well data, after all, was publicly filed, and the record demonstrates that investment analysts consulted that data, and that institutional investors such as DL Carlson, St. Louis' investment advisor, were aware that the data was available from the State of Oklahoma,. *See, e.g.*, Ex. 18, BNP

Paribas Analyst Report, at 1, 3–5 (discussing Oklahoma well data); Ex. 19, JP Morgan Analyst Report, at 3 (similar); *see also see* Ex. 20, D.L. Carlson Email (discussing publicly-available well data).  Where information that would allegedly have alerted investors to a claimed fraud is publicly available, the need for individualized inquiries into the knowledge of proposed class members may defeat the predominance requirement of Rule 23(b)(3).  *See, e.g., Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986) ("Because the extent of knowledge of the omitted facts or reliance on misrepresented facts will vary from shareholder to shareholder, the question of whether the omission was material might require an individual inquiry for each shareholder."); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 170 (S.D.N.Y. 2011) (finding no predominance because the proposed class "would include individuals with different levels of knowledge" (citing *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 44 (2d Cir. 2006))).

## CONCLUSION

The Court should deny class certification.  Plaintiff's Proposed Class Period is overbroad and they have demonstrated neither that they are typical and adequate representatives nor that common issues would predominate over individual issues.

Dated: June 1, 2018                          Respectfully Submitted,

                                             CHRISTENSEN LAW GROUP

                                             */s/ Thomas B. Snyder*
Of Counsel:                                  Thomas B. Snyder, Esq., OBA #31428
                                             tom@christensenlawgroup.com
COVINGTON & BURLING LLP                       The Parkway Building
Mark P. Gimbel (admitted *pro hac vice*)      3401 N.W 63rd St., Ste. 600
mgimbel@cov.com                              Oklahoma City, OK 73116
C. William Phillips (admitted *pro hac vice*) (405) 232-2020
cphillips@ cov.com
The New York Times Building                   *Attorneys for James D. Bennett and*
620 Eighth Avenue                            *Matthew K. Grubb*
New York, NY 10018-1405
(212) 841-1000


                                             CORBYN HAMPTON LAW FIRM

                                             */s/ George S. Corbyn*
Of Counsel:                                  George S. Corbyn, Jr., OBA #1910
                                             gcorbyn@corbynhampton.com
LATHAM & WATKINS LLP                          211 North Robinson, Suite 1910
J. Christian Word (admitted *pro hac vice*)   One Leadership Square
christian.word@lw.com                        Oklahoma City, OK 73102
555 Eleventh Street, NW, Suite 1000           (405) 239-7055
Washington, D.C. 20004
(202) 637-2200                                *Attorneys for Defendant Tom L. Ward*

CONNER & WINTERS, LLP

*/s/ Kiran A. Phansalkar*
Kiran A. Phansalkar, OBA #11470
kphansalkar@cwlaw.com
Mitchell D. Blackburn, OBA #12217
mblackburn@cwlaw.com
211 North Robinson
Oklahoma City, OK 73102
(405) 272-5711

*Attorneys for SandRidge Energy, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2018, I electronically transmitted the attached document to the Clerk of the Court using the ECF system for filing, which will send notification of such filing to all counsel registered through the ECF System.

*/s/ Thomas B. Snyder*
Thomas B. Snyder