# EXHIBIT 1

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT

     FOR THE WESTERN DISTRICT OF OKLAHOMA

3    - - - - - - - - - - - - - - - - - - -x

4

     IN RE SANDRIDGE ENERGY,    ) No. CIV-12-1341-W

5    INC. SECURITIES LITIGATION ) Relating to All

                                ) Securities Actions

6

7

8

9                        620 Eighth Avenue

                         New York, New York

10

                         April 19, 2018

11                       9:07 a.m.

12

13

14

15

16        VIDEOTAPED DEPOSITION of JAMES MACE,

17    on behalf of Lead Plaintiffs Laborers

18    Pension Trust Fund for Northern Nevada,

19    in the above-entitled action, held at the

20    above time and place, taken before Dawn

21    Matera, a Shorthand Reporter and Notary

22    Public of the State of New York

23

24

25

Page 10

JAMES MACE

1
2    Q.   Who did you meet with?
3    A.   Frank and Nathan.
4    Q.   And those are the two attorneys
5  who are here with you today?
6    A.   Yes.
7    Q.   How long did you meet with
8  them?
9    A.   Three hours.
10   Q.   Did you do anything else to
11 prepare for your deposition?
12   A.   No.
13   Q.   And in the course of the three
14 hour meeting that you had with your
15 counsel to prepare for your deposition,
16 did you review any documents?
17   A.   Yes.
18   Q.   What documents did you review?
19        (DIRECTION NOT TO ANSWER)
20        MR. KARAM:  I object and direct
21 the witness not to answer based on
22 work product privilege.
23        MR. GIMBEL:  Okay.
24   Q.   Did any of the documents that
25 you reviewed refresh your recollection as

Page 11

JAMES MACE

1
2  to the matters that we are going to be
3  discussing here today?
4    A.   Yes.
5    Q.   Why don't you tell us, for the
6  record, what those documents were.
7    A.   The complaint.  The retainer
8  agreement.  I think that's all I recall
9  that we looked at.
10   Q.   Anything else?
11   A.   Not that I recall.
12   Q.   Okay.
13        MR. GIMBEL:  We're going to mark
14 as Exhibit 1, the Notice of Your
15 Deposition.
16        [The Notice of Deposition, ]was
17 hereby marked as Mace Exhibit 1 for
18 identification, as of this date.]
19   Q.   Do you have Exhibit 1 in front
20 of you?
21   A.   Yes.
22   Q.   Do you recognize this document?
23        (Witness reviews document.)
24   A.   No.
25   Q.   Did you review it before, in

Page 12

JAMES MACE

1
2  the course of your preparation or any
3  other time?
4    A.   No.
5    Q.   There is a -- you will see on
6  page 2 that it gives notice, among other
7  things, of the deposition of the Laborers
8  Pension Trust Fund for Northern Nevada.
9  And on pages 4, 5 and -- 4 through 7, it
10 has a list of topics of examination.
11        Have you ever reviewed that
12 list of topics for examination?
13   A.   No.
14   Q.   So I take from the fact that
15 you haven't reviewed the list, that you
16 didn't do anything to prepare yourself to
17 testify on behalf of Northern Nevada on
18 these 22 topics?
19        MR. KARAM:  Objection.  Assumes
20 facts not in evidence.
21   Q.   You can answer the question.
22   A.   Would you repeat that?
23   Q.   I will rephrase the question.
24   A.   Okay.
25   Q.   Did you do anything to prepare

Page 13

JAMES MACE

1
2  to testify today as to the list of topics
3  in the deposition notice that has been
4  marked as Exhibit 1?
5    A.   No.
6    Q.   Scanning down the list, can you
7  tell me if there are topics on this list
8  which you're prepared to not to testify
9  to today?
10   A.   I'm sure they will come up.
11 Again, I have not seen this document, so
12 I can't -- without reading it.
13   Q.   So we'll try to get through the
14 deposition, as best we can.
15   A.   Okay.
16   Q.   Why don't we just start with a
17 couple of background questions.
18   A.   Okay.
19   Q.   If you could summarize for me,
20 briefly, your educational background,
21 beginning with where you went to college?
22   A.   Graduated from the University
23 of California at Santa Barbara.  And then
24 became a CPA in the State of Nevada in
25 the '80s, early '80s.  Have been a fund

4 (Pages 10 - 13)

Page 22

JAMES MACE

1
2    A.   Maybe four.
3    Q.   Is that the only law firm that
4  you have such an arrangement with?
5    A.   Yes.
6    Q.   Why don't we mark as Exhibit 2
7  Lead Plaintiffs' Responses and Objections
8  to Defendants' James Bennett and Matthew
9  Grubb's First Set of Interrogatories.
10       [The document titled Lead
11   Plaintiffs' Responses and Objections
12   to Defendants James D. Bennett and
13   Matthew K. Grubb's First Set of
14   Interrogatories, was hereby marked as
15   Mace Exhibit 2 for identification, as
16   of this date.]
17   Q.   Let me know when you have
18  Exhibit 2 in front of you.
19   A.   I have Exhibit 2 in front of
20  me.
21   Q.   Do you recognize this document?
22       (Witness reviews document.)
23   A.   Yes.
24   Q.   And have you reviewed it
25  before?

Page 23

JAMES MACE

1
2    A.   I have seen it.  I haven't read
3  every word.
4    Q.   Am I correct, sir, that you
5  verified these interrogatory responses?
6    A.   I did, yes.
7    Q.   And you did that without
8  reading every word?
9    A.   I thought this was the --
10       (Witness reviews document.)
11   A.   I'm sorry, I thought this was
12  the complaint.
13   Q.   Have you seen this document
14  before?
15   A.   Yes.
16   Q.   And why don't you tell me what
17  you think this document is then, so that
18  we're all on the same page.
19   A.   I thought this was -- I believe
20  this is responses to questions by your
21  firm about the complaint.
22   Q.   And have you read every word of
23  this document?
24   A.   Most, but not every word.
25   Q.   And you verified this document?

Page 24

JAMES MACE

1
2    A.   Yes, I did.
3    Q.   So you believe the responses in
4  this document to be true?
5    A.   Yes.
6    Q.   And when you were mistaken a
7  moment ago and you thought you were
8  looking at the complaint, you haven't
9  read every word of the complaint?
10   A.   That's correct.
11   Q.   Fair enough.
12       On page 19, if you will take a
13  look at that, you see at the top of the
14  page it identifies four securities class
15  actions in which the Laborers Pension
16  Trust Fund for Northern Nevada sought to
17  become a Lead Plaintiff.
18       Do you have that in front of
19  you?
20   A.   I do, yes.
21   Q.   And it states that Robbins
22  Geller served as counsel in each of those
23  four cases; is that correct?
24   A.   Yes.
25   Q.   Could you briefly describe for

Page 25

JAMES MACE

1
2  the record -- obviously, one of those
3  cases is this case, so we will leave that
4  out.
5       But the three other cases, can
6  you briefly describe for the record what
7  each of those cases was about, starting
8  with the first Glass versus ATI
9  Technologies?
10   A.   I don't recall what Glass was
11  specifically about.
12       The second was Children's
13  Place.  That was where there was errors
14  made by the executives.
15       I don't -- and then I don't --
16  obviously, we're passing SandRidge.
17       And I don't recall what BofI
18  Holdings was.
19   Q.   So let me go back for a second
20  to Robbins Geller serving as your counsel
21  in all of these cases.
22       I think you testified earlier
23  that you had an arrangement with Robbins
24  Geller where they identified potential
25  litigation to you; is that right?

7 (Pages 22 - 25)

Page 26

JAMES MACE

1
2    A.   Yes.
3    Q.   And were all of these cases
4  identified to you by Robbins Geller to
5  Northern Nevada?
6    A.   Yes.
7    Q.   As potential claims?
8    A.   Yes.
9        MR. KARAM:  Let counsel finish.
10       THE WITNESS:  I know, I know.
11  Sorry.
12   Q.   So the idea of filing
13  litigation in each of these cases
14  originated with Robbins Geller.
15       Would that be fair to say?
16   A.   Yes.
17   Q.   How did Northern Nevada's
18  relationship with Robbins Geller begin?
19   A.   Years ago, to the best of my
20  recollection, they contacted Mr. Jenkins
21  and offered to provide this service.  And
22  Mr. Jenkins accepted or recommended that
23  the Trust Fund accept their services.
24   Q.   And since Mr. Jenkins is
25  sitting right here with us, it would be

Page 27

JAMES MACE

1
2  discourteous not to ask for the record
3  what services he performs for Northern
4  Nevada?
5    A.   He's Trust Fund legal counsel.
6    Q.   Okay.  And for how long has he
7  occupied that position?
8    A.   30, 40 years.
9    Q.   Did you ever consider using a
10  firm other than Robbins Geller for any of
11  these four cases listed in the
12  interrogatories?
13   A.   No.
14   Q.   Did you ever interview another
15  firm?
16   A.   No.
17   Q.   Have you ever sought securities
18  litigation advice from a firm other than
19  Robbins Geller?
20   A.   No.
21   Q.   Why not?
22   A.   It's not a primary function of
23  the Trust Fund.
24   Q.   I want to talk about and talk a
25  little bit about each of these cases.

Page 28

JAMES MACE

1
2        And you talked about the Hall
3  case is a case involving some errors by
4  the Children's Place retail stores?
5    A.   Yes.
6    Q.   Am I correct that that case
7  ultimately ended in a settlement?
8    A.   Yes.
9    Q.   So there was no judicial
10  decision on the merits of those claims,
11  correct?
12       MR. KARAM:  Objection.  Calls
13  for a legal conclusion.
14   Q.   You can answer the question.
15   A.   I believe so, yes.
16   Q.   How about the Glass case, am I
17  correct that there was a judicial
18  decision on the merits of that case?
19   A.   I don't recall.
20   Q.   Let me take a step back.
21       We will go back to the Glass
22  case in a minute.
23       But it says in the
24  interrogatory response that Northern
25  Nevada sought to become a Lead Plaintiff

Page 29

JAMES MACE

1
2  in each of these cases or a Class
3  representative, correct?
4    A.   Yes.
5    Q.   And was it, in fact, appointed
6  Lead Plaintiff or Class representative in
7  each of these cases; do you know?
8    A.   Don't know.
9    Q.   But the BofI case, that is
10  still pending; is that correct?
11   A.   I don't know.
12   Q.   Was filed in February of 2016,
13  correct?
14   A.   Correct.
15   Q.   And you have no recollection of
16  what that case is about?
17   A.   I do not.
18   Q.   Do you know what BofI is?
19   A.   I do not.
20   Q.   Who at Northern Nevada would
21  know that?
22   A.   Perhaps Mr. Jenkins.
23   Q.   Is there anyone internal to
24  Northern Nevada, if you will, any
25  trustees of Northern Nevada or anyone who

8 (Pages 26 - 29)

Page 34

JAMES MACE

1   filed.
2   
3       I am going to ask you to take a
4   look at the Court's discussion, beginning
5   on page 15.
6       Do you see the paragraph that
7   begins "As stated above, Plaintiffs
8   specify in their consolidated amended
9   class action complaint 16 allegedly
10  misleading statements made by Defendants
11  or other parties during the Class
12  period"?
13  A.   Yes.
14  Q.   And just you can take your time
15  to look at this, I just want to know
16  whether this refreshes your recollection
17  at all as to this litigation?
18  A.   No, it does not.
19  Q.   Was it fair to say this case
20  was basically run by your outside counsel
21  at the time, and Northern Nevada didn't
22  have much involvement in it day-to-day?
23      MR. KARAM:  Objection.
24  Q.   You can answer the question.
25      MR. KARAM:  Objection.  That

Page 35

JAMES MACE

1   assumes facts not in evidence.
2   
3   A.   I don't know.
4   Q.   Who at Northern Nevada would
5   know the answer to that question?
6   A.   Perhaps Mr. Jenkins.
7   Q.   And Mr. Jenkins, again, is your
8   outside counsel?
9   A.   Correct.
10  Q.   Is Mr. Jenkins also someone who
11  has appeared as a Plaintiff's lawyer in
12  securities litigation on behalf of
13  Northern Nevada?
14  A.   In the Children's Place, yes.
15  Q.   The order that has been marked
16  as Exhibit 5 dismisses the complaint in
17  the ATI case.
18      Did Northern Nevada, to your
19  recollection, ever appeal that decision?
20  A.   I don't know.
21  Q.   And who would have the answer
22  to that question?
23  A.   Legal counsel.
24  Q.   And that's Mr. Jenkins, again?
25  A.   And Robbins Geller, yes.

Page 36

JAMES MACE

1   
2   Q.   But nobody inside of Northern
3   Nevada would know the disposition of this
4   case?
5   A.   Correct.
6       MR. GIMBEL:  So why don't we
7   mark Exhibit 6.
8       [The retainer agreement between
9   Laborers Pension Trust Fund for
10  Northern Nevada and the law firm of
11  Milberg Weiss Bershad Hynes & Lerach,
12  LLP, Bates stamped NNEV0000001
13  through 004, was hereby marked as
14  Mace Exhibit 6 for identification, as
15  of this date.]
16  Q.   Exhibit 6 is an agreement
17  between Laborers Pension Trust Fund for
18  Northern Nevada and the law firm of
19  Milberg Weiss Bershad Hynes & Lerach,
20  LLP.  It is Bates numbered NNEV 1 through
21  4.
22      Do you have that document in
23  front of you?
24  A.   Yes.
25  Q.   Do you recognize this document?

Page 37

JAMES MACE

1   
2       (Witness reviews document.)
3   A.   Yes.
4   Q.   Would you please identify it
5   for the record?
6   A.   It's a retainer agreement for
7   portfolio monitoring.
8   Q.   And what was the purpose of
9   this agreement, as you understood it?
10  A.   The process was that the Trust
11  Fund would send information to this law
12  firm.  And they would review --
13  investment information to the law firm.
14  And they would review the transactions of
15  the portfolio of the Trust, and they
16  would make recommendations to Mr. Jenkins
17  or the Trust Fund legal counsel who would
18  then, in turn, would take that
19  information to the Board of Trustees to
20  make a decision as to whether to follow
21  those recommendations.
22  Q.   Okay.  And would it be fair to
23  say that, in essence, Northern Nevada
24  outsourced the function of identifying
25  potential litigation claims to its

10 (Pages 34 - 37)

Page 38

```
1          JAMES MACE
2  counsel?
3    A.  Yes.
4    Q.   And this particular agreement
5  is with the firm of Milberg Weiss --
6    A.  Yes.
7    Q.  -- correct?
8        You were the primary contact
9  for Northern Nevada under this agreement,
10 correct?
11   A.  Outside legal counsel would
12 have been.  Mr. Jenkins would have been.
13   Q.   I ask you to look at paragraph
14 10.
15   A.  Correct.
16   Q.   And it designates two parties
17 as primary contacts under the agreement.
18       Do you see that?
19   A.  I do.
20   Q.   And you're designated for
21 Northern Nevada as the primary contact?
22   A.  Right.  They would provide
23 information to me along with Mr. Jenkins.
24   Q.   But functionally, Mr. Jenkins
25 was playing a greater role; is that fair?
```

Page 39

```
1          JAMES MACE
2    A.  Yes.
3    Q.   And the primary contact who's
4  designated at Milberg Weiss was William
5  Lerach; is that right?
6    A.  That's what it says.
7    Q.  Okay.  Mr. Lerach was
8  responsible for soliciting lead
9  Plaintiffs, in fact, for at least one of
10 the lawsuits in which Northern Nevada
11 participated; is that right?
12       MR. KARAM:  Objection.  The
13 witness is not competent.  But if you
14 know, go ahead.
15   Q.  Go ahead.
16   A.  I don't know.
17       MR. GIMBEL:  I ask the court
18 reporter to mark as Exhibit 7, a press
19 release titled "Lerach Coughlin Stoia
20 Geller Rudman & Robbins LLC Files
21 class Action Suit Against ATI
22 Technologies."
23       [The press release titled
24 "Lerach Coughlin Stoia Geller Rudman
25 & Robbins LLC Files Class Action Suit
```

Page 40

```
1          JAMES MACE
2  Against ATI Technologies," was hereby
3  marked as Mace Exhibit 7 for
4  identification, as of this date.]
5        Do you see that?
6       (Witness reviews document.)
7    A.  I do.
8    Q.   And I am going to direct your
9  attention to the second paragraph.
10       Do you see that it is
11 soliciting persons who might wish to
12 serve as Lead Plaintiff in the ATI
13 securities litigation?
14   A.  Yes.
15   Q.   And it directs anybody who
16 might be interested in performing that
17 role to please contact Plaintiff's
18 counsel William Lerach.
19       Do you see that?
20   A.  Yes.
21   Q.   Does that refresh your
22 recollection that Mr. Lerach solicited
23 Lead Plaintiffs for the ATI Technologies
24 securities case?
25       MR. KARAM:  Objection.
```

Page 41

```
1          JAMES MACE
2  Competence.  Go ahead.
3    Q.  You can answer the question.
4       MR. KARAM:  You have to use
5  words.
6    A.  No.
7    Q.   Am I correct, sir, that Milberg
8  Weiss, the law firm with which you
9  entered this portfolio monitoring
10 agreement, was indicted for bribery and
11 fraud for paying illegal kickbacks to
12 parties willing to serve as lead
13 Plaintiffs?
14   A.  I believe so.
15   Q.   And several of its partners
16 went to jail in connection with that
17 kickback scheme, correct?
18   A.  I believe the only one that I
19 was aware of was Mr. Weiss.
20   Q.   Isn't it true, sir, that
21 Mr. Lerach, who was your primary contact
22 in your portfolio monitoring agreement,
23 also went to jail with the kickback
24 scheme?
25   A.  I don't know.
```

11 (Pages 38 - 41)

1           JAMES MACE
2       MR. GIMBEL:  Why don't we mark
3   Exhibit 8.
4       [The news release from the
5   United States Attorney's Office for
6   the Central District of California,
7   dated September 18th, 2007, titled
8   William Lerach, Former Name Partner
9   in Milberg Weiss, to Plead Guilty to
10  Conspiracy to Obstruct Justice and
11  Make False Statements to Federal
12  Judges Across U.S., was hereby marked
13  as Mace Exhibit 8 for identification,
14  as of this date.]
15      MR. GIMBEL:  I asked the court
16  reporter to mark as Exhibit 8, a news
17  release from the United States
18  Attorney's Office for the Central
19  District of California, dated
20  September 18th, 2007, titled William
21  Lerach, Former Name Partner in Milberg
22  Weiss, to Plead Guilty to Conspiracy
23  to Obstruct Justice and Make False
24  Statements to Federal Judges Across
25  U.S.

1           JAMES MACE
2       (Witness reviews document.)
3   Q.   Do you have that in front of
4   you, sir?
5   A.   Yes.
6   Q.   And do you see that in the
7   first paragraph, it notes that William
8   Lerach has agreed to plead guilty to a
9   federal conspiracy charge and acknowledge
10  that he and others agreed to conceal from
11  judges in federal courts Milberg Weiss'
12  secret payment arrangements with named
13  Plaintiffs in class-action lawsuits?
14  A.   I see that.
15  Q.   And you see that in paragraph
16  3, it notes "The indictment of Milberg
17  Weiss and two of its name partners for
18  allegedly participating in a scheme in
19  which several individuals were paid
20  millions of dollars in secret kickbacks
21  in exchange for serving as Lead
22  Plaintiffs in more than 150 class action
23  and shareholder derivative action
24  lawsuits."
25      Do you see that?

1           JAMES MACE
2   A.   Yes.
3   Q.   Does that refresh your
4   recollection that, in fact, William
5   Lerach was incited and pled guilty in
6   connection with this kickback scheme
7   involving Lead Plaintiff in securities
8   litigation?
9   A.   It does not.
10  Q.   Did you have any knowledge or
11  awareness of this at the time that you
12  entered into a -- or that the portfolio
13  monitoring agreement that you had was in
14  place?
15  A.   No.
16      MR. KARAM:  I am going to object
17  to that because --
18      MR. GIMBEL:  Excuse me?
19      MR. KARAM:  I object, counsel.
20  It's a misleading question, because
21  portfolio --
22      MR. GIMBEL:  Your speaking
23  objections are not appropriate and
24  you're now coaching the witness.  If
25  you have an objection to form.

1           JAMES MACE
2       MR. KARAM:  Objection.
3   Misstates prior evidence.
4       MR. GIMBEL:  Objection to form,
5   that's enough.
6       MR. KARAM:  Mischaracterizes the
7   document.  These are all legally
8   cognizable grounds on which a judge
9   can rule.
10      MR. GIMBEL:  You're well beyond
11  federal rules in a civil procedure.
12      MR. KARAM:  I am allowed to
13  state the ground for my objection,
14  counsel.
15      MR. GIMBEL:  No, you're not.
16      MR. KARAM:  Yes, I am.
17      MR. GIMBEL:  This is a speaking
18  objection and you are coaching the
19  witness.
20      MR. KARAM:  Objection.
21  Argumentative.  Objection, misleading
22  to the witness.  Objection, misstates
23  prior evidence.
24      MR. GIMBEL:  You're coaching the
25  witness.

12 (Pages 42 - 45)

Page 46

JAMES MACE

1
2      MR. KARAM:  Objection,
3  mischaracterizes the evidence.  Those
4  are my objections.
5      MR. GIMBEL:  You should confine
6  your objections to form.  And they
7  need to be stated concisely.  And you
8  know the federal rule on that.
9   Q.   Going back to the portfolio
10  monitoring agreement that we marked as
11  Exhibit 6, was this agreement ever
12  terminated?
13   A.   I don't know.
14   Q.   In paragraph 11, it states "The
15  client may terminate this agreement at
16  any time in writing."
17      Do you see that?
18   A.   Yes.
19   Q.   Did Northern Nevada ever
20  terminate this agreement in writing?
21   A.   I don't know.
22   Q.   Who would have the answer to
23  that question?
24   A.   Legal counsel.
25   Q.   Mr. Jenkins?

Page 47

JAMES MACE

1
2   A.   Yes.
3   Q.   You don't recall any discussion
4  at Northern Nevada of the indictment of
5  the Milberg Weiss firm in the Lead
6  Plaintiff kickback scam?
7   A.   I do not.
8      MR. GIMBEL:  I would like to
9  mark as Exhibit 9, another portfolio
10  monitoring agreement.
11      [The retainer agreement between
12  the Laborers Pension Trust Fund and
13  Robbins Geller, was hereby marked as
14  Mace Exhibit 9 for identification, as
15  of this date.]
16   Q.   Before we get to Exhibit 9, let
17  me just ask you, would you have had
18  concerns about working with the Milberg
19  Weiss firm if you had known about this
20  bribery and kickback scheme involving
21  Lead Plaintiffs?
22      MR. KARAM:  Objection.
23      THE WITNESS:  I can answer?
24      MR. KARAM:  You can answer.
25   A.   Sorry.

Page 48

JAMES MACE

1
2   Q.   You can answer.
3   A.   I believe it would have been
4  discussed.
5   Q.   Might it have caused you to
6  terminate your relationship with the
7  firm?
8   A.   I don't know.
9   Q.   What sort of diligence does
10  Northern Nevada do in deciding whether to
11  obtain -- I am sorry, retain counsel?
12   A.   In this case, we would rely on
13  Trust Fund's legal counsel.
14   Q.   And that's Mr. Jenkins?
15   A.   Yes.
16   Q.   All right.  Do you have Exhibit
17  7 in front of you?
18   A.   Yes.
19   Q.   Do you recognize Exhibit 7?
20   A.   You just handed it to me, yes.
21   Q.   Well, have you ever seen it
22  before?
23   A.   No.
24   Q.   Okay.  So Exhibit 7 is a --
25      MR. JENKINS:  I think you're on

Page 49

JAMES MACE

1
2  the wrong Exhibit.
3      MR. GIMBEL:  Do we have a
4  confusion of the numbers?
5      We just marked another portfolio
6  monitoring agreement.  Exhibit 9.  My
7  apologies.
8   Q.   So why don't you put Exhibit 9
9  in front of you.
10   A.   Yes.
11   Q.   And we'll start over.
12      Do you recognize Exhibit 9?
13      (Witness reviews document.)
14   A.   Yes.
15   Q.   Can you describe, for the
16  record, what it is?
17   A.   Retainer agreement between the
18  Laborers Pension Trust Fund and Robbins
19  Geller.
20   Q.   Is this another portfolio
21  monitoring agreement?
22   A.   Yes.
23   Q.   Why did Northern Nevada enter
24  into this portfolio monitoring agreement
25  with Robbins Geller?

13 (Pages 46 - 49)

1        JAMES MACE
2    A.   I don't know.
3    Q.   Who would know the answer to
4 that question?
5    A.   Legal counsel.
6    Q.   And that's Mr. Jenkins?
7    A.   Yes.
8    Q.   Would the trustees know why
9 they entered into this agreement?
10    A.   They probably followed
11 Mr. Jenkins' recommendation.
12    Q.   Are you aware of any other
13 portfolio monitoring agreements entered
14 into by Northern Nevada other than the
15 two that we have identified on the record
16 today?
17    A.   No.
18    Q.   You hesitated there, I think,
19 for the moment.
20    A.   Well, the relationship remained
21 the same.  Laura and Sandra Stein were
22 with both firms.  I think you see that
23 here, their names are familiar to me.
24 And if there is another firm, then it
25 would be related to them.

1              JAMES MACE
2    Q.   Okay.  Can you explain who
3 Laura and Sandra Stein are, and what
4 Northern Nevada's relationship is and has
5 been with them over the years?
6    A.   They represent Robbins Geller.
7    Q.   They are attorneys at Robbins
8 Geller?
9    A.   Yes.
10    Q.   And how did Northern Nevada get
11 involved with Laura and Sandra Stein?
12    A.   I don't know.
13    Q.   Is that a long-standing
14 relationship?
15    A.   Years.
16    Q.   It's a relationship that dates
17 back to when Laura and Sandra Stein were
18 at Milberg Weiss; is that correct?
19    A.   I believe so.
20    Q.   In paragraph 3 of the
21 agreement, it states, in substance, that
22 to assist Robbins Geller in fulfilling
23 its duties under this agreement, Northern
24 Nevada was to provide five years of past
25 statements showing monthly transactions

1              JAMES MACE
2 and publically traded equities, and to
3 provide monthly updates to Robbins Geller
4 on securities transactions.
5        Do you see that?
6    A.   Yes.
7    Q.   And did Northern Nevada fulfill
8 its obligations under that paragraph?
9    A.   I don't know.
10    Q.   Okay.  Does Robbins Geller
11 receive monthly statements showing
12 securities transactions of Northern
13 Nevada?
14    A.   I believe so.
15    Q.   And in paragraphs 1 and 2, it
16 states, in substance, that Robbins
17 Geller, for its part, will then determine
18 whether there are potential claims that
19 Northern Nevada might bring for losses
20 under the federal securities laws.
21        Is that a fair summary?
22    A.   Yes.
23    Q.   Why enter into this agreement
24 rather than simply monitoring your own
25 portfolio and deciding on your own

1              JAMES MACE
2 whether you might have securities
3 litigation claims?
4    A.   Specialized area of the law
5 that we don't have the expertise to make
6 those decisions.
7    Q.   So you're better off letting
8 counsel decide whether you have a claim?
9    A.   Right.  Correct.
10        MR. KARAM:  Counsel, when you
11    feel it's an appropriate time to take
12    a break in the next --
13        MR. GIMBEL:  Sure.  We can take
14    a break in a few minutes.
15        MR. KARAM:  Take your time.
16    Q.   Did you have a portfolio
17 monitoring arrangement in place at the
18 time that you first got involved in this
19 litigation about SandRidge Energy?
20    A.   Just rephrase that or a little
21 bit more specific?
22    Q.   Did you have a portfolio
23 monitoring arrangement with Robbins
24 Geller when you first got involved in
25 this litigation?

14 (Pages 50 - 53)

Page 54

JAMES MACE

1          JAMES MACE
2   A.   I believe so.
3          MR. GIMBEL:  We can take a
4   break.
5          MR. KARAM:  Thank you.
6          THE VIDEOGRAPHER:  We are now
7   off the record.  The time is 9:55.
8          (Off the record.)
9          THE VIDEOGRAPHER:  Now on the
10   record.  The time on the video monitor
11   is 10:05.
12   Q.   So Mr. Mace, let's resume.
13   A.   Okay.
14   Q.   How did Northern Nevada first
15   get involved in this case?
16   A.   The process, as we talked about
17   before, is that we retained Robbins
18   Geller under legal counsel's
19   recommendation.
20          And part of that is that we
21   provide them with investment information.
22   They analyze that information.
23          And then they, Robbins Geller,
24   would come back to Mr. Jenkins with a
25   recommendation.

Page 55

1          JAMES MACE
2          And then Mr. Jenkins would
3   submit that recommendation to the
4   trustees, which they did, which was to
5   get involved.
6   Q.   I understand the process,
7   generally.
8   A.   Okay.
9   Q.   So I am just focused on this
10   case, in particular.
11          What do you recall about the
12   genesis of this litigation?
13   A.   Mr. Jenkins brought a
14   recommendation to the trustees to get
15   involved in this case.
16   Q.   The trustees followed his
17   recommendation, I take it?
18   A.   They did, yes.
19   Q.   Did the trustees ever consider
20   hiring other counsel to prosecute this
21   litigation?
22   A.   I don't know.
23   Q.   Have the trustees ever used
24   other counsel to bring securities claims
25   on their behalf?

Page 56

1          JAMES MACE
2   A.   No, I don't believe so.
3   Q.   Did it occur to Northern Nevada
4   that it might have a possible claim
5   before being approached by counsel under
6   this portfolio monitoring agreement?
7   A.   I don't believe so.
8          MR. KARAM:  What number is this?
9          THE REPORTER:  10.
10          [The retainer agreement between
11   Robbins Geller Rudman & Dowd and the
12   Trust Fund to enter into litigation
13   with SandRidge Energy Inc., Bates
14   stamped NNEV0000015, was hereby
15   marked as Mace Exhibit 10 for
16   identification, as of this date.]
17   Q.   Do you have Exhibit 10 in front
18   of you, sir?
19   A.   Yes.
20   Q.   Do you recognize this document?
21          (Witness reviews document.)
22   A.   Yes.
23   Q.   Would you identify it please
24   for the record?
25   A.   It's the retainer agreement to

Page 57

1          JAMES MACE
2   have the Trust Fund enter into the
3   prosecution, I guess, of the SandRidge
4   Energy claims.
5   Q.   The letter is addressed to
6   Mr. Jenkins; is that correct?
7   A.   Yes.
8   Q.   And why is that?
9   A.   Mr. Jenkins is Trust fund legal
10   counsel.
11   Q.   Now in paragraph 9 of this
12   agreement, it provides that "Robbins
13   Geller will defend and indemnify Northern
14   Nevada Laborers for any claims asserted
15   against Northern Nevada Laborers for its
16   institution, prosecution and/or
17   resolution of this action including but
18   not limited to claims or sanctions
19   involving attorneys' fees or costs."
20          Do you see that?
21   A.   Yes.
22   Q.   Do you know what the genesis of
23   that provision is?
24   A.   No.
25   Q.   Would it be fair to say that,

15 (Pages 54 - 57)

Page 70

JAMES MACE

1            JAMES MACE
2   three trustees and an alternate.
3      Q.   Okay.  So the trustees are
4   appointed, essentially by unions.
5         Is that fair to say?
6      A.   Half by unions, half by
7   management.
8      Q.   Okay.  Maybe you could just
9   describe, for the record, what the
10   Laborers Pension Trust for Northern
11   Nevada is.  I don't think we have that in
12   the record.
13      A.   It's a defined benefit pension
14   plan.  It covers 5,600 pensioners.  The
15   collective bargaining parties agree to a
16   specific contribution amount that goes
17   into the Trust based on number of hours
18   worked.  And that, in turn, there's
19   formulas that calculate the benefits that
20   a retiree will get when they retire.
21      Q.   Okay.  Thank you.
22         Have you ever heard of the
23   SandRidge Investor Group?
24      A.   No.
25      Q.   Have you ever communicated with

Page 71

1            JAMES MACE
2   any of the other Plaintiffs, named
3   Plaintiffs in this action?  And by "you,"
4   I mean Northern Nevada.
5      A.   I believe there is a conference
6   call.  We had a conference call somewhere
7   in this process to discuss it.
8      Q.   And which Plaintiffs
9   participated in that conference call?
10      A.   I don't recall.
11      Q.   Okay.  As you sit here now, can
12   you tell me who the other named
13   Plaintiffs are?
14      A.   I believe it's the Construction
15   Laborers Trust Fund out of St. Louis.
16   And then the -- a husband and wife, I
17   believe.  A man and a woman.  It begins
18   with a G.
19      Q.   Would that be the Galkins?
20      A.   Thank you, the Galkins.
21      Q.   Has Northern Nevada ever
22   communicated with the Galkins?
23      A.   I think just on the conference
24   call.
25      Q.   When was that conference call,

Page 72

1            JAMES MACE
2   approximately?
3      A.   Years ago.
4      Q.   Has Northern Nevada ever
5   communicated with the Construction
6   Laborers Pension Fund of Greater St.
7   Louis?
8      A.   Not that I am aware of.
9      Q.   Were they involved in the
10   conference call that you just mentioned?
11      A.   I believe so.
12      Q.   Has Northern Nevada done
13   anything independent of counsel to
14   investigate the basis for its claims in
15   this case?
16      A.   No.
17         [The document titled
18   Declaration of James G. Mace In
19   Support of Lead Plaintiffs' Motion
20   For Class Certification, was hereby
21   marked as Mace Exhibit 13 for
22   identification, as of this date.]
23      Q.   Do you have Exhibit 13 in front
24   of you, sir?
25      A.   Yes.

Page 73

1            JAMES MACE
2         MR. GIMBEL:  For the record,
3   Exhibit 13 is an Exhibit from the
4   Court filings in this case.  And I
5   believe it contains declarations from
6   each of the parties who are seeking
7   appointment as class representatives.
8   But the first declaration is titled
9   the Declaration of James Mace in
10   Support of Lead Plaintiffs' Motion For
11   Class Certification.
12      Q.   Do you see that?
13         (Witness reviews document.)
14      A.   I do, yes.
15      Q.   Now, is this a declaration that
16   you executed on behalf of Northern
17   Nevada?
18      A.   I did, yes.
19      Q.   Who drafted the document?
20      A.   It was presented to me by
21   Mr. Jenkins, Trust Fund's legal counsel.
22      Q.   And did you make any comments
23   on the document?
24      A.   I don't recall.
25      Q.   Do you know whether it's

19 (Pages 70 - 73)

JAMES MACE

1
2 essentially identical to the declarations
3 submitted by the other named Plaintiffs?
4     A.   I do not know.  I don't know.
5     Q.   In paragraph 2, it says that
6 you're the Fund manager for the Laborers
7 Pension Trust Fund For Northern Nevada.
8         Do you see that?
9     A.   Yes.
10    Q.   And it notes that you
11 participate and oversee decisions
12 regarding administration of the Laborers
13 Pension Trust Fund.
14        Do you see that?
15    A.   Yes.
16    Q.   Just to be clear, I think I
17 asked about this at the start of the
18 deposition, but would that involve
19 overseeing litigation or no?
20    A.   No.
21    Q.   Okay.  In paragraph 6, you
22 state that Northern Nevada is "Committed
23 to vigorously prosecuting this litigation
24 as it has since its appointment."
25        Do you see that language?

JAMES MACE

1
2     A.   Yes.
3     Q.   And it goes on in the paragraph
4 to say that Northern Nevada is "Committed
5 to maximizing the recovery for the Class
6 by making necessary appearances, sitting
7 for depositions and overseeing critical
8 junctures of the litigation as
9 appropriate."
10        Do you see that?
11    A.   Yes.
12    Q.   What critical junctures in the
13 case have you overseen to date?
14    A.   Appearing for the deposition
15 would be one.
16        Again, we monitor with Trust
17 Fund's legal counsel's direction with the
18 efforts of Robbins Geller.
19    Q.   Apart from appearing for
20 today's deposition, are you aware of any
21 other specific critical juncture in the
22 case that Northern Nevada has overseen?
23        MR. KARAM:  Objection.  Vague.
24 Go ahead and answer.
25    A.   There was a settlement, there

JAMES MACE

1
2 was a settlement proposed that we were
3 involved in that discussion where it
4 didn't, wasn't agreed to.
5         So I guess that settlement was
6 rejected.  That's all I can recall at
7 this time.
8     Q.   Okay.  Are you aware of any
9 other critical junctures that have taken
10 place in the case?
11    A.   Not at this time, no.
12    Q.   How many complaints have been
13 filed in this action?
14    A.   I think there are amended
15 complaints.  There are several.  But I
16 don't have a number.
17    Q.   What did Northern Nevada do to
18 oversee the complaints?
19    A.   Have Mr. Jenkins, legal
20 counsel, review those and make
21 recommendations and directions he thought
22 necessary.
23    Q.   Are there any motions in the
24 case that you're aware of since the case
25 began?

JAMES MACE

1
2     A.   Probably.  But I could not give
3 you a specific.
4     Q.   And I am asking you -- just to
5 be clear, I am asking you as a
6 representative of Northern Nevada, can
7 you tell us today that you're aware of
8 any motion that has been filed in the
9 case since commencement?
10    A.   There were motions.  I believe
11 some of the -- again, they are legal
12 questions, and some of the Defendants
13 have been removed from the case.  They
14 are not -- so there are some motions in
15 that regard, if that's what you're
16 asking.
17    Q.   Are you able to describe any
18 motion beyond the description that you
19 just gave me?
20    A.   No.
21    Q.   Are you aware of any decisions
22 having been issued by the Court in the
23 case?
24    A.   I thought there was a
25 bankruptcy decision or a motion where the

20 (Pages 74 - 77)

Page 78

JAMES MACE

1   JAMES MACE
2   assets were protected.  And there was
3   some -- there was a Court decision as
4   related to that, I believe.
5       Q.   Could you describe any other --
6   does Northern Nevada have knowledge of
7   any other decision that's been issued in
8   the case?
9       A.   Not that I'm aware.
10      Q.   Do you know whether there are
11  any motions pending right now?
12      A.   Do not.
13      Q.   Has Northern Nevada -- withdraw
14  that.
15          You spoke about having some
16  awareness of a settlement proposal that
17  was made, at some point in time?
18      A.   Yes.
19      Q.   And approximately when was
20  that?
21      A.   I don't know.
22      Q.   Do you know whether it was this
23  year, or last year or the year before?
24      A.   I thought it was years.  I
25  thought it was years.

Page 79

1   JAMES MACE
2       Q.   Are you aware of any other
3   settlement-related efforts in the case?
4       A.   No.
5       Q.   Did Northern Nevada provide any
6   instructions to its counsel with respect
7   to the settlement proposal, as you
8   recall, being discussed years ago?
9       A.   Legal counsel would have
10  presented the settlement to, to the
11  trustees.  And that's what they would
12  have acted on.
13      Q.   When you say "they would have
14  acted on" --
15      A.   I believe they did.  I believe
16  they did.  I believe the settlement offer
17  was rejected.
18      Q.   Okay.  And what's your basis
19  for making that statement?
20      A.   Just my recollection in
21  conversations with legal counsel and...
22      Q.   Okay.  In paragraph 6 of your
23  declaration, the last sentence which
24  appears on page 2, you say "The Laborers
25  Pension Trust Fund understands that it

Page 80

JAMES MACE

1   JAMES MACE
2   owes a fiduciary duty to all members of
3   the proposed class to provide fair and
4   adequate representation by, among other
5   things, directing the efforts of Robbins
6   Geller."
7          Do you see that?
8       A.   Yes.
9       Q.   What is your understanding of
10  Northern Nevada's fiduciary duties as a
11  Class representative?
12      A.   We're going to follow legal
13  counsels' recommendations in terms of the
14  direction of the litigation.
15      Q.   Do you have any responsibility
16  as a fiduciary to oversee what legal
17  counsel is doing?
18      A.   Yes.  And they will do that.
19  But I think if legal counsels'
20  recommendations are prudent, we are going
21  to follow legal counsels'
22  recommendations.
23      Q.   Are you aware of any other
24  obligations that you may have as a
25  fiduciary, that Northern Nevada might

Page 81

1   JAMES MACE
2   have as a fiduciary with respect to the
3   litigation?
4       A.   We will rely on our legal
5   counsel to provide us with that direction
6   and that guidance.
7       Q.   And as a fiduciary, is it your
8   testimony that Northern Nevada would rely
9   on Robbins Geller to decide what to do in
10  the litigation?
11      A.   Primarily to rely on the Trust
12  Fund counsel who will direct, supervise
13  the relationship with Robbins Geller.  So
14  dealing with attorneys and attorneys.
15      Q.   The Trust Fund counsel is
16  Mr. Jenkins?
17      A.   Yes.
18      Q.   And Mr. Jenkins is, as we
19  established, someone who has worked with
20  Robbins Geller as a Plaintiffs' attorney
21  in securities litigation in the past?
22          MR. KARAM:  Objection.
23  Mischaracterizes prior testimony.  But
24  go ahead.
25      Q.   You can answer.

21 (Pages 78 - 81)

Page 82

JAMES MACE

1
2   A.   Yes.
3   Q.   At the end of that last
4   sentence we were reading, it talks about
5   directing the efforts of Robbins Geller.
6        Do you see that?
7   A.   Yes.
8   Q.   What has Northern Nevada done
9   to date to direct the efforts of Robbins
10  Geller in this litigation?
11       A.   Mr. Jenkins would have given
12  any direction that would have been
13  required.
14       Q.   Okay.  Can you, as you sit here
15  now, as a representative of Northern
16  Nevada, tell me any step that has been
17  taken by Northern Nevada to direct the
18  efforts of Robbins Geller in this
19  litigation?
20       A.   No.
21       Q.   In paragraph 7, it says that
22  "On behalf of Laborers Pension Trust
23  Fund," which we are calling Northern
24  Nevada today, "I have reviewed and
25  monitored the progress of this litigation

Page 83

JAMES MACE

1
2   and the active participation of Robbins
3   Geller in its prosecution."
4        Do you see that?
5   A.   Yes.
6   Q.   It goes on to say that you
7   received and reviewed periodic updates
8   and correspondence from counsel regarding
9   important aspects of the case.
10       Do you see that?
11  A.   Yes.
12  Q.   Can you describe for the record
13  what the important aspects of the case
14  that you received updates about have
15  been?
16       A.   They provide us with quarterly
17  reports on the activity.  Robbins Geller
18  provides us with quarterly reports on the
19  activity.  Mr. Jenkins reviews those
20  reports.
21       Q.   Okay.  For the record, can you
22  explain any important aspect of this case
23  that you were briefed on by Robbins
24  Geller and Mr. Jenkins?
25       A.   The nature of the loss.  The

Page 84

JAMES MACE

1
2   nature of the loss that we had.  The
3   bankruptcy.  At least one of the
4   Defendants being removed.  The settlement
5   offers.
6   Q.   Anything else?
7   A.   No.
8   Q.   It also states in paragraph 7
9   that you have received and reviewed
10  significant pleadings.
11       Do you see that?
12  A.   Yes.
13  Q.   Would you please identify for
14  the record the significant pleadings
15  received and reviewed by you?
16       A.   Don't know specifically, at
17  this point, what those would have been.
18  Q.   It also states in paragraph 7
19  that you received and reviewed Court
20  orders.
21       Would you please identify for
22  the record what Court orders you received
23  and reviewed?
24       A.   Can't recall at this time.
25  Q.   It also notes in paragraph 7

Page 85

JAMES MACE

1
2   that you received updates and
3   correspondence from counsel regarding the
4   progress of discovery.
5        Do you see that?
6   A.   Yes.
7   Q.   What do you understand to be
8   the status of discovery in this action?
9   A.   It's ongoing.
10  Q.   What has taken place in
11  discovery to date?
12  A.   Today's deposition for one.
13  The nature -- that it's ongoing.
14  Discovery is still ongoing.
15  Q.   Apart from today's deposition,
16  are you aware of anything else that has
17  actually happened in discovery in this
18  case?
19       A.   I believe there has been
20  scheduling, there has been a schedule for
21  you to take the deposition of other
22  Plaintiffs.
23       And that's all I can recall.
24  Q.   It also states in paragraph 7
25  that you have participated in discussions

22 (Pages 82 - 85)

Page 86

JAMES MACE

1
2 with counsel regarding significant
3 developments in the case as a
4 representative of Northern Nevada.
5      Can you tell me what
6 significant developments you have
7 discussed with your counsel?
8    A.   The bankruptcy, the nature of
9 the loss.  Two things.
10   Q.   Do you know whether documents
11 have been produced in this litigation?
12   A.   Some documents, I think yes.
13   Q.   What parties have produced
14 documents in this litigation?
15   A.   The Northern Nevada Laborers
16 Pension Trust Fund have produced
17 documents.
18   Q.   Do you know if the other
19 parties have produced documents?
20   A.   I don't know.
21   Q.   Who are the Defendants in this
22 lawsuit?
23   A.   SandRidge Energy, some
24 individuals.
25   Q.   Do you know who the individuals

Page 87

JAMES MACE

1
2 are?
3    A.   I don't.  Never met them.
4    Q.   Do you have any idea what role
5 they played at SandRidge?
6    A.   I believe they were executives,
7 at the time.
8    Q.   Do you know if they are current
9 or former executives?
10   A.   I believe they are former
11 executives.
12   Q.   How did you -- how did Northern
13 Nevada decide to file suit against these
14 individuals?
15   A.   Follow the recommendation of
16 legal counsel.
17   Q.   Did Northern Nevada play any
18 role in that process or was it outsourced
19 entirely to legal counsel?
20   A.   Legal counsel would have
21 provided recommendations.
22   Q.   The operative complaint in this
23 case alleges that the Defendants made
24 various misrepresentations or omissions
25 relating to SandRidge; is that fair?

Page 88

JAMES MACE

1
2    A.   Yes.
3    Q.   Can you explain to me the
4 nature of the alleged misrepresentation
5 or omissions, in your own words?
6    A.   The reserves, I believe, that
7 they made representations as it related
8 to the reserve levels, and then the
9 allocation of gas and oil.  And those
10 were the primary.
11   Q.   Are you aware of any other
12 categories of misrepresentations or
13 omissions that the Plaintiffs have
14 alleged at any point in this litigation
15 were made by the Defendants?
16   A.   That's the substance of what I
17 am aware of.
18   Q.   So the only misrepresentations
19 or omissions that were allegedly made, as
20 far as Northern Nevada knows, are related
21 to reserve levels and gas and oil levels?
22   A.   Right.  That's all I was aware
23 of.
24   Q.   Do you know who Tom Ward is?
25   A.   I recognize the name.  I

Page 89

JAMES MACE

1
2 believe he was a Defendant in this.  I
3 believe he was an executive with
4 SandRidge.  I believe he is one of the
5 ones who have been removed or no longer
6 part of the litigation, I believe.
7    Q.   Did Mr. Ward -- was Mr. Ward
8 responsible for any misrepresentations or
9 omissions?
10   A.   I don't know.
11   Q.   Do you know who Matthew Grubb
12 is?
13   A.   I do not.
14   Q.   Who is James Bennett?
15   A.   Don't know.
16   Q.   Do you know if Mr. Grubb or
17 Mr. Bennett is responsible for any
18 alleged misrepresentation or omission?
19   A.   Only what, only through legal
20 counsel on what the complaint would have
21 listed.
22   Q.   Does Northern Nevada make any
23 claims against James Bennett?
24      MR. KARAM:  Objection.  Calls
25   for a legal conclusion, but go ahead.

23 (Pages 86 - 89)

Page 90

1          JAMES MACE
2     Q.   You can answer.
3     A.   I don't know.
4     Q.   Does Northern Nevada make any
5  claims against Matthew Grubb?
6          MR. KARAM:  Same objection.  Go
7  ahead.
8     A.   I would have to ask legal
9  counsel.
10    Q.   Does Northern Nevada make any
11 claims against Tom Ward?
12         MR. KARAM:  Objection.  Calls
13 for a legal conclusion.  Go ahead.
14    Q.   You can answer these questions.
15    A.   Would have to ask legal
16 counsel.
17    Q.   Does Northern Nevada contend
18 that the price of SandRidge stock was
19 inflated?
20    A.   I believe so, yes.
21    Q.   When was it inflated?
22    A.   I think 2011.
23    Q.   Was it --
24    A.   February.
25    Q.   Was the price of SandRidge

Page 91

1          JAMES MACE
2  stock inflated in 2012?
3     A.   At the end it -- the
4  disclosures came out.  So I think that
5  was the Class period that we're talking
6  about.
7     Q.   So what is your understanding
8  of the Class period?
9     A.   The period where the
10 misrepresentations of SandRidge were
11 active in the market until they were
12 clarified or corrected, in which case,
13 the market could adjust given the correct
14 information.
15    Q.   Do you know when in terms of
16 time the Class period was?  I mean, do
17 you know what the dates are of the Class
18 period?
19    A.   I think December of 2012.  Or
20 November, I am sorry.  November 2000 --
21    Q.   The Class period begins on a
22 date and ends on a date, right?
23    A.   Right.
24    Q.   So can you give me the
25 beginning date and end date?

Page 92

1          JAMES MACE
2     A.   February 2011 to November 2012.
3     Q.   And why does the Class period
4  begin in February of 2011?
5     A.   I believe SandRidge issued some
6  information to the public to, that was
7  acted on.  It was inaccurate on the
8  reserve levels and the oil and the gas
9  percentage.
10    Q.   What was the nature of the
11 information that was released that
12 commenced the Class period, if you will?
13    A.   I think again, the allocation
14 of the gas and oil in the reserve was and
15 the reserve areas.
16    Q.   Was there a particular
17 statement that caused SandRidge's stock
18 to become inflated?
19    A.   I don't have a specific
20 statement, no.
21    Q.   Do you know when inflation
22 first entered SandRidge's stock price,
23 according to Northern Nevada?
24    A.   Again, February of 2011.
25    Q.   Is there a point in time when

Page 93

1          JAMES MACE
2  Northern Nevada contends that the truth
3  came out, if you will, and the inflation
4  left the stock?
5     A.   That would have been at the end
6  of 2012, November.  November 2012.
7     Q.   Is that the only occasion when
8  the truth came out and the inflation left
9  the stock?
10    A.   That was one of them, I think.
11    Q.   Is there another?
12    A.   I believe there is a second
13 one.
14    Q.   And when was that second
15 occasion?
16    A.   I don't know.
17    Q.   And what caused the truth to
18 come out, if you will, as Plaintiffs
19 would characterize it?
20    A.   I don't know.
21    Q.   Were there particular
22 disclosures that were made to the market
23 that Plaintiffs contend caused the truth
24 to come out?
25    A.   Probably.

24 (Pages 90 - 93)

Page 94

JAMES MACE

1
2  Q.  Probably, but you're not sure?
3  A.  I'm not sure.
4  Q.  Approximately, what is the
5  total value of Northern Nevada's
6  investments?
7  A.  I think 120, 120 million
8  dollars.
9  Q.  And what was its total
10  investment in SandRidge, approximately?
11  A.  The loss was 100,000.  We
12  currently still have some of that stock.
13  I don't know specifically what that would
14  be.
15  Q.  So the loss was less than a
16  10th of a percent of Northern Nevada's
17  assets?
18  A.  Yes.
19  Q.  We talked a little bit at the
20  start of the deposition at how Northern
21  Nevada makes its investment decisions.
22  And you told me that the trustees
23  delegate the function, I believe, to
24  Sierra.  And then Sierra uses some
25  sub-advisors?

Page 95

JAMES MACE

1
2  A.  Correct.
3  Q.  I would like to go through that
4  in a little bit more detail.
5       But let me just start with, are
6  there any internal employees apart from
7  the trustees that have involvement in
8  investment decisions?
9  A.  No internal employees.
10  Q.  Okay.  Does Sierra and its
11  sub-advisors manage the entirety of
12  Northern Nevada's portfolio?
13  A.  No.
14  Q.  Who else plays a role in
15  managing the portfolio?
16  A.  Ullico has some investments.
17  Q.  What is Ullico?
18  A.  Ullico is an insurance
19  investment company.  The Union Labor Life
20  Insurance Company.
21  Q.  Are there any other investment
22  managers that are used by Northern
23  Nevada?
24  A.  U.S. Bank.
25  Q.  As custodian?

Page 96

JAMES MACE

1
2  A.  Custodian, and they also manage
3  some cash reserves.
4  Q.  Okay.  Are there any other
5  active managers that are used by Northern
6  Nevada?
7  A.  No.
8       [The Trust Fund Statement of
9  Investment Policy, dated November 15,
10  2005, Bates stamped NNEV0000539, was
11  hereby marked as Mace Exhibit 14 for
12  identification, as of this date.]
13  Q.  Do you have Exhibit 14 in front
14  of you, sir?
15  A.  Yes.
16  Q.  Do you recognize Exhibit 14?
17       (Witness reviews document.)
18  A.  Yes.
19  Q.  Would you identify it for the
20  record, please?
21  A.  It's the Trust Fund statement
22  of investment policy.
23  Q.  And this particular statement
24  of investment policy is dated November
25  15th, 2005; is that correct?

Page 97

JAMES MACE

1
2  A.  Yes.
3  Q.  Okay.  Was this statement of
4  investment policy still in effect when
5  Northern Nevada made its investment in
6  SandRidge?
7  A.  I believe so, yes.
8  Q.  What led to the adoption of
9  this statement of investment policy?
10  A.  The trustees need to give some
11  direction to the investment managers.
12  Q.  Was there anything else that
13  led to the adoption of this statement of
14  investment policy?
15  A.  No.
16  Q.  On page 2, the investment
17  policy memo states Target Asset
18  Allocations for the Fund.
19       Do you see that?
20  A.  Yes.
21  Q.  And the second one is U.S.
22  large cap value equities?
23  A.  Yes.
24  Q.  What is your understanding of
25  what a value equity is?

25 (Pages 94 - 97)

JAMES MACE

1
2    A.   In layman's terms it's -- there
3  is more intrinsic value in the stock
4  versus the potential for growth.  They
5  are usually large companies.
6    Q.   Okay.  Would it be fair to say
7  that a value equity or that value
8  investing is a strategy that involves
9  selecting stocks that are, in the
10  manager's view, undervalued by the
11  market?
12    A.   Yes.
13    Q.   So Northern Nevada's investment
14  policy called for at least 20 percent of
15  its portfolio to be allocated to funds
16  that pursue a value in investing
17  strategy; is that right?
18    A.   Yes.
19    Q.   How did Northern Nevada come to
20  invest in SandRidge?
21    A.   Riazzi, who was a sub-advisor
22  to Sierra, Riazzi decided and made the
23  buy decision.
24    Q.   So let's take a step back then
25  just for the clarity of the record.

JAMES MACE

1
2    A.   Okay.
3    Q.   In the interrogatory responses
4  we looked at earlier today, Northern
5  Nevada identified three investment
6  advisors as having provided advice at
7  some point in time in connection with its
8  investment in SandRidge:  Sierra
9  Investment Partners, Riazzi Asset
10  Management, and Baird Equity Asset
11  Management; is that right?
12    A.   I don't know who Baird is.
13    Q.   Okay.  Why don't we take a look
14  then at your interrogatory responses,
15  which I think are Exhibit number 2.
16       Do you have that in front of
17  you?
18    A.   I have Exhibit number 2.
19    Q.   Do you see that on page 16, it
20  identifies a number of investment
21  advisors of Construction Laborers Pension
22  Trust of Greater St. Louis and the
23  Laborers Pension Trust Fund for Northern
24  Nevada?
25    A.   Yes.

JAMES MACE

1
2    Q.   And one of the advisors that is
3  identified here is Baird Equity Asset
4  Management.  And its identified as
5  additional investment manager for Lead
6  Plaintiff Laborers Pension Trust Fund for
7  Northern Nevada.
8       Do you see that?
9    A.   I do.
10    Q.   Does that refresh your
11  recollection of what Baird Equity
12  Management is or does?
13    A.   It's a typo.  I think it's a
14  typo.
15    Q.   As you sit here today, your
16  belief is that Baird Equity Asset
17  Management did not, in fact, provide any
18  services to Northern Nevada?
19    A.   Correct, yes.
20    Q.   Okay.  We'll take you through
21  this.  But maybe we can start with Sierra
22  Asset Management, which we've talked
23  about a little bit today.
24       MR. KARAM:  Counsel, at a point
25    where you feel it's appropriate, can

JAMES MACE

1
2  we take another break.
3       MR. GIMBEL:  Sure.  But I want
4  to get through a series of questions.
5       MR. KARAM:  Do what you need to
6    do.
7    Q.   Can you describe for the record
8  what Sierra Asset Management is?
9    A.   Sierra Investment Partners?
10    Q.   Perhaps it's Sierra Investment
11  Partners.  My apologies, if I got it
12  wrong.
13    A.   They are investment managers
14  who have been delegated investment
15  authority to the trustees, and then they,
16  in turn, hire sub-advisors with the
17  expertise to invest in various asset
18  investment classifications.
19    Q.   Okay.  Fair enough.
20       MR. GIMBEL:  So let's mark as
21  Exhibit, a document titled Sierra
22  Investment Partners, Inc., Investment
23  Management Agreement Small Cap Equity.
24  And let me know when you have that if
25  front of you.

26 (Pages 98 - 101)

Page 102

```
1            JAMES MACE
2      [The document titled Sierra
3  Investment Partners, Inc., Investment
4  Management Agreement Small Cap
5  Equity, was hereby marked as Mace
6  Exhibit 15 for identification, as of
7  this date.]
8      A.   I have it in front of me.
9      Q.   Do you recognize the document?
10      (Witness reviews document.)
11      A.   Yes.
12      Q.   Can you identify it for the
13  record, please?
14      A.   It's the agreement between
15  Sierra and the Trust Fund as it relates
16  to the small cap equity portion of the
17  portfolio.
18      Q.   Was this agreement in effect at
19  the time of Northern Nevada's investment
20  in SandRidge?
21      A.   I believe it was.
22      Q.   In paragraph 2, it states that
23  "Subject to the terms and conditions of
24  this agreement, the attached Consent
25  Orders, and Statement of Investment
```

Page 103

```
1            JAMES MACE
2  Policy, Sierra and its sub-advisor, The
3  Glenmede Trust Company, shall have full
4  and complete discretion and authority
5  with respect to Management of the assets
6  allocated to it, including, without
7  limitation, authority to purchase, sell,
8  exchange, convert, trade and generally to
9  deal in securities and other property in
10  the Account at the risk of, and in the
11  name of the Client."
12      Do you see that?
13      A.   Yes.
14      Q.   My first question is:  What are
15  the Consent Orders that are referred to
16  here?
17      A.   In the past, the Laborers
18  Pension were subject to consent orders as
19  it related to investments.
20      Q.   The document refers to the
21  consent orders being attached.
22      Do you know why the consent
23  orders were not produced together with
24  this document?
25      A.   I don't know.
```

Page 104

```
1            JAMES MACE
2      Q.   So I am going to put in front
3  of you documents 16, 17 and 18.
4      [The document titled Consent
5  Order With Defendant Trustees, was
6  hereby marked as Mace Exhibit 16 for
7  identification, as of this date.]
8      [The document titled Consent
9  Order With Laborers Plans, was hereby
10  marked as Mace Exhibit 17 for
11  identification, as of this date.]
12      [The complaint filed that led to
13  the consent orders, was hereby marked
14  as Mace Exhibit 18 for
15  identification, as of this date.]
16      Q.   Let me know when you have those
17  documents in front of you.
18      A.   I have them.
19      Q.   In document 16, if I am getting
20  the number right, is a document entitled
21  Consent Order With the Defendant
22  Trustees.
23      Do you see that?
24      (Witness reviews document.)
25      A.   Yes.
```

Page 105

```
1            JAMES MACE
2      Q.   Is that one of the consent
3  orders that is referred to in the
4  investment management agreement of Sierra
5  partners?
6      A.   Yes.
7      Q.   And that is a consent order
8  under which the trustees agreed to pay
9  over 1.7 million dollars to settle claims
10  that had been made that they breached
11  their fiduciary obligations under ERISA;
12  is that right?
13      A.   Yes.
14      Q.   Exhibit 17 is a Consent Order
15  With Laborers Plans.
16      Do you have that in front of
17  you?
18      (Witness reviews document.)
19      A.   Yes.
20      Q.   And is that also one of the
21  consent orders that's referred to in the
22  investment management agreement?
23      A.   Yes.
24      Q.   And what's the nature of this
25  consent order?
```

27 (Pages 102 - 105)

Page 106

1           JAMES MACE
2      A.   This is the, what I would call
3   the administrative procedures that the
4   trustees agreed to follow.
5      Q.   Okay.  Exhibit 18 is the
6   complaint that was filed that led to the
7   consent orders that we've been
8   discussing; is that right?
9           (Witness reviews document.)
10     A.   Yes.
11     Q.   Are the consent orders still in
12  place?
13     A.   No, they're not.
14     Q.   When were they vacated?
15     A.   I believe two years ago.
16     Q.   So they were in place for over
17  a decade; is that right?
18     A.   Yes.
19     Q.   Why were they in place so long?
20          MR. KARAM:  Objection.
21  Argumentative.  Go ahead.
22     A.   The process to remove them was
23  to go to the Department of Labor, and to
24  say we no longer need these orders to be
25  in effect.  And so we would ask the

Page 107

1           JAMES MACE
2   Department of Labor to remove them and
3   they did.
4      Q.   When did you make that
5   application?
6      A.   Again, years ago, in that --
7   years ago.
8      Q.   Approximately two years ago?
9      A.   Yes.
10     Q.   If you could turn back to the
11  Sierra Investment Partners investment
12  management agreement, which is Exhibit
13  15.
14     A.   Yes.
15     Q.   Do you have that in front of
16  you?
17     A.   Yes.
18     Q.   We were talking about paragraph
19  2 and its preference to the consent
20  orders.
21          It also refers to the statement
22  of investment policy.
23          Do you see that?
24     A.   Yes.
25     Q.   Is that the document that we

Page 108

1           JAMES MACE
2   marked as Exhibit 14?
3      A.   Yes.
4      Q.   In paragraph 2, it goes on to
5   say that Sierra has full discretion and
6   authority with respect to the management
7   of the assets allocated to it.
8          Do you see that?
9      A.   Yes.
10     Q.   Okay.  And did Sierra have full
11  discretion and authority with respect to
12  Northern Nevada's investment in
13  SandRidge?
14     A.   Through Riazzi.
15     Q.   Okay.  Well, Riazzi was a
16  sub-advisor to Sierra?
17     A.   Right.
18     Q.   And Riazzi is Riazzi Asset
19  Management, correct?
20     A.   Right.
21     Q.   Riazzi Asset Management was a
22  sub-advisor that was chosen by Sierra to
23  manage a portion of Northern Nevada's
24  assets?
25     A.   Yes.

Page 109

1           JAMES MACE
2          MR. GIMBEL:  Why don't we mark
3      as Exhibit 19 a letter -- Exhibit 19
4      is a letter, dated October 7th, 2008,
5      from Sierra Investment Partners,
6      Inc.
7          [The letter from Sierra
8      Investment Partners, Inc., dated
9      October 7th, 2008, Bates stamped
10     NNEV0000648, was hereby marked as
11     Mace Exhibit 19 for identification,
12     as of this date.]
13     Q.   Do you have that document in
14  front of you?
15     A.   Yes.
16     Q.   Do you recognize it?
17          (Witness reviews document.)
18     A.   Yes.
19     Q.   Would you describe it for the
20  record, please?
21     A.   Sierra made a change in
22  sub-advisors.  Transamerica Investment
23  Management became or ended up being
24  Riazzi.
25     Q.   Okay.  So, in substance, the

28 (Pages 106 - 109)

Page 114

1          JAMES MACE
2        Do you see that?
3    A.   Yes.
4    Q.   And this refers to the Fund or
5  product that Riazzi was using when it
6  managed Northern Nevada's assets.
7        Would that be fair to say?
8    A.   Yes.
9    Q.   Please turn to page 6.
10       Do you see that there is a
11  paragraph titled Investment Objective?
12   A.   Yes.
13   Q.   Okay.  And it states in that
14  paragraph that "The goal of the Small Cap
15  Value Fund or product is to provide
16  superior risk adjusted returns and
17  outperform the Russell 2000 Value Index."
18       Do you see that?
19   A.   Yes.
20   Q.   And it goes on to state that
21  "Riazzi aims to accomplish this by
22  creating portfolios of companies that we
23  expect to exceed Street expectations."
24       Do you see that?
25   A.   Yes.

Page 115

1          JAMES MACE
2    Q.   And it goes on to state that it
3  looks to identify stocks that traded at
4  discounts to its proprietary calculations
5  and fair value.
6        Do you see that?
7    A.   Yes.
8    Q.   Is that consistent with your
9  understanding of the investment
10  philosophy that Riazzi employed in making
11  investment decisions for SandRidge?
12   A.   I don't know.
13   Q.   Do you have any reason to
14  dispute that that was the philosophy it
15  employed?
16   A.   No.
17   Q.   It was a value fund, as you
18  understood it, correct?
19   A.   Right.
20   Q.   And value funds seek to
21  identify stocks that are trading at
22  discounts to fair value.
23       Is that fair to say?
24   A.   I don't know.
25   Q.   Okay.  On page 8 of the

Page 116

1          JAMES MACE
2  document it states that one of the
3  strategies followed in Riazzi's
4  investment process is to identify stocks
5  that are mispriced relative to intrinsic
6  value.
7        Is that a fair summary of
8  Riazzi's investment philosophy?
9    A.   Yes, yes.
10   Q.   And so Northern Nevada
11  understood that its funds were being
12  invested using that general philosophy?
13       MR. KARAM:  Objection.
14   Q.   You can answer.
15   A.   Northern Nevada would follow --
16  yes.
17   Q.   Okay.  All right.
18       So I would like to move on to
19  talk a little bit about the individual
20  transactions in the SandRidge stock, just
21  so we have some clarity in the record as
22  to when those occurred.
23       I am going to ask the court
24  reporter to mark three Exhibits, 22, 23
25  and 24, which are U.S. Bank statements

Page 117

1          JAMES MACE
2  and we can have you identify them.
3        [The U.S. Bank statement for
4  Northern Nevada's account for the
5  period of February 1, 2011 to
6  February 28, 2011, Bates stamped
7  NNEV0000022 through 42, was hereby
8  marked as Mace Exhibit 22 for
9  identification, as of this date.]
10       [The U.S. Bank statement for
11  Northern Nevada's account for the
12  period from March 1st, 2011 to March
13  31st, 2011, Bates stamped NNEV0000044
14  through 60, was hereby marked as Mace
15  Exhibit 23 for identification, as of
16  this date.]
17       [The U.S. Bank statement for
18  Northern Nevada's account for the
19  period August 1, 2011 to August 31,
20  2011, Bates stamped NNEV0000138
21  through 153, was hereby marked as Mace
22  Exhibit 24 for identification, as of
23  this date.]
24       (Witness reviews documents.)
25   Q.   Let me know when you have those

30 (Pages 114 - 117)

Page 118

JAMES MACE

1           JAMES MACE
2   three Exhibits ready to go?
3       A.   I have them.
4       Q.   So Exhibit 22 is a U.S. Bank
5   statement for an account of Northern
6   Nevada's for the period of February 1,
7   2011 February 28, 2011.  And it is
8   Bates stamped NNEV 22 to NNEV 42.
9           Do you have that in front of
10  you?
11      A.   Yes.
12      Q.   Is this an account statement
13  for an account managed by Riazzi?
14      A.   Yes.
15      Q.   If you look at page 19 of the
16  statement, it shows a purchase of
17  SandRidge stock.
18          Let me know when you have that
19  in front of you.
20      A.   Not the Bates stamp, this is
21  the U.S. Bank statement?
22      Q.   U.S. Bank page number.
23      A.   Yes, I have it.
24      Q.   And it reflects the purchase of
25  11,960 shares of SandRidge Energy on

Page 119

1           JAMES MACE
2   February 28th, 2011.
3           Do you see that?
4       A.   Yes.
5       Q.   Was that the first investment
6   by Northern Nevada in SandRidge
7   securities?
8       A.   I believe so.
9       Q.   Okay.  Second statement is
10  marked Exhibit 23.
11          You have that in front of you?
12      A.   Yes.
13      Q.   That's another account
14  statement for the same Northern Nevada
15  account held at U.S. Bank for the period
16  from March 1st, 2011 to March 31st, 2011,
17  correct?
18      A.   Yes.
19      Q.   And it is Bates stamped, for
20  the record, NNEV 44 to 60, correct?
21      A.   Yes.
22      Q.   Okay.  If you turn to page 14
23  of this statement, it shows another
24  purchase of SandRidge common stock on
25  March 3rd, 2011.  Specifically, the

Page 120

1           JAMES MACE
2   purchase of 4,324 shares of SandRidge
3   Energy on March 3rd.
4           Do you see that?
5       A.   Yes.
6       Q.   And was that the second
7   investment by Northern Nevada in
8   SandRidge securities?
9       A.   I believe so.
10      Q.   The third statement is marked
11  Exhibit 24, and it is a statement for the
12  same account managed by Riazzi for
13  Northern Nevada for the period August 1,
14  2011 to August 31, 2011; is that correct?
15      A.   Yes.
16      Q.   And for the record it's Bates
17  stamped NNEV 138 to 148 -- I'm sorry, to
18  153; is that correct?
19      A.   Yes.
20      Q.   If you look at Page 14 of this
21  statement, NNEV 151, it shows the
22  purchase of 4,241 shares of SandRidge
23  Energy on August 4th, 2011.
24          Do you see that?
25      A.   Yes.

Page 121

1           JAMES MACE
2       Q.   Was that the third and final
3   purchase of SandRidge securities by
4   Northern Nevada?
5       A.   I believe so.
6       Q.   Are you aware of any other
7   transactions in SandRidge securities by
8   Northern Nevada?
9       A.   No.
10      Q.   Okay.  Who is Helen Martin, who
11  the statements were addressed to?
12      A.   She's an employee of Benefit
13  Plan Administrators.  She's a bookkeeper.
14      Q.   Okay.  Did Northern Nevada have
15  any involvement in the decision to
16  purchase SandRidge stock on any of the
17  three occasions reflected in these
18  statements?
19      A.   No.
20      Q.   Was that decision made
21  exclusively by the investment advisor
22  Riazzi?
23      A.   Yes.
24      Q.   When did Northern Nevada first
25  learn that it had acquired SandRidge

31 (Pages 118 - 121)

JAMES MACE

1
2    this date.]
3    Q.   Let me know when you have
4  Exhibit 25 in front of you, sir.
5    A.   I have it.
6    Q.   And do you recognize Exhibit
7  25?
8        (Witness reviews document.)
9    A.   I have seen it with legal
10 counsel.
11   Q.   Can you describe it for the
12 record, please?
13   A.   It's the Third Consolidated
14 Amended Complaint.
15   Q.   Is this one of the documents
16 that you reviewed in preparation for your
17 deposition?
18   A.   Earlier.  Earlier.  When we got
19 it.
20   Q.   You reviewed this?
21   A.   With legal counsel.
22   Q.   With legal counsel?
23   A.   Earlier.  Not yesterday.
24   Q.   Do you understand this to be
25 the operative complaint in the case?

JAMES MACE

1
2  to ascertain the information that these
3  individuals allegedly provided was
4  reliable?
5    A.   We would have relied on legal
6  counsel.
7    Q.   Do you know why their names
8  were anonymized?
9    A.   I do not.
10   Q.   Is Northern Nevada aware of any
11 reason why their names couldn't be
12 provided?
13       MR. KARAM:  Objection.  Calls
14   for a legal conclusion.  Go ahead.
15   A.   You would have to ask legal
16 counsel.
17   Q.   I am asking you, though.
18       As a representative of Northern
19 Nevada --
20   A.   I don't --
21   Q.   -- are you aware of any reason
22 why Northern Nevada could not provide the
23 names of these individuals to the
24 Defendants?
25   A.   I am not aware of any reason.

JAMES MACE

1
2    A.   "Operative" meaning current?
3    Q.   The current complaint in the
4  case?
5    A.   Yes.
6    Q.   Am I correct that the claims
7  made here by Northern Nevada are based,
8  in part, on information provided by
9  confidential witnesses?
10   A.   I don't know.
11   Q.   Well, why don't you turn to
12 page 9, if you would, please.
13   A.   I have it.
14   Q.   You will see on page 9 -- you
15 can take the time to read it, if you
16 want -- it refers to information that was
17 allegedly communicated to Plaintiffs'
18 counsel by three former employees of
19 SandRidge who are identified as FE1, FE2
20 and FE3.  Do you see that?
21   A.   Yes.
22   Q.   Do you know the identity of any
23 of these employees?
24   A.   I do not.
25   Q.   Did Northern Nevada do anything

JAMES MACE

1
2    Q.   So in paragraph 22, it says
3  that FE1 was a senior geologist at
4  SandRidge until November 2010.
5        Do you see that?
6    A.   Yes.
7    Q.   So he apparently left in
8  November of 2010 before Northern Nevada
9  made its investment, right --
10   A.   Yes.  Correct.
11   Q.   -- according to the allegation.
12       So I am going to focus a couple
13 of questions on FE2 and FE3, because it
14 appears that FE1 left before Northern
15 Nevada made its investment.
16       In paragraph 128 of the
17 complaint?
18   A.   I have that.
19   Q.   Do you have that in front of
20 you?
21   A.   Yes.
22   Q.   It says According to FE2, since
23 at least early 2012, the Mississippian
24 was not performing as well as expected.
25       Do you see that?

33 (Pages 126 - 129)

Page 130

```
 1           JAMES MACE
 2    A.   Yes.
 3    Q.   Early 2012 was after Northern
 4 Nevada invested in SandRidge, right?
 5    A.   Yes.
 6    Q.   In paragraph 126, which is a
 7 little farther up the page, it says that
 8 According to FE3, oil production in the
 9 Mississippian play was lower than
10 anticipated, and that was causing
11 frustration within SandRidge.
12       Do you see that?
13    A.   Yes.
14    Q.   And FE3 goes on to say he
15 believed, he or she believed it was
16 common knowledge at SandRidge that the
17 Mississippian was underperforming.
18       Do you see that?
19    A.   Yes.
20    Q.   But according to the
21 allegations of the complaint, FE3 joined
22 SandRidge in May of 2012.
23       Do you recall that, it's back
24 at paragraph 24?
25    A.   Yes.
```

Page 131

```
 1           JAMES MACE
 2    Q.   So that was also after Northern
 3 Nevada purchased its SandRidge stock,
 4 correct?
 5    A.   Yes.
 6    Q.   Are you aware of any reports
 7 that anyone within SandRidge believed
 8 that the Mississippian was not performing
 9 as well as expected at any time before
10 2012?
11    A.   I am not aware of any.
12    Q.   Okay.  And to be clear, you're
13 testifying as a representative of
14 Northern Nevada today?
15    A.   Right.
16    Q.   Are you aware of any
17 information establishing that prior to
18 2012, the Mississippian was not
19 performing as well as expected?
20       MR. KARAM:  Objection.  Calls
21 for a legal conclusion.  Go ahead.
22    Q.   You can answer.
23    A.   I am not aware.
24    Q.   And to be clear again, you're
25 testifying as a representative of
```

Page 132

```
 1           JAMES MACE
 2 Northern Nevada?
 3    A.   Correct.
 4    Q.   I would like you to turn, if
 5 you would, to paragraph 20 of the
 6 complaint.
 7       Do you have that in front of
 8 you?
 9    A.   Yes.
10    Q.   In paragraph 20, it states that
11 Plaintiffs' counsel with the assistance
12 of an independent controlling engineering
13 consulting firm analyzed certain
14 production data of SandRidge's wells.
15       Do you see that?
16    A.   Yes.
17    Q.   Can you identify the petroleum
18 engineering consulting firm that's listed
19 in this paragraph?
20    A.   I cannot.
21    Q.   Did Northern Nevada play any
22 role in retaining that firm?
23    A.   No.
24    Q.   Or are you familiar with the
25 analysis that it supposedly conducted?
```

Page 133

```
 1           JAMES MACE
 2    A.   No.
 3    Q.   Did Northern Nevada do anything
 4 to verify that the firm had appropriate
 5 qualifications and experience?
 6    A.   We would have relied on legal
 7 counsel.
 8    Q.   Turn to paragraph 135, if you
 9 would.  Paragraph 35 says It had become
10 apparent by March of 2012 that there was
11 a steep drop in oil production rates in
12 SandRidge's older wells in the
13 Mississippian, and rates were declining
14 much faster than the type well produced
15 by SandRidge.
16       Do you see that?
17    A.   Yes.
18    Q.   March 2012 was also after
19 Northern Nevada made its investment in
20 SandRidge, correct?
21    A.   Yes.
22    Q.   And then the paragraph goes on
23 to talk about an analysis of information
24 provided by SandRidge to the Oklahoma Tax
25 Commission for what was allegedly a
```

34 (Pages 130 - 133)

Page 166

JAMES MACE

1
2     Q.   Mr. Mace, we've marked as
3   Exhibit 26, a U.S. Bank account statement
4   for the period from November 1, 2012 to
5   November 30th, 2012.  And it's Bates
6   stamped NNEV 414 to 453.
7         Do you have that in front of
8   you?
9     A.   Yes.
10    Q.   And is that a true and correct
11  copy of an account statement for the
12  account of Northern Nevada that we've
13  been discussing today in which its
14  SandRidge investment was made?
15        (Witness reviews document.)
16    A.   Yes.
17    Q.   And this is an account for the
18  period that encompasses the end of the
19  Class period, correct?
20    A.   Yes.
21    Q.   So we'll move on.
22        [The document titled
23  Plaintiffs' Motion For Relief From
24  Orders Pursuant to
25  FED.R.CIV.P.60(b)(6) and Opening

Page 167

JAMES MACE

1
2   Brief in Support, was hereby marked
3   as Mace Exhibit 27 for
4   identification, as of this date.]
5     Q.   We marked as Exhibit 27
6   Plaintiffs' Motion For Relief From Orders
7   Pursuant to FED.R.CIV.P.60(b)(6) and
8   Opening Brief in Support.
9         Have you seen this before?
10        (Witness reviews document.)
11    A.   No.
12    Q.   Were you aware of this motion
13  for relief?
14    A.   No.
15    Q.   Do you have any understanding
16  of the relief being sought by Plaintiffs?
17    A.   No.
18    Q.   I will represent to you, sir,
19  that this motion seeks certain relief
20  permitting certain dismissed claims to be
21  reasserted in the litigation on behalf of
22  investors in units of certain royalty
23  trusts associated with SandRidge.
24        My question for you is:  Are
25  aware that claims have been asserted in

Page 168

JAMES MACE

1
2   this action on behalf of unitholders in
3   Trust offerings?
4     A.   No, I was not.
5     Q.   Okay.
6     A.   We were not.
7     Q.   I am sorry, was Northern Nevada
8   aware that --
9     A.   No.
10    Q.   Did Northern Nevada ever
11  consider whether it was in the best
12  interests of common stockholders to allow
13  claims to be reasserted in this action on
14  behalf of unitholders in Mississippian
15  Royalty Trust?
16    A.   It would be a question for
17  legal counsel.
18    Q.   Okay.  As a representative of
19  Northern Nevada, you're not aware of
20  anyone having considered that issue?
21    A.   I am not aware.
22    Q.   Do you have any understanding
23  as to the funds that might be available
24  to settle this action?
25    A.   My understanding was that there

Page 169

JAMES MACE

1
2   was a reserve set aside outside of the
3   bankruptcy.
4     Q.   And do you know the
5   circumstances under which the reserve you
6   mentioned was established?
7     A.   I do not.
8     Q.   Do you know if there are
9   insurance resources available to resolve
10  this action?
11    A.   There may be.
12    Q.   And if you bring a different
13  class of securities holders into the
14  case, such as unitholders in the
15  Mississippian Royalty Trusts, won't you
16  have essentially a competing set of
17  claimants for the same pot of money, the
18  reserve you're talking about?
19    A.   I think it's a legal question.
20  I don't know.
21    Q.   Would it be in the interest of
22  the Class that you're seeking to
23  represent to allow a different Class of
24  securities holders to make claims
25  essentially against the same pot of

43 (Pages 166 - 169)

Page 170

1          JAMES MACE
2  money?
3     A.    Again, it's a legal question in
4  terms of the exposure in the case.
5     Q.    And so you haven't given any
6  thought or consideration to that
7  question?
8     A.    That's correct.
9     Q.    Okay.  Do you know whether it
10  would be in the interest of Robbins
11  Geller have a different Class of
12  security holders come in and assert
13  claims?
14     A.    I don't know.
15     Q.    Don't know.
16          Do you think it might be an
17  obligation of a Class representative to
18  determine whether motions that are being
19  filed by its counsel are really in the
20  best interests of the Class?
21     A.    We would rely on the Trust
22  Fund's legal counsel to give us that
23  direction.
24     Q.    But as far as you know,
25  Northern Nevada hasn't considered that

Page 171

1          JAMES MACE
2  issue to date?
3     A.    As far as I know.
4     Q.    Are you aware of any claims
5  having been dismissed in this action?
6     A.    I believe some were excluded,
7  or some were dismissed or there were some
8  reduction.  But I don't, can't give you
9  the specifics on that.
10     Q.    Okay.
11          [The document titled Defendants
12  James D. Bennett and Matthew K.
13  Grubb's First Set of Requests for
14  Production to Plaintiffs, was hereby
15  marked as Mace Exhibit 28 for
16  identification, as of this date.]
17     Q.    Do you have Exhibit 28 in front
18  of you, sir?
19     A.    I do, yes.
20     Q.    And is this a document that you
21  recognize?
22          (Witness reviews document.)
23     A.    I do.
24     Q.    And you never reviewed it
25  before?

Page 172

1          JAMES MACE
2     A.    Not seen this, no.
3     Q.    I will represent to you it's a
4  set of responses and objections filed by
5  the Lead Plaintiff to document requests
6  that were propounded by my clients James
7  Bennett and Matthew Grubb.
8          And so if you look, starting at
9  page 10, you will see all of the various
10  document requests are listed, and all the
11  various responses that were offered by
12  Northern Nevada.
13          Do you see that?
14     A.    Yes.
15     Q.    Was Northern Nevada aware that
16  these requests for production have been
17  made?
18     A.    Through legal counsel.  Legal
19  counsel would have coordinated any of
20  these, any of these pieces of
21  information.
22     Q.    What did Northern Nevada do to
23  collect documents in response to this
24  request, these requests?
25     A.    If legal counsel did not

Page 173

1          JAMES MACE
2  already have the documents, then they
3  would have requested it from the, they
4  would have requested it from the Trust
5  Fund's files.
6     Q.    Did anyone make a request of
7  you, James Mace, for documents in
8  connection with this litigation?
9     A.    Not -- there is some limited
10  requests.  Mr. Jenkins asked for some
11  limited documents.
12     Q.    And he made that request of
13  you?
14     A.    The Trust Fund, yes.
15     Q.    So describe the nature of the
16  search that you did to identify documents
17  responsive to these documents requests.
18     A.    The investment policy
19  statements or a couple of things like
20  that.
21     Q.    And are you aware of having
22  looked for any other documents in
23  response to these requests?
24     A.    No.
25     Q.    Did anyone else at Northern

44 (Pages 170 - 173)

JAMES MACE

1
2  at Northern Nevada have personal e-mail?
3     A.   I am sure they do.
4     Q.   Have any steps been taken to
5  preserve those e-mails?
6     A.   I wouldn't know.
7     Q.   Was a document retention
8  memorandum sent around to individuals at
9  Northern Nevada, at any point in time?
10     A.   Yes.  The record retention
11  policy.
12     Q.   Beyond the record -- so -- the
13  record retention policy is a general
14  policy; is that right?
15     A.   Yes.
16     Q.   Was there any document
17  retention memorandum tailored to this
18  litigation sent around?
19     A.   No.
20     Q.   Has Northern Nevada had any
21  discussions or communications with third
22  parties about this litigation?
23     A.   No.  Only through legal
24  counsel.
25     Q.   Has Northern Nevada ever

JAMES MACE

1
2  communicated with Sierra investment
3  management about this litigation?
4     A.   Yeah, to find out -- yes, in
5  terms of what documents they might need.
6  If we needed anything from them or they
7  needed anything from us, to make them
8  aware the case was going.
9     Q.   When did those communications
10  with Sierra about the litigation
11  commence?
12     A.   I think relatively recently.
13  And in addition we, when litigation
14  commenced, we -- the Trust requested that
15  Baird/Sierra not sell the shares of
16  stock.  So that was a communication.
17     Q.   Why was that instruction given?
18     A.   Requested by legal counsel.
19     Q.   Do you have an understanding of
20  the reasons?
21     A.   No.
22     Q.   Who at Sierra did Northern
23  Nevada communicate with about this
24  litigation?
25     A.   Bruce Dereschuk.

JAMES MACE

1
2     Q.   Who is Mr. Dereschuk?
3     A.   He's the president of Sierra
4  Investment.
5     Q.   And who at Northern Nevada had
6  that communication?
7     A.   I discussed it with him.  And I
8  believe Mr. Jenkins discussed it with
9  him.
10     Q.   Okay.  And what was the
11  substance of your communication with
12  Mr. Dereschuk?
13     A.   Mr. Dereschuk, well, just the
14  direction -- Riazzi, whereas they made
15  the decisions.  Riazzi made the
16  decisions.  Riazzi was the buy/sell
17  investment manager and not Sierra.  Not
18  Mr. Dereschuk.
19     Q.   And are you saying that you
20  communicated that to him, or they
21  communicated that to you or --
22     A.   Well, I think it was the
23  substance of a phone call.  And it was
24  his disclaimer saying this is a Riazzi
25  issue.  It's not a Sierra issue.

JAMES MACE

1
2     Q.   Did he reach out to Northern
3  Nevada; is that what happened?
4     A.   I don't remember the genesis of
5  the phone call.
6     Q.   Okay.  Has Northern Nevada had
7  any other communications that you can
8  recall with Sierra?
9     A.   No.
10     Q.   Has Northern Nevada had any
11  communications with Riazzi Asset
12  Management or anyone there?
13     A.   No.  I believe they are out of
14  business.
15     Q.   And do you know who the
16  principals are at Riazzi who made the
17  investment decisions relating to
18  SandRidge?
19     A.   Do not.
20     Q.   Has Northern Nevada had -- I
21  think you're going to tell me you don't
22  know, because we didn't know about this
23  organization earlier, but has Northern
24  Nevada had any communication with Baird
25  about this litigation?

46 (Pages 178 - 181)

Page 186

```
 1
 2  EXHIBITS (Continued):
 3
 4  Exhibit 16   document titled      104
         Consent Order With
 5       Defendant Trustees
 6
 7  Exhibit 17   document titled      104
         Consent Order With
 8       Laborers Plans
 9
10  Exhibit 18   complaint filed that  104
         led to the consent
11       orders
12
13  Exhibit 19   letter from Sierra    109
         Investment Partners,
14       Inc., dated October
         7th 2008, Bates stamped
15       NNEV0000648
16
17  Exhibit 20   letter from Sierra    111
         Investment Partners,
18       Inc., dated February
         25th, 2012, Bates
19       stamped NNEV0000649
20
21  Exhibit 21   document titled       113
         Riazzi Asset Management
22       Small Cap Value, Bates
         stamped SIERRA_0000002
23
24
25
```

Page 188

```
 1
 2  EXHIBITS (Continued):
 3
    Exhibit 27   document titled       166
 4       Plaintiffs' Motion For
         Relief From Orders
 5       Pursuant to
         FED.R.CIV.P.60(b)(6)
 6       and Opening Brief in
         Support
 7
 8
 9
10  Exhibit 28   document titled       171
         Defendants James D.
11       Bennett and Matthew K.
         Grubb's First Set of
12       Requests for Production
         to Plaintiffs
13
    (The court reporter has retained all
14  exhibits.)
15
16
17       DIRECTION NOT TO ANSWER
18          Page 10, Line 19
19
20
21
22
23
24
25
```

Page 187

```
 1
 2  EXHIBITS (Continued):
 3
    Exhibit 22   U.S. Bank statement   117
 4       for Northern Nevada's
         Account for the period
 5       Of February 1, 2011 to
         February 28, 2011, Bates
 6       stamped NNEV0000022
         through 42
 7
 8
    Exhibit 23   U.S. Bank statement   117
 9       for Northern Nevada's
         account for the period
10       from March 1st, 2011 to
         March 31st, 2011, Bates
11       stamped NNEV0000044
         through 60
12
13
    Exhibit 24   U.S. Bank statement   117
14       for Northern Nevada's
         account for the period
15       August 1, 2011 to
         August 31, 2011, Bates
16       stamped NNEV0000138
         through 153
17
18
    Exhibit 25   Third Consolidated    125
19       Amended Complaint
20
21  Exhibit 26   U.S. Bank account     165
         Statement for the
22       period from November
         1, 2012 to November
23       30th, 2012, Bates
         stamped NNEV0000414
24       through 453
25
```

Page 189

```
 1
 2            CERTIFICATION
 3
 4    I, Dawn Matera, a Notary Public for
 5  and within the State of New York, do
 6  hereby certify:
 7    That the witness whose testimony as
 8  herein set forth, was duly sworn by me;
 9  and that the within transcript is a true
10  record of the testimony given by said
11  witness.
12    I further certify that I am not
13  related to any of the parties to this
14  action by blood or marriage, and that I
15  am in no way interested in the outcome of
16  this matter.
17    IN WITNESS WHEREOF, I have hereunto
18  set my hand this 24th day of April, 2018.
19
20
21
                    Dawn Matera
22                  Dawn Matera
23
24
25
```

48 (Pages 186 - 189)