**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

|   |   |   |
|---|---|---|
| IN RE SANDRIDGE ENERGY, INC. | ) | |
| SECURITIES LITIGATION | ) | Case No. CIV-12-1341-G |
| | ) | |

## <u>ORDER</u>

In December 2012, Lead Plaintiffs[1] filed this lawsuit alleging that Defendants SandRidge Energy, Inc. ("SandRidge") and its senior executives Tom L. Ward, James D. Bennett, and Matthew K. Grubb had violated the federal securities laws in 2011 and 2012. Following dismissal of various claims, there remain pending allegations of violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78j(a), as amended, and the Securities and Exchange Commission's Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.[2]

Now before the Court is Lead Plaintiffs' Motion for Class Certification, in which Lead Plaintiffs request certification of a class "consisting of all purchasers of SandRidge

---

[1] Laborers Pension Trust Fund for Northern Nevada ("Northern Nevada"), Construction Laborers Pension Trust of Greater St. Louis ("Greater St. Louis"), Vladimir Galkin, and Angelica Galkin.

[2] Specifically, Lead Plaintiffs claim violation of section 10(b) and Rule 10b-5 by Defendants SandRidge, Grubb, and Ward, and violation of section 20(a) by Defendants Grubb, Ward, and Bennett. *See In re SandRidge Energy, Inc. Sec. Litig.*, No. CIV-12-1341-W, 2017 WL 3309758, at *20 (W.D. Okla. Aug. 1, 2017) (Doc. No. 239); *In re SandRidge Energy, Inc. Sec. Litig.*, No. CIV-12-1341-W, 2017 WL 3317862, at *11-12 (W.D. Okla. Aug. 1, 2017) (Doc. No. 240). Although the parties' papers focus upon the section 10(b) claims, the Court finds that certification of the class is likewise proper as to the section 20(a) claims, which are "essentially derivative of other securities claims." *Lane v. Page*, 581 F. Supp. 2d 1094, 1112 (D.N.M. 2008).

common stock between February 24, 2011 and November 8, 2012, inclusive," "who were damaged thereby."[3]  Lead Pls.' Mot. (Doc. No. 268) at 7; *see also* Lead Pls.' Decl. (Doc. No. 269); Third Am. Compl. ¶¶ 1, 33 (Doc. No. 225).  Defendants have responded, *see* Doc. Nos. 329, 330, 331, 332, and Lead Plaintiffs have replied, *see* Doc. Nos. 340, 341, 342, 343, 344, 345, 346.  In addition, the Court heard argument at a hearing on the Motion on September 6, 2019.  *See* Doc. No. 448.

Upon review of the relevant record, and for the reasons outlined below, the Court hereby GRANTS Lead Plaintiffs' Motion, subject to one modification to the named Class Representatives.

## I. Background

As previously outlined by the Court,

SandRidge is an oil and gas exploration company, *see* [Third Am. Compl.] ¶ 2, and this lawsuit focuses on "one of SandRidge's core holdings referred to as the Mississippian play," *id.*, "a geological formation that extends hundreds of miles across northern Oklahoma and south-central Kansas." *Id.* at 21, ¶ 53.

The Lead Plaintiffs have contended that during the Class Period, co-defendant Tom L. Ward, SandRidge's founder and then chief executive officer and Chairman of its Board of Directors ("Board"), *see id.* at 15, ¶ 29, together with Bennett, then SandRidge's chief financial officer and a senior vice president, *see id.* at 16, ¶ 30, and Grubb, then SandRidge's president and chief operating officer, *see id.* ¶ 31, made certain materially false and

---

[3] Excluded from the putative class are: "Defendants, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party."  Lead Pls.' Mot. at 7 n.1.

misleading statements and failed to disclose certain material information about SandRidge's business and its activities in the Mississippian formation.

*In re SandRidge*, 2017 WL 3309758, at *2-3 (footnote omitted).

In their remaining claim, Lead Plaintiffs allege that

although Ward, Grubb and Bennett "told investors that SandRidge was investing in the Mississippian due to the large amounts of oil reserves and the favorable amount of oil relative to gas in the area,'" [Third Am. Compl.] at 7, ¶ 4; *e.g.*, *id.* at 62, ¶ 152, these "statements misrepresented the nature of the Mississippian properties," *id.* at 7, ¶ 4[.]

*Id.* at *4 (alteration omitted). Specifically, Lead Plaintiffs allege that Defendants misrepresented the economic value of the Mississippian formation to investors by (i) understating the amount of gas relative to oil (the "GOR") in the formation; and (ii) overstating the amount of oil recoverable from a typical horizontal well—i.e., the estimated ultimate recovery (the "EUR")—in the formation. *Id.* at *4 n.10; *see also* Third Am. Compl. ¶¶ 47, 51, 132, 141-148, 152, 153(d), 155-156.

## II.    *Class Certification Standard*

"'The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1217 (10th Cir. 2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011)). Federal Rule of Civil Procedure 23 prescribes the requirements for class certification.

Rule 23(a) requires the party seeking certification to demonstrate that: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there is a question of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the

representative parties will fairly and adequately protect the interests of the class (adequacy).

*Id.*

The class also must satisfy one of the three requirements listed in Rule 23(b). In this case, Lead Plaintiffs rely on Rule 23(b)(3), which requires the Court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350. The Court "has an independent obligation to conduct a rigorous analysis before concluding that Rule 23's requirements have been satisfied." *Roderick*, 725 F.3d at 1217 (internal quotation marks omitted). "Granting or denying class certification is a highly fact-intensive matter of practicality." *Monreal v. Potter*, 367 F.3d 1224, 1238 (10th Cir. 2004).

III.    *Discussion*

A. *Rule 23(a)*

Before analyzing the Rule 23(a) factors, the Court must determine whether the suit has been brought by "[o]ne or more members of [the] class." Fed. R. Civ. P. 23(a); *Paton v. N.M. Highlands Univ.*, 275 F.3d 1274, 1278 (10th Cir. 2002); *see also Dukes*, 564 U.S. at 348 (noting that "a class representative must be part of the class" (internal quotation marks omitted)).

As defined above, the putative class consists of "all *purchasers* of SandRidge common stock between February 24, 2011 and November 8, 2012, inclusive," "who were damaged thereby." Lead Pls.' Mot. at 7 (emphasis added). The parties' argument and evidence reflect that the SandRidge stock relevant to Vladimir and Angelica Galkin, who are husband and wife, was purchased during the class period through an individual brokerage account owned and held by Angelica Galkin only. *See* Defs.' Resp. (Doc. No. 332) at 32-33; *id.* Ex. 12, V. Galkin Dep. 38:19-40:6 (Doc. No. 331-4); *id.* Ex. 21 (Doc. No. 331-7) at 22-100; *id.* Ex. 21 (Doc. No. 331-8) at 2-60; Hr'g Tr. 55:19-56:18 (Doc. No. 449). As a result, regardless of how the law in the Galkins' state of residence might characterize the posttrade ownership of the stock, Vladimir Galkin was not a "purchaser" of SandRidge stock during the class period.[4] It follows that Mr. Galkin is not a member of the proposed class and may not "sue . . . as [a] representative part[y] on behalf of all members" of that class. Fed. R. Civ. P. 23(a); *see Dukes*, 564 U.S. at 348; *cf. Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007) ("Section 10(b) . . . affords a right of action to *purchasers* or sellers of securities injured by its violation." (emphasis added)).[5]

---

[4] Lead Plaintiffs rely on *In re Lehman Bros. Securities & ERISA Litigation*, where the district court rejected the argument that two individuals whose spouses had purchased the securities were atypical or inadequate class representatives. *See In re Lehman Bros.*, No. 09-MD-2017(LAK), 2013 WL 440622, at *2 (S.D.N.Y. Jan. 23, 2013). The Court is not persuaded by that decision, however, as the relevant class was not pursuing section 10(b) claims and was more broadly defined than in the instant case. *See id.* at *1, *5.

[5] The Court therefore need not address Defendants' argument that Mr. Galkin's presence as a class representative defeats the typicality of the class under Rule 23(a)(3).

### 1. Numerosity

To satisfy the element of numerosity, Lead Plaintiffs must show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This element, which is "rarely disputed in securities fraud class actions," is not contested by Defendants and is clearly met here. *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 406 (E.D. Va. 2015); *see* Third Am. Compl. ¶ 35 (alleging that SandRidge is a publicly traded company with approximately 415.4 million shares outstanding in February 2012).

### 2. Commonality

To establish commonality, Lead Plaintiffs need only demonstrate a "single" "question[] of law or fact common to the class." *Dukes*, 564 U.S. at 359; Fed. R. Civ. P. 23(a)(2). Here, Lead Plaintiffs' claims all "depend upon" at least one "common contention"—i.e., that Defendants made material misrepresentations as to the makeup of the Mississippian formation—that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350; *see also* Third Am. Compl. ¶ 39. Defendants do not contest that this element has been met and the Court likewise finds it so.

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties" be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Defendants contend that two Lead Plaintiffs cannot make this showing due to varying defenses between them and the remainder of the class. *See* Defs.' Resp. at 31, 33-36 (citing *Hanon v.*

*Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (noting decisions holding that "class certification is inappropriate where a putative class representative is subject to unique defenses [that] threaten to become the focus of the litigation" (internal quotation marks omitted))).

### a. Angelica Galkin

The record reflects that Angelica Galkin, through her brokerage account, purchased more than two million shares of Sandridge stock after the allegedly fraudulent nature of Defendants' statements was revealed on November 8, 2012. *See* V. Galkin Dep. 55:24-60:6; Defs.' Resp. Ex. 21 (Doc. No. 331-8) at 53-95. Defendants cite cases to support their argument that these post-class-period purchases support Defendants raising a unique defense against Ms. Galkin and thereby render Ms. Galkin atypical. Defs.' Resp. at 33-24 (citing *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (finding that a plaintiff who made "numerous post-class purchases" of stock "'after revelation of an alleged fraud involving that security" was subject to potential unique defenses and therefore atypical of the rest of the proposed class)). But other decisions have found that such post-disclosure purchases do not "automatically" make those plaintiffs unique and do not "automatically defeat typicality." *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 577 (N.D. Ca. 2009). In *In re Connetics*, the court discussed the contrasting views and found that "the weight of authority appears to favor the position that the purchase of stock after a partial disclosure is not a per-se bar to satisfying the typicality requirement." *Id.*; *accord Antonson v. Robertson*, 141 F.R.D. 501, 508 (D. Kan. 1991). Here, Defendants "do not explain why the timing of [Ms. Galkin's] purchases automatically make[s] it unique—

other class members may also have purchased [SandRidge common] stock after partial adverse disclosures by the company." *In re Connetics*, 257 F.R.D. at 576-77. And even if Ms. Galkin "is revealed to be the only class member that bought additional stocks after the disclosures," Defendants have not shown that this issue "threatens to become the focus of the litigation" or that she "was not relying on the integrity of the market" in the later purchases of the stock. *Id.* at 577; *see also Feder v. Elec. Data. Sys. Corp.*, 429 F.3d 125, 138 (5th Cir. 2005) ("Reliance on the integrity of the market prior to disclosure of alleged fraud (i.e. during the class period) is unlikely to be defeated by post-disclosure reliance on the integrity of the market.").

Next, Defendants argue that Ms. Galkin is atypical because she "ceded all authority over investment decisions" to Mr. Galkin. Defs.' Resp. at 34. But while Mr. Galkin stated that he "made all the decisions" on his wife's brokerage account, V. Galkin Dep. 38:2-5, Ms. Galkin testified that her husband and she "invest together." A. Galkin Dep. 33:12 (Doc. No. 345). Further, the cases do not uniformly indicate that such a spousal arrangement renders the accountholder atypical for purposes of Rule 23(a)(3). *Compare In re Caremark Int'l, Inc. Sec. Litig.*, No. 94-C-4751, 1996 WL 351182, at *6 (N.D. Ill. June 24, 1996), *with In re Consumer Powers Co. Sec. Litig.*, 105 F.R.D. 583, 605 (E.D. Mich. 1985).

### b. St. Louis Trust

St. Louis Trust has participated in eleven securities class actions since 2005, including ten where it was represented by current counsel Robbins Geller Rudman & Dowd LLP ("Robbins Geller") or a predecessor, and it sought to be appointed as a lead plaintiff

in each. Defendants argue that this litigation history and the fund's longstanding relationship with its counsel will require St. Louis Trust to meet unique defenses and therefore St. Louis Trust should be found atypical. *See* Defs.' Resp. at 35-36.

Lead Plaintiffs correctly point out, however, that Defendants rely on authority that predates the 1995 Private Securities Litigation Reform Act ("PSLRA") for this contention. The now-enacted PSLRA "was designed to increase the likelihood that institutional investors will serve as lead plaintiffs." *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003) (internal quotation marks omitted). The Court finds persuasive a fellow district court's lack of undue concern over a plaintiff's continued relationship with a particular law firm. *See In re Am. Italian Pasta Co. Sec. Litig.*, No. 05-0725-CV-W-ODS, 2007 WL 927745, at *5 (W.D. Mo. Mar. 26, 2007) ("The existence of a prior relationship between Lead Plaintiff and Class Counsel is not a problem[.]); *id.* at *5 n.4 ("The PSLRA does not require a prospective lead plaintiff to reconsider the issue of representation anew; it was proper for Lead Plaintiff to rely on Class Counsel's past successes in deciding to [use] those services again in this case.").

### c. Conclusion

In sum, the cited factual distinctions and potential defenses "do not defeat typicality" here, as "the claims of the class representative[s] and class members are based on the same legal . . . theory" and establishment of the class representatives' claims will "establish the bulk of the elements of each class member's claim." *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988); *United Food & Commercial Workers Union v. Chesapeake Energy Corp.*, 281 F.R.D. 641, 652 (W.D. Okla. Mar. 30, 2012); *see also In*

*re Ribozyme Pharm., Inc. Sec. Litig.*, 205 F.R.D. 572, 578 (D. Colo. 2001) ("[T]he typicality requirement is satisfied because the claims brought by the Lead Plaintiffs arise out of the same course of conduct by Defendants and rest on exactly the same legal theory, securities fraud, as those of the potential class members."); *In re Williams Sec. Litig.*, No. 02-CV-72-H(M), 2002 WL 32153476, at *6 (N.D. Okla. July 8, 2002) ("[T]he existence of minor distinctions will not preclude the typicality requirement from being met.").

### 4. Fair and Adequate Representation

Defendants additionally argue that Lead Plaintiffs will not "fairly and adequately protect the interests of the class" as required by Rule 23(a)(4). The Tenth Circuit has identified two questions whose resolution determines the adequacy inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members? and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002) (internal quotation marks omitted).

Defendants assert that Lead Plaintiffs are inadequate representatives because they lack sufficient knowledge and understanding of this lawsuit and "have repeatedly abdicated all responsibility for litigation to their counsel." Defs.' Resp. at 27; *see Kelley v. Mid-Am. Racing Stables, Inc.*, 139 F.R.D. 405, 409 (W.D. Okla. 1990) (finding putative class plaintiffs inadequate "because of their almost total lack of familiarity with the case"); *Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 553 (D. Colo. 1998) (noting that a finding of adequacy of representation includes a finding "that the plaintiffs are knowledgeable as to the status and underlying legal basis of the action" (internal quotation

marks omitted)).  Specifically, Defendants contend that representatives from Northern Nevada and St. Louis Trust, as well as Ms. Galkin, lack sufficient awareness of the claims of this lawsuit and have delegated all responsibility to Robbins Geller.  Defendants argue that this "abdication" of authority to Robbins Geller has resulted in Lead Plaintiffs' complete ignorance of a potential conflict of interest advanced by that law firm.  *See* Defs.' Resp. at 26-30.

Having reviewed the relevant record, the Court does not find evidence to support the contention that Lead Plaintiffs have abandoned their responsibilities or given improper control to their law firm as a "*de facto* plaintiff."  *Kelley*, 139 F.R.D. at 409.  Although the relevant individuals are fuzzy on some details on the litigation, their depositions reflect that they do possess reasonable understanding of this lawsuit and their expected role in it, including their monitoring responsibilities.  *See, e.g.*, Pls.' Reply Ex. 5, J. Mace Dep. 65:15-20, 75:12-18, 79:22-81:14, 82:21- 84:5, 87:22-88:10, 90:17-93:13, 123:24-124:5 (Doc. No. 342-5); Pls.' Reply Ex. 6, D. Willey Dep.  20:19-21:20, 25:18-25, 26:4-9, 66:18-67:10, 72:9-20, 80:22-83:2, 127:11-133:23 (Doc. No. 342-6); A. Galkin Dep. 65:2-67:15, 71:22-24, 72:25-73:2, 77:1-80:25, 82:24-83:24, 90:15-94:3, 182:18-185:20.

> The adequacy requirement does not require class representatives to initiate legal proceedings[;] nor does it mandate that representatives have intricate knowledge of complex legal claims. . . . . Particularly in complex cases, "the qualifications of class counsel are generally more important in determining adequacy than those of the class representatives."  [*Harris v. Koenig*, 271 F.R.D. 383, 392 (D.D.C. 2010)] (quoting *In re Avon Secs. Litig.*, No. 91-cv-2287, 1998 WL 834366, at *9 (S.D.N.Y. Nov. 30, 1998)).  Indeed, courts rarely deny class certification on the basis of the inadequacy of class representatives, doing so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an

> unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case.

*Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 135 (D.D.C. 2017) (alteration, citation, and internal quotation marks omitted).

Both of the institutional investors retain counsel independent of Robbins Geller to assist with this lawsuit and others. Lead Plaintiffs present a persuasive reply that Defendants' conflict-of-interest argument is moot and that even if the supposed conflict had arisen, it could have been remedied procedurally by the Court. *See* Pls.' Reply (Doc. No. 340) at 22-23. As alluded to above, courts have refused to find that the presence of monitoring agreements precludes the proper certification and maintenance of class actions. *See, e.g.*, *In re Am. Italian Pasta Co.*, 2007 WL 927745, at *5 ("[G]iven the extensive investments inherent in the operation of a pension fund, the Court is not surprised Lead Plaintiff has arranged for a law firm to keep it apprised of events (including lawsuits) that might be of interest. Arguably, a pension fund's failure to take steps to be aware of existing or prospective litigation that affects its investments would be an abdication of duty."). And Defendants' omission of any direct challenge to the appointment of Robbins Geller as Class Counsel under Rule 23(g) undermines its challenge to adequate representation. *See Rutter & Wilbanks Corp.*, 314 F.3d at 1187-88; *cf. Schwartz*, 178 F.R.D. at 553 ("Defendants pose no objection to the experience and commitment of Plaintiffs' counsel. This in itself goes a long way to negating their argument that the class will be inadequately represented.").

*B. Rule 23(b)(3)*

Because the requirements of Rule 23(a) have been met, the Court must determine whether Lead Plaintiffs have shown that "the questions of law or fact common to class members predominate over any questions affecting only individual class members" and that "a class actions is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In making these findings, the Court may consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

*Id.* R. 23(b)(3)(A)-(D).

For Lead Plaintiffs to meet their burden under Rule 23(b)(3), they must

> "show that common question[s] subject to generalized, classwide proof *predominate* over individual questions." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014). "'The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 622-23 (1997)). "Put differently, the predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'"  *Id.* (quoting 2 William B. Rubenstein et al., Newberg on Class Actions § 4:49, at 195-96 (5th ed. 2012)).

*Naylor Farms, Inc. v. Chaparral Energy, LLC*, No. CIV-11-634-HE, 2017 WL 187542, at *7 (W.D. Okla. Jan. 17, 2017).

*1. Lead Plaintiffs' Damages Model*

As part of their certification request, Lead Plaintiffs have presented the expert report and damages calculations of Bjorn Steinholt. *See* Lead Pls.' Mot. Ex. 4, Steinholt R. (Doc. No. 269-4). Defendants argue that Lead Plaintiffs have failed to show predominance under Rule 23(b)(3) because they have not proposed a method to measure damages on a classwide basis consistent with their theory of liability. *See* Defs.' Resp. at 37 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). According to Defendants, Mr. Steinholt's proposed damages model, an event-study framework, suffers from two deficiencies that render it "inadequate." First, they argue, Mr. Steinholt's model cannot separate any damages attributable to the allegedly unlawful misrepresentations and omissions from those shareholder losses attributable to other unrelated events. Second, they assert that the model "inaccurately assume[s] that any purported inflation in SandRidge's share price remained constant throughout the proposed class period despite numerous changes that would have impacted the amount of price inflation under Plaintiffs' theory of liability." *Id.* at 37-39.

These may be tenable objections in the context of a *Daubert* challenge[6] or a summary-judgment motion. For current purposes, however, the alleged flaws in Mr. Steinholt's damages model do not demonstrate that his model is entirely nonviable or that there would be "material differences" between each class member's damages determination that would "require individualized inquiries." *Roderick*, 725 F.3d at 1220.

---

[6] No such *Daubert* or Rule 702 challenge has been made, although the Supreme Court has indicated that those standards may be invoked at this stage. *See Dukes*, 564 U.S. at 354.

If Mr. Steinholt's model improperly fails to consider certain other losses or to account for inflation changes during the class period, it would seemingly be flawed in this manner as to every member of the class. "[T]he focus of the 23(b)(3) class certification inquiry—predominance—is not whether the plaintiffs will fail or succeed, but whether they will fail or succeed *together*." *In re BP P.L.C. Sec. Litig.*, No. 10-md-2185, 2014 WL 2112823, at *7 (S.D. Tex. May 20, 2014) (internal quotation marks omitted). Defendants' attack on the damages model does not persuade the Court against finding predominance. *See id.* (rejecting argument that treating certain disclosures as corrective events was fatal under Rule 23(b)(3) as the plaintiffs' "alleged failure of proof" was "a classwide failure amenable to a classwide solution"); *see also Naylor Farms*, 2017 WL 187542, at *8; *cf. Hill v. Kaiser-Francis Oil Co.*, No. CIV-09-7-R, 2010 WL 2474051, at *6 (W.D. Okla. June 9, 2010) (finding that predominance was not met for fraud claims where "determinations of when each putative class member discovered or should have discovered the alleged misrepresentations and omission on his or her check stub," which would affect that class member's damages, were "individual questions, not subject to common proof").

### 2. Issues of Investor Knowledge

For every "securities-fraud claim," "'the complaint shall specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading.'" *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1096 (10th Cir. 2003) (alteration omitted) (quoting 15 U.S.C. § 78u-4(b)(1))). And "when allegations are made on information and belief the complaint 'shall state with particularity all facts on which that belief is formed.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)). In the Third Amended

Complaint, Lead Plaintiffs set forth various factual allegations to substantiate their allegations that Defendants misrepresented the characteristics of the Mississippian formation. These supporting facts include Lead Plaintiffs' analysis of "public data related to SandRidge's well production performance, including production data provided to the Oklahoma Tax Commission by SandRidge." Third Am. Compl. ¶ 18; *see also id.* ¶¶ 6, 7, 135, 137, 143, 145, 152, 153, 292, 293. Lead Plaintiffs also allege:

> Plaintiffs' counsel, with the assistance of an independent petroleum engineering consulting firm, analyzed the production data of SandRidge's wells available at the time of Defendants' statements about those wells during the Class Period and obtained and reviewed a statistically significant and unbiased selection of data concerning SandRidge wells in its most active areas of drilling. Data was obtained for individual wells producing in the most active counties for SandRidge in the Mississippian play. Much of the data was provided by SandRidge to governmental authorities. The underlying data and analysis of that data performed by Plaintiffs were not readily available to [the] public.

*Id.* ¶ 20.

Defendants first argue that if such production data was publicly available, Lead Plaintiffs' claims must fail because that data would have been reflected in the price of the SandRidge stock, precluding a claim that the market was misled by the alleged misrepresentations. *See* Defs.' Resp. at 40. Lead Plaintiffs accurately argue that this amounts to Defendants raising a truth-on-the-market defense, which "is inappropriate on a motion for class certification" and more properly a matter for summary judgment or trial. *In re Virtus Partners, Inc. Sec. Litig.*, No. 15cv1249, 2017 WL 2062985, at *5 (S.D.N.Y. May 15, 2017) (citing *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 (2013)).

Defendants alternatively contend that if such production data was publicly available, but not "readily" available and so not reflected in the stock price, the Court will be required to conduct individualized inquiries to gauge each investor's knowledge of this information and that the predominance requirement therefore cannot be met. *See* Defs.' Resp. at 40-41 (citing *Zimmerman v. Bell*, 800 F.2d 386 (4th Cir. 1986); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160 (S.D.N.Y. 2011)); *cf. Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996) (noting that the truth-on-the-market defense is only available when the withheld or misrepresented information had been "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance" the insiders' statements (internal quotation marks omitted)). The possibility that some investors had knowledge of this data, however, does not direct a finding that common issues do not prevail over those issues "subject only to individualized proof." *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 136 (S.D.N.Y. 2008). Defendants' cited authorities do not persuade the Court otherwise.[7]

Importantly, Lead Plaintiffs allege that Defendants affirmatively refuted findings based upon the public data. *See* Third Am. Compl. ¶¶ 152, 155; Lead Pls.' Reply Ex. 10, BNP Paribas R. (Doc. No. 342-10). Further, with respect to the elements Lead Plaintiffs

---

[7] In *New Jersey Carpenters Health Fund*, a non-section 10(b) case, the court focused upon a statutory actual-knowledge defense that does not appear in section 10(b), as well as evidence reflecting many of the class members were sophisticated investors. *See N.J. Carpenters Health Fund*, 272 F.R.D. at 168, 170. *Zimmerman* predates both the PLRSA and *Basic* and was addressing investors' knowledge of "omitted information" that had been "extensively" covered by the media, rather than information that had been contradicted by the defendants and was not "readily available" to the public. *Zimmerman*, 800 F.2d at 390.

in this action must prove, any "individualized investor knowledge" of the public data would be most relevant to whether that knowledge precluded a particular investor from relying upon the alleged misrepresentation or omission in purchasing SandRidge Stock. *See Amgen*, 568 U.S. at 460-61 (explaining that a section 10(b) plaintiff must prove, *inter alia*, "reliance upon the misrepresentation or omission" made by the defendant); *cf. Erica P. John Fund, Inc. v. Halliburton*, 563 U.S. 804, 809 (2011) ("Considering whether 'questions of law or fact common to the class predominate' begins, of course, with the elements of the underlying cause of action."). Defendants, however, have not challenged Lead Plaintiffs' entitlement to a presumption of reliance under *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).

### 3. Conclusion

Here, the record before the Court, including the allegations regarding data transmitted by SandRidge to the Oklahoma Tax Commission, does not support a finding that individual questions predominate over common ones or are "more prevalent or important" than the "common, aggregation-enabling issues in the case." *CGC Holding Co.*, 773 F.3d at 1087 (internal quotation marks omitted). Having considered the arguments and the record, the Court finds that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The Court further finds that a class action is the superior method for the adjudication of the claims raised in this case. *Id.*

## C. Commencement of Class Period

In conjunction with their objections to certification, Defendants assert that the proposed class-period starting date of February 24, 2011, "begins more than a year too early" and that any certification should open the class period no earlier than May 2012. According to Defendants, the remaining claims in this action do not allege any scienter on the part of Defendants prior to May 2012, and so the class period should not commence prior to that date. Defs.' Resp. at 7-8, 21-25; *see Tellabs*, 551 U.S. at 319 ("To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." (internal quotation marks omitted)).

The Court rejects Defendants' attempt to have the Court dissect the claims in a manner inconsistent with the directives of *Amgen* or to revisit its Rule 12(b)(6) and Rule 9(b) rulings as to those underlying claims, as neither is a proper focus in determination of the class-certification issue. *See* Defs.' Resp. at 21-23 (relying on *Inst. Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009), which was an appeal of a dismissal rather than of a class-certification determination); *Amgen*, 568 U.S. at 466 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."); *In re SandRidge*, 2017 WL 3309758, at *4 n.10 (noting that the misstatements of GOR were alleged to have been made during 2011 and 2012); *In re SandRidge*, 2017 WL 3317862, at *4 n.10 (same). Whether Lead Plaintiffs will ultimately be able to *prove* scienter as to statements made early during the class period, and thereby prevail on their legal claims, is a matter for another day. *Cf. Amgen*, 568 U.S. at 464 (noting that the section 10(b) class

was certified "on behalf of all investors who purchased Amgen stock between the date of the first alleged misrepresentation and the date of the last alleged corrective disclosure").[8]

## IV. *Appointment of Class Counsel*

In connection with their request for class certification, Lead Plaintiffs seek to have Robbins Geller appointed as their class counsel under Federal Rule of Civil Procedure 23(g). Beyond raising their challenges to the adequacy of representation (which the Court rejected above), Defendants do not offer any objections to this request.

Before appointing this firm as class counsel, the Court:

(A) must consider:

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class[.]

Fed. R. Civ. P. 23(g). The Court also may consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." *Id.* R. 23(g)(1)(B). And "[c]lass counsel must fairly and adequately represent the interests of the class." *Id.* R. 23(g)(4).

The Court's review of the work performed in this litigation, as well as the evidence in the record, shows that the attorneys of Robbins Geller are experienced class-action litigators and are sufficiently committed to this litigation. *See, e.g.*, Lead Pls.' Mot. Ex. 5,

---

[8] This finding moots Defendants' argument that Northern Nevada is not a member of or destroys the typicality of the proposed class due to its having purchased stock only in 2011.

Robbins Geller Firm Resume (Doc. No. 269-5). The Court finds that Robbins Geller can and should be appointed Class Counsel in this matter pursuant to Federal Rule of Civil Procedure 23(g).

CONCLUSION

For all the reasons outlined above, Lead Plaintiffs' Motion for Class Certification (Doc. No. 268) is GRANTED. Lead Plaintiffs' proposed class is hereby certified under Federal Rule of Civil Procedure 23(a) and (b)(3) to pursue the pending securities-fraud claims. With the exception of Vladimir Galkin, the Lead Plaintiffs—Laborers Pension Trust Fund for Northern Nevada, Construction Laborers Pension Trust of Greater St. Louis, and Angelica Galkin—shall continue as Class Representatives. Robbins Geller Rudman & Dowd LLP is hereby appointed as Class Counsel pursuant to Federal Rule of Civil Procedure 23(g).

IT IS SO ORDERED this 30th day of September, 2019.

CHARLES B. GOODWIN
United States District Judge