# EXHIBIT 3

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

In re: SANDRIDGE ENERGY, )
INC. SECURITIES LITIGATION,) Case No. 15-cv-00634-SLP
____________________________)

VIDEOTAPED DEPOSITION OF LINDSEY WALTON

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON JANUARY 31, 2019

REPORTED BY: DAVID BUCK, CSR

A P P E A R A N C E S

For the Lanier Trust Plaintiffs:
Jonathan Horne
THE ROSEN LAW FIRM
275 Madison Avenue
34th Floor
New York, NY 10016
(212)686-1060
jhorne@rosenlegal.com

For the Class Lead Plaintiffs:
Francis P. Karam
Mario Lattuga
ROBBINS GELLER RUDMAN & DOWD
58 South Service Road
Suite 200
Melville, NY 11747
(631)367-7100
fkaram@rgrdlaw.com

For the Class Lead Plaintiffs: (By Telephone)
Christopher T. Gilroy
ROBBINS GELLER RUDMAN & DOWD
58 South Service Road
Suite 200
Melville, NY 11747
(631)367-7100
cgilroy@rgrdlaw.com

For the SandRidge Mississippian Trust I:
W. Stephen Benesh
BRACEWELL
111 Congress Avenue
Suite 2300
Austin, TX 78701-4061
(512)494-3617
steve.benesh@bracewelllaw
com



For the SandRidge Mississippian Trust I: (By Telephone)
David B. Springer
BRACEWELL
111 Congress Avenue
Suite 2300
Austin, TX 78701-4061
(512)494-3617
david.springer@bracewell.
com

For Mr. Tom Ward:
J. Christian Word
LATHAM & WATKINS, LLP
505 Montgomery Street
Suite 1900
San Francisco, CA 94111
(415)391-0600
christian.word@lw.com

For Mr. Tom Ward:
George Corbyn
GEORGE CORBYN LAW FIRM
211 North Robinson
Suite 1910
Oklahoma City, OK 73102
(405)239-7055
gcorbyn@corbynhampton.com

For The Witness, SandRidge Energy, Mr. James Bennett, Mr. Matt Grubb:
Mark P. Gimbel
Amy Bond
COVINGTON & BURLING, LLP
The New York Times Bldg.
620 Eighth Avenue
New York, NY 10018-1405
(212)841-1213
mgimbel@cov.com

Also Present: Lynn Pittinger (By Phone)
Matt Thompson

The Videographer: Bruce Rodgers



S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and among the attorneys for the respective parties hereto that the deposition of LINDSEY WALTON may be taken on behalf of the Plaintiffs on the 31st of January, 2019, in Oklahoma City, Oklahoma, by David Buck, Certified Shorthand Reporter for the State of Oklahoma, taken pursuant to Notice.

IT IS FURTHER STIPULATED AND AGREED by and among the attorneys for the respective parties hereto that all objections, except as to the form of the question and the responsiveness of the answer, are reserved until the time of trial, at which time they may be made with the same force and effect as if made at the time of the taking of this deposition.

* * * * * *



CONTENTS


| | Page |
|---|---|
| Direct Examination By Mr. Karam | 9 |
| Further Direct Examination By Mr. Horne | 122 |
| Cross Examination By Mr. Gimbel | 195 |
| Further Cross Examination By Mr. Word | 202 |
| Further Cross Examination By Mr. Benesh | 205 |
| Jurat Page | 209 |
| Reporter's Certificate | 211 |


Index of Exhibits


| | Page |
|---|---|
| Exhibit Number 1 Bates SD-SECURITIES-0213704-0213705 | 18 |
| Exhibit Number 2 Bates SD-SECURITIES-0491199 With Native Attachment | 23 |
| Exhibit Number 3 Bates SD-SECURITIES-0716313 With Native Attachment | 28 |
| Exhibit Number 4 Bates SD-SECURITIES-0456113-00456114 | 32 |
| Exhibit Number 5 Bates SD-SECURITIES-0456287-0456288, With Native Attachment | 44 |
| Exhibit Number 6 Bates SD-SECURITIES-0456685 | 54 |
| Exhibit Number 7 Bates SD-SECURITIES-0426082 | 55 |
| Exhibit Number 8 Bates SD-SECURITIES-0228258, 0228054, With Native Attachment | 58 |
| Exhibit Number 9 Bates NSAI_SD_061713 | 64 |

| | | |
|---|---|---|
| Exhibit Number 10 | One Page Printout of Group of Excluded Wells | 67 |
| Exhibit Number 11 | One Page Printout of a Different Group of Wells | 69 |
| Exhibit Number 12 | Bates SD-SECURITIES-0032430 | 71 |
| Exhibit Number 13 | Bates SD-SECURITIES-0457220, 0032431-0032434 | 86 |
| Exhibit Number 14 | Bates SD-SECURITIES-0351368-0351369 | 87 |
| Exhibit Number 15 | Bates SD-SECURITIES-0428789-0428843 | 89 |
| Exhibit Number 16 | Bates SD-SECURITIES-0457747 | 92 |
| Exhibit Number 17 | Bates SD-SECURITIES-0589939 With Native Attachment | 93 |
| Exhibit Number 18 | Bates SD-SECURITIES-00428957 | 98 |
| Exhibit Number 19 | Bates SD-SECURITIES-0032244 | 106 |
| Exhibit Number 20 | Bates SD-SECURITIES-0032311-0032313 | 106 |
| Exhibit Number 21 | Bates SD-SECURITIES-0032822, 0033239-0033240, 0032902, 0033014-0033015, 0033031, 0033063, 0033126, 0033172 | 110 |
| Exhibit Number 22 | Bates SD-SECURITIES-0035493-0035494, 0035528 | 115 |
| Exhibit Number 23 | Bates SD-SECURITIES-0489233-0489234 | 117 |
| Exhibit Number 24 | Bates SD-SECURITIES-0352803-0352836 | 123 |
| Exhibit Number 25 | Bates SD-SECURITIES-0353225-0353226 | 128 |
| Exhibit Number 26 | Bates SD-SECURITIES-0418717, With Native Attachment | 132 |



| | | |
|---|---|---|
| Exhibit Number 27 | Bates SD-SECURITIES-0419140-0419142 | 133 |
| Exhibit Number 28 | Bates SD-SECURITIES-0213063-0213104 | 138 |
| Exhibit Number 29 | Bates SD-SECURITIES-0419647-0419649 | 141 |
| Exhibit Number 30 | Bates SD-SECURITIES-0431615-0431616 | 146 |
| Exhibit Number 31 | Bates SD-SECURITIES-0453021-0453023 | 152 |
| Exhibit Number 32 | Bates SD-SECURITIES-0213645 | 154 |
| Exhibit Number 33 | Bates SD-SECURITIES-0221408, 0221470 | 157 |
| Exhibit Number 34 | Bates SD-SECURITIES-0455826 With Attachment, 0221409-0221410 | 165 |
| Exhibit Number 35 | Bates SD-SECURITIES-0226362-0226364 | 167 |
| Exhibit Number 36 | Bates SD-SECURITIES-0456697 | 174 |
| Exhibit Number 37 | Bates NSAI_SD_156078-156122 | 179 |
| Exhibit Number 38 | Bates SD-SECURITIES-0682478-0682479 | 181 |
| Exhibit Number 39 | Bates SD-SECURITIES-0457664 | 182 |
| Exhibit Number 40 | Bates SD-SECURITIES-0031183-0031187 | 184 |
| Exhibit Number 41 | Bates SD-SECURITIES-0428758 | 188 |
| Exhibit Number 42 | Bates SD-SECURITIES-0032804 | 193 |



THE VIDEOGRAPHER: Here begins videotape number one in the deposition of Lindsey Walton in the matter of Duane and Virginia Lanier Trust versus SandRidge Mississippian Trust, et al in the United States District Court for the Western District of Oklahoma, Case Number 15-cv-00634-SLP. Today's date is January 31st, 2019. The time on the video monitor is 9:10 a.m. This deposition is taking place at 400 North Walker, Suite 160 in Oklahoma City, Oklahoma.

Will counsel please state their name and who they represent?

MR. KARAM: Francis Karam for the lead plaintiffs in the class action.

MR. LATTUGA: Mario Lattuga from Robbins Geller Rudman & Dowd on behalf of lead plaintiffs in the Glitz action.

MR. HORNE: Jonathan Horne, The Rosen Law Firm, on behalf of the plaintiffs in the Lanier Trust action.

MR. CORBYN: George Corbyn for Tom Ward.

MR. WORD: Christian Word also for Tom Ward.

MS. BOND: Amy Bond, Covington & Burling, on behalf of SandRidge, James Bennett and Matt Grubb.

MR. GIMBEL: Mark Gimbel of Covington & Burling on behalf of SandRidge, James Bennett, Matt Grubb and



the witness.

MR. BENESH: Steve Benesh with Bracewell representing Mississippian Trust I in the Lanier action only.

THE VIDEOGRAPHER: The court reporter is David Buck of D&R Reporting.

Will the reporter please swear in the witness?

LINDSEY WALTON,

after having been first duly sworn at 9:12 a.m. deposes and says in reply to the questions propounded as follows, to wit:

* * * * * *

DIRECT EXAMINATION

BY MR. KARAM:

**Q. Good morning, Ms. Walton.**

A. Good morning.

**Q. Have you ever given a deposition before?**

A. I have once before.

**Q. When was that?**

A. That was in 2012.

**Q. What kind of case did that involve?**

A. It was malpractice.

**Q. Okay. So you're basically familiar with the rules. I'll ask you some questions. Try to give your**

best and most honest answer if you can. Would you agree to that?
A. I do.
Q. And even though the court reporter can type very fast, he will appreciate it if we talk as slowly as possible and that we don't talk over one another. So, I might ask you to pause for a second after my question and then give your answer so that we're not talking at the same time. Is that okay?
A. Yes.
Q. Can you tell us about your employment history starting with the present and working back chronologically to your education?
A. Sure. Right now I'm VP of engineering at a private equity backed company called Native Oil and Gas. I am the reservoir engineer there. I have been with them for about three and a half years, since I left SandRidge. I -- at SandRidge I believe I left in April of 2015. My last three years at SandRidge I was in a development group, worked under Aaron Reyna, and the first five years of SandRidge I worked in corporate reserves with Rodney Johnson, under Rodney Johnson. I graduated from OU in petroleum engineering in 2007.
Q. Was SandRidge your first job out of college?



A. It was.
Q. And you worked there approximately eight years. Is that right?
A. Yes.
Q. Was your -- did you go immediately into reservoir engineering under Mr. Johnson?
A. Yes.
Q. Can you tell me what your duties were at that time?
A. Sure. So, basically at that time we ran the drill schedule, which basically means we populated the drill schedule with wells to drill. We were in charge of running all of the economics for the wells to make sure that they were economic to -- to drill. We worked with the third party auditors, mainly Netherland & Sewell, to do reserve reports. And just in general in charge of looking at well performance, maybe evaluating some acquisitions.
Q. I'm going to bring you up to about 2010. What was your position at that time within SandRidge?
A. I was working in corporate reserves under Rodney Johnson as a reservoir engineer.
Q. Were you assigned to a particular geographic or economic area within SandRidge?
A. At that time I was probably working the



Miss Lime.
Q. And what is the Miss Lime?
A. The Miss Lime is the reservoir or zone in northern Oklahoma that SandRidge was drilling horizontally.
Q. Is that the Mississippian?
A. Yes.
Q. Okay. Do you know when your assignment to the Mississippian began?
A. I do not.
Q. Now, you said you worked with Netherland Sewell, the auditors. What was -- describe what you did in relation to Netherland Sewell as part of your job at SandRidge.
A. So, with Netherland & Sewell we would send them our well data. We would work closely with them for a period of time, mainly at year-end, to develop our corporate type curve and have a final reserve report for that year.
Q. What is a corporate type curve?
A. A type curve, a corporate type curve is an estimation or prediction of EUR oil reserves for a well set or a group of wells.
Q. Do you know if -- what the first year that SandRidge developed with Netherland Sewell a corporate



type curve for the Mississippian area?
A. I don't know the exact year.
Q. Do you know when SandRidge began drilling in the Mississippian?
A. I don't know the exact year but I would say 2010, 2011.
Q. Can you describe for me the process by which you worked with Netherland Sewell? What did you actually do?
A. So, the process would be that we have a database that has all of our wells or cases in them. We would forecast our wells. We would send the database and all of the data to Netherland & Sewell. They would look at the data and we would start kind of a back and forth process of, you know, Dave would or Netherland & Sewell would review our forecast and then he would -- we would go well by well and kind of compare forecasts or notes on EUR.
Q. So let's -- let's focus on 2011. You mentioned Dave. Is that David Miller?
A. That's David Miller.
Q. And he was the person at Netherland Sewell who dealt with SandRidge primarily?
A. Yes.
Q. Did SandRidge have an internal type curve

**that was developed independently of Netherland Sewell in 2011?**
A. SandRidge -- now, I think we always worked with the previous year's type curve that Netherland & Sewell developed for us or that we came to as the corporate type curve with Netherland & Sewell. We did -- as we drilled wells we did always internally review those wells and look at what maybe a new type curve would look like as time went on and as we continued to drill wells. I don't know that we had an internal type curve that was different than what Netherland Sewell had developed with us the previous year.
**Q. Would there -- if I were going to look for a document that by which SandRidge internally compared its type curve, did that document have a title or a name or was it a spreadsheet of some kind?**
A. I don't know that it would have had a title or a name that was specific to that.
**Q. What type of application or program did you work that, SandRidge's internal type curve comparison?**
MR. GIMBEL: Objection to form.
**Q. (By Mr. Karam) Do you understand what I'm --**
A. If we ever looked at well performance against Netherland & Sewell's previous year's type



curve we would look at it in Ares or Excel.
**Q. Was there -- was that done regularly or periodically, was there any kind of regular review that was done?**
A. I don't know if it was done. I mean, I would say it may have been done biannually, so we may had -- we may try to look at that internally midyear in preparation for the end of the year's review with Netherland & Sewell.
**Q. Now, can you describe Mr. Johnson's role in the interaction with Netherland Sewell, Mr. Rodney Johnson?**
A. Uh-huh. Rodney was the executive vice-president of reservoir engineering, so he had a major role in communication with Netherland & Sewell. You know, he was my boss and during the time period in question I was a three or four year engineer, so I was pretty junior in my career. So, you know, I worked under him and then with Dave and we together and as a -- as a group worked with Netherland & Sewell.
**Q. And there came a time when Mr. Lance Johnson came on. Is that correct?**
A. Yes, there was that time.
**Q. Do you remember when that was?**
A. No.



**Q. And did -- did he also interact with Mr. Miller and with Netherland Sewell?**
A. I'm sure he did. I'm sure he did, yes.
**Q. How did you work with Mr. Johnson? Did you have like physical meetings with him, was there planning sessions, was there a regular meeting? That's the type of information I'm looking for.**
A. With Dave? With Netherland & Sewell?
**Q. With Mr. Johnson and -- and Mr. Miller.**
MR. GIMBEL: Do you mean Mr. Galvin? Lance Johnson.
MR. KARAM: Oh, I'm sorry, Rodney Johnson. Let me -- let me rephrase that.
**Q. (By Mr. Karam) Can you describe the -- the work process by which you worked with Mr. Johnson and Mr. Galvin and Mr. Miller to arrive at the year-end type curve in 2011?**
A. Sure. We would have -- we would have meetings with Dave. There were times when Dave would come to Oklahoma City. There are times when we would go to Dallas. We would have many conference calls or phonecalls and we also communicated through e-mail pretty regularly. I'm remembering that mainly Rodney was involved at that time. Like I said, I don't know when Lance came on at SandRidge, but we would have



meetings, phonecalls and e-mails.
**Q. Is it correct that you would send Mr. Miller data in the form of a spreadsheet? Is that accurate?**
A. In the form of a spreadsheet or a database.
**Q. And then would Mr. Miller send something back to you for -- for you -- for you to process and analyze as well?**
A. Yes.
**Q. Can you tell me what, what those documents were?**
A. Dave would send back databases with his forecasts. Dave would send back spreadsheets with maybe his EURs. Dave would send back -- you know, it was really just a back and forth process of, you know, us comparing declines or B factors, us comparing EURs, him saying he agrees with us, him saying he doesn't agree with us and we just -- we kind of had a back and forth process with him until we had arrived or agreed upon a type curve.
**Q. If -- if you ever need a break just say so. Generally we don't take a break in the middle of a question, but feel free just to either tell me or your counsel and we can take a break. Usually it's about every fifty minutes to an hour or so.**
A. Okay.