# EXHIBIT 4

CRANE - 5/16/19

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

--------------------------

In re: SANDRIDGE ENERGY, No. 5:12-cv-01341-G
INC. SECURITIES LITIGATION

--------------------------

This Document relates to:
ALL ACTIONS.

--------------------------

VIDEOTAPED DEPOSITION OF STEVEN D. CRANE

DALLAS, TEXAS

May 16, 2019

Reported by: Susan S. Klinger, RMR-CRR, CSR
Job No. 160526

CRANE - 5/16/19

May 16, 2019
8:34 a.m.

Deposition of STEVEN D. CRANE, held at the offices of Bracewell, LLP, 1445 Ross Avenue, Dallas, Texas, before Susan S. Klinger, a Registered Merit Reporter and Certified Realtime Reporter of the State of Texas.



CRANE - 5/16/19

A P P E A R A N C E S:

Attorneys for the Glitz Plaintiff(s) and the witness:
Mr. Francis Karam
Mr. Evan Kaufman
Mr. Chris Gilroy (Telephonically)
ROBINS GELLER RUDMAN & DOWD
58 South Service Road
Melville, New York 11747

Attorneys for Tom Ward:
Ms. Steven Bauer
LATHAM & WATKINS
505 Montgomery Street
San Francisco, California 94111

Attorneys for
Mr. C. William Phillips
Ms. Amy Bond
COVINGTON & BURLING
The New York Times Building
620 Eighth Avenue
New York, New York 10018

Also Present:
Mr. Matt Thompson, SandRidge Energy (Telephonically)
Mr. Roberg Rasor, H.J. Gruy (Telephonically)
Mr. Brandon Drake, videographer



CRANE - 5/16/19

I N D E X



| WITNESS | PAGE |
|---|---|
| STEVEN D. CRANE | |
| EXAMINATION BY MR. BAUER | 6 |
| EXAMINATION BY MR. PHILLIPS | 218 |
| EXAMINATION BY MR. KARAM | 333 |
| EXAMINATION BY MR. PHILLIPS | 337 |

E X H I B I T S

| No. | Description | Page |
|---|---|---|
| Exhibit 1 | Appendix 1 | 18 |
| Exhibit 2 | Expert Report, 3/1/19 | 32 |
| Exhibit 3 | Expert Rebuttal Report, 4/29/19 | 51 |
| Exhibit 4 | Crane Exhibits 1-60 | 109 |
| Exhibit 5 | Petroleum Resources Management System, 6/2018 | 246 |
| Exhibit 6 | SPE-185496-MS | 250 |
| Exhibit 7 | John Paul Dick affidavit | 267 |
| Exhibit 8 | Type Curve Discussion, PowerPoint, 6/21/11 | 269 |
| Exhibit 9 | Midstates Petroleum PowerPoint, 10/20/15 | 272 |
| Exhibit 10 | Chaparral Corporate Presentation, May 2016 | 274 |





CRANE - 5/16/19

VIDEOGRAPHER: Good morning. This is the start of the deposition of Steven Crane. We are now on record at 8:35 a.m. on May 16th, 2019. This is for the case titled In Re: SandRidge Energy, Incorporated Securities Litigation in the United States District Court, Western District of Oklahoma for Case Number CIV-15-634-G.

Will counsel please identify yourselves, after which the court reporter will swear in the witness.

MR. KARAM: My name is Francis Karam of Robbins Geller Rudman & Dowd representing the Glitz plaintiffs and the witness, Mr. Crane.

MR. KAUFMAN: Evan Kaufman with Robbins Geller Rudman & Dowd on behalf of the lead plaintiff in the Glitz action, as well as Mr. Crane.

MR. BAUER: Hi, I'm Steve Bauer from Latham & Watkins representing Tom Ward in both cases.

MS. BOND: Amy Bond from Covington &

A. At 50 miles or 100 miles, the answer is no.
Q. Okay. Let's just take the geographic distance out of it. If the well is in the same play and has the same geology, are there any standards in the SPE that says it must be included in the type curve?
A. In the standards, it talks about in early development stages that PUD well values are the P1 values, so once again, looking back to the proven reserve values. So there is that statement. It does not go into the depth or detail that you are discussing, and this is in the -- not the SPE. This is going to be in the -- the big one, the multi organizational one.
Q. Okay. What is the statement that you are referring to, sir?
A. Could I get a copy of that?
Q. Sure.
MR. PHILLIPS: This is marked as Exhibit 5.
(Exhibit 5 marked.)
A. Is that the 140-page document?





Q. I have no idea. It's the Petroleum Resources Management System.
A. There is a 141-page version of this, so...
Q. Okay. And you want to tell me exactly what you are referring to, sir?
A. There is a -- there is a series of graphs talking about the stages of development, whether it is in exploration stages, whether it is in early development stages, whether it is in late development stages.
And in that, it talks about in the early development stages, I think the statement is -- and I'm going to paraphrase this because I don't have it front of me -- it is something about your PUD -- your PUD value should be your -- your P1 values.
Q. And what -- P1 values are what, sir?
A. P1 values are proven reserve values.
Q. And does it say that any well that you drill in the same geology, in the same play must be included in your type curve?
A. It is not that explicit.
Q. It doesn't say that?





A. It does not say that -- those words.
Q. Let me move on just a little bit.
You mentioned that proved reserves require 90 percent probability, that the quantities actually recovered will equal or exceed the estimate; correct, sir?
A. On a probabilistic basis.
Q. But probabilistic basis is not the only basis you can make those determinations; is it, sir?
A. Yes.
Q. You can also use the deterministic basis, can't you, sir?
A. You can.
Q. And, in fact, Netherland Sewell used a deterministic basis, not a probabilistic basis, didn't it, sir?
A. They did.
Q. And, indeed, it is perfectly acceptable to use a deterministic basis; correct, sir?
A. It is.
Q. And the deterministic basis does not have the 90 percent probability standard in it,





does it, sir?
A. They have a high degree of probability. And on the probabilistic basis, they are meant to be equivalent of similar levels of uncertainty.
Q. It's a high degree of confidence is the standard, isn't it, sir?
A. It is.
Q. Okay. And if you choose to do a deterministic basis, you don't need to meet the probabilistic basis; correct, sir? They're either/ors; correct, sir?
A. You can't quantify the probability of your calculation on a deterministic basis.
Q. Reasonable certainty as used in the deterministic method is understood to mean something less than 90 percent, though, isn't it?
A. No.
Q. It is not, sir? Is that your testimony?
A. My testimony is they are meant to be approximate equivalents.
Q. Well, do you believe that the

CRANE - 5/16/19

understanding of most people in the Society of Petroleum Engineers has an understanding that in fact it is something less than 90 percent?

A. You can't calculate whether it is 90 percent or not on a deterministic basis.

MR. PHILLIPS: Let me ask the reporter to mark as Exhibit 6 a document that is produced -- published by the Society of Petroleum Engineers, SPE-185496-MS.

(Exhibit 6 marked.)

MR. KARAM: Can I have one for Evan?

MR. PHILLIPS: Oh, sure. I have many of them.

THE WITNESS: Here is an extra.

Q. Now, sir, let me ask you, before we get to that, if you can't calculate whether it is 90 percent or not on a deterministic basis, then how can you tell if it is inaccurate?

A. In this case, B values greater than 1, which are outside the range of what is accepted by the experts such as Dr. Lee, who is an engineering fellow for the SEC on the reserve standards, is -- shows that you are in



CRANE - 5/16/19

the transient flow, and I think as he stated, it results in erroneous estimates.

Q. Now, going back to this document that I put before you, have you ever seen this before?

A. This one I have not seen.

Q. Okay. I refer you to the third paragraph on the first page.

A. Uh-huh.

Q. Tests show repeatedly that industry professionals believe the probability value that corresponds to, quote, reasonable certainty, closed quote, is in the range of 70 to 75 percent. This is far less than the implied 90 percent figure assigned to the probabilistic low estimate of recoverable volumes, generally as taken -- generally taken as the equivalent of the 1P deterministic case.

Do you see that, sir?

A. I do.

Q. Do you have any reason to doubt what is written here, sir?

A. I would like to see what his basis is to say tests have repeatedly shown the



CRANE - 5/16/19

reasonable certainty is in the range of 70 to 75 percent.

MR. KARAM: Yeah, and, counsel, you haven't read the entire paragraph, so can we let the witness read the entire paragraph?

MR. PHILLIPS: He can read whatever he wants, Mr. Karam.

MR. KARAM: Yeah. I think it might be helpful.

Q. Sir, my question is really about the first page. You can, of course, read anything you want, but --

A. Well, you're asking me to offer an opinion on the basis of this paper.

Q. No, I'm not, sir. I'm not asking you that.

A. Okay. You're just telling me this?

Q. No, I'm not asking you that, sir.

A. Okay.

Q. If you will listen to my question, I will be glad to give it to you.

When something is published in the Society of Petroleum Engineers letterhead, what



CRANE - 5/16/19

is the significance of that, sir?

A. It is a document that is going to be in a -- presented at a conference. It does not necessarily mean it has been peer-reviewed yet.

Q. Do you know whether this document was peer-reviewed or not peer-reviewed?

A. At this moment, what is on here shows it has not been peer-reviewed. It says it was prepared for presentation at the SP Latin American, etcetera, etcetera, conference, and nowhere does it say it has been -- let me read this next one -- selected for presentation -- this actually states, contents of the paper have not been reviewed by the Society of Petroleum Engineers and are subject to correction of the author, sir.

Q. Do you have any reason to dispute the statement that I read that tests show repeatedly that industry professionals believe the probability value that responds -- that corresponds to reasonable certainty is in the range of 70 to 75 percent, sir?

A. I have no idea where he's gotten that information. He does later on state, if

CRANE - 5/16/19

you don't mind --

Q. Sir, I think you've answered my question, thank you. Your counsel can ask you questions on this.

A. Okay.

MR. KARAM: Do you want to add anything to your answer?

MR. PHILLIPS: Excuse me, Frank. That's entirely improper. You can ask questions at the end of all of this. Thank you.

MR. KARAM: I wasn't sure if he wanted to say something. I mean, I think you can have it read --

MR. PHILLIPS: Excuse me.

MR. KARAM: -- back. He asked if he could -- I think he asked if -- I could be wrong, Will.

MR. PHILLIPS: Okay. Can we move on?

MR. KARAM: Let's see if he asked to continue.

MR. PHILLIPS: Why don't you just ask your questions at the end of it, Frank.



CRANE - 5/16/19

MR. KARAM: I'm happy to do that.

MR. PHILLIPS: Thank you.

MR. KARAM: But I don't want you cutting off the witness.

MR. PHILLIPS: I'm not cutting off the witness, sir.

Q. Now, oil and gas reserves estimation involves judgment about how to -- how to interpret available data, doesn't it, sir?

A. Yes.

Q. And that judgment includes what to include and not to include in a type curve analysis, doesn't it, sir?

A. Yes.

Q. Do you agree that two engineers acting in good faith could reach different conclusions about a particular well's EUR?

A. Yes.

Q. And do you agree with my statement that -- strike that.

Do you agree that type curves are predictive statements?

A. Yes.

Q. Now, I would like to go to your



CRANE - 5/16/19

opening report, the chart on page 5. We talked a little bit about that before. I hope not to go over any prior questions.

A. What table do you mean?

Q. The table on page 5.

A. Okay.

Q. The table at the top.

A. Yes, okay.

Q. Now, for mid-year 2011, you calculated an average oil EUR of 89 kbbls and an average total hydrocarbon EUR of 231 kBOE; correct, sir?

A. Correct.

Q. And if you turn to page 17 of this report, for mid-year 2012, you calculated an average oil EUR of 64 kbbls, thousand barrels; right?

A. Yes.

Q. And an average total hydrocarbon EUR of 187 kBOE; correct, sir?

A. Correct.

Q. Now, you have here -- you have several groupings here of -- I take that OK refers to Oklahoma?



CRANE - 5/16/19

A. Yes.

Q. Did you only examine Oklahoma wells?

A. I examined Kansas wells as well.

Q. Okay. But your -- but the statements I just read in terms of the barrels of oil and the BOE were only for Oklahoma; correct, sir?

A. Yes.

Q. Now, one of my questions is referring to page 5, and then to this, why did the EURs -- page 16, thank you. If you look at page 16 for a second.

A. Uh-huh.

Q. This is the 2011 evaluation of the same data; correct, sir?

A. Uh-huh.

Q. Why is it --

MR. KARAM: You have to say yes or --

A. Yes, yes.

Q. Why did the EURs for pre-2011 wells and H1 2011 wells in Oklahoma increase from mid-2011 to mid-2012?

A. Okay, let's see. Pre-2011, oil EUR

Page 258

CRANE - 5/16/19
is 137. And in '12 -- oh, pre-Oklahoma is 127. That actually decreased.
Q. Okay.
A. There is an addition -- if you look at the top of page 17.
Q. Right.
A. That includes an addition of 16 wells that were too early to produce.
If we go back and look at the previous wells, what we see is the previous wells decreased from 89 barrels to 86,000 -- from 89,000 to 86,000 barrels with the additional year's worth of metadata and trends.
Q. So your projected EURs changed between that mid-2011 and 2012; correct, sir?
A. For those wells, they went down by 3,000 barrels out of 89,000 barrels.
Q. The H1 oil goes up from 2011 to 2012 though; correct, sir?
A. Yes. And H1 is going to be the addition of the 16 wells.
Q. Okay. Why are the average oil EURs for these wells different between 2011 and 2012?

Page 259

CRANE - 5/16/19
A. Individual wells or for the overall average?
Q. Overall average.
A. Well, for the H -- for the first half of 2011, that's what the H1 means, we had added an additional 16 wells to the -- to the wells that were drilled there. So you have their individual EURs going into the average.
And then on the individual wells themselves, I would have to go back and look at what changes are on a well-by-well basis. That is why I tried to reference the original wells that were all included were -- like I said, the average for those were only from 89 to 86.
Q. Would you expect that the average oil EURs for the Mississippian wells to be different at different times in the class period?
A. For an individual well, no.
Q. They should be the same at any given time in the -- for an individual well, at any given time of the class period?
A. They should change within a few percent.

Page 260

CRANE - 5/16/19
Q. And how many percent?
A. If you are doing your job right, I would hope they're going to change with less than 10 percent.
Q. What about the total well average?
A. The total well average can vary, especially early on in play.
Q. Why is that?
A. You're still working your statistics.
Q. Would you expect it to change as new wells are drilled?
A. During the development, you would expect it to change and the -- with time and the more number of wells you drill, that uncertainty is going to decrease, and they will come to a fairly routine standard.
Q. Now, let's look at your table on page 5 for a second.
A. Yes.
Q. And let's ignore the column SandRidge 2011 type wells, because we know you don't think that is accurate. And we'll ignore the NSAI year-end 2011 reserve report PDP wells

Page 261

CRANE - 5/16/19
because you have also questioned that.
So let's just take the last four columns, and they range from your mid-year 2011 evaluation of 89 TPH's 141 to PES's 128, and then the SandRidge lookback of 76.
MR. KARAM: We're going to bring you in at 3:00 clock in every deposition to kind of liven things up.
Q. Why the disparity between these?
A. Okay. From -- can we talk about TPH?
Q. Sure.
A. Okay. TPH -- and can I get a copy of the TPH?
Q. Let's go first and get your answer, and then we can go back as we need.
A. Okay. TPH in their analysis did, from what they presented in the PowerPoint presentation, they looked like they evaluated -- they show they evaluated the reserves in two ways. One was they averaged 88 wells in three counties all together. And using a similar type curve analysis approach at SandRidge where you just average all the data