# EXHIBIT 5

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

DUANE & VIRGINIA LANIER TRUST,)
individually and on behalf of )
all others similarly situated,)
)
Plaintiffs, )
)
vs. ) Case No. CIV-15-634-G
)
SANDRIDGE MISSISSIPPIAN TRUST )
I, et al., )
)
Defendants. )
________________________________)
)
In re: SANDRIDGE ENERGY, ) Case No. CIV-12-1341-G
INC. SECURITIES LITIGATION, )
________________________________)
)
This Document Relates to: )
)
ALL ACTIONS )

VOLUME I

VIDEOTAPED DEPOSITION OF MATTHEW GRUBB
TAKEN ON BEHALF OF THE PLAINTIFFS
IN OKLAHOMA CITY, OKLAHOMA
ON MARCH 21, 2019

REPORTED BY: DAVID BUCK, CSR

A P P E A R A N C E S

For the Lanier Trust Plaintiffs: Jonathan Horne
THE ROSEN LAW FIRM
275 Madison Avenue
34th Floor
New York, NY 10016
(212)686-1060
jhorne@rosenlegal.com

For the Class Lead Plaintiffs: (By Telephone) Evan Kaufman
Mario Lattuga
Frank Karam
ROBBINS GELLER RUDMAN & DOWD
58 South Service Road
Suite 200
Melville, NY 11747
(631)367-7100
ekaufman@rgrdlaw.com

For the SandRidge Mississippian Trust I: W. Stephen Benesh
BRACEWELL
111 Congress Avenue
Suite 2300
Austin, TX 78701-4061
(512)494-3617
david.springer@bracewell.com

For Mr. Tom Ward: Steven M. Bauer
Kelsey Ferguson
LATHAM & WATKINS, LLP
505 Montgomery Street
Suite 1900
San Francisco, CA 94111
(415)391-0600
steve.bauer@lw.com



For SandRidge Energy, Mr. James Bennett, Mr. Matt Grubb: C. William Phillips
Amy Bond
COVINGTON & BURLING, LLP
The New York Times Bldg.
620 Eighth Avenue
New York, NY 10018-1405
(212)841-1213
cphillips@cov.com

Also Present: Matt Thompson

The Videographer: Bruce Rodgers



S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and among the attorneys for the respective parties hereto that the deposition of MATTHEW GRUB may be taken on behalf of the Plaintiffs on the 21st of March, 2019, in Oklahoma City, Oklahoma, by David Buck, Certified Shorthand Reporter for the State of Oklahoma, taken pursuant to Notice and Subpoena.

IT IS FURTHER STIPULATED AND AGREED by and among the attorneys for the respective parties hereto that all objections, except as to the form of the question and the responsiveness of the answer, are reserved until the time of trial, at which time they may be made with the same force and effect as if made at the time of the taking of this deposition.

* * * * * *



CONTENTS


| | Page |
|---|---|
| Direct Examination By Mr. Kaufman | 10 |
| Jurat Page | 250 |
| Reporter's Certificate | 252 |


Index of Exhibits


| | Page |
|---|---|
| Exhibit Number 1 Bates SD-SECURITIES-0029968-0030815 | 28 |
| Exhibit Number 2 March 1, 2011 Investor/Analyst Meeting | 49 |
| Exhibit Number 3 May 2012 Investor Presentation | 57 |
| Exhibit Number 4 Bates SD-SECURITIES-0360819 | 71 |
| Exhibit Number 5 Final Transcript SandRidge Energy Investor/Analyst Meeting May 1, 2011 | 76 |
| Exhibit Number 6 Final Transcript SandRidge Energy at Raymond James Institutional Investors, May 7, 2011 | 85 |
| Exhibit Number 7 Final Transcript SD-Q1 2011 SandRidge Energy Inc. Earnings Conference Call, May 6, 2011 | 88 |
| Exhibit Number 8 June 6, 2011 RBC Capital Markets 2011 Energy and Power Conference | 92 |
| Exhibit Number 9 Bates SD-SECURITIES-0431615-0431616 | 94 |
| Exhibit Number 10 Bates SD-SECURITIES-0432858-0432860 | 104 |
| Exhibit Number 11 Bates SD-SECURITIES-0432871 | 111 |

Watkins on behalf of Tom Ward.
MR. BAUER: Steve Bauer, Latham, Tom Ward.
MS. BOND: Amy Bond from Covington & Burling on behalf SandRidge, James Bennett and the witness.
MR. PHILLIPS: Will Phillips, Covington & Burling, same.
THE VIDEOGRAPHER: The court reporter is David Buck of D & R Reporting who will now swear in the witness.

MATTHEW GRUBB,
after having been first duly sworn at 9:34 a.m. deposes and says in reply to the questions propounded as follows, to wit:

******

DIRECT EXAMINATION

BY MR. KAUFMAN:
Q. Good morning, Mr. Grubb.
Have you ever been deposed before?
A. Yes.
Q. Okay. How many times?
A. Twice.
Q. Okay. And in what context?
A. You know, when I was at Samson Resources it had to do with a casing, bad casing, parted casing, mechanical issues.



Q. Were you on the plaintiff's side or the defendant's side?
A. I was on the plaintiff's side.
Q. Okay. And what was the other case?
A. The other case, and I can't remember the case, it had to do with some mineral owners in Pecos County, it was with SandRidge, but I can't -- I can't remember the details of that. It had to do with drilling or not drilling wells on their leases.
Q. Okay. Was SandRidge the plaintiff or the defendant in that action?
A. Defendant.
Q. Okay. So since you've been deposed a couple times you have an idea of how this process works. I'm just going to go over a few -- a few -- a few of the like the type of, you know, ground rules or just so we have a similar understanding. Okay?
As you know, there's a court reporter here. He's taking down everything you're saying. So it's important for you to answer questions audibly as opposed to a head nod. Okay?
A. Okay.
Q. Okay. If at any time you do not understand a question just ask me to rephrase it and I will do my best to do so. Okay?



A. Okay.
Q. If at any time you're uncomfortable, you need a break just let me know and as long as we're not in the middle of a question, you know, I'll make sure to honor the request. Okay?
A. Okay.
Q. And you understand the court reporter has sworn you in and you're required to answer my questions honestly and to the best of your ability as if you were in courtroom?
A. Yes.
Q. Okay. Could you describe your educational history after high school?
A. Went to school at Texas A & M, received a bachelor's degree in petroleum engineering and a master's degree in mechanical engineering.
Q. Okay. And after you obtained your -- your degree did you do work or did you go entertain a different degree?
A. I went to work.
Q. Okay. And where did you go work?
A. I went to work in Oklahoma City.
Q. For a particular company?
A. Conoco.
Q. Okay. And what did you do for Conoco?



A. I was a production engineer.
Q. Okay. What years did you work for Conoco?
A. 1988 to I believe 1991.
Q. Okay. And can you describe generally what your responsibilities were as a production engineer at Conoco?
A. Well, I was over our Kansas operations. It was mostly oil wells in Kansas with pumping units and I would do workovers to keep the wells producing, monitor production, work with the geologists to decide whether we were going to drill a well or not, made recommendations on ways to increase production.
Q. Okay. And how did you work with geologists to determine if you were going to drill a well or not?
MR. PHILLIPS: At that time?
Q. (By Mr. Kaufman) Yes, when you were at Conoco.
A. Well, we look at the areas, we look at the wells and the geologists would map the -- the play and would make recommendation whether to drill or not to drill or if we had any drilling potential and I would work on how do we hook the well up, where would the production go and how do we -- what kind of artificial lift do we put on it to produce the well.
Q. And when you were at ConocoPhillips was

there any type of reservoir engineering analysis done in connection with deciding where to drill wells?
A. Yes, there would have been reservoir engineering analysis.
Q. And what types of reservoir engineering analysis was incorporated into the decision at Conoco to decide where to drill or not?
A. Typically decline curves and volumetrics.
Q. And how were decline curves and volumetrics used to determine whether to drill?
A. To determine reserves.
Q. To determine the reserves where?
A. In the formation.
Q. Okay. So, what historic -- okay, rephrase it.
So, did reservoir engineers do decline curve analysis on PDPs?
A. Yes.
Q. And did you use the decline curve analysis on PDPs to assist in determining whether to drill or not?
A. Can you rephrase the question? I'm not sure what you're asking me.
Q. My question was whether -- when deciding whether -- when deciding where to drill or not whether



at ConocoPhillips you utilized the result of the decline curve analysis on PDPs?
A. That was part of it.
Q. Right. So my question relate -- relates to that part of it. So, how did you utilize the results of the decline curve analysis on the PDPs in deciding where to drill or not?
A. So, typically the reservoir engineer would do the decline curves on the wells and they'd come up with an ultimate recovery, an EUR, which stands for estimated ultimate recovery. They estimate the reserves from the wells. The geologist would map the area that he wants to drill and then they would try to do volumetrics to see if the decline curves fit with the volumetrics on the well to see and determine if there could be another location to drill in that area.
Q. And was the result of the decline curve analysis, the EUR for the PDPs used to help determine or estimate how much oil would be in the new areas you were drilling?
A. I'm going to rephrase your question to make sure I understand what you're asking me. Is that okay?
Q. Okay, sure.
A. Or do you want to rephrase it?



Q. No, why don't you rephrase it, you know.
A. You're asking me if the decline curves on the PDP helped to estimate the reserves for the new well?
Q. Yes.
A. Is that what you're asking me?
Q. Yes.
A. Yeah, so the decline curves, and I think -- I don't know how to answer it differently than I just did. The decline curves in conjunction with the volumetrics help to estimate the remaining reserves in the area that you're going to drill.
Q. And what is volumetrics?
A. Well, volumetrics is you take the area that you're going to drill and you assume a drainage area, for example, a 40-acre drainage area, you -- you take the thickness of the reservoir you're drilling and you take the porosity, okay, so you have porosity, you have the surface area and you have the thickness of the reservoir and from that and from well logs you can estimate the water saturation and you can estimate the gas saturation, oil saturation, the reservoir engineers would do all this and calculate what he thinks is the reserves in place are in the case of that's volumetrics and then he tries to tie that with



decline curve analysis and see if it makes sense.
Q. Is there typically like a formula that's used where -- where you plug in numbers that are the result of the volumetrics and you then plug in numbers that are the results of the decline curve analysis to come up with a reserve number?
A. Yeah, that's the formula.
Q. So the volumetrics analysis, does that come -- does that result in a number?
A. Yes.
Q. Okay. What did you do after you left ConocoPhillips?
A. I went to work for an intrastate pipeline company called Enogex.
Q. Okay. And what years was that?
A. I believe that was '91 to '90 -- to the end of '94.
Q. And what was your position there?
A. I was what they call a system planning engineer.
Q. And what were your responsibilities as a system planning engineer?
A. Run nodal analysis on the pipeline system.
Q. And what's a nodal analysis?
A. It determines the pressure points on the

pipelines and where the company could move more gas, less gas, need to add compression, need to add pipe, et cetera.
Q. And then after you left that company did you go back to school?
A. No.
Q. Oh, so where did -- where did you go after, after that company?
A. I went to work in Tulsa for a company called Samson Resources.
Q. Okay. And what was your position at Samson Resources?
A. I was a -- my position when I started there, I was an area engineer.
Q. Okay. And then did you hold different positions during your tenure?
A. Yes.
Q. And what were those positions? And if you could also associate it with the year, please.
A. I don't remember the years. I was there for 12 years, from 1995 to 2006. I started out working international in Venezuela and then I worked Oklahoma, east Texas, northern Louisiana as a production engineer, area engineer, I can't remember the exact title. And then I was promoted to operations manager



where I was overseeing everything from eastern Oklahoma to east Texas, northern, northern Louisiana through Mississippian and Alabama.
Q. And what -- how would you describe your responsibilities as operations manager of Samson Resources?
A. Well, I managed the operations. I had operations engineers reported to me. I reviewed their workover procedures, made sure everything was done safely and made sure that they, you know, made any changes that I thought was needed to -- to be made and then we would -- I had some spending authority, I don't remember what the numbers were, I could approve some of this work, it was less than a certain dollar amount. If it was above my level of authority I would send it up to the vice-president.
Q. And then after you left Samson Resources in 2006, where did you go?
A. I went to work for SandRidge.
Q. And what was your first position at SandRidge?
A. I -- I was either vice-president of operations or senior vice-president of operations, I can't -- I can't remember.
Q. And did there come a time when your, your



title at Sand -- at SandRidge changed?
A. Yes. It changed to chief operating officer.
Q. Do you remember what year?
A. I do not.
Q. Do you remember approximately what year?
A. Maybe 2007. I don't remember.
Q. At some point did you also become the president of SandRidge?
A. At some point I did, yes.
Q. Okay. And approximately when was that?
A. I -- I don't remember. Maybe 2011.
Q. Have you obtained any, any other degrees besides your -- your BS in petroleum engineering?
MR. PHILLIPS: Objection, asked and answered.
You can answer it again.
THE WITNESS: Yeah, I had a master's in mechanical engineering.
Q. (By Mr. Kaufman) Right, you did say that.
And you worked at SandRidge until 2013?
A. That's correct.
Q. And what were the circumstances of your departure from SandRidge?
A. There was activism in the company and I was president of the company and they were not going to make me CEO, they made James Bennett CEO, so I thought



it was a good time for me to leave.
Q. So you resigned from the company?
A. Yeah.
Q. And you resigned after you learned that James Bennett was going to be made CEO?
A. Yes.
Q. And what was the name of the -- the activists?
A. The individual name?
Q. Was there an entity that was the activist?
A. Yeah, TPG. I believe it's called TPG Axon, Axon or something like that.
Q. Did have you any conversations with anyone at TPG Axon about you becoming CEO?
A. I did not.
Q. And why not?
MR. PHILLIPS: Objection.
THE WITNESS: I was never invited for a conversation. No one contacted me.
Q. (By Mr. Kaufman) Do you have an understanding as why no one contacted you?
MR. PHILLIPS: Objection.
THE WITNESS: I do not.
Q. (By Mr. Kaufman) Around the time that Mr. Bennett was -- let me rephrase the question.