# EXHIBIT 7

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re SANDRIDGE ENERGY, INC. SECURITIES LITIGATION, | ) | No. 5:12-cv-01341-G |
| | ) | |
| This Document Relates To: | ) | |
| ALL ACTIONS. | ) | |

EXPERT REPORT OF BJORN I. STEINHOLT, CFA

March 1, 2019

**CONFIDENTIAL**

CONFIDENTIAL

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION AND QUALIFICATIONS ....................................................................1

II. OVERVIEW OF ASSIGNMENT ....................................................................................3

III. SUMMARY OF OPINIONS ..........................................................................................4

IV. COMPANY BACKGROUND ........................................................................................5

V. PLAINTIFFS' ALLEGATIONS ....................................................................................13

VI. MARKET EFFICIENCY IN A FRAUD-ON-THE-MARKET CONTEXT .....................15

VII. THE EVENT STUDY METHODOLOGY ......................................................................24

VIII. LOSS CAUSATION........................................................................................................30

IX. ECONOMIC FRAMEWORK TO QUANTIFY SECTION 10(b) DAMAGES ...............41

X. LIMITING FACTORS .....................................................................................................44

## I. INTRODUCTION AND QUALIFICATIONS

1. I am a Managing Director at Caliber Advisors, Inc. ("Caliber"), a full-service valuation and economic consulting firm with offices in San Diego, California and Chicago, Illinois. Prior to Caliber, I was a founding Principal of Financial Markets Analysis ("FMA"), an economic consulting, valuation and litigation support firm focusing on securities litigation consulting. Prior to FMA, I was a Vice President and then Principal at Business Valuation Services ("BVS"), a national full-service financial valuation firm that was part of publicly traded CBIZ, Inc. (NYSE: CBZ). Prior to BVS, I was a Financial Analyst, Vice President and Senior Vice President in the San Diego office of Princeton Venture Research, Inc. ("PVR"), a national investment banking, venture capital and litigation support firm. Prior to PVR, I was a Graduate Fellow performing investment research at the University of San Diego.

2. I have approximately 30 years of experience providing capital markets consulting, including analyzing and valuing investments. Over the past 15 years, I have been retained on numerous occasions to provide expert opinions relating to market efficiency, materiality, loss causation and damages in large and complex securities class actions similar to this litigation. In *China Intelligent Lighting and Electronics, Inc.*, No. 11-cv-02768 (C.D. Cal.), the Court entered its judgment based on my aggregate damages estimate. In *Jaffe v. Household Intl Inc, et al.*, No. 02-cv-05893 (N.D. Ill.), the Court adopted my guidance and applied the prime rate when calculating pre-judgment interest. In *Novatel Wireless Sec. Litig.*, No. 08-cv-01689 (S.D. Cal.), the Court undertook a rigorous *Daubert* analysis of every element of my comprehensive loss causation and damages methodology, stating that the "Court concludes that Steinholt's testimony on loss causation and damages, based on his event study analysis, is reasonable and reliable." In *Alan Willis, et al. v. Big Lots, Inc.*, No. 12-cv-00604 (S.D. Ohio), the Court concluded that "Steinholt has set forth a methodology for later calculating damages on a class-wide basis. . . .

and explained how it is both workable and consistent with Plaintiffs' theory of liability in this particular case," calling my damages opinion "both relevant and reliable."

3. Other Courts have similarly found my testimony admissible, including in *New England Health, et al. v. Qwest Comm. Int'l Inc, et al.*, No. 01-cv-01451 (D. Col.), *Employer-Teamsters Joint Council Pension Trust Fund v. America West Holding, et al.*, No. 99-CV-399 (D. Ariz.), *Nursing Home Pension Fund et al. v. Oracle Corporation et al.*, No. 01-cv-00988 (N.D Cal.) and *Carson, et al v. Neopharm Inc, et al.*, No. 02-cv-02976 (N.D. Ill.). Furthermore, several other Courts have cited my testimony in support of their own decisions, including in *Healthsouth Corp. Sec. Litig.*, No. 03-cv-01501 (N.D. Ala.), *Luman v. Anderson, et al.*, No. 08-cv-00514 (W.D. Mo.), *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, No. 08-CV-7508 (S.D. NY), *Smilovits, et al. v. First Solar Inc.*, *et al.*, No. 12-cv-00555 (D. Ariz.) and *Marcus, et al. v. J.C. Penney Co. Inc.*, *et al.*, No. 13-cv-00736 (E.D. Tex.).

4. I received a Master of International Business degree from the University of San Diego and a Bachelor of Science degree in Computer Science and Engineering from California State University, Long Beach. In addition to my graduate business degree and my engineering degree, I have earned the professional designation Chartered Financial Analyst ("CFA") awarded by the CFA Institute, and I participate in its continuing education program. The CFA designation is a qualification for finance and investment professionals focusing on investment management and securities analysis of common stock, fixed income and other investments. A summary of my background and qualifications is attached as Exhibit A to this report.

5. On February 16, 2018, I submitted a report in support of Plaintiffs' class certification motion in this case (the "Steinholt Class Cert. Report").

6. The compensation for the work performed in this matter is based on the number of hours worked times each analyst's billable rate. My billable rate is currently $475 per hour. My compensation is not contingent on the outcome of this case.

## II. OVERVIEW OF ASSIGNMENT

7. Plaintiffs' counsel has requested that I examine, analyze and discuss the economic issues relating to market efficiency, loss causation and damages in this matter. First, I have been asked to examine whether the market in which SandRidge Energy, Inc. ("SandRidge" or the "Company") common stock traded between February 24, 2011 and November 8, 2012, inclusive (the "Class Period"), was open, developed, and efficient, in that the market prices during this time period quickly changed to reflect new and material information concerning SandRidge as such information became available.

8. Second, I have been asked to opine on whether the alleged misrepresentations in this case contained, or omitted, important information that a reasonable investor would have wanted to consider prior to making an investment decision, and whether the alleged misrepresentations caused economic losses to investors who purchased SandRidge common stock during the Class Period.

9. Third, assuming that Plaintiffs can prove their factual allegations, I have been asked to provide an economic framework to quantify the Section 10(b) damages suffered by purchasers of SandRidge common stock during the Class Period.

10. My opinions in this matter are based on my professional experience, as well as my review of a substantial amount of information, including: (a) the Third Consolidated Amended Complaint for Violation of the Federal Securities Laws, dated October 21, 2016 (the "Complaint"); (b) Orders, dated August 1, 2017; (c) public filings by SandRidge with the United States Securities and Exchange Commission ("SEC") during 2011 and 2012, including filings on

Form 10K, Form 10Q, Form 8K, Schedule D, Schedule G, Annual Reports, Prospectuses and Proxy Statements; (d) Company press releases, conference call transcripts and presentations during 2011 and 2012; (e) securities analyst reports relating to SandRidge and the oil & gas exploration & production ("E&P") industry during 2011 and 2012; (f) contemporaneous media reports regarding SandRidge and its industry from Bloomberg and Lexis/Nexis during 2011 and 2012; (g) price, volume and other trading information for SandRidge securities, as well as market and industry indices, and commodity prices; (h) information obtained through discovery in this matter; and (i) articles, court decisions and other relevant information cited in the text, or in footnotes to the text, of this report. A list of the information I relied on to form my opinion in this report is attached hereto as Exhibit B.

## III. SUMMARY OF OPINIONS

11. This report is based on the evidence I have reviewed to date. I understand that Plaintiffs are still in the process of conducting fact discovery and that the full set of information they intend to use to prove their allegations at trial is likely not available yet. Consequently, my opinions in this report are preliminary and may need to be updated at some later date as additional information becomes available.

12. With the above limitation in mind, based on my review and analysis of the available evidence, as well as my professional experience, it is my opinion that:

- The market in which SandRidge's common stock traded during the Class Period was open, developed, and efficient, in that the market prices during this time period quickly changed to reflect new and material information concerning the Company as such information became available. Specifically, new and material information about SandRidge was widely disseminated to the market, analyzed by market participants and traded on, causing the information to quickly become reflected in the Company's stock price.

- The allegedly false and misleading statements contained, or omitted, information that a reasonable investor would have wanted to consider

prior to making an investment decision, causing SandRidge's common stock to trade at artificially inflated prices during the Class Period.

- When the alleged truth was publicly disclosed, SandRidge's stock price declined, causing Class members to suffer economic damages as a result of the alleged fraud (*i.e.*, disclosure of the alleged truth).

- The price impact of the disclosure of the alleged truth on November 9, 2012 was 9.9%, or $0.60 per share, and represents the inflation from the first actionable misrepresentation concealing the alleged truth until the disclosure of the alleged truth. Damages per share is then the inflation per share at the time of purchase for shares still owned at the time the alleged truth was disclosed, limited by the 90-day bounce back rule.

## IV. COMPANY BACKGROUND

13. SandRidge is an oil and natural gas E&P company headquartered in Oklahoma City, Oklahoma. In 2007, the Company went public and started to trade on the New York Stock Exchange ("NYSE"). In 2011, revenues from oil and gas production were $1.23 billion, or 87% of the Company's total revenues, accounting for all of SandRidge's income from operations.[1] For the first nine months of 2012, revenues from oil and gas production were $1.26 billion, or more than 90% of the Company's total revenues, again accounting for all of SandRidge's income from operations.[2]

14. Early on, SandRidge was primarily focused on gas production. Then, in late 2009 through 2010, SandRidge decided to significantly increase its focus on the more profitable oil production. As explained in an October 5, 2010 KeyBanc analyst report:

> ***SD: New Oil Focused Company; Execution Is Key***
>
> Over the course of about nine months, SandRidge Energy (SD-NYSE) aggressively and successfully transitioned from a natural gas focused company to an oil focused company with considerable natural gas upside potential. In December 2009, the Company acquired oily Permian Basin assets from Forest Oil

---

1 SandRidge Form 10-K filed with the SEC on February 27, 2012, pages F-5 and F-54.

2 SandRidge Form 10-Q filed with the SEC on November 9, 2012, pages 5 and 40.

> Corporation (FST-NYSE) for $800 million and in July 2010, SD acquired Permian Basin-focused Arena Resources for $1.4 billion.
>
> * * *
>
> In mid-September [2010], SD announced a new core area, the horizontal Mississippian oil play (horizontal Mississippi) in northwestern Oklahoma. SD has been aggressively leasing in the play and now controls more than 300,000 net acres, up from about 115,000 net acres as of March. The Company is also ramping up the rig count by moving rigs from its Piñon field to its horizontal Mississippi position.[3]

15. An important part of SandRidge's new oil strategy was their acquisition and monetization of the Company's drilling rights in the Mississippian horizontal oil play in the Mid-Continent area of Oklahoma and Kansas (also referred to herein as the "Mississippian" and the "Mid-Continent"). This included monetizing the Mississippian through: (a) the Company's own drilling operation, (b) joint ventures with other parties, and (c) through royalty trusts.[4]

16. On February 8, 2011, SandRidge did a presentation at the Credit Suisse 2011 Energy Summit. In the presentation, the Company indicated that the average Mississippian well

---

[3] KeyBanc Capital Markets, SandRidge analyst report, "SD: New Oil Focused Company; Execution Is Key," dated October 5, 2010 (emphasis in original).

[4] During the Class Period, SandRidge created two royalty trusts related to the Mississippian. In April 2011 and April 2012, SandRidge raised funds through the Mississippian Trust I and Mississippian Trust II, respectively, totaling almost $1 billion. *See* also SandRidge's February 25, 2011, conference call with analysts. (James Vasser - Wells Fargo Securities - Analyst: "[C]an you give us any idea on potential timing of further horizontal Mississippian monetizations beyond your royalty trust structure?" Tom Ward (SandRidge's Chairman & CEO): "The timing on the Mississippian is that . . . we just have now just finished buying the acreage so have potentially the first asset monetization in . . . late March, early April. We'll continue to look for ways to monetize but we're in really no hurry because we do have long term on our leases. So I think throughout the year, we'll continue to do several things. We'll look at other asset monetizations like we've already done. We will talk to other people about either joint venturing with us or partnering with us, selling acreage, or we'll decide that we want to develop areas ourselves and maybe look at other ways to bring in capital. So I think that we're wide open to other ideas.")

would produce 211 Mbbl[5] of oil over its lifetime (*i.e.*, that the estimated ultimate recovery ("EUR") for oil was 211 Mbbl), and that crude oil would represent 52% of total production.[6] On February 17, 2011, SunTrust issued an analyst report that stated:

> ***Raising Price Target as Horizontal Mississippian Play Ready to Run***
>
> **New price target accounts for increased activity.** We are increasing our price target by $2 per share, as we believe upcoming asset monetizations and sales provide capital to ramp 2012 activity.
>
> **Horizontal Mississippian play becoming a company maker.** We believe SandRidge should be able to further monetize the play beyond the royalty trust given the nearly one million acres the company is soon likely to control. Our channel checks also indicate that other major players are aggressively adding acres and a private has 80,000 acres in the play with final bids expected next week.[7]

17. From January 31, 2011 through February 24, 2011, SandRidge's stock price increased more than 23%, compared to an increase in the S&P 500 of 1.6% and in the S&P Oil & Gas E&P index of 2.0%. On February 24, 2011, SandRidge reported its results for 4Q2010 and FY2010 that were largely in-line with expectations, and increased its operational guidance (including production of oil) for FY2011.[8] The following day, on February 25, 2011, SandRidge

---

[5] One Mbbl is 1,000 barrels of oil. One MMbbl is one million barrels of oil. One Mboe is 1,000 barrels of oil equivalents. One MMboe is one million barrels of oil equivalents. One MMcf is one million cubic feet of gas, and 6 MMcf equal one Mboe.

[6] SandRidge presentation at the February 8, 2011 Credit Suisse 2011 Energy Summit, pages 10-11. Total EUR (both oil and gas) was estimated at 409 Mboe, with a low to high range of 300 Mboe to 500 Mboe.

[7] SunTrust Robinson Humphrey, SandRidge analyst report, "Raising Price Target as Horizontal Mississippian Play Ready to Run," dated February 17, 2011 (emphasis in original).

[8] The notation "4Q2010" represents the fourth quarter of fiscal year 2010, while the notation "FY2010" is fiscal year 2010. I will use this notation throughout this report to refer to different fiscal quarters and fiscal years.

held a conference call with analysts to discuss the results. On the conference call, Tom Ward (Chairman and CEO) stated:

> As most of you know, we have completed the transition to crude oil that started two years ago. While challenging during the process and viewed by many as contrarian move, we can now look back and see that we not only made the right call on commodities, but did so in size and scale that transformed our Company. Only two years ago, our revenue consisted of over 80% natural gas and now is more than 80% oil. We remain true to our conviction on developing shallow, low cost, proven carbonate reserves.
>
> First, we expanded our holdings in the Central Basin Platform with the acquisition of assets from Forest and Arena and now we have 780,000 acres in the horizontal Mississippian carbonate play in Oklahoma and Kansas. These two areas have the important characteristics we require in all of our plays – low cost, low reservoir risk, scalability and repeatability. Key infrastructure is in place for oil and gas development, rigs are readily available, shallow reservoirs mean fewer drilling days and low horsepower requirements for hydraulic fracturing all contribute to low costs and very high rates of return. Furthermore, because we work in areas that have been proven by thousands of vertical wells over decades of drilling, we take on little reservoir risk in generating these high rates of return. We also have a drilling inventory in place to continue this type of drilling success for many years to come.
>
> Another advantage to our Mississippian play is our low entry cost. We've now basically shut down our leasing efforts but once all the numbers come in, we expect to have spent less than $200 per acre and should have over 900,000 net acres leased. This is in stark contrast to the entry cost of many of the recent high-profile plays where acreage costs have been 10 times to 100 times higher. We could only accomplish putting together our holdings in the Central Basin Platform by being ahead of the industry, and deciding to make this a core area in early 2009. Today, it would be impossible to duplicate. Also, it would be impossible to have our acreage position in the Mississippian play had we not moved aggressively during the last year. We spent two years acquiring oil production and oil drilling locations in areas that most others have overlooked.

18. On the February 25, 2011 conference call, James Bennett (SandRidge's CFO) also explained that the oil production was "much more valuable" than the gas production:

> Of course, when the oil and gas ratio is trading at 22 to 1, looking at the absolute volume growth based on a 6 to 1 equivalent becomes a lot less meaningful. In this commodity market environment, growth in oil production is just much more valuable. As I mentioned, we're forecasting CapEx of $1.3 billion, up from our previous guidance of $1.1 billion. And 100% of our drilling expenditures for the remainder of the year will be dedicated to oil projects as we develop our assets in the Permian and the Mississippian.

19. At the beginning of the proposed Class Period, the Company indicated that the average Mississippian well would produce 211 Mbbl of oil over its lifetime (*i.e.*, that the EUR for oil was 211 Mbbl), that crude oil would represent 52% of total EUR of 409 Mboe, and that the internal rate of return ("IRR") would be 100%.[9] On March 1, 2011, a SandRidge investor presentation referenced the "high rate of return" for horizontal Mississippian wells with the rate of return now at 120%. The Company's March 1 presentation also reiterated that the average horizontal Mississippian well would have an oil EUR of 211 Mbbl and a total EUR of 409 Mboe, equating to 52% oil and 48% gas. SandRidge continued to represent these production figures to investors, including at a March 7, 2011 Raymond James Institutional Investors Conference, its June 3, 2011 Annual Shareholders Meeting, a June 6, 2011 RBC Capital Markets Energy and Power Conference, and in SandRidge's June 14, 2011 Investor Presentation.

20. On August 4, 2011, SandRidge reported their 2Q2011 results and provided updated guidance for 2011 and new guidance for 2012. On the August 5, 2011 conference call, SandRidge's President and COO, Matt Grubb, revealed that the Company was seeing "more gas in the Mississippi drilling."[10] The decrease in oil relative to gas was also reflected in the Company's increased guidance of 2011 production due, at least in part, to a significant increase

---

[9] SandRidge presentation at the February 8, 2011 Credit Suisse 2011 Energy Summit, pages 10-11. *See* also SandRidge February 25, 2011 conference call. (Tom Ward: "If you were at our Analyst Day presentation last year, you would have seen a slide that expected a 235 MBOE EUR. We have since moved the EUR to more than 300 MBOE to 500 MBOE and our latest type curve from Netherland Sewell is 409 MBOE per well with 52% crude oil, not liquids, but oil, an important distinction when NGLs are trading at less than 40% of crude.") Oil EUR for the average Mississippian well is calculated as 52% of total EUR (409 Mboe), which the Company (presumably using more precise numbers) calculated to be 211 Mbbl oil EUR.

[10] SandRidge August 5, 2011 conference call. (Matt Grubb: "Really our gas decline outside the Permian and the Mid-Con and the non-active areas have been fairly consistent with what we predicted early in the year. But, what we are seeing is more gas in the Mississippi drilling. Not at the [expense of] oil, but certainly a higher gas rate than we have projected on the type curve.")

in capital expenditures.[11] Despite the increase in gas, SandRidge did not change its guidance relating to the gas to oil ratio or oil production in the Mississippian at that time, stating that they would instead revisit their estimate at the end of 2011.[12]

21. On November 3, 2011, SandRidge, reported their 3Q2012 results, and on November 4, 2011, the Company held a conference call with analysts. On the call, Tom Ward stated that a "Miss well is now projected to produce 56% natural gas," implying a production from oil of 44%.[13]

---

[11] SandRidge August 4, 2011 Press Release, "SandRidge Energy, Inc. Reports Financial and Operational Results for Second Quarter and First Six Months of 2011." The previous projection, dated May 5, 2011, estimated that SandRidge would produce 12.3 Mmbbl of oil, compared to a total production of 23.3 MMBoe, translating into 52.8% of total production. The new projection estimated that SandRidge would produce 12.4 Mmbbl of oil, compared to a total production of 24.1 MMBoe, translating into 51.5% of total production, a reduction of 1.3%. SandRidge's August 5, 2011 conference call. ("As you have seen, we've increased our 2011 budget by $500 million to $1.8 billion total. The allocation for the increase is as follows. $150 million for drilling more wells in the Permian and the Miss wells, including saltwater disposal wells. And also that includes the adjustment of the well cost in the Miss from $2.5 million to $3 million. There are also $50 million of non-op drilling in the Mississippian, and increased work-overs and re-completions in the Company. The biggest part of the increase is in land, $275 million in additional land spending for acquisition of new acreage in the Central Basin platform and the new Mississippian play, and $25 million for oil field services in Midstream. We also have guided to $1.8 billion -- $1.8 billion budget in 2012, where we anticipate drilling about 850 wells in the Permian Basin and about 350 Horizontal Miss wells in the Mid-Con next year.")

[12] SandRidge August 5, 2011 conference call. (Joseph Allman - JPMorgan Chase & Co. - Analyst: "Could you describe that for us?. . . what is the trend above the 409,000? Or what are those wells trending towards in terms of an EUR, and so how much incremental gas are you actually seeing?" Matt Grubb: "Starting with the type curve . . . that represents 400,000 barrels of oil equivalent is almost 50-50. I think it's 48 gas and 52 oil." On possible EUR update, Tom Ward: "We will revisit the type curve at the end of the year, and make a decision at that time whether we want to change the type curve in the range or not, but we are not there yet.")

[13] SandRidge November 4, 2011 conference call. (Tom Ward: "[O]ur Mississippian production has performed above our expectations. The Mississippian oil production is in line with our type curve and our natural gas production is better than we anticipated. A Miss well is now projected to produce 56% natural gas.") Robert W. Baird analyst report, "Permian Drove Underperformance; Old Miss Play Performing Well," dated November 4, 2011. ("Old Miss play continues to outperform. 30-day IP rate at SD's old Miss play has averaged 308 boe/d from its last 119 wells, above the 244 boe/d IP rated assumed in its current type curve. Upside is driven

22. On January 10, 2012, SandRidge provided guidance regarding oil EUR for the Mississippian of 204 Mbbl (down from 211 Mbbl in 2011), while total EUR was 456 Mboe (up from 409 Mboe), resulting in oil EUR now representing 45% of total EUR (down from 52% in 2011).[14] This guidance was premised (at least in part) on an initial production of 275 Boe per day and an IRR of 96%, which was repeated at the Credit Suisse Energy Summit on February 7, 2012, and on the February 24, 2012, conference call discussing SandRidge's 4Q2011 and FY2011 performance.[15] Furthermore, in SandRidge's annual 2011 Letter to Shareholders, the Company similarly represented that the average horizontal Mississippian well would produce 456 Mboe and provide an IRR of approximately 98%.[16]

---

by higher natural gas rate with gas mix of 56%. We believe SD's Miss EUR of 409 MBoe has upward bias.")

14 SandRidge presentation at the Goldman Sachs Global Energy Conference on January 10, 2012, pages 19-20.

15 SandRidge presentation at the Credit Suisse Energy Summit on February 6-7, 2012, page 15. February 24, 2012, SandRidge conference call. ("Neal Dingmann - SunTrust Robinson Humphrey – Analyst: "Morning, gentlemen, solid quarter. Say, Tom, first question, just on it looked like the last several results in the horizontal Miss have been a bit better than what it was towards the beginning. Just wondering if you could comment on the type curve? Do you see that potentially reflecting a change again upwards or are you going to be content with that for a bit?" Tom Ward: "We'll be content for this year at 275 barrels a day on the first 30 days. We're the only company that gives all of the data on our wells and the 30 day average of all of our wells that we drill. And so far, we're above the 275. In fact, in 2011 we were at 302 per day on the first 30 day average, and we're continuing to be above that in 2012. However, we won't change our type curve. If it changes at all, it won't change until the end of 2012 when we look back at the overall program as – at the end of the year when we do our outside reserves.")

16 SandRidge 2011 Annual Report, page 3.

23. SandRidge's production guidance for the Mississippian was repeated in many presentations during 2012, including as late as SandRidge's presentation at the Johnson Rice Energy Conference on October 2, 2012.[17]

24. On November 8, 2012, SandRidge reported their 3Q2012 results and provided updated guidance for 2012 and new guidance for 2013.[18] While the prior 2012 production guidance (dated August 2, 2012) had oil making up more than 55% of total production, the revised 2012 production guidance reduced this ratio to approximately 53.5%, and the new 2013 production guidance had oil making up less than 50% of total production. On the November 9, 2012 conference call, Matt Grubb stated that: "As for the Mississippian, while the gas performance has been on target, we are seeing a steeper oil decline than we previously anticipated, and have made revision to our model accordingly for 2013."[19] More specifically, the average Mississippian well was now expected to produce 155 Mbbl of crude oil during its lifetime, *i.e.*, its EUR for oil was 155 Mbbl, down from the Company's previous estimate of 204 Mbbl, or a decline of 24%, and the IRR was now 50% (down from 82% on October 2, 2012).[20] This event marks the end of the Class Period.

---

[17] SandRidge's presentation at the Johnson Rice Energy Conference on October 2, 2012, page 8: Estimated Oil EUR of 204 Mbbl (100% Crude); estimated Gas EUR of 1,512 MMcf (or 252 Mboe); Total EUR is 456 Mboe and in IRR of 82%.

[18] SandRidge November 8, 2012 Press Release, "SandRidge Energy, Inc. Reports Financial and Operational Results for Third Quarter and First Nine Months of 2012."

[19] SandRidge November 9, 2012 conference call.

[20] SandRidge November 9, 2012 conference call. (Matt Grubb: "But based on our observations of performance now from over 400 wells, and with more history, we're modeling 155,000 barrels of oil and 1.6 Bcf per well," which translates into a total EUR of 422 Mboe and oil as a percentage of total of 37%. "…in regard to the Mississippian performance, we are at about 50% rate of return on our drilling.") For prior Mississippian estimates, see SandRidge's presentation at the Johnson Rice Energy Conference on October 2, 2012, page 8, where Oil EUR

25. Below is a graph showing SandRidge's stock price from February 1, 2011 through November 30, 2012.




## V. PLAINTIFFS' ALLEGATIONS

26. For the purpose of my analysis, I have assumed that Plaintiffs will be able to prove their factual allegations at trial.[21] Generally, it is my understanding that Plaintiffs allege that Defendants made numerous false and misleading statements that misrepresented the

---

is 204 Mbbl (100% Crude); Gas EUR is 1,512 MMcf; and Total EUR is 456 Mboe. In other words, oil EUR as a percentage of total EUR declined from 45% (204/456) to 37% (155/422).

[21] This is consistent with the traditional role of a damages expert. *Reference Manual on Scientific Evidence: Reference Guide on Estimation of Economic Damages*, 3rd. ed. at 432. ("In almost all cases, the damages expert proceeds on the hypothesis that the defendant committed the harmful act and that it was unlawful.")

prospects of the Mississippian while concealing the truth about its EUR for oil and gas, its ratio of gas or oil to total production and that the economics of the Company's Mississippian wells were much worse than represented.[22] Plaintiffs' allegations are summarized in greater detail in the Complaint. That said, below is my understanding of the key allegations in this matter.

27. Plaintiffs allege that, throughout the Class Period, Defendants "told investors that SandRidge was investing in the Mississippian due to the large amounts of oil reserves and the favorable amount of oil relative to gas in the area," and that these "statements misrepresented the nature of the Mississippian properties."[23] Specifically, Plaintiffs allege that, during the Class Period, Defendants: (a) grossly overstated the amount of oil relative to gas of the typical SandRidge horizontal Mississippian well; (b) falsely represented during 2011 that its average horizontal Mississippian well was expected to produce 52% oil and 48% gas over its lifetime, even though production data indicated oil production of 45% or less oil; and (c) falsely represented during 2012 that its average horizontal Mississippian well was expected to produce 45% oil and 55% gas over its lifetime, even though production data indicated a much lower oil production.[24]

28. Furthermore, Plaintiffs allege that, during the Class Period, Defendants overstated the oil EUR, falsely representing that the estimated oil EUR for the Company's average horizontal Mississippian well was expected to be at least 204 Mbbl.[25] However, a decline curve

---

[22] Complaint, ¶¶146-148.

[23] Complaint, ¶4.

[24] Complant, ¶¶5-6, 152. It is my understanding that discovery has so far produced internal estimates of oil as a percentage of total EUR of 40% on 7/8/2011, 7/26/2011 and 8/4/2011. Source files: SD-SECURITIES-0419919, SD-SECURITIES-0455614, SD-SECURITIES-0681687 and SECURITIES-0723995.

[25] Complaint, ¶¶7, 153.

analysis of reported production data for SandRidge's initial horizontal Mississippian wells indicated that these wells would produce 155 Mbbl (*i.e.*, oil EUR was 155 Mbbl) or less.[26]

29. Additionally, Plaintiffs allege that Defendants misrepresented the economics of the Mississippian, including the IRR of the typical horizontal well, and that the Mississippian wells performed much worse than represented.[27] Since the wells were expected to produce much less oil, and more gas relative to oil, than represented, SandRidge misrepresented the IRR and economics of the typical Mississippian wells.

30. On November 8, 2012, SandRidge finally revealed the alleged truth concealed by the alleged misrepresentations, that the average Mississippian well was now expected to produce less than 40% oil, and that the oil EUR was 155 Mbbl.[28]

31. The above summary of the factual allegations that Plaintiffs intend to prove at trial may be incomplete because it likely does not reflect all the evidence as fact discovery has not yet been completed.

## VI. MARKET EFFICIENCY IN A FRAUD-ON-THE-MARKET CONTEXT

32. An efficient market is one that efficiently processes new and material information. In an efficient market, new and material information is quickly incorporated into the stock price as different investors buy and sell based on their respective evaluations of the new information

---

[26] *Id.* It is my understanding that discovery has so far produced internal oil EUR estimates for the Mississippian of 156.5 Mbbl (7/8/2011), 150 Mbbl (7/26/2011) and 151 Mbbl (8/4/2011). Source files: SD-SECURITIES-0419919, SD-SECURITIES-0455614, SD-SECURITIES-0681687 and SECURITIES-0723995.

[27] Complaint, ¶¶146-148, 267.

[28] Complaint, ¶¶11, 346, 347. SandRidge November 8, 2012 press release, "SandRidge Energy, Inc. Reports Financial and Operational Results for Third Quarter and First Nine Months of 2012," and SandRidge November 9, 2012 conference call.

disclosed.[29] This also means that the resulting stock price will reflect the investors' consensus regarding the stock's value given the available public mix of information.[30] The driving force that causes markets to be efficient is the competition amongst investors to quickly analyze and trade on new information as it becomes available. As a result of this competition, riskless profit opportunities are short lived and do not persist in efficient markets. This concept has broad empirical support.[31]

33. For securities class actions, there are two important implications of an efficient market. First, in an efficient market it is reasonable for investors to rely on the integrity of the market price. As explained in a commonly used finance textbook: "[i]n an efficient market you can trust prices," because they quickly impound new and material information, meaning that "in an efficient market, there is no way for most investors to achieve consistently superior rates of return."[32]

34. Second, in an efficient market, the impact of the alleged misrepresentations can be estimated, and class-wide damages quantified, based on an analysis of the market prices using an

---

29 How quickly new information is incorporated into the stock price depends on how unexpected and complex the information is. Generally, it is reasonable to assume that new and material information is incorporated into a stock price within one day.

30 This does not mean that all market participants agree on what the true value of the common stock is, as evidenced by the fact that some investors sell as others buy. Rather, it means that the respective investor's view of the stock's true value drives their purchases and sales (*i.e.*, the demand and supply for the stock), which in turn becomes the basis for the consensus price set by the overall market.

31 Burton G. Malkiel, *Rethinking the Financial Crisis*, Russell Sage Found., Ch. 4, at 75 (2012) ("At its core, EMH [the Efficient Market Hypothesis] implies that arbitrage opportunities for riskless gains do not exist in an efficiently functioning market and that, if they do appear from time to time, they do not persist. The evidence is clear that this version of EMH is strongly supported by the data.").

32 Richard A. Brealey, Stewart C. Myers & Franklin Allen, *Principles of Corporate Finance*, McGraw-Hill (11th ed. 2013), Ch. 13 at 337.

event study.[33] This is so because the "alleged misrepresentations and omissions, whether material or immaterial, would be so equally for all investors composing the class," and that, therefore, the Class "will prevail or fail in unison."[34]

35. In *Cammer v. Bloom*, the court analyzed the criteria that should be evaluated in determining whether a market is efficient.[35] The *Cammer* court asked for evidence that the stock traded in an open and developed market, and provided five factors to assess market efficiency, including evidence showing that the market participants had the sophistication to understand the economic implications of new and material information (market makers/institutions), that they analyzed the information (analyst coverage), and that they traded on the information (trading volume). In my experience, and from an economic point of view, I find that these factors are very useful in determining whether a market was open and developed, and would be expected to efficiently process new, material information. As discussed above, academic research has shown that equity securities that trade in such markets quickly react to new and material information so that it is extremely difficult, if not impossible, to consistently outperform the overall market. prices.[36] Consequently, in such markets, it would be reasonable to rely on the integrity of the

---

33 *See*, Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 Bus. Law 545 (1994).

34 *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 459-60 (2013).

35 *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

36 *See* Robert Merton, "On the Current State of the Stock Market Rationality Hypothesis," *Macroeconomics and Finance: Essays in Honor of Franco Modigliani*, (1987); Eugene Fama, "Efficient Capital Markets: II," *Journal of Finance*, Vol. 46 (1991); Jonathan Macey, Geoffrey Miller, Mark Mitchell & Jeffry Netter, "Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson," Vol. 77 *Virginia Law Review*, (1991); Richard Roll, "What Every CFO Should Know About Scientific Progress in Financial Economics: What Is Known and What Remains to be Resolved," Vol. 23 *Fin. Mgmt.* (1994); Burton Malkiel, *Rethinking the Financial Crisis*, Russell Sage Found., Ch. 4, (2012); Eugene

market prices. *Cammer* also explained that it would be "helpful" to demonstrate that the stock price in question quickly reacted to new and material company-specific information, as this represents direct evidence of market efficiency. Below, I will review the *Cammer* factors used to assess market efficiency.[37]

### A. Trading on the New York Stock Exchange Supports My Conclusion that SandRidge traded in an Efficient Market

36. During the entire Class Period, SandRidge's common stock was listed and traded on the NYSE under the ticker symbol "SD." The NYSE is one of the largest and most sophisticated securities markets in the world, and, as a result, market efficiency is commonly presumed for securities that trade on the NYSE.[38] The fact that SandRidge's common stock traded on the NYSE supports my opinion that it traded in an efficient market.[39]

---

Fama & Kenneth French, "Luck Versus Skill in the Cross-Section of Mutual Fund Returns," Vol. 65 *The J. of Fin.* (2010); and Richard Brealey, Stewart Myers & Franklin Allen, *Principles of Corporate Finance*, McGraw-Hill (11th ed. 2013), Ch. 13.

37 In addition, I have also analyzed the additional factor first identified in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). These additional factors are: (a) market capitalization, which for SandRidge exceeded $2 billion; (b) bid-ask spread, which for SandRidge's common stock that traded on the NYSE averaged approximately $0.011 per share; and (c) the public float, or shares in public hands (*i.e.*, excluding shares owned by insiders), which for SandRidge exceeded 350 million shares. Each of these three additional Krogman factors have also been met. *See* Steinholt Class Cert. Report, ¶¶46-52.

38 *Cammer*, 711 F. Supp. at 1292 (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, §8.6 (1988)) ("'We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges . . .'"). *See* also Michael C. Jensen, "Some Anomalous Evidence Regarding Market Efficiency," 6 J. of Fin. Econ. 95 (1978). ("I believe there is no other proposition in economics which has more solid empirical evidence supporting it than the Efficient Market Hypothesis. That hypothesis has been tested and, with very few exceptions, found consistent with the data in a wide variety of markets: the New York and American Stock Exchanges, . . .")

39 Steinholt Class Cert. Report, ¶¶19-20.

### B. *Cammer* Factor 1: Large Trading Volume Supports My Conclusion that SandRidge Traded in an Efficient Market

37. The first *Cammer* factor relates to SandRidge's trading volume.[40] In its opinion, the *Cammer* court explained:

> The reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.[41]

38. SandRidge total reported trading volume during the Class Period was more than 5.7 billion shares (dollar trading volume exceeding $46.9 billion), while the average reported daily trading volume for exceeded 13.2 million shares (average daily dollar volume of approximately $108.8 million). This demonstrates that there was "significant investor interest" in the stock, and that there were willing buyers and sellers who provided liquidity for the stock. Furthermore, SandRidge's average weekly trading volume was approximately 13%, thereby substantially exceeding the 2% benchmark used by some courts to justify a strong presumption of market efficiency.[42] Based on these two analyses, I concluded that *Cammer* factor 1 has been met.[43]

---

[40] Academic research has found that trading volume is one factor "that systematically differentiate[s] between efficiently and inefficiently priced stocks." Brad M. Barber, Paul A. Griffin & Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. of Corp. L. 285 (1994).

[41] *Cammer*, 711 F. Supp. at 1286.

[42] *Cammer*, 711 F. Supp. at 1293 (quoting Bromberg & Lowenfels, §8.6, *supra* fn. 18). ("'[t]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.'")

[43] *See also* Steinholt Class Cert. Report, ¶¶21-23.

### C. *Cammer* Factor 2: Analyst Coverage Supports My Conclusion that SandRidge Traded in an Efficient Market

39. The second *Cammer* factor relates to the number of securities analysts that followed and reported on SandRidge.[44] In its opinion, the *Cammer* court explained:

> The existence of such analysts would imply, for example, the [Company] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors. In this way the market price of the stock would be bid up or down to reflect the financial information contained in the [Company] reports, as interpreted by the securities analysts.[45]

40. Analyst coverage refers to securities analysts who follow, analyze and report on a company to their clients.[46] Many firms do not have any analyst coverage, and are therefore more likely to trade in less efficient markets than firms with analyst coverage.[47] SandRidge, on the other hand, had at least 24 firms that followed the Company during the Class Period.[48] So far, I have obtained approximately 240 analyst reports covering SandRidge issued by brokerage firms

---

[44] Academic research has found that analyst coverage is one factor "that systematically differentiate[s] between efficiently and inefficiently priced stocks." Barber, Griffin & Lev, *supra* fn 40.

[45] *Cammer*, 711 F. Supp. at 1286.

[46] Analysts providing analysis and recommendations to their clients are commonly referred to as sell-side analysts. In addition, public companies are also followed by a presumably much larger number of so-called buy-side analysts, or analysts who work for investment firms and whose research is generally used internally by these firms to make investment decisions. The number of buy-side analysts of a particular company is not publicly known.

[47] *See* fn 40. One study found that approximately 35% of a large sample of publicly traded firms in the U.S. did not have any analyst coverage. Fang (Frank) Yu, *Analyst Coverage and Earnings Management*, 88 J. of Fin. Econ. 245 (2008). Another study found that the median and mean number of analysts covering a company was one and five, respectively. Pandej Chintrakarn, Pornsit Jiraporn, Young S. Kim and Jang-Chul Kim, *Does Corporate Governance Quality Affect Analyst Coverage? Evidence from the Institutional Shareholder Services (ISS)*, SSRN Working Paper, http://ssrn.com/abstract=2458841.

[48] *Bloomberg* (SD Equity ANR).

from February 2011 through November 2012.[49] In addition, during the Class Period, SandRidge also presented and answered questions at different analyst conferences.[50] There were also more than 1,000 media reports on *Bloomberg* (SD US Equity, CN) during the Class Period. Based on the above evidence, I conclude that *Cammer* factor 2 has been met.[51]

### D. *Cammer* Factor 3: The NYSE Designated Market Maker Structure, the Numerous Liquidity Providers and Institutional Investors Support My Conclusion that SandRidge Traded in an Efficient Market

41. The third *Cammer* factor relates to the number of arbitrageurs, market makers and/or other sophisticated investors such as institutional investors, who traded SandRidge. In its opinion, the *Cammer* court explained:

> Third, it could be alleged the stock had numerous market makers. The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level.[52]

42. Transactions on the NYSE do not go through market makers, as the term was used in *Cammer*.[53] Rather, transactions on the NYSE go through a designated market maker

---

[49] Exhibit B.

[50] Steinholt Class Cert. Report, ¶26.

[51] *See also* Steinholt Class Cert. Report, ¶24-27.

[52] *Cammer*, 711 F. Supp. at 1286-87.

[53] In 2005, the SEC adopted REG NMS (Regulation National Market System) requiring orders to be executed at the best price, fostering competition amongst the exchanges. This means that NYSE-listed stocks only trade through the NYSE if it provides the best price, or best bid and offer. If not, transactions go through one of the other exchanges, *i.e.*, the exchange with the best price. These other exchanges, such as NASDAQ, do have market makers or liquidity providers. According to *Bloomberg*, out of more than 250 supplemental liquidity providers, there were 59 such liquidity providers for SandRidge common stock with volume of at least 1,000,000 shares from February 2011 through November 2012. *Bloomberg* SD US Equity, BAS.

("DMM"), formerly known as the specialist, who is responsible for maintaining a fair, competitive, orderly and efficient market for the security assigned to them. The DMM is responsible for maintaining orderly trading while continually showing the best bids and offers, and will enter into a transaction using its own capital if there is a willing buyer or seller with no counter party. The DMM system enables investors to trade continuously during market hours in an orderly and liquid market, thereby facilitating market efficiency.

43. The sophisticated investors discussed in *Cammer* are investors who are able to quickly evaluate new information and understand its potential impact on the value of a security, and who then take appropriate investment actions causing the new information to become reflected in the price of the security. The presence of sophisticated investors is an important factor ensuring that a security is traded in an efficient market.[54] Institutional investors are such sophisticated investors. According to the available information, there were at least 484 institutional investors that reportedly owned between 258 million and 304 million SandRidge's shares each quarter during the Class Period, or between 59% and 73% of its common stock outstanding.[55] The substantial presence of sophisticated institutional investors supports my opinion that SandRidge's common stock traded in an efficient market.

44. Based on the above evidence, I conclude that *Cammer* factor 3 has been met.[56]

### E. *Cammer* Factor 4: Eligibility to File on Form S-3 Satisfied

45. The fourth *Cammer* factor relates to SandRidge's eligibility to file on Form S-3. To be eligible to file Form S-3, a company has to be an SEC reporting company for at least 12

---

[54] Academic research has shown that efficiently traded firms tend to have higher institutional ownership than inefficiently traded firms. Barber, Griffin & Lev, *supra* fn 40.

[55] Steinholt Class Cert. Report, ¶30.

[56] *See also* Steinholt Class Cert. Report, ¶¶28-30.

months, and have $75 million in voting stock held by non-affiliates (average during 60-day period prior to filing). SandRidge was eligible to file on Form S-3 during the entire Class Period, and, in fact, did file on Form S-3 on March 30, 2011; May 25, 2011; January 5, 2012 and October 24, 2012. Based on the above evidence, I conclude that *Cammer* factor 4 has been met.[57]

### F. *Cammer* Factor 5: Material Market, Industry and Company-Specific Information Was Quickly Incorporated into SandRidge's Stock Price, Supporting My Conclusion that SandRidge Traded in an Efficient Market

46. The direct test of market efficiency relates to whether a stock price quickly reacts to unexpected new material information. While *Cammer* factors one through four discussed above provide evidence that the competitive environment that facilitates market efficiency was in place during the Class Period, the last *Cammer* factor calls for some empirical evidence that SandRidge's common stock price quickly incorporated new and material information. More specifically, in its opinion, the *Cammer* court explained:

> Finally, it would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. This, after all, is the essence of an efficient market and the foundation for the fraud on the market theory.[58]

47. In the Steinholt Class Cert. Report, I demonstrated that price returns on financial releases days were significantly more likely to be statistically significant than price returns on days without financial releases, a result that had only a once in 2.5 million chance of occurring randomly.[59] I also went through each of the financial releases with statistically significant price

---

57 *See also* Steinholt Class Cert. Report, ¶¶31-32.

58 *Cammer*, 711 F. Supp. at 1287.

59 Steinholt Class Cert. Report, ¶37.

returns during the Class Period and concluded that the returns were directionally consistent with what one would expect in an efficient market.[60] This represents empirical evidence showing a "cause and effect" relationship between "financial releases and an immediate response in SandRidge's stock price."[61] Based on the above evidence, I conclude that *Cammer* factor 5 has been met.[62]

### G. Conclusion: The *Cammer* and *Krogman* Factors Support My Opinion that SandRidge Traded in an Efficient Market

48. The above analyses demonstrates that new and material market, industry and Company-specific information was quickly incorporated into SandRidge's stock price during the Class Period, as one would expect in an efficient market. Specifically, the evidence I have reviewed shows that new and material information about SandRidge was widely disseminated to the market, analyzed by market participants and traded on, causing the information to quickly become reflected in the Company's stock price.

## VII. THE EVENT STUDY METHODOLOGY

49. In securities litigation cases, the event study is generally considered superior to other valuation techniques in isolating the impact of new information on stock prices. In an efficient market, securities prices quickly incorporate new, material information. Consequently, the price movement following a disclosure of new information can be analyzed to: (a) assess statistical significance; and (b) quantify the portion of the price movement not explained by

---

60 Steinholt Class Cert. Report, ¶¶38-44.

61 *Cammer*, 711 F. Supp. at 1287.

62 *See also* Steinholt Class Cert. Report, ¶¶33-45.

market and industry factors, *i.e.*, the company specific portion of the price movement.[63] This type of analysis is generally referred to as an event study.[64] Below, I will discuss the five different steps that are generally included when conducting an event study: (a) define the event(s); (b) adjust for market and industry factors; (c) select control period(s); (d) calculate predicted returns, abnormal returns and t-statistics; and (e) interpret results.

### A. <u>Step One:</u> Define the Event(s)

50. The first step in the event analysis generally involves defining the event or events. In this case, I assessed the statistical significance of every day during the Class Period. That said, of primary importance were the price returns on the key event days containing alleged misrepresentations, and the event day(s) that partially revealed the alleged truth in this case. For my purposes, the key fraud-related event days analyzed were the following eight days when SandRidge issued their financial releases during 2011 and 2012.[65]

February 25, 2011: After the market closed on February 24, 2011, SandRidge reported its 4Q2010 and FY2010 results, and in the morning of February 25, 2011, SandRidge held its conference call with analysts to discuss the results. Among other things, the Company reported on the performance of the Mississippian, discussed its "move to oil" and reiterated its allegedly inflated oil guidance regarding Mississippian containing 52% oil.[66]

---

63 A statistically significant price movement is one that is unlikely to have occurred simply by chance, and is therefore a price movement likely caused by the event.

64 For a more detailed explanation of the event study methodology, *see* Mark Mitchell & Jeffry Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *49 Bus. Law* 545, (Feb. 1994).

65 Each of the financial release days are specifically alleged in the Complaint to be days on which Defendants made misrepresentations regarding the Mississippian.

66 SandRidge February 24, 2011 Press Release, "SandRidge Energy, Inc. Reports Financial and Operational Results for Fourth Quarter and Full Year 2010"; SandRidge February 25, 2011 Conference Call; Complaint, ¶¶155-156.

**CONFIDENTIAL**

May 6, 2011: After the market closed on May 5, 2011, SandRidge reported its 1Q2011 results, and in the morning of May 6, 2011, SandRidge held its conference call with analysts to discuss the results. Among other things, the Company reported on the performance of the Mississippian, stated that they "continue[d] to execute [their] oil-directed plan" and that the Company's "[p]roduction growth [was] matching [their] expectations."[67]

August 5, 2011: After the market closed on August 4, 2011, SandRidge reported its 2Q2011 results, and in the morning of August 5, 2011, SandRidge held its conference call with analysts to discuss the results. Among other things, the Company significantly increased its 2011 capital expenditures, reported on the performance of the Mississippian, stated that the Mississippian "results continue to meet or exceed [their] expectations," but also that they were seeing "more gas in the Mississippi drilling" and that they would "revisit the type curve at the end of the year," updated production guidance for 2011 reflecting less gas as a percentage of total production, and reiterated SandRidge's allegedly inflated oil guidance regarding Mississippian containing 52% oil.[68]

November 4, 2011: After the market closed on November 3, 2011, SandRidge reported its 3Q2011 results, and in the morning of November 4, 2011, SandRidge held its conference call with analysts to discuss the results. Among other things, the Company reported on the performance of the Mississippian, stated that the "Mississippian production has performed above our expectations," and that a "Miss well is now projected to produce 56% natural gas."[69]

January 10, 2012: On January 10, 2012, SandRidge was a presenter at the Goldman Sachs Global Energy Conference, and provided an updated guidance regarding the Mississippian. According to the Company, total (gas and oil) EUR for the Mississippian horizontal wells was 456 Mboe, 45% (or 204 Mbbl) which was from crude oil.[70]

---

[67] SandRidge May 5, 2011 Press Release, "SandRidge Energy, Inc. Reports Financial and Operational Results for First Quarter 2011"; SandRidge May 6, 2011 Conference Call; Complaint, ¶¶183-188.

[68] SandRidge August 4, 2011 Press Release "SandRidge Energy, Inc. Reports Financial and Operational Results for Second Quarter and First Six Months of 2011"; SandRidge August 5, 2011 Conference Call; Complaint, ¶¶198-203.

[69] SandRidge November 3, 2011 Press Release, "SandRidge Energy, Inc. Reports Financial and Operational Results for Third Quarter and First Nine Months of 2011"; SandRidge November 4, 2011 Conference Call; Complaint, ¶¶209-213.

[70] SandRidge presentation at the Goldman Sachs Global Energy Conference on January 10, 2012, pages 19-20; Complaint, ¶¶221-223.

February 24, 2012: After the market closed on February 23, 2012, SandRidge reported its 4Q2011 and FY2011 results, and in the morning of February 24, 2012, SandRidge held its conference call with analysts to discuss the results. Among other things, the Company reported on the performance of the Mississippian and stated that "the success in the original Miss and the thousands of vertical wells drilled today gave us the history needed to find a partner without spending the capital to drill new wells."[71]

May 4, 2012: After the market closed on May 3, 2012, SandRidge reported its 1Q2012 results, and in the morning of May 4, 2012, SandRidge held its conference call with analysts to discuss the results. Among other things, the Company reported on the performance of the Mississippian, stated that "right now everything looks to be on track with what we have modeled to the 456,000 barrels EUR."[72]

August 3, 2012: After the market closed on August 3, 2012, SandRidge reported its 2Q2012 results, and in the morning of August 4, 2012, SandRidge held its conference call with analysts to discuss the results. Among other things, the Company reported on the performance of the Mississippian and reiterated SandRidge's guidance regarding Mississippian having an EUR of 456 Mboe.[73]

November 9, 2012: After the market closed on November 8, 2012, SandRidge reported its 3Q2012 results, and in the morning of November 9, 2012, SandRidge held its conference call with analysts to discuss the results. Among other things, the Company reported on the performance of the Mississippian and the alleged truth, that the average Mississippian well was expected to contain approximately 37% crude oil resulting in an oil EUR of 155 Mbbl.[74]

---

[71] SandRidge February 23, 2012 Press Release, "SandRidge Energy, Inc. Reports Financial and Operational Results for Fourth Quarter and Full Year 2011"; SandRidge February 24, 2012 Conference Call; Complaint, ¶¶233-237.

[72] SandRidge May 3, 2012 Press Release, "SandRidge Energy, Inc. Reports Financial and Operational Results for First Quarter 2012"; SandRidge May 4, 2012 Conference Call; Complaint, ¶¶255-262.

[73] SandRidge August 3, 2012 Press Release, "SandRidge Energy, Inc. Reports Financial and Operational Results for Second Quarter and First Six Months of 2012"; SandRidge August 4, 2012 Conference Call; Complaint, ¶¶268-274.

[74] SandRidge November 8, 2012 Press Release, "SandRidge Energy, Inc. Reports Financial and Operational Results for Third Quarter and First Nine Months of 2012"; SandRidge November 9, 2012 Conference Call; Complaint, ¶¶275-277, 344, 346-349.

### B. Step Two: Adjust for Market and Industry Factors

51. The second step involves selecting market and industry indices used to control for market and industry factors. Consistent with the Company's public filings, I selected the S&P 500 as a proxy for the market, and the S&P Oil & Gas E&P index as a proxy for the industry.[75] Both of these indices exhibited a statistically significant relationship with SandRidge during the relevant time period.[76]

### C. Step Three: Select a Control Period

52. The third step involves selecting a control period with normal price returns unaffected by the events examined, or estimation window, to determine the normal historical statistical relationship between SandRidge's price returns and that of the market and industry indices. In this case, I used the 252 day (approximately one-year) period prior to each event as the control period for the event, excluding the price movements on other potentially fraud-related event days.[77]

53. As a result of the above methodology, the control period is close to the actual day analyzed, and excludes potentially fraud-related event days that could taint the analysis. Regression analyses using the price returns during the control periods were then run to determine the regression equations used to predict SandRidge's price returns on the days analyzed.

---

[75] These are the market and industry indices used by SandRidge to measure its stock price performance against. *See* SandRidge 2012 Form 10-K, at 57.

[76] Steinholt Class Cert. Report, ¶¶35-36.

[77] *See* supra fn 33**,** Mitchell & Netter (Feb. 1994).

### D. <u>Step Four:</u> Calculate Predicted Returns, Abnormal Returns and T-Statistics

54. The fourth step involves using the regression equation discussed above to calculate SandRidge's predicted returns for each day analyzed. The difference between SandRidge's actual return and its predicted return is the abnormal return, *i.e.*, SandRidge's return net of market and industry factors. Statistical significance was then assessed by calculating the t-statistic (abnormal return divided by the standard error during the control period). The magnitude of the t-statistic was used to assess statistical significance, *i.e.*, the likelihood of the price return occurring simply by chance. More specifically, the t-statistic translates into a p-value, or probability that a price movement of equal or greater magnitude would occur randomly. A p-value of 5% or less, *i.e.*, a result that has a 5% or less chance of occurring randomly, is defined as being statistically significant at the 5% level. Similarly, a p-value of 1% or less, *i.e.*, a result that has a 1% or less chance of occurring randomly, is defined as being statistically significant at the 1% level.

### E. <u>Step Five:</u> Interpret Results

55. Finally, the fifth step involves interpreting the regression results for the events analyzed. The event study methodology provides an objective way to estimate the portion of a price movement not explained by market and industry factors, *i.e.*, explained by Company specific factors, known as the abnormal return. It also provides an objective way to assess statistical significance by comparing the abnormal return to the returns during the control period, as explained above. As explained above, statistical significance is frequently communicated using the p-value, or the probability of randomly obtaining a price return equal to or less than the

abnormal return.[78] While different experts will almost always use slightly different indices and control periods, using the steps listed above generally ensures that the statistical results from different experts remain reasonably similar. Attached as Exhibit C is a summary of the statistical analyses of the potentially fraud-related event days.

## VIII. LOSS CAUSATION

56. Loss causation relates to whether the alleged fraudulent act or omission "caused the loss for which plaintiffs seeks to recover damages."[79] In 2005, in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court considered the issue of loss causation in securities cases. The *Dura* opinion stated that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss," because "if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."[80] Instead, loss causation is established when the "relevant truth begins to leak out," and the stock price declines as a result.[81] The "relevant truth" is generally considered to be the truth allegedly omitted or concealed by the misrepresentation. As one court explained, "to establish loss causation this disclosed information must reflect part of the 'relevant truth' – the

---

78 It should also be noted that the results can be reported using a two-tailed or one-tailed test. A one-tailed test is useful when an event can be independently determined to have a negative future cash flow impact, or positive future cash flow impact, but not both. A two-tailed test is useful when the future cash flows of an event is uncertain. *Reference Manual on Scientific Evidence: Reference Guide on Multiple Regression*, 3rd. ed. at 321. ("A one-tailed test would usually be applied when the expert believes, perhaps on the basis of other direct evidence presented at trial, that the alternative hypothesis is either positive or negative, but not both.)

79 Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4.

80 *Dura*, 544 U.S. at 342.

81 *Id*.

truth obscured by the fraudulent statements."[82] While loss causation is a legal concept, below I will discuss the framework generally used by experts to analyze loss causation from an economic point of view.

57. In order to analyze loss causation, it is necessary to understand the various elements of the alleged fraudulent conduct. Generally, as in this case, plaintiffs allege that defendants made certain misrepresentations that concealed an undisclosed, material truth (including the foreseeable economic consequences that flow from this material truth). The misrepresentations are deemed to be material if they, and their concealment of the alleged or relevant truth, would have been considered important by reasonable investors making investment decisions. Material misrepresentations artificially inflate the stock price and, thereby, cause public investors to overpay for their shares, *i.e.*, the price paid for the shares exceeds their true value. The artificial stock price inflation is then reduced or eliminated as information reflecting the alleged truth concealed by the fraud (including the foreseeable economic consequences thereof) is revealed, thereby causing economic losses to public investors who overpaid for their shares and now are unable to recover this overpayment by selling the shares. Importantly, the resulting economic losses are losses that would not have occurred had the alleged truth not been fraudulently concealed, as alleged by Plaintiffs.[83] Below I discuss the issues regarding materiality and loss causation in greater detail.

---

[82] *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009).

[83] From an economic point of view, a loss caused by fraud-related factors is the difference between an investor's: (a) actual loss, less (b) loss that still would have been incurred even in the absence of the alleged fraudulent conduct. This is the same economic principle used in event studies when calculating the abnormal returns, discussed below, to quantify the impact of an event.

### A. Materiality

58. Material information is often defined as information that a reasonable investor would want to consider prior to making an investment decision. In *Basic Inc. v. Levinson*, the Supreme Court quoted *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976), which stated that a fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision or if it would have "significantly altered the 'total mix' of information made available" to the shareholder.[84] The issues that are important to investors, *i.e.*, the information that reasonable investors would want to consider prior to making an investment decision, are usually factors that impact the value of an investment.

59. From an economic point of view, the value of an investment is based on the expected future cash flows of that investment, including the timing and associated risk of such cash flows.[85] Securities analysts typically analyze a company's revenues and profits to forecast that company's future performance and cash flows. In this case, SandRidge's revenues come primarily from the sale of oil and gas, including from the horizontal Mississippian.[86] Therefore, the amount of oil and gas produced by the average well in the Mississippian was very important when estimating the Company's future cash flows and value.

60. For example, a SunTrust analyst report dated August 5, 2011 provides a table that demonstrates the sensitivity of SandRidge's stock price to decreases/increases in the volume of

---

84 *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC*, 426 U.S. at 449).

85 *See* fn 32, (Brealy, Myers & Allen), *Principles of Corporate Finance: Chapter 4 - The Value of Common Stocks*.

86 *See* supra fn 13.

gas and oil produced.[87] According to the table, a 1% shift in production towards oil away from gas would have a positive impact on SandRidge's stock price of $0.25 per share, while a 1% shift in production towards gas away from oil would have a negative impact on SandRidge's stock price of minus $0.25 per share.[88]

61. Similarly, a J.P. Morgan analyst report dated November 16, 2012 provides an analysis of the adverse news specifically regarding the Mississippian (reduced EUR, oil cut and increased cost) disclosed on November 8 and November 9, 2012.[89] According to this analysis, the new assumptions for the Mississippian reduce its value by approximately 40% or more than $1.6 billion. Clearly, the information Plaintiffs allege was misrepresented is information that a reasonable investor would have wanted to consider prior to making an investment decision in SandRidge's common stock.

### B. Disclosure(s) of the Alleged Truth

62. Loss causation relates to the question of whether an alleged fraud caused plaintiffs to suffer economic losses. In 2005, in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), the

---

[87] SunTrust Robinson Humphrey SandRidge analyst report, "Can't Argue with this 1-2 punch," dated February 25, 2011, page 4, Figure 3.

[88] The SunTrust table is based on 2012 production, and is both linear and symmetrical. Consequently, a 10% increase in the volume of oil has a $3.09 per share positive impact on SandRidge's stock price, implying that a 1% increase has a $0.31 per share positive impact. A 10% decline in the volume of gas has a negative $0.56 per share impact of SandRidge's stock price, implying that a 1% decline has a $0.06 per share negative impact. Therefore, together, a 1% shift in volume from gas to oil has a $0.25 per share (31 cents minus 6 cents) positive impact on SandRidge's stock price. Similarly, a 1% shift in volume from oil to gas has a $0.25 per share negative impact on SandRidge's stock price.

[89] J.P. Morgan SandRidge analyst report, "Less Enthused but Still Think the Stock Is Cheap and Will Outperform," dated November 16, 2012, pages 1-2. ("Last week, SandRidge reported earnings and disclosed new data on its Miss play. It also indicated that it plans to pursue a potential sale of its Permian assets. Some of its biggest shareholders are calling for significant changes in the company. We reduced our valuation on the Miss play and the shares, but we think the stock still is cheap and has catalysts.")

Supreme Court considered the issue of loss causation in securities cases. The *Dura* opinion stated that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss," because "if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."[90] In other words, there has to be some causal relationship between the alleged misrepresentations and the economic loss plaintiffs seek to recover.

63. It is my understanding that Plaintiffs will allege that there was (at least) one disclosure of the alleged truth correcting the alleged misrepresentations relating to the oil production in the Mississippian, SandRidge's 3Q2011 announcement.[91] More specifically, on November 9, 2012, after the market closed on November 8, 2012, SandRidge reported its 3Q2012 results, updated its FY2012 guidance and initiated new FY2013 guidance; and in the morning of November 9, 2012, SandRidge held its conference call with analysts to discuss the results and guidance. The November 8, 2012 press releases stated:

> Oklahoma City, Oklahoma, November 8, 2012 , SandRidge Energy, Inc. (NYSE: SD) today announced financial and operational results for the quarter and nine months ended September 30, 2012.
>
> Key Financial Results
> Third Quarter
>
> - Adjusted EBITDA of $297 million for third quarter 2012 compared to $171 million in third quarter 2011.
> - Operating cash flow of $281 million for third quarter 2012 compared to $147 million in third quarter 2011.
> - Net loss applicable to common stockholders of $184 million, or $0.39 per diluted share, for third quarter 2012 compared to net income available to

---

90 *Dura*, 544 U.S. at 342.

91 Complaint, ¶¶11, 346, 347.

common stockholders of $561 million, or $1.16 per diluted share, in third quarter 2011.

- Adjusted net income of $29.6 million, or $0.05 per diluted share, for third quarter 2012 compared to adjusted net income of $5.1 million, or $0.01 per diluted share, in third quarter 2011.

* * *

SandRidge announced that it is exploring the sale of its assets in the Permian Basin, other than those associated with SandRidge Permian Trust. The relevant assets produce approximately 24,500 Boe per day (67% oil, 15% NGLs and 18% natural gas). Proceeds would be used to fund the company's capital expenditure program in the Mississippian Play and to repay debt, building upon SandRidge's strong liquidity and further improving its leverage.

Tom Ward, SandRidge's Chairman and CEO, commented, Our acquisitions and development of properties in the Permian Basin over the last four years have been integral to our conversion from a natural gas company to an oil rich enterprise. Now, we believe there is an opportunity to capitalize on current strong valuations for mature, conventional oil assets in the Permian Basin and convert the proceeds of a sale into development of our industry leading position in the high growth, high return Mississippian Play. At the same time, this transaction would strengthen our balance sheet and provide liquidity that, together with cash flow, would fully fund capital expenditures through 2014.

* * *

2012 Operational Guidance:

| | **Year Ending December 31, 2012** | |
|---|---|---|
| | **Previous Projection as of August 2, 2012** | **Updated Projection as of November 8, 2012** |
| Production | | |
| Oil (MMBbls) [(1)] | 18.2 | ***17.8*** |
| Natural Gas (Bcf) | 88.8 | ***93.0*** |
| Total (MMBoe) | 33.0 | ***33.3*** |

* * *

2013 Operational Guidance:

| | Year Ending December 31, 2013 |
|---|---|
| | Initial Projection as of November 8, 2012 |
| Production | |
| Oil (MMBbls) (1) | 19.5 |
| Natural Gas (Bcf) | 118.2 |
| Total (MMBoe) | 39.2 |

64. SandRidge's 3Q2012 results reported on November 8, 2012 beat analysts' estimates. A November 8, 2012, RBC Capital analyst report stated:

**3Q12 Earnings Beat; Exploring Permian Asset Sale**

- Recurring EPS/CFPS of $0.05/$0.41 beat our $0.01/$0.34 and the consensus $0.00/$0.35 estimates. Our CFPS estimate is reduced for cash distributions paid to royalty trust owners because the reported cash flow consolidates SD's various publicly traded royalty trusts. Consolidated discretionary CFPS was $0.50.

- Production of 103 Mboe/d was 3% above our 99.5 Mboe/d estimate. Mississippian production reached 30.2 Mboe/d, up 20% sequentially and slightly ahead of our model.

- The company announced that it is looking to sell 24.5 Mboe/d of producing assets in the Permian and reduce activity in that region. This represents 80% of its Permian volumes as asset associated to the royalty trusts are expected to be retained. Proceeds will fund development in the Mississippian.

- We think the asset sales and reduced spending in 2013 will be seen as favorable as SD has a significant FCF deficit to fund.[92]

65. On November 9, 2012, a Stifel Nicolaus analyst report stated:

**Reducing Target Price; 2013 Guidance Is Negative; Potential Permian Sale Is a Positive**

---

[92] RBC Capital Markets analyst report, "Looking More Focused," dated November 8, 2012. Emphasis in original. Another analyst report, also on November 8, 2012, by SunTrust Robinson Humphrey similarly stated, in its headline: "SD – Results Appear Slightly Positive Provided Certain Steps Taken" (emphasis in original)

> Investment summary. We are reducing our target price from $10 to $8.50 on disappointing initial 2013 guidance that was released yesterday along with better than expected 3Q earnings and plans from the company that it is looking to sell its Permian assets. Bottom line, the guidance is a negative and the Permian asset sale would be a positive. The key issue with the guidance is that oil volumes essentially remain flat from 3012 levels, resulting in 10% y/y growth, while gas volumes increase 27% y/y, resulting in full-year growth of 18%. This lower-than-expected growth and the higher gas mix results in our 2013 CFPS estimate reducing meaningfully from $1.72 to $1.39, and we expect consensus numbers, which are sitting at $1.83, to come down as well. Using a 6.5x 2013 EBITDA multiple and 50% of our risked NAV (below the group average of 69% to reflect the balance sheet risk), we arrive at our lowered target price of $8.50 [from $10 per share]. On the positive front, the company is considering selling its Permian assets, which could help reduce leverage metrics, and reduce P/NAV discount, but will not necessarily be accretive on an EBITDA basis. Bottom line, the introduction of 2013 guidance is a negative and will have the largest impact on the stock tomorrow, in our opinion, while the positive news from the potential sale of the Permian could help close the NAV discount over time as visibility on the timing/amount of proceeds firm up. Additionally, Miss Lime operating well results were incrementally positive and 3Q CFPS was better than expected.[93]

66. In the morning of November 9, 2012, SandRidge held its conference call with analysts to discuss the 3Q2012 results, and the 2012 and 2013 guidance. On the call, the Company provided more details regarding the Mississippian:

> Tom Ward - SandRidge Energy Inc - Chairman and CEO
>
> As we continue to grow the Mississippian well count across a larger area, we also are seeing an increase in our natural gas production. And this increase has been offset by a lower amount of oil than we anticipated at the beginning of last year. However, we continue to be driven by high rates of return. And the Mississippian oil production, along with the associated natural gas, continues to provide one of the best places to drill in the US. We do not need to drill the core of a core area, but can focus on one of the largest stratigraphic traps in North America that lies across northern Oklahoma and western Kansas. This is a massive area that has so far shown the same statistical potential across the entire area, and covers hundreds of miles and thousands of locations.

* * *

---

93 Stifel Nicolaus analyst report, "Reducing Target Price; 2013 Guidance Is Negative; Potential Permian Sale Is a Positive," dated as of November 9, 2012 (emphasis in original).

Matt Grubb - SandRidge Energy Inc - President and COO

As for the Mississippian, while the gas performance has been on target, we are seeing a steeper oil decline than we previously anticipated, and have made revision to our model accordingly for 2013. We will not have a third-party consultant type curve until year end. But based on our observations of performance now from over 400 wells, and with more history, we're modeling 155,000 barrels of oil and 1.6 Bcf per well. This assumes a 30-day oil IP rate of 160 barrels of oil per day, an initial decline in the neighborhood of 50% versus our previous model of 63%, and a B factor in the 1.7 to 1.8 range versus the previous B factor of 1.5.

So, this steeper oil decline, coupled with spending cuts in the Permian Basin, leads us to flat oil production year over year. That is, we estimate about 6.8 million barrels of oil from the Miss in 2013, as compared to 4.4 million barrels of oil this year. While this is a healthy 55% growth in Mississippian oil, it is largely offset by the Permian oil production due to CapEx reduction. With this said, in regard to the Mississippian performance, we are at about 50% rate of return on our drilling. So, as we increase our 2013 production guidance overall by 18% to 39.2 million barrels of oil equivalent, we are at the same time reducing 2013 capital spending by 19% to $1.5 billion.

67. As disclosed above, the average Mississippian well was now expected to produce 155 Mbbl of crude oil during its lifetime, *i.e.*, its EUR for oil was 155 Mbbl, down from the Company's previous estimate of 204 Mbbl, or a decline of 24%.[94] This had a significant negative impact on SandRidge's future cash flows, the Company's value and its stock price.

68. According to a November 11, 2012, analyst report by RBC Capital Markets:

SD shares went on a roller coaster ride following the 3Q12 earnings release and operational update. At one point in early Friday trading SD shares were down nearly 20% but recovered some to end the day down 10%. The reaction is related to reduced well performance in the Mississippian and a FCF deficit that could now bleed well into 2015.

---

[94] SandRidge November 9, 2012 conference call. (Matt Grubb: "But based on our observations of performance now from over 400 wells, and with more history, we're modeling 155,000 barrels of oil and 1.6 Bcf per well," which translates into a total EUR of 422 Mboe and oil as a percentage of total of 37%.) For prior Mississippian estimates, see for example, SandRidge's presentation at the Johnson Rice Energy Conference on October 2, 2012, page 8, where Oil EUR is 204 Mbbl (100% Crude); Gas EUR is 1,512 MMcf; and Total EUR is 456 Mboe. In other words, oil EUR as a percentage of total EUR declined from 45% (204/456) to 37% (155/422).

We are reducing our target price by $1/share to $7/share as a result of our lower NAV assessment. At current strip prices, our NAV is $8/share.[95]

69. A November 12, 2012, Canaccord analyst report stated:

AND WE THOUGHT MISSISSIPPIAN WAS AN OIL PLAY?

We our reducing our target price $2 to $4 per share due to $400 million lower per annum capital spending, a higher gas composition in the Mississippian play and consequently lower oil production outlook.[96]

70. A November 13, 2012, Deutsche Bank analyst report stated:

**Missing Barrels: Deteriorating Miss outlook takes a bite out of valuation**
Friday's conference call confirmed concerns about deteriorating oil performance in the Mississippian, where a material reduction to the type curve drastically reduces equity value and exacerbates concerns regarding the timing and rationale of the proposed Permian disposition. Despite returns that are still relatively robust in the Miss, we remain unconvinced that the asset will be sufficient to dig out from under the current debt burden. We have reduced our NAV and target price from $9 to $5 and maintain our Hold rating.

**Structural headwinds increasing as oil barrels go Missing**
Weaker than expected oil production out of Mississippian wells (gassier wells, faster than expected oil decline) have reduced Miss. type curves by 8% (from 456 Mboe to 420 Mboe) and per well oil reserves by 25% (204 Mbbls to 155 Mbbls), offset partially by successful downspacing to 4 wells per section. The concern is less about the absolute value of the play, where returns are still attractive, but in the trends, where the 2nd reduction to date in the oil content and flat Q4 oil production guidance raise concerns of further deterioration (particularly in the extension) and worrisome capital efficiency. The move also highlights the dangers of leverage, as a ~20% change to EV resulted in a nearly 50% reduction to equity value.

**Headwinds remain, with or without a Permian sale**
Despite the attention garnered by the proposed Permian sale, the reality is that given the step down in the Miss, the portfolio is fighting an uphill battle with or without the Permian.[97]

---

[95] RBC Capital Markets analyst report, "Reducing oil Growth," dated as of November 11, 2012.

[96] Canaccord Genuity analyst report, "And We Thought Mississippian was an Oil Play?" dated as of November 12, 2012 (emphasis in original).

71. As discussed above, after the market opened on November 8, 2012, SandRidge reported its 3Q2012 results, updated its 2012 guidance and provided initial 2013 guidance. Also, prior to the open on November 9, 2012, SandRidge conducted a conference call with analysts to discuss the results and guidance, and that provided additional detail regarding the lower gas EUR (155 Mbbl) for the average Mississippian well. The new negative information disclosed regarding the lower oil production by the Mississippian wells represents a disclosure of the alleged truth (*see* supra at ¶¶26-31).

72. Following SandRidge's 3Q2012 announcement, the Company's stock price declined from a closing price of $6.10 per share on November 8, 2012, to a closing price of $5.51 per share on November 9, 2012, a price decline of $0.59 per share or 9.7%, on volume of 76.7 million (approximately 6.75 times the median volume during the Class Period). The abnormal return (return net of market and industry factors) was highly statistically significant at the 1% level. The 3Q2012 results reported was better than expected, and could therefore not have caused SandRidge's stock price to decline. Similarly, the potential Permian sale was a choice made by the Company to benefit SandRidge, was generally viewed by analysts as a positive (as discussed above), and, therefore, does not explain the large price decline in the Company's stock price either. Consequently, it is my opinion that the adverse information relating to the oil production at the Mississippian caused the Company's stock price to decline on November 9, 2012. This information relates to the alleged truth, and its disclosure caused economic harm to the Class members.

---

[97] Deutsche Bank analyst report, "Doubling Down in the Miss," dated as of November 13, 2012.

73. Furthermore, Plaintiffs have alleged that SandRidge announced on August 4 and 5, 2011 that SandRidge was accelerating activities in the Mississippian, increasing capital expenditures by $500 million, and that SandRidge common stock declined in response to those announcements.[98] Plaintiffs have alleged that the decline in the price in SandRidge's stock price after these August disclosures came to light were a direct result of the nature and extent of some information being revealed to investors and the market and as the risk of Defendants' fraud materialized. I may supplement my report related to SandRidge's August 2011 stock price decline after fact discovery is completed.

74. Based on the above, it is my opinion that: (a) the allegedly false and misleading statements contained, or omitted, information that a reasonable investor would have wanted to consider prior to making an investment decision, and caused SandRidge's common stock to trade at artificially inflated prices during the Class Period; and (b) when the alleged truth was publicly disclosed, SandRidge's stock price declined, causing Class members to suffer economic damages as a result of the alleged fraud.

## IX. ECONOMIC FRAMEWORK TO QUANTIFY SECTION 10(b) DAMAGES

75. The loss-causation section above focused on the existence of damages for Class members who purchased SandRidge's common stock during the Class Period, and held or sold after the disclosure of the alleged truth on November 9, 2012. In this section I will discuss the quantification of the resulting Section 10(b) damages. It is my understanding that the so-called out-of-pocket methodology is the appropriate measure for calculating damages under Section 10(b) of the Securities Exchange Act of 1934. The out-of-pocket measure quantifies the damages based on the stock price inflation, *i.e.*, difference between the actual stock price and its

---

[98] Complaint, ¶343.

true value. In addition, it should be noted that recoverable damages are limited by the Federal 90-day bounce-back rule.

### A. Section 10(b): Out-of-Pocket Damages

76. Securities cases, such as this one, generally involve allegations that defendants misled investors, either by (a) making affirmatively false or misleading statements that concealed some material information, and/or (b) omitting material information. The material information concealed or omitted is commonly referred to as the alleged truth, or relevant truth. In an efficient market, concealing an alleged truth or risk that is materially different than the public mix of information will distort the stock price and cause it to trade at artificially inflated prices. Investors who overpaid for their shares as a result of the artificially inflated prices are then damaged when the alleged truth is disclosed (or partially disclosed), or the concealed risk materializes, and the stock price declines as a result. Consequently, quantifying the fraud-related portion of the price decline caused by the disclosure of the alleged truth, or the materialization of a concealed risk, is key to quantifying Class-wide damages.

77. As noted in one frequently referenced academic article:[99]

> The most common method of calculating damages in Rule 10b-5 cases is the out-of-pocket measure. This test fixes recovery as the difference between the purchase price and the value of the security at the date of purchase less the difference between the sale price and the value of the security at the date of sale.
>
> * * *
>
> Once one calculates the value line, the measure of damages for an investor is simply the difference between the price and the value on the date of purchase, or, for plaintiffs who sold their securities before the corrective disclosure, the difference between the price inflation at the time of purchase and the price inflation at the time of sale. If the inflation at the time of sale equals or exceeds

---

[99] Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 *UCLA L. Rev.*, 883, 885 (June 1990).

the inflation level on the purchase date, the investor has recouped his loss from the marketplace and has no claim for recovery of damages.

78. In other words, the measure of out-of-pocket damages, as defined above, is either: (a) the artificial inflation per share at the time of purchase for shares purchased but not sold during the Class Period; or (b) the artificial inflation per share at the time of purchase less the artificial inflation per share at the time of sale for shares both purchased and sold during the Class Period.

### B. Quantifying the Inflation

79. The event study framework is a well-accepted framework for calculating class-wide damages in class action securities cases. First, the impact of the disclosure of the alleged truth or the materialization of a concealed risk (the event) on the stock price is quantified using an event study.[100] Second, this fraud-related impact is then used as the inflation from the misrepresentations concealing the alleged truth or risk until its disclosure. Third, because each Class member purchased and/or sold their shares at market prices, after quantifying the inflation the Class members' individual damages can now be calculated based on the inflation at the time of their respective purchases and sales.

80. The quantification of the inflation, in this case, is simply the abnormal return on November 9, 2012 of 9.9%. This translates into a dollar inflation of $0.60 per share (November 8, 2012 closing price of $6.10 per share times 9.9%). There were also two positive confounding factors disclosed at the same time as the alleged truth: (a) the 3Q2012 results that beat estimates, and, (b) the potential Permian sale. Such positive confounding events will mitigate the impact of

---

100 *See* Mitchell & Netter (1994), *supra* fn 33**.** In some circumstances, the general event study methodology described in this article is further refined using fundamental valuation tools based on the premise that the present value of an investment is a reflection of its future cash flows, including the riskiness of these cash flows.

the negative disclosure relating to the Mississippian. Consequently, using the abnormal return to quantify the inflation, in this case, is conservative.

81. Based on the above, it is my opinion that the inflation from the first misrepresentation that concealed the alleged truth (to be determined by the jury), through its disclosure after the market closed on November 8, 2012, is at least $0.60 per share.[101]

## X. LIMITING FACTORS

82. This report is furnished solely for the purpose of the court proceedings in this matter, referenced above. It should not be referenced or used or any other purposes. This report is based on the evidence I have reviewed to date. I understand that Plaintiffs are still in the process of conducting fact discovery and that the full set of information they intend to use to prove their allegations at trial is likely not all available yet. Consequently, my opinions in this report are preliminary and may need to be updated at some later date as additional information becomes available.

Dated: March 1, 2019

Respectfully submitted,

BJORN I. STEINHOLT, CFA

[101] It should be noted that recoverable damages are also limited by the Federal 90-Day Bounce Back Rule that became effective on January 1, 1996. 1995 Act, Sec. 21D(e). According to this Rule, recoverable damages are limited to, either: (a) the purchase price per share less the average closing price from November 9, 2012 through the day of the sale, if sold prior to February 7, 2013, or (b) the purchase price less $6.40 per share (90-day average closing price after the Class Period) if still retained at the end of February 6, 2013. See Analysis of Damages per Share and Inflation attached hereto as Exhibit D.

# Exhibit A

# Bjorn I. Steinholt, CFA

**Caliber Advisors, Inc.**
10620 Treena Street, Suite 230, San Diego, CA 92131
Telephone: (858) 549-4900 • Facsimile: (858) 549-9317
Bjorn@CaliberAdvisors.com

---

## Employment History

**Caliber Advisors, Inc.**
*Managing Director* (2014 to present)

Caliber Advisors is a full-service valuation and economic consulting firm. Mr. Steinholt provides a broad range of capital markets consulting, including financial and economic analyses relating to mergers and acquisitions, initial public offerings, fairness opinions, structured finance, portfolio risk management, market structure, securities analysis and financial valuations, including litigation consulting and expert testimony relating to the economic issues that arise in large complex securities fraud cases.

**Financial Markets Analysis, LLC**
*Principal* (2000 to 2014)

Financial Markets Analysis was a financial valuation and economic consulting firm that primarily focused on providing economic analyses and expert testimony relating to securities analysis and financial economics. Mr. Steinholt provided capital markets consulting, financial valuation services, and various litigation consulting and expert testimony in large complex securities fraud cases.

**Business Valuation Services, Inc. (subsidiary of CBIZ, Inc.)**
*Principal* (1999 -2000)
*Vice President* (1998-1999)

Business Valuation Services was a national full-service financial valuation firm. Mr. Steinholt provided valuations of businesses and financial securities, including common stock, warrants, options, preferred stock, debt instruments and partnership interests, as well as intangible assets such as patents, trademarks, software, customer lists, work-force and licensing agreements. Mr. Steinholt also provided litigation support in shareholder disputes.

**Princeton Venture Research, Inc.**
*Senior Vice President* (1996-1998)
*Vice President* (1993-1996)
*Financial Analyst* (1990-1993)

Princeton Venture Research was a venture capital, investment banking and economic consulting firm. Mr. Steinholt provided various financial and economic analyses for venture capital, investment banking and consulting assignments, including shareholder disputes. Among other things, he helped identify and evaluate prospective emerging technology companies in need of venture capital funding.

**University of San Diego**
*Research Assistant, Graduate Fellow* (1988-1989)

Mr. Steinholt assisted with research regarding the performance of international equity markets following the 1987 stock market crash. He also developed computer programs related to the portfolio theory, including risk minimization and portfolio optimization based on quadratic programming techniques.

## Educational Background

- **Chartered Financial Analyst**
  CFA Institute, 1997

- **Master of International Business**
  University of San Diego, 1989

- **Sivilingeniør** - (Norwegian graduate level engineering designation)
  University of Trondheim, Norway, 1987

- **Bachelor of Science in Computer Science, Computer Science and Engineering**
  California State University, Long Beach, 1987

## Professional Affiliations

- **Member, CFA Institute**

- **Member, Financial Analysts Society of San Diego**

## Publications

"Price Impact Analysis – Where The Halliburton Court Erred," Expert Analysis Section, *Law360* (August 25, 2015).

## Testimony

*In re: New England Health, et al v. Qwest Comm Intl Inc, et al.,* Case No. 1:01-cv-01451 (United States District Court for the District of Colorado). QwestDex Hearing Testimony relating to Section 11 damages: January 28, 2003. Mr. Steinholt was retained to opine on potential Section 11 damages.

*In re: King, et al v. CBT Group PLC, et al.,* Case No. 98-CV-21014 (United States District Court, Northern District of California, San Jose Division). Deposition Testimony: November 5, 2003. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*In re: Employer-Teamsters Joint Council Pension Trust Fund v. America West Holding, et al.,* Case No. 99-CV-399 (United States District Court, District of Arizona). Deposition Testimony: October 28, 2004. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*In re: Howard Yue vs. New Focus,* Case No. CV808031 (Superior Court of the State of California, County of Santa Clara). Deposition Testimony: July 28, 2005. Mr. Steinholt was retained to opine on the potential damages and other economic issues relating to the defendants' acquisition of Globe Y.Technology, Inc.

*In re: Howard Yue vs. New Focus,* Case No. CV808031 (Superior Court of the State of California, County of Santa Clara). Deposition Testimony: August 9, 2005. Mr. Steinholt was retained to opine on the potential damages and other economic issues relating to the defendants' acquisition of Globe Y.Technology, Inc.

*In re: AB Liquidating Corp., fka Adaptive Broadband Corporation v. Ernst & Young, LLP* (American Arbitration Association). Arbitration, March 23, 2006. Mr. Steinholt was retained to analyze the share turnover in Adaptive Broadband Corporation in connection with the liquidation of the company's assets.

*In re: AOL Time Warner, Inc. Securities and "ERISA" Litigation, Consolidated Opt-Out Action*, Case No. 1:06-cv-00695 (United States District Court, Southern District of New York). Deposition Testimony: September 28, 2006. Mr. Steinholt was retained to opine on materiality and loss causation in a Section 11 context.

*In re: Ohio Public Employees Retirement System vs. Richard Parsons, et al.,* Case No. 03-CVH07-7932 (Court of Common Pleas of Franklin County, Ohio). Deposition Testimony: March 22, 2007. Mr. Steinholt was retained to quantify Section 11 damages for various institutional investors.

*In re: Ryan v. Flowserve Corporation et al.,* Case No. 3:03-cv-01769 (United States District Court, Northern District of Texas, Dallas Division). Deposition Testimony: June 15, 2007. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*In re: Nursing Home Pension Fund et al v. Oracle Corporation et al.,* Case No. 3:01-cv-00988 (United States District Court, Northern District of California). Deposition Testimony: July 2, 2007. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*In re: Carson, et al v. Neopharm Inc, et al.,* Case No. 1:02-cv-02976 (United States District Court, Northern District of Illinois, Eastern Division). Deposition Testimony: January 22, 2008. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*In re: HealthSouth Corporation Securities Litigation*, Case No. 2:03-cv-01501-S (United States District Court, Northern District of Alabama, Southern Division). Deposition Testimony: February 1, 2008. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality and loss causation.

*In re: Robert Kelleher, et al. v. ADVO, Inc., et al.*, Case No. 3:06-cv-01422 (United States District Court, District of Connecticut). Deposition Testimony: September 16, 2008. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality and loss causation in a class certification context.

*In re: HealthSouth Corporation Securities Litigation*, Case No. 2:03-cv-01501-S (United States District Court, Northern District of Alabama, Southern Division). Deposition Testimony: January 30, 2009. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality and loss causation.

*In re: Huffy Corporation Securities Litigation*, Case No. 3:05-cv-00028 (United States District Court, Southern District of Ohio, Western Division (at Dayton)). Deposition Testimony: November 12, 2009. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and potential damages for lead plaintiff.

*Lori Weinrib v. The PMI Group, Inc. et al.*, Case No. 3:08-cv-01405, (United States District Court for the Northern District of California). Deposition Testimony: June 14, 2010. Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*Kenneth McGuire, et al. v. Dendreon Corporation, et al.*, Case No. 2:07-cv-00800 (United States District Court, Western District of Washington at Seattle). Deposition Testimony: June 18, 2010. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*City of Livonia Employees' Retirement System v. The Boeing Company et al.*, Case No. 1:09-cv-07143, (United States District Court, Northern District of Illinois, Eastern Division). Deposition Testimony: November 5, 2010. Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*Maureen Backe, et al. v. Novatel Wireless, Inc., et al.*, Case No.08-cv-1689 (United States District Court, Southern District of California). Deposition Testimony: February 1, 2011. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*Paul Luman, et al. v. Paul G. Anderson, et al.* (*FCStone Group Securities Litigation*), Case No. 4:08-cv-00514 (United States District Court, Western District of Missouri, Western Division). Deposition Testimony: January 5, 2012. Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*T Grocery & Food Employees Welfare Fund v. Regions Financial Corporation et al.*, Case No. 2:10-cv-02847 (United States District Court, Northern District of Alabama). Deposition Testimony: May 8, 2012. Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*City of Pontiac General Employee's Retirement System v. Lockheed Martin Corporation et al.*, Case No. 1:11-cv-05026, (United States District Court, Southern District of New York). Deposition Testimony: May 18, 2012. Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*United Food and Commercial Workers Union et al v. Chesapeake Energy Corporation et al.*, Case No. 5:09-cv-01114 (United States District Court, Western District of Oklahoma). Deposition Testimony: August 14, 2012. Mr. Steinholt was retained to opine on loss causation in a Section 11 context.

*City of Pontiac General Employee's Retirement System v. Lockheed Martin Corporation et al.*, Case No. 1:11-cv-05026, (United States District Court, Southern District of New York). Deposition Testimony: October 4, 2012. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*Western Pennsylvania Electrical Employees Pension Fund, et al. v. Dennis Alter, et al.*, (*Advanta International Inc. Securities Litigation*) Case No. 2:09-cv-04730 (United States District Court, Eastern District of Pennsylvania). Deposition Testimony: May 1, 2013. Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*Southern Avenue Partners LP v. The Perot Family Trust et al.*, (*Parkcentral Global Litigation*) Case No. 3:09-cv-00765 (United States District Court, Northern District of Texas, Dallas Division). Deposition Testimony: May 6, 2013. Mr. Steinholt was retained to opine on the calculation of potential damages.

*Maureen Backe, et al. v. Novatel Wireless, Inc., et al.*, Case No. 08-cv-1689 (United States District Court, Southern District of California). Deposition Testimony: June 25, 2013. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*Garden City Employees' Retirement System v. Psychiatric Solutions, Inc. et al.*, Civil Action No. 3:09-cv-00882 (United States District Court, Middle District of Tennessee, Nashville Division). Deposition Testimony: June 6, 2014. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*City of Pontiac General Employees' Retirement System v. Wal-Mart Stores, Inc. et al.*, Case No. 12-cv-05162 (United States District Court, Western District of Arkansas (Fayetteville)). Deposition Testimony: November 9, 2015. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Alan B. Marcus, et al. v. J.C. Penney Company, Inc., et al.*, Case No. 13-CV-00736 (United States District Court, Eastern District of Texas (Tyler Division)). Deposition Testimony: March 4, 2016. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Group, Inc., et al.*, Index No: 652996/2011 (Supreme Court of the State of New York, County of New York). Deposition Testimony: April 1, 2016. Mr. Steinholt was retained to analyze loss causation related to two CDO-squared securities purchased by Basis Yield Alpha Fund (Master) from Goldman Sachs.

*John Sender v. Franklin Resources, Inc.*, Case No. 11-cv-03828 (United States District Court, Northern District of California). Deposition Testimony: June 17, 2016. Mr. Steinholt was retained to analyze ERISA damages related to plaintiff's participation in defendant's Employee Stock Ownership Plan.

*Alan Willis, et al. v. Big Lots, Inc., et al.*, Case No. 12-CV-00604 (United States District Court, Southern District of Ohio (Columbus)). Deposition Testimony: July 21, 2016. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*In re: Beaver County Employees Retirement Fund vs. Cyan, Inc., et al.*, Lead Case No. CGC-14-538355 (Superior Court of the State of California, County of San Francisco). Deposition Testimony: October 14, 2016. Mr. Steinholt was retained to opine on potential damages pursuant to §§11 and 12 of the Securities Act of 1933.

*In Re Willbros Group, Inc. Securities Litigation*, Case No. 14-CV-3084 (United States District Court, Southern District of Texas, Houston Division). Deposition Testimony: April 14, 2017. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Shankar v. Imperva, Inc. et al.*, Case No. 14-cv-01680 (United States District Court, Northern District of California (Oakland)). Deposition Testimony: May 5, 2017. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Glitz et al. v. Sandridge Energy Inc et al.*, Case No. 12-cv-01341 (United States District Court, Western District of Oklahoma). Deposition Testimony: May 3, 2018. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Gary Curran, et al. v. Freshpet, Inc., et al.*. Case No. 16-cv-02263 (United States District Court, District of New Jersey). Deposition Testimony: July 25, 2018. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Megan Villella , et al. v. Chemical & Mining Co. of Chile, Inc., et al.*, Case No. 15-cv-02106 (United States District Court, Southern District of New York). Deposition Testimony: November 9, 2018. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

# Exhibit B

# Exhibit B
# Information Relied Upon

**Case Documents**

- Third Consolidated Amended Complaint for Violation of the Federal Securities Laws, dated October 21, 2016
- Order on Ward's Motion to Dismiss, dated August 1, 2017
- Order on SandRidge, Bennett and Grubb's Motion to Dismiss, dated August 1, 2017

**Media Reports**

- Lexisi/Nexis media reports from February 2011 to November 2012 (search term: SandRidge Energy).

- Bloomberg media reports from February 2011 through November 2012 (SD US CN).

**SEC Filings**

- All filings by SandRidge Energy with the Securities and Exchange Commission during 2011 and 2012 (sec.gov).

**Analyst Reports**

- SunTrust Robinson Humphrey Capital Markets, 04 January 2011.
- RBC Capital Markets (Canada), 06 January 2011.
- Boenning And Scattergood INC., 06 January 2011.
- Scotia Howard Weil Inc, 06 January 2011.
- MKM Partners, 06 January 2011.
- RBC Capital Markets (Canada), 06 January 2011.
- Canaccord Genuity, 10 January 2011.
- JPMorgan, 12 January 2011.
- SunTrust Robinson Humphrey Capital Markets, 17 February 2011.
- Boenning and Scattergood INC., 25 February 2011.
- MKM Partners, 25 February 2011.
- Susquehanna Financial Group LLLP, 25 February 2011.
- MKM Partners, 25 February 2011.
- SunTrust Robinson Humphrey Capital Markets.
- KeyBanc Capital Markets, 25 February 2011.
- Boenning and Scattergood INC., 25 February 2011.
- JPMorgan, 25 February 2011.
- Ladenburg, Thalmann & CO. INC., 28 February 2011.
- Deutsche Bank FI Research, 28 February 2011.
- Canaccord Genuity, 28 February 2011.

**Exhibit B**
**Information Relied Upon**

- RBC Capital Markets (Canada), 28 February 2011.
- KeyBanc Capital Markets, 28 February 2011.
- Susquehanna Financial Group LLLP, 01 March 2011.
- KeyBanc Capital Markets, 01 March 2011.
- Credit Suisse – North America, 01 March 2011.
- Stifel Nicolaus, 01 March 2011.
- Boenning And Scattergood INC., 02 March 2011.
- Stifel Nicolaus, 14 March 2011.
- JPMorgan, 25 March 2011.
- SunTrust Robinson Humphrey Capital Markets, 01 April 2011.
- KeyBanc Capital Markets, 07 April 2011.
- Canaccord Genuity, 07 April 2011.
- Boenning And Scattergood INC., 13 April 2011.
- Canaccord Genuity, 19 April 2011.
- Morgan Stanley, 19 April 2011.
- ICD Research – Company SWOT, 25 April 2011.
- KeyBanc Capital Markets, 03 May 2011.
- JPMorgan, 06 May 2011.
- MKM Partners, 06 May 2011.
- Boenning and Scattergood INC., 06 May 2011.
- KeyBanc Capital Markets, 06 May 2011.
- Morgan Stanley, 06 May 2011.
- MKM Partners, 09 May 2011.
- SunTrust Robinson Humphrey Capital Markets, 09 May 2011.
- RBC Capital Markets (Canada), 09 May 2011.
- Canaccord Genuity, 09 May 2011.
- Morgan Keegan & CO., 17 May 2011.
- Morgan Stanley, 24 May 2011.
- Ladenburg, Thalmann & CO. INC., 26 May 2011.
- Boenning and Scatter good INC., 26 May 2011.
- KeyBanc Capital Markets, 26 May 2011.
- SunTrust Robinson Humphrey Capital Markets, 22 June 2011.
- Susquehanna Financial Group LLLP, 30 June 2011.
- Susquehanna Financial Group LLLP, 01 August 2011.
- ISI Group, 03 August, 2011.
- ISI Group, 04 August 2011.
- Robert W. Baird, 05 August 2011.
- Stifel Nicolaus, 05 August 2011.
- BMO Capital Markets U.S., 05 August 2011.
- MKM Partners, 05 August 2011.

# Exhibit B
# Information Relied Upon

- Susquehanna Financial Group LLLP, 05 August 2011.
- MKM Partners, 05 August 2011.
- SunTrust Robinson Humphrey Capital Markets, 05 August 2011.
- JPMorgan, 05 August 2011.
- Canaccord Genuity, 05 August 2011.
- RBC Capital Markets (Canada), 08 August 2011.
- Canaccord Genuity, 08 August 2011.
- Deutsche Bank Research, 11 August 2011.
- Canaccord Genuity, 11 August 2011.
- ISI Group, 18 August 2011.
- JPMorgan, 19 August 2011.
- Morgan Keegan & CO., 30 August 2011.
- Capital One Southcoast, 09 September 2011.
- SunTrust Robinson Humphrey Capital Markets, 28 September 2011.
- JPMorgan, 28 September 2011.
- MKM Partners, 28 September 2011.
- KeyBanc Capital Markets, 28 September 2011.
- Capital One Southcoast INC., 29 September 2011.
- Ladenburg, Thalmann & CO. INC., 04 October 2011.
- Credit Suisse – North America, 04 October 2011.
- SunTrust Robinson Humphrey Capital Markets, 06 October 2011.
- RBC Capital Markets (Canada), 10 October 2011.
- JPMorgan, 13 October 2011.
- Capital One Southcoast INC., 13 October 2011.
- Robert W. Baird, 28 October 2011.
- KeyBanc Capital Markets, 03 November 2011.
- BMO Capital Markets U.S., 04 November 2011.
- Ladenburg, Thalmann & CO. INC., 04 November 2011.
- Deutsche Bank Research, 04 November 2011.
- Capital One Southcoast INC., 04 November 2011.
- Susquehanna Financial Group LLLP, 04 November 2011.
- Canaccord Genuity, 04 November 2011.
- SunTrust Robinson Humphrey Capital Markets, 04 November 2011.
- MKM Partners, 04 November 2011.
- Robert W. Baird, 04 November 2011.
- Stifel Nicolaus, 04 November 2011.
- Morgan Keegan & CO., 07 November 2011.
- MKM Partners, 07 November 2011.
- RBC Capital Markets (Canada), 07 November 2011.
- Stephens INC., 07 November 2011.

**Exhibit B**
**Information Relied Upon**

- Canaccord Genuity, 08 November 2011.
- SunTrust Robinson Humphrey Capital Markets, 18 November 2011.
- JPMorgan, 29 November 2011.
- Susquehanna Financial Group LLLP, 30 November 2011.
- SunTrust Robinson Humphrey Capital Markets, 06 December 2011.
- Deutsche Bank Research, 09 December 2011.
- RBC Capital Markets (Canada), 22 December 2011.
- Morgan Keegan & CO., 23 December 2011.
- Capital One Southcoast INC., 23 December 2011.
- Ladenburg, Thalmann & CO. INC., 23 December 2011.
- KeyBanc Capital Markets, 23 decmber 2011.
- JPMorgan, 23 December 2011.
- SunTrust Robinson Humphrey Capital Markets, 23 December 2011.
- Capital One Southcoat INC., 23 December 2011.
- Robert W. Baird, 23 December 2011.
- Stifel Nicolaus, 23 November 2011.
- SunTrust Robinson Humphrey Capital Markets, 27 December 2011.
- KeyBanc Capital Markets, 05 January 2012.
- Goldman Sachs, 05 January 2012.
- Morgan Keegan & CO., 06 January 2012.
- Robert W. Baird, 06 January 2012.
- Scotia Howard Weil Inc., 06 January 2012.
- Stifel Nicolaus, 06 January 2012.
- Capital One Southcoast INC., 06 January 2012.
- Deutsche Bank Research, 09 January 2012.
- Canaccord Genuity, 19 January 2012.
- Robert W. Baird, 01 February 2012.
- Canaccord Genuity, 02 February 2012.
- SunTrust Robinson Humphrey Capital Markets, 02 February 2012.
- Capital One Southcoast INC., 02 February 2012.
- Scotia Howard Weil Inc., 02 February 2012.
- Stifel Nicolaus, 02 February 2012.
- Canaccord Genuity, 02 February 2012.
- JPMorgan, 02 February 2012.
- Ladenburg, Thalmann & CO. INC., 02 February 2012.
- Deutsche Bank Research, 02 February 2012.
- KeyBanc Capital Markets, 02 February 2012.
- Robert W. Baird, 06 February 2012.
- Tudor Pickering & Co., 06 February 2012.
- Deutsche Bank Research, 08 February 2012.

# Exhibit B
# Information Relied Upon

- Stifel Nicolaus, 12 February 2012.
- BNP Paribas Securities (Asia), 14 February 2012.
- KeyBanc Capital Markets, 23 February 2012.
- Canaccord Genuity, 23 February 2012.
- BMO Capital Markets U.S., 23 February 2012.
- RBC Capital Markets (Canada), 24 February 2012.
- Stifel Nicolaus, 24 February 2012.
- SunTrust Robinson Humphrey Capital Markets, 24 February 2012.
- Capital One Southcoast INC., 24 February 2012.
- Susquehanna Financial Group LLLP, 24 February 2012.
- Ladenburg, Thalmann & CO. INC., 24 February 2012.
- JPMorgan, 24 February 2012.
- Deutsche Bank Research, 24 February 2012.
- SunTrust Robinson Humphrey Capital Markets, 28 February 2012.
- Capital One Southcoast INC., 28 February 2012.
- Capital One Southcoast INC., 29 February 2012.
- Ladenburg, Thalmann & CO. INC., 29 February 2012.
- Susquehanna Financial Group LLLP, 29 February 2012.
- Deutsche Bank Research, 29 February 2012.
- KeyBanc Capital Markets, 29 February 2012.
- Morgan Keegan & CO., 29 February 2012.
- BMO Capital Markets U.S., 01 March 2012.
- Canaccord Genuity, 01 March 2012.
- SunTrust Robinson Humphrey Capital Markets, 06 March 2012.
- BNP Paribas Securities (Asia), 15 March 2012.
- Capital One Southcoast INC., 15 March 2012.
- Stephens INC., 20 March 2012.
- Susquehanna Financial Group LLLP, 23 March 2012.
- SunTrust Robinson Humphrey Capital Markets, 26 March 2012.
- Susquehanna Financial Group LLLP, 29 March 2012.
- Capital One Southcoast INC., 30 March 2012.
- SunTrust Robinson Humphrey Capital Markets, 02 April 2012.
- Capital One Southcoast INC., 09 April 2012.
- Canaccord Genuity, 18 April 2012.
- JPMorgan, 30 April 2012.
- BNP Paribas Securities (Asia), 02 May 2012.
- Canaccord Genuity, 03 May 2012.
- JPMorgan, 03 May 2012.
- JPMorgan, 03 May 2012.
- Deutsche Bank FI Research, 04 May 2012.

**Exhibit B**
**Information Relied Upon**

- Ladenburg, Thalmann & CO. INC., 04 May 2012.
- Susquehanna Financial Group LLLP, 04 May 2012.
- Stifel Nicolaus, 04 May 2012.
- KeyBanc Capital Markets, 04 May 2012.
- Deutsche Bank Research, 04 May 2012.
- JPMorgan, 04 May 2012.
- RBC Capital Markets (Canada), 07 May 2012.
- Canaccord Genuity, 07 May 2012.
- SunTrust Robinson Humphrey Capital Markets, 07 May 2012.
- Stephens INC., 08 May 2012.
- RBC Capital Markets (Canada), 08 May 2012.
- ISI Group, 14 May 2012.
- Canaccord Genuity, 16 May 2012.
- BNP Paribas Securities (Asia), 21 May 2012.
- Wunderlich Securities, 07 June 2012.
- JPMorgan, 12 June 2012.
- SunTrust Robinson Humphrey Capital Markets, 13 June 2012.
- Goldman Sachs, 07 July 2012.
- Deutsche Bank FI Research, 03 August 2012.
- JPMorgan, 03 August 2012.
- Deutsche Bank Research, 03 August 2012.
- Ladenburg, Thalmann & CO. INC., 03 August 2012.
- SunTrust Robinson Humphrey Capital Markets, 03 August 2012.
- Johnson Rice & Co., 03 August 2012.
- Stifel Nicolaus, 03 August 2012.
- Ladenburg, Thalmann & CO. INC., 03 August 2012.
- SunTrust Robinson Humphrey Capital Markets, 03 August 2012.
- Ladenburg, Thalmann & CO. INC., 03 August 2012.
- KeyBanc Capital Markets, 03 August 2012.
- Stephens INC., 03 August 2012.
- JPMorgan, 03 August 2012.
- BMO Capital Markets U.S., 05 August 2012.
- Wunderlich Securities, 06 August 2012.
- SunTrust Robinson Humphrey Capital Markets, 06 August 2012.
- Stephens INC., 07 August 2012.
- RBC Capital Markets (Canada), 08 August 2012.
- Canaccord Genuity, 17 August 2012.
- Stifel Nicolaus, 22 August 2012.
- Johnson Rice & Co., 23 August 2012.
- JPMorgan, 05 September 2012.

# Exhibit B
# Information Relied Upon

- Johnson Rice & Co., 25 September 2012.
- Johnson Rice & Co., 27 September 2012.
- SunTrust Robinson Humphrey Capital Markets, 28 September 2012.
- SunTrust Robinson Humphrey Capital Markets, 09 October 2012.
- Canaccord Genuity, 19 October 2012.
- Susquehanna Financial Group LLLP, 05 November 2012.
- SunTrust Robinson Humphrey Capital Markets, 08 November 2012.
- Stifel Nicolaus, 08 November 2012.
- RBC Capital Markets (Canada), 08 November 2012.
- JPMorgan, 08 November 2012.
- BMO Capital Markets U.S., 09 November 2012.
- Johnson Rice & Co., 09 November 2012.
- Scotia Howard Weil Inc., 09 November 2012.
- Stifel Nicolaus, 09 November 2012.
- JPMorgan, 09 November 2012.
- Deutsche Bank Research, 09 November 2012.
- Susquehanna Financial Group LLP, 09 November 2012.
- Canaccord Genuity, 09 November 2012.
- Stephens INC., 09 November 2012.
- LadenBurg, Thalmann & CO. INC., 09 November 2012.
- RBC Capital Markets (Canada), 11 November 2012.
- Susquehanna Financial Group LLLP, 12 November 2012.
- Canaccord Genuity, 12 November 2012.
- Wunderlich Securities, 12 November 2012.
- Susquehanna Financial Group LLP, 13 November 2012.
- Deutsche Bank Research, 13 November 2012.
- JPMorgan, 16 November 2012.
- Stephens INC., 21 November 2012.
- SunTrust Robinson Humphrey Capital Markets, 23 November 2012.
- Susquehanna Financial Group LLLP, 03 December 2012.
- Canaccord Genuity, 17 December 2012.
- BMO Capital Markets U.S., 19 December 2012.
- SunTrust Robinson Humphrey Capital Markets, 20 December 2012.
- Ladenburg, Thalmann & CO. INC., 20 December 2012.
- Canaccord Genuity, 20 December 2012.
- Stifel Nicolaus, 20 December 2012.
- KeyBanc Capital Markets, 20 December 2012.
- Deutsche Bank Research, 20 December 2012.
- JPMorgan, 20 December 2012.

# Exhibit B
# Information Relied Upon

## Company Presentations

- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Goldman Sachs Global Energy Conference, 11 January 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Credit Suisse 2011 Energy Summit, 08 February 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy 2011 Investor / Analyst Meeting, 01 March 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Simmons & Co. Int'l 11th Annual Energy Conference, 04 March 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Raymond James' 32nd Annual Institutional Investors Conference, 07 March 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Barclays Capital 2011 High Yield Conference, 25 March 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Howard Weil 2011 Energy Conference, 29 March 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy IPAA 2011 Oil &Gas Investment Symposium, 12 April 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Canaccord Genuity Inc. Permian Bus Tour, 19 May 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Stifel Nicolaus Denver 1x1 Conference, 19 May 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy 2011 Annual Shareholders Meeting, 03 June 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy RBC Capital Markets 2011 Energy and Power Conference, 06 June 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Investor Presentation, 14 June 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Investor Presentation, 05 August 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy EnerCom's The Oil & Gas Conference, 16 August 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Summer NAPE E&P Conference, 17 August 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Barclays 2011 CEO Conference, 07 September 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Deutsche Bank 2011 Energy Conference, 21 September 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Johnson Rice Energy Conference, 05 October 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Deutsche Bank 2011 Leveraged Finance Conference, 12 October 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Investor Presentation, 18 October 2011.

# Exhibit B
# Information Relied Upon

- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Barclays Capital – Energy, Engineering & Construction Forum, 10 November 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Stephens – Fall Investment Conference, 15 November 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Bank of America-Merrill Lynch – Global Energy Conference, 16 November 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy J.P. Morgan SMid Cap Conference, 01 December 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Capital One Southcoast – 2011 Energy Conference, 06 December 2011.
- SD – 2011 Sandridge Energy, Inc. – Sandridge Energy Sandridge Announces Mississippian Joint Venture, 22 December 2011.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy Goldman Sachs Global Energy Conference, 10 January 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy Credit Suisse Energy Summit, 6 February 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy 2012 Investor / Analyst Meeting, 28 February 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy Barclays High Yield Conference, 26 March 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy Howard Weil Energy Conference, 26 March 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy IPAA – 2012 OGIS New York, 17 April 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy Value Investing Conference, 25 April 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy Investor Presentation, 03 May 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy Investor Presentation, 29 May 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy RBC Capital Markets' Global Energy and Power Conference, 04 June 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy 2012 Citi Global Energy Conference, 05 June 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy Investor Meeting, 11 June 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy Investor Presentation, 19 June 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy Global Hunter Securities – 100 Energy Conference.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy UBS Access: Energy 1x1 Conference, 11 July 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy Investor Presentation, 8 August 2012.

**Exhibit B**
**Information Relied Upon**

- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy Enercom's The Oil and Gas Conference, 14 August 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy Barclays CEO Energy-Power Conference, 05 September 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy 2012 Johnson Rice Energy Conference, 02 October 2012.
- SD – 2012 Sandridge Energy, Inc. – Sandridge Energy Bank of America Merrill Lynch – Global Energy Conference, 13 November 2012.

**Academic Articles**

- Burton G. Malkiel, *Rethinking the Financial Crisis*, Russell Sage Found.
- Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, The J. of Fin. (2010).
- Richard Roll, *What Every CFO Should Know About Scientific Progress in Financial Economics: What Is Known and What Remains to be Resolved*, Fin. Mgmt. (1994).
- Jonathan Macey, Geoffrey Miller, Mark Mitchell & Jeffry Netter, *Lessons From Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson*, Va. L. Rev. (1991).
- Richard A. Brealey, Stewart C. Myers & Franklin Allen, *Principles of Corporate Finance*, McGraw-Hill (11th ed. 2013).
- Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, Bus. Law (1994).
- Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev., 883 (June 1990).
- Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, J. of Fin. Econ. (1978).
- Brad M. Barber, Paul A. Griffin & Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, J. of Corp. L. (1994).
- Fang (Frank) Yu, *Analyst Coverage and Earnings Management*, J. of Fin. Econ. (2008).
- Pandej Chintrakarn, Pornsit Jiraporn, Young S. Kim and Jang-Chul Kim, *Does Corporate Governance Quality Affect Analyst Coverage? Evidence from the Institutional Shareholder Services (ISS)*, SSRN Working Paper.
- Robert Merton, "On the Current State of the Stock Market Rationality Hypothesis," *Macroeconomics and Finance: Essays in Honor of Franco Modigliani*, (1987).
- Eugene Fama, "Efficient Capital Markets: II," *Journal of Finance*, Vol. 46 (1991).

**Data Sources**

- Bloomberg
- Thomson Financials

# Exhibit B
# Information Relied Upon

**Documents/Files Obtained in Discovery**

- SD-Sec-0419919 .
- SD-Sec-0455614 .
- SD-Sec-0681687.
- SD-Sec-0723995.

# Exhibit C

# SandRidge Securities Litigation

## Regression Analysis of Event Days

| | SandRidge Energy | | | | | Regression Analysis * | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Event Day | Reported Volume | Closing Price | Return | S&P 500 | S&P Oil & Gas E&P Index | Predicted Return | Abnormal return | t-statistic * | Two-tailed p-value ** | One-tailed p-value ** |
| 2/25/2011 | 43,496,625 | $10.53 | 14.71% | 1.08% | 2.83% | 2.45% | 12.25% | 4.61 | 0.0% | 0.0% |
| 5/6/2011 | 27,983,985 | $10.36 | -2.91% | 0.39% | 1.04% | 1.08% | -3.98% | (1.50) | 13.5% | 6.7% |
| 8/5/2011 | 69,730,832 | $7.79 | -20.18% | -0.06% | -1.31% | -1.35% | -18.83% | (7.30) | 0.0% | 0.0% |
| 11/4/2011 | 17,926,276 | $7.86 | -4.73% | -0.63% | -0.45% | -0.56% | -4.16% | (1.79) | 7.4% | 3.7% |
| 1/10/2012 | 19,757,869 | $8.73 | 2.71% | 0.89% | 0.38% | 1.00% | 1.70% | 0.65 | 51.7% | 25.9% |
| 2/24/2012 | 30,458,517 | $8.81 | 6.92% | 0.18% | 0.52% | 0.83% | 6.08% | 2.27 | 2.3% | 1.2% |
| 5/4/2012 | 29,930,669 | $7.08 | 2.46% | -1.61% | -2.41% | -3.69% | 6.15% | 2.29 | 2.2% | 1.1% |
| 8/3/2012 | 28,460,816 | $6.37 | -3.19% | 1.92% | 2.97% | 4.60% | -7.79% | (3.08) | 0.2% | 0.1% |
| **11/9/2012** | **76,724,060** | **$5.51** | **-9.67%** | **0.17%** | **0.16%** | **0.18%** | **-9.86%** | **(3.94)** | **0.0%** | **0.0%** |

* Control Period 252-day period prior to the event, excluding other event days

** A p-value equal to or less than 5% is statistically significant at the 5% level; and a p-value equal to or less than 1% is statistically significant at the 1% level

Exhibit C

# Exhibit D

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Implied Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 2/25/2011 | 43,496,625 | $10.53 | $9.93 | $0.60 | |
| 2/28/2011 | 27,711,247 | $10.81 | $10.21 | $0.60 | |
| 3/1/2011 | 20,982,891 | $10.66 | $10.06 | $0.60 | |
| 3/2/2011 | 21,500,321 | $10.25 | $9.65 | $0.60 | |
| 3/3/2011 | 21,327,353 | $10.40 | $9.80 | $0.60 | |
| 3/4/2011 | 20,303,877 | $11.11 | $10.51 | $0.60 | |
| 3/7/2011 | 17,407,952 | $11.26 | $10.66 | $0.60 | |
| 3/8/2011 | 13,739,649 | $10.81 | $10.21 | $0.60 | |
| 3/9/2011 | 10,654,028 | $10.79 | $10.19 | $0.60 | |
| 3/10/2011 | 17,921,003 | $10.05 | $9.45 | $0.60 | |
| 3/11/2011 | 12,513,478 | $10.49 | $9.89 | $0.60 | |
| 3/14/2011 | 8,053,238 | $10.49 | $9.89 | $0.60 | |
| 3/15/2011 | 9,652,227 | $10.41 | $9.81 | $0.60 | |
| 3/16/2011 | 15,919,659 | $10.42 | $9.82 | $0.60 | |
| 3/17/2011 | 12,692,240 | $10.62 | $10.02 | $0.60 | |
| 3/18/2011 | 14,134,591 | $10.63 | $10.03 | $0.60 | |
| 3/21/2011 | 10,101,382 | $11.12 | $10.52 | $0.60 | |
| 3/22/2011 | 8,114,036 | $11.27 | $10.67 | $0.60 | |
| 3/23/2011 | 8,525,828 | $11.48 | $10.88 | $0.60 | |
| 3/24/2011 | 16,493,161 | $11.70 | $11.10 | $0.60 | |
| 3/25/2011 | 14,280,040 | $12.13 | $11.53 | $0.60 | |
| 3/28/2011 | 16,253,629 | $11.82 | $11.22 | $0.60 | |
| 3/29/2011 | 13,798,708 | $12.20 | $11.60 | $0.60 | |
| 3/30/2011 | 12,700,179 | $12.38 | $11.78 | $0.60 | |
| 3/31/2011 | 13,699,099 | $12.80 | $12.20 | $0.60 | |
| 4/1/2011 | 14,400,175 | $12.96 | $12.36 | $0.60 | |
| 4/4/2011 | 9,738,965 | $12.97 | $12.37 | $0.60 | |
| 4/5/2011 | 10,871,547 | $12.97 | $12.37 | $0.60 | |
| 4/6/2011 | 11,974,300 | $12.88 | $12.28 | $0.60 | |
| 4/7/2011 | 10,838,675 | $12.85 | $12.25 | $0.60 | |
| 4/8/2011 | 11,403,842 | $12.94 | $12.34 | $0.60 | |
| 4/11/2011 | 13,554,447 | $12.22 | $11.62 | $0.60 | |
| 4/12/2011 | 23,442,926 | $11.64 | $11.04 | $0.60 | |
| 4/13/2011 | 18,316,551 | $11.57 | $10.97 | $0.60 | |
| 4/14/2011 | 14,423,537 | $11.80 | $11.20 | $0.60 | |
| 4/15/2011 | 9,701,839 | $11.90 | $11.30 | $0.60 | |
| 4/18/2011 | 8,064,451 | $11.62 | $11.02 | $0.60 | |
| 4/19/2011 | 11,240,795 | $12.11 | $11.51 | $0.60 | |
| 4/20/2011 | 12,520,416 | $12.47 | $11.87 | $0.60 | |
| 4/21/2011 | 6,232,962 | $12.60 | $12.00 | $0.60 | |
| 4/25/2011 | 5,608,649 | $12.41 | $11.81 | $0.60 | |
| 4/26/2011 | 6,617,260 | $12.56 | $11.96 | $0.60 | |
| 4/27/2011 | 8,542,093 | $12.44 | $11.84 | $0.60 | |
| 4/28/2011 | 8,691,609 | $12.30 | $11.70 | $0.60 | |
| 4/29/2011 | 6,853,591 | $12.36 | $11.76 | $0.60 | |
| 5/2/2011 | 8,702,124 | $12.24 | $11.64 | $0.60 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Implied Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 5/3/2011 | 14,212,552 | $11.74 | $11.14 | $0.60 | |
| 5/4/2011 | 18,541,478 | $11.00 | $10.40 | $0.60 | |
| 5/5/2011 | 14,695,518 | $10.67 | $10.07 | $0.60 | |
| 5/6/2011 | 27,983,985 | $10.36 | $9.76 | $0.60 | |
| 5/9/2011 | 15,991,275 | $11.14 | $10.54 | $0.60 | |
| 5/10/2011 | 9,479,713 | $10.94 | $10.34 | $0.60 | |
| 5/11/2011 | 14,606,096 | $10.23 | $9.63 | $0.60 | |
| 5/12/2011 | 19,045,398 | $10.27 | $9.67 | $0.60 | |
| 5/13/2011 | 10,351,743 | $10.04 | $9.44 | $0.60 | |
| 5/16/2011 | 14,207,133 | $10.02 | $9.42 | $0.60 | |
| 5/17/2011 | 14,344,059 | $10.23 | $9.63 | $0.60 | |
| 5/18/2011 | 11,572,550 | $10.70 | $10.10 | $0.60 | |
| 5/19/2011 | 11,620,238 | $10.45 | $9.85 | $0.60 | |
| 5/20/2011 | 9,012,464 | $10.45 | $9.85 | $0.60 | |
| 5/23/2011 | 9,956,191 | $10.07 | $9.47 | $0.60 | |
| 5/24/2011 | 10,822,260 | $10.33 | $9.73 | $0.60 | |
| 5/25/2011 | 12,172,319 | $10.80 | $10.20 | $0.60 | |
| 5/26/2011 | 34,261,626 | $12.07 | $11.47 | $0.60 | |
| 5/27/2011 | 17,900,508 | $11.44 | $10.84 | $0.60 | |
| 5/31/2011 | 21,026,758 | $11.32 | $10.72 | $0.60 | |
| 6/1/2011 | 14,443,697 | $11.12 | $10.52 | $0.60 | |
| 6/2/2011 | 10,066,538 | $11.11 | $10.51 | $0.60 | |
| 6/3/2011 | 10,930,601 | $11.09 | $10.49 | $0.60 | |
| 6/6/2011 | 11,794,843 | $10.44 | $9.84 | $0.60 | |
| 6/7/2011 | 8,992,734 | $10.45 | $9.85 | $0.60 | |
| 6/8/2011 | 9,828,110 | $10.27 | $9.67 | $0.60 | |
| 6/9/2011 | 6,836,634 | $10.54 | $9.94 | $0.60 | |
| 6/10/2011 | 7,888,404 | $10.51 | $9.91 | $0.60 | |
| 6/13/2011 | 15,528,344 | $9.98 | $9.38 | $0.60 | |
| 6/14/2011 | 11,195,706 | $10.39 | $9.79 | $0.60 | |
| 6/15/2011 | 15,909,483 | $10.30 | $9.70 | $0.60 | |
| 6/16/2011 | 9,038,593 | $10.27 | $9.67 | $0.60 | |
| 6/17/2011 | 9,604,539 | $10.33 | $9.73 | $0.60 | |
| 6/20/2011 | 5,403,295 | $10.32 | $9.72 | $0.60 | |
| 6/21/2011 | 9,334,545 | $10.60 | $10.00 | $0.60 | |
| 6/22/2011 | 10,271,904 | $10.50 | $9.90 | $0.60 | |
| 6/23/2011 | 10,706,084 | $10.55 | $9.95 | $0.60 | |
| 6/24/2011 | 11,654,174 | $10.37 | $9.77 | $0.60 | |
| 6/27/2011 | 6,847,234 | $10.20 | $9.60 | $0.60 | |
| 6/28/2011 | 12,714,531 | $10.58 | $9.98 | $0.60 | |
| 6/29/2011 | 8,805,256 | $10.76 | $10.16 | $0.60 | |
| 6/30/2011 | 8,320,824 | $10.66 | $10.06 | $0.60 | |
| 7/1/2011 | 9,230,107 | $10.57 | $9.97 | $0.60 | |
| 7/5/2011 | 9,422,003 | $10.88 | $10.28 | $0.60 | |
| 7/6/2011 | 8,170,439 | $10.85 | $10.25 | $0.60 | |
| 7/7/2011 | 8,834,249 | $11.19 | $10.59 | $0.60 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Implied Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 7/8/2011 | 7,757,569 | $10.83 | $10.23 | $0.60 | |
| 7/11/2011 | 8,083,948 | $10.28 | $9.68 | $0.60 | |
| 7/12/2011 | 9,009,405 | $10.22 | $9.62 | $0.60 | |
| 7/13/2011 | 13,454,590 | $10.28 | $9.68 | $0.60 | |
| 7/14/2011 | 15,865,698 | $10.37 | $9.77 | $0.60 | |
| 7/15/2011 | 18,413,601 | $11.20 | $10.60 | $0.60 | |
| 7/18/2011 | 11,599,642 | $11.19 | $10.59 | $0.60 | |
| 7/19/2011 | 20,803,691 | $11.39 | $10.79 | $0.60 | |
| 7/20/2011 | 12,248,059 | $11.24 | $10.64 | $0.60 | |
| 7/21/2011 | 17,163,133 | $11.27 | $10.67 | $0.60 | |
| 7/22/2011 | 23,430,866 | $12.11 | $11.51 | $0.60 | |
| 7/25/2011 | 15,790,606 | $11.92 | $11.32 | $0.60 | |
| 7/26/2011 | 16,404,060 | $12.01 | $11.41 | $0.60 | |
| 7/27/2011 | 14,239,299 | $11.70 | $11.10 | $0.60 | |
| 7/28/2011 | 10,869,555 | $11.60 | $11.00 | $0.60 | |
| 7/29/2011 | 14,916,531 | $11.52 | $10.92 | $0.60 | |
| 8/1/2011 | 17,234,043 | $11.70 | $11.10 | $0.60 | |
| 8/2/2011 | 18,994,753 | $11.21 | $10.61 | $0.60 | |
| 8/3/2011 | 16,665,812 | $11.17 | $10.57 | $0.60 | |
| 8/4/2011 | 34,391,581 | $9.76 | $9.16 | $0.60 | |
| 8/5/2011 | 69,730,832 | $7.79 | $7.19 | $0.60 | |
| 8/8/2011 | 42,344,166 | $6.55 | $5.95 | $0.60 | |
| 8/9/2011 | 33,960,907 | $7.41 | $6.81 | $0.60 | |
| 8/10/2011 | 29,133,384 | $7.17 | $6.57 | $0.60 | |
| 8/11/2011 | 24,331,250 | $7.50 | $6.90 | $0.60 | |
| 8/12/2011 | 19,417,013 | $7.69 | $7.09 | $0.60 | |
| 8/15/2011 | 18,681,939 | $8.10 | $7.50 | $0.60 | |
| 8/16/2011 | 21,723,637 | $7.69 | $7.09 | $0.60 | |
| 8/17/2011 | 14,265,301 | $7.88 | $7.28 | $0.60 | |
| 8/18/2011 | 17,208,040 | $7.01 | $6.41 | $0.60 | |
| 8/19/2011 | 11,288,056 | $6.72 | $6.12 | $0.60 | |
| 8/22/2011 | 28,226,490 | $6.29 | $5.69 | $0.60 | |
| 8/23/2011 | 13,209,153 | $6.68 | $6.08 | $0.60 | |
| 8/24/2011 | 11,247,457 | $6.70 | $6.10 | $0.60 | |
| 8/25/2011 | 12,682,775 | $6.54 | $5.94 | $0.60 | |
| 8/26/2011 | 11,302,768 | $6.92 | $6.32 | $0.60 | |
| 8/29/2011 | 9,681,769 | $7.35 | $6.75 | $0.60 | |
| 8/30/2011 | 12,146,790 | $7.49 | $6.89 | $0.60 | |
| 8/31/2011 | 13,648,765 | $7.34 | $6.74 | $0.60 | |
| 9/1/2011 | 8,130,694 | $7.27 | $6.67 | $0.60 | |
| 9/2/2011 | 8,288,712 | $6.91 | $6.31 | $0.60 | |
| 9/6/2011 | 10,150,292 | $6.80 | $6.20 | $0.60 | |
| 9/7/2011 | 10,571,451 | $7.39 | $6.79 | $0.60 | |
| 9/8/2011 | 14,039,120 | $7.34 | $6.74 | $0.60 | |
| 9/9/2011 | 14,754,281 | $6.87 | $6.27 | $0.60 | |
| 9/12/2011 | 10,368,595 | $6.84 | $6.24 | $0.60 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Implied Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 9/13/2011 | 13,017,047 | $7.04 | $6.44 | $0.60 | |
| 9/14/2011 | 14,099,222 | $7.21 | $6.61 | $0.60 | |
| 9/15/2011 | 11,516,181 | $7.61 | $7.01 | $0.60 | |
| 9/16/2011 | 12,152,158 | $7.53 | $6.93 | $0.60 | |
| 9/19/2011 | 10,060,322 | $7.35 | $6.75 | $0.60 | |
| 9/20/2011 | 9,167,364 | $7.08 | $6.48 | $0.60 | |
| 9/21/2011 | 12,164,225 | $6.76 | $6.16 | $0.60 | |
| 9/22/2011 | 19,635,416 | $6.10 | $5.50 | $0.60 | |
| 9/23/2011 | 9,521,280 | $6.01 | $5.41 | $0.60 | |
| 9/26/2011 | 13,221,109 | $6.32 | $5.72 | $0.60 | |
| 9/27/2011 | 12,717,626 | $6.49 | $5.89 | $0.60 | |
| 9/28/2011 | 12,128,841 | $5.96 | $5.36 | $0.60 | |
| 9/29/2011 | 14,496,738 | $5.96 | $5.36 | $0.60 | |
| 9/30/2011 | 12,592,052 | $5.56 | $4.96 | $0.60 | |
| 10/3/2011 | 21,141,648 | $5.01 | $4.41 | $0.60 | |
| 10/4/2011 | 20,486,170 | $5.42 | $4.82 | $0.60 | |
| 10/5/2011 | 20,275,599 | $5.95 | $5.35 | $0.60 | |
| 10/6/2011 | 13,234,081 | $6.14 | $5.54 | $0.60 | |
| 10/7/2011 | 15,209,289 | $6.11 | $5.51 | $0.60 | |
| 10/10/2011 | 10,921,404 | $6.38 | $5.78 | $0.60 | |
| 10/11/2011 | 12,753,555 | $6.52 | $5.92 | $0.60 | |
| 10/12/2011 | 8,403,322 | $6.54 | $5.94 | $0.60 | |
| 10/13/2011 | 7,378,186 | $6.55 | $5.95 | $0.60 | |
| 10/14/2011 | 10,973,040 | $6.78 | $6.18 | $0.60 | |
| 10/17/2011 | 13,918,127 | $6.89 | $6.29 | $0.60 | |
| 10/18/2011 | 16,055,778 | $6.92 | $6.32 | $0.60 | |
| 10/19/2011 | 11,545,349 | $6.77 | $6.17 | $0.60 | |
| 10/20/2011 | 9,274,349 | $6.75 | $6.15 | $0.60 | |
| 10/21/2011 | 12,999,997 | $7.15 | $6.55 | $0.60 | |
| 10/24/2011 | 13,431,486 | $7.65 | $7.05 | $0.60 | |
| 10/25/2011 | 11,387,730 | $7.23 | $6.63 | $0.60 | |
| 10/26/2011 | 11,139,420 | $7.48 | $6.88 | $0.60 | |
| 10/27/2011 | 18,276,539 | $7.93 | $7.33 | $0.60 | |
| 10/28/2011 | 12,428,239 | $8.19 | $7.59 | $0.60 | |
| 10/31/2011 | 10,545,943 | $7.66 | $7.06 | $0.60 | |
| 11/1/2011 | 12,538,894 | $7.32 | $6.72 | $0.60 | |
| 11/2/2011 | 15,413,134 | $7.98 | $7.38 | $0.60 | |
| 11/3/2011 | 14,623,615 | $8.25 | $7.65 | $0.60 | |
| 11/4/2011 | 17,926,276 | $7.86 | $7.26 | $0.60 | |
| 11/7/2011 | 12,410,366 | $7.81 | $7.21 | $0.60 | |
| 11/8/2011 | 10,219,912 | $7.75 | $7.15 | $0.60 | |
| 11/9/2011 | 14,394,709 | $7.22 | $6.62 | $0.60 | |
| 11/10/2011 | 22,537,317 | $6.90 | $6.30 | $0.60 | |
| 11/11/2011 | 9,950,561 | $7.27 | $6.67 | $0.60 | |
| 11/14/2011 | 6,975,194 | $7.24 | $6.64 | $0.60 | |
| 11/15/2011 | 9,168,633 | $7.50 | $6.90 | $0.60 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Implied Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 11/16/2011 | 17,771,503 | $7.60 | $7.00 | $0.60 | |
| 11/17/2011 | 10,919,952 | $7.07 | $6.47 | $0.60 | |
| 11/18/2011 | 8,657,850 | $7.13 | $6.53 | $0.60 | |
| 11/21/2011 | 11,046,418 | $6.80 | $6.20 | $0.60 | |
| 11/22/2011 | 10,490,454 | $6.80 | $6.20 | $0.60 | |
| 11/23/2011 | 10,651,972 | $6.27 | $5.67 | $0.60 | |
| 11/25/2011 | 5,630,168 | $6.35 | $5.75 | $0.60 | |
| 11/28/2011 | 8,777,850 | $6.81 | $6.21 | $0.60 | |
| 11/29/2011 | 8,775,619 | $6.91 | $6.31 | $0.60 | |
| 11/30/2011 | 10,373,557 | $7.35 | $6.75 | $0.60 | |
| 12/1/2011 | 9,834,712 | $7.50 | $6.90 | $0.60 | |
| 12/2/2011 | 12,469,249 | $7.52 | $6.92 | $0.60 | |
| 12/5/2011 | 12,245,200 | $7.81 | $7.21 | $0.60 | |
| 12/6/2011 | 8,552,583 | $7.75 | $7.15 | $0.60 | |
| 12/7/2011 | 7,998,838 | $7.68 | $7.08 | $0.60 | |
| 12/8/2011 | 8,705,201 | $7.21 | $6.61 | $0.60 | |
| 12/9/2011 | 8,167,409 | $7.65 | $7.05 | $0.60 | |
| 12/12/2011 | 6,856,756 | $7.34 | $6.74 | $0.60 | |
| 12/13/2011 | 8,070,783 | $7.09 | $6.49 | $0.60 | |
| 12/14/2011 | 9,095,624 | $6.70 | $6.10 | $0.60 | |
| 12/15/2011 | 9,615,131 | $6.58 | $5.98 | $0.60 | |
| 12/16/2011 | 7,575,156 | $6.76 | $6.16 | $0.60 | |
| 12/19/2011 | 9,859,283 | $6.30 | $5.70 | $0.60 | |
| 12/20/2011 | 11,008,168 | $6.70 | $6.10 | $0.60 | |
| 12/21/2011 | 9,406,166 | $6.67 | $6.07 | $0.60 | |
| 12/22/2011 | 31,101,232 | $8.21 | $7.61 | $0.60 | |
| 12/23/2011 | 26,761,595 | $8.57 | $7.97 | $0.60 | |
| 12/27/2011 | 10,745,766 | $8.46 | $7.86 | $0.60 | |
| 12/28/2011 | 7,549,466 | $8.09 | $7.49 | $0.60 | |
| 12/29/2011 | 7,299,234 | $8.22 | $7.62 | $0.60 | |
| 12/30/2011 | 6,171,316 | $8.16 | $7.56 | $0.60 | |
| 1/3/2012 | 15,282,296 | $8.35 | $7.75 | $0.60 | |
| 1/4/2012 | 8,228,205 | $8.30 | $7.70 | $0.60 | |
| 1/5/2012 | 20,088,448 | $8.73 | $8.13 | $0.60 | |
| 1/6/2012 | 18,744,528 | $8.54 | $7.94 | $0.60 | |
| 1/9/2012 | 8,934,616 | $8.50 | $7.90 | $0.60 | |
| 1/10/2012 | 19,757,869 | $8.73 | $8.13 | $0.60 | |
| 1/11/2012 | 15,361,313 | $8.47 | $7.87 | $0.60 | |
| 1/12/2012 | 12,447,010 | $8.13 | $7.53 | $0.60 | |
| 1/13/2012 | 10,799,610 | $8.05 | $7.45 | $0.60 | |
| 1/17/2012 | 7,339,053 | $8.10 | $7.50 | $0.60 | |
| 1/18/2012 | 9,403,993 | $8.19 | $7.59 | $0.60 | |
| 1/19/2012 | 8,494,867 | $7.97 | $7.37 | $0.60 | |
| 1/20/2012 | 17,941,290 | $7.61 | $7.01 | $0.60 | |
| 1/23/2012 | 14,771,156 | $7.99 | $7.39 | $0.60 | |
| 1/24/2012 | 11,111,021 | $7.91 | $7.31 | $0.60 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Implied Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 1/25/2012 | 13,348,928 | $8.40 | $7.80 | $0.60 | |
| 1/26/2012 | 9,783,083 | $8.08 | $7.48 | $0.60 | |
| 1/27/2012 | 7,563,981 | $8.18 | $7.58 | $0.60 | |
| 1/30/2012 | 7,895,920 | $7.96 | $7.36 | $0.60 | |
| 1/31/2012 | 9,538,431 | $7.78 | $7.18 | $0.60 | |
| 2/1/2012 | 12,392,481 | $7.83 | $7.23 | $0.60 | |
| 2/2/2012 | 65,579,574 | $7.16 | $6.56 | $0.60 | |
| 2/3/2012 | 15,264,104 | $7.22 | $6.62 | $0.60 | |
| 2/6/2012 | 12,480,697 | $7.56 | $6.96 | $0.60 | |
| 2/7/2012 | 16,068,308 | $7.42 | $6.82 | $0.60 | |
| 2/8/2012 | 12,449,285 | $7.35 | $6.75 | $0.60 | |
| 2/9/2012 | 11,608,770 | $7.45 | $6.85 | $0.60 | |
| 2/10/2012 | 10,413,562 | $7.46 | $6.86 | $0.60 | |
| 2/13/2012 | 18,202,659 | $7.79 | $7.19 | $0.60 | |
| 2/14/2012 | 11,357,727 | $7.91 | $7.31 | $0.60 | |
| 2/15/2012 | 17,256,950 | $7.97 | $7.37 | $0.60 | |
| 2/16/2012 | 9,463,759 | $8.01 | $7.41 | $0.60 | |
| 2/17/2012 | 9,632,189 | $8.15 | $7.55 | $0.60 | |
| 2/21/2012 | 11,683,689 | $8.18 | $7.58 | $0.60 | |
| 2/22/2012 | 10,460,658 | $8.02 | $7.42 | $0.60 | |
| 2/23/2012 | 13,225,308 | $8.24 | $7.64 | $0.60 | |
| 2/24/2012 | 30,458,517 | $8.81 | $8.21 | $0.60 | |
| 2/27/2012 | 22,363,730 | $8.78 | $8.18 | $0.60 | |
| 2/28/2012 | 15,748,704 | $8.82 | $8.22 | $0.60 | |
| 2/29/2012 | 15,333,417 | $8.67 | $8.07 | $0.60 | |
| 3/1/2012 | 21,418,106 | $8.58 | $7.98 | $0.60 | |
| 3/2/2012 | 19,373,209 | $8.04 | $7.44 | $0.60 | |
| 3/5/2012 | 13,227,417 | $7.79 | $7.19 | $0.60 | |
| 3/6/2012 | 10,033,413 | $7.67 | $7.07 | $0.60 | |
| 3/7/2012 | 13,678,455 | $7.96 | $7.36 | $0.60 | |
| 3/8/2012 | 11,269,091 | $8.19 | $7.59 | $0.60 | |
| 3/9/2012 | 8,020,308 | $8.18 | $7.58 | $0.60 | |
| 3/12/2012 | 8,773,907 | $7.97 | $7.37 | $0.60 | |
| 3/13/2012 | 9,878,956 | $8.18 | $7.58 | $0.60 | |
| 3/14/2012 | 9,048,337 | $8.12 | $7.52 | $0.60 | |
| 3/15/2012 | 13,741,450 | $8.31 | $7.71 | $0.60 | |
| 3/16/2012 | 13,367,831 | $8.47 | $7.87 | $0.60 | |
| 3/19/2012 | 9,957,530 | $8.39 | $7.79 | $0.60 | |
| 3/20/2012 | 16,377,757 | $7.98 | $7.38 | $0.60 | |
| 3/21/2012 | 10,040,519 | $7.96 | $7.36 | $0.60 | |
| 3/22/2012 | 14,391,828 | $7.63 | $7.03 | $0.60 | |
| 3/23/2012 | 29,713,717 | $8.29 | $7.69 | $0.60 | |
| 3/26/2012 | 14,281,973 | $8.21 | $7.61 | $0.60 | |
| 3/27/2012 | 10,295,703 | $8.02 | $7.42 | $0.60 | |
| 3/28/2012 | 17,479,510 | $7.84 | $7.24 | $0.60 | |
| 3/29/2012 | 11,011,855 | $7.81 | $7.21 | $0.60 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Implied Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 3/30/2012 | 9,546,361 | $7.83 | $7.23 | $0.60 | |
| 4/2/2012 | 10,674,294 | $7.96 | $7.36 | $0.60 | |
| 4/3/2012 | 17,933,993 | $8.14 | $7.54 | $0.60 | |
| 4/4/2012 | 16,888,130 | $7.74 | $7.14 | $0.60 | |
| 4/5/2012 | 11,269,967 | $7.72 | $7.12 | $0.60 | |
| 4/9/2012 | 10,478,074 | $7.42 | $6.82 | $0.60 | |
| 4/10/2012 | 13,762,803 | $7.08 | $6.48 | $0.60 | |
| 4/11/2012 | 10,423,263 | $7.17 | $6.57 | $0.60 | |
| 4/12/2012 | 11,303,859 | $7.55 | $6.95 | $0.60 | |
| 4/13/2012 | 11,403,260 | $7.27 | $6.67 | $0.60 | |
| 4/16/2012 | 13,294,437 | $7.11 | $6.51 | $0.60 | |
| 4/17/2012 | 9,274,492 | $7.33 | $6.73 | $0.60 | |
| 4/18/2012 | 7,438,608 | $7.21 | $6.61 | $0.60 | |
| 4/19/2012 | 12,048,813 | $7.05 | $6.45 | $0.60 | |
| 4/20/2012 | 6,549,261 | $7.06 | $6.46 | $0.60 | |
| 4/23/2012 | 9,036,573 | $7.18 | $6.58 | $0.60 | |
| 4/24/2012 | 7,305,599 | $7.28 | $6.68 | $0.60 | |
| 4/25/2012 | 14,504,173 | $7.41 | $6.81 | $0.60 | |
| 4/26/2012 | 8,569,047 | $7.66 | $7.06 | $0.60 | |
| 4/27/2012 | 7,577,677 | $7.54 | $6.94 | $0.60 | |
| 4/30/2012 | 19,890,015 | $7.99 | $7.39 | $0.60 | |
| 5/1/2012 | 14,379,028 | $8.02 | $7.42 | $0.60 | |
| 5/2/2012 | 47,230,703 | $7.25 | $6.65 | $0.60 | |
| 5/3/2012 | 30,421,839 | $6.91 | $6.31 | $0.60 | |
| 5/4/2012 | 29,930,669 | $7.08 | $6.48 | $0.60 | |
| 5/7/2012 | 14,353,312 | $7.05 | $6.45 | $0.60 | |
| 5/8/2012 | 11,251,913 | $7.07 | $6.47 | $0.60 | |
| 5/9/2012 | 11,762,384 | $7.13 | $6.53 | $0.60 | |
| 5/10/2012 | 10,285,159 | $7.04 | $6.44 | $0.60 | |
| 5/11/2012 | 8,826,684 | $6.89 | $6.29 | $0.60 | |
| 5/14/2012 | 7,671,049 | $6.70 | $6.10 | $0.60 | |
| 5/15/2012 | 20,445,380 | $6.20 | $5.60 | $0.60 | |
| 5/16/2012 | 19,457,704 | $6.28 | $5.68 | $0.60 | |
| 5/17/2012 | 11,116,596 | $6.04 | $5.44 | $0.60 | |
| 5/18/2012 | 10,498,335 | $6.08 | $5.48 | $0.60 | |
| 5/21/2012 | 9,133,296 | $6.50 | $5.90 | $0.60 | |
| 5/22/2012 | 17,404,977 | $6.17 | $5.57 | $0.60 | |
| 5/23/2012 | 12,015,485 | $6.41 | $5.81 | $0.60 | |
| 5/24/2012 | 10,838,555 | $6.32 | $5.72 | $0.60 | |
| 5/25/2012 | 7,539,366 | $6.48 | $5.88 | $0.60 | |
| 5/29/2012 | 11,728,263 | $6.85 | $6.25 | $0.60 | |
| 5/30/2012 | 13,575,652 | $6.36 | $5.76 | $0.60 | |
| 5/31/2012 | 11,647,608 | $6.35 | $5.75 | $0.60 | |
| 6/1/2012 | 11,082,922 | $5.96 | $5.36 | $0.60 | |
| 6/4/2012 | 17,916,269 | $5.89 | $5.29 | $0.60 | |
| 6/5/2012 | 10,316,815 | $6.07 | $5.47 | $0.60 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Implied Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 6/6/2012 | 14,952,079 | $6.31 | $5.71 | $0.60 | |
| 6/7/2012 | 13,800,549 | $6.27 | $5.67 | $0.60 | |
| 6/8/2012 | 10,571,704 | $6.34 | $5.74 | $0.60 | |
| 6/11/2012 | 10,153,570 | $6.07 | $5.47 | $0.60 | |
| 6/12/2012 | 11,884,521 | $6.11 | $5.51 | $0.60 | |
| 6/13/2012 | 11,124,792 | $5.98 | $5.38 | $0.60 | |
| 6/14/2012 | 12,714,552 | $6.26 | $5.66 | $0.60 | |
| 6/15/2012 | 9,160,837 | $6.48 | $5.88 | $0.60 | |
| 6/18/2012 | 11,562,603 | $6.44 | $5.84 | $0.60 | |
| 6/19/2012 | 11,771,708 | $6.77 | $6.17 | $0.60 | |
| 6/20/2012 | 12,825,761 | $6.49 | $5.89 | $0.60 | |
| 6/21/2012 | 13,895,882 | $6.04 | $5.44 | $0.60 | |
| 6/22/2012 | 22,411,311 | $6.06 | $5.46 | $0.60 | |
| 6/25/2012 | 9,527,628 | $5.91 | $5.31 | $0.60 | |
| 6/26/2012 | 10,988,894 | $5.96 | $5.36 | $0.60 | |
| 6/27/2012 | 13,701,907 | $6.37 | $5.77 | $0.60 | |
| 6/28/2012 | 12,880,907 | $6.39 | $5.79 | $0.60 | |
| 6/29/2012 | 15,666,394 | $6.69 | $6.09 | $0.60 | |
| 7/2/2012 | 8,318,256 | $6.54 | $5.94 | $0.60 | |
| 7/3/2012 | 7,907,141 | $6.72 | $6.12 | $0.60 | |
| 7/5/2012 | 9,630,028 | $6.54 | $5.94 | $0.60 | |
| 7/6/2012 | 8,861,293 | $6.43 | $5.83 | $0.60 | |
| 7/9/2012 | 9,092,787 | $6.41 | $5.81 | $0.60 | |
| 7/10/2012 | 14,239,788 | $6.10 | $5.50 | $0.60 | |
| 7/11/2012 | 14,006,572 | $6.16 | $5.56 | $0.60 | |
| 7/12/2012 | 11,143,398 | $6.20 | $5.60 | $0.60 | |
| 7/13/2012 | 9,066,913 | $6.41 | $5.81 | $0.60 | |
| 7/16/2012 | 10,642,330 | $6.59 | $5.99 | $0.60 | |
| 7/17/2012 | 10,676,608 | $6.65 | $6.05 | $0.60 | |
| 7/18/2012 | 9,641,637 | $6.52 | $5.92 | $0.60 | |
| 7/19/2012 | 8,339,203 | $6.69 | $6.09 | $0.60 | |
| 7/20/2012 | 8,514,229 | $6.79 | $6.19 | $0.60 | |
| 7/23/2012 | 8,381,292 | $6.54 | $5.94 | $0.60 | |
| 7/24/2012 | 10,875,642 | $6.36 | $5.76 | $0.60 | |
| 7/25/2012 | 9,601,878 | $6.33 | $5.73 | $0.60 | |
| 7/26/2012 | 10,698,798 | $6.64 | $6.04 | $0.60 | |
| 7/27/2012 | 10,895,094 | $6.80 | $6.20 | $0.60 | |
| 7/30/2012 | 9,364,470 | $7.04 | $6.44 | $0.60 | |
| 7/31/2012 | 10,690,885 | $6.82 | $6.22 | $0.60 | |
| 8/1/2012 | 23,323,356 | $6.85 | $6.25 | $0.60 | |
| 8/2/2012 | 24,857,730 | $6.58 | $5.98 | $0.60 | |
| 8/3/2012 | 28,460,816 | $6.37 | $5.77 | $0.60 | |
| 8/6/2012 | 11,107,182 | $6.66 | $6.06 | $0.60 | |
| 8/7/2012 | 13,111,251 | $6.64 | $6.04 | $0.60 | |
| 8/8/2012 | 9,684,065 | $6.61 | $6.01 | $0.60 | |
| 8/9/2012 | 11,442,513 | $6.79 | $6.19 | $0.60 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Implied Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 8/10/2012 | 6,543,632 | $6.83 | $6.23 | $0.60 | |
| 8/13/2012 | 17,209,322 | $6.45 | $5.85 | $0.60 | |
| 8/14/2012 | 11,551,923 | $6.39 | $5.79 | $0.60 | |
| 8/15/2012 | 9,958,300 | $6.47 | $5.87 | $0.60 | |
| 8/16/2012 | 7,795,269 | $6.56 | $5.96 | $0.60 | |
| 8/17/2012 | 7,717,765 | $6.45 | $5.85 | $0.60 | |
| 8/20/2012 | 7,313,124 | $6.44 | $5.84 | $0.60 | |
| 8/21/2012 | 8,610,245 | $6.43 | $5.83 | $0.60 | |
| 8/22/2012 | 10,417,211 | $6.55 | $5.95 | $0.60 | |
| 8/23/2012 | 13,242,591 | $6.52 | $5.92 | $0.60 | |
| 8/24/2012 | 7,783,072 | $6.51 | $5.91 | $0.60 | |
| 8/27/2012 | 6,764,985 | $6.45 | $5.85 | $0.60 | |
| 8/28/2012 | 9,480,181 | $6.65 | $6.05 | $0.60 | |
| 8/29/2012 | 6,597,443 | $6.52 | $5.92 | $0.60 | |
| 8/30/2012 | 7,007,510 | $6.43 | $5.83 | $0.60 | |
| 8/31/2012 | 7,257,828 | $6.57 | $5.97 | $0.60 | |
| 9/4/2012 | 5,356,237 | $6.52 | $5.92 | $0.60 | |
| 9/5/2012 | 12,861,704 | $6.79 | $6.19 | $0.60 | |
| 9/6/2012 | 10,844,128 | $6.87 | $6.27 | $0.60 | |
| 9/7/2012 | 9,245,527 | $6.99 | $6.39 | $0.60 | |
| 9/10/2012 | 9,683,757 | $7.12 | $6.52 | $0.60 | |
| 9/11/2012 | 9,487,108 | $7.20 | $6.60 | $0.60 | |
| 9/12/2012 | 8,884,196 | $7.24 | $6.64 | $0.60 | |
| 9/13/2012 | 19,133,027 | $7.32 | $6.72 | $0.60 | |
| 9/14/2012 | 19,408,907 | $7.75 | $7.15 | $0.60 | |
| 9/17/2012 | 9,642,601 | $7.58 | $6.98 | $0.60 | |
| 9/18/2012 | 13,472,794 | $7.39 | $6.79 | $0.60 | |
| 9/19/2012 | 8,937,306 | $7.28 | $6.68 | $0.60 | |
| 9/20/2012 | 10,179,364 | $7.30 | $6.70 | $0.60 | |
| 9/21/2012 | 7,681,659 | $7.27 | $6.67 | $0.60 | |
| 9/24/2012 | 8,336,270 | $7.15 | $6.55 | $0.60 | |
| 9/25/2012 | 9,443,418 | $7.02 | $6.42 | $0.60 | |
| 9/26/2012 | 10,220,342 | $6.84 | $6.24 | $0.60 | |
| 9/27/2012 | 7,305,853 | $6.99 | $6.39 | $0.60 | |
| 9/28/2012 | 6,637,286 | $6.98 | $6.38 | $0.60 | |
| 10/1/2012 | 8,226,281 | $7.03 | $6.43 | $0.60 | |
| 10/2/2012 | 7,652,942 | $7.05 | $6.45 | $0.60 | |
| 10/3/2012 | 8,912,273 | $7.00 | $6.40 | $0.60 | |
| 10/4/2012 | 16,595,632 | $7.38 | $6.78 | $0.60 | |
| 10/5/2012 | 9,676,471 | $7.27 | $6.67 | $0.60 | |
| 10/8/2012 | 7,397,885 | $7.16 | $6.56 | $0.60 | |
| 10/9/2012 | 9,636,921 | $7.35 | $6.75 | $0.60 | |
| 10/10/2012 | 21,844,235 | $7.08 | $6.48 | $0.60 | |
| 10/11/2012 | 12,395,036 | $7.32 | $6.72 | $0.60 | |
| 10/12/2012 | 5,831,227 | $7.24 | $6.64 | $0.60 | |
| 10/15/2012 | 8,303,925 | $7.14 | $6.54 | $0.60 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Implied Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 10/16/2012 | 9,229,309 | $7.37 | $6.77 | $0.60 | |
| 10/17/2012 | 7,535,748 | $7.38 | $6.78 | $0.60 | |
| 10/18/2012 | 9,109,868 | $7.29 | $6.69 | $0.60 | |
| 10/19/2012 | 13,090,647 | $7.06 | $6.46 | $0.60 | |
| 10/22/2012 | 13,046,920 | $6.91 | $6.31 | $0.60 | |
| 10/23/2012 | 18,568,467 | $6.67 | $6.07 | $0.60 | |
| 10/24/2012 | 13,065,901 | $6.45 | $5.85 | $0.60 | |
| 10/25/2012 | 16,052,348 | $6.42 | $5.82 | $0.60 | |
| 10/26/2012 | 18,789,296 | $6.36 | $5.76 | $0.60 | |
| 10/31/2012 | 8,320,319 | $6.22 | $5.62 | $0.60 | |
| 11/1/2012 | 11,864,572 | $6.27 | $5.67 | $0.60 | |
| 11/2/2012 | 12,243,390 | $6.11 | $5.51 | $0.60 | |
| 11/5/2012 | 11,893,944 | $6.22 | $5.62 | $0.60 | |
| 11/6/2012 | 6,767,763 | $6.25 | $5.65 | $0.60 | |
| 11/7/2012 | 17,194,291 | $6.00 | $5.40 | $0.60 | |
| 11/8/2012 | 40,539,696 | $6.10 | $5.50 | $0.60 | |
| 11/9/2012 | 76,724,060 | $5.51 | | | $5.51 |
| 11/12/2012 | 30,582,795 | $5.39 | | | $5.45 |
| 11/13/2012 | 41,799,082 | $5.60 | | | $5.50 |
| 11/14/2012 | 22,607,136 | $5.19 | | | $5.42 |
| 11/15/2012 | 27,475,829 | $5.32 | | | $5.40 |
| 11/16/2012 | 15,755,927 | $5.34 | | | $5.39 |
| 11/19/2012 | 18,899,733 | $5.62 | | | $5.42 |
| 11/20/2012 | 18,933,716 | $5.72 | | | $5.46 |
| 11/21/2012 | 7,231,488 | $5.62 | | | $5.48 |
| 11/23/2012 | 4,078,272 | $5.72 | | | $5.50 |
| 11/26/2012 | 15,104,965 | $5.73 | | | $5.52 |
| 11/27/2012 | 11,554,941 | $5.57 | | | $5.53 |
| 11/28/2012 | 11,918,432 | $5.60 | | | $5.53 |
| 11/29/2012 | 10,684,238 | $5.67 | | | $5.54 |
| 11/30/2012 | 22,483,362 | $5.85 | | | $5.56 |
| 12/3/2012 | 21,607,501 | $6.08 | | | $5.60 |
| 12/4/2012 | 11,942,127 | $6.11 | | | $5.63 |
| 12/5/2012 | 13,812,728 | $6.45 | | | $5.67 |
| 12/6/2012 | 28,234,180 | $6.79 | | | $5.73 |
| 12/7/2012 | 38,157,355 | $7.29 | | | $5.81 |
| 12/10/2012 | 22,763,036 | $6.78 | | | $5.85 |
| 12/11/2012 | 11,301,821 | $6.85 | | | $5.90 |
| 12/12/2012 | 10,228,950 | $6.84 | | | $5.94 |
| 12/13/2012 | 8,441,909 | $6.67 | | | $5.97 |
| 12/14/2012 | 4,576,882 | $6.70 | | | $6.00 |
| 12/17/2012 | 12,487,321 | $6.42 | | | $6.02 |
| 12/18/2012 | 7,374,688 | $6.48 | | | $6.03 |
| 12/19/2012 | 13,348,034 | $6.50 | | | $6.05 |
| 12/20/2012 | 24,774,522 | $6.19 | | | $6.06 |
| 12/21/2012 | 14,875,312 | $6.26 | | | $6.06 |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Implied Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 12/24/2012 | 2,815,486 | $6.25 | | | $6.07 |
| 12/26/2012 | 3,626,789 | $6.25 | | | $6.07 |
| 12/27/2012 | 7,601,440 | $6.41 | | | $6.08 |
| 12/28/2012 | 6,513,915 | $6.23 | | | $6.09 |
| 12/31/2012 | 7,687,203 | $6.35 | | | $6.10 |
| 1/2/2013 | 9,745,088 | $6.48 | | | $6.11 |
| 1/3/2013 | 7,233,942 | $6.46 | | | $6.12 |
| 1/4/2013 | 8,112,931 | $6.56 | | | $6.13 |
| 1/7/2013 | 9,226,289 | $6.80 | | | $6.14 |
| 1/8/2013 | 11,822,666 | $6.97 | | | $6.17 |
| 1/9/2013 | 8,692,710 | $6.93 | | | $6.18 |
| 1/10/2013 | 9,768,035 | $6.87 | | | $6.20 |
| 1/11/2013 | 6,770,701 | $6.86 | | | $6.22 |
| 1/14/2013 | 5,846,372 | $6.66 | | | $6.23 |
| 1/15/2013 | 3,783,823 | $6.73 | | | $6.24 |
| 1/16/2013 | 4,244,924 | $6.79 | | | $6.25 |
| 1/17/2013 | 11,830,297 | $6.99 | | | $6.26 |
| 1/18/2013 | 7,800,352 | $7.02 | | | $6.28 |
| 1/22/2013 | 9,504,190 | $7.18 | | | $6.30 |
| 1/23/2013 | 11,888,446 | $7.24 | | | $6.32 |
| 1/24/2013 | 8,212,657 | $7.05 | | | $6.33 |
| 1/25/2013 | 6,775,750 | $7.07 | | | $6.35 |
| 1/28/2013 | 6,915,808 | $7.00 | | | $6.36 |
| 1/29/2013 | 6,659,450 | $7.18 | | | $6.37 |
| 1/30/2013 | 12,875,866 | $7.13 | | | $6.39 |
| 1/31/2013 | 5,684,444 | $7.08 | | | $6.40 |
| 2/1/2013 | 26,268,713 | $6.62 | | | $6.40 |
| 2/4/2013 | 15,451,717 | $6.28 | | | $6.40 |
| 2/5/2013 | 21,697,791 | $6.25 | | | $6.40 |
| 2/6/2013 | 9,560,887 | $6.15 | | | $6.40 |