# EXHIBIT 18

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

IN RE SANDRIDGE ENERGY, INC. )
SECURITIES LITIGATION )
______________________________)
)
) No. 5:12-cv-01341-G
This Document Relates To: )
)
)
ALL ACTIONS. )
______________________________)

VIDEOTAPED DEPOSITION OF BJORN I. STEINHOLT, CFA
Los Angeles, California
Wednesday, June 12, 2019

Stenographically Reported by:
AMANDA J. KALLAS
CSR No. 13901

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

In Re SANDRIDGE ENERGY, INC. )
SECURITIES LITIGATION )
______________________________)
)
) No. 5:12-cv-01341-G
This Document Relates To: )
)
)
ALL ACTIONS. )
______________________________)

Deposition of BJORN I. STEINHOLT, CFA, taken on behalf of Defendant, at 1999 Avenue of the Stars, Los Angeles, California 90067-6045, beginning at 9:09 A.M. and ending at 4:58 P.M. on Wednesday, June 12, 2019, before Amanda J. Kallas, Certified Shorthand Reporter No. 13901.



APPEARANCES:

For Lead Plaintiffs:
ROBBINS GELLER RUDMAN & DOWD
BY: EVAN KAUFMAN, ESQ.
58 SOUTH SERVICE ROAD
MELVILLE, NEW YORK 11747
631-367-7100
EKAUFMAN@RGRDLAW.COM

For Defendant Tom L. Ward:
LATHAM & WATKINS
BY: CHRISTIAN WORD, ESQ.
555 ELEVENTH STREET, N.W.
SUITE 1000
WASHINGTON, D.C. 20004-1304
202-637-2200
CHRISTIAN.WORD@LW.COM

(APPEARANCES CONTINUED ON THE FOLLOWING PAGE.)



APPEARANCES CONTINUED:

For Defendants JAMES BENNETT, MATTHEW GRUBB, AND SANDRIDGE ENERGY:
COVINGTON & BURLING LLP
BY: MARK GIMBEL, ESQ.
BRYANT E. PULSIPHER, ESQ.
MATT THOMPSON, ESQ. (TELEPHONICALLY)
415 MISSION STREET
SAN FRANCISCO, CALIFORNIA 94105-2533
415-591-7055
MGIMBEL@COV.COM
BPULSIPHER@COV.COM
MTHOMPSON@COV.COM

Also Present:
RICHARD SMITH, Videographer



INDEX


| WITNESS | EXAMINATION |
|---|---|
| BJORN I. STEINHOLT, CFA | |
| (By Mr. Gimbel) | 11 |
| (By Mr. Word) | 243 |

QUESTIONS INSTRUCTED NOT TO ANSWER
Page Line
NONE

INFORMATION REQUESTED
Page Line
NONE

MARKED QUESTIONS
Page Line
NONE

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | EXPERT REPORT OF BJORN I. STEINHOLT, CFA DATED MARCH 1, 2019 | 15 |
| Exhibit 2 | REBUTTAL EXPERT REPORT OF BJORN I. STEINHOLT, CFA DATED APRIL 29, 2019 | 15 |
| Exhibit 3 | OIL AND GAS PRICES VS. INFLATION IN THE STEINHOLT REBUTTAL REPORT | 75 |
| Exhibit 4 | JANUARY 2005 ARTICLE "REDISCOVERING THE ECONOMICS OF LOSS CAUSATION" | 87 |
| Exhibit 5 | MARCH 1, 2011 POWERPOINT 2011 INVESTOR/ANALYST MEETING BATES: SD-SECURITIES-0000654 - 0000745 | 126 |





EXHIBITS CONTINUED

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 6 | FEBRUARY 28, 2011 KEYBANC ANALYST REPORT BATES: SD-SECURITIES0002847 - 00002859 | 132 |
| Exhibit 7 | CANACCORD GENUITY ANALYST REPORT BATES: SD-SECURITIES-0004080 - 0004097 | 160 |
| Exhibit 8 | DEUTSCHE BANK ANALYST REPORT BATES: CAL-0000663 - 0000670 | 161 |
| Exhibit 9 | J P MORGAN ANALYST REPORT BATES: CAL-0000645 - 0000662 | 168 |
| Exhibit 10 | LADENBURG THALMANN ANALYST REPORT BATES: SD-SECURITIES-0004180 - 00004185 | 180 |
| Exhibit 11 | SUSQUEHANNA FINANCIAL GROUP, LLP ANALYST REPORT BATES: SD-SECURITIES-0004108 - 0004114 | 183 |





EXHIBITS CONTINUED

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 12 | JOHNSON RICE & COMPANY, LLC BATES: SD-SECURITY-0002999 - 0003003 | 218 |




Wednesday, June 12, 2019; Los Angeles, California
9:09 A.M.
-- o0o --

THE VIDEOGRAPHER: Good morning. Today's date is June the 12th, 2019. The time is 9:09 a m. Please note that microphones are sensitive and may pick up whispering, private conversations, and cellular interference. Please turn off all your cellphones or place them away from the microphones as they can interfere with deposition audio. Your audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit No. 1 of the video-recorded deposition of Mr. Bjorn Steinholt. It's being taken by counsel for the defendant in the matter of SandRidge Energy, Inc., securities litigation. It's pending trial in the US District Court, for the Western District of Oklahoma. The docket number is 5:12-cv-01341-G.

The deposition is being held at the law firm of Covington & Burling, located at 1999 Avenue of the Stars, Los Angeles, California 90067.

My name is Richard Smith, I'm the videographer. I'm here with the court reporter, Ms. Amanda Kallas. We represent Veritext Legal

Solutions.
I am not related to any party in this action, nor am I financially interested in the outcome.
The counsel and all present in the room can now state their affiliations for the record. If there are any objections to the proceeding, please state them at the time of your appearance, and we'll begin with the noticing attorney.
MR. GIMBEL: Mark Gimbel, of Covington & Burling, for James Bennett, Matthew Grubb, and the nominal defendant. And with me today are Bryant Pulsipher and, on the line, is Matt Thompson.
MR. WORD: Christian Word, of Latham & Watkins. And I represent Tom Ward.
MR. KAUFMAN: Evan Kaufman, with Robbins Geller Rudman & Dowd, on behalf of the lead plaintiffs in the securities -- SandRidge Energy's securities class action.
THE VIDEOGRAPHER: Thank you.
If I could please have the court reporter please swear in the witness.
---oOo---
//
//
//



BJORN I. STEINHOLT, CFA,
having been duly administered an oath by the court reporter, was examined and testified as follows:
THE WITNESS: I do.
---oOo---
EXAMINATION
BY MR. GIMBEL:
Q So good morning, Mr. Steinholt.
A Good morning.
Q We met during your deposition in class certification proceedings, but let me introduce myself again:
I'm Mark Gimbel, with Covington & Burling. And I represent the individual defendants, James Bennett and Matthew Grubb in this action, as well as nominal defendant, SandRidge.
Now, you've been hired to give expert testimony on behalf of the plaintiffs; correct?
A That's correct. Yes.
Q Okay. And you're a professional expert witness; correct?
A I'm a consultant, to do expert witness work as part of my consulting.
Q Okay. And 80 percent of what you do,



approximately, is litigation consulting; is that right?
A That's correct. Yes.
Q And you've been deposed on many occasions; correct?
A That's correct. Yes.
Q Okay. And so you understand that you're under oath here today?
A Yes.
Q Okay. And you understand the ground rules of a deposition; correct?
A Yes.
Q Okay. Is there any reason that you feel you can't testify truthfully today?
A No.
Q Okay. What did you do to prepare for this deposition?
A I reviewed my reports and underlying documents.
Q Okay. Did you meet with anyone to prepare for the deposition?
A I -- I met with Evan Kaufman yesterday. For about four hours or so.
Q Okay. Was anyone else present during that meeting?



A No.
Q All right. We spent lot of time going over your qualifications at the class certification deposition, so I won't dwell on that a lot here. But let me review a few points:
Am I correct, sir, that you don't have a doctorate or undergraduate degree in economics?
A That's correct. Yes.
Q You have never published any articles on loss, causation, or damages in peer review journals; correct?
A That's correct. Yes.
Q You've never lectured on either topic at a university; correct?
A That's correct. Yes.
Q Okay. And you don't hold a faculty position, do you?
A That's correct, I'm not an academic.
Q Your only professional publication is an article in Law360; is that right?
A That is correct. Yes.
Q Okay. And you mentioned earlier that, approximately, 80 percent of your income comes from serving as a litigation consultant; is that right?
A That's correct. Yes.

Page 14

Q Okay. And am I also correct that Robbins Geller, which represents the plaintiffs in this matter, is your most important client?
A They are my largest client, yes.
Q Okay. How much have you been paid for your testimony and services in this matter?
A Quite honestly, I -- I do not know. I thought that we produced the invoices to you guys. But on top of my head, I'm -- I'm sorry, I don't know.
Q Can you provide a range, for the benefit of the jury?
A Right now, I -- I do not recall exactly what the invoices were, it -- it probable -- it's probably -- the two reports, probably they're between $100,000 and 150,000.
Q Okay. And would that include fees paid to Caliber?
A Correct. Yes.
Q And you're the principal of Caliber Advisors; is that right?
A I'm a managing director. We don't have principals.
Q Let's mark the two reports.
//

Page 15

(Exhibit 1 was marked for identification.)
MR. GIMBEL: This will be 1. And will be 2.
//
(Exhibit 2 was marked for identification.)
MR. KAUFMAN: Is Exhibit 1 the March 1st report?
MR. GIMBEL: Exhibit 1 is the initial report, and Exhibit 2 is the rebuttal report.
MR. KAUFMAN: Okay.
BY MR. GIMBEL:
Q So Mr. Steinholt, we've marked as Exhibits 1 and 2, your initial report and rebuttal report.
Do you recognize those documents?
A I do, yes.
Q Okay. And are these the expert reports you prepared on the issues of loss, causation, and damages in this matter?
A Yes. As for -- far as I can tell, yes, absolutely.
Q And did you prepare the initial report marked as Exhibit 1?
A Yes.
Q Okay.

Page 16

A I did.
Q Did anyone assist you in preparing that report?
A I had -- I believe I had some assistance from one of my individuals at Caliber. And Ramsey Kukalis, I think he assisted me with respect to analyst reports. But in terms of writing the report and doing the analysis, I did all of it.
Q Okay. Did plaintiff's counsel review and provide comments on your report?
A Yes.
Q Okay. Is Exhibit 2 the rebuttal report you've submitted in this matter?
A Yes.
Q Did you prepare that report?
A Yes, I did.
Q Did anyone assist you in preparing that report?
A I had conversations with plaintiff's counsel throughout the process.
Q Okay. And what were the conversations about?
A The scope of what I would address.
Q Okay. And what did they tell you about the scope of what you needed to address?
A They asked me to review a rebuttal report by

Page 17

Dr. Grenadier. And also asked me to do an analysis of the August 5th, 2011 price decline.
Q Okay. The analysis of the August 5th, 2011 price decline is something you undertook independent of rebutting Mr. -- Professor Grenadier's report; correct?
A That is correct. Yes.
Q Okay. Did plaintiff's counsel review and comment on the content of your rebuttal report?
A The -- well, they reviewed it. And most of the comments were what I characterize as paralegal comments. So there were some changes, grammatical changes, and things of that nature. I -- there were -- I don't recall any substantive changes. Other than there's -- on both reports, there are -- there's one section where I really encouraged them to -- to spend a lot of time. And that is the section relating to plaintiff's allegations. So they had a lot of input relating to those two sections.
And there, I would effectively, you know, take a lot of guidance in terms of how to write those sections.
Q Okay. Did plaintiff's counsel provide you with any discovery materials for the purpose of

Page 18

preparing your rebuttal report?
A Yes. And I think that, in the first -- particularly, in the first report. And I think I cited the -- certain things that I looked at in the original or opening report in here. But yes, I did receive some discovery materials.
Q Okay. So my question was geared at the rebuttal report.
A Oh, I'm sorry.
Q Were you provided with any discovery, for purposes of your rebuttal report, that you did not have when you prepared your initial report?
A Yes. There were a couple of deposition transcripts --
Q Okay.
A -- by Ward and by Grubb, that I did not have before. Those are the main things that I recall.
Q Okay. You don't cite those deposition transcripts anywhere in your rebuttal report, do you?
A Yes, I mean, I -- I discuss the Ward deposition specifically. It was something that was brought up by Dr. Grenadier, and so I discuss his -- I -- I do discuss the Ward deposition.
Q Okay. Let me focus the question.

Page 19

So you do discuss that deposition, I stand corrected. You discuss it in connection with a November 2012 stock drop; right?
A Yes.
Q Right. And then you cite some testimony of Mr. Ward about the announcement of a potential transaction in the Permian.
Is that what you're referring to?
A Yes. Exactly.
Q Did you rely on any deposition testimony, for purposes of the opinion you -- express in the rebuttal report, about the August 5th, 2011 stock drop?
A I -- well, I -- I reviewed the -- the depositions for purposes of trying to ascertain what their reasoning for the increase in capital expenditures were.
Q Okay. And you don't cite that anywhere in -- in your report in connection with your opinions on the August 2011 stock drop, do you?
A That's correct.
Q Okay.
A Yes.
Q Are there any other discovery materials, that were not available to you at the time of your

Page 20

initial report, that you relied on in forming your opinions about the August 5th, 2011 stock drop?
A No. It would be -- the only other thing would be plaintiff's allegations, that section. But that is their, kind of, interpretation of the discovery material. It is not me looking at discovery material and relying --
Q Okay.
A -- on the discovery material.
Q And we're going to go over that in some detail later, but is it fair to say that, apart from the third amended complaint, you don't cite any document summarizing the plaintiff's allegations?
A Well, I don't cite any documents. I -- I do summarize my understanding of what their allegations are. And I also did review the motion by the Court -- motion to dismiss, in order to get some understanding in terms of what plaintiff's actionable allegations were. But I relied on communications from plaintiff's counsel, and I relied on the complaint, and I summarized my understanding in both reports.
Q Okay. The complaint and the Court's decision on the motion to dismiss are materials that were available to you before you issued your initial

Page 21

report; correct?
A That's correct. Yes.
Q Okay. Was there anything that -- that you learned about plaintiff's allegations after the initial report?
A I -- yes, I mean, there were several things. And I think I -- I actually have a summary of it in my report here.
Q Well, we'll -- we'll get to the summary later. And I've seen it. But what stood out to me is that it doesn't cite any documentary source, apart from the third amended complaint, and maybe you cite the Court's decision.
But is there any sort of document, that was generated after the time of your initial report, that you relied upon for your understanding of plaintiff's allegations?
A I did not directly rely on any specific documents. I relied on what was communicated to me by plaintiffs, in terms of what they intend to prove at trial. And that changed between me writing the first original report and me writing my second report.
Q Okay. So you're saying that plaintiff's allegations changed, as you understood them, between

Page 22

the first report and the second report; is that right?
MR. KAUFMAN: Object to the form.
BY MR. GIMBEL:
Q You can answer the question.
A Yes. My understanding of their allegations changed, yes.
Q Okay. And are you aware of any amendment of plaintiff's complaint that occurred between your first report and your second report?
A No.
Q Okay. So to the extent the allegations changed, that's not been reflected in the pleading; is that correct?
A No, I don't think it has been reflected in the pleading.
Q Okay. And who communicated to you that plaintiff's allegations had changed?
A It was my discussions with Evan Kaufman.
Q Okay. Were those oral discussions?
A Yes. It was on the -- well, it was on the phone, and I would, you know, write them up here. So you basically see -- and I would send it back to him, and he would review whether or not my understanding was correct. And I'm talking about

Page 23

paragraph 71 through 75 in my second report. So I would write down my understanding of the new allegations relating to August 5th, 2011.
Q Okay.
MR. KAUFMAN: Mr. Steinholt, I just want to caution you just to be careful not to communicate work product. So you can discuss what -- what was in the report, but not specific communications with -- with counsel.
MR. GIMBEL: He's relying on it for his opinion --
THE WITNESS: Okay.
MR. GIMBEL: -- so we may need to seek a ruling on that. There's no document that's been cited, it's just his understanding of what you told him about plaintiff's new allegations. So I think we're entitled to explore that.
BY MR. GIMBEL:
Q When did Mr. --
MR. KAUFMAN: The report is clear on what it relies on.
BY MR. GIMBEL:
Q When did Mr. Kaufman start to communicate plaintiff's new allegations to you?
A Well, when I wrote my original report, I -- I

Page 24

understood that the allegations relating to the August 5th, 2011 disclosure had not been finalized yet. Because discovery had not been completed. So I understood, at that point in time, that this -- the allegations -- there may be allegations relating to the August 5th, 2011 decline.
And the -- then, as -- it must have probably been after the completion of discovery, we were talking about these changes. And I put down in writing my understanding of what those changes were.
Q Okay. When you say you put down your understanding of Mr. Kaufman's changed allegations, did you do that in any form other than your report?
A You -- you say "the changed allegations." I'm not sure that the allegations changed. For my purposes, I was not asked to address any allegations relating to August 5th, 2011, and -- but I was -- it was my understanding that there may be allegations relating to that price decline. And I was provided that in information -- it wasn't as if I had a set of allegations at the time of my initial report, and that those allegations changed; it was just that I was not asked to address any allegations relating to August 5th, 2011 at the time of my initial report. Because, according to plaintiffs they had not

Page 25

completed discovery. And I made a note of that in my original report, my understanding of what was going on in the -- in my original report. And then after completion of discovery, I got the full summary of what they intended to prove at trial.
Q Okay.
A But it doesn't -- I don't have any -- I would write it up. And the only, you know, write-up of the allegations that I have are what -- what is in my second report here, which is in Paragraph 71 through 75.
Q And we'll get there in more detail later. But is it your understanding that these allegations were new? Or these allegations were available at the time that you issued your initial report --
A I think it was --
MR. KAUFMAN: Objection to --
BY MR. GIMBEL:
Q You can answer.
MR. KAUFMAN: -- the form.
THE WITNESS: My understanding -- and by the way, I'm -- this is beyond, you know, my expertise. But my understanding is that it relates to allegations that were in the -- in the complaint. But it -- to me, my understanding was it was more

Page 26

about what plaintiffs would be able to prove at trial, which is the relevant thing at this stage of the litigation.

So any way, that was my understanding.

BY MR. GIMBEL:

Q Okay. So your understanding is that the allegations that form the basis for your opinion about August 5th, 2011 appear in the initial complaint or the existing complaint?

MR. KAUFMAN: Object to the form.

BY MR. GIMBEL:

Q You can answer.

MR. KAUFMAN: Mischaracterizes.

THE WITNESS: My understanding is that the -- these allegations, which are a different type of allegations than the allegations that relate to the November 9th, 2012 price decline, are, you know, a -- are a materialization of an undisclosed risk type of allegations.

My understanding is that that was in the original complaint. In fact, I think that both, at class cert and in my opening report, I talk about materialization of an undisclosed risk. And the only reason I did that is because, you know, there was one component of the allegations in the original

Page 27

complaint that related to that. As opposed to just the disclosure of the alleged truth, which is the -- which is how I would characterize the disclosure at the end of the class period.

So my understanding is that the allegations have been there, but in terms of the factual support for the allegation, my understanding is that that is something that plaintiffs or their counsel was not able to communicate, or -- or finalize, or what have you at the time of my original report.

BY MR. GIMBEL:

Q Okay. Is there anything that prevented you from offering your opinion on August 5th, 2011 in your initial report? Is there any critical piece of information that you can point to that you were missing?

A Yes. I mean, I would need to know what the magnitude -- or what portion of the -- what portion of the capital expenditures that plaintiffs would allege related to the material -- materialization of the undisclosed risk.

Q And how did you find out what portion related to the undisclosed risk, as you put it?

A I would -- that was communicated to me by Mr. Kaufman. And it was part of the allegations

Page 28

that I have in my report here.

Q Did -- were you provided with any discovery documents showing the proportion of capital expenditures that relate to the materialize -- materialization of this allegedly undisclosed risk?

A As I sit here, I -- I don't know exactly how the 400 million was arrived at. But my -- what I do, I -- I am providing assumptions, what -- or allegations that plaintiffs intend to prove at trial. And so I work with those assumptions or those allegations, and I quantify what I think the impact would be on the stock price based on the assumptions given.

Q Okay. So my question was simpler.

Were you provided with any discovery documents demonstrating the 400 million in capital expenditures related to this alleged fraudulent scheme?

A I were provided discovery documents, but I don't know if those -- those discovery documents are the discovery documents that plaintiffs -- I don't know how they came up with the 400 million. So I can't answer that question, whether or not it is specifically from a discovery document that was provided to me or not.

Page 29

Q Okay. As you sit here now, you can't point to a discovery document that's relevant to that opinion; would that be fair to say?

MR. KAUFMAN: Object to the form.

THE WITNESS: I -- I would have to -- I can't point to any document, as I sit here right now, that form their allegation relating to 400 million. So -- so no, I -- I don't know what it is.

BY MR. GIMBEL:

Q Okay. As you sit here now, can you point to any deposition testimony that forms the basis for that allegation?

A Well, I would imagine that they would want to find out what Ward and Grubb had to say about the capital expenditures, and what the reasoning was. So -- but then again, you have to ask plaintiffs in terms of how they came up with that number.

Q So as you sit here now, you can't point to testimony of Mr. Ward or Mr. Grubb, or any other witness, that supports plaintiff's conclusion that there was a fraudulent scheme that was revealed when the market was told of increased capital expenditures?

MR. KAUFMAN: Object to the form.

THE WITNESS: Well, I -- again, this is

Page 30

outside of what I've been looking at, but I would imagine that the -- the absence of an explanation for the capital expenditures, like, contradicted their hypothesis or their allegation, would be relevant to them in determining whether or not to make these allegations. But then again, this is so far outside -- I mean, I don't have any personal knowledge in terms of what plaintiff's counsel's -- counsel went through.

BY MR. GIMBEL:

Q Okay. Let's put your imagination aside.

Is there any testimony, in this action, in discovery, that you're aware of, that supports plaintiff's theory that $400 million in announced capital expenditures, in August 2011, were part of a fraudulent scheme?

MR. KAUFMAN: Objection.

THE WITNESS: It is just not something that -- well, whenever you look at an allegation, you look at whether or not it's contradicted by other types of evidence. And so that's where it all becomes relevant. In other words, is there a -- what is the reasoning for the capital expenditures? And so, yeah, I -- I think -- I certainly think that it would be relevant to see what Grubb and Ward

Page 31

would have to say about it.

BY MR. GIMBEL:

Q Do you know --

A But -- but -- but --

Q -- what they have to say about it?

A Well, I read the deposition transcripts.

Q Okay. You don't cite them in your report, do you?

A Well, when they don't provide any information -- you look at it to determine whether or not there is information to contradict the allegations. And you don't know what they will say until they testify.

Consequently, there may not be anything there that -- that is relevant, but you don't know that until you review it. But that doesn't mean that you wouldn't review what they have to say.

Q Okay. Is this rebuttal report a complete statement of all of your opinions on the August 5th, 2011 stock drop?

A Yes, it is.

Q Okay. And did you cite all of the materials that you relied on in forming your opinions on the August 5th, 2011 stock drop?

A I -- well, I have to see in Exhibit B. I

Page 32

mean... or -- I guess, I didn't -- I provided you with some list of all of the information I relied on. And...

But -- and if the question is whether or not the deposition transcripts would be something that I would have reviewed, it would have. But it is not something -- I mean, there wasn't anything there that, in my view, explained very much the reasoning behind increase in capital expenditures.

Q Do you cite Mr. Grubb or Mr. Ward's testimony anywhere in the section of your report dealing with the August 5th, 2011 stock drop?

MR. KAUFMAN: Objection. Asked and answered.

THE WITNESS: I don't -- I don't believe I -- I cited his report in here, no.

BY MR. GIMBEL:

Q Okay. And you understand that it's your obligation as a witness -- as an expert witness to disclose all of the materials you relied on in reaching your opinions; correct?

A Yes. And I do believe that those two documents were -- or provided to you in connection with the information that I relied on.

Q Okay. Where, in your report, does it say that you relied on the testimony of either of those

Page 33

individuals in forming your views about the August 5th, 2011 stock drop?

A I don't think I have anything in report that specifically states that. But it is part of the documents that I produce that I relied on in this case, I'm pretty sure.

Q What do you mean by that?

A As part of this deposition, I was asked to produce to you guys documents that I relied on.

MR. KAUFMAN: Oh.

THE WITNESS: In --

MR. GIMBEL: So we have not seen the reliance materials that Mr. Steinholt is saying that he asked you to produce to us. So I'd like you to produce those to us. And we'll reserve the right to recall for a further deposition.

(Simultaneous speaking.)

THE REPORTER: Excuse me, one at a time.

MR. KAUFMAN: That wasn't the testimony. Mr. Steinholt never asked us --

MR. GIMBEL: Don't coach the witness.

MR. KAUFMAN: -- us to --

Just making sure the record's clear.

MR. GIMBEL: (Reading):

As part of this deposition, I

Page 34

was asked to produce to you guys
documents that I relied on.
Those are the documents I haven't seen.
Okay.
So our request for those is on the record, Evan, you can produce them.
MR. KAUFMAN: Take -- take it under advisement.
BY MR. GIMBEL:
Q Have you formed any opinions in this matter that are not disclosed in Exhibits 1 and Exhibit 2?
A Not the opinions that I intend to testify about -- I mean, you always have opinions -- I mean, you have hundreds of opinions in your head. But no, the opinions that I intend to testify on are the ones that are disclosed in my report.
Q Okay. As you sit here now, do you plan to amend or supplement either report?
A No.
Q In your expert reports, you calculate the inflation that you estimate existed in SandRidge's stock price over the class period; correct?
A That's correct. Yes.
Q Okay. And by "inflation," you mean the amount by which the value of the stock was inflated

Page 35

by alleged misrepresentations or omissions by the defendants; correct?
A Yes. I mean, inflation is the -- is the -- effectively, the measure used to quantify recoverable damages. It's the overstatement -- or it's the amount that the investors overpaid for the stock, and they were not -- and they were -- and if they were un -- unable to recover that overpayment, then you have damages.
Q Okay. And Exhibit D to your initial report, if you can turn to that, contains an analysis of damages per share and inflation; is that correct?
A That is correct. Yes.
Q Okay. And according to Exhibit D, on every day of the class period, inflation was the same amount, $0.60 per share; is that correct?
A That is correct. Yes.
Q Okay. Your rebuttal report also attaches a similar table entitled, (reading):
Analysis per share inflation.
And that's Exhibit A to your rebuttal report; is that correct?
A Yes.
Q Okay. And the calculation of inflation in your rebuttal report is very different.

Page 36

Would that be fair to say?
A No, it's not very different. The only difference is whether or not you keep -- whether or not you use a return base methodology or $1 based methodology. So the -- the inflation -- the inflation, typically, is a ribbon from the misrepresentation to the disclosure of the alleged truth. And there are two ways of doing it, and I know we discussed at the other deposition for class certification, there are two ways of looking at it. And they have a little bit different meaning, depending on how you look at it.
Q Well, let's look --
A So --
Q -- here --
MR. KAUFMAN: Please let the witness finish answering the question.
THE WITNESS: So --
BY MR. GIMBEL:
Q Please.
A -- you can do it on a dollar basis, and you can do it on a percentage basis. And that's what -- I have here.
MR. GIMBEL: I'm going to make a motion to strike that as nonresponsive.

Page 37

BY MR. GIMBEL:
Q And I'd like you to focus on my question. And we established a moment ago that your inflation estimate, in the initial report, was $0.60 on every day of the class period; is that correct?
A Correct.
Q Okay.
A Using the dollar --
Q And now --
A -- methodology, yes.
Q -- turn to Exhibit A, please.
A I --
Q Your rebuttal report.
A Just wait until I finish the answer, and not start asking the second question, because I'd like to hear what you're asking.
Q Well, I'm going to give you all the time in the world to hear it. Turn to Exhibit A, please.
A Yes. I have Exhibit A here.
Q Okay. Am I correct that, in Exhibit A, instead of calculating a constant $0.60 of inflation on every single day of the class period, you have variable estimates of inflation that range from a low of $0.49 to a high of $1.28?
A Um.

Page 38

Q Try to answer that "yes" or "no."
A I don't know --
MR. KAUFMAN: Object to the form.
THE WITNESS: -- whether the high is $1.28, but what I can tell you is that it's based on the percentage inflation and -- or, I keep inflation constant on a percentage basis.
BY MR. GIMBEL:
Q Okay.
A And so it would vary because it takes into account market factors operating on the fraud.
Q In your initial report, the inflation estimate for April 5th, 2011 is $0.60; correct?
A April 5th...
Q 2011. I'm going to help you, because it's the same on every day of the class period. But if you want to verify that, you can check it.
A Yeah, I mean, April 5th, it's $0.60. Or --
Q Okay. And in your rebuttal report, the inflation estimate for April 5th, 2011 is $1.28 per share?
A That is correct. Yes.
Q Okay. So that's more than double the $0.60 of inflation you estimated when you first looked at this in your initial report; right?

Page 39

MR. KAUFMAN: Objection.
THE WITNESS: No, I mean, it's -- it's -- my initial report has the percentage inflation, and it has the -- quantified the dollar inflation. It's double the exhibit in -- Exhibit D, is it? -- in my report. Because Exhibit D, in the report, doesn't take into account market factors operating on the fraud and Exhibit A does.
BY MR. GIMBEL:
Q Okay. And so I'm just going to ask you to answer very simply for a jury.
Is your estimate of $1.28 in inflation, in your rebuttal report for April 5th, 2011, more than double your estimate of $0.60 inflation in your additional -- your initial report for that date?
MR. KAUFMAN: Objection.
THE WITNESS: Yes. They are two different measures of inflation. So yes, they are different.
BY MR. GIMBEL:
Q Okay. In your opinion, what is the correct estimate of inflation for April 5th, 2011? Is it $0.60 or is it $1.28?
A Part of that is a legal issue. And it reflects two different things. It -- part of it is, it depends on what the counterfactual is. So if the

Page 40

assumption is that, absent the alleged fraud, which is the counterfactual, let's -- having a counterfactual would be that the misrepresentations were true, then the stock price would have been exactly the same. But for one day, which is on November 9th, where you have the price decline. So the price decline itself capture the inflation or capture the damages, in which case you would go with the $0.60 inflation.
And -- but if you have -- if you're trying to estimate what the value would be, had there been similar disclosure earlier on, in other words, I think it's 9.9 percentage disclosure earlier on, that number would be different because the stock price is different.
Q All right. So I'm not asking you to testify about legal issues. Let's be clear about that.
In your opinion, what is the correct estimate of inflation for April 5th, 2011? $0.60 or $1.28?
MR. KAUFMAN: Object to the form.
THE WITNESS: It depends on what the law is. So, because you can use both these measures, and experts have used both these measures, in quantifying the inflation. So it -- it's very much a legal issue, which one that you use.

Page 41

Can you get more than the decline at the end of the class period? That is up to debate. So when you're -- so the way that I do inflation is to quantify the inflation that is recoverable. What is recoverable depends on what the law is. If you're asking me, "which one reflects the true value better, the 60 -- or -- or the value line where you just subtract the $0.60 versus the value line that is based on the returns," I would say that the value line, based on the returns, is the one that reflects the value better and is more consistent with economic theory. But that may or may not be what you're entitled to under the law.
BY MR. GIMBEL:
Q So if I understand you correctly, in your capacity as an expert, and without offering an opinion on the law, you think that the $1.28 estimate of inflation April 5th, 2011 is more accurate than the initial estimate you provided of $0.60; is that right?
MR. KAUFMAN: Object to the form.
THE WITNESS: Again, if the inflation is defined as being the difference between the price and where it would have traded, had there been full disclosure, then yes, that would be the one that I

Page 42

would -- would prefer to use. Because it does reflect the changed inflation, during it -- it -- it reflects the market forces operating on the fraud, which was one of the criticism of your expert. In fact, your expert -- I agree with your expert, and that is that the -- that, you know, having an inflation that reflects the market forces makes sense from an economic point of view.

BY MR. GIMBEL:

Q Okay. So you've offered, on a dollar basis, two very different calculations of inflation between the first report and the second report. And you've explained that that depends on a change in method, as I understood it; is that right?

MR. KAUFMAN: Objection.

THE WITNESS: That's incorrect.

BY MR. GIMBEL:

Q Okay. Well, what caused you to change your calculation of inflation --

A Can I --

MR. KAUFMAN: Just wait for -- for Mr. Gimbel to finish his question.

BY MR. GIMBEL:

Q What caused you to change your method of calculating inflation between the first report and

Page 43

the second report?

MR. KAUFMAN: Object to the form.

THE WITNESS: In my first report, my opinion was that the price impact of the disclosure of the alleged truth, on November 9th, 2012, was 9.9 percent, and represents the inflation from the first actionable misrepresentation concealing the alleged truth until the disclosure of the alleged truth. That is my opinion in my summary page. Now, the only thing I excluded from that sentence was an insertion I have, "or $0.60 per share." And so I provided the economic -- the analysis of both, percentage methodology and the dollar methodology, and I provided both of them in my report.

Now, to the question why would I, then, in the second report, do it on a percentage basis? And that was in response to your expert's criticism, why I didn't incorporate the market forces operating on the fraud.

BY MR. GIMBEL:

Q Well, I think you -- you probably misinterpreted our expert, but we can move on.

MR. KAUFMAN: Objection.

BY MR. GIMBEL:

Q I'm correct that you had a table labeled

Page 44

Exhibit D in your initial report, and that laid out the dollar value of inflation on every day during the class period; right?

A Yes.

Q And that dollar value was $0.60; right?

A Yes.

Q Okay.

A And I --

Q And --

A As I explained in my --

Q It was a simple "yes" or "no."

MR. KAUFMAN: Please -- please let Mr. Steinholt finish his answer before --

MR. GIMBEL: He's --

MR. KAUFMAN: -- you start speaking.

MR. GIMBEL: I'm going to move to strike the answer.

MR. KAUFMAN: Objection to that motion.

THE WITNESS: So -- so -- my opinion is that it is at least $0.60 per share, or -- yeah, $0.60 per share. And that is in Paragraph 81. And I provide an exhibit of what I considered to be a conservative estimate of damages, which is the dollars methodology.

//

Page 45

BY MR. GIMBEL:

Q The exhibit says $0.60 a share on every single day of the class period; correct?

A And that is my conservative estimate of damages --

Q Okay.

A -- in this --

(Reporter requested clarification.)

(Off the record conversation.)

MR. KAUFMAN: Mark, please let -- this is like the third time we've done this. Please.

MR. GIMBEL: Stop speechifying, now you're both doing it.

MR. KAUFMAN: I'm not speechifying.

THE WITNESS: Listen, can I --

MR. KAUFMAN: I'm asking you to let the witness finish.

THE WITNESS: Can I finish my sentence?

MR. GIMBEL: I think I got my answer. So I think we can move on.

THE WITNESS: Well, I don't care if you got the portion of the answer that you like. I want to be able to provide a complete answer to the questions.

//

BY MR. GIMBEL:
Q The question was very simple, it's whether the calculation is $0.60 a share in Exhibit D. It's a yes-or-no question.
A No. No.
Q It's not?
A The -- the -- the -- the question left out the fact that I provided two quantifications of the inflation in my initial report. I clearly stated that the conservative estimate --
Q All right.
A -- was the $0.60 per share. I included that as an exhibit.
MR. GIMBEL: I'm going to move to strike.
THE WITNESS: That is -- that is just the fact.
MR. KAUFMAN: Mark, I'm not going to let this continue if you keep interrupting the witness.
THE WITNESS: And you -- you can pretend as if $0.60 is the only thing that's in the first report. But that is not true.
MR. GIMBEL: All right. I'm going to ask you to focus on my questions. I'm going to make a motion to strike your response, which is inappropriate speechifying. And it is not for you



to reframe my questions, it is for you to answer them. We'll get through the day a lot more quickly if you can understand that.
MR. KAUFMAN: I'm --
MR. GIMBEL: We're going to move on.
MR. KAUFMAN: I'm objecting to that.
Please let me at least object, Mark.
MR. GIMBEL: Your objection is noted.
MR. KAUFMAN: Okay. I'm objecting.
MR. GIMBEL: It's noted. And stop your speaking objections.
MR. KAUFMAN: Well, stop cutting off the witness. It's like bordering on harassment almost.
MR. GIMBEL: No. What's gone on here is ridiculous.
MR. KAUFMAN: Is this a good time for a break?
MR. GIMBEL: No, it's not.
MR. KAUFMAN: We've been going for an hour.
BY MR. GIMBEL:
Q In your initial report, beginning at Paragraph 50, you have a list of the key fraud-related events that you've identified; is that right?
A Yes.



Q Okay. Are you aware of any alleged misrepresentations or omissions by the defendants other than the ones you've identified and listed here?
A These are the ones that I identified as potential fraud related events. They may or may not all be -- have all been fraud-related events, but they were the ones that I focused on.
Q Okay. The first event that you identify is a company statement on the morning of February 5th, 2011, that, in your words, (reading):
Reiterated the allegedly inflated guidance indicating that Mississippian wells would produce 52 percent oil.
Do you see that?
A Yes.
Q Okay. Do you know when that guidance, that Mississippian wells were expected to produce 52 percent oil, was first released to the market?
A I think I may have discussed an earlier presentation, but I can double check. August -- let's see.
I certainly know that -- I'm pretty sure that, on February 8th of 2011, the company did a



presentation where they represented that crude oil would make up 52 percent of the total production. And I discuss that in -- briefly, in the report.
Q Okay. So that was not new information on February 25th, 2011; right?
A Yeah, that's correct. Yes.
Q Okay. So to the extent that statements about a 52 percent oil percentage inflated SandRidge's stock price, would it be fair to say that inflation took place before the class period began?
A No.
Q And why is that?
A Because -- there wouldn't be any inflation prior to the class period because there's no misrepresentation prior to the class period.
Q Okay. So none of the statements that were made prior to the class period constitute a misrepresentation?
MR. KAUFMAN: Objection.
THE WITNESS: Correct -- correct. According to plaintiff's allegations, they are not alleging that the 52 percent number in that presentation was misrepresentation. It may have been incorrect information, but it wasn't a misrepresentation in that the company had knowledge that it was

Page 50

incorrect.
BY MR. GIMBEL:
Q So -- but by -- so on February 8th, 2011, that statement about 52 percent oil percentage was not a misrepresentation, as you understand it?
A It's not an alleged misrepresentation, no.
Q Okay. By February 25th, 2011, it becomes a misrepresentation; is that right?
A According to plaintiff's allegations, yes.
Q Okay. What happened between February 8th and February 25th, 2011, to suddenly make that statement become a misrepresentation?
A Well, according to plaintiffs, they would have to prove that the company stated something that they knew or should have known was not true.
Q Okay.
A So that is -- that is part of what they have to prove.
Q Okay. So as you understand it, part of what they have to prove is that the company learned, between February 8th, 2011 and February 25th, 2011, that a projected 52 percent oil percentage was -- was false or misleading?
MR. KAUFMAN: Object to the form.
THE WITNESS: I can't speak to what time

Page 51

period they would have to learn that. All I -- because, you know, I -- but I -- the only thing that matters is that, as of the beginning of the class period, there has to be some alleged truth, that the company -- company knew or should have known, that made that representation false or misleading.
BY MR. GIMBEL:
Q Okay. Are you aware of any information that the company learned, between February 8th, 2011, and February 25th, 2011, that made that representation misleading?
A I have not looked into that issue.
Q Okay.
A No.
Q Well, would it be fair to say -- putting the concept of inflation aside, would it be fair to say that whatever impact the prediction of 52 percent oil had on SandRidge's stock price was felt weeks before the class period began?
A The 52 percent was reflected in the stock price prior to the beginning of the class period, because it hadn't been disclosed before -- before the class period. Exactly where -- where the impact would be, I'm not quite sure. I know that the stock price pretty much doubled from the third quarter

Page 52

announcement, when it was roughly $5, through the fourth quarter announcement, when it was north of $10. So I don't actually know exactly where the impact would be, but it would be reflected prior to the beginning of the class period.
Q Okay. Have you done anything to identify the impact on SandRidge's stock of the projection that Mississippian wells would yield 52 percent oil?
A No, I have not done any analysis other than just observing the fact that you have a dramatic increase in the stock price over that particular quarter. In other words, between the third quarter 2010 announcement and the fourth quarter 2010 announcement, there was a lot of information that was disclosed during this time period, so it may not be possible to isolate the 52 percent, I just don't know.
Q Okay. Do you know when the prediction of 52 percent oil was first disclosed publicly?
A You're talking to -- with respect to Mississippian?
Q Correct.
A No. I think that the presentation I looked at was the first presentation that I had that I no- -- noted it. It -- but, for my purposes, I

Page 53

wanted to know whether or not it had been disclosed prior to the class period.
Q Do you know who developed the projection of 52 percent oil for Mississippian wells?
A No.
Q Do you know what the basis was for the projection that Mississippian wells would yield 52 percent oil?
A I have looked at the presentation, there's a lot of information there. I assume that is -- that forms the basis. But -- so, I can point to the -- the presentation itself that has a lot of information. But I haven't specifically gone through it to -- or, you know, calculate it myself. So I can't really point to the specific information.
Q Do you know what --
A Are you --
Q -- data it was based on? Can you describe the data sets?
A Well, what they would -- yeah. They would -- the report itself would have various different curves in terms of -- well, first, they would have data in terms of how much oil and gas a particular oil well was producing at -- at the early going of drilling. And then they would make projections

Page 54

using some sort of type curves to project what it would produce over the lifetime.
Q Okay. And when you say "they," who is they?
A Well, this would be, I assume, the engineers that were doing this type of work.
Q Okay. And who did the engineers work for?
A I don't know.
Q Okay. Is it your understanding that they work for SandRidge?
A I think that they were consultants outside of SandRidge. And -- that clearly also were working on this. So no, my assumption is not that they -- at least not all worked for SandRidge.
Q Do you know who developed the specific projection that Mississippian wells would produce 52 percent oil that we've been referring to?
MR. KAUFMAN: Objection.
THE WITNESS: Again, as I -- no, I have not delved into that particular issue in more greater detail than what I've just explained and what's in my report.
BY MR. GIMBEL:
Q Do you know whether that projection was developed by SandRidge internally, or by an external consultant?

Page 55

MR. KAUFMAN: Objection. Asked and answered.
THE WITNESS: I know that they had external consultants. And so I would -- whether or not these individuals worked in a consulting capacity or were full-time employees of SandRidge, I don't know, but I know that there were certainly external consultants involved.
BY MR. GIMBEL:
Q Okay. And -- but you don't know who was principally responsible for leasing that projection?
A No, that's outside the scope of what I did.
Q Do you know how many wells --
Let me withdraw that question.
Do you -- we talked a little bit about the data that was available. And I think you said that your understanding was that the projections of 52 percent oil were based, in part, on well data; is that right?
A That's my understanding.
Q Okay. Do you know how many wells were consulted to come up with the 52 percent oil projection in 2011?
A I know there were spreadsheets in terms of -- or tables in the reports that identified specific wells and so on, but -- and of course, you know,

Page 56

if -- I -- I don't know if that is the data that actually was used in order to come up with 52 percent. But I -- I've certainly seen the pages in those reports that has listed individual wells.
Q Okay. How many wells did they have data for when they prepared that projection?
MR. KAUFMAN: Objection.
THE WITNESS: I don't know the answer to that. As I said, I've seen, in presentations, tables that have, you know, different wells identified. But other than that, I -- I don't know.
BY MR. GIMBEL:
Q You don't know how many?
A No.
Q Okay. Do you know if the data that was used to develop that projection was data as of a particular period in time?
A Was data as of a particular --
Q Yeah, was it --
A Well --
Q -- data that was available as of a particular period in time?
A Well, I assume the data was available at the time they made the projections.
Q Okay. What --

Page 57

A If they based it on it.
Q What was the time period applicable to that projection?
A Well, I -- I don't know what the time period was. I know that that 52 percent projection went down, I think, until January 10th of 2012, so they kept that projection for a fairly long period of time.
Q Okay. But I think we're confusing two concepts.
So you'd agree with me that this is a projection of the percentage of oil that's going to be produced by Mississippian wells in the future, that's what we're talking about; right?
A My understanding is that it is the estimated projection of oil as a percentage of the total production over the lifetime of -- of a well.
Q Okay. And is that projection based, in part, on historical well data that was available as of a certain date and time?
A My understanding is that it would be based on the early -- partly on the early drilling results of a -- particular wells. And then you have more than one wells, and then you have -- you use that data to come up with that projection. But again, this is

Page 58

outside the scope of my assignment and what I looked at.
Q Okay. But one of the things you looked at was the prediction released by SandRidge in 2011 that Mississippian wells would produce 52 percent oil; right?
A Yes. I mean, I -- I -- I -- that is one of the things that -- that is part of plaintiff's allegations, yes.
Q Okay. And do you know the -- the data set that that was based on? In other words, to the extent that they relied on historical data in making that projection, as of what date in time was that historical data collected?
A Other than what I've already explained, I -- I haven't looked at that particular issue.
Q Okay. So you don't know whether it's year-end 2009, year-end 2010, first quarter 2011?
A I think it's noted in the presentation, in terms of -- at least the data I'm thinking of, I think it -- there is some specification in the presentation. But as I sit here right now, it's not something that I recall.
MR. GIMBEL: Okay. So we can take a break. You wanted to take a break.

Page 59

THE VIDEOGRAPHER: One moment, please. We're off the record. The time is now 10:13. This will be the end of disk 1 of the deposition of Mr. Bjorn Steinholt.
(Break in proceedings.)
THE VIDEOGRAPHER: And we're back on the record. The time is now 10:24. This is disk 2 of the deposition of Mr. Bjorn Steinholt.
BY MR. GIMBEL:
Q So Mr. Steinholt, if you could turn to Exhibit A of your rebuttal report, which has your latest calculation of inflation. Do you have that in front of you?
A Yes, I do.
Q Okay. In this calculation, you estimate that SandRidge's stock was inflated by a total of $1.04 as of the close of trading on February 25th, 2011; is that right?
A The inflation using the percentage methodology is 1.04 on February 25th, 2011. Correct.
Q Okay. And then according to the estimate in your rebuttal report, inflation then increased, by over 25 percent, to $1.28 per share as of the close of trading on April 1, 2011; right?

Page 60

A That's correct. Yes.
Q Okay. You haven't identified any additional -- any misrepresentations or omissions made by the defendants that would have increased the amount of inflation in the stock between February 25th, 2011 and April 1st, 2011, have you?
A That's correct. This increase does not reflect any additional -- the dollar increase doesn't reflect any increase due to additional misrepresentation; what it reflects is the market operating on the fraud.
So the stock price is increasing consequently when you keep the inflation constant on a dollar basis; in other words, if you -- if you quantify the value of the company absent the fraud, and you use the actual stock price as to determine that value, then inflation increases on a dollar basis, but it remains the same on a percentage basis.
Q Okay. So according to your analysis, then, as I understand it, exactly the same alleged misrepresentations or omissions by the defendants had a very different impact, in dollar terms, on different days; right?
A Correct. Because it -- yes. As -- and this is the point that Dr. Grenadier was making, and that

Page 61

is that why does the inflation remain constant on a dollar basis when there are changes in all sorts of things? He pointed out oil and -- and gas prices, other things would be inflation -- interest rates, which would be important to a company such as this. So there would be -- so either you account for it or you don't. And in Exhibit A, I do account for market forces operating on the fraud. And Exhibit D of the initial report, I just look at the price decline.
Q Okay. So focusing then on -- on February 25th, 2011, the first day of the class period, where your -- your current calculation is 1.04 in inflation; right?
A Yes.
Q So am I correct then in understanding that $0.44 of that inflation represents market forces that the defendants had no control over?
A No. What the -- because the stock price is higher at that point in time, the impact of the fraud would have been greater. It's still the fraud that you're measuring, but the impact of the fraud would be greater.
So let's say that the fraud is that you say that you have 1 million barrels of oil, but you

Page 62

don't. Now, if, when you disclose that fraud, the impact of that disclosure depend on, well, how valuable is 1 million barrels of oil? And if the price of oil is high, you would get a larger impact than if the oil is less.

So that's how it works, in a simplified way.

Q Well, what explains the difference between your initial calculation of $0.60 per share inflation on the first day of the class period and your new calculation of $1.04 per share inflation? Is that because the higher calculation takes into account market forces?

A My initial calculation -- I did two calculation, initially. One relates to looking at the inflation on a percentage basis, and one on a dollar basis. And the difference between the two is that, as the stock price change, effectively, what you have -- you have a stock, let's say it's $10 stock. Now, you have -- you divide that stock price into two components:

You have a fraud-related component, which is the inflation. And you have a non fraud-related component. Now, the question is, what happens when that stock price goes up to $12? Is -- do you -- does that mean that the non fraud-related component

Page 63

increases to $10, and the fraud-related component remains $2? Or do you split it even -- evenly between the two?

And from an economic point of view -- and I cited a paper in my original report, it was the Cornell & Morgan paper. From an economic point of view, the percentage methodology in a case like this, that relates to oil prices and gas prices and interest rates are so important, it makes sense to do it on that -- on that basis.

So -- but that's the difference. I mean, what do you do with respect to changes in -- in the stock price? Does it all go in inflation? If it does, you effectively have a value line that is straight and all of the variation in the stock price is in inflation.

You know, there's been 30 years since anyone did that type of an analysis. They used to do it on the plaintiff's side back in the day. Or, do you do a -- keep all of the variation in the company's specific portion? In which case, the inflation remains constant on the dollar basis.

Or, do you do what is suggested in Cornell & Morgan paper, which is, well, you do it like a securities analyst would look at it, and that

Page 64

is you -- you predict the returns and you determine the value line that way.

Q Okay. But -- I'm just trying to focus you on the first day of the class period.

So there's no issue of stock price increasing or decreasing; right? We have the stock that has a closing price of $10.53; right? First day of the class period; correct?

A Correct.

Q Okay. And your initial estimate, in dollar terms, was $0.60 of inflation. And your revised estimate, in dollar terms, is $1.04 of inflation. So what I'm trying to get at is the $0.44 differential, is that because, in the second estimate, you're taking into account market forces?

A Well, my initial -- I had two initial estimates, as I said. And it is looking at where the stock would have traded had the disclosure been made on February 25th, 2011. In other words, if -- just the same as my million barrel of oil example, the impact would depend on what the price of oil and price of gas, and what the interest rates would be, there's a host of different things.

So when you look at the percentage basis, you try to account for that. And you're trying to

Page 65

figure out, what would the impact have been had it been disclosed on February 25th, 2011? And using that approach, the impact would have been -- would have been $1.04.

Now, if you're just looking at the actual impact at the end of the class period, then that is just $0.60. But that is the difference between the two, is that we are talking about two different points in time.

Q Right; but I'm -- I'm asking about your estimate for inflation on day one of the class period. And I'm just trying to differentiate between the two. And I think what you're telling me is that the higher estimate, the dollar four -- right? -- takes into account market factors such as interest rates, the price of gas, the price of oil; is that right?

A Yes, to the extent that the price is higher because of these factors. Which means that the impact of the corrective disclosure on the first day of the class period would have been greater because of those facts.

Q Okay. So -- and then when we move from February 25th, 2011, where your current estimate of inflation is 1.04 -- right? -- to April 1, 2011,

Page 66

where your estimate of inflation is $1.28, that $0.24 increase is the product of market forces; is that right?
A Well, there isn't -- so there is an increase -- there's $1 increase. There is zero increase on a percentage basis, it's still the same -- the same amount. And the difference between the two is that the stock price is higher on April -- whatever date you pick, as opposed to the first day of the class period.
Q Okay. And that reflects market forces such as, you mentioned, the price of oil, the price of gas, interest rates, as opposed to anything that the defendants ever did; is that right?
A It -- it reflects non fraud-related factors.
Q Okay. So you agree that the impact of the misrepresentation about oil production depends, in part, on the price of oil at the time the misrepresentation is made?
A Yes. And -- and it depends on a host of different things, but the economic environment would be one thing that could -- that would impact it. And -- and that is why some people like to do it more simplistically, by just looking at it -- at the price decline at the very end, and -- because you

Page 67

know that that $0.60 is an amount that specifically relates -- you know what the $0.60 is. Because you know it happened, it did decline on November 9th. When you get into these other time periods, there is a host of different additional issues that could impact the impact of the disclosure.
Early on, for instance, the difference between the alleged truth and what was the misrepresentations with respect to the oil EUR, was greater, which would imply a greater impact early on in the class period. You have the issue of the $0.60 being mitigated because of positive confounding factors; whereas, if you just have a disclosure early on in the class period, there wouldn't be any confounding factors.
You have the possibility of leakage. And that would also mitigate the $0.60. Had you had a disclosure early on in the class period, you wouldn't have that, so the impact would be greater.
And the other thing is that had there been a full disclosure early on in the class period, there would be questions whether or not the company would have changed its strategy. Could they have followed the strategy of funding part of the drilling through royalty trusts, through joint ventures, and -- and

Page 68

so on, to -- so at some point, it becomes so cumbersome to try to, you know, estimate, with certainty, what the impact would have been earlier on, that it may be easier just to look at the price decline at the very end.
Q Okay. So I'm going to, again, just try to get you to focus on simple questions, simple concepts.
The question I asked was, would you agree that the impact of a misrepresentation concerning oil production depends, in part, on the price of oil?
MR. KAUFMAN: Object to the form.
THE WITNESS: That --
BY MR. GIMBEL:
Q Yes; right?
A That's correct.
Q Okay.
A That's one of the factors.
Q The plaintiffs, for example, allege that SandRidge misrepresented the total amount of oil the EUR, estimated ultimate recovery, expected to be produced by the average Mississippian well; right? That's one of the allegations?
A That's correct. Yes.

Page 69

Q Okay. And that would have had a greater impact, if the price of oil were higher than if the price of oil were lower, all else being equal; right?
A That's correct.
Q Okay. And would it also be true that the impact of statements about the oil to gas ratio could be expected to vary based on relative prices of oil and gas?
A That would be one factor. And I mentioned a host of other factors, yes.
Q Okay. So if you assume, for example, that the prices of oil and gas were exactly the same, would you expect a statement inflating the percentage of oil to have any impact in that situation?
A I'm sorry, could you repeat the question.
Q So if you assume that oil and gas prices were exactly the same, would you expect the -- a statement inflating the oil percentage to have any kind of impact in that situation?
A If there was no difference between oil and gas, then the -- it seems to me that the percentage would be irrelevant.
Q Okay. And -- but if the price of oil was a

Page 70

thousand times the price of gas, you would expect a statement inflating the oil percentage to have an impact; right?
A Yes. Then it would have -- it could have an impact.
Q Okay. And so the impact of statements about the oil to gas ratio of Mississippian wells would be expected, then, to vary based on the relative prices of oil and gas?
A It could, yes.
Q Okay. Now, your initial constant dollar calculation of inflation, in your initial report, didn't take into account changes in the relative prices of oil and gas; right?
MR. KAUFMAN: Object to the form.
THE WITNESS: Well, as you know, I did two calculations. And I attached the more conservative of the two calculations as an exhibit. And that would keep it constant on a dollar basis. And the economic rationale for that is that, if the company was as represented, the counterfactual stock price would be exactly as it was until you get to the point at the very end, where it would just drop by $0.60 and cause damages for everybody that is equal to -- to $0.60.

Page 71

The -- so that was the -- that is -- in this case -- it doesn't have to be that way, but in this case, using the dollar approach is the most conservative approach.
BY MR. GIMBEL:
Q Okay. The -- the constant dollar estimate in your initial report, that estimate does not take into account changes in the price of oil or gas over the class period; correct?
A Exactly. So that inflation that's not account for here, is then, effectively, excess inflation that is not recoverable under this damage view.
Q Okay. And the revised calculation of inflation that appears in Exhibit A of your rebuttal report, calculates inflation on a percentage basis; is that right?
MR. KAUFMAN: Object to the form.
THE WITNESS: It's not the revised calculation; it is the calculation based on the percentages that was quantified in the first report.
And that would take into account a host of different issues. In other words, non -- or -- I mentioned three big issues, but it -- it -- there could be a host of different issues, and it keeps

Page 72

the inflation constant on a dollar basis. In other words, when the stock price changes, that changes the inflation just as it changes the non inflation portion of the stock price in the same manner. So you don't have one being constant and the other one fluctuating.
BY MR. GIMBEL:
Q So I think maybe -- maybe you misspoke, because the -- the -- the calculation in the rebuttal report, in Exhibit A, does not keep inflation constant on a dollars basis, does it?
A It keeps it constant on a percentage basis.
Q Okay.
A And if I said dollar basis, I misspoke.
Q So according to your calculation of inflation in the rebuttal report, the defendant's statements about oil and gas production had the same percentage impact throughout the class period, notwithstanding changes in the price of oil and gas?
A Correct. What the Cornell & Morgan paper proposes, is to keep the changes -- the percentage changes in the so-called value line. In other words, where the company's stock price would have traded absent the fraud, keep that percentage change the same as the actual percentage change in the

Page 73

stock price on days when there is no fraud-related disclosures, and just change it on the day or days where there are fraud-related disclosures. And the result of this methodology, then, is that the inflation is con- -- held constant, on a percentage basis, during periods when there is no fraud-related disclosures.
Q So the analysis assumes that the fraudulent statements have the same percentage impact, notwithstanding changes in the price of oil and gas, over the class period?
A It's -- it actually -- it's a little bit different, what the methodology tries to do. What it try -- instead of providing a valuation for each day during the class period, what Cornell & Morgan proposes is to come up with the return on each day -- not the value, but the return on each day, during the class period.
And if there is no fraud related -- and -- and this is consistent with the concept of event studies and so on, so it's a return based methodology. And on days when there's no fraud-related disclosures, the best prediction is the company's stock price actual return. And when there is fraud-related disclosures, then you use the

event study to predict the return. And you use that return to predict the return as opposed to the actual return. The implication of that is that the inflation is constant on -- on a percentage basis. But it's not -- it's not an assumption, it is just what happens. You don't start out making any assumptions. What you're trying to do is to determine where the stock would have traded absent the alleged fraud.

Q Okay. But the --

THE VIDEOGRAPHER: Excuse me, one moment. Your microphone fell. I didn't want to interrupt you.

THE WITNESS: Oh, I'm sorry.

THE VIDEOGRAPHER: Yeah. I did pick it up, but we're good.

Thanks.

BY MR. GIMBEL:

Q Am I correct that the estimate of inflation in your rebuttal report holds inflation constant, at 9.9 percent, throughout the class period, notwithstanding changes in the price of oil and gas?

A Yes. It's --

Q Okay.

A -- an inflation ribbon of 9. -- you end up



with an inflation ribbon of 9.9 percent. Yes.

Q Okay. Am I also correct that changes in the dollar estimates of inflation in your rebuttal report don't correspond to changes in the relative prices of oil and gas?

A I'm sorry. That the --

Q Can the changes in -- in dollar estimates of inflation in your rebuttal report be explained by changes in the relative prices of oil and gas over the class period?

A That would be one of the factors that would cause the stock price to change, and it is the stock price change that causes the inflation to change. But it takes into all -- into account all of the factors, non fraud-related factors that impacted the stock price.

Q Okay.

MR. GIMBEL: Why don't we -- we'll mark as Exhibit 3.

(Exhibit 3 was marked for identification.)

BY MR. GIMBEL:

Q So Exhibit 3, which I'm going to ask you to take a look at, is an exhibit that compares oil and gas prices with the oil to gas price ratio and with



the estimates -- dollar estimates of inflation in your rebuttal report.

Do you have that in front of you?

A Yes.

Q Okay. So on February 25th, 2011, at the very beginning of the class period, you'll see that the ratio of oil to gas prices is 25.33.

Do you see that?

A Yes.

Q Okay. And your estimate of inflation on that day is $1.04.

Do you see that?

A Yes.

Q Okay. And if you turn to April 20th, 2012, you will see that the ratio of oil prices to gas prices, on that day, is 56.91, which I'll represent to you is the class period peak.

Do you see that?

A Can you give me the --

Q April 20th, 2012.

A Oh, okay. 2012.

Yes. Okay.

Q So that's over double the ratio at the start of the class period; right?

A Right. Yes.



Q But your estimate of inflation on that day is only $0.69, which is much less than it was at the start of the class period.

A Right.

Q Okay. And isn't that precisely the opposite of what you would expect given the plaintiff's allegations in this case?

A No.

Q Okay.

A It's -- it's --

Q Well, let me focus you on a particular allegation; okay?

MR. KAUFMAN: Please let Mr. Steinholt finish his answer.

THE WITNESS: The -- you can selectively pick up things and -- and -- and look at the oil/gas ratio, but in -- the question is, well, how did it impact SandRidge's stock price? And the way it's impacting SandRidge's stock price is what's reflected in the inflation.

BY MR. GIMBEL:

Q Okay. The plaintiffs allege that SandRidge misled investors into believing that Mississippian wells had a higher percentage of oil relative to gas; right?

Page 78

A Correct.
Q Okay. And all else being equal, you would expect that to cause greater inflation when the price of oil was higher relative to the price of gas; right?
A Yes.
Q Okay. But your calculation of inflation is producing the opposite result; inflation is lower when the ratio of oil to -- prices to gas prices is higher; right?
A Right.
Q In the example we looked at.
A Right.
Q And despite that result, is it your opinion that your methodology accurately adjusts inflation based on the relative values of oil and gas?
A Right. Because -- well, first of all, you can selectively pick -- pick out a particular factor, but I'm looking at all the factors. And for instance, when you talk about oil prices, for instance, well, how -- how does the hedging strategy play out in this particular scenario?
So there is a lot of -- it is more complicated than the simplistic way that you're looking at it. Not only -- in other words, it --

Page 79

it's one factor that you're looking at, it's one allegation that you're looking at. And you're ignoring -- even -- even looking at that, you're ignoring the hedging.
What I'm looking at is the stock price. And the stock price would reflect all of this. The oil -- the oil to gas price ratio would -- the changes in the oil and gas price ratio would be reflected in SandRidge's stock price.
I'm not trying to pick every little factor, and make an adjustment, and hope that it ends up being correct. I'm just saying that, by looking at SandRidge's stock price, I get the interest rates, I get the oil prices, I get the gas prices, and I get all of the other non fraud-related factors as well. Including whatever the hedging they had on these were.
Q Have you done any kind of analysis of SandRidge's hedges?
A No, because I -- because I'm using SandRidge's stock price. However it reacts to these changes in the economic environment is reflected in the stock price. And that is what I'm using to determine what would happen in the inflation, with respect to the inflation.

Page 80

Q And your estimate of inflation, as I understand it, is taking into account lots of different things; right? One -- one factor is the defendant's alleged misrepresentations or omissions; right?
A Well, it's simpler than -- yes. But I mean, it's simpler than that. It's just that one portion of the company was fraudulent, and people thought it was more profitable than it really was. So -- and -- and so either you take that portion, and you keep that portion, the 9.9 percent, and you keep it constant, and you let the stock price determine the variation in the inflation, or you keep it constant on a dollar basis.
Q Okay. And if it's higher during some points in the class period, that could reflect market prices -- market factors such as interest rates, I think you mentioned?
A Yes, it can -- it can reflect a lot of different things.
Q Okay. So you express the opinion in your rebuttal report that it's appropriate to adjust estimates of inflation for market and industry factors that operated on the fraud; is that right?
A That's one way of doing it. If you're going

Page 81

to do it, that is the way to do it. And that is the way that traditionally have been used. I used it in the Novatel case, that went through a Daubert. And my opinions relating to inflation was found to be reliable -- reasonable and reliable, I think the term was by the judge. So that is what -- that is how you would do it.
The alternative approach, which is to, let's take every little factor of -- let's take 40, 50 different factors, and value the company on each day during the class period to try to come up with what the inflation is, doesn't make a lot of practical sense. And I don't think that you are going to get a better outcome than using the event strategy approach and using inflation ribbons either on a dollar basis or a percentage basis.
Q So I'd like you to explain if you could what some of the market forces, that are taken into account in your estimates of inflation, are. I think you mentioned interest rates, so that's one; right? And you mentioned oil and gas prices. I got those; right?
A Yes.
Q Okay.
A It --

Page 82

Q So let me just ask a couple of others; right?
So if OPEC announced that it was increasing production over the course of the class period, would that be a market force that would be taken into account by your calculation?
A If it impacts the stock price, it impacts the inflation. Yes.
Q Okay. What if there were industry facts, specific facts like increased drilling costs or increases in the price of oil and gas leases, would -- would that impact your estimate of inflation?
A It depends on whether or not it impacts SandRidge's stock price. If it does, yes. I mean, it's -- it's -- everything -- anything that impacts SandRidge's stock price would impact the inflation.
Q Okay. Is your estimate of inflation impacted by investor expectations about the future by changes in investor expectations?
A If it impacts SandRidge's stock price, it would impact the inflation.
Q Okay. So your calculation of inflation might depend, for example, on forecasts of inflation and growth?
A If it impacts the SandRidge's stock price, it

Page 83

would impact the inflation under a percentage methodology.
Q Okay. So the inflation estimate could be impacted by any number of factors that the defendants had no control over.
Would that be fair to say?
A All the factors that impacted SandRidge's stock price would -- would impact the inflation.
Q Okay.
A On a percent -- when you do it on a percentage basis.
Q You -- in the portion of your rebuttal report that advocates for adjusting inflation based on market forces operating on the fraud, you cite an article by Thorsen, Kaplan & Hakala; is that right?
A Yes.
Q And --
A They were the ones who, I think, coined the term "market forces operating on the fraud."
Q Okay.
A And that's why I cited it.
Q And I think that appears on Page 35 of your rebuttal report, if you want to turn to that. Let me know when you get there.
A I'm on Page 35, yes.

Page 84

Q Okay. And you cite this article in footnote 110, and you quote a particular section of the report, which reads, (reading):

> The concept of market forces operating on a fraud and causing dissipation of inflation, has not been well-explained in the case law and has caused needless confusion.
>
> It is rooted in 30-year old legal precedent, sound economic theory; and as an added bonus, courts accept it.

Do you see that language?
A Yes.
Q Do you know what the very next sentence that you left out of your parenthetical is?
A No, why don't you read it to me?
Q Okay. The very next sentence is, (reading):

> Nevertheless, it is controversial under Dura.

A Right. That's true.
Q Okay. So why did you leave that sentence out?
A Why did I leave it out?
Q Yeah.
A I was explaining what the market forces

Page 85

operating on the fraud was. I mean, you can take a whole -- I mean, that was the purpose of it.
Q Wouldn't it have been more transparent and candid to acknowledge that this approach is controversial after Dura?
A I -- I think that it would be more proper for you to acknowledge that I did it both ways, precisely because of that reason, in my original report. I provided it on a percentage basis, and I provided on a dollar basis.
And as I previously said during this deposition, it's also a legal issue. And with that, I was specifically thinking of Dura because there are different interpretations of Dura. So this was a -- a paper that would view Dura as not -- as -- as being acceptive -- accepting the percentage methodology, and -- but there's also views, and that's what I was referring to earlier in the deposition, that it's -- that you should limit damages to the dollar decline at the very end of the class period.
My purpose here is not to provide legal opinions. I do quantifications based on the facts, the economic data that I have. And so you're, kind of, moving towards legal side of it, and I can

Page 86

explain, kind of, the pro and cons of the different ways of looking at it from an economic point of view, but ultimately, it is something that has to be decided, you know, by the Courts.
Q Okay. Who -- who were Thorsen, Kaplan & Hakala?
A Who are they?
Q Yeah, do you have any --
A I think they are two lawyers and one expert.
Q Okay. So Thorsen & Kaplan are trial lawyers; right?
A I -- I think -- I just recall seeing they were from a law firm. If you're telling me they are trial lawyers, then I accept that. But I have never -- I don't know them.
Q You think that a piece written by two trial lawyers might be an advocacy piece?
A I have no clue. I mean, you can -- you can say that any article is an advocacy piece. The question is, does it -- what's in there? Does it ring true?
Q Okay. Do you consider articles by trial lawyers to be reliable sources, supporting your expert opinions on matters of economics?
A Are you a trial lawyer?

Page 87

Q Do you want to answer my question?
A I mean, it's -- I don't -- I think that trial lawyers, as anyone else, can write papers that are valid and write papers that are not valid. I -- I -- personally, maybe you do, but I don't -- I don't prejudge a paper based on whether or not someone is a trial lawyer or not.
Q Do you know who Hakala is?
A Oh, yeah, I know Hakala. He's an expert in this area.
Q Okay. Is he a colleague of yours, in fact?
A We were colleagues from -- we worked for the same firm from 1998 to 2000. He was in the Dallas office of Business Valuation Services, and I was in the San Diego office.
Q Okay. And Dr. Hakala is someone who, like you, testifies for the plaintiffs in securities fraud cases; right?
A I think that he testifies for both sides, but I -- I'm not up on his CV.
Q Okay.
MR. GIMBEL: Well, why don't we take a look at his article?
(Exhibit 4 was marked for identification.)

Page 88

MR. GIMBEL: And mark it as Exhibit 4.
BY MR. GIMBEL:
Q Do you have Exhibit 4 in front of you?
A Yes. Any particular page?
Q Well, you see, in the footnote, on the second sentence, it says, (reading):
Dr. Hakala has testified for plaintiffs in securities fraud cases.
Do you have any reason to dispute that?
A No, I know he has.
Q Okay. And isn't it also the case that Dr. Hakala's opinions have repeatedly been rejected or excluded by the Courts?
A You're asking about another expert, and I don't -- I don't think that that is a fair characterization, but I'm -- I'm not up on whether or not he has been excluded or -- or not excluded.
Q Do you know one way or the other?
A I -- I certainly do not believe that he has repeatedly -- I know that he has testified a lot. I don't know in how many cases his testimony has been excluded, and how many it has not been excluded.
Of course, he testified on a lot of different things, particularly in business valuation. So -- but I haven't followed -- quite frankly, I -- I

Page 89

don't even -- I didn't even know he -- I haven't heard him testify in a case for -- I think he used to -- but lately, I think he has been doing mostly business valuation work, but I'm not up on his career and what he's doing.
Q Would it give you any pause to learn that his opinions have been repeatedly excluded by the Courts?
MR. KAUFMAN: Objection.
THE WITNESS: "Pause," with respect to what?
BY MR. GIMBEL:
Q Relying on his opinions.
A I didn't rely on his opinion.
Q You relied on his article; right?
A I read his article, and his article describes the concept, a particular concept.
Q Okay. Do you -- would you characterize an article written by two trial lawyers and a plaintiff's expert, whose opinions have been rejected, as a reliable source?
MR. KAUFMAN: Object to the form.
THE WITNESS: I -- you know, I can't agree or dispute anything that you said, because I don't know what you're talking about when you -- I don't know these -- I've never met these two individuals who --

Page 90

who you call trial lawyers, which is, supposedly, a really bad thing. And I have -- I know Hakala, I knew him, as I said, 20 years ago, we -- we -- he worked in the Dallas office and I worked in the San Diego office.

There's a lot of articles I read, and I don't -- I don't know any -- you know -- you know, I don't go through and read, and just accept what they say because they have written an article. I look at the content of what they are saying, what the article says, and whether or not it rings true or not. That is what -- how I evaluate the articles.

BY MR. GIMBEL:

Q Is the backgrounded qualifications of the authors of the articles you cite important?

A I don't know the background of the two first ones, but I do know that Hakala has a Ph.D., and he is a -- charged with financial analyst, so I mean, the guy's not stupid.

Q Well, I -- I don't know whether the guy is stupid or not. I guess, we'd have to have a deposition or something to figure that one out. But look, it's -- it's -- it's a matter of record, we don't need to go through the opinions addressing Dr. -- if it's a doctor -- Hakala.

Page 91

You cite two other sources in this section of your rebuttal report that addresses market forces operating on the fraud; right?

MR. KAUFMAN: Objection.

THE WITNESS: Yes. I'm --

BY MR. GIMBEL:

Q One is an article that you referred to before by Cornell & Morgan?

A Yes.

Q And that was published in 1990; is that right?

A That was published in 1990, yes.

Q Okay. And the other is an excerpt from something called the Litigation Services Handbook that was published in 2001; is that right?

A That's correct. Yes.

Q Okay. And both of these sources were written many years prior to the Supreme Court's decision in Dura; right?

A Yes. Only the Hakala report was written after Dura, Yes.

Q You agree, as I understand it, that the size of SandRidge's Mississippian holdings increased over the class period; is that correct?

MR. KAUFMAN: Objection the form.

Page 92

THE WITNESS: That it increased, yes.

BY MR. GIMBEL:

Q Okay. Would you agree with me that, if SandRidge was inflating the value of its Mississippian holdings, that would have had a greater impact when the company's holdings in the Mississippian were more extensive?

A My review of the data was that it was pretty much known, from the -- from the beginning of the class period, that -- at least with respect to the old Mississippian investors, knew what the size of the Mississippian was. And the market is forward looking, so they would have known the size of the old Mississippian from the get-go, even though I'm not sure that all of the land had been acquired at the very beginning of the class period.

Now, then you have, of course, the -- the additional acreage that was acquired at the end of 2011; I don't know if that is the increase that you're talking about. But I think it was pretty much known in terms of the size of what the old Mississippian at least would be.

Q Well, I mean, the size of the old Mississippian, as a geographical area, might have been known; right?

Page 93

A The 900,000 acres, which is what I was thinking that I -- or 900,000 to 1 million acres was known at the beginning of the -- beginning of the class period.

Q So your understanding is that, at the beginning of the class period, investors understood that SandRidge would have, approximately, 900,000 to 1 million acres in the Mississippian; is that right?

A That's correct. Yes.

Q Okay. And did that acreage grow over time?

A They had some -- well, this has -- relates to the August 5th, 2011 increase in capital expenditures, wherein they said that they were going to acquire additional land, and that was for $275 million.

Q Okay. So -- and in fact, SandRidge's acreage in the Mississippian grew extensively over the course of the class period; correct?

A I think --

MR. KAUFMAN: Objection -- object to the form.

Go ahead.

THE WITNESS: If you look at total acreage, yes, that would -- it would have grown. Yes.

//

Page 94

BY MR. GIMBEL:
Q Okay. And am I also correct that SandRidge's reserves in the Mississippian grew substantially over the course of the class period?
A As the acreage grows, I mean, there are proven reserves and -- and risk reserves and so on. I -- I haven't looked at that, but I would imagine it would grow, too, yes.
Q Okay. Would you agree with me that a statement inflating the value of oil and gas wells in the Mississippian would have a larger impact when the company's holdings in the Mississippian were larger?
A That could be true.
Q Okay. So for example, if the Mississippian accounted for only 5 percent of SandRidge's oil and gas assets, you would expect a statement to have a different impact than if it accounted for 95 percent of SandRidge's oil and gas assets?
A Yeah. Then that big difference would certainly make a difference, yes.
Q Okay. And your estimates of price inflation make no attempt to adjust for changes in the size of in SandRidge's Mississippian holdings over the class period, do they?

Page 95

A Now we're back to -- no. It's -- it doesn't make any changes specifically for the size of the Mississippian holdings, no. And I'm talking about, the dollar inflation is kept constant and percentage inflation is kept constant. To the extent it's reflected in the stock price, it partly could be reflected in -- in the percentage inflation, but as we all know, when they announced it on August 5th, 2011, the stock price did not view that very favorably.
Q In fact, your dollar estimates of inflation are less at some points in the class period when SandRidge's holdings in the Mississippian were substantially greater; right?
A Yeah, I believe that's true. Yes.
Q All right.
A Towards the end, it would be less because the stock price is less, yes.
Q Paragraph 78 of your initial report provides a measure of damages for shareholders who both, purchased and sold during the class period.
Can you turn to that paragraph, please?
A Yes.
Q Okay. And it states that the measure of damages for those investors is the artificial

Page 96

inflation per share at the time of purchase, less the artificial inflation per share at the time of sale; right?
A It says that the measure of out-of-pocket damages. That is what -- that's how out-of-pocket damages are defined.
Q Okay. And so why don't we just take an example from your rebuttal report?
Assume that a stockholder purchased a share of stock on April 1st, 2011.
What was the inflation per share on that date?
A On April 1st, 2011, the inflation would be $1.28.
Q Okay. And assume that same shareholder sold his share of stock on October 3rd, 2011.
A Okay. October 3rd, 2011, you have an inflation of 49 -- 50 -- let me see if it have it lined up.
October 3rd would be $0.49.
Q Right.
So to estimate damages for that shareholder, you would take inflation per share at the time of purchase, that's $1.28; right? And subtract inflation per share at the time of sale,

Page 97

that's $0.49; right?
A Correct. Yeah.
Q And you would -- you would get per share damages of $0.89 a share?
A By definition, that would be out-of-pocket damages. Yes.
Q Okay.
A That would not be recoverable, because there's no loss causation, but that would be the out-of-pocket damages. Yes.
Q Okay. So using your calculation of damages, if the same shareholder purchased 100,000 shares on April 1st, 2011, and sold them on October 3rd, 2011, he would have $89,000 in out-of-pocket damages; right?
A I accept your calculation.
Q Okay. And I think what you were leading to is that you express the opinion that, if inflation is constant on a percentage basis, then there is no loss causation.
A Yes.
Q Okay. Is --
A Well --
Q Is that a legal opinion?
A Yeah, that is -- so that is a legal

Page 98

determination, but -- and certainly, because the level of inflation doesn't change. So there's no corrective disclosure, there's no leakage of the alleged truth. So -- so there's nothing to connect those losses with the -- the disclosure -- the corrective disclosure.

So -- but again, that is the legal determination. And I think that -- even though I don't give legal opinions, I think that Dura was very clear on that, so you cannot recover those damages. Now, I used to do expert reports prior to Dura as well, and even prior to Dura, I would exclude in-and-out damages when there was no disclosure of the -- no disclosure of the alleged truth. So for the way that I -- the way that I did damages, it didn't change.

The controversy comes in whether or not that also means that -- that damages would then have to be constant on a dollar basis throughout, because of Dura, and that is a different issue.

Q Okay. But your opinion, that there is no loss causation, is a legal opinion; right?

MR. KAUFMAN: Objection.

THE WITNESS: That is my understanding of Dura. And that is also what I believe to be true

Page 99

prior to Dura.

BY MR. GIMBEL:

Q Okay. Does Dura discuss constant percentage calculations of damages versus constant dollar calculations of damages?

A No. So this is --

Q Okay.

A But following Dura, the Dura opinion was interpreted differently by different lawyers, and attorneys, and experts and so on. So -- because Dura actually only relates to loss causation. The only reference I think to damages in Dura, if I'm not mistaken, was to the --

I think it was called the second restatement of tort.

You guys can look it up there.

And so they effectively said, "you have to look at" -- you know, to -- to quantify damages, they -- they reference -- I think it was the second -- could have been the third, but I think it was second restatement of -- of tort.

But it is a loss causation opinion, in other words, can you connect losses to -- to the fraud or not.

Q Now, you state, in -- in Paragraph 68 of your

Page 100

rebuttal report, that, (reading):

If inflation is constant on a percentage basis, then there is no loss causation when using a returned base methodology, because the investment returns are the same regardless of whether there was fraud.

Right?

A That's correct. Yes.

Q But -- but an investor can have suffered out-of-pocket losses; right?

A Right.

Q So using your calculations -- right? -- if an investor who purchases 100 shares of SandRidge stock on April 1, 2011, and sells those same shares, sticking with the dates we've been using, on October 3rd, 2011, would sustain less of a loss if -- would have sustained less of a loss if there was no inflation in the stock; right?

A That's correct. Yes.

Q But it's your legal opinion, I guess, that you're offering, is those losses would be unrecoverable?

MR. KAUFMAN: Objection. Mischaracterizes.

THE WITNESS: No, actually, my opinion is

Page 101

because there is -- because the investment returns are the same. That's -- you know, so there are no losses when you look at the investment returns.

BY MR. GIMBEL:

Q Well, but let's -- let's take a look at that; right?

So assume our investor buys 100 shares of stock on April 1st, 2011; right?

A Right.

Q It's 12.97 a share -- or 12.96 a share, sorry.

Right?

THE VIDEOGRAPHER: One moment.

Something went wrong with my video, can we go off the record, please?

MR. GIMBEL: Sure.

THE WITNESS: Sure.

(Break in proceedings.)

THE VIDEOGRAPHER: And we're back on the record. The time is 11:41. This is disk No. 3 of the deposition of Mr. Bjorn Steinholt.

MR. GIMBEL: Okay. Back on the record, I'll withdraw my last question, whatever that was.

BY MR. GIMBEL:

Q So as I understand it, Mr. Steinholt, you've

Page 102

attempted to quantify inflation throughout the class period by measuring the market's response to the alleged truth on November 9th, 2012, and then backcasting to the beginning of the class period; is that right?
A Yes, I used the event study approach. So I use an event study to quantify the impact of the disclosure of the alleged truth. And I use that as a basis for the inflation throughout the class period, either on a dollar basis or a percentage basis.
Q Okay. So your damages model measures the market reaction to what you're calling the alleged truth, and assumes that that alleged truth was concealed throughout the class period; is that fair?
A Well, it would only react to -- it doesn't assume that it's concealed throughout the entire -- it assumes that it was fraudulently concealed during the class period. So I assume the fraud aspect of it.
But the market doesn't react to information that it already knows, so -- it only reacts to new information, so it was not known, prior to the disclosure, whatever the market reacted to.
Q Okay. And the alleged truth has three

Page 103

components, as I understand it, according to your rebuttal report. And I think you spell them out in Paragraph 25, if you want to turn to that paragraph.
And the three components that you identify in Paragraph 25 are -- of your rebuttal report, are --
A Oh, rebuttal report. I'm sorry.
Q Do you have Paragraph 25 of your rebuttal report in front of you?
A Yes. I have it.
Q You identify the alleged truth in that paragraph; correct?
A Yes. Obviously, I'm referencing the -- or it -- it comes from a complaint that is, you know, a lot more detailed, but in short, it relates to the economics of the Mississippian wells.
Q Okay. And there are three components to that alleged truth, that you call out in Paragraph 25:
No. 1, that the average Mississippian well was expected to produce 155,000 barrels of oil. No. 2, that the average Mississippian well was expected to produce less than 40 percent oil. And No. 3, that the average Mississippian well was expected to have an internal rate of return, or IRR, of 50 percent; is that right?
A That's correct. Yes.

Page 104

Q Okay. Am I correct that your damages methodology assumes that all of these things were true throughout the class period?
A Actually, I have provided the framework. And damages will different -- be different if it wasn't true throughout the entire class period. In other words, let's say that the representations made by the company early on during the class period were true, in that case, during that period of time, you wouldn't have, under my framework, any damages.
You would have to wait until you have a misrepresentation that conceals these facts.
Q Okay. So --
A Or this alleged truth.
Q Okay. So if any of these three components of the alleged truth were not, in fact, the truth earlier in the class period, your estimate would not be reliable; is that right?
A I -- I don't think that that is necessarily true. I think that -- I mean, from my point of view, I've always focused in on the -- the oil EUR, I think that there are degree of importance here. For example, the gas to oil ratio, even -- and this is an issue that was discussed both, on the second quarter 2011 and third quarter 2011, earnings

Page 105

announcement or conference call, and that is that you could have a situation whereby the -- there is an increase in gas, but no reduction in oil, where the well's not necessarily worse off. So I think that you have to have a little bit more holistic approach to the misrepresentations. It is -- I wouldn't say that just because one of them, you know, is found to not have been false, then that necessarily undermines the entire damages framework. I would like to know a little bit more.
Q Okay. Is it possible that, if the plaintiffs can't prove, for example, that the average Mississippian well was expected to prove -- produce 155,000 barrels of oil throughout the class period, that your damages calculation would not be reliable?
A That is an important factor, so you would have to take a look at that. And in -- using my dangerous framework, if -- if they cannot prove that this is something that were known or should have been knowable, then that would undermine damages -- not the damages framework, but the damages for that particular period.
Q Okay.
A And the reason I -- I -- I talk about it in terms of damages versus -- talk about it as damages

Page 106

framework, is that it is framework where it is possible to come up with zero damages, you know. The -- so that doesn't undermine the framework; it just means that plaintiffs haven't proven their case.
Q Well, let me ask you to assume that, in 2011, based on all of the information that was available to the defendants, it was reasonable to predict that the average Mississippian well would produce 175,000 barrels of oil.
Do you have that in your head?
A Yeah.
Q Okay. Would your estimate of damages apply in that case? Would it be reliable?
A No, because it would be based on 155,000.
Q Right.
A So --
Q That's what I'm trying to get at. In other words --
A Yeah, so --
Q -- you're assuming that the truth throughout the class period is that the average Mississippian well was expected to produce 155,000 barrels of crude oil; correct?
A I'm not -- I mean, the -- the framework

Page 107

doesn't assume anything. The framework is designed to quantify damages, but it's also designed to be flexible depending on whether or not what plaintiffs can prove. And there hasn't been that many cases like this going to trial, but I would venture to guess most of them or many of them -- you know, the jury has enough information, if there is a change to, you know, make their own determination based on the framework that is provided.
So let's say that only half of the -- you know, maybe the truth is that, from one point or another, you know, the misrepresentation was just half of what plaintiffs claim, you know, then, you know, the impact would only be half.
So -- but that is something that you cannot, you know -- I -- I can't do a framework for every possible situation, because there is an infinite number of numbers between 155 and 204. So you can't do that, all you can do is provide the framework.
Q Taking the example of your estimate of inflation on the first day of the class period, which is 1.04. For that to be an accurate estimate of inflation, as I understand it, the plaintiffs would have to prove that, as of that date, the average Mississippian well was expected to produce

Page 108

155,000 barrels of crude oil; is that right?
A If they can prove that, then that is the inflation that follows.
Q Okay.
A And -- and --
Q If they --
A -- as I said, there is an infinite number of possibilities between that number and 2004. So no, there may have to be some adjustment. And maybe there is no adjustment that can be made, you know.
Q Okay. So if the average Mississippian well was expected to produce 175,000 barrels of oil as of that date, hypothetically, you would have to adjust your estimate of inflation in some fashion; right? Because the --
A Yes. If it's possible.
Q Okay.
A And if it's not possible, then inflation -- I mean, the -- the damages ends up being zero. The question is whether or not -- is it -- is it even possible to come up with a reasonable estimate? And that, you know, you have to sit down and you have to look at it.
Q Okay. Does your damages estimate also depend upon plaintiff's ability to prove that the internal

Page 109

rate of return of Mississippian wells was expected to be 50 percent throughout the class period?
A No, I -- well, specifically, the -- the -- the internal rate of return is one thing that is also impacted by factors such as oil prices and things like that, so it would be expected to -- to change. I think that a more appropriate thing to look at there is the difference between the 82 and -- and the 50 percent. The 82 percent that was disclosed on October 2nd and the 50 percent that was disclosed at the very end of the class period.
So it -- it would be a little bit of a different analysis. But again, you can have different outcomes. And my experience with these trials is that things always changes, so you have to try and provide a framework that is as flexible as possible.
Q So are you -- are you assuming, for purposes of your report, that -- the alleged truth about the internal rate of return of Mississippian wells is -- that they were 50 percent? That rate of return was 50 percent throughout the class period?
A I would not make -- I would not make that assumption. I think that it's the difference -- so it -- if they -- if they have an internal rate of

Page 110

return of 100 percent, as they did in the beginning of the class period, you know, maybe -- maybe there is a constant inflation in the internal rate of return that is -- that reflects the fraud, if there was a fraud. So that is not necessarily -- that is not necessarily correct. I think that the internal rate of return would also fluctuate because of other factors.
Q Okay. So it would not have been true at all times during the class period that a Mississippian well was expected to have an internal rate of return of 50 percent; right?
A I don't believe that that was -- would be true, no.
Q Okay. It would have -- in fact, the internal rate of return for Mississippian wells would have fluctuated constantly throughout the class period; right?
MR. KAUFMAN: Well --
THE WITNESS: Correct. As -- as it actually did.
BY MR. GIMBEL:
Q Have you made any effort to quantify the inflation associated with each component of what you describe as the alleged truth? In other words, the

Page 111

internal rate of return, the oil percentage, and the estimated ultimate oil production.
A No, I think it's -- there are too many variables, it's an impossible task to, you know, quantify every possibility. And -- and the thing is that you have to look at the totality of it, it's not -- you wouldn't just look at one part of it; you would have to look at everything.
And the example of that is the example that just because the oil percentage of total goes down, that doesn't -- it's not necessarily a negative thing, if oil production is constant. So -- so you would have to, kind of -- you would have to look at all of the factors to understand whether or not -- whether or not there was a negative or positive.
Q When you refer to the alleged truth about the average Mississippian well, in Paragraph 25, what do you mean by "the average Mississippian well"?
A My understanding is that these numbers relate to the average Mississippian wells. So that's why I used that term.
Q Okay. Well, do you mean the average well operated by SandRidge?
A Yes. I mean, I was -- I was look -- I think they may have used some data from other operators.

Page 112

But I wasn't trying to get a definition that was any different than however they defined it when they were making presentations and when they made their corrective disclosure, at the very end of the class period.
Q Okay. Do you -- do you know whether the alleged truth about the average Mississippian well, if that refers to wells that that were owned by the SandRidge Royalty Trust, or just wells that were owned by SandRidge?
A My understanding is that that Royalty Trust would have a percentage interest in certain wells. So -- but I don't think that -- whatever they refer to, they refer to, but that's my understanding.
Q Okay. So just to break it down, are you -- you said the -- the average Mississippian well, that's referred to here, might have been -- might have included trust wells and might have included wells operated by other companies; is that right?
A It -- whatever they refer to. I mean, I -- I may -- I was focusing in on the misrepresentation. And I was focusing on quantifying the impact of the alleged truth when it was disclosed.
Q Okay.
A And so whatever -- however -- whatever they

Page 113

refer to, they refer to. And I wasn't looking -- I remember something about the different types of wells that they were looking at. And of course, the Royalty Trust, I remember something about them owning a -- a piece of different wells. But I didn't focus on that.
Q Okay.
A It was outside of what I focused on.
Q So you can't really define what the average Mississippian well is; is that right?
A Well, I define it as whatever they -- however they defined it.
Q Okay. And in your report, you recite some alleged misrepresentations, that were made earlier in the class period, about the performance of Mississippian wells; is that correct?
A Well, can you point -- I --
Q Okay. Why don't I take you --
A I don't know what you want me to --
Q Paragraph 19 of your initial report.
A Okay.
Q And will you just start with the first sentence? You said, (reading):
At the beginning of the proposed class period, the company

Page 114

indicated that the average Mississippian well would produce 211,000 barrels of oil over its lifetime.

Do you see that?

A Yes.

Q Okay. Do you know what -- what "the average well being" referred to there is?

A I was just trying to be -- reference what the company stated. And my recollection is that -- that's the way that they described it. So that's all I did.

Q Okay. Do you know if that average well, being referred to in Paragraph 19 of your report, is the same as the average well that is referred to at the time the alleged truth is disclosed?

A I looked at various reports throughout the class period that seemed to be referring to the same -- same thing, with respect to the Mississippian and the average well at the Mississippian. And I don't know to what -- to what degree anything was updated. I presume it was updated as new information came in, but I -- I didn't track any of those changes.

Q So do you know whether they're referring to the same sets of wells? In other words, do --

Page 115

whether the prediction, at the beginning of the class period, that a well would produce 211,000 barrels of oil, refers to the same sets of wells as the disclosure at the end of the class period, that Mississippian wells were expected to produce 155,000 barrels of oil?

A I would imagine that, throughout, they would drill new wells, and that would become reflected in their estimate -- I mean, this is an estimate of the ultimate recovery for their wells in that area, of course. So the way I was looking at it was just that this is a number that can be used in order to quantify the future cashflows of the company.

So what analysts would do, would be, they would look at -- they would have information that was provided by SandRidge with respect to the wells that they were drilling, and also the wells that they intended to drill in the future. And in order to come up with a valuation of the company, what you would have to do is to have some sense in terms of, "well, how much oil would this well produce over the lifetime?"

So that is how an analyst would use the number. So -- but what the number -- you know, whether -- what the number was based on, which wells

Page 116

it was based on, presumably, it was updated as more information came available during the class period, that is not something that I -- I specifically looked at. For my purposes, it was, just look at a number that was important to investors, because it is a number that has implications when you value the company.

Q Okay. Is it possible that both of the estimates that we've been talking about were true, they were just based on different data?

A Well, the question whether or not it's true and so on, it's not something that I have focused on. I don't know what the variability is. And I don't -- I know it's alleged to have been false or misleading. But I -- you know, I -- I can't comment on that, because I -- I haven't -- I can't comment on data that I haven't studied.

Q Okay. But would you agree that you're comparing predictions that were made at two very different moments in time?

A There are estimates at different points in time, yes.

Q Okay. And the estimate of 155,000 barrels of oil, that was made at the end of the class period, was, presumably, based on much more data than the

Page 117

estimate of 211,000 barrels of oil, that was made at the beginning of the class period?

A Correct.

Q Okay.

A And then -- so it -- it doesn't -- that in and of itself doesn't prove that the company lied. You have to take a look at what they stated publicly and what they knew internally early on in the class period, or throughout the class period, to make that determination. But that's outside of the scope of my work.

Q Okay. But you would agree, based on the materials that you reviewed, that SandRidge's drilling in the Mississippian increased dramatically over the course of the class period; right?

MR. KAUFMAN: Object to the form.

THE WITNESS: Yes. It was -- the recount increased quite a bit. So yeah, the drilling increased quite a bit. Yes.

BY MR. GIMBEL:

Q As of year-end 2010, it had 34 wells in the Mississippian; right?

A I'm just looking at the spreadsheet or the presentation, and that seem -- that seems right.

Q But by the end of 2012, it had drilled over

Page 118

500 wells in the Mississippian; is that right?
A Yes. Which is a much larger number of wells, yes.
Q Okay. And --
A Although, I don't rec- -- remember exactly the numbers, so -- but I -- I take your representation as true, that there was 500.
Q Okay. In light of the expansion of drilling and the receipt of additional data over the course of the class period, wouldn't you expect that predictions of the average performance of Mississippian wells might have changed over time?
A Yeah. So you always have a variability, where you predict something and then you have a variability when you actually -- as time goes by in terms of the results. So I mean, that's a statistical analysis, and that's beyond my scope, and -- and I don't know enough about oil wells to -- to do those type of calculations, whether or not it was within the reasonable range or -- or what have you.
Q Okay. Your model doesn't account for the possibility that predictions of oil production could have changed over time for reasons having nothing to do with fraud?

Page 119

A My model has nothing to do with whether or not fraud was committed or not. It doesn't tell you whether or not fraud was committed or not. It only quantifies damages if plaintiffs can prove that fraud was committed.
Q And specifically, what plaintiffs have to prove is that, throughout the class period, the average Mississippian well, whatever that means, was expected to produce 155,000 barrels of crude oil; right?
A What plaintiffs legally have to prove or not, is not something that I can opine on.
Q Okay. But I'm asking for purposes of your model. In other words, for every estimate of inflation that you give for the class period to be correct, they have to prove that fact; right?
MR. KAUFMAN: Object to the form.
THE WITNESS: The -- well, you have to -- you have to prove that defendants knew or should have known the alleged truth as defined by plaintiffs. And if there is any variability -- variability from what they alleged to have been true and what they actually can prove, then you have to sit down and determine, "well, what is the impact of that?"
If they can prove everything, then it's --

Page 120

it's easy, you know, the quantification is easy. If they can't prove anything, well, again, the quantification is easy, you know, damages are zero.
But in my experience, very often, you know -- you know, you have a situation where it's, "well, you know, the -- they misled with respect to this, and -- but not with respect to this," and so on.
And then you have to sit down and determine what the consequences of that is. Do you have to start the class period at -- at a later point in time? Do you have to make other types of modification? Can you even do the modification?
You know, you -- I try to design the framework as possible -- as flexible as possible. But it is impossible to take into account everything that -- everything that could possibly be determined to be true at the end of the trial.
BY MR. GIMBEL:
Q Okay. Would you agree with me that predicting the performance of a well is not an exact science?
MR. KAUFMAN: Objection.
THE WITNESS: Well, the name itself, to predict something, means that it's not -- it's not certain. The degree of certainty, that is something

Page 121

that somebody with an expertise in that particular area should opine on. And I -- I just don't have that expertise.
BY MR. GIMBEL:
Q Okay. But would you agree that two different petroleum engineers, acting in good faith, could come up with different predictions of the amount of oil that is expected to be recovered from the average Mississippian well?
MR. KAUFMAN: Objection.
THE WITNESS: Again, that doesn't seem unreasonable to me. But the degree to which it would vary, that is something that I'm not, you know, I -- I just don't have the expertise in these type of, you know, the -- the type curves that they are doing and so on, I mean, I don't -- I don't have that expertise. So I don't know what the degree of difference -- what would be a reasonable degree of difference, I don't know what that would be.
BY MR. GIMBEL:
Q Okay. Well, let -- let me ask you to assume that, at the beginning of the class period, one petroleum engineer could, in good faith, have predicted what you call the alleged truth about oil production, that is that 155,000 barrels of oil

Page 122

would be recovered from the average Mississippian well. Okay; let's assume one engineer could -- could reasonably have come to that conclusion; right?
A Okay.
Q Okay. But assume also that, at the same time, looking at the same data, another petroleum engineer could, in good faith, have predicted that oil production would be 10 percent higher, say, roughly, 170,000 barrels of oil per well.
Do you have that in your --
A Okay.
Q -- head? Okay.
Assuming that two reasonable estimates would be possible, how would you calculate inflation in that situation?
MR. KAUFMAN: Object to the form.
THE WITNESS: You can calculate the inflation of one or you can calculate the inflation based on the other. And, you know, I -- and it's not my job to evaluate the evidence in that type of a -- of a matter. You have to make the determination. If the -- you have to make a determination. Was -- was it misleading, or wasn't it -- and to what degree was it misleading? Was it misleading from a

Page 123

difference of -- I guess it was 211,000 at that -- at the early on in the class period, or is that the -- and down to 175, is that what you want to quantify, or do you want to quantify the difference between 211 and down to 155? Is that what you want to quantify? But, you know, if you have two different inputs, you're going to get two different results.
BY MR. GIMBEL:
Q Does your method of calculating inflation provide any way of dealing with the fact that there might be a range of reasonable estimates of oil production from Mississippian wells?
A My framework -- you -- you -- I mean, you cannot possibly do what you're proposing. So I mean, the short answer is no. You cannot provide a framework that takes into account every range of possible outcomes that could result from a trial, because there's an infinite number of possibilities, so you can't do that. What it does do is to provide a framework that clearly quantifies damages -- if plaintiffs prove their case, it clearly identified damages if defendants prevail, because damages then would be zero.
And then you have all of these different

Page 124

things in between, and you try to provide as much flexibility in the model as possible, but is impossible to -- now you're talking about ranges, I mean, it's -- so what you're asking is -- no, it's impossible to do.
Q Okay. Going back to Paragraph 19 of your report, where you state that the company indicated, at the beginning of the class period, that the average Mississippian well would produce 211,000 barrels of crude oil, representing 52 percent of a total predicted estimated ultimate recovery of 409,000 barrels of oil equivalent.
Do you have that in front of you?
A Yes, I do.
Q Okay. And you cite a number of sources in which these projections were disclosed, including SandRidge's presentation at the February 8th, 2011 Credit Suisse Energy Summit; right?
A That's correct. Yes.
Q Okay. And am I correct that these numbers are part of SandRidge's type curve for the Mississippian that was released in 2011?
MR. KAUFMAN: Object to the form.
THE WITNESS: I believe this is based on whatever type curve they had at the beginning of the

Page 125

class period, start -- actually, goes back to February 8th of 2011. I believe that is correct, but it's not something I have studied in -- in detail.
BY MR. GIMBEL:
Q Is it your opinion that the type curve that SandRidge released for the Mississippian in 2011 inflated the price of SandRidge's stock?
A I have no opinion with respect to the type curve.
Q Okay. Do you --
A I don't even know if I have mentioned type curve in any of my reports.
Q Okay. Well, the -- am I correct that the figures you're citing are the key figures that are drawn from the type curve?
A I believe -- I believe they are, but it is not something that I have studied in detail. But that would make sense.
Q Okay. Do you know who prepared the type curve?
A Well, you -- that goes back to what you've already been asking me, about, you know, consultants and all of those things. It's -- I know of references to consultants and -- and so on, but it's

Page 126

not something that I have -- I spent time investigating.

Q Okay.

MR. GIMBEL: Why don't we -- I'll make it easier for you, we'll mark one of the presentations.

MR. PULSIPHER: Credit Suisse.

MR. GIMBEL: Why don't we do the 2011 investor analyst meeting?

(Exhibit 5 was marked for identification.)

MR. GIMBEL: This is 5.

BY MR. GIMBEL:

Q Do you have Exhibit 5 in front of you?

A Yes, I do.

Q Okay. Why don't you turn to Page 67, if you would.

A Yes.

Q And you see that there is a type curve for the Mississippian that is presented on that page?

A Page 67?

Q Yes. Mississippian, horizontal, you see that?

A On page -- (reading):

Single well comparison oil liquid place.

Page 127

MR. KAUFMAN: What's the Bates stamp?

THE WITNESS: Page 67?

MR. GIMBEL: It's Bates stamped 720, is the last.

BY MR. GIMBEL:

Q The first -- the very first column, you see it's labeled Mississippian, horizontal, you see that?

A Yeah, I see that. Correct.

Q Right.

And then you see in the middle, there's a section called "type curve"?

A Yes. I see that, yes.

Q Right.

And you see that the type curve has the allegedly misleading predictions of 409,000 barrels of oil equivalent total recovery and 52 percent liquids content.

Do you see that?

A Yes, I do.

Q And if you followed the footnote down to Footnote 2, you'll see that it identifies the source as the Netherland Sewell year-end 2010 type curve?

Do you see that?

A That's correct. Yes.

Page 128

Q And do you have an understanding of who Netherland Sewell was or is?

A I think that that was the type curve that they prepared early on, but I could be mistaken. I --

Q Okay. Netherland Sewell was an independent petroleum engineering firm; is that right?

A That is my recollection, but --

Q And Netherland Sewell prepared the type curve; is that correct?

MR. KAUFMAN: Objection.

THE WITNESS: I -- listen, I'm -- I don't know more than what is on this document here. I mean, I can't -- I'm not the fact witness here.

BY MR. GIMBEL:

Q You're not aware of any evidence that would allow you to conclude that Netherland Sewell issued an inaccurate or misleading type curve that's a fact issue; is that right?

MR. KAUFMAN: Objection.

THE WITNESS: I have -- you know, this is so far outside the scope of -- I mean, who prepared the type curves and -- and so on, this is far outside the scope of what I've been looking at. If you want to talk about the quantification of damages and

Page 129

impact on the stock price of various different disclosures, I'll perfectly be happy to talk about it.

In terms of whether or not these individuals or what this firm is as outside consultants or whatever, all of the -- these characterizations is just me, basically, repeating what you're asking me, because I have no firsthand knowledge other than what the document says.

BY MR. GIMBEL:

Q Okay. And you have -- you don't know what the basis was for Netherland Sewell's year-end 2010 type curve; right?

A I -- as I sit here right now, no. I -- I -- it was not particularly important for me to quantify the impact on the stock price of these various disclosures.

Q You're not aware of any evidence suggesting that SandRidge had the ability to cause Netherland Sewell to change its year-end 2010 type curve to reveal the alleged truth or anything else, are you?

MR. KAUFMAN: Object to the form.

THE WITNESS: I -- I don't know one way or the other.

Page 130

BY MR. GIMBEL:
Q Okay. Am I correct that SandRidge, in fact, provided different estimates of production from the production estimates in Netherland Sewell's type curve?
MR. KAUFMAN: Object to the form.
THE WITNESS: I have no knowledge one way or the other.
BY MR. GIMBEL:
Q Okay. Well, you did review this presentation in preparing your report; right?
A I prepared -- I -- I reviewed a lot of information, and that doesn't mean that I know the background of every page of every -- of every page that I reviewed. For my purposes, I -- I looked at why the stock reacted to certain information that was disclosed.
Q Okay. Take a look at Page 50, if you would.
A Sure.
Q You see on Page 50 that SandRidge predicted a range of possible outcomes for Mississippian wells, from 300 to 500,000 barrels of oil equivalent per well?
A Yes.
Q Okay. Am I correct that analysts understood

Page 131

that the company's own estimates were different from the estimates in Netherland Sewell's type curve?
MR. KAUFMAN: Object to the form.
THE WITNESS: The analysts would look at this information, and they would have evaluated it however they evaluated it. But it's clear that they understood that, on this page, we are talking about the range, and on the other page, we're talking about a particular number. A analyst would know the difference between a range and a particular number.
BY MR. GIMBEL:
Q And they would understand that the numbers came from different sources; right?
MR. KAUFMAN: Objection.
THE WITNESS: They probably -- I don't know if the source of this particular information is identified anywhere, but I would imagine they would know -- I mean, they probably would have asked the company and gotten that information. But I mean, I -- I don't have a firsthand knowledge of what questions they asked the company of and what they didn't ask the company.
MR. GIMBEL: Why don't we mark as Exhibit 6, a KeyBanc analyst report dated February 28th, 2011.
//

Page 132

(Exhibit 6 was marked for identification.)
BY MR. GIMBEL:
Q Do you have Exhibit 6 in front of you?
A I do, yes.
Q Okay. If you turn to -- and this is a -- an analyst report that you reviewed; correct?
A I'm pretty sure I reviewed this one, yes.
Q Okay. If you turn to Page 4 of the analyst report, I'd like you to take a look at the section titled, (reading):
Potential for EURs to move higher.
Do you see that?
A Yes.
Q Okay. And in the middle of that section, it says, (reading):
SandRidge estimates EURs in the 300 to 500,000-barrel of oil equivalent range, again with Netherland Sewell & Associates, Inc., estimating 409,000-barrel of oil equivalent EURs.
Do you see that?
A Yes.
Q So the analyst there is distinguishing

Page 133

between the range provided by SandRidge and the type curve estimate provided by Netherland Sewell; right?
A Yeah. I mean, the sentence is what it is.
Q Okay. Have you made any effort to disaggregate the impact of statements made by Netherland Sewell from statements made by the defendants?
A What statements made by Netherland Sewell?
Q Okay. So have you made any effort to disaggregate the impact of Netherland Sewell's type curve from the impact of statements made by the defendants about oil and gas production in the Mississippian?
MR. KAUFMAN: Object to the form.
THE WITNESS: I -- I don't even know what it -- is there a press conference that Netherland Sewell made with the analysts? I don't -- I don't really understand the question.
I mean, what -- the -- the two different -- I mean, I -- I have a SandRidge presentation here, and I have -- I mean, SandRidge provided the information to the market. Are you talking about the information that SandRidge provided to the market, or are you talking about something different that their consultant provided to the market?

Page 134

BY MR. GIMBEL:
Q Well, I'm -- we've established, I think, that Netherland Sewell prepared the year-end 2010 type curve; right? That's what the footnote in the presentation that we looked at indicates; right?
MR. KAUFMAN: Object to the form.
THE WITNESS: Yeah, I don't have any -- I mean, the -- the documents speak for themselves.
BY MR. GIMBEL:
Q Right.
And that type curve is the basis for the alleged misrepresentation that Mississippian wells would have 52 percent oil, and would produce 211,000 barrels of oil over their lifetime; right?
A Well, I -- I can only speak to the misrepresentation. That is what the misrepresentation, the alleged misrepresentation is.
Q Okay. Would you agree with me that, if that prediction is attributable to Netherland Sewell and not to the defendants, then any related inflation is attributable to Netherland Sewell and not to the defendants?
MR. KAUFMAN: Objection.
THE WITNESS: I -- I don't -- I mean, this seems to be a completely legal issue. I mean, I --

Page 135

it's totally outside the scope of my analysis.
BY MR. GIMBEL:
Q Okay. And have you done anything to try to disaggregate the impact of statements reciting Netherland Sewell's type curve from statements made by the defendants over the course of the class period?
MR. KAUFMAN: Objection.
THE WITNESS: No, there is no distinction made between the two in plaintiff's allegations, and I go by plaintiff's allegations.
BY MR. GIMBEL:
Q Okay. And would your methodology permit you to do that?
A I haven't even thought about it, so I don't -- I don't -- I don't even understand, really, how this relates to the economic analysis.
MR. GIMBEL: Okay. Why don't we break for lunch?
MR. KAUFMAN: Okay.
THE VIDEOGRAPHER: One moment, please.
We're off the record. The time is 12:30.
This will conclude disk No. 3 of the video deposition of Mr. Bjorn Steinholt.
(At 12:30 p m., the deposition adjourned for lunch.)

Page 136

(At 1:22 p m., the deposition of Bjorn Steinholt was reconvened.)
THE VIDEOGRAPHER: And we're back on the record. The time is now 1:22. This will be disk 4 of the deposition of Mr. Bjorn Steinholt.
BY MR. GIMBEL:
Q Okay. So Mr. Steinholt, we talked earlier about the alleged truth and the market's response to the alleged truth.
Do you recall that?
A Yes.
Q Okay. Would you agree with me that, if negative confounding information is released at the same time as the alleged truth, it would be necessary to separate the impact of that negative confounding information, from the disclosure of the alleged truth, in order to come up with an accurate estimate of inflation?
A When there is negative confounding factors, you have to look at them in aggregate, and you have to see whether or not that should be accounted for, if there is a way to account for them. So you have to determine, are they material? Did they have future cashflow implications? And then you either present value of those future cashflow implications,

Page 137

or use some other fundamental methodology in order to exclude those particular confounding factors or the aggregate impact of those confounding factors.
Q Okay. So would you agree with me that an estimate of inflation that fails to account for material negative confounding information would be unreliable -- at least if that information in the aggregate would have a negative impact on the stock price?
A If you have material confounding factors, and if you fail to exclude the impact, then the result will be a result that is, in this case, too large by whatever the magnitude is of that particular impact.
Q Okay. What methods are available to disaggregate the impact of negative confounding information?
A The methods I have used in the past, and I think is most often used, is fundamental valuation techniques. There are other ways that other experts have used, they have used econometrics, for instance, to quantify, for instance, impact of earnings, disappointments, and -- and so on, but that is not my preferred way of doing it.
I would use fundamental valuation techniques, and that is what I have used in the past when I

Page 138

have, you know, conducted such analyses.
Q Okay. By "fundamental valuation techniques," what do you mean?
A Well, as securities analyst, when we -- when we value companies, we look at -- we have various different value -- valuation techniques that we use, but it's -- it's basically premised on the fact that the value is equal to the present value of future cashflows, as well as the riskiness of those cashflows.
Q Okay. So is one fundamental valuation technique a DCF analysis?
A One would be a DCF analysis. A PE analysis, price over earnings analysis, could be like a shorthand of a DCF analysis. But it's premised on the same thing, nobody can run a model that incorporates -- well, actually, there is a way, but -- but usually, you don't incorporate all of the future cashflow -- cashflows to the end of time, because, you know, you -- you end up with a terminal value at some point in time. That's usually how you do it. Although, if you have a constant growth rate, and -- and so on, you can -- you can actually do something -- do a valuation that way as well.
But yeah, those are the type -- DCF is one

Page 139

way, price earnings. You can look at the PEG ratio, you can look at all sorts of different ways of -- of valuing it.
Q Am I correct that SandRidge released new information concerning a variety of different subjects after the close of trading on November 8th, 2012 and before the market opened on November 9th, 2012?
A That is correct, it was an earnings release. So an earnings release necessarily will have a lot of information in it. Yes.
Q Okay. The company disclosed, for example, that it was considering a sale of its Permian assets; is that right?
A That is correct. Yes.
Q The company disclosed that average well costs in the Mississippian had increased from 3 million to 3.25 million; is that correct?
A That is correct.
Q Okay. The company disclosed that Hurricane Isaac had resulted in the shutdown of rigs operating in the Gulf of Mexico; is that correct?
A Yes. I mean, that wasn't new information, but yes, I mean, that was part of what they discussed. Yes.

Page 140

Q And I understand that, for a variety of reasons explained in your rebuttal report, you have not tried to quantify the individual impact that any of these factors had on the stock price on November 9th, 2012; is that right?
A Yes. That's correct. Because when the impact would be positive, typically, the expert will not do any modification to increase the impact. It is just something that becomes relevant if the aggregate impact is negative.
Q Okay. Putting aside whether you think it's necessary to do in this case, would it be possible to quantify the impact of these factors?
A There's always -- is -- yes, you can always quantify something. The question is, how reliable such quantification is. The -- any quantification would be -- you could have some information that you would base that on. So when you do the fundamental analysis, you try to simplify it, and you try to do so, so you use the least number of assumptions. And -- because the more assumptions you use, the more moving parts there are, and -- but you can always, you know, incorporate, you know, a lot of assumptions. But it may end up becoming less and less reliable, the more and more assumptions that

Page 141

you end up incorporating.
Q Is there a method available by which you could reliably quantify the market's reaction to SandRidge's announcement that it was exploring the sale of its Permian assets?
A Well, you can -- in this case, what I did was to -- well, in all of these cases, what you want to do is to determine what the impact is on expectations, expectations with respect to the company's future cashflows. So you would have to try to determine the inputs that would go into such -- such a model.
In this case, you know, you -- it was viewed as positive information by the analysts. I viewed it positive when I was looking at it independently, for the reason that it was -- I viewed effectively as an option on behalf of the company, so consequently, it wasn't necessary for me to do the analysis.
Had I done the analysis, I would have to have made some assumptions in terms of what the likely acquisition price of the Permian would be, so there would be a lot of analysis into that. And that would be one of the key things.
What you would want to see is, what is the

Page 142

difference between what you receive and what you give up? So that is, in a nutshell, a -- the simplified analysis, but there's a lot of work that would go into that.

Q Okay. But you haven't attempted to analyze the specific impact of the Permian sale or the announcement of a Permian sale; correct?

A No. So what I did, I -- I did my analysis, and based on my opinion, it was positive. Which basically means that, if I had done such an analysis, I would end up with a positive value for that.

Now, I know the opposing expert here has come up with the opinion that it's negative, but it's not clear exactly what he based that opinion on. He hasn't provided any analysis to determine that it had any negative impact on the future cashflows; he hasn't done any analysis to determine that it was material. So we have different roles, and depending on which role you have, you have to provide some sort of an analysis to support your opinion. And in this case, for my purposes, it wasn't necessary to do the analysis. But I don't see, if you want to credibly argue that it has a negative impact, that -- why you wouldn't be required to at least

Page 143

provide some analysis of it, and explain why you thought that it was -- that it had a negative impact on the value of the company.

Q Have you come up with a method by which you could reliably estimate or quantify the impact of the announcement of the Permian sale?

A I haven't sat down and considered the methodology I would use. But like in the big picture, what you would have to do is to look at, what is the value of what you're giving up and what is the value of what you're receiving? So there are two numbers there that you have to figure out.

Now, in terms of what you are giving up, you can look at what the cashflow benefit to -- to SandRidge was, and what you would be giving up when you were selling it. And the other thing is to make some sort of an estimate of what the likely acquisition price would be. What was the market price? What was the market willing to pay for an asset such as the Permian at that point in time?

And, you know, had you done that analysis, at least you would have a basis for saying that it was -- that it was material and it -- that it was a negative, we don't have that -- I don't have that in this particular case. So -- but that's how I

Page 144

would -- I would view it.

Q Okay. And you haven't done that analysis to support your view that it was a positive development?

MR. KAUFMAN: Objection.

THE WITNESS: I -- that analysis? No, I mean, I have -- the inputs of that would have -- I would have the -- I would look at -- for instance, when you look at the acquisition price, I would -- I would have used the acquisition price that the analysts were talking about. And I would look at the explanation that Mr. Ward gave at the conference call in terms of receiving a premium price, that's what I would rely on. And the fact that, if they did not receive a premium price that was -- would be beneficial to them, they simply would not go forward with the sale of the Permian. Which makes perfect sense to me.

So based on that, you know, I conclude that it was -- that it was a positive. Now, I could go through the quantification, but it's not necessary because, you know, it is not something that would result in -- in a change in my estimate of the inflation. And it's not necessary for me to even demonstrate that it was material, because my opinion

Page 145

is not that it would be a positive impact, it is just that it is -- would have been not material, or that it would be positive.

It is when you make the opinion that it is material and negative, that's when you have to provide some additional quantification of, well, is it really -- even if it's negative, is it really material?

BY MR. GIMBEL:

Q So why is it that you would only have to quantify it if your opinion is that it's negative, and not if your opinion is that it's a positive?

A Well, if -- if you want to have credibility, you would have to do it.

Q Either way; right?

A To demonstrate that -- that it is -- that it is material and negative. I mean, you can -- everybody can have an opinion, but any opinion that you provide is based on whatever -- whatever work that you have done in order to support that opinion.

Q Right.

And your opinion, that this was a positive development, in the eyes of the market, is not supported by any kind of econometric analysis or quantification; right?

Page 146

A No, I -- I'm not requiring -- I'm not saying that it requires an econometric analysis. It has to -- I have analyzed the inputs that would go into my model, which is very simple, what is the difference between what you give up and what you receive? So when I'm looking at the difference between the two, and I determine that it's positive, it is not necessary for me to -- to quantify it.
Q Okay.
A It doesn't even matter whether it's material or not.
Q What were --
A And that is different between the two -- two positions taken.
Q We'll get back to the Permian.
Let me turn, though, to the disclosure about increased well costs; all right? I think we've established that, on November 9th, SandRidge disclosed, in its earning call, that average well costs in the Mississippian had increased by almost 10 percent, from 3 million to 3.25 million; is that right? That's --
A Yes.
Q Okay. And am I correct that analysts reacted negatively to that development?

Page 147

A Yes, I mean, this -- this is -- if you have -- if the well cost goes up, that means that your expenses go up. And if the expenses go up, that means that earnings and future cashflows go down. So that would be a negative piece of information, yes.
Q Okay. And your analysis didn't attempt to disaggregate the impact of SandRidge's announcement that well costs had increased; right?
A Well, I wouldn't disaggregate the -- I would not disaggregate fraud-related information. Confounding factors, the way that you define it is as factors that's unrelated to the fraud, so you wouldn't take a fraud-related factor and disaggregate it. So that's why I didn't do that.
Q Did the plaintiffs allege anywhere in their complaint that the defendants made misrepresentations about well costs at any point during the class period?
A My understanding is that the plaintiff's allegations include the increases in average well costs. If it didn't, I would have looked at it to determine whether or not this particular piece, when included in the overall picture, would constitute a negative factor, and whether or not that was

Page 148

material, and whether or not it should be adjusted for.
Q So if the plaintiffs had not alleged any misrepresentation relating to well costs, you would need to adjust your damages estimate?
A There may be a need, and there may not be a need. It depends on the totality of the information, that totality of the confounding information.
Q Okay. Are you aware of any evidence, based on your review of the discovery record, that the defendants made any misrepresentation about well costs over the course of the class period?
A That's outside the scope of my work. That's not what I -- you know, I -- I'm -- I look at plaintiff's allegations, and I assume them to be true. I don't go through discovery documents to prove or disprove plaintiff's allegations, so I don't have -- I don't know one way or the other.
Q Okay. And your analysis is premised on your understanding that plaintiffs are alleging that defendants made misrepresentations about well costs; is that right?
A Yeah.
Q All right.

Page 149

A Well, it is premised on my understanding that this would be part of plaintiff's allegations and not a confounding factor.
Q We talked a little bit about the Permian, and you testified that you had not made an attempt to quantify the impact of the company's announcement that it was exploring a sale of its Permian assets.
And is that -- is that -- do I understand correctly that you didn't do that because you thought that, generally speaking, analysts responded positively to that development?
MR. KAUFMAN: Object to the form.
THE WITNESS: No, I think I lay out quite clearly what I did in this particular respect. I looked at the information, and I looked at it -- I analyzed the information myself, and -- to determine whether or not it would have a positive or negative cashflow impact.
And one of the things that I -- I did was to look at, well, what -- what did the company itself explain with respect to the potential sale of the Permian? And my -- just to paraphrase, my understanding of what the company said is that, you know, if you didn't get a premium value, if you didn't receive a value for the Permian that was

Page 150

sufficient, then they would simply not sell it.
So here, you have an option that, if the company get what they expect to get, which is the premium value for the company, then -- for the Permian, then they will sell it. And if -- of course, if they get a premium value for the company, and I think it's explained by -- by Defendant Ward, that, yes, some other entity can operate the Permian more efficiently than we can, consequently, they can make more money, so it's more valuable to them than to us. And that is, really, the reason for a transaction like that. If the Permian was more valuable to another firm, for them to operate, then sell it to that firm, and then, you know, that's a net benefit to the company.
BY MR. GIMBEL:
Q Okay. Let me direct you to Paragraph 72 of your initial report. Let me know when you have that in front of you.
A Yeah. I have that.
Q Okay. So in Paragraph 72, you discuss the decline of SandRidge's stock on November 9th, 2012.
You see that?
A Yes. I do see that.
Q Okay. And you talk about possible causes for

Page 151

that decline; right?
A That's correct.
Q Right.
And you rule out some possible causes, as I understand the paragraph; right?
A Yes.
Q Okay. And you rule out the Permian sale as a possible cause of that decline because, as you put it, the potential Permian sale was generally viewed by analysts as a positive?
A That's correct. Yes.
Q Okay. Am I correct that analysts had divergent views about the Permian sale?
A Yeah, of course, they did. I think that I have a paragraph in here where I have differences of opinions with respect to what the -- what they expected to receive for the Permian. And so of course, that -- if you think that they are going to receive a high price for the Permian, you would be more optimistic than if you did not. And different analysts would have different opinions.
Q Okay. How do you reconcile divergent views of analysts in determining whether a piece of information is greeted positively or negatively by the market?

Page 152

A You can come -- you can look at it in terms of coming up with a consensus, maybe a median or an average or something, something like that, in terms of what their expectations are. But moreover, if you -- if you have a majority -- majority of them looking at it in a positive light, and you know that the company itself has stated -- said, quote, (reading):

So there's nothing that makes us sell the Permian, end quote.

Which is in Paragraph 46, when I'm quoting Tom Ward. You understand that there isn't much negative, there isn't much of a negative tale to this particular proposition, but you have a substantial -- or you have an upside, if they get a premium price.
And the company talked to both, the fact that these type of assets were selling at a premium price, so the expectations would be that the price that they would receive would be similar to other similar assets sold at that point in time.
So if you have eliminated the negative tale of the probabilities, but you retain the positive, then the expectation is that this is going to be neutral, at worst, to -- to positive.

Page 153

Q Did you do any analysis to determine the median or average price at which analysts expected that SandRidge's Permian assets would be sold in a potential transaction?
A No. I've listed the numbers in Paragraph 47, I have not literally gone through it and figured out what the median -- median or the average price would be. But -- but whether or not they received that price -- and -- and quite frankly, they -- my understanding, if I recall correctly, is, they received, just as the company stated they would, a premium price that was at the very high end of the estimates of the analysts, including analysts who were positive to the sale.
So, you know, it's -- again, you have eliminated the negative tale, so what is the expected value of that? You can look at it, and in my view, it is positive. And I have looked at numbers, I have looked at what the analysts have said, I have explained methodology of -- of -- of -- of why an option, generally, is considered as positive, and that is the basis for my opinion. But there's nothing in terms of analysis or anything like that in the -- in Dr. Grenadier's report.
Q Okay. Have you done any analysis to

Page 154

determine the median or average estimate that analysts held of how a sale of a Permian would affect the company's future cashflows?

A How it would affect the future cashflows...

No. But obviously, the -- the future cashflows, after selling the Permian, would be lower, because you're losing an asset. So that is the cost of the transaction. So you have a benefit and you have a cost.

Q But you haven't attempted to figure out what analysts believed, on a median or average or consensus basis, about the transaction?

A No.

MR. KAUFMAN: Object to the form.

THE WITNESS: No. They were positive with respect to it. And if it was something that was materially negative, the company would not have to do it. And it's, in fact, stated that they wouldn't do it. So again, you have eliminated the negative tale, so, you know, the -- the -- it's -- how positive it is was not really a big concern to me.

BY MR. GIMBEL:

Q Have you done any analysis of the average impact of the potential Permian transaction on the company's valuation according to analysts?

Page 155

MR. KAUFMAN: Object to the form.

THE WITNESS: Again, the impact -- if you eliminate the negative tale, the impact would be positive. And that's the only thing that is -- matters to me, how positive it is. Doesn't really matter because I'm not including that into my analysis.

BY MR. GIMBEL:

Q Okay. So you haven't tried to come up with an average analyst's assessment of the impact of the transaction on the company's value?

A There would be no purpose in doing so, because I am not increasing damages for any mitigation caused by the Permian, potential Permian sale. So there would be no purpose for me doing so.

Q Okay. Am I correct that not every analyst viewed the sale as a positive?

A I -- I think that there were neutral analyst reports there. But that would not be characterized as positive. I think Morningstar is probably the one that was the most negative. And on Paragraph 47, they were the ones who had the lowest estimate of what would be received from a potential Permian sale.

Q Okay. So you'd agree with me that

Page 156

Morningstar at least had a negative reaction the -- the potential transaction?

MR. KAUFMAN: Objection.

THE WITNESS: No, I wouldn't say that. I would say that they had the lowest range of what SandRidge would receive. And they talked a lot about what SandRidge would give up; in other words, obviously, they would lose the cashflow of the Permian. But I don't think that they provided an opinion, and certainly did not consider the fact that, if, in fact, the transaction was not beneficial to -- to SandRidge, the company had stated that they would not go through with the transaction.

BY MR. GIMBEL:

Q Okay. Morningstar concluded that SandRidge might get as little as $1.5 billion for the sale of its Permian assets; right?

A They actually had a range of 1.5 to 2 billion, which was the lowest that I saw.

Q Okay. And Morningstar questioned SandRidge's decision to part with what it called a mature asset that contributes a meaningful amount of cashflow to the firm; right?

A Well, the company had not made a decision to

Page 157

part with the asset. The company had made a decision to look into a potential sale of an asset. And if you don't make that distinction, I can see why you may draw the wrong conclusion. But the company had not, in fact, made a decision to sell the asset.

Q But Morningstar was questioning whether or not that would be a good decision; would that be fair to say?

A Yeah. And -- and maybe it was a good decision, maybe it -- it was a bad decision; but that good doesn't go into -- but that is a decision that hasn't been made yet. So you can't -- you can't assume that, "oh, it has a negative impact because the company, in the future, is going to make a bad decision," well, the company hasn't made a bad decision; it has just decided to explore the option of selling the Permian. And to me, I -- I don't -- I, frankly, don't even understand why that would be viewed negatively. Unless, as, perhaps, Morningstar states, they thought the decision had already been made, but I think that the evidence is that it hadn't been made.

But so I mean, for my -- this is not really one of those factors that I would adjust my analysis

Page 158

for in order to estimate an impact of the -- the alleged truth on SandRidge's stock price.

Q You would agree that Morningstar didn't have a positive reaction to that piece of news; right?

A It had a -- that Morningstar did not have a positive reaction? No, I never claimed that everybody had a positive reaction to it. When analysts look at it, they try to provide information looking at it from both -- from both views. And Morningstar -- then Morningstar pointed out some of the costs of doing it. But of course, there's also benefit. And the fact of the matter is that they received more than $1 billion more for the Permian than the 1.5 billion that you referenced as Morningstar's estimate. So clearly, Morningstar wasn't exactly on target in terms of what the value of the Permian was.

Q Right. I'm not asking you to judge, with the benefit of hindsight, of whether they were on target or whether they were not on target. Nobody knew, on November 9th, 2012, exactly what those assets would sell for; right?

A No, I think you're missing the point. The point is that these are equity analysts, and this is what they do, they analyze these things. So they

Page 159

will have a pretty good understanding of what the company will be able to get for a particular asset.

So -- so -- and -- and I think that that is why a lot of them were positive.

Q But they had -- they had different understandings, would it be fair to say, of what the company was likely to realize from a sale of the Permian assets?

A Yes. There was a difference, Morningstar being at the very bottom, and then there were other ones that had different views, typically from 2 to 2-and-a-half billion, which is half $1 billion more than what Morningstar talked about. And I think, if I'm not mistaken, they received 2.6 billion for the Permian. So the company was correct, it said it would receive -- they thought they would receive a premium price, and they did, in fact, receive a premium price.

Q Am I correct that some analysts concluded that a sale could exacerbate the company's funding problems?

A I would have to see the -- the quote. I see you have an analyst report there, I --

MR. GIMBEL: Let's mark that.

//

Page 160

(Exhibit 7 was marked for identification.)

BY MR. GIMBEL:

Q Do you have Exhibit 7 in front of you?

A Yeah. I have Exhibit 7.

Q And for the record, Exhibit 7 is a analyst report of Cacaccord Genuity, dated November 12th, 2012.

So let me direct you to the section titled, (reading):

Regrettably, a Permian sale is unlikely to improve SandRidge's long-term financial standing.

Do you have that in front of you?

A Yes, I do.

Q According to this report, (reading):

Assuming a sale in the indicated value range of 2 to $2.5 billion, SandRidge outspends cashflow by, approximately, 1.2 billion, annually, from 2014 to 2017.

Do you see that?

A Yeah.

Q Okay. (Reading):

If, on the other hand, the

Page 161

company retained the assets, Canaccord estimated that SandRidge's cashflow imbalance would only be, approximately, $1 billion per year.

Do you see that?

A Correct.

Q Okay. So according to Canaccord, the sales transaction in the value range that they were assuming was going to add to the company's funding gap; right?

A In terms of the funding gap, yes.

Q Okay. And there were other analysts that concluded, for example, that the transaction would have a generally dilutive impact on the stock; right?

A Can you show me that analyst report?

Q Okay.

(Exhibit 8 was marked for identification.)

MR. GIMBEL: Exhibit 8.

BY MR. GIMBEL:

Q Okay. So do you have Exhibit 8 in front of you?

A Yes.

Q Okay. And Exhibit 8, for the record, is a

Page 162

Deutsche Bank market's research analyst report, dated November 13th, 2012.

Let me direct you to the section of that report titled, (reading):

Headwinds remain with or without a Permian sale.

A Correct. Yes.

Q Okay. Do you see that Deutsche Bank estimates that assuming a sale price of 2 to 2.5 billion, the sale would have a generally dilutive impact on metrics?

A Yes.

Q Okay. And Deutsche Bank also concluded that, (reading):

The funding gap, from 2013 to 2015, would increase from 4 billion to 4.2 billion.

Do you see that? (Reading continued):

If -- if a transaction was consummated.

A Yes. It goes on to say that, (reading):

The underlying problem is the sheer size of the funding gap at the core Mississippian asset.

Q It also concluded that, (reading):

Page 163

The biggest casualty of a Permian sale might be the investors' confidence in management, because it represented a significant strategic change.

A Well --

Q Correct?

A This is a strategic change that was caused by the -- I think they talk about it here. (Reading):

Caused by the weaker-than-expected oil production note of Mississippian wells, that has reduced Mississippian type curves by 8 percent. And per oil reserves by 25 percent.

Q They -- sticking to the --

A So --

Q -- Permian transaction, which is what I'm asking you about.

A Well --

Q Deutsche Bank concludes that the sale of a Permian assets would have a dilutive impact, and would increase the funding gap; right?

A I would have to look at it more closely. I don't think that I -- my recollection of Deutsche Bank is that the -- well, actually, the -- the

Page 164

heading says, (reading):

The headwind remains with or without the Permian sale.

So the Mississippian problem has caused a problem, the company is trying to find a solution to that problem, and one of the solution to that problem, according to the company, is to raise cash by selling the Permian. Now, the question is, you know, is that going to be positive or is it going to be a negative? Well, if it is a negative, then the company doesn't have to do it. If it is a positive, as the many analysts' reports that I -- that I have cited, then you would go ahead with it.

So, you know, nobody knows what the price will be, different analysts would have different estimates. But there is nothing there to demonstrate that there is a material negative impact as a result of the Permian sale, particularly since if there is, the company does not have to go through with it.

Q Am I correct that a number of analysts concluded that it was possible that SandRidge would sell its Permian assets for less than the value that they had assigned to those assets in their models?

A In their models to come up with a price

Page 165

target? Yeah, maybe less than the models that they have for the price target, but that doesn't mean that it is necessarily less than the price it was trading at.

Q For example, if you turn back to the Canaccord Genuity analyst report that's been marked as Exhibit 7, Canaccord concluded that the sale would be value neutral at -- assuming a price of $2.4 billion; right? It's the very bottom of that section that we looked at.

A So it's valued neutral at -- they estimate, at 2.4 billion, in other words, if it's 200 million below the price they actually receive. So we're talking about, did the -- did the market perceive it as a negative at the time of the announcement was made? Well, again, the company said that they are exploring it. If they get the premium price, they'll sell it; and if not, they won't.

Q Okay. So according to Canaccord, it would be value neutral at $2.4 billion; right?

A Yes.

Q Okay.

A And on --

Q And they assumed that, based on precedent transactions, the sale of the Permian assets

Page 166

could -- could be as low as $2 billion in price; right?

A They had -- let's see, Canaccord had it between 2 and 2.5 billion.

Q Right; so --

A That is --

Q -- according to their estimate, that -- it might have been value neutral or it might have been value destroying; right?

A Yeah, but you're missing the point. If it's value -- the company believed they could get a premium price. If the company was wrong, they didn't have to do the transaction. Nobody is saying that whatever price they received for the Permian, this thing would be a positive. What I'm saying is, when you're looking at something, and you're trying to determine what the impact is, the way that I analyzed it was that, "listen, this is a transaction that will take place if the company gets the value that it expects to get, a premium value."

In this case, $2.6 billion. If they do not get that value, or get that price, they don't have to sell. And that has to go into the analysis.

Q SandRidge didn't announce that there was a minimum price at which it was going to sell its

Page 167

Permian assets; right?

A They -- they stated that they believed that they would get a premium price, in other words, that they would get a price above, you know, what it was worth to them. So, you know -- you know, we can look at it differently, but I have my view in terms of what the value is. And I have -- I have explained exactly what goes into the -- the factors that goes into my analysis.

Now, you may disagree with it. You can come up with some other type of analysis, and you can assume that, listen, as Dr. Grenadier apparently believes that the market only thought that you would get $1 billion for the Permian, and apparently, believed that that would be acceptable to the company, and that that would then be a negative -- have a negative impact on -- on the stock price, but, you know, you -- you -- you -- but that's just making up numbers. That is not -- that is not what analysts were discussing. So then it becomes, well, is it material or not? And there's no evidence that it is material.

So not only do I have a basis for my analysis that is -- that it is neutral to positive, which is my conclusion, but I have -- I have no analysis

Page 168

that -- to demonstrate that it was a negative and material.

So under those circumstances, there's no way anyone would adjust the -- the quantification of the impact of the alleged truth based on just the speculation that it could be negative.

Q But you haven't done any analysis comparing, for example, consensus analyst estimates, as to the price at which the assets would be sold, with how the analysts were valuing those assets in their financial models before the announcement?

A Because I didn't have to.

Q Okay.

A Because -- because --

Q J.P. Morgan, let me ask you about J.P. Morgan.

A Sure.

Q Do you recall how J.P. Morgan valued the Permian assets?

A J.P. Morgan, I have it in my -- the analyst reports that I saw, I put in here. So I have 2.6 billion.

Q Okay. Why don't we mark as Exhibit 9.

(Exhibit 9 was marked for identification.)

Page 169

BY MR. GIMBEL:

Q Do you have Exhibit 9 in front of you?

A Yes.

Q Okay. And Exhibit 9, for the record, is a J.P. Morgan analyst report dated November 16th, 2012 --

A Yeah.

Q -- right?

And according to your report, as I think you just summarized, J.P. Morgan concluded that the -- that the Permian assets would be sold for 2.6 billion, that was their estimate; is that right?

A According to my report, that is what it says. Yes.

Q Okay. Take a look at Page 6, if you would, of J.P. Morgan's report.

A Yeah.

Q Which is a discussion of the Permian assets.

A Yeah.

Q And if you look at the paragraph beginning "using NYMEX futures," it has their calculation of value of those assets.

Do you see that?

And J.P. Morgan valued the total package of Permian assets, excluding the Permian royalty --

Page 170

Royalty Trust, at $3.2 billion; is that right?
A Let's see, it says, (reading):
We value the proved developed reserves at, approximately, 2.6 billion. Backing out the value of the Royalty Trust assets of 436 million, values the total package as 3.2 billion.
Q You missed the first sentence, which is I think what --
A Oh, okay.
Q -- may be throwing the math off; right?
A Okay, yeah. Using -- using...
Q They valued undrilled locations at $1 billion; right?
A Right.
Q They valued proved developed reserves at $2.6 billion; right?
A Right.
Q And then they backed out the value of Royalty Trust to assets of 436 million, which would not be sold as part of a Permian transaction; right?
A Right.
Q And then, after performing those calculations, they valued the total package at $3.2 billion.

Page 171

A Right.
Q Okay. But they assumed that, in fact, the sale might generate as little as $2.6 billion.
A Right. I -- I think that we are now talking about their price target. And -- which is about where the -- you have to compare what their valuation is to where the stock price actually traded, in order to determine what the company is effectively giving up.
Q But what we've just seen in the J.P. Morgan report is that they valued the assets at 3.2 billion, which is 600 million higher than they were eventually sold for; is that right?
A Right; so this is a valuation that relates to coming up with price targets. Price targets -- price targets is greater than the way that the market values -- typically, greater than where the market values the company.
Q Okay. So you haven't done any kind of financial analysis that aggregates all of these estimates of analysts about the impact of the Permian sale, have you?
A I looked at the analyst reports, I've looked at their discussion of the sale of the Permian. I have looked at how I would have looked at the

Page 172

potential sale of the Permian, which I know you, kind of, overlook it, but the key point that you're -- that you're overlooking is that, if it wasn't beneficial to the company, the company didn't have to sell. This is not a forced sale situation. It would be different if the company was forced to sell an asset, because then you would have to sell below market value. And when you look at all of those factors, there's simply no basis for saying that exploring the potential sale of the Permian would have a negative impact on the company.
Q Well, you keep trying to insert it in your answer, so I'm going to ask you about your -- your option theory.
Your report characterizes the sale of the Permian assets as an option. And asserts that the value of an option is never negative; is that right?
A If you look at a publicly traded option, it would never be negative. Now, you can have -- when it comes to an option in this context, you can have a situation where the company makes a bad decision. So that is really what you're saying. And you're saying, you know, "listen, the company is making a bad decision, and is doing something that hurts shareholders."

Page 173

Q So --
A And --
Q -- isn't it possible that some analysts could have drawn the conclusion that SandRidge was about to make a bad decision with respect to its Permian assets?
A Yeah. And -- and there is a difference between what's possible and what you determine what the value is. So you have a distribution, probability distribution of possible outcomes, knowing the same that there couldn't be a possible negative outcome. But a possible negative outcome would be if management, when they are looking at the price that they are getting and making a decision that is against the interests of the shareholders and the company. So that possibility exists, but it only happened if the company decides to give up more than what they receive in this particular transaction.
But, just because something is possible, that doesn't mean that that is where the expected value is. The expected value would be somewhere above zero, because -- because of all of the positive implications of a sale, they are in need of cash -- SandRidge is in need of cash. This is a company

Page 174

that, a couple of years later, went bankrupt. Cash -- they had a lot of debt, and they're finding out that they are not general -- generating as much cash from their Mississippian play as they had represented before. So they need cash. One way to get that cash, to rectify the problem, is to sell the Permian assets.

Now, maybe in the future, they would make a bad decision. From my view, I don't believe that the expected value, when you are analyzing it, would be negative. Now, someone may have a different view, they may have a different view of management, they may not have as much confidence in management. They may think that, "listen, these guys are going to make a bad decision."

But from my point of view, the reason that the company considered selling the Permian in the first place is their rationale, to me, is that they were in need of cash because of the problems at the Mississippian, and so they were rational there. And it seems to me that they would act rationally in terms of evaluating whether or not to sell the Permian or not.

So that is a -- is part of any analysis that anyone would make in terms of determining whether or

Page 175

not this was positive or negative information.

Q Isn't it possible that some market analysts concluded that the company would sell the Permian assets for less than they were worth because of its acute need for cash?

A And that's exactly what you're asking. You're talking about, isn't it possible? Just because something is possible doesn't make it so. That is why I explained in my prior answer that we're dealing with a probability distribution here. And what is likely -- what is the most likely outcome? And what I'm saying is that, based on my view and my analysis, the most likely outcome is that this was a neutral or positive.

Now, I see no evidence that it could be negative and material negative. I just don't -- don't see any evidence of that. Because there is no analysis to that effect. I cannot reduce the $0.60 by just, "well, isn't it possible that somebody didn't like it and thought that this was a negative thing."

That doesn't form a basis to do any analysis on.

Q But you also haven't done any financial analysis proving that it was a positive.

Page 176

A I think that that is nonsense. I've -- I've explained to you what would go into such an analysis. And when you look at what goes into that analysis, it is --

Q But where is the analysis --

A I don't have the complete -- I don't have to complete the analysis in order -- in order to -- for instance, the -- the whole issue of a negative outcome, if you incorporate, into the analysis, the -- that this is an option, that the company had the opportunity to eliminate the negative outcome, how can you then possibly say that, "not only would there be a negative outcome, but this would be material, and so material that you needed to adjust the other portion of the analysis, despite the analysts -- many analysts talking about it as -- as a positive."

Q Is it your opinion --

A That is not the way that it works. You have to have some basis for what you're doing.

Q Well, what I'm having trouble with is finding the basis for your opinion that it was positive.

But is it -- is it your opinion that the market will always react positively to the announcement of a potential transaction that could

Page 177

be characterized as an option?

A No, but you have to differentiate about two -- two different things. You have to differentiate between the -- the reason why a company is exploring a potential divestiture or sale and the sale itself. The reason that the company is looking at a potential sale is to take care of a problem caused with respect to the Mississippian. And the funding gap at the Mississippian.

So you have a -- so when you -- when you look at why somebody is exploring this solution to the problem, well, the problem is the problem, of course. The Mississippian is a problem. They are not going to generate as much cash as investors were expecting; that is a problem. The question is, is -- is a sale of the Permian the solution to the problem to the funding gap? And there may be differences of opinion with respect to that.

So if you look at the totality of the information, of course, it was negative because of the problems at the Mississippian.

Q Am I correct that the market sometimes reacts negatively to the announcement of transactions that could be characterized as an option, potential transactions?

Page 178

MR. KAUFMAN: Objection.
THE WITNESS: As I said before, the -- it depends on the reasons for the transactions. If you do not distinguish between the sale of the Permian and the problems at the Mississippian, and just look at -- at it in totality, fine, you can look at it as a negative. What I'm trying to do is to look at the option itself. And I'd be hard pressed to think of a situation where giving a company option and flexibility is viewed as a negative; typically that is viewed as a positive.
Is this a good time for a break?
MR. GIMBEL: Sure, we could take a break.
THE VIDEOGRAPHER: One moment, please.
We're off the record. The time is now 2:24. This is the end of disk 4 of the video deposition of Mr. Bjorn Steinholt.
(Break in proceedings.)
THE VIDEOGRAPHER: And we're back on the record. The time is now 2:43; this is disk No. 5 of the videotaped deposition of Mr. Bjorn -- Bjorn Steinholt.
BY MR. GIMBEL:
Q Okay. You've acknowledged in your rebuttal report that, in the wake of the company's

Page 179

disclosures on November 8th and November 9th, 2012, some analysts expressed concerns about the company's funding gap; is that correct?
A Oh, yes. Yeah.
Q Okay. And you state in your rebuttal report, that concerns about the company's funding gap -- excuse me -- are not confounding factors because you say that they were related to the under performance of Mississippian wells --
A Yes.
Q -- is that right?
A I mean, they -- we -- yes. I mean, the -- because the Mississippian wells were under performing, obviously, the cashflow is lower. And yeah, you -- that results in a funding gap, yes.
Q Okay. And am I correct that the funding gap also resulted, in part, from expectations of reduced production in the Permian Basin?
A I don't know what you're referring to.
Q Okay. Well -- why don't we take out some analyst reports.
A So now we're arguing that the Permian actually did not have that much value to SandRidge?
Q Do you have something you want to say?
A Yeah, I -- I was just -- I was just trying --

Page 180

Q So, sir, I ask the questions here.
A Okay. Fair enough.
Q Okay.
(Exhibit 10 was marked for identification.)
MR. GIMBEL: Why don't we mark this as an exhibit?
BY MR. GIMBEL:
Q Exhibit 10, for the record, is a Ladenburg Thalmann analyst report, dated November 9th, 2012.
Do you have that in front of you?
A Yes, I do.
Q Okay. And do you see, sir, that, in the fourth bullet, on the first page of that report, it states that, (reading):
Assuming it does not divest its non trust Permian assets, SandRidge's Permian production is expected to decline.
Do you see that?
A Yes.
Q Okay. And it predicts a significant reduction of drilling activity in the Permian; correct?
A There is a reduction -- a significant

Page 181

reduction in drilling activity, yes.
Q And that would be expected to have a negative impact on the company's cashflows; right? If you're drilling less, you're generating less cash?
A You also spend less money drilling.
Q Okay. But --
A So I mean, capital expenditures -- I mean, the -- there are expenses that will go down, there is, you know, funds coming in that will be less. So I mean, there are a couple of things going on here. Yes.
Q Right; but -- but one of those things, that the company is going to generate less cashflow and less profit from its Permian assets because its production in the Permian is projected to go down; right?
A That's a decision that -- my recollection is that that is a decision that the -- that the company made. And I don't know if that relates to -- as I sit here right now, I don't recall whether or not that relates to not having the capacity to drill as much as they would like to or not. I know that Tom Ward, on a conference call, talked about selling -- one of the rationales for selling the Permian was that he thought that that may be an asset that was

Page 182

in better hands with someone else, who may be able to exploit the -- that particular asset better than SandRidge was able to.

Q Would you agree with me that a projected decline in Permian production would have the effect of increasing the company's funding gap?

A It could. I'm not quite sure. I mean, if -- it depends on how it's -- how it's structured. Drilling costs money. And then the question is, you know, if -- if you're drilling -- drilling new wells, and you don't know what the result is, then I mean, the -- it costs money. Their -- part of the drilling is a capital expenditures, is part of basically investing in the property, and that costs money. And that may be negative early on, and then it turns positive. So it depends on at what point we're talking about reducing the drilling activity.

Q Okay. Am I correct that some analysts were projecting that SandRidge's drilling in the -- in the Permian --

Let me withdraw that.

Am I correct that among the news that was disclosed by SandRidge was a -- a decline in Permian production of 30 percent?

A I don't remember if it was 30 percent or -- I

Page 183

mean, it was some percentage.

Q Okay. And wouldn't a decline in Permian production be expected to have some kind of impact on the company's funding gap?

A It could have an impact on funding gap. The question is, is it different when -- than what was expected? And I mean, it's -- there's just a lot more factors involved.

Q Okay. Have you done any analysis of the extent to which the company's funding gap was influenced by the projected decline in drilling in the Permian?

A I have not done a particular analysis looking at, you know, a -- potential problems in the Permian. I did not -- I do not recall any analyst reports pointing out that they viewed the Permian -- they viewed there to be any problems or new problems with the -- at the Permian.

MR. GIMBEL: So what are we at, 10? 11.

(Exhibit 11 was marked for identification.)

MR. GIMBEL: We'll mark this as 11.

BY MR. GIMBEL:

Q Do you have Exhibit 11 in front of you?

A Yes, I do.

Page 184

Q And Exhibit 11, for the record, is an analyst report of Susquehanna Financial Group, dated November 12th, 2012.

Let me ask you to turn to Page 3 of this report.

Do you see the section titled "Appendix"?

A Page 3.

Q On Page 3?

MR. PULSIPHER: Page 4.

MR. GIMBEL: Sorry.

BY MR. GIMBEL:

Q Page 4.

A I see the heading "Appendix."

Q Okay. And the appendix has a list of news that came out of the third quarter call.

Do you see that?

A Yes.

Q Okay. And one of the items of news that's identified is a base decline in production of 30 percent of the Permian.

Do you see that? It's the very last bullet.

A Yes.

Q Okay. And another item of news that's identified is that the company's 2013 guidance assumes 1.5 million barrels of oil equivalent, lower

Page 185

in Permian production?

A Yes.

Q Okay. Have you done any kind of analysis to quantify and disaggregate the impact of those disclosures?

A No. There were a host of things that were disclosed on the conference call. And I have not done so, no.

Q Okay. We talked a little bit, at the start of the deposition, about the new opinion that you offer about the August 5, 2011 stock drop. And I believe you told me that counsel had given you -- plaintiff's counsel had given you some information about what the plaintiff's allegations were with respect to that stock drop.

A That's correct. Yes.

Q Okay. And by "plaintiff's counsel," you meant Mr. Kaufman, sitting next to you; is that right?

A That is correct. Yes.

Q Okay. What are plaintiff's allegations relating to the August 5th, 2011 stock drop, as you understand them?

A The allegations is that -- that there was a steep decline in the older Mississippian wells. And

Page 186

that, again, that the company was grossly overstating the EURs for the typical Mississippian well.

So -- and my understanding is, as time goes on, if you have the same number of wells, that will be observable by the production data that you report. So what plaintiffs allege is that the company was spending a lot of money drilling new wells in the Mississippian, to hide or conceal the steep decline in oil production in the older Mississippian wells.

And it's also my understanding that that was -- that also, the increased capital expenditures relating to acquisition of additional acreage, where they could also drill, would also conceal the alleged truth with respect to that matter.

And their allegations, with respect to the August 5th decline, as I understand, is that this was a materialization of an undisclosed risk. And that 400 million of the 500 million increase in capital expenditures related to this material -- materialization of an undisclosed risk.

And I was asked to quantify, on a conservative basis, what the impact of that disclosure was. And that's what I did.

Page 187

Q Okay. Do you refer to the company's disclosures, on August 5th, 2011, as the materialization of an undisclosed risk anywhere in your rebuttal report?

A I -- it's actually -- I don't know if I refer to it as such in the rebuttal report, but that's what I've been calling it in the prior reports. In the -- in my opening report, when I explained it, I think I characterized it, risk of defendant's fraud. I have to figure out exactly what paragraph that would be.

Q Well, let me -- let me ask another question:

Did SandRidge's disclosures, on August 4th or 5th, 2011, correct any prior false statements to that you're aware of?

A Correct prior false statements?

Q Yeah.

A I'm not quite sure what you mean by that. I mean, it was a materialization of an undisclosed risk.

Q Okay. So SandRidge -- SandRidge's disclosures, on August 4th and August 5th, did they correct any prior false or misleading statement?

A My understanding is that it doesn't -- I mean, materialization of an undisclosed risk doesn't

Page 188

correct a prior statement. It is just that, it is a materialization of a risk.

Q Okay. And the undisclosed risk that you're talking about is what, exactly?

A Well, it is defined as defendant's fraud, the risk of defendant's fraud, so that -- so the allegation is that the $400 million of the increase in capital expenditures is a consequence of defendant's fraud.

Q I guess, what I'm trying to understand is, what about the disclosures that the company made at the time corrected any kind of misimpression that the market may have had, whether it's a better risk or about some statement that the defendants made?

MR. KAUFMAN: Objection.

THE WITNESS: No, I don't think that that is the way that -- my understanding is, it's -- when something is undisclosed, it's similar to, like, an omissions case. So you wouldn't -- in terms of correcting a prior misrepresentation, there has to be a misrepresentation. In this particular case, I don't think there is misrepresentation, it's a -- if the risk is undisclosed, then you're not correcting a prior misrepresentation.

//

Page 189

BY MR. GIMBEL:

Q Okay. So the -- the undisclosed risk, I think you told me, was the risk that the defendants were engaging in fraud; is that right?

A Correct. And the consequences -- and of course, the risk is that -- in this case, the increase in capital expenditures is the consequence of defendant's fraud.

Q Okay. And the -- the risk -- you're saying the risk that the defendants were engaging in fraud materialized on August 4th, 2011; is that right?

A What I'm saying is that plaintiff's allegation is that the increase -- $400 million of the increase in capital expenditures is a materialization -- materialization of an undisclosed risk.

Q Did any analyst draw the conclusion, on August 5th, 2011, that the risk that the company was engaging in fraud had materialized?

A No, I don't think that that -- but they talked about the consequences, which plaintiffs allege resulted from the fraud -- the alleged fraudulent scheme.

Q Now, the alleged fraudulent scheme, as you've described it in your rebuttal report, included

Page 190

increasing the drilling of new wells in order to enable the company to keep up with production targets while avoiding having to reveal the truth about the economics of the Mississippian.
Did I get that right?
A If you read it from my report, that is correct. That's my understanding.
Q Okay. You've reviewed a large record in this case; right?
A Yes, I have reviewed a lot of documents. Yes.
Q Are you aware of any internal documents of SandRidge suggesting that it was engaged in a scheme to increase drilling to avoid having to directly reveal the truth about the performance of Mississippian wells?
A I have not reviewed any such documents, no.
Q Okay. Am I correct that SandRidge publicly disclosed how many wells it drilled in the Mississippian?
A Yes. And they also disclosed that they were increasing drilling, which is, presumably, what plaintiffs are referring to.
Q Okay. And if it was drilling more wells to meet its production guidance, that would be

Page 191

disclosed to the public; right?
A Yes. And they -- and that is -- yes, I mean that -- that is part of the whole allegation here.
Q And so why would that conceal the economics of the Mississippian? In other words, if you're announcing that you have to drill more wells than previously expected to meet your guidance, aren't you disclosing, effectively, that the Mississippian is underperforming?
MR. KAUFMAN: Objection.
THE WITNESS: No, you're -- no, you're not. No, the allegation is that, during the growth stage, when you're growing drilling, that at that point in time, the proportion of old wells versus new wells will heavily be weighted towards new wells. Consequently, you will not observe the sharp decline that occurs in the old -- old wells.
BY MR. GIMBEL:
Q Now, you -- you say in Paragraph 74 of your rebuttal report that you, (reading):
Understand that plaintiffs intend to prove that as much as $200 million of increased drilling was part of this alleged fraudulent scheme.
You see that?

Page 192

A I know I have it here somewhere, yes. Yes.
Q Okay. What's the basis for that understanding?
A Oh, that is what they've -- that is from plaintiffs. That is what they will allege, and that is what they intend to prove. That is what was communicated to me.
Q Okay. That's not in the third amended complaint, is it?
MR. KAUFMAN: Objection.
THE WITNESS: I -- no, the $400 million, presumably, is a number that they have arrived at based on their review of the internal documents based on discovery in this particular case.
BY MR. GIMBEL:
Q Have you seen the discovery documents?
A I have not, no.
Q Okay. So your opinion here is based on Mr. Kaufman telling you that plaintiffs intend to prove that $200 million in increased drilling was part of the so-called fraudulent scheme; is that right?
MR. KAUFMAN: Objection.
THE WITNESS: I have no opinions with respect to the allegation. The allegation is for plaintiffs

Page 193

to determine. All I do is the quantification of the impact of that.
BY MR. GIMBEL:
Q Okay. Your understanding of plaintiffs's allegation is based on Mr. Kaufman conveying that to you; correct?
A Yes. That is -- I have my understanding based on representations made by plaintiffs. And I wrote it up as I understood it. And I ran it by them, and -- to make sure that I had it correct.
Q Okay. And who is "them"?
A Well, it would be Evan, speaking for plaintiff's counsel.
Q Okay. You go on to say that, (reading):
Plaintiffs intend to prove that another $200 million of additional land acquisitions also was part of the fraudulent scheme.
Do you see that?
A Well, that's 200, which is part of the 400 million. So there's 200 in increased drilling, and 200 in additional land acquisitions.
Q Okay. And Mr. Kaufman told you that the plaintiffs intend to prove that this $200 million in land acquisitions was part of a fraudulent scheme?

Page 194

MR. KAUFMAN: Objection.
THE WITNESS: Yes, it was tied to the fraudulent scheme. Yes.
BY MR. GIMBEL:
Q Okay. But it doesn't say that anywhere in the plaintiff's amended -- third amended complaint, does it?
A The -- I think there are some allegations to this effect, but, I mean, that's a legal issue, whether -- I mean, I think that the earlier portion of this is actually quoting the complaint, Paragraph 135, 53. Paragraph 148 and 53. 292 and 293 from the complaint. I haven't read the complaint in a while, until I -- since I wrote this thing. And I don't -- but I quoted it. And that is where this allegation is tied to the complaint.
Q All right. But you haven't cited any paragraphs of the complaint, on either of these points, about the hundreds of millions of dollars in land acquisitions, and acreage, and drilling, have you?
A Well, relating to the four -- well, relating to me explaining plaintiff's allegations, I have cited the paragraphs in the complaint that I just referenced. With respect to the 400 million, that

Page 195

is -- as I explained earlier, my understanding is that that is a new number that they had come up with based on the review of discovery material.
Q Do you have an understanding of what specifically in the acquisitions plaintiffs intend to prove were part of a fraudulent scheme?
A I do not know how that 200 million was arrived, no.
Q Okay. You state, in Paragraph 74, that, (reading):

> Plaintiffs intend to prove that $200 million in land acquisitions were part of a fraudulent scheme, and that they did not generate any material positive cashflows in a foreseeable timeframe.

Do you see that?
A Yes. I see that.
Q Okay. If the defendants were engaged in a fraudulent scheme to try to keep up with production targets, why would they acquire acreage that would not generate any material positive cashflows in a foreseeable timeframe?
A Well, it's -- I think it says here it did not generate any material positive cashflows. But I

Page 196

don't know what the intention was at the time they acquired the land.
Q Were you talking about --
A Specifically --
Q -- a land acquisition that has occurred, or are you talking about a capital expenditure increase for future land acquisitions?
A My understanding is that the 200 million would relate to land acquisition that was to be -- to be made. Obviously, they -- they hadn't -- this was an increase in capital expenditures. And the allegations was also that these land acquisition -- acquisitions did not generate any material positive -- positive cashflows after they were made.
Q So your understanding is that SandRidge announced that it was going to spend an additional $200 million acquiring acreage; right? That --
A Well --
Q -- is related to this fraudulent scheme; right?
A Well, my recollection is that they disclosed that they were going to spend $275 million acquiring additional land. And my understanding is that 200 million of this related to the fraudulent scheme.

Page 197

Q Okay. And -- but the $200 million in land acquisitions that you understand related to the fraudulent scheme, according to your report and your summary of the plaintiff's allegations, were not expected to add material cashflow; right?
A I think that it -- according to this, it says that it did not generate any material cashflows in the foreseeable timeframe.
Q Why would that help the defendants conceal a scheme?
A Well, my understanding, in terms of the concealing the scheme, was that they would -- they would go there and drill, looking for possible newer wells that would then generate -- produce oil. And while having more -- you know, newer wells, that way, you would, through growth, have a disproportionate number of newer wells compared to older wells, which would conceal the alleged fraud.
Q But if you were trying to conceal the under performance of Mississippian wells by acquiring additional acreage, wouldn't you want to acquire acreage that would result in your being able to increase your production guidance?
A Oh, absolutely -- yeah, I mean, that's -- you would have to drill new wells there. Because the

Page 198

whole issue, as I understand it, is to drill wells so that you have -- the proportion of new wells is greater than -- much greater than the proportion of oil wells -- old wells, yeah.

Q If the defendants were engaged in a fraudulent scheme to mask the performance of Mississippian wells through these capital expenditures, why wouldn't that have increased their production guidance at the time, substantially?

A Well, that was one of the problems, is that, if you have an under performance in the Mississippian, in order to meet projection -- production guidance, you have to drill more. And if -- so that is also to meet the production guidance. And also have the proportion of new wells versus old wells, make sure that the proportion is heavily weighted towards new wells that has better production than old -- old wells.

Q If you're trying to defraud the market about the productivity about Mississippian wells, isn't that, kind of, a stupid way to do it?

MR. KAUFMAN: Objection.

BY MR. GIMBEL:

Q I mean, in other words, the theory is that SandRidge announced a massive, you know, set of new

Page 199

expenditures without a corresponding change in production guidance; right?

MR. KAUFMAN: Objection.

THE WITNESS: I've had -- been in many cases where I shook my head, thinking about what actions seem to be -- not make much sense -- much sense that individuals have been shown to have -- have done. I don't know what the case is here. I don't have a dog in the race.

BY MR. GIMBEL:

Q So on August 5th, 2011, the first trading day following the announcement of increased capital expenditures, SandRidge's stock price declined by 20 percent or 1.97 a share; right?

A That's correct. Yes.

Q Okay. You offer the opinion in your report that the evidence you have reviewed demonstrates that $1 increase in capital expenditures resulted in at least $1 decrease in a company's market capitalization.

Do you recall that opinion?

A Yes. I mean, my opinion is really that it -- it's more than a one-to-one relationship between the increase in capital expenditures and the impact on the stock price. I think the impact on the market

Page 200

capitalization is 800 million, while the increase in capital expenditures is 500 million.

Q Is there any kind of economic or financial model that you constructed that demonstrates that the company's announcement of 1 increase in capital expenditures resulted in at least $1 increase in market capitalization on August 5th, 2011?

A Yes, I mean, that is based on my event study. So -- and my event study quantified the company-specific portion of -- of the price decline. And then I looked at the news that could explain that price decline. So that's...

Q Okay.

A That's the basis for it.

Q Wouldn't that be an economically irrational response to -- to the announcement of increased capital expenditures? In other words, if the company announces that it's increasing its capital expenditures by $1, presumably, it's going to get something in return for that dollar; correct?

A The issue, again, is, what is the difference between what you give up and what you receive? In this case, what the company's going to do is to spend an additional $500 million, out of which 400 million is part of the alleged fraudulent

Page 201

scheme. But in any event, they are announcing that they are going to spend $500 million. And this is at a time when the company -- investors are looking to the company to reduce the debt, to -- and here, we have, you know, the company increasing the -- its spending.

So the reaction from the market represents their view on the -- the benefit of increasing capital expenditures, given the financial condition that the company is in at that point in time.

Q Okay. But let's break it down a little bit.

One -- one facet of the announcement was that the company was going to spend $275 million acquiring additional acreage; right?

A Correct. Yes.

Q Okay. And so the company was going to receive something of value in exchange for that $275 million; right?

A Correct. And you can look at the value in two different ways:

You can look at the value as the value of the land in the transaction, if you buy and sell the land. Or you can look at it in terms of being on the books of company as an ongoing concern, in other words, what are the cashflows that the land is going

Page 202

to -- to generate? And until there is drilling on the land, of course, it -- the cashflows that it's generating is zero. You know, there is cashout flows associated with it. At the time, I think the company had close to $3 billion in debt. They were paying between 7-and-a-half to 10 percent on that debt.

So -- and I think the weighted average capital was -- was even higher than 10 percent. So when you're looking at it from an investor's point of view, the first thing that you look at is, "why are we buying this thing? And when is it start going -- going to generate cash? And we know it's going to cost money because, you know, there's a cost of capital issue."

And so that's a different analysis than just looking at the value from the point of view of something that was just recently bought or sold.

Q Is it correct to say, however, that the company would be expected to obtain something of value in exchange for its $275 million?

A Investors would view -- yes. I mean, investors would look at it from the point of view of, "well, how can this increase our future cashflows?"

Page 203

And of course, the way that you increase future cashflows is that you go and drill on the land. But you already have land, you already have 1 million acres in the Mississippian. So the question for investors is, "well, what benefit will this additional land have?"

So as investors, you have to assess, "well, how are they going to do that? Are they going to -- you know, monetize it some other way? Are they going to set up an -- another Royalty Trust? Or are they" --

You know, so there's a lot of factors that go into this. And the scary part is the -- the increased spending when the company already is -- investors already are concerned about the overall financial condition of the company. This is a company that has a tremendous amount of debt on its book, they are paying -- I think on an annual basis, at the time, they were paying probably interest, a quarter of $1 billion just in interest payments.

So another way -- and probably, the -- the way that investors would have preferred would be for the company to use any additional cash -- cash, perhaps the cash they receive from the joint venture the prior day, to pay down some of its debt, debt

Page 204

that had interest rates of close -- some as -- some of the interest was as high as -- as 10 percent.

So the company itself, by making this decision to increase capital expenditures, then becomes a much more riskier company. And by being risky, you can -- perhaps, if you're very, very successful, that will work out in the benefit of investors. But if you are unsuccessful, you know, you can risk, you know, bankruptcy if you're too -- if you're not managing the funds properly.

Q Okay. So part of the market response might be explained by investor views about the risks associated with making these investments?

A The risk in -- I think that the risk embedded in SandRidge, I think that is a better way of looking at it. Given that the company has already a lot of debt, spending an additional 500 million, in a very short period of time -- remember, this is August 5th of 2011, and we are talking about just the remainder of the year, they are going to spend $500 million. And then the expectation that, of course, after you buy the land, in the Mississippian, if you are going to drill on it, well, that's going to be even more capital expenditures in 2012.

Page 205

So this is not -- so the 500 is just the tip of -- tip of -- of the iceberg of a strategy that some investors appear to have viewed as somewhat reckless.

What I can objectively do, though, is look at how the market reacted to the announcement. And clearly, the stock price declined significantly in response. It was the largest price decline during the class period.

Q So in Paragraph 82, you -- you calculate that the impact on the stock price of the announcement of increased capital expenditures was $0.81 per share; is that right?

A Well, yes. I mean, that is what I quantified, and what I viewed to be a conservative estimate of the impact.

Q Okay. That estimate depends on the assumption that $1 increase in capital expenditures resulted in at least $1 decrease in the company's market capitalization; is that correct? That's how you get to that number?

A It's not an assumption, it's based on my interpretation of the evidence. When I look at the total price decline in the stock price, and when I look at the increase in capital expenditures, it's

Page 206

greater than one.

Now, there is a possibility that there were confounding factors, other factors that caused some of it. So I -- I considered that, too, and I decided on having the most conservative view of -- of -- a more conservative view on it. And that's why I decided on the one-to-one relationship. And that is how the $0.81 is calculated.

Q Okay. So the $0.81 calculation depends on a one-to-one relationship between increase in capital expenditures and decrease in market value of the company stock; right?

A That is how it is arrived. That is one of the -- that is one of the inputs of the calculation, yes.

Q And more specifically, it's assuming that a $1 increase in capital expenditures resulted in a $1 decrease in market capitalization. Which I understand you're saying is a conservative assumption, but that -- that's the relationship?

A It is -- that is the relationship. And when I say "conservative assumption," it's not -- it is a conservative assumption when I look at the decline in market capitalization of 800 million, you know, following the 500 million increase.

Page 207

Q Okay. And you're assuming that $300 million of the market cap decline was due to non fraud-related factors; is that right?

A It would -- well, in the market cap, no. I think that it ends up being a little bit different. I think the actual price decline was a buck 97. And I think that I came up with 81 percent so you can take 81 percent and divide it by 1.97, and you can see what portion of the price decline that -- that I have here. So it's going to be 40-some percent of the actual price decline.

Q Well, you -- you say that the evidence you've reviewed demonstrates that $1 increase in capital expenditures resulted in at least $1 decrease in market capitalization; right?

A Correct. Yes.

Q And -- and for purposes of this $0.81 calculation, aren't you, then, assuming that $500 million of the market cap decline was related to the announcement of $500 million in increased capital expenditures?

A Well, the 81 percent is not for 500, it is for 400 million. So -- but what I did, when I came up with 81 percent -- 81 per share number, I was also using fully diluted shares outstanding, which

Page 208

is much higher than what is used to quantify the market cap decline. So it's even lower than when you just use the shares outstanding.

Q All right; but -- so let me take a step back, because I think I did state something incorrectly.

In other words, you're saying that the announcement of $400 million in fraud-related capital expenditures resulted in the decline of $400 million in the market value of the company? Is that what's underlying the $0.81 calculation?

A That is what is underlying the $0.81 calculation, yes.

Q Okay. So 400 -- another $400 million of the decline of the market capitalization related to factors unrelated to the fraud?

A Well, it's -- you end up with a cushion, yes. You end up with a cushion that -- so -- and that's why it's conservative. What I was looking at was, are there any other factors that could be viewed as negative? Some of those factors are actually fraud-related factors, and I concluded that these fraud-related factors -- for the purposes of quantifying damages, I concluded that these fraud-related factors did not impact the stock price.

Page 209

But I did saw, because I did not believe that I had sufficient evidence and proof, that -- that they did. Consequently, even though it is -- I think it's very unlikely that they impacted the stock price, I concluded they -- for the purposes of my opinion, which, you know -- which is based on -- which I believe -- I'm reasonably certain that my opinions are correct, because my standard is not more likely than not, I mean, I -- I'm -- I want to be -- I want to be able to prove and have confidence in it.

So even though I could not prove that these -- that these factors caused a price decline for purposes of quantifying damages, I could not exclude the possibility of them causing some decline in the stock price of -- you know, when I was quantifying the impact of this particular portion of -- of my analysis.

Q Okay. So --

A And the capital expenditures.

Q But this particular portion of your analysis, effectively, assumes that half of the market cap drop was attributable to fraud-related factors, and half was attributable to non fraud-related factors. And that might be a conservative assumption, but I'm

Page 210

just trying to understand if that's what -- what it does.

A It's -- well, because of -- it's a little bit different. Because you're using the drop in market capitalization for purposes of quantifying -- when you look at the loss in market capitalization, it's based on shares outstanding.

When it comes to the $0.81, it is based on the fully diluted shares, which is a larger number. So the $0.81 is less -- as a proportion, it's less than half of the price decline that is attributable -- that I am confident is attributable to $400 million in increase in capital expenditures.

Q You state in the footnote that there are -- in your opinion, there are, (reading):

No material confounding factors unrelated to the alleged fraud, that, in the aggregate, caused a larger negative impact than your estimate of the non fraud-related portion of the company's specific decline.

Do you recall that opinion?

A No, where -- where do you have that?

Q The paragraph -- footnote 120, on Page 144. States your opinion that, (reading):

Page 211

There are no material confounding factors unrelated to the alleged fraud that, in the aggregate, caused a larger negative impact than your estimate of the non fraud-related portion of the company specific decline.

Do you see that?

A Yeah.

Q What is your estimate of the non fraud-related portion of the company's specific decline?

A My estimate of it? I don't have an estimate of it, because I don't have the -- you know, I -- the -- the earnings disclosed were roughly in line and -- with expectations. Now, you have the issue of the gassier production in the Mississippian, and again, some increased cost relating to the Mississippian wells, I think that was also part of it.

But this is not something that could explain -- well, first of all, it -- it would be fraud related, and I already determined not to include it in the quantification of damages. But -- but even so, I -- I don't know of any other factors that could have caused the remaining -- you know, a

Page 212

price decline that would have explained the close -- roughly 20 percent decline in the stock price.

Q So you -- you refer, in the footnote, to your estimate of the non fraud-related portion of the company's specific decline, but you don't actually have such an estimate; is that right?

MR. KAUFMAN: Objection.

THE WITNESS: Well, my rough -- rough estimate is that, you know, there are none. Now, if you go into detail, there may be some variations to that estimate. The issue is whether or not that variation comes anything close to the portion of the decline that I deem to be non fraud related. Which still would be, by the way, the largest price decline during the class period. Even when you take away the $0.81, the remaining portion of the -- of the -- the price decline, which is I think 10-and-a-half percent or thereabouts, would be larger than any other price decline.

So the only -- the only confounding factor that could explain this large portion of the price decline would -- would be a non fraud-related factor that was very, very significant, and certainly, would be discussed in all of the analyst reports. And I just did not find such a factor.

Page 213

BY MR. GIMBEL:

Q Okay. So you haven't attempted to quantify the impact of any non fraudulent-related news that was released on August 4th or 5th, 2011; correct?

A I don't have a specific quantification, other than what I just discussed.

Q Okay. The company announced that it had missed its earnings per share guidance; correct?

A Yes. It was mixed -- let me just see exactly what they -- they announced.

The -- the cashflow per share was ahead of consensus. And earnings per share was lagging estimates. So it was, kind of, a mixed result. And some analysts talked about it as being -- I think they used the term "in line," I'm -- I don't actually see it here, so I'm not going to say that for certain. But I think, you know, it's a mixed result in the sense that, if you look at earnings per share, or if you look at cashflow per share, you know, it may have beat or miss -- missed expectations.

Q You haven't attempted to quantify the impact of the announcement that the company had missed its earnings per share guidance; correct?

A No, because analysts would look at it in

Page 214

combination with -- with cashflows per share. I mean, both of -- there are two measures of earnings, one beat and one missed.
Q Okay. The company also announced, on August 5th, in the morning --
Sorry, let me withdraw that.
Am I correct that, on the morning of August 5th, 2011, before trading began, SandRidge held an investor conference call?
A That -- I believe that's correct. Yes.
Q Okay. SandRidge announced on that call that Mississippian well costs had increased from 2.5 million to $3 million; is that right?
A There was an increase, I don't remember exactly the -- the number. But yes, there was an increase in -- in well cost. Yes.
Q And that's a negative piece of news; correct?
A That is a negative piece of news, yes.
Q Have you done any analysis to quantify the impact of that piece of news?
A No. I looked at that piece of news in connection with, you know, the -- my analysis of the fraud -- whether or not it related to the alleged fraud. There was some increase in cost, I did not view it as changing the value of the company

Page 215

significantly, or at least not significantly enough to warrant the largest price decline, absent the August 5th decline, during the class period.
Q So you've done no financial analysis of the impact of the company's announcement that well costs had increased?
A I don't have a specific quantification with respect to this particular increase. I mean, I -- there are other quantifications with respect to -- well, the increases in well costs, and it does have -- it does have some impact, but I did not do a specific quantification --
Q Okay.
A -- for this particular announcement.
Q And am I correct that the company also announced that there had been other cost increases in the Mississippian?
A There were cost increases, I thought that the well cost was -- it was predominantly well costs. But there may be others, too.
Q The company also announced cost increases relating to salt water disposal; is that right?
A Yes. There was also some for that, yes.
Q The company also announced cost increases relating to power lines and power generation; is

Page 216

that right?
A I don't recall, specifically, power generations. No, I don't think that that was something that was mentioned in a lot of the analyst reports, but I may be wrong.
Q Well, let's start with salt water disposal costs, then.
Have you done any financial analysis to try to quantify and disaggregate the impact of the company's announcement that its salt water disposal costs had increased?
MR. KAUFMAN: Objection.
THE WITNESS: Well, I think that part of the capital expenditures was actually for drilling for salt water disposal costs, I may be incorrect, but -- but I haven't specifically looked at that, no.
BY MR. GIMBEL:
Q Okay. And you also haven't looked at the impact of any announcement relating to increased costs for power lines; right? You don't recall that being an issue?
MR. KAUFMAN: Objection.
THE WITNESS: That is not -- that would not -- I don't recall that, but it's -- it's not an

Page 217

issue that would -- that I think would have a sig- -- that significant impact on a stock price as what we are talking about here, when we're talking about hundreds of millions of dollars of loss in market capitalization.
BY MR. GIMBEL:
Q You have not done any analysis of the financial impact of increases in power costs; right?
A No. I, essentially, concluded that none of the confounding factors could explain the large remaining portion of SandRidge's price decline.
Q Okay. Am I correct that SandRidge announced that -- a new play on August 4th, 2011?
A I'm not -- I don't know what you're referring to, other than I know that they were talking about spending more money to acquire land, which would be -- well, you can tell me what you're talking about.
Q Well, do you -- do you have an understanding one way or the other about whether SandRidge announced that it was expanding into a new play?
A Well, they called it the Mississippian. So in terms of the -- I don't know if you're referring -- you know, I'm sitting here guessing at what you're talking about, but you can -- you can

Page 218

provide me with a document if you want me to review it.

MR. GIMBEL: All right. I think I found what I wanted to show you.

(Exhibit 12 was marked for identification.)

MR. GIMBEL: I'm not sure what we're up to.

THE REPORTER: 12.

MR. GIMBEL: 12.

BY MR. GIMBEL:

Q Exhibit 12, for the record, is a Johnson Rice & Company analyst report, dated August 8th, 2011.

Do you have that in front of you?

A Yes. The one headlined, (reading):

Updating estimates increased cap X drives investor's concerns.

Yes, I have that.

Q Okay. And under the heading "Key Takeaway" --

A Yes.

Q -- the first sentence says, (reading):

A difficult quarter with increased 2011 cap X and the announcement of a new play, which has investors concerned about additional

Page 219

funding ahead and how the company will fund the growth.

Do you see that?

A Yes.

Q Okay. And do you have an understanding of what's meant by the "new play"?

A I -- well, my understanding is that the -- they are going to make additional land acquisition. So if you could point me to what that new play is, that would be -- I can read it.

Q Well, take a look at Page 2, if you would. Page 2, under "cap X moves up," refers to (reading):

The acquisition of acreage in a new Mississippian play in an as-yet-unidentified location.

Do you see that?

A Yes. This seemed to confirm what I thought you meant when you said "new play." It's -- and it relates to the capital expenditures for additional land.

Q Okay. And so SandRidge, according to this report, disclosed to the market that it was going the acquire up to 1 million acres in this new play; is that right?

A Correct. And that -- that is what the

Page 220

$275 million refers to, I would imagine.

Q Well, it says $275 million for acquiring acreage, including the new Mississippian play; right?

A Exactly.

Q So do you know how much of the 275 million breaks out between the so-called new Mississippian play and the other acreage that the company was acquiring?

A It doesn't say.

Q Do you know that based on your review of the record?

A Based on my review of the record?

Q Yeah.

A It is not something that I have specifically looked at. But I know that there is -- you know, there were new areas that they were acquiring acreage.

Q Okay. And the news that's announced is that the company is going to acquire up to 1 million net acres, by year-end 2011, in a new Mississippian play; is that right?

A It's -- well, it -- they're gonna spend $275 million for new acreage, including this new Mississippian play.

Page 221

Q And it states that they're targeting 1 million net acres, by year-end 2011, in the new Mississippian play.

Do you see that?

A Yes.

Q Okay. And that play is in an as-yet-unidentified location --

A Correct.

Q -- is that right?

So isn't there some uncertainty associated with the company acquiring up to 1 million acres in -- in a new play in an unidentified location?

A Of course. That's --

Q Okay.

A That's -- that is why one of the reasons that the market responded so negatively to the announcement of the increase in capital expenditures.

Q So a large portion of the market's response was associated, in your view, with the risks of expanding into a new play?

A There were many risks. And it -- looking at it, it just became a much riskier company. And they didn't give any credit to, you know -- you know, they didn't really give much credence or credit to

Page 222

the future cashflows that SandRidge may or may not believe that they -- that investors would have believed that they would generate from this -- this investment.

But yes, I mean, this all relates to the announcement of capital expenditures.

Q The market's response to the risks associated with this new play might have been the same, absent any fraud; right?

MR. KAUFMAN: Objection.

THE WITNESS: You would have had the same reaction to this information whether or not it was materialization of the risk of fraud or the consequence of fraud than if it was not. This has nothing to do with proving plaintiff's allegation. This has to do with quantifying the impact of something that plaintiffs allege was a consequence of the fraudulent conduct.

BY MR. GIMBEL:

Q Okay. Have you quantified the market's response specifically to the risk of expanding into a new play in an undisclosed location?

A No, that would be part of the analysis I did of the increase in capital expenditures. So increase capital expenditures. And there was a

Page 223

reaction to the stock price, that reaction includes all of the analysis that investors did relating to the increase in capital expenditures, including what the additional capital was supposed to be used for. Such as increasing their land acquisition.

Q So if the plaintiffs failed to establish that the risks of expanding into this new play were related to the fraud, would -- would your calculation of $0.81 per share in damages be valid, or would you have to adjust that calculation?

A It would not relate to that, it would relate to whether or not they can prove that this -- the increase in capital expenditures was related to consequences of the risk, if this was part of the materialization of the risk.

So there isn't any, you know, small little buckets within that. Either it -- this is -- either you -- you can fit it into the theory of materialization of an undisclosed risk or you can't.

Q You've talked about different capital expenditures -- right? -- there's $275 million in capital expenditures that were for the purposes of acquiring new acreage, and then there's additional capital expenditures that were for the purpose of acquiring -- I'm sorry, of increased drilling;

Page 224

right?

A Right.

Q Okay. So if a Court were to rule, for example, that only one of those sets of expenditures were potentially related to the fraud -- right? -- wouldn't you have to adjust your damages analysis accordingly?

A You would have to consider it depending on the ruling. You can have a -- you know, in -- just as -- you can have a -- if it's $1, doesn't matter, you know, $2, and then you can have all the way up to 200 on each. You know, so that is something that one would have to have to consider. Because one of the reasons why you have such a massive reaction to this particular disclosure relates to the magnitude of the disclosure. The 500 million. And if you look at this being, you know, 400 of the 500 million... but -- so that is something that you would have to consider.

Q Okay. So --

A And it certainly could impact the analysis.

Q Based on the analysis you've done today -- to date, excuse me, there's no way for you to disaggregate the impact of the company's announcement that it was spending additional capital

Page 225

to acquire acreage in the -- in the new play?

MR. KAUFMAN: Objection.

THE WITNESS: Additional capital to acquire acreage in the new play...

I -- I mean, it -- I would -- it is something that I would want to consider. If the amounts changed, it is something that I would have to consider. Right now, I just have not considered it.

BY MR. GIMBEL:

Q Okay.

A But there could be an -- as I said, the magnitude of the increase in capital expenditures clearly had something to do with -- do with the response by the market. And you wouldn't -- you know, let's say it was $1 million, you wouldn't necessarily have a reaction to $1 million increase in capital expenditures that would have the one-to-one relationship.

Q So as you sit here now, you can't quantify the impact specifically of capital expenditures relating to the acquisition of acreage in the new play?

MR. KAUFMAN: Objection.

THE WITNESS: No. I have looked at it in terms of a dollar per dollar basis. If the ratios

Page 226

changed and so on, it is something that I would like to revisit with -- with the new assumptions.
BY MR. GIMBEL:
Q Okay. Am I correct that the company also announced that it was entering into a joint venture with Atinum?
A They announced that that prior day, yes.
Q Right.
And specifically on August 4th, 2011, after the close of trading, SandRidge announced a $500 million joint venture with Atinum; correct?
A I would have to revisit that, because I thought that was before the market closed.
Q Do you believe it was before the market closed on -- what date?
A I believe that -- my recollection was that there was some announcement on -- on -- it would have been August 4th of 2011. Unless I'm getting something -- or maybe that was the joint -- another joint venture. Maybe I'm getting them mixed up, I don't know.
Q Okay. Have you done anything to quantify the impact of the company's announcement of a joint venture with Atinum?
A I would have to -- my recollection was that,

Page 227

on the day prior, they had a joint venture announcement. It related to $500 million, that -- $250 million would be cash, that -- that SandRidge would receive, and then there would be another $250 million in some sort of payments later on. But as I sit here right now, I -- my recollection is that that deal closed -- or it didn't close, but was announced on the prior day.
Q You're saying it was announced on the prior date during trading or after the close of trading?
A My recollection, as I sit here right now, is that it was disclosed on August 4th.
Q Okay. Well, putting aside the --
A Unless I'm mixing up what you're talking about.
Q Have you done anything to quantify the impact of the announcement of the Atinum JV? Irrespective of when it was disclosed, have you done any kind of analysis to quantify the impact of the announcement of the JV on SandRidge's stock price?
A I have not, no.
Q Okay.
A If it is the -- if it is the announcement on August 4th, I have done an analysis of the stock price movement on August 4th, and -- but again,

Page 228

I'm -- I'm not sure if I'm mixing up what you're talking about.
Q Okay.
MR. GIMBEL: Why don't we look at Stevens?
THE REPORTER: If it's convenient, Counsel, or when it's...
MR. GIMBEL: You want to take a break? Sure.
THE VIDEOGRAPHER: Off the record. The time is 4:05. This is the end of disk 5 of the deposition of Mr. Bjorn Steinholt.
(Break in proceedings.)
THE VIDEOGRAPHER: And we're back on the record. The time is now 4:21. This is disk No. 6 of the deposition of Mr. Bjorn Steinholt.
BY MR. GIMBEL:
Q So Mr. Steinholt, in paragraph 83 of your rebuttal report, you talk about the $0.81 per share impact that you measured.
Do you see that?
A Yes.
Q And you state that, (reading):
This represents the impact of the fraudulent scheme, and is used as the inflation from the first alleged misrepresentation that triggers

Page 229

liability with respect to these allegations, until the disclosure of the increase in capital expenditures after the market closed on August 4th, 2011.
Do you see that?
A Yes, I do.
Q Okay. What is the first alleged misrepresentation that triggers liability with respect to these allegations?
A Let me just say that I should have said the alleged fraudulent scheme, on Paragraph 83.
With respect to the -- I don't think that -- as I answered earlier, I do not believe that there is a specific misrepresentations relating to this theory of the fraud. I don't think that there is a specific statement; it's more similar to an omissions case, whereby the allegations relate to an undisclosed risk.
Q What is the risk that was undisclosed here?
A The risk of consequences from the fraudulent conduct. The alleged fraudulent conduct by defendants.
Q The market was aware, am I correct, of the risk that SandRidge would increase its capital expenditures; is that right?

Page 230

A Yeah, the -- I think that that is a different issue. So if -- so increase in capital expenditures, by itself, is something that happens. It is whether or not plaintiffs can prove that it related to some fraudulent conduct.

Q But you would agree with me that the market was aware of the possibility that SandRidge would increase its capital expenditures?

A They were aware that sometimes SandRidge increased the capital expenditures, and sometimes they decreased capital expenditures.

Q Okay.

A Although, you don't have a day like this where the stock price declines 20 percent as a result of a $500 million increase in capital expenditures. It was a unique situation. But as a general matter, yes, of course, investors knew that there is a possibility that the capital expenditures will increase or decrease as time -- times go by.

Q Okay. In Paragraph 83, the language that I just pointed you to, you said that, (reading):

> $0.81 was the measure of inflation from the first alleged misrepresentation that triggers liability with respect to these allegations, until the increase in capital expenditures was disclosed on August 4th, 2011.

Page 231

So in -- I asked you, when was the first alleged misrepresentation that triggers liability with respect to these allegations, and I think your response was, it was more of an omission than a misrepresentation; is that right?

A Yes, that's my understanding of it. And I don't think there is a misrepresentations, you know, relating to this type of measure when we are dealing with an undisclosed risk.

Q When was the first omission that triggers liability with respect to these allegations?

A Well, that is something that is for plaintiffs to prove, it's a legal issue. So it's not something that I have examined, but you had to have trigger of liability at some point in order to get damages.

Q Okay. Do you have any idea when the first alleged omission that triggers liability with respect to these allegations occurred?

A You would have to ask plaintiffs. But I was asked to quantify the inflation from the first day of the class period, so presumably, that is when

Page 232

plaintiffs will intend to prove that liability is triggered.

Q Mr. Kaufman didn't tell you his theory of when the first alleged omission, that triggers liability with respect to these representations, occurred?

MR. KAUFMAN: Objection. He's asking for a work product conversations.

MR. GIMBEL: I'm asking for a basis of his opinion.

THE WITNESS: I --

MR. GIMBEL: Which is what you told him.

THE WITNESS: I -- as I -- just to repeat myself, I -- I was asked to quantify the inflation from the beginning of the class period through August 4th of 2011.

BY MR. GIMBEL:

Q So is it your understanding that the first omission, that triggers liability with respect to these allegations, occurred at the very beginning of the class period?

A I think that that logically follows from the instructions that I received. But it was not something that, you know, I -- I have any additional information about.

Page 233

Q Okay. Well, in Paragraph 50 of your report, you define the so-called key fraud-related event days.

Do you recall that?

A 50 -- oh, my original report?

Q Your initial report, correct.

A Paragraph 50? Yes.

Q Is the --

A Yes.

Q -- first omission that triggers liability with respect to these allegations listed here anywhere?

A It wouldn't be listed -- it wouldn't be listed here, because it not -- it wouldn't be mis -- a misrepresentation. So this is for the purposes of doing my event analysis to look at misrepresentations that may or may not impact the stock price.

With respect to an omission, that would not be identified because omissions do not impact the stock price, because the market cannot react to something it does not know about. Just like in this case, they cannot react to an undisclosed risk if they don't know about the risk.

Q Well, you understand that to be held liable

for an omission, you have to have a duty to disclose something; right?

MR. KAUFMAN: Objection.

THE WITNESS: Well, I mean, that is outside my scope. I don't have a problem with that statement, but I mean, I'm not here to talk about -- or to talk about what the law requires in omissions cases.

BY MR. GIMBEL:

Q Okay. Do you have any understanding of plaintiff's theory as to when SandRidge had a duty to disclose the -- the allegedly undisclosed risk?

MR. KAUFMAN: Objection.

THE WITNESS: It seems to be the same question -- question you asked before. And I provided you the information that I have, and that is that I was asked to start at the beginning of the class period.

BY MR. GIMBEL:

Q So your -- you're assuming that the -- the first omission occurred at the very beginning of the class period?

A I am assuming that, if it starts at the beginning of the class period, I have quantified a number. And if it starts at a later date, you know,



it -- my framework still works. I mean, again, I -- I've created a framework so whenever it starts, that's -- whenever liability starts, if it starts at all, that's when the calculation would start. But I was asked to quantify it from the beginning of the class period, but, you know, I -- I don't have any specific additional information than that.

Q Okay. Why do you calculate the inflation attributable to this disclosure on a constant dollar basis rather than on a percentage basis?

A Because the consequences of the risk is quantified, and it does not have any oil component or anything like that, or market component, embedded in it. It is -- it's kind of like if you have a drunk driver, who's speeding, and you look at the consequence of that act, you know, if he gets into a car accident, you look at, "well, what happened? It's -- that was the materialization of the risk of driving drunk and speeding." But the quantification happens at the time of the car crash, and you quantify the -- the impact of it at that point in time. I viewed my assignment similar to that, I did the quantification, and I -- as of August 5th of 2011. So that's what I used as the inflation.

Q Okay. So define for me again, then, what you



believe the undisclosed risk was.

A The undisclosed risk is the risk of defendant's fraud.

Q And wasn't that fraud related to oil and gas?

A No, it's -- it's -- in this case, it relates to an increase in capital expenditures that -- that -- to conceal the alleged truth with respect to oil and gas, but it's that increase in capital expenditures and the investor's view of that increase in capital expenditures at the time, and their revaluation of the value of the company, and the decline in the company's stock price.

Q So you were measuring the market's response to the increase in capital expenditures at a particular moment in time; right?

A Correct. Yes.

Q Okay. And wouldn't the market have had a different response to the increase in capital expenditures depending on, for example, the price of oil and gas?

A I don't -- well, I don't know, as I sit here, if that -- there would be a material impact. But that is not the quantification that I did. I did a -- you know, if the car -- if the drunk driver had gotten in a car crash a little bit earlier, maybe



the damages -- maybe he wouldn't have totaled his car. It happened when it happened. And that is the quantification.

Q If the company announces that it's going to spend an additional $500 million developing oil and gas properties, wouldn't you expect that announcement to have a different impact depending on where oil and gas prices were?

A I'm not sure in terms of how much difference it would have had, and whether or not that is material. But that is not what I intended to do in this particular case. In this particular case, I intended to quantify the impact on that day, and absent the increase in the capital expenditures, investors who purchased prior to that day wouldn't -- and still owned it at -- at the time of the announcement of increased capital expenditures, wouldn't have lost this money. They did lose the money. And -- because there wasn't announcement of capital expenditures. And I have quantified the amount of money that they lost at that point in time.

Q Okay. Is -- if oil was at $500 a barrel, isn't it possible that the company -- that the market would have had a very different response to

Page 238

the announcement of the increased capital expenditures?
A It is possible. In terms of my analysis, it's, kind of, irrelevant to speculate whether or not -- what the reaction would be if oil happened to be $500 a barrel.
Q Well, the price of oil and gas did fluctuate over the course of the class period, between the -- between the beginning of the class period and the disclosure of increased capital expenditures, on August 4th, 2011; right?
A That's correct. But the -- the company did not increase their capital expenditures during those days, they increased it on August 5th. So that is the result of the increase. That is when it happened. And that's what I've quantified.
Q But aren't you trying to measure the inflation that was in the stock earlier?
A I'm measuring the inflation by looking at what happened on August 5th, and this is -- that is what it declined. So that is what I used as a measure of the inflation throughout this entire period of time.
I'm not doing a but-for disclosure, I don't even -- you know, it's -- it's -- I'm not even sure

Page 239

what the but-for disclosure in a materialization of risk would be, if you are quantifying damages based on the consequences -- consequences that actually occurred.
You don't know, at the beginning of the class period, how -- what's going to happen, you only know that after the fact. So you have a risk, and you don't know what the outcome will be during -- until it happens. And when it happens, that's when you can quantify what the impact of that is.
Q What precisely should the company have disclosed, at the beginning of the class period, to avoid misleading investors?
A Well, this -- well, this risk disclosure relates to defendant's fraud and fraudulent conduct. So it's a little bit different than just a disclosure relating to, you know, oil and gas being -- you know, the production being a little bit different. But I don't view it that way. I just view it as quantifying the -- the impact of the disclosure when it occurred. And in terms of the disclosure itself, that has legal components that goes beyond the scope of what I'm focusing in on.
Q So as you sit here now, can you answer the question of what the company should have disclosed

Page 240

earlier in the class period --
MR. KAUFMAN: Objection.
BY MR. GIMBEL:
Q -- to avoid inflating the price of the stock?
MR. KAUFMAN: Objection.
THE WITNESS: I -- I answered it -- I answered it, and I explained my understanding of it. And I don't have anything to add to that.
BY MR. GIMBEL:
Q Are you saying that the company should have disclosed earlier that it was going to increase its capital expenditures?
MR. KAUFMAN: Objection.
THE WITNESS: That is not what my answer states. And I -- I answered the question the way that I answered it, and --
BY MR. GIMBEL:
Q Well, I didn't understand --
A So that's why --
Q -- it, so I'm asking you to explain it again.
Can you explain to me what you believe the company should have disclosed earlier to avoid inflating the price of the stock?
MR. KAUFMAN: Objection.
THE WITNESS: I don't know how I can use

Page 241

different words to explain it. If the issue is that you have to disclose a risk, then you have to disclose that risk. If that risk is as alleged here, it is defendant's fraudulent conduct, then you had to disclose defendant's fraudulent conduct. That is my understanding. And I added that I'm not a lawyer. I -- I'm not here to provide legal opinions, but that is just my understanding of it.
For the purposes of doing my analysis, my understanding is that the relevant inflation is the one that's caused by the materialization of the risk at the very end.
BY MR. GIMBEL:
Q Isn't there a risk in every case that the defendants are engaged in or that a company's engaged in fraud? Isn't that a risk that investors appreciate, at least in the days since Enron?
A It is an undisclosed risk. And it's different between a company who's not -- a company who's engaged in fraud, whether or not they disclose it, versus a general disclosure that any company can be involved in risk.
If there is a company that is engaged in fraudulent conduct, then disclosure -- then, of course, there is a risk that that conduct can have

Page 242

negative consequences. And the negative consequences is what I have disclosed. But I don't think that every -- every company has to make a specific disclosure that, you know, "we may be engaged in fraudulent conduct" if they are not engaged in fraudulent conduct.
Q But you're assuming, in this case, that SandRidge should have made a disclosure, at the beginning of the class period, that there was a risk that it might be engaging in fraudulent conduct?
A Again, you're -- you're asking me questions about something that I -- that is not part of -- part of my analysis. I haven't assumed anything with respect to what the disclosure should be. But typically, what you have -- if you -- if it is in a case relating to an undisclosed risk, it seems to me, just logically, well, did the -- the proper disclosure would be to disclose the risk.
This case is, kind of, different in the sense that the risk here is defendant's fraudulent conduct.
Q And you define that as what, specifically?
A Fraudulent conduct is defined by plaintiffs. And it -- in this particular case, it relates to the concealment of -- of the alleged truth by increasing

Page 243

the capital expenditures. That is actually the consequences of it at the very end. But it relates to the concealment of the alleged truth.
Q All right.
MR. GIMBEL: I'm going to take a few minutes and look at my notes, and see what else I have.
THE VIDEOGRAPHER: One moment.
We're off of the record. The time is 4:44.
(Break in proceedings.)
THE VIDEOGRAPHER: And we're back on the -- back on the record. The time is 4:54.
---oOo---
EXAMINATION
BY MR. WORD:
Q Good afternoon, Mr. Steinholt.
A Good afternoon.
Q My name is Christian Word, with Latham & Watkins; I represent Mr. Ward, who's a defendant in this case.
A Okay.
Q I have a few questions for you.
I've been listening throughout the day, and my understanding is that it's your view or your testimony that the August 5th disclosure was a materialization of an undisclosed risk; is that

Page 244

correct?
A That's correct. Yes.
Q And it's my understand -- is it correct that Mr. Kaufman identified for you what the undisclosed risk was?
A Yes, in the sense that the undisclosed risk was defendant's fraudulent conduct. And he also -- and the consequences of that was the $400 million increase in capital expenditures.
Q You didn't perform any economic analysis to -- to attempt to determine what the undisclosed risk was; correct?
A That's correct. I assumed that the allegations were true, yes.
Q And -- and am I also correct that Mr. Kaufman told you that that undisclosed risk materialized on August 5th?
A He stated more specifically that 400 million of the increase in capital expenditures was a consequence of the undisclosed risk. In other words, that was the materialization of the undisclosed risk.
Q And so Mr. Kaufman told you that that materialization occurred on August 5th?
A Correct. Yes.

Page 245

Q Okay. And I understand your job was to attempt to determine how much of the damages or the stock price declined, that occurred on that day, is attributable to the materialization of an undisclosed risk; correct?
A Yes. Which in- -- more specifically, involves determining what the impact of the 400 million -- what the impact of $400 million of the increase in capital expenditures were.
Q Among other things, SandRidge disclosed, on August 5th, that it was increasing its cap X; correct?
A Yes. That was the major disclosure on that day, yes.
Q And there was not an undisclosed risk that SandRidge would increase its cap X that was undisclosed at the beginning of the class period; correct?
A No, the undisclosed risks relate to defendant's alleged fraudulent conduct, concealing the alleged truth.
Q SandRidge did not disclose on August 5th that it was engaged in fraud, did it?
A Oh, no. No.
Q All right.

A It was the materialization of the consequences. And it was not disclosed that the consequences were -- was a result of the fraud, that is up to plaintiffs to prove.

Q SandRidge had previously disclosed that there was a risk that actual results could be less than projected results; correct?

A Correct. Yes.

Q And so what was it that the market learned, on August 5th, that it previously did not know?

A Well, it was the increase in capital expenditures.

Q That's all that it learned; correct? That the capital expenditures had -- were going to be increased?

A Correct. And everything related to that that's in the press release and -- and -- and conference call, yes. There was no disclosure that the company had engaged in fraudulent conduct or that the increase in capital expenditures -- expenditures were a consequence of fraudulent conduct.

MR. WORD: I have no further questions. Thank you.

THE WITNESS: Okay.



MR. KAUFMAN: Okay. I have no questions. All right.

THE VIDEOGRAPHER: That's it? Conclude the video?

MR. WORD: Yeah, I think we're concluded with this deposition.

THE VIDEOGRAPHER: Okay. One moment, please. We're off the record. The time is 4:58. This will be the conclusion of disk No. 6 of the deposition of Mr. Bjorn Steinholt. The time is 4:58.

(Whereupon the deposition of Bjorn I. Steinholt, CFA was concluded at 4:58 p.m.)

---oOo---



ACKNOWLEDGMENT OF DEPONENT

I, BJORN I. STEINHOLT, CFA, do hereby certify that I have read the foregoing transcript of my testimony taken on 6/12/19, and further certify that it is a true and accurate record of my testimony (with the exception of the corrections listed below):

| Page | Line | Correction | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

____________________________
BJORN I. STEINHOLT, CFA

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF ____________, 20___.

__________________ ______________________
(NOTARY PUBLIC) MY COMMISSION EXPIRES:



STATE OF CALIFORNIA )
COUNTY OF LOS ANGELES ) ss.

I, AMANDA KALLAS, C.S.R. No. 13901, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is a true, correct, and complete transcript of said proceedings;

That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript { } was { } was not required.

I further certify that I am not interested in the event of this action.

Witness my hand this 17th day of June, 2019.

AMANDA KALLAS, C.S.R. No. 13901

**&**

**&** 3:4,12 4:5 8:3 9:21 10:9,14,16 11:14 63:6,24 72:20 73:15 83:15 86:6,10 91:8 132:20 218:12 243:18

**0**

**0.24** 66:2
**0.44** 61:17 64:13
**0.49** 37:24 97:1
**0.49.** 96:20
**0.60** 35:16 37:4,21 38:13,23 39:14,22 40:9,19 41:8,20 43:11 44:5,20,20 45:2 46:3,12,20 62:8 64:11 67:1,2 67:12 70:24 175:18
**0.60.** 38:18 65:7 67:17 70:25
**0.69** 77:2
**0.81** 205:12 206:8 206:9 207:17 208:10,11 210:8 210:10 212:16 223:9 228:17 230:22
**0.89** 97:4
**00002859** 7:6
**00004185** 7:20
**0000645** 7:16
**0000654** 6:20
**0000662** 7:16
**0000663** 7:13
**0000670** 7:13
**0000745** 6:21
**0002999** 8:4
**0003003** 8:5
**0004080** 7:9
**0004097** 7:10
**0004108** 7:24
**0004114** 7:25
**0004180** 7:19
**01341** 1:6 2:6 9:19

**1**

**1** 6:3,5,18 9:13 15:1,3,7,9,13,23 34:11 36:4 59:3 59:25 61:25 62:3 65:25 66:5 93:2,8 100:15 103:18 158:13 159:12 161:4 167:14 170:14 199:18,19 200:5,6,19 203:4 203:20 205:18,19 206:17,17 207:13 207:14 219:23 220:20 221:2,11 224:10 225:15,16
**1.04** 59:16,20 61:13 62:10 64:12 65:25
**1.04.** 65:4 76:11 107:22
**1.2** 160:20
**1.28** 37:24 38:4,20 39:12,22 40:19 41:17 59:24 66:1 96:24
**1.28.** 96:14
**1.5** 156:17,19 158:14 184:25
**1.97** 199:14 207:8
**10** 7:18 52:3 62:18 63:1 122:9 146:21 180:4,9 183:19 202:6,9 204:2 212:18
**10.53** 64:7
**100** 100:14 101:7 110:1
**100,000** 14:16 97:12
**1000** 3:15
**10:13** 59:2
**10:24** 59:7
**10th** 57:6
**11** 5:4 7:22 183:19 183:20,22,24 184:1
**110** 84:2
**11747** 3:7
**11:41** 101:20
**12** 1:15 2:19 8:3 9:1 62:24 218:5,8 218:9,11
**12.96** 101:10
**12.97** 101:10
**120** 210:24
**12136** 249:24
**126** 6:18
**12:30** 135:22,25
**12th** 9:5 160:7 184:3
**132** 7:3
**135** 194:12
**13901** 1:23 2:20 249:4,25
**13th** 162:2
**144** 210:24
**148** 194:12
**15** 6:3,7
**150,000** 14:16
**155** 107:18 123:5
**155,000** 103:19 105:14 106:15,23 108:1 115:6 116:23 119:9 121:25
**160** 7:8
**161** 7:12
**168** 7:15
**16th** 169:5
**170,000** 122:10
**175** 123:3
**175,000** 106:10 108:12
**17th** 249:21
**180** 7:18
**183** 7:22
**19** 113:20 114:13 124:6
**1990** 91:10,12
**1998** 87:13
**1999** 2:16 9:21
**1:22** 136:1,4
**1st** 15:7 60:6 96:10 96:13 97:13 101:8

**2**

**2** 6:7 15:3,5,10,14 16:12 34:11 59:7 63:2 103:20 127:22 156:19 159:11,12 160:18 162:9 166:1,4 219:11,12 224:11
**2.4** 165:9,12,20
**2.5** 160:19 162:10 166:4 214:13
**2.6** 159:14 166:21 168:22 169:12 170:4,17 171:3
**20** 90:3 199:14 212:2 230:14 248:23
**200** 165:12 191:23 192:20 193:16,20 193:21,22,24

195:7,12 196:8,17 196:24 197:1 224:12
**2000** 87:13
**20004-1304** 3:16
**2001** 91:15
**2004** 108:8
**2005** 6:14
**2009** 58:18
**2010** 52:13,13 58:18 117:21 127:23 129:12,20 134:3
**2011** 6:18,19 7:3 17:2,3 19:12,20 20:2 23:3 24:2,6 24:17,24 26:8 27:13 30:15 31:20 31:24 32:12 33:2 38:13,15,20 39:13 39:21 40:19 41:18 48:11,25 49:5 50:3,7,11,21,21 51:9,10 55:22 58:4,18 59:17,20 59:25 60:6,6 61:12 64:19 65:2 65:24,25 76:5 92:19 93:12 95:9 96:10,13,16,17 97:13,13 100:15 100:17 101:8 104:25,25 106:6 124:17,22 125:2,7 126:7 131:24 185:11,22 187:2 187:14 189:11,18 199:11 200:7 204:19 213:4 214:8 217:13 218:12,23 220:21 221:2 226:9,18 229:4 231:3 232:16 235:24 238:11
**2012** 19:3 26:17 43:5 57:6 76:14 76:20,21 102:3 117:25 139:7,8 140:5 150:22 158:21 160:8 162:2 169:6 179:1 180:10 184:3 204:25
**2013** 162:15 184:24
**2014** 160:21
**2015** 162:16
**2017** 160:21
**2019** 1:15 2:19 6:5 6:9 9:1,5 249:22
**202-637-2200** 3:17
**204** 107:18
**20th** 76:14,20
**211** 123:5
**211,000** 114:2 115:3 117:1 123:1 124:10 134:14
**218** 8:3
**243** 5:5
**25** 59:24 103:3,5,7 103:17 111:17 163:14
**25.33.** 76:7
**250** 227:3,5
**25th** 49:5 50:7,11 50:21 51:10 59:17 59:20 60:6 61:12 64:19 65:2,24 76:5
**275** 93:15 196:22 201:13,18 202:21 220:1,2,6,24 223:21
**28** 7:3
**28th** 131:24
**29** 6:9
**292** 194:12
**293** 194:13
**2:24** 178:15
**2:43** 178:20
**2nd** 109:10

**3**

**3** 6:11 75:19,20,23 101:20 103:22 135:23 139:17 146:21 184:4,7,8 202:5 214:13
**3.2** 170:1,7,25 171:12
**3.25** 139:18 146:21
**30** 63:17 84:9 182:24,25 184:20
**300** 130:22 132:19 207:1
**34** 117:21
**35** 83:22,25
**3rd** 96:16,17,20 97:13 100:17

**4**

**4** 6:14 87:24 88:1 88:3 132:9 136:4 162:16 178:16 184:9,12
**4.2** 162:17
**40** 81:9 103:21 207:10
**400** 28:7,16,22 29:7 30:14 186:20 188:7 189:13 192:11 193:21 194:25 200:25 207:23 208:7,9,13 208:13 210:13 224:17 244:8,18 245:8,8
**409,000** 124:12 127:16 132:22
**415** 4:9
**415-591-7055** 4:11
**436** 170:6,20
**46** 152:11
**47** 153:5 155:22
**49** 96:18
**4:05** 228:9
**4:21** 228:13
**4:44** 243:8
**4:54** 243:11
**4:58** 2:18 247:8,11 247:13
**4th** 187:13,22 189:11 213:4 217:13 226:9,18 227:12,24,25 229:4 231:3 232:16 238:11

**5**

**5** 6:18 52:1 94:16 126:9,11,13 178:20 185:11 228:9
**50** 47:22 81:9 96:18 103:24 109:2,9,10,21,22 110:12 130:18,20 233:1,5,7
**500** 118:1,7 186:20 200:2,24 201:2 204:17,21 205:1 206:25 207:19,20 207:22 224:16,18 226:11 227:2 230:15 237:5,23

238:6
**500,000** 130:22 132:19
**52** 48:15,20 49:2,8 49:22 50:4,22 51:17,20 52:8,16 52:19 53:4,8 54:16 55:17,21 56:3 57:5 58:5 124:11 127:17 134:13
**53** 194:12,12
**555** 3:14
**56.91** 76:16
**58** 3:6
**5:12** 1:6 2:6 9:19
**5th** 17:2,3 19:12 20:2 23:3 24:2,6 24:17,24 26:8 27:13 31:19,24 32:12 33:2 38:13 38:14,18,20 39:13 39:21 40:19 41:18 48:10 93:12 95:8 185:22 186:18 187:2,14,22 189:18 199:11 200:7 204:19 213:4 214:5,8 215:3 235:23 238:14,20 243:24 244:17,24 245:11 245:22 246:10

**6**

**6** 7:3 131:23 132:1 132:4 169:15 228:13 247:9
**6/12/19** 248:4
**60** 41:7
**600** 171:12
**631-367-7100** 3:8
**67** 126:15,20 127:2
**68** 99:25

**7**

**7** 7:8 160:1,4,5,6 165:7 202:6
**71** 23:1 25:10
**72** 150:17,21
**720** 127:3
**74** 191:19 195:9
**75** 6:11 23:1 25:11
**78** 95:19

**8**

**8** 7:12 161:18,20 161:22,25 163:13
**80** 11:25 13:23
**800** 200:1 206:24
**81** 44:21 207:7,8 207:22,24,24
**82** 109:8,9 205:10
**83** 228:16 229:11 230:20
**87** 6:14
**89,000** 97:14
**8th** 48:25 50:3,10 50:21 51:9 124:17 125:2 139:6 179:1 218:12

**9**

**9** 7:15 74:25 168:23,24 169:2,4
**9.9** 40:13 43:6 74:21 75:1 80:11
**900,000** 93:1,2,7
**90067** 9:22
**90067-6045** 2:17
**94105-2533** 4:10
**95** 94:18
**97** 207:6
**9:09** 2:18 9:2,5
**9th** 26:17 40:6 43:5 67:3 102:3 139:7 140:5 146:18 150:22 158:21 179:1 180:10

**a**

**a.m.** 2:18 9:2,5
**ability** 108:25 129:19
**able** 26:1 27:9 45:23 159:2 182:1 182:3 197:22 209:10
**absence** 30:2
**absent** 40:1 60:15 72:24 74:8 215:2 222:8 237:14
**absolutely** 15:21 197:24
**academic** 13:18
**accept** 84:11 86:14 90:8 97:16
**acceptable** 167:15
**accepting** 85:16
**acceptive** 85:16
**accident** 235:17
**account** 38:11 39:7 61:6,7 62:12 64:15,25 65:15 70:13 71:8,11,22 75:14 80:2 81:19 82:5 118:22 120:15 123:17 136:22 137:5
**accounted** 94:16 94:18 136:21
**accurate** 41:19 107:22 136:17 248:5
**accurately** 78:15
**acknowledge** 85:4 85:7
**acknowledged** 178:24
**acknowledgment** 248:1
**acquire** 93:14 195:21 197:21 217:16 219:23 220:20 225:1,3
**acquired** 92:15,18 196:2
**acquiring** 196:17 196:22 197:20 201:14 220:2,9,17 221:11 223:23,25
**acquisition** 141:22 143:18 144:9,10 186:14 196:5,9,12 219:8,13 223:5 225:21
**acquisitions** 193:17,22,25 194:20 195:5,12 196:7,13 197:2
**acreage** 92:18 93:10,16,23 94:5 186:14 194:20 195:21 196:17 197:21,22 201:14 219:13 220:3,8,18 220:24 223:23 225:1,4,21
**acres** 93:1,2,8 203:4 219:23 220:21 221:2,11
**act** 174:21 235:16
**acting** 121:6
**action** 10:2,18 11:16 30:12

249:20
**actionable** 20:19 43:7
**actions** 1:8 2:8 199:5
**activity** 180:23 181:1 182:17
**actual** 60:16 65:5 72:25 73:24 74:3 207:6,11 246:6
**acute** 175:5
**add** 161:9 197:5 240:8
**added** 84:11 241:6
**additional** 39:15 60:3,8,9 67:5 92:18 93:14 118:9 145:6 186:14 193:16,22 196:16 196:23 197:21 200:24 201:14 203:6,23 204:17 218:25 219:8,19 223:4,23 224:25 225:3 232:24 235:7 237:5
**address** 16:22,24 24:16,23
**addresses** 91:2
**addressing** 90:24
**adjourned** 135:25
**adjust** 80:22 94:23 108:13 148:5 157:25 168:4 176:14 223:10 224:6
**adjusted** 148:1
**adjusting** 83:13
**adjustment** 79:11 108:9,10
**adjusts** 78:15
**administered** 11:2
**advisement** 34:8
**advisors** 14:20
**advocacy** 86:17,19
**advocates** 83:13
**affect** 154:3,4
**affiliations** 10:5
**afternoon** 243:15 243:16
**aggregate** 136:20 137:3,8 140:10 210:18 211:3
**aggregates** 171:20
**ago** 37:3 90:3
**agree** 9:12 42:5 57:11 66:16 68:9 89:22 91:22 92:3 94:9 116:18 117:12 120:19 121:5 134:18 136:12 137:4 155:25 158:3 182:4 230:6
**ahead** 93:22 164:13 213:11 219:1
**allegation** 27:7 29:7,12 30:4,19 77:12 79:2 188:7 189:13 191:3,12 192:25,25 193:5 194:16 222:15
**allegations** 17:18 20:4,13,15,19 21:4 21:17,25 22:6,12 22:18 23:3,16,24 24:1,5,5,12,14,15 24:16,18,21,22,23 25:9,13,14,24 26:7 26:15,16,16,19,25 27:5,25 28:9,11 30:6 31:12 49:21 50:9 58:9 68:24 77:7 135:10,11 147:21 148:16,18 149:2 185:14,21 185:24 186:17 194:8,23 196:12 197:4 229:2,9,17 231:1,6,14,22 232:20 233:11 244:14
**allege** 27:20 68:20 77:22 147:16 186:7 189:22 192:5 222:17
**alleged** 27:2 28:17 35:1 36:7 40:1 43:5,8,8 48:1 50:6 51:4 60:20 67:8 74:9 80:4 98:4,14 102:3,8,13,14,25 103:10,17 104:14 104:16 109:19 110:25 111:16 112:7,23 113:14 114:15 116:14 119:20,22 121:24 129:21 134:12,17 136:8,9,14,17 148:3 158:2 168:5 186:16 189:22,24 191:24 197:18 200:25 210:17 211:3 214:23 228:24 229:7,11 229:21 230:23 231:5,21 232:4 236:7 241:3 242:25 243:3 245:20,21
**allegedly** 28:5 48:12 127:16 234:12
**alleging** 49:21 148:21
**allow** 128:17
**alternative** 81:8
**amanda** 1:22 2:19 9:25 249:4,25
**amend** 34:18
**amended** 20:12 21:12 192:8 194:6 194:6
**amendment** 22:8
**amount** 34:25 35:6,16 60:5 66:7 67:1 68:21 121:7 156:23 203:17 237:21
**amounts** 225:6
**analyses** 138:1
**analysis** 16:8 17:1 17:3 35:11,20 43:12 52:9 60:19 63:18 73:8 79:18 109:13 118:17 135:1,17 138:12 138:13,13,14,15 140:19 141:19,20 141:23 142:3,8,11 142:16,18,21,23 143:1,21 144:2,6 145:24 146:2 147:7 148:20 153:1,23,25 154:23 155:7 157:25 166:23 167:9,11,23,25 168:7 171:20 174:24 175:13,18 175:22,25 176:3,4

176:5,7,9,15 183:9 183:13 185:3 202:16 209:18,21 214:19,22 215:4 216:8 217:7 222:23 223:2 224:6,21,22 227:19,24 233:16 238:3 241:9 242:13 244:10
**analyst** 6:19 7:3,8 7:12,15,18,23 16:7 63:25 90:18 115:23 126:8 131:9,24 132:7,9 132:25 138:4 155:16,18 159:23 160:6 161:16 162:1 165:6 168:8 168:20 169:5 171:23 179:21 180:10 183:15 184:1 189:17 212:24 216:4 218:12
**analyst's** 155:10
**analysts** 115:14 130:25 131:4 133:17 141:14 144:11 146:24 149:10 151:10,12 151:21,23 153:2 153:13,13,19 154:2,11,25 158:8 158:24 159:19 161:12 164:12,15 164:21 167:20 168:10 171:21 173:3 175:2 176:16,16 179:2 182:18 213:14,25
**analyze** 142:5 158:25
**analyzed** 146:3 149:16 166:18
**analyzing** 174:10
**angeles** 1:14 2:17 9:1,22 249:2
**announce** 166:24
**announced** 30:14 82:2 95:8 196:16 198:25 213:7,10 214:4,11 215:16 215:21,24 217:12 217:21 220:19 226:5,7,10 227:8,9
**announcement** 19:6 52:1,2,13,14 105:1 141:4 142:7 143:6 147:8 149:6 165:15 168:11 176:25 177:23 199:12 200:5,16 201:12 205:6,11 207:20 208:7 213:23 215:5,14 216:10,20 218:24 221:17 222:6 224:25 226:17,23 227:2,17,19,23 237:7,17,19 238:1
**announces** 200:18 237:4
**announcing** 191:6 201:1
**annual** 203:18
**annually** 160:21
**answer** 5:8 22:5 25:19 26:12 28:23 37:14 38:1 39:11 44:13,17 45:19,22 45:23 47:1 56:8 77:14 87:1 123:16 172:13 175:9 239:24 240:14
**answered** 32:13 55:1 229:13 240:6 240:7,15,16
**answering** 36:17
**apart** 20:11 21:12
**apparently** 167:12 167:14
**appear** 26:8 205:3
**appearance** 10:7
**appearances** 3:1 3:20 4:1
**appears** 71:15 83:22
**appendix** 184:6,13 184:14
**applicable** 57:2
**apply** 106:13
**appreciate** 241:17
**approach** 65:3 71:3,4 81:8,15 85:4 102:6 105:6
**appropriate** 80:22 109:7
**approximately** 12:1 13:23 93:7 160:20 161:3 170:4
**april** 6:9 38:13,14 38:18,20 39:13,21 40:19 41:18 59:25 60:6 65:25 66:9 76:14,20 96:10,13 97:13 100:15 101:8
**area** 87:10 92:24 115:10 121:2
**areas** 220:17
**argue** 142:24
**arguing** 179:22
**arrived** 28:7 192:12 195:8 206:13
**article** 6:14 13:20 83:15 84:1 86:19 87:23 89:14,15,15 89:18 90:9,11 91:7
**articles** 13:9 86:22 90:6,12,15
**artificial** 95:25 96:2
**ascertain** 19:15
**aside** 30:11 51:16 140:11 227:13
**asked** 16:25 17:1 24:16,23 32:13 33:8,13,20 34:1 55:1 68:9 131:18 131:21 186:23 231:4,24 232:14 234:15,17 235:5
**asking** 37:15,16 40:16 41:6 45:16 65:10 88:14 119:13 124:4 125:23 129:7 158:18 163:18 175:6 232:7,9 240:20 242:11
**aspect** 102:19
**asserts** 172:16
**assess** 203:7
**assessment** 155:10
**asset** 143:20 154:7 156:22 157:1,2,6 159:2 162:24 172:7 181:25 182:2

**assets** 94:17,19 139:14 141:5 149:7 152:18,21 153:3 156:18 158:21 159:8 161:1 163:21 164:23,24 165:25 167:1 168:9,10,19 169:11,18,22,25 170:6,20 171:11 172:16 173:6 174:7 175:4 180:17 181:14
**assigned** 164:24
**assignment** 58:1 235:22
**assist** 16:2,17
**assistance** 16:4
**assisted** 16:6
**associated** 110:24 202:4 204:13 221:10,20 222:7
**associates** 132:21
**assume** 53:10 54:4 56:23 69:12,18 96:9,15 101:7 102:17,19 106:6 107:1 121:21 122:2,6 148:16 157:14 167:12
**assumed** 165:24 171:2 242:13 244:13
**assumes** 73:8 102:14,18 104:2 184:25 209:22
**assuming** 106:21 109:18 122:14 160:17 161:9 162:9 165:8 180:16 206:16 207:1,18 234:20 234:23 242:7
**assumption** 40:1 54:12 74:5 109:24 205:18,22 206:20 206:22,23 209:25
**assumptions** 28:8 28:10,13 74:7 140:20,21,24,25 141:21 226:2
**atinum** 226:6,11 226:24 227:17
**attached** 70:17
**attaches** 35:18
**attempt** 94:23 147:7 149:5 244:11 245:2
**attempted** 102:1 142:5 154:10 213:2,22
**attorney** 10:8
**attorneys** 99:10
**attributable** 134:19,21 209:23 209:24 210:12,12 235:9 245:4
**audio** 9:10,11
**august** 17:2,3 19:12,20 20:2 23:3 24:2,6,17,24 26:8 27:13 30:15 31:19,24 32:12 33:1 48:22 93:12 95:8 185:11,22 186:18 187:2,13 187:22,22 189:11 189:18 199:11 200:7 204:19 213:4 214:4,7 215:3 217:13 218:12 226:9,18 227:12,24,25 229:4 231:3 232:16 235:23 238:11,14,20 243:24 244:17,24 245:11,22 246:10
**authors** 90:15
**available** 19:25 20:25 25:14 55:15 56:21,23 57:19 106:7 116:2 137:14 141:2
**avenue** 2:16 9:21
**average** 68:23 103:18,20,22 105:12 106:9,22 107:25 108:11 111:17,18,20,22 112:7,16 113:9 114:1,6,12,14,19 118:11 119:8 121:9 122:1 124:9 139:16 146:19 147:21 152:3 153:2,7 154:1,11 154:23 155:10 202:8
**avoid** 190:14 239:13 240:4,22
**avoiding** 190:3
**aware** 22:8 30:13 48:1 51:8 128:16 129:18 148:10 187:15 190:12 229:23 230:7,9

**b**

**b** 31:25
**back** 22:23 59:6 63:19 95:1 101:19 101:22 124:6 125:1,22 136:3 146:15 165:5 178:19 208:4 228:12 243:10,11
**backcasting** 102:4
**backed** 170:19
**background** 90:16 130:14
**backgrounded** 90:14
**backing** 170:5
**bad** 90:2 157:11 157:16,16 172:21 172:24 173:5 174:9,15
**bank** 7:12 162:1,8 162:13 163:20,25
**bankrupt** 174:1
**bankruptcy** 204:9
**barrel** 64:20 132:19,22 237:23 238:6
**barrels** 61:25 62:3 103:19 105:14 106:10,23 108:1 108:12 114:2 115:3,6 116:23 117:1 119:9 121:25 122:10 124:10,12 127:16 130:22 134:14 184:25
**base** 36:4 100:4 140:18 184:19
**based** 28:12 36:4 38:5 41:9,10 53:18 55:17 57:1 57:18,21 58:11 69:8 70:8 71:20 73:21 78:16 83:13 85:23 87:6 106:7 106:15 107:8

115:25 116:1,10 116:25 117:12 122:19 124:24 142:9,15 144:19 145:19 148:10 165:24 168:5 175:12 192:13,14 192:18 193:5,8 195:3 200:8 205:22 209:6 210:7,8 220:11,13 224:22 239:2
**basically** 22:23 129:7 138:7 142:10 182:14
**basin** 179:18
**basis** 26:7 29:11 36:21,22 38:7 42:10 43:16 53:6 53:11 60:14,17,18 61:2 62:15,16 63:10,22 64:24 66:6 70:19 71:16 72:1,11,12,14 73:6 74:4 80:14 81:16 81:16 83:11 85:9 85:10 97:19 98:19 100:3 102:9,10,11 129:12 134:11 143:22 153:22 154:12 167:23 172:9 175:22 176:20,22 186:24 192:2 200:14 203:18 225:25 232:9 235:10,10
**bates** 6:20 7:5,9,13 7:16,19,24 8:4 127:1,3
**beat** 213:20 214:3
**becoming** 140:24
**began** 49:10 51:19 214:8
**beginning** 2:18 47:21 51:3,21 52:5 76:6 92:9,16 93:3,3,6 102:4 110:1 113:24 115:1 117:2 121:22 124:8,25 169:20 232:15,20 234:17,21,24 235:5 238:9 239:5 239:12 242:9 245:17
**behalf** 2:16 10:16 11:19 141:17
**believe** 16:4 32:14 32:21 88:19 95:15 98:25 110:13 124:24 125:2,17 125:17 174:9 185:12 209:1,7 214:10 222:2 226:14,16 229:13 236:1 240:21
**believed** 154:11 166:11 167:2,15 222:3
**believes** 167:13
**believing** 77:23
**beneficial** 144:16 156:12 172:4
**benefit** 14:11 143:14 150:15 154:8 158:12,19 201:8 203:5 204:7
**bennett** 4:3 10:10 11:16
**best** 73:23
**better** 41:7,11 81:14 182:1,2 188:13 198:17 204:15
**beyond** 25:22 118:17 239:23
**big** 71:24 94:20 143:8 154:21
**biggest** 163:1
**billion** 156:17,20 158:13,14 159:12 159:12,14 160:19 160:20 161:4 162:10,16,17 165:9,12,20 166:1 166:4,21 167:14 168:22 169:12 170:1,4,7,14,17,25 171:3,12 202:5 203:20
**bit** 36:11 55:14 73:12 105:5,10 109:12 117:18,19 149:4 185:9 201:11 207:5 210:3 236:25 239:16,18
**bjorn** 1:13 2:15 5:3 6:3,7 9:14 11:1 59:4,8 101:21 135:24 136:2,5 178:17,21 178:21 228:10,14 247:10,12 248:2 248:21
**bonus** 84:11
**book** 203:18
**books** 201:24
**bordering** 47:13
**bottom** 159:10 165:9
**bought** 202:18
**bpulsipher** 4:13
**break** 47:17 58:24 58:25 59:5 101:18 112:15 135:18 178:12,13,18 201:11 228:7,11 243:9
**breaks** 220:7
**briefly** 49:3
**brought** 18:23
**bryant** 4:7 10:11
**buck** 207:6
**buckets** 223:17
**bullet** 180:14 184:21
**burling** 4:5 9:21 10:10 11:14
**business** 87:14 88:24 89:4
**buy** 201:22 204:22
**buying** 202:12
**buys** 101:7

**c**

**c.s.r.** 249:4,25
**cacaccord** 160:7
**cal** 7:13,16
**calculate** 34:20 53:14 122:15,18 122:19 205:10 235:8
**calculated** 206:8
**calculates** 71:16
**calculating** 37:21 42:25 123:10
**calculation** 35:24 42:19 46:3 59:12 59:15 61:13 62:8 62:10,11,13,14 70:12 71:14,20,20 72:9,15 78:7 82:5

82:22 97:11,16 105:15 169:21 206:9,14 207:18 208:10,12 223:9 223:10 235:4
**calculations** 42:11 70:17,18 99:4,5 100:13 118:19 170:24
**caliber** 14:18,20 16:5
**california** 1:14 2:17 4:10 9:1,22 249:1,5
**call** 90:1 103:17 105:1 121:24 144:13 146:19 181:23 184:15 185:7 214:9,11 246:18
**called** 72:22 91:14 99:14 127:12 156:22 192:21 217:22 220:7 233:2
**calling** 102:13 187:7
**canaccord** 7:8 161:1,7 165:6,7,19 166:3
**candid** 85:4
**cap** 207:2,4,19 208:2 209:22 218:16,23 219:12 245:11,16
**capacity** 41:16 55:4 181:21
**capital** 19:16 27:19 28:3,16 29:15,22 30:3,15 30:23 32:9 93:12 181:7 182:13 186:13,21 188:8 189:7,14 196:6,11 198:7 199:12,18 199:24 200:2,5,17 200:18 201:9 202:9,15 204:4,24 205:12,18,25 206:10,17 207:13 207:21 208:8 209:20 210:13 216:14 219:19 221:17 222:6,24 222:25 223:3,4,13 223:20,22,24 224:25 225:3,12 225:17,20 229:3 229:24 230:2,8,10 230:11,15,18 231:2 236:6,8,10 236:14,18 237:14 237:17,20 238:1 238:10,13 240:12 243:1 244:9,19 245:9 246:11,14 246:20
**capitalization** 199:20 200:1,7 205:20 206:18,24 207:15 208:14 210:5,6 217:5
**capture** 40:7,8
**car** 235:17,20 236:24,25 237:2
**care** 45:21 177:7
**career** 89:5
**careful** 23:6
**case** 33:6 40:8 63:7,21 71:2,3 77:7 81:3 84:7 88:11 89:2 104:9 106:5,14 123:22 137:12 140:12 141:6,13 142:22 143:25 166:21 188:19,21 189:6 190:9 192:14 199:8 200:23 229:17 233:23 236:5 237:12,12 241:14 242:7,16 242:19,24 243:19 249:17
**cases** 87:18 88:8 88:21 107:4 141:7 199:4 234:8
**cash** 164:7 173:24 173:25 174:2,4,5,6 174:19 175:5 177:14 181:4 202:13 203:23,23 203:24 227:3
**cashflow** 136:24 136:25 138:19 143:14 149:18 156:8,23 160:20 161:2 179:14 181:13 197:5 213:11,19
**cashflows** 115:13 138:9,10,19 141:10 142:17 147:4 154:3,4,6 181:3 195:15,22 195:25 196:14 197:7 201:25 202:2,25 203:2 214:1 222:1
**cashout** 202:3
**casualty** 163:1
**causation** 6:16 13:10 15:18 97:9 97:20 98:22 99:11 99:22 100:4
**cause** 70:24 75:12 78:3 129:19 151:8
**caused** 42:18,24 84:8 155:14 163:8 163:10 164:4 177:8 206:3 209:13 210:18 211:4,25 241:11
**causes** 75:13 150:25 151:4
**causing** 84:5 209:15
**caution** 23:6
**cellphones** 9:9
**cellular** 9:8
**cert** 26:22
**certain** 18:4 57:20 112:12 120:25 130:16 209:7 213:17
**certainly** 30:24 48:24 55:6 56:3 88:19 94:21 98:1 156:10 212:23 224:21
**certainty** 68:3 120:25
**certification** 11:12 13:3 36:10
**certified** 2:20
**certify** 248:2,4 249:5,19
**cfa** 1:13 2:15 5:3 6:4,8 11:1 247:12 248:2,21
**change** 42:13,18 42:24 62:17 72:24 72:25 73:2 75:12 75:13,13 98:2,16

107:7 109:7 129:20 144:23 163:5,8 199:1
**changed** 21:21,25 22:7,13,18 24:12 24:14,15,22 42:2 67:23 118:12,24 225:7 226:1
**changes** 17:12,13 17:14 24:9,10 61:2 63:12 70:13 71:8 72:2,2,3,19 72:21,22 73:10 74:22 75:2,4,7,9 79:8,22 82:18 94:23 95:2 109:15 114:23
**changing** 214:25
**characterization** 88:16
**characterizations** 129:6
**characterize** 17:11 27:3 89:17
**characterized** 155:19 177:1,24 187:9
**characterizes** 172:15
**charged** 90:18
**check** 38:17 48:22
**christian** 3:13 10:13 243:17
**christian.word** 3:18
**circumstances** 168:3
**cite** 18:18 19:5,18 20:12,14 21:11,13 31:7,22 32:10 83:14 84:1 90:15 91:1 124:15
**cited** 18:4 23:15 32:15 63:5 83:21 164:13 194:17,24
**citing** 125:15
**claim** 107:13
**claimed** 158:6
**clarification** 45:8
**class** 10:18 11:11 13:3 26:22 27:4 34:22 35:15 36:9 37:5,22 38:16 41:2 44:3 45:3 49:10,14,15,17 51:3,19,21,23 52:5 53:2 61:12 62:9 64:4,8 65:6,11,21 66:10 67:11,14,18 67:21 71:9 72:18 73:11,15,18 74:21 75:10 76:6,17,24 77:3 80:16 81:11 82:3 85:21 91:24 92:10,16 93:4,6,18 94:4,24 95:12,21 102:1,4,9,15,19 104:3,6,8,17 105:14 106:22 107:21 109:2,11 109:22 110:2,10 110:17 112:4 113:15,25 114:17 115:2,4 116:2,24 117:2,8,9,15 118:10 119:7,15 120:10 121:22 123:2 124:8 125:1 135:6 147:19 148:13 205:9 212:15 215:3 231:25 232:15,21 234:18,22,24 235:6 238:8,9 239:5,12 240:1 242:9 245:17
**clear** 23:20 33:23 40:17 98:10 131:6 142:15
**clearly** 46:9 54:11 123:21,22 149:14 158:15 205:7 225:13
**client** 14:3,4
**close** 59:17,24 139:6 202:5 204:1 212:1,12 226:10 227:7,10
**closed** 226:13,15 227:7 229:4
**closely** 163:23
**closing** 64:7
**clue** 86:18
**coach** 33:21
**coined** 83:18
**colleague** 87:11
**colleagues** 87:12
**collected** 58:14
**column** 127:6
**combination** 214:1
**come** 55:21 56:2 57:25 73:16 81:11 106:2 108:21 115:19 121:7 122:3 136:17 142:13 143:4 152:1 155:9 164:25 167:10 195:2
**comes** 13:23 98:17 103:13 172:20 210:8 212:12
**coming** 152:2 171:15 181:9
**comment** 17:9 116:15,16
**comments** 16:10 17:11,12
**commission** 248:25
**committed** 119:2 119:3,5
**communicate** 23:6 23:23 27:9
**communicated** 21:19 22:17 27:24 192:7
**communications** 20:20 23:8
**companies** 112:19 138:5
**company** 8:3 48:10,25 49:25 50:14,20 51:5,5,9 60:15 61:5 67:22 70:20 80:8 81:10 104:8 113:25 114:9 115:13,19 116:7 117:6 124:7 131:19,21,22 139:12,16,20 141:17 143:3 149:20,23 150:3,4 150:6,15 152:7,17 153:11 154:17 156:12,25 157:1,5 157:15,16 159:2,7 159:15 161:1 164:5,7,11,19 165:16 166:11,12 166:19 167:16 171:8,18 172:4,4,6 172:11,21,23

173:16,17,25
174:17 175:3
176:10 177:5,6
178:9 181:13,18
186:1,8 188:11
189:18 190:2
200:10,18 201:3,4
201:5,10,13,16,24
202:5,20 203:14
203:16,17,23
204:3,5,16 206:12
208:9 211:6 213:7
213:23 214:4,25
215:15,21,24
218:12 219:1
220:8,20 221:11
221:23 226:4
236:11 237:4,24
238:12 239:11,25
240:10,22 241:19
241:19,21,23
242:3 246:19
**company's** 63:20
72:23 73:24 92:6
94:12 131:1
141:10 149:6
154:3,25 155:11
159:20 161:9
178:25 179:2,6
181:3 182:6 183:4
183:10 184:24
187:1 199:19
200:5,23 205:19
210:21 211:10
212:5 215:5
216:10 224:24
226:23 236:12
241:15
**compare** 171:6
**compared** 197:17
**compares** 75:24
**comparing** 116:19
168:7
**comparison**
126:24
**complaint** 20:12
20:21,23 21:12
22:9 25:24 26:9,9
26:21 27:1 103:13
147:17 192:9
194:6,11,13,14,16
194:18,24
**complete** 31:18
45:23 176:6,7
249:14
**completed** 24:3
25:1
**completely** 134:25
**completion** 24:8
25:4 249:17
**complicated** 78:24
**component** 26:25
62:21,23,25 63:1
110:24 235:12,13
**components** 62:20
103:1,4,16 104:15
239:22
**con** 73:5
**conceal** 186:9,15
191:4 197:9,18,19
236:7
**concealed** 102:15
102:17,18
**concealing** 43:7
197:12 245:20
**concealment**
242:25 243:3
**conceals** 104:12
**concept** 51:16
73:20 84:4 89:16
89:16
**concepts** 57:10
68:8
**concern** 154:21
201:24
**concerned** 203:15
218:25
**concerning** 68:10
139:5
**concerns** 179:2,6
218:16
**conclude** 128:17
135:23 144:19
247:3
**concluded** 156:16
159:19 161:13
162:13,25 164:22
165:7 169:10
175:3 208:21,23
209:5 217:9 247:5
247:13
**concludes** 163:20
**conclusion** 29:20
122:3 157:4
167:25 173:4
189:17 247:9
**condition** 201:9
203:16
**conduct** 222:18
229:21,21 230:5
239:15 241:4,5,24
241:25 242:5,6,10
242:21,23 244:7
245:20 246:19,22
**conducted** 138:1
**conference** 105:1
133:16 144:12
181:23 185:7
214:9 246:18
**confidence** 163:3
174:13 209:10
**confident** 210:12
**confirm** 219:17
**confounding**
67:13,15 136:13
136:16,19 137:2,3
137:6,10,15
147:12 148:8
149:3 179:7 206:3
210:16 211:2
212:20 217:10
**confusing** 57:9
**confusion** 84:8
**connect** 98:4
99:23
**connection** 19:2
19:19 32:22
214:22
**cons** 86:1
**consensus** 152:2
154:12 168:8
213:12
**consequence**
188:8 189:7
222:14,17 235:16
244:20 246:21
**consequences**
120:9 189:5,21
223:14 229:20
235:11 239:3,3
242:1,2 243:2
244:8 246:2,3
**consequently**
31:14 60:12
141:18 150:9
191:16 209:3
**conservative**
44:23 45:4 46:10
70:17 71:4 186:24
205:15 206:5,6,19
206:22,23 208:18
209:25

**consider** 86:22 156:10 224:8,13 224:19 225:6,8
**considered** 44:22 143:7 153:21 174:17 206:4 225:8
**considering** 139:13
**consistent** 41:11 73:20
**constant** 37:21 38:7 60:13 61:1 63:22 70:11,19 71:6 72:1,5,11,12 73:5 74:4,20 80:12,13 95:4,5 97:19 98:19 99:3 99:4 100:2 110:3 111:12 138:22 235:9
**constantly** 110:17
**constitute** 49:17 147:24
**constructed** 200:4
**consultant** 11:23 13:24 54:25 133:25
**consultants** 54:10 55:3,7 125:23,25 129:5
**consulted** 55:21
**consulting** 11:24 12:1 55:4
**consummated** 162:20
**contains** 35:11
**content** 17:9 90:10 127:18
**context** 172:20
**continue** 9:11 46:18
**continued** 3:20 4:1 7:1 8:1 162:18
**contradict** 31:11
**contradicted** 30:3 30:20
**contributes** 156:23
**control** 61:18 83:5
**controversial** 84:19 85:5
**controversy** 98:17
**convenient** 228:5
**conversation** 45:9
**conversations** 9:7 16:19,21 232:8
**conveying** 193:5
**core** 162:24
**cornell** 63:6,24 72:20 73:15 91:8
**correct** 11:19,20 11:22 12:3,5,6,11 13:6,8,11,12,14,15 13:18,21,25 14:1 14:19 17:6,7 19:21 21:1,2 22:14,25 32:20 34:22,23 35:2,12 35:13,16,17,22 37:5,6,20 38:13,22 39:20 40:18 43:25 45:3 49:6,20,20 52:22 59:21 60:1 60:7,24 61:16 64:8,9 68:17,25 69:5 71:9 72:20 74:19 75:2 78:1 79:12 91:16,24 93:9,18 94:2 97:2 100:9,20 103:11 103:25 104:1 106:24 110:6,20 113:16 117:3 119:16 124:19,20 125:2,14 127:9,25 128:10 130:2,25 132:7 139:4,9,15 139:18,19,22 140:6 142:7 146:24 151:2,11 151:12 155:16 159:15,19 161:6 162:7 163:7 164:21 177:22 179:3,16 180:24 182:18,22 185:16 185:20 187:14,16 187:23 188:1 189:5 190:7,18 193:6,10 199:15 200:20 201:15,19 202:19 205:20 207:16 209:8 213:4,8,24 214:7 214:10,17 215:15 217:12 219:25 221:8 226:4,11 229:23 233:6 236:16 238:12 244:1,2,3,12,13,15 244:25 245:5,12 245:18 246:7,8,13 246:16 249:13
**corrected** 19:2 188:12
**correcting** 188:20 188:23
**correction** 248:8
**corrections** 248:6
**corrective** 65:20 98:3,6 112:4
**correctly** 41:15 149:9 153:10
**correspond** 75:4
**corresponding** 199:1
**cost** 147:2 154:8,9 202:14,15 211:17 214:16,24 215:16 215:18,19,21,24
**costs** 82:9 139:16 146:17,20 147:9 147:18,22 148:4 148:13,22 158:11 182:9,12,14 214:12 215:5,10 215:19 216:7,11 216:15,21 217:8
**counsel** 9:15 10:4 16:9,19 17:8,24 20:20 23:9 27:8 30:9 185:12,13,17 193:13 228:5
**counsel's** 30:8
**counterfactual** 39:25 40:2,3 70:21
**county** 249:2
**couple** 18:13 82:1 174:1 181:10
**course** 55:25 82:3 88:23 92:17 93:18 94:4 113:3 115:11 117:15 118:9 135:6 148:13 150:6 151:14,18 158:11 177:13,20 189:6 202:2 203:1 204:22 221:13 230:17 238:8 241:25

**court** 1:1 2:1 9:18 9:24 10:20 11:3 20:17 224:3
**court's** 20:23 21:13 91:18
**courts** 84:11 86:4 88:13 89:8
**cov.com** 4:12,13 4:14
**covington** 4:5 9:21 10:9 11:14
**crash** 235:20 236:25
**created** 235:2
**credence** 221:25
**credibility** 145:13
**credibly** 142:24
**credit** 124:18 126:6 221:24,25
**critical** 27:14
**criticism** 42:4 43:17
**crude** 49:1 106:24 108:1 119:9 124:10
**csr** 1:23
**cumbersome** 68:2
**current** 61:13 65:24
**curve** 124:21,25 125:6,10,13,16,21 126:18 127:12,15 127:23 128:3,10 128:18 129:13,21 130:5 131:2 133:2 133:11 134:4,11 135:5
**curves** 53:22 54:1 121:15 128:23 163:13
**cushion** 208:16,17
**cutting** 47:12
**cv** 1:6 2:6 9:19 87:20

**d**

**d** 35:10,14 39:5,6 44:1 46:3 61:8
**d.c.** 3:16
**dallas** 87:13 90:4
**damage** 71:12
**damages** 13:10 15:19 35:5,9,12 40:8 44:23 45:5 70:24 85:20 95:20 95:25 96:5,6,22 97:4,6,10,11,14 98:11,13,16,18 99:4,5,12,18 102:12 104:1,5,10 105:9,15,20,21,21 105:25,25 106:2 106:13 107:2 108:19,24 119:4 120:3 123:21,23 123:23 128:25 148:5 155:13 208:23 209:14 211:23 223:9 224:6 231:19 237:1 239:2 245:2
**dangerous** 105:18
**data** 53:18,19,23 55:15,17 56:1,5,15 56:16,18,21,23 57:19,24 58:10,12 58:14,20 85:24 92:8 111:25 116:10,17,25 118:9 122:7 186:6
**date** 9:5 39:15 57:20 58:13 66:9 96:12 107:24 108:13 224:23 226:15 227:10 234:25
**dated** 6:5,9 131:24 160:7 162:2 169:5 180:10 184:2 218:12
**dates** 100:16
**daubert** 81:3
**day** 35:15 37:5,22 38:16 40:5 44:2 45:3 47:2 61:12 62:9 63:19 64:4,7 65:11,20 66:10 73:2,15,17,17 76:11,16 77:1 81:10 107:21 199:11 203:25 226:7 227:1,8 230:13 231:24 237:13,15 243:22 245:3,14 248:23 249:21
**days** 60:23 73:1,2 73:22 233:3 238:14 241:17
**dcf** 138:12,13,15 138:25
**deal** 227:7
**dealing** 32:11 123:11 175:10 231:11
**debate** 41:2
**debt** 174:2 201:4 202:5,7 203:17,25 203:25 204:17
**decided** 86:4 157:17 206:5,7
**decides** 173:17
**decision** 20:23 21:13 91:18 156:22,25 157:2,5 157:8,11,11,12,16 157:17,21 172:21 172:24 173:5,14 174:9,15 181:17 181:18 204:4
**decline** 17:2,4 24:6 24:19 26:17 40:6 40:7 41:1 61:10 66:25 67:3 68:5 85:20 150:22 151:1,8 180:19 182:5,23 183:2,11 184:19 185:25 186:10,18 191:16 200:10,12 205:8 205:24 206:23 207:2,6,9,11,19 208:2,8,14 209:13 209:15 210:11,21 211:6,11 212:1,2,5 212:13,15,17,19 212:22 215:2,3 217:11 236:12
**declined** 199:13 205:7 238:21 245:3
**declines** 230:14
**decrease** 199:19 205:19 206:11,18 207:14 230:19
**decreased** 230:11
**decreasing** 64:6
**deem** 212:13
**defendant** 2:16 3:11 9:15 10:11 11:17 150:7 243:19

**defendant's** 72:16 80:4 187:9 188:5 188:6,9 189:8 236:3 239:15 241:4,5 242:20 244:7 245:20
**defendants** 4:3 11:15 35:2 48:2 60:4,21 61:18 66:14 83:5 106:8 119:19 123:23 133:7,12 134:20 134:22 135:6 147:17 148:12,22 188:14 189:3,10 195:19 197:9 198:5 229:22 241:15
**define** 113:9,11 147:12 233:2 235:25 242:22
**defined** 41:23 96:6 112:2 113:12 119:20 188:5 242:23
**definition** 97:5 112:1
**defraud** 198:19
**degree** 13:7 104:22 114:21 120:25 121:12,17 121:18 122:24
**delved** 54:19
**demonstrate** 144:25 145:16 164:17 168:1
**demonstrates** 199:17 200:4 207:13
**demonstrating** 28:16
**depend** 62:2 64:21 82:23 108:24
**depending** 36:12 107:3 142:19 224:8 236:19 237:7
**depends** 39:25 40:21 41:5 42:13 66:17,20 68:11 82:13 148:7 178:3 182:8,16 205:17 206:9
**deponent** 248:1
**deposed** 12:4
**deposition** 1:13 2:15 9:10,14,20 11:11 12:11,17,21 13:4 18:13,18,22 18:24 19:1,10 29:11 31:6 32:5 33:8,16,25 36:9 59:3,8 85:12,19 90:22 101:21 135:24,25 136:1,5 178:16,21 185:10 228:10,14 247:6 247:10,12 249:7 249:10,16
**depositions** 19:15
**describe** 53:18 110:25
**described** 114:10 189:25
**describes** 89:15
**description** 6:2 7:2 8:2
**design** 120:13
**designed** 107:1,2
**despite** 78:14 176:15
**destroying** 166:9
**detail** 20:11 25:12 54:20 125:4,18 212:10
**detailed** 103:14
**determination** 98:1,8 107:8 117:10 122:22,23
**determine** 31:10 60:16 64:1 74:8 79:24 80:12 119:24 120:8 136:23 141:8,11 142:16,18 146:7 147:23 149:16 153:1 154:1 166:17 171:8 173:8 193:1 244:11 245:2
**determined** 120:16 211:22
**determining** 30:5 151:23 174:25 245:7
**deutsche** 7:12 162:1,8,13 163:20 163:24
**develop** 56:16
**developed** 53:3 54:14,24 170:3,16
**developing** 237:5
**development** 144:4 145:23 146:25 149:11
**diego** 87:15 90:5
**difference** 36:3 41:23 62:7,16 63:11 65:7 66:7 67:7 69:22 94:20 94:21 109:8,24 121:18,19 123:1,4 131:10 142:1 146:5,6 159:9 173:7 200:21 237:9
**differences** 151:15 177:18
**different** 26:15 35:25 36:2,11 39:17,18,24 40:14 40:15 42:11 53:21 56:10 60:22,23 64:23 65:8 66:21 67:5 71:23,25 73:13 80:3,20 81:10 85:14 86:1 88:23 94:18 98:20 99:9 104:5,5 109:13,14 112:2 113:2,5 116:10,20 116:21 121:5,7 123:7,7,25 129:1 130:3 131:1,13 133:19,24 138:6 139:2,5 142:19 146:13 151:20,21 159:5,11 164:15 164:15 172:6 174:11,12 177:3 183:6 201:20 202:16 207:5 210:4 223:20 230:1 236:18 237:7,25 239:16 239:19 241:1,19 242:19
**differential** 64:14
**differentiate** 65:12 177:2,4
**differently** 99:9 167:6

**difficult** 218:22
**diluted** 207:25 210:9
**dilutive** 161:14 162:11 163:21
**direct** 150:17 160:9 162:3
**direction** 249:13
**directly** 21:18 190:14
**director** 14:22
**disaggregate** 133:5,10 135:4 137:15 147:8,10 147:11,15 185:4 216:9 224:24
**disagree** 167:10
**disappointments** 137:22
**disclose** 32:19 62:1 234:1,12 241:2,3,5,20 242:18 245:22
**disclosed** 34:11,16 51:22 52:15,19 53:1 65:2 109:10 109:11 112:23 114:15 124:16 130:17 139:12,16 139:20 146:19 182:23 185:7 190:19,21 191:1 196:21 211:14 219:22 227:12,18 231:2 239:12,25 240:11,22 242:2 245:10 246:2,5
**disclosing** 191:8
**disclosure** 24:2 27:2,3 36:7 40:12 40:13 41:25 43:4 43:8 62:2 64:18 65:20 67:6,14,18 67:21 98:3,5,6,14 98:14 102:8,24 112:4 115:4 136:16 146:16 186:25 224:15,16 229:2 235:9 238:10,24 239:1 239:14,17,21,22 241:21,24 242:4,8 242:14,18 243:24 245:13 246:18
**disclosures** 73:2,3 73:7,23,25 129:2 129:17 179:1 185:5 187:2,13,22 188:11
**discovery** 17:25 18:6,10 19:24 20:6,7,9 24:3,8 25:1,4 28:2,15,19 28:20,21,24 29:2 30:13 148:11,17 192:14,16 195:3
**discuss** 18:21,23 18:24 19:1,2 23:7 49:3 99:3 150:21
**discussed** 36:9 48:21 104:24 139:25 212:24 213:6
**discussing** 167:20
**discussion** 169:18 171:24
**discussions** 22:19 22:20
**disk** 59:3,7 101:20 135:23 136:4 178:16,20 228:9 228:13 247:9
**dismiss** 20:17,24
**disposal** 215:22 216:6,10,15
**disproportionate** 197:17
**disprove** 148:18
**dispute** 88:9 89:23
**dissipation** 84:6
**distinction** 135:9 157:3
**distinguish** 178:4
**distinguishing** 132:25
**distribution** 173:9 173:10 175:10
**district** 1:1,2 2:1,2 9:17,18
**divergent** 151:13 151:22
**divest** 180:16
**divestiture** 177:5
**divide** 62:19 207:8
**docket** 9:19
**doctor** 90:25
**doctorate** 13:7
**document** 1:7 2:7 20:13 21:14 23:14 28:24 29:2,6 128:13 129:9 218:1
**documentary** 21:11
**documents** 12:19 15:15 20:14 21:19 28:3,16,19,20,21 32:22 33:5,9 34:2 34:3 134:8 148:17 190:10,12,17 192:13,16
**dog** 199:9
**doing** 16:8 36:8 45:13 54:5 80:25 89:3,5 121:16 137:23 155:12,15 158:11 172:24 176:20 233:16 238:24 241:9
**dollar** 36:21 37:8 39:4 42:10 43:13 44:2,5 60:8,13,17 60:22 61:2 62:16 63:22 64:10,12 65:14 70:11,19 71:3,6 72:1,14 75:3,7 76:1 80:14 81:16 85:10,20 95:4,11 98:19 99:4 102:10 200:20 225:25,25 235:9
**dollars** 44:24 72:11 194:19 217:4
**double** 38:23 39:5 39:14 48:22 76:23
**doubled** 51:25
**dowd** 3:4 10:16
**dr** 17:1 18:23 60:25 87:16 88:7 88:12 90:25 153:24 167:12
**dramatic** 52:10
**dramatically** 117:14
**draw** 157:4 189:17
**drawn** 125:16 173:4
**drill** 115:8,18 181:21 186:15 191:6 197:13,25 198:1,13 203:2

204:23
**drilled** 117:25 190:19
**drilling** 53:25 57:22 67:24 82:9 115:17 117:14,18 118:8 180:23 181:1,4,5 182:9,10 182:10,13,17,19 183:11 186:8 190:1,14,22,24 191:13,23 192:20 193:21 194:20 202:1 216:14 223:25
**driver** 235:15 236:24
**drives** 218:16
**driving** 235:19
**drop** 19:3,13,20 20:2 31:20,24 32:12 33:2 70:23 185:11,15,22 209:23 210:4
**drunk** 235:15,19 236:24
**due** 60:9 207:2
**duly** 11:2 249:7
**dura** 84:19 85:5 85:13,14,15 91:19 91:21 98:9,12,12 98:20,25 99:1,3,8 99:8,11,12
**duty** 234:1,11
**dwell** 13:4

**e**

**e** 4:7
**earlier** 13:22 40:12,13 48:21 68:3 85:18 104:17 113:14 136:7
194:10 195:1 229:13 236:25 238:18 240:1,11 240:22
**early** 53:24 57:22 57:22 67:7,10,14 67:18,21 104:8 117:8 123:2 128:4 182:15
**earning** 146:19
**earnings** 104:25 137:22 138:14 139:1,9,10 147:4 211:14 213:8,12 213:18,24 214:2
**easier** 68:4 126:5
**easy** 120:1,1,3
**econometric** 145:24 146:2
**econometrics** 137:20
**economic** 41:12 42:8 43:12 63:4,6 66:21 70:20 79:22 84:10 85:24 86:2 135:17 200:3 244:10
**economically** 200:15
**economics** 6:15 13:7 86:24 103:15 190:4 191:4
**effect** 175:18 182:5 194:9
**effectively** 17:21 35:4 62:17 63:14 71:11 99:17 141:16 171:9 191:8 209:22
**efficiently** 150:9
**effort** 110:23 133:4,9
**either** 13:13 32:25 34:18 61:6 80:10 81:15 102:10 136:24 145:15 194:18 223:17,17
**ekaufman** 3:9
**eleventh** 3:14
**eliminate** 155:3 176:11
**eliminated** 152:22 153:16 154:19
**embedded** 204:14 235:13
**employees** 55:5
**enable** 190:2
**encouraged** 17:16
**ends** 79:11 108:19 207:5
**energy** 1:4 2:4 4:4 9:16 124:18
**energy's** 10:17
**engaged** 190:13 195:19 198:5 241:15,16,20,23 242:5,6 245:23 246:19
**engaging** 189:4,10 189:19 242:10
**engineer** 121:23 122:2,8
**engineering** 128:7
**engineers** 54:4,6 121:6
**enron** 241:17
**entering** 226:5
**entire** 102:17 104:6 105:9 238:22
**entitled** 23:17 35:19 41:13
**entity** 150:8
**environment** 66:21 79:22
**equal** 69:3 70:24 78:2 138:8
**equity** 158:24
**equivalent** 124:12 127:17 130:22 132:19,22 184:25
**esq** 3:5,13 4:6,7,8
**essentially** 217:9
**establish** 223:6
**established** 37:3 134:2 146:18
**estimate** 34:21 37:4 38:13,20 39:12,14,21 40:11 40:18 41:18,19 44:23 45:4 46:10 59:15,22 64:10,12 64:15 65:11,14,24 66:1 68:2 71:6,7 74:19 76:10 77:1 80:1 82:11,17 83:3 96:22 104:17 106:13 107:20,22 108:14,21,24 115:9,9 116:23 117:1 119:14 133:2 136:18 137:5 143:5,17 144:23 148:5 154:1 155:23 158:1,15 165:11 166:7 169:12 205:16,17 210:19 211:5,9,12,12 212:4,6,9,11

**estimated** 38:24 57:15 68:22 111:2 124:11 161:2
**estimates** 37:23 64:17 75:3,7 76:1 76:1 80:23 81:19 94:22 95:11 116:9 116:21 122:14 123:12 130:3,4 131:1,2 132:18 153:13 162:9 164:16 168:8 171:21 213:13 218:15
**estimating** 132:21
**eur** 67:9 68:22 104:21
**eurs** 132:12,18,22 186:2
**evaluate** 90:12 122:21
**evaluated** 131:5,6
**evaluating** 174:22
**evan** 3:5 10:15 12:22 22:19 34:6 193:12
**evenly** 63:2
**event** 48:9 73:21 74:1 81:14 102:6 102:7 200:8,9 201:1 233:2,16 249:20
**events** 47:23 48:6 48:7
**eventually** 171:13
**everybody** 70:24 145:18 158:7
**evidence** 30:21 122:21 128:16 129:18 148:10 157:22 167:21 175:15,17 199:17 205:23 207:12 209:2
**exacerbate** 159:20
**exact** 120:20
**exactly** 14:13 19:9 28:6 40:5 51:23 52:3 60:20 69:13 69:19 70:22 71:10 118:5 142:15 158:16,21 167:8 175:6 187:10 188:4 213:9 214:15 220:5
**examination** 5:2 11:7 243:13
**examined** 11:3 231:17 249:6
**example** 64:20 68:20 69:12 78:12 82:23 94:15 96:8 104:23 105:12 107:20 111:9,9 139:12 161:13 165:5 168:8 224:4 236:19
**exception** 248:6
**excerpt** 91:13
**excess** 71:11
**exchange** 201:17 202:21
**exclude** 98:13 137:2,11 209:15
**excluded** 43:10 88:13,17,17,22,22 89:7
**excluding** 169:25
**excuse** 33:18 74:11 179:7 224:23
**exhibit** 6:3,7,11,14 6:18 7:3,8,12,15 7:18,22 8:3 15:1,5 15:7,9,10,23 16:12 31:25 34:11 35:10 35:14,21 37:11,18 37:19,20 39:5,5,6 39:8 44:1,22 45:2 46:3,13 59:11 61:7,8 70:18 71:15 72:10 75:19 75:20,23,24 87:24 88:1,3 126:9,13 131:23 132:1,4 160:1,4,5,6 161:18 161:20,22,25 165:7 168:23,24 169:2,4 180:4,7,9 183:20,24 184:1 218:5,11
**exhibits** 6:1 7:1 8:1 15:13 34:11
**existed** 34:21
**existing** 26:9
**exists** 173:16
**expanding** 217:21 221:21 222:21 223:7
**expansion** 118:8
**expect** 69:14,19 70:1 77:6 78:3 94:17 118:10 150:3 237:6
**expectation** 152:24 204:21
**expectations** 82:18,19 141:9,9 152:4,19 179:17 211:15 213:21
**expected** 48:19 68:22 69:8 70:8 103:19,21,23 105:13 106:23 107:25 108:12 109:1,6 110:11 115:5 119:9 121:8 151:17 153:2,17 163:11 173:21,22 174:10 180:18 181:2 183:3,7 191:7 197:5 202:20
**expecting** 177:15
**expects** 166:20
**expenditure** 196:6
**expenditures** 19:17 27:19 28:4 28:17 29:15,23 30:3,15,23 32:9 93:13 181:7 182:13 186:13,21 188:8 189:7,14 196:11 198:8 199:1,13,18,24 200:2,6,17,19 201:9 204:4,25 205:12,18,25 206:11,17 207:14 207:21 208:8 209:20 210:13 216:14 219:19 221:18 222:6,24 222:25 223:3,13 223:21,22,24 224:4 225:12,17 225:20 229:3,25 230:3,8,10,11,16 230:18 231:2 236:6,9,10,14,19 237:14,17,20 238:2,10,13 240:12 243:1

244:9,19 245:9 246:12,14,20,21
**expenses** 147:3,3 181:8
**experience** 109:14 120:4
**expert** 6:3,7 11:18 11:21,23 15:17 32:18 34:20 41:16 42:4,5,5 43:22 86:9,24 87:9 88:14 89:19 98:11 140:7 142:13
**expert's** 43:17
**expertise** 25:22 121:1,3,14,17
**experts** 40:23 99:10 137:19
**expires** 248:25
**explain** 81:17 86:1 143:1 149:21 200:11 211:21 212:21 217:10 240:20,21 241:1
**explained** 32:8 42:13 44:10 54:20 58:15 75:8 84:7 140:2 150:7 153:20 167:8 175:9 176:2 187:8 195:1 204:12 212:1 240:7
**explaining** 84:25 194:23
**explains** 62:7
**explanation** 30:2 144:12
**exploit** 182:2
**explore** 23:17 157:17
**exploring** 141:4 149:7 165:17 172:10 177:5,11
**express** 19:11 80:21 97:18
**expressed** 179:2
**extensive** 92:7
**extensively** 93:17
**extent** 22:12 49:7 58:12 65:18 95:5 183:10
**external** 54:24 55:2,6
**eyes** 145:23

**f**

**facet** 201:12
**fact** 26:21 42:5 46:8,16 52:10 87:11 93:16 95:11 104:16 110:15 119:16 123:11 128:14,18 130:2 138:7 144:14 152:17 154:18 156:10,11 157:5 158:12 159:17 171:2 239:7
**factor** 69:10 78:19 79:1,10 80:3 81:9 105:16 147:14,25 149:3 212:20,22 212:25
**factors** 38:11 39:7 65:15,19 66:15 67:13,15 68:19 69:11 75:11,15,15 78:19 79:15 80:17 80:24 81:10 83:4 83:7 109:5 110:8 111:14 136:19 137:2,3,10 140:4 140:13 147:12,13 157:25 167:8 172:9 179:7 183:8 203:12 206:3,3 207:3 208:15,19 208:20,21,22,24 209:13,23,24 210:16 211:2,24 217:10
**facts** 65:22 82:8,9 85:23 104:12
**factual** 27:6
**faculty** 13:16
**fail** 137:11
**failed** 223:6
**fails** 137:5
**fair** 20:11 29:3 36:1 49:9 51:15 51:16 83:6 88:15 102:15 157:9 159:6 180:2
**fairly** 57:7
**faith** 121:6,23 122:8
**false** 50:23 51:6 105:8 116:14 187:14,16,23
**far** 15:20 30:7 128:22,23
**fashion** 108:14
**favorably** 95:10
**february** 7:3 48:10,25 49:5 50:3,7,10,11,21,21 51:9,10 59:17,20 60:5 61:11 64:19 65:2,24 76:5 124:17 125:2 131:24
**federal** 249:16
**feel** 12:13
**fees** 14:17
**fell** 74:12
**felt** 51:18
**figure** 65:1 90:22 143:12 154:10 187:10
**figured** 153:6
**figures** 125:15,15
**finalize** 27:9
**finalized** 24:2
**financial** 7:22 90:18 160:13 168:11 171:20 175:24 184:2 200:3 201:9 203:16 215:4 216:8 217:8
**financially** 10:3
**find** 27:22 29:14 164:5 212:25
**finding** 174:2 176:21
**fine** 178:6
**finish** 36:16 37:14 42:22 44:13 45:17 45:18 77:13
**firm** 9:20 86:13 87:13 128:7 129:5 150:13,14 156:24
**first** 18:2,3 21:22 22:1,10 38:24 42:12,25 43:3,7 46:20 48:9,20 52:19,24 53:22 58:18 61:12 62:9 64:4,7 65:20 66:10 71:21 78:17 90:16 107:21 113:22 127:6,6 170:8 174:18

180:14 199:11 202:11 211:21 218:21 228:24 229:7 230:23 231:4,13,20,24 232:4,18 233:10 234:21
**firsthand** 129:8 131:20
**fit** 223:18
**flexibility** 124:2 178:10
**flexible** 107:3 109:16 120:14
**flows** 202:4
**fluctuate** 110:7 238:7
**fluctuated** 110:17
**fluctuating** 72:6
**focus** 18:25 37:2 46:23 64:3 68:7 77:11 113:6
**focused** 48:8 104:21 113:8 116:12
**focusing** 61:11 112:21,22 239:23
**followed** 67:23 88:25 127:21
**following** 3:20 99:8 199:12 206:25
**follows** 11:4 108:3 232:22
**footnote** 84:1 88:5 127:21,22 134:4 210:14,24 212:3
**force** 82:4
**forced** 172:5,6
**forces** 42:3,7 43:18 61:8,17 62:12 64:15 66:2 66:11 81:18 83:14 83:19 84:4,25 91:2
**forecasts** 82:23
**foregoing** 248:3 249:7,15
**foreseeable** 195:15 195:23 197:8
**form** 22:3 24:13 25:20 26:7,10 29:4,7,24 38:3 40:20 41:21 43:2 50:24 68:13 70:15 71:18 89:21 91:25 93:21 117:16 119:17 122:17 124:23 129:23 130:6 131:3 133:14 134:6 149:12 154:14 155:1 175:22
**formed** 34:10
**forming** 20:1 31:23 33:1
**forms** 29:11 53:11
**forward** 92:12 144:16
**found** 81:4 105:8 218:3
**four** 12:23 65:14 194:22
**fourth** 52:2,13 180:14
**framework** 104:4 104:10 105:9,18 105:21 106:1,1,3 106:25 107:1,9,16 107:19 109:16 120:14 123:14,17 123:21 235:1,2
**francisco** 4:10
**frankly** 88:25 153:9 157:19
**fraud** 38:11 39:8 40:1 42:3 43:19 47:23 48:6,7 60:11,15 61:8,21 61:21,22,24 62:1 62:21,22,25 63:1 66:15 72:24 73:1 73:3,6,19,23,25 74:9 75:15 79:15 80:24 83:14,19 84:5 85:1 87:18 88:8 91:3 99:23 100:7 102:19 110:4,5 118:25 119:2,3,5 147:11 147:13,14 187:9 188:5,6,9 189:4,8 189:10,19,22 197:18 207:3 208:7,15,21,22,24 209:23,24 210:17 210:20 211:3,5,10 211:22 212:4,13 212:22 214:23,24 222:9,13,14 223:8 224:5 229:15 233:2 236:3,4 239:15 241:16,20 245:23 246:3
**fraudulent** 28:17 29:21 30:16 73:8 80:8 189:23,24 191:24 192:21 193:18,25 194:3 195:6,13,20 196:19,24 197:3 198:6 200:25 213:3 222:18 228:23 229:11,20 229:21 230:5 239:15 241:4,5,24 242:5,6,10,20,23 244:7 245:20 246:19,21
**fraudulently** 102:18
**front** 59:13 76:3 88:3 103:8 124:13 126:13 132:4 150:19 160:4,14 161:22 169:2 180:11 183:24 218:13
**full** 25:4 41:24 55:5 67:21
**fully** 207:25 210:9
**fund** 219:2
**fundamental** 137:1,18,24 138:2 138:11 140:18
**funding** 67:24 159:20 161:9,11 162:15,23 163:22 177:9,17 179:3,6 179:15,16 182:6 183:4,5,10 219:1
**funds** 181:9 204:10
**further** 33:16 246:23 248:4 249:19
**future** 57:13 82:18 115:13,18 136:24 136:25 138:8,19 141:10 142:17 147:4 154:3,4,5 157:15 174:8 196:7 202:24 203:2 222:1

**futures** 169:21

**g**

**g** 1:6 2:6 9:19
**gap** 161:10,11 162:15,23 163:22 177:9,17 179:3,6 179:15,16 182:6 183:4,5,10
**gas** 6:11 53:23 61:3 63:8 64:22 65:16 66:13 69:7 69:9,13,18,23 70:1 70:7,9,14 71:8 72:17,19 73:10 74:22 75:5,9,25,25 76:7,15 77:16,25 78:5,9,16 79:7,8 79:14 81:21 82:10 94:10,17,19 104:23 105:3 133:12 236:4,8,20 237:6,8 238:7 239:17
**gassier** 211:16
**geared** 18:7
**geller** 3:4 10:16 14:2
**general** 174:3 230:17 241:21
**generally** 149:10 151:9 153:21 161:14 162:10
**generate** 171:3 177:14 181:13 195:14,22,25 196:13 197:7,14 202:1,13 222:3
**generated** 21:15
**generating** 174:3 181:4 202:3
**generation** 215:25
**generations** 216:3
**genuity** 7:8 160:7 165:6
**geographical** 92:24
**getting** 173:14 226:18,20
**gimbel** 4:6 5:4 10:9,9 11:8,14 15:3,9,12 22:4 23:10,13,18,22 25:18 26:5,11 27:11 29:9 30:10 31:2 32:16 33:12 33:21,24 34:9 36:19,24 37:1 38:8 39:9,19 41:14 42:9,17,21 42:23 43:20,24 44:14,16 45:1,12 45:19 46:1,14,22 47:5,8,10,14,18,20 50:2 51:7 54:22 55:8 56:12 58:24 59:9 68:15 71:5 72:7 74:18 75:18 75:22 77:21 87:22 88:1,2 89:11 90:13 91:6 92:2 94:1 99:2 101:4 101:16,22,24 110:22 117:20 120:18 121:4,20 123:9 125:5 126:4 126:7,11,12 127:3 127:5 128:15 129:10 130:1,9 131:11,23 132:3 134:1,9 135:2,12 135:18 136:6 145:9 150:16 154:22 155:8 156:15 159:24 160:3 161:20,21 169:1 178:13,23 180:6,8 183:19,22 183:23 184:10,11 189:1 191:18 192:15 193:3 194:4 198:23 199:10 213:1 216:18 217:6 218:3,7,9,10 222:19 225:9 226:3 228:4,7,15 232:9,12,17 234:9 234:19 240:3,9,17 241:13 243:5
**give** 11:18 37:17 76:19 89:6 98:9 119:15 142:2 146:5 156:7 173:17 200:22 221:24,25
**given** 28:13 77:6 185:12,13 201:9 204:16
**giving** 143:10,13 143:15 171:9 178:9
**go** 9:12 20:10 40:8 63:13 90:8,24 92:14 93:22 101:14 135:11 141:11 142:4 144:16,20 146:3 147:3,3,4 148:17 156:13 157:12 164:13,19 166:23 176:2 181:8,15 193:14 197:13 203:2,12 212:10 230:19
**goes** 62:24 111:10 118:15 125:1,22 147:2 162:21 167:8,9 176:3 186:4 239:23
**going** 13:2 20:10 25:3 36:24 37:17 38:15 39:10 44:16 46:14,17,22,23 47:5,19 53:24 57:12 68:6 75:23 80:25 81:13 93:13 107:5 123:7 124:6 151:18 152:24 157:15 161:9 164:9,9 166:25 172:13 174:14 177:14 181:10,13 196:16,22 200:19 200:23 201:2,13 201:16,25 202:13 202:13,14 203:8,8 203:10 204:20,23 204:24 207:10 213:16 219:8,22 220:20 237:4 239:6 240:11 243:5 246:14
**gonna** 220:23
**good** 9:4 11:9,10 47:16 74:16 121:6 121:23 122:8 157:8,10,12 159:1 178:12 243:15,16
**gotten** 131:19 236:25
**grammatical** 17:12

**greater** 54:19 61:21,23 65:21 67:10,10,19 69:1 78:3 92:6 95:14 171:16,17 198:3,3 206:1
**greeted** 151:24
**grenadier** 17:1 18:23 60:25 167:12
**grenadier's** 17:5 153:24
**grew** 93:17 94:3
**grossly** 186:1
**ground** 12:10
**group** 7:22 184:2
**grow** 93:10 94:8
**growing** 191:13
**grown** 93:24
**grows** 94:5
**growth** 82:24 138:22 191:12 197:16 219:2
**grubb** 4:3 10:10 11:16 18:16 29:14 29:19 30:25 32:10
**guess** 32:1 90:21 100:21 107:6 123:1 188:10
**guessing** 217:24
**guidance** 17:22 48:13,18 184:24 190:25 191:7 197:23 198:9,13 198:15 199:2 213:8,24
**gulf** 139:22
**guy** 90:20
**guy's** 90:19
**guys** 14:8 33:9 34:1 99:16 174:14

**h**

**hakala** 83:15 86:6 87:8,9,16 88:7 90:2,17,25 91:20
**hakala's** 88:12
**half** 107:10,13,14 159:12,12 202:6 209:22,24 210:11 212:18
**hand** 160:25 249:21
**handbook** 91:14
**hands** 182:1
**happen** 79:24 239:6
**happened** 50:10 67:3 173:17 235:17 237:2,2 238:5,16,20
**happens** 62:23 74:6 230:3 235:20 239:9,9
**happy** 129:2
**harassment** 47:13
**hard** 178:8
**head** 14:9 34:14 106:11 122:13 199:5
**heading** 164:1 184:13 218:18
**headlined** 218:14
**headwind** 164:2
**headwinds** 162:5
**hear** 37:16,18
**heard** 89:2
**heavily** 191:15 198:17
**hedges** 79:19
**hedging** 78:21 79:4,16
**held** 9:20 73:5 154:2 214:8 233:25
**help** 38:15 197:9
**hide** 186:9
**high** 37:24 38:4 62:4 151:19 153:12 204:2
**higher** 61:20 62:11 65:14,18 66:8 69:2 77:24 78:4,10 80:15 122:9 132:13 171:12 202:9 208:1
**hindsight** 158:19
**hired** 11:18
**historical** 57:19 58:12,14
**hold** 13:16
**holdings** 91:23 92:5,6 94:12,24 95:3,13
**holds** 74:20
**holistic** 105:5
**honestly** 14:7
**hope** 79:11
**horizontal** 126:21 127:7
**host** 64:23 66:20 67:5 69:11 71:22 71:25 185:6
**hour** 47:19
**hours** 12:23
**hundreds** 34:14 194:19 217:4
**hurricane** 139:20
**hurts** 172:24
**hypothesis** 30:4
**hypothetically** 108:13

**i**

**iceberg** 205:2
**idea** 231:20
**identification** 15:2 15:6 75:21 87:25 126:10 132:2 160:2 161:19 168:25 180:5 183:21 218:6
**identified** 47:23 48:3,5 55:24 56:11 60:2 123:22 131:17 184:19,24 233:20 244:4
**identifies** 127:22
**identify** 48:9 52:6 103:4,10
**ignoring** 79:3,4
**imagination** 30:11
**imagine** 29:13 30:2 94:7 115:7 131:17 220:1
**imbalance** 161:3
**impact** 28:12 43:4 51:17,23 52:4,7 60:22 61:20,22 62:2,4 64:21 65:1 65:3,6,20 66:16,22 67:6,6,10,19 68:3 68:10 69:2,7,15,21 70:3,5,6 72:18 73:9 77:18 82:11 82:16,21 83:1,8 92:6 94:11,18 102:7 107:14 112:22 119:24 129:1,16 133:5,10 133:11 135:4 136:15 137:3,8,11 137:13,15,21 140:3,7,8,10,13

141:8 142:6,17,24 143:2,5 145:1 147:8 149:6,18 154:24 155:2,3,10 157:14 158:1 161:14 162:11 163:21 164:17 166:17 167:17 168:5 171:21 172:11 181:3 183:3,5 185:4 186:24 193:2 199:24,25 205:11 205:16 208:24 209:17 210:19 211:4 213:3,22 214:20 215:5,11 216:9,20 217:2,8 222:16 224:21,24 225:20 226:23 227:16,19 228:18 228:22 233:17,20 235:21 236:22 237:7,13 239:10 239:20 245:7,8
**impacted** 75:15 82:17 83:4,7 109:5 209:4
**impacting** 77:19
**impacts** 82:6,6,13 82:15,20,25
**implication** 74:3
**implications** 116:6 136:24,25 173:24
**imply** 67:10
**importance** 104:22
**important** 14:3 61:5 63:9 90:15 105:16 116:5 129:15
**impossible** 111:4 120:15 124:3,5
**improve** 160:12
**inaccurate** 128:18
**inappropriate** 46:25
**include** 14:17 147:21 211:23
**included** 46:12 112:18,18 147:24 189:25
**includes** 223:1
**including** 79:16 124:16 153:13 155:6 220:3,24 223:3
**income** 13:23
**incorporate** 43:18 138:18 140:23 176:9
**incorporates** 138:17
**incorporating** 141:1
**incorrect** 42:16 49:23 50:1 216:15
**incorrectly** 208:5
**increase** 19:16 32:9 52:11 60:7,8 60:9 66:2,5,5,6 92:19 93:12 105:3 140:8 162:16 163:22 186:20 188:7 189:7,13,14 190:14 196:6,11 197:23 199:18,24 200:1,5,6 202:24 203:1 204:4 205:18,25 206:10 206:17,25 207:13 210:13 214:14,16 214:24 215:8 221:17 222:24,25 223:3,13 225:12 225:16 229:3,24 230:2,8,15,19 231:1 236:6,8,10 236:14,18 237:14 238:13,15 240:11 244:9,19 245:9,16 246:11,20
**increased** 29:22 59:23 60:4 82:9 91:23 92:1 117:14 117:18,19 139:17 146:17,20 147:9 186:13 191:23 192:20 193:21 198:8 199:12 200:16 203:14 205:12 207:20 211:17 214:12 215:6 216:11,20 218:15,23 223:25 230:10 237:17 238:1,10,14 246:15
**increases** 60:17 63:1 82:10 147:21 215:10,16,18,21 215:24 217:8
**increasing** 60:12 64:5 82:2 155:13 182:6 190:1,22 200:18 201:5,8 223:5 242:25 245:11
**independent** 17:4 128:6
**independently** 141:15
**index** 5:1
**indicated** 114:1 124:7 160:18
**indicates** 134:5
**indicating** 48:13
**individual** 11:15 56:4 140:3
**individuals** 16:5 33:1 55:4 89:25 129:4 199:7
**industry** 80:23 82:8
**infinite** 107:17 108:7 123:19
**inflated** 34:25 48:13 49:8 59:16 125:8
**inflating** 69:14,20 70:2 92:4 94:10 240:4,23
**inflation** 6:11 34:21,24 35:3,12 35:15,20,24 36:5,6 37:3,21,23 38:6,6 38:12,20,24 39:3,4 39:12,14,18,21 40:7,9,19,24 41:3 41:4,18,22 42:2,7 42:11,19,25 43:6 44:2 46:9 49:9,13 51:16 59:12,19,23 60:5,13,17 61:1,4 61:14,17 62:9,10 62:15,22 63:13,16 63:21 64:11,12 65:11,25 66:1 70:12 71:10,12,15 71:16 72:1,3,3,11 72:15 73:5 74:4 74:19,20,25 75:1,3 75:8,13 76:1,10

77:1,20 78:3,7,8 78:15 79:24,25 80:1,13,23 81:4,12 81:15,19 82:7,12 82:16,17,21,22,23 83:1,3,8,13 84:6 94:22 95:4,5,7,11 96:1,2,11,13,18,23 96:25 97:18 98:2 100:2,19 102:1,9 107:21,23 108:3 108:14,18 110:3 110:24 119:15 122:15,18,19 123:10 134:20 136:18 137:5 144:24 228:24 230:23 231:24 232:14 235:8,24 238:18,19,22 241:10

**influenced** 183:11

**information** 5:12 24:20 27:15 31:10 31:11 32:2,23 49:4,24 51:8 52:14 53:10,13,15 102:21,23 106:7 107:7 114:22 115:15 116:2 130:13,16 131:5 131:16,19 133:21 133:23 136:13,16 137:6,7,16 139:5 139:11,23 140:17 141:14 147:6,11 148:8,9 149:15,16 151:24 158:8 175:1 177:20 185:13 222:12 232:25 234:16 235:7

**initial** 15:9,14,22 18:12 20:1,25 21:5,15 24:21,24 25:15 26:8 27:14 35:10 37:4 38:12 38:25 39:3,15 41:19 44:1 46:9 47:21 61:9 62:8 62:13 64:10,16,16 70:11,12 71:7 95:19 113:20 150:18 233:6

**initially** 62:14

**input** 17:19

**inputs** 123:7 141:11 144:7 146:3 206:14

**insert** 172:12

**insertion** 43:11

**instance** 67:7 78:20,21 137:21 137:21 144:8 176:8

**instructed** 5:8

**instructions** 232:23

**intend** 21:20 28:9 34:12,15 191:22 192:6,19 193:15 193:24 195:5,11 232:1

**intended** 25:5 115:18 237:11,13

**intention** 196:1

**interest** 61:4 63:9 64:22 65:16 66:13 79:13 80:17 81:20 112:12 203:19,20 204:1,2

**interested** 10:3 249:19

**interests** 173:15

**interfere** 9:10

**interference** 9:8

**internal** 103:23 108:25 109:4,20 109:25 110:3,6,11 110:15 111:1 190:12 192:13

**internally** 54:24 117:8

**interpretation** 20:5 205:23

**interpretations** 85:14

**interpreted** 99:9

**interrupt** 74:13

**interrupting** 46:18

**introduce** 11:12

**investigating** 126:2

**investing** 182:14

**investment** 100:5 101:1,3 222:4

**investments** 204:13

**investor** 6:19 82:18,19 100:10 100:14 101:7 126:8 204:12 214:9

**investor's** 202:10 218:16 236:9

**investors** 35:6 77:23 92:11 93:6 95:25 116:5 163:2 177:14 201:3 202:22,23 203:5,7 203:15,22 204:8 205:3 218:25 222:2 223:2 230:17 237:15 239:13 241:16

**invoices** 14:8,14

**involved** 55:7 183:8 241:22

**involves** 245:7

**irr** 103:23

**irrational** 200:15

**irrelevant** 69:24 238:4

**irrespective** 227:17

**isaac** 139:21

**isolate** 52:16

**issue** 39:23 40:25 51:12 54:19 58:16 64:5 67:11 85:12 98:20 104:24 128:19 134:25 176:8 194:9 198:1 200:21 202:15 211:15 212:11 216:22 217:1 230:2 231:16 241:1

**issued** 20:25 25:15 128:17

**issues** 15:18 40:17 67:5 71:23,24,25

**item** 184:23

**items** 184:18

**j**

**j** 1:22 2:19

**j.p.** 7:15 168:15,16 168:18,20 169:5 169:10,16,24 171:10

**james** 4:3 10:10 11:15

**january** 6:14 57:6
**job** 122:20 245:1
**johnson** 8:3 218:11
**joint** 67:25 203:24 226:5,11,19,20,23 227:1
**journals** 13:10
**judge** 81:6 158:18
**june** 1:15 2:19 9:1 9:5 249:22
**jury** 14:12 39:11 107:7
**jv** 227:17,20

**k**

**kallas** 1:22 2:19 9:25 249:4,25
**kaplan** 83:15 86:6 86:10
**kaufman** 3:5 10:15,15 12:22 15:7,11 22:3,19 23:5,20,23 25:17 25:20 26:10,13 27:25 29:4,24 30:17 32:13 33:10 33:19,22 34:7 36:16 38:3 39:1 39:16 40:20 41:21 42:15,21 43:2,23 44:12,15,18 45:10 45:14,16 46:17 47:4,6,9,12,16,19 49:19 50:24 54:17 55:1 56:7 68:13 70:15 71:18 77:13 89:9,21 91:4,25 93:20 98:23 100:24 110:19 117:16 119:17 120:22 121:10 122:17 124:23 127:1 128:11,20 129:23 130:6 131:3,14 133:14 134:6,23 135:8,20 144:5 149:12 154:14 155:1 156:3 178:1 185:18 188:15 191:10 192:10,19 192:23 193:5,23 194:1 198:22 199:3 212:7 216:12,23 222:10 225:2,23 232:3,7 234:3,13 240:2,5 240:13,24 244:4 244:15,23 247:1
**kaufman's** 24:12
**keep** 36:3 38:6 46:18 60:13 63:20 70:19 72:10,21,24 80:11,11,13 172:12 190:2 195:20
**keeps** 71:25 72:12
**kept** 57:7 95:4,5
**key** 47:22 125:15 141:24 172:2 218:18 233:2
**keybanc** 7:3 131:24
**kind** 20:5 69:21 79:18 85:24 86:1 111:13 145:24 171:19 172:2 183:3 185:3 188:12 198:21 200:3 213:13 227:18 235:14 238:4 242:19
**knew** 50:15 51:5 90:3 92:11 117:8 119:19 158:20 230:17
**know** 14:7,10 17:21 22:22 25:8 25:22 26:17,24 27:17 28:6,20,22 29:8 31:3,12,15 36:9 38:2 42:6 48:18,24 51:2,24 52:3,17,18 53:1,3 53:6,14,16 54:7,14 54:23 55:2,5,6,9 55:12,20,23,25 56:1,8,10,11,13,15 57:4,5 58:10,17 63:17 67:1,2,3 68:2 70:16 83:24 84:14 86:4,15 87:8,9 88:10,18,20 88:21 89:1,22,23 89:24 90:2,7,7,7 90:16,17,20 92:19 95:8 99:18 101:2 103:13 105:8,10 106:2 107:6,8,11 107:12,13,14,16 108:10,22 110:2 111:4 112:6 113:19 114:6,12 114:20,24 115:24 116:13,14,15 118:18 120:1,3,4,5 120:6,13 121:14 121:15,17,19 122:20 123:6 125:12,20,23,24 128:13,21 129:11 129:24 130:13 131:9,15,18 133:15 138:1,20 140:23,23 141:13 142:13 143:21 144:19,22 148:15 148:19 149:24 150:14,18 152:6 153:15 154:20 164:9,14 167:4,5,5 167:18 172:1,23 179:19 181:9,19 181:22 182:10,11 183:14 187:5 192:1 195:7 196:1 197:15 198:25 199:8 201:5 202:3 202:13,14 203:9 203:12 204:8,9 206:24 209:6,16 211:13,24,25 212:9 213:17,20 214:22 217:14,15 217:23,24 220:6 220:11,16,16 221:24,24 223:16 224:9,11,12,17 225:15 226:21 231:10 232:24 233:22,24 234:25 235:6,16 236:21 236:24 238:25 239:5,6,8,17,18 240:25 242:4 246:10
**knowable** 105:20
**knowing** 173:11
**knowledge** 30:8 49:25 129:8 130:7 131:20
**known** 50:15 51:5 92:9,13,21,25 93:3 102:23 105:19

119:20
**knows** 102:22 164:14
**kukalis** 16:6

**l**

**l** 3:11
**labeled** 43:25 127:7
**ladenburg** 7:18 180:9
**lagging** 213:12
**laid** 44:1
**land** 92:15 93:14 193:16,22,25 194:20 195:12 196:2,5,7,9,12,23 197:1 201:22,23 201:25 202:2 203:3,3,6 204:22 217:16 219:8,20 223:5
**language** 84:12 230:20
**large** 137:12 190:8 212:21 217:10 221:19
**larger** 62:4 94:11 94:13 118:2 210:9 210:18 211:4 212:19
**largest** 14:4 205:8 212:14 215:2
**lately** 89:3
**latest** 59:12
**latham** 3:12 10:14 243:18
**law** 9:20 40:21 41:5,13,17 84:7 86:13 234:7
**law360** 13:20
**lawyer** 86:25 87:7 241:7
**lawyers** 86:9,10 86:14,17,23 87:3 89:18 90:1 99:9
**lay** 149:13
**lead** 3:3 10:16
**leading** 97:17
**leakage** 67:16 98:3
**learn** 51:1 89:6
**learned** 21:4 50:20 51:9 246:9,13
**leases** 82:10
**leasing** 55:10
**leave** 84:21,23
**lectured** 13:13
**left** 46:7 84:15
**legal** 9:25 39:23 40:17,25 84:10 85:12,22,25 97:24 97:25 98:7,9,22 100:21 134:25 194:9 231:16 239:22 241:7
**legally** 119:11
**level** 98:2
**liability** 229:1,8 230:25 231:5,14 231:18,21 232:1,5 232:19 233:10 235:3
**liable** 233:25
**lied** 117:6
**lifetime** 54:2 57:17 114:3 115:22 134:14
**light** 118:8 152:6
**limit** 85:19
**line** 5:9,13,18 10:12 41:7,8,10 63:14 64:2 72:22 211:14 213:15 248:8
**lined** 96:19
**lines** 215:25 216:21
**liquid** 126:25
**liquids** 127:18
**list** 32:2 47:22 184:14
**listed** 48:3 56:4 153:5 233:11,13 233:14 248:7
**listen** 45:15 128:12 166:18 167:12 172:23 174:14
**listening** 243:22
**literally** 153:6
**litigation** 1:5 2:5 9:17 12:1 13:24 26:3 91:14
**little** 36:11 55:14 73:12 79:10 81:9 105:5,10 109:12 149:4 156:17 171:3 185:9 201:11 207:5 210:3 223:16 236:25 239:16,18
**llc** 8:3
**llp** 4:5 7:22
**located** 9:21
**location** 219:15 221:7,12 222:22
**locations** 170:13
**logically** 232:22 242:17
**long** 57:7 160:13
**look** 30:19,20 31:10 36:12,13 61:9 63:25 64:24 68:4 75:24 77:16 87:22 90:9,23 93:23 99:16,18 101:3,5 105:17 108:23 109:8 111:6,7,8,13,24 115:15 116:4 117:7 130:18 131:4 132:10 136:20 138:5 139:1,2 143:9,14 144:8,9,11 148:15 149:20 152:1 153:17 157:2 158:8 163:23 167:6 169:15,20 172:8,18 176:3 177:10,19 178:5,6 178:7 201:19,21 201:23 202:11,23 205:5,23,25 206:23 210:6 213:18,19,25 219:11 224:17 228:4 233:16 235:15,17 243:6
**looked** 18:4 38:24 51:12 52:23 53:9 58:1,3,16 78:12 94:7 114:16 116:4 130:15 134:5 147:22 149:15,15 153:18,19 165:10 171:23,23,25,25 200:11 214:21 216:16,19 220:16 225:24
**looking** 20:6 30:1 36:10 62:14 64:17 65:5 66:24 78:19 78:25 79:1,2,3,5

79:12 86:2 92:13 113:1,3 115:11 117:23 122:7 128:24 141:15 146:6 152:6 158:9 166:16 173:13 177:7 183:13 197:13 201:3 202:10,17 204:16 208:18 221:22 238:19
**los** 1:14 2:17 9:1 9:22 249:2
**lose** 156:8 237:18
**losing** 154:7
**loss** 6:16 13:10 15:18 97:9,20 98:22 99:11,22 100:3,17,18 210:6 217:4
**losses** 98:5 99:23 100:11,22 101:3
**lost** 237:18,21
**lot** 13:2,4 17:17,19 17:22 47:2 52:14 53:10,12 78:23 80:19 81:12 88:20 88:23 90:6 103:14 130:12 139:10 140:23 141:23 142:3 156:6 159:4 174:2 183:7 186:8 190:10 203:12 204:17 216:4
**lots** 80:2
**low** 37:24 166:1
**lower** 69:3 78:8 154:7 179:14 184:25 208:2
**lowest** 155:22 156:5,20
**lunch** 135:19,25
**lw.com** 3:18

**m**

**magnitude** 27:18 137:13 224:15 225:12
**main** 18:17
**major** 245:13
**majority** 152:5,5
**making** 33:23 58:12 60:25 74:6 112:3 167:19 172:23 173:14 204:3,13
**management** 163:3 173:13 174:12,13
**managing** 14:22 204:10
**manner** 72:4
**march** 6:5,18 15:7
**mark** 4:6 10:9 11:14 14:24 45:10 46:17 47:7 75:18 88:1 126:5 131:23 159:24 168:23 180:6 183:22
**marked** 5:17 15:2 15:6,13,22 75:21 87:25 126:10 132:2 160:2 161:19 165:6 168:25 180:5 183:21 218:6
**market** 29:22 38:11 39:7 42:3,7 43:18 48:20 60:10 61:8,17 62:12 64:15 65:15 66:2 66:11 80:16,17,23 81:18 82:4 83:14 83:19 84:4,25 91:2 92:12 102:13 102:21,24 133:22 133:23,25 139:7 143:18,19 145:23 151:25 165:14 167:13 171:17,18 172:8 175:2 176:24 177:22 188:13 198:19 199:19,25 200:7 201:7 204:11 205:6,20 206:11 206:18,24 207:2,4 207:15,19 208:2,9 208:14 209:22 210:4,6 217:5 219:22 221:16 225:14 226:13,14 229:4,23 230:6 233:21 235:13 236:17 237:25 246:9
**market's** 102:2 136:8 141:3 162:1 221:19 222:7,20 236:13
**mask** 198:6
**massive** 198:25 224:14
**material** 20:6,7,9 27:20 136:23 137:6,10 142:19 143:23 144:25 145:2,5,8,17 146:10 148:1 164:17 167:21,22 168:2 175:16 176:14,14 186:21 195:3,14,22,25 196:13 197:5,7 210:16 211:1 236:22 237:11
**materialization** 26:18,23 27:20 28:5 186:19,22 187:3,19,25 188:2 189:15,15 222:13 223:15,19 235:18 239:1 241:11 243:25 244:21,24 245:4 246:1
**materialize** 28:4
**materialized** 189:11,19 244:16
**materially** 154:17
**materials** 17:25 18:6 19:24 20:24 31:22 32:19 33:13 117:13
**math** 170:11
**matt** 4:8 10:12
**matter** 9:16 14:3,6 15:19 16:13 34:10 90:23 122:22 146:10 155:6 158:12 186:16 224:10 230:17
**matters** 51:3 86:24 155:5
**matthew** 4:3 10:10 11:16
**mature** 156:22
**mean** 18:21 21:6 27:17 30:7 31:16 32:1,7 33:7 34:13 34:13,24 35:3 38:18 39:2 58:7 62:25 63:11 80:6 82:14 85:1,2 86:18 87:2 90:18 92:23 94:5 104:20

106:25 108:19 111:18,22,24 112:20 115:9 118:16 121:16 123:14,16 124:4 128:14,22 130:13 131:18,19 133:3 133:19,20,21 134:8,24,25 138:3 139:23,24 144:7 145:17 147:1 157:24 165:2 173:21 179:12,12 181:7,7,10 182:7 182:12 183:1,7 187:18,19,25 191:2 194:9,10 197:24 198:24 199:22 200:8 202:22 205:14 209:9 214:2 215:8 222:5 225:5 234:4 234:6 235:1
**meaning** 36:11
**meaningful** 156:23
**means** 65:19 98:18 106:4 119:8 120:24 142:10 147:2,4
**meant** 185:18 219:6,18
**measure** 35:4 95:20,24 96:4 230:22 231:11 238:17,22
**measured** 228:18
**measures** 39:18 40:22,23 102:12 214:2
**measuring** 61:22 102:2 236:13 238:19
**media** 9:13
**median** 152:2 153:2,7,7 154:1,11
**meet** 12:20 190:25 191:7 198:12,14
**meeting** 6:19 12:25 126:8
**melville** 3:7
**mentioned** 13:22 66:12 69:10 71:24 80:18 81:20,21 125:12 216:4
**met** 11:11 12:22 89:25
**method** 42:13,24 123:10 141:2 143:4
**methodology** 36:4 36:5 37:10 43:13 43:13 44:24 59:20 63:7 73:4,13,22 78:15 83:2 85:17 100:5 104:2 135:13 137:1 143:8 153:20
**methods** 137:14 137:17
**metrics** 162:11
**mexico** 139:22
**mgimbel** 4:12
**microphone** 74:12
**microphones** 9:6,9
**middle** 127:11 132:16
**million** 28:7,16,22 29:7 30:14 61:25 62:3 64:20 93:2,8 93:15 139:17,18 146:21,21 165:12 170:6,20 171:12 184:25 186:20,20 188:7 189:13 191:23 192:11,20 193:16,21,24 194:25 195:7,12 196:8,17,22,24 197:1 200:1,2,24 200:25 201:2,13 201:18 202:21 203:4 204:17,21 206:24,25 207:1 207:19,20,23 208:7,9,13 210:13 214:13,13 219:23 220:1,2,6,20,24 221:2,11 223:21 224:16,18 225:15 225:16 226:11 227:2,3,5 230:15 237:5 244:8,18 245:8,8
**millions** 194:19 217:4
**minimum** 166:25
**minutes** 243:5
**mis** 233:14
**mischaracterizes** 26:13 100:24
**misimpression** 188:12
**misinterpreted** 43:22
**misleading** 50:23 51:6,11 116:15 122:24,25,25 127:16 128:18 187:23 239:13
**misled** 77:23 120:6
**misrepresentation** 36:7 43:7 49:15 49:18,23,24 50:5,6 50:8,12 60:10 66:17,19 68:10 104:12 107:12 112:21 134:12,16 134:17,17 148:4 148:12 188:20,21 188:22,24 228:25 229:8 230:24 231:5,8 233:15
**misrepresentatio...** 35:1 40:3 48:2 60:3,21 67:9 80:4 105:6 113:14 147:18 148:22 229:14 231:10 233:17
**misrepresented** 68:21
**missed** 170:8 213:8,20,23 214:3
**missing** 27:16 158:23 166:10
**mission** 4:9
**mississippian** 48:14,19 52:8,21 53:4,7 54:15 57:13 58:5 68:23 70:7 77:23 91:23 92:5,7,11,12,14,22 92:24 93:8,17 94:3,11,12,15,24 95:3,13 103:15,18 103:20,22 105:13 106:9,22 107:25 108:11 109:1,20 110:10,16 111:17 111:18,20 112:7 112:16 113:10,16

114:1,19,20 115:5 117:14,22 118:1 118:12 119:8 121:9 122:1 123:13 124:9,22 125:7 126:19,21 127:7 130:21 133:13 134:12 139:17 146:20 162:24 163:12,13 164:4 174:4,20 177:8,9,13,21 178:5 179:9,13 185:25 186:2,9,11 190:4,16,20 191:5 191:8 197:20 198:7,12,20 203:4 204:23 211:16,18 214:12 215:17 217:22 219:14 220:3,7,21,25 221:3
**misspoke** 72:8,14
**mistaken** 99:13 128:4 159:14
**mitigate** 67:17
**mitigated** 67:12
**mitigation** 155:14
**mixed** 213:9,13,17 226:20
**mixing** 227:14 228:1
**model** 102:12 118:22 119:1,14 124:2 138:16 141:12 146:4 200:4
**models** 164:24,25 165:1 168:11
**modification** 120:12,12 140:8
**moment** 37:3 59:1 74:11 101:13 135:21 178:14 236:15 243:7 247:7
**moments** 116:20
**monetize** 203:9
**money** 150:10 181:5 182:9,12,15 186:8 202:14 217:16 237:18,19 237:21
**morgan** 7:15 63:6 63:24 72:20 73:15 91:8 168:15,16,18 168:20 169:5,10 169:24 171:10
**morgan's** 169:16
**morning** 9:4 11:9 11:10 48:10 214:5 214:7
**morningstar** 155:20 156:1,16 156:21 157:7,20 158:3,5,10,10,15 159:9,13
**morningstar's** 158:15
**motion** 20:16,17 20:24 36:24 44:18 46:24
**move** 43:22 44:16 45:20 46:14 47:5 65:23 132:12
**movement** 227:25
**moves** 219:12
**moving** 85:25 140:22
**mthompson** 4:14

**n**

**n.w.** 3:14
**name** 9:23 120:23 243:17
**named** 249:7,11
**nature** 17:13
**necessarily** 104:19 105:4,9 110:5,6 111:11 139:10 165:3 225:16
**necessary** 136:15 140:12 141:18 142:22 144:21,24 146:8
**need** 23:13 27:17 90:24 148:5,6,7 173:24,25 174:5 174:19 175:5
**needed** 16:24 176:14
**needless** 84:8
**negative** 111:11 111:15 136:13,15 136:19 137:6,8,15 140:10 142:14,17 142:24 143:2,24 145:5,7,11,17 147:5,25 149:17 152:13,13,22 153:16 154:17,19 155:3,21 156:1 157:14 164:10,10 164:17 165:15 167:16,17 168:1,6 172:11,17,19 173:12,12 174:11 175:1,16,16,20 176:8,11,13 177:20 178:7,10 181:2 182:15 208:20 210:18 211:4 214:17,18 242:1,1
**negatively** 146:25 151:24 157:20 177:23 221:16
**net** 150:15 220:20 221:2
**netherland** 127:23 128:2,6,9,17 129:12,20 130:4 131:2 132:20 133:2,6,8,10,17 134:3,19,21 135:5
**neutral** 152:25 155:18 165:8,11 165:20 166:8 167:24 175:14
**never** 13:9,13 33:20 86:15 89:25 158:6 172:17,19
**nevertheless** 84:18
**new** 3:7 23:2,16,24 25:14 49:4 62:10 102:22 114:22 115:8 139:4,23 182:10 183:17 185:10 186:8 190:1 191:14,15 195:2 197:25 198:2,15,17,25 217:13,21 218:24 219:6,9,14,18,23 220:3,7,17,21,24 220:24 221:2,12 221:21 222:8,22 223:7,23 225:1,4 225:21 226:2
**newer** 197:13,15 197:17
**news** 158:4 182:22 184:14,18,23

Case 5:12-cv-01341-G Document 476-18 Filed 04/02/20 Page 92 of 112



200:11 213:3 214:17,18,20,21 220:19
**nominal** 10:11 11:17
**non** 62:22,25 66:15 71:23 72:3 75:15 79:15 180:17 207:3 209:24 210:20 211:5,10 212:4,13 212:22 213:3
**nonresponsive** 36:25
**nonsense** 176:1
**north** 52:2
**notary** 248:25
**note** 9:6 25:1 163:11
**noted** 47:8,10 52:25 58:19
**notes** 243:6
**noticing** 10:8
**notwithstanding** 72:18 73:10 74:22
**novatel** 81:3
**november** 19:3 26:17 40:6 43:5 67:3 102:3 139:6 139:7 140:4 146:18 150:22 158:21 160:7 162:2 169:5 179:1 179:1 180:10 184:3
**number** 6:2 7:2 8:2 9:19 29:17 40:14 49:22 83:4 107:18 108:7,8 115:12,24,24,25 116:5,6 118:2 123:19 124:15 131:9,10 140:20 164:21 186:5 192:12 195:2 197:17 205:21 207:24 210:9 214:15 234:25
**numbers** 107:18 111:19 118:6 124:20 131:12 143:12 153:5,19 167:19
**nutshell** 142:2
**nymex** 169:21

**o**

**o0o** 9:3
**oath** 11:2 12:8
**object** 22:3 26:10 29:4,24 38:3 40:20 41:21 43:2 47:7 50:24 68:13 70:15 71:18 89:21 93:20 117:16 119:17 122:17 124:23 129:23 130:6 131:3 133:14 134:6 149:12 154:14 155:1
**objecting** 47:6,9
**objection** 25:17 30:17 32:13 39:1 39:16 42:15 43:23 44:18 47:8 49:19 54:17 55:1 56:7 89:9 91:4,25 93:20 98:23 100:24 120:22 121:10 128:11,20 131:14 134:23 135:8 144:5 156:3 178:1 188:15 191:10 192:10,23 194:1 198:22 199:3 212:7 216:12,23 222:10 225:2,23 232:7 234:3,13 240:2,5 240:13,24
**objections** 10:6 47:11
**objectively** 205:5
**obligation** 32:18
**observable** 186:6
**observe** 191:16
**observing** 52:10
**obtain** 202:20
**obviously** 103:12 154:5 156:8 179:14 196:10
**occasions** 12:4
**occurred** 22:9 196:5 231:22 232:6,20 234:21 239:4,21 244:24 245:3
**occurs** 191:17
**october** 96:16,17 96:20 97:13 100:16 109:10
**offer** 185:11 199:16
**offered** 42:10
**offering** 27:13 41:16 100:22
**office** 87:14,15 90:4,5
**oh** 18:9 33:10 74:14 76:21 87:9 103:6 157:14 170:10 179:4 192:4 197:24 233:5 245:24
**oil** 6:11 48:15,20 49:1,8 50:4,22 51:18 52:8,19 53:4,8,23,24 54:16 55:17,21 57:12,16 58:6 61:3,25 62:3 62:4,5 63:8 64:20 64:21 65:16 66:12 66:17,18 67:9 68:11,12,21 69:2,3 69:7,9,13,15,18,20 69:22,25 70:2,7,9 70:14 71:8 72:17 72:19 73:10 74:22 75:5,9,24,25 76:7 76:15 77:16,24 78:4,9,16,20 79:7 79:7,8,14 81:21 82:10 94:10,16,19 103:19,21 104:21 104:23 105:3,14 106:10,24 108:1 108:12 109:5 111:1,2,10,12 114:3 115:3,6,21 116:24 117:1 118:18,23 119:9 121:8,24,25 122:9 122:10 123:12 124:10,12 126:24 127:17 130:22 132:19,22 133:12 134:13,14 163:11 163:14 184:25 186:10 197:14 198:4 235:12 236:4,8,20 237:5,8 237:23 238:5,7 239:17

**okay** 11:21,25 12:7,10,13,16,20 12:24 13:16,22 14:1,5,17 15:11,17 15:25 16:9,12,21 16:23 17:3,8,24 18:7,15,18,25 19:18,22 20:8,23 21:3,24 22:8,12,17 22:20 23:4,12 24:11 25:6 26:6 27:12 28:14 29:1 29:10 30:11 31:7 31:18,22 32:17,24 34:4,17,24 35:10 35:14,18,24 37:7 37:20 38:9,19,23 39:10,20 42:10,18 44:7 45:6 47:9 48:1,9,18 49:4,7 49:16 50:7,10,16 50:19 51:8,13 52:6,18 54:3,6,8 55:9,20 56:5,15,25 57:9,18 58:3,10,17 58:24 59:15,22 60:2,19 61:11 64:3,10 65:23 66:11,16 68:6,18 69:1,6,12,25 70:6 70:11 71:6,14 72:13 74:10,24 75:2,17 76:5,10,14 76:21,22 77:5,9,12 77:22 78:2,7 80:15,21 81:24 82:8,17,22 83:3,9 83:20 84:1,17,21 86:5,10,22 87:11 87:16,21 88:11 89:17 91:13,17 92:3 93:10,16 94:2,9,15,22 95:24 96:7,15,17 97:7,11 97:17,22 98:21 99:3,7 101:22 102:12,25 103:16 104:1,13,15 105:11,23 106:13 108:4,11,17,24 110:9,15 111:22 112:6,15,24 113:7 113:13,18,21 114:6,12 116:8,18 116:23 117:4,12 118:4,8,22 119:13 120:19 121:5,21 122:2,5,6,12,13 124:6,15,20 125:11,14,20 126:3,15 128:6 129:11 130:2,10 130:18,25 132:6,9 132:16 133:4,9 134:18 135:3,13 135:18,20 136:7 136:12 137:4,14 138:2,11 139:12 139:20 140:11 142:5 144:2 146:9 146:24 147:7 148:10,20 150:17 150:21,25 151:7 151:12,22 153:25 155:9,16,25 156:16,21 160:24 161:7,12,17,22,25 162:8,13 165:19 165:22 168:13,23 169:4,15 170:10 170:12 171:2,19 178:24 179:5,16 179:20 180:2,3,13 180:22 181:6 182:18 183:2,9 184:14,18,23 185:3,9,17,21 187:1,21 188:3 189:2,9 190:8,18 190:24 192:2,8,18 193:4,11,14,23 194:5 195:9,19 197:1 199:16 200:13 201:11,16 204:11 205:17 206:9 207:1 208:13 209:19 213:2,7 214:4,11 215:13 216:19 217:12 218:18 219:5,21 220:19 221:6,14 222:20 224:3,20 225:10 226:4,22 227:13 227:22 228:3 229:7 230:12,20 231:20 233:1 234:10 235:8,25 236:17 237:23 243:20 245:1 246:25 247:1,7

**oklahoma** 1:2 2:2 9:18

**old** 84:9 92:11,14 92:21,23 191:14 191:17,17 198:4 198:16,18,18

**older** 185:25 186:10 197:18

**omission** 231:7,13 231:21 232:4,19 233:10,19 234:1 234:21

**omissions** 35:1 48:2 60:3,21 80:4 188:19 229:17 233:20 234:7

**ones** 34:16 48:3,5 48:8 83:18 90:17 155:22 159:11

**ongoing** 201:24

**ooo** 10:22 11:6 243:12 247:14

**opec** 82:2

**opened** 139:7

**opening** 18:5 26:22 187:8

**operate** 150:8,13

**operated** 80:24 111:23 112:19

**operating** 38:11 39:7 42:3 43:18 60:11 61:8 83:14 83:19 84:5 85:1 91:3 139:21

**operators** 111:25

**opine** 119:12 121:2

**opinion** 19:11 23:11 26:7 27:13 29:3 39:20 40:18 41:17 43:3,9 44:19 78:14 80:21 89:13 97:18,24 98:21,22 99:8,22 100:21,25 125:6,9 142:9,14,15,21 144:25 145:4,11 145:12,18,18,20 145:22 153:22 156:10 176:18,22 176:23 177:18 185:10 192:18 199:16,21,22

209:6 210:15,22 210:25 232:10
**opinions** 19:19 20:2 31:19,23 32:20 34:10,12,13 34:14,15 81:4 85:23 86:24 88:12 89:7,12,19 90:24 98:9 151:16,21 192:24 209:8 241:8
**opportunity** 176:11
**opposed** 27:1 66:9 66:13 74:2
**opposing** 142:13
**opposite** 77:5 78:8
**optimistic** 151:20
**option** 141:17 150:2 153:21 157:17 172:14,16 172:17,18,20 176:10 177:1,24 178:8,9
**oral** 22:20
**order** 20:17 56:2 115:12,18 136:17 137:1 145:20 158:1 171:8 176:7 176:7 190:1 198:12 231:18
**original** 18:5 21:22 23:25 25:2 25:3 26:21,25 27:10 63:5 85:8 233:5 249:16
**outcome** 10:3 81:14 173:12,12 175:12,13 176:9 176:11,13 239:8
**outcomes** 109:14 123:18 130:21 173:10
**outside** 30:1,7 54:10 55:11 58:1 113:8 117:10 128:22,23 129:5 135:1 148:14 234:4
**outspends** 160:19
**outstanding** 207:25 208:3 210:7
**overall** 147:24 203:15
**overlook** 172:2
**overlooking** 172:3
**overpaid** 35:6
**overpayment** 35:8
**overstatement** 35:5
**overstating** 186:2
**owned** 112:8,10 237:16
**owning** 113:5

**p**

**p.m.** 2:18 135:25 136:1 247:13
**package** 169:24 170:7,24
**page** 3:20 5:9,13 5:18 6:2 7:2 8:2 43:9 83:22,25 88:4 126:15,19,20 126:23 127:2 130:14,14,18,20 131:7,8 132:9 169:15 180:14 184:4,7,8,9,12 210:24 219:11,12 248:8
**pages** 56:3
**paid** 14:5,17
**paper** 63:5,6,24 72:20 85:15 87:6
**papers** 87:3,4
**paragraph** 23:1 25:10 44:21 47:22 95:19,22 99:25 103:3,3,5,7,11,17 111:17 113:20 114:13 124:6 150:17,21 151:5 151:15 152:11 153:5 155:22 169:20 187:10 191:19 194:12,12 195:9 205:10 210:24 228:16 229:11 230:20 233:1,7
**paragraphs** 194:18,24
**paralegal** 17:11
**paraphrase** 149:22
**parenthetical** 84:15
**part** 11:24 27:25 30:15 33:4,8,25 39:23,24 50:17,19 55:17 57:18 58:8 66:18 67:24 68:11 111:7 124:21 139:24 149:2 156:22 157:1 170:21 174:24 179:17 182:12,13 191:3,24 192:21 193:17,20,25 195:6,13 200:25 203:13 204:11 211:18 216:13 222:23 223:14 242:12,13
**particular** 52:11 53:23 54:19 56:17 56:18,21 57:23 58:16 77:11 78:18 78:22 84:2 88:4 89:16 105:22 121:1 131:9,10,16 137:2,13 143:25 147:23 149:14 152:14 159:2 173:18 182:2 183:13 188:21 192:14 209:17,21 215:8,14 224:15 236:15 237:12,12 242:24
**particularly** 18:3 88:24 129:15 164:18
**parties** 9:12
**partly** 57:22 95:6
**parts** 140:22
**party** 10:2
**pause** 89:6,10
**pay** 143:19 203:25
**paying** 202:6 203:18,19
**payments** 203:20 227:5
**pe** 138:13
**peak** 76:17
**peer** 13:10
**peg** 139:1
**pending** 9:17
**people** 66:23 80:8
**perceive** 165:14
**percent** 11:25 13:23 43:6 48:15

48:20 49:2,8,22 50:4,22 51:17,20 52:8,16,19 53:4,8 54:16 55:17,21 56:3 57:5 58:5 59:24 74:21 75:1 80:11 83:10 94:16 94:18 103:21,24 109:2,9,9,10,21,22 110:1,12 122:9 124:11 127:17 134:13 146:21 163:13,14 182:24 182:25 184:20 199:14 202:6,9 204:2 207:7,8,10 207:22,24 212:2 212:18 230:14

**percentage** 36:22 38:6,7 39:3 40:13 43:13,16 49:8 50:4,22 57:12,16 59:19 60:18 62:15 63:7 64:24 66:6 69:15,20,23 70:2 71:16 72:12,17,21 72:24,25 73:5,9 74:4 77:24 81:16 83:1,11 85:9,16 95:4,7 97:19 99:3 100:3 102:10 111:1,10 112:12 183:1 235:10

**percentages** 71:21

**perfect** 144:17

**perfectly** 129:2

**perform** 244:10

**performance** 113:15 118:11 120:20 179:8 190:15 197:20 198:6,11

**performing** 170:23 179:14

**period** 27:4 34:22 35:15 37:5,22 38:16 41:2 44:3 45:3 49:10,14,15 49:17 51:1,4,19,21 51:23 52:5,15 53:2 56:17,22 57:2,4,7 61:12 62:9 64:4,8 65:6 65:12,21 66:10 67:11,14,18,21 71:9 72:18 73:11 73:15,18 74:21 75:10 76:6,17,24 77:3 80:16 81:11 82:3 85:21 91:24 92:10,16 93:4,6,18 94:4,25 95:12,21 102:2,4,10,15,19 104:3,6,8,9,17 105:14,22 106:22 107:21 109:2,11 109:22 110:2,10 110:17 112:5 113:15,25 114:17 115:2,5 116:2,24 117:2,9,9,15 118:10 119:7,15 120:10 121:22 123:2 124:8 125:1 135:7 147:19 148:13 204:18 205:9 212:15 215:3 231:25 232:15,21 234:18 234:22,24 235:6 238:8,9,23 239:6 239:12 240:1 242:9 245:17

**periods** 67:4 73:6

**permian** 19:7 139:13 141:5,22 142:6,7 143:6,20 144:17 146:15 149:4,7,22,25 150:5,8,12 151:7,9 151:13,17,19 152:10 153:3 154:2,6,24 155:14 155:14,24 156:9 156:18 157:18 158:13,17 159:8 159:15 160:11 162:6 163:2,17,21 164:3,8,18,23 165:25 166:14 167:1,14 168:19 169:11,18,25,25 170:21 171:22,24 172:1,10,16 173:5 174:7,17,23 175:3 177:16 178:4 179:18,22 180:17 180:18,23 181:14 181:15,24 182:5 182:20,23 183:2 183:12,15,16,18 184:20 185:1

**permit** 135:13

**personal** 30:7

**personally** 87:5

**pertains** 249:15

**petroleum** 121:6 121:23 122:7 128:7

**ph.d.** 90:17

**phone** 22:22

**pick** 9:7 66:9 74:15 77:15 78:18 78:18 79:10

**picture** 143:9 147:24

**piece** 27:14 86:16 86:17,19 113:5 147:5,23 151:23 158:4 214:17,18 214:20,21

**place** 9:9,12 49:10 126:25 166:19 174:18 249:11

**plaintiff's** 16:9,19 17:8,18,24 20:4,13 20:18,20 21:4,17 21:24 22:9,18 23:16,24 29:20 30:8,14 49:21 50:9 58:8 63:19 77:6 89:19 108:25 135:10,11 147:20 148:16,18 149:2 185:13,14,17,21 189:12 193:13 194:6,23 197:4 222:15 234:11

**plaintiffs** 3:3 10:17 11:19 14:2 21:20 24:25 26:1 27:8,19 28:9,21 29:16 50:13 68:20 77:22 87:17 88:8 105:11 106:4 107:3,13,23 119:4 119:6,11,20 123:22 147:16 148:3,21 186:7 189:21 190:23 191:21 192:5,19 192:25 193:8,15 193:24 195:5,11 222:17 223:6

230:4 231:16,23 232:1 242:23 246:4
**plaintiffs's** 193:4
**plan** 34:17
**play** 78:22 174:4 217:13,21 218:24 219:6,9,14,18,23 220:3,8,22,25 221:3,6,12,21 222:8,22 223:7 225:1,4,22
**pleading** 22:13,16
**please** 9:6,8 10:6 10:20,21 36:16,20 37:11,18 44:12,12 45:10,11 47:7 59:1 77:13 95:22 101:15 135:21 178:14 247:7
**pocket** 96:4,5 97:5 97:10,14 100:11
**point** 24:4 27:15 29:1,6,10,18 42:8 53:11,15 60:25 61:20 63:4,6 68:1 70:23 86:2 104:20 107:11 113:17 120:10 138:21 143:20 147:18 152:21 158:23,24 166:10 172:2 174:16 182:16 191:13 201:10 202:10,17,23 219:9 231:18 235:21 237:21
**pointed** 61:3 158:10 230:21
**pointing** 183:16
**points** 13:5 65:9 80:15 95:12 116:21 194:19
**portion** 27:18,18 27:22 45:22 63:21 72:4 80:7,10,11 83:12 176:15 194:10 200:10 207:9 209:17,21 210:20 211:6,10 212:4,12,16,21 217:11 221:19
**position** 13:16
**positions** 146:14
**positive** 67:12 111:15 140:7 141:14,15 142:9 142:11 144:3,20 145:1,3,12,22 146:7 149:17 151:10 152:6,23 152:25 153:14,18 153:22 154:15,21 155:4,5,17,20 158:4,6,7 159:4 164:9,11 166:15 167:24 173:23 175:1,14,25 176:17,22 178:11 182:16 195:15,22 195:25 196:14,14
**positively** 149:11 151:24 176:24
**possibilities** 108:8 123:19
**possibility** 67:16 111:5 118:23 173:16 206:2 209:15 230:7,18
**possible** 52:16 105:11 106:2 107:17 108:16,18 108:21 109:17 116:8 120:14,14 122:15 123:18 124:2 130:21 140:12 150:25 151:4,8 164:22 173:3,8,10,11,12 173:20 175:2,7,8 175:19 197:13 237:24 238:3
**possibly** 120:16 123:15 176:12
**potential** 19:6 48:6 132:12 149:21 151:9 153:4 154:24 155:14,23 156:2 157:2 172:1,10 176:25 177:5,7,24 183:14
**potentially** 224:5
**power** 215:25,25 216:2,21 217:8
**powerpoint** 6:18
**practical** 81:12
**precedent** 84:10 165:24
**precisely** 77:5 85:8 239:11
**predict** 64:1 74:1 74:2 106:8 118:14 120:24
**predicted** 121:24 122:8 124:11 130:20
**predicting** 120:20
**prediction** 51:17 52:18 58:4 73:23 115:1 134:19
**predictions** 116:19 118:11,23 121:7 127:16
**predicts** 180:22
**predominantly** 215:19
**prefer** 42:1
**preferred** 137:23 203:22
**prejudge** 87:6
**premised** 138:7,15 148:20 149:1
**premium** 144:13 144:15 149:24 150:4,6 152:16,18 153:12 159:17,18 165:17 166:12,20 167:3
**prepare** 12:16,20 15:22 16:15
**prepared** 15:18 18:12 56:6 125:20 128:4,9,22 130:12 134:3
**preparing** 16:2,17 18:1 130:11
**present** 4:16 10:4 12:24 136:25 138:8
**presentation** 48:22 49:1,22 52:23,24 53:9,12 58:19,22 117:24 124:17 130:10 133:20 134:5
**presentations** 56:9 112:3 126:5
**presented** 126:19
**press** 133:16 246:17

**pressed** 178:8
**presumably** 116:1 116:25 190:22 192:12 200:19 231:25
**presume** 114:21
**pretend** 46:19
**pretty** 33:6 48:24 51:25 92:8,20 132:8 159:1
**prevail** 123:23
**prevented** 27:12
**previously** 85:11 191:7 246:5,10
**price** 17:2,4 24:19 26:17 28:12 34:22 40:4,6,7,15 41:23 43:4 49:9 51:18 51:21,25 52:11 60:12,16 61:9,19 62:4,17,19,24 63:13,15 64:5,7,21 64:22 65:16,16,18 66:8,12,12,18,25 68:4,11 69:2,3,25 70:1,21 71:8 72:2 72:4,19,23 73:1,10 73:24 74:22 75:12 75:13,16,25 77:18 77:19 78:4,4 79:5 79:6,7,8,9,13,21 79:23 80:12 82:6 82:10,14,16,20,25 83:8 94:22 95:6,9 95:18 125:8 129:1 129:16 137:9 138:14 139:1 140:4 141:22 143:18,19 144:9 144:10,13,15 151:19 152:16,19 152:19 153:2,7,9 153:12 158:2 159:17,18 162:9 164:14,25 165:2,3 165:8,13,17 166:1 166:12,14,22,25 167:3,4,17 168:9 171:5,7,15,15,16 173:14 199:13,25 200:10,12 205:7,8 205:11,24,24 207:6,9,11 208:25 209:5,13,16 210:11 212:1,2,14 212:17,19,21 215:2 217:2,11 223:1 227:20,25 230:14 233:18,21 236:12,19 238:7 240:4,23 245:3
**prices** 6:11 61:3 63:8,8 69:8,13,18 70:8,14 75:5,9,25 76:7,15,16 78:9,9 78:20 79:14,14 80:17 81:21 109:5 237:8
**principal** 14:20
**principally** 55:10
**principals** 14:23
**prior** 49:14,15,17 51:21 52:4 53:2 91:18 98:11,12 99:1 102:23 175:9 187:7,14,16,23 188:1,20,24 203:25 226:7 227:1,8,9 237:15 249:6
**private** 9:7
**pro** 86:1
**probabilities** 152:23
**probability** 173:10 175:10
**probable** 14:14
**probably** 14:15,15 24:7 43:21 131:15 131:18 155:20 203:19,21
**problem** 162:22 164:4,5,6,7 174:6 177:8,12,12,12,13 177:15,17 234:5
**problems** 159:21 174:19 177:21 178:5 183:14,17 183:17 198:10
**proceeding** 10:6
**proceedings** 11:12 59:5 101:18 178:18 228:11 243:9 249:14,17
**process** 16:20
**produce** 33:5,9,14 33:14 34:1,6 48:14,19 54:2,15 58:5 103:19,21 105:13 106:9,23 107:25 108:12 114:2 115:2,6,21 119:9 124:9 134:13 197:14
**produced** 14:8 57:13 68:23
**producing** 53:24 78:8
**product** 23:7 66:2 232:8
**production** 49:2 57:17 66:17 68:11 72:17 82:3 111:2 111:12 118:23 121:25 122:9 123:13 130:3,4 133:12 163:11 179:18 180:18 181:15 182:5,24 183:3 184:19 185:1 186:6,10 190:2,25 195:20 197:23 198:9,13 198:14,18 199:2 211:16 239:18
**productivity** 198:20
**professional** 11:21 13:19
**professor** 17:5
**profit** 181:14
**profitable** 80:9
**project** 54:1
**projected** 50:22 181:15 182:4 183:11 246:7
**projecting** 182:19
**projection** 52:7 53:3,7 54:15,23 55:10,22 56:6,16 57:3,5,7,12,16,18 57:25 58:13 198:12
**projections** 53:25 55:16 56:24 124:16
**proof** 209:2
**proper** 85:6 242:17
**properly** 204:10
**properties** 237:6
**property** 182:14

**proportion** 28:3 191:14 198:2,3,15 198:16 210:10
**proposed** 113:25
**proposes** 72:21 73:16
**proposing** 123:15
**proposition** 152:14
**prove** 21:20 25:5 26:1 28:9 50:14 50:18,20 105:12 105:13,18 107:4 107:24 108:2,25 117:6 119:4,7,11 119:16,19,23,25 120:2 123:22 148:18 191:22 192:6,20 193:15 193:24 195:6,11 209:10,12 223:12 230:4 231:16 232:1 246:4
**proved** 170:3,16
**proven** 94:6 106:4
**provide** 14:11 16:10 17:24 31:9 44:22 45:23 85:22 107:19 109:16 123:11,16,20 124:1 142:20 143:1 145:6,19 158:8 218:1 241:7
**provided** 18:10 24:19 28:2,15,19 28:25 32:1,22 41:19 43:12,14 46:8 85:9,10 104:4 107:9 115:16 130:3 133:1,2,21,23,25 142:16 156:9 234:16
**provides** 95:19
**providing** 28:8 73:14
**proving** 175:25 222:15
**public** 191:1 248:25
**publication** 13:19
**publicly** 52:19 117:7 172:18 190:18
**published** 13:9 91:10,12,15
**pulsipher** 4:7 10:12 126:6 184:9
**purchase** 96:1,24
**purchased** 95:21 96:9 97:12 237:15
**purchases** 100:14
**purpose** 17:25 85:2,22 155:12,15 223:24
**purposes** 18:11 19:11,15 24:16 52:25 109:18 116:4 119:13 130:15 142:22 207:17 208:22 209:5,14 210:5 223:22 233:15 241:9
**put** 24:9,11 27:23 30:11 151:8 168:21
**putting** 51:15 140:11 227:13

**q**

**qualifications** 13:3 90:14
**quantification** 120:1,3 128:25 140:16,16 144:21 145:6,25 168:4 193:1 211:23 213:5 215:7,12 235:19,23 236:23 237:3
**quantifications** 46:8 85:23 215:9
**quantified** 39:4 71:21 200:9 205:15 222:20 234:24 235:12 237:20 238:16
**quantifies** 119:4 123:21
**quantify** 28:11 35:4 41:4 60:14 99:18 102:1,7 107:2 110:23 111:5 115:13 123:4,4,6 129:15 137:21 140:3,13 140:15 141:3 143:5 145:11 146:8 149:6 185:4 186:23 208:1 213:2,22 214:19 216:9 225:19 226:22 227:16,19 231:24 232:14 235:5,21 237:13 239:10
**quantifying** 40:24 112:22 208:23 209:14,17 210:5 222:16 239:2,20
**quarter** 51:25 52:2,12,12,13 58:18 104:25,25 184:15 203:20 218:22
**question** 18:7,25 22:5 28:14,23 32:4 36:17 37:2 37:15 42:22 43:15 46:2,4,7 55:13 62:23 68:9 69:17 77:17 86:20 87:1 101:23 108:20 116:11 133:18 140:15 164:8 177:15 182:9 183:6 187:12 203:5 234:15,15 239:25 240:15
**questioned** 156:21
**questioning** 157:7
**questions** 5:8,17 45:24 46:23 47:1 67:22 68:7 131:21 180:1 242:11 243:21 246:23 247:1
**quickly** 47:2
**quite** 14:7 51:24 88:25 117:18,19 149:13 153:9 182:7 187:18
**quote** 84:2 152:7 152:10 159:22
**quoted** 194:15
**quoting** 152:11 194:11

**r**

**race** 199:9
**raise** 164:7

**ramsey** 16:5
**ran** 193:9
**range** 14:11 37:23 118:20 123:12,17 130:21 131:8,10 132:20 133:1 156:5,19 160:18 161:8
**ranges** 124:3
**rate** 103:23 109:1 109:4,20,21,25 110:3,7,11,16 111:1 138:23
**rates** 61:4 63:9 64:22 65:16 66:13 79:13 80:17 81:20 204:1
**ratio** 69:7 70:7 75:25 76:7,15,23 77:17 78:9 79:7,8 104:23 139:1
**rational** 174:20
**rationale** 70:20 174:18
**rationales** 181:24
**rationally** 174:21
**ratios** 225:25
**reaching** 32:20
**react** 102:16,21 176:24 233:21,23
**reacted** 102:24 130:16 146:24 205:6
**reaction** 102:13 141:3 156:1 158:4 158:6,7 201:7 222:12 223:1,1 224:14 225:16 238:5
**reacts** 79:21 102:22 177:22
**read** 31:6 84:16 89:15 90:6,8 190:6 194:13 219:10 248:3
**reading** 33:24 35:19 48:11 84:3 84:17 88:6 100:1 113:23 126:23 132:11,17 152:8 160:10,16,24 162:4,14,18,21,25 163:9 164:1 170:2 180:15 191:20 193:14 195:10 210:15,25 218:14 218:21 219:12 228:21 230:21
**reads** 84:3
**realize** 159:7
**really** 17:16 53:15 80:9 90:2 113:9 133:18 135:16 145:7,7 150:11 154:21 155:5 157:24 172:22 199:22 221:25
**reason** 12:13 26:24 85:8 88:9 105:24 141:16 150:11 174:16 177:4,6
**reasonable** 81:5 106:8 108:21 118:20 121:18 122:14 123:12
**reasonably** 122:3 209:7
**reasoning** 19:16 29:15 30:23 32:8
**reasons** 118:24 140:2 178:3 221:15 224:14
**rebuttal** 6:7,12 15:10,14 16:12,25 17:9 18:1,8,11,19 19:12 31:18 35:18 35:21,25 37:13 38:19 39:13 59:11 59:23 71:15 72:10 72:16 74:20 75:3 75:8 76:2 80:22 83:12,23 91:2 96:8 100:1 103:2 103:5,6,7 140:2 178:24 179:5 187:4,6 189:25 191:20 228:17
**rebutting** 17:5
**rec** 118:5
**recall** 14:13 17:14 18:17 33:15 58:23 86:12 136:10 153:10 168:18 181:20 183:15 199:21 210:22 216:2,21,25 233:4
**receipt** 118:9
**receive** 18:6 142:1 144:15 146:6 149:25 151:17,19 152:20 156:6 159:16,16,17 165:13 173:18 200:22 201:17 203:24 227:4
**received** 153:8,11 155:23 158:13 159:14 166:14 232:23
**receiving** 143:11 144:13
**recite** 113:13
**reciting** 135:4
**reckless** 205:4
**recognize** 15:15
**recollection** 114:9 128:8 163:24 181:17 196:21 226:16,25 227:6 227:11
**reconcile** 151:22
**reconvened** 136:2
**record** 9:12 10:5 34:5 45:9 59:2,7 90:23 101:15,20 101:22 135:22 136:4 148:11 160:6 161:25 169:4 178:15,20 180:9 184:1 190:8 218:11 220:12,13 228:8,13 243:8,11 247:8 248:5
**record's** 33:23
**recorded** 9:14
**recording** 9:11
**recount** 117:17
**recover** 35:8 98:10
**recoverable** 35:5 41:4,5 71:12 97:8
**recovered** 121:8 122:1
**recovery** 68:22 115:10 124:12 127:17
**rectify** 174:6
**rediscovering** 6:15
**reduce** 175:18 201:4
**reduced** 163:12 179:17 249:12

**reducing** 182:17
**reduction** 105:3 180:23,25 181:1
**refer** 111:16 112:13,14,20 113:1,1 187:1,5 212:3
**reference** 99:12,19 114:8
**referenced** 158:14 194:25
**references** 125:25
**referencing** 103:12
**referred** 91:7 112:17 114:7,13 114:14
**referring** 19:8 54:16 85:18 114:17,24 179:19 190:23 217:14,24
**refers** 112:8 115:3 219:12 220:1
**reflect** 42:2 60:8,9 79:6 80:16,19
**reflected** 22:13,15 51:20 52:4 77:20 79:9,22 95:6,7 115:8
**reflects** 39:24 41:6 41:10 42:3,7 60:10 66:11,15 110:4
**reframe** 47:1
**regardless** 100:6
**regrettably** 160:11
**reiterated** 48:12
**rejected** 88:12 89:20
**relate** 26:16 28:4 111:19 196:9 223:11,11 229:17 245:19
**related** 10:2 27:1 27:20,22 28:17 47:23 48:6,7 62:21,22,25 63:1 66:15 73:1,3,6,19 73:23,25 75:15 79:15 134:20 147:11,14 179:8 186:21 196:19,24 197:2 207:3,19 208:7,14,21,22,24 209:23,24 210:20 211:5,10,22 212:4 212:13,22 213:3 214:23 223:8,13 224:5 227:2 230:5 233:2 236:4 246:16
**relates** 1:7 2:7 25:23 62:14 63:8 67:2 93:11 99:11 103:14 135:17 171:14 181:19,21 219:19 222:5 224:15 236:5 239:15 242:24 243:2
**relating** 17:18,19 23:3 24:1,5,17,19 24:23 29:7 81:4 148:4 185:22 186:14 194:22,22 211:17 215:22,25 216:20 223:2 225:21 229:14 231:11 239:17 242:16
**relationship** 199:23 206:7,10 206:20,21 225:18
**relative** 69:8 70:8 70:13 75:4,9 77:24 78:4,16
**release** 139:9,10 246:17
**released** 48:20 58:4 124:22 125:7 136:13 139:4 213:4
**relevant** 26:2 29:2 30:5,22,25 31:15 140:9 241:10
**reliable** 81:5,5 86:23 89:20 104:18 105:15 106:14 140:15,25
**reliably** 141:3 143:5
**reliance** 33:12
**relied** 20:1,19,21 21:16,19 31:23 32:2,19,23,25 33:5 33:9 34:2 58:12 89:14
**relies** 23:21
**rely** 19:10 21:18 89:13 144:14
**relying** 20:7 23:10 89:12
**remain** 61:1 162:5
**remainder** 204:20
**remaining** 211:25 212:16 217:11
**remains** 60:18 63:2,22 164:2
**remember** 113:2,4 118:5 182:25 204:18 214:14
**repeat** 69:17 232:13
**repeatedly** 88:12 88:20 89:7
**repeating** 129:7
**report** 6:3,7,12 7:4 7:8,12,15,18,23 15:8,9,10,14,14,22 16:3,7,10,12,15,18 16:25 17:5,9 18:1 18:3,5,8,11,12,19 19:12,19 20:1 21:1,5,8,15,22,23 22:1,1,10,10 23:1 23:8,20,25 24:13 24:21,24 25:2,3,10 25:15 26:22 27:10 27:14 28:1 31:7 31:18 32:11,15,24 33:3 34:16,18 35:10,18,21,25 37:4,13 38:12,19 38:25 39:3,6,6,13 39:15 42:12,12,25 43:1,3,14,16 44:1 46:9,21 47:21 49:3 53:21 54:21 59:11,23 61:9 63:5 70:12 71:7 71:16,21 72:10,16 74:20 75:4,8 76:2 80:22 83:12,23 84:3 85:9 91:2,20 95:19 96:8 100:1 103:2,5,6,8 109:19 113:13,20 114:13 124:7 130:11 131:24 132:7,10 140:2 150:18 153:24 159:23 160:7,16 161:16

162:1,4 165:6 169:5,9,13,16 171:11 172:15 178:25 179:5 180:10,14 184:2,5 186:7 187:4,6,8 189:25 190:6 191:20 197:3 199:16 218:12 219:22 228:17 233:1,5,6
**reported** 1:21
**reporter** 2:20 9:24 10:20 11:3 33:18 45:8 218:8 228:5
**reports** 12:18 14:15,24 15:17 16:7 17:15 20:22 34:20 55:24 56:4 98:11 114:16 125:13 155:19 164:12 168:21 171:23 179:21 183:16 187:7 212:24 216:5
**represent** 9:25 10:14 11:15 76:16 243:18
**representation** 51:6,10 118:7
**representations** 104:7 193:8 232:5
**represented** 49:1 70:21 163:4 174:5
**representing** 124:10
**represents** 14:2 43:6 61:17 201:7 228:22
**request** 34:5
**requested** 5:12 45:8
**required** 142:25 249:18
**requires** 146:2 234:7
**requiring** 146:1
**research** 162:1
**reserve** 33:15
**reserves** 94:3,6,6 163:14 170:4,16
**respect** 16:6 52:20 63:12 67:9 79:25 89:10 92:10 114:18 115:16 120:6,7 125:9 141:9 149:14,21 151:16 154:16 173:5 177:8,18 185:15 186:16,17 192:24 194:25 215:8,9 229:1,9,12 230:25 231:6,14 231:22 232:5,19 233:11,19 236:7 242:14
**responded** 149:10 221:16
**response** 43:17 46:24 102:2 136:8 200:16 204:11 205:8 221:19 222:7,21 225:14 231:7 236:13,18 237:25
**responsible** 55:10
**restatement** 99:14 99:21
**result** 73:4 78:8,14 123:18 137:11,12 144:23 164:18 182:11 197:22 213:13,18 230:15 238:15 246:3
**resulted** 139:21 179:17 189:22 199:18 200:6 205:19 206:17 207:14 208:8
**results** 57:22 118:16 123:8 179:15 246:6,7
**retain** 152:23
**retained** 161:1
**return** 36:4 73:16 73:17,21,24 74:1,2 74:2,3 103:23 109:1,4,20,21 110:1,4,7,11,16 111:1 200:20
**returned** 100:4
**returns** 41:9,10 64:1 100:6 101:1 101:3
**revaluation** 236:11
**reveal** 129:21 190:3,15
**revealed** 29:21
**review** 13:5,10 16:9,25 17:8 20:16 22:24 31:16 31:17 92:8 130:10 148:11 192:13 195:3 218:1 220:11,13 249:17
**reviewed** 12:18 17:10 19:14 32:6 117:13 130:12,15 132:7,8 190:8,10 190:17 199:17 207:13
**revised** 64:11 71:14,19
**revisit** 226:2,12
**rgrdlaw.com** 3:9
**ribbon** 36:6 74:25 75:1
**ribbons** 81:15
**rice** 8:3 218:11
**richard** 4:17 9:23
**ridiculous** 47:15
**right** 12:2 13:2,20 13:24 14:13,21 19:3,5 22:2 29:6 33:15 38:25 40:16 41:20 42:14 44:3 44:5 46:11,22 47:24 49:5 50:8 55:18 57:14 58:6 58:22 59:18,25 60:23 61:14 64:6 64:7 65:10,15,17 65:25 66:3,14 68:16,23 69:4 70:3,14 71:17 76:24,25 77:4,25 78:5,10,11,13,17 80:3,5,24 81:21,22 82:1 83:15 84:20 86:11 87:18 89:14 91:3,11,15,19 92:25 93:8 95:14 95:16 96:3,21,24 97:1,15 98:22 100:8,11,12,13,19 101:6,8,9,12 102:5 103:24 104:18 106:16 108:1,14 110:12,18 112:19 113:10 117:15,22 117:24 118:1 119:10,16 122:4

124:18 127:10,14 128:7,19 129:13 129:14 130:11 131:13 133:2 134:4,5,10,14 139:14 140:5 145:15,21,25 146:17,22 147:9 148:23,25 151:1,3 151:5 156:18,24 158:4,18,22 161:10,15 163:22 165:9,20 166:2,5,9 167:1 169:8,12 170:1,11,14,15,17 170:18,21,22 171:1,4,13,14 172:17 179:11 181:3,12,16,20 185:19 189:4,11 190:5,9 191:1 192:22 194:17 196:17,20 197:5 199:2,14 201:14 201:18 205:13 206:12 207:3,15 208:4 212:6 214:13 215:22 216:1,21 217:8 218:3 219:24 220:4,22 221:9 222:9 223:21 224:1,2,5 225:8 226:8 227:6,11 229:25 231:8 234:2 236:15 238:11 243:4 245:25 247:2
**rigs** 139:21
**ring** 86:21
**rings** 90:11
**risk** 26:18,23 27:21,23 28:5 94:6 186:19,22 187:3,9,20,25 188:2,3,6,13,23 189:2,3,6,9,10,16 189:18 204:9,14 204:14 222:13,21 223:14,15,19 229:18,19,20,24 231:12 233:23,24 234:12 235:11,18 236:1,2,2 239:2,7 239:14 241:2,3,3 241:11,14,16,18 241:22,25 242:9 242:16,18,20 243:25 244:5,6,12 244:16,20,22 245:5,15 246:6
**riskier** 204:5 221:23
**riskiness** 138:9
**risks** 204:12 221:20,22 222:7 223:7 245:19
**risky** 204:6
**road** 3:6
**robbins** 3:4 10:15 14:1
**role** 142:20
**roles** 142:19
**room** 10:4
**rooted** 84:9
**rough** 212:8,8
**roughly** 52:1 122:10 211:14 212:2
**royalty** 67:25 112:9,11 113:4 169:25 170:1,5,19 203:10
**rudman** 3:4 10:16
**rule** 151:4,7 224:3
**rules** 12:10
**ruling** 23:14 224:9
**run** 138:16

**s**

**sale** 96:3,25 139:13 141:5 142:6,7 143:6 144:17 149:7,21 151:7,9,13 153:14 154:2 155:15,17 155:24 156:17 157:2 159:7,20 160:11,17 162:6,9 162:10 163:2,20 164:3,18 165:7,25 171:3,22,24 172:1 172:5,10,15 173:24 177:5,6,7 177:16 178:4
**sales** 161:7
**salt** 215:22 216:6 216:10,15
**san** 4:10 87:15 90:5
**sandridge** 1:4 2:4 4:4 9:16 10:17 11:17 54:9,11,13 54:24 55:5 58:4 68:21 77:22 92:4 93:7 100:14 111:23 112:9,10 115:16 125:7 129:19 130:2,20 132:18 133:1,20 133:21,23 139:4 143:15 146:18 156:6,7,12,16 160:19 164:22 166:24 173:4,25 179:23 182:3,23 187:21 190:13,18 196:15 198:25 204:15 214:8,11 217:12,20 219:21 222:1 226:10 227:3 229:24 230:7,9 234:11 242:8 245:10,16 245:22 246:5
**sandridge's** 34:21 49:8 51:18 52:7 59:16 77:18,19 79:9,13,19,21 82:14,16,20,25 83:7 91:23 93:16 94:2,16,19,24 95:13 117:13 124:17,21 125:8 141:4 147:8 150:22 153:3 156:21 158:2 160:12 161:2 180:17 182:19 187:13,21 199:13 217:11 227:20
**sat** 143:7
**saw** 156:20 168:21 209:1
**saying** 21:24 33:13 79:12 90:10 143:22 146:1 166:13,15 172:9 172:22,23 175:12 189:9,12 206:19 208:6 227:9 240:10
**says** 45:2 88:6 90:11 96:4 129:9

132:17 164:1
169:13 170:2
195:24 197:6
218:21 220:2
**scary** 203:13
**scenario** 78:22
**scheme** 28:18
29:21 30:16
189:23,24 190:13
191:24 192:21
193:18,25 194:3
195:6,13,20
196:19,25 197:3
197:10,12 198:6
201:1 228:23
229:11
**science** 120:21
**scope** 16:22,24
55:11 58:1 117:10
118:17 128:22,24
135:1 148:14
234:5 239:23
**sd** 6:20 7:5,9,19,24
8:4
**second** 21:22 22:1
22:10 23:1 25:10
37:15 42:12 43:1
43:16 64:14 88:5
99:14,20,21
104:24
**section** 17:16,18
20:4 32:11 84:2
91:1 127:12
132:10,16 160:9
162:3 165:10
184:6
**sections** 17:20,23
**securities** 1:5 2:5
6:20 7:9,19,24
9:16 10:17,18
63:25 87:17 88:8
138:4
**securities0002847**
7:5
**security** 8:4
**see** 22:23 30:25
31:25 48:16,23
76:6,8,12,15,18
84:12 88:5 96:18
114:4 126:18,21
127:6,7,9,11,13,15
127:19,22,24
130:20 132:14,23
136:21 141:25
142:23 150:23,24
157:3 159:22,22
160:22 161:5
162:8,18 166:3
169:23 170:2
175:15,17 180:13
180:20 184:6,13
184:16,21 191:25
193:19 195:17,18
207:9 211:7 213:9
213:16 219:3,16
221:4 228:19
229:5 243:6
**seeing** 86:12
**seek** 23:13
**seen** 21:10 33:12
34:3 56:3,9
171:10 192:16
**selectively** 77:15
78:18
**sell** 150:1,5,14
152:10 157:5
158:22 164:23
165:18 166:23,25
172:5,7,7 174:6,22
175:3 201:22
**selling** 143:16
152:18 154:6
157:18 164:8
174:17 181:23,24
**sells** 100:15
**send** 22:23
**sense** 42:8 63:9
81:13 115:20
125:19 144:18
199:6,6 213:18
242:19 244:6
**sensitive** 9:6
**sentence** 43:10
45:18 84:14,17,21
88:6 113:23 133:3
170:8 218:21
**separate** 136:15
**service** 3:6
**services** 14:6
87:14 91:14
**serving** 13:24
**set** 24:20 58:10
198:25 203:10
**sets** 53:19 114:25
115:3 224:4
**sewell** 127:23
128:2,6,9,17
129:20 132:20
133:2,6,8,17 134:3
134:19,21
**sewell's** 129:12
130:4 131:2
133:10 135:5
**share** 35:12,16,20
38:21 43:11 44:20
44:21 45:2 46:3
46:12 59:24 62:8
62:10 96:1,2,9,11
96:16,23,25 97:3,4
101:10,10 199:14
205:12 207:24
213:8,11,12,19,19
213:24 214:1
223:9 228:17
**shareholder** 96:15
96:22 97:12
**shareholders**
95:20 172:25
173:15
**shares** 97:12
100:14,15 101:7
207:25 208:3
210:7,9
**sharp** 191:16
**sheer** 162:23
**shook** 199:5
**short** 103:14
123:16 204:18
**shorthand** 2:20
138:15 249:11
**show** 161:16 218:4
**showing** 28:3
**shown** 199:7
**shutdown** 139:21
**side** 63:19 85:25
**sides** 87:19
**sig** 217:2
**signature** 249:24
**significant** 163:4
180:22,25 212:23
217:2
**significantly** 205:7
215:1,1
**similar** 35:19
40:12 152:20,21
188:18 229:16
235:22
**simple** 44:11 46:2
68:7,7 146:4
**simpler** 28:14 80:6
80:7
**simplified** 62:6
142:3

**simplify** 140:19
**simplistic** 78:24
**simplistically** 66:24
**simply** 39:11 144:16 150:1 172:9
**simultaneous** 33:17
**single** 37:22 45:3 126:24
**sir** 13:6 180:1,13
**sit** 28:6 29:1,6,10 29:18 34:17 58:22 108:22 119:23 120:8 129:14 181:20 225:19 227:6,11 236:21 239:24
**sitting** 185:18 217:24
**situation** 69:16,21 105:2 107:17 120:5 122:16 172:5,21 178:9 230:16
**size** 91:22 92:11 92:13,21,23 94:23 95:2 162:23
**small** 223:16
**smith** 4:17 9:23
**sold** 95:21 96:15 97:13 152:21 153:3 168:9 169:11 170:21 171:13 202:18
**solution** 164:5,6 177:11,16
**solutions** 10:1
**somebody** 121:1 175:19 177:11
**somewhat** 205:3
**sorry** 14:9 18:9 69:17 74:14 75:6 101:11 103:6 184:10 214:6 223:25
**sort** 21:14 54:1 142:21 143:17 227:5
**sorts** 61:2 139:2
**sound** 84:10
**source** 21:11 89:20 127:22 131:16
**sources** 86:23 91:1 91:17 124:15 131:13
**south** 3:6
**speak** 50:25 134:8 134:15
**speaking** 33:17 44:15 47:11 149:10 193:12
**specific** 21:18 23:8 53:15 54:14 55:24 63:21 82:9 142:6 200:10 210:21 211:6,10 212:5 213:5 215:7,12 229:14,16 235:7 242:4
**specifically** 18:22 28:24 33:4 53:13 67:1 85:13 95:2 109:3 116:3 119:6 195:5 196:4 206:16 216:2,16 220:15 222:21 225:20 226:9 242:22 244:18 245:6
**specification** 58:21
**speculate** 238:4
**speculation** 168:6
**speechifying** 45:12,14 46:25
**speeding** 235:15 235:19
**spell** 103:2
**spend** 17:17 181:5 196:16,22 200:24 201:2,13 204:20 220:23 237:5
**spending** 186:8 201:6 203:14 204:17 217:16 224:25
**spent** 13:2 126:1
**split** 63:2
**spreadsheet** 117:23
**spreadsheets** 55:23
**ss** 249:2
**stage** 26:2 191:12
**stamp** 127:1
**stamped** 127:3
**stand** 19:1
**standard** 209:8
**standing** 160:13
**stars** 2:17 9:22
**start** 23:23 37:15 44:15 74:6 76:23 77:3 113:22 120:10 125:1 185:9 202:12 216:6 234:17 235:4
**starts** 234:23,25 235:2,3,3
**state** 10:5,7 99:25 124:7 179:5 195:9 208:5 210:14 228:21 249:1,5
**stated** 46:9 50:14 114:9 117:7 152:7 153:11 154:18 156:13 167:2 244:18
**statement** 31:19 48:10 50:4,11 69:14,20 70:2 94:10,17 187:23 188:1,14 229:16 234:6
**statements** 49:7 49:16 69:7 70:6 72:16 73:9 133:5 133:6,8,11 135:4,5 187:14,16
**states** 1:1 2:1 33:4 95:24 157:21 180:15 210:25 221:1 240:15
**statistical** 118:17
**steep** 185:25 186:10
**steinholt** 1:13 2:15 5:3 6:4,8,12 9:14 11:1,9 15:13 23:5 33:13,20 44:13 59:4,8,10 77:13 101:21,25 135:24 136:2,5,7 178:17 178:22 228:10,14 228:16 243:15 247:10,12 248:2 248:21
**stenographically** 1:21

**step** 208:4
**stevens** 228:4
**sticking** 100:16 163:15
**stock** 19:3,12,20 20:2 28:12 31:20 31:24 32:12 33:2 34:22,25 35:7 40:4,14 49:9 51:18,20,24 52:7 52:11 59:16 60:5 60:12,16 61:19 62:17,18,19,19,24 63:13,15 64:5,6,18 66:8 70:21 72:2,4 72:23 73:1,24 74:8 75:12,12,16 77:18,19 79:5,6,9 79:13,21,23 80:12 82:6,14,16,20,25 83:8 95:6,9,18 96:10,16 100:14 100:19 101:8 125:8 129:1,16 130:16 137:8 140:4 150:22 158:2 161:14 167:17 171:7 185:11,15,22 199:13,25 205:7 205:11,24 206:12 208:24 209:5,16 212:2 217:2 223:1 227:20,24 230:14 233:18,21 236:12 238:18 240:4,23 245:3
**stockholder** 96:9
**stood** 21:10
**stop** 45:12 47:10 47:12
**straight** 63:15
**strategic** 163:4,8
**strategy** 67:23,24 78:21 81:14 205:2
**street** 3:14 4:9
**strike** 36:25 44:16 46:14,24
**structured** 182:8
**studied** 116:17 125:3,18
**studies** 73:21
**study** 74:1 102:6,7 200:8,9
**stupid** 90:19,21 198:21
**subjects** 139:6
**submitted** 16:13
**subscribed** 248:22
**substantial** 152:15
**substantially** 94:3 95:14 198:9
**substantive** 17:14
**subtract** 41:8 96:24
**successful** 204:7
**suddenly** 50:11
**suffered** 100:10
**sufficient** 150:1 209:2
**suggested** 63:23
**suggesting** 129:18 190:13
**suisse** 124:18 126:6
**suite** 3:15
**summarize** 20:15
**summarized** 20:21 169:10
**summarizing** 20:13
**summary** 21:7,9 25:5 43:9 197:4
**summit** 124:18
**supplement** 34:18
**support** 27:6 142:21 144:3 145:20
**supported** 145:24
**supporting** 86:23
**supports** 29:20 30:13
**supposed** 223:4
**supposedly** 90:1
**supreme** 91:18
**sure** 24:15 33:6,23 48:24 51:24 92:15 101:16,17 130:19 132:8 168:17 178:13 182:7 187:18 193:10 198:16 218:7 228:1,7 237:9 238:25
**susquehanna** 7:22 184:2
**sustain** 100:17
**sustained** 100:18
**swear** 10:21
**sworn** 248:22 249:8

**t**

**table** 35:19 43:25
**tables** 55:24 56:10
**take** 9:11 17:22 34:7,7 39:7 58:24 58:25 70:13 71:7 71:22 75:24 80:10 81:9,9 85:1 87:22 96:7,23 101:5 105:17 113:18 117:7 118:6 120:15 130:18 132:10 147:14 166:19 169:15 177:7 178:13 179:20 207:8 208:4 212:15 219:11 228:7 243:5
**takeaway** 218:19
**taken** 2:16 9:15 81:18 82:4 146:14 248:4 249:10
**takes** 38:10 62:11 65:15 75:14 123:17
**tale** 152:13,22 153:16 154:20 155:3
**talk** 26:22 78:20 105:24,25 128:25 129:2 150:25 163:9 228:17 234:6,7
**talked** 55:14 136:7 149:4 152:17 156:6 159:13 181:23 185:9 189:21 213:14 223:20
**talking** 22:25 24:9 52:20 57:14 65:8 89:24 92:20 95:3 116:9 124:3 131:7 131:8 133:22,24 144:11 165:14 171:4 175:7 176:16 182:17 188:4 196:3,6 204:19 217:3,3,15 217:17,25 227:14 228:2

**target** 158:16,19 158:20 165:1,2 171:5
**targeting** 221:1
**targets** 171:15,15 171:16 190:3 195:21
**task** 111:4
**technique** 138:12
**techniques** 137:19 137:24 138:2,6
**telephonically** 4:8
**tell** 15:20 16:23 38:5 119:2 217:17 232:3
**telling** 65:13 86:13 192:19
**term** 81:6 83:19 111:21 160:13 213:15
**terminal** 138:20
**terms** 16:7 17:22 20:18 21:20 27:6 29:17 30:8 53:22 53:23 55:23 58:20 60:22 64:11,12 92:21 105:25 115:20 118:16 129:4 141:21 143:13 144:13 152:1,3 153:23 158:16 161:11 167:6 174:22,25 188:19 197:11 201:23 217:23 225:25 237:9 238:3 239:21
**testified** 11:3 88:7 88:20,23 149:5
**testifies** 87:17,19
**testify** 12:14 31:13 34:12,15 40:16 89:2 249:8
**testimony** 11:19 14:6 19:5,10 29:11,19 30:12 32:10,25 33:19 88:21 243:24 248:4,6
**thalmann** 7:18 180:10
**thank** 10:19 246:24
**thanks** 74:17
**theory** 30:14 41:12 84:10 172:14 198:24 223:18 229:15 232:3 234:11
**thereabouts** 212:18
**thing** 20:3 26:2 43:10 46:20 51:2 66:22 67:20 90:2 109:4,7 111:5,12 114:18 138:16 143:16 155:4 166:15 175:21 194:15 202:11,12
**things** 17:13 18:4 18:17 21:6 39:24 58:3,8 61:3,4 64:23 66:21 77:16 80:3,20 88:24 104:2 109:6,15 124:1 125:24 141:24 149:19 158:25 177:3 181:10,12 185:6 245:10
**think** 16:6 18:2,3 21:7 22:15 23:16 25:16 26:21 28:11 30:24,24 33:3 40:13 41:17 43:21 45:19,20 48:21 52:23 54:10 55:15 57:6,9 58:19,21 65:13 72:8 80:18 81:5,13,20 83:18 83:22 85:6 86:9 86:12,16 87:2,19 88:15 89:2,3 92:20 93:19 97:17 98:8,9 99:12,14,19 99:20 103:2 104:19,20,22 105:4 109:7,24 110:6 111:3,24 112:13 128:3 134:2 137:18 140:11 146:17 149:13 150:7 151:14,18 155:18 155:20 156:9 157:22 158:23 159:3,13 163:9,24 169:9 170:9 171:4 174:14 176:1 178:8 187:9 188:16,22 189:3 189:20 194:8,10 195:24 197:6 199:25 202:4,8 203:18 204:14,15 207:5,6,7 208:5 209:4 211:18 212:17 213:14,17 216:3,13 217:1 218:3 229:12,15 230:1 231:6,10 232:22 242:3 247:5
**thinking** 58:20 85:13 93:2 199:5
**third** 20:12 21:12 45:11 51:25 52:12 99:20 104:25 184:15 192:8 194:6
**thompson** 4:8 10:12
**thorsen** 83:15 86:5 86:10
**thought** 14:8 80:8 135:15 143:2 149:10 157:21 159:16 167:13 175:20 181:25 215:18 219:17 226:13
**thousand** 70:1
**three** 71:24 102:25 103:4,16 104:15
**throwing** 170:11
**tied** 194:2,16
**time** 9:5 10:7 13:2 17:17 19:25 21:15 24:4,21,24 25:15 27:10 33:18 37:17 45:11 47:16 50:25 52:15 55:5 56:17 56:22,24 57:2,4,8 57:20 58:13 59:2 59:7 61:20 65:9 66:18 67:4 93:10 96:1,2,23,25 101:20 104:9 114:15 116:20,22 118:12,15,24 120:11 122:7 126:1 135:22

136:4,14 138:19 138:21 143:20 152:21 165:15 178:12,15,20 186:4 188:12 191:14 196:1 198:9 201:3,10 202:4 203:19 204:18 228:8,13 230:19 235:20,22 236:10,15 237:16 237:22 238:23 243:8,11 247:8,10 249:11
**timeframe** 195:16 195:23 197:8
**times** 70:1 110:10 230:19
**tip** 205:1,2
**titled** 132:11 160:9 162:4 184:6
**today** 10:11 12:8 12:14 224:22
**today's** 9:4
**told** 23:15 29:22 185:12 189:3 193:23 232:12 244:16,23
**tom** 3:11 10:14 152:12 181:22
**top** 14:9
**topic** 13:13
**tort** 99:15,21
**total** 49:2 57:16 59:16 68:21 93:23 111:10 124:11 127:17 169:24 170:7,24 205:24
**totaled** 237:1
**totality** 111:6 148:7,8 177:19
178:6
**totally** 135:1
**track** 114:23
**traded** 41:24 64:18 72:24 74:8 171:8 172:18
**trading** 59:17,25 139:6 165:4 199:11 214:8 226:10 227:10,10
**traditionally** 81:2
**transaction** 19:7 150:12 153:4 154:8,12,24 155:11 156:2,11 156:14 161:8,13 162:19 163:17 166:13,18 170:21 173:19 176:25 201:22
**transactions** 165:25 177:23,25 178:3
**transcript** 248:3 249:14,16,18
**transcripts** 18:14 18:19 31:6 32:5
**transparent** 85:3
**tremendous** 203:17
**trial** 9:17 21:21 25:5 26:2 28:10 86:10,14,16,22,25 87:2,7 89:18 90:1 107:5 120:17 123:18
**trials** 109:15
**tried** 140:3 155:9
**tries** 73:13
**trigger** 231:18
**triggered** 232:2
**triggers** 228:25 229:8 230:24 231:5,13,21 232:4 232:19 233:10
**trouble** 176:21
**true** 40:4 41:6 46:21 50:15 69:6 84:20 86:21 90:11 94:14 95:15 98:25 104:3,6,9,20 110:9 110:14 116:9,11 118:7 119:22 120:17 148:17 244:14 248:5 249:13
**trust** 112:9,11,18 113:4 170:1,6,20 180:17 203:10
**trusts** 67:25
**truth** 27:2 36:8 43:5,8,9 51:4 67:8 98:4,15 102:3,8,14 102:14,25 103:10 103:17 104:14,16 104:16 106:21 107:11 109:19 110:25 111:16 112:7,23 114:15 119:20 121:24 129:21 136:8,9,14 136:17 158:2 168:5 186:16 190:3,15 236:7 242:25 243:3 245:21 249:8,8,9
**truthfully** 12:14
**try** 38:1 64:25 68:2,6 73:14 81:11 109:16 120:13 124:1
135:3 140:19,19 141:11 158:8 195:20 216:8
**trying** 19:15 40:10 64:3,13,25 65:12 74:7 79:10 106:18 112:1 114:8 164:5 166:16 172:12 178:7 179:25 188:10 197:19 198:19 210:1 238:17
**turn** 9:8 35:11 37:11,18 59:10 76:14 83:23 95:22 103:3 126:15 132:6,9 146:16 165:5 184:4
**turns** 182:16
**two** 14:15,24 17:19 32:21 36:8 36:10 39:17,24 42:11 46:8 57:9 62:13,16,20 63:3 64:16 65:8,8,13 66:8 70:16,18 86:9,16 89:18,25 90:16 91:1 116:19 121:5 122:14 123:6,7 133:19 135:10 143:12 146:7,13,13 177:3 177:3 201:20 214:2
**type** 26:15,19 54:1 54:5 63:18 118:19 121:15,15 122:21 124:21,25 125:6,9 125:12,16,20 126:18 127:12,15 127:23 128:3,9,18

128:23 129:13,20 130:4 131:2 133:1 133:10 134:3,11 135:5 138:25 152:18 163:13 167:11 231:11
**types** 30:21 113:2 120:11
**typewriting** 249:12
**typical** 186:2
**typically** 36:6 140:7 159:11 171:17 178:10 242:15

**u**

**ultimate** 68:22 111:2 115:10 124:11
**ultimately** 86:3
**um** 37:25
**un** 35:8
**unable** 35:8
**uncertainty** 221:10
**undergraduate** 13:7
**underlying** 12:18 162:22 208:10,11
**undermine** 105:20 106:3
**undermines** 105:9
**underperforming** 191:9
**understand** 12:7 12:10 32:17 41:15 47:3 50:5,19 60:20 80:2 91:22 101:25 103:1 107:23 111:14 131:12 133:18 135:16 140:1 149:8 151:5 152:12 157:19 185:23 186:18 188:10 191:21 197:2 198:1 206:19 210:1 233:25 240:18 244:3 245:1
**understanding** 20:15,18,22 21:16 22:6,25 23:2,15 24:10,12,18 25:2 25:13,21,23,25 26:4,6,14,20 27:5 27:7 54:8 55:16 55:19 57:15,21 61:16 93:5 98:24 111:19 112:11,14 128:1 147:20 148:21 149:1,23 153:10 159:1 186:4,12 187:24 188:17 190:7 192:3 193:4,7 195:1,4 196:8,15 196:23 197:11 217:19 219:5,7 231:9 232:18 234:10 240:7 241:6,8,10 243:23
**understandings** 159:6
**understood** 21:25 24:1,4 42:14 93:6 130:25 131:7 193:9
**undertook** 17:4
**undisclosed** 26:18 26:23 27:21,23 28:5 186:19,22 187:3,19,25 188:3 188:18,23 189:2 189:15 222:22 223:19 229:18,19 231:12 233:23 234:12 236:1,2 241:18 242:16 243:25 244:4,6,11 244:16,20,22 245:5,15,17,19
**undrilled** 170:13
**unidentified** 219:15 221:7,12
**unique** 230:16
**unit** 9:13
**united** 1:1 2:1
**university** 13:14
**unreasonable** 121:12
**unrecoverable** 100:23
**unrelated** 147:13 208:15 210:17 211:2
**unreliable** 137:7
**unsuccessful** 204:8
**updated** 114:21,22 116:1
**updating** 218:15
**upside** 152:15
**use** 36:4 40:22,25 42:1 57:24 60:15 73:25 74:1 102:7 102:8 115:23 137:1,24 138:6 140:20,21 143:8 203:23 208:3 240:25
**usually** 138:18,21

**v**

**valid** 87:4,4 223:9
**valuable** 62:3 150:10,13
**valuation** 73:14 87:14 88:24 89:4 115:19 137:18,24 138:2,6,11,24 154:25 171:7,14
**value** 34:25 40:11 41:6,7,8,9,11 44:2 44:5 60:15,16 63:14 64:2 72:22 73:17 81:10 92:4 94:10 116:6 136:25 138:5,6,8,8 138:21 142:11 143:3,10,11 149:24,25 150:4,6 153:17 155:11 158:16 160:18 161:8 164:23 165:8,20 166:8,9 166:11,19,20,22 167:7 169:22 170:3,5,19 172:8 172:17 173:9,21 173:22 174:10 179:23 201:17,19 201:21,21 202:17 202:21 206:11 208:9 214:25 236:11
**valued** 165:11 168:18 169:24 170:13,16,24 171:11
**values** 78:16 170:6 171:17,18
**valuing** 139:3 168:10

**variability** 116:13 118:13,15 119:21 119:21
**variable** 37:23
**variables** 111:4
**variation** 63:15,20 80:13 212:12
**variations** 212:10
**variety** 139:5 140:1
**various** 53:21 114:16 129:1,16 138:5
**vary** 38:10 69:8 70:8 121:13
**venture** 107:5 203:24 226:5,11 226:20,24 227:1
**ventures** 67:25
**verify** 38:17
**veritext** 9:25
**versus** 41:8 99:4 105:25 191:14 198:16 241:21
**video** 9:11,14 101:14 135:23 178:16 247:4
**videographer** 4:17 9:4,24 10:19 59:1 59:6 74:11,15 101:13,19 135:21 136:3 178:14,19 228:8,12 243:7,10 247:3,7
**videotaped** 1:13 178:21
**view** 32:8 42:8 63:4,7 71:13 85:15 86:3 95:9 104:21 144:1,3 153:18 167:6 174:9,12,12,16 175:13 201:8 202:11,17,22,23 206:5,6 214:25 221:20 236:9 239:19,20 243:23
**viewed** 141:13,14 141:16 151:9 155:17 157:20 178:10,11 183:16 183:17 205:3,15 208:19 235:22
**views** 33:1 85:17 151:13,22 158:9 159:11 204:12
**vs** 6:11

**w**

**wait** 37:14 42:21 104:11
**wake** 178:25
**want** 23:5 29:13 38:17 45:22 74:12 83:23 87:1 103:3 113:19 123:3,4,5 128:24 141:7,25 142:23 145:13 179:24 197:21 209:9,10 218:1 225:6 228:7
**wanted** 53:1 58:25 218:4
**ward** 3:11 10:14 18:16,21,24 19:6 29:14,19 30:25 144:12 150:7 152:12 181:23 243:18
**ward's** 32:10
**warrant** 215:2
**washington** 3:16
**water** 215:22 216:6,10,15
**watkins** 3:12 10:14 243:18
**way** 25:22 26:4 41:3 62:6 64:2 71:2 77:18 78:24 80:25 81:1,2 88:18 98:15,15 114:10 115:11 123:11 129:24 130:7 136:22 137:23 138:17,24 139:1 145:15 147:12 148:19 166:17 168:3 171:16 174:5 176:19 188:17 197:16 198:21 203:1,9,21,22 204:15 212:14 217:20 224:11,23 239:19 240:15
**ways** 36:8,10 85:7 86:2 137:19 139:2 201:20
**we've** 15:13 45:11 47:19 54:16 100:16 116:9 134:2 146:17 171:10
**weaker** 163:11
**wednesday** 1:15 2:19 9:1
**weeks** 51:18
**weighted** 191:15 198:17 202:8
**well's** 105:4
**wells** 48:14,19 52:8 53:4,7 54:15 55:12,20,25 56:4,5 56:10 57:13,23,24 58:5 70:7 77:24 94:10 103:15 109:1,20 110:16 111:20 112:8,9,12 112:18,19 113:3,5 113:16 114:25 115:4,5,8,10,16,17 115:25 117:21 118:1,2,12,18 123:13 130:21 134:12 163:12 179:9,13 182:11 185:25 186:5,9,11 190:1,16,19,24 191:6,14,14,15,17 197:14,15,17,18 197:20,25 198:1,2 198:4,4,7,15,16,17 198:18,20 211:18
**went** 30:9 57:5 81:3 101:14 174:1
**western** 1:2 2:2 9:18
**whispering** 9:7
**willing** 143:19
**withdraw** 55:13 101:23 182:21 214:6
**witness** 5:2 10:21 11:5,22,23 23:12 25:21 26:14 29:5 29:20,25 30:18 32:14,18,18 33:11 33:21 36:16,18 38:4 39:2,17 40:21 41:22 42:16 43:3 44:19 45:15 45:17,18,21 46:15 46:18,19 47:13 49:20 50:25 54:18

55:2 56:8 68:14 70:16 71:19 74:14 77:15 89:10,22 91:5 92:1 93:23 98:24 100:25 101:17 110:20 117:17 119:18 120:23 121:11 122:18 124:24 127:2 128:12,14 128:21 129:24 130:7 131:4,15 133:15 134:7,24 135:9 144:6 149:13 154:15 155:2 156:4 178:2 188:16 191:11 192:11,24 194:2 199:4 212:8 216:13,24 222:11 225:3,24 232:11 232:13 234:4,14 240:6,14,25 246:25 249:6,21

**word** 3:13 5:5 10:13,13 243:14 243:17 246:23 247:5

**words** 30:22 40:12 48:11 52:12 58:11 60:14 64:19 71:23 72:2,23 78:25 99:23 104:7 106:19 110:25 114:25 119:14 156:7 165:12 167:3 191:5 198:24 200:17 201:25 208:6 241:1 244:21

**work** 11:23 23:7 28:10 54:5,6,9 89:4 117:11 142:3 145:19 148:14 204:7 232:8

**worked** 54:13 55:4 87:12 90:4,4

**working** 54:11

**works** 62:6 176:19 235:1

**world** 37:18

**worse** 105:4

**worst** 152:25

**worth** 167:5 175:4

**write** 17:22 22:22 23:2 25:8,8 87:3,4

**writing** 16:7 21:21 21:22 24:10

**written** 86:16 89:18 90:9 91:17 91:20

**wrong** 101:14 157:4 166:12 216:5

**wrote** 23:25 193:9 194:14

**x**

**x** 218:16,23 219:12 245:11,16

**y**

**yeah** 30:24 38:18 44:20 49:6 53:20 56:19 74:15 84:24 86:8 87:9 94:20 95:15 97:2,25 106:12,20 117:18 118:13 127:9 133:3 134:7 138:25 148:24 150:20 151:14 157:10 160:5,23 165:1 166:10 169:7,17,19 170:12 173:7 179:4,15,25 187:17 197:24 198:4 211:8 220:14 230:1 247:5

**year** 58:18,18 84:9 117:21 127:23 129:12,20 134:3 161:4 204:20 220:21 221:2

**years** 63:17 90:3 91:18 174:1

**yesterday** 12:22

**yield** 52:8 53:7

**york** 3:7

**z**

**zero** 66:5 106:2 108:19 120:3 123:24 173:23 202:3

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.