# EXHIBIT 19

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re SANDRIDGE ENERGY, INC. SECURITIES LITIGATION, | ) | No. 5:12-cv-01341 |
| | ) | |
| This Document Relates To: | ) | |
| ALL ACTIONS. | ) | |

**REBUTTAL EXPERT REPORT OF BJORN I. STEINHOLT, CFA**

**April 29, 2019**

**CONFIDENTIAL**

## TABLE OF CONTENTS

Page

I. BACKGROUND ....1

II. SUMMARY OF THE GRENADIER REPORT....2

III. ECONOMIC LOSS CAUSATION ....7

A. Economic Analysis Establishing Loss Causation ....8

B. Dr. Grenadier's Flawed Economic Loss Causation Criticisms ....10

IV. SECTION 10(b) DAMAGES ....13

A. The Alleged Truth Caused the November 9, 2012 Price Decline....13

B. Confounding Factors Did Not Cause November 9, 2012 Price Decline ....17

1. The 3Q2012 earnings release....18

2. The potential sale of Permian assets ....18

3. Mississippian average well cost relates to the alleged fraud ....25

4. Concerns regarding cash flow and funding issues were caused by the Mississippian disclosure, and not a confounding factor ....26

5. The impact of hurricane Isaac in August of 2012 did not prevent the Company from reporting better than expected 3Q2012 earnings....26

6. The TPG-Axon letter was not new information, and did not cause the price decline on November 9, 2012 ....27

C. My Event Study Damages Framework is Reasonable and Reliable....28

1. The changing size and economics of the Mississippian ....31

2. Market forces operating on the fraud....35

V. AUGUST 5, 2011 DISCLOSURE....37

A. Plaintiffs' Allegations Relating to the August 5, 2011 Disclosure....37

B. SandRidge's August 5, 2011 Disclosure ....39

C. The Quantification of Inflation and Damages ....44

**CONFIDENTIAL**

# I. BACKGROUND

1. On March 1, 2019, I submitted an expert report in this case (the "Steinholt Report") in which I provided expert opinions on the economic issues relating to market efficiency, loss causation and damages in this matter. First, I opined that the market in which SandRidge Energy, Inc. ("SandRidge" or the "Company") common stock traded between February 24, 2011 and November 8, 2012, inclusive (the "Class Period"), was open, developed, and efficient, in that the market prices during this time period quickly changed to reflect new and material information concerning the Company as such information became available. More specifically, I opined that new and material information about SandRidge was widely disseminated to the market, analyzed by market participants and traded on, causing the information to quickly become reflected in the Company's stock price.[1]

2. Second, I opined that the allegedly false and misleading statements contained or omitted information that a reasonable investor would have wanted to consider prior to making an investment decision, causing SandRidge's common stock to trade at artificially inflated prices during the Class Period. I also opined that when the alleged truth was publicly disclosed, SandRidge's stock price declined, causing Class members to suffer economic damages as a result of the alleged fraud (*i.e.*, disclosure of the alleged truth).[2]

3. Third, I conducted an event analysis to quantify the impact of the alleged fraud, and opined that the price impact of the disclosure of the alleged truth on November 9, 2012 was 9.9%, or $0.60 per share, and that this represents the level of inflation from the first actionable

---

1 Steinholt Report, ¶12.

2 *Id.* Plaintiffs' allegations can be found in the Third Consolidated Amended Complaint for Violation of the Federal Securities Laws, dated October 21, 2016 (the "Complaint") and this Court's two Orders dated August 1, 2017 ("August 1 Orders"). In addition, my understanding of Plaintiffs' allegations is summarized in the Steinholt Report, ¶¶26-31.

misrepresentation concealing the alleged truth until its disclosure. Damages per share is the inflation per share at the time of purchase for shares still owned at the time the alleged truth was disclosed, limited by the 90-day bounce back rule.[3]

4. I have now been asked to review and discuss an expert report submitted by Defendants' expert Dr. Steven Grenadier ("Grenadier Report") dated April 4, 2019.

## II. SUMMARY OF THE GRENADIER REPORT

5. Dr. Grenadier does not dispute my opinion that the market in which SandRidge's common stock traded during the Class Period was efficient, or that new and material information was quickly reflected in the Company's stock price. He further acknowledges that, in an efficient market, an expert "can study the price reaction immediately following a company disclosure to assess its effect on the security price."[4] Market efficiency enables the expert to use event studies to analyze price impact, just as I have done in this case.[5]

6. Furthermore, Dr. Grenadier does not dispute my event study results. Specifically, he does not dispute my quantification of abnormal returns and statistical significance, or conduct his own event studies. In other words, he does not dispute that the abnormal return in SandRidge's stock price on November 9, 2012 was highly statistically significant at the 1%

---

3 Steinholt Report, ¶75.

4 Grenadier Report, ¶13. *See, e.g.*, Marge Thorsen, Richard Kaplan & Scott Hakala, "Rediscovering the Economics of Loss Causation," 6 J. Bus. & Sec. L. 93, 109 (2006). ("Forensic experts agree generally on the techniques to be used to show inflation and dissipation in stock prices. The gold standard, which is accepted by both courts and economists, is the event study. Other tools such as valuation analyses often aid the event study.")

5 Steinholt Report, ¶49. ("In an efficient market, securities prices quickly incorporate new, material information. Consequently, the price movement following a disclosure of new information can be analyzed to: (a) assess statistical significance; and (b) quantify the portion of the price movement not explained by market and industry factors, *i.e.*, the company specific portion of the price movement. This type of analysis is generally referred to as an event study.")

level, strongly indicating that the abnormal price decline was caused by the negative Company specific information disclosed on that day.[6]

7. Dr. Grenadier's first set of criticisms relate to loss causation, or whether the "revelation of the information that Plaintiffs have identified as corrective with respect to the misrepresentations and omissions alleged in [the Complaint] caused the price of SandRidge's common stock to decline and, in turn, caused investors in SandRidge's common stock to incur losses."[7] His criticisms, however, do not actually address my analysis of economic loss causation, perhaps because: (a) the economic evidence is virtually conclusive that SandRidge's stock price decline on November 9, 2012 was caused, at least in part, by the disclosure of the alleged truth that Plaintiffs claim was previously concealed by the alleged misrepresentations, and, if so, then (b) it is self-evident that the alleged concealment of this material truth during the Class Period caused economic harm to Class members because, given that the market was efficient and the alleged truth material, Class members would have overpaid for SandRidge's common stock during the Class Period, and then suffered losses when the stock price declined (and the inflation was eliminated) on November 9, 2012 as a result of the disclosure of the alleged truth (previously concealed).

8. Instead of providing legitimate criticisms of my economic loss causation analysis, Dr. Grenadier states that I have "not clearly articulated . . . what information Defendants could and should have disclosed to market participants in order to avoid investors being misled by each alleged misrepresentation or omission," or articulated "when the information that would have

---

6 Steinholt Report, Exhibit C.

7 Grenadier Report, ¶4. Dr. Grenadier frequently uses the term "corrective disclosure" in his report, which I take to mean the disclosure of the alleged truth, as defined by Plaintiffs.

been disclosed in this 'but-for' disclosure became known or knowable to Defendants."[8] However, these are Plaintiffs' allegations, and while summarized by me, they can be found in the Complaint and the August 1 Orders.[9] The expectation by Dr. Grenadier that I, prior to even the completion of fact discovery, could and should have "articulated" everything Plaintiffs will eventually be able to prove at a future trial is misplaced and self-serving. Instead, I provided a framework to quantify damages depending on what allegations Plaintiffs are able to prove. If Plaintiffs fail to prove any of their allegations, then there is no loss causation and damages are zero.

9. Dr. Grenadier's second set of criticisms relate to damages, or "the per-share damages (if any) to members in the putative class who incurred losses from the price declines in SandRidge's common stock on the identified loss causation dates."[10] According to Dr. Grenadier, I "fail[ed] to remove the price impact of confounding factors that appear to have played a role in the stock drop that occurred on November 9, 2012."[11] However, because I determined that there was no material negative impact on SandRidge's stock price from the potentially confounding factors I identified, because they were both positive, no adjustment for negative confounding factors was necessary.[12]

---

8 Grenadier Report, ¶6.a. Dr. Grenadier frequently uses the term "'but-for' disclosure" in his Report, which I take to mean the disclosure of the alleged truth, as defined by Plaintiffs.

9 Complaint, August 1 Orders, and summary in the Steinholt Report, ¶¶26-31.

10 Grenadier Report, ¶4.

11 Grenadier Report, ¶6.b. Confounding factors are factors unrelated to the alleged fraud.

12 Steinholt Report, ¶80. ("There were also two positive confounding factors disclosed at the same time as the alleged truth: (a) the 3Q2012 results that beat estimates, and, (b) the potential Permian sale. Such positive confounding events will mitigate the impact of the negative disclosure relating to the Mississippian. Consequently, using the abnormal return to quantify the inflation, in this case, is conservative.")

10. To the extent Dr. Grenadier believes that the confounding factors on November 9, 2012, in aggregate, did negatively impacted SandRidges stock price, he has failed to provide any economic analysis to support such an opinion.[13] Specifically, Dr. Grenadier does not provide any economic analysis to demonstrate that the confounding factors he identifies are, in fact, material, or that they negatively impacted the Company's future cash flows. He further fails to quantify any negative impact of the confounding factors on SandRidge's stock price. As a result, his opinion is rather unhelpful to a judge or jury. Again, I determined that the confounding factors, if anything, had a positive impact on SandRidge's November 9, 2012 stock price, meaning that there was zero negative impact.[14]

11. Finally, Dr. Grenadier criticizes me for "incorrectly assum[ing] that price inflation would have remained constant throughout Plaintiffs' [Class Period]."[15] Dr. Grenadier is incorrect. It is the level of price inflation used to quantify recoverable damages that is constant (either on a dollar or percentage basis) between fraud-related events, (*i.e.*, the misrepresentation(s) and the corrective disclosure(s)). As explained below, there may arguably be excess inflation for a host of different reasons,[16] but because such excess inflation is not

---

[13] Dr. Grenadier states that the confounding factors "appear to have played a role in the stock drop," but that is different than stating that it did, let alone actually quantifying the impact. Grenadier Report, ¶6.b.

[14] Steinholt Report, ¶72. ("The 3Q2012 results reported was better than expected, and could therefore not have caused SandRidge's stock price to decline. Similarly, the potential Permian sale was a choice made by the Company to benefit SandRidge, was generally viewed by analysts as a positive (as discussed above), and, therefore, does not explain the large price decline in the Company's stock price either.")

[15] Grenadier Report, ¶6.c.

[16] Such reasons could include the view that the price decline on November 9, 2012 was mitigated by positive confounding information, or that there was leakage (or reduction in inflation) prior to the official disclosure used to quantify impact.

quantified or tied to *both* the misrepresentation and the corresponding corrective disclosure, loss causation is not established, and the excess inflation does not generate recoverable damages, and is thus irrelevant.

12. Dr. Grenadier, further claims that "[d]espite the fact that SandRidge's Mississippian holdings increased substantially during the Class Period," I did "not investigate or consider whether the Company's alleged misrepresentations about the Mississippian would consequently have had a different impact on investors at different points in time."[17] This is not true. I did, in fact, consider the importance of the Mississippian from the beginning of, and even prior to, the Class Period, and even discussed it in my report.[18] SandRidge's increased drilling in the Mississippian over the Class Period was planned and discussed at the very beginning of the Class Period.[19] Absent any supporting economic analysis (which he did not provide), I have no ability to further assess his criticism, and Dr. Grenadier's assertion that the impact would be different at different times during the Class Period is pure speculation.

---

[17] Grenadier Report, ¶66.

[18] Steinholt Report, ¶¶14-17. Furthermore, analysts generally understood that drilling in the play would grow significantly (with capital being the main constraint on growth), and that the Mississippian represented a substantial portion of the value of the Company. *See, e.g.*, March 2, 2011 Boenning & Scattergood analyst report: "SD plans to increase its 830,000 net acres (3,400+ locations based on ~215 acre spacing) to up to 1.0 million net acres by end of Q1. SD plans to operate 12 rigs and drill 138 horizontal wells in the play in 2011. SD believes its current 12-rig program will allow it to validate ~500,000 net acres over the next 5 years. Thus, SD plans to pursue ways (additional royalty trusts, joint ventures etc) to monetize its remaining 500,000 net acres (primarily 5-year leases)." In August 2011, the Company did announce another $275 million future investment of land in the Mississippian, but "assum[ed] no success for the 'New Miss' play in the production forecast." Morgan Keegan analyst report, "SD: Sifting Through Q2 Noise, Assets Support Price Target," dated August 30, 2011.

[19] *See, e.g.,* February 28, 2011 Key Bank analyst report. ("An interesting comment on the conference call to us was that the Company has the ability in the play to even double its activity levels, capital being the main constraint at this point. . . . We have increased our RNAV to incorporate a significant increased value for the horizontal Mississippian play of roughly $9.17 per share (of our $19.50/share total RNAV).")

13. Finally, Dr. Grenadier claims that I fail to "justify [my] implicit assumption that inflation remained constant despite fluctuations in the relative prices of gas and oil," a phenomenon commonly referred to as the market forces operating on the fraud.[20] However, my damages framework is fully compatible with incorporating the market forces operating on the fraud into the analysis. Specifically, a returned based methodology would imply that as market forces impact the stock price, this same level of impact can be applied to the estimated true value (non-fraud related component) and inflation (fraud related component), which results in a constant level of inflation.[21] I have used this well accepted methodology to incorporating the market forces operating on the fraud in numerous cases using the same event study damages framework that I am using here, as I will explain below.

## III. ECONOMIC LOSS CAUSATION

14. Loss causation is a legal issue that relates to the causal connection between: (a) the economic loss plaintiffs seek recovery for; and (b) the alleged fraudulent conduct, or misrepresentation(s).[22] That said, damages experts can assist in the analysis of loss causation by performing event analyses to demonstrate price impact following a fraud related disclosure, and analyzing the future cash flow implications of the fraud related information to further establish

---

20 Grenadier Report, ¶70.

21 Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 *UCLA L. Rev.* (1990) 883, 899. ("The event study approach assumes that the price and the value of the security move in tandem except on days when fraud-related information is disclosed. On days when fraud-related information is revealed, the value line is calculated from the predicted return." Mathematically, this results in an inflation that is constant on a percentage basis, keeping investors' returns unchanged during periods with no fraud-related events.)

22 15 U. S. C. §78u–4(b)(4). ("Loss Causation: In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.")

that it was the fraud related event that caused the price impact, and not confounding factors. Specifically, damages experts with a background in finance and statistics, and experience in the use of single firm event studies, can help with the analysis of statistical significance and the quantification of price impact. Similarly, damages experts with a background in valuation, and experience in securities analysis, can help with the evaluation of the future cash flow implications of the fraudulent event and its impact on the stock price.

15. In this case, I used both of the two approaches above, and based on my approximately 30 years of experience doing these exact types of analyses, I opined that: (a) the allegedly false and misleading statements contained, or omitted, information that a reasonable investor would have wanted to consider prior to making an investment decision, causing SandRidge's common stock to trade at artificially inflated prices during the Class Period, and (b) when the alleged truth was publicly disclosed, SandRidge's stock price declined, causing Class members to suffer economic damages as a result of the alleged fraud (*i.e.*, disclosure of the alleged truth).[23] This is what is commonly referred to as economic loss causation. That said, the appropriate legal standard to establish loss causation, and whether it has been established in this particular case, is ultimately a legal issue.

### A. Economic Analysis Establishing Loss Causation

16. Dr. Grenadier's assignment was straight forward: to assess whether I had "established that revelation of the information that Plaintiffs have identified as corrective with respect to the misrepresentations and omissions alleged in [the Complaint] caused the price of SandRidge's common stock to decline and, in turn, caused investors in SandRidge's common

---

23 Steinholt Report, ¶12.

stock to incur losses."[24] His criticism of my analysis of economic loss causation is somewhat baffling because, if Plaintiffs' factual allegations are true, then the alleged fraud certainly caused Class members to incur losses. Importantly:

- Dr. Grenadier does not dispute that SandRidge traded in an efficient market, which means that, given that the alleged truth represented new and material information, it would have been quickly incorporated into, and inflated, the stock price had it been disclosed earlier during the Class Period.[25]

- Dr. Grenadier does not dispute that the Complaint identifies November 9, 2012 as a corrective disclosure day, disclosing the alleged truth, including that the "Company's Mississippian formation assets consisted of far more low-margin natural gas deposits and far fewer high-margin oil deposits than the market had previously been led to believe," and that the "average Mississippian well was now expected to produce . . . 155 Mbbl" over its lifetime, compared to 204 Mbbl.[26]

- Dr. Grenadier cannot credibly dispute that this disclosure of the alleged truth "had a significant negative impact on SandRidge's future cash flows, the Company's value and its stock price."[27]

---

[24] Grenadier Report, ¶4.

[25] Steinholt Report, ¶¶32-48.

[26] Complaint, ¶346; Steinholt Report, ¶¶ 19-24, 27-30. More specifically, that the alleged truth disclosed on November 9, 2012, was that the average Mississippian well now was expected: (a) to produce 155 Mbbl of crude oil during its lifetime, down from the Company's previous guidance of 204 Mbbl, (b) to produce less than 40% oil, down from the Company's previous guidance of at least 45% oil, and (c) to have an IRR of just 50%, down from the Company's previous guidance of at least 80%.

[27] Steinholt Report, ¶67. *See* also valuation model demonstrating that the lower oil production and higher cost for the Mississippian disclosed negatively impacted the value of the Company and its stock price, *Id*. ¶61. ("the new assumptions for the Mississippian reduce its value by approximately 40% or more than $1.6 billion.") *See* also analyst report commentary explaining why the new information relating to the economics of the Mississippian was negative, *Id*. ¶¶68-70. (RBC Capital Markets: "SD shares went on a roller coaster ride . . . The reaction is related to reduced well performance in the Mississippian and a FCF deficit that could now bleed well into 2015." Canaccord: "We our reducing our target price $2 to $4 per share due to $400 million lower per annum capital spending, a higher gas composition in the Mississippian play and consequently lower oil production outlook." Deutsche Bank: "Missing Barrels: Deteriorating Miss outlook takes a bite out of valuation.")

- Dr. Grenadier does not dispute that following this disclosure of the alleged truth, SandRidge's stock price declined more than 9%, a price decline that was statistically significant at the 1% level, thereby demonstrating that it is virtually certain that the Company's stock price declined as a result of the negative Company-specific information disclosed.[28]

- Dr. Grenadier fails to provide any legitimate argument to dispute the obvious: if the disclosure of the alleged truth caused SandRidge's stock price to decline on November 9, 2012, then, in an efficient market, the alleged concealment of the alleged truth during the Class Period necessarily would mean that Class members overpaid for SandRidge's common stock and incurred losses when this material truth was disclosed on November 9, 2012 as a result of the price decline and the elimination of the inflation.

17. For the reasons explained above, it is my opinion that Dr. Grenadier has not provided any relevant criticisms relating to my analysis of economic loss causation.

### B. Dr. Grenadier's Flawed Economic Loss Causation Criticisms

18. Dr. Grenadier's criticisms of my loss causation analysis centers around his claim that I have "not clearly articulated ... what information Defendants could and should have disclosed to market participants in order to avoid investors being misled by each alleged misrepresentation or omission," and "when the information that would have been disclosed in this 'but-for' disclosure became known or knowable to Defendants."[29] Setting aside the fact that Plaintiffs' allegations are provided in the Complaint and the two August 1 Orders, as well as summarized in my report, Dr. Grenadier's criticism that I, prior to even the completion of fact discovery, could and should have "articulated" everything Plaintiffs will eventually prove at a future trial lacks merit. Instead, I provided a framework to quantify damages depending on which allegations Plaintiffs are able to prove at a possible future trial. If Plaintiffs fail to prove any of their allegations, then there is no loss causation and damages are zero.

---

28 Steinholt Report, ¶72.

29 Grenadier Report, ¶6.a. I assume that Dr. Grenadier uses the term 'but-for' disclosure to mean the disclosure of the alleged truth.

19. Furthermore, according to Dr. Grenadier, "to demonstrate loss causation, [the expert] must . . . identify whether there were any 'corrective disclosures' that revealed some truth that was previously concealed by the alleged misrepresentations or omissions and was not already known to market participants[.]"[30] This is a non-issue here. In this case, the alleged truth disclosed on November 9, 2012 was the Company's new expectations for the Mississippian wells (new EURs, oil to gas ratio and IRR), information that had not previously been disclosed by the Company.[31] Furthermore, the evidence clearly demonstrates that the new information regarding the new economics for the Mississippian wells came as a surprise to analysts, as evidenced by the analyst commentary.[32]

20. Finally, Dr. Grenadier explains that "to demonstrate loss causation, [the expert] must . . . analyze the price reaction of SandRidge stock to the 'corrective disclosures,' while accounting for any confounding information to determine whether investors in SandRidge equity incurred losses."[33] Analyzing whether the disclosure of the alleged truth previously concealed by the alleged misrepresentations caused SandRidge's stock price to decline is, of course, the essence of the economic loss causation analysis, and in this case, for the reasons explained

---

[30] Grenadier Report, ¶28. I assume that Dr. Grenadier uses the term 'corrective' disclosure to mean the disclosure of the alleged truth.

[31] *Supra*, ¶25.. EUR refers to the estimated ultimate recovery for the average well over its lifetime. IRR refers to the internal rate of return for the average well over its lifetime.

[32] Steinholt Report, ¶¶68-70. (RBC Capital Markets: "SD shares went on a roller coaster ride . . . The reaction is related to reduced well performance in the Mississippian and a FCF deficit that could now bleed well into 2015." Canaccord: "We our reducing our target price $2 to $4 per share due to $400 million lower per annum capital spending, a higher gas composition in the Mississippian play and consequently lower oil production outlook." Deutsche Bank: "Missing Barrels: Deteriorating Miss outlook takes a bite out of valuation.")

[33] Grenadier Report, ¶28.

below, and in my opening report, it is my opinion that the disclosure of the alleged truth clearly caused SandRidge's stock price to decline, and the Class members to sustain losses.[34]

21. Dr. Grenadier, on the other hand, states that "[c]ritically, Mr. Steinholt has failed to articulate the 'but-for' disclosure," and that this articulation is necessary to "consider when this information became known or knowable to Defendants, as Defendants could not be held liable for the failure to disclose information that was not known or knowable to them."[35] The alleged truth concealed by the alleged misrepresentations is "articulated" in the Complaint and August 1 Orders, and are also summarized in my Report. It is the task of Plaintiffs to prove liability, including what information was known or knowable to Defendants. If there is no liability, then Plaintiffs have failed to prove their case, and there is no loss causation or damages.

22. Dr. Grenadier continues, "Mr. Steinholt appears to conclude that the inflation in the price of SandRidge's common stock started at the beginning of the Class Period, regardless of whether SandRidge knew or could have known information that would have corrected the alleged misstatements and omissions."[36] This is simply not true. Again, to state the obvious, if Plaintiffs fail to prove their allegations with respect to the first misrepresentation starting the Class Period, then there is no liability at the beginning of the Class Period, and no inflation at the beginning of the Class Period.[37]

---

[34] *Infra*, ¶¶31-32.

[35] Grenadier Report, ¶30.

[36] *Id.*, ¶31.

[37] That is why my opening opinion, which Dr. Grenadier cites to, references the "first actionable misrepresentation concealing the alleged truth," and for the misrepresentation to be actionable at the end of trial Plaintiffs have to have proven liability with respect to that misrepresentation. Steinholt Report, ¶12.

23. I have reviewed Dr. Grenadier's criticisms of my analysis of economic loss causation and find them to lack merit, as explained in greater detail above. As a result, Dr. Grenadier's report does not change any of my prior opinions relating to economic loss causation.

## IV. SECTION 10(b) DAMAGES

24. Dr. Grenadier makes three criticisms regarding my damages analysis. First, he claims that I have failed to demonstrate that the November 9, 2012 price decline was "driven" by the disclosure of the alleged truth.[38] Second, he claims that my analysis of confounding factors is "incomplete" and "misleading."[39] Third, he claims that my damages estimate does not account for changing conditions over the Class Period.[40] Below I will address each of these criticisms separately.

### A. The Alleged Truth Caused the November 9, 2012 Price Decline

25. Although it is not part of Dr. Grenadier's "Summary of Opinions" section, he opines later in his Report that I have "Failed to Demonstrate That the Market Movement on November 9, 2012 Was Driven by the Corrective Disclosure of Alleged Misstatements."[41] I take "Corrective Disclosure of Alleged Misstatements" above to mean the disclosure of the alleged truth. In this case, Plaintiffs allege that Defendants misrepresented the economics (EURs, oil versus gas and IRR) of the Mississippian wells during the Class Period.[42] The alleged truth disclosed on November 9, 2012, was the true economics regarding the Mississippian wells,

---

38 Grenadier Report, ¶¶34-38.

39 *Id.*, ¶¶39-56.

40 *Id.*, ¶¶57-78.

41 *Id.*, III; V.C. Headline.

42 Steinholt Report, ¶¶26-31.

including that the average Mississippian well now: (a) expected to produce 155 Mbbl of crude oil during its lifetime, down from the Company's previous guidance of 204 Mbbl, (b) expected to produce less than 40% oil, down from the Company's previous guidance of at least 45% oil, and (c) have an IRR of just 50%, down from the Company's previous guidance of at least 82%.[43]

26. The alleged truth regarding the Mississippian had a significant negative impact on the Company's prospects and its 2013 guidance. For example, a November 16, 2012 J.P. Morgan analyst report, based on using the Company's new Mississippian projections into their valuation model, quantified the impact of the worsening economics for the Mississippian at about $1.6 billion.[44] Dr. Grenadier does not examine whether the worse economics for the Mississippian (the EURs, oil vs gas ratio and IRR) significantly reduced SandRidge's future cash flows and 2013 guidance, and therefore also reduced the Company's value and the value of its common stock. According to my analysis, as well as the analysis by J.P. Morgan and many other analysts, it did.

27. Analyst commentary was negative regarding the new Mississippian economics and 2013 guidance. A November 9, 2012 Stifel Nicolaus analyst report stated: "2013 guidance is a negative and will have the largest impact on the stock tomorrow."[45] A November 11, 2012 RBC Capital Markets analyst report stated that "SD shares went on a roller coaster ride . . . The reaction is related to reduced well performance in the Mississippian and a FCF deficit that could now bleed well into 2015."[46] A November 12, 2012 Canaccord analyst report stated: "We are

---

43 *Id.*, ¶¶19-24, 27-30.

44 *Id.*, ¶61.

45 *Id.*, ¶65.

46 *Id.*, ¶64.

reducing our target price $2 to $4 per share due to $400 million lower per annum capital spending, a higher gas composition in the Mississippian play and consequently lower oil production outlook."[47] A November 13, 2012 Deutsche Bank analyst report stated: "Missing Barrels: Deteriorating Miss outlook takes a bite out of valuation."[48] Based on all the economic evidence I have reviewed, and the analyst commentary, there can be no credible dispute that the November 9, 2012 price decline "Was Driven by the Corrective Disclosure of Alleged Misstatements," *i.e.*, the lower expected well performance at the Mississippian.

28. Dr. Grenadier ignores my analysis and incorrectly claims that I simply "assume[] that the negative movement in SandRidge's stock price on November 9, 2012 was driven by disclosures concerning the performance of wells in the Mississippian play."[49] This is not true. I did not "assume," but instead based on my conclusion on the available facts and evidence. I concluded that the new information disclosed regarding the Mississippian wells caused the price decline based on my analysis of the economic implications of the alleged truth, the analyst commentary and my event study of the subsequent price reaction in SandRidge's common stock on November 9, 2012.

29. In stark contrast, Dr. Grenadier's criticism is based on selectively quoting analyst commentary, misrepresenting the commentary, and claiming that it does not demonstrate price impact.[50] He claims that "analysts did not uniformly interpret as positive or negative the disclosures in SandRidge's quarterly filing and related conference call," although he cannot point

---

[47] *Id.*, ¶69.

[48] *Id.*, ¶70.

[49] Grenadier Report, ¶34.

[50] *Id.*, ¶¶34-35.

to a single analyst who interpreted the new economics for the Mississippian wells to be positive.[51] Instead, Dr. Grenadier cites:

- A November 13, 2012 Deutsche Bank analyst report stating that the conference call "confirmed concerns about deteriorating oil performance in the Mississippian" as evidence that the information was not new, but omits the part where the report states that "[s]tructural headwinds increasing as oil barrels go Missing," as a result of "[w]eaker than expected oil production out of Mississippian wells," reducing "target price from $9 to $5."[52]

- A November 9, 2012 Susquehanna analyst report characterizing 2012 guidance as "mostly improved guidance,"[53] but not the relevant 2013 guidance, nor does the report address the lower economics for the Mississippian, suggesting it was written prior to the conference call, although on November 12, 2012, another Susquehanna report specifically addressed the alleged truth related to the reduction in IRR from 80% to 50%, stating "SD's A+ Mississippian oil wells (80% project returns) are now expected to be A- (50%, in line with Permian Basin drilling) as results are gassier in most recent drilling."

- A November 8, 2012 Citi analyst report stating there was upside to their valuation due to "rapid development of the Mississippian to drive strong, oily production growth in 2012, 2013, and longer term," omitting to disclose that the lower oil EUR for the Mississippian wells was not disclosed until the conference call the next day, on November 9, 2012.[54]

- A November 9, 2012 Canaccord analyst report stating it had a "highly optimistic outlook as to liquids growth" for 2013, as evidence of optimism about potential growth in Mississippian oil production, omitting to state that the quote does not mention the Mississippian, but does state that "[t]he company's '13 guidance should have a negative valuation impact given . . . a higher requisite gas composition and, consequently a lower oil production outlook."[55]

---

51 *Id.*, ¶34.

52 *Id.*, ¶35.

53 *Id.*, ¶36.

54 *Id.*, ¶37.

55 *Id.*

30. The number of analyst quotes provided by Dr. Grenadier that actually comments on the new economics (EURs, oil vs gas or IRR) disclosed for the Mississippian (*i.e.*, the alleged truth), ***is zero***. As such, his criticisms on this issue have no value.

**B. Confounding Factors Did Not Cause November 9, 2012 Price Decline**

31. When performing single firm event studies in securities litigations, confounding factors are defined as factors that are unrelated to the alleged fraud. If these factors are material, they may cause the damage analysis to over- or under estimate damages. For a damages expert working on behalf of plaintiffs, the concern is generally that the event study overestimates damages, or include more damages than can be proven by the available evidence.[56] In this case, that would occur if the confounding factors were material, and, in aggregate, caused or contributed to SandRidge's November 9, 2012 stock price decline, *i.e.*, the aggregate price impact was negative. In the Steinholt Report, I concluded that the confounding factors all were either neutral or positive. Consequently, no adjustment was made to my calculation of November 9, 2012 price impact from the disclosure of the alleged truth.

32. Dr. Grenadier states that I have "faile[d] to remove the price impact of confounding factors that appear to have played a role in the stock drop that occurred on November 9, 2012."[57] However, if there is no negative impact, there is nothing to remove. To the extent Dr. Grenadier disagrees with my analysis, it is he who has failed to provide any economic analysis to demonstrate that the confounding factors were material, and to quantify the aggregate impact on SandRidge's stock price consistent with his view. I cannot perform his

---

[56] While it is well understood that the event study approach will often underestimate damages, it is still frequently used because of its often superior ability to quantify provable damages.

[57] *Id.*, 6.b.

work for him because I find his views to be inconsistent with the available economic evidence. Below, I will review the potential confounding factors.

**1. The 3Q2012 earnings release**

33. On November 8, 2012, after the market closed, SandRidge reported its 3Q2012 earnings that were viewed as positive given that both the Company's earnings per share ("EPS") and cash flow per share ("CFPS") beat analyst expectations.[58] The earnings beat was not caused by the lower economics of the Mississippian wells, and thus represents confounding positive information. Such positive confounding events will mitigate the impact of the negative disclosure relating to the Mississippian, meaning that using the entire abnormal return to quantify damages per share, as I have done in this case, represent a conservative estimate of damages.[59]

34. Dr. Grenadier does not specifically identify SandRidge's 3Q2012 earnings as a confounding factor. However, any legitimate analysis of confounding factors would consider the impact of all the confounding factors, in aggregate. Only if it can be determined that the confounding factors, in aggregate, impacted SandRidge's stock price negatively is Dr. Grenadier's criticism legitimate. In his Report, Dr. Grenadier does not even try to do so.

**2. The potential sale of Permian assets**

35. In its 3Q2012 earnings release, SandRidge also announced that it was considering raising much needed capital by selling certain Permian assets. The Company November 8, 2012 press release stated:

> SandRidge announced that it is exploring the sale of its assets in the Permian Basin, other than those associated with SandRidge Permian Trust. The relevant assets produce approximately 24,500 Boe per day (67% oil, 15% NGLs and 18%

---

[58] *See, e.g.*, November 8, 2012, RBC Capital analyst report that stated: "Recurring EPS/CFPS of $0.05/$0.41 beat our $0.01/$0.34 and the consensus $0.00/$0.35 estimates."

[59] Steinholt Report, ¶80.

> natural gas). Proceeds would be used to fund the company's capital expenditure program in the Mississippian Play and to repay debt, building upon SandRidge's strong liquidity and further improving its leverage.[60]

36. The potential Permian sale was related to the need for cash, a need that increased as a result of the Company's disclosure that future cash flows from the Mississippian wells would be substantially lower. In other words, the potential Permian sale was arguably related to the alleged fraud. That said, if the Permian disclosure is viewed as a confounding factor, it does not reduce my estimate of damages per share because the announcement was "generally viewed by analysts as a positive."[61]

37. It may not be obvious why securities analyst would generally view this information as a positive, so I'll explain. When securities analysts analyze new information, we generally attempt, as best as possible, to translate that information into economic terms, *i.e.*, to determine its impact on future cash flows. In this case, selling the Permian assets had a positive component (the cash SandRidge would receive from the sale), and a negative component (the loss of the future cash flows the Permian assets would have generated). In the simplest terms, the impact of the sale would be the cash received from the sale of the Permian assets less the value of the future cash flows from the Permian assets given up.

38. However, in this case, there is no actual sale of the Permian assets, and no sales price. This is just an announcement that the Company is "exploring" a possible sale. In other words, the Company is creating *an option* for itself to sell the Permian assets given its need for cash, a need that was increased as a result of the poor economics for the Mississippian wells disclosed. As noted by one analyst, "SD only plans to sell its non-trust Permian assets . . . if it

---

[60] November 8, 2012 SandRidge press release.

[61] Steinholt Report, ¶72.

receives an acceptable offer."[62] The theoretical value of an option is never negative, because the option would not be executed by a rational option holder if it did not have positive value. In this case, the option holder is SandRidge, and presumably the Company would only have exercised the option if the sales price was sufficiently high to justify giving up the value of the Permian's future cash flows.

39. In the Steinholt Report, I also noted the fact that several analysts explicitly stated that they viewed the potential sale of the Permian assets as a positive. On November 8, 2012, an RBC Capital analyst report stated: "We think the asset sales . . . will be seen as favorable as SD has a significant FCF deficit to fund."[63] On November 9, 2012, a Stifel Nicolaus analyst report stated, in the headline: "Potential Permian Sale Is a Positive."[64] On November 12, 2012 a Wunderlich Securities analyst report stated: "The potential Permian sale makes sense from both a timing and financial standpoint."[65] Some analysts were neutral on the potential Permian sale, particularly since the sales price was not known at that time. A Susquehanna analyst report dated November 9, 2012, provided the following negative view: "Bears will see Permian oil slowdown masking gassier Mississippian production."[66] However, this negative view relates directly to Plaintiffs' allegation about the Mississippian's gassier production. That said, my

---

62 Ladenburg Thalmann analyst report, "Q3 '12 Conference Call Key Takeaways," dated November 9, 2012.

63 Steinholt Report, ¶64.

64 *Id.*, ¶65.

65 Wunderlich Securities analyst report, "Focusing on the Core Growth Play While Reducing Debt," dated November 12, 2012.

66 Susquehanna analyst report, "SandRidge Energy, Inc.: Good 3Q, Fresh Bold Tactics and We Ponder Activist Agendas," dated November 9, 2012.

review of the analyst reports supports my statement that the potential sale of the Permian assets was generally viewed by analysts as positive.

40. Dr. Grenadier claims that my statement that the Permian sale was "generally viewed by analysts as a positive" is misleading, because I "disregard[ed] ample analyst commentary demonstrating that some market participants viewed the potential Permian sale as a negative development."[67] He then presents cherry-picked quotes, often taken out of context, to try to support his claim that there was "ample analyst commentary" that viewed the potential Permian sale as a negative.[68]

41. The first two analyst reports cited to support Dr. Grenadier's contention that there was "ample analyst commentary" that viewed the potential Permian sale as a negative are two reports by the same firm, Deutsche Bank, dated November 8 and November 13 of 2012.[69] However, the issue addressed by Deutsche Bank was whether selling the Permian assets would solve the funding gap created by the "[w]eaker than expected oil production out of Mississippian wells," and Deutsche Bank concluded that "[d]espite the attention garnered by the proposed Permian sale, the reality is that given the step down in the Miss, the portfolio is fighting an uphill battle with or without the Permian," because of the "sheer size of the funding gap at the core Mississippian asset."[70]

---

67 Grenadier Report, V.D.1, ¶40.

68 *Id.*

69 *Id.*, ¶40. ("For example, on November 8, 2012, analysts from Deutsche Bank cautioned that the 'loss of Permian cash flow' could lead to 'funding issues' in the long term and posited on November 13, 2012 that the sale may cause some investors to lose confidence in SandRidge management due to the sudden strategic shift.")

70 Deutsche Bank, "Doubling Down in the Miss," dated November 13, 2012.

42. Dr. Grenadier then references a November 16, 2012 J.P. Morgan analyst report, and states that it "noted that some investors had questioned the proposed Permian sale due to the high margins generated by these assets and their corresponding impact on EBITDA."[71] The full quote in context, not provided by Dr. Grenadier, is: "On the one hand, selling the Permian, because of its high-margin production, has an outsized impact on EBITDA. On the other hand, it makes sense to sell oil assets when the price of oil is relatively high, and SD needs some funds to cover the capex-minus operating cash flow deficit."[72] I do not view this quote as negative. I view it as even handed, weighing the potential cost versus benefit of the sale at a time when the purchase price is not known and the Company has not committed itself to sell.

43. Dr. Grenadier then references a November 8, 2012 SunTrust analyst report that "not[ed] that the sale of the Permian assets would result in a lower ratio of oil across SandRidge's remaining (primarily Mississippian) assets," a statement that is factually true.[73] However, this quote does not reveal whether the SunTrust analyst viewed the potential Permian sale as a positive or negative. Dr. Grenadier, once again, omitted the relevant part of the analyst report, which listed the Permian sale as one of the positive items reported by SandRidge. Specifically, the SunTrust report stated: "Positive items reported: . . . Announced it could sell all Permian not associated with royalty trusts = 24,500 Boe/d production. (Assuming $90,000/flowing bbl proceeds would be $2.2B.)."[74]

---

71 Grenadier Report, ¶40.

72 J.P. Morgan, "Less Enthused but Still Think the Stock Is Cheap and Will Outperform, dated November 16, 2012.

73 Grenadier Report, ¶40.

74 SunTrust Robinson Humphrey analyst report, "SD- Results Appear Slightly Positive Provided Certain Steps Taken," dated November 8, 2012.

44. Grenadier also references a November 9, 2012, analyst report from Morningstar that "question[s] the decision to part with a mature asset that contributes a meaningful amount of cash flow to the firm," but omits that this may be due to Morningstar's view that the Permian sale will only "generate between $1.5 billion and $2 billion in proceeds," far below the estimates of other analysts, and even further below the actual $2.6 billion sales price.[75] Of course, if the sales price is too low, then SandRidge could chose not to sell.

45. Dr. Grenadier then references a question by an analyst from Tudor, Pickering, Holt & Co. as evidence of analyst "skepticism."[76] However, as the exchange below makes clear, the Company believed they could get a "premium" price, and, if not, they did not have to sell.

> **Brian Liveley - Tudor, Pickering, Holt & Co. – Analyst**
> I'm just kind of curious on what other opportunities you guys looked at. You know, versus doing the Permian sale, given that these are pretty high-margin barrels.
>
> **Tom Ward - SandRidge Energy Inc - Chairman and CEO**
> Sure. The other option is that you just keep the Permian and continue to -- and cut back CapEx, and drill in just the Mississippian, but have the production in the Permian. That's the way we modeled the Company. So that is our other option. Depending on what the sale price comes in on the Permian.
>
> **Brian Liveley - Tudor, Pickering, Holt & Co. – Analyst**
> Tom, I'm just confused on why is the existing plan not the best option?
>
> **Tom Ward - SandRidge Energy Inc - Chairman and CEO**
> Well, because we think the Permian assets will bring a premium and -- in the market. Because of other sales that have happened in the Permian. And if it does, then it would be a better asset in someone else's hands that has maybe a lower cost of capital, or has the ability to focus just on the Permian. Where we have two very large assets to try to grow.
>
> **Brian Liveley - Tudor, Pickering, Holt & Co. – Analyst**

---

75 Grenadier Report, ¶40; Morningstar, "Rollercoaster Ride Continues: SandRidge Looks to Sell Permian, Delivers Underwhelming 2013 Guidance," dated November 9, 2012.

76 Grenadier Report, ¶41.

> That's understandable, but it just seems like it's probably some of the higher-margin barrels you have within the organization.
>
> **Tom Ward - SandRidge Energy Inc - Chairman and CEO**
> Well, I don't think you're taking into context how much we might receive from it. So there's nothing that makes us sell the Permian.[77]

46. Dr. Grenadier then cites Tom Ward's deposition transcript from March 29, 2019 (weeks after I submitted my opening Report) as evidence that investors viewed the Permian sale as a negative. Mr. Ward testified:

> [T]he investment community thought that we were only going to receive a billion dollars or it would be dilutive to our stock to sell the Permian. And ultimately that proved not to be true and within a month we were back higher than we were the day before of the press release….[The sale of the Company's Permian assets] ended up making— sold for $2.6 billion and… the company was in an extraordinarily good financial position by the end of 2012."[78]

47. Dr. Grenadier presumably has reviewed the analyst reports in this matter, and presumably knows that analysts did not believe SandRidge was "only going to receive a billion dollars" for the Permian assets.[79] Still, Dr. Grenadier includes Defendant Ward's self-serving testimony to support his proposition that the Permian sale was viewed as a negative. Contemporaneous analyst reports indicate that analysts viewed the sale of the Permian assets to generate far greater proceeds than just one billion dollars, including: Citi 11/8/2012 ($2.8 billion); Stephens 11/9/2012 ($2.2 billion); Howard Weil 11/9/2012 ($1.9-$2.4 billion); Stifel Nicolaus 11/9/2012 ($2.0-$2.5 billion); Morningstar 11/9/2012 ($1.5-$2.0 billion); Johnson Rice 11/12/2012 ($2 billion); Susquehanna 11/12/2012 ($2 billion); Canaccord Genuity 11/12/2012 ($2.0-$2.5 billion); Wunderlich Securities 11/12/2012 ($2.0-$2.5) billion; Deutsche bank

---

77 SandRidge November 9, 2012 conference call.

78 Grenadier Report, ¶43.

79 *Id.*

11/13/2012 ($2.0-$2.5 billion); and J.P Morgan 11/16/2012 ($2.6 billion). Also, as Defendant Ward testified, the Company received a good price ($2.6 billion) and decided to sell. If they had not received a good price, they would not have had to sell.

48. Dr. Grenadier then claims that I "assume[d], without analysis, that the disclosure of a potential Permian transaction must have had a positive impact on SandRidge's stock price," and concludes that my "failure to appropriately account for this confounding information in his analysis renders [my] opinion regarding loss causation and [my] estimation of damages unreliable."[80] I did not simply "assume" that the potential Permian sale had a "positive" impact. I concluded, based on my own analysis and my review of the contemporaneous analyst reports that it most likely had a neutral to positive impact on SandRidge's stock price, and that it was highly unlikely that it had a material negative impact. As a result, even assuming that the sale of Permian assets should be considered to be unrelated to the alleged fraud, my estimate of damages per share was not reduced for the potential Permian sale.

### 3. Mississippian average well cost relates to the alleged fraud

49. Dr. Grenadier claims that increased average well cost within the Mississipian play is a confounding factor, and that I do "not address this disclosure and makes no effort to disaggregate any effect it had on SandRidge's stock price when assessing loss causation and estimating price inflation."[81] The average Mississipian well cost is one reason the Company's IRR was now only 50%, down from 82% on October 2, 2012.[82] According to Plaintiffs' allegations, "Defendants misrepresented the economics of the Mississippian, including the IRR

---

[80] *Id.*, ¶¶44-46.

[81] *Id.*, ¶47.

[82] Steinholt Report, ¶¶23-24.

of the typical horizontal well, and that the Mississippian wells performed much worse than represented."[83] Because the average Mississippian well cost relates to Plaintiffs' allegations, it is not a confounding factor, and, to the extent it is material on a stand-alone basis, any impact from this component of the overall disclosure about the average Mississippian well should not be removed from the damages estimate.

### 4. Concerns regarding cash flow and funding issues were caused by the Mississippian disclosure, and not a confounding factor

50. The disclosure that the average Mississippian well would be expected to produce less oil, and that the oil to gas ratio and IRR would be lower, meant that the Company's future cash flows also would be substantially lower than expected. The lower cash flows also meant that there would be less cash flows to fund the Company's operation. As explained by Deutsche Bank, the funding gap was created by the "[w]eaker than expected oil production out of Mississippian wells," and in their opinion, "[d]espite the attention garnered by the proposed Permian sale, the reality is that given the step down in the Miss, the portfolio is fighting an uphill battle with or without the Permian," because of the "sheer size of the funding gap at the core Mississippian asset."[84] The cash flows and funding issues raised by Dr. Grenadier were not issues unrelated to the alleged fraud, and, consequently, not confounding factors.

### 5. The impact of hurricane Isaac in August of 2012 did not prevent the Company from reporting better than expected 3Q2012 earnings

51. Dr. Grenadier notes that hurricane Issac, in August 2012, caused mechanical difficulties that shut down some rigs in the Gulf of Mexico and caused fewer barrels of oil to be produced in 3Q2012. I have not analyzed whether the impact from this shut down was more, or

---

83 *Id.*, ¶29.

84 Deutsche Bank, "Doubling Down in the Miss," dated November 13, 2012.

less, than analysts expected. Nor has Dr. Grenadier. However, for me, this was not necessary because the impact of hurricane Issac on SandRidge's 3Q2012 earnings did not prevent the Company from reporting better than expected earnings.[85] In other words, when combining the confounding factors that impacted the 3Q2012 earnings, the impact on earnings was positive given that the Company was able to report better-than-expected earnings. Because the 3Q2012 earnings beat expectations, there is no negative impact to be removed.

### 6. The TPG-Axon letter was not new information, and did not cause the price decline on November 9, 2012

52. The TPG-Axon letter did contain a lot of negative information about SandRidge's management. Among other things, the letter "attacked 'egregious' compensation for Ward," and claimed that "[t]he company ha[d] also engaged in 'self-dealing that ha[ve] transferred significant value to Mr. Ward at the expense of shareholders.'"[86] However, it was disclosed on November 8, 2012, before the market closed, and as one analyst noted: "SD Trades Up on Shareholder Letter Calling Management/Board Shakeup."[87] My event study confirmed that there was no decline in SandRidge's stock price following the TPG-Axon letter on November 8, 2012.[88] Given that there was no negative price impact following the TPG-Axon letter on SandRidge's November 8, 2012 stock price, in an efficient market, there would be not be any residual negative impact on the Company's stock price on November 9, 2012 either. Nor is it

---

85 *Supra*, ¶¶33-34.

86 Bloomberg News, "SandRidge Should Replace CEO After 'Disastrous' Performance," dated November 8, 2012 (13:04:32).

87 Stifel Nicolaus, "SD Trades Up on Shareholder Letter Calling Management/Board Shakeup," dated November 8, 2012.

88 SandRidge's November 8, 2012 abnormal return was positive, although not statistically significant at either the 5% or 10% level.

credible that a failure by the Company to "advance a point-by-point rebuttal or otherwise respond to the substance of TPG-Axon's allegations," as characterized by Dr. Grenadier, allegations that did not negatively impact SandRidge's stock price, all of a sudden, on November 9, 2012, caused SandRdige's stock price to decline.[89] Consequently, Dr. Grenadier has failed to provide any legitimate economic basis, or any economic analysis, to support the notion that what he characterized as "potential confounding information" actually contained material confounding information that negatively impacted SandRidge's stock price on November 9, 2012.

### C. My Event Study Damages Framework is Reasonable and Reliable

53. The event study framework is a well-accepted framework for calculating class-wide damages in class action securities cases.[90] First, the impact of the disclosure of the alleged truth (*i.e.*, the corrective disclosure) on the stock price is quantified. Second, this fraud-related impact is then used as the inflation from the misrepresentation concealing the alleged truth until its disclosure (*i.e.*, the corrective disclosure). Third, because each Class member purchased and/or sold their shares at market prices, after quantifying the inflation, the Class members' individual damages can now be calculated based on the inflation at the time of their respective purchases and sales.[91]

54. The implication of the event study damages framework is that the level of inflation is held constant between fraud-related events (alleged misrepresentation(s) and

---

89 Grenadier Report, ¶¶54-55.

90 Marge Thorsen, Richard Kaplan & Scott Hakala, "Rediscovering the Economics of Loss Causation," 6 J. Bus. & Sec. L. (2006) 93, 109. ("Forensic experts agree generally on the techniques to be used to show inflation and dissipation in stock prices. The gold standard, which is accepted by both courts and economists, is the event study. Other tools such as valuation analyses often aid the event study.")

91 Steinholt Report, ¶79.

corrective disclosure(s)), known as an inflation ribbon. This is so because the level of inflation (either on a dollar or percentage basis) used to quantify damages has to reflect both (a) the inflation that existed at the time of the misrepresentation, as well as (b) the inflation removed by the corrective disclosure.

55. How the level of inflation is determined in the damages calculation is sometimes not fully understood, so I will explain. If the level of inflation (either on a dollar or percentage basis) is greater at the time of the misrepresentation than the level of inflation removed by the corrective disclosure, then the inflation ribbon is based on the level of inflation removed by the corrective disclosure. On the other hand, if the level of inflation can be shown to be less at the time of the misrepresentation than the level of inflation removed by the corrective disclosure, then the inflation ribbon is based on the level of inflation at the time of the misrepresentation. If it cannot be determined that there is a material difference between the two measures of the inflation, then the inflation removed by the corrective disclosure is generally used because: (a) it is generally quantified using the event study, which is the preferred methodology, often referred to as the "gold standard" for these types of analyses, and (b) it is the removal of inflation that actually causes damages. Excess inflation is irrelevant for the purpose of calculating damages, because such inflation does not translate into recoverable damages.

56. Furthermore, what I have provided is a framework to quantify damages that can be modified to best reflect the allegations that Plaintiffs eventually prove at trial. There is a myriad of possible interpretations of the factual evidence, and what a judge or jury will ultimately decide is, at this point, unknown. As a result, there are also many different possible damages outcomes, which is why I have presented a damages framework. For example, if Plaintiffs fail to prove their allegations at the beginning of the Class Period, then the inflation will have to start with another misrepresentation at some later point in time that Plaintiffs can

prove was false or misleading. Similarly, if Plaintiffs fail to prove any of their allegations, then there is no loss causation and damages are zero. I have used the above damages framework in numerous other cases, and my testimony using this framework has been found to be "reasonable and reliable."[92]

57. Dr. Grenadier criticizes me for "incorrectly assum[ing] that price inflation would have remained constant throughout Plaintiffs' [Class Period]."[93] Specifically, Dr. Grenadier argues that the inflation cannot be constant because there are both Company-specific factors and market-specific factors during the Class Period that changed, and therefore would have impacted the inflation different at different periods of time.[94] As explained above, because only inflation that can result in recoverable damages is relevant, the level of inflation (on either a dollar or percentage basis) is constant between fraud-related events.[95] This means that, even if there was a decrease in the level of inflation prior to the corrective disclosure, this removal of excess inflation would be irrelevant for the purpose of quantifying recoverable damages because the

---

92 Steinholt Report, ¶2.

93 Grenadier Report, ¶6.c.

94 Dr. Grenadier claims that my damages framework does not account for changing conditions over the Class Period, such as: (a) differences in the information available to SandRidge over the Class Period, (b) the growing importance of SandRidge's Mississippian Holding, (c) changes in the substance of SandRidge's disclosures concerning its oil and gas assets in the Mississippian, (d) movements in the prices of oil and gas. Grenadier Report, V.E.1, V.E.2, V.E.3 and V.E.4.

95 Dr. Grenadier appears to elude to this fact when he states that "any price decline occurring prior to a corrective disclosure—that is, the disclosure that reveals the Defendants' alleged misstatements or omissions—cannot have been caused by the alleged fraud and is not recoverable by Plaintiffs or members of the class." Grenadier Report, ¶9. In other words, there is no decline in the level of inflation that would trigger loss causation if the level is constant. There is, however, loss causation if there is removal of inflation as a result of the "relevant truth [leaking] out," and the stock price declines as a result. *Dura*, 544 U.S. at 342.

resulting damages would not be connected to the disclosure of the alleged truth (*i.e.*, there would be no loss causation).

### 1. The changing size and economics of the Mississippian

58. Dr. Grenadier argues that the inflation used to quantify damages should account for the changing conditions relating to the Mississippian during the Class Period.[96] According to Dr. Grenadier, "[b]ecause of changes in the extent of SandRidge's business in the Mississippian, changes in SandRidge's disclosures about the Mississippian . . . the alleged misstatements and omissions would have been expected to have a different impact at different points during the Class Period."[97] Again, Dr. Grenadier conducts no economic analysis to demonstrate that the changes he claims occurred materially impacted the inflation, and no quantification of what the inflation under his interpretation of the evidence should be. Below I will discuss the relevant changes he brings up, and my view on what the impact of these changes would have on the inflation.

59. First, it is true that the alleged misrepresentation regarding the oil EUR for the average Mississippian well did change during the Class Period. At the beginning of the Class Period, the oil EUR for the Mississippian was 211 Mbbl.[98] Then, on January 10, 2012, SandRidge lowered the oil EUR for the Mississippian to 204 Mbbl, and it remained at 204 Mbbl until November 9, 2012, when the Company disclosed the alleged truth by lowering the oil EUR to down to 155 Mbbl.[99] Disclosing the allege truth when the oil EUR was reportedly 211 Mbbl,

---

[96] Grenadier Report, ¶¶58-69.

[97] *Id.*, ¶57.

[98] SandRidge's February 8, 2011 presentation at the Credit Suisse 2011 Energy Summit.

[99] SandRidge's October 2, 2012 presentation at the 2012 Johnson Rice Energy Conference; Steinholt Report, ¶30.

as opposed to when it was 204 Mbbl, would have caused a greater impact on SandRidge's stock price, and therefore a higher inflation. However, this excess inflation would have been removed prior to the corrective disclosure, and therefore would not impact my damages analysis.

60. Second, it is also true that the alleged misrepresentation with respect to the oil to gas ratio for the average Mississippian well changed during the Class Period. At the beginning of the Class Period, oil was reported by the Company to be 52% of production.[100] Then, on January 10, 2012, SandRidge lowered the oil projection to 45%, and it remained at 45% until November 9, 2012 when the Company disclosed the alleged truth by lowering it to less than 40% oil.[101] Disclosing the allege truth when the oil was reportedly 52% of production, as opposed to when it was 45%, would have caused a greater impact on SandRidge's stock price, and therefore a higher inflation. However, this excess inflation would have been removed prior to the corrective disclosure, and therefore would not impact my damages analysis.

61. Third, it is also true that the alleged misrepresentation with respect to the IRR for the average Mississippian well changed during the Class Period. At the beginning of the Class Period, the IRR was 100%.[102] This IRR changed over time, and by October 2, 2012, it had been lowered to 82%, and, on November 9, 2012, the Company disclosed the alleged truth by further lowering the IRR to only 50%.[103] Disclosing the allege truth when IRR was reportedly above 82%, as opposed to when it was 82%, would have caused a greater impact on SandRidge's stock

---

[100] SandRidge's February 8, 2011 presentation at the Credit Suisse 2011 Energy Summit.

[101] SandRidge's October 2, 2012 presentation at the 2012 Johnson Rice Energy Conference; Steinholt Report, ¶30.

[102] SandRidge's February 8, 2011 presentation at the Credit Suisse 2011 Energy Summit.

[103] SandRidge's October 2, 2012 presentation at the 2012 Johnson Rice Energy Conference; Steinholt Report, ¶24.

price, and therefore a higher inflation. However, this excess inflation would have been removed prior to the corrective disclosure, and therefore would not impact my damages analysis.

62. Fourth, it is true that the size of the Mississippian also changed during the Class Period. At the beginning of the Class Period, SandRidge owned 780,000 acres in the Horizontal Mississippian, or 47% of the Company's total net acreage.[104] Investors were also told, from the very beginning, that the Company intended to increase its Mississippian holdings to more than 900,000 acres.[105] Also, investors were told during 2011 that the average Mississippian well was very profitable (100% IRR) and was expected to produce 211 Mbbl of oil over its lifetime (*i.e.*, its EUR), compared to an IRR of 88% and an oil EUR of only 75 Mbbl for the average Permian well.[106] The evidence I have reviewed demonstrates that investors understood, from the very beginning of the Class Period, that the Mississippian was very important to the Company's future, as evidenced by one analyst calculating the risked net asset value for the horizontal Mississippian to be $9.17 per share, or more than SandRidge's entire stock price at the very end of the Class Period.[107]

63. In my opinion, using SandRidge's Company-specific price decline on November 9, 2012 to quantify the level of inflation during the Class Period is conservative. The November price decline was mitigated by the positive confounding factors (the positive 3Q2012 earnings

---

[104] SandRidge's March 1, 2011 Investor/Analyst Meeting. In August 2011, the Company did announce another $275 million future investment of land in the Mississippian, but "assum[ed] no success for the 'New Miss' play in the production forecast." Morgan Keegan analyst report, "SD: Sifting Through Q2 Noise, Assets Support Price Target," dated August 30, 2011.

[105] Steinholt Report, ¶17.

[106] *Id.*

[107] Keybank, "SD: Quick Thoughts Post Analyst Day; Reaffirm BUY," dated March 31, 2011. *See also*, Steinholt Report, ¶¶14-19.

reported and the disclosure of the potential Permian sale to help with the Company's funding problems). Furthermore, even though the worsening economics for the Mississippian wells gradually revealed prior to the final disclosure would also have had a negative impact on SandRidge's stock price, it is not included in the damages analysis because I am using the event study methodology.[108]

64. In addition, had the Company announced the allegedly true economics for the average Mississippian well at the early part of the Class Period, that the oil EUR was 24% less than represented, that oil represented less than 40% of total production instead of 52%, and that the IRR was not 100% but only 50%, it would, in my opinion, have created severe difficulties for the Company in its efforts to implement its overall strategy, particularly as it relates to monetization and raising capital through its royalty trusts. This is another reason why grounding the damages analysis based on what we know actually occurred when the alleged truth was disclosed is on more solid ground than speculating as to how investors would have reacted in an alternative reality to the same information had it been disclosed at different times during the Class Period. In the absence of any supporting economic analysis (which Dr. Grenadier has not provided), I have no ability to further assess his criticism, and Dr. Grenadier's assertion that the impact would be different at different times during the Class Period, and that this would materially have changed the estimate of inflation used to calculate damages, is therefore pure speculation.

---

[108] It is well understood that the event study methodology will underestimate damages if there are a disclosures that gradually reveals the alleged truth. Cornell & Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," (1990) 903-905. ("Unfortunately, the event study procedure will be biased if there is leakage of information. By the time a public announcement occurs, often the market price already reflects some of the information contained in the announcement. . . . As a result, a value line which substitutes predicted returns for actual returns only on disclosure days will understate damages.")

### 2. Market forces operating on the fraud

65. Dr. Grenadier argues that my damages analysis should "Account for Relative Movements in the Prices of Oil and Gas."[109] In this case, I agree. In fact, given the characteristics of the allege fraud in this case, I believe that using an approach designed to account for the market factors would improve the damages analysis here. A company's stock price is almost always, to some degree, impacted by market and industry factors. In this case, these factors would have impacted both the non-fraud related (true value) and allegedly fraud-related (inflation) component of the Company. The impact of market factors on the inflation is often referred to as the market forces operating on the fraud.[110] When a returned based methodology is used to model the so-called value line, *i.e.*, where the stock would have traded absent the alleged fraud, the market forces operating on the fraud is accounted for based on the Company returns that would have reflected all of these market forces.

66. A widely accepted methodology for estimating the value line is to use an event study to predict the stock price returns on fraud-related disclosure days, and then replace the actual returns on the fraud-related disclosure days with the predicted returns. The value line can then be calculated using backcasting, *i.e.*, working backwards replacing the stock's actual return on the fraud-related disclosure days with the predicted returns, while using the stock's actual returns on all other days. This methodology is described in one reference text as follows:

---

[109] Grenadier Report, V.E.3., ¶¶70-75.

[110] Thorsen, Kaplan & Hakala, "Rediscovering the Economics of Loss Causation," (2006) 93, 105. ("The concept of 'market forces operating on a fraud,' and causing dissipation of inflation has not been well explained in the case law and has caused needless confusion. It is rooted in thirty year old legal precedent, sound economic theory, and, as an added bonus, courts accept it.")

> On disclosure dates only, this approach replaces actual returns with returns estimated from a market model. The declines on the disclosure dates are thereby limited to those attributable to the fraud.
>
> * * *
>
> With backcasting, the true-value line results from working backwards using the true returns and the security's actual price on the day after the class period ends. This price contains no effect of fraud and misrepresentations because the class period, by definition, ends with full disclosure.[111]

67. Consequently, to account for market forces operating on the fraud, I used the event study methodology to calculate the value by effectively replacing the fraud-related price return with the predicted price returns on November 9, 2012, while holding all other price returns constant. Exhibit A attached hereto shows the resulting value line and inflation using the above methodology.

68. For investors who purchased their SandRidge shares and sold their shares prior to November 9, 2012, their out-of-pocket damages are the difference between the inflation per share at the time of purchase less the inflation per share at the time of sale. However, if the inflation is constant on a percentage basis, then there is no loss causation when using a returned based methodology because the investment returns are the same regardless of whether there was fraud. Consequently, the recoverable damages are zero.

69. For investors who purchased their SandRidge shares during the Class Period and retained these shares at the end of November 8, 2012, their out-of-pocket damages are simply the inflation per share at the time of purchase.

---

[111] Nicholas I. Crew, Patrick G. Goshtigian, Marnie A. Moore and Atulya Sarin, "Securities Act Violations: Estimation of Damages," *Litigation Services Handbook: The Role of the Financial Expert*, (2001), Ch. 17, at 12-13. For a more detailed explanation of this methodology, *see* Cornell & Morgan, *supra* at fn 21.

## V. AUGUST 5, 2011 DISCLOSURE

70. In the Steinholt Report I stated that I may supplement my analysis after the completion of fact discovery to include damages related to the August 5, 2011 disclosure.[112] I have now been provided more information about what Plaintiffs intend to prove in connection with their allegations relating to the August 5 price decline, and will discuss the implications of this more complete understanding below.

### A. Plaintiffs' Allegations Relating to the August 5, 2011 Disclosure

71. As discussed in my opening report, Plaintiffs allege that, during the Class Period, Defendants misrepresented the overall economics of the Mississippian wells.[113] In the Complaint, Plaintiffs also allege that "there was a steep drop in oil production rates in SandRidge's older wells in the Mississippian and rates were declining much faster than the type well presented by SandRidge," and that SandRidge "grossly overstated the EUR for its typical Mississippian play horizontal well."[114] It is my understanding that Plaintiffs now intend to prove that this was known, or should have been known, from early on in the Class Period.

72. Furthermore, Plaintiffs also allege that "[t]he Company's large amounts of spending on drilling new wells in the Mississippian enabled SandRidge to report increasing total production numbers in that area even though older wells with more production history experienced steep declines," and that therefore "the increased drilling activity masked the rapid decline and depletion in SandRidge's horizontal Mississippian wells."[115] It is my understanding

---

112 Steinholt Report, ¶73.

113 Steinholt Report, ¶¶26-31.

114 Complaint, ¶¶135, 153(a), 153(d).

115 Complaint, ¶¶148, 153(b), 292(f), 293(d).

that Plaintiffs intend to prove that this fraudulent scheme was a key reason for the Company to increase its capital expenditures for 2011 by $500 million, which the Company publicly disclosed prior to the opening of the market on August 5, 2011.

73. In other words, to avoid disclosing the true economics of the Mississippian wells, Defendants allegedly entered into a fraudulent scheme whereby the Company would: (a) increase the drilling of new wells, thereby enabling the Company to attempt to keep up with production targets, despite the lower economics and EUR of the Mississippian wells, and also avoid having to directly reveal the truth about the economics of the Mississippian wells as more new wells would be part of the operational statistics disclosed; and (b) acquire new acreage that Defendants could use to continue to conceal the true economics of the Mississippian in the future, or could, potentially, include wells with better economics that would put the Company back on track to meet their operational goals.

74. I further understand that Plaintiffs intend to prove that as much as $200 million of increased drilling was part of the fraudulent scheme, that it did not materially improve the Company's future production above investors' expectations, and that it recklessly added to SandRidge's debt to the detriment of the Company. In addition, I understand that Plaintiffs intend to prove that another $200 million of additional land acquisitions was also part of the fraudulent scheme, that it also did not generate any material positive cash flows in a foreseeable time frame, and that it recklessly added to SandRidge's debt to the detriment of the Company's financial health.

75. Plaintiffs also intend to prove that the fraudulent scheme was revealed as a failure, as investors did not accept the Company's value proposition and reasoning behind the increased capital expenditures, as evidenced by the significant decline in SandRidge's stock price following the disclosure. The impact of the increased capital expenditures on SandRidge's stock

price was swift and severe, resulting in the largest one-day price decline, by far, for the Company during all of 2011 and 2012. In fact, following the increase in 2011 capital expenditures, the market punished SandRidge's stock price, decreasing its market capitalization by about $800 million, *i.e.*, more than the entire 2011 increase in capital expenditures of $500 million. It is my understanding that Plaintiffs intend to prove that $400 million of this $500 million increase in capital expenditures was tied to the fraudulent scheme, and that they intend to seek recovery for the losses associated with this fraudulent scheme.

**B. SandRidge's August 5, 2011 Disclosure**

76. After the market closed on August 4, 2011, SandRidge reported 2Q2011 results and provided updated guidance for 2011 and new guidance for 2012; and in the morning of August 5, 2011, SandRidge held its conference call with analysts to discuss the results and guidance. The August 4, 2011 press release stated:

> Oklahoma City, Oklahoma, August 4, 2011. SandRidge Energy, Inc. (NYSE: SD) today announced financial and operational results for the quarter and six months ended June 30, 2011.
>
> Key Financial Results
> Second Quarter
>
> - Adjusted EBITDA of $156 million ($182 million including realized gains on out-of-period derivative contract settlements) for second quarter 2011 compared to $132 million ($195 million including realized gains on out-of-period derivative contract settlements) in second quarter 2010.
>
> - Operating cash flow of $134 million for second quarter 2011 compared to $135 million in second quarter 2010.
>
> - Net income available to common stockholders of $196 million, or $0.42 per diluted share, for second quarter 2011 compared to net income available to common stockholders of $45 million, or $0.21 per diluted share, in second quarter 2010.
>
> - Adjusted net loss of $2.0 million, or $0.00 per diluted share, (adjusted net income of $23.9 million, or $0.05 per diluted share, including realized gains on out-of-period derivative contract settlements) in second quarter 2011 compared to adjusted net loss of $1.9 million, or $0.01 per diluted

share, (adjusted net income of $60.4 million, or $0.23 per diluted share, including realized gains on out-of-period derivative contract settlements) in second quarter 2010.

* * *

Increasing 2011 capital expenditure guidance by $500 million, from $1.3 billion to $1.8 billion, reflecting an increase in Mississippian drilling activity and continued acreage purchases both in the Mississippian and the Central Basin Platform.

Increasing 2011 production guidance to 24.1 MMBoe from 23.3 MMBoe.

Guiding 2012 capital program to $1.8 billion and production to 29.1 MMBoe. Tom L. Ward, Chairman and CEO commented, „We are pleased to announce the joint venture with Atinum Partners on our Mississippian project where results continue to meet or exceed our expectations. Our management team has been consistent in discussing several alternatives to fund the drilling of our large Mississippian acreage position within ten years and bring forward the NAV of this asset. With this announcement, we will begin to increase our rig count in Oklahoma and Kansas to average 24 rigs in 2012, which nearly doubles our current rig count. Additionally, we have identified and established an acreage position in a new area that is similar in size, characteristics and cost to our first Mississippian play. In connection with increasing our rig count and acreage position, we are increasing our 2011 capital budget to $1.8 billion and establishing a 2012 capital budget of $1.8 billion.

* * *

Operational Guidance:

| | **Year Ending December 31, 2011** | |
|---|---|---|
| | **Previous Projection as of May 5, 2011** | **Updated Projection as of August 4, 2011** |
| Production | | |
| Oil (MMBbls) [(1)] | 12.3 | ***12.4*** |
| Natural Gas (Bcf) | 66.5 | ***70.0*** |
| Total (MMBoe) | 23.3 | ***24.1*** |

* * *

| | **Year Ending December 31, 2012** |
|---|---|
| | **Initial** |

| | **Projection as of August 4, 2011** |
|---|---|
| Production | |
| Oil (MMBbls) (1) | 16.7 |
| Natural Gas (Bcf) | 74.8 |
| Total (MMBoe) | 29.1 |
| Capital Expenditures ($ in millions) | |

77. The 2Q2011 results were roughly in-line with expectations (CFPS beat while EPS missed), although production was gassier than expected.[116] The new, unexpected information that dominated the analyst commentary was the $500 million increase to 2011 capital expenditures that resulted in just a slight increase in total 2011 production (oil production only increased 0.8%), a 2012 production guidance that was roughly in-line with expectations, and somewhat gassier wells. In the morning of August 5, 2011, SandRidge held its conference call with analysts. On the call, the Company provided more details regarding the increase in guidance:

> **Matt Grubb - SandRidge Energy, Inc - President and COO**
> As you have seen, we've increased our 2011 budget by $500 million to $1.8 billion total. The allocation for the increase is as follows. $150 million for drilling more wells in the Permian and the Miss wells, including saltwater disposal wells. And also that includes the adjustment of the well cost in the Miss from $2.5 million to $3 million. There are also $50 million of non-op drilling in the Mississippian, and increased work-overs and re-completions in the Company.
>
> The biggest part of the increase is in land, $275 million in additional land spending for acquisition of new acreage in the Central Basin platform and the new

---

116 Stifel Nicolaus (8/5/2011): "SD reported 2Q11 CFPS/EPS of $0.27/$0.00, ahead our estimates of $0.22/$0.05 and the Street at $0.25/$0.03. Production for the quarter averaged 62.0 mboe/d, slightly below our estimate of 63.0 mboe/d, but the production split was more gas weighted than expected." BMO (8/5/2011): "Production increased 2.2% q/q, but was below our estimate with an unfavorable gas/oil mix." MKM Partners (8/5/2011): "SD's results matched our expectations." Susquehanna (8/5/2011): "The earnings miss was due to lower realized oil/gas prices and higher LOE/G&A cost." SunTrust (8/5/2011): "Solid 2Q11." RBC Capital markets (8/5/2011): "Last week, SandRidge reported 2Q11 recurring EPS/CFPS of $0.00/$0.27, basically in line with our $0.03/$0.24 estimate and consensus $0.03/$0.25 estimates."

> Mississippian play, and $25 million for oil field services in Midstream. We also have guided to $1.8 billion -- $1.8 billion budget in 2012, where we anticipate drilling about 850 wells in the Permian Basin and about 350 Horizontal Miss wells in the Mid-Con next year.
>
> * * *
>
> In terms of 2011, we are increasing our production guidance by 3%, or 800,000 BOE to $24.1 million BOE. We are also increasing 2011 CapEx by $500 million, to $1.8 billion, reflecting the increase in the rate count in Mississippian play and leasing efforts in our second Mississippian play.
>
> Recall that 100% of our drilling expenditures this year are directed towards oil, as returns on our oil projects are superior to those on our gas assets.
>
> * * *
>
> Really our gas decline outside the Permian and the Mid-Con and the non-active areas have been fairly consistent with what we predicted early in the year. But, what we are seeing is more gas in the Mississippi drilling. Not at the [expense of] oil, but certainly a higher gas rate than we have projected on the type curve.

78. The disclosure relating to gassier Mississippian wells relates to Plaintiffs' allegation that the oil to gas ratio was inflated during the Class Period. However, the literal disclosure by Defendant Matt Grubb on the conference call was that the Company was "seeing ... more gas in the Mississippi drilling," but "[n]ot at the [expense of] oil."[117] Strictly speaking, if the overall disclosure was viewed by the market as simply revealing that gas production increased with oil production remaining the same, then this disclosure would not be negative, nor would it be expected to cause the stock price to decline. This may not be entirely the case, but without more evidence, I cannot conclude that this disclosure caused a portion of SandRidge's August 5, 2011 price decline.

79. The disclosure relating to increased capital expenditures for 2011 was, by itself, neither positive nor negative. In this case, however, the increase ($500 million, out of which

---

[117] Steinholt Report, ¶20.

$200 million was for drilling) was unusually large and represented an increase of 38.5% from the prior guidance. The 2011 guidance regarding total production only increased 3%, and the increase from the more profitable oil production was only 0.8%.[118] Furthermore, the Company's new guidance for 2012 production did not represent an increase from analysts' expectations, but a decrease, at least for some analysts. For example, an August 5, 2011 SunTrust analyst report stated: "We are lowering production to be more in-line with management's initial 2012 guidance though we believe their forecast could be conservative given production guidance has increased the past two quarters."[119] In other words, the increase in spending was not matched with an equal or greater increase in production compared to expectations.

80. The analyst commentary surrounding the increased capital expenditures was mostly negative and/or attributed the decline in SandRidge's stock price to the increased capital expenditures. An August 5, 2011 Stifel Nicolaus analyst report stated: "SD: Higher Capex Leads to Increased Funding Shortfall." An August 5, 2011 MKM Partners analyst report succinctly stated: "SD Raises Capex, Shares Tumble." An August 5, 2011 BMO analyst report stated: "Paying More for Similar Growth . . . Production guidance for 2011 was raised 3%, but primarily due to gas, and capex increased 38% to $1.8bn." An August 5, 2011 SunTrust analyst report stated: "The bears are likely to point to CAPEX increasing 38.5% ($1.8 billion versus $1.3 billion) and production increasing just 3.4% (24.1 Mmboe versus 23.3 Mmboe)." An August 8, 2011 RBC Capital Markets analyst report stated: "CAPEX Fears Overshadow Operational Success."

---

118 Steinholt Report, ¶18.

119 SunTrust Robinson Humphrey analyst report, "Lowering Price Target on More Conservative Production Forecasts." dated August 5, 2011.

81. Following SandRidge's 2Q2011 announcement, the Company's stock price declined from a closing price of $9.76 per share on August 4, 2011, to a closing price of $7.79 per share on August 5, 2011, a price decline of $1.97 per share or 20%, on volume of 69.7 million shares (more than 6 times the median volume during the Class Period). The abnormal return (return net of market and industry factors) was highly statistically significant at the 1% level. In my opinion, the price decline was a result of the extraordinary increase in capital expenditures, putting a strain on the Company's financial condition while generating 2011 and 2012 production that was not materially above analysts' expectations prior to the announcement of the capital expenditures.

**C. The Quantification of Inflation and Damages**

82. The damages framework I have created is designed to be flexible and to be able to incorporate different views of the evidence presented. For example, the evidence I have reviewed demonstrates that a dollar increase in capital expenditures resulted in at least a dollar decrease in the Company's market capitalization, given the market's severe reaction to the August 5 announcement. If $400 million of the increase in capital expenditures were part of the fraudulent scheme, which means that the impact on the stock price, on a dollar for dollar basis, would have been $0.81 per share on a fully diluted basis ($400 million divided by 495,982,000 SandRidge fully diluted shares).[120]

83. The $0.81 per share impact would then represent the impact of the fraudulent scheme and is used as the inflation from the first alleged misrepresentation that triggers liability

[120] Using a dollar for dollar basis is, in my view, conservative because the actual price decline reflects an even larger price impact per dollar of increased capital expenditures. Furthermore, in my opinion, there are no material confounding factors unrelated to the alleged fraud that, in aggregate, caused a larger negative impact than my estimate of the non-fraud related portion of the Company specific decline.

with respect to these allegations until the disclosure of the increase in capital expenditures after market close on August 4, 2011. This inflation is quantified on a dollar basis and is in addition to the inflation estimated above and in my prior report relating to the November 9, 2012 corrective disclosure.

Dated: April 29, 2019

Respectfully submitted,

BJORN I. STEINHOLT, CFA

# Exhibit A

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 2/25/2011 | 43,496,625 | $10.53 | $9.49 | $1.04 | |
| 2/28/2011 | 27,711,247 | $10.81 | $9.75 | $1.06 | |
| 3/1/2011 | 20,982,891 | $10.66 | $9.61 | $1.05 | |
| 3/2/2011 | 21,500,321 | $10.25 | $9.24 | $1.01 | |
| 3/3/2011 | 21,327,353 | $10.40 | $9.38 | $1.02 | |
| 3/4/2011 | 20,303,877 | $11.11 | $10.02 | $1.09 | |
| 3/7/2011 | 17,407,952 | $11.26 | $10.15 | $1.11 | |
| 3/8/2011 | 13,739,649 | $10.81 | $9.75 | $1.06 | |
| 3/9/2011 | 10,654,028 | $10.79 | $9.73 | $1.06 | |
| 3/10/2011 | 17,921,003 | $10.05 | $9.06 | $0.99 | |
| 3/11/2011 | 12,513,478 | $10.49 | $9.46 | $1.03 | |
| 3/14/2011 | 8,053,238 | $10.49 | $9.46 | $1.03 | |
| 3/15/2011 | 9,652,227 | $10.41 | $9.39 | $1.02 | |
| 3/16/2011 | 15,919,659 | $10.42 | $9.39 | $1.03 | |
| 3/17/2011 | 12,692,240 | $10.62 | $9.58 | $1.04 | |
| 3/18/2011 | 14,134,591 | $10.63 | $9.58 | $1.05 | |
| 3/21/2011 | 10,101,382 | $11.12 | $10.03 | $1.09 | |
| 3/22/2011 | 8,114,036 | $11.27 | $10.16 | $1.11 | |
| 3/23/2011 | 8,525,828 | $11.48 | $10.35 | $1.13 | |
| 3/24/2011 | 16,493,161 | $11.70 | $10.55 | $1.15 | |
| 3/25/2011 | 14,280,040 | $12.13 | $10.94 | $1.19 | |
| 3/28/2011 | 16,253,629 | $11.82 | $10.66 | $1.16 | |
| 3/29/2011 | 13,798,708 | $12.20 | $11.00 | $1.20 | |
| 3/30/2011 | 12,700,179 | $12.38 | $11.16 | $1.22 | |
| 3/31/2011 | 13,699,099 | $12.80 | $11.54 | $1.26 | |
| 4/1/2011 | 14,400,175 | $12.96 | $11.68 | $1.28 | |
| 4/4/2011 | 9,738,965 | $12.97 | $11.69 | $1.28 | |
| 4/5/2011 | 10,871,547 | $12.97 | $11.69 | $1.28 | |
| 4/6/2011 | 11,974,300 | $12.88 | $11.61 | $1.27 | |
| 4/7/2011 | 10,838,675 | $12.85 | $11.59 | $1.26 | |
| 4/8/2011 | 11,403,842 | $12.94 | $11.67 | $1.27 | |
| 4/11/2011 | 13,554,447 | $12.22 | $11.02 | $1.20 | |
| 4/12/2011 | 23,442,926 | $11.64 | $10.49 | $1.15 | |
| 4/13/2011 | 18,316,551 | $11.57 | $10.43 | $1.14 | |
| 4/14/2011 | 14,423,537 | $11.80 | $10.64 | $1.16 | |
| 4/15/2011 | 9,701,839 | $11.90 | $10.73 | $1.17 | |
| 4/18/2011 | 8,064,451 | $11.62 | $10.48 | $1.14 | |
| 4/19/2011 | 11,240,795 | $12.11 | $10.92 | $1.19 | |
| 4/20/2011 | 12,520,416 | $12.47 | $11.24 | $1.23 | |
| 4/21/2011 | 6,232,962 | $12.60 | $11.36 | $1.24 | |
| 4/25/2011 | 5,608,649 | $12.41 | $11.19 | $1.22 | |
| 4/26/2011 | 6,617,260 | $12.56 | $11.32 | $1.24 | |
| 4/27/2011 | 8,542,093 | $12.44 | $11.22 | $1.22 | |
| 4/28/2011 | 8,691,609 | $12.30 | $11.09 | $1.21 | |
| 4/29/2011 | 6,853,591 | $12.36 | $11.14 | $1.22 | |
| 5/2/2011 | 8,702,124 | $12.24 | $11.04 | $1.20 | |
| 5/3/2011 | 14,212,552 | $11.74 | $10.58 | $1.16 | |
| 5/4/2011 | 18,541,478 | $11.00 | $9.92 | $1.08 | |
| 5/5/2011 | 14,695,518 | $10.67 | $9.62 | $1.05 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 5/6/2011 | 27,983,985 | $10.36 | $9.34 | $1.02 | |
| 5/9/2011 | 15,991,275 | $11.14 | $10.04 | $1.10 | |
| 5/10/2011 | 9,479,713 | $10.94 | $9.86 | $1.08 | |
| 5/11/2011 | 14,606,096 | $10.23 | $9.22 | $1.01 | |
| 5/12/2011 | 19,045,398 | $10.27 | $9.26 | $1.01 | |
| 5/13/2011 | 10,351,743 | $10.04 | $9.05 | $0.99 | |
| 5/16/2011 | 14,207,133 | $10.02 | $9.03 | $0.99 | |
| 5/17/2011 | 14,344,059 | $10.23 | $9.22 | $1.01 | |
| 5/18/2011 | 11,572,550 | $10.70 | $9.65 | $1.05 | |
| 5/19/2011 | 11,620,238 | $10.45 | $9.42 | $1.03 | |
| 5/20/2011 | 9,012,464 | $10.45 | $9.42 | $1.03 | |
| 5/23/2011 | 9,956,191 | $10.07 | $9.08 | $0.99 | |
| 5/24/2011 | 10,822,260 | $10.33 | $9.31 | $1.02 | |
| 5/25/2011 | 12,172,319 | $10.80 | $9.74 | $1.06 | |
| 5/26/2011 | 34,261,626 | $12.07 | $10.88 | $1.19 | |
| 5/27/2011 | 17,900,508 | $11.44 | $10.31 | $1.13 | |
| 5/31/2011 | 21,026,758 | $11.32 | $10.21 | $1.11 | |
| 6/1/2011 | 14,443,697 | $11.12 | $10.03 | $1.09 | |
| 6/2/2011 | 10,066,538 | $11.11 | $10.02 | $1.09 | |
| 6/3/2011 | 10,930,601 | $11.09 | $10.00 | $1.09 | |
| 6/6/2011 | 11,794,843 | $10.44 | $9.41 | $1.03 | |
| 6/7/2011 | 8,992,734 | $10.45 | $9.42 | $1.03 | |
| 6/8/2011 | 9,828,110 | $10.27 | $9.26 | $1.01 | |
| 6/9/2011 | 6,836,634 | $10.54 | $9.50 | $1.04 | |
| 6/10/2011 | 7,888,404 | $10.51 | $9.48 | $1.03 | |
| 6/13/2011 | 15,528,344 | $9.98 | $9.00 | $0.98 | |
| 6/14/2011 | 11,195,706 | $10.39 | $9.37 | $1.02 | |
| 6/15/2011 | 15,909,483 | $10.30 | $9.29 | $1.01 | |
| 6/16/2011 | 9,038,593 | $10.27 | $9.26 | $1.01 | |
| 6/17/2011 | 9,604,539 | $10.33 | $9.31 | $1.02 | |
| 6/20/2011 | 5,403,295 | $10.32 | $9.30 | $1.02 | |
| 6/21/2011 | 9,334,545 | $10.60 | $9.56 | $1.04 | |
| 6/22/2011 | 10,271,904 | $10.50 | $9.47 | $1.03 | |
| 6/23/2011 | 10,706,084 | $10.55 | $9.51 | $1.04 | |
| 6/24/2011 | 11,654,174 | $10.37 | $9.35 | $1.02 | |
| 6/27/2011 | 6,847,234 | $10.20 | $9.20 | $1.00 | |
| 6/28/2011 | 12,714,531 | $10.58 | $9.54 | $1.04 | |
| 6/29/2011 | 8,805,256 | $10.76 | $9.70 | $1.06 | |
| 6/30/2011 | 8,320,824 | $10.66 | $9.61 | $1.05 | |
| 7/1/2011 | 9,230,107 | $10.57 | $9.53 | $1.04 | |
| 7/5/2011 | 9,422,003 | $10.88 | $9.81 | $1.07 | |
| 7/6/2011 | 8,170,439 | $10.85 | $9.78 | $1.07 | |
| 7/7/2011 | 8,834,249 | $11.19 | $10.09 | $1.10 | |
| 7/8/2011 | 7,757,569 | $10.83 | $9.76 | $1.07 | |
| 7/11/2011 | 8,083,948 | $10.28 | $9.27 | $1.01 | |
| 7/12/2011 | 9,009,405 | $10.22 | $9.21 | $1.01 | |
| 7/13/2011 | 13,454,590 | $10.28 | $9.27 | $1.01 | |
| 7/14/2011 | 15,865,698 | $10.37 | $9.35 | $1.02 | |
| 7/15/2011 | 18,413,601 | $11.20 | $10.10 | $1.10 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 7/18/2011 | 11,599,642 | $11.19 | $10.09 | $1.10 | |
| 7/19/2011 | 20,803,691 | $11.39 | $10.27 | $1.12 | |
| 7/20/2011 | 12,248,059 | $11.24 | $10.13 | $1.11 | |
| 7/21/2011 | 17,163,133 | $11.27 | $10.16 | $1.11 | |
| 7/22/2011 | 23,430,866 | $12.11 | $10.92 | $1.19 | |
| 7/25/2011 | 15,790,606 | $11.92 | $10.75 | $1.17 | |
| 7/26/2011 | 16,404,060 | $12.01 | $10.83 | $1.18 | |
| 7/27/2011 | 14,239,299 | $11.70 | $10.55 | $1.15 | |
| 7/28/2011 | 10,869,555 | $11.60 | $10.46 | $1.14 | |
| 7/29/2011 | 14,916,531 | $11.52 | $10.39 | $1.13 | |
| 8/1/2011 | 17,234,043 | $11.70 | $10.55 | $1.15 | |
| 8/2/2011 | 18,994,753 | $11.21 | $10.11 | $1.10 | |
| 8/3/2011 | 16,665,812 | $11.17 | $10.07 | $1.10 | |
| 8/4/2011 | 34,391,581 | $9.76 | $8.80 | $0.96 | |
| 8/5/2011 | 69,730,832 | $7.79 | $7.02 | $0.77 | |
| 8/8/2011 | 42,344,166 | $6.55 | $5.91 | $0.64 | |
| 8/9/2011 | 33,960,907 | $7.41 | $6.68 | $0.73 | |
| 8/10/2011 | 29,133,384 | $7.17 | $6.46 | $0.71 | |
| 8/11/2011 | 24,331,250 | $7.50 | $6.76 | $0.74 | |
| 8/12/2011 | 19,417,013 | $7.69 | $6.93 | $0.76 | |
| 8/15/2011 | 18,681,939 | $8.10 | $7.30 | $0.80 | |
| 8/16/2011 | 21,723,637 | $7.69 | $6.93 | $0.76 | |
| 8/17/2011 | 14,265,301 | $7.88 | $7.10 | $0.78 | |
| 8/18/2011 | 17,208,040 | $7.01 | $6.32 | $0.69 | |
| 8/19/2011 | 11,288,056 | $6.72 | $6.06 | $0.66 | |
| 8/22/2011 | 28,226,490 | $6.29 | $5.67 | $0.62 | |
| 8/23/2011 | 13,209,153 | $6.68 | $6.02 | $0.66 | |
| 8/24/2011 | 11,247,457 | $6.70 | $6.04 | $0.66 | |
| 8/25/2011 | 12,682,775 | $6.54 | $5.90 | $0.64 | |
| 8/26/2011 | 11,302,768 | $6.92 | $6.24 | $0.68 | |
| 8/29/2011 | 9,681,769 | $7.35 | $6.63 | $0.72 | |
| 8/30/2011 | 12,146,790 | $7.49 | $6.75 | $0.74 | |
| 8/31/2011 | 13,648,765 | $7.34 | $6.62 | $0.72 | |
| 9/1/2011 | 8,130,694 | $7.27 | $6.55 | $0.72 | |
| 9/2/2011 | 8,288,712 | $6.91 | $6.23 | $0.68 | |
| 9/6/2011 | 10,150,292 | $6.80 | $6.13 | $0.67 | |
| 9/7/2011 | 10,571,451 | $7.39 | $6.66 | $0.73 | |
| 9/8/2011 | 14,039,120 | $7.34 | $6.62 | $0.72 | |
| 9/9/2011 | 14,754,281 | $6.87 | $6.19 | $0.68 | |
| 9/12/2011 | 10,368,595 | $6.84 | $6.17 | $0.67 | |
| 9/13/2011 | 13,017,047 | $7.04 | $6.35 | $0.69 | |
| 9/14/2011 | 14,099,222 | $7.21 | $6.50 | $0.71 | |
| 9/15/2011 | 11,516,181 | $7.61 | $6.86 | $0.75 | |
| 9/16/2011 | 12,152,158 | $7.53 | $6.79 | $0.74 | |
| 9/19/2011 | 10,060,322 | $7.35 | $6.63 | $0.72 | |
| 9/20/2011 | 9,167,364 | $7.08 | $6.38 | $0.70 | |
| 9/21/2011 | 12,164,225 | $6.76 | $6.09 | $0.67 | |
| 9/22/2011 | 19,635,416 | $6.10 | $5.50 | $0.60 | |
| 9/23/2011 | 9,521,280 | $6.01 | $5.42 | $0.59 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 9/26/2011 | 13,221,109 | $6.32 | $5.70 | $0.62 | |
| 9/27/2011 | 12,717,626 | $6.49 | $5.85 | $0.64 | |
| 9/28/2011 | 12,128,841 | $5.96 | $5.37 | $0.59 | |
| 9/29/2011 | 14,496,738 | $5.96 | $5.37 | $0.59 | |
| 9/30/2011 | 12,592,052 | $5.56 | $5.01 | $0.55 | |
| 10/3/2011 | 21,141,648 | $5.01 | $4.52 | $0.49 | |
| 10/4/2011 | 20,486,170 | $5.42 | $4.89 | $0.53 | |
| 10/5/2011 | 20,275,599 | $5.95 | $5.36 | $0.59 | |
| 10/6/2011 | 13,234,081 | $6.14 | $5.54 | $0.60 | |
| 10/7/2011 | 15,209,289 | $6.11 | $5.51 | $0.60 | |
| 10/10/2011 | 10,921,404 | $6.38 | $5.75 | $0.63 | |
| 10/11/2011 | 12,753,555 | $6.52 | $5.88 | $0.64 | |
| 10/12/2011 | 8,403,322 | $6.54 | $5.90 | $0.64 | |
| 10/13/2011 | 7,378,186 | $6.55 | $5.91 | $0.64 | |
| 10/14/2011 | 10,973,040 | $6.78 | $6.11 | $0.67 | |
| 10/17/2011 | 13,918,127 | $6.89 | $6.21 | $0.68 | |
| 10/18/2011 | 16,055,778 | $6.92 | $6.24 | $0.68 | |
| 10/19/2011 | 11,545,349 | $6.77 | $6.10 | $0.67 | |
| 10/20/2011 | 9,274,349 | $6.75 | $6.09 | $0.66 | |
| 10/21/2011 | 12,999,997 | $7.15 | $6.45 | $0.70 | |
| 10/24/2011 | 13,431,486 | $7.65 | $6.90 | $0.75 | |
| 10/25/2011 | 11,387,730 | $7.23 | $6.52 | $0.71 | |
| 10/26/2011 | 11,139,420 | $7.48 | $6.74 | $0.74 | |
| 10/27/2011 | 18,276,539 | $7.93 | $7.15 | $0.78 | |
| 10/28/2011 | 12,428,239 | $8.19 | $7.38 | $0.81 | |
| 10/31/2011 | 10,545,943 | $7.66 | $6.91 | $0.75 | |
| 11/1/2011 | 12,538,894 | $7.32 | $6.60 | $0.72 | |
| 11/2/2011 | 15,413,134 | $7.98 | $7.19 | $0.79 | |
| 11/3/2011 | 14,623,615 | $8.25 | $7.44 | $0.81 | |
| 11/4/2011 | 17,926,276 | $7.86 | $7.09 | $0.77 | |
| 11/7/2011 | 12,410,366 | $7.81 | $7.04 | $0.77 | |
| 11/8/2011 | 10,219,912 | $7.75 | $6.99 | $0.76 | |
| 11/9/2011 | 14,394,709 | $7.22 | $6.51 | $0.71 | |
| 11/10/2011 | 22,537,317 | $6.90 | $6.22 | $0.68 | |
| 11/11/2011 | 9,950,561 | $7.27 | $6.55 | $0.72 | |
| 11/14/2011 | 6,975,194 | $7.24 | $6.53 | $0.71 | |
| 11/15/2011 | 9,168,633 | $7.50 | $6.76 | $0.74 | |
| 11/16/2011 | 17,771,503 | $7.60 | $6.85 | $0.75 | |
| 11/17/2011 | 10,919,952 | $7.07 | $6.37 | $0.70 | |
| 11/18/2011 | 8,657,850 | $7.13 | $6.43 | $0.70 | |
| 11/21/2011 | 11,046,418 | $6.80 | $6.13 | $0.67 | |
| 11/22/2011 | 10,490,454 | $6.80 | $6.13 | $0.67 | |
| 11/23/2011 | 10,651,972 | $6.27 | $5.65 | $0.62 | |
| 11/25/2011 | 5,630,168 | $6.35 | $5.73 | $0.62 | |
| 11/28/2011 | 8,777,850 | $6.81 | $6.14 | $0.67 | |
| 11/29/2011 | 8,775,619 | $6.91 | $6.23 | $0.68 | |
| 11/30/2011 | 10,373,557 | $7.35 | $6.63 | $0.72 | |
| 12/1/2011 | 9,834,712 | $7.50 | $6.76 | $0.74 | |
| 12/2/2011 | 12,469,249 | $7.52 | $6.78 | $0.74 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 12/5/2011 | 12,245,200 | $7.81 | $7.04 | $0.77 | |
| 12/6/2011 | 8,552,583 | $7.75 | $6.99 | $0.76 | |
| 12/7/2011 | 7,998,838 | $7.68 | $6.92 | $0.76 | |
| 12/8/2011 | 8,705,201 | $7.21 | $6.50 | $0.71 | |
| 12/9/2011 | 8,167,409 | $7.65 | $6.90 | $0.75 | |
| 12/12/2011 | 6,856,756 | $7.34 | $6.62 | $0.72 | |
| 12/13/2011 | 8,070,783 | $7.09 | $6.39 | $0.70 | |
| 12/14/2011 | 9,095,624 | $6.70 | $6.04 | $0.66 | |
| 12/15/2011 | 9,615,131 | $6.58 | $5.93 | $0.65 | |
| 12/16/2011 | 7,575,156 | $6.76 | $6.09 | $0.67 | |
| 12/19/2011 | 9,859,283 | $6.30 | $5.68 | $0.62 | |
| 12/20/2011 | 11,008,168 | $6.70 | $6.04 | $0.66 | |
| 12/21/2011 | 9,406,166 | $6.67 | $6.01 | $0.66 | |
| 12/22/2011 | 31,101,232 | $8.21 | $7.40 | $0.81 | |
| 12/23/2011 | 26,761,595 | $8.57 | $7.73 | $0.84 | |
| 12/27/2011 | 10,745,766 | $8.46 | $7.63 | $0.83 | |
| 12/28/2011 | 7,549,466 | $8.09 | $7.29 | $0.80 | |
| 12/29/2011 | 7,299,234 | $8.22 | $7.41 | $0.81 | |
| 12/30/2011 | 6,171,316 | $8.16 | $7.36 | $0.80 | |
| 1/3/2012 | 15,282,296 | $8.35 | $7.53 | $0.82 | |
| 1/4/2012 | 8,228,205 | $8.30 | $7.48 | $0.82 | |
| 1/5/2012 | 20,088,448 | $8.73 | $7.87 | $0.86 | |
| 1/6/2012 | 18,744,528 | $8.54 | $7.70 | $0.84 | |
| 1/9/2012 | 8,934,616 | $8.50 | $7.66 | $0.84 | |
| 1/10/2012 | 19,757,869 | $8.73 | $7.87 | $0.86 | |
| 1/11/2012 | 15,361,313 | $8.47 | $7.64 | $0.83 | |
| 1/12/2012 | 12,447,010 | $8.13 | $7.33 | $0.80 | |
| 1/13/2012 | 10,799,610 | $8.05 | $7.26 | $0.79 | |
| 1/17/2012 | 7,339,053 | $8.10 | $7.30 | $0.80 | |
| 1/18/2012 | 9,403,993 | $8.19 | $7.38 | $0.81 | |
| 1/19/2012 | 8,494,867 | $7.97 | $7.19 | $0.78 | |
| 1/20/2012 | 17,941,290 | $7.61 | $6.86 | $0.75 | |
| 1/23/2012 | 14,771,156 | $7.99 | $7.20 | $0.79 | |
| 1/24/2012 | 11,111,021 | $7.91 | $7.13 | $0.78 | |
| 1/25/2012 | 13,348,928 | $8.40 | $7.57 | $0.83 | |
| 1/26/2012 | 9,783,083 | $8.08 | $7.29 | $0.79 | |
| 1/27/2012 | 7,563,981 | $8.18 | $7.38 | $0.80 | |
| 1/30/2012 | 7,895,920 | $7.96 | $7.18 | $0.78 | |
| 1/31/2012 | 9,538,431 | $7.78 | $7.01 | $0.77 | |
| 2/1/2012 | 12,392,481 | $7.83 | $7.06 | $0.77 | |
| 2/2/2012 | 65,579,574 | $7.16 | $6.46 | $0.70 | |
| 2/3/2012 | 15,264,104 | $7.22 | $6.51 | $0.71 | |
| 2/6/2012 | 12,480,697 | $7.56 | $6.82 | $0.74 | |
| 2/7/2012 | 16,068,308 | $7.42 | $6.69 | $0.73 | |
| 2/8/2012 | 12,449,285 | $7.35 | $6.63 | $0.72 | |
| 2/9/2012 | 11,608,770 | $7.45 | $6.72 | $0.73 | |
| 2/10/2012 | 10,413,562 | $7.46 | $6.73 | $0.73 | |
| 2/13/2012 | 18,202,659 | $7.79 | $7.02 | $0.77 | |
| 2/14/2012 | 11,357,727 | $7.91 | $7.13 | $0.78 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 2/15/2012 | 17,256,950 | $7.97 | $7.19 | $0.78 | |
| 2/16/2012 | 9,463,759 | $8.01 | $7.22 | $0.79 | |
| 2/17/2012 | 9,632,189 | $8.15 | $7.35 | $0.80 | |
| 2/21/2012 | 11,683,689 | $8.18 | $7.38 | $0.80 | |
| 2/22/2012 | 10,460,658 | $8.02 | $7.23 | $0.79 | |
| 2/23/2012 | 13,225,308 | $8.24 | $7.43 | $0.81 | |
| 2/24/2012 | 30,458,517 | $8.81 | $7.94 | $0.87 | |
| 2/27/2012 | 22,363,730 | $8.78 | $7.92 | $0.86 | |
| 2/28/2012 | 15,748,704 | $8.82 | $7.95 | $0.87 | |
| 2/29/2012 | 15,333,417 | $8.67 | $7.82 | $0.85 | |
| 3/1/2012 | 21,418,106 | $8.58 | $7.74 | $0.84 | |
| 3/2/2012 | 19,373,209 | $8.04 | $7.25 | $0.79 | |
| 3/5/2012 | 13,227,417 | $7.79 | $7.02 | $0.77 | |
| 3/6/2012 | 10,033,413 | $7.67 | $6.92 | $0.75 | |
| 3/7/2012 | 13,678,455 | $7.96 | $7.18 | $0.78 | |
| 3/8/2012 | 11,269,091 | $8.19 | $7.38 | $0.81 | |
| 3/9/2012 | 8,020,308 | $8.18 | $7.38 | $0.80 | |
| 3/12/2012 | 8,773,907 | $7.97 | $7.19 | $0.78 | |
| 3/13/2012 | 9,878,956 | $8.18 | $7.38 | $0.80 | |
| 3/14/2012 | 9,048,337 | $8.12 | $7.32 | $0.80 | |
| 3/15/2012 | 13,741,450 | $8.31 | $7.49 | $0.82 | |
| 3/16/2012 | 13,367,831 | $8.47 | $7.64 | $0.83 | |
| 3/19/2012 | 9,957,530 | $8.39 | $7.56 | $0.83 | |
| 3/20/2012 | 16,377,757 | $7.98 | $7.19 | $0.79 | |
| 3/21/2012 | 10,040,519 | $7.96 | $7.18 | $0.78 | |
| 3/22/2012 | 14,391,828 | $7.63 | $6.88 | $0.75 | |
| 3/23/2012 | 29,713,717 | $8.29 | $7.47 | $0.82 | |
| 3/26/2012 | 14,281,973 | $8.21 | $7.40 | $0.81 | |
| 3/27/2012 | 10,295,703 | $8.02 | $7.23 | $0.79 | |
| 3/28/2012 | 17,479,510 | $7.84 | $7.07 | $0.77 | |
| 3/29/2012 | 11,011,855 | $7.81 | $7.04 | $0.77 | |
| 3/30/2012 | 9,546,361 | $7.83 | $7.06 | $0.77 | |
| 4/2/2012 | 10,674,294 | $7.96 | $7.18 | $0.78 | |
| 4/3/2012 | 17,933,993 | $8.14 | $7.34 | $0.80 | |
| 4/4/2012 | 16,888,130 | $7.74 | $6.98 | $0.76 | |
| 4/5/2012 | 11,269,967 | $7.72 | $6.96 | $0.76 | |
| 4/9/2012 | 10,478,074 | $7.42 | $6.69 | $0.73 | |
| 4/10/2012 | 13,762,803 | $7.08 | $6.38 | $0.70 | |
| 4/11/2012 | 10,423,263 | $7.17 | $6.46 | $0.71 | |
| 4/12/2012 | 11,303,859 | $7.55 | $6.80 | $0.74 | |
| 4/13/2012 | 11,403,260 | $7.27 | $6.55 | $0.72 | |
| 4/16/2012 | 13,294,437 | $7.11 | $6.41 | $0.70 | |
| 4/17/2012 | 9,274,492 | $7.33 | $6.61 | $0.72 | |
| 4/18/2012 | 7,438,608 | $7.21 | $6.50 | $0.71 | |
| 4/19/2012 | 12,048,813 | $7.05 | $6.36 | $0.69 | |
| 4/20/2012 | 6,549,261 | $7.06 | $6.37 | $0.69 | |
| 4/23/2012 | 9,036,573 | $7.18 | $6.47 | $0.71 | |
| 4/24/2012 | 7,305,599 | $7.28 | $6.56 | $0.72 | |
| 4/25/2012 | 14,504,173 | $7.41 | $6.68 | $0.73 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 4/26/2012 | 8,569,047 | $7.66 | $6.91 | $0.75 | |
| 4/27/2012 | 7,577,677 | $7.54 | $6.80 | $0.74 | |
| 4/30/2012 | 19,890,015 | $7.99 | $7.20 | $0.79 | |
| 5/1/2012 | 14,379,028 | $8.02 | $7.23 | $0.79 | |
| 5/2/2012 | 47,230,703 | $7.25 | $6.54 | $0.71 | |
| 5/3/2012 | 30,421,839 | $6.91 | $6.23 | $0.68 | |
| 5/4/2012 | 29,930,669 | $7.08 | $6.38 | $0.70 | |
| 5/7/2012 | 14,353,312 | $7.05 | $6.36 | $0.69 | |
| 5/8/2012 | 11,251,913 | $7.07 | $6.37 | $0.70 | |
| 5/9/2012 | 11,762,384 | $7.13 | $6.43 | $0.70 | |
| 5/10/2012 | 10,285,159 | $7.04 | $6.35 | $0.69 | |
| 5/11/2012 | 8,826,684 | $6.89 | $6.21 | $0.68 | |
| 5/14/2012 | 7,671,049 | $6.70 | $6.04 | $0.66 | |
| 5/15/2012 | 20,445,380 | $6.20 | $5.59 | $0.61 | |
| 5/16/2012 | 19,457,704 | $6.28 | $5.66 | $0.62 | |
| 5/17/2012 | 11,116,596 | $6.04 | $5.45 | $0.59 | |
| 5/18/2012 | 10,498,335 | $6.08 | $5.48 | $0.60 | |
| 5/21/2012 | 9,133,296 | $6.50 | $5.86 | $0.64 | |
| 5/22/2012 | 17,404,977 | $6.17 | $5.56 | $0.61 | |
| 5/23/2012 | 12,015,485 | $6.41 | $5.78 | $0.63 | |
| 5/24/2012 | 10,838,555 | $6.32 | $5.70 | $0.62 | |
| 5/25/2012 | 7,539,366 | $6.48 | $5.84 | $0.64 | |
| 5/29/2012 | 11,728,263 | $6.85 | $6.18 | $0.67 | |
| 5/30/2012 | 13,575,652 | $6.36 | $5.73 | $0.63 | |
| 5/31/2012 | 11,647,608 | $6.35 | $5.73 | $0.62 | |
| 6/1/2012 | 11,082,922 | $5.96 | $5.37 | $0.59 | |
| 6/4/2012 | 17,916,269 | $5.89 | $5.31 | $0.58 | |
| 6/5/2012 | 10,316,815 | $6.07 | $5.47 | $0.60 | |
| 6/6/2012 | 14,952,079 | $6.31 | $5.69 | $0.62 | |
| 6/7/2012 | 13,800,549 | $6.27 | $5.65 | $0.62 | |
| 6/8/2012 | 10,571,704 | $6.34 | $5.72 | $0.62 | |
| 6/11/2012 | 10,153,570 | $6.07 | $5.47 | $0.60 | |
| 6/12/2012 | 11,884,521 | $6.11 | $5.51 | $0.60 | |
| 6/13/2012 | 11,124,792 | $5.98 | $5.39 | $0.59 | |
| 6/14/2012 | 12,714,552 | $6.26 | $5.64 | $0.62 | |
| 6/15/2012 | 9,160,837 | $6.48 | $5.84 | $0.64 | |
| 6/18/2012 | 11,562,603 | $6.44 | $5.81 | $0.63 | |
| 6/19/2012 | 11,771,708 | $6.77 | $6.10 | $0.67 | |
| 6/20/2012 | 12,825,761 | $6.49 | $5.85 | $0.64 | |
| 6/21/2012 | 13,895,882 | $6.04 | $5.45 | $0.59 | |
| 6/22/2012 | 22,411,311 | $6.06 | $5.46 | $0.60 | |
| 6/25/2012 | 9,527,628 | $5.91 | $5.33 | $0.58 | |
| 6/26/2012 | 10,988,894 | $5.96 | $5.37 | $0.59 | |
| 6/27/2012 | 13,701,907 | $6.37 | $5.74 | $0.63 | |
| 6/28/2012 | 12,880,907 | $6.39 | $5.76 | $0.63 | |
| 6/29/2012 | 15,666,394 | $6.69 | $6.03 | $0.66 | |
| 7/2/2012 | 8,318,256 | $6.54 | $5.90 | $0.64 | |
| 7/3/2012 | 7,907,141 | $6.72 | $6.06 | $0.66 | |
| 7/5/2012 | 9,630,028 | $6.54 | $5.90 | $0.64 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 7/6/2012 | 8,861,293 | $6.43 | $5.80 | $0.63 | |
| 7/9/2012 | 9,092,787 | $6.41 | $5.78 | $0.63 | |
| 7/10/2012 | 14,239,788 | $6.10 | $5.50 | $0.60 | |
| 7/11/2012 | 14,006,572 | $6.16 | $5.55 | $0.61 | |
| 7/12/2012 | 11,143,398 | $6.20 | $5.59 | $0.61 | |
| 7/13/2012 | 9,066,913 | $6.41 | $5.78 | $0.63 | |
| 7/16/2012 | 10,642,330 | $6.59 | $5.94 | $0.65 | |
| 7/17/2012 | 10,676,608 | $6.65 | $6.00 | $0.65 | |
| 7/18/2012 | 9,641,637 | $6.52 | $5.88 | $0.64 | |
| 7/19/2012 | 8,339,203 | $6.69 | $6.03 | $0.66 | |
| 7/20/2012 | 8,514,229 | $6.79 | $6.12 | $0.67 | |
| 7/23/2012 | 8,381,292 | $6.54 | $5.90 | $0.64 | |
| 7/24/2012 | 10,875,642 | $6.36 | $5.73 | $0.63 | |
| 7/25/2012 | 9,601,878 | $6.33 | $5.71 | $0.62 | |
| 7/26/2012 | 10,698,798 | $6.64 | $5.99 | $0.65 | |
| 7/27/2012 | 10,895,094 | $6.80 | $6.13 | $0.67 | |
| 7/30/2012 | 9,364,470 | $7.04 | $6.35 | $0.69 | |
| 7/31/2012 | 10,690,885 | $6.82 | $6.15 | $0.67 | |
| 8/1/2012 | 23,323,356 | $6.85 | $6.18 | $0.67 | |
| 8/2/2012 | 24,857,730 | $6.58 | $5.93 | $0.65 | |
| 8/3/2012 | 28,460,816 | $6.37 | $5.74 | $0.63 | |
| 8/6/2012 | 11,107,182 | $6.66 | $6.00 | $0.66 | |
| 8/7/2012 | 13,111,251 | $6.64 | $5.99 | $0.65 | |
| 8/8/2012 | 9,684,065 | $6.61 | $5.96 | $0.65 | |
| 8/9/2012 | 11,442,513 | $6.79 | $6.12 | $0.67 | |
| 8/10/2012 | 6,543,632 | $6.83 | $6.16 | $0.67 | |
| 8/13/2012 | 17,209,322 | $6.45 | $5.82 | $0.63 | |
| 8/14/2012 | 11,551,923 | $6.39 | $5.76 | $0.63 | |
| 8/15/2012 | 9,958,300 | $6.47 | $5.83 | $0.64 | |
| 8/16/2012 | 7,795,269 | $6.56 | $5.91 | $0.65 | |
| 8/17/2012 | 7,717,765 | $6.45 | $5.82 | $0.63 | |
| 8/20/2012 | 7,313,124 | $6.44 | $5.81 | $0.63 | |
| 8/21/2012 | 8,610,245 | $6.43 | $5.80 | $0.63 | |
| 8/22/2012 | 10,417,211 | $6.55 | $5.91 | $0.64 | |
| 8/23/2012 | 13,242,591 | $6.52 | $5.88 | $0.64 | |
| 8/24/2012 | 7,783,072 | $6.51 | $5.87 | $0.64 | |
| 8/27/2012 | 6,764,985 | $6.45 | $5.82 | $0.63 | |
| 8/28/2012 | 9,480,181 | $6.65 | $6.00 | $0.65 | |
| 8/29/2012 | 6,597,443 | $6.52 | $5.88 | $0.64 | |
| 8/30/2012 | 7,007,510 | $6.43 | $5.80 | $0.63 | |
| 8/31/2012 | 7,257,828 | $6.57 | $5.92 | $0.65 | |
| 9/4/2012 | 5,356,237 | $6.52 | $5.88 | $0.64 | |
| 9/5/2012 | 12,861,704 | $6.79 | $6.12 | $0.67 | |
| 9/6/2012 | 10,844,128 | $6.87 | $6.19 | $0.68 | |
| 9/7/2012 | 9,245,527 | $6.99 | $6.30 | $0.69 | |
| 9/10/2012 | 9,683,757 | $7.12 | $6.42 | $0.70 | |
| 9/11/2012 | 9,487,108 | $7.20 | $6.49 | $0.71 | |
| 9/12/2012 | 8,884,196 | $7.24 | $6.53 | $0.71 | |
| 9/13/2012 | 19,133,027 | $7.32 | $6.60 | $0.72 | |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 9/14/2012 | 19,408,907 | $7.75 | $6.99 | $0.76 | |
| 9/17/2012 | 9,642,601 | $7.58 | $6.83 | $0.75 | |
| 9/18/2012 | 13,472,794 | $7.39 | $6.66 | $0.73 | |
| 9/19/2012 | 8,937,306 | $7.28 | $6.56 | $0.72 | |
| 9/20/2012 | 10,179,364 | $7.30 | $6.58 | $0.72 | |
| 9/21/2012 | 7,681,659 | $7.27 | $6.55 | $0.72 | |
| 9/24/2012 | 8,336,270 | $7.15 | $6.45 | $0.70 | |
| 9/25/2012 | 9,443,418 | $7.02 | $6.33 | $0.69 | |
| 9/26/2012 | 10,220,342 | $6.84 | $6.17 | $0.67 | |
| 9/27/2012 | 7,305,853 | $6.99 | $6.30 | $0.69 | |
| 9/28/2012 | 6,637,286 | $6.98 | $6.29 | $0.69 | |
| 10/1/2012 | 8,226,281 | $7.03 | $6.34 | $0.69 | |
| 10/2/2012 | 7,652,942 | $7.05 | $6.36 | $0.69 | |
| 10/3/2012 | 8,912,273 | $7.00 | $6.31 | $0.69 | |
| 10/4/2012 | 16,595,632 | $7.38 | $6.65 | $0.73 | |
| 10/5/2012 | 9,676,471 | $7.27 | $6.55 | $0.72 | |
| 10/8/2012 | 7,397,885 | $7.16 | $6.46 | $0.70 | |
| 10/9/2012 | 9,636,921 | $7.35 | $6.63 | $0.72 | |
| 10/10/2012 | 21,844,235 | $7.08 | $6.38 | $0.70 | |
| 10/11/2012 | 12,395,036 | $7.32 | $6.60 | $0.72 | |
| 10/12/2012 | 5,831,227 | $7.24 | $6.53 | $0.71 | |
| 10/15/2012 | 8,303,925 | $7.14 | $6.44 | $0.70 | |
| 10/16/2012 | 9,229,309 | $7.37 | $6.64 | $0.73 | |
| 10/17/2012 | 7,535,748 | $7.38 | $6.65 | $0.73 | |
| 10/18/2012 | 9,109,868 | $7.29 | $6.57 | $0.72 | |
| 10/19/2012 | 13,090,647 | $7.06 | $6.37 | $0.69 | |
| 10/22/2012 | 13,046,920 | $6.91 | $6.23 | $0.68 | |
| 10/23/2012 | 18,568,467 | $6.67 | $6.01 | $0.66 | |
| 10/24/2012 | 13,065,901 | $6.45 | $5.82 | $0.63 | |
| 10/25/2012 | 16,052,348 | $6.42 | $5.79 | $0.63 | |
| 10/26/2012 | 18,789,296 | $6.36 | $5.73 | $0.63 | |
| 10/31/2012 | 8,320,319 | $6.22 | $5.61 | $0.61 | |
| 11/1/2012 | 11,864,572 | $6.27 | $5.65 | $0.62 | |
| 11/2/2012 | 12,243,390 | $6.11 | $5.51 | $0.60 | |
| 11/5/2012 | 11,893,944 | $6.22 | $5.61 | $0.61 | |
| 11/6/2012 | 6,767,763 | $6.25 | $5.64 | $0.61 | |
| 11/7/2012 | 17,194,291 | $6.00 | $5.41 | $0.59 | |
| 11/8/2012 | 40,539,696 | $6.10 | $5.50 | $0.60 | |
| 11/9/2012 | 76,724,060 | $5.51 | | | $5.51 |
| 11/12/2012 | 30,582,795 | $5.39 | | | $5.45 |
| 11/13/2012 | 41,799,082 | $5.60 | | | $5.50 |
| 11/14/2012 | 22,607,136 | $5.19 | | | $5.42 |
| 11/15/2012 | 27,475,829 | $5.32 | | | $5.40 |
| 11/16/2012 | 15,755,927 | $5.34 | | | $5.39 |
| 11/19/2012 | 18,899,733 | $5.62 | | | $5.42 |
| 11/20/2012 | 18,933,716 | $5.72 | | | $5.46 |
| 11/21/2012 | 7,231,488 | $5.62 | | | $5.48 |
| 11/23/2012 | 4,078,272 | $5.72 | | | $5.50 |
| 11/26/2012 | 15,104,965 | $5.73 | | | $5.52 |

# SandRidge Securities Litigation

Analysis of Damages per Share/Inflation

| Date | Reported Volume | Closing Price | Value | Inflation | 90-day Moving Average |
|---|---|---|---|---|---|
| 11/27/2012 | 11,554,941 | $5.57 | | | $5.53 |
| 11/28/2012 | 11,918,432 | $5.60 | | | $5.53 |
| 11/29/2012 | 10,684,238 | $5.67 | | | $5.54 |
| 11/30/2012 | 22,483,362 | $5.85 | | | $5.56 |
| 12/3/2012 | 21,607,501 | $6.08 | | | $5.60 |
| 12/4/2012 | 11,942,127 | $6.11 | | | $5.63 |
| 12/5/2012 | 13,812,728 | $6.45 | | | $5.67 |
| 12/6/2012 | 28,234,180 | $6.79 | | | $5.73 |
| 12/7/2012 | 38,157,355 | $7.29 | | | $5.81 |
| 12/10/2012 | 22,763,036 | $6.78 | | | $5.85 |
| 12/11/2012 | 11,301,821 | $6.85 | | | $5.90 |
| 12/12/2012 | 10,228,950 | $6.84 | | | $5.94 |
| 12/13/2012 | 8,441,909 | $6.67 | | | $5.97 |
| 12/14/2012 | 4,576,882 | $6.70 | | | $6.00 |
| 12/17/2012 | 12,487,321 | $6.42 | | | $6.02 |
| 12/18/2012 | 7,374,688 | $6.48 | | | $6.03 |
| 12/19/2012 | 13,348,034 | $6.50 | | | $6.05 |
| 12/20/2012 | 24,774,522 | $6.19 | | | $6.06 |
| 12/21/2012 | 14,875,312 | $6.26 | | | $6.06 |
| 12/24/2012 | 2,815,486 | $6.25 | | | $6.07 |
| 12/26/2012 | 3,626,789 | $6.25 | | | $6.07 |
| 12/27/2012 | 7,601,440 | $6.41 | | | $6.08 |
| 12/28/2012 | 6,513,915 | $6.23 | | | $6.09 |
| 12/31/2012 | 7,687,203 | $6.35 | | | $6.10 |
| 1/2/2013 | 9,745,088 | $6.48 | | | $6.11 |
| 1/3/2013 | 7,233,942 | $6.46 | | | $6.12 |
| 1/4/2013 | 8,112,931 | $6.56 | | | $6.13 |
| 1/7/2013 | 9,226,289 | $6.80 | | | $6.14 |
| 1/8/2013 | 11,822,666 | $6.97 | | | $6.17 |
| 1/9/2013 | 8,692,710 | $6.93 | | | $6.18 |
| 1/10/2013 | 9,768,035 | $6.87 | | | $6.20 |
| 1/11/2013 | 6,770,701 | $6.86 | | | $6.22 |
| 1/14/2013 | 5,846,372 | $6.66 | | | $6.23 |
| 1/15/2013 | 3,783,823 | $6.73 | | | $6.24 |
| 1/16/2013 | 4,244,924 | $6.79 | | | $6.25 |
| 1/17/2013 | 11,830,297 | $6.99 | | | $6.26 |
| 1/18/2013 | 7,800,352 | $7.02 | | | $6.28 |
| 1/22/2013 | 9,504,190 | $7.18 | | | $6.30 |
| 1/23/2013 | 11,888,446 | $7.24 | | | $6.32 |
| 1/24/2013 | 8,212,657 | $7.05 | | | $6.33 |
| 1/25/2013 | 6,775,750 | $7.07 | | | $6.35 |
| 1/28/2013 | 6,915,808 | $7.00 | | | $6.36 |
| 1/29/2013 | 6,659,450 | $7.18 | | | $6.37 |
| 1/30/2013 | 12,875,866 | $7.13 | | | $6.39 |
| 1/31/2013 | 5,684,444 | $7.08 | | | $6.40 |
| 2/1/2013 | 26,268,713 | $6.62 | | | $6.40 |
| 2/4/2013 | 15,451,717 | $6.28 | | | $6.40 |
| 2/5/2013 | 21,697,791 | $6.25 | | | $6.40 |
| 2/6/2013 | 9,560,887 | $6.15 | | | $6.40 |