## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

In re SANDRIDGE ENERGY, INC.
SECURITIES LITIGATION

Case No. CIV-12-1341-G

This Document Relates To:

ALL ACTIONS.

## MEMORANDUM OF LAW IN SUPPORT OF THE
## MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS
## <u>JAMES BENNETT AND MATTHEW GRUBB</u>

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................. 3

I.     FORWARD-LOOKING STATEMENTS ABOUT THE MISSISSIPPIAN .......... 3

II.     SANDRIDGE'S CAUTIONARY STATEMENTS TO INVESTORS ................. 6

III.     THE ROLE OF NETHERLAND SEWELL ........................................... 8

IV.     CHANGES IN AVAILABLE DATA OVER THE CLASS PERIOD ................. 12

V.     DEFENDANTS' END OF CLASS PERIOD DISCLOSURES ........................... 12

VI.     PLAINTIFFS' CLAIMS ...................................................................... 14

ARGUMENT..................................................................................................... 14

I.     THE MAJORITY OF PLAINTIFFS' ALLEGATIONS ARE BASED ON FORWARD-LOOKING STATEMENTS THAT ARE IMMUNE FROM LIABILITY. ......................................................................................... 15

     A.     The Forward-Looking Statements are Protected Under the PSLRA Safe Harbor and Bespeaks Caution Doctrine. ............................................. 16

     B.     No Reasonable Jury Could Find that Defendants Had Actual Knowledge that Any Forward-Looking Statement Was False. .................. 18

     C.     Defendants Had No Duty to Update the Forward-Looking Estimates. ...... 23

II.     PLAINTIFFS' OTHER ALLEGATIONS FAIL AS A MATTER OF LAW ........ 23

III.     PLAINTIFFS CANNOT ASSERT STATEMENTS OR THEORIES NOT ALLEGED IN THE COMPLAINT. ...................................................... 25

IV.     PLAINTIFFS CANNOT DEMONSTRATE LOSS CAUSATION. ..................... 27

     A.     Plaintiffs Have Failed to Adduce Any Reliable Expert Evidence Disaggregating the Impact of Fraud and Non-Fraud Related Disclosures. ................................................................................... 27

     B.     Plaintiffs Cannot Demonstrate that Any Truth Relating to the Geology of the Mississippian Was Revealed in Advance of the Stock Drop.............................................................................................. 28

V.      PLAINTIFFS' CONTROL PERSON LIABILITY CLAIMS SHOULD
        ALSO BE DISMISSED. ......................................................................................29

CONCLUSION ...........................................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999)............................................................24

*In re Allaire Corp. Sec. Litig.*,
   224 F. Supp. 2d 319 (D. Mass. 2002) ...........................................24

*Amoco Prod. Co. v. Newton Sheep Co.*,
   85 F.3d 1464 (10th Cir. 1996) .......................................................26

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).......................................................................14

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
   827 F.3d 1229 (10th Cir. 2016) .....................................................19

*In re Apple Comput., Inc. Sec. Litig.*,
   243 F. Supp. 2d 1012 (N.D. Cal. 2002) .........................................19

*Barilli v. Sky Solar Holdings, Ltd.*,
   389 F. Supp. 3d 232 (S.D.N.Y. 2019).............................................26

*Bumgarner v. Williams Cos.*,
   2016 WL 1717206 (N.D. Okla. Apr. 28, 2016)..............................16

*In re China N. E. Petroleum Holdings Ltd. Sec. Litig.*,
   2014 WL 7243149 (S.D.N.Y. Dec. 11, 2014) ................................18

*De Vito v. Liquid Holdings Grp., Inc.*,
   2018 WL 6891832 (D.N.J. Dec. 31, 2018)......................................26

*Del Noce v. Delyar Corp.*,
   1976 WL 813 (S.D.N.Y. July 30, 1976) .........................................22

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005)........................................................................27

*Erber v. Williams Cos.*,
   2017 WL 930828 (N.D. Okla. Mar. 8, 2017), *aff'd*, 889 F.3d 1153 (10th
   Cir. 2018) .......................................................................................23

*In re Exxon Mobil Corp. Sec. Litig.*,
   500 F.3d 189 (3d Cir. 2007)...........................................................25

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & ERISA Litig.*,
  898 F. Supp. 2d 176 (D.D.C. 2012) ............................................................................ 21

*Firefighters Pension & Relief Fund v. Bulmahn*,
  2015 WL 4879217 (E.D. La. Aug. 14, 2015) ...................................................... 17, 22

*In re Gold Res. Corp. Sec. Litig.*,
  957 F. Supp. 2d 1284 (D. Colo. 2013), *aff'd*, 776 F.3d 1103 (10th Cir.
  2015) ............................................................................................................................ 19

*Grossman v. Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997) .......................................................................... 16, 24

*Hampton v. root9B Techs., Inc.*,
  897 F.3d 1291 (10th Cir. 2018) ................................................................................ 22

*In re Hansen Nat. Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) ..................................................................... 19

*In re Ikon Office Sols., Inc.*,
  277 F.3d 658 (3d Cir. 2002) ...................................................................................... 20

*Johnson v. Tellabs, Inc.*,
  262 F. Supp. 2d 937 (N.D. Ill. 2003) ........................................................................ 24

*Karacand v. Edwards*,
  53 F. Supp. 2d 1236 (D. Utah 1999) .......................................................................... 23

*Maher v. Durango Metals, Inc.*,
  144 F.3d 1302 (10th Cir. 1998) .......................................................................... 29, 30

*McKibben v. Chubb*,
  840 F.2d 1525 (10th Cir. 1988) ................................................................................ 14

*Middlesex Ret. Sys. v. Quest Software Inc.*,
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) ..................................................................... 30

*In re Molycorp, Inc. Sec. Litig.*,
  2015 WL 1540523 (D. Colo. Mar. 31, 2015) ............................................................ 17

*In re Molycorp, Inc. Sec. Litig.*,
  2016 WL 9735753 (D. Colo. May 25, 2016) .............................................................. 26

*N.J. & its Div. of Inv. v. Sprint Corp.*,
  758 F. Supp. 2d 1186 (D. Kan. 2010) ........................................................................ 26

*In re Omnicom Grp., Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd,* 597 F.3d 501 (2d Cir.
  2010) ..................................................................................................... 28

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
  96 F.3d 1151 (9th Cir. 1996) ................................................................. 30

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010)........................................... 19, 20, 22

*Rochester Laborers Pension Fund v. Monsanto Co.*,
  883 F. Supp. 2d 835 (E.D. Mo. 2012).................................................... 24

*Rohrbaugh v. Celotex Corp.*,
  53 F.3d 1181 (10th Cir. 1995) ................................................................ 14

*S.E.C. v. Lucent Techs., Inc.*,
  610 F. Supp. 2d 342 (D.N.J. 2009) ........................................................ 20

*In re SandRidge Energy, Inc. Sec. Litig.*,
  2017 WL 3309758 (W.D. Okla. Aug. 1, 2017) ................................. 16, 28

*In re Scientific Atlanta, Inc. Sec. Litig.*,
  754 F. Supp. 2d 1339 (N.D. Ga. 2010), *aff'd* 489 F. App'x 339 (11th
  Cir.) ....................................................................................................... 27

*Silverman v. Motorola, Inc.*,
  772 F. Supp. 2d 923 (N.D. Ill. 2011) ..................................................... 29

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) ................................................................. 19

*In re St. Jude Med., Inc., Sec. Litig.*,
  629 F. Supp. 2d 915 (D. Minn. 2009)..................................................... 26

*In re Thornburg Mortg., Inc. Sec. Litig.*,
  824 F. Supp. 2d 1214 (D.N.M. 2011), *aff'd*, 719 F.3d 1190 (10th Cir.
  2013) ...................................................................................................... 30

*Truk Int'l Fund LP v. Wehlmann*,
  737 F. Supp. 2d 611 (N.D. Tex. 2009), *aff'd*, 389 F. App'x 354 (5th Cir.
  2010) ...................................................................................................... 18

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) .................................................. 24

*In re Williams Sec. Litig.*,
496 F. Supp. 2d 1195 (N.D. Okla. 2007), *aff'd*, 558 F.3d 1130 (10th Cir. 2009) ........................................................................................... 27, 28, 29

*In re Williams Sec. litigation-WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009) ........................................................... 27, 29

## Statutes

15 U.S.C. § 78t ............................................................................................ 30

15 U.S.C. § 78u-4 ...................................................................... 16, 18, 23, 26

28 U.S.C. § 1658 ......................................................................................... 25

## Other Authorities

17 C.F.R. § 229.1202 ................................................................................... 23

17 C.F.R. § 210.4-10 ................................................................................. 4, 6

Defendants James Bennett and Matthew Grubb respectfully submit this Memorandum in Support of their Motion for Summary Judgment.

## INTRODUCTION

This is a stock drop class action in which Plaintiffs claim the market was misled by forward-looking estimates of oil and gas production.  In 2009, SandRidge Energy, Inc. ("SandRidge" or the "Company") began to acquire acreage in the Mississippian formation in Oklahoma and Kansas.  To provide guidance to investors about the expected production from its Mississippian wells, SandRidge retained Netherland Sewell and Associates, Inc. ("NSAI"), an independent petroleum engineering firm which developed a "type curve" and prepared reserve estimates for SandRidge's Mississippian properties.  NSAI prepared Mississippian type curves as of year-end 2010 and year-end 2011, based on the data available to it at the time.  Plaintiffs now assert that these type curves and related statements were misleading, because SandRidge's Mississippian wells ultimately produced less oil and more gas than predicted.  This claim of fraud-by-hindsight fails as a matter of law.

A majority of the statements challenged in Plaintiffs' Third Amended Complaint ("Complaint" or "Compl.") are forward-looking statements that fall squarely within each prong of the safe harbor in the Private Securities Litigation Reform Act ("PSLRA").  First, the safe harbor insulates Defendants from liability for any forward-looking statement that is identified as such and accompanied by meaningful cautionary language, regardless of its truth or falsity and regardless of Defendants' knowledge.  Here, the undisputed facts show that NSAI's type curves and related statements were identified as forward-looking and ac-companied by warnings that actual production could—and "most likely" would—vary

from estimates for a host of reasons, including the inherently imprecise and subjective nature of projecting oil and gas production. Second, the safe harbor immunizes Defendants from liability unless Plaintiffs can prove that each had "actual knowledge" that a forward-looking projection was false. Plaintiffs cannot meet this high standard because Defendants reasonably relied on NSAI, an independent reserves estimator, to prepare and approve the challenged projections. The safe harbor alone disposes of the lion's share of the Complaint.

The assorted other statements challenged by Plaintiffs also cannot support liability. Some, such as Mr. Grubb's statement that the Mississippian was performing "beyond our expectations," are vague and immaterial puffery, and therefore not actionable as a matter of law. Some are simply not false or misleading, such as the factually true observation that Mississippian production grew over time. Still other statements were never pleaded in the Complaint, are barred by the statute of repose, and thus cannot provide a basis for resisting summary judgment.

Moreover, Defendants are entitled to summary judgment for the independent reason that Plaintiffs cannot prove the essential element of loss causation. In opining that Defendants' November 2012 disclosure about SandRidge's Mississippian production caused Plaintiffs' alleged loss, Plaintiffs' damages expert ignores several confounding factors that affected SandRidge's stock price. Under controlling Supreme Court and Tenth Circuit precedent, Plaintiffs' inability to disaggregate these confounding factors is a fatal defect in their case that, in and of itself, is grounds for granting summary judgment.

For these reasons and others explained in detail below, it is now time for what remains of this nearly decade-old case to be dismissed.

2

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Nominal Defendant SandRidge is an oil and natural gas company based in Oklahoma City, Oklahoma. *See* Compl. ¶¶ 2, 28.  During the class period (February 24, 2011 to November 8, 2012), Tom Ward was SandRidge's Chief Executive Officer, Matthew Grubb was its Chief Operating Officer, and James Bennett was its Chief Financial Officer. *See id.* ¶¶ 29-31.  Mr. Grubb and Mr. Bennett reported to Mr. Ward.  *See* Grubb Decl. ¶ 3; Bennett Decl. ¶ 4.

2.      In 2009, SandRidge embarked on a new strategy to increase its oil production. *See* Ex. 1, -0003097.  As part of that strategy, the Company began to acquire acreage in the Mississippian formation—an expansive carbonate hydrocarbon system located in Oklahoma and Kansas.  Ex. 2, SandRidge 2010 10-K, at 5.

3.      SandRidge's drilling in the Mississippian expanded significantly over the class period.  At the end of 2010, before the class period, SandRidge had drilled only 37 horizontal wells in the Mississippian.  Ex. 3,  -1238058.  In 2011, SandRidge drilled 167 such wells.  *Id.*  In 2012, SandRidge drilled another 396 such wells.  *Id.*

4.      SandRidge disclosed to investors how much oil and gas it produced in each fiscal quarter during the class period.  *See, e.g.*, Ex. 4, Press Release (Nov. 3, 2011), at 3.

## I.      FORWARD-LOOKING STATEMENTS ABOUT THE MISSISSIPPIAN

5.      During the class period, SandRidge also disclosed a variety of forward-looking estimates of the expected future oil and gas production of its Mississippian wells, including, as defined below, (i) type curves, (ii) EURs (iii) GORs, (iv) rates of return, and (v) proved reserves.  *See* Compl. ¶¶ 41, 47, 59.

6.     <u>Type Curve, EUR, and GOR</u>.  A type curve is a predictive estimate of the expected production profile of a representative well in a specific play or area.  *See* Ex. 5, Walton Tr. at 12:20-23; Ex. 6, Crane Tr. at 255:22-24.

7.     SandRidge's independent reserve estimator, NSAI, developed type curves for certain wells in the Mississippian.  Ex. 5, Walton Tr. at 12:11-19.  The NSAI type curves projected production only for wells designated as "Proved Undeveloped" wells (PUDs) by NSAI. Ex. 7, R. Johnson Tr. at 38:22-39:23.  Classification of PUDs is determined by SEC guidance. *Id.* at 37:22-39:3, 195:1-9; Ex. 8, Grubb Tr. at 52:2-14.

8.     The Company also publicly disclosed other estimates derived from these NSAI type curves, including projections of the "EUR" and "GOR" for Mississippian PUD wells.  The "EUR" is the estimated ultimate recovery from a given well—a projection of the sum of all oil and gas reserves that will be recovered over time.  *See* 17 C.F.R. § 210.4-10(a)(11); Compl. ¶ 47; Ex. 8, Grubb Tr. at 15:8-16.  The "GOR," or gas-to-oil ratio, is a projection of the amount of all gas reserves compared to oil reserves that will be recovered from a well.  *See* Compl. ¶ 51; Ex. 9, Miller Tr. at 248:12-16.

9.     NSAI's year-end 2010 Mississippian type curve was based on 37 wells. Ex. 10, -0000974.  It projected an EUR of 409 thousand barrels of oil equivalent ("Mboe"), including 211 thousand barrels of oil ("Mbbl"), for a type well.  *See* Ex. 11, -0000716. These production estimates yield a GOR of 48% gas and 52% oil.  SandRidge publicly disclosed and referred to these NSAI projections at various points in 2011.  *See, e.g.*, *id.*

10.    NSAI's year-end 2011 Mississippian type curve was based on 145 wells. *See* Ex. 12, -0001448.  It projected an EUR of 456 Mboe, including 204 Mbbl of oil, for a type

well. *Id.* These production estimates yield a GOR of 55% gas and 45% oil. SandRidge publicly disclosed and referred to these projections at various points in 2012. *See, e.g.*, *id.*

11.     In addition to providing the NSAI type curves, SandRidge disclosed its own internal EUR estimate of 300 to 500 Mboe per well across its Mississippian wells. *See, e.g.*, Ex. 13, -0004667. The Company explained to investors that it provided a range because it expected EUR to vary across the Mississippian. *See, e.g.*, Ex. 14, -0002091 ("[W]e keep a range of 300 [Mboe] to 500 [Mboe], even though Netherland Sewell has us at 409 [Mboe] per well, [a]s we don't know from one section to the next, or one area to the next which ones might be better or worse."); Ex. 1, -0003102 ("I think there's still a lot of variability. We're still saying internally 300,000 to 500,000 barrels ….").

12.     SandRidge also warned investors that there were "varying degrees of gas performance across" the Mississippian and, specifically, "variations in gas/oil ratio from well to well." Ex. 15, -0004613.

13.     <u>Rate of Return</u>. Rate of return ( "ROR") and internal rate of return ("IRR") are projections of the return on investment over the life of a well or set of wells. *See* Ex. 8, Grubb Tr. at 65:6-19; Ex. 16, Knupp Tr. at 151:7-16.

14.     During the class period, SandRidge disclosed ROR and IRR estimates for its Mississippian PUD wells based on the then-current NSAI type curve as well as other inputs, including oil and gas prices and well costs. *See* Ex. 8, Grubb Tr. at 55:3-11, 65:2-19; Ex. 17, Ward Tr. at 27:22-28:8, 46:8-12.

15.     SandRidge cautioned investors that the ROR and IRR also varied widely across the Mississippian play. *See, e.g.*, Ex. 18, -0003214 ("[T]here are good and bad

wells… [O]n the downside[,] you have a low rate of return and on the upside you … have some extraordinary wells… But there is a wide variance ….").

16.    Oil and Gas Reserves. Proved oil and gas reserves are:

those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probabilistic methods are used for the estimation. The project to extract the hydrocarbons must have commenced or the operator must be reasonably certain that it will commence the project within a reasonable time.

17 C.F.R. § 210.4-10(a)(22); Compl. ¶ 59.  Reserve estimates are forward-looking projections.  *See, e.g.*, Ex. 19, Galvin Tr. at 77:16-20.

17.    During the class period, SandRidge's Mississippian proved reserves were estimated by NSAI annually based in part on the NSAI type curve.  *See, e.g.*, Ex. 8, Grubb Tr. at 52:2-14; Ex. 19, Galvin Tr. at 316:8-13.

## II.    SANDRIDGE'S CAUTIONARY STATEMENTS TO INVESTORS

18.    SandRidge repeatedly cautioned investors that its public disclosures, including those discussing type curves, EURs, GORs, RORs, and reserves, contained forward-looking statements.  *See* Ex. 48, App. B (examples of relevant cautionary language).

19.    Earnings Calls. The Company warned investors that its quarterly and annual earnings calls "contain forward-looking statements and assumptions, which are subject to risks and uncertainties, and actual results may differ materially from those projected in these forward-looking statements."  *See e.g.*, Ex. 14, -0002084; Ex. 20, -0688338; Ex. 21, -0003157; Ex. 18, -0003196; Ex. 22, -0003225; Ex. 13, -0004647; Ex. 23, -0004685.

20.    <u>Press Releases, 8-Ks, and Annual Reports</u>.  SandRidge's press releases, 8-Ks, and Annual Reports stated that they contain forward-looking statements, including projections and estimates of rates of return and oil and natural gas production, that were subject to a number of risks and uncertainties, and referred investors to risk factors in SandRidge's 10-K.  *See, e.g.*, Ex. 4, Press Release (Nov. 3, 2011), at 17; Ex. 24, SandRidge 8-K (May 3, 2012), at 16; Ex. 25, 2010 Annual Report.

21.    <u>Investor and Analyst Presentations</u>.  Defendants' investor and analyst presentations about the Mississippian stated that they contained forward-looking statements based on current expectations and assumptions, and that actual results and developments were subject to a number of risks and uncertainties and thus may not conform with expectations or projections.  *See, e.g.*, Ex. 26,  -0000458; Ex. 27, -0001352.  These presentations also cited the risk factors in SandRidge's 10-K.  *See, e.g.*, Ex. 26,  -0000458; Ex. 27, -0001352.

22.    <u>SandRidge SEC Filings</u>. SandRidge's quarterly and annual reports filed with the SEC likewise warned that they included forward-looking statements that were based on current expectations and assumptions about future events and were subject to significant risks and uncertainties.  *See, e.g.*, Ex. 2, SandRidge 2010 10-K, at 48-49; Ex. 28, SandRidge Q1 2012 10-Q, at 3.  SandRidge's 10-Ks included a description of risk factors relevant to the Company's forward-looking estimates.  For example, the 2010 10-K included the following risk factors, among many others:

a.  ***Our estimated reserves are based on many assumptions that may turn out to be inaccurate. Any significant inaccuracies in these reserve estimates or underlying assumptions could materially affect the quantities and present value of our reserves.  Our current estimates of reserves could change, potentially in material amounts, in the future.***

The process of estimating oil and natural gas reserves is complex and inherently imprecise. It requires interpretations of available technical data and many assumptions, including assumptions relating to production rates and economic factors such as oil and natural gas prices, drilling and operating expenses, capital expenditures and availability of funds.

Actual future production, … and quantities of recoverable oil and natural gas reserves most likely will vary from our estimates….

b.  The use of seismic data and other technologies and the study of producing fields in the same area does not enable us to know conclusively prior to drilling whether oil or natural gas will be present or, if present, whether oil or natural gas will be present in sufficient quantities to be economically viable….

c.  ***Drilling for and producing oil and natural gas are high risk activities with many uncertainties that could adversely affect our business … or results of operations.***

Ex. 2, SandRidge 2010 10-K, at 33-34, 39. SandRidge also "disclaim[ed] any obligation to update or revise" its forward-looking statements. *Id.* at 48. SandRidge's 2011 10-K contained substantially similar risk factors. *See* Ex. 29, SandRidge 2011-K, at 33, 35-36.

## III.   THE ROLE OF NETHERLAND SEWELL

23.    As SandRidge cautioned investors, developing a type curve and estimating reserves is complex and inherently imprecise; it is not an exact science. Ex. 2, SandRidge 2010 10-K, at 33. The accuracy of type curves and reserve estimates depends on a variety of factors including the quality and quantity of available data and subjective judgments. *Id.* at 68-69; Ex. 6, Crane Tr. at 255:8-19. Even given the same data, different engineers may arrive at different type curves, different EUR and GOR projections, and different reserve estimates. *See* Ex. 5, Walton Tr. at 84:2-8 ("If you put 10 engineers in a room and ask them to develop a type curve you'd get a different EUR from every single person.").

24.    To make these complex and subjective judgment calls, SandRidge retained NSAI to act as an independent reserves estimator for its Mississippian reserves during the

class period.  *See* Ex. 29, SandRidge 2011 10-K, at 5; Ex. 2, SandRidge 2010 10-K, at 4-5.  A reserves estimator is given full responsibility for estimating and evaluating reserves.  *See* Ex. 30, SPE Standards § 2.2(b).  This is in contrast to a reserve auditor, which merely audits reserve estimates prepared by a company.  *See id.* at (e).

25.     NSAI is a leading independent petroleum engineering firm.  *See* Ex. 16, Knupp Tr. at 215:2-18; Ex. 31, Stark Tr. at 415:9-416:7.  As of 2011, NSAI had more than 30 years of experience in petroleum engineering and almost 15 years of experience estimating reserves.  Ex. 29, SandRidge 2011 10-K, at 9-10.  NSAI has worked with many established oil and gas companies, including Chesapeake Energy Corp. and Shell Oil Co.  *See* Ex. 32, NSAI website.  NSAI did not have any ownership interest in SandRidge or in the Mississippian during the class period.  *See* Ex. 29, SandRidge 2011 10-K, at F-63.

26.     NSAI prepared type curves and reserve estimates for SandRidge's Mississippian properties annually, as of year-end.  *See, e.g.*, Ex. 33, Koontz Tr. at 41:17-21, 46:2-3; Ex. 7, R. Johnson Tr. 77:7-11; Ex. 34, White Tr. at 88:7-10.

27.     In order to develop the year-end 2010 and 2011 type curves, NSAI obtained and reviewed production data from SandRidge's reservoir engineering department.  *See, e.g.*, Ex. 19, Galvin Tr. at 22:13-24:2; Ex. 9, Miller Tr. at 205:9-22.  SandRidge provided NSAI with all of the data it requested.  *See, e.g.*, Ex. 5, Walton Tr. at 203:2-17.

28.     In preparing these reserves and type curves, NSAI was bound by the Society of Petroleum Engineers' Standards Pertaining to the Estimating and Auditing of Oil and Gas Reserves Information (the "SPE Standards").  *See* Ex. 29, SandRidge 2011 10-K, Ex.

99.1, at 3-4; Ex. 2, SandRidge 2010 10-K, Ex-99.2.  Under the SPE Standards, NSAI was required to maintain independence and objectivity.  Ex. 30, SPE Standards Art. 4.

29.    As recognized by the SPE Standards:  "Reserves Information is imprecise due to the inherent uncertainties in, and the limited nature of, the accumulation and inter-pretation of data upon which the estimating and auditing of Reserves Information is pred-icated." *Id.* § 1.3.  This imprecision is due in part to the fact that persons estimating reserves "are required, in applying generally accepted petroleum engineering and evaluation prin-ciples, to make numerous unbiased judgments based upon their educational background, professional training, and professional experience." *Id.* Reserve estimation thus involves "extensive judgments." *Id.* § 1.2.

30.    As SandRidge's independent reserves estimator, NSAI had ultimate decisionmaking authority over SandRidge's publicly-announced reserves and type curves for the Mississippian. *See, e.g.*, *id.* § 2.2(b); Ex. 35, Bennett Tr. at 364:4-10; Ex. 5, Walton Tr. at 204:14-16; Ex. 7, R. Johnson Tr. at 21:6-15.  This included authority over which wells to include in its type curves (Ex. 19, Galvin Tr. at 91:6-16, Ex. 5, Walton Tr. at 178:19-179:4), the EUR estimates (Ex. 5, Walton  Tr. at 54:20-55:6, 85:7-15), and whether to develop one type curve or multiple type curves for the Mississippian (*Id.* at 171:13-172:17; Ex. 9, Miller Tr. at 223:18-224:9). *See also* Bennett Decl. ¶ 6; Grubb Decl. ¶ 5.

31.    Although employees in SandRidge's reservoir engineering department made certain suggestions to NSAI relating to the year-end 2010 and 2011 NSAI type curves, it was NSAI's decision whether or not to agree with and implement these suggestions. *See* Ex. 5, Walton Tr. at 180:2-11; Ex. 9, Miller Tr. at 32:10-24.  This back-and-forth discussion

between NSAI and SandRidge employees was the standard process NSAI used in interacting with its clients.  *See* Ex. 9, Miller Tr. at 32:10-24.

32.  The NSAI employee responsible for estimating the reserves and type curve for SandRidge, David Miller, believed that NSAI's work for SandRidge was completed in accordance with the underlying data and SEC regulations.  *See id.* at 43:9-15, 61:2-9.

33.  Mr. Bennett and Mr. Grubb did not participate in creating the NSAI type curves or estimating reserves during the class period.  *See* Bennet Decl. ¶ 5; Grubb Decl. ¶ 4; Ex. 5, Walton Tr. at 198:1-199:12; Ex. 9, Miller Tr. at 48:14-19, 115:9-19; Ex. 8, Grubb Tr. at 165:15-21 ("I had very little to no involvement in the process with Netherland Sewell."); Ex. 35, Bennett Tr. at 56:16-19 ("I was CFO [in 2011 and 2012] and [type curves and reserves were] not under my purview."), 57:21-24, 149:12-18.  Instead, they relied on NSAI to develop the type curves with support from members of SandRidge's internal reservoir engineering group.  *See* Bennett Decl. ¶ 7; Grubb Decl. ¶ 6; Ex. 8, Grubb Tr. at 109:19-110:6, 165:5-21; Ex. 35, Bennett Tr. at 32:24-33:7.

34.  NSAI's staff did not communicate with Messrs. Bennett or Grubb concerning NSAI's type curves or reserve estimates for the Mississippian during the class period.  *See* Ex. 9, Miller Tr. at 48:14-19, 115:9-19.  In connection with its work on the Mississippian, NSAI's principal contacts at SandRidge were employees in the Company's reservoir engineering group—Rodney Johnson, Lance Galvin, and Lindsey Walton (née Austin).  *See* Ex. 7, R. Johnson Tr. at 44:21-45:7; Ex. 36, Interrogatory 11.  Mr. Bennett and Mr. Grubb were sometimes kept informed about aspects of these discussions with NSAI, but

did not themselves participate in them.  *See* Ex. 8, Grubb Tr. at 164:25-165:9; Ex. 35, Bennett Tr. at 57:25-58:17, 149:19-22.

## IV.   CHANGES IN AVAILABLE DATA OVER THE CLASS PERIOD

35.    As SandRidge and other operators drilled additional horizontal wells in the Mississippian and existing wells accumulated longer production histories, SandRidge collected more data.  *See* Ex. 37, C. Johnson Tr. at 94:10-19; Ex. 38, Lawler Tr. at 201:15-18. In connection with NSAI's annual updates to the type curves, SandRidge's reservoir engineering group provided that additional data to NSAI, allowing NSAI to refine and improve its type curves and reserve estimates.  *See* Ex. 15, -0004625; Ex. 9, Miller Tr. at 20:13-24. Thus, while NSAI's year-end 2010 type curve was based on production data for only 37 wells, NSAI's year-end 2011 type curve was based on data for 145 wells.  *Supra* ¶¶ 9-10.

36.    In 2012, the Company developed still more production data as it ramped up its Mississippian drilling program.  By the end of the third quarter of 2012, the Company had drilled approximately 475 horizontal wells in the Mississippian, compared to 205 wells at the end of 2011.  *See* Ex. 2, SandRidge 2010 10-K, at 5 (37 wells drilled in 2010); Ex. 29, SandRidge 2011 10-K, at 5 (167 wells drilled in 2011); Ex. 39, -0004721 (271 wells drilled in first three quarters of 2012).  In the second and third quarters of 2012 alone, SandRidge drilled approximately 203 wells—nearly as many as it had drilled in all of 2010 and 2011 combined.  *See* Ex. 39, -0004721.

## V.   DEFENDANTS' END OF CLASS PERIOD DISCLOSURES

37.    Following the market close on November 8, 2012, SandRidge made several announcements that at least some analysts viewed as negative developments.

38.     First, SandRidge announced its intent to sell its assets in the Permian Basin. Ex. 39, -0004719.  In response to this announcement, Deutsche Bank opined that the loss of Permian cash flow could lead to "funding issues" and predicted that the transaction would be "dilutive" to shareholders and might cause some investors to lose confidence in management.  Ex. 40, -0022859; Ex. 41, -0004115.  Morningstar questioned the Company's "decision to part with a mature asset that contributes a meaningful amount of cash flow to the firm." Ex. 42, -0004053.  Tudor Pickering expressed confusion about why the Company would not continue to develop its Permian assets, noting that the Permian was the source of "some of the higher margin barrels" of oil developed by SandRidge.  Ex. 39, -0004735.  As Plaintiffs' Complaint asserts, analysts "were concerned and confused about the Company's sale of its valuable Permian Basin assets."  Compl. ¶ 304

39.     Second, SandRidge announced that average well costs within the Mississippian play had increased from $3 million to $3.25 million per well.  Ex. 39, -0004749-50; *see also* Ex 43, -0322389 (Capital One analyst report characterizing the cost increase as one of several "negative items").

40.     Third, SandRidge indicated on a conference call that although the official type curve for 2012 would not be released until year-end, the Company's internal modeling—based on data from more than 400 Mississippian wells and longer production histories—pointed towards an oil EUR of 155 Mbbl, a total EUR (including gas) of 422 Mboe, and an oil percentage of 37%—estimates that were in each case less than the projections derived from the NSAI year-end 2011 type curve.  *See* Ex 39, -0004722; Ex. 44, -0004123.

SandRidge also lowered its 2012 guidance for oil production by 2% and increased its guidance for gas production by 5%.  Ex. 39,  -0004721.

## VI.   PLAINTIFFS' CLAIMS

41.     Plaintiffs filed the operative Complaint on October 21, 2016.  *See* Dkt. 225. After the Court granted Defendants' motions to dismiss in part, Plaintiffs were allowed to proceed to discovery on two categories of claims based on alleged misrepresentations and omissions concerning the Company's Mississippian wells: (i) primarily liability claims under Section 10(b) against Mr. Ward, Mr. Grubb, and SandRidge (as a nominal defendant), and (ii) control person liability claims under Section 20(a) against Mr. Bennett, Mr. Grubb, and Mr. Ward.  *See* Dkt. 239.

## ARGUMENT

Under Federal Rule 56(a), summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Once the moving party makes a showing that there is "no evidence to establish an essential element of the claim, the burden then shifts to the party opposing the motion." *McKibben v. Chubb*, 840 F.2d 1525, 1532 (10th Cir. 1988).  If the opposing party does not carry its burden to "adduce probative evidence on an element of its claim," summary judgment should be granted.  *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1183 (10th Cir. 1995).  A plaintiff cannot defeat summary judgment based on unsupported, conclusory allegations or "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (internal citations omitted).

## I.   THE MAJORITY OF PLAINTIFFS' ALLEGATIONS ARE BASED ON FORWARD-LOOKING STATEMENTS THAT ARE IMMUNE FROM LIABILITY.

The bulk of Plaintiffs' remaining claims involve forward-looking projections of

Mississippian well performance.  For example,[1] Plaintiffs challenge:

- Statement 1. A February 24, 2011 press release announcing that the Company planned to drill wells in the Permian and Mississippian, where its "average wellhead return" was then "expected to exceed 90%."  Compl. ¶ 155.

- Statements 4, 5, 8, 12, 14, 18.  Projections derived from the NSAI year-end 2010 type curve, including a total EUR of 409 Mboe and oil EUR of 211 Mbbl (equivalent to 52% oil and 48% gas), which appeared in investor or analyst presentations from March 1, March 7, April 12, June 3, June 6, June 14, August 5, and November 16, 2011.  Compl. ¶¶ 166, 168, 181, 196, 202, 219.

- Statement 16. An investor conference call from November 14, 2011, in which Mr. Grubb stated "we project to exceed our year-end production target for the Mid-Con-tinent region by about 260,000 barrels of oil equivalent" and "30-day IPs have come in better than the type curve that was generated at year-end 2010."  Compl. ¶ 212.

- Statements 19, 22, 26, 30, 32, 33.  Projections derived from the NSAI year-end 2011 type curve, including a total EUR of 456 Mboe and oil EUR of 204 Mbbl (equivalent to 45% oil and 55% gas), which appeared in investor or analyst presentations from January 10, February 7, March 12, May 4, August 14, and September 5, 2012, and SandRidge's 2011 Annual Report.  Compl. ¶¶ 221-222, 228, 242, 257, 261, 279, 281.

Summary judgment dismissing all claims based on these forward-looking statements

should be granted for three reasons: (A) the statements are protected by the first prong of

safe harbor because they were accompanied by meaningful cautionary language, (B) the

---

[1] The statement numbers correspond to those identified by Plaintiffs in interrogatory re-sponses served at the end of discovery. *See* Ex. 45, Plaintiffs' Statement Chart. A complete list of the forward-looking statements identified by Plaintiffs is included with this motion as Ex. 47, Appendix A. For example, although not alleged in the Complaint and therefore barred by the statute of repose (*see* Part III), Statements 2, 3, 6, 11, 20, 21, and 34 are also forward-looking and fail for the same reasons. *See* Ex. 45, Plaintiffs' Statement Chart.

statements are immunized by the second prong of the safe harbor because Plaintiffs cannot establish that any Defendant had "actual knowledge" that they were false or misleading, and (C) Defendants had no duty to update any of the statements as a matter of law.

### A.  The Forward-Looking Statements are Protected Under the PSLRA Safe Harbor and Bespeaks Caution Doctrine.

Under the safe harbor provision of the PSLRA, forward-looking statements such as financial projections, statements of future economic performance, and the assumptions underlying such statements are not actionable if they are accompanied by "meaningful cautionary language."  15 U.S.C. § 78u-5(i)(1)(A)-(D).[2]  Cautionary language is meaningful when it warns of important factors that could cause actual results to differ from projections. *Bumgarner v. Williams Cos.*, 2016 WL 1717206, at *3 (N.D. Okla. Apr. 28, 2016).  Cautionary language need not mention all possible factors causing an unanticipated result, or even the specific factor that ultimately causes the statement to be incorrect.  *Id.*  Such statements are immune from liability regardless of the defendant's state of mind.  *In re SandRidge Energy, Inc. Sec. Litig.*, 2017 WL 3309758, at *7 (W.D. Okla. Aug. 1, 2017).

For example, Defendants' statements about the NSAI type curves, EUR, GOR, rate of return, and reserves are quintessential examples of forward-looking statements:

- An EUR is a *projection* of the sum of all oil and gas that will be recovered from a well or set of wells over time.  *See* Statement of Undisputed Facts ("SUF") ¶ 8.

---

[2] Likewise, under the bespeaks caution doctrine, forward-looking statements are "considered immaterial when the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect."  *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1120 (10th Cir. 1997).  Like the PSLRA safe harbor, the bespeaks caution doctrine provides a "mechanism by which a court can rule as a matter of law," including on a motion for summary judgment.  *Id.* at 1120.

- Type curves are *predictive estimates* of the future expected production profile for a representative well.  *See* SUF ¶ 6.

- A GOR is a *projection* of the amount of all gas reserves compared to oil reserves that will be recovered from a well or set of wells.  *See* SUF ¶ 8.

- ROR and IRR are *projections* of the return on investment over the life of a well or set of wells.  *See* SUF ¶ 13.

- Reserves are *projections* of the remaining quantities of oil and gas anticipated to be economically producible from a well or set of wells.  *See* SUF ¶ 16.

*See Firefighters Pension & Relief Fund v. Bulmahn*, 2015 WL 4879217, at *13 (E.D. La. Aug. 14, 2015) (finding "estimates of [company's] oil and gas reserves" and future production to be forward-looking statements, and dismissing claims based on same); *In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1540523, at *26 (D. Colo. Mar. 31, 2015) (finding estimates of rare earth element reserves to be forward-looking statements).  These statements were identified as forward-looking at the time.  SUF ¶¶ 19-22; Ex. 47, App. A.

Each of Defendants' forward-looking statements were accompanied by meaningful cautionary language.  SandRidge investor conference calls, presentations, press releases, and SEC filings all included warnings that Defendants' statements were subject to risks and uncertainties that may cause actual results to differ materially from projections.  *See* SUF ¶¶ 18-22.  SandRidge's disclosures also referred investors to the Company's then-current 10-K, which provided a detailed discussion of relevant risk factors, including disclosures warning that:

- "estimating oil and natural gas reserves is complex and inherently imprecise";

- "use of seismic data and other technologies … does not enable us to know conclusively prior to drilling … whether oil and natural gas will be present in sufficient quantities to be economically viable";

- "[a]ctual future production … and quantities of recoverable oil and natural gas reserves most likely will vary from" projections; and

- "[d]rilling for and producing oil and natural gas are high risk activities with many uncertainties that could adversely affect our business, financial condition or results of operations."

SUF ¶ 22.  These warnings and risk factors, as well as the many others in SandRidge's 10-Ks and other public disclosures, including Defendants' numerous warnings that EURs, GORs, and RORs would vary (SUF ¶¶ 11, 12, 15), are sufficient to protect Defendants' statements under the PSLRA safe harbor and bespeaks caution doctrine.  *See In re China N. E. Petroleum Holdings Ltd. Sec. Litig.*, 2014 WL 7243149, at *3 (S.D.N.Y. Dec. 11, 2014) (dismissing claim that defendants overstated the amount of oil reserves because they "were labeled as estimates in … public disclosures and were accompanied by cautionary statements"); *Truk Int'l Fund LP v. Wehlmann*, 737 F. Supp. 2d 611, 615 (N.D. Tex. 2009), *aff'd*, 389 F. App'x 354 (5th Cir. 2010) (dismissing claim based on proved reserve estimates because they were accompanied by adequate warnings to investors).[3]

### B.    No Reasonable Jury Could Find that Defendants Had Actual Knowledge that Any Forward-Looking Statement Was False.

The PSLRA safe harbor also separately immunizes Defendants from liability for forward-looking statements unless Plaintiffs can demonstrate "actual knowledge" that the statements were false or misleading. 15 U.S.C. § 78u-5(c)(1)(B)(i).  This is the highest

---

[3] Defendants' motion to dismiss the third amended complaint focused on whether scienter had been adequately pleaded.  *See* Dkt. 189, 227.  The Court therefore did not have occasion at the motion-to-dismiss stage to address the applicability of the safe harbor for forward-looking statements relating to Mississippian production.

level of scienter under the federal securities laws; even extreme recklessness will not suffice. *See In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1297-98 (D. Colo. 2013), *aff'd*, 776 F.3d 1103 (10th Cir. 2015). Plaintiffs cannot sustain this heavy burden of proof as to any of the Defendants in this case.

Plaintiffs cannot establish the requisite intent based simply on an individual's position within the Company or access to relevant information—rather, to withstand summary judgment, Plaintiffs "must present significant probative evidence" that a defendant actually knew the challenged statements were false or misleading. *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1236 (S.D. Cal. 2010). In the case of an individual defendant, this means proving that the individual had knowledge of falsity at the relevant time and not only in hindsight. *See Gold Res. Corp.*, 957 F. Supp. 2d at 1298. In the case of a corporate defendant, it means proving "the state of mind of the individual corporate official or officials" who made the challenged statement. *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004); *see also In re Apple Comput., Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002) (same). The knowledge of a low-level employee cannot be attributed to executives or to the corporation itself. *See Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1244 (10th Cir. 2016) (holding that low-level employees' knowledge could not be imputed to executives).

Here, summary judgment is appropriate because Defendants' forward-looking statements were based on and supported by the opinion of an independent petroleum engineer. It is well-established that approval of challenged statements by a qualified third party such as an auditor is "'highly probative' of an absence of scienter." *In re Hansen Nat. Corp.*

19

*Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007). For this reason, courts repeatedly have granted summary judgment when alleged misstatements were approved by an independent auditor. *See, e.g.*, *In re Ikon Office Sols., Inc.*, 277 F.3d 658, 669 (3d Cir. 2002) (independent auditor's review of financial statements was "highly probative" of lack of scienter on summary judgment); *REMEC Inc.*, 702 F. Supp. 2d at 1246 ("The independent auditor's approval of [assumptions underlying the alleged misstatements] undercuts any claim by Plaintiffs that [the defendant] knew or should have known the assumptions were false."); *S.E.C. v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 367 (D.N.J. 2009) (holding that the "persuasive evidence in favor of granting summary judgment to [the defendant] is that [the company's] management, its outside auditor, and outside counsel approved the" alleged misstatements).

Importantly, the "highly probative" force that third-party approval has in rebutting fraudulent intent is considerably stronger here than in the typical case for several reasons. ***First***, there is no evidence that any Individual Defendant[4] participated in the creation of the NSAI type curve or reserve estimates *at all*, let alone that they knew the estimates were false. As the undisputed evidence makes clear, the Individual Defendants were not responsible for estimating the NSAI type curve or reserve estimates; they did not provide any data to NSAI, check NSAI's estimates, or even communicate directly with NSAI. SUF ¶¶ 33-34. Instead, they relied on NSAI to prepare accurate type curve and reserve estimates, and

---

[4] Although the Court has already dismissed the primary liability claims against Mr. Bennett, his lack of participation or knowledge concerning these statements supports his good faith defense to Plaintiffs' control person liability claims, *see infra* Part V.

on employees in SandRidge's internal reservoir engineering department, which specializes in estimating production and reserves, to coordinate with NSAI. *See* SUF ¶ 33. NSAI, in turn, developed and approved type curves and reserve estimates that its staff thought were appropriate. *See* SUF ¶ 32. This reasonable reliance on internal and external experts to develop the type curve and reserve estimates forecloses any finding of fraudulent intent. *See In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & ERISA Litig.*, 898 F. Supp. 2d 176, 182 (D.D.C. 2012) (claims of scienter defeated on summary judgment where the defendant "relied on internal and external accounting experts to ensure that the company's financial statements complied with GAAP").[5]

*Second*, NSAI was not merely SandRidge's reserves auditor, but its independent reserves *estimator*. SUF ¶ 24. Unlike a reserves auditor, a reserves estimator independently determines a company's reserves; it does not simply audit reserve estimates prepared by a company. SUF ¶¶ 24, 30. Although SandRidge made certain suggestions to NSAI, NSAI had final decisionmaking authority over the type curve and reserve estimates it developed, including the EUR and GOR estimates Plaintiffs challenge. SUF ¶ 31.

*Third*, NSAI is a reputable and experienced independent petroleum engineering firm that had no plausible incentive to misstate its type curves or reserves. *See* SUF ¶ 25.

---

[5] Without any evidence that Defendants participated in preparing these estimates, in discovery Plaintiffs resorted to vague allegations that Defendants "improperly pressured" NSAI into accepting SandRidge's internal estimates. Even if the Court considers this unpleaded allegation (and as discussed below in Part III, it should not), it is not supported by the evidence: Defendants did not communicate with (let alone pressure) NSAI about its estimates during the class period, and David Miller testified that the back-and-forth discussions he had with SandRidge employees was the standard process NSAI used with its clients. SUF ¶¶ 31-34.

Defendants are generally entitled to rely on estimates by independent third-party petroleum engineers like NSAI. *See Bulmahn*, 2015 WL 4879217, at *18 (dismissing fraud claims based on reserve estimates prepared by third-party petroleum engineer).

**Fourth**, SandRidge provided NSAI all the data it requested. *See* SUF ¶ 27. This level of transparency negates any inference of scienter. *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1246 (finding that "transparency … negate[d] an inference that [the defendant] had a scheme to defraud investors" where "Defendants showed that [its outside auditor] had full access to conduct a thorough, professional, and independent audit").

**Finally**, type curves and reserve estimates are "inherently imprecise" opinions that require complex, subjective judgment calls, meaning that different interpretations of the same data are more likely to be the product of a reasonable difference of opinion than a scheme to defraud. SUF ¶¶ 22, 29; *see also Del Noce v. Delyar Corp.*, 1976 WL 813, at *10 (S.D.N.Y. July 30, 1976) (recognizing that "valuation of petroleum reserves … involves a long and difficult process in which even highly regarded experts are ultimately forced to rely on their subjective judgments both in the selection and weighing of data"). Even if Plaintiffs could point to different possible interpretations of the available Mississippian production data, the undisputed evidence is that NSAI believed that its opinions were appropriate based on the underlying data and SEC regulations. SUF ¶ 32; *see Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1299 (10th Cir. 2018) ("Pure statements of opinion … are *not* material misstatements *unless* they inaccurately represent 'the speakers' beliefs concerning then-present factual conditions.'").

### C.     Defendants Had No Duty to Update the Forward-Looking Estimates.

Nor can Plaintiffs circumvent the PSLRA safe harbor by asserting (*see* Compl. ¶ 153(c)) that the Defendants should have updated or adjusted the NSAI type curve or other forward-looking statements earlier than November 2012 based on the alleged underperformance of SandRidge's Mississippian wells.   The PSLRA expressly provides that there is no duty to update forward-looking statements.  *Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1243 (D. Utah 1999); 15 U.S.C. § 78u-5(d) ("Nothing in this section shall impose upon any person a duty to update a forward-looking statement.").   Courts thus reject claims that a defendant was required to update forward-looking forecasts like those at issue here.  *See Erber v. Williams Cos.*, 2017 WL 930828, at *4 (N.D. Okla. Mar. 8, 2017), *aff'd*, 889 F.3d 1153 (10th Cir. 2018) ("[T]he Tenth Circuit has not recognized a 'duty to update,' and other courts have refused to do so.").   Moreover, SandRidge cautioned investors in SEC filings and other disclosures that it undertook no duty to update or revise any forward-looking statement.  *See* SUF ¶ 22.   And it was well understood by the market based on Defendants' statements, SEC guidance, and the Company's and industry's practices that NSAI's type curves and reserve estimates were revised only as of year-end and not on an interim basis.  *See* SUF ¶ 26; 17 C.F.R. § 229.1202(a)(2), Instruction 1 (requiring publicly traded companies to disclose updated reserves at "the close of each fiscal year").

## II.     PLAINTIFFS' OTHER ALLEGATIONS FAIL AS A MATTER OF LAW.

As explained in the motion for summary judgment filed by Mr. Ward, which Defendants Bennett and Grubb adopt and incorporate by reference, Plaintiffs' claims based on a variety of challenged statements fail because the statements are inactionable as matter

of law or indisputably accurate.  *See* Ward Br., Part V.A.1-2.  This includes Statements 4, 6-11, 13, 18, 21-23, 25-28, 30-31, and 34 (which constitute inactionable puffery or corporate optimism); and Statements 1-9, 11-20, 22, and 24-34 (which are indisputably true).

In addition, the claims based on the following additional statements of Mr. Grubb fail because they are classic examples of immaterial optimism and/or puffery:

- <u>Statement 5</u>.  Mr. Grubb's March 7, 2011 statement describing the Mississippian's "high rate of return."  Compl. ¶ 168.  *See, e.g.*, *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 537 (3d Cir. 1999) (statement that company "achieve[d] outstanding returns" inactionable); *Rochester Laborers Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835, 882 (E.D. Mo. 2012) (statement that certain company products had "compelling returns" was a "soft, puffing statement[]").

- <u>Statement 16</u>.  Mr. Grubb's November 4, 2011 statement that the Mississippian has performed "beyond our expectations."  Compl. ¶ 212.  *See, e.g.*, *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 951 (N.D. Ill. 2003) (statement that "demand for that product is exceeding our expectations" was puffery); *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 331 (D. Mass. 2002) (statement that new product "exceeded our expectations" was "clear puffery").

- <u>Statements 17, 30</u>.  Mr. Grubb's November 11, 2011 statement that "on a type curve basis the liquids were *roughly on trend*" and May 4, 2012 statement that "right now everything looks to be *on track* with what we have modeled to the 456,000 barrels EUR." Compl. ¶¶ 217, 260 (emphasis added).  *See, e.g.*, *Monsanto Co.*, 883 F. Supp. 2d at 882 ("[S]tatements about 'being on track' … to reaching the predicted goals of gross profitability" are "inactionable puffery"); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1167-68 (C.D. Cal. 2007) (statement that company was "on track to meet our sales estimates for December" was "mere corporate puffery").[6]

---

[6] A number of the unpleaded statements attributed to Mr. Grubb or Mr. Bennett are likewise not actionable, including Statements 10 ("these wells are statistically as good as the ones we've drilled"), 18 ("production growth has been pretty dramatic," "working very well"), and 21 ("we have so much control," "very low-risk drilling," "[y]ou're not going to miss the Mississippian," "[y]ou'll hit it and you'll set pipe every time and produce a well").

These vague, optimistic statements "are not actionable because reasonable investors do not rely on them in making investment decisions." *Grossman*, 120 F.3d at 1119.

## III.   PLAINTIFFS CANNOT ASSERT STATEMENTS OR THEORIES NOT ALLEGED IN THE COMPLAINT.

Stuck with claims that are deficient as a matter of law, Plaintiffs try to avoid dismissal by inventing new ones.  In interrogatory responses served after the close of fact discovery, Plaintiffs asserted, for the first time, that their claims were based on 10 allegedly false or misleading statements that were not pleaded in the Complaint[7] and 4 statements only part of which were pleaded in the Complaint.[8]  *See* Ex. 49, App. C (collecting the unpleaded statements).  In addition, Plaintiffs identified previously unpled theories for why they claim Defendants' statements were false or misleading, including a new theory that Defendants failed to disclose that they allegedly pressured NSAI to meet SandRidge's internal oil and gas estimates.[9]  The Court should reject any attempt to assert claims not pleaded with specificity in the Complaint.

Allowing Plaintiffs to raise these unpleaded claims now would violate the statute of repose, 28 U.S.C. § 1658(b)(2), which bars securities fraud claims from being brought more than 5 years after an alleged misstatement.  *See In re Exxon Mobil Corp. Sec. Litig.*,

---

[7] *See* Ex. 45, Statements 2, 6, 10, 11, 15, 20, 21, 25, 27, 34. Although the Complaint alleges the existence of the presentations, press releases, or conference calls that included some of these statements, it nowhere alleges that these particular statements were misleading.

[8] *See id.*, Statements 3, 4, 18, 31.

[9] *See, e.g., id.*, Statements 2-6, 22. Similarly, Plaintiffs have asserted new theories that SandRidge's wells were underperforming in Grant County (*e.g., id.*, Statements 4, 5, 7, 11) and that the EUR of its Proved Developed Producing wells was lower than represented with a higher gas content (*e.g., id.*, Statements 2-6, 8-20, 22-27, 29-34).  A complete list of Plaintiffs unpleaded theories, or theories only alleged as part of their dismissed CapEx claims, is provided in Ex. 50, Appendix D.

500 F.3d 189, 200 (3d Cir. 2007).  All of the statements identified by Plaintiffs in their discovery responses occurred in 2011 or 2012—well beyond the 5-year repose period.  And Plaintiffs cannot avoid the statute of repose by amending their Complaint, even if the Court were to grant them leave to do so (and it should not).[10]  The majority rule is that amendments do not "relate back" for the purposes of a statute of repose.  *See, e.g., Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 263 (S.D.N.Y. 2019); *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *24 (D.N.J. Dec. 31, 2018).  This is consistent with the fact that the statute of repose is not merely a procedural rule, but a substantive right "to be free from liability after a legislatively-determined period of time."  *Amoco Prod. Co. v. Newton Sheep Co.*, 85 F.3d 1464, 1472 (10th Cir. 1996).

Permitting Plaintiffs to raise unpleaded securities fraud allegations on the verge of summary judgment would also "bypass entirely the pleading requirements of the PSLRA, which requires a complaint to specify not only each allegedly misleading statement but the reason or reasons why the statement is misleading."  *N.J. & its Div. of Inv. v. Sprint Corp.*, 758 F. Supp. 2d 1186, 1207 (D. Kan. 2010); *see* 15 U.S.C. § 78u-4(b)(1) (requiring plaintiffs to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading").  Plaintiffs "may not proceed past the motion-to-dismiss stage … on one theory, while fighting summary judgment on another, untested theory."  *In re Molycorp, Inc. Sec. Litig.*, 2016 WL 9735753, at *5 (D. Colo. May 25, 2016); *see also In re St. Jude Med., Inc., Sec. Litig.*, 629 F. Supp. 2d 915, 921 (D. Minn. 2009).

---

[10] To the extent that Plaintiffs seek leave to amend the Complaint, Defendants respectfully request the opportunity to oppose the application.

## IV.   PLAINTIFFS CANNOT DEMONSTRATE LOSS CAUSATION.

Summary judgment should be granted for the additional and independent reason that Plaintiffs cannot prove the essential element of loss causation, as required under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).

### A.   Plaintiffs Have Failed to Adduce Any Reliable Expert Evidence Disaggregating the Impact of Fraud and Non-Fraud Related Disclosures.

To demonstrate loss causation, a plaintiff must prove that its "losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price." *In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009); *In re Scientific Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1373 (N.D. Ga. 2010), *aff'd* 489 F. App'x 339 (11th Cir.) (the Tenth Circuit requires "the plaintiff at the summary judgment phase to exclude loss causation factors unrelated to the fraud").  As explained in Defendants' motion to exclude the testimony of Plaintiffs' expert Bjorn Steinholt, Plaintiffs cannot satisfy this requirement because they have failed to present reliable expert evidence that would "disentangle the effects of the alleged fraud from … company-specific information unrelated to such fraud." *Scientific Atlanta*, 754 F. Supp. 2d at 1376.

While Plaintiffs' expert has opined that corrective disclosures relating to Mississippian oil and gas production caused the November 9, 2012 stock drop, his analysis fails to disaggregate the impact of non-fraud related information including announcements of increased well costs and plans to divest the Company's Permian Basin assets.  SUF ¶¶ 38-39.  Plaintiffs' failure to satisfy this requirement of *Dura* is fatal on summary judgment. *See In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1295 (N.D. Okla. 2007),

*aff'd*, 558 F.3d 1130 (10th Cir. 2009); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008), *aff'd,* 597 F.3d 501 (2d Cir. 2010) (granting summary judgment where expert failed to isolate effect of corrective disclosures from other confounding factors).[11]

### B.    Plaintiffs Cannot Demonstrate that Any Truth Relating to the Geology of the Mississippian Was Revealed in Advance of the Stock Drop.

To demonstrate loss causation, Plaintiffs must also "establish how and when the truth was revealed, and link the revelation of that truth to a corresponding loss." *SandRidge*, 2017 WL 3309758, at *14 (citation, internal quotation marks, and alterations omitted).  Applying this rule, the Court previously dismissed Plaintiffs' claims relating to alleged transactions with Ward-related entities because the Complaint did not link the stock drop to any disclosures about those transactions. *See id*.  The same logic requires dismissal of Plaintiffs' claim that Defendants misrepresented the geology of the Mississippian as consistent and "well understood" when, according to Plaintiffs, it was highly variable and not well understood. *See, e.g.*, Compl. ¶¶ 175-176.

Plaintiffs do not point to any disclosure revealing this alleged truth to the market. For example, SandRidge's November 8 and 9, 2012 disclosures, which in the words of Plaintiffs' damages expert "finally revealed the alleged truth," Ex. 46, Steinholt Report ¶ 30, did not even mention the Mississippian's geology, let alone "reveal" that it was purportedly poorly understood or highly variable.  Because Plaintiffs cannot "explain how the

---

[11] As noted in the motion to exclude Mr. Steinholt's testimony, his damages opinion—that the price of SandRidge stock was inflated during the class period —is also unreliable and inadmissible.  This provides an additional ground for granting summary judgment, as damages are an essential element of Plaintiffs' claims. *See Williams*, 496 F. Supp. 2d at 1295.

truth was revealed to the market and … link the revelation of truth to a corresponding loss," summary judgment as to Plaintiffs' claims of purported misrepresentations and omissions concerning the geology of the Mississippian is appropriate. *Williams* 558 F.3d at 1139.

## V.   PLAINTIFFS' CONTROL PERSON LIABILITY CLAIMS SHOULD ALSO BE DISMISSED.

To establish control person liability, Plaintiffs must show "(1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998).  Here, summary judgment dismissing Plaintiff's control person liability claims should be granted because Plaintiffs cannot establish a primary violation of Section 10(b), for the reasons discussed at length above. *See, e.g.*, *Williams*, 496 F. Supp. 2d at 1295.

Moreover, even if Plaintiffs' could establish a triable issue of fact as to whether a primary violation occurred, the undisputed facts demonstrate that they will not be able to show the requisite control over the primary violator by Mr. Bennett or Mr. Grubb.  No reasonable jury could find that Mr. Bennett or Mr. Grubb had control over (i) NSAI's type curve and estimates, (ii) Mr. Ward's statements, or (iii) each other's statements:

- NSAI's Type Curve and Estimates. Undisputed testimony establishes that NSAI, not SandRidge or its executives, had final decisionmaking authority over the NSAI type curve and reserve estimates for SandRidge's Mississippian wells.  *See* SUF ¶ 30.  Because Mr. Bennett and Mr. Grubb had no control over NSAI's decisions relating to the type curve and related estimates, there is no genuine issue of material fact as to control over such statements.  *See Silverman v. Motorola, Inc.*, 772 F. Supp. 2d 923, 928 (N.D. Ill. 2011) (granting summary judgment where defendants "had no responsibility for" decisions giving rise to primary violation).

- Tom Ward's Statements. It is also undisputed that Mr. Bennett and Mr. Grubb reported to Mr. Ward, SandRidge's CEO, during the class period.  *See* SUF ¶ 1.  As Mr. Ward's subordinates, Mr. Bennett and Mr. Grubb had no power to control Mr.

Ward's statements. Bennett Decl. ¶ 4; Grubb Decl. ¶ 3; *see In re Thornburg Mortg., Inc. Sec. Litig.*, 824 F. Supp. 2d 1214, 1284 (D.N.M. 2011), *aff'd*, 719 F.3d 1190 (10th Cir. 2013) (rejecting allegations that defendant had control over statements made by his supervisor).

- <u>Each Other's Statements</u>. Similarly, as peers in SandRidge's corporate hierarchy who did not report to each other, Mr. Bennett and Mr. Grubb lacked the power to control each other's statements. Bennett Decl. ¶ 4; Grubb Decl. ¶ 3; *see Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1194 (C.D. Cal. 2007) (dismissing control person liability claims where plaintiff did not allege how the defendant could "exercise control over either his peer Vice Presidents or his supervisors"). For example, there is no evidence that Mr. Bennett, as CFO, had authority to control Mr. Grubb's statements about oil and gas production as COO.

Finally, the undisputed evidence establishes that Mr. Bennett and Mr. Grubb had no knowledge of the falsity of any statement made by another party and are therefore insulated from liability by the statutory good faith defense, which protects those with a "lack of culpable participation [in] or knowledge" of the primary violation. *Maher*, 144 F.3d at 1305; *see also* 15 U.S.C. § 78t(a). Mr. Bennett and Mr. Grubb were not involved in estimating type curves and related estimates, let alone culpably involved, and instead reasonably relied on NSAI and SandRidge's internal reservoir engineers to ensure the accuracy of those estimates. *See* SUF ¶ 33; *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir. 1996) (accepting good faith defense on summary judgment where evidence showed that defendant was not involved in alleged fraud).

## CONCLUSION

For the foregoing reasons, the Court should grant this motion for summary judgment and dismiss all claims against Matthew Grubb and James Bennett.

Dated: April 2, 2020

Respectfully submitted,

CROWE & DUNLEVY

/s/ Evan G.E. Vincent

Evan G.E. Vincent, OBA #22325
evan.vincent@crowedunlevy.com
324 North Robinson Avenue Suite 100
Oklahoma City, OK 73102
(405) 239-6696

COVINGTON & BURLING LLP
Mark P. Gimbel (admitted *pro hac vice*)
mgimbel@cov.com
C. William Phillips (admitted *pro hac vice*)
cphillips@cov.com
Christopher Y.L. Yeung (admitted *pro hac vice*)
cyeung@cov.com
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000

*Attorneys for Defendants James D.
Bennett and Matthew K. Grubb*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 2, 2020, I electronically transmitted the attached Memorandum in Support of Defendants' Motion for Summary Judgment to the Clerk of the Court using the ECF system for filing, which will send notification of such filing to all counsel registered through the ECF System.

*/s/ Evan G.E. Vincent*