# EXHIBIT 1

Southern International Incorporated

4200 Perimeter Center Drive, Suite 205
Oklahoma City, OK 73112-2391 USA
Telephone: (405) 943-5288 Telefax: (405) 947-4149

| | | | |
|---|---|---|---|
| OK | CA 1884PE | MT | CA 1577 |
| AR | CA 2158 | ND | COCP 1065PE |
| KS | E-1926 | OH | CA03996 |
| LA | EF 0004800 | TX | F-8348 |
| MS | E-2537 | WV | C04507-00 |
| WY | E-0571 | | |


**Report of Expert Witness**

**Terry L. Brittenham**

**April 4, 2019**

Re: In re SandRidge Energy, Inc. Securities Litigation
United States District Court for the Western District of Oklahoma
Case No. 12-cv-01341-G, Relating to All Securities Actions

and,

Re: Duane & Virginia Lanier Trust, individually and on behalf of all others similarly situated,
v.
SandRidge Mississippian Trust I, *et al.*
United States District Court for the Western District of Oklahoma
Case No. 15-cv-00634-G

The above captioned lawsuits include allegations by Plaintiffs, who are purchasers of securities of SandRidge Energy, Inc. ("SandRidge"), SandRidge Mississippian Trust I ("Trust I"), and/or SandRidge Mississippian Trust II ("Trust II"), between certain dates in 2011 through November 8, 2012 (the "Class Periods"), against SandRidge, Trust I, and several SandRidge officers (collectively, the "Defendants"), concerning SandRidge's crude oil and natural gas exploration and production activities within the Mississippian formation oil and gas leasehold (the "Mississippian," "Mississippian Play," or "Play") and related statements and alleged omissions by certain Defendants.

# I. ASSIGNMENT

1. I have been retained by Latham & Watkins, counsel for Defendant Tom L. Ward, to examine certain petroleum engineering issues involving the subject allegations and to address, at least, the following topics:

A. Relevant background on the technical, operational, and business aspects of oil and gas exploration, development, and production generally, and as they were known and applied in the Mississippian Play during the Class Periods.

B. The geology of the Mississippian and to what extent has the industry's understanding of that geology changed over time.

C. Whether the process SandRidge used to estimate and disclose its oil and gas reserves for its Mississippian interests was consistent with the industry norms and best practices in 2010, 2011, and 2012. Whether its retention of and interactions with Netherland Sewell & Associates, Inc. ("NSAI") were reasonable and appropriate.

D. The opinions of *Lanier*[1] Plaintiffs' expert witness Letha C. Lencioni regarding "[t]he predictability, or lack thereof, of well performance in the Mississippian formation;"[2] and "[t]he effect of ESPs used by SandRidge to increase production rates."[3]

E. The *Lanier* Plaintiffs' expert witness Jan J. Tomanek's "opinion that based on the information available at the time of each of the Trusts' IPOs, the geology of the Mississippian Lime was not well understood by SandRidge. Thus, the results of their drilling was not predictable or consistent."[4]

F. The opinion of *Glitz*[5] Plaintiffs' expert witness Steven D. Crane that SandRidge "convinced" NSAI to make inappropriate inclusions or exclusions of wells within NSAI's type curve calculations, as well as Crane's characterization that SandRidge overstated its average estimated ultimate recovery from existing and future undeveloped wells.[6]

---

1 "*Lanier*" refers to the case *Duane & Virginia Lanier Trust, et al., v. SandRidge Mississippian Trust I, et al.*, No. 15-cv-00634-G (W.D. Okla.).

2 Corrected Expert Report of Letha C. Lencioni § 1(1) (Mar. 21, 2019).

3 Lencioni Report § 1(4).

4 Expert Report of Jan J. Tomanek ("Tomanek Report") § 1.3 (Mar. 1, 2019).

5 "*Glitz*" refers to the case *In re SandRidge Energy, Inc., Sec. Litig.*, No. 12-cv-01341-G (W.D. Okla.).

6 Expert Report of Steven D. Crane (Mar. 1, 2019).

## II. QUALIFICATIONS

2. I am an Oklahoma professional petroleum engineer with education, training, and industry experience in the drilling, completion, and operation of oil and gas wells and the estimation of future oil and gas well production and crude oil and natural gas reserves.

3. I graduated with honors from the University of Wyoming, where I received a Bachelor of Science degree in Petroleum Engineering in 1975. I am a member of the Association of Energy Service Companies, the International Association of Drilling Contractors, the American Association of Drilling Engineers, both the Societies of Petroleum and Professional Engineers, the American Association of Petroleum Geologists, and the Rocky Mountain Association of Geologists. I have published peer-reviewed works regarding well operations, well equipment, and engineering. I have lectured extensively to the industry on these and other subjects. I am licensed to practice engineering in Oklahoma and most jurisdictions where oil and gas activities are performed in the United States of America. The most recent edition of my Resume is attached, which more fully discloses my education, professional and industry experience, publications, and professional affiliations.[7]

4. I am an employee of Southern International, Incorporated ("SII"). For my services in performing the investigation, preparing this Report, and subsequently providing testimony, SII is being compensated at a rate of $375/hour and any reimbursement for travel expenses and third party charges. In addition, SII is being compensated at rate of $280/hour for staff engineering assistance. This compensation was not contingent upon the substance or outcome of the opinions issued in this Report.

5. I founded SII in 1982 with one other individual. Since its founding, SII has been involved with Oklahoma oil and gas development, production, and management as consulting engineers, well operator, drilling contractor, well site consultants, and directional drillers on behalf of oil and gas well operators, service companies, and other stakeholders involved with development of oil and gas in Oklahoma, including the Mississippian Lime vertical play until about 2009, followed by the Mississippian Lime horizontal play, which continues today.

6. My work with SII in the Mississippian Play spans the breadth of reserves estimation, engineering design and forensic services, well site supervision, directional drilling, regulatory support, incident investigation and analysis, disputes between stakeholders, transaction support, produced water management, and litigation support. Each engagement provided me the opportunity for a first-hand look into the details of Mississippian Play development, including best practices, equipment application, process management, economics, and the business aspects of the Play.

7. I have worked with well operators of every size, oilfield drilling and completion service companies, equipment vendors, and mineral and land owners. Representative clients I have worked for include Newfield Exploration, Midstates Petroleum, White Star Petroleum,

---

7 *See* Appendix B.

Kirkpatrick Oil and Gas, Devon Energy, Tarka, Gulf Exploration, Eagle Road, Weatherford, Chaparral, SandRidge, Range Resources, Brown and Borelli, Chesapeake, Ward Production, Gungoll, Kaiser Francis, Unit, Marathon, Cheyenne Drilling, Apache, Samson Resources, Whitmar, Berexco, Crown, Payne, H&P, Cimarex, Grand, Marjo, New Dominion, Continental Resources, Okland Oil, Plymouth, and many others.

8. I have been retained as an expert witness in the oil and gas exploration and development industry approximately 650 times over the past 35 years. Approximately 250 of those engagements included testifying in depositions, arbitrations, or state and federal trials. My expert work in these litigation matters has included engagements by well operators, drilling contractors, oilfield services providers, non-operating working interest owners, and many others.

9. Additionally, I have provided sworn testimony in oilfield administrative matters before regulatory bodies, such as the Oklahoma Corporations Commission, approximately 300 times.

## III. OPINIONS

10. I herein state and disclose my opinions and their bases regarding my work and these issues. My opinions are expressed in this report to a reasonable degree of engineering and operational certainty and are based on my review and analysis of the information provided, the information I have otherwise secured, the engineering work I have performed, and my education, training, and more than forty years of experience as a petroleum engineer, well operator, and industry consultant, including considerable work involved with the vertical and horizontal development of the Mississippian Play. These opinions may be revised or supplemented if additional materials are reviewed, other evidence or facts are revealed, Plaintiffs' expert witnesses modify or add to their opinions, or additional work is necessarily performed.

### A. <u>Relevant Background on Oil and Gas Exploration and the Mississippian Play</u>

#### *§III(A)(1) The Nature and Occurrence of Crude Oil and Natural Gas*

11. Crude oil and natural gas are, respectively, liquid and gaseous forms of petroleum, a naturally occurring complex mixture of hydrocarbons (molecules containing hydrogen and carbon) which exist in the subsurface as liquids or gases depending upon their unique chemical composition and the pressure and temperature at which they are confined.

12. Most of the earth's crust where petroleum is found is comprised of layer upon layer of "sedimentary rock" formations deposited over hundreds of millions of years of geologic time by various earth processes. Younger rock formations are generally positioned on top of older rock formations. The oldest of these rock formations, where oil and gas are found in Oklahoma, were either deposited in or ultimately inundated by ancient saline seas, resulting in the filling of the porosity of these sedimentary formations by brine water, commonly referred to as "connate water," "interstitial water," or "formation water."

13. Petroleum is not found in underground lakes or rivers, but it exists within the void space ("pore space" or "porosity") of certain rocks. Most of the rock formations which comprise the earth's crust do not contain petroleum, and the determination of its whereabouts in commercial quantities is the basic objective of oil and gas exploration.

14. The mechanisms of the origin and accumulation of petroleum are not unique, but relevant to this work, petroleum is known to generate within a "source rock," such as an organically rich shale formation under the extremes of subsurface temperature and pressure to which the rock is exposed following its burial deep within the earth's crust. Subsequent to formation, petroleum may migrate from the source rock through and into adjacent rock formations having sufficient porosity and permeability to permit the petroleum to flow through and accumulate in the rock formation, expelling a portion of the connate water that previously occupied the porosity. While the term porosity is used to describe the extent of void space which occurs within a rock formation, the term "permeability" is used to define the extent to which those void spaces are interconnected and capable of flowing petroleum fluids (fluids are gasses and liquids) when a pressure differential is applied across the rock. Ultimately, the migrating petroleum will encounter a subsurface condition, known as a "trap" which restricts further movement such that it may accumulate in "oil and gas reservoirs."

15. Following the accumulation of petroleum in the reservoir trap, over the course of geologic time, gravitational forces separate the mixture of natural gas, crude oil (if both are present), and the remaining connate water into horizontal layers due to their density differences with natural gas rising to the attic of the trap, the connate water settling to the bottom, and the crude oil forming a layer between the gas and the water. Due to capillary forces, the surfaces of the pore spaces generally remain wetted with some amount of connate water that adheres to the rock. The relative amounts of oil, gas, and water within a given portion of the reservoir are denoted by the term "saturation." For example, a reservoir is 50 percent saturated with water if that liquid occupies 50 percent of the pore space.

16. Fluids contained within the porosity of subsurface rock formations are under increasing pressure with depth of occurrence, commonly referred to as "pore pressure" or "reservoir pressure." Relevant to the Mississippian portion of Oklahoma and Kansas, the reservoir pore pressure encountered typically is slightly less than the hydrostatic pressure which would be exerted by a column of brine water from the ground surface to the depth of the formation (for example, approximately 2,400 psi at a vertical depth of 5,000 feet). Similarly, formation temperature is also observed to increase with depth by approximately ten degrees Fahrenheit for each thousand feet of vertical depth from the ambient surface formation temperature of about 65 degrees Fahrenheit.

17. Natural gas is increasingly "soluble" (will dissolve) in crude oil with increased pressure and temperature. For example, at initial reservoir conditions of pressure and temperature, one barrel of medium-gravity crude oil such as that produced by the Mississippian reservoirs in Oklahoma and Kansas, may contain perhaps 1,000 standard cubic feet of natural gas per stock tank barrel of crude oil (scf/stbo). This term is referred to as the

"solution gas-oil ratio" (GOR). Standard surface conditions for gas and crude oil are stipulated to be 60 degrees Fahrenheit and 14.7 pounds per square inch.[8]

18. If more natural gas is present in the reservoir than can dissolve in the crude oil at reservoir conditions of pressure and temperature, that "excess" gas will remain in a gaseous phase in the reservoir and will either migrate into the gas cap or it may become trapped within the pore spaces of the rock also occupied by crude oil.

### *§III(A)(2) Production of Crude Oil and Associated Natural Gas*

19. With few exceptions, petroleum is produced from the subsurface through wellbores drilled to and completed within the oil and gas reservoir. Crude oil does not produce itself. It must be associated with an energy source in order to be transported though the reservoir, into the wellbore, and raised to the surface of the earth. The sources of natural energy, one or more of which are present in all commercially productive oil reservoirs include:

A. Expansion, as a result of reservoir pressure reduction, of gas which has come out of solution from the reservoir oil or of free gas initially present in the reservoir, commonly called "solution gas drive";

B. Formation water encroachment into the reservoir, also as a result of reduction of reservoir pressure, commonly called "water drive";

C. Expansion of the reservoir oil as pressure is released; and

D. Gravitational force.

20. In the early life of a well, the initial reservoir pressure may cause reservoir fluids to "flow naturally" up the wellbore and to the ground surface. However, with an initial reservoir pressure that is very close to the hydrostatic pressure exerted by a column of formation water or even crude oil, wells, such as those in the Mississippian Play, which produce primarily crude oil and water, will not flow naturally for a long period, if at all, and certainly not at the maximum efficient rate of production from the reservoir.

21. Therefore, very early in the life of an oil well, some form of artificial lift typically will be installed in the wellbore to lift the reservoir liquids to the surface and permit any associated natural gas to simultaneously flow to the surface. In order to efficiently lift several hundred barrels of oil and water daily, an electrical submersible pump ("ESP") is commonly used.[9] Alternatively, the well may be equipped with a gas or air-lift system. As the well declines in total liquid production rate, at some point a sucker-rod actuated insert pump, or "beam pumping" system will be installed and used for most of the life of the well. Finally, when the well produces only a few barrels of liquid per day, or less, a more efficient plunger lift system may be installed and used for the remaining life of the well.

---

8 *See* Donald L. Katz, *Handbook of Natural Gas Engineering*, ch. 8 (McGraw-Hill 1959).

9 For a depiction of an ESP, see **Figure 1**.

22. As the reservoir pressure depletes, the solution gas in the reservoir will expand increasing the saturation of gas in the reservoir at the expense of the crude oil and water. As a result, the "relative permeability" to gas in the reservoir will increase and gas will flow preferentially through the reservoir to the detriment of crude oil or water. This is one of the principles responsible for the common observation that wells that start out performing primarily as oil wells will end up performing more as gas wells as the reservoir pressure depletes.

23. The rate of oil and gas production from a well is directly related to the pressure remaining in the reservoir. In order to produce oil and gas from the well, reservoir energy in the form of pressure must be expended and depleted, thus the term "reservoir depletion." Because reservoirs have finite limits, as oil, gas, and water are produced from the reservoir, the rate of production from any well connected thereto will decline.

24. The computation of the original volume of oil and gas in place in a reservoir is a function of the total pore volume, the oil and gas saturation, and the properties of the fluids that are affected by changes in pressure and temperature. However, not all of the oil and gas originally in place in the reservoir is recoverable, either due to the efficiency of the reservoir drive mechanism or the economic validity of producing the well in consideration of the cost ("operating cost" or "lifting cost") when compared to the revenue generated by the sale of oil and gas produced from the well. The point of zero economic return is termed the "economic limit."

25. The volume of oil and gas that engineers predict will be economically recovered by a producing well during its lifetime is called its "oil and gas reserve."

### *§III(A)(3) Ownership, Development, and Sale of Produced Oil and Gas*

26. In the Mississippian Play, oil and gas mineral rights are generally owned by a private party (the lessor) who typically leases the right to develop the oil and gas to an oil and gas company in return for a royalty interest in the income derived from the sale of oil and gas, and often a bonus payment, and other considerations.

27. The leasehold interests of the parties having the right to drill an oil and gas well in a particular drilling and spacing unit are pooled by the state oil and gas regulatory authority (here, the Oklahoma Corporation Commission or the Kansas Oil and Gas Commission), and an Operator of the well is designated.

28. The costs of drilling, completing, and producing an oil and gas well are shared by the working interest owners. The royalty owners do not share in these costs.

29. Crude oil, natural gas, and produced water are transported from the wellhead of the producing well by a flowline into a tank battery facility where the oil and water are separated and stored in tanks and the natural gas is discharged into a gas sales pipeline owned by the gas purchaser. The crude oil is transported by the crude oil purchaser from the lease either by truck or by pipeline. The produced water is transported from the lease by truck or pipeline and is disposed into a nearby Class II disposal well.

30. The "First Purchaser" of the crude oil and natural gas sold from a well or lease has the responsibility to report to the state the volume of oil and gas produced and sold.

31. The First Purchaser or the well operator will disburse proceeds from the sale of oil and gas to the working and royalty interest owners, withholding the requisite production taxes levied by the state.

### *§III(A)(4) The Mississippian Play and Modern Horizontal Drilling and Completion Technology*

32. Since the advent of rotary drilling in Oklahoma nearly one hundred years ago, oil and gas wells have been drilled vertically into underground oil and gas formations that are generally horizontally postured. Hydraulic fracturing has been used to stimulate the production from Oklahoma wells for the last eighty of those years. However, petroleum engineering has long recognized that, if wells could be drilled horizontally, somewhat parallel to the over and underlying boundaries of the rock formations, the production of oil and gas from certain types of reservoirs could be enhanced. In particular, oil and gas formations having limited vertical thickness, low permeability, or vertical natural fractures in the rock are potential candidates for horizontal drilling. The Mississippian formation, although comparatively thick, was known to be naturally fractured and to have low matrix permeability and was considered a viable candidate for development by horizontal drilling and completion.

33. Modern horizontal drilling technology includes the equipment, services, and knowledge to drill a useable wellbore vertically from the surface of the ground, controlling its trajectory in order to land at a specific geologically advantageous point in the target oil and gas reservoir with a near horizontal attitude and at a pre-determined heading.[10] Subsequently, the horizontal portion of the wellbore (the "lateral") is extended several thousand feet in a particular trajectory dictated by geotechnical criteria through the objective geologic interval(s) or "pay zones" in the oil and gas reservoir, with the length of the lateral generally limited only by lease boundaries and regulatory considerations.

34. Modern horizontal completion technology includes the equipment, services and knowledge to accomplish a process termed "multistage hydraulic fracturing." The process involves installing steel casing and other specialized hardware into the horizontal lateral to permit the isolation and selective hydraulic fracture stimulation of short lengths of the lateral in succession beginning at the end or "toe" of the lateral. Subsequently, the expendable portions of the isolation hardware are drilled out of the inside of the production casing, and the completion effort continues to recover (flow and pump) the large volume (50,000 bbl, for example) of water-based stimulation fluids which were used in the fracturing process out of the oil and gas reservoir. These fluids must be disposed of properly at the conclusion of the fracturing process.

---

[10] See **Figure 2** for examples of horizontal and vertical wells. These images are examples only, and are not necessarily reflective of the geology or casing programs used in the Mississippian or in any particular well. *See also* **Figure 3**.

35. In its initial forms, the described horizontal well drilling and multistage hydraulic fracturing technology was generally available in Oklahoma and Kansas by approximately 2004; however, an increase in the price of crude oil was necessary to make the application to most of Mid-Continent candidate-reservoirs economically viable, and that did not occur until about 2008.

### B. Understanding the Geology and History of The Mississippian Horizontal Play in Oklahoma and Kansas

36. A "play" is a geographical trend of one or more geologically related prospects for the development of oil and gas resources. Such a geographical trend is typically not referred to as a "play" until explorationists seek to develop the prospect or prospects. The designation of a prospect as a "play" is not an indication that economic oil and gas production will necessarily result, as the business of oil and gas exploration remains highly risky even after a geographical trend of geologically related prospects is identified.

37. I understand from reviewing the Plaintiffs' allegations in these matters that the Trust I Registration Statement filed with the SEC on April 6, 2011 stated that the "Mississippian formation's geology" was then "well understood as a result of the thousands of vertical wells drilled and produced there since the 1940s."[11] I understand that the same section of the Trust I Registration Statement stated that "[b]eginning in 2007, the application of horizontal case-hole drilling and multi-stage hydraulic fracturing treatments have demonstrated the *potential* for extracting significant additional quantities of oil and natural gas from the formation." And another part of the Trust I Registration Statement noted that the "continuity of the formation across the AMI area was established by reviewing electric well logs, geologically mapping the analogous reservoir and reviewing extensive production data from more than 1,200 vertical and 40 horizontal wells."[12] Based on my experience working in the Mississippian, the geology of the Mississippian formation was reasonably well understood prior to the alleged Class Periods, as was the continuity of the formation across the areas where Trust wells were drilled.[13] It was reasonably certain that oil and gas was present in the formation, although the quantities and exact locations, of course, were not known.

38. Prior to 2007, horizontal drilling was virtually unexplored in the Mississippian within Oklahoma and Kansas. Vertical drilling in the area, however, was extensive and provided a wealth of information that could inform operators seeking to employ horizontal drilling technologies in the area.

39. Between 1920 and 2009, there were approximately 53,000 vertical wells drilled in the 22-township by 13-township rectangular area (10,296 square miles) surrounding the Trust I

---

11 *See, e.g.*, Third Consol. Am. Compl. ¶ 130, *In re SandRidge Energy, Inc., Sec. Litig.*, No. 12-cv-1341-G (W.D. Okla. Oct. 21, 2016) (Doc. No. 225).

12 *See, e.g.*, Consol. Am. Compl. ¶¶ 114, 192, *Duane & Virginia Lanier Trust v. SandRidge Mississippian Trust I*, No. 15-cv-00634-G (Nov. 11, 2016) (Doc. No. 78).

13 For an image of the Trust areas of mutual interest, see **Figures 4-5**.

and Trust II Areas of Mutual Interest (“AMIs”).[14] A significant portion of these wells penetrated at least the top of the Mississippian, and over 11,000 penetrated the entire Mississippian sequence. And even those wells that did not still provided information regarding the geologic stratigraphy bounding the Mississippian. At least 13,500 of the vertical wells drilled prior to 2009 were production tested in the Mississippian.

40. A substantial amount of information about the Mississippian oil formation, including scout cards, well completion reports, open hole logs, well drilling and completion reports, drill stem tests, back pressure tests, shut-in pressure data, and oil and gas production and sales data, for example, was available in the public domain prior to 2009. This represented a significant database of information regarding the material petrophysical properties of the Mississippian, including information necessary to determine the regional extent of the geological formation, the presence of hydrocarbon saturation, the structural geology, the thickness of the formation, the presence of faults and fractures, the mineralogy, porosity and qualitative permeability of the formation, the fluid saturations in the formation, and the formation pore pressure and temperature. Production tests and completed wells provided information as to the gravity, composition and pressure-volume-temperature properties of the reservoir fluids, the response of the wells to stimulation, and historical well production performance information. The professional and academic library of studies performed on the Mississippian formation, especially regarding the potential for oil and gas production, were extensive.[15]

41. Volumetric studies, whether offered in support of applications for increased density development of the Mississippian or performed by engineers for well owners to justify a Mississippian completion, clearly demonstrated a vast accumulation of original oil in place and that the recoverable reserves yet remaining after vertical well development clearly supported substantial additional drilling and development, if the economics could be made to work. The application of horizontal drilling to take advantage of the significant near-vertical fracture swarms in the Mississippian, essentially inaccessible to vertical wells, appeared to be the key to materially increase oil and gas production and reserves at a lower finding cost than offered by a vertical well.

42. Most Mississippian vertical wells were designated by the Oklahoma Corporation Commission and the Kansas Corporation Commission as oil wells and generally spaced to permit the production of one well on each 80 acres.

43. The geologic model for the pore volume of oil accumulation and reservoir permeability was regionally well established many years before horizontal development was undertaken. Crude oil was generally believed to migrate from the underlying Woodford organic shale, ascending the paleo-structure northward through the Mississippian rocks and

---

[14] *See* **Figures 6, 8**.

[15] For an example of early literature on these topics, see Wallance Lee, *Relation of Thickness of Mississippian Limestones in Central and Eastern Kansas to Oil and Gas Deposits*, Bulletin of Univ. of Kansas (June 15, 1939), http://www.kgs.ku.edu/Publications/Bulletins/26/.

trapped stratigraphically due to the discontinuous nature of lateral fracture and joint permeability.

44. Regionally, the Mississippian Limestone represents a shallow, warm and quiet, marine-shelf carbonate mud accumulation building from north to south with periodic depositional hiatus due to fluctuations in sea level, during which impure carbonates and siltstones were deposited. The geologic unit thins southward toward the paleo-basin due to deposition and to the north due to Pennsylvanian erosion, which removed a portion of the Mississippian sediments (Chester facies). Through diagenesis, the main fabric of the lime mud was recrystallized to an overall anhedral mosaic of sparry carbonate.

45. The principle Mississippian facies units exist in belts trending east-northeast to west-southwest. The portion of the Mississippian Play developed by SandRidge was situated predominately in the siliceous facies with a much smaller portion in the siltstone facies.

46. Historically, the best vertical well production was generally observed to occur in the Mississippian rocks containing siliceous or cherty members, where the rock was the thickest and had the highest primary porosity. Existing secondary fractures and joint systems contributed to increased well production and ultimate reserves. The best matrix porosity is associated with the siliceous horizons located on the east-west paleo-structural trends. Thicker sections (biohermal mounds) of rock developed on the east-west structural trends and experienced siliceous replacement that developed increased matrix porosity.

47. As operators began to explore the possibility of horizontal drilling development, it was commonplace for them to rely upon vertical well data to inform their efforts. In some cases, operators even drilled new vertical wells to inform their horizontal well development efforts.[16] However, it should be noted that even having a good understanding of a formation's geology does not eliminate the inherent risk and uncertainty associated with oil and natural gas exploration.

48. Applying the vast amount of vertical data to the newer horizontal drilling approaches was not an exact science. This is something operators in the Mississippian publicized, and it was generally understood within the industry. Furthermore, it cannot be understated that reserves estimation and oil exploration is inherently a highly speculative business. That too was well understood by the industry and disclosed by Mississippian operators.

49. Nonetheless, armed with geological information derived from decades of vertical drilling, operators found very encouraging results from initial horizontal drilling efforts within the Mississippian. Chesapeake Energy is often credited as drilling the first modern horizontal well in the Mississippian in 2007. Chesapeake reported that well, the Howell 1-33H, as producing approximately 285 MBoe at a cost of only $2.7 million, which Chesapeake

[16] *See* Devon Energy Corp. Q2 2011 Earnings Call at 7, S&P Capital IQ Estimates (Aug. 3, 2011) ("This is a play originally established by vertical production years ago, but is now being pursued with horizontal drilling. We drilled our first vertical well to gather data in the second quarter, and we're currently drilling our first horizontal well. In total, we plan to drill or participate in 12 to 15 wells in 2011.").

promoted as being a "very, very successful first effort."[17] SandRidge Energy was a major investor in the Mississippian Play.

50. The modern Mississippian Play accelerated in 2009 as data continued to come in regarding significant horizontal well completions spanning a wide portion of the regionally hydrocarbon-saturated Mississippian limestone formation. The outlook among operators was also positive based on the refinement in the application of available drilling and completion technology, as well as further understanding of intrinsic reservoir properties.

51. The Mississippian horizontal play was dynamic and highly competitive, with a good number of large independent exploration and production companies taking part with reported high hopes and ambitions for great success.[18] There were several "key" wells completed during the early activities that drove some of the exuberance.[19] Results were positive, and with refinement in the application of available drilling and completion technology and operations, as well as identification of intrinsic reservoir properties, developers hoped to identify "sweet spots" both within the reservoir column and in certain areas.

52. Early efforts by developers in the Play concentrated on establishing production on existing leases to preserve their ownership beyond their respective primary terms. Since most horizontal Mississippian spacing units were 640 acres, generally only one well was drilled on each section of a leasehold. The drilling of additional wells in each section ("increased density drilling") generally did not commence until later in the Play.

53. Based upon early production results, coupled with historical knowledge of the Play, most reservoir engineers operated with the premise that the Mississippian was a regionally extensive, conventional, heavily fractured, oil-saturated, volumetric limestone reservoir exhibiting low permeability; otherwise a "tight oil" play, as the term is used in the industry. There was also an understanding that, because of the high water saturation observed in the fractured Mississippian, it may also respond to a "dewatering" effort, as had recently been observed in Hunton limestone reservoirs and thick Pennsylvanian sand reservoirs in Oklahoma, which, after pressure depletion by water removal, established increasing rates of oil and gas production and reserves.

54. Before any actual horizontal well performance was available, it was customary for petroleum engineers to estimate the performance of a horizontal well based upon a mathematically supported multiple of the performance of the vertical well. Examples of vertical wells which produced from only a low permeability matrix and other examples of vertical wells that had fortuitously penetrated some portion of a fracture swarm were both available to establish the basis for projection in the Mississippian. The estimate was further

---

[17] Chesapeake Energy Q2 2011 Earnings Call at 4, S&P Global Market Intelligence (July 29, 2011).

[18] For a map showing the presence of some operators in the Mississippian, see **Figure 12**.

[19] For maps showing the location of various operators' Mississippian horizontal wells, including some highly productive wells, see **Figures 10-11**.

refined by considering the performance of a horizontal well, which would be anticipated to intercept multiple swarms of naturally occurring vertical fractures.

55. The orientation of regional horizontal stress in the Mississippian formation was known to the industry and, as a result, most horizontal wells were drilled in a North-South trajectory, in approximately the direction of minimum horizontal stress in order to maximize the frequency of intercepting conductive, naturally-occurring, vertical fractures and to permit the fracture stimulation of the horizontal lateral with fractures created perpendicular to the axis of the lateral.[20]

56. As frequently observed during the early stages of a new play, there was a learning curve in the optimization of the process of well drilling, completion, and operation by operators in the Mississippian that served to establish the best practices that would be carried forward in the remaining development. Examples of efforts undertaken to increase production and reserves included:

A. Increasing the length of the horizontal lateral to expose more productive rock and more fracture swarms;

B. Using swellable packers as isolation tools attached to the production casing/liner to prevent plugging natural fractures with cement;

C. Shortening the length of each stage, increasing the volume of proppant injected into each fracture stimulation;

D. Tailoring the stage geometry and the fracture stimulation on each stage to the petrophysical properties of the rock in each stage observed during drilling;

E. Increasing the size of the tubulars in the vertical portion of the well to accommodate high volume lift equipment;

F. Use of high volume lift equipment (ESP, gas lift, air lift) to improve the rate and fraction of stimulation (load) water recovered, to reduce back pressure applied to the producing formation, and to expedite dewatering of the reservoir;

G. Installing surface infrastructure (electrical power, separation and storage facilities, produced water disposal, gas sales connection, compression, etc.) prior to stimulation to permit continuous production of the well as quickly as possible afterwards.

57. By 2011, the Play had experienced intense land-acquisition and exploration interest by oil and gas exploration companies. This had the effect of driving up lease prices in the Play.

---

[20] For a depiction of the directionality of the laterals drilled in the Mississippian between 2007 and 2012, see **Figures 10-11**.

58. By mid-2012, approximately 1,100 horizontal wells had been drilled in the Play, about forty percent by SandRidge and about thirty percent by Chesapeake.[21] The balance were drilled by developers such as Eagle, Calyx, Range, Plymouth, Shell, Territory Resources, Panther, Chaparral, Devon and others. This was yet very early in the development of the Play, with only about ten percent of these wells having over one year of production history. At that time, there was optimism that early projected estimated ultimate recoveries ("EURs") may have been conservative and that estimated reserves per well were improving. The use of open-hole packers to isolate frac stages was providing encouraging results. There were also indications that planning and design could improve performance and economics.

59. Optimism for horizontal drilling in the Play continued through the alleged class period with major operators continuing to invest in the area. As just one example, in October 2012, Midstates Petroleum Co., Inc. acquired the Mississippian assets of Eagle Energy.[22] During a November 8, 2012 earnings call, Midstates highlighted that "Eagle's last 30 wells had averaged over 600 Boes per day as an IP" and that Midstates thought it could "back up kind of 1.5 B factors pretty easily and maybe as much as 2 in some cases."[23]

60. In subsequent years, the development of the Mississippian Play was slowed considerably when oil and natural gas prices collapsed, consistent with the unpredictable nature of petroleum price cycles.

61. Based on the foregoing, it is my opinion that the geology of the Mississippian was generally understood prior to the beginning of the alleged Class Periods, as was the continuity of the Mississippian formation within the Trust AMIs. Part of that understanding was based on information obtained from vertical well data, which was informative of reservoir properties and customary to be used to forecast production within a drilling area being newly developed with horizontal drilling exploration. However, even where the geology of a reservoir is well understood, like the Mississippian, there are a substantial number of factors that cause variability of production results between wells and areas.

## C. SandRidge Energy's Process for Disclosing Reserves Estimates and the Central Role of Netherland Sewell & Associates

### *§III(C)(1) Estimation of Crude Oil and Natural Gas Reserves*

62. The phrase "oil and gas reserves" (hereinafter "reserves") is defined as "those quantities of petroleum which are anticipated to be commercially recovered from known accumulations from a given date forward."[24]

---

21 *See* **Figures 10-11**.

22 Midstates Petroleum Co., Inc., Q3 2012 Earnings Call at 2, S&P Capital IQ (Nov. 8, 2012).

23 *Id.* at 17.

24 Society of Petroleum Engineers ("SPE"), "Petroleum Reserves Definitions," https://www.spe.org/industry/petroleum-reserves-definitions.php (last visited Apr. 4, 2019).

63. Estimating reserves has historically been a fundamental task performed by petroleum engineers in order to compare the estimated cost of an oil and gas undertaking with the anticipated result in quantities of oil and gas developed and their estimated value. Reserves estimates are also commonly performed for academic, regulatory, research, and governmental purposes.

64. Reserves estimates are commonly performed by Reserves Estimators for regulatory reporting and compliance purposes for and on behalf of entities engaged in the exploration for or production of oil and gas or the acquisition or ownership of interests in the properties or results of such exploration or production activities. Reserves Estimator services are customarily provided by qualified independent engineering and geotechnical consulting companies to the aforementioned stakeholders. As defined by the Society of Petroleum Engineers ("SPE"):

> A Reserves Estimator is a person who is designated to be in responsible charge for estimating and evaluating reserves and other Reserves Information. A Reserves Estimator either may personally make the estimates and evaluations of Reserves Information or may supervise and approve the estimation and evaluation thereof by others.[25]

65. Reserves estimating is a subjective process and involves uncertainty in the requisite technical, economic, and political or governmental predictions. Reserves estimating and reporting regulations for the work of the Reserves Estimator are customarily provided by the Regulating Agency. Guidelines and standards are also provided by the industry to support the Reserves Estimator.

66. Ultimately, the actual amount of oil or natural gas to be recovered by any well will only be known when the well permanently ceases to produce. Despite this limitation, there is generally a significant need for reserves estimates early in the life of a well, including before it is actually drilled and placed into production. Aided by geotechnical and economic information, petroleum engineering techniques have been developed to identify and quantify the presence of recoverable oil and gas reserves in a reservoir, to predict the ability of oil gas wells to produce therefrom into the future, and to estimate the value of the oil and gas which is sold from such wells until their economic limit is attained.

67. "Reserves" are estimated physical quantities (in barrels of oil or cubic feet of natural gas) extractable from a company's properties. "Proved Reserves" are those quantities of oil and gas estimated with a high degree of certainty to be producible under certain (geological, technological, political, and economic) assumptions.

---

[25] SPE, "Standards Pertaining to the Estimating and Auditing of Oil and Gas Reserves Information" ("SPE Standards") § 2.2(b), https://www.spe.org/industry/docs/Reserves_Audit_Standards_2007.pdf (last revised Feb. 19, 2007).

68. Estimating reserves can be especially complex and subjective when they involve a new play or new technology. For example, as with horizontal drilling in the Mississippian, the data upon which a reserves estimate is based may be limited as a play is initially developed. More information is obtained about the mix of oil, gas, and water, the reservoir pressure, and other relevant data as the field is developed; requiring reserves estimates to be revised over the life of a field. Based on my experience, a reserves estimate for any given well will only be 100% accurate when the well has gone dry.

69. In the evaluation of a Resource Play (one that performs according to a statistical norm), it is customary for a Reserves Estimator to prepare a type curve or type-well curve, which is intended to represent the performance of an average well in a program of wells. A type curve is an estimated projection of average future well performance. It is not a guarantee that all future wells, or any particular future well, will yield a production output that comports exactly with the estimated type curve. Indeed, by definition, some individual wells are expected to yield a higher production output than the estimated type curve projects, while other individual wells are expected to perform below the estimated type curve.

70. Type curves can be developed for various categories of reserves. For example, an estimated type curve may be used to forecast the potential production from an operators' Proved Undeveloped locations, or "PUDs." The SEC defines a "proved" reservoir as "(A) [t]he area identified by drilling and limited by fluid contacts, if any, and (B) [a]djacent undrilled portions of the reservoir that can, with reasonable certainty, be judged to be continuous with it and to contain economically producible oil or gas on the basis of available geoscience and engineering data."[26] By contrast, production forecasts for proved *developed* producing locations—which are already producing oil or gas—would customarily be estimated using decline curve analysis.

71. Separate and apart from any type curve that an operator (or a third party at the operator's request) may develop for purposes of forecasting PUD production, it is not uncommon for operators internally to develop various other curves that project estimated well outputs—on an individual or aggregate basis—for other purposes.

72. Industry participants also use the terminology "infill" and "step-out" wells. Infill drilling is the practice of adding wells within the parameters of already existing wells. A step-out well, by contrast, is an exploratory well drilled outside of the parameter of already existing wells. Because of data limitations, it is generally more difficult to estimate future production from a step-out well than it is to estimate future production from an infill well.

73. Based on my experience working as a professional petroleum engineer, including reviewing and estimating reserve reports, it is common for oil and gas producers to retain third-party engineering firms to estimate oil and gas reserves. Although there is no formal requirement that oil and gas producers estimate reserves using third-party engineering firms, doing so avoids any perceived conflict of interest that might attach to internal

---

[26] SEC Regulation S-X, 17 C.F.R. § 210.4-10(a)(22).

estimates and demonstrates a company's confidence in its assets and commitment to transparency. During the year-end 2010, 2011, and 2012 reserves estimating process, SandRidge retained NSAI to estimate its reserves in the Mississippian.

74. NSAI was reputable and qualified to estimate SandRidge's Mississippian reserves. NSAI has been in operation for almost 60 years and is one of the largest oil and natural gas consultants with over 60 engineers, geoscientists, and petrophysicists, and over 75 engineering and geoscience analysts.[27] It is my understanding that NSAI also had experience estimating reserves in the Mississippian for companies besides SandRidge, such as Midstates Petroleum Company, Inc. and others.[28] I have also reviewed NSAI's work in the past and, in my estimation, their work was consistent with industry standards.

75. The Society of Petroleum Engineers' ("SPE") mission is "[t]o collect, disseminate and exchange technical knowledge concerning the exploration, development and production of oil and gas resources, and related technologies for the public benefit; and to provide opportunities for professionals to enhance their technical and professional competence."[29] In connection with this mission, the SPE has published "Standards Pertaining to the Estimating and Auditing of Oil and Gas Reserves Information" (SPE Standards).[30] Among these, is the standard that reserves estimators maintain independence and objectivity.[31] Based on my industry experience and review of the applicable record, it is my opinion that NSAI maintained its independence and objectivity when estimating the year-end 2010, 2011, and 2012 reserves in the Mississippian that are at issue in this case.

76. Section 4.3 of the SPE Standards describes the standards for determining the independence of a Reserves Estimator.[32] Based on review of these standards, my experience, and review of the record, NSAI was independent. NSAI had no direct or independent investments in SandRidge or the Trusts; was not involved in any joint business venture with SandRidge or the Trusts; was not indebted to SandRidge or the Trusts; had no material interest in SandRidge or the Trusts, or had any other pecuniary interest in SandRidge or the Trusts.[33] Furthermore, it is my understanding that SandRidge represented less than 1 percent of NSAI's revenue; David Miller testified that if SandRidge were to replace NSAI, it wouldn't "mean anything material in the way of lost revenue to Netherland Sewell."[34] The reports submitted by Mr. Tomanek, Ms. Lencioni, and Mr. Crane do not identify any evidence that calls into question NSAI's independence as SandRidge's reserves estimator.

---

[27] *See* "About NSAI," https://netherlandsewell.com/about/ (last visited Apr. 3, 2019).

[28] Midstates 2012 Form 10-K, at 8; Miller Dep. 278:7-16.

[29] SPE, Fact Sheet, https://www.spe.org/about/docs/FactSheet.pdf.

[30] SPE Standards, https://www.spe.org/industry/docs/Reserves_Audit_Standards_2007.pdf.

[31] *Id.*

[32] *Id.*

[33] Miller Dep. 41:19-21; SD-SECURITIES-0005670; SD-SECURITIES-0005586; SD-SECURITIES-0214996.

[34] Miller Dep. 89:12-24.

77. Section 4.1 of the SPE Standards describes the importance that reserves be estimated in an "unbiased and objective manner."[35] Based on my review of the SPE Standards, my experience, and review of the record, NSAI's work estimating reserves on behalf of SandRidge and the Trusts was unbiased and objective.

78. First, it is important to note that NSAI was provided with all necessary data by SandRidge to perform its reserves estimating work.[36] Consistent with industry practice, the data provided by SandRidge consisted of commercial and performance data including: well name, location, ownership, lease operating expenses, production information, product pricing and sales data, maps, geologic data, and other related information.[37] There are no indications in the record that restrictions were placed on the data that NSAI was permitted to review in estimating reserves in the Mississippian.[38] The data provided by SandRidge was supplemented with additional production data from SandRidge as it became available.[39]

79. NSAI estimated reserves based on its own analysis of the available data. David Miller, NSAI's Reserves Estimator, testified that his conclusions were not based on any target set by SandRidge, but rather, he was "simply trying to get [an] answer that sits on the data correctly and with respect to the reserve definitions correctly."[40] Consistent with industry custom and practice, Mr. Miller performed his work in iterations, reported preliminary results to his client SandRidge, received feedback from the SandRidge professionals, obtained additional data in order to prepare subsequent iterations until Mr. Miller's final reserves estimate was completed.[41] At the end of the engagement, Mr. Miller and NSAI's reserves estimates were NSAI's alone, regardless of the client's input, concurrence, or disagreement.[42]

80. The process by which NSAI estimated the appropriate B-factor to use in modelling production decline and election of a single type curve for SandRidge's reserves in the Mississippian demonstrated NSAI's objectivity. Both instances support my opinion that NSAI carefully considered the available data and reached a conclusion based on its own assessment.

A. With regard to the B-Factor, it was SandRidge's view during the year-end reserves estimating processes for 2010, 2011, and 2012, that a B-factor of 2.0 was appropriate in modelling the production decline of crude oil in Mississippian wells.[43] Documents indicate that this position was repeatedly expressed by

---

35 SPE Standards, https://www.spe.org/industry/docs/Reserves_Audit_Standards_2007.pdf.
36 Miller Dep. 31:9-32:2; R. Johnson Dep. 29:6-18; Nguyen Dep. 47:19-23.
37 Miller Dep. 20:13-21:2; Jan. 8, 2019 Galvin Dep. 22:3-24:2.
38 Miller Dep. 31:9-14.
39 Miller Dep. 31:15-32:2.
40 Miller Dep. 62:1-5.
41 Miller Dep. 32:13-24; 94:14-95:11; Walton Dep. 180:2-11.
42 Nguyen Dep. 47:2-11; R. Johnson Dep. 21:9-18, 273:23-274:2.
43 Miller Dep. 161:25-162:6; SD-SECURITIES-0456113.

SandRidge personnel to NSAI. As Mr. Miller testified, "I think [Galvin and R. Johnson's] perspective was a 2.0 was the correct B factor to use, whereas my consistent viewpoint for the oil was 1.5."[44] Although Mr. Miller considered SandRidge's analysis, in all three years, NSAI concluded that based on its analysis of the available data that a B-factor of 1.5 was appropriate.[45] This consideration of a client's viewpoint is consistent with the custom and practice for estimating reserves in the oil and gas industry. NSAI's objectivity is demonstrated by Mr. Miller considering SandRidge's interpretation of the data but ultimately coming to his own conclusion of what was appropriate.

B. Similarly, the decision to use a single type curve or multiple geographically subdivided type curves also demonstrated NSAI's objectivity. During the 2011 year-end reserves estimating process, Mr. Miller initially believed that multiple type curves might be appropriate; however, he ultimately concluded that there was not sufficient data available to support such an approach.[46] In reaching his conclusion, it is my opinion that Mr. Miller appropriately considered that subdividing the population of wells supporting each area would become statistically insignificant and provide unreliable results. Given the small number of horizontal wells in the data, particularly in year-end 2010 and 2011, the decision not to subdivide the data is consistent with industry pattern and practice.[47]

81. In conclusion, it is my opinion, based on my experience as a professional petroleum engineer, my work reviewing and estimating reserves in the Mississippian, and my review of the record evidence, including the reports of Plaintiffs' experts that (1) NSAI was a reputable and qualified estimator of oil and gas reserves during the time period at issue; (2) NSAI adhered to industry and professional standards regarding independence when estimating SandRidge's year-end reserves in 2010, 2011, and 2012; and (3) NSAI adhered to industry and professional standards regarding objectivity when estimating SandRidge's year-end reserves in 2010, 2011, and 2012.

82. It is my understanding that Plaintiffs have criticized SandRidge, Trust I, and Trust II's practice of updating NSAI's public reserve report and type curve only once per year in 2010, 2011, and 2012. Based on my experience operating in the Mississippian at the time, as well as my review of certain record evidence, that was consistent with industry norms and practice.

83. Although I am not a lawyer and am not offering a legal opinion in this case, it is my understanding from operating in this regulated industry that public companies disclose

---

44 Miller Dep. 161:25-162:6.

45 Miller Dep. 117:25-118:10, 200:22-25.

46 Miller Dep. 224:2-225:2.

47 Miller Dep. 30:15-22.

reserves estimations in order to comply with SEC regulations. Those regulations require public disclosure of reserves estimates annually.[48]

84. Consistent with those SEC requirements, I have observed that it is commonplace for oil and gas exploration companies operating in the Mississippian to estimate and to report estimated reserves only once per annum.[49] And the companies following that approach often disclosed it to the public, as did SandRidge, Trust I, and Trust II.[50]

85. There were many legitimate reasons for opting to update public reserves estimations annually during the early stages of horizontal development within the Mississippian in 2010, 2011, and 2012. Those reasons include the need to acquire a critical mass of production data, changes in oil and gas prices that may influence the point of efficient operation, the development and application of ever-improving drilling technologies and techniques, and the intensive effort required to formally estimate reserves for public release.

86. The rationale for conducting a public reserves estimate review process annually does not foreclose the possibility that an oil and gas exploration company may utilize different estimation or projection techniques internally for purposes of selecting drilling locations. That is a common practice within the oil and gas exploration companies that I have observed and worked for, particularly in the Mississippian Play. The two types of estimations (external and internal) serve different purposes. Publicly stated reserves are created to comply with SEC reporting requirements so as to estimate proved reserves . Internal estimations, by contrast, may be used for high grading well locations among existing PUD locations at a hyper-localized level and for other categorization or monitoring purposes that do not affect public reserves estimations.

## IV. REBUTTAL OF THE WORK OF PLAINTIFFS' DESIGNATED EXPERTS

87. To the extent I have not already addressed the opinions expressed by Plaintiffs' experts as presented in their respective reports, I additionally disclose the following observations, conclusions, and opinions.

---

[48] *See* 17 C.F.R. § 229.1202(a)(2) (requiring disclosure of "[s]ummary of oil and gas reserves at fiscal year end" that must include "(i) Proved developed reserves; (ii) Proved undeveloped reserves; [and] (iii) Total proved reserves").

[49] *See, e.g.*, Midstates Petroleum, 2012 Form 10-K at 9 ("All field and reservoir technical information, which is updated annually, is assessed for validity when the reservoir engineers hold technical meetings with geoscientists, operations, and land personnel to discuss field performance and to validate future development plans."); Newfield Exploration, 2011 Form 10-K at 8 ("Our reserves estimates . . . made by our petroleum engineering staff, are reviewed annually with management and revised, either upward or downward.").

[50] *See* SandRidge Energy, Inc., 2011 Form 10-K at 9; Trust I Registration Statement at 66 (Apr. 6, 2011); Trust II Registration Statement at 68 (Apr. 17, 2012).

**A. <u>Jan J. Tomanek (Report dated March 1, 2019)</u>**

88. Mr. Tomanek is a geologist who has offered the following opinion in the *Lanier* case:

> [A]t the time of each of the Trusts' IPOs, the geology of the Mississippian Lime was not well understood by SandRidge. Thus, the results of their drilling was not predictable or consistent. The Mississippian interval in northern Oklahoma and southern Kansas is geologically complex and changes across the subject area. The Mississippian section is not uniform or homogeneous even over relatively short distances such that the results of drilling a particular horizontal well could not be predicted.[51]

89. As discussed in the above Section III(A)(4)(B), Mr. Tomanek is mistaken that the Mississippian was not well understood by SandRidge and others operating in the Mississippian around 2010 to 2012. To summarize, the geology of the Mississippian was well-understood and, based on the extensive history of vertical well production, it was reasonably certain that oil and gas were present throughout the formation. That is not to say that any single well would necessarily produce oil and gas in predictable economic quantities without any variance, which, of course, is a fundamental truth in any exploration play. Mr. Tomanek is wrong to conclude that a direct relationship exists between production variability and geologic understanding.

90. Mr. Tomanek apparently bases his opinion on a misinterpretation of facts and geological information, which calls into question the validity of his entire opinion. Below are just a few of the examples of those misinterpretations:

A. Mr. Tomanek refers to a type log from a well in Osage County, Oklahoma on page 7 of his report.[52] Osage County, however, is east of a geologic feature known as the Nemaha Ridge. SandRidge did not drill any wells or book any reserves from Osage County. Thus, this type log cannot inform his opinion about the areas in which SandRidge actually operated.

B. On page 7 of his report, Mr. Tomanek refers to a diagram depicting stratigraphy to reach the conclusion that "clearly" the "Mississippian interval is changing from one location to another."[53] As an initial point, the diagram Mr. Tomanek cites contains a disclaimer that it "is not to scale and is for illustration purposes only."[54] Thus, it is error to base a conclusion regarding the characteristics of the Mississippian stratigraphy based on this diagram. Furthermore, that the Mississippian interval appears at different depths or in different thicknesses does not lead to the conclusion

---

51 Tomanek Report § 1.3.

52 *Id.* § 2.1.

53 *Id.*

54 *Id.* (citing SD-SECURITIES-0678580, at -593).

that the Mississippian interval is not generally understood or continuous in any part of the formation.

C. On page 13, Mr. Tomanek states that "the brown line on Figure 2-7 which is the furthest south on the map shows that the Chester does not exist south of that line."[55] Mr. Tomanek is in error, either in his interpretation or his knowledge of Oklahoma geology. In fact, the Chester formation does not exist north of the subcrop brown line shown on Figure 2-7. Furthermore the Chester formation is essentially non-existent in any of the Play operated by SandRidge.

D. On pages 15-20, Mr. Tomanek makes a comparison between the open hole logs on three SWD wells drilled vertically through the Mississippian formation generally situated in the northwest, northcentral, and northeast portions of the Trust acreage, spanning a distance of some 37 miles. Mr. Tomanek seems to make the point that the indicated porosity and thickness is highest in the most easterly well (the Donnie SWD) and lowest in the most westerly well (the Jessica), yet the estimated oil reserves at year-end 2012 for each was highest in the westernmost producing wells and lowest in the easternmost producing wells and goes on to point out that even wells surrounding each of the three SWD wells had differing estimated reserves. Mr. Tomanek apparently uses the log character of these three SWD wells and the estimated reserves of the wells in the vicinity of each to conclude that the Mississippian section is not uniform or homogeneous, and therefore the results would not be predictable. To the contrary, what this data better demonstrates is that well log-indicated porosity (and even thickness) is not always a reliable indicator of well production or reserves. NSAI did not rely on well logs alone to estimate reserves. What this data also demonstrates is that, regardless of what the well logs appear to show below the uppermost 150 feet of the Mississippian section, the best indicated porosity in each well is concentrated in the upper portion where SandRidge and others drilled their horizontal wells, even if the stratigraphic section thins on the top, that is where the best porosity is located.

91. In the actual completion of the horizontal producing wells, the lateral is drilled across the uppermost portion of the Mississippian Meramec interval, positioned about 150 feet, or slightly deeper, below the top of the formation. Then the lateral is hydraulically fractured which creates a dozen or more vertically oriented fractures extending upward to the top of the Mississippian, and downward perhaps a few hundred feet and laterally outward as much as 500 feet to 1,000 feet, stimulating any portion of the Mississippian rock it encounters, regardless of thickness, mineralogy, porosity, extent of fracturing or other geologic variations. Those created fractures are also propped with sand at least within the first 100 to 200 feet of the wellbore. The variability, predictability, or uniformity or complexity of all the rock in this stimulated volume is immaterial; it all gets mixed in together and produced.

---

55 *Id.* at p.13.

**B. Letha C. Lencioni (Report dated March 1, 2019; [Corrected] Report dated March 21, 2019)**

92. The opinions stated within Ms. Lencioni's executive summary paragraph 1 are (a) "that well performance in the Mississippian formation varies widely from area to area within the AMIs, and from well to well even with small areas;" and (b) that "[i]t is invalid to attempt to predict performance of an undrilled horizontal well based on the performance of vertical wells."[56]

A. In response to (a), it is generally correct that well performance varies for wells drilled in the Mississippian across the Play, and not just SandRidge wells. This is a common characteristic of most oil and gas plays. That does not mean, however, that wells across the AMI will not be expected collectively to produce oil and natural gas in a log normal distribution.

B. In response to (b), there are aspects of vertical Mississippian well performance, some of which were used by NSAI in their reserves estimates prepared for SandRidge, which are valid to use, as explained by Mr. Miller, including identifying the regional extent of the oil saturated resource, establishing late-term decline rate, observing GOR performance with depletion, and using suitable analogs of vertical and adjacent horizontal offsets for comparative performance. These are all valid uses, according to SPE and custom.

93. Throughout her report, Ms. Lencioni asserts several conclusions regarding SandRidge's use of ESPs. For example, Ms. Lencioni concludes that SandRidge attempted to "compensate" for below-expectation oil production from Trust I wells by "accelerating the rate of drilling development wells and by installing electrical submersible pumps (ESPs)."[57] Ms. Lencioni also opines that "ESPs increase production rates in the short term, with accelerated decline thereafter;" and "ESPs do not increase reserves, and reporting of higher rates associated with ESPs can be misleading without proper explanation."[58]

94. Ms. Lencioni's opinions are based on several misinterpretations of the production characteristics of ESPs and how oil and gas operators used that technology in the Mississippian, as explained further below.

A. First, the use of high volume lift equipment such as ESPs is common for well operators in the Mississippian Play. High volume lift is used to maximize the rate and volume of recovered stimulation load fluids thereby accelerating and maximizing the production of oil and gas and its value. Many Mississippian wells continued to produce high volumes of liquid after recovering load fluids and high volume lift was required to efficiently produce the well.

---

56 Corrected Expert Report of L. Lencioni § 1(1)(a)-(b) (Mar. 21, 2019).

57 *Id.* § 1(3)(b).

58 *Id.* § 1(4)(a)-(b).

B. Second, certainly ESPs do not decrease reserves, and Ms. Lencioni has not identified any source purporting to claim that they do. The use of ESPs in this application accelerates the recovery of load fluids, thereby accelerating the recovery and net present value of the oil and gas reserves.

C. Third, there is a general belief by those operating in the Play, and with engineering justification, that well production and reserves may be diminished if load water is left in the reservoir, and that load water left in the reservoir too long will never be recovered and that high volume lift is the most common method to address these issues. Noteworthy is that high volume lift is more expensive than placing the well on beam pump and would not be done by well operators absent reasonable justification.

D. Finally, there is general belief by operators in the Play that the most fractured and water-dominated portions of the Mississippian reservoir may benefit materially by quickly "dewatering" the reservoir, that is to say, producing connate water out of the reservoir, depleting the reservoir pressure, causing gas to come out of solution of both the crude oil and the connate water and liberating oil and gas that is bound due to capillary pressure and other entrapment mechanisms. That process cannot be accomplished absent high volume lift such as ESPs.

**C. <u>Steven D. Crane (Report dated March 1, 2019)</u>**

95. Mr. Crane is a petroleum engineer who reportedly performed his own reserves estimates as of mid-year 2011 and mid-year 2012 and apparently compared them to various representations during the Class Periods. Mr. Crane offers criticism of the methodology used by SandRidge to compute reserves and comments reportedly made by SandRidge about their reserves.

96. I have offered opinions responding to similar opinions offered by Mr. Tomanek or Ms. Lencioni in my responses to criticisms of the reserves estimates performed by NSAI.

97. Mr. Crane relies extensively upon a July 12, 2011 letter written by Mr. Dick of Pinnacle Energy Services. Mr. Crane concludes this letter supports that "Sandridge was aware of Pinnacle Energy Services' (PES) independent EUR evaluation of Sandridge wells in July 2011 which showed significantly lower EURs than Sandridge's public values." He relies upon that conclusion as a basis for his opinion that "SandRidge overstated the average expected ultimate recovery values on existing wells and significantly overstated the average expected ultimate recovery values of future undeveloped wells during the Class Period of February 24, 2011 through November 8, 2012, inclusive."[59]

98. The July 12, 2011 letter, however, does not support Mr. Crane's conclusion. Furthermore, the letter contains statements by Mr. Dick that are inconsistent with other opinions that Plaintiffs' experts have offered in this case, as explained further below:

---

59 Expert Report of Steven D. Crane at p.4 (Mar. 1, 2019).

A. First, the letter from Mr. Dick, by its own terms, was not intended to, and does not, represent a reserves estimation akin to that performed by NSAI for SandRidge. The first page of the letter makes that clear by stating the following:

> [T]his evaluation is not to be considered a Reserves Evaluation as defined by the SEC as the intent was a determination of the future potential and present value of the Mississippian play and as such, some rates and reserves utilized are based on expected results and not entirely based on existing well performance.[60]

B. Second, Mr. Dick, on page two, describes his efforts to determine and compare the average EUR for vertical and horizontal wells drilled in each of Woods, Alfalfa, and Grant counties and presents his results at the top of page three. In the first paragraph of page three, Mr. Dick states that "[t]he averages generated and published by SandRidge for each county were generally close but higher than those calculated by Pinnacle."[61] Furthermore, Mr. Dick notes that "[r]esults from the vertical wells can also be helpful in predicting whether certain areas will have higher gas-oil ratios."[62] These statements by Mr. Dick further support the opinions I offer in this case regarding the valuable use of vertical well data when assessing a new and developing horizontal play like the Mississippian.

C. Third, on page five, Mr. Dick compares his EUR calculations for PDP wells in May 2011, to the type curve generated by NSAI and used by NSAI to prepare SandRidge's year-end 2010 PUD reserves and notes that the NSAI type curve predicts higher reserves than Mr. Dicks analysis indicates months later.[63] Such a comparison is flawed, as Mr. Dick's analysis consisted of an average of existing production, included 5 months of production data not included in NSAI's year-end 2010 type curve, and included data from wells not included in NSAI's year-end 2010 type curve (both because some had yet to be drilled and others were not included because no wells were planned offsetting them).

D. Finally, the last page of Mr. Dick's letter states:

> Horizontal development of the Mississippian formation appears to be a statistical and commercial success in Northern Oklahoma, with oil and gas recoveries exceeding 300 MBOE based on the detailed analysis of ninety-one (91) recent wells. Horizontal development of the Mississippian in additional counties within Oklahoma and Southern Kansas is also expected to be successful due to similar reservoir parameters and qualities, but has not been proven at this time. As in all

---

60 PINN0013891, at -891.

61 *Id.* at -893.

62 *Id.*

63 *Id.* at -895.

> large resource plays, it is expected that average per-well rates and recoverable reserves will increase over the next several years as more wells are drilled, and drilling and completion processes are optimized.[64]

99. An objective reading of Mr. Dick's letter, in my opinion, does not support the opinions Mr. Crane asserts.

100. I reserve the right to supplement this report if provided more information or if Plaintiffs' experts modify or add to their opinions.

---

64 *Id.* at -905-06.

Terry L. Brittenham, P.E.
April 4, 2019

LICENSED PROFESSIONAL ENGINEER
TERRY
L.
BRITTENHAM
4/4/19
16903
OKLAHOMA

# APPENDIX A

## EXHIBITS WHICH MAY BE USED AS A SUMMARY OF OR SUPPORT FOR THE OPINIONS

# APPENDIX A

## EXHIBITS WHICH MAY BE USED AS A SUMMARY OF OR SUPPORT FOR THE OPINIONS

Based upon the documents and information reviewed and produced by the Parties at this time, the following demonstrative exhibits are contemplated to be used at trial. Any of the previously listed materials which were considered in forming opinions and the attachments to this report may also be presented as exhibits. This list may be supplemented pending further discovery.

1. Maps; well status and production.

2. Charts/schematic; chronology of events, well performance.

3. Geologic maps, cross sections, type logs.

4. Wellbore schematics.

5. Charts/diagrams presenting reservoir engineering principles.

6. Exemplars of engineering tools used to estimate oil and gas well production and reserves.

7. Photos, illustrations demonstrating customary operations in the Mississippian Play.

# APPENDIX B

## QUALIFICATIONS, INCLUDING ALL PUBLICATIONS AUTHORED WITHIN THE PRECEDING TEN YEARS

Southern International Incorporated

4200 Perimeter Center Drive, Suite 205
Oklahoma City, OK 73112-2391 USA
Telephone: (405) 943-5288 Telefax: (405) 947-4149

| | | | |
|---|---|---|---|
| OK | CA 1884PE | MT | CA 1577 |
| AR | CA 2158 | ND | COCP 1065PE |
| KS | E-1926 | OH | CA03996 |
| LA | EF 0004800 | TX | F-8348 |
| MS | E-2537 | WV | C04507-00 |
| WY | E-0571 | | |


# RESUME

## TERRY L. BRITTENHAM

05/06/18

**PERSONAL**

United States Citizen
Date of Birth: February 20, 1953
Married, two children

**EDUCATION**

Bachelor of Science Degree in Petroleum Engineering with Honor
University of Wyoming, May, 1975

Continuing education approximately 30 hr/yr (see pp 13)

**PROFESSIONAL**

Registered/Licensed Professional Engineer:

AR, CA, CO, KS, LA, MI, MS, MT, ND,
NM, NY (ina), OH, OK, PA, TX, WV, WY

**AFFILIATIONS**

Society of Petroleum Engineers (SPE)
- 1976 Officer Wyoming Petroleum Section
- 1989-93 Officer Oklahoma City Section
- "25 Year Club"

National Society of Professional Engineers (NSPE)
Oklahoma Society of Professional Engineers (OSPE)
American Association of Drilling Engineers (AADE)
International Association of Drilling Contractors (IADC)
Association of Energy Service Companies (AESC)
- HSE Committee

API Subcommittee on Geothermal Cements
Rocky Mountain Association of Geologists
American Association of Petroleum Geologists (AAPG)

**PUBLICATIONS**

Technical papers and articles concerning well pressure and flow control, hostile environment drilling, directional drilling, geothermal drilling, new drilling equipment and techniques, igneous rock drilling, deep water drilling and coring and crustal scientific research.

Peer-reviewed works have been published in trade journals, technical conference proceedings, magazines and books (see pp 15).

**PATENTS** US 7,254,944 B1 Energy Storage System, August 14, 2007, co-inventor.

**PROFESSIONAL HISTORY**

**Employment Summary (Post-Degree)**

08/82 - ***Southern International, Incorporated***: Engineer, Petroleum Consultant, President, Director (Oklahoma City, OK).

11/80 - 07/82 ***PES, Inc.***: Petroleum Consultant, President, Director (Bozeman, MT).

09/77 - 10/80 ***Grace, Shursen, Moore & Associates***: Engineer, Petroleum Consultant, (Amarillo, TX).

09/76 - 08/77 ***The Monsanto Company***: Drilling Engineer - Madden Deep Unit (Casper, WY).

05/75 - 08/76 ***CONOCO***: Petroleum Engineer, Associate Engineer (Casper, WY).

**Employment Summary (Pre-Degree)**

09/74 - 04/75 ***US DOI Energy Research and Development Agency***: Engineering Technician (Laramie, WY).

05/74 - 09/74 ***Continental Oil Company***: Student Engineer (Lake Charles, LA).

11/73 - 04/74 ***Rocky Mountain Oil & Gas Association***: Engineering Technician (Cooper Cove, WY)

05/73 - 09/73 ***Continental Oil Company***: Student Engineer (Casper, WY).

05/72 - 09/72 ***Continental Oil Company***: Student Engineer (Casper, WY).

05/71 - 04/74 ***Various Drilling & Well Servicing Contractors***: Rig hand (Rocky Mountain Area)

05/70 - 04/71 ***Coleman & Son***: Oil Tool Mechanic, Welder's Helper (Casper, WY).

**Professional Experience**

***Southern International, Incorporated*** (August, 1982 to current time...)

Co-founded and owned by Terry Brittenham, SII is considerably experienced with a diversity of petroleum, geothermal and scientific endeavors industry and world-wide. The Company, its principals and technical staff are recognized for their particular expertise in well design, construction, servicing and operations planning and management, directional drilling, well control, well stimulation and environmental, safety and regulatory considerations and compliance. SII offers and has completed a wide spectrum of oil and gas engineering projects on behalf of stakeholders and affected parties under nearly every circumstance of occurrence, onshore and offshore, domestic and foreign, conventional and unconventional, exploration, development and mature operations, upstream and downstream, complex and critical to straightforward and routine including the following examples;

- design of drilling, completion, intervention and production equipment and facilities,

- well construction, operation, maintenance, and remedial design and supervision,
- operations review, oversight and performance analysis,
- property and joint operations management,
- surface use accommodation and conflict resolution,
- design and operations oversight for coal bed methane and fractured shales
- reservoir studies,
- property and reserve valuations,
- enhanced recovery feasibility studies,
- regulatory review, response and compliance,
- job safety analysis and hazard identification,
- environmental assessment and remediation,
- performance and failure analysis of oil and gas equipment, systems and personnel,
- accident and/or incident investigations involving personal injury and/or property damage,
- unitization proceedings,
- technical support for business transactions, contracts, agreements and risk management,
- dispute resolution,
- expert witness services and,
- support to parties involved with litigation, insurance underwriting and claims analysis.

SII is recognized for its active involvement in crustal science research. The company has furnished its unique expertise in this field to, among others, the Camborne School of Mines Hot Dry Rock Project (UK DOE), the Ocean Drilling Program (NSF), the Swedish State Power Board Deep Gas Project (GRI), the Socomine Geothermal Project (EEC-EU), the Shell International and BESTEC GmbH geothermal projects and the United Downs Hot Dry Rock Project.

SII has provided directional drilling, drilling contracting and oil and gas property operating services both for its own account and to the industry.

SII has provided training, schools, short courses and lectures to the industry in drilling and completion technology, practices and operations, advanced well control, drilling fluids technology, directional drilling and various related curricula including cost and risk management, safety, environmental and regulatory considerations and compliance. Competency and training assessments are frequently performed for Client companies and their employees.

In addition to Company management, Terry Brittenham's specific involvements in the business activities of SII are listed, in part, as follows.

## *Oil and Gas Engineering and Operations*

### Wellsite Supervision

Provided wellsite directional, drilling, evaluation, completion, stimulation and workover supervision to operators developing oil and gas properties.

Supervised well control operations.

Supervised field trials of various experimental drilling and coring equipment on behalf of the manufacturers and operators.

Supervised well testing operations.

Supervised the installation and retrofitting of production facilities.

### Drilling/Completion Engineering

Provided engineering design and planning of drilling, completion, workover, stimulation and remedial operations.

Provided operations surveillance.

Provided engineering services for the permitting and regulatory authorization of new-drill wells and intervention of existing wells.

Performed various analyses related to wells, facilities, systems, activities and operations including the failure of well services, tubulars, surface equipment, pipelines, stimulation treatments, cement systems, drilling, completion and workover tools, rigs and guying systems, drilling and completion fluids, well control, well stability and other assorted well difficulties and their associated operations.

Investigated and provided engineering analysis and consultancy regarding accidents and incidents occurring during well and wellsite operations which may have resulted in personal injury, property damage or environmental impact.

Provided consulting services regarding blow out and well control problems in Oklahoma, the Norwegian North Sea, Algeria and Italy.

Prepared engineering design for horizontal wells in the South China Sea, North Sea, Wyoming and Oklahoma.

Prepared feasibility studies and engineering services for clients undertaking oil and gas development offshore Western India, Russia and Kyrgystan.

Participated in the analysis and mitigation of various operational difficulties for an underground gas storage facility in Oklahoma.

Represented and provided consultancy to clients owning non-operating interests in oil and gas wells.

Provided technical and operations analyses and consultancy on behalf of surface owners and mineral lessees to resolve and accommodate surface use conflicts.

Assisted client drilling company to prepare bid proposals for development drilling in Oman.

Provided engineering services to client companies to procure and refurbish drilling rigs and equipment.

Provided engineering services regarding contract negotiations, construction and disputes.

Provided engineering analyses of reparation claims for various well incidents including blowout and well control events, completion, workover and production problems, subsurface equipment failure, rig collapse and overturn, personal injuries, property damage, loss of well, pollution events and contract application.

Reservoir Engineering

Prepared oil and gas property valuations for various clients for varied purposes including property acquisition and divestiture, estate management, dispute resolution and condemnation.

Prepared oil and gas reserve reports for client companies and evaluated third party reserve reports.

Represented various clients in oil and gas property unitization proceedings.

Provided gas well testing design and evaluation services for various operators.

Prepared waterflood feasibility studies.

Prepared reservoir studies to support well spacing, density and reservoir drilling, development and exploitation strategies and as a basis for drainage analyses.

Production/Facility Engineering, Property Management

Prepared oil and gas reservoir, production and facility management and operations studies for various operators and purposes.

Provided oil and gas producing property management and operation.

Designed oil and gas production and processing facilities and supervised construction for client companies.

Assisted client companies with regulatory compliance for their production and service wells and the associated facilities and activities.

Provided engineering services to manage environmental impact during oil and gas well operations on intra-city and flood-prone well sites and the operation of commercial saltwater disposal facilities.

Represented operating and non-operating working interest owners, mineral and royalty owners, landowners and other stakeholders in the management of their properties, including those conducted pursuant to a variety of operating and development agreements and conveyance documents.

Provided technical assistance to client surface landowners and mineral rights owners to resolve surface use conflicts.

Designed and supervised maintenance, repair, modification and/or replacement of oil and gas wells, pipelines, processing and storage facilities.

Provided engineering services to client companies to analyze various operational difficulties with their physical oil and gas infrastructure and to recommend, design and/or implement corrective measures.

Provided engineering services concerning environmental site assessments, incident investigation, nuisance and property damage claims, abatement, mitigation, remediaton and reclamation including liaison with regulatory authorities.

Provided engineering services to clients involved in various transactions related to oil and gas assets including, leaseholds, property, equipment, companies and businesses, and rights arising from agreements, contracts, leases and other conveyance documents. Such transactions have included purchase and sale, farmout, assignment, easement, assessments, joint operations, participation, condemnation, valuation and loss.

Investigated accidents and incidents related to oil and gas operations, wells, surface and subsurface production and well servicing equipment, storage and processing facilities, pipelines and the various activities associated thereon which may have resulted in spills, flows, fires, explosions, equipment failures and blowouts; some of which involved property damage and/or personal injury. These investigations have included cause and origin analyses and assessment of damage.

Provided engineering services to abate, remediate and reclaim environmental impact and/or property damage related to petroleum operations including blowouts, spills, abandoned facilities and normal construction activities.

Provided engineering support to client companies involved in disputes or litigation regarding oil and gas systems, facilities and operations.

Provided engineering support to manage and operate gas storage reservoir and facility.

*Earth Science Activities*

Prepared well design and operation plan to drill additional 3,000 m Hot Dry Rock well in the Camborne School Of Mines, Cornish geothermal facility. Furnished wellsite directional and drilling supervision.

Assisted in various engineering efforts to drill and complete a hydrothermal well for the U.K. A.E.A. geothermal project, Cleethorpes, England.

Prepared drilling and completion plans and economic feasibility studies for GEO Cornwall in their efforts to develop a full scale 6,000 m HDR geothermal facility in Cornwall, England.

Provided geothermal well planning services to client contractors and companies in the UK.

Provided drilling and completion engineering services and well stimulation design and pumping services to the Socomine, Hot Dry Rock Project, Soultz, France.

Provided engineering services to major oil company to characterize naturally-occurring brine water.

Provided engineering and operations consultancy to various clients involved with continental scientific drilling operations.

Designed hard rock seafloor drilling and coring system for the Ocean Drilling Program, Texas A&M University, subsequently used at several sites on the Mid-Atlantic Ridge in 3,500-4,000 m water depth. Provided ship-board drilling supervision for ODP Leg 106 at the Mid-Atlantic Ridge.

Provided engineering consultancy to the Ocean Drilling Program's Continental Lithosphere Committee for operations on the Mid-Atlantic Ridge and the East Pacific Rise.

Prepared design, operation plans and budget for seismometer stations constructed in Oklahoma by the USGS and in Germany by the DOD.

Provided drilling engineering, wellsite supervision, completion, stimulation, well testing and reservoir engineering services to the Vattenfall and DDP Deep Gas Projects, Orsa, Sweden.

Provided engineering consultancy to client company for mineral leaching operation in Israel.

*Dispute Resolution, Expert Witness, Litigation and Claims Consulting*

Provided expert witness testimony in State, Federal and Tribal Courts, the Oklahoma Corporation Commission, Wyoming Oil and Gas Commission, Texas Railroad Commission and arbitration and mediation proceedings.

Provided engineering services and consultation to parties involved in or contemplating insurance and contract claims and/or litigation.

Provided arbitration services to parties involved in oil and gas disputes.

*Industry Teaching, Training and Publishing*

Provided course instructor services to Preston L. Moore Inc. within the scope of Dr. Moore's Drilling Practices School.

Provided course instructor services for Drilling Practices and Advanced Well Control schools jointly offered by SII and Dr. Moore.

Provided course instructor services for Drilling Practices and Drilling Technology schools sponsored by Halliburton.

Guest lecturer for Halliburton's Modern Completion Practices school, OGCI's Drilling Practices school and Oklahoma State University's Continuing Education Program (Directional Drilling).

Prepared and taught "in-house" short courses in Drilling Fluids Technology, Introduction to Drilling Technology and Deep Well Completion and Stimulation Practices for major oil and gas operators and drilling contractors.

Provided course instructor services for NExT for their Wellsite Operations and Supervision Certificate schools.

Assisted in the preparation of competency evaluation materials and procedures for Halliburton and NExT in the disciplines of Drilling Engineering and Drilling Wellsite Supervision.

Assisted in the preparation of Horizontal Drilling Short Course presented by SII staff at Prairie View A&M University.

Prepared a "Drilling Practices Guide" for use by major offshore Operator.

***PES, Inc.*** (November, 1980 to November, 1982)

Provided wellsite drilling and completion supervision in the Rocky Mountain overthrust region of Montana and Utah. Specific studies undertaken during this effort are outlined below.

Influence of plastic salt formations on the drilling and casing of wells in the Overthrust Belt of northeastern Utah and Southwestern Wyoming.

Application of cross-linked polymers to control severe lost circulation in the Rocky Mountain overthrust region.

Performance of rotary-driven bottom hole assemblies to control deviation in the Rocky Mountain overthrust region.

Prepared well system design and operational planning for the Camborne School of Mines Hot Dry Rock Geothermal Project, Cornwall, England, as part of a research program to study the permeability enhancement of granite with specific reference to hot dry rock geothermal exploitation. Provided wellsite directional supervision and drilling supervision during the drilling and completion of a two-well, 2,200 m HDR system in Cornwall, England. Prepared well system design and cost estimate for a full scale 6,000 m HDR geothermal system for the Camborne site. Additional investigations conducted during the scope of this project are listed as follows.

Application of multilobe positive displacement drilling motors for directional drilling operations in granite.

Application of a three dimensional wellbore trajectory prediction computer code for directional drilling operations.

Application of new generation roller cone coring bits for cutting large diameter granite cores.

Application of large-diameter inertial gyro for surveying deep, open-hole wellbores.

Bottomhole assembly performance in directionally-drilled granite wellbores.

Prepared well system design, construction budget and operational plans for Pan American Energy Corporation, Los Alamos, New Mexico, to develop a 300 Mw hot dry rock geothermal energy facility in eastern Arizona.

Provided completion and stimulation consulting services to Kerr-McGee corporation during their efforts to drill and complete twenty eight wells below 20,000' in the deep Anadarko Basin of Oklahoma. A few of the special studies undertaken during this project are presented as follows.

Review of Morrow-Springer stimulation experience in the deep Anadarko Basin of Oklahoma.

Performance predictions of hydraulically fractured Springer reservoirs.

Containment of deeply-penetrating vertical fractures in Springer reservoirs.

Influence of reservoir pressure depletion on the conductivity of propped, vertical fractures in deep Springer gas reservoirs.

Application of the "mini frac” technique to aid in the preliminary evaluation of reservoir quality and the subsequent design and performance prediction of hydraulic fracturing in deep Springer gas reservoirs.

State of the art technology for gelling liquid carbon dioxide.

Application of aqueous clean-up fluids to remove near-wellbore damage caused by weighted, oil-based drilling fluids.

Design of well tubulars and completion techniques to optimize hydraulic stimulation of deep Springer reservoirs.

Laboratory testing of Springer sand core samples to determine fracture design parameters.

***Grace, Shursen, Moore & Associates*** (September, 1977 to October, 1980)

Principal assignments as drilling, completion and workover wellsite supervisor in the following oil and gas provinces.

Anadarko Basin of Oklahoma and Texas
Permian Basin of Texas
Powder River Basin of Wyoming
Denver Julesburg Basin of Colorado
Rocky Mountain Overthrust region of Wyoming and Utah
Green River Basin of Wyoming

As GSM staff engineer, prepared drilling and completion prognoses, AFE's, oil and gas property valuations and completed engineering projects of various nature.

Worked as consulting staff engineer for sizeable Oklahoma independent to evaluate and subsequently manage a field-wide well stimulation program. The program utilized the technology of horizontal fracturing to accelerate the recovery of low gravity crude oil in the Texas Panhandle Field dolomite reservoirs.

Worked as the consulting drilling engineer responsible for the subsurface design and construction of the US DOE-sponsored Geothermal Hot Dry Rock Demonstration Project, Ph II, managed by the Los Alamos National Laboratory, Los Alamos, New Mexico.

Undertook extensive assignments as wellsite supervisor and troubleshooter. Performed the following special investigations during the course of this assignment, to name a few.

Performance of various drilling, directional drilling and completion tools, equipment and materials in deep, hot, granite wellbores.

Development and testing of bits, drilling motors, shock subs, drilling jars, fishing tools, explosives, logging cables, float valves, wellhead systems, steering and surveying equipment, mud lubricants, corrosion inhibitors, elastomers and numerous other items vital to the successful completion of this project.

Evaluation of bottomhole assembly performance in directionally-drilled granite wellbores.

Design and installation of deep production casing string for a deviated, geothermal wellbore.

Influence of cyclical loading on deep, large diameter casing string.

Degradation of casing annular cement isolation under loads exceeding the shear strength of the cement and the hydraulic bond strength of the composite.

Performance of portland cement and substitutes under geothermal well conditions. Participated on the API subcommittee for geothermal cementing.

Performance of common drilling fluid lubricants in high temperature, granite wellbores.

Assignment as course instructor for Pressure Control and Advanced Pressure Control School taught in Trinidad, West Indies.

Provided wellsite supervision and trouble-shooting services to the Los Alamos National Laboratory Sigma Mesa hot aquifer project, Los Alamos, New Mexico.

***The Monsanto Company*** (September, 1976 to August, 1977)

Specifically assigned as the drilling engineer for an extensive exploratory and development drilling program in the Wind River Basin of central Wyoming. Principal duties included the design of drilling and completion programs with extended assignments as field supervisor. Typically supported four to seven rigs drilling simultaneously each with a 14,000' to 21,000' objective. Province characterized by shallow, unstable shale intervals, abnormal pressure and temperature, deep lost circulation and significant gas deliverability.

Undertook specific investigations and studies in the following matters.

Influence of elevated temperature (400°F) on the performance of weighted, water base drilling fluids, portland cement systems, drilling motors, logging and perforating equipment.

Laboratory investigation of the susceptibility of Waltman shale to hydration in an aqueous environment and the resulting alteration of physical properties.

Application of various pore pressure prediction techniques, principally derived for youthful sediments, to the Wind River Basin deep stratigraphy.

Use of drag bits to improve drilling economics in rotary-speed sensitive intervals of the intermediate depth Wind River Basin stratigraphy.

Massive hydraulic fracturing as a means to profitably develop the deep, low permeability Mesaverde gas sand reservoirs.

Application of shaly-sand log evaluation techniques in the upper cretaceous gas sand reservoirs.

Development of techniques to prevent and control top-to-bottom underground blowouts.

***CONOCO*** (May, 1972 to August, 1976)

Worked during the summers of 1972 and 1973 as a student engineer for Conoco in the Casper Division producing areas. Conoco's summer training program provided a broad exposure to field production operations with considerable involvement in well testing, production chemistry, field automation, facility maintenance and problem well analysis. Office responsibilities included rudimentary well design, AFE construction and the preparation of drilling/workover prognoses.

Accepted permanent employment with Conoco in May 1974 and worked during the summer of 1974 as a student drilling engineer in Conoco's CAGC offshore operations office in Lake Charles, Louisiana.

Principal duties included the preparation of well designs, drilling prognoses, rig and material schedules and AFE's for platform development in East and West Cameron, jack-up exploration in South Marsh Island and floating exploration in Vermilion block. Special investigations were performed in the following areas.

Influence of survey calculation technique on the subsea location of directionally-drilled wellbores.

Modification of drive pipe design to accommodate variable drive pipe diameters with a single size connector.

Implementation and analysis of a program to evaluate the performance of various surface-controlled subsurface safety valves.

Evaluation and implementation of solar-powered electrical generators on offshore platforms.

Analysis of mudline suspension system economics and implementation of design modifications to reduce abandonment costs.

Evaluation of atmospheric pressured subsea system for manned access to sub-sea wellheads and production equipment.

Following a leave of absence to complete degree requirements, resumed work for Conoco in the Casper Division office in May 1975 in petroleum engineering with particular emphasis on well stimulation, natural gas processing and enhanced oil recovery. Primary areas of responsibility included the Denver-Julesburg Basin of northern Colorado and the Powder River, Wind River, Bighorn and Green River Basins of Wyoming, Colorado and Montana.

Undertook special studies in the following topics.

Application of horizontal fracturing to accelerate recovery of low gravity crude in shallow, steeply dipping, gravity-driven reservoirs.

Application of various mobility control agents to enhance the secondary recovery of low gravity crude in reservoirs with low conformance factors.

Application of carbon dioxide in well stimulation.

Economic and physical considerations of re-fracturing wells completed in sandstone reservoirs.

Application of pulsed-neutron logging to the identification of hydrocarbon-bearing reservoirs behind casing.

***US DOI Energy Research and Development Agency*** (September, 1974 to April, 1975)

Worked part time during the 1974-75 school year as an engineering technician for the Laramie Energy Research Center in various thermal hydrocarbon recovery research programs. Duties included design and implementation of pilot projects for the in situ gasification of coal and above-ground retorting of oil shale.

Assisted in the implementation of computerized data acquisition systems and subsequent data and pilot test analysis.

***Rocky Mountain Oil and Gas Association*** (November, 1973 to April, 1974)

Worked part time during the 1973-74 school year as an engineering technician for the RMO&GA in cooperation with the Wyoming Occupational Health and Safety Commission constructing a field test facility to investigate Wind-Induced Load on Guyline Anchors. Duties included design and supervision of field construction.

***Various Drilling and Well Servicing Contractors*** (May, 1971 to April, 1974)

Worked during the summer of 1971 and part time thereafter on University holidays, weekends and other spare time during school year as rig hand in Wyoming, Utah, Colorado, Nebraska and Oklahoma.

***Coleman & Son*** (May, 1970 to April, 1971)

Worked during summer of 1970 and part time during the 1970-71 school year as an oil tool mechanic and welder's helper.

**CONTINUING EDUCATION (excluding self study, meetings, conferences & safety orientations)**

**Semester Courses - Accredited:**

| | | |
|---|---|---|
| Groundwater Hydrology | OSU-OKC | 1992 |
| Environmental Law | OSU-OKC | 1991 |

**Semester Courses - Non-Accredited:**

| | | |
|---|---|---|
| Russian I, II | FT VT | 1994 |
| Lotus 123 Advanced | FT VT | 1988 |
| IBM PC DOS Advanced | FT VT | 1988 |
| Lotus 123 Basic | FT VT | 1988 |
| IBM PC DOS Intro | FT VT | 1988 |
| Computer Literacy | FT VT | 1988 |

**Short Courses:**

| | | |
|---|---|---|
| Shale Gas: Environmental Considerations | DPD | 2018 |
| America's Greatest Projects & Their Engineers; The Alaska Pipeline | DPD | 2017 |
| Engineering Ethics: The East Ohio Gas Company Explosion | DPD | 2017 |
| South Dakota Technical Professions Laws and Rules | SDBTP | 2017 |
| Engineering Ethics: Social Responsibility vs. Legal Liability | DPD | 2016 |
| Engineering Ethics: Conservatism in Engineering Design | DPD | 2016 |
| Anatomy of a Waste Water Tank Explosion | DPD | 2016 |
| Failure Appraisement | DPD | 2016 |
| Static Electricity in Industry | DPD | 2016 |
| Ethical Issues in Forensic Engineering | Guyer | 2015 |

| | | |
|---|---|---|
| Engineering Ethics: The Piper Alpha Disaster | DPD | 2015 |
| Determining Negligence in Engineering Failures | DPD | 2015 |
| Laws, Rules and Ethics for Louisiana Engineers | DPD | 2015 |
| Pipeline Awareness for Excavator Operations | Paradigm | 2014 |
| Horizontal Well Completion and Stimulation Optimization | IPT | 2013 |
| Shale Oil and Tight Oil Fundamentals | SPE | 2013 |
| Oklahoma Water Laws and Regulations | HEI | 2012 |
| Case Studies of Three Explosions & a Chemical Accident | DPD | 2012 |
| Profiles of Energy Efficient Technologies | DPD | 2012 |
| OSHA Personal Protective Equipment | DPD | 2011 |
| Ethics: Guidelines for Professional Conduct | DPD | 2011 |
| Engineering Ethics: Accepting Gifts and Amenities | DPD | 2011 |
| Laws, Rules & Ethics for New Mexico Engineers | DPD | 2011 |
| Advanced Oil & Gas Drilling & Completion Technologies | DPD | 2011 |
| AC Rig Control Systems | Omron | 2011 |
| Engineering Patents | DPD | 2010 |
| Electrostatic Treating of Emulsions | DPD | 2010 |
| Professional Ethics for Texas Engineers-Rev 2010 | DPD | 2010 |
| OSHA General Safety and Health Provisions | GIS | 2009 |
| Job Hazard Analysis | GIS | 2009 |
| Oil & Gas-Chapter 52 of Texas Natural Resources Code | GIS | 2009 |
| Ethics Using the Rules of Practice | GIS | 2009 |
| Oilwell Derrick Stability & Guywire Anchor Systems | GIS | 2008 |
| Professional Ethics for Petroleum Engineers | GIS | 2008 |
| Ethics for Professional Engineers | SPEE | 2007 |
| Coalbed Methane | SPE | 2007 |
| Case Studies Using the NSPE Code of Ethics | GIS | 2006 |
| Professional Ethics for Engineering | GIS | 2006 |
| Ethics Using the SPE Guide for Professional Conduct | GIS | 2006 |
| ACEC Ethics Guidelines | GIS | 2006 |
| Drilling Seminar: Drilling Fluids Technology | AADE | 2006 |
| Legal Issues for Oklahoma Professional Engineers | Halfmoon | 2005 |
| Insurance and Risk Management in the Oil and Gas Industry | SRI | 2005 |
| Drilling Seminar: Drill Bit Technology | AADE | 2005 |
| Drilling Seminar: Casing Buckling, Expandable Casing, Casing Drilling, Directional, Rotary Steerable, and Horizontal Drilling | SPE | 2004 |
| First Aid/Adult CPR & AED | AHA | 2003 |
| The Most Difficult Questions for Experts | SEAK | 2003 |
| How to Be an Effective and Ethical Expert Witness | SEAK | 2003 |
| The Expert Deposition | SEAK | 2003 |
| Marketing Your Forensic Practice | SEAK | 2001 |
| OCC Oil & Gas Workshop: Tools, Techniques & Trials | OGS/OCC | 2001 |
| Microsoft Office 97 | Metro-Tech | 1999 |
| OCC Administrative and Hearing Processes | OSU-OKC | 1999 |
| Petroleum Drilling Fluids | SPE | 1999 |
| Successful Drilling Practices; Extended Reach Drilling | GRI/OGCI | 1996 |
| Criminal Enforcement Under Environmental Law | OSU-OKC | 1991 |

| | | |
|---|---|---|
| Horizontal Well Technology | Joshi | 1991 |
| Economic Considerations of Horizontal Wells | OSU-OKC | 1991 |
| Horizontal Drilling | Smith Int'l | 1990 |
| Oilfield Pollution Abatement Strategies | OSU-OKC | 1990 |
| Horizontal Wells | Halliburton | 1990 |
| Petroleum Engineering Numerical Methods | OU | 1989 |
| Basic Well Control | Moore/Abel | 1986 |
| Pressure Control Refresher | GSM | 1983 |
| Deep Anadarko Basin Stimulation | Dowell | 1982 |
| Geothermal Well Drilling and Completion Practices | GRC | 1982 |
| Geothermal Completion Practices | LANL/GSM | 1980 |
| Geothermal Drilling and Completion Technology | GRC | 1980 |
| Drilling Practices | PL Moore | 1977 |
| Oil Well Blowout Control | OU/IADC | 1977 |
| Practical Kick Control | IMCO | 1977 |
| Well Stimulation | Conoco | 1976 |
| Basic Well Logging | Conoco | 1976 |
| Water Control-Production Logging Tools | Conoco | 1976 |
| Beam Pumping Engineering and Operating | Conoco | 1976 |

**PAPERS, PUBLICATIONS AND BOOKS**

2003 - Co-author, "Advanced Well Control", SPE Text Book Series, Vol. 10

1987 - Co-author, "Drilling of the Gravberg No. 1-Review and Operational Problems", presented at the Third International Symposium on Observation of the Continental Crust through Drilling, September 7-10, 1987, Mora, Sweden and published in EXPLORATION OF THE DEEP CONTINENTAL CRUST; DEEP DRILLING IN CRYSTALLINE BEDROCK, Vol I, (1988) pp 71-80

1986 - Co-author "Development of a Scientific Drilling and Coring System for the Mid-Atlantic Ridge", presented at the 1986 ASME Energy Sources Technology Conference and Exhibition, February 23-27, 1986, New Orleans, Louisiana.

1982 - Contributor (Co-author) SPE No. 11168 "New Low-Speed High-Torque Motor Experience in Europe". presented at the 57th Annual Technical Conference and Exhibition, September 26-29, 1982, New Orleans, Louisiana.

1981 - Author, "Directional Equipment and Techniques for Deep Hot Granite Wells", JOURNAL OF PETROLEUM TECHNOLOGY, Vol. 34 (7) (July, 1982) pp. 1421-30.

1980 - Co-author, "Directional Drilling Equipment for Hot Granite Wells", presented at International Conference on Geothermal Drilling and Completion Technology, January 21-23, 1981, Albuquerque, New Mexico.

1980 - Author, "Hot Abrasive Formations Test New Drilling Equipment", WORLD OIL (October 1980) 95-102.

1980 - Co-author GRC Paper, "Directional Drilling Operations Hot Dry Rock Well EE-2". Presented at 1980 Annual Geothermal Resources Council; September 9-11, 1980, Salt Lake City, Utah.

1980 - Author SPE No. 9227, "Directional Drilling Equipment and Techniques for Deep, Hot Granite Wells", presented at 55th Annual Technical Conference and Exhibition, September 21-24, 1980, Dallas, Texas.

1979 - Co-author SPE No. 8268 "Equipment for Drilling and Fracturing Hot Granite Wells", presented at the 54th Annual Technical Conference and Exhibition, September 23-26, 1979, Las Vegas, Nevada.

# APPENDIX C

# EXPERT TRIAL OR DEPOSITION TESTIMONY IN THE PRECEDING FOUR YEARS

| No | Case | Court | Case No. |
|---|---|---|---|
| 1 | Binkley, et al vs. White Star Petroleum, LLC, Mid-Con Energy Partners, LLP, Berexco, LLC, Tarka Energy, LLC, Crown Energy Co., Eastok Pipeline, LLC and John Does 1-12 | District Court of Osage County, OK | Case No. CJ-2017-44 |
| 2 | Jesus Hidalgo vs. CWS Wireline, LLC, Crescent Consulting, and Steve Hitshew and XYH, LLC | District Court of Oklahoma County, OK | Case No. CJ-2017-360 |
| 3 | Sheila Turner, Individually and As Next Friend of David Justin Turner, Jr., and Aleigha Turner, Minor Children and Danny Earl Cain as Representative of the Estate of David Justin Turner, Jr., and Aleigha Turner, Minor Children, vs. Basic Energy Services, LP Midstates Petroleum Company, Knight Oil Tools, LLC, Schwab's Tinker Shop, Intl., Red's Satellite Services, Taylor Industries, and Guice Engineering | 295th Judicial Court of Harris County, TX | Cause No. 2015-73209 |
| 4 | Adam Peterson vs. Murex Petroleum Corporation, Mickey Peck, Stokes and Spiehler, Stokes and Spiehler Onshore, Inc., Earl Britzenhoff, Phoenix Operating Company | United States District Court, District of North Dakota, Northwest Division | Case No. 1:17-cv-00165-CSM |
| 5 | Panther Drilling Systems, LLC vs. Jay-Bee Oil & Gas, Inc., Jay-Bee Production Co. and JB Exploration I, LLC | Circuit Court of Tyler County, WV | Civil Action No. 15-P-9 |
| 6 | Payne Exploration Company, et al. vs. Sabine Pipe, Inc., Tenaris Global Services USA Corporation, et al. | District Court of Oklahoma County, OK | Case No. CJ-2017-1470 |
| 7 | Cedric Amaya vs. EOG Resources, Inc., Renegade Well Services, LLC, Oak Lease Service Co. and Enersafe, Inc. and Taylor chase Routon vs. EOG Resources, Inc., Renegade Well Services, LLC, Oak Lease Service Co., Enersafe, Inc. and Dale Willenbring, P.E. and Josh Stralow | 295th Judicial District Court of Harris County, TX | Cause No. 2015-34043 |
| 8 | Johnathan David Rice and Diana Rice vs. Lewis Energy Group, LP, Lewis Petro Properties, Inc., Lewis Resource Management, LLC, et.al. | American Tribunals of the American Arbitration Association | Arbitration No. 01-16-0000-0683 |
| 9 | Steve Caruthers vs. TCI Services, Inc., TCI Services Holdings, Inc., TEAM Industrial Services, Inc., TEAM Inc., and Tank Consultants, Inc. | District Court of Tulsa County, OK | Case No. CJ-2016-02480 |
| 10 | Certain Underwriters at Lloyd's London and Certain Insurance Companies, Walter Oil and Gas Corporation, Tana Exploration Company, LLC and Helis Oil and Gas Company, LLC vs. Cameron International Corporation, Axon Pressure Products, Inc., Axon EP, Inc., Lloyd's Register Drilling Integrity Services, Inc., ASAP Industries, LLC, Partek Laboratories, Inc., and CAD Control Systems, Inc. | United States District Court, Southern District of Texas, Houston Division | Civil Action No. 4:14-CV-02105 |
| 11 | Brad Lodholtz and Courtney Lodholtz vs. Continental Resources, Inc. | United States District Court, District of North Dakota, Northwestern Division | Civil No. 4:15-CV-116 |
| 12 | Adelaida Alvarado and Irineo Alvarado and Maria Moctezuma v. Trinidad Drilling Limited Partnership, Chesapeake Operating, Inc., Victory rig Equipment Corporation, National Oilwell Varco, LP, National Oilwell Varco, Inc., Varco, LP, Super Slings, Inc. and Ted Devaney | 270th Judicial District Court, Harris Co., TX | Cause No. 2012-39781 |
| 13 | Certain Underwriters at Lloyds London Syndicates, International Insurance Co. of Hannover, Ltd., and New York Marine and General Insurance Co., Subrogees of Noram Drilling Company v. Cimarex Energy Co. | 385th Judicial District Court, Midland Co., TX | Cause No. CV-51496 |
| 14 | Luz Vargas v. Banta Oilfield Services, Inc., Harry Leyva, Mewbourne Oil Company, Steven Cooper and Leonard Pounds | Fifth Judicial District Court, Eddy County, NM | Case No. D-503-CV-2015-00574 |
| 15 | Nathaniel Fleck and Alma Bergman as Co-Trustees of the George J. Fleck Trust v. Missouri River Royalty Corporation, Exxon Mobil Corporation, and Mountain Pacific General, Inc. | McKenzie County District Court, North West Judicial District, ND | Case No. 27-2012-CV-169 |
| 16 | Robert Simmons v. Cudd Pressure Control, Inc., Murex Petroleum Corporation, Specialized Technical Threading, Inc., Tillman & Associates, LLC and Robert Hoffpauir, Jr. and Murex Petroleum Corporation v. Wisco, Inc. | Williams County District Court, North West Judicial District, ND | Case No. 53-2014-CV-00665 |
| 17 | John Aragon, Estate of Fabian Martinez et al. v. Agave Energy Company | First Judicial District, Santa Fe County, NM | Case No. D-101-CV-2014 01811 |
| 18 | Claude C. Arnold Non-Operated Royalty Interest Properties, LLC, et al. v. Courson Oil and Gas Inc., Cabot Oil and Gas Corporation, et al. | District Court of Beaver Co., OK | Case No. CV-2012-42 |
| 19 | Application of Oklahoma Energy Acquisitions, LP Horizontal Well Spacing, Location Exception, Waiver | Corporation Commission of the State of Oklahoma | Cause CD No. 201600086<br>Cause CD No. 201600087<br>Cause CD No. 201600088 |
| 20 | Scott Manley and Jose Betancur v. XTO Energy, Inc., | 5th Judicial District Court, Eddy Co., NM | Case No. D-503-CV-2013-00241 |

| No | Case | Court | Case No. |
|---|---|---|---|
| | Weatherford Artificial Lift Sysems, Inc., Weatherford International, Inc., Weatherford U.S., LP, Basic Energy Services, Inc., BOS Roustabout Service, LLC, Gabriel Valdez and Randy Green | | |
| 21 | Dominic Edmonds v. EOG Resources, Inc., Richard Tom Chaney, Hebbronville Lone Star Rentals, Inc., Basic Energy Services, TC Safety | 215th Judicial District Court, Harris Co., TX | Cause No. 2013-67786 |
| 22 | Admiral Insurance Company v. Petrohawk Energy Corporation, Patterson-UTI Drilling Company, LLC and Stage 3 Separation, Inc. | 113th Judicial District Court, Harris Co., TX | Cause No. 2011-61026 |
| 23 | Sterling Sugars, Inc. v. Amerada Hess Corporation, et al. | 17th Judicial District Court, Parish of St. Mary, LA | Cause No. 100091, Div. "D" |

# APPENDIX D

# DOCUMENTS CONSIDERED IN FORMING OPINIONS

## DOCUMENTS CONSIDERED IN FORMING OPINIONS

The opinions expressed in this report are based upon my education, training, and experience and on my review of certain materials, including all of the materials cited in my Report, as well as the following:

Documents Filed with and Issued by the Court:

1. Third Consolidated Amended Complaint for Violations of the Federal Securities Laws, No. 5:12-cv-01341 (Doc. No. 225).

2. Protective Order, No. 5:12-cv-01341 (Doc. No. 322).

3. Second Amended Scheduling Order, No. 5:12-cv-01341 (Doc. No. 410).

4. Consolidated Amended Complaint for Violations of the Federal Securities Laws, No. 5:15-cv-00634 (Doc. No. 78)

5. [Proposed] Stipulated Protective Order, 5:15-cv-00634 (Doc. No. 190).

6. Second Amended Scheduling Order, No. 5:15-cv-00634 (Doc. No. 302).

Deposition Transcripts and Exhibits.

7. David Miller (Dec. 12-13, 2018).

8. Lance Galvin (Aug. 15, 2018; Jan. 8-9, 2019).

9. Lindsey Walton (Jan. 31, 2019).

10. Danh Nguyen (Feb. 27, 2019).

11. Rodney Johnson (Mar. 14-15, 2019).

Documents and Information Obtained from Other Sources

12. Well records from IHS and OCC.

13. "SEC Reserves Reporting; Jan 1 2010 revisions", 17 CFR Parts 210, 211, 229 and 249, SPE/API Joint Meeting.

14. McKenna, Robert D., "Petroleum Geology of the Mississippian Lime in Parts of Payne and Pawnee Counties, Oklahoma", Master's Thesis, Oklahoma State University (May, 1982).

15. Garb, Forrest A., "Assessing Risk in Estimating Hydrocarbon Reserves and in Evaluating Hydrocarbon Producing Properties", (pp 765-778) Journal of Petroleum Technology, (June 1988).

16. Garb, Forrest A., "Oil and Gas Reserves Classification, Estimation, and Evaluation", (pp 373-390) Journal of Petroleum Technology, (March 1985).

17. Fetkovich, M.J., "Decline Curve Analysis Using Type Curves" SPE 4629, (pp 1065-1077) Journal of Petroleum Technology (June 1980).

18. Arps, J.J., "Analysis of Decline Curves", Petroleum Technology, AIME, T.P. 1758, Chapter II. Petroleum Economics, pp 228-247 (September 1944).

19. Arps, J.J., "Estimation of Primary Oil Reserves", Petroleum Transactions, AIME, Vol 207, pp 182-191 (1956).

20. "Thirty-Third Annual Survey of Parameters Used in Property Evaluation", Society of Petroleum Engineers (June 2014).

21. "Guidelines for the Application of Petroleum Reserves Definitions", Society of Petroleum Evaluation Engineers (October 1998).

22. "Guidelines for the Evaluation of Petroleum Reserves and Resources", Society of Petroleum Engineers, Inc. (2001).

23. "Guidelines for the Practical Evaluation of Undeveloped Reserves in Resource Plays", Monograph 3, Society of Petroleum Evaluation Engineers (2010).

24. "Standards Pertaining to the Estimating and Auditing of Oil and Gas Reserves Information", Approved by the Board of Society of Petroleum Engineers in June, 2001, Revision as of February 19, 2007.

25. Watson, D. *et al*, "Advanced Well Control", Society of Petroleum Engineers, Richardson Texas (2003).

26. Gatlin, Carl, "Petroleum Engineering", Prentice-Hall, Inc., Englewood Cliffs, N.J. (1960).

Figure 1




Source: http://www.resonantlinktechnology.com/onshore-and-offshore-esp-vfd-systems/

Figure 2




Source: https://www.energyindepth.org/wp-content/uploads/2009/03/API-HF.pdf

# Figure 3

**Sandridge Puffinbarger 1-28H**
**Directional Profile View**




Source: IHS Data

# Figure 4

**Trust I AMI**




Source: Trust I Registration Statement

# Figure 5

**Trust II AMI**




Source: Trust II Registration Statement

# Figure 6

## SandRidge Horizontal Mississippian Wells Completed 2010-2012




Source: IHS Data

# Figure 7

## SandRidge Horizontal Mississippian Wells Completed 2010-2012




Source: IHS Data

Figure 8

## Chesapeake Horizontal Mississippian Wells Completed 2007-2012




Source: IHS Data

Figure 9

**Chesapeake Horizontal Mississippian Wells Completed 2007-2012**




Source: IHS Data

Figure 10

**All Operators - Horizontal Mississippian Wells Completed 2007-2012**




Source: IHS Data

Figure 11

**All Operators - Horizontal Mississippian Wells Completed 2007-2012 , with Highlights**




Source: IHS Data

Figure 12

# Horizontal Mississippian Oil – Industry Activity






SANDRIDGE THE POWER OF US

SD-SECURITIES-0001422

Source: SD-SECURITIES-001378