# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

DUANE & VIRGINIA LANIER TRUST, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

SANDRIDGE MISSISSIPPIAN TRUST I, et al.,

Defendants.

Case No. CIV-15-634-G

---

IN RE: SANDRIDGE ENERGY, INC. SECURITIES LITIGATION,

Case No. CIV-12-1341-G

---

This Document Relates To ALL ACTIONS

VIDEOTAPED DEPOSITION OF TERRY BRITTENHAM

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON JUNE 4, 2019

REPORTED BY: KAREN B. JOHNSON, CSR

A P P E A R A N C E S

For the Lanier Trust Plaintiffs:

Jonathan Horne
The Rosen Law Firm
275 Madison Avenue
34th Floor
New York, New York 10016
(212)686-1060
jhorne@rosenlegal.com

For the Glitz Lead Plaintiffs:

Francis P. Karam
Robbins, Geller, Rudman & Dowd
58 South Service Road, Suite 200
Melville, New York 11747
(631)367-7100
fkaram@rgrdlaw.com

For the SandRidge Mississippian Trust I:

David Springer
Bracewell
111 Congress Avenue, Suite 2300
Austin, Texas 78701-4061
(512)494-3617
david.springer@bracewell.com

For Mr. Tom Ward:

Steven M. Bauer
Latham & Watkins
505 Montgomery Street
Suite 1900
San Francisco, California 94111
(415)391-0600
steve.bauer@lw.com

David Johnson
Latham & Watkins
555 11th Street N.W., Suite 1000
Washington, D.C.
(202)637-2200
david.johnson@lw.com

George S. Corbyn, Jr.
Corbyn Law Firm
One Leadership Square
211 North Robinson, Suite 1910
Oklahoma City, Oklahoma 73102

For SandRidge Energy, Mr. James Bennett, Mr. Matt Grubb and the Witness:

C. William Phillips
Covington & Burling
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212)841-1213
cphillips@cov.com

For SandRidge:

Kiran A. Phansalkar
Conner & Winters
211 North Robinson
Suite 1700
One Leadership Square
Oklahoma City, Oklahoma 73102
(405)272-5711
kphansalkar@cwlaw.com

Also Present:

Matt Thompson
Letha Lencioni
Robert Rasor (by phone)

Videographer:

Bruce Rodgers

CONTENTS


| | Page |
|---|---|
| Direct Examination by Mr. Horne | 7 |
| Cross-Examination by Mr. Karam | 166 |
| Cross-Examination by Mr. Bauer | 227 |


EXHIBITS


| | | Page |
|---|---|---|
| Exhibit Number 1 | Mr. Brittenham's Report | 17 |
| Exhibit Number 2 | SEC Letter Trust I | 23 |
| Exhibit Number 3 | SEC Letter Trust II | 24 |
| Exhibit Number 4 | CFR Printout | 31 |
| Exhibit Number 5 | Mr. Tomanek's Report | 97 |
| Exhibit Number 6 | E-mail SD Securities 0435928 | 133 |
| Exhibit Number 7 | Mr. Brittenham's Report | 162 |
| Exhibit Number 8 | Power Point Printout | 174 |
| Exhibit Number 9 | Mr. Crane's Report | 209 |

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and among the attorneys for the respective parties hereto that the deposition of TERRY BRITTENHAM may be taken on behalf of the Plaintiffs on the 4TH of JUNE, 2019, in OKLAHOMA CITY, OKLAHOMA, by Karen Johnson, Certified Shorthand Reporter for the State of Oklahoma, taken pursuant to Federal Rules of Civil Procedure.

* * * * * *

THE VIDEOGRAPHER: We're going on the record. The time is 9:05, today's date is June 6, 2019, for the deposition of Terry Brittenham in the case of Duane and Virginia Lanier Trust versus SandRidge Mississippian Trust I, Case Number CIV-15-634-G. Will all attorneys present please state your name and who you represent.

MR. HORNE: Jonathan Horne, Rosen Law Firm for the Lanier plaintiffs.

MR. KARAM: Francis Karam of Robbins, Geller, Rudman & Dowd for the Glitz lead plaintiffs.

MR. SPRINGER: David Springer of Bracewell for defendant SandRidge Mississippian Trust I in the Lanier action.

MR. PHILLIPS: Will Phillips, Covington & Burling, for defendants Matt Grubb, James Bennett, and SandRidge.

MR. CORBYN: George Corbyn for Tom Ward.

MR. JOHNSON: David Johnson, Latham & Watkins for Tom Ward.

MR. BAUER: Steve Bauer, Latham, Tom Ward.

VIDEOGRAPHER: Will the reporter please swear in the witness.

TERRY BRITTENHAM,

after having been first duly sworn at 9:05 a.m.

deposes and says in reply to the questions propounded as follows, to wit:

DIRECT EXAMINATION

BY MR. HORNE:

Q Good morning, Mr. Brittenham, we met a moment ago, I get a feeling you know this already, but I'm going to run through a couple rules first. The court reporter is trying to take down what we're saying, and that means we each have to give verbal answers. So no nodding, no uh-huh, just yes, no, whatever the answer is. The court reporter is going to hate us if we speak over each other, and so I'm going to let you finish your answers and I'd ask that you let me finish my questions. Is that okay with you?

A Yeah, yes.

Q All right. Can you please state for me what your qualifications are to provide an expert opinion in this case?

A Based on my education, experience and training, the work I performed in this matter, make up the basis for my qualifications. My education includes bachelor's degree of petroleum engineering, 1975, subsequent industry experience working as a petroleum engineer, subsequent industry experience

working in -- in Oklahoma during the course of the Mississippian play, my review of -- my review of parts of the evidence relative to my work -- relevant to my work in this matter. In general, that's it.

Q Let's break that down. Your experience, I'm not going to ask you about your education, but your experience as a petroleum engineer, what did you do after college?

A I went to work for a major oil company while I was in college, worked for Continental Oil Company as a petroleum engineer, then I went to work for second major oil company, Monsanto Company, left Monsanto, went to work for a large consulting firm, petroleum oil and gas consulting firm, and then I went to work for myself beginning in 1980, and I've been working for myself ever since.

Q Okay. And while you were at Continental, did you -- were you responsible for any reserves estimation?

A Yes.

Q Tell me about that.

A As an area engineer in the Casper office, well, quite frankly, all my assignments, but as an area engineer, I was responsible for the annual

estimation of oil and gas reserves for the property areas of which I had oversight for the purposes -- for corporate purposes of reporting and other financial aspects. From a day-to-day standpoint, I was responsible to estimate reserves and value of reserves with regard to proposed expenditure of money to drill wells, complete wells, recomplete wells, other investments to enhance or acquire or dispose of oil and gas properties, in general, that was the work.

Q Okay. And when you were at Monsanto, were you responsible for estimating or auditing reserves?

A Yes.

Q Okay. Tell me a little bit -- tell me a little bit about that.

A Sure. Once again, I had assignments in -- in two areas, two geographic areas, and during the course of my work there, I was responsible to -- for the same purposes, to generate reserves forecasts and valuation of those reserves for proposed projects, for drilling new wells, for continuing to produce existing wells, for modifications, recompletions of existing wells or perhaps even idle wells.

Q And what percentage of your work was

reserves estimation?

A From the time spent at Monsanto was probably 10, 15 percent of my time. Of course, I worked seven days a week.

Q I know the life. Okay. And when you joined a consulting firm, did you do any reserves estimations or auditing?

A Didn't do any auditing. I worked a portion of my time at GSM as a staff engineer in support of other engineers' reserves analysis, estimating reserves for client companies. I also, once again, did similar work as I did at Monsanto and Conoco, but now for client companies, where I would have to work up the costs to drill and complete a well in Oklahoma, forecast the reserves, forecast the value of the reserves, do the economic analysis rate of return, try to compare that with other opportunities for investment for, say, Kerr-McGee as an example or other client companies. So the nature of my work really didn't change, the location of it, the client base got larger, changed.

Q And were you involved in creating type curves?

A Where needed, yes.

Q Okay. You said you went into --

A Just to make sure we understand, there's various types of type curves, but I was involved with creating various types of type curves for reservoir engineering analysis of well and reservoir performance.
Q Okay. And you said that in 1980 you went into business for yourself, is that at the company where you are now?
A No, 1980, I went to work for myself with a company called PES, Inc.
Q Uh-huh. And how long did that last?
A Quit working for the company in about 1982. I think the company survived a year or two after that, but that's when I quit working for it.
Q Okay. And after PES, Inc., did you join your current firm?
A Yes.
Q Okay. And were you a founder of that firm?
A Yes.
Q Okay. And tell me a little bit about your responsibilities at that firm, let's say 19 -- strike that.
Did your responsibilities at that firm change over time?

A Generally, yes. Well, the work I performed, the scope of the work and the clients changed over time, but it was still petroleum engineering.
Q Okay. And what types of work do you do at your current firm?
A It's changed over time, my current firm has been involved with -- I'll just start on one end, with exploration for oil and gas in Oklahoma, operation, producing of wells. We've been involved with drilling contracting, directional drilling, well site supervision, the consulting engineering part of my work, our work has been involved with most all upstream activities for about every stakeholder you can imagine.
I do consulting engineering work for oil producers, oil and gas companies, for non-operating working interest owners, for royalty owners, for landowners, for academic institutions, government institutions, research organizations. I teach schools, industry schools about various aspects of petroleum engineering and operations. Since, oh, I'm going to say probably about the late 1980s, from time to time I've been asked to provide engineering work in support of either dispute resolution or

litigation activities, sometimes projects that aren't in litigation that ultimately end up there. Oftentimes that results in providing testimony as an expert witness in trial and deposition or administrative proceedings, such as the Oklahoma Corporation Commission or Wyoming Oil and Gas Commission or Texas Railroad Commission.

A portion of my engineering activities is related to what I call forensic practice, truly forensic practice, otherwise, in the business of oil and gas production and well construction, well operations, things don't go as planned, things break, so part of my work has been to figure out what went wrong, fix it, correct it for the future, that sort of thing. And that's just an overview, I got a 15-page, 16, whatever, resume' that comes a little closer. I'll be glad to expound anywhere you want.

Q Okay. Let's say in the past 19 years, so since 2000, have you done any reserves estimation work?

A Yes.

Q And what percentage of your time was spent on reserves estimation?

A Of my billable time, projects that involve

reserve estimation probably are in the 15 to 30 percent fraction over that 19-year period.

Q And has that changed over time?

A Oh, yeah, it changes up and down regularly, but overall, that's probably a pretty good average.

Q Okay. And is there a trend during those 19 years of either increasing or decreasing reserves estimation?

A I don't think so.

Q Okay. What percentage of your work is related to litigation, dispute resolution, and your forensic practice?

A During the last 19 years again or --

Q Uh-huh, during the last 19 years. And thank you for the clarification.

A Sure. My personal time, probably something in excess of one-half.

Q And during that time, have you worked for SandRidge?

A As I recall, yes.

Q How many times?

A Once, maybe twice, something like that.

Q Have you ever worked opposite SandRidge?

A Not that I recall.

Q Are you a trained geologist?
A I'm not a degreed geologist, no.
Q And what does that mean?
A As a part of petroleum engineering, probably I took as many geoscience courses as I did engineering courses, so I have a strong training in geology. A good portion of my work, petroleum engineer's work, is related to geology, so I have -- let me put this, petroleum geology. So I have a practical understanding in the day-to-day conduct of my engineering practice as it relates to the flow of fluids through pores and permeable rocks, the nature and occurrence of rocks.

As a part of my teaching schools and writing books, I have expertise in -- in the origin, nature and occurrence and prediction of subsurface pore pressures, so a lot of that has to do with the understanding of the history, origin and accumulation of rocks, geology, and the fluids that they contain. A good portion -- you looked at my resume', but a good portion of my work has been involved with what I call earth science, otherwise, have been involved with geothermal exploration, production, an awful lot of scientific drilling and exploration for pure science activities.

For instance, I was a science manager on the Dahla Deep Gas project. I've worked for the deep sea drilling program all around the world. I was involved with continental scientific drilling in the United States and Europe, Russia. I've been involved with the hot dry rock research in the United States and elsewhere, so I have a strong background in geology, and certainly, it's focused on construction of wells, production of fluids from the subsurface, prediction of subsurface conditions. I belong to the AAPG, Wyoming Association of Geologists, so I try to stay current with relevant geological concepts and investigations.

Q Has a judge ever accepted you as an expert on geology?

A I'm going to say no, with the possible exception of the administrative proceedings. There have been times when it's not uncommon to have, for instance, at the Oklahoma Corporation Commission for a petroleum engineer such as myself to offer opinions with regard to geological issues.

Q And when you offer opinions with regard to geological issues, are you relying on the work of any geologist?

A If there's geological evidence for me to

consider, I might, but generally I do my own work.
Q And did anyone help you draft your report?
A Not substantive. I've had administrative help in formatting, that sort of thing, that's it.
Q Okay. Did a geologist help you draft your report?
A No.
Q Okay. Did you talk about your report with anyone other than your counsel?
A Outside of staff, no.
Q Okay. What kinds of issues have you been asked to opine on in connection with reserves estimation?
A Tried to identify answer to that question --
Q Why don't -- you know what --
A -- on Page 1 of my report.
Q Let's -- why don't I give you your report and we can mark it as Exhibit 1.
A That's fine.
Q And you can refer to that. It's just a little cleaner for the record.
(Exhibit Number 1 marked for identification and made part of the record)

MR. HORNE: Could you reread the question, please?

COURT REPORTER: "What kinds of issues have you been asked to opine on in connection with reserves estimation?"

THE WITNESS: You want to read my answer, too?

MR. HORNE: Oh, was that your complete answer?

COURT REPORTER: "Tried to identify answer to that question -- "

THE WITNESS: I guess it didn't get finished. On Page 1 of my report under this heading of assignment, Items A through F, I identified those items I was asked to address.

Q (By Mr. Horne) What about in previous instances?

A I don't understand your question.

Q Sure. Let me rephrase. Have you been asked to opine in litigation on reserves estimation?

A Yes.

Q What kinds of questions were you asked to opine on in litigation on reserves estimation?

A The results of my work, the methodology employed, comparisons with others, other estimates,

anything having to do with clarifying my work, I guess.
Q What about total reserves estimates?
A What about them?
Q Were you asked to opine on total reserves estimates?
A In prior cases?
Q Yes.
A I don't understand your question.
Q Were you asked to provide an opinion that the reserves of certain area or certain well were X?
A In prior matters?
Q Yes.
A Prior work? Yes.
Q Do you wish to amend your opinions in any way in response to anything that has happened since the date of your report?
A Not that I can think of, no.
Q Okay. What is your understanding of proved reserves?
A Proved reserves is a defined term, been defined by people like the SEC or SPE, and generally they're consistent, but proved reserves are oil and gas reserves, we can go to the definition, but this is off the top of my head, oil and gas reserves that

can be forecast or predicted to be produced by existing infrastructure under existing conditions for the properties in question.

Q Okay. And you testified that you've been involved in reserves estimation; is that correct?

A I don't recall that question specifically, but that question would be correct.

Q Okay. And did the reserves estimation include estimation of proved reserves?

A Yes.

Q Okay. And was there any instance in which the amount of proved reserves that you estimated fell in previous years?

MR. BAUER: Objection.

THE WITNESS: I need you to clarify your question.

Q (By Mr. Horne) Did I say previous? I meant later, sorry, let me -- let me rephrase. Were there any instances in which the amount of proved reserves that you estimated actually fell in later years?

A I can recall a situation -- the answer would generally be I'm sure there are. To give you -- to cite them one by one would be impossible for me, but it was typical, for instance, during the

1970s to have proved reserves go up and down as prices -- product prices went up and down, as we had oil and gas embargoes, we had FERC changes in regulated prices, new oil, old oil, those made recoverable reserves, proved reserves go up and down essentially overnight.

Q What about changes not in connection with prices?

A I'm sure there have been.

Q Do you recall any particular instances?

A Not specifically, but every -- every year, I'd go over every well, over every decline curve, modify as need be, if the flood front had changed and a well wasn't responding this year when it wasn't responding last year, that would change the reserve up or down, as an example.

Q What about overall reserves for a particular field?

A Reserve for a field, what about them, what was your question?

Q Are there any instances in which proved reserves for a particular field declined in later years that are not related to prices, for reasons that are not related to prices?

A I'm sure there were, the answer to your

question includes not only remaining proved reserves, but estimated ultimate proved reserves.

Q Okay.

A That's customary, they go up and down.

Q Okay. Do they tend to go up more often than they go down?

A My experience it's about a split. If it's being actively developed, they probably go up more often than they go down. If it's mature property, if they change, they generally change down, if at all.

Q Okay. And would you consider the Mississippian as of 2010, 2011, and 2012 a field that was being actively developed?

A Back to the development by the use of horizontal wells, the answer would be yes.

Q Did you attempt to -- strike that.

Are you aware of the amount -- strike that, too.

Are you aware of the percentage by which proved reserves of the trusts declined in this matter?

MR. BAUER: Objection.

Q (By Mr. Horne) In 2013?

MR. BAUER: Objection.

THE WITNESS: No.
Q (By Mr. Horne) Did you attempt to determine that amount?
MR. BAUER: Objection.
THE WITNESS: Or if they did, no.
Q (By Mr. Horne) Okay. Let's mark this 2.
(Exhibit Number 2 marked for identification and made part of the record)
Q (By Mr. Horne) Actually, just one more before that. What is the largest percentage decrease of proved reserves in an actively developed field that you are aware of that is not related to prices?
A I don't know.
Q More than 50 percent?
A Sure, I mean, I've had -- I've had fields, one- or two-well fields that literally watered out in a week where the reserves went from what they were last week to nothing today, so 100 percent.
Q What about a larger field like the Mississippian?
MR. BAUER: Objection.
THE WITNESS: Mississippian's not a field, the Mississippian is a play as it was being

developed by horizontal wells.

Q (By Mr. Horne) Well, what about a larger play like the Mississippian?

A I haven't tried to quantify that for the -- for the large resource type plays, no number comes to mind.

Q Okay.

(Exhibit Number 3 marked for identification and made part of the record)

Q (By Mr. Horne) Let's mark these as 2 and 3. Take a moment to review 2 and 3, but I'm only going to ask you about Question 1 and the response thereto.

MR. BAUER: So 2 is the one for Trust I and 3 is the one related to Trust II?

MR. HORNE: That's correct.

THE WITNESS: Okay. I've read trust Exhibit 2.

Q (By Mr. Horne) Okay. We can -- we can focus on Exhibit 2, but I'm going to have basically the same questions for Exhibit 3.

A I'll read it before you do, but that's fine.

Q Yeah. But we can -- we can do Exhibit 2

right now. Let me read part of it into the record. And this is from the paragraph with the 1 in front of it, "Based upon the information presented on Pages F17 and F18, it appears the trust recognized significant reductions in the December 31, 2011, proved oil and natural gas amounting to 4,361.1 thousand barrels or approximately 52 percent of the oil reserves." And I'm going to focus on that part. Do you have any reason to dispute that that's accurate?

A I don't know.

Q Okay. Do you have any reason to dispute that it's accurate, though?

MR. BAUER: Asked and answered.

THE WITNESS: I don't have any reason one way or the other, it's not something I've investigated.

Q (By Mr. Horne) Okay. And let me read the response -- strike that.

What is Exhibit 2?

A Looks like a letter.

Q Letter to the SEC; is that right?

A From trustee.

Q The trustee?

A To the SEC.

Q The trustee --
A Mr. Skinner in particular.
Q I'm sorry. The court reporter's going to yell at me. But it's the trustee of Trust I; is that correct?
A That is apparently the case.
Q Okay. And let me read part of the response into the record. "Substantially all of the net production in the trust's December 31, 2011, oil reserves is attributable to performance revisions for wells that were producing the December 31, 2011," going to skip the number," or changes in the trust type curves for location that were undrilled as of December 31, 2011," do you see that?
A Yes.
Q So those revisions are not due to changes in prices; is that correct?
MR. BAUER: Objection.
THE WITNESS: It's apparently what it says.
Q (By Mr. Horne) It apparently says that the reductions are not due to changes in prices?
A Well, it says what it says, but that's -- it identifies December 31st, 2011, reserves estimate and then it identifies the wells involved and the

amount of the change and explains the change.
Q And these --
A Doesn't appear to be price was a part of that explanation.
Q Okay. And do you have an estimate of how many wells were in Trust I?
A Not off the top of my head, no.
Q Is it more than 100?
A I don't recall.
Q Okay.
A At this particular time?
Q Not at this particular time, in general, how many wells were to be drilled in Trust I?
MR. BAUER: Objection.
Q (By Mr. Horne) You can answer.
A Were to be drilled?
Q Uh-huh.
A As I recall in the prospectus, there was identified existing producers, they identified in another 123 to be drilled or something of that nature, whether that's the full answer to your question, I don't know, but that's a number I recall.
Q Okay. And would a large number of wells in a play smooth or reduce the fluctuation in

ultimate reserves?
A I don't understand your question.
Q Okay. You mentioned that if there are one or two wells, the proved reserves might go down to zero percent; is that correct?
A I gave you an example, yes.
Q Okay. Now, if there were a larger number of wells, would you expect that to happen?
A Not in a mature field, absent some calamity. In a field being developed where you're gaining -- basically birthing new information with each well, yeah.
Q Okay.
A You might have tremendous swings in all directions.
Q And would you expect those swings in proved reserves?
A As compared to unproved reserves?
Q As compared to probable or possible reserves.
A The swing -- the swing should be less.
Q Okay.
A For proved.
Q And to the extent that there are any swings, it should be in the direction of having more

proved reserves; is that correct?
A Not necessarily, no.
Q Typically?
A I see it both ways.
Q Okay. Let me turn to Exhibit 3, and I'm going to have the exact same questions, if you feel the need to review Exhibit 3, let me know, but they're just going to be the same questions.
MR. BAUER: It's a different exhibit, go ahead and review it.
THE WITNESS: Pretty busy document, but I read it.
Q (By Mr. Horne) Okay. What is Exhibit 3?
A Letter dated October 11, 2013, from -- apparently from the trustee of SandRidge Mississippi Trust II to Brad Skinner with the SEC.
Q Okay. And let me read part of the paragraph beginning 1 into the record. "Based on the information presented on Page F16, it appears the trust recognized significant reductions in the December 31, 2011, proved oil and natural gas reserves amounting to," and I'm going to skip the amounts" or approximately 53 percent of the oil reserves," do you see that?
A Yes.

Q Did I read it correctly?
A Yes.
Q Do you have any reason to dispute that this is accurate?
A I don't know one way or the other.
Q Okay. And let me read part of the response into the record. "Substantially all of the net reduction in the trust December 31, 2011, oil reserves attributable to performance revisions for wells that were producing at December 31, 2011," skip the number "or changes in the trust type curve for locations that were undrilled as of December 31, 2011," skip the number, do you see that?
A Yes.
Q Do you have any reason to -- did I read it correctly?
A The portion you read, yes.
Q Okay. And does this mention price changes as a reason for the revisions?
A Not for the oil reserves, no.
Q Okay. And I want to make sure I got your answer right, you said that for developing field, the proved reserves could go up or could go down?
A Generally in a proved developing field where a -- a new development technique is being

applied, we see reserves go up with time, with refinement. If it's just a repetition of the same way that you developed the last seven fields to look like this one, then I see them go up and down.
Q Up and down to the same extent?
A I don't recall.
Q Okay.
(Exhibit Number 4 marked for identification and made part of the record)
Q (By Mr. Horne) Let's mark this Exhibit 4. Can you tell me what this document is, Mr. Brittenham?
A It's a citation or extraction for a specific CFR related to accounting, reporting for oil and gas assets or reserves.
Q And have you seen this particular section of the CFR, not necessarily in this form?
A At some point in time, yes.
Q Okay. Can you turn to Page -- well, this is not paginated, but definition 22. Oh, no, it is, it's Page 7.
A I'm there.
Q Okay. Now, can you -- can you -- strike that.

MR. BAUER: Should we all be reading 22?
MR. HORNE: Well, let's first turn to on Page 8, definition 24. Well, I'm sorry.
Q (By Mr. Horne) Let's -- let's stick to 22. Now, the definition of proved oil and gas reserves begin with "Proved oil and gas reserves are those quantities of oil and gas which by analysis of geoscience and engineering data can be estimated with reasonable certainty to be economically producible," did I read that right?
A Correct.
Q Do you have any reason to doubt that that is the SEC's definition of proved reserves?
A For the period 2011 to '18, I believe that's it.
Q Okay. And that's during the class period at issue here; is that correct?
A Portion of it, anyway.
Q Okay. And what is reasonable certainty?
A Defined term by the SEC.
Q Okay. And what is your understanding of reasonable certainty?
A Well, as I just responded to your question, I would read it as defined by the SEC on Page 8 at Definition Number 24.

Q Okay. And let me read part of it into the record. "Reasonable" -- "if deterministic methods are used -- strike that.
Did SandRidge use deterministic methods to estimate its reserves?
A I've never seen SandRidge estimated reserves. You mean did Netherland Sewell use deterministic methods?
Q Okay. There is a dispute in this case about whether the reserves estimates are SandRidge or Netherland Sewell's. In this deposition, I'm going to refer to the estimate as Netherland Sewell's, but that's not a concession from our part that the reserves estimates are not SandRidge's as well. So with that said, do you know if Netherland Sewell used deterministic reserves -- deterministic methods?
MR. PHILLIPS: Objection.
THE WITNESS: That's my impression, yes.
Q (By Mr. Horne) Okay. And so the definition states, "If deterministic methods are used, reasonable certainty means a high degree of confidence that the quantities will be recovered," do you see that?
A Yes.

Q Okay. And if you continue, "A high degree of confidence exists that the quantity is much more likely to be achieved than not." And it continues, "Reasonably certain EUR is much more likely to increase or remain constant than to decrease," do you see that?
A Just a minute. You keep jumping over here.
MR. BAUER: Why don't we read the whole thing.
Q (By Mr. Horne) I'm sorry, read the whole thing.
A Okay. I read it.
Q Okay. And did I read it accurately?
MR. BAUER: Objection.
THE WITNESS: The portion you read I believe was accurate.
Q (By Mr. Horne) Okay. And in particular, it says, "EUR is much more likely to increase or remain constant than to decrease," do you see that?
A Yes.
Q Okay. Does this conflict with your testimony that EURs could go up or go down --
MR. BAUER: Objection.
Q (By Mr. Horne) -- of proved reserves?

A Not at all.
Q Why not?
A Well, even the SEC admits that it goes -- go either way, and I agree, that's been my experience.
Q Okay. Your experience is that it goes up or down in roughly the same proportions?
A No, I have never quantified that.
Q Okay. Okay. Then is it your testimony that proved reserves are much more likely to go up or stay the same than they are to go down?
MR. BAUER: Objection.
THE WITNESS: Well, last time I answered that question, as I recall, I said for a -- a new play or a play under new development, especially where new techniques or technology is being applied, that it's been my experience that there's a learning curve with time and with effort with wells drilled that generally results in the earliest estimates of reserves being conservative, that's been my experience. But I've seen it go both ways.
Q (By Mr. Horne) Okay. And would you describe the Mississippian as just such a play?
A Yes.
Q So you would expect reserves to go up

then?
A Under the conditions I just described, yes, for the reasons I just described, yes.
Q Which conditions apply here to the Mississippian?
A Which ones?
Q The conditions you've just described.
MR. BAUER: Objection; timing.
THE WITNESS: I don't understand your question.
Q (By Mr. Horne) I'll withdraw it. If proved reserves go down significantly, does this imply an error or problem in the manner in which they were estimated per the standards?
A Could you repeat that?
COURT REPORTER: "If proved reserves go down significantly, does this imply an error or problem in the manner in which they were estimated per the standards?"
THE WITNESS: Well, if they were estimated per the standards, there's no error.
Q (By Mr. Horne) Okay.
A However, the circumstance or the excuse you use as to why the proved reserves went down is not a unique one, otherwise, it's not a -- it's not

a human error, there's other reasons why proved reserves go up or down.

Q And you stated that in an early play, you would expect reserves estimates to be conservative; is that correct?

A Generally my experience has been early in a -- back up. Early in a conventional play, early estimates are conservative, in the unconventional plays, that's not necessarily been the case. Where the results are statistically driven, early estimates are usually confounded by low volumes of initial data, otherwise, until you get up to something that is statistically significant, the error range is much higher for statistically driven plays.

Q And would you expect the error range to go -- to be more -- strike that.

Would you expect the errors to go mostly in the direction of more reserves in an unconventional play?

A Could go either way, there's no reason to predict it to go up or down.

Q Okay. Now, how is that consistent with the SEC definition that reasonably certain EUR is much more likely to increase or remain constant than

to decrease?

MR. BAUER: Objection.

THE WITNESS: Why is it consistent?

Q (By Mr. Horne) Yes.

A Because it is. They define that EURs go up or down, but are more likely to go up -- I don't know, I don't know whether that final sentence includes both deterministic and probabilistic or not, so my answer is going to assume that it is determined -- it just used deterministic, but I don't know that that's the case. So my answer would be that the SEC generally is of the mind that high degree of confidence exists if any subsequent changes to EUR increase the reserve.

Q Okay. And the reserves in this case, were they SEC reported proved reserves?

A There were SEC reported proved reserves in -- by the trust.

Q Okay.

A Or on behalf of the trust.

Q If there isn't enough data to estimate reserves with high degree of confidence, should proved reserves be assigned?

A Well, by definition, there needs to be adequate confidence, it's a subjective process and

it's up to the reserve estimator to make that decision.

Q Now, you drew a distinction between whether reserves were likely to go up or down based on whether the field was -- sorry, the play was conventional or unconventional; is that right?

A Yes.

Q Was the Mississippian a conventional play?

A Well, the industry's -- depending on the time and the person making the utterance, but the industry has described the Mississippian play, horizontal play, as both, conventional and unconventional. In my experience, it's a conventional title reservoir, but it has some resource play characteristics.

Q Okay.

A So far.

Q Okay. And what are those characteristics?

A The results of completing wells, production results of completing wells that end up in reserves, appear to be statistically driven. Overall across the play, the results are pretty uniform.

Q Okay.

A Well to well, property to property,

sidetrack to -- sidetrack to sidetrack, we see differences.

Q And is it your understanding that there are aerial variations within the Mississippian -- Mississippian?

A Got to make sure we're talking about the same thing here, so clarify as best you can your question, and I'll try to answer it.

Q Is it your understanding that certain areas within the Mississippian produce more oil than certain other areas?

A Are you talking about geography or are you talking about areas within the Mississippian formation?

Q That's a fair qualification. I'm talking about geography.

A Okay. So if I've got an overhead view of a map of the earth surface, I can tear away everything and expose the Mississippian, then one area may perform different than another area, is that your question?

Q Yes, that's my question.

A Generally, that's reasonable, that's been observed over -- at least over large areas.

Q Okay. Can you turn to Page 53 of your

report, which is Exhibit 1. Sorry, Paragraph 53. It's on Page 11. Now, I'm going to read part of it into the record. "Based upon early production results coupled with historical knowledge of the play, most reservoir engineers operated with a premise that the Mississippian was a regionally extensive, conventional, heavily fractured oil saturated volumetric limestone reservoir exhibiting low permeability." Now, you used the word "conventional" in that; is that correct?
A Is my statement correct?
Q No, is it correct that you used the word "conventional" in that?
A Yes.
Q And that's a conventional play, is that correct, that's a reference to the Mississippian being a conventional play?
A It's a conventional tight oil play, at least in that half of the sentence.
Q Okay. And are there -- strike that.
Is there another part of the sentence that suggests it is not a conventional play?
A No, as that term is used in the industry.
Q Okay. And what are the characteristics listed here that make the Mississippian potentially

an unconventional play?
A In Paragraph 53?
Q Uh-huh. Yes. I was breaking the rules.
A Answering your question what in Paragraph 53 makes the Mississippi unconventional?
Q Yes.
A Nothing in Paragraph 53.
Q Okay. Anything in the four corners of your report?
A That make it unconventional?
Q Strike that.
What is a conventional play?
A From a lay person, conventional reservoir is one that is, quite frankly, conventionally developed by vertical wells, wells that are reservoirs that lend themselves to deterministic methods of predicting oil and gas reserves that provide -- that provide results that are not necessarily statistically driven, I guess that would be my definition right now.
Q Okay. And --
A But, I mean, the best example, though, are the shale reservoirs, the source rocks for petroleum, we typically call unconventional reservoirs.

Q Okay. And you mentioned not necessarily statistically driven, what do you mean by that?
A Just that, that generally for reservoirs that are not statistically driven or plays, for that matter, a -- an existing well generally provides a good example of the performance of an immediately adjacent or offsetting well, in the adjacent drilling and spacing unit, as compared to statistically driven play or resource that an existing well may not be an example or demonstrative of the results that would be achieved by an immediately offsetting well drilled to the same reservoir.
Q Okay. And does the Mississippian fit this definition that you've just provided?
MR. BAUER: Of which -- which definition?
Q (By Mr. Horne) That's a fair qualification. You mentioned three things, vertical wells -- well, my notes are not very clear, so can you tell me the definition of conventional again, and I apologize?
A This where we get to read it back?
Q Yeah, it's a while back.
MR. HORNE: You can read it back if you would like.

COURT REPORTER: Let me find it.
Q (By Mr. Horne) All right. You know what, I can -- I can read it. Your definition was "Conventional reservoir is one that is, quite frankly, conventionally developed by vertical wells, wells that are reservoirs that lend themselves to deterministic case methods of predicting oil and gas reserves that provide results that are not necessarily statistically driven," did I read that?
A That's accurate, as I recall.
Q Okay. And based on this definition, is the Mississippian a conventional play?
A It has conventional attributes, but the statistical performance attribute is contrary to a conventional characteristic, it's more of a resource play characteristic.
Q And --
A So it has characteristics of both.
Q Okay. And given the Mississippian's statistical performance, are there any risks in estimating proved undeveloped locations based on lateral offsets?
A Based only on an immediate lateral offset?
Q Yes.
A Nothing else? There can be, yes.

Q Okay. And --
A Of course, there's all kinds of risks in oil and gas predictions anyway, but, yes, just for the reasons I just defined, an offset well is not necessarily the best predictor of the performance of a well in a resource play or in a statistically driven play such as the Mississippian.
Q Okay. And what information -- what other information -- strike that.
And so if all you have is a lateral offset, could you call the well which is offset proved reserves?
A Of course.
Q Why?
A That's the nature of a statistical play, that you've got a large accumulation of hydrocarbons in a stratigraphically consistent formation.
Q Are you finished with your answer?
A Yes.
Q Okay. What are the conventional aspects of the Mississippian?
A Well, as I previously defined, it lends itself to vertical development, it is conventional reservoir rock, it's a limestone, although it has other attributes, but it's a limestone as opposed to

a shale. It is a storage or trap of petroleum as opposed to a generator or source of petroleum, for example.

Q Okay. Now, I want to make sure I get your testimony right. Are you aware of any instance in which a play with a large number of wells, like the Mississippian, there was a decrease in proved reserves of 52 percent?

A Anybody's reserves? I'm not privy to everybody's reserves, so.

Q I'm asking if you're aware of an instance.

A Couldn't give you a specific instance, I suspect the Austin Chalk was one of them as an example.

Q Anything else?

MR. BAUER: Anything else what?

Q (By Mr. Horne) Any other instances?

A Not off the top of my head.

Q Did you attempt to determine whether other operators in the Mississippian decreased their proved reserves by amounts similar to SandRidge?

A No, I did not make that comparison.

Q Okay. And is it correct that you did not attempt to determine whether SandRidge had reduced its proved reserves?

A Correct.
Q Okay. And so you never knew until today that SandRidge Trust I had reduced its proved reserves by 52 percent?
A Correct.
Q And you never knew until today that SandRidge Trust II had reduced its proved reserves by 53 percent?
A It's my recollection, that's right. I knew there was a reduction, I didn't know what it was quantified to be.
Q Did you know there was reduction in Trust I?
A Yes.
Q Okay. And does this affect your opinion?
A Doesn't.
Q Okay. What is the source rock for oil accumulation in the Mississippian?
MR. BAUER: Jonathan, are we changing topics, should we take our break, we're a little more than an hour in?
MR. HORNE: I've got another two questions that my colleagues have sent me.
THE WITNESS: As I pointed out in my report, I won't say it's unique, but the general

consensus is that the underlying Woodford Shale is the preponderance source of hydrocarbons in the Mississippian, at least in this area.

MR. HORNE: We can -- we can take a break. We can take a break.

THE VIDEOGRAPHER: Off the record.

(Break taken from 10:12 to 10:28)

THE VIDEOGRAPHER: Back on, 10:28.

Q (By Mr. Horne) Now, Mr. Brittenham -- Brittenham or Brittenham?

A Depending on which side of the equator you're on. It's Brittenham.

Q Brittenham?

A Yeah.

Q Got it. So you stated that in preparing for your deposition, you reviewed evidence; is that correct?

A I don't recall, but I did review evidence, I don't recall whether I stated it.

Q Okay. What evidence did you review?

A I disclosed it in my report, I read a couple of depositions, read all the deposition exhibits attached thereto, looks like in Appendix D. So I read five deposition transcripts and the exhibits that were attached. I read the -- they may

have been duplicated as attached exhibits, but I read the trust registration statements, the prospectus, I read earnings calls, not evidence, I guess, but I read the petitions.

Q I'm sorry to interrupt, petitions, you mean complaint?

A I think that's it. Yes.

Q Okay. And other than those items, the trust registration statement and prospectus, some earnings calls and the complaints, are there any documents that do not appear on Appendix D that you did review?

A Again, to the extent that they're not duplicated as deposition exhibits, I separate -- I think they all are, but I separately reviewed, what may not be, but there were several prospectus, I'm going to use the wrong word, but amendments, drafts, whatever, that I read several iterations of those. I think everything else is on the -- in the report.

Q Okay.

MR. BAUER: Can I interject? You also looked at some materials from the other experts, right, that came out of these depositions and things; right? I'm not sure that's in your report because of timing.

THE WITNESS: That's not true, I --
MR. BAUER: You got it in there?
THE WITNESS: I didn't -- in my report, I talk about the -- specifically in the body of the report, I talk about the reports written by three of plaintiffs' experts.
MR. BAUER: Okay.
Q (By Mr. Horne) And, sorry, and have you reviewed the depositions --
A Although that's not evidence, but I guess.
Q Have you reviewed the deposition transcripts of Steven Crane, Letha Lencioni and Jan Tomanek?
A No.
Q And have you reviewed any deposition transcripts and exhibits, other than David Miller, Lance Galvin, Lindsey Walton, Danh Nguyen and Rodney Johnson, which are the ones listed in Appendix D?
A Yes, I've reviewed deposition transcript, I think there's just one, of Tom Ward. I think that's all.
Q Okay. Did you review Matt Grubb?
A I don't believe so.
Q You've more or less said so already, but I want a clean answer for the record. So you've

reviewed the five people listed on Appendix D and Tom Ward and no one else?
A As far as full transcript, yes, that's not to say that if during the course of a deposition, there was a citation out of one of the deposition transcripts that got marked as a deposition exhibit, I've read that.
Q Okay. And did you read all the exhibits to these depositions?
A Yes.
Q Okay. And how did you select deposition transcripts to review?
A As I recall, I initially received unsolicited deposition transcripts for Miller and Galvin, and I requested Walton, Nguyen and Johnson, I believe.
Q What about Ward?
A That as well.
Q Okay. And were you provided access with a database of documents?
A No, not a physical access.
Q Electronic access?
A I guess that's what I meant, no.
Q Okay.
A I mean, I had access to the point where if

there was something I needed, I would request that information.

Q Okay. And did you review any documents produced in this action, other than those which were exhibits to the six depositions you reviewed?

A Other than what I've already described, no.

Q Okay. Did you review any -- strike that.

Your Appendix D contains documents and information obtained from other sources, do you see that?

A Yes.

Q Did you review anything other than the items reflected in that section of your Appendix D?

A Not for the purposes of this report, no.

Q What do you mean by "not for the purposes of this report"?

A To the extent that I specifically went and reviewed a document that I relied upon for this report, it's listed in the report. To the extent over the last eight or nine years I've reviewed documents that the results of that review are embedded in my brain, as opposed to going and looking up the document, I just relied upon that knowledge.

Q Okay. Can you turn to Exhibit -- I believe it's Exhibit 4, it's the SEC definition of proved reserves. The SEC definition, period. And if you could turn to Page 8, Definition 24. Can you explain for me the difference between deterministic and probabilistic methods?

A Generally, they're defined, but --

Q Please.

A Deterministic methodology involves selecting unique single parameters for the variables that go into the analysis of the reserves, as compared to the probabilistic where the range of each of those variables is applied in the final determination of a range of results.

Q Okay. And when you estimate reserves, do you typically use deterministic or probabilistic methods?

A Depends on the nature of the reserve. If the reserve is a resource play, that generally lends itself best to probabilistic techniques, if -- otherwise, I use deterministic. It's not unusual to use deterministic in conjunction with statistical analysis of existing production to predict the performance of undeveloped reserves.

Q Okay. Have you estimated reserves in the

Mississippian?
A Oh, yes.
Q Have you estimated reserves of proved undeveloped locations in the Mississippian?
A I'm sure I have, yes.
Q What methods do you use -- strike that.
Do you use probabilistic or deterministic methods?
A Depends on the timing. Prior to probably 2011, 2010, I used what I'd call a hybrid, I used deterministic methods, and where data was available, tried to temper that result with statistical analysis.
Q And after 2010, 2011?
A Sure. Once it became more common to examine the performance of horizontal wells or to predict the performance of horizontal wells, there was a stronger push to use statistical analysis, at least for the purposes of predicting the performance of undeveloped proved reserves.
Q And --
A Still use performance-based decline curve analysis for existing reserves.
Q Okay. And statistical analysis, is that probabilistic methods?

A Can be. Doesn't have to be, you may use a type curve, you may use a series of performance indicators. Quite frankly, I don't know anybody that has tried to use probabilistic for the Mississippian, I'm sure they have, I haven't seen it.
Q Okay. And you've stated that prior to 2011, 2010, you used deterministic methods and statistical data where available; is that correct?
A Yes.
Q Is that what SandRidge did?
A I don't know what SandRidge did.
Q Okay.
A I know what Netherland Sewell did.
Q I'm sorry, is that what Netherland Sewell did?
A Generally, yes.
Q Okay.
A For their horizontal well reserves. I described to you prior to 2010, 2011, the bulk of that work was for vertical well reserves.
Q Okay. And what method did you use for horizontal well reserves?
A Once the data became available, then statistical analysis was used for predicting the

performance of undrilled or proved reserves that were undeveloped, until data became available, used the same result I did for the vertical or the same methodology.
Q And you stated that the -- you used these methods prior to 2011, 2010, do you recall more specifically whether you used them in 2011?
A Not specifically, no.
Q Okay. Did you look at SandRidge's internal reserves estimates?
A Only as they were represented in the deposition transcripts of Galvin, Johnson.
Q And why did you ask to see -- I'm sorry, you were provided with Mr. Galvin's transcripts; is that right?
A Yes, Mr. Galvin and Mr. Miller.
Q Okay. Are deterministic methods meant to be an easier standard to meet for proved reserves than probabilistic methods?
A Meant by who?
Q Meant by the SEC definition.
A I don't know that.
Q You don't know whether they're meant to be an easier standard?
A I don't know what the intention of the SEC

is.

Q Okay. What about by reserves estimators?

MR. BAUER: Objection.

THE WITNESS: Repeat your underlying question, please.

Q (By Mr. Horne) Sure. Are deterministic methods meant to be an easier standard to reach proved reserves than probabilistic methods by operators?

MR. BAUER: Objection.

THE WITNESS: The actual generation of the work or the conduct of the work is -- I wouldn't say one is easier than the other.

Q (By Mr. Horne) Right, because they both draw -- they both require you to prove reasonable certainty; is that correct?

A High degree of confidence.

Q And does high degree of confidence have a meaning in the oil and gas profession that goes beyond the information provided in the SEC's definition?

A Probably, yeah, and although it may not be different than the SEC, but for petroleum engineers involved with reserve assessments, the context that the work is being done in the oil and gas

exploration development business is important, simply because the work is done with subjective procedures by human beings that rely on their judgment, there's risk that -- not only in the values for the underlying variables, but the physical infrastructure itself, the wells, economic factors, whatnot, are out of the control of the estimator. So to the extent that's not specified in the SEC's definition, that certainly is the customary understanding for reserves assessment, this is oil and gas production, it's not how many cars are coming off the assembly line in Detroit.

Q And is the estimator meant to apply the estimator's expertise to the judgment that the estimator makes?

A In my experience, yes.

Q Okay. And does reserves estimations, therefore, partake of some science?

MR. BAUER: Objection.

THE WITNESS: I don't think I heard your complete sentence.

Q (By Mr. Horne) Yeah, I don't think it made sense.

A That may be.

MR. CORBYN: It did.

Q (By Mr. Horne) And I was hoping for some backup from someone.
So would you expect oil and gas reserves estimates -- strike that.
Are deterministic methods of calculating reserves less accurate than probabilistic methods?
A All other things being equal, if both are performed properly, they should both get useful results. I wouldn't think that I would -- I've ever heard anybody say one's more accurate than another, there are a lot of reasons criticized if improper methodology is used.
Q Can you turn to Paragraph 37 of your report, which is Exhibit 1. Page 8, you can take a moment to read it to yourself.
A Okay.
Q Okay. Is it -- do you agree with me that SandRidge is a leading operator in the Mississippian?
A Today?
Q Strike that.
Do you agree with me that in 2010 through 2012, SandRidge was a leading operator in the Mississippian?
A They were the most accurate, as I recall,

or, I mean, the most active, as I recall.
Q And so if you describe a fact as being generally known by operators in the Mississippian, you would expect SandRidge to know it; right?
MR. BAUER: Objection.
THE WITNESS: Somebody.
Q (By Mr. Horne) Somebody at SandRidge?
A Yeah.
Q Okay. Now, you state that the Mississippian was well understood, what do you mean by "well understood"?
A I state that the geology of the Mississippian formation was reasonably well understood. And that's in the context towards, as I present in the subsequent paragraphs, the effort to drill and complete -- drill usable wellbores, horizontal wellbores in the target formation, complete those wells in the target formation appropriate to the geology, and -- and produce the wells.
Q Can you break that down for me?
A I can give you examples. I mean, I broke it down in, for instance, Paragraph 40, 41, 42, 43.
Q Okay.
A But at the end of the day, the geology as

it relates to defining the target reservoir was well understood. Where's the oil, what's the -- what's the characteristics, I mean, not only where it is, but where is it with regard to where you're going to drill the well, where are you going to guide the horizontal well through the reservoir, that's the geology that was well understood.

I add in there, I talk about in subsequent paragraphs that the -- that portion of the Mississippian formation that contain the target zone or zones was stratigraphically continuous over a large area, certainly an area much larger than that being developed by SandRidge and the trust. So that's the geology that was well understood.

Now, if you want to get into the pore fluids and the nature of the pore fluids and -- and how the geology affect completion, I present that in my report and we can talk about it, but that -- that's what was important to understand about the geology.

Q Were the pore fluids well understood?

A Yes.

Q The nature of the pore fluids?

A They were.

Q Okay. And you said it was well understood

where the oil was; is that correct?
A Yes.
Q And is that both vertically and horizontally -- sorry, vertically and geographically?
A Yes.
Q Okay. So in other words, SandRidge knew -- or strike that.
Operators knew where to find the oil in any particular -- where to find the oil vertically in any particular geographical location?
A Correct. And I call that the target.
Q Okay.
A Otherwise, that portion of the accumulation that lends itself well to commercial development.
Q Okay. And did the target change throughout the Mississippian?
A Not within the area that was developed by SandRidge. There are parts -- if I compare Logan County with, you know, southwestern Nebraska, they're different.
Q Okay.
A But they're different in physical intrinsic properties that are recognizable and

understood, they're still understood, even though they're different.

Q Okay. And with the -- within the target -- strike that.

Within the AMI -- strike that.

What is the AMI?

A There are two AMIs, one for each of the trusts, subject trusts, and they're basically a property description, a collection of leaseholds, certain rights were given to the trust -- trusts.

Q And within the AMI, was the target location located in the same vertical depth?

A Within the AMIs, the target, the primary target was located in the uppermost portion of the Meramec formation that had been materially altered at the time of deposition and reworking to lend itself well to being a oil and gas reservoir.

Q Did you attempt to determine whether SandRidge's targeted and drilled horizontal wells in different layers of the Mississippian within the AMIs?

A You'll have to say that again.

Q Okay.

MR. HORNE: Can you read the question back?

COURT REPORTER: "Did you attempt to determine whether SandRidge's targeted and drilled horizontal wells in different layers of the Mississippian within the AMIs?"

THE WITNESS: That doesn't make sense. I don't understand your question.

Q (By Mr. Horne) Do you understand what a layer of the Mississippian is, am I using the wrong word?

A Probably.

Q Probably you understand or probably I'm using --

A Probably using the wrong word.

Q Okay. When you talk about the target, you're talking a particular vertical depth; is that correct?

A No.

Q You mentioned that SandRidge targeted the uppermost portion of a given formation; is that correct?

A Of the Mississippian formation.

Q Okay. And is the uppermost portion -- how would you refer to the uppermost portion -- strike that.

Now, I've been calling the uppermost

portion of the Mississippian a layer, what is the right word for it?

A Target.

Q Target. Okay. All right. So if you were to refer to a different depth within the Mississippian, would that also be called a target?

A No, because the same target occurs at different depths throughout the play.

Q Okay. Does the Mississippian have layers?

A It has layers.

Q Okay.

A Like all other rock formations, sedimentary rock formations, they're comprised of layers.

Q Okay. And what does layer mean to you?

A Doesn't mean much to me, but I'm patient enough to let you use the term.

Q The -- what -- what word would you use to describe layer?

A In a carbonate formation, you're looking at -- well, any -- any deposition, any sedimentary formation, generally, as I point out in my report, is created by the successive laying down or deposition of successive rock layers, even though there may be no physical discontinuity between the

layers, but -- other than time, and the accumulation of those may result in one or more formations, if you will. And formation has a unique description, if you will.
Q Okay. Did the Miss -- did SandRidge target and drill horizontal wells in the Mississippian -- within the AMI, other than in the upper Mississippian?
A I don't know whether it was in the -- whether SandRidge's efforts to look at other portions of the Mississippian formation were in the trust AMIs or not.
Q Did you attempt to determine whether they were?
A No.
Q Why not?
A Wasn't part of my task, I already knew that they -- SandRidge and others had occasionally probed about other portions of the Mississippian column to identify anything prospective. But at the end of the day, the target was essentially unchanged.
Q And did the depth of the target change rapidly in the Mississippian geographically?
A Those are both undefined terms, but I can

tell you it has a -- a gentle slope, the subcrop surface of the Mississippian dips gently from well to well, from section to section, otherwise, it doesn't -- there's not 1,000 feet of elevation change between wells separated by one mile distance.
Q Okay. What is your definition of a gentle slope?
A Well, I'd have to -- I don't know that I'd quantify it, it's a handful of degrees, otherwise from -- the true vertical depth of most of the wells in northern Oklahoma, southern Kansas, to the top of the Mississippian varied by, as I recall, less than 1,500 feet.
Q Okay. And so is it your opinion that throughout -- let's leave it to the AMIs, the slope of the Mississippian was no more than a few degrees?
A I haven't calculated it, it's not great.
Q Okay. And --
A If it turned out to be seven or eight, I don't know what it is, just have to calculate it.
Q And is it your opinion that that seven or eight degrees is constant throughout the AMIs?
A No, it's not, never is. In well understood geology, it never -- never is.
Q And are there areas in which the slope is

much greater than seven or eight degrees?
A I don't even -- it's your seven or eight degrees, not mine, so I don't know that.
Q Okay.
A There may be, but I don't know that. Absent -- no, for actual dip, I don't know.
Q And do you know if SandRidge knew it as of 2010 and 2011?
A Based on the description that SandRidge, in fact, had put together, structural isopach maps on the Mississippian, that knowledge would be a byproduct of that work.
Q Okay. And where are you getting that description from?
A I've seen it in the SandRidge documents, it may have been in earnings call, it may have been in the prospectus where vertical wells were used to generate geologic maps, both isopach and structural maps, and -- and those are what I speak.
Q And so you're talking about public statements made by SandRidge; is that correct?
A Yes.
Q What about internal documents?
A Well, I'm not -- I haven't looked at SandRidge internal documents beyond, for instance,

what's been used at the Corporation Commission. I've seen both isopach and some structural maps at the Corporation Commission by all of the operators, including SandRidge and Chesapeake, others.

Q And so is it your opinion that the slope of the Mississippian was understood throughout the AMIs?

A Was what?

Q Understood throughout the AMIs by SandRidge as of 2010?

A Yes, the dip of the surface, the unconformable surface on top of the Mississippian was understood by SandRidge in the AMIs.

Q And have you seen any of the isopach -- isopach maps?

A Not in this proceeding.

Q What about otherwise?

A I've seen structural maps on top of the Mississippi at the Corporation Commission by SandRidge and others.

Q Okay. And what was the date of those maps?

A Don't know.

Q Would they have been after 2012?

A May have been, may have been before as

well.

Q Okay. So you don't know what the date of those maps were?

A I don't.

Q You don't know when they were generated?

A No.

Q You don't know if they were --

A The map generation date may be different than the date it was presented at the Corporation Commissions, but I don't know.

Q Okay. So you don't know if it was generated as of the time of the trusts' IPOs?

A The specific maps I've seen, I don't know.

Q Now, you state that "The geology of the Mississippian formation was reasonably well understood prior to the alleged class periods, as was the continuity of the formation across the areas where trust wells were drilled." What do you mean by "continuity of the formation"?

A The stratigraphic continuity, otherwise, there's no discontinuities, there's no -- you can walk across the surface of the Mississippian, if you could get there, from one end of the AMI to the other.

Q Okay. So what you're saying by that is no

more than the Mississippian exists throughout the AMIs or am I missing something?

A No, that's it, it's continuous across the AMIs and further.

Q Okay. Were there discontinuities in the productive portions of the Mississippian?

A Not as developed by horizontal wells. When I say production, I'm using your words "productive portions," the entirety of the Mississippian below the unconformable surface contains oil and gas, some of it is more amenable to the flow of fluids than others, but it's all productive. And if you connect it with horizontal well that's multistage fracture stimulated, that should make it all productive as well.

Q Is it all economically productive?

A If you put it together in a well, yes.

Q Is it all productive in a way that will generate positive rates of return?

A One -- they're one and the same, if you say it's economic, to me, that means it generates positive rate of return.

Q So is it your opinion that you could drill -- I just want to understand the contours of your opinion. Is it your opinion that you could

drill a -- a horizontal well anywhere in the AMI provided you targeted the target and you would have an economically productive well?

A That's probably true, certainly it's the case that across the play, that's true, the play of the AMI, encompassed by the AMI. I don't know of any exception, there may be some. By definition, because it's a statistical play, some wells are going to be better than others, not all wells are completed the same, though I don't know of any exceptions, there may be one.

Q And so you wouldn't -- strike that.

And have you found this to be true -- strike that.

Have you found this to be stated in SandRidge's public statements?

A Found what to be stated?

Q That all wells drilled in the AMI will be economically productive.

MR. BAUER: Objection.

THE WITNESS: I don't recall.

Q (By Mr. Horne) How much oil and gas is required to generate a positive rate of return for horizontal wells in the Mississippian?

MR. BAUER: Objection.

THE WITNESS: Varies, I don't know, it depends on how you handle the costs.

Q (By Mr. Horne) Based on SandRidge's average cost of drilling a well?

MR. BAUER: Objection.

THE WITNESS: Beyond the reported $3 million, I don't know. Again, you have to allocate infrastructure, disposal, depending on how that's handled, that may affect the economics of one well versus another that produce the same amount of oil and gas.

Q (By Mr. Horne) As of December 2010, did SandRidge have enough information to always hit the target within the trust -- within the AMIs?

A I believe so, yes.

Q And again, that's based on the maps that you -- I'm sorry, were you finished with your answer?

A Yes.

Q Okay. And again, that's based on the maps that you consulted in SandRidge's public statements?

A No, it's based on my knowledge of how the wells get drilled, that the landing point has to be determined, landing point typically determined by close-by vertical wells or you can drill another

vertical well to determine landing point. Once a landing point is determined, then the geoscientists on the well actually steer the bit through the target as it does or doesn't move about in the formation.

Q Okay. Do you need to know the location of the target in order to steer the bit to the target?

A You have to know where it's at, you have to know -- you have to know a landing point, otherwise, a place to intersect the target at a near horizontal trajectory, after that, you leave it up to the geo steerers to keep you in it.

Q And how do they do that?

A Combination of examining the lithology of the drill cuttings, the downhole measurements of gamma ray, at least, and perhaps other petrophysical properties of the rock using the MWD systems that were available at that time. And there's others available, but that would be a bare minimum.

Q Okay. And in order to find the location of the target at any particular area, would you need a nearby vertical well?

A Vertical wells are used to identify the target, at least initially, and whatever distance they are, they're mapped up to try to determine the

predictability, if you will, or the trajectory of the vertical well of the target between vertical wells.

Q Did you determine the total acreage of the trusts' AMIs?

A Not independently, I didn't look at any land records.

Q Were you aware of -- strike that.

What saturation vertical wells would you expect would be necessary within the Trust I, within, let's say, the Trust I AMI in order to gain an understanding of the location of the target?

MR. BAUER: Objection.

THE WITNESS: Don't know. You just have to start doing the work, there's some places where -- some places where we have a well almost on every section, there's some places where a handful of wells in a township are adequate to pick the target, if you will.

Q (By Mr. Horne) Okay. And sitting here today, do you believe that the Mississippian's geology is variable?

A The target geology or the total formation, Mississippian formation geology?

Q Let's talk about the target, let's start

with the target geology.
A The target geology is not variable as to its occurrence, otherwise, where it's at, where it's located. It may be variable as to its specific intrinsic attributes, mineralogy, porosity, permeability. That's the end of my answer.
Q Okay. And is it variable as to its depth?
A Can be.
Q Does it -- I'm sorry, was that your complete answer?
A Well, it's not a horizontal plane, it has a finite thickness. The target generally is closer to the unconformable surface than it is the bottom of the Mississippian formation, much closer, usually within the top 200 feet of the Mississippian formation. And the target geology, if you will, may or may not dip parallel to the surface of the unconformity to the top of the Mississippian.
Q Okay.
A So that's why -- that's why you draw maps and stick diagrams to see where it's at and then you use -- then you actually, when you get in it, you steer it.
Q Okay. And does the target's -- the target's depth vary over short distances?

A No.

Q Okay.

A Generally not that I've seen. At least its trajectory, when you say its depth, the target may actually be -- let's say its -- its position is at a horizontal trajectory of 103 degrees, so it may be 103 degrees at the heel of the horizontal, it may be 103 degrees at the toe, it may vary a few degrees in between, but in all cases, that's going to be -- the toe is at a shallower depth than the heel, even though there's not much change in trajectory of the target. There may be a change in depth.

Q Okay. And just -- I want to make sure I understand. And so the trajectory will not change, but the depth may change over short periods, short distances; is that correct?

A Well, trajectory may change some, but not much. Again, we're looking at a -- an interval that may be from tens of feet to up to a couple hundred feet in thickness.

Q And the second part of my question, the depth may change over short distances; is that correct?

A No, not in my experience. I guess if you cut a fault or something like that, it may, may -- a

post-Mississippian fault, but I've not seen that.
Q Now, let me take you to the last sentence of your Paragraph 37, "It was reasonably certain that oil and gas was present in the formation, although the quantities and exact locations, of course, were not known." Can you infer from the geology that certain reserves would be proved?
A Proved as to a horizontal undrilled well?
Q Yes.
A Yes.
Q How?
A Well, not only the -- I mean, not only the geology, you need to have some production, so if you take production of a existing well, vertical well, horizontal well, whatever, examine the correlative geology, the relevant geology, it's often the case that we support PUD reserves based on that.
Q And have you in the past --
A Yes.
Q -- estimated PUD reserves based on vertical wells --
A Yes.
Q You have to let me finish the question, even if you know where I'm going.
A I don't know where you're going. Go

ahead.
MR. HORNE: Can you read the question back?
COURT REPORTER: "Have you in the past estimated PUD reserves?"
Q (By Mr. Horne) You know what --
A That's what I answered.
Q Have you in the past estimated PUD reserves based on vertical wells?
A Yes.
Q In which cases?
A Not cases, just jobs.
Q Which jobs?
A I don't recall specifically.
Q How many times?
A I don't recall that, either.
Q Is it more than ten?
A Probably not.
Q Out of how many reserves estimates that you've created over time?
A Related to the Mississippi, probably in the earliest time, so it would have been the first 10 or 20 percent. After that, we had horizontal wells, for the most part, to drill with or to deal with.

Q Okay. And have you recognized PUD locations of horizontal wells based on vertical wells in the Mississippian?
A I thought that was the question I was answering.
Q Okay. Just so the record is clean, can you provide the answer?
A It's the answer is still yes.
Q Okay. Now, you stated that the target may vary from tens of feet to a couple of hundreds, was the distribution of this thickness variation well understood?
A I believe so.
Q And what is this based on?
A Primarily open hole logs, mud logs, otherwise drill cutting analysis. Those would be the base and most prevalent data to the extent there were any cores cut, drill stem tests performed, that would add to the database.
Q Turn to your Paragraph 38. I'm going to read part of it into the record. "Vertical drilling in the area, however, was extensive and provided a wealth of information that could inform operators seeking to employ drilling areas" -- "seeking to employ drilling technologies in the area," do you

see that?

MR. BAUER: You missed the word "horizontal."

MR. HORNE: Oh, did I?

MR. BAUER: Yes.

Q (By Mr. Horne) Okay. Well, let me read it again just so it's clear. "Vertical drilling in the area, however, was extensive and provided a wealth of information that could inform operators seeking to employ horizontal drilling technologies in the area," do you see that?

A I do.

Q In your opinion, what information from vertical drilling could inform operators about the performance of future horizontal wells in an area with no horizontal wells producing?

A As I pointed out in Paragraph 39, that database identified the boundaries and the stratigraphic correlation, stratigraphic continuity of not only the formation, the Mississippian, but also those target attributes that existed in the Mississippian. As I point out in Paragraph 40, the type of information that would be useful would be -- I listed the source of that information, but the petrophysical properties of the Mississippian,

otherwise looking for the target attributes, the stimulation -- let me back up. The reservoir fluids that were produced from those formations from vertical wells, from those target formations vertical wells, including the -- the nature of the hydrocarbons, the extent of mobile formation water, there are chemical and physical characteristics.

The geological correlation of the target formation would include, I think I mentioned earlier, structural and isopachous mapping of not only the target zones, but the encasing zones, the top of the Mississippian, all the way to the base of the Mississippian, identification of any structural anomalies, otherwise faults, if they existed, those would be examples. Most of them I list in Paragraph 40, at least the sources.

Q Okay. And does that lead to reasonable certainty required for proved reserves?

A Yes, you've got vertical wells producing from continuous reservoir with known fluid context and horizontal wells that are planned to be drilled into the same reservoir, target reservoir, ideally resulting in enhanced productivity compared to the underlying verticals, those would be the basis for a proved reserves or a PUD horizontal.

Q And how does all that data from vertical wells give you confidence in the volumes of the oil and gas to be produced in horizontal wells?

A As I point out in my report, petroleum engineers, if we go back to -- if we assume the worst case, that there's no particular attribute that's going to be useful to a horizontal well, all we have is just a -- if we look at the flow equation for a vertical well versus a horizontal well, there's more, for the same pressure drop, the same intrinsic properties of the rock and the fluids that's in the rock, you're going to get more production from a horizontal well than you will a vertical well, that's the beginning. And it's a multiple. So those petroleum engineering techniques exist to help predict the minimum reserves that would be available to a horizontal well.

In this particular case, vertical wells demonstrated the productivity increase that occurred when they penetrated fractures or fracture swarms, that is something that a horizontal well is intended to do, so that was -- that would be the second discriminator, if you will. There are ways to predict fracture frequencies, and based upon prediction of fracture frequency and the lateral

length, you can predict the performance resulting from fracture penetration of a horizontal well.
Q And what are the methods to determine fracture frequencies?
A Most of them, they're all geophysical, geotechnical. They have to do with the ductility of the rock, the brittleness of the rock, the bending of the rock, if you will, the dip, the change in dip, those go to predicting fracture frequencies. We have existing wells that have penetrated fractures that give you at least a baseline of fracture frequency.
Q Okay. And which data do you use to determine -- strike that.
Which data do you use to find vertical swarms -- fracture swarms?
A Actual drilling data, we look for lost circulation while drilling, we look for -- during stimulation, it's not unusual to get different apparent permeability of the rock during stimulation, otherwise, the fractured rock is easier to pump into than a rock that's barren. And then finally, the open hole logs, depending on the logs that were used, can be used to identify the presence of fractured rock. Can also be used to identify the

presence of brittle rock that tends to be fractured when put under stress. And then finally, we look at the actual performance of the vertical wells.
Q Okay. And did all of those factors vary within the Mississippian?
A They varied from fractured to non-fractured, yes.
Q But you've described a number of factors used to predict the existence of fracture swarms; is that correct?
A Right.
Q Did those factors vary geographically within the Mississippian?
MR. BAUER: Objection.
THE WITNESS: The only thing that I saw that varied would be fracture density seemed to increase in the close proximity of major thrust, if you will, across the Nemaha, across the distal end of the Pratt anticline, to some degree south central Kansas where we've actually got some en echelon faults, but other than that, the fracture frequency is pretty constant.
Q (By Mr. Horne) And did you determine whether NSAI or SandRidge used those methods in connection with reserves in 2010 or 2011?

MR. PHILLIPS: Objection.

THE WITNESS: I don't know specifically the methodology, I hadn't seen the documents, but I know that Mr. Miller described his methodology to predict the PUD reserves for a well using vertical well data, PUD reserves for a horizontal well, and using as a basis or at least a partial basis vertical well data. It seemed consistent what I just told you.

Q (By Mr. Horne) Did he mention any of those methods in his testimony?

A Sure. He said they looked at open hole logs, he had geotechnical assistance that drew maps, they had maps, talked about base well data, public data such as the typical public well data that is found as scout cards and drill stem tests, completion reports, production reports, initial production reports. That's what I recall.

Q Is seismic data helpful in identifying fracture swarms?

A Depending on how the seismic is performed, but it can be, yes.

Q Can you explain that?

A Sure. If the seismic is performed with a view towards examining, to use your word, this layer

of rock, that's number one. Number two, it can be processed to identify any seismic swarms that are sufficient to create a change in the acoustic velocity of the rock.
Q And is 2-D seismic data sufficient or do you need 3-D seismic data?
A Both work. Neither are necessary, but both work.
MR. HORNE: Probably a good place to stop, I think we've been going for about an hour.
THE VIDEOGRAPHER: Off the record, 11:31.
MR. BAUER: I don't know if we put on the record that Ms. Lencioni is in the room assisting Mr. Horne with his questioning, I'm not saying there's anything wrong with that, but I can't remember if we actually have that on the record, I want it to be clear. Okay. Thank you.
THE VIDEOGRAPHER: Off the record.
(Break taken from 11:31 to 11:45)
THE VIDEOGRAPHER: Back on, 11:45.
Q (By Mr. Horne) Mr. Brittenham, we talked before the break about the use of vertical wells to recognize PUDs. Did those vertical wells give a high degree of certainty about the volume of oil that those PUDs would produce?

MR. BAUER: Objection.
THE WITNESS: As they were used by Mr. Miller, as I recall, he described the use of at least some existing horizontal wells in his mix of vertical wells to predict horizontal PUDs. I don't recall him stating, maybe he did, I don't recall him stating that he only used vertical wells to support horizontal Mississippian PUD. I have, but I don't recall that he did.
Q (By Mr. Horne) Okay. And do vertical wells, given the other information you know SandRidge had as of 2010, did those vertical wells give a high degree of confidence that the PUDs would produce at least as much volume of oil as -- as stated?
MR. BAUER: Objection.
THE WITNESS: You mean as a hypothetical, are you telling me that that was done?
Q (By Mr. Horne) Yes.
MR. BAUER: Still objection.
THE WITNESS: If -- if all of the -- if the only data that was used to generate substantiation for a horizontal PUD was vertical well data, no horizontal data at all, using the proper methodology, a result that has a high degree

of confidence can be determined. Whether Mr. Miller did that work, used that methodology, I don't know.

Q (By Mr. Horne) And to determine it, in your opinion, you would use the methods we previously discussed before the break?

MR. PHILLIPS: Objection; form.

THE WITNESS: The methods I used in the past we discussed.

Q (By Mr. Horne) And just to be clear, you haven't attempted to determine whether Mr. Miller's methods to recognize PUDs in the presence only of vertical wells are appropriate, because you don't know whether Mr. Miller recognized PUDs only in the presence of vertical wells; is that correct?

MR. BAUER: Objection.

THE WITNESS: Well, my recollection is he didn't. I think when he was asked that line of questions, he said that the closest he come, as I recall, and I'm characterizing, was to justify horizontal PUD, based upon the performance of a horizontal PUD compared to the existence of a immediately offsetting vertical well correlative to the vertical well that his horizontal PUD being analyzed existed. So there was a -- there was still an existing horizontal in the analytical process or

work flow.
Q (By Mr. Horne) Can you explain what that means?
A My understanding, based on his deposition testimony, Mr. Miller, for the purposes of determining or estimating reserves for a horizontal PUD in the Mississippi, the only time that he used an immediately offsetting vertical well as support for that PUD was when he had in conjunction with that an analogous vertical well that offset an existing horizontal Mississippian developed drilled well. And he used that information collectively.
Q Okay.
A That's my recollection.
Q And did you attempt to determine whether there was a correlation between vertical well performance in certain areas and horizontal well performance?
A Oh, I have, yes.
Q And was there such a correlation?
A Just a naked correlation, there's not, but if you look at the -- what vertical wells that penetrated fractures compared to horizontal wells which penetrated fractures, there's good correlation.

Q And would you point out to me which portion of your report makes that analysis?
A I didn't, you just asked me if I've ever done that.
Q Okay. Are you now expressing an opinion on that subject which you intend to express at trial?
MR. BAUER: Objection; he can express any opinion that you ask him for at the deposition. It's not his call.
THE WITNESS: I just answered your question.
Q (By Mr. Horne) Okay. But I'm asking you, are you disclosing at this moment an opinion which you have not previously expressed, but which you intend to express at trial?
MR. BAUER: Objection.
THE WITNESS: Only if I'm asked the same question, I'll give the same answer.
Q (By Mr. Horne) Okay. When did you conduct that analysis?
A Over the course of several years.
Q Which years?
A Probably 2009 through '15.
Q Can you turn to Paragraph 90 of your

report?
A 90, 9-D?
Q 90, 9-0. And Subparagraph D. And let me direct you to a sentence within it. "To the contrary, what this data better demonstrates" --
A Just a moment, where are you?
Q Sure. It's --
A Two-thirds of the way down, okay, I found it.
Q "To the contrary, what this data better demonstrates is that well log indicated porosity and even thickness is not always a reliable indicator of well production or reserves." What do you mean by that?
A Sure. A lot of the -- well, for instance, the open hole logs that Mr. Tomanek.
Q Tomanek.
A Tomanek offered in his report at Pages 15 through 20, as I recall, those open hole logs identified portions of silicic limestone, chert, altered carbonate in the top of the uppermost portion of each one of the well log indicated or measured properties of the Mississippian. The logs that were run, in particular, compensated neutron density log, based on how it's calibrated, how it's

set up, will respond to, for instance, if densities run on 271 matrix, it will respond to a silica, a chert, as an inflated porosity, so it's easy to find cherty or siliceous rocks with those logs, and that's what those logs are showing. Although it doesn't tell you for sure whether or not the porosity being measured or indicated, the apparent porosity is effective porosity. It's not very responsive to fractures, at least closed fractures.

Q Okay.

A So that's an example of why -- don't get me wrong, the industry likes to find as much porosity as you can, both primary and secondary, and open hole logs can indicate, can support the presence, but in this particular case, the open hole logs are actually supporting the presence of a mineralogy that is particularly sensitive or particularly adept at being fractured, and, therefore, that's something that we want to explore it with horizontal wells. And it may have a lot of porosity, too, but we don't know that for certain.

Q In your own work in the period 2009 through 2012, were you able to locate fracture swarms within the Mississippian?

MR. BAUER: Objection.

THE WITNESS: I believe so.
Q (By Mr. Horne) Can you give me an example?
A For instance, even prior to that, the best indicators of fracture swarms or just for individual fractures, what we originally talked about all of the ways during the course of drilling and completion, stimulation and producing the well, you can get indications of fractures. In particular with regard to estimation of reserves, the best wells support that -- best vertical wells support that they, in fact, penetrated in this area one or more vertical -- one fracture or one fracture swarm. Did that answer your question? I can't recall.
Q Well, you answered the question of what estimators could do, but I don't think you answered the question of what you, as an estimator, did do.
A For the purposes of assisting me in predicting the performance of horizontal wells or looking for correlation, I just looked where we had the best vertical wells, they tended to perform, as did horizontal wells, even some of the shortest lateral horizontal wells, demonstrative of both of them were intersecting at least one fracture set or one fracture swarm.

Q Okay. And did you look at any of the other factors that you've described in your answer to how to find vertical swarms -- fracture swarms?

A A portion of them, the portion that are publicly available, I have. Those that, you know, you have to have the daily drilling reports to see whether or not you lost circulation, you have to have the mud log to look for secondary deposition and fracture surfaces, I don't have those, but I've generally got open hole logs, got production reports, perhaps even stimulation reports that were available in the public record.

Q And how accurate was the information that you had?

MR. BAUER: Objection.

THE WITNESS: The open hole logs are usually pretty accurate, otherwise, they have a known performance understanding. Completion reports, all in the context of oil and gas well operations and production reporting, a knowledgeable person can sort through and decide when you have good, reliable data and perhaps when you don't.

Q (By Mr. Horne) Okay.

A And there are sometimes where things are just inadvertently misreported or omitted.

Q Okay.
A And that's taken into consideration.
Q Okay. And how effective was the publicly available information in identifying fracture swarms?
MR. BAUER: Objection.
THE WITNESS: Useful. We've got -- particularly in Oklahoma, we've got maps, Oklahoma Geological Survey has maps of faults, which are large fractures. There's a lot of publications in the literature about the existence of fractures and faults in the Mississippian. The public data, the individual well data that I just described is useful.
Q (By Mr. Horne) How reliable is it in predicting vertical swarms -- fracture swarms?
A It's not reliable enough to be able to hit it with, you know, hit a vertical fracture intentionally with a vertical well, with only one shot, but it is reliable enough to establish an area where presence of vertical fractures exists.
Q Did you ever attempt to determine whether every PUD well SandRidge drilled produced commercially successful amounts of oil and gas?
A No.

Q Why not?

A Wasn't part of my charge.

Q You state that well log indicated porosity is not always a reliable indicator of well production or reserves, are you talking generally or are you talking about the Mississippian in particular?

A Well, I'm specific talking about the Mississippian, but that comment would be -- would be equally applicable to similar formations, the Hunton, for instance, the Viola.

Q Okay.

A Even the Arbuckle.

Q Let's mark this Exhibit 5.

(Exhibit Number 5 marked for identification and made part of the record)

Q (By Mr. Horne) That's -- Exhibit 5 is Mr. Tomanek's expert report. I don't think you need to read the whole thing, but read as much as you want. I can tell you my only questions are going to be about Page 16.

A I probably wait for your question, then I'll read.

Q Okay. Yeah. This is the analysis

referenced in your Paragraph 90-D; is that correct?
A Yes.
Q Okay. And on Page 16, can you tell me what the figure is of?
A Tell you what the figure what?
Q Okay. Let me see if I can put it better. Page 16, Figure 2-9 is captioned "vertical well log sections offset to horizontal wells," do you see that?
A I do.
Q Okay. What is a vertical well log section?
A This is a cross-section, as it's presented, we've got three well log suites presented in a stratigraphic cross-section.
Q And there are certain intervals --
A Actually, this is probably a structural cross-section, but go ahead.
Q Okay. There are certain intervals that are marked on these well logs; is that correct?
A Appear to be.
Q Okay. And certain intervals appear in some of the wells, but not in others; is that correct?
A I don't see where -- the intervals you're

talking about, I take it, are the ones that apparently have been identified by a blue, gold, green and black lines?
Q That's correct. Actually, I think the black is the top and the bottom.
A Maybe the top. I got blue for potentially a bottom.
Q I think there's a black line on the bottom as well. Okay.
A Okay. Your question is?
Q Yeah. So the red interval appears in the Millie and the Donnie, do you see that?
A There's a red interval, otherwise, the thickness between the horizontal red line and the horizontal black line?
Q No, there is a red interval, and there's a red line indicating an interval in the Millie and the Donnie, do you see that?
A I do.
Q And there's no red line indicating a particular interval in the Jessica, do you see that?
A I do.
Q So that interval doesn't appear in the Jessica; right?
A According to this author.

Q Okay. And if you see -- you know what a Bates stamp is?
A Yeah.
Q Okay. And there are Bates stamps on each of the drawing, do you see that?
A Yes.
Q So the author is someone at SandRidge?
MR. BAUER: Objection.
MR. PHILLIPS: Objection.
Q (By Mr. Horne) Well, let me --
A Are you sure? Is this just one document? This looks like multiple documents pasted together.
Q Okay. Let me -- let me see if I can be a little clearer. The Jessica is Bates stamped SD Securities 0677641, do you see that?
A Okay.
Q And the Millie is Bates stamped SD Securities 0677642, do you see that?
MR. PHILLIPS: Counsel, can I ask you, are you representing that these are exact replicas of those pages or -- or that the -- your graphs are replica of the pages and this is where they come from? I'm just trying to understand.
MR. HORNE: Yeah. The graphs appear at the pages and this is where they come from.

MR. PHILLIPS: Okay.
Q (By Mr. Horne) And so the Millie appears one page over from the Jessica; is that correct?
MR. BAUER: Objection.
MR. PHILLIPS: Objection.
THE WITNESS: Apparently, the Bates numbers are sequential.
Q (By Mr. Horne) Okay. And the Donnie appears four page later -- four pages later; is that correct?
MR. BAUER: Objection.
MR. PHILLIPS: Objection.
THE WITNESS: Wait a minute. There's three Bates numbers listed at the bottom of Figure 2-9, the first two are numerically adjacent and 646 is separated by three or four pages.
Q (By Mr. Horne) Okay. And I'll represent to you that documents bearing the Bates stamp SD Securities were produced to us by the defendants in this case, specifically SandRidge.
A Are these separate pages that somebody's pasted together for Figure 2-9 or did Figure 2-9 exist as it is represented in this report?
Q These are separate pages, each of which is identified with a particular Bates stamp. I believe

they're from the same report.
A So Mr. Tomanek has added the green, yellow, gold and black lines?
Q No. I do not believe that is the case.
A Okay. Go ahead with your question.
Q So I'll represent to you that the author is someone at SandRidge. So according to this, there are certain -- strike that.
And the orange interval appears in the Jessica and the Millie; is that correct?
A According to this author, I mean, that's how apparently it's been.
Q Okay. It doesn't appear in the Donnie; is that correct?
A Apparently.
Q Okay. And even where intervals appear in two wells, sometimes they appear at vastly different locations, for example, the red interval appears about a third of the way from the bottom in the Donnie and maybe one-tenth of the way from the top in the Millie, do you see that?
A I do.
Q Okay. And can you mark on Exhibit -- sorry, on Page 16 of Exhibit 5 the best location to drill a horizontal well in each of these locations?

MR. BAUER: Objection.
THE WITNESS: Sure.
Q (By Mr. Horne) You need a pen?
A Just generally.
Q Yeah. You can just circle it just so it's clear.
A I'm going to draw a horizontal target interval.
Q Okay. Are you finished?
A Okay.
Q And why do you think that location is the best, for example, in the Millie?
A Well, you can see that the rock has been altered, the carbonate has been altered, silica's been added, it's of the mineralogy now that lends itself to being fractured. The mud log shows that silica exists, the density neutron logs show that silica exists, and it's in the upper portion of the Mississippian section below the unconformity that would have been the source for the meteoric waters to cause this modification of the mineralogy and the structure of the Mississippian carbonate.
Q What does the last -- the fourth blue column on each of these vertical well logs show?
A The several curve traces in the fourth

column, if you will, starting from the top, they identify open hole log conductivity, the indicated density and neutron porosities, a PE log, otherwise, a log intending to support the mineralogy of the rock. And then there's a shading, if you will, called gas effect between the neutron and density curves that tends to highlight in this particular case the presence of silica.

Q Okay. And are all of those factors reflected in the fourth -- the fourth column, so in other words, the one with the red line and the black line and the other black line?

A Yes.

Q Okay. And are these factors the kinds of factors that lend themselves to higher oil and gas reserves?

A They lend themselves to tell the driller where to place a horizontal well in the target zone to recover oil and gas reserves. I mean, it tells you the place to drill.

Q Okay. And --

A Only statistics are going to tell you the volume of production, if you will, of the reserve.

Q And in the Millie, do these statistics indicate that the best place to drill is just above

the horizontal line -- the orange line?
A No.
Q Why not?
A In fact, that may be getting a little too close to the top. When I drew my boundaries, the target boundary, I used as the turning points the -- the neutron -- the density curve on the fourth column.
Q Uh-huh.
A Anyway.
Q You got to keep it.
A Okay.
Q Turn to Paragraph 38 of your report.
MR. PHILLIPS: Page 38 or Paragraph 38?
MR. HORNE: Paragraph 38, but actually, you know what, I think we've covered that one.
Q (By Mr. Horne) Now, if you look at Appendix D of your report, now, you didn't review the deposition transcripts of Todd Tipton; is that correct?
A I did not.
Q And Todd Tipton was a geologist at SandRidge; is that correct?
A That's my understanding.
Q Why didn't you review Mr. Tipton's

deposition transcripts?
A Just didn't, didn't know existed.
Q Okay. And did you attempt to determine whether -- turning back to 41, did you attempt to determine whether SandRidge had seismic data?
A Focused on the Mississippi in the AMI?
Q Yes.
A I did not.
Q Okay. Why not?
A Wasn't relevant to my work.
Q Would a play like this have benefited from seismic data?
A At the time, it probably would not have benefited from new seismic, there was a lot of 2-D seismic already existing and some 3-D, but I don't know, I've not seen it applied for the purposes of predicting or estimating reserves in this area.
Q And that -- and you're speaking to your work as well in estimating reserves?
A Yes, in the Mississippian.
Q Would 3-D seismic data be used to locate fracture swarms?
A Could it? Under the right circumstances, yes.
Q What are those circumstances?

A I'm not a geophysicist, so I probably can't tell you all of them, but you have to be looking for fracture swarms in the right spot with the seismic you run. And I'm sure that there is some sensitivity of the ability to transmit acoustic signals that can and cannot be effectually detected, but I'm not -- I'm not an expert at that, it's just based on my experience.
Q Okay.
MR. HORNE: It's probably a good place to break for lunch.
THE VIDEOGRAPHER: Off the record, 12:18.
(Lunch break was taken from 12:18 to 1:00)
THE VIDEOGRAPHER: Back on at 1:00.
Q (By Mr. Horne) Can you turn to Paragraph 51 of your report, Exhibit 1, please. It's on Page 11.
A Okay.
Q Let me read part of it into the record. "Results were positive and with refinement in the application of available drilling and completion technology and operations, as well as identification of intrinsic reservoir properties, developers hoped to identify sweet spots both within the reservoir column and in certain areas." Now, you used the

phrase "hoped to identify;" is that correct?
A Yeah.
Q What did you mean by "hoped to identify"?
A Based on my experience, there was an effort made to see if there was a correlation between the better wells and any intrinsic rock properties or anything else, for that matter, as to -- so at the end of the day, you can only drill the best of the best wells every time, that was the idea.
Q Okay. And when did that effort take place?
A I think it was a continuous effort.
Q Okay. And --
A By the industry, I don't know, I'm sure that some gave up sooner than others.
Q And why did they give up?
A Generally there's not.
Q In the Mississippian, there's no sweet spots?
A No, there are sweet spots, the predictability of the sweet spots is -- or the lack thereof is what makes this a statistical play.
Q Okay. And what is a sweet spot?
A Just a fishing hole where the fishing is

better than the rest of the stream.
Q Okay. And do you know when SandRidge gave up?
A I don't know that they did.
Q How do you drill without sweet spots?
A I don't understand your question.
Q How do you find the best places to drill if there are -- if sweet spots are unpredictable?
A How does the industry in the Mississippi play do that?
Q General question, how do you, as an operator, find the best place to drill if sweet spots are unpredictable?
A Well, the first effort in the oil and gas industry is to identify the contributing factors or causes that may make wells in a certain area better than others, if there are any.
Q Okay. And how do you identify those factors?
A Look for everything that might relate to the ability of the rock to store hydrocarbons, to deliver hydrocarbons, I guess that's it.
Q And what do you need to do to obtain the data necessary to identify the contributing factors?
A Well, during the course of drilling for

any well, we're talking general now, during the course of drilling, you obtain petrophysical information, otherwise, samples of the rock while you're drilling, you obtain electrical and -- and physical measurements of the rock itself after the borehole was drilled, fluids that it might contain.

There are tests that can be done, run, you can run pressure transient testing to determine structure and aspect of the reservoir, if you're looking for barriers to flow or permeability, just depending on which aspect you think, you, as an operator, think might be most likely to be a positive contributing factor. There are tests that can be run by petroleum engineers and other geoscientists to look for those factors, the presence of or the correlation to, if any, the results observed.

Q Okay. Did you attempt to determine whether SandRidge looked for sweet spots?

A Yeah, just in my work, it was pretty obvious that SandRidge and everybody else did as well.

Q And you said it's pretty obvious, pretty obvious how?

A Well, I'll give you an example. As I

recall, Mr. Ward testified that during the course of development, that it was generally SandRidge's effort to drill wells close to good wells, where that opportunity presented itself, those were given priority.

Q Okay. And is that trying to find a sweet spot?

A Well, you may have found one with the good well, you don't know.

Q Right.

A Till you extend it, usually you like to think a sweet spot has more breadth to it than a single well.

Q And did it typically in the Mississippian?

A No.

Q Okay. And so what was your basis of recognizing a PUD next to a single well?

A You've lost me.

MR. BAUER: Objection.

THE WITNESS: Put it in context. Terry Brittenham working in the industry?

Q (By Mr. Horne) Fair enough. What was -- you construct type curves in the Mississippian today?

A Do I?

Q Yes.
A No.
Q Have you constructed type curves in the Mississippian in the last eight years?
A Not that I recall.
Q Do you construct type curves in plays as variable as the Mississippian today?
MR. BAUER: Objection.
THE WITNESS: I'm sure I have.
Q (By Mr. Horne) And when you do so, do you select PDPs and take adjacent wells and call those wells PUDs, develop a type curve and have a PUD type curve?
MR. BAUER: Objection.
MR. PHILLIPS: Objection.
THE WITNESS: In resource plays, regardless of the variability, magnitude of variability, it's customary, and I have, where the data exists, developed type curves for the purpose -- type curves from existing producing wells in the play for the purpose of predicting the performance of a proved undeveloped or undrilled well.
Q (By Mr. Horne) What about in statistical plays?

A Typically not.
Q Okay. And why not?
A Outside where conventional reservoirs have statistical performance characteristics, I don't know that I've ever had enough data to prepare a type curve in my work.
Q And would that include the Mississippian?
A Yes.
Q SandRidge developed a type curve, though; right? Strike that.
Netherland Sewell developed a type curve; right?
A Yes.
Q Would you have if you were them?
A If I was Netherland Sewell?
Q Uh-huh.
A Charged with doing reserves, preparing reserve estimates on the Mississippi, yes, that would be a good approach.
Q How do you estimate PUD reserves, how do you estimate PUD reserves in a statistical play?
A Well, one example you just brought up is to use a type curve.
Q I want to make sure I understand your testimony. You said that you -- well, did you say

that you typically did not have enough information in the statistical play to develop a type curve?

MR. BAUER: Objection.

THE WITNESS: That I haven't personally, that's correct.

Q (By Mr. Horne) Okay. And so what's the difference between you and Netherland Sewell in this case?

A Netherland Sewell was working in the Mississippi developing PUD reserves at a time when I wasn't.

Q And how many wells are needed to form a type curve in a statistical play?

A There's no hard fixed number. As an industry, we know that to the extent you can say a statistical play is a subset of a resource play, at least they have some things in common, most resource plays require at least 100 data points, maybe more to get a statistically significant result.

Q And do those data points have to be horizontal wells?

A They have to be, generally that's the case, if you're looking for -- if you're comparing apples with apples, that's not to say that you couldn't justify using a vertical well with certain

types of prediction of horizontal development, I can see that.

Q Okay. And in what circumstances would you be able to use a vertical well?

A For instance, if I'm going to drill a short lateral and I'm planning on intersecting, you know, one or two vertical fractures during the course of drilling the horizontal, I would go back and look at the vertical wells that obviously had intersected one, at least, vertical fracture and use that as a basis how a wellbore would intersect one vertical fracture performance.

Q Anything else?

A That would be a start.

Q Can you think of anything else?

A Not that I've done personally.

Q Okay. That other people have done?

A You're going to have to ask your whole question prior to that, can you think of anything else.

Q Sure. Can you think of anything else that other people have done to use vertical wells to generate a data point in constructing a type curve?

A Not that I've had knowledge of, I mean, I can think of some that you could go through the

statistical exercise, but I haven't seen it done.
Q And do you know how many data points SandRidge used in general -- strike that.
Do you know how many points, data points Netherland Sewell used in generating SandRidge's year end 2010 type curve?
A Not off top of my head, no.
Q Is it more or less than 100?
A I don't recall for sure.
Q And if it were less than 100, would that be a problem?
A I don't know, depending on results you got.
Q How so?
A Well, you would have to look at the -- in the judgment of the estimator, if the data that was used to prepare the type curve appeared to him to be providing useful results, then I wouldn't have any problem with him using it. At the end of the day, if the skew was such that the utility looked poor, I wouldn't have any problem with him rejecting it.
Q Are there any results -- strike that.
Are there any circumstances in which you would have a problem with an estimator honestly using his or her own judgment? Let me see if I can

ask that better. Are there any circumstances in which you would believe that an estimator honestly using his or her own judgment is nevertheless wrong?

A No, that's what an estimator does.

Q Turn to Paragraph 53, I know we've gone over it a little bit before. "Based upon early production results, coupled with historical knowledge of the play," excuse me, "most reservoir engineers operated with the premise that the Mississippian was a regionally extensive, conventional, heavily fractured, oil saturated, volumetric limestone reservoir exhibiting low permeability." And I'm going to ask you what each of those terms mean, other than conventional, which I think you've explained before.

A Okay. Regionally extensive means that the Mississippian has been mapped to extend physically over probably the north -- northern two -- I can draw you a map, but the northern two-thirds, north central two-thirds of Oklahoma, portion of southeastern Kansas, most of trend of southwestern, if you just wrap around the arch in central Kansas trending north-south, and extending into corner region between Colorado, Nebraska and Kansas. So that's regionally extensive. That's been mapped,

been verified.

Heavily fractured, vertical well performance of wells drilled into the Mississippi demonstrated the -- that some wells intersected natural fractures. The larger fault systems were mapped that tend to correspond with the origin and frequency of natural fracturing. Vertical well drilling established that the Mississippian porosity, where it had the ability to store migrated crude oil, was, in fact, saturated with crude oil.

The limestone reservoir, it's limestone, it's a carbonate, just lack of a better word, limestone. The volumetric nature of the reservoir is such that it produces primarily due to solution gas drive, at least in the area that was being developed in the play, in the Mississippi play, it was not known to be water driven. There were no -- at least no broad areas of free gas accumulation, certainly, prior to development, vertical development.

Permeability was low, the primary permeability was certainly low, intergranular or primary -- permeability resulting from primary porosity, it was known that much improved permeability was encountered when natural fractures

were found. They were symptomatic, one or the other, if you will. That's the -- if you went back and looked at the book, that would be a definition of a tight oil play.

Q Okay. And you mentioned that the play was not known to be water driven, what does that mean?

A The hydrocarbon accumulation was not in contact with a large aquifer that was capable of maintaining reservoir pressure.

Q And was there a large aquifer in the Hunton limestone?

A In the Hunton, in this area, in the immediate area, generally not.

Q Okay. And are the characteristics that you set out in Paragraph 53 consistent with the Mississippian having sweet spots?

A Probably to the extent where fracturing was -- fracture frequency was enhanced, it's also probably coupled with the presence of not just diagenetically, but alteration by influx of meteoric water containing silica tended to enhance the porosity and preserve the porosity and permeability, and that occurred close to the unconformable surface during pre-Pennsylvanian times.

Q Anything else?

A I think I answered your question.

Q Just want to make sure I have your complete answer. So in other words, what might contribute to a sweet spot is -- strike that.

You mentioned the presence of silica, and is that consistent throughout the Mississippian?

A Generally not.

Q Okay. Had operators identified --

A Let me back up. Vertically, not consistently present throughout the Mississippian stratigraphic column.

Q That was my question.

A Laterally, everywhere where there was an unconformable surface that was aerially -- that was exposed to the atmosphere and where the opportunity for the infiltration of surface water, ground water, we find that alteration.

Q Okay. So just to make sure I understand, vertically, the silica is not present throughout the Mississippian, but geographically, it's present throughout the Mississippian; is that correct?

A That's correct.

Q Okay. And heavily fractured, is that present throughout the Mississippian, the level of fracturing?

A The fracturing is present essentially everywhere we have brittle rocks, which are the silica-altered carbonate rocks that I just described, we find that the fracture intensity increases where their rate of folding, such as like draping over the Nemaha Ridge also increases.

Q When was this discovered?

A I don't know. I read about it in treatises that are older than me.

Q Okay. I'm not going to ask you your age.

A I'm pretty old, I understand.

Q And was the location of higher fracture intensity areas known as of 2009?

A I believe so, yes.

Q Okay.

A Certainly published.

Q And are there any reason -- other reasons why there would be variations in the Mississippian productivity?

MR. BAUER: Objection.

THE WITNESS: I guess I need to understand your question, you say are there other reasons why there are variations in the productivity of the Mississippi, I don't think that's the question I've been answering.

Q (By Mr. Horne) Okay.
A If you want to ask that question, I can answer it.
Q I'll withdraw it. Were the locations of sweet spots known in 2009 through 2010?
A I'm going to say generally no. The locations of wells that had -- that were very productive and abnormally productive were known. There may have been a mental correlation between those involved with developing the play and -- and those facts, but there's no sweet spot map.
Q And do you know for a fact that there was a mental correlation?
A Don't know.
Q Okay. Speak to anyone about it?
A Sure.
Q Who?
A All of my clients, where should I drill, drill all the same places we've been drilling, while you're at it, may as well drill close to the best wells, can't hurt.
MR. PHILLIPS: We're going to break, the phone apparently isn't on.
MR. HORNE: Yeah, can we go off the record a few minutes?

THE VIDEOGRAPHER: Off the record.

(Break taken from 1:23 to 1:30)

THE VIDEOGRAPHER: Back on, 1:30.

Q (By Mr. Horne) Now, let me take you to the latter part of your paragraph. "There was also an understanding that because of the high water saturation observed in the fractured Mississippian, it may also respond to a dewatering effort," what do you mean by "dewatering effort"?

A As the process was known in -- at least in Oklahoma at that time, it had been observed prior to that time, it had been observed that certain reservoirs, reservoirs that had a -- say classic reservoirs that had a long oil-water transition zone or carbonate reservoirs that had what I call a bimodal porosity development, that in the latter case, by quickly removing, depressuring the fracture system in the carbonate reservoir, only then would the threshold of expulsion be realized to allow the less permeable, but perhaps more storativity porosity to divulge its oil and gas.

Q And what is the consequence of dewatering?

A The consequence of dewatering, it's actually depressuring, but you depressure by removing the liquid from the fractures, the more

permeable fracture system. The consequence is to allow the rest of the porosity that has lower permeability to also produce and produce sooner.

Q What are examples of types of formation that respond to depressuring?

A Well, I brought up two. Any type of -- for instance, any carbonate, not any, but a carbonate that has a dual porosity system with the secondary porosity system being much more permeable than the primary porosity system, and -- and with that primary porosity system containing hydrocarbons, that would be a candidate.

Q Okay. And you state -- you begin your sentence with "there was also an understanding," whose understanding are you talking about?

A I would say oil and gas operators that were working in central Oklahoma, people that were following the efforts of, for instance, Dominion and others in the Carney field, in the West Edmond Hunton field, at Pawnee Masham field, and others, dewatering efforts.

Q And how do you know they had --

A Southeast Oklahoma City.

Q I'm sorry.

A Excuse me, also southeast Oklahoma City.

Q And how do you know they had that understanding?
A Many of them were my clients, many of them, professionally, we worked together, through SPE primarily.
Q Talk to anyone about it?
A In all those cases.
Q Okay. SandRidge was a substantial operator in the Mississippian; is that correct?
A Yes.
Q And SandRidge has produced some 2.6 million pages of documents in this action; is that correct?
A I don't know.
Q Okay. I will represent to you that they did. Did you attempt to go through those documents for evidence of what you're asserting in Paragraph 53?
A The entirety of what I asserted in 53?
Q Just the part that begins "there was also an understanding that."
A I didn't intend to go through all of those documents for any purpose.
Q Okay. Even though you're making assertions about the oil and gas industry throughout

your declaration, and SandRidge was a significant operator in the Mississippian, in fact, the most significant operator, you didn't attempt to go through those 2.6 million pages of documents to figure out if your theories were correct?

MR. PHILLIPS: Objection; form.

MR. BAUER: Object to form of the question, also, argumentative and kind of stupid.

THE WITNESS: I didn't go through the documents, and these aren't theories, they're just knowledge that I've come to have or possess based on my work in the industry at the time.

Q (By Mr. Horne) Is there any expertise involved in knowing what operators believed about the Mississippian?

MR. PHILLIPS: Objection.

Q (By Mr. Horne) At that time, as stated in Paragraph 53?

MR. PHILLIPS: Objection.

THE WITNESS: Otherwise, I don't understand your question.

Q (By Mr. Horne) Are these just things you witnessed?

MR. BAUER: Objection.

THE WITNESS: In part, yes.

Q (By Mr. Horne) What part is not just things you witnessed?
A My factual knowledge is what I witnessed, my professional expertise extends what I witnessed to the logic of the effort, the candidate reservoirs, I guess that's it.
Q So, for example, when you say "there was also an understanding that" and continue "because of the high water saturation serving in the fractured Mississippian," what you are reporting, what you're basing this on is conversations with persons to which you were a witness or documents or --
A Yeah, the fact that the fractured portion of the Mississippian tended to produce a lot of water is an observed fact, that's based on experience from drilling wells, producing wells, watching others do the same thing. The observation that with pressure depletion, most of the vertical wells establish a permeability to gas that exceeds that to liquids, and gas becomes the primary producing phase, generally, in the vertical wells, indicative of a two porosity system where the primary porosity has got hydrocarbons in it.
Q Have you observed decreasing water production, along with increasing oil production in

Mississippian wells?
A We see decreasing water production generally parallel to decreasing oil production in the Mississippian thus far.
Q Okay. And would it then be fair to say that the Mississippian is not responding to a dewatering effort?
A Not widely, it's not got to that point yet.
Q Just want to make sure I understand. The Mississippian is not responding to a dewatering effort to this point?
A At least not widely, if -- there might be 100 wells that I've missed that may be responding that I don't know about, but it's not widely reported that that's being observed.
Q Okay. You're not aware of any instance in which the Mississippian responded to a dewatering effort?
A To this point, that's correct.
Q Okay. Which thick Pennsylvanian sand reservoirs are you referring to?
A Primarily Red Fork, Bartlesville; Red Fork and Bartlesville.
Q Turn to Paragraph 54. And let me read

part of it into the record. "Before any actual horizontal well performance was available, it was customary for petroleum engineers to estimate the performance of a horizontal well based upon a mathematically supported multiple of the performance of the vertical well." Did operators recognize proved reserves in this matter, SEC proved reserves?
A I don't know.
Q Did SandRidge?
A Did SandRidge?
Q Did NSAI?
A Same answer, I don't know.
Q Would it be proper to do so, in your opinion?
A It would be a start, yeah.
Q What do you mean by that?
A Well, we've already talked about it, that would be the first step, that would be a first step, absent any other data, say I just -- in a real imaginary world, what will a horizontal well produce compared to a vertical well, just due to geometrical constraints.
Q Okay. And would that be sufficient to recognize SEC proved reserves?
A Depends on the value you used, I reckon.

It might. I haven't, just haven't had the opportunity. But there would be a level of certainty that would be supported by the engineering calculations, which are proven, so there would be some -- some level of reserve that would be supported, even under SEC definitions.

Q Let me turn you to Paragraph 56, and I'm not going to read it into the record because it's very long, but if you could take a moment and read it to yourself.

A Okay.

Q These are methods that would increase production, is that correct, and reserves?

A Yes.

Q Okay. And --

A At least.

Q I'm sorry?

A If not increase the reserve, increase the value of the reserve.

Q And that's by increasing production?

A And maybe both.

Q And is it appropriate to recognize increased reserves based on the anticipation that these methods would be used?

MR. PHILLIPS: Objection.

THE WITNESS: Generally the -- we have to rely on the estimator and the actual facts, but generally definitions for proved reserves have to do with characterizing the efforts as under existing conditions, under existing technology, under existing protocol, but there's certainly room for best practices to be considered and applied, but the estimator's got to draw the line for when is something obviously going to be applied that results are reasonably predictable and when it's something, just an experiment.

Q (By Mr. Horne) Okay. So I just want to make sure I understand. Is it your opinion that if an estimator reviews these techniques and determines that certain of them are likely to be applied and their estimates are reasonably estimable, then the estimator can assume any benefit from those techniques in determining proved reserves now?

MR. BAUER: Objection.

THE WITNESS: If it's supported, yes, for instance, if he's got an example that one of these items worked in an analogous well or offsetting well, and it was going to be applied in a PUD well, then it would be reasonable to apply it. But you can make arguments against that, well, it hasn't

been demonstrated in this area under these conditions yet, but it's something that was part of the optimization and best practices development process. So I could see it working both ways. The estimator still has to do his work right.
Q (By Mr. Horne) Okay. All right. Let's turn to Paragraph 55. If you could take a moment to read it to yourself.
A Okay.
Q And would you explain to me what you mean by Paragraph 55.
A Sure. The science existed at the time of the Mississippi play, horizontal development play, to understand the horizontal stress field that controlled the orientation of created vertical fractures and, otherwise, the azimuthal orientation, north, south, east, west, and also controlled or tended to keep open naturally occurring vertical fractures that weren't chemically sealed or something like that. So that was known at the time.
Q So as a result, operators knew that they would have more productive wells if they drilled in a north-south trajectory?
A Generally, that's correct, yes.
Q And would you expect SandRidge -- strike

that.
When was this known more specifically?
A Well before the Mississippi play commenced.
Q Okay. So 2007 maybe, definitely before 2009, 2010?
A Maybe 1939, '45, something like that.
Q Okay. And SandRidge being one of the largest operators, if not the largest operator in the Mississippian, you would expect them to know that; right?
A To know the orientation of hydraulic fracture or the likely orientation of an open natural fracture, I would.
Q Who's Lance Galvin again?
A Sir?
Q Who is Lance Galvin again?
A Petroleum engineer, he's an engineer for -- that works for SandRidge.
Q Okay. And what was his role?
A At the time, I think he worked in the reserves department. Reservoir engineer.
Q Let's mark this Exhibit 6.
(Exhibit Number 6 marked for identification and made part of the

record)

Q (By Mr. Horne) Take a moment to review the e-mail and let me know when you're done. For the record, Exhibit 6 is a document, an e-mail Bates stamped SD Securities 0435928.

A Okay.

Q And what is your understanding of what's happening here?

A There's an e-mail correspondence between a land manager, Mr. Beaver, and Lance Galvin regarding -- basically what it has to do with where to site the surface location, drilling wells from the north to the south or drilling wells from the south to the north.

Q Okay.

A And Mr. Beaver basically is asking Lance and the reservoir group, does it make any difference to you guys as to well performance whether we put the toe at the south or the toe at the north.

Q Okay. And Mr. Galvin responds, "We haven't drawn or worked to conclusion yet;" is that correct?

A That's what it says.

Q So at this point, Mr. Galvin doesn't know whether to drill north to south or south to north?

A Early indication revealed that wells drilled up dip from south to north outperform wells drilled from the north, but their work is continuing.

Q And, in fact, you stated that from 1935, operators knew that wells drilled in a north-south trajectory were more productive; is that correct?

A Not north to south, a north-south trajectory. All of these wells are drilled in a north-south trajectory.

Q I see. Okay. So in other words, what you're saying is most horizontal wells -- what you're saying in your report is that wells were drilled north-south, as opposed to east-west, not north to south?

A Correct.

Q Okay.

MR. BAUER: You finished with Exhibit 6?

MR. HORNE: I am finished with Exhibit 6.

Q (By Mr. Horne) Turn to Page 58.

MR. PHILLIPS: Paragraph 58?

MR. HORNE: Yeah, Paragraph 58.

Q (By Mr. Horne) Now, you state that by mid 2012, SandRidge was very -- or the Mississippian was very early in its development?

MR. BAUER: Objection.
THE WITNESS: Mid 2012, according to Paragraph 58, was yet very early in the development of the play.
Q (By Mr. Horne) Okay. And --
A That's what I say.
Q What can be known about EURs very early in the development of a play?
A EURs can be known very early in the play, is that your question?
Q What can be known about them?
A What can be known about EUR? Some initial indication of magnitude, some initial indication of distribution between oil and gas, that can be known.
Q Okay. What about later stage decline curves?
A What about them?
MR. PHILLIPS: Objection.
Q (By Mr. Horne) Can that be known early in the development of the play as of mid 2012?
A I don't understand your question.
Q Okay. Let me try to rephrase then. What about decline rates during the later part of a well's life, can that be known early in the development of a play by mid 2012?

A Not from the horizontal wells themselves generally.
Q Okay. How would you calculate it?
A There would be a -- the methodology that was commonly used was to use, at least as a guide, the exponential performance of wells that had already produced for a long period of time from the formation, in this case, they were vertical wells.
Q Okay. And you state "There was optimism that early projected estimated ultimate recoveries may have been conservative in that estimated reserves per well were improving," do you see that?
A Yes.
Q Did you consult SandRidge's documents in arriving at this opinion?
A I've seen some, yes.
Q Okay. Which ones?
A That would have been deposition exhibits.
Q Did you see any documents suggesting the opposite?
A Not that I recall.
Q And were you aware before today that by November 2012, SandRidge disclosed that its estimates of decline rates had actually been too low?

A I thought we were talking about mid 2012.
Q We were talking about mid 2012, now we're talking about November 2012.
A Okay. Well, we just went over the correspondence between the trustee and the SEC, I mean, in addition to that or information in addition to that?
Q The question was, were you aware before today that in November 2012, SandRidge reported that the decline rate it had reported was too low?
MR. BAUER: Objection.
THE WITNESS: All decline rates or a certain decline rate?
Q (By Mr. Horne) Throughout the Mississippian.
A Let's talk about a given well.
Q I'm sorry, SandRidge didn't talk about a given well.
MR. BAUER: Objection.
THE WITNESS: Okay. Maybe, I don't recall a specific document, you and I may not be talking about the same thing.
Q (By Mr. Horne) Okay. And do you have a recollection of whether by November 2012, operators still were optimistic about the Mississippian? Let

me see if I can ask that a little better. Do you have a recollection of whether by November 2012, operators still had optimism that early projected estimated ultimate recoveries may have been conservative and that estimated reserves per well were improving?

A Sure.

Q Okay.

A Even later in 2012, the end of the year.

Q Okay. Not SandRidge, though; right?

A Not in the SandRidge documents I've seen.

Q Would it affect your opinion to know that SandRidge had, in fact, indicated that its decline rate was too low in November 2012?

A No.

Q Why not?

A Because I didn't offer an opinion about what SandRidge expected for a decline rate outside of what I knew was projected by Netherland Sewell.

Q Let me see if I can understand your statement then. When you state "At that time, there was optimism that early projected estimated ultimate recoveries may have been conservative and that estimated reserves per well were improving," are you expressing this opinion -- this as an opinion?

A An opinion and observed fact.

Q Okay. And does knowing that SandRidge announced in November 2012 that its decline rates were too low affect your expression of this particular opinion?

A Probably not. At the end of the day, if there were public disclosures by SandRidge that the decline rates that had been a basis for the book reserves estimates provided by Netherland Sewell were too low, it's still my opinion that overall in the industry, there was a general consensus that early projected EURs may have been conservative.

Q Okay.

A Basically all -- all of these efforts that were designed to improve EURs, improve the value of EURs had not been fully implemented, were still in a drilling phase for the most part. I think most of my clients, most of the industry were of the mind that the results weren't in, but they were still spending money to do the things that we listed previously in Paragraph 56 to improve production EURs and the value of the EURs.

Q And was SandRidge one of your clients?

A No.

Q Okay. And were you aware of whether

SandRidge had actually already tried any of these methods?
A Yes.
Q Okay. What was your awareness of which methods SandRidge had actually tried?
A Well, my understanding through my work in this matter that SandRidge had at least tried A and B, I see evidence of D, they had committed to E, were using F, and committed to G.
Q Okay. So A, B, D and F could not increase EURs then because it had already been tried?
A That's not true.
Q Okay. Explain to me how they could.
A Sure. If you just -- if I just installed high lift equipment on a well drilled four months ago, it's too early to condemn the effort at this point. Same thing with most of these that are designed to improve the recovery, changing of the stimulation protocol.
There was some discussion, I think probably the most -- A was probably the most up in the air as to whether or not it was going to be effective by SandRidge, but all of the others, SandRidge was in the process of implementing, most all the wells got drilled in 2012 for the most part.

Q Can you turn to Paragraph 79? Now, the last sentence -- well, I'll let you get to it. The last sentence of Paragraph 79 is "At the end of the engagement, Mr. Miller and NSAI's reserves estimates were NSAI's alone, regardless of the client's input, concurrence or disagreement." What do you mean by stating that the estimates were NSAI's alone?
A Based on the deposition testimony of Mr. Miller first, Nguyen and Walton supported the testimony as well, as did Nguyen and Johnson, but as I recall, Mr. Miller was specifically asked what his methodology was to arrive at the results and whether he -- and I'm just characterizing, but whether he adopted SandRidge's or somebody else's results or whether his results were his own, and whether he sought a concurrence between the client and his own work or not or whether he achieved one, that was the primary basis. Quite frankly, the other deponents just corroborated that statement.
Q And are those the only things you are relying on, the items cited in Footnote 42?
A Also relying upon the custom and standard in the industry, that independent reserve estimators are just that, they're required to be independent, required to be objective.

Q Okay. And --
A Doesn't mean they don't make mistakes, but that's their job.
Q Okay. And I just, you know, really basic question, you're not expressing an opinion that -- strike that.
Are you expressing an opinion that legally speaking, the NSAI's reserve estimates were NSAI's alone?
A I'm expressing opinion about observed facts, I don't know that there's a legal inference or anything legal with regard to that.
Q Well, let me see if I can get the contours of your opinion. And I'm going to attempt to paraphrase your opinion, and you let me know whether I'm paraphrasing it wrong. You are saying that NSAI had the responsibility to come up with reserves, is that your opinion?
A That's the work they were hired to do, yes.
Q Okay. Do you -- is your opinion anything more than that?
MR. BAUER: Objection.
THE WITNESS: Yes.
Q (By Mr. Horne) What is it more?

A Well, notwithstanding the observed facts that form the basis for my opinion, my opinion is that Mr. Miller and NSAI factually were independent of the client, SandRidge, did undertake to prepare an objective analysis, in consideration of, but notwithstanding input from its client, SandRidge. And at the end of the day, the reserve estimates that were signed, executed by professional engineers for Netherland Sewell were theirs.

Q Okay. Did you attempt to determine whether SandRidge endorsed NSAI's estimate?

A Endorsed, agreed with?

Q Let me see if I can phrase it better. Did you attempt to determine whether SandRidge stated publicly that they agreed with NSAI's estimate?

A I guess my impression was that SandRidge thought that NSAI's estimate was too conservative, at least at some point in time, but I don't specifically recall the document.

Q And at which point in time is that?

A Early on.

Q 2010?

A That was my impression.

Q And do you know what SandRidge's internal type curve was at the time?

A What their internal type curve, if there is just one, I don't think I've seen it.
Q Okay. Do you know if it was materially different from NSAI's type curve?
MR. BAUER: Objection.
THE WITNESS: I don't know.
Q (By Mr. Horne) And if you're saying that it's too conservative, would you expect SandRidge's type curve to be materially higher than NSAI's type curve -- than NSAI's type curve?
A Don't know that that would be the case, either. It was my impression SandRidge thought that Miller at times was too conservative in his work, that was my impression. I didn't carry it as far as comparing type curves, if there was type curves, were type curves to compare for the same data for the same time, I didn't do that work.
Q Okay. All right. So returning to what we were talking about, are you -- did you attempt to determine whether SandRidge publicly stated that they compared their own internal reserves estimates and methodologies to Netherland Sewell's to test the reserve estimates and conclusions before the reserve estimates were included in the registration statement?

A The first part of that question was did I attempt to do something?

Q Did you attempt to determine whether SandRidge -- SandRidge's internal reserves estimates and methodologies were compared to Netherland Sewell's to test the reserves estimates and conclusions before the Netherland Sewell type curve was included in the registration statement, the Trust I registration statement?

A I don't recall that SandRidge did anything publicly, other than the -- between the two companies back and forth that is typical between a client or an entity and a reserve estimator. That's all I recall.

Q Okay. And do you recall attempting to determine whether SandRidge's senior management publicly stated that they had reviewed and approved the Trust I reserve report?

A I don't specifically recall.

Q Would it affect your opinion that the NSAI's work was NSAI's alone?

A No.

Q Okay. Even if SandRidge senior management endorsed it and publicly stated that they endorsed it?

A Even if.
Q Okay.
A Doesn't change my opinion.
Q Okay. Are you expressing an opinion about whether, legally speaking, SandRidge's management can be held responsible for stating that they reviewed and approved NSAI's reserve report?
MR. PHILLIPS: Objection; form.
THE WITNESS: I'm not offering any legal opinions.
Q (By Mr. Horne) Okay. So you're not offering a legal opinion on that subject?
A I'm not offering legal opinions, period.
Q Okay. Just --
A At least I'm not intending to.
Q That's good enough for me. Are you -- can you turn to Paragraph 94-A of your report. It's on Page 22. Do you need some water, sir?
A Got some, sorry.
Q Coffee or anything like that?
A Define anything like that.
Q Whiskey?
A Off the record. Okay.
Q Okay. First sentence of your Paragraph 94-A is "First, the use of high volume lift

equipment such as ESPs is common for well operators in the Mississippian play," and you state, "high volume lift equipment such as ESPs," does that include gas lift?

A Yes.

Q Was it known whether -- strike that.

Was it common to use ESPs?

A Yes.

Q At what time?

A At appropriate times in the life of a well.

Q I think we're speaking past each other. At what time in terms of calendar years did it become common to use ESPs in the Mississippian?

A I think the first one that I have a specific recollection is going to be SandRidge ran an ESP, going to say 2009, but it may have been a year earlier.

Q And how did you find out that SandRidge ran an ESP in 2009?

A Or maybe a year earlier.

Q Or maybe a year earlier?

A Maybe even two years earlier. One of their earliest wells, because SandRidge -- or excuse me, I meant Chesapeake if I said SandRidge.

Chesapeake reported to the Corporation Commission that they wanted to run an ESP in a horizontal Mississippi well at that time.

Q And that's one well; right?

A Yes.

Q When did the use of ESPs become common?

A At least then, maybe earlier. The only reason that one got reported is because at that time frame, I recall they were getting a credit in the Oklahoma Tax Commission in Oklahoma, production tax applied by running high volume lift, you actually had to pay less taxes, you as an operator.

Q Okay.

A And that's why it got reported to Corporation Commission after -- I'm thinking it was 2009, after that, that tax credit expired, so nobody reported it anymore.

Q Okay.

A But I recall clients, my clients running ESPs as an alternative, a better alternative to air lift. Air lift had safety issues, and certainly, by 2010, and gas lift was expensive till they had gas lines laid to central facilities, and until ESP could be run from highline power, there was a lot of engine generator sets that got rented and put out in

the field. I can remember my clients complaining about them, Kirkpatrick spending tens of thousands of dollars a month, and this would have been 2010, 2011.

Q Okay. Do you recall being able to -- strike that.

If SandRidge was using ESPs widely in the Mississippian in 2011 to 2012, is that information that would be useful -- would have been useful to you at the time?

A At what time?

Q 2011, 2012.

MR. BAUER: Objection.

THE WITNESS: Useful to me in 2011 or '12?

Q (By Mr. Horne) Yes, in doing your job.

A No, because most prudent operators were, I didn't need to know what a prudent operator would do.

Q Do you have a recollection of what percentage of your clients' oil production came from wells in which ESPs were installed in 2011, 2012, just a general ballpark?

A The bulk of my clients, I take that one step further, and those that I was aware of, certainly by 2012 were using high volume lift

equipment. I'd say there was an equal distribution between high pressure gas lift and electric submersible pumps. There were a handful of wells that either the operator just ignored it, didn't pump the well off or for whatever the reason, the well didn't make much liquid, but for the most part, they all did. And with time, those that were using ESPs went to gas lift, those that were using gas lift went to ESPs, back and forth.

Q And how did you determine that your clients were using ESPs?

A Reading daily reports, looking at cost records, talking to my clients about how to design a gas lift installation for horizontal well.

Q Did you look at public records?

A I looked at public records, yes. I think the only public record that expressly identified the lift equipment was the one I just referred you to, the Chesapeake well.

Q Okay.

A Generally there's no requirement to report lift technique to the state.

Q And so using only public records, it would not have been possible to determine the number of ESPs that SandRidge had on its wells; is that

correct?
MR. PHILLIPS: Objection to form.
THE WITNESS: At least the Oklahoma Corporation Commission records. I mean, to the extent there's securities-related records out there, I don't -- I don't know that.
Q (By Mr. Horne) Okay. Did you have clients in 2011, 2012 who weren't operators, but were instead investors?
A I had a lot of clients that were non-operated working interest owners, had some that were royalty owners. I don't know that I had any that were investors. I had some that were, for lack of a better word, friends and associates, otherwise they weren't paying me for my advice, so that's what I had, talking about this subject, these issues.
Q Okay. Was the number of wells that were on ESPs and their impact considered proprietary information by your clients?
A Not that I know of.
Q Did you talk about it to people outside of your clients?
A Did I?
Q Yes.
A Sure. It's common knowledge. Everybody

had to use high volume lift, either that or you wouldn't produce your well.
Q But I'm talking specifically about ESPs.
A I mean, the type of high volume lift was discussed on occasion, anecdotally or specifically.
Q What occasions?
A I mentioned to you Kirkpatrick was complaining about the cost of rental engine generators. I had a client, Range, that hired me to go on the inspection, tear down of an ESP that had quit pumping in a horizontal Mississippi well. I'm sure there's other examples, but those come to mind.
Q But, for example, did you talk about Range's use of ESPs in a public setting?
MR. BAUER: Objection.
THE WITNESS: What, did I put it in the newspaper, what do you mean?
Q (By Mr. Horne) Newspaper, convention, anything?
A No.
Q Okay. Did you sign an NDA with Range when you did consulting work for them?
A Not generally.
Q What do you mean by "not generally"?
A Depends on the work, if they were doing

a -- an acquisition or some type of property transfer, or if I had access to information they considered confidential, then it was not unusual, with Range and the rest of my clients, but as what artificial lift was being used, it's public knowledge. You can drive out there and look at the well.

Q What about the number of wells that had artificial lift and the impact on oil production, was that common knowledge?

MR. PHILLIPS: Objection to form.

THE WITNESS: I don't understand your question.

Q (By Mr. Horne) Sure. Did people know how many ESPs --

A People?

Q Strike that. Did -- well, no, actually, did the public know how many ESPs Range had and how much of Range's production came from ESPs?

MR. BAUER: Objection.

THE WITNESS: From ESP pumped wells?

Q (By Mr. Horne) Yes.

A I don't know that.

Q Okay. Do you know of any way in which the public would know that?

MR. PHILLIPS: Objection.
THE WITNESS: Would or could?
Q (By Mr. Horne) Could.
A Sure, if I was -- if a public person was a beneficiary owner, had a reason to know, they could ask.
Q Okay.
A If a -- if I wanted to know if the well across the street is producing with a pump jack or rod pump or an ESP or gas lift, I could walk over there to the gate and look. It would be obvious.
Q And if you wanted to know how many SandRidge wells had ESPs, could you do anything other than walk to every single SandRidge well and try to figure out if it had an ESP?
MR. BAUER: Objection.
THE WITNESS: If you weren't in the chain of ownership or information flow, then you would probably have to ask somebody that knew.
Q (By Mr. Horne) Okay. And would the beneficiary owners have information on all of SandRidge's wells or just the SandRidge well in which they had a beneficiary ownership?
A Typically just be whatever they had a right to know. Let me back up. There's, you know,

you talk about in the public record, there's -- there's publications, SPE papers, Hart's investor magazine, Oil and Gas Journal, World Oil, Oklahoma Shale Shaker that talks about activities, what's going on, what people are spending money on. So there may very well be public avenues to find out what is the common convention for artificial lift on Mississippi wells in whatever time frame you want to look at.

Q Okay. And you didn't find any; is that right?

A I didn't look.

Q Okay.

A I don't think, I mean, yeah, I looked for a lot having to do with Mississippian, I didn't look specifically for that, because I already knew they were all on artificial lift.

Q Okay. Is it your understanding that ESPs increase initial production, but also increase the initial decline rate?

A It's not that simple. All artificial lift increases the draw down at the sand phase or at the perforations, and ideally, the goal is to increase the rate of production, and if at the end of the day it's a fixed container, fixed volume of fluid to be

pumped out of the reservoir, if you will, if the time that it takes to recover the fluids from the container will be reduced. If you draw a straight line between those two points, one has a steeper gradient or one curve is different than the other curve.

Q Okay. And you said if it's a fixed container, and then you made some statements, was the Mississippian -- were wells in the Mississippian drawing from fixed containers?

A Probably not in practical sense, within the time frame we're talking about.

Q How so?

A The Mississippian might be the largest stratigraphic trap in North America, the boundaries are very far away, most boundaries are probably no flow boundaries between producing wells.

Q Did each individual well draw from a fixed container?

A No, they all drew from scientifically the same reservoir, practically from individual reservoirs, otherwise, the time frame we're talking about, wells would perform infinite acting for a long time.

Q Over the course of, let's say, 30 years,

were wells drilled in the Mississippian drawing from a fixed container over that 30-year period?
A Sure, I mean, the containers has boundaries, otherwise, if it wasn't trapped, the oil and gas wouldn't be there.
Q So what you're saying is that the oil and gas will continue to seep back in, but it will take geological amounts of time?
A Not geological, but it will take quite a while, that's why you drill more wells.
Q Okay. All right. So in other words, the condition that you described, fixed containers is accurate for time frames of around 30 years?
MR. BAUER: Objection.
THE WITNESS: I don't make that correlation.
Q (By Mr. Horne) Okay.
A I would just -- the fixed container came up with your hypothetical about whether -- what effect the high volume lift or the electric submersible pumps have on the decline curve characteristics of a well.
Q Okay.
A I said it's -- it's not that simple, so that was my answer.

Q Okay. And over the course of 30 years, is the amount of oil that the well can draw on, is that fixed over the course of 30 years, more or less?

MR. BAUER: Objection.

THE WITNESS: Only by economic limit probably.

Q (By Mr. Horne) Okay. What do you mean by that?

A Wells only produce until they will no longer economically produce, otherwise until the value of the sales of oil and gas produced by the well equal or exceed the lifting cost to get that oil and gas to market.

Q Okay.

A You can continue producing wells much longer than they would be economically viable in the Mississippi.

Q And do ESPs affect the economically recoverable amount of oil more so than other forms of artificial lift?

A Compared to other forms of artificial lift having the same lifting capacity, no.

Q Does gas lift generally have the same lifting capacity?

A Can, yes.

Q Okay.
A Gas lift can -- in terms of -- well, you ask the questions.
Q I don't want to interrupt your answer.
A That's fine. No, gas lift and ESPs can have comparable production rates.
Q Okay. Do wells on gas lift produce oil more slowly than wells on ESPs?
A Only if you pump them slower.
Q Okay.
A If you set the producing rate for either the same, then it should just be up to the reservoir, it's independent of the artificial lift mechanism.
Q Okay. Is it practical to use ESPs in late stage of the life of the well? Sorry. Is it economically productive to use ESPs in the late stage of the well?
A Some wells, yes, some wells, no.
Q Most wells?
A Well, depends on how much water they make. High volume lift, ESPs in particular, designed to lift a lot of liquids, whether it's oil or water, and if your well makes a lot of liquids, water, and at this depth of 5,000 feet, your well's making over

a few hundred barrels a day, you're going to have to put a high volume lift in the well, ESP, hydraulic lift, gas lift, whatever. And most of the wells in this area, based on my clients and my knowledge of wells in this area, make several thousand barrels a day for a long time. That's -- that's going to require high volume lift. Now, a long time might be a year, might be five years, so from the time -- the well flow for a little while, as I pointed out, just because you pressured up the near wellbore area during the fracture stimulation, the well will flow for a while, once it ceases to flow or starts to diminish in flow materially, then it has to be put on high volume lift, generally.

And the most cost effective, efficient high volume lift is what's used, that high volume lift will then be continued to be used until a more efficient and less costly insert pump, typically a beam operated pump, but a rod string actuated insert pump can be used. Usually that will carry the well on out until the total liquid production becomes only a few barrels per day or less. And typically wells will use plungers or intermitters or both to produce the well for the rest of its life at that point.

So there's a window of production that a prudent operator has to use high volume lift. Now, the reservoir doesn't care what it is, whether it's an electric submersible pump, a hydraulic pump, a combination pump, a gas lift, air lift, whatever, however you want to evacuate the wellbore of liquids, that's what a prudent operator has to do to efficiently produce his well, maximize not only the reserves, but importantly, the value of the reserves.

Q Let's mark this Exhibit 7.

(Exhibit Number 7 marked for identification and made part of the record)

Q (By Mr. Horne) And I'm sorry, the Bates stamp didn't print fully, which I will blame a paralegal for, even though I'm the one that did the printing. And I believe it's Bates stamped TB 00404, although we can find out and e-mail you afterwards if it's not that. And I will represent to you that this is one of your expert reports that you produced.

A Okay.

Q Now, I'm not going to have a lot of things -- I will also represent to you that any

handwriting on this expert report was as produced, it's not mine, it was just the way it was produced to us. If you could turn to Page 16, do you see -- and if you look at your Paragraph 10, take a moment to read it over to yourself, let me know when you're done.
A I read it.
Q If you knew a well's initial production and the type curve that was used to generate it, would you be able to determine what its EUR was, just those two pieces of information?
A Say that again.
Q If you knew a well's initial -- just the well's initial production and the -- the type curve, the EUR number from the type curve that was used to generate it, would you be able to figure out what that well's EUR was?
A Under the normal course of the use of type curves, that would be the process, at least part of the process.
Q Are there other variables and conditions --
A Oh, yes.
Q -- that could affect the inference of EUR from initial production?

A Yes.
Q Are there many such variables and conditions?
A Are there many?
Q Yes, sir.
A I suppose, yes, a few.
Q Okay. That's a fair response to a bad question. Now, you state that "Deriving a well's EUR proportionately to its initial production rate exclusive of all other variables and conditions is an invalid assumption and leads to unreliable results and conclusions." Do you see that?
A Yes.
Q Do you stand by that opinion?
A Certainly, under the conditions of this particular -- I think it's an Atoka gas well, yes.
Q And so in order to determine how much a well would produce, you need more information than the initial production and more information than the type curve EUR?
A If I could have assurances that all of the factors that went into the construction of the type curve on all the wells that contributed data to the type curve, those same processes and conditions were applied to the subject well, the one I'm going to

get an initial potential from, then it would have stronger utility, otherwise, you have to go back and, for instance, in this particular case, what you're interested in is the initial draw down, not the initial flow, in this particular case, you know, all the wells didn't have the same surface flowing pressure, therefore, they didn't have the same bottomhole flowing pressure.

In this particular case, like we see in the Mississippi and other wells comparable to those in the Mississippi, that you have to be at least consistent where you pick the initial potential for the well and how you characterize it, do you take an average of a few days, do you take an average of several days, do you take a single point after some volume of extraction, do you wait until X amount of the stimulation fluid is recovered, all of them are right, you just have to be consistent. So, and this was my criticism of Mr. Schubarth here is he had two great big kettles of oranges and apples and tried to compare them.

Q Let me check my notes, I don't think I have more questions, but I may.

THE VIDEOGRAPHER: Off the record.

(Break taken from 2:38 to 2:52)

THE VIDEOGRAPHER: Back on, 2:52.
MR. HORNE: Pass the witness.

CROSS-EXAMINATION

BY MR. KARAM:
Q Good afternoon, Mr. Brittenham.
A Good afternoon, sir.
Q I refer you to Paragraph 20 of your report, which is on Page 5.
A Yes, sir.
Q In the first sentence you say, "In the early life of the well, the initial reservoir pressure may cause reservoir fluids to flow naturally up the wellbore and to the ground surface." Can you elaborate and explain that a little bit to me?
A Sure. The vertical wellbore during production is going to be full of the fluid being produced, oil and gas. If we take the simplest condition, say it's just full of brine water that comes from the reservoir, the pressure in the Mississippi reservoir has to be greater than the hydrostatic pressure driven by that column of brine water in the tubing in order to force water out the top of the well to flow. What we know in this area is that the initial reservoir pressure is, in fact,

slightly less than the hydrostatic pressure of column of brine water, so it's own produced water will kill the well. The well won't -- the reservoir won't flow up wells a full column of brine water.

If you add oil, which is less dense than brine water, to that column of fluid being produced up the tubing, it will lighten it somewhat, and if you get the oil close enough to the surface where the solution gas can come out of the oil into a gaseous phase, you may actually be able to -- then the gas will rise buoyantly through the liquid, so the net result is the well will flow naturally, that's the process.

Now, what we know, though, is that that only goes on as you continue to produce fluids out of the reservoir, the reservoir pressure decreases, especially in the area of the wellbore, so it's a very short-lived condition, the well quickly dies, and Mississippi wells won't flow on their own.

Q You're talking about vertical wells there only?

A You know, doesn't make any difference.

Q Okay. So that could also apply to horizontal wells?

A It does apply.

Q Can you estimate the length of that period for Mississippian horizontal wells, that natural flow period?

A For a well that's not been stimulated?

Q Correct.

A About half the wells won't flow at all, about half will -- well, not quite half, maybe the other 49 percent will flow some limited amount of oil, gas and water for a few days or few weeks, you might get that one that is very gassy for reasons we can talk about that may flow longer, but the natural flow period is very limited for Mississippi wells.

Q Would it be less than 30 days on average?

A Generally, yes, yes.

Q Now, I refer you to Paragraph 22. So in this paragraph, you describe how wells start out performing as primarily as oil wells and end up performing as gas wells, do you see that?

A Yes.

Q And does this -- does the phenomenon that you describe in Paragraph 22 affect the rate at which the hydrocarbons and fluids flow from the well?

A It does, both -- we have a mechanism that improves the rate of flow and we have a mechanism

that -- that diminishes the rate of flow of all liquids, the expanding gas itself will tend to lift whatever liquids are in the wellbore. However, as I point out, if the -- if the natural gas becomes free gas, otherwise, it's in a gaseous state in the reservoir itself, and the saturation increases, at some point in time there's a critical saturation to where no more liquid will flow in the reservoir.

Q So let's turn to Paragraph 23. You say in the second sentence, "In order to produce oil and gas from the well, reservoir energy in the form of pressure must be expended and depleted, thus the term reservoir depletion." And you say, "Because reservoirs have finite limits, as oil, gas and water are produced, the rate of production from any well connected thereto will decline." What do you mean by the term "finite limits"?

A Finite limits can be hard boundaries, no flow boundaries in the rock itself. More the case in the Mississippian is that the natural permeability is so low that regardless of the size of the reservoir, and it is a continuous reservoir, you get to the point where no pressure drop can be affected very far away from the wellbore, so the well doesn't cease to produce, but it ceases to

produce at any material rate.

Q So the term "finite limits" as used here means basically the end of the economically viable life of the well, would that be fair?

A It may be both economic and physical, it may just be that you get to the point where the well won't produce.

Q Have you ever heard the terms "transient flow regime" or "transient flow and boundary flow"?

A Yes.

Q Can you tell me in what context you've heard those terms?

A Reservoir engineering school, to begin with, used those terms in my entire career.

Q And are those terms still used in connection with reservoir engineering?

A Yes, those and substitutes for those or terms in addition to those to describe the various flow regimes in reservoirs that are encountered.

Q So can -- now, I've just read you, gone over a couple paragraphs where you've described the life of the well and flow characteristics of the well.

A Right.

Q Can you tell me if -- how to maybe

superimpose the term "transient" and "boundary flow" on your Paragraphs 20 to 23, if you can, if they apply?

A Sure. In the case of the Mississippian, where realistically we've got multiple hydraulic fractures, vertical fractures, in a horizontal lateral that's maybe 4,000 feet long, and those vertical fractures maybe extend upwards to the top of the Mississippian 100 feet, 150 feet, downwards several hundred feet, maybe outwards 500 feet. They tend to act as a group, but if one of them hits a no flow boundary, the others may continue to produce.

In the ideal sense, the initial production from the well is -- is in a flow regime that we typically call infinite acting or transient condition, otherwise, the pressures are diminishing at a greater and greater radius away from the wellbore, the reservoir pressures. And the ideal condition when that pressure boundary, when that pressure sink reaches a no flow boundary, say a wall, it's a hypothetical one, because there probably isn't one, but if it reaches a boundary, then the pressure throughout the reservoir continues to reduce, even though it's reduced more at the wellbore than it is at the boundary, and typically

we call that -- usually we call that a steady state -- a pseudo steady state flow.

If you actually get to the point where -- where the pressure at the boundary is being reduced at a -- at a -- at a constant rate, you may actually get to a steady state flow regime, but all of those have -- we have mathematical equations to describe those, and all of the curves that you guys have been looking at, the decline curves and the type curves and all that, those are just graphical representations of flow models that are formula engineers have worked up to describe how fluids flow through the reservoir.

Q Is there -- so is it correct that the same curve can describe the early flow regime, which I think you described as transient, and you may have used another term for it, as well as the later flow regime, the steady state/boundary?

A Otherwise the same equation is not going to describe both. You have to substitute equations, and if a line on a piece of paper or a line on a graph is a representation of that equation, then you have to substitute lines, they have different equations that support them.

Q Are you familiar with John Lee?

A Yes.
Q Who is that?
A John Lee is a petroleum engineer who spent most of his career working in reservoir processes, artificial lift, production operations.
Q Is he -- is he involved in the SPEE at all, do you know if he held any position with that organization?
A At some point in time, sure.
Q Is he -- does he also publish articles, academic articles and -- well, does he publish academic articles?
A He has.
Q And does he also speak at conferences and give presentations at SPEE conferences and functions?
A I know he spoke at SPE conferences, I wouldn't be surprised at SPEE conferences, but I don't know that for sure.
Q Is he -- is his reputation respected in the field?
A Sure, John knows what he's doing.
Q All right. Would he be -- would his articles be considered reliable by engineers, a reliable resource to help understand and rely on for

information regarding petroleum reserve engineering?
A I'm going to say generally so. Problem with saying -- giving you a unilateral yes or no is that we find that really smart guys early on, and girls, develop theories and techniques and technology that later on are proven to be wrong, you know, E equal didn't equal MC squared. And so John kind of fits that category, some of his work has been disputed by others in the past, and rightfully so, some are still in dispute.
Q I'm going to let you correct the word "girls" to women in the record.
A At my age, they're all girls.
Q Okay. Let's mark this as Number 1. Oh, yeah, Number 8.
(Exhibit Number 8 marked for identification and made part of the record)
Q (By Mr. Karam) Take your time to peruse, it's a Power Point. I'm just going to ask you some general questions.
A I'm just about done, if you don't mind.
Q I don't.
A Okay. I'm finished. Thank you.
Q All right. So have you -- are you

familiar with this particular presentation?
A Not the presentation, no.
Q Okay. Having perused it, are you familiar with the general subject matter that it pertains to?
A Yes.
Q And is it -- first of all, is it correct that he's talking or -- about unconventional reservoirs in this Power Point; right?
A Yes.
Q And you have said that the Mississippian is a conventional reservoir with unconventional characteristics or certain characteristics of unconventional; isn't that correct?
A No, I believe my testimony, my belief is, if that isn't what I testified to, that Mississippian is a conventional reservoir with what I call -- what the industry calls resource play characteristics, some resource play characteristics, and some unconventional, most unconventionals are resource plays.
Q Is it correct also that in this presentation, Dr. Lee advocates using different models for different phases of production?
MR. PHILLIPS: Objection.
Q (By Mr. Karam) To evaluate different

phases of production?

MR. PHILLIPS: Objection.

THE WITNESS: He discusses the potential application of modeling for what he identifies as a problem.

Q (By Mr. Karam) What problem does he identify?

A He says "To forecast for unconventional reservoirs, we are using reserves estimation practices developed during the last century for conventional reservoirs based on empirical observation of production declines over a century, modeling capabilities developed in the second half of 20th century, but generally supporting simple decline models for estimating reserves."

He's basically saying the practices being used to forecast production in unconventional reservoirs are using archaic techniques, if you will, or methodology, that in his mind, may not be giving the best answer.

Q So turn to the -- these things don't have numbers on them, unfortunately, but there's a slide that says how can we deal with all this.

A Yes.

Q It's about the fourth or fifth. And he

says -- the top bullet point is common approach simple models, "Rationale, hundreds of wells to analyze in short periods of time, example, two-segment Arps model."

A I see that.

Q So before we looked at this presentation, we were talking about the different flow periods in conventional wells, wells in conventional, and you said that you might use two different equations to evaluate the two different flow regimes; is that correct?

A Yes. If there were two, yes.

Q All right. Can you tell me what the two equations are that you would use to evaluate a conventional well like one in the Mississippian?

A Well, I would use a equation for boundary lists, otherwise infinite flow for this particular fluid, otherwise, consider this to be a -- an oil reservoir, I guess, liquid reservoir.

Q Mississippian?

A Yes.

Q Right. So you would just use one equation?

A Yeah.

Q A boundary equation?

A And then -- and then for -- in fact, you get into pseudo steady state, then I would use a pseudo steady state equation for -- for flow with the observed boundary. Otherwise, I'm reducing the pressure at the boundary.

Q And what about in this, the initial --

A I haven't said that, that's the simplified version, that doesn't just -- that doesn't take into account, that's what I pointed out early on, that we don't have a vertical wellbore or single production point in the wellbore, we've got a 4,000 foot long lateral into which fluids are flowing at different places, and there have been at least, I don't know, a dozen hydraulic fractures created every 4 or 500 feet along that lateral, having different dimensions. So -- and this is what he talks about here is that there's a large number of equations that would be required to model and a large number of assumptions that would be required to model the actual case, where we've got a horizontal well with a multistage hydraulic fracture completion.

Q And are you talking about the initial phase production in what you just said?

A Really, all of it. In fact, his suggestion is throw away all the initial data, none

of it's reliable, even with his models. So until you get months and months down the road, just throw up your hands, it's impossible, according to John.

Q Okay. All right. Let's put that aside. Could you turn to Page 13, Paragraph 59 of your report?

A Okay.

Q And the first word in Paragraph 59 is the word "optimism," you see that?

A Yes.

Q And actually on -- in Paragraph 51 on Page 11, in the middle of that paragraph, you use the word "exuberance," do you see that?

A Yes.

Q And these are -- these are two descriptions, I guess, of the psychological state of operators in the Mississippian during that time period?

A Everybody that had a financial interest in the effort, yes.

Q Okay. Now, engineers who were -- such as Netherland Sewell who were -- whose job it was to form type curves are required to use objective judgment; correct?

A They're required to be objective, yes.

They're not required to form type curves, they can -- estimators can use any methodology they -- they choose.

Q Okay. But in this case, for the years involved, 2000 -- year end 2010, year end 2011, year end 2012, Netherland Sewell formed type curves; correct?

A Yes.

Q And used that to estimate EURs; correct?

A For PUDs.

Q For PUDs. And PDPs as well; right?

A No. They used decline curve analysis for PDPs.

Q Are they required to exercise judgment objectively?

MR. BAUER: Objection.

THE WITNESS: Industry expects reserve estimators to be objective, the industry expects that reserve estimators will have to use judgment.

Q (By Mr. Karam) Right. And when you say everybody was infected with optimism and exuberance, that's not appropriate for a reservoir engineer, an independent reserve estimator who's estimating EUR; correct?

MR. BAUER: Objection.

THE WITNESS: Yeah, in fact, the estimator is required to be independent, otherwise, the estimator can't have a financial benefit in the outcome of the properties that he's evaluating, the wells that he's estimating reserves for, other than just being paid for his services, that's it, so there should be no incentive for non-objectivity by the estimator.
Q (By Mr. Karam) And the estimator should neither be optimistic, nor exuberant, but should be -- follow an accepted methodology; correct?
MR. BAUER: Objection.
THE WITNESS: I believe that's correct.
Q (By Mr. Karam) Going back to Paragraph 59 you say that "During a November 8, 2012, earnings call, Midstates highlighted that Eagle's last 30 wells had averaged over 600 BOEs per day as an IP," what does -- what does the term "IP" stand for?
A Initial potential.
Q Can you explain that to me?
A In the ideal case, that would be the first dot on your decline curve. That would be the first production from the well before any pressure is reduced in the reservoir.
Q So would that be equivalent to a transient

flow period?
A More likely than not.
Q And it would not be appropriate for Eagle to -- or if Eagle had an independent reserve estimator to establish a type curve of 600 BOEs based on an IP; correct?
A I think we're crossing. This won't have anything to do with a type curve, the initial potential is what it is, 600 BOE.
Q It's not a type curve?
A No.
Q And it's not appropriate data, not enough data, one data point is not enough on which to form a type curve; correct?
A Correct.
Q I think we're saying the same thing.
A Okay.
Q And then Midstates said -- by the way, Number 23, your -- your footnote, Number 22, that's -- is that an analyst report?
A Probably.
Q And the analyst is recounting what Midstates said on the conference call?
A This is a -- my recollection, this is a published earnings call.

Q It says here S&P Capital IQ.
A Right.
Q Right? Is that -- that's an analyst; right?
A That may -- yeah, that may have been the avenue by which the document was obtained. I don't recall.
Q You actually -- okay. You read the actual transcript?
A Yes.
Q So Midstates is saying that it thought it could back up kind of 1.5 B-factors pretty easily and maybe as much as 2 in some cases; right?
A Correct.
Q And this is Midstates showing some optimism and exuberance; right?
MR. BAUER: Objection.
Q (By Mr. Karam) That's what you're using it as an example for?
MR. BAUER: Objection.
THE WITNESS: The example is to demonstrate that at the end of 2012, operators were continuing to invest in the area that production results were supporting the economic viability of paying a lot of money, quite frankly, between

Midstates and Eagle to acquire position in the Mississippian.
Q (By Mr. Karam) And the data, you say is this -- this IP is just really on the initial data point, so they're making -- your point in this paragraph is they're making these investments based on fairly early data returns; correct?
MR. BAUER: Objection.
THE WITNESS: These aren't really fairly early, in fact, Eagle had some of the earliest wells, but they say in the last 30 wells out of Eagle's wells that they drilled averaged -- their initial production was 600 barrels a day, BOE, and they were going to -- I mean, that's one point on a decline curve, if you will, hyperbolic decline curve, that said they would support a B-factor of 1.5 or maybe higher. So that would describe -- to a petroleum engineer, that would describe the performance of this group of 30 wells.
Q (By Mr. Karam) Do you know if SandRidge had a group of 30 wells that performed at that level?
A I don't know.
Q Did you -- you had access to look at SandRidge's internal quarterly reserve estimations;

did you not?
MR. PHILLIPS: Objection; form.
THE WITNESS: I don't recall.
Q (By Mr. Karam) Do you know -- they were in the form of Excel spreadsheets, do you remember that?
A I didn't look at those.
Q Well, the depositions, there were certain spreadsheets attached as exhibits; right?
A Correct.
Q And those spreadsheets contained reserve estimations of SandRidge producing wells in the Mississippian; right?
A I think those were internal reservoir forecasts, as opposed to those were not public reserve estimates, I don't believe, that was my recollection.
Q There were reservoir forecasts; right?
A Yes.
Q Of using decline curves to establish reserve estimations for groups of wells; correct?
MR. PHILLIPS: Objection.
THE WITNESS: That was generally my understanding.
Q (By Mr. Karam) And using the Arps

equation; right?
MR. PHILLIPS: Objection.
THE WITNESS: I have no idea what they were using. No, these -- these are actual decline curves.
Q (By Mr. Karam) Okay.
A Once you get the data put on the decline curve, you can throw all the equations away.
Q Okay. Good.
A Let me back up, I don't know what they used.
Q Well, you read Mr. Miller's -- I'm sorry, Mr. Lance Galvin's deposition; right?
A Yes.
Q And Ms. Lindsey Austin Walton's deposition; right?
A Correct.
Q And they described their work as reservoir engineers; right?
A Correct.
Q And they used conventional decline curve methods; right?
A Generally, I believe so.
Q So turn to Page 15, in Paragraph 69, about two or three sentences in, you say, "A type curve is

an estimated projection of average future well performance;" right?
A That's a -- an -- a definition, yes.
Q And that's -- you've chosen to use that particular definition?
A I did.
Q And it's not a guarantee that all future wells or any particular well will fall exactly on the type curve; correct?
A Correct.
Q And by definition in an average, some are above and some are below; correct?
A Yes.
Q When you -- when a professional, this is a hypothetical, forms a type curve, let's say I have 200 wells, is it correct that my first step in forming the type curve would be to do a decline curve analysis on those 200 wells?
A Individually?
Q Yes.
A That's one approach.
Q Do you know if Netherland Sewell used that approach?
A I don't know.
Q Did you -- did you read Mr. Miller's

deposition?
A I did.
Q Did he describe that approach in his deposition?
A Yeah, he had, in fact, in order to -- to derive his PDPs reserves, he had to do that work.
Q Okay. So -- so he took, and again, I'm using this number, year end 2011, is it correct that SandRidge had approximately 200 horizontal wells in the Mississippian?
A That's the question?
Q Yes.
A I don't know, I don't recall.
Q Is it correct that Mr. Miller did decline curves on whatever number of wells SandRidge had at that time and arrived at a PDP estimation?
A For each well.
Q Right. So then is there -- there's no such thing as a PDP type curve; right? Or is there?
A Not for the purpose of reserve estimation.
Q But there -- Mr. Miller could calculate an average of the PDP reserves of the several hundred wells that he analyzed; correct?
A Yes.
Q Does -- and he would then have a PDP

average; right?
A Correct.
Q He would have an oil number; right? Oil EUR number?
A Correct.
Q Gas EUR number?
A For each well.
Q And MBOE, I'm talking about an average for the universe of wells.
A Okay.
Q That could be done; right?
A Could be done.
Q Do you know if it, in fact, was done?
A I don't know.
Q Do you know what that number was?
A No. I mean, I may have in the reporting and the testimony, I just don't have it committed to memory.
Q Does that number have any relation to an estimate for PUDs?
A If it was used, if that -- if those calculations were used as basis for Mr. Miller's type curve, which he intended to use for PUD reserve estimates, then, yes. If he did not, then the answer is no, and I don't recall which it is.

Q Okay. If -- let's assume that he did use the PDPs as a -- at least a starting point for his PUD analysis, tell me what the proper way for him to arrive at that analysis is.
MR. BAUER: Objection.
Q (By Mr. Karam) In other words, I have -- I have 200 wells, I have a -- I've averaged the PDP number for those wells.
A There are various ways to build a type curve, if you will, a curve that represents performance of wells, and averaging is one, averaging continuously is another, averaging begin points and end points is another, and more -- more than just arithmetically averaging, they may do a statistical fit of that data, otherwise, make it fit a curve, make it fit a analytical equation, and those are all methods of type curve analysis. All of them are used, quite frankly, and others, and I specifically don't recall how he described his methodology.
Q And you earlier in your testimony discussed a statistical play; correct?
A Yes.
Q And you, I think, mentioned 100 wells as being a minimum sample size or an acceptable sample

size; is that correct?
A No, here's -- for a true resource play, the industry has got together and decided, yeah, we'd like to have perhaps 100 wells for a statistical play, play in particular conventional reservoir, we really don't have any internal guidelines or industry guidelines, that objectivity and methodology is left to the estimator to decide when does he have enough data that he has confidence, reasonable assurance that his mathematical manipulation into a type curve, whatever, is going to give him useful results.
Q Is it generally correct that the bigger the sample size you have, the more reliable your results are going to be?
A All things being equal, yes.
Q Now, you used the term "skew" earlier in your testimony, what does that mean?
A I don't recall the context. Generally it means to -- to bias a result or observation.
Q And that would be something you would not want to do in a statistical analysis; correct?
A Not --
Q Almost by definition?
A Not inappropriately. You have to start

out with an objective and then ensure that all of the data that goes into that analysis is -- remains objective towards your target. At the end of the day, if -- there may be an intentional skew or bias to support the objectivity, otherwise, you may decide to bias in favor of phase, otherwise, oil versus gas, may decide to bias in favor of early performance versus later performance, because you have more data, so it can be done intentionally, but it has to be done objectivity.

Q Okay. You used the word "objective," is it correct that Mr. Miller's objective in executing this type curve or creating this type curve is to comply with the SEC's regulations?

A That's -- that's his -- that's his real client.

Q And his objective is to create a type curve in which he has a high degree of confidence; correct?

A Yes.

Q A high degree --

A One of his objectives.

Q A high degree of confidence that the actual production will meet or exceed the type curve, according to those regulations that you

looked at earlier; right?

MR. PHILLIPS: Object to the form.

THE WITNESS: Actually it's more than a type curve, it's ultimate reserve.

Q (By Mr. Karam) Right.

A The value of his ultimate reserve. Yeah, that's his objective.

Q And it's possible to skew a bias or to create a bias or a skew to -- to be more conservative; correct?

A It is possible.

Q To make -- to make it more probable that you will meet your objective as designated by the SEC?

MR. BAUER: Objection.

THE WITNESS: Not sure about that one. The SEC, when they give us guidelines on -- they give us guidelines on methodology, not on results generally, although there's some results-oriented definitions that we have to consider, I think the SEC's, my understanding, the reading, I'm not an SEC expert, is to ensure that the methodology that's used by reserve estimators is uniform, applied by everybody the same way.

Q (By Mr. Karam) I'm sorry, we talked

earlier about resource plays and statistical plays, why is there a difference in that analysis?

A I don't have them all off the top of my head, but if you were to sit down and -- and characterize a resource play, they would include more attributes than just a pure statistical play.

Q Okay. So let's just say I have 200 wells, right, and you talked earlier about choosing PUD locations next to your best performing wells; right?

A Yes.

Q Do you remember talking about that? So let's say I'm going to create a PUD type curve, that would be what I would want to do; right? Let's -- let's say I have 200 producing wells, and I have PDP numbers on them; right?

A Correct.

Q And I rank them by EUR, right, and I take the top 100 and I say to my reserve estimator, I'm going to put a PUD next to these top hundreds, would that be appropriate?

A You mean as the entity, as the operator, SandRidge, in this case?

Q Right. SandRidge tells NSAI where its PUDs are; right?

A Correct.

Q So I'm SandRidge, I've got 200 wells, and I tell Mr. Miller I'm only going to drill next to the best 100 wells; right?
A Okay. Under your hypothetical.
Q Okay. Then is it -- is it correct or is it proper for Mr. Miller to throw out the bottom 100 wells and estimate the PUDs based on the top 100 wells, the PDPs of the top 100 wells?
A In his type curve?
Q Yeah.
A To the extent that all the other wells are relevant, otherwise, they're relevant to the data set, you have to leave them in, to the extent that they are outliers, not relevant, then we don't.
Q I'm going to change the subject a little bit. Did you -- you reviewed Mr. Miller's deposition; right?
A I did.
Q And did you review the testimony concerning his creation of the year-end 2011 type curve?
A I reviewed all of his testimony.
Q And he -- is it correct that he testified about interaction with certain SandRidge reservoir engineers during the creation of the 2011 type

curve; right?
A I recall his testimony about his interaction with the client, client representatives, I didn't -- I don't specifically have it cataloged as to which time, which engagement, which effort. I thought, quite frankly, it was pretty uniform.
Q Do you recall that he, around October 20th of 2011, he sent an e-mail to Mr. Rodney Johnson, Lance Galvin, Lindsey Austin reflecting his first pass at the 2011 type curve?
A So October 2011?
Q Right.
A Not really, but sounds reasonable.
Q Okay. I mean, generally he sent them a reserve number, did he not, an EUR number, average?
A He sent them a type curve, according to you.
Q A type curve, yeah.
A Okay.
Q That was expressed in EUR numbers.
A Presumably.
Q Right?
A Yes.
Q Do you remember if that first pass was higher or lower than his end result type curve?

A I do not.
Q I'm going to change the subject a little bit. You, yourself, have done reserve estimations; right?
A Yes.
Q And you've done type curves using the Arps equation?
A I've performed various types of type curves for various purposes, including type curves using iterations of Arps equations, yes.
Q What do you mean by iterations?
A They're not all the same, it's not a unique Arps equation. You have to put conditions on them, but, yes.
Q And the term "B-factor" has been used before here, what is a B-factor?
A A B-factor is a variable in a flow equation that is an exponent, and it's commonly, quite frankly, when I grew up, we called it N-factor, nowadays we call it B-factor.
Q I think Netherland Sewell uses the N term as well.
A Rees is as old as I am.
Q So my question is, is the B-factor an objective expression of the Arps equation or is --

is it necessary to use judgment or estimation to assign a B-factor to a particular well?

MR. BAUER: Objection.

THE WITNESS: In the practical application to the underlying flow equation, otherwise, a curve fit for existing production data history match, usually the fit comes first and then whatever the exponent factor turns out to be, it is. Generally you don't go into it with -- I mean, in the days of mechanical curve fitting, we did, you know, literally had pieces of plastic that we could draw lines with on paper having different exponents. But since Bill Gates got us out of that period, the effort is really to make a history match, a curve fit and then see what the values for the variables turn out to be, including the exponent.

Q (By Mr. Karam) So the engineer does the curve fit, and the software spits out the B-factor?

A In today's time, yes.

Q Have you ever encountered --

A Or you may actually talk the computer into doing the curve fit for you.

Q Have you ever encountered a B-factor of 1?

A Not that I recall.

Q Have you ever encountered a B-factor below

1?

A Not that I recall.

Q So every B-factor that you have ever experienced has been above 1?

A That I recall, that's true.

Q Are you aware of any written material, have you ever read about any B-factor being less -- being less than 1?

A Probably.

Q But you would -- so it would be your testimony that -- is there any industry literature saying that a B-factor of 1 or less is improper?

A Haven't looked.

Q Are you aware of any?

A Don't know; not off top of my head.

Q Have you ever, in your experience in the industry, have you ever heard anyone accused of lack of best practices for using a B-factor of 1 or less?

A No. I'm aware of surveys where reserve estimators have been asked what their -- I won't call it best practices, but what their experience has been for the reservoirs and the types of wells they worked on, and there have actually been some that have identified they've used B-factors less than 1. The vast majority haven't. But that

doesn't mean that either one of them are mathematically invalid, it just means that that's been the experience of their application.

Q So you -- in your whole career, you've never encountered a B-factor of 1 or less?

A Not that I recall.

Q Let's turn to Page 23 of your report in -- in which you discuss Mr. Crane's report. You read Mr. Crane's report thoroughly; correct?

A Yes.

Q And it was -- it was your choice to choose the topics on which -- in which you discuss Mr. Crane's report; right?

A Yes.

Q And no one directed you, for example, to discuss the Pinnacle report in connection with Mr. Crane; right?

A That's correct.

Q So in Paragraph 95 you said "Mr. Crane is a petroleum engineer who reportedly performed his own reserve estimates as of midyear 2011 and midyear 2012 and apparently compared them to various representations during the class periods." So you used the word "reportedly" and "apparently."

A Correct.

Q Did you check to see if Mr. Crane actually did his own reserve estimates?

A I've got all of his report attachments.

Q So were you able to verify whether, in fact, he did reserve estimates or not?

A I took him at his word, that was not in the scope of my work, so I read his report where he said what he did. I saw the attachments to his report, and that's where I identified that he -- he reportedly, this is the work he did, and apparently he said he was comparing them to utterances, so apparently he did that, I didn't go back and verify that those utterances occurred or that he actually did for every well. It just wasn't in the scope of my work. I'm trying to encapsulate my understanding of his work.

Q Not in the scope of your work, according to whom?

A To me, I guess.

Q Did counsel tell you, don't look at those Crane decline curves that he did?

A No. It was just outside the scope of my initial assignment that I presented on Page 1.

Q It says here you've been retained to examine petroleum engineering issues involving the

subject allegations and to address the following topics; right? That's what the top paragraph says; right?
A Yes.
Q And Subparagraph F is where you address Mr. Crane's report; correct?
A Yes.
Q And the assignment there is that only whether Mr. Crane -- only Mr. Crane's opinion that SandRidge convinced NSAI to make inappropriate inclusions or exclusions of wells during the type curve calculations, as well as Mr. Crane's characterization that SandRidge overstated its average estimated recovery from existing and future undeveloped wells; right?
A Correct.
Q So that's really two parts; right?
A It is, that's right.
Q Did -- is Crane correct when he said SandRidge convinced NSAI about exclusions, that's part 1; right?
A It is.
Q And part 2 is, is Crane correct in his opinion that SandRidge overstated its average estimated ultimate recovery? That's part 2; right?

A I'm going to say yes.
Q So there was nothing -- his -- these -- let's -- we're going to mark an exhibit electronically because it's a massive amount of paper and I'm not going to be asking any detailed questions about it, so we're going to save trees. We have it up here on the laptop.
THE VIDEOGRAPHER: You just need you to move the mouse, it should be.
Q (By Mr. Karam) Okay. If you move the mouse. There's something that says Appendix III up there. Could you click that and open that? So we're going to virtually mark Crane Appendix III as Brittenham Number 9. Double click that and open that up. And this has been -- a link to this has been sent to all counsel before the deposition.
MR. BAUER: You're going to have to answer these questions for me, Frank. Do you want to open it in Microsoft Edge?
MR. HORNE: I have no idea.
THE WITNESS: Isn't this marked as an appendix to Mr. Crane's report?
Q (By Mr. Karam) Correct. Yeah, it's -- it's very big, and I didn't want to bring all the paper.

A I've seen it.
Q All right. I tell you what, let's -- let's -- let me just ask him some questions and maybe we don't have to open it.
MR. BAUER: I got progress. What app do you want?
MR. KARAM: You want to go off the record for just a second.
THE VIDEOGRAPHER: Off the record.
(Discussion off the record)
THE VIDEOGRAPHER: Back on.
Q (By Mr. Karam) So you -- you recognize that there was Appendix III to Mr. Crane's report; right?
A Correct.
Q And Appendix III contained the decline curves that he said that he did for two periods; right?
A That's my recollection.
Q Did you take a look at those decline curves?
A Not individually, no, I just -- I opened up the file to identify what was there, and what he said was there appeared to be there. I didn't count them, I didn't identify the names, I didn't do any

analytical work, I just identified what they were.
Q So on that level, you did not examine to see whether Mr. Crane's B-factor for those individual well analyses was correct or incorrect?
A I did not.
Q In Paragraph 97 you say, "Mr. Crane relies extensively on a July 12, 2011, letter written by Mr. Dick of Pinnacle Energy Services." Where did you get that conclusion?
A That would have to be from Mr. Crane's report.
Q Isn't it correct that Mr. Crane's opinion that SandRidge overstated its EUR estimations was based on his own decline curve analysis and -- question ends right there?
A That was my understanding.
Q So that was the primary basis for Mr. Crane's opinion; correct?
MR. BAUER: Objection.
THE WITNESS: My understanding Mr. Crane relied upon his decline curve -- decline curve analysis to reach his own reserve estimates at a certain time at a certain -- of a certain data set.
Q (By Mr. Karam) Okay. And then isn't it correct that he presented or in a table some data

from Pinnacle's analysis as corroboration for his own -- Mr. Crane's own decline curve analysis?

MR. BAUER: Objection.

THE WITNESS: I don't recall how he presented his data.

Q (By Mr. Karam) Okay. Isn't it true that he said, I did my own decline curve analysis and I reached a certain number and Pinnacle, completely separate from me, did a decline curve analysis and they reached a similar number?

MR. BAUER: Objection.

Q (By Mr. Karam) Isn't that what he said?

A I don't recall that.

MR. PHILLIPS: Objection.

THE WITNESS: I specifically put into Paragraph 97 what I recalled that Mr. Crane concluded, that Mr. Dick's letter supported that SandRidge was aware of Pinnacle's independent EUR evaluation of SandRidge wells in July of 2011, which showed significantly lower EURs and SandRidge public values. That was -- that was my conclusion, my observation.

Q (By Mr. Karam) Okay. My -- my -- my issue here is I think you left out most of Mr. -- Mr. Crane's analysis, you only put in his

Pinnacle -- what was in a minor part of his report that Pinnacle corroborated his analysis, and you don't even address his primary analysis, which is his decline curves.

MR. PHILLIPS: Objection.

Q (By Mr. Karam) Isn't that correct?

MR. BAUER: Objection.

THE WITNESS: Paragraph 97 is only to address his discussion of the Pinnacle letter.

Q (By Mr. Karam) Right.

A It's not to address anything else.

Q Right.

A I'm only -- I'm focusing on that one item, period.

Q Right. And you've left the whole -- the whole rest of his report, you don't talk about.

A Not in 97, I was just talking about Mr. Dick's letter.

MR. PHILLIPS: Objection.

Q (By Mr. Karam) You don't talk about his decline curve analysis anywhere in your report, other than to say that he apparently reportedly did it.

A Agreed.

Q And you don't talk about, for example, the

fact that he cites a TPH report also as corroboration; correct?

MR. BAUER: Objection.

THE WITNESS: Corroboration of what?

Q (By Mr. Karam) Of his decline curve analysis.

A I didn't look at everything that Mr. Crane thought said he was the smartest guy in the room, I'm sorry. I was only addressing that his comments about Mr. Dick's letter, I believed, were in error, and so that was the reason for 97, 98, part of my report, that was it.

Q Okay. Mr. Crane --

A I had no intention of addressing Mr. Crane's work in reserves analysis done after the fact on a different data set for a different time period, that wasn't my scope of work. I'm just addressing the Dick letter.

Q He ever use the term "smartest guy in the room" in his report?

A No, but he's really sensitive to the fact that I didn't acknowledge he did that all work, I told -- I said he did, it just wasn't something I was going to dig into, and I didn't.

Q All right. Let's turn to -- let's mark

the Crane report, all right, we're not going to mark the virtual appendix, right, and we'll mark the Crane report as Number 9, since no -- no work was done on the virtual.

MR. BAUER: I think it's here now.

MR. KARAM: It's here now, of course, of course, it's here now.

MR. BAUER: It's virtually here.

MR. KARAM: Virtually.

(Exhibit Number 9 marked for identification and made part of the record)

Q (By Mr. Karam) So to turn to Page 5. There's a table on the top of Page 5; right?

A There is.

Q And on that table, Mr. Crane has certain data; correct?

A Yes.

Q So the -- the first column says "category," says, "oil EUR and total hydrocarbon EUR; right?

A It does.

Q And next is units; right?

A Yes.

Q Thousands of barrels; right?

A Yeah. We usually use M for thousands in reserve estimation work, but I understand what he means.
Q K means -- is also taken to be thousands; isn't that right?
A That's right.
Q And so -- and then he puts down the SandRidge 2011 type curve; right?
A That's what he says, I didn't know there was a SandRidge 2011 type curve.
Q Well, it was Netherland Sewell's on behalf of SandRidge; right?
A Netherland Sewell's type curve, you're right.
Q Is the data correct in that box?
A Otherwise, did he copy it right, I don't know.
Q Did you, by the way, going through his report, did you find that Mr. Crane falsely stated any data or miscopied any data?
A I think the only thing that I addressed was Mr. Dick's report or letter.
Q So having --
A But I didn't look, I don't know.
Q Well, you read Mr. Crane's report; right?

A I did, but I didn't -- I didn't go back and check his numbers.
Q So then in the next column what he's doing is he's -- he appears to be using NSA year end 2000 reserve report PDP wells, and he's comparing that with the 2011 type well; right?
A Apparently.
Q And that's a lower number, so the 2011 type curve was created at the beginning of 2011; right?
A End of 2010, beginning 2011.
Q But SandRidge published it with their -- at the beginning of 2011; right?
A First quarter, as I recall.
Q With their SEC filings; right?
A That's my recollection.
Q And they -- they communicated that number to investors; right?
A I don't recall that, I'm not so sure that they just didn't report the Netherland Sewell reserves summary, I don't think there's a type curve in the filing, but I could be wrong.
Q In other instances of communication with investors, they communicated the type curve; right?
A I don't specifically recall. I wouldn't

be surprised.
Q So this indicates that by year end 2011, the PDP reserve number was below the type curve in both oil and MBOE or KBOE; right?
MR. BAUER: What are you pointing at, Frank?
MR. KARAM: I'm pointing to the column that says NSAI year-end 2011 reserve report PDP wells.
MR. BAUER: Thank you.
THE WITNESS: Correct.
Q (By Mr. Karam) Then he does the Crane midyear 2011 evaluation; right? The next column?
A Yes.
Q And that's 89 and 231; right? That's much lower; right?
A Than?
Q Than the previous two numbers.
A I agree.
Q Then he cites TPH; right? TPH June 2011; right?
A For the same wells?
Q For a subset of wells.
A I don't think any of these are the same wells, but go ahead.

Q TPH explains what wells it analyzed; right?

A I would presume so.

Q Did you read the TPH report?

A If it wasn't marked as a deposition exhibit, I did not.

Q But if it was, you did?

A Yes.

Q Okay. Were you aware that it existed?

A Certainly by the time I received Mr. Crane's report, I was.

Q Mr. Crane discusses it in his report; does he not?

A Yes.

Q And you didn't read -- decide to read the TPH report?

A No, that wasn't in the scope of my work.

Q Then he -- and that -- that -- those numbers are 141 and 274; right?

A Yes.

Q So you're saying maybe it's a different group of wells; right?

MR. BAUER: Objection.

THE WITNESS: Might be.

Q (By Mr. Karam) You're not saying 100

percent, you don't know if it's a different group of wells; right?

A Well, they're all done at different times over the course of a year, so.

Q Okay.

A Unless we've got everybody using the original data set for the -- it would be unusual to have a year-end 2011 data set be the same as a midyear data set.

Q Right.

A But if you specifically sat down to take out wells or put in wells, you could arrange that.

Q Well, but Mr. Crane did a midyear 2011 evaluation; right?

A Yes.

Q And TPH did a June 2011 evaluation; right?

A Correct.

Q And PES was dated July, but according to Mr. Crane's report, TPH and PES got the same well data because they were working on the same deal; right?

A I don't recall.

Q So these three are comparable; right? Mr. Crane's midyear 2011, TPH and PES, right, because they were all done at the same time?

MR. BAUER: Objection.
MR. PHILLIPS: Objection.
THE WITNESS: I haven't verified the data set for each, I mean, the results are all different. The only ones that agree are TPH and PES.
Q (By Mr. Karam) Both lower than SandRidge; right?
A Yeah, Crane's lower than all five of them.
Q Well, he's not lower than the 2013 look back; right?
A You mean his own 2013 look back?
Q No. It cites that's a SandRidge 2013 look book. That's SandRidge's internal numbers.
MR. BAUER: Objection.
THE WITNESS: I don't recall.
Q (By Mr. Karam) Did you read that, did you read that exhibit that was attached to Mr. Crane's report?
A No.
Q So you don't know if he's correct or not?
A I don't.
Q And you certainly don't offer an opinion that he's not correct?
A I don't.
Q If I have a type curve, for example, for a

year 2011, is it useful or appropriate for SandRidge to compare its own internal reserve estimations quarter by quarter with the past year type curve?
MR. BAUER: Objection.
THE WITNESS: Is it appropriate?
Q (By Mr. Karam) Yeah.
A It's done.
Q To see if they're meeting the type curve; right?
A For various reasons.
Q Well, to see if they're meeting the type curve is an important reason; right?
A That would be one.
Q Because the SEC says you got to meet or exceed the type curve with a high degree of confidence; right?
MR. BAUER: Objection.
THE WITNESS: In the reserve estimate, not in the daily operations of drilling, completing wells.
Q (By Mr. Karam) But on average, that's what you're supposed to do; right?
MR. BAUER: Objection.
THE WITNESS: In the reserve estimating process.

Q (By Mr. Karam) Right.
A That's what the SEC says, it doesn't have -- doesn't have anything to do with the actual conduct of drilling, completing, producing wells.
Q But you want to know if you're ahead of your type curve or behind your type curve; right?
A I think that's generally accurate.
Q Right. You're telling your investors you're going to meet this type curve; right?
MR. BAUER: Objection.
MR. PHILLIPS: Objection.
THE WITNESS: I don't know, generally you tell them here's what the reserves are.
Q (By Mr. Karam) Here's what the reserves are; right?
A Once a year.
Q Once a year. And then during the year, if you're not meeting that type curve, you might have to tell your investors; right?
MR. BAUER: Objection.
MR. PHILLIPS: Objection.
THE WITNESS: I don't know.
Q (By Mr. Karam) That's what SandRidge did on November 9, 2012; right?
MR. PHILLIPS: Objection.

MR. BAUER: Objection.
Q (By Mr. Karam) Said we're not meeting our type curve?
MR. PHILLIPS: Objection.
MR. BAUER: Objection.
Q (By Mr. Karam) We're lower than our type curve?
MR. PHILLIPS: Objection. Pull out the transcript, Frank, it's not what it said.
MR. BAUER: I have seven objections.
Q (By Mr. Karam) True or false?
A No, it's not true.
MR. PHILLIPS: Objection.
THE WITNESS: There was a trustee that reported a reduction in reserves, I don't remember even the word "type curve" being in the letter.
Q (By Mr. Karam) But SandRidge also made an announcement in November of 2012 concerning its reserves; correct?
A I don't know.
MR. PHILLIPS: Objection.
Q (By Mr. Karam) It made a disclosure of its reserves; correct?
A I don't know.
Q And it disclosed that its oil EUR was

lower than the Netherland Sewell type curve; isn't that correct?

MR. BAUER: Objection.

MR. PHILLIPS: Objection.

THE WITNESS: I don't recall.

MR. BAUER: You feel like there's a break in the action taking a little break?

MR. KARAM: Yeah, we can take a break, I'm actually probably closer to the end than the beginning. Let's take a break.

THE WITNESS: Five minutes, I appreciate it.

THE VIDEOGRAPHER: Off the record.

(Break taken from 4:12 to 4:25)

THE VIDEOGRAPHER: Back on.

Q (By Mr. Karam) Mr. Brittenham, you said earlier that you had done some reserve estimation in the Mississippian; is that correct?

A Correct.

Q Can you describe your methodology step by step, please?

A Most of my reserve work has been for vertical wells, at least earliest 20 years of it, and for the most part, that is either proved producing or wells that have just been drilled and

are considered for being recompleted or completed in the Mississippian. At that point in time, my methodology is to identify volumetric reserves in place, look at the well logs, if available, look at the immediate production in the drilling and spacing unit or offsetting drilling and spacing unit, and then if nothing more, by analogy, see whether or not this well's liable to perform as a well in an unfractured reservoir or is it going to perform as a well in a fractured reservoir. Then I'll pick a vertical well immediately offsetting that and use that as the type well, as a analogous well, if you will. And that's proven to be the best for vertical wells.

Q I'm sorry for -- you're talking that's a PUD well estimation that you just talked about?

A Yeah, although some of them have been drilled, they just haven't been completed.

Q Okay. I'm sorry, continue.

A For horizontal wells, most of my early work was really early, otherwise, we had almost no existing horizontal production data and very few existing horizontal wells. So my methodology was to use, based on the anticipated geometry of the wellbore, assuming that we were going to intercept

at least one fracture set with the horizontal, I would then pick the best of the verticals or at least the verticals that demonstrated that they had penetrated a vertical fracture in the area of the horizontal that I was going to drill, then I'd use a combination of the engineering mathematical improvement of production, if you will, and reserves going from a vertical geometry to a horizontal geometry, and then add to that the fracture production.

Q Was any of this work for the estimation of proved reserves?

A Yeah, it was.

Q In how many instances did you do that?

A I would say all.

Q For when you say "all," how many times, how many jobs did you have where you did it?

A Over the course of 30 years, if I said 30, that's probably pretty close.

Q And these were -- were these proved reserve estimates according to SEC standards?

A Certainly according to SPE standards, none of these were for SEC reserves filings, they were for oil and gas well operators that were paying the bills that had to make economic decisions on whether

to -- whether to undertake the money expenditure. There were some of them, let me back up, there were some of them that were with regard to estate management, probate, divorce agreements, private agreements, transactional.

Q Or divorce disagreements?

A They all are, aren't they? Anyway.

Q Have you ever done a -- in the Mississippian, a reserve estimate based solely on horizontal wells?

A No, not that I recall.

Q Have you ever compared the actual performance of the wells that you estimated with your reserve estimate?

A Otherwise, how did I do?

Q Yes.

A I'm sure I did, yes.

Q Talking about SEC regulations, are -- are -- are these regulations designed to elicit conservative reserve estimates?

MR. BAUER: Objection.

THE WITNESS: I'm sure somewhere in the SEC literature they're going to tell us and they have told us why they did what they did, why they structured the rules as they are. My understanding,

as a petroleum engineer involved with reservoir engineering and reserve estimates, is that the SEC was most interested in creating a uniform methodology for reporting reserves, so that maybe none of them are correct, but they can all be compared one to the other fairly, that was my understanding.

Q (By Mr. Karam) And isn't it correct that a lot of companies have internal reserve estimates that are much lower than their SEC estimates?

A Lower and higher, in my experience.

Q What's your understanding based on of this?

A Just the business aspects of running the company, borrowing money, other reasons to create a reserve valuation independent of regulatory reporting. I mean, the SEC reserve estimates require specific methodology, most importantly, they require specific economic management of the results, if you will, to end up in a value that may or may not be representative of proper result for other purposes, fair market value analysis or tax liability analysis or other reasons.

Q And, in fact, SandRidge had a lower set of type curves that it used in its operations division;

correct?
MR. BAUER: Objection.
THE WITNESS: I don't know.
Q (By Mr. Karam) Now, earlier you said that you had -- you had not encountered a -- a B-factor of 1 or below; is that correct?
A To the best of my recollection, yes.
Q Did you read Mr. Miller's e-mails in which he reported his -- the B-factors that he was arriving at on the SandRidge wells?
A If they were marked as deposition exhibits, I did.
Q Isn't it correct that in a number of wells, Mr. Miller received a B-factor of 1.0?
A I don't recall.
Q Now, when you say you've never encountered a B-factor of 1.0, you don't remember; right?
A That's right, and I don't recall the original question that that was the answer to, but, yeah, I don't recall any.
Q So you, yourself, may have arrived at a B-factor of 1.0 and forgotten about it?
A That's possible. Or the computer did.
Q Turn to Page 1 of your report. We looked at this earlier, where the first task in

Subparagraph 1-F that you were asked to perform is to comment on the opinion of Mr. Crane that SandRidge convinced NSAI to make inappropriate inclusions or exclusions of wells within NSAI's type curve calculations. Can you point me to the paragraphs in your report where you did that?

A Beginning on Page 17, maybe in Page 16, I described my understanding of the recounting of that interaction by Mr. Miller and Mr. Galvin, Paragraph 76 through -- really through 81.

Q So it's -- can you point to the paragraph in which you discussed the interaction regarding exclusion or inclusion of wells?

A I think the topic is generally addressed in Paragraph 79.

Q Is the word "exclusion" or "inclusion" used in that paragraph?

A No, it's broader than that.

Q Okay.

A Just that --

Q You don't specifically discuss that; right?

A Let me look. I'm guessing overall, because there were several criticisms about the -- that interaction, everything from which wells to

include in a type curve, which wells to consider for PUD analysis, whether or not the use of artificial -- certain artificial lift equipment or any interference between wells, all of that, I believe, fell under my opinion culminating Paragraph 79 that at the end of the day while that information may have been debated, provided, discussed by and between SandRidge or, this particular case, Mr. Galvin and others and Mr. Miller, but at the end of the day, Mr. Miller was free to use the methodology he chose and the values for the variables that he used that were his choices to result in his results.

Q But you don't specifically discuss inclusions and exclusions; right?

A I guess not.

Q All right. This is written for me, I'm going to read it. When you use volumetric -- because I don't want him to think I know what this is about. When you use volumetric calculations to estimate reserves from Mississippian wells, what drainage area did you use?

A Typically for the horizontal wells, we would use a drainage area that was consistent with what had been observed as fracture penetrations, as

I recall, something like 200 feet, or around the wellbore. The drainage area, actually I would take the vertical data and back calculate a drainage area using all the volumetric parameters to basically provide support to both drainage area and recovery factors that are intertwined, kind of got to use both of them, but that would be the effort.

Q And what recovery factor?

A Recovery factors varied from, as I recall, typically 6 to 7 percent to a high of, goodness, not much over 10 percent.

MR. KARAM: I have no further questions.

MR. BAUER: So I have two questions.

CROSS-EXAMINATION

BY MR. BAUER:

Q First one is I've heard you refer to IP as initial potential, but then also as initial production, is there a difference between those two terms in your view?

A Not as I use the term.

Q And then I may not have this right, because it was a long time ago, but did you intend to testify at some point here that -- or let me ask you this, is every reserve estimator always right when he or she is using his or her judgment?

A The reserve -- the answer is no, reserve estimator is tasked with responsibility of meeting the requirements for certainty. Having said that, they keep their job because they're right more than they are wrong, but they're not always right.

MR. BAUER: I have no more questions.

MR. PHILLIPS: No questions here.

MR. SPRINGER: No questions for me, either. Thank you.

MR. HORNE: Give me two minutes.

THE VIDEOGRAPHER: Off the record.

(Discussion off the record)

MR. HORNE: Back on the record. We don't have anything.

MR. BAUER: We're finished. Thank you.

THE WITNESS: I would like to read and sign.

(Deposition adjourned at 4:44 p.m.)

* * * * *

J U R A T P A G E

I, TERRY BRITTENHAM, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcript of my testimony so given at said time and place, except for the corrections noted.

______________________________

TERRY BRITTENHAM

Subscribed and sworn to before me, the undersigned Notary Public in and for the State of Oklahoma, by said witness _________________, on this the _____ day of ________________, 2019.

______________________________

Notary Public

My Commission Expires: ______________________

KBJ

Correction Sheet

Witness: TERRY BRITTENHAM Reporter: KBJ
Attorney: JONATHAN HORNE, 275 MADISON AVE., 34TH FL., NY, NY 10016 Date: 6-4-19
OA: STEVE BAUER, WILL PHILLIPS, DAVID SPRINGER

Case Style: SANDRIDGE ENERGY SECURITIES LITIGATION & LANIER TRUST;CIV-12-1341-G;CIV-15-634-G

Page Line Correction Reason for Correction

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

# C E R T I F I C A T E

STATE OF OKLAHOMA )
) SS:
COUNTY OF OKLAHOMA )

I, Karen B. Johnson, Certified Shorthand Reporter, within and for the State of Oklahoma, do hereby certify that TERRY BRITTENHAM was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the case aforesaid; that the above and foregoing deposition was by me taken in shorthand and thereafter transcribed; that the same was taken on JUNE 4, 2019, that the deposition was taken in OKLAHOMA CITY, State of Oklahoma; that I am not an attorney for nor a relative of any said parties or otherwise interested in the event of said action.

IN WITNESS WHEREOF, I have hereunto set my hand and seal of office on this 9TH day of JUNE, 2019.

-------------------------
Karen B. Johnson
State of Oklahoma CSR #1376