# EXHIBIT 5

LINDSEY WALTON - 01/31/2019

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE WESTERN DISTRICT OF OKLAHOMA

 3

 4   In re:  SANDRIDGE ENERGY,   )
     INC. SECURITIES LITIGATION, )Case No. 15-cv-00634-SLP
 5   _____)

 6

 7

 8

 9

10

11

12

13         VIDEOTAPED DEPOSITION OF LINDSEY WALTON

14             TAKEN ON BEHALF OF THE PLAINTIFFS

15                IN OKLAHOMA CITY, OKLAHOMA

16                    ON JANUARY 31, 2019

17

18

19           REPORTED BY:  DAVID BUCK, CSR

20

21

22

23

24

25
```

1    Miss Lime.
2         Q.   And what is the Miss Lime?
3         A.   The Miss Lime is the reservoir or zone in
4    northern Oklahoma that SandRidge was drilling
5    horizontally.
6         Q.   Is that the Mississippian?
7         A.   Yes.
8         Q.   Okay.  Do you know when your assignment to
9    the Mississippian began?
10        A.   I do not.
11        Q.   Now, you said you worked with Netherland
12   Sewell, the auditors.  What was -- describe what you
13   did in relation to Netherland Sewell as part of your
14   job at SandRidge.
15        A.   So, with Netherland & Sewell we would send
16   them our well data.  We would work closely with them
17   for a period of time, mainly at year-end, to develop
18   our corporate type curve and have a final reserve
19   report for that year.
20        Q.   What is a corporate type curve?
21        A.   A type curve, a corporate type curve is an
22   estimation or prediction of EUR oil reserves for a
23   well set or a group of wells.
24        Q.   Do you know if -- what the first year that
25   SandRidge developed with Netherland Sewell a corporate

1    initially designed pro forma curves.
2         Can you explain to me what that means?
3    A.   No.  I don't know what --
4    Q.   You can't --
5    A.   -- that means.
6    Q.   You can't shed any light on that?
7    A.   I don't know what pro forma curves it's
8    referring to, but I -- I guess that well didn't have
9    any production when we or SandRidge designed some pro
10   forma curves.
11        MR. KARAM:  This will be Number 6.
12            (Deposition Exhibit Number 6 marked for
13            identification purposes and made part of
14            the record.)
15   Q.   (By Mr. Karam) And it is SandRidge Bates
16   number 0456685.
17            (A brief pause.)
18        Do you recognize this?
19   A.   From yesterday.
20   Q.   And does this refresh your memory that
21   SandRidge was urging Mr. Miller to use a 2.0 B factor?
22        MR. GIMBEL:  Objection to form.
23        THE WITNESS:  I don't believe SandRidge urged.
24   We worked in conjunction with Dave to look at each
25   individual well and develop a type curve and

1  ultimately Netherland & Sewell developed and agreed
2  with their own type curve for SandRidge.  We believed
3  in some instances some wells' production profile
4  needed an N of two, some others needed a different N,
5  but I think that ultimately Dave made his own decision
6  on that value.
7        Q.   (By Mr. Karam) He, he believed an N of 1.5
8  was more appropriate.  Isn't that right?
9        MR. GIMBEL:  Objection to form.
10       MR. WORD:  Objection to form.
11       THE WITNESS:  It looks like he says on a type
12 curve we get a better fit to the data using N 2.0.
13       Q.   (By Mr. Karam) Do you know if he ultimately
14 used 2.0?
15       A.   I don't remember.
16       MR. KARAM:  This will be Number 7.
17            (Deposition Exhibit Number 7 marked for
18            identification purposes and made part of
19            the record.)
20       Q.   (By Mr. Karam) It's SandRidge Bates number
21 0426082.  This is an e-mail from -- from Lindsey
22 Austin to David Miller with a copy to Cristie Moss and
23 Lance Galvin.
24            Do you recognize this, Ms. Walton?
25       A.   No.

1  today.
2      Q.  (By Mr. Karam) You would agree that there was
3  some judgment involved in forming a type curve?
4      A.  Yes.  It -- yes, it's completely subjective.
5      Q.  Completely subjective?
6      A.  If you put 10 engineers in a room and ask
7  them to develop a type curve you'd get a different EUR
8  from every single person.
9      Q.  Okay.  So, of those 10 engineers, one would
10 be the highest and one would be the lowest.  Right?
11     A.  Sure.
12     Q.  Or there might be some ties in there.
13 Right?
14     A.  Sure.
15     Q.  And was there any suggestion that maybe it's
16 best to use the reasonable judgment that ends up with
17 the highest type curve?
18         MR. GIMBEL:  Objection to form.
19         THE WITNESS:  I don't know that the highest
20 number would be the most reasonable.  I may take the
21 middle.
22     Q.  (By Mr. Karam) And that was what SandRidge
23 did?
24     A.  I don't know or remember what SandRidge did.
25     Q.  Did anyone within SandRidge ever express to

LINDSEY WALTON - 01/31/2019                                   Page 85

1   you unofficially or otherwise that -- that a higher
2   type curve or higher numbers, higher judgments were
3   preferred by management?
4           MR. GIMBEL:  Objection to form.
5           THE WITNESS:  I don't know that I remember anyone
6   expressing that to me.
7       Q.  (By Mr. Karam) Did SandRidge in its dealings
8   with Mr. Miller have -- try to get him up to
9   SandRidge's target EUR?
10          MR. GIMBEL:  Objection to form.
11          THE WITNESS:  Sand -- SandRidge had an internal
12  type curve that we worked with Dave on to develop.
13  Dave engineered his own type curve and the type curve
14  that we ultimately adopted as year-end was Netherland
15  & Sewell's approved type curve.
16      Q.  (By Mr. Karam) Is it correct that in the
17  e-mails we saw earlier, Dave's 1st pass, those were
18  lower than SandRidge's numbers?
19      A.  It may have been, but it was also first
20  pass.
21      Q.  And then eventually Netherland & Sewell's
22  numbers moved up to what SandRidge's numbers were?
23          MR. GIMBEL:  Objection to form.
24          THE WITNESS:  They may have.
25      Q.  (By Mr. Karam) Do you ever remember SandRidge

1    Q.   Okay.  And by this point, which is 2011,
2  have you drilled enough wells in Grant County to reach
3  that determination?
4    A.   I don't know how many wells that we had
5  drilled in Grant County as of this date.
6    Q.   Well, if you look higher it says Grant,
7  southeast Alfalfa and northern Garfield, 34 of 50
8  wells included.
9         So it looks like that area has 50 wells
10 drilled.  Is that correct?
11        MR. GIMBEL:  Objection, form.
12        THE WITNESS:  From this e-mail it appears so.
13   Q.   (By Mr. Horne) And it also looks like
14 Mr. Miller is telling you, Mr. Rodney Johnson,
15 Mr. Galvin -- well, and Mr. Galvin that there do
16 appear to be discrepancies between Grant wells and
17 other wells?
18   A.   David in his e-mail did bring that up.
19   Q.   And do you recall discussing this issue with
20 Mr. Miller?
21   A.   I don't recall discussing it with
22 Mr. Miller.
23   Q.   Would it have reduced -- strike that.
24        If Grant County and other counties had very
25 distinct production, would it have been appropriate to

1  have different type curves for the two areas?
2       MR. GIMBEL:  Objection to form.
3       THE WITNESS:  I think ultimately all data was
4  supplied to David Miller and if he believed in his
5  expertise it should have been separated then he would
6  have developed more than one type curve.
7       Q.  (By Mr. Horne) Okay.  And my question is, if
8  Grant County is different than -- is very different
9  than other areas, would it have been appropriate to
10 have different type curves for the areas?
11      MR. GIMBEL:  Objection to form.
12      THE WITNESS:  I can't say it wouldn't have been
13 appropriate.  Sorry.  I don't know that it was
14 appropriate in this instance.  I think that Dave had
15 the data and we presented him with the data and he
16 developed type curves to the best that -- of his
17 knowledge or expertise.
18      Q.  (By Mr. Horne) And it looks like in this
19 instance you provided him with the data and he's
20 saying it looks like they're different.  Is that
21 correct?
22      A.  Uh-huh.  He is saying that.
23      Q.  Okay.  So it looks like you have provided
24 him with the data and he has said they're different?
25      MR. WORD:  Object to form.

1     Q.   (By Mr. Horne) Yes.
2     A.   I think that we were keeping the PUDs in
3  those sections, 13, 14 and 16, because we had plans to
4  drill those wells like the Olivia which we believed to
5  have performed well.
6     Q.   Okay.  And there are wells within that
7  section that did not -- PDPs within that section that
8  did not perform well.  Is that correct?
9     A.   I don't know that they didn't perform well,
10 but it appears here that they were excluded for a
11 various reason from the type curve.
12    Q.   Okay.  And could it be, just could it be
13 just simply luck of the draw that the Olivia did well
14 while the other ones are excluded?
15    MR. GIMBEL:  Objection.
16    Q.   (By Mr. Horne) The other ones are more
17 representative but the Olivia just happened to do
18 well?
19    A.   No, I would -- I would believe that if they
20 were excluded that there was a reason other than just
21 being a poor performer for them to be excluded.
22    Q.   They would have --
23    A.   So --
24    Q.   I'm sorry.
25    A.   I was -- we -- we provide -- these wells if

1  they are excluded from the type curve we provide that
2  data to Netherland & Sewell and our reasoning why.
3  Dave, Dave and Netherland & Sewell ultimately chooses
4  whether they are in or out of the curve.
5       MR. HORNE:  Walton 37.
6            (Deposition Exhibit Number 37 marked for
7            identification purposes and made part of
8            the record.)
9       Q.   (By Mr. Horne) I'll keep the bad one, give
10 the good ones.
11           For the record, Walton 37 is NSAI_SD_156078
12 and its attachment beginning 156122.  I believe there
13 may have been another attachment.  And I'm going to
14 ask you to go through this exhibit and point out all
15 of the changes that SandRidge is requesting that would
16 result in a lower EUR as opposed to a higher EUR.
17           (A brief pause.)
18      A.   Well, there doesn't appear to be any.
19      Q.   Okay.  And about how many pages did you go
20 through?  Well, you know what, we can calculate it
21 with the Bates stamps.  NSAI_SD_156079 through
22 NSAI_SD_156122 and there is one change per page.
23 That's all I have on this one.  Oh, actually, has --
24 did sand -- did SandRidge ever, to your knowledge did
25 SandRidge ever request a change that would lower the

1  EUR of a well?
2      A.  I don't remember that.  I don't remember
3  that but I don't think that that's the relationship
4  between necessarily a company and a third party
5  auditor.  I mean, I think that we were advocating for
6  the production to be matched and we were suggesting
7  changes and ultimately it was Dave's decision to
8  change those as he would see fit.  So, I believed that
9  these things needed to happen on these graphs and if
10 Dave agreed with me then he'd change them and if he
11 didn't he didn't.
12     Q.  Okay.  But you advocated in one direction
13 and one direction only.  Right?  You think --
14     MR. GIMBEL:  Objection to form.
15     Q.  (By Mr. Horne) -- that the EUR should be
16 higher?
17     MR. GIMBEL:  Objection to form, argumentative.
18     THE WITNESS:  I advocated for the production to
19 be matched in a more precise way.
20     Q.  (By Mr. Horne) What does that mean?
21     A.  It means that in my opinion I was -- I
22 thought that the curve could be -- could better fit
23 the data and so I was asking him to do so.
24     Q.  Would -- strike that.
25         Would the B factor that is used have an

1      Q.   Did Matt Grubb have any involvement to the
2  best of your recollection in preparing SandRidge's
3  type curve for the Mississippian?
4      A.   No.
5      Q.   Did James Bennett have any involvement to
6  the best of your recollection in creating the type
7  curve for the Mississippian?
8      A.   No.
9      Q.   How about James Bennett?
10     A.   No.
11     Q.   Did Matt Grubb have any involvement in the
12 decision about whether to include or exclude
13 particular wells in preparing a type curve to the best
14 of your knowledge?
15     A.   No.
16     Q.   Did James Bennett have any involvement in
17 the decision of whether to include or exclude
18 particular wells to the best of your knowledge?
19     A.   No.
20     Q.   Did Tom Ward have any role in deciding
21 whether to include or exclude particular wells to the
22 best of your knowledge and recollection?
23     A.   No.
24     Q.   Were you involved in any discussions with
25 Netherland Sewell either --

1      A.    I'm sorry.
2      Q.    Sorry, either by e-mail or orally concerning
3   the type curve in which Matt Grubb was also involved?
4      A.    Not that I remember, no.
5      Q.    Okay.  Do you recall James Bennett ever
6   being involved in discussions with Netherland Sewell
7   about SandRidge's type curve?
8      A.    No, I don't recall.
9      Q.    Do you recall Tom Ward ever being involved
10  in discussions with Netherland Sewell about
11  SandRidge's type curve?
12     A.    No.
13     Q.    I'm going to ask you to turn to Exhibit 25,
14  which Mr. Horne showed you earlier today.  Let me know
15  when you have that.
16           (A brief pause.)
17           Do you have that in front of you now?
18     A.    Yes, I do.
19     Q.    And Exhibit 25 is an e-mail and an
20  attachment.  I'd like you to take a look at the
21  attachment if you would.  Do you have that --
22     A.    Yes.
23     Q.    -- in front of you?
24     A.    Yes, I have it.
25     Q.    Okay.  And do you recall the attachment

```
 1      A.   No.
 2      Q.   Did Mr. Ward tell you to withhold or
 3  misstate any data you were providing to Netherland
 4  Sewell?
 5      A.   No.
 6      Q.   Was Mr. Ward at all involved in creating the
 7  Netherland Sewell type curve for the Mississippian?
 8      A.   No.
 9      Q.   Was the information that you and SandRidge
10  provided to Netherland Sewell accurate?
11      A.   Yes.
12      Q.   Do you believe that information was also
13  complete?
14      A.   Yes.
15      Q.   Was there anything that Netherland Sewell
16  asked you to provide that you didn't provide?
17      A.   No.
18      Q.   Did Netherland Sewell ever question the
19  accuracy of any of the data you provided for them?
20      A.   Not that I remember, no.
21      Q.   Do you believe the Netherland Sewell type
22  curves were a reasonable estimate of EUR at that time?
23      A.   I do remember thinking that, yes.
24      Q.   Do you believe that Netherland Sewell's type
25  curves were the best estimate of the EUR based upon
```

1  all information that you had?
2      MR. HORNE:  Objection to form.
3      THE WITNESS:  I believed it was a good estimate.
4      Q.  (By Mr. Word) Do you think there's ways in
5  which the estimate could have been improved?
6      MR. HORNE:  Objection, calls for speculation.
7      THE WITNESS:  I mean, we just did it -- I mean,
8  there were -- there were things that I didn't
9  personally agree with, you know, Dave's suggestions,
10 but in the end Dave was obviously a longer tenured
11 engineer than I was and he did work for Netherland &
12 Sewell, so I was happy to accept Dave's
13 recommendation.
14     Q.  (By Mr. Word) And ultimately these were
15 Netherland Sewell's type curves.  Correct?
16     A.  Yes, ultimately, yes, they were.
17     Q.  Did SandRidge misstate any of its actual
18 financial results in its public SEC filings?
19     A.  Not that I know of.
20     Q.  Did SandRidge accurately disclose its gas to
21 oil ratio of Mississippian wells in its SEC filings?
22     A.  I don't -- I don't know.  I -- I wasn't a
23 part of the SEC filings and I don't know those
24 numbers.
25     MR. WORD:  Thank you.  I'll pass the witness.