# EXHIBIT 9

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

IN RE SANDRIDGE ENERGY, INC. ) No. 5:12-cv-01341-G
SECURITIES LITIGATION )

AND

IVAN NIBUR, LAWRENCE ROSS, JASE LUNA, MATTHEW WILLENBUCHER, and the DUANE & VIRGINIA LANIER TRUST, Individually and On Behalf of All Others Similarly Situated,

VS. ) Civil Action No. 15-cv-00634-M

SANDRIDGE MISSISSIPPIAN TRUST I, SANDRIDGE MISSISSIPPIAN TRUST II, TOM L. WARD, JAMES D. BENNETT, MATTHEW K. GRUBB, RANDALL D. COOLEY, JIM J. BREWER, EVERETT R. DOBSON, WILLIAM A. GILLILAND, DANIEL W. JORDAN, ROY T. OLIVER, JR., JEFFREY S. SEROTA, D. DWIGHT SCOTT, RAYMOND JAMES & ASSOCIATES, INC., MORGAN STANLEY & CO. LLC (F/K/A MORGAN STANLEY & CO. INC.), MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., CITIGROUP GLOBAL MARKETS, INC., and RBC CAPITAL MARKETS, LLC,
Defendants. ) Job No. 10050010

**************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
DAVID TODD MILLER
DECEMBER 12, 2018
VOLUME I

**************************************************

with Rodney and...

**Q. Rodney Johnson?**

A. Yes. And their -- Danh -- Danh Nguyen, I believe. It was three main people we talked with, was Lance, Rodney and Danh Nguyen.

**Q. Do you know how to spell Mr. Nguyen's name?**

A. N-G-U-I-N, I think.

**Q. Sounds close.**

A. Yeah. And I think it's D-A -- there's an "H" in there.

**Q. D-A-H-N?**

A. Okay.

**Q. So can you describe what the process was -- well, let me just take a step back.**

**You mentioned that you got data from SandRidge. What data did you get?**

A. The data would kind of fall into two classes, commercial data, I'll say, and performance data. So the performance data would be by well, by month production data that would be, if we had done -- if this is like 2010 or '11, or '12, this would be new data since the last time we did the report and then we would also get daily data by well, by day.

**Q. Daily production data?**

second week of the month so you may get another month of data, depending on how that sat.

**Q. And do you remember in 2012, what your -- what your second -- your results for your second pass was?**

A. No.

**Q. Okay. Do you know if it was higher or lower than your first pass?**

A. No.

**Q. And then, if you could, describe the process that got -- got you from the second pass to the ultimate report.**

A. It's kind of the standard process that we have that I have with all of my clients and that we had at Netherland Sewell, is that there's kind of an interaction and a back-and-forth. It's not a one-way kind of delivery of results. We feel like we -- we get a better answer by interacting with the client and getting their perspective on things and fairly representing their perspective on things. So usually if there's a back-and-forth, and then we try to make sure that we assimilate all the information we can and everyone's opinions and then arrive at an answer that we're happy with.

**Q. So you mentioned you got data from**

pages -- starting on page 5 of the report, and almost to the end of the report, are adapted from regulations of the Securities Exchange Commission?
A. These are Netherland Sewell's presentation of our understanding of the definitions of reserves.
Q. So going to -- at -- the SEC definitions, right?
A. Yes.
Q. The SEC has regulations as to public company's statements of oil and gas reserves?
A. Yes.
Q. And you -- you did your best to employ those or to follow those regulations in your work with SandRidge, right?
A. Yes.
Q. So go to page 7. And at the bottom is paragraph 17. It has something called "possible reserves."
A. Uh-huh (affirmative response).
Q. You have to say "yes."
A. Yes.
Q. What is -- what are "possible reserves"?
A. Possible reserves are on the -- there's a risk spectrum of reserves from proved, to probable, to possible. Possible reserves are the least likely

A. When we found out we were no longer working it?

**Q. Right.**

A. No.

**Q. So you've read through this and the first page appears to be an e-mail string.**

**Is that correct?**

MR. BOECK: Objection; the document speaks for itself. He's not copied on this e-mail.

BY MR. KARAM:

**Q. You can answer that.**

A. It's -- it's a string of e-mails from other people.

**Q. Okay. Mr. Bennett is on one of the e-mails, right?**

A. Yes, and I -- I don't remember -- I don't know who Mr. Bennett is. I don't know if I ever met him during my tenure at Netherland Sewell and working with SandRidge.

**Q. Okay. The bottom of the e-mail string is dated October 29, 2013.**

A. Uh-huh (affirmative response).

**Q. 4:46 p.m., right?**

A. Okay, yes.

**Q. And that's from Mr. Galvin, right?**

BY MR. KARAM:
**Q. You can answer.**
**Did you use conservatism in your reserve estimations for SandRidge?**
MR. BOECK: Objection; vague question.
A. I used the same approach that we used for all of our clients where we're doing proved reserves and it's trying to use the data and honor the definitions.
BY MR. KARAM:
**Q. So -- I guess what I'm asking is, in your work for SandRidge, you understood that investors might be looking at the numbers that you produced, right?**
A. That's the case for every Netherland Sewell report. There's usually always a financial interest on the other end of the report.
**Q. Right. And you also understood that sometimes, whether consciously or unconsciously, the client may want a higher number, right?**
A. That is almost universally the case.
**Q. So would you agree that it's your job to -- to be more independent and, therefore, a little more conservative than the client?**
MR. PHILLIPS: Objection; compound.

e-mail.

**Q. Okay. Let's start with the last -- with the earliest e-mail, which is one from Mr. Rees to Mr. Grubb, with you and Mr. Galvin, Johnson and Spellman copied.**

A. Uh-huh (affirmative response).

**Q. Do you see that?**

A. Yes.

**Q. Okay. So first of all, at what point did -- in the prior years, in 2010 or 2011, was Mr. Grubb involved in the finalization of Netherland Sewell's work?**

A. From my perspective, I just met Matt on -- just to say hello when I went to the Oklahoma City office, but what's going on within SandRidge, I don't know.

**Q. So he -- he was not involved in the prior two years that -- in 2010 or 2011, in the --**

A. In this kind of -- yeah, no, he was not.

**Q. Okay. And do you know how or why he became involved in 2012?**

A. Because of the -- we were in a very severe time scale crunch, and so when we had these issues about -- that we were trying to resolve about how best to forecast the gas. And so not only did -- so

**Q. Do you recognize this?**

A. Yes.

**Q. Tell me what it is, please.**

A. It is a preliminary run. And a run -- as opposed to a report, a run is just a -- the summary cash flows and the one-liners presented in an informal manner, whereas a report gets signed and everything.

**Q. So in order to produce this, is it correct that you required certain financial data from SandRidge?**

A. You. That was part of -- seems like yesterday, but earlier today we were talking about the information that we receive early on in the process. Some of it's technical, the well-by-well monthly and daily data. The other part is commercial data. There are lease operating statements by month so that we can build operating expense models, how much of the operating expense is fixed, how much is variable and then bill pricing models of what is the observed differential to pricing benchmarks.

**Q. Okay. Thank you.**

MR. KARAM: Okay. Let's do B and then C.

MR. PHILLIPS: If gets us out of here a little earlier so we don't have any problems keeping flights.

MR. KARAM: Yeah, I think I'm -- I think I'm close but I want to -- I want to look over stuff tonight just to make sure. I think everyone is going to make an afternoon flight tomorrow. Okay?

THE VIDEOGRAPHER: Off record, Counsel?

MR. KARAM: Off the record.

THE VIDEOGRAPHER: We are off the record. The time is 4:53 p.m.

(Break taken, 4:53 p.m. to 4:58 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 4:58 p.m.

BY MR. KARAM:

**Q. Mr. Miller, earlier we discussed that you were considering investigating perhaps breaking out type curves by geography and that there was a decision made not to do that.**

**Is that correct?**

A. Yes.

**Q. Can you explain for me what the evidence or data was that -- that caused you to come to that**

**conclusion?**

A. I guess I -- the answer is simply that I didn't have good enough evidence to do -- to do the subdivision. There's always attention when you're looking at type curves between wanting to subdivide them and create groups that feel like they're more representative of a certain area, versus getting the population size down so small that it becomes nonrepresentative.

**Q. Okay. So can you be just a little more specific in that? What were you looking for that you found to be insufficient, if that's a correct characterization?**

A. I guess there was not a systematic reason to have the subdivisions and the -- the data did not warrant subdividing.

**Q. What kind of data were you looking for that would have maybe changed your opinion?**

A. A clear systemic difference in the -- in the -- in the completion or the rock being encountered or the fluids being encountered, but I did not see that at the end of the day.

**Q. So it was in part geology-based?**

A. The lack of being able to see a geology-based differentiation, either at a county

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

IN RE SANDRIDGE ENERGY, INC. ) No. 5:12-cv-01341-G
SECURITIES LITIGATION )

AND

IVAN NIBUR, LAWRENCE ROSS, JASE LUNA, MATTHEW WILLENBUCHER, and the DUANE & VIRGINIA LANIER TRUST, Individually and On Behalf of All Others Similarly Situated,

VS. ) Civil Action No. 15-cv-00634-M

SANDRIDGE MISSISSIPPIAN TRUST I, SANDRIDGE MISSISSIPPIAN TRUST II, TOM L. WARD, JAMES D. BENNETT, MATTHEW K. GRUBB, RANDALL D. COOLEY, JIM J. BREWER, EVERETT R. DOBSON, WILLIAM A. GILLILAND, DANIEL W. JORDAN, ROY T. OLIVER, JR., JEFFREY S. SEROTA, D. DWIGHT SCOTT, RAYMOND JAMES & ASSOCIATES, INC., MORGAN STANLEY & CO. LLC (F/K/A MORGAN STANLEY & CO. INC.), MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., CITIGROUP GLOBAL MARKETS, INC., and RBC CAPITAL MARKETS, LLC,
Defendants. ) Job No. 10050011

**************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
DAVID TODD MILLER
DECEMBER 13, 2018
VOLUME II
**************************************************

A. The ratio of the gas to the oil.

**Q. So you would agree that 203 is a larger part of 5600 than it is of 7900, right?**

MR. BOECK: Objection; form.

MR. PHILLIPS: Objection.

A. I'm sorry, but your question -- and it makes no sense to me.

BY MR. KARAM:

**Q. Well, if you divided 5600 by 203, right, you'll get a number?**

A. Divided 5600 by 203?

**Q. Right. To try to take apart the ratio. A ratio is a division of two numbers, right?**

A. The 5600 is the ratio of the gas reserves well-by-well, divided by the oil reserves well-by-well.

**Q. What? All right. Consultant tells me I'm going down the wrong -- I'm not doing well, so I'll change.**

A. I'm sorry.

**Q. Let me just stay nearby.**

**By being -- by choosing 5600 out of conservatism, you are choosing the GOR with less gas; is that correct?**

A. I'm choosing to have less gas in the