# EXHIBIT 35

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

In re: SANDRIDGE ENERGY, )
INC. SECURITIES LITIGATION,) Case No. 5:12-cv-01341-G
)

VOLUME I
VIDEOTAPED DEPOSITION OF JAMES BENNETT
TAKEN ON BEHALF OF THE PLAINTIFFS
IN OKLAHOMA CITY, OKLAHOMA
ON FEBRUARY 13, 2019

REPORTED BY: DAVID BUCK, CSR

when we started using ESPs more broadly. I don't remember what year that was. I don't. That might have been after Dave became COO. I don't recall.

Q. Was any information about the ESP program withheld from you?

MR. GIMBEL: Objection, foundation.

THE WITNESS: When you say withheld, none that I -- I know of.

Q. (By Mr. Horne) Right.

A. If I asked for something I would routinely get it.

Q. You later became CEO. Is that correct?

A. Yes.

Q. When you became CEO did you determine that any information at all had been withheld from you when you were CFO?

A. I don't recall.

Q. You mentioned that you signed annual and quarterly SandRidge at least filings. Is that correct?

A. Yes.

Q. Were you involved in drafting them?

A. No.

Q. What was your process for ensuring that the statements contained therein were true and not

misleading?
A. Meeting with -- one, relying on internal audit and our outside experts to -- to a certain extent, but also understanding the financials of the company myself and understanding the process in which they were put together, the controls we had in place, the people who were preparing them.
Q. Did you read them all?
A. Yes.
Q. Cover to cover?
A. I may not have read the -- the boilerplate, some of the boilerplate legal language that was the same every time, but yes, I read a vast majority of all the Ks and Qs.
Q. And when you say boilerplate legal language, what are you referring to?
A. Maybe some of the -- the standard footnotes that are the same every time that says this -- these financial statements follow Generally Accepted Accounting Principles, you know, some of the legal language that's in every K and Q that's repetitive.
Q. What about the risk factors?
A. Yes, I would have read the risk factors.
Q. Okay. Did you ever when you were reading the Qs or Ks kind of see some language that seemed off

mean by executive committee.
Q. Did SandRidge have an executive committee?
A. There was an executive committee outlined in one or more of the trusts. Is that -- is that what you're -- is that what you're referring to?
Q. Yes.
A. Yeah. I don't remember if it was in that.
Q. Were there any changes made going forward on the -- the process through which SandRidge estimated reserves?
A. What timeframe are you --
MR. GIMBEL: Object to form.
THE WITNESS: -- talking about?
Q. (By Mr. Horne) Following the 2012 reduction of the type curve and reserves estimates.
A. You know, I was -- I was CFO at that time and that was not under my purview. Reserves and specific how they were exactly put together was more corporate reserves and Netherland Sewell.
Q. What about in -- when you became CEO in 2013?
A. Could you ask the question again?
Q. Yeah, sure.
Were there any changes that were made to the process through which SandRidge estimated reserves

after you became CEO in June 2013?
A. After I became CEO we appointed a new head of reservoir engineering, Lance Galvin, and I believe he had some -- he had some different methods and different ways he would present the data and calculate reserves.
Q. Okay. What were the differences between his ways and was it Mr. Rodney Johnson's before?
A. Correct, it was Rodney Johnson. I don't remember the specifics.
Q. Did SandRidge try to be more conservative in the future when it was estimating reserves?
MR. GIMBEL: Objection to form.
THE WITNESS: I don't know about -- I don't know -- it's hard to characterize reserves as conservative. They're your best estimate at the time. We tried to be as diligent as we could with reserves and follow all the -- follow all the SEC and all the SEC guidelines. At the end of the day it was Netherland Sewell that was preparing the reserves.
Q. (By Mr. Horne) Were you personally involved when you were CFO in the process through which the reserves report was created?
A. No.
Q. Were you kept abreast of that process?

A. I was -- I was kept updated on annual or semiannual meetings on the status of reserves, but it was a meeting with the larger group to review the reserves.

Q. Is it your understanding that there were discussions between SandRidge and Netherland Sewell at the end of each year to create the year-end reserve report?

A. There were -- there would be -- it would be standard for there to be a dialogue between the company and Netherland Sewell on the reserves every year, yes.

Q. Were you kept abreast of that dialogue?

A. No. Sometimes I would be brought in because there was an item that was needed from my group and my accounting group would need to be involved, so periodically I was looped into the discussion.

Q. Okay. Who was Kevin White?

A. He was, I forget his exact title, head of -- I believe it was head of corporate development and investor relations, something like that. I may not get it specifically correct.

Q. Who did he report to?

A. Tom Ward. Yes, I believe that's correct, Tom Ward.

A. Okay.

Q. Okay. Let me direct you to the 10:19 e-mail, the first in time e-mail. You were not on this e-mail but it looks like you received it through the 10:35 a.m. e-mail.

Do you see that?

A. Correct, I was not on the first e-mail. Okay.

Q. But you received it through the 10:35 e-mail?

A. I was cc'd on it, yes, on the 10:35.

Q. Okay. And were you involved in the formation of the type curve either for 2010 or for 2011?

A. No.

Q. Okay.

A. That would have been Netherland Sewell and the reserve -- corporate reserve group.

Q. Okay. Were you kept abreast of steps in the formation of a type curve, either Netherland Sewell's or the corporate reserve group's type curves?

A. Kept abreast of the steps? No.

Q. Okay. Let me focus you on the third paragraph of the 10:19 e-mail. This includes the new Miss type curve 470 MBOE, slightly higher initial

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

In re: SANDRIDGE ENERGY, )
INC. SECURITIES LITIGATION, ) Case No. 5:12-cv-01341-G
_____________________________)

VOLUME II

CONTINUED VIDEOTAPED DEPOSITION OF JAMES BENNETT

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON FEBRUARY 14, 2019

REPORTED BY: DAVID BUCK, CSR

Q. -- for SandRidge as of December 31, 2012. Do you recall that?
A. Yes, I recall that.
Q. Okay. Did SandRidge have the authority to dictate what Netherland Sewell put in that reserve estimate?
A. No.
Q. Who had final authority over that reserve estimate?
A. Netherland Sewell.
Q. Okay. Going back to the -- the 10-K that we looked at for the year 2012, were there sections of that 10-K that you were more responsible for than others in your role at the time?
A. Yes.
Q. Can you describe for the record what those were?
A. As CFO those would have been the financial statements, certainly the statement of profit and loss, the balance sheet and cash statement, the audit itself and the footnotes to the financial statements.
Q. Okay. Were there sections of the 10-K for which you did not have primary responsibility?
A. Yes.
Q. Can you give us a few examples of that for