# EXHIBIT 36

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| In re SANDRIDGE ENERGY, INC. SECURITIES LITIGATION | No. 5:12-cv-01341-G |
| | CLASS ACTION |
| This Document Relates To: ALL ACTIONS. | RESPONSES AND OBJECTIONS TO DEFENDANT JAMES D. BENNETT AND MATTHEW K. GRUBB'S THIRD SET OF INTERROGATORIES TO PLAINTIFFS |

Pursuant to Federal Rules of Civil Procedure 26, 33 and applicable Local Rules of the United States District Court for the Western District of Oklahoma, Lead Plaintiffs Laborers Pension Trust Fund for Northern Nevada, Construction Laborers Pension Trust of Greater St. Louis, and Vladimir Galkin and Angelica Galkin ("Lead Plaintiffs") hereby respond to Defendants James D. Bennett and Matthew K. Grubb's Third Set of Interrogatories to Plaintiffs dated February 27, 2019 (the "Interrogatories"), as follows:

## PRELIMINARY STATEMENT

Lead Plaintiffs' investigation is ongoing and is not complete as of the date of these responses. Therefore, these responses are limited to the information presently available to Lead Plaintiffs as of the date(s) signed below. Lead Plaintiffs reserve the right to conduct further investigation and discovery, including expert discovery, and specifically reserve the

(d) all rights to object on any ground to any further Interrogatories or other discovery involving or related to the subject matter of any Interrogatory;

(e) rights to amend, modify, supplement or clarify any of the responses or objections set forth herein at a later time; and

(f) any and all privileges and rights under the applicable sections of the Federal Rules of Civil Procedure, the Local Rules, or other statutes, guidelines or common law.

## SPECIFIC OBJECTIONS AND RESPONSES

The following specific objections and responses are subject to the General Objections. By setting forth specific objections, Lead Plaintiffs do not intend to limit or restrict the General Objections. Lead Plaintiffs incorporate the General Objections into their responses to each of the Interrogatories. To the extent that Lead Plaintiffs respond to the Interrogatories, any stated objections are not waived by providing responses.

INTERROGATORY NO. 11[1]:

If Plaintiffs contend that any Defendant improperly influenced NSAI's type curve for the Mississippian during the Putative Class Period, state the basis for any such contention, and identify all evidence in support of such contention.

RESPONSE TO INTERROGATORY NO. 11:

Lead Plaintiffs object to this Interrogatory on the ground that substantive fact discovery has only recently been completed, and expert discovery has yet to complete.

---

[1] As Lead Plaintiffs noted in their Responses and Objections to Defendants James D. Bennett and Matthew K. Grubb's First Set of Interrogatories, served on all parties on January 19, 2018, Defendants provided two Interrogatory Nos. 4. Lead Plaintiffs have renumbered their Responses and Objections accordingly.

Plaintiffs are responding to this Interrogatory based on their current knowledge and expressly reserve their right to modify, amend or supplement their response based upon, among other things, their continuing review of documents, deposition testimony and the work of their experts. Lead Plaintiffs further object to this Interrogatory as overly broad, unduly burdensome and not proportional to the needs of the case because it seeks the identification of "all evidence." This would require Lead Plaintiffs to provide the equivalent of a narrative or otherwise detailed account of Lead Plaintiffs' entire case in chief, together with identification of virtually all supporting evidence for each fact. Federal Rule of Civil Procedure 1 states that the rules should be construed to "secure the just, speedy, and inexpensive determination of every action and proceeding." To require Lead Plaintiffs to produce all evidence in response to this Interrogatory does not comport with the just, speedy, and inexpensive determination of the action. Requiring Lead Plaintiffs to produce all evidence in response to this Interrogatory would cause them to incur undue expense of time, burden, and cost.

Subject to and without waiving the foregoing General and Specific Objections, Lead Plaintiffs respond as follows:

Netherland, Sewell & Associates, Inc. ("NSAI") conducted the year end reserve analyses for SandRidge during the Year End 2010 through Year End 2012 time frame for SandRidge's holdings in the Mississippian. The Expert Report of Steven D. Crane, dated March 1, 2019 ("Crane Rpt.") at 30. The type curves at issue during the Class Period were the YE2010 and YE2011 analyses. NSAI maintained the same engineer, David Miller, as the primary contact person with SandRidge's reservoir engineering team and as the lead

engineer on NSAI's reserve reports for SandRidge during those periods. *Id.* Lance Galvin, Lindsey Austin ("Austin") and Rodney Johnson ("R. Johnson") were primary SandRidge points of contact with NSAI during the year-end reserve process. *See*, *e.g.*, Rodney Johnson Transcript ("R. Johnson Tr.") at 44:21 – 45:7. Miller performed a decline curve analysis on every SandRidge well during the year-end reserve process. *Id.* at 47:3 – 11. According to R. Johnson, a "decline curve analysis is an engineering methodology to project the future forecasted production of oil, gas and water from a producing well." *Id.* at 47:5 – 7; *see also* Crane Rpt. at 9-12.

In pertinent part, the nomenclature used in SandRidge's discussions with NSAI followed industry reserve reporting guidelines. Crane Rpt. at 30. For instance, existing wells with production were called Proven Developed Producing, or PDP. *Id.* at 30-31. Future undrilled wells with a high confidence of recoverable reserves were called Proven Undeveloped wells, or PUDs. *Id.*

SandRidge, under the leadership of the Individual Defendants, pressured and improperly influenced Miller and NSAI in connection with their YE2010 and YE2011 reserve reports.

<u>YE2010 Reserve Analysis</u>

With respect to the 2010 year-end reserve report, Defendants Ward and Grubb, and Rodney Johnson, admitted to "push[ing]" NSAI towards their oil curve and their "base PUD type curve." Rodney Johnson Exhibit ("R. Johnson Ex. _") 2. R. Johnson testified that SandRidge's internal oil type curve was approximately "200 [MBO]" and that NSAI ultimately agreed to this figure. R. Johnson Tr. at 21:6 – 18. Defendant Ward acknowledged

to Grubb and R. Johnson this push was necessary at the time because, as he put it, "[w]e obviously need to maximize the reserves so that we don't sell too cheap" in prospective equity offerings. R. Johnson Ex. 3; R. Johnson Tr. at 24:24 – 25:18. Prior to this push, Miller came up with 152 MBO, and advised R. Johnson and Austin that SandRidge's internal type curve could only be attained by excluding only underperforming wells. R. Johnson Ex. 4. It was improper to only exclude underperforming wells. Crane Rpt. at 4. Miller nonetheless capitulated to SandRidge's influence. *See, e.g.*, SD-SECURITIES-0213704 (12/15/2010 email from Miller to R. Johnson and others confirming well exclusions, among other things, leading to higher oil EUR). Defendants have not provided valid bases for these exclusions during discovery.

<u>YE2011 Reserve Analysis</u>

SandRidge's process of pressuring NSAI to exclude underperforming wells from the type curve continued in 2011, which resulted in an artificially inflated EUR for SandRidge's horizontal Mississippian wells. NSAI initially computed an average EUR of 144 kbbls of oil for the Mississippian PDP wells but SandRidge pressured NSAI to exclude poorly performing wells, and include high-EUR non-SandRidge wells, which resulted in an artificially inflated average oil EUR of 204 MBO based on the YE2011 type curve. Miller's initial analysis also found a consistently high degree of variation in the average oil EUR across different counties in the Mississippian.

SandRidge rebuffed Miller's observation of varying EURs across different areas and counties in mid-October 2011. *See* SD-SECURITIES-0226337. Specifically, SandRidge received Miller's "well analysis that attempts to define performance trend areas and

ultimately develop unique area based type-curves" but claimed "[g]eological differences from one area to anther [sic] are not distinct." *Id.* Miller was similarly pressured to revise his finding that "[t]he average EUR of the infill wells (92 mbo) is about 1/2 the average EUR of the original well (185 mbo)." *See* SD-SECURITIES-0226432. In response, SandRidge manipulated the b-factor to change the average ratio of these wells to the original wells to 1.0. SD-SECURITIES-0456294; 6295. All infill wells were ultimately assigned the same type curve as original wells. *See* SD-SECURITIES-0005586. SandRidge also instructed Miller to exclude various wells to increase the average EUR from his initial lower observations. SD-SECURITIES-0457226. A significant number of wells Miller initially reviewed were excluded, at the behest of SandRidge (as detailed below), in order to attain the 456 MBOE type curve that was reported to the market. *See* SD-SECURITIES-0228054. SandRidge's undue influence caused Miller to forego his initial assessment that the Mississippian was producing less oil than SandRidge ultimately presented to the market, *i.e.*, 144 kbbls was inflated to 204 MBO, and the Mississippian was falsely portrayed as a single type curve of 456 MBOE.

During the 2011 year-end review process, SandRidge excluded 52 wells out of the 182 SandRidge PDP wells at that time, thereby excluding 29% of SandRidge's producing wells from its PUD EUR calculations. *See* SD-SECURITIES-0456288; SD-SECURITIES-0228054; Crane Rpt. at 32. SandRidge improperly excluded these wells as non-representative of the type curve due to either remoteness or being drilled and completed in the wrong zone. *See* SD-SECURITIES-0456288; Crane Rpt. at 32 – 36. PDP well inclusion and exclusion for NSAI's calculations was detailed in an excel spreadsheet. *See* Expert

Rebuttal Report of Steven D. Crane ("Crane Rebuttal Rpt. ¶") at ¶71; SD-SECURITIES-0228258. It is a high burden to exclude existing PDP wells from PUD type well calculations by claiming the intent to not drill there in the future. Crane Rebuttal Rpt. at ¶71.

Specifically, SandRidge improperly excluded six (6) wells on the grounds they were in the wrong zone. Crane Rpt. at 33. Each of these wells, however, were drilled and completed in the Mississippian formation, according to state records and SandRidge's internal data. Crane Rpt. Ex. 51; Crane Rpt. at 33. When considering the vertical growth and connectivity from the hydraulic fractures present in the Mississippian formation, and comparing it to SandRidge's original theory for using unconventional well completions on conventional geology, exclusion of any Mississippian well for being out of the zone is eliminated. Crane Rpt. at 33. Thus, SandRidge's exclusion of these six wells for being in the wrong zone was improper. *Id.* at 34. Excluding these wells improperly influenced NSAI's analyses of the type curve in 2011.

Forty-six (46) wells were excluded from the type curve on the basis of remoteness. Crane Rpt. at 34; Crane Rpt. Ex. 53. Most of these exclusions were poor performing wells located in Grant County. Crane Rpt. at 34. These exclusions had a material impact on the presentation of SandRidge's type curve because the company had leased more acres in Grant County than any other county in the Mississippian. SD-SECURITIES-0217803.

There are two groups of tightly clustered exclusions in Grant County, showing poor quality geology, albeit without any apriori method of predicting where such poor geology exists. Crane Rpt. at 34. During the early stages of the 2011 review, Miller's independent analysis consistently found a high degree of variation in the average oil EUR spread across

the counties in the Mississippian, and he advised R. Johnson and Austin that SandRidge wells in Grant, SE Alfalfa and NW Garfield counties were underperforming year-end 2010 type curve by 77 percent. R. Johnson Ex. 7. Despite Miller's observation, Galvin issued R. Johnson an internal memorandum rebuffing Miller's observations. SD-SECURITIES-0226336; 6337. The memorandum stated, among other things, that "[g]eological differences from one area to another are not distinct" and the company would not accept a previous recommendation by Miller to "develop unique area based type-curves" consistent with Miller's observations at this time. *Id.*

SandRidge continued to advocate for NSAI to exclude low performing wells, primarily from Grant County, during the year-end review and these exclusions were a dominant mechanism for SandRidge to drive NSAI to higher PUD EURs than NSAI's own PDP values. Crane Rpt. at 32 – 33.

Additionally, the selective addition of high EUR wells located in Woods County provided SandRidge with a means to improperly influence NSAI to higher PUD EURs than NSAI's own PDP values. Crane Rpt. at 32 – 33. The selection addition of non-SandRidge, high EUR wells operated by Chesapeake Energy Corporation (CHK), mainly in Woods County, also improperly inflated the oil EUR. Crane Rpt. at 36; SD-SECURITIES-0228258; NSAI_SD_108054; NSAI_SD_108003. The oil EUR of the CHK wells was substantially higher than SandRidge's wells. *Id.* As Austin later admitted to Galvin, SandRidge "always included the non-ops to help our type curves. They are still better than our wells and help our average." SD-SECURITIES-0032430. Miller's understanding that the inclusion of Chesapeake wells was proper was solely based on conversations with SandRidge personnel.

David Miller Transcript ("Miller Tr.") (Vol. II) at 293:16-19. Miller just went along with SandRidge and failed to perform an independent analysis on the propriety of including those wells in the type curve. *Id.* at 293:9 - 295:4.

As a result of SandRidge's selective exclusion of 52 lower EUR wells and selective addition of 15 high EUR wells, NSAI's initial average of 144 kbbls of oil for the Mississippian PDP wells with an oil content of 45% was artificially inflated to 204 kbbls of oil with an oil content of 45%. Crane Rpt. at 39.

<u>INTERROGATORY NO. 12</u>:

If Plaintiffs contend that any Defendant should have publicly disclosed prior to November 9, 2012 that the wells in the Mississippian were producing less oil than expected, identify the date(s) that Plaintiffs contend each Defendant should have made such a disclosure, state the basis for Plaintiffs' contention, and identify all evidence in support of Plaintiffs' contention.

<u>RESPONSE TO INTERROGATORY NO. 12</u>:

Lead Plaintiffs object to this Interrogatory on the ground that substantive fact discovery has only recently been completed, and expert discovery has yet to complete. Plaintiffs are responding to this Interrogatory based on their current knowledge and expressly reserve their right to modify, amend or supplement their response based upon, among other things, their continuing review of documents, deposition testimony and the work of their experts. Lead Plaintiffs further object to this Interrogatory as overly broad, unduly burdensome and not proportional to the needs of the case because it seeks the identification of "all evidence" and "all dates." This would require Lead Plaintiffs to provide the equivalent of a narrative or otherwise detailed account of Lead Plaintiffs' entire case in chief, together with identification of virtually all supporting evidence and corresponding dates for