**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| In re SANDRIDGE ENERGY, INC. SECURITIES LITIGATION | Case No. 12-cv-01341-G |
| This Document Relates to: <br> ALL ACTIONS. | |

**DEFENDANT TOM L. WARD'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF**

Defendant Tom L. Ward respectfully moves this Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, for summary judgment against Lead Plaintiffs Laborers Pension Trust Fund for Northern Nevada, Construction Laborers Pension Trust of Greater St. Louis, and Vladimir and Angelica Galkin on all claims. In support of this Motion, Mr. Ward files the accompanying Memorandum and Appendices, Declaration of Stephen P. Barry, and exhibits cited therein. Based upon the record and applicable law, there are no material factual disputes and Mr. Ward is entitled to judgment dismissing all claims against him.

Additionally, Mr. Ward joins the Motion for Summary Judgment and Memorandum of Law in Support filed on behalf of Defendants James D. Bennett and Matthew K. Grubb.

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. STATEMENT OF UNDISPUTED MATERIAL FACTS .......... 3

A. The History of the Mississippian and SandRidge .......... 3

B. Netherland Sewell's Annual Type Curves .......... 4

C. SandRidge's Production Results .......... 8

D. Geological Consistency and Production Variance in the Mississippian .......... 9

E. Mr. Ward's Personal Investment in SandRidge .......... 11

III. PLAINTIFFS' CLAIMS .......... 11

IV. LEGAL STANDARDS .......... 12

V. DISCUSSION .......... 13

A. Element 1: Plaintiffs Cannot Prove an Actionable Misstatement .......... 13

1. *The Forward-Looking Statements Are Immunized by the PSLRA Safe Harbor and Defendants Had No Duty to Update* .......... 13

2. *Defendants' Factually Accurate Statements About SandRidge's Historical Results Were Not "Misleading"* .......... 13

3. *Defendants' Statements About the Geology of the Mississippian Were Demonstrably True and Accurate* .......... 19

B. Element 2: The Evidence Shows Mr. Ward Did Not Act with "Scienter" .......... 21

1. *Not a Single Witness Testified That Mr. Ward Lied* .......... 21

2. *The Evidence Shows Mr. Ward Believed the Forward-Looking Statements Were Accurate* .......... 22

3. *The Evidence Shows Mr. Ward Was Not Reckless in Describing SandRidge's Accurate Results or Geology* .......... 25

4. *Mr. Ward Had No Motive to Commit Fraud* .......... 29

C. Plaintiffs' "Control Person" Claim Fails As a Matter of Law .......... 30

VI. CONCLUSION .......... 30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Spirit AeroSystems Holdings, Inc.*,
105 F. Supp. 3d 1246 (D. Kan. 2015),
*aff'd*, 827 F.3d 1229 (10th Cir. 2016) ........ 15, 18, 25, 28

*Avon Pension Fund v. GlaxoSmithKline PLC*,
343 F. App'x 671 (2d Cir. 2009) ........ 29

*Bader v. Roberts*,
No. CIV-19-297-G, 2020 WL 33746 (W.D. Okla. Jan. 2, 2020) ........ 12

*Brody v. Transitional Hosp. Corp.*,
280 F.3d 997 (9th Cir. 2002) ........ 15

*Caprin v. Simon Transp. Servs.*,
112 F. Supp. 2d 1251 (D. Utah 2000) ........ 24

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ........ 18

*In re Cisco Sys. Inc. Sec. Litig.*,
No. C 11-1568 SBA, 2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ........ 18

*City of Philadelphia v. Fleming Cos., Inc.*,
264 F.3d 1245 (10th Cir. 2001) ........ 26, 29, 30

*Del Noce v. Delyar Corp.*,
No. 72 Civ. 1819-CLB, 1976 WL 813 (S.D.N.Y. July 30, 1976) ........ 24

*Dronsejko v. Thornton*,
632 F.3d 658 (10th Cir. 2011) ........ 25

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & ERISA Litig.*,
898 F. Supp. 2d 176 (D.D.C. 2012) ........ 22

*Fezzani v. Bear, Stearns & Co. Inc.*,
716 F.3d 18 (2d Cir. 2013),
*reh'g and reh'g en banc denied*, 777 F.3d 566 (2d Cir. 2015) ........ 11

*FindWhat Inv'r Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ........ 15

*Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*,
53 F. Supp. 3d 882 (E.D. La. 2014) ........ 15, 22

*In re Ford Motor Co. Sec. Litig.*,
381 F.3d 563 (6th Cir. 2004) ........ 21

*In re FX Energy, Inc. Sec. Litig.*,
Nos. 2:07-CV-874 CW, 2009 WL 1812828 (D. Utah June 25, 2009) ........ 28

*In re Gold Res. Corp. Sec. Litig.*,
957 F. Supp. 2d 1284 (D. Colo. 2013),
*aff'd*, 776 F.3d 1103 (10th Cir. 2015) ........ 22

*Grossman v. Novell, Inc.*,
120 F.3d 1112 (10th Cir. 1997) ........ 24

*Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*,
638 F. App'x 778 (10th Cir. 2016) ........ 21

*In re Intrexon Corp. Sec. Litig.*,
No. 16-cv-02398-RS, 2017 WL 732952 (N.D. Cal. Feb. 24, 2017) ........ 20

*Jensen v. Kimble*,
1 F.3d 1073 (10th Cir. 1993) ........ 18

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) ........ 18, 20

*Maher v. Durango Metals, Inc.*,
144 F.3d 1302 (10th Cir. 1998) ........ 13

*McDonald v. Kinder-Morgan, Inc.*,
287 F.3d 992 (10th Cir. 2002) ........ 15

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
761 F.3d 1109 (10th Cir. 2014) ........ 30

*In re N. Telecom Ltd. Sec. Litig.*,
116 F. Supp. 2d 446 (S.D.N.Y. 2000) ........ 30

*Norfolk Cty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*,
22 F. Supp. 3d 669 (E.D. Ky. 2014), *aff'd by*, *Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*,
614 F. App'x 237 (6th Cir. 2015) ........ 18

*Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*,
No. 5:11-CV-4-D, 2013 WL 1192004 (E.D.N.C. Mar. 22, 2013) .............................. 19

*Rochester Laborers Pension Fund v. Monsanto Co.*,
883 F. Supp. 2d 835 (E.D. Mo. 2012) .............................................................. 18

*Schuster v. Symmetricon, Inc.*,
No. C9420024RMW, 2000 WL 33115909 (N.D. Cal. Aug. 1, 2000),
*aff'd*, 35 F. App'x 705 (9th Cir. 2002) ............................................................ 29

*Stichting Pensioenfonds ABP v. Merck & Co., Inc.*,
No. 05-5060 (SRC), 2012 WL 3235783 (D.N.J. Aug. 1, 2012) ................................ 19

*In re Sun Healthcare Grp., Inc. Sec. Litig.*,
181 F. Supp. 2d 1283 (D.N.M. 2002) .............................................................. 22

*In re Thornburg Mortg., Inc. Sec. Litig.*,
695 F. Supp. 2d 1165 (D.N.M. 2010),
*aff'd by*, *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190 (10th Cir.
2013) ........................................................................................................ 20

*Truk Int'l Fund LP v. Wehlmann*,
737 F. Supp. 2d 611 (N.D. Tex. 2009),
*aff'd*, 389 F. App'x 354 (5th Cir. 2010) ............................................................ 15

*In re Williams Sec. Litig.*,
496 F. Supp. 2d 1195 (N.D. Okla. 2007),
*aff'd sub nom.*, 558 F.3d 1130 (10th Cir. 2009) ............................................ 12, 30

## STATUTES

15 U.S.C. § 78u-5(c)(1)(B)(i) ............................................................................ 21

Okla. Admin. Code § 165:10-13-2(c) .................................................................. 20

## REGULATIONS

17 C.F.R.
§ 210.4-10(a)(11) ........................................................................................ 4
§ 210.4-10(a)(26) ........................................................................................ 4

## OTHER AUTHORITIES

L.C. Snider, *The Mississippian Rocks of Northeastern Oklahoma*, 22 U.
Chi. J. Geo. 6 (Oct. 1914), https://www.journals.uchicago.edu/
doi/pdfplus/10.1086/622176 ........................................................................ 3

Robert Daniel McKenna, *Petroleum Geology of the Mississippi Lime in Parts of Payne and Pawnee Counties, Oklahoma*, Okla. St. Univ. (1979), https://shareok.org/bitstream/handle/11244/16586/Thesis-1982-M155p.pdf?sequence=1&isAllowed=y; ........ 3

Timothy R. Carr, et al., *Improved Oil Recovery in Mississippian Carbonate Reservoirs of Kansas – Near Term – Class 2*, The Univ. of Kansas Ctr. For Research (June 1, 1999), https://www.osti.gov/servlets/purl/824383 ........ 3

Wallace Lee, *Relation of Thickness of Mississippian Limestones in Central & Eastern Kansas to Oil and Gas Deposits*, Bulletin of Univ. of Kansas (June 15, 1939), http://www.kgs.ku.edu/Publications/Bulletins/26/ ........ 3

## I. INTRODUCTION

Exploration of the Mississippian geological formation has been a centerpiece of Oklahoma's oil and gas industry, and a critical part of the State's economy, since the first well was drilled 80 years ago or more. More than 17,000 vertical wells have been drilled exploring the formation. Many fortunes were won and lost in the boom and bust cycles of oil and gas development, and that trend continues to this day.

In the late 2000s, with advancements in horizontal drilling technology and hydraulic fracturing, many believed in a new boom exploring the Mississippian using horizontal wells—and they were right. Lease prices skyrocketed and leaseholders received substantial royalties, as major oil companies bid for leases and drilled productive wells, bringing revenue to Oklahoma's businesses and landowners. Encouraging results fueled this optimism, with profitable forecasts of estimated ultimate recovery ("EUR") by companies like Chesapeake (410 thousand barrels of oil equivalent ("MBoe")), Range (600 MBoe), Encana (425 MBoe), and SandRidge (409 MBoe).

Starting in late 2009, Oklahoma City-based SandRidge saw the horizontal Mississippian Play as an opportunity in its own backyard. It parlayed its historical knowledge of the formation, the landowners, the support economy, and its past drilling into a substantial position in the Play. But when describing this new opportunity to investors, SandRidge repeatedly disclosed what every investor knows: that there are major risks in a speculative resource development play in its early stages, using new technologies, selling into an international economy marked by geopolitical uncertainty. Mindful of these uncertainties, SandRidge retained one of the top reserve engineering

firms, Houston-based Netherland, Sewell & Associates, to perform an independent estimate of SandRidge's Mississippian reserves each year for disclosure to the public.

Confirming the risks of oil and gas development, SandRidge stock was volatile during this time. In 2011 and 2012 alone, it experienced price swings of 5% or more 82 times, and saw price changes exceeding 10% on 8 days over the same span. On November 9, 2012, the stock dipped 9.7% from the prior day's close. Plaintiffs brought this securities fraud lawsuit against SandRidge and several of the company's senior officers 26 days later. By the time they sued, the stock had bounced back and was actually trading higher than on November 8, 2012. In fact, an investor who bought SandRidge stock on November 9 would have enjoyed a 17% return by the time this case was filed. Plaintiffs nonetheless continued to pursue litigation.

This lawsuit—like the *Lanier* action based on a royalty trust developed to raise capital for SandRidge's Mississippian efforts—has always been in search of a viable theory. Judge West initially dismissed it. Plaintiffs resurrected their complaint with the promise of damaging insider testimony, but that promise completely evaporated during the witnesses' depositions—so much so that Plaintiffs no longer rely upon them at all. Plaintiffs have changed their theories as one allegation after another has failed to pan out. What is left is a handful of after-the-fact, often conflicting arguments trying to convert a speculative oil and gas investment into a sure thing—when everyone knew it was not.

These basic failings lead to a number of ways that these lawsuits are simply not viable. The Defendants' current motions—to exclude expert witnesses, to renew their request for dismissal, and for summary judgment—delve into the details and explain the

many reasons the Court should dismiss these cases short of trial.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. The History of the Mississippian and SandRidge

1. Before 2009, over 10,000 vertical oil and gas wells had been drilled into the Mississippian Play, an expansive carbonate hydrocarbon formation spanning parts of Oklahoma and Kansas. Those vertical wells yielded publicly available geological information. There also existed at that time an extensive body of professional and academic literature regarding the Mississippian, including related to the potential for oil and gas production in the reservoir. Ex. 111 (Brittenham Rep. ¶¶ 37-61); Ex. 11 (Miller Dep. 29:7-19); Ex. 32 (SD 2010 10-K at 5).[1]

2. SandRidge, an oil and gas exploration company founded in 2006, predicted, based on available vertical well data and other resources regarding the Mississippian's geology, that there was oil throughout the formation. Ex. 35 (Nov. 4, 2010 SD 8-K).

3. Starting in or around 2009, SandRidge began to acquire land leases in Oklahoma and Kansas for drilling horizontal wells. Ex. 32 (SD 2010 Form 10-K at 1, 4-5).

---

[1] *See, e.g.*, Timothy R. Carr, et al., *Improved Oil Recovery in Mississippian Carbonate Reservoirs of Kansas – Near Term – Class 2*, The Univ. of Kansas Ctr. For Research (June 1, 1999), https://www.osti.gov/servlets/purl/824383; Robert Daniel McKenna, *Petroleum Geology of the Mississippi Lime in Parts of Payne and Pawnee Counties, Oklahoma*, Okla. St. Univ. (1979), https://shareok.org/bitstream/handle/11244/16586/Thesis-1982-M155p.pdf?sequence=1&isAllowed=y; Wallace Lee, *Relation of Thickness of Mississippian Limestones in Central & Eastern Kansas to Oil and Gas Deposits*, Bulletin of Univ. of Kansas (June 15, 1939), http://www.kgs.ku.edu/Publications/Bulletins/26/; L.C. Snider, *The Mississippian Rocks of Northeastern Oklahoma*, 22 U. Chi. J. Geo. 6 (Oct. 1914), https://www.journals.uchicago.edu/doi/pdfplus/10.1086/622176.

4. In 2010, SandRidge drilled 37 horizontal oil and gas wells across more than half a million acres in the Mississippian. Ex. 32 (SD 2010 10-K at 1, 4-5). By year-end 2011, SandRidge had drilled 205 wells across more than 1.5 million acres. Ex. 33 (SD 2011 10-K at 5). And SandRidge had drilled 396 wells by 2012. Ex. 34 (SD 2012 10-K at 5).

5. SandRidge publicly disclosed certain forward-looking estimates of future production during the class period, including (i) type curves; (ii) expected ultimate recoveries ("EURs"); (iii) gas-to-oil ratios ("GORs"); (iv) rates of return ("ROR"); and (v) proved reserves. *See, e.g.*, Ex. 35 (SD Nov. 2010 8-K at 2-3).[2] SandRidge consistently cautioned, however, that actual results could—and "most likely" would—vary for a number of reasons, including the "complex and inherently imprecise" nature of projecting oil and gas production. Ex. 114 (Pls.' RFA Resp. No. 3 (b), (c), & (f)); *see also, e.g.*, Ex. 32 (SD 2010 10-K at 33-34, 39); Ex. 33 (SD 2011 10-K at 33, 35-36).

**B. Netherland Sewell's Annual Type Curves**

6. SandRidge retained Netherland, Sewell & Associates ("NSAI"), an independent petroleum engineering firm, to estimate SandRidge's Mississippian oil and gas reserves.

---

[2] A type curve estimates the expected production profile of an average well in a given play or area. *See* Ex. 14 (Walton Dep. 12:21-23); Ex. 2 (Crane Dep. 255:22-24). The "EUR" is the estimated total recovery of oil and gas reserves from a well over time. 17 C.F.R. § 210.4-10(a)(11); Third Consol. Am. Compl., filed Oct. 21, 2016, Dkt. 225 ("Compl.") ¶ 47. A "GOR" compares the amount of gas and oil reserves that will be recovered from a well. Compl. ¶ 51; Ex. 11 (Miller Dep. 244:14-15, 248:14-16). "ROR" is the return on investment over the life of a well or group of wells. *See* Ex. 4 (Grubb Dep. 65:11-19); Ex. 8 (Knupp Dep. 151:13-16). And proved reserves are "those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible from a given date forward[.]" 17 C.F.R. § 210.4-10(a)(22); Compl. ¶ 56.

Ex. 34 (SD 2012 10-K at Ex. 99.1); Ex. 33 (SD 2011 10-K at Ex. 99.1). Specifically, NSAI developed type curves for Proved Undeveloped ("PUD") wells at year-end 2010 and 2011. *See* Ex. 14 (Walton Dep. 12:15-19, 13:5-6); Ex. 7 (R. Johnson at 38:22-39:3).

7. NSAI is one of the most respected reserves estimation firms in the industry. *See* Ex. 98 (May 2011 Morgan Keegan Report at 3) ("the venerable Netherland Sewell").

8. NSAI estimated SandRidge's reserves in accordance with the Society of Petroleum Engineers' Standards Pertaining to the Estimation and Auditing of Oil and Gas Reserve Information ("SPE Standards"), which obligated NSAI to remain objective and independent in its work. *See* Ex. 112 (SPE Standards at art. IV).

9. David Miller was the NSAI employee principally responsible for estimating SandRidge's 2010 and 2011 year-end reserves. *See* Ex. 11 (Miller Dep. 14:22-15:5). Mr. Miller followed NSAI's standard approach in estimating these reserves, which included "interaction and a back-and-forth" with certain SandRidge reservoir engineering personnel. *Id*. at 32:13-24, 42:16-19.

10. Tom Ward—SandRidge's founder and President, Chairman, and CEO until June 2013—did not participate in NSAI's reserves estimation process. *See* Ward Decl. ¶¶ 3-4; Ex. 11 (Miller Dep. 21:10-22:12); Ex. 14 (Walton Dep. 203:6-8). SandRidge employees occasionally gave Mr. Ward updates, Ex. 15 (Ward Dep. 115:9-15), but Mr. Ward did not interact directly with Mr. Miller or the NSAI team, Ex. 11 (Miller Dep. 21:10-22:12). Mr. Ward never directed any SandRidge employee to withhold data from NSAI, to pressure NSAI to achieve a specific EUR or type curve result, to exclude or include

particular wells within NSAI's analysis, or to use a specific "B-factor."[3] Ward Decl. ¶ 4; Ex. 14 (Walton Dep. 203:2-5); App. C (collecting testimony).

11. Mr. Ward trusted NSAI's experience and judgment for the estimation of SandRidge's reserves, type curve, and EUR projections. *See* Ward Decl. ¶ 5.

12. The SandRidge employees Mr. Miller primarily interacted with were Rodney Johnson, Lance Galvin, Lindsey Walton, and Danh Nguyen. Ex. 113 (Pls.' Interrog. Resps. No. 17); Ex. 11 (Miller Dep. 19:15-20:5, 21:24-22:4). NSAI obtained and reviewed production data provided by these individuals. Ex. 11 (Miller Dep. 19:21, 20:17-24); Ex. 3 (Galvin Dep. 23:3-24:10). And SandRidge provided NSAI with all the data it requested. Ex. 14 (Walton Dep. 203:15-20).

13. Mr. Miller at times disagreed with SandRidge reservoir engineering personnel regarding aspects of NSAI's analysis. For example, some SandRidge employees proposed a B-factor of 2.0 for the initial decline of the type curve. Ex. 11 (Miller Dep. 161:21-162:6). But Mr. Miller concluded a B factor of 1.5 was more appropriate, and because NSAI had ultimate decision-making authority in developing SandRidge's reserve estimates (Ex. 14 (Walton Dep. 204:14-16, 54:20-55:6, 85:7-15); Ex. 1 (Bennett Dep. 364:8-10)), he decided to use that lower variable. Ex. 11 (Miller Dep. 161:21-162:6).

14. NSAI also had authority to decide which wells to include in its analysis (Ex. 3, (Galvin Dep. 91:10-16, 110:13-16); Ex. 14 (Walton Dep. 178:25-179:4)), and whether to develop one aggregate Mississippian type curve or multiple curves for different parts of

---

[3] A "B-factor" is the industry term for the initial rate of decline associated with the type curve. NSAI refers to this as the "N-factor." *See* Ex. 11 (Miller Dep. 100:17-24).

the play (Ex. 14 (Walton Dep. 172:3-6); Ex. 11 (Miller Dep. 224:2-22)).

15. Mr. Miller never believed SandRidge was "pushing [him] to have a higher reserves report." Ex. 11 (Miller Dep. 276:13-15). And SandRidge's reserve engineers believed NSAI reached its own independent judgments in developing estimates for SandRidge. Ex. 7 (R. Johnson Dep. 205:10-206:4, 273:23-274:2); Ex. 12 (Nguyen Dep. 46:10-18); Ex. 14 (Walton Dep. 54:20-55:2, 83:9-17, 196:5-197:1, 204:4-16).

16. NSAI performed its year-end 2010 estimates based on data from 37 horizontal wells and prior vertical wells. Ex. 97 (-0563904);[4] Ex. 11 (Miller Dep. 122:20-123:1). NSAI estimated an EUR for SandRidge's average Mississippian PUD well of 409 MBoe, including 211 thousand barrels of oil ("MBbl"), yielding a GOR of 48% gas and 52% oil.

17. NSAI's year-end 2011 estimates comprised data from 145 horizontal wells and prior vertical wells. Ex. 97 (-0563904); Ex. 11 (Miller Dep. 122:20-123:1). NSAI estimated a 456 MBoe EUR, including 204 MBbl of oil, with a 55% gas / 45% oil GOR.

18. SandRidge publicly disclosed and referred to NSAI's year-end type curves and projections at various points throughout 2011 and 2012. *See, e.g.*, Statements 4 & 30(c).

19. SandRidge also created internal EUR and GOR estimates for its Mississippian wells. In 2010, SandRidge expected ultimate recovery to range from 300-500 MBoe per well, with a GOR of 53% oil and 47% gas. Ex. 35 (SD Nov. 2010 8-K at 2). SandRidge disclosed its predictions to investors. *Id.*; Ex. 18 (SD Feb. 2011 Call at 3); Ex. 56 (May 2011 Conf. Tr. at 4); Ex. 20 (SD Aug. 2011 Call at 27); Ex. 23 (SD May 2012 Call at

---

4 Certain documents produced in discovery are referenced using the numbered portion of their Bates label; *e.g.*, SD-SECURITIES-0563904 is cited as "-0563904."

19); Ex. 84 (Sept. 2012 Conf. Tr. at 4).

**C. SandRidge's Production Results**

20. SandRidge accurately reported the quantity of oil and gas its Mississippian wells produced in each quarter during the class period, and achieved increased quarter-over-quarter and year-over-year oil and gas production during the class period. For example:

a. Between the start of fiscal year ("FY") 2010 and the first quarter of 2011 ("1Q11"), average daily production grew expontentially from just 250 Boe per day to over 5,300 Boe per day. Ex. 37 (SD May 2011 8-K at 1-2).

b. Daily average production in the Mississippian increased by more than 50% in each of the next two quarters—2Q11 and 3Q11—to over 8,400 Boe and over 12,700 Boe, respectively. *See* Ex. 38 (SD Aug. 2011 8-K at 2); Ex. 39 (SD Nov. 2011 8-K at 2).

c. SandRidge's 4Q11 and FY 2011 oil production results represented a 26% and 60% increase over SandRidge's 4Q10 and FY 2010 production figures. *See* Ex. 41 (Feb. 2012 SD 8-K at 2, 5).

d. SandRidge reported record total oil production for both FY 2011 and 1Q12, with average daily Mississippian production for 1Q12 reaching 19,300 Boe and marking a 23% quarter-over-quarter increase. *See* Ex. 31 (SD Mar. 2012 10-K/A at 10); Ex. 42 (SD May 2012 8-K at 1). And SandRidge's 2Q12 results reflected a 65% year-over-year increase in overall oil production and another 31% quarter-over-quarter increase in Mississippian daily average oil production. *See* Ex. 43 (SD Aug. 2012 8-K at 1).

21. SandRidge also achieved aggregate class period production results through August 2012 (2Q12) that met or exceeded the applicable NSAI projections. For example:

a. A February 2011 investor presentation showed SandRidge's average first month production for Mississippian wells was 274 Boe per day, above NSAI's FY 2010 type curve projection of 244 Boe. *See* Ex. 48 (Feb. 2011 Presentation at 14).

b. An August 20, 2011 internal report showed that SandRidge's production from all Mississippian wells from 2010 through August 2011 was "within tolerance" of the then-applicable type curve. Ex. 62 (Aug. 2011 Internal Rep. at -0420022).

c. A February 28, 2012 internal report showed SandRidge's 30-day average production for horizontal Mississippian wells was 312 Boe per day, exceeding the NSAI type curve for both FY 2010 (244 Boe per day average) and FY 2011 (275 Boe per day average). *See* Ex. 68 (Feb. 2012 Internal Rep. at 73).

d. Monthly internal reports continued to show wells performing above target, on average, on a barrel of oil equivalence basis in June 2012 (6% above target), July 2012 (9% above target), and August 2012 (5% above target). *See* Ex. 82 (Aug. 2012 Internal Rep. at 6); Ex. 85 (Sept. 2012 Internal Rep. at 6); Ex. 86 (Oct. 2012 Internal Rep. at 6).

**D. Geological Consistency and Production Variance in the Mississippian**

22. Throughout the class period, Mr. Ward and other SandRidge employees made public statements emphasizing that production would and did vary among wells and areas within the Mississippian, including, in addition to others listed in Appendix D:

- Mr. Ward (Feb. 25, 2011): "[T]here's a wide variability of production location to location . . . . [W]e're going to have very good wells mixed with poorer wells or even just good wells across the play." Ex. 18 (SD Feb. 2011 Call at 22-23).
- Mr. Ward (Mar. 1, 2011): "We've drilled some excellent wells. We've drilled some poor wells in other parts of the play." Ex. 50 (SD Mar. 2011 Conf. Tr. at 3).

- Mr. Ward (Nov. 4, 2011): "So within each of the areas we drill, there are good and bad wells . . . . [I]t's consistently variable." Ex. 21 (SD Nov. 2011 Call at 17-18).

- Mr. Ward (Feb. 7, 2012): "[T]here [are] some very very good wells and some poor wells. We see that all the way across the play." Ex. 67 (Feb. 2012 Conf. Tr. at 3).

23. Separately, Mr. Ward and other SandRidge employees also publicly emphasized throughout the class period that the geology of the Mississippian itself was variable in certain respects, including, in addition to other statements listed in Appendix D:

- Mr. Ward (Mar. 7, 2011): "[W]e look at this as a statistical play when you have an area this big, certainly you're going to have variations in some of the rock properties, but I think if we drill 100 wells here and 100 wells here, your statistics are going to be very close." Ex. 52 (Mar. 2011 Conf. Tr. at 4).

- Mr. Grubb (June 6, 2011): "There is variation because in an area that big, you're going to have some little bit of variation in permeability, a little variation in porosity." Ex. 59 (June 2011 Conf. Tr. at 9).

24. SandRidge repeatedly disclosed maps in 2012 showing 30-day peak production by county. *See* App. D. In May 2012, for example, SandRidge disclosed to investors a map with 30-day peak average production rates by county, which showed Grant County as being more productive than some counties, but less productive than numerous others—including Alfalfa, Barber, Harper, and Kay. Ex. 73 (May 2012 Presentation at 8).

25. Mr. Ward stated in February 2012 that "we still don't know enough about the entirety of the play to be breaking out different type curves." Ex. 22 (SD Feb. 24, 2012 Call at 6). NSAI's David Miller similarly concluded during the 2011 year-end reserve estimation process that "there was not a systematic reason to have [] subdivisions and . . . the data did not warrant subdividing." Ex. 11 (Miller Dep. 224:14-16); *see also* Ex. 14 (Walton Dep. 43:23-24 ("During this time period it was not a fact that Grant wells were

poorer performers.”)). He similarly “did not see a geographic distribution . . . to the GOR or gas family types” in 2012. Ex. 11 (Miller Dep. 225:21-23).

### E. Mr. Ward’s Personal Investment in SandRidge

26. During the class period, Mr. Ward’s SandRidge stock holdings increased by over 1.98 million shares. *See* Ex. 44 (Jan. 14, 2011 Form 4); Ex. 45 (Oct. 1, 2012 Form 4).

27. No SandRidge employee, including Plaintiffs’ purported “confidential witnesses,” identified during their depositions a single instance in which Mr. Ward made a false or misleading statement about SandRidge’s production at all (or directed anyone else to do so). *See* App. C (indexing testimony regarding Mr. Ward).

## III. PLAINTIFFS’ CLAIMS

In their response to Mr. Ward’s Interrogatory No. 7, Plaintiffs identified 34 statements[5] they now contend were false or misleading—more than a third of these were not pled in their Complaint.[6] These statements can be grouped into three categories.

First, Plaintiffs challenge statements about NSAI’s reserve estimates and predictive type curves developed for SandRidge.[7] Plaintiffs contend those forward-looking statements about the amount of oil and gas SandRidge might eventually recover from the Mississippian were false or misleading when made, based mostly on after-the-

---

5 *See* App. A: Challenged Statements. Only 12 of these statements were made by Mr. Ward. Mr. Ward cannot be liable under Section 10(b) for statements he did not make. *Fezzani v. Bear, Stearns & Co. Inc.*, 716 F.3d 18, 25 (2d Cir. 2013).

6 *See* Mem. Supp. Mot. for Summ. J. of Defs. Bennett & Grubb [hereinafter, “Bennett & Grubb Br.”] at § IV (discussing Statements 2-11, 13-27, 29-34). These statement numbers correspond to those identified in Plaintiffs’ interrogatory responses. *See* Ex. 113 (Pls.’ Interrog. Resps., Ex. A).

7 *See* App. A (Statements 1-6, 8, 11-12, 14, 16, 18-22, 26, 30(a)-(c), 32-34).

fact criticisms of subjective judgments that NSAI made when modeling its projections.

Second, Plaintiffs identify statements in which Defendants accurately reported SandRidge's actual production results and discussed them in relation to NSAI's predictions.[8] Plaintiffs cannot show that any such statement was actually false, but nevertheless contend they were misleading because SandRidge did not disclose that some individual wells or groups of wells produced below-average results.

Third, Plaintiffs claim statements describing the geology of the Mississippian were false because Defendants "did not have a strong understanding of the geology of the Mississippian" and misled reasonable investors to believe "well *performance*" would be "consistent across [SandRidge's] entire leasehold."[9]

## IV. LEGAL STANDARDS

This Court recently articulated the standard of review on summary judgment in *Bader v. Roberts*, 2020 WL 33746, at *1 (W.D. Okla. Jan. 2, 2020). Plaintiffs cannot avoid summary judgment with only "a scintilla of evidence in support"; instead, "there must be evidence on which the trier of fact could reasonably find for [them]." *Id.* at *2.

Plaintiffs' Section 10(b) claim requires them to prove each Defendant "(1) made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which [Plaintiffs] relied; (5) that [Plaintiffs] suffered an economic loss; and (6) that the material misrepresentation was the cause of that loss." *In re Williams Sec. Litig.*, 558 F.3d 1130, 1136 (10th Cir. 2009). Mr. Ward is

---

[8] *Id.* (Statements 6, 9, 11, 13, 15-18(b), 22, 24, 26-27, 29, 30(a), 31(a)-(b), 34).
[9] *Id.* (Statements 7, 9-11, 13-18, 21-22, 25-28, 30).

entitled to summary judgment based on Plaintiffs' inability to prove elements 1, 2, or 6. Mr. Ward is also entitled to summary judgment on Plaintiffs' Section 20(a) control person claim because Plaintiffs cannot establish "a primary violation of the securities laws." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998).

## V. DISCUSSION

### A. Element 1: Plaintiffs Cannot Prove an Actionable Misstatement

#### 1. *The Forward-Looking Statements Are Immunized by the PSLRA Safe Harbor and Defendants Had No Duty to Update*

This case is fundamentally about estimates of the amount of oil and gas in the Mississippian that turned out, in retrospect, to be overly optimistic. Common sense dictates that even the most experienced developer cannot predict with certainty what lies thousands of feet below the earth's surface. And, except in extraordinary circumstances, the federal securities laws protect public companies from liability to disappointed investors merely because results fall short of projections. For the reasons set forth in Messrs. Bennett and Grubb's summary judgment motion, the estimates Plaintiffs challenge are classic forward-looking statements immunized by the Safe Harbor of the Private Securities Litigation Reform Act ("PSLRA"). *See* Bennett & Grubb Br. at § I.

#### 2. *Defendants' Factually Accurate Statements About SandRidge's Historical Results Were Not "Misleading"*

Plaintiffs also challenge each statement in which SandRidge reported its financial and production results and compared them favorably to projections and prior periods. For example, Plaintiffs challenge statements that production was "matching [SandRidge's] expectations" or that "Mississippian daily average production grew by

23% quarter over quarter."[10] Importantly, Plaintiffs are unable to claim that these historical results were not reported completely accurately. Indeed, the aggregate results cited in each challenged statement, on a barrels of oil equivalency, were better than predicted in the applicable type curve,[11] and SandRidge increased its actual production over time. *See* SUF 20-21.[12]

Yet Plaintiffs contend these accurate statements still misled investors because SandRidge did not disclose that (1) some individual wells or regions were not meeting expectations,[13] or (2) some individual Proved Developed Producing wells ("PDPs") were yielding a higher GOR than the type curve projected; and, thus, investors would have concluded that SandRidge would continue to beat the projections.[14] No reasonable investor, however, would have expected hundreds of wells across millions of acres to perform uniformly, or that present production promised identical future output. Rather, a

---

10 *See* Statements 6, 9, 11, 13, 15-17, 18(b), 22, 24, 26-27, 29, 30(a), 31(a)-(b), 34.

11 *Compare* Statements 6, 9, 13, *with* Ex. 62 (Aug. 2011 Internal Rep. at -0420022); *compare* Statements 16-17 *with* Ex. 68 (Feb. 2012 Internal Rep. at 73); *compare* Statement 31(b), *with* Ex. 82 (Aug. 2012 Internal Rep. at 6).

12 Statements 15, 24, 27, 29, & 31(a). *Compare, e.g.*, Statement 24, *with* Ex. 41 (SD Feb. 2012 8-K at 2, 5). Moreover, many of these statements were consistent with then-applicable type curve. *See* App. A (Statements 2-3, 4(a)-(b), 5-6, 8, 11-12, 14, 16, 18(a)-(b), 19-20, 22, 26, 30(a)-(c), 32-34; *see also, e.g.*, Ex. 51 (SD Mar. 2011 Presentation at 60) ("NSAI YE 2010 PUD 409 Mboe/location" for Mississippian); Ex. 68 (SD Feb. 2012 Presentation at 71) ("Consultant Type Curve" of "456 MBoe/well").

13 *See* Ex. 113 (Pls.' Interrog. Resps., Ex. A, Statements 13, 22, 29, & 30).

14 *See id.* (Statement 9 ("Contrary to statement that 'Production growth is matching our expectations,' the EUR for recently drilled wells, in addition to all wells, was lower than represented by Defendants."); statement 2 ("Misleading because the EUR from SD's PDPs were lower than represented with a higher gas percentage."); Statements 11, 13, 22-24, 26, 27, 29, 30(a), & 31(a)-(b)). Plaintiffs identify as "Additional Evidence" documents about certain counties underperforming. *See, e.g.*, *id.* (Statement 13).

"reasonable investor would have recognized the speculative and uncertain nature of the formulation of estimates of proved reserves." *Truk Int'l Fund LP v. Wehlmann*, 737 F. Supp. 2d 611, 623-24 (N.D. Tex. 2009) (rejecting securities fraud claim based on 20% reserve estimate reduction). It was therefore not misleading for SandRidge to accurately report its overall results each quarter without separately describing each individual well or grouping of wells that performed below (or above) the mean.

As a legal matter, Defendants had no "affirmative duty to disclose any and all material information under § 10(b) and Rule 10b-5(b)." *Anderson v. Spirit AeroSystems Holdings, Inc.*, 105 F. Supp. 3d 1246, 1260 (D. Kan. 2015). "[A] duty to disclose arises only when both the statement made is material, *and* the omitted fact is material to the statement in that it alters the meaning of the statement." *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002). And in the Tenth Circuit, "[i]t is well-established that the accurate reporting of historic successes does not give rise to a duty to further disclose contingencies that might alter the revenue picture in the future." *Id.* Defendants therefore had no duty to disclose sub-level "updates on the performance of each and every one of its wells" from which one might try to predict future output. *Firefighters Pens. & Relief Fund v. Bulmahn*, 53 F. Supp. 3d 882, 906 (E.D. La. 2014).[15]

---

[15] *See also, e.g.*, *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1305-06 (11th Cir. 2011) ("No reasonable investor would believe that a conclusory, but apparently accurate, report of company-wide revenue growth naturally implied that all was well within every component of the company that could possibly affect revenue in the future."); *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 n.8 (9th Cir. 2002) ("[I]f a company reports that its sales have risen from one year to the next, that statement is not misleading even though it does not include a detailed breakdown of the company's region by region or month by month sales.").

Plaintiffs' theory is also contrary to the undisputed facts. Defendants repeatedly and explicitly emphasized that they "expect[ed] to have a statistical combination of good and not-as-good wells." Statement 30(a); *see also* App. D (cataloging dozens of statements disclosing production variances). For example, Mr. Ward made clear at the outset of the class period in February 2011 the "wide variability" SandRidge anticipated:

> **[T]here's a wide variability of production, location to location.** So we don't anticipate every well coming on at 800 barrels a day and we don't anticipate every well coming on at 100 barrels per day equivalent. But what we do anticipate [is that] over the course of a play that you can have this 240 barrel a day type curve through first 30 days of production. And then you should be able to feel more comfortable in the ultimate decline of the wells because you have all the vertical wells that show basically a 2.5 B factor and we're coming in with a 1.5 B factor in our type curve. So again, it's just how many years' worth of production, knowing the decline, **and then the variability, you really can't tell because it has to do with the permeability across a 4,000-foot lateral in between well to well. So what I always try to say is that we're going to have very good wells mixed with poorer wells or even just good wells across the play.** And we don't see yet that there's any certain one spot that is better than others and that includes us or our peers drilling. So we're not claiming our acreage is better or worse than anyone else.[16]

Wall Street analysts, in turn, frequently highlighted "what investors have long known, that the Mississippian is highly variable,"[17] and that "specific well performance [was] expected to vary across the play (among counties)."[18] For example, analysts reported:

- The Mississippian is a "statistical play," with "variability . . . expected in EURs," (Mar. 1, 2011 KeyBanc Report);
- SandRidge "expect[ed] to continue to see significant variability in results," (Apr. 13, 2011 Boenning Report); and

---

16 Ex. 18 (SD Feb. 2011 Call at 22-23 (emphases added)).
17 Ex. 106 (Feb. 2012 Deutsche Bank Report at 4).
18 Ex. 98 (May 17, 2011 Morgan Keegan Report at 6).

- Although SandRidge's wells "statistically" were "conforming to a very good average," there was "still a wide variation" and "long-term production history for horizontal wells" was "limited," (May 9, 2011 RBC Report).[19]

Defendants thus disclosed, and the market understood, that certain wells would underperform and that past success did not guarantee future results.

The same holds true for Plaintiffs' theory that it was misleading for Defendants not to disclose that some wells were gassier than others. Defendants *did* disclose that fact—explicitly stating, for example, in August 2011 that SandRidge was "going to have some wells that have a higher GOR." Ex. 20 (SD Aug. 2011 Call at 17). Moreover, beyond disclosing that the gassiness of wells would vary, Defendants transparently notified investors as broader trends in SandRidge's overall Mississippian output emerged. For instance, Mr. Ward reported by February 2012 that "the wells overall in the play appear[ed] to be gassier than . . . initially projected." Ex. 28 (SDT Feb. 2012 Call at 3). And analysts could independently determine the relative gassiness of SandRidge's wells and EUR trend. In May 2012, for example, BNP Paribas reported that "[p]ublic data on drilling results to date in the Miss"—including production information published by the Oklahoma Corporation and Tax Commissions—"appear[ed] below the company's type curve . . . with a gassier production mix" and "a relatively rapid decline in oil in the production stream."[20] Defendants had no duty to disclose information "already in the public domain." *Jensen v. Kimble*, 1 F.3d 1073, 1079 n.11 (10th Cir. 1993).

---

19 Ex. 114 (Pls.' RFA Resp. No. 2(a), (c), (d) (admitting analyst statements)).

20 Ex. 114 (Pls.' RFA Resp. No. 2(r) & (s)); *see also id.* (admitting an August 2012 analyst report stated SandRidge's Mississippian production was "much gassier than anticipated . . . while crude volumes [were] below expectations").

In any event, many of Defendants' statements reflect nothing more than a positive spin on accurate business results, which is classic "puffery"—*i.e.*, "vague . . . management-speak" that is "not capable of objective verification" and "upon which no reasonable investor would base a trading decision." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1339-40 (10th Cir. 2012); *see also Anderson*, 105 F. Supp. 3d at 1256. Mr. Ward's statements, for example, that "[t]he Mississippian continues to be our growth engine" and that one newly drilled well was an example of a "success stor[y]"[21] are immaterial and not actionable as a matter of law. So too for the following:

- Statements 9 & 13. Mr. Ward's May 5 and August 4, 2011 statements that "[p]roduction growth is matching our expectations" and "results" from "our Mississippian project . . . continue to meet or exceed our expectations."[22] *See, e.g.*, *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) ("exceeding expectations" was "a vague expression of optimism").

- Statement 11. Mr. Ward's May 24, 2011 statement that there were "exceptional wells statistically across the whole play."[23] *See, e.g.*, *Rochester Laborers Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835, 882 (E.D. Mo. 2012) ("products delivered 'great' or 'exceptional' performance" was "inactionable puffery").

- Statement 22. Mr. Ward's February 7, 2012 statement that "performance in the Mississippian has continued to improve." *See, e.g.*, *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1321 (11th Cir. 2019) ("improved results" was "immaterial as a matter of law"); *Norfolk Cty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*, 22 F. Supp. 3d 669, 686-89 (E.D. Ky. 2014) ("continuing to improve gross margins").

- Statement 23. Mr. Ward's February 27, 2012 statement that oil was "coming in on target."[24] *See, e.g.*, *Anderson*, 105 F. Supp. 3d at 1256 ("tracking within expectations" is a "rosy affirmation[]"); *Stichting Pensioenfonds ABP v. Merck & Co., Inc.*, 2012 WL 3235783, at *6 (D.N.J. Aug. 1, 2012) ("remain[s] on target").

---

21 Statements 30(a) & 31(b).
22 *See also* Statement 30(b) ("everything looks to be on track" with the type curve).
23 *See also* Statement 10 ("statistically as good").
24 *See also* Statement 17 ("overall the well performed better"; "roughly on trend").

- Statement 26. Mr. Ward's March 12, 2012 statement that "we believe [the Mississippian] generates the highest rate of return for horizontal drilling in the U.S. today and will be the primary driver of growth for the company going forward."[25] *See, e.g., Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*, 2013 WL 1192004, at *16 (E.D.N.C. Mar. 22, 2013) ("growth driver for our business going forward" was "immaterial puffery").

### 3. *Defendants' Statements About the Geology of the Mississippian Were Demonstrably True and Accurate*

Plaintiffs first contend that statements about the geology of the Mississippian were misleading because "Defendants did not have a strong understanding of the geology of the Mississippian Play."[26] Plaintiff do not (and cannot) seriously dispute that geologists and reserve engineers universally agree on the geology of the Mississippian and that Defendants' statements about its "porosity," "permeability," "thickness," and other physical attributes were accurate. Ex. 111 (Brittenham Report ¶ 37). Indeed, Plaintiffs' own oil and gas expert testified at his deposition that SandRidge's representations related to geology were not misleading. *See* Ex. 2 (Crane Dep. 244:6-10).

So Plaintiffs again claim that Defendants' true statements about geology "misrepresented that *well performance* was consistent across" the Mississippian.[27] But Defendants never predicted that the undisputable continuity of the Mississippian formation—and its basic geological properties—would yield uniform *performance*.

---

25 *See also* Statements 4(a) & 5 ("high rate of return"). Plaintiffs contend Statement 8 discusses the "high rate of return" for the Mississippian. In fact, the only reference to a "high rate of return" in Statement 8 describes the Central Basin Platform, which is part of the Permian Basin—not the Mississippian. Regardless, "high rate of return" is puffery.

26 *See* Ex. 113 (Pls.' Interrog. Resps., Ex. A, Statements 7, 10-11, 13-15, 18, 21-22, 25-28, 30).

27 *Id.* (Statement 7; *see also* Statements 9, 22, 25, 27-28).

Defendants *repeatedly said the exact opposite*, predicting substantial variation of "high-rate wells intermixed with some poorer wells across the whole play." Ex. 49 (Feb. 2011 Presentation Tr. at 3), *see also* App. D (listing statements about production variances). No one in the oil and gas industry would make such an outrageous and impossible prediction,[28] and no reasonable investor would believe it if they did.

In any event, general statements about SandRidge's "thorough understanding" of the "Mississippian formation's geology," its status as a "leader" in the play, or its view of the Mississippian as a "great play" and "the very best place to drill" are far from the sort of specific factual representations capable of giving rise to a § 10(b) claim.[29] Comments suggesting SandRidge had "pioneered development and proven the play's value" or had drilling "expertise" are likewise immaterial as a matter of law.[30] *See Level 3*, 667 F.3d at 1340 ("proven [] experience" was, "as a matter of law, nothing more than puffery");

---

[28] Only 1 of the 11 geology statements challenged on this basis actually uses the word "consistency" *at all*—and that statement (from the Trust I Registration Statement) unmistakably refers only to the geological "formation" and "consistency in reservoir properties such as porosity, thickness, and stratigraphic conformity." *See* Statement 7.

[29] Statements 7, 18(b), 22, 25, 28-29, 30(a), 34. There was also nothing untrue about characterizing SandRidge's move to the Mississippian as a "move to oil" on the company's part. *See* Statement 1. The wells SandRidge operated in the Mississippian were defined as "oil" wells by law. *See* Okla. Admin. Code § 165:10-13-2(c) ("Any well having a gas-oil ratio of less than 15,000 to one shall be classified as an oil well for allowable purposes."). Plaintiffs cannot show that SandRidge's Mississippian output during the relevant period fell below the applicable legal threshold for "oil well" classification. And Mr. Ward's statement—that SandRidge "significantly enhanced" its value by the "move to oil"—was otherwise puffery. *See, e.g.*, *In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *3 (N.D. Cal. Feb. 24, 2017) ("first-mover advantage" inactionable puffery); *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1224 n.43 (D.N.M. 2010), *aff'd*, 719 F.3d 1190 (10th Cir. 2013) ("strategic focus").

[30] Statements 9 & 27.

*Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 786 (10th Cir. 2016) ("best possible care"); *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) ("worldwide leader in automotive safety"; "best quality ever").

### B. Element 2: The Evidence Shows Mr. Ward Did Not Act with "Scienter"

To survive summary judgment, Plaintiffs must present sufficient evidence to show that Mr. Ward made misstatements with fraudulent intent. The requisite scienter for forward-looking statements is "actual knowledge" that the statements were "false or misleading" when made. 15 U.S.C. § 78u-5(c)(1)(B)(i). For all other statements, Plaintiffs must show that Mr. Ward engaged in either intentional or reckless misconduct. Far from meeting that standard, Plaintiffs offer only speculation and conjecture that Mr. Ward deliberately misled the market, while ignoring that he had no motive to do so.

#### 1. *Not a Single Witness Testified That Mr. Ward Lied*

Not one person has testified that Mr. Ward perpetrated a fraud. To the contrary, every percipient witness deposed in this case consistently testified they could not recall a single instance when Mr. Ward made a false or misleading statement about—or caused anyone else to misrepresent—SandRidge's Mississippian production. *See* App. C (collecting testimony). As just one example, SandRidge's former Executive Vice President and Chief Operating Officer, David Lawler, stated unequivocally that he was not "aware of Tom Ward ever making any false statements about SandRidge production" or doing "anything to attempt to mislead investors or to hide negative production trends"; that Mr. Ward never asked him "to in any way manipulate production data"; and that he

had no "reason to believe that Mr. Ward didn't believe that SandRidge would achieve its [oil production] goals." *Id.* Plaintiffs' self-serving interpretation of innocuous internal documents cannot overcome the weight of this testimony.

### 2. *The Evidence Shows Mr. Ward Believed the Forward-Looking Statements Were Accurate*

"'Actual knowledge' is a higher level of scienter than the 'recklessness'" standard applicable to statements of present or historical fact. *In re Sun Healthcare Grp., Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1289 (D.N.M. 2002); *see In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1296-98 (D. Colo. 2013), *aff'd*, 776 F.3d 1103 (10th Cir. 2015).

There is not a scrap of evidence that Mr. Ward had actual knowledge when he made any forward-looking statement that NSAI's type curves—or SandRidge's predictive statements based on NSAI's analysis—were overstated.[31] To start, the facts that SandRidge engaged NSAI, a world-class petroleum engineering firm, to prepare the type curve and related projections and that NSAI stated the type curve was reasonable and reliable based on all the data is strong evidence that Mr. Ward believed those projections to be faithfully and accurately prepared—as he has testified. *See* Ward. Decl. ¶ 5; Ex. 15 (Ward Dep. 224:5-17, 230:3-11); *In re Fed. Nat'l Mortg. Ass'n Sec., Deriv. & ERISA Litig.*, 898 F. Supp. 2d 176, 182 (D.D.C. 2012) (no scienter where defendant "relied on internal and external accounting experts"); *Bulmahn*, 2015 WL 4879217 at *18 (dismissing fraud claims based on reserves estimates prepared by third-party engineer).

---

31 *See* Statements 1-5, 8, 11-12, 18(a), 19-20, 22, 26, 30(a) & (c), 32-34.

Plaintiffs attempt to overcome this unrefuted evidence by arguing that Mr. Ward must have known NSAI's work was unreliable because "SandRidge improperly pressured NSAI during the year-end review process for 2010 and 2011 in order to make SandRidge's Mississippian holdings appear more oily, and therefore more appealing to prospective investors."[32] This is not supported by the evidence for two reasons. First, every former SandRidge employee involved and Mr. Miller from NSAI testified that SandRidge did not pressure NSAI, NSAI controlled and exercised ultimate decision-making authority over the estimation process, and NSAI believed its work was performed accurately and based on the best available information. SUF 6-12. Plaintiffs' negative portrayal of SandRidge's NSAI interactions cannot overcome this first-hand testimony. Second, Plaintiffs have no evidence to show Mr. Ward had any involvement whatsoever in creating the NSAI type curves or even interacted with NSAI staff *at all*. Again, every percipient witness testified he was not involved with NSAI's work and did not improperly influence it. SUF 10. Plaintiffs thus argue merely that, as CEO, Mr. Ward was generally "kept apprised" of *other* SandRidge employees' "dealings with NSAI."[33] That does not come close to showing actual knowledge that NSAI's work was unreliable.

Nor does evidence that Mr. Ward received information showing some individual wells producing below the type curve long after the type curve was disclosed. NSAI projected the performance of *future*, *undrilled* wells in proved undeveloped locations. As Mr. Ward put it, production results and projections in the type curve are "two different

---

32 Ex. 113 (Pls.' Interrog. Resps., No. 17).
33 Ex. 113 (Pls.' Interrog. Resps., No. 9).

things." Ex. 15 (Ward Dep. 225:22-226:9). NSAI created a type curve once annually, after months of analysis. And subsequent production results obtained only *after* the type curve is created cannot prove that earlier projection was false or misleading *at the time it was made*—much less knowingly so. "[S]ecurities claims will not be based on 'fraud by hindsight.'" *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997).

Moreover, information that some wells are performing worse than projected does not mean that Mr. Ward knew NSAI's projections were unattainable. It is undisputed that a type curve is designed to project "the *average* EUR per well of [a] *typical* horizontal well,"[34] based on available data from a large number of wells. Oil reserves and production are notoriously complicated to predict and "involv[e] a long and difficult process in which even highly regarded experts are ultimately forced to rely on their subjective judgments both in the selection and weighing of data." *Del Noce v. Delyar Corp.*, 1976 WL 813, at *10 (S.D.N.Y. July 30, 1976). Accordingly, the mere existence of some negative historical data points, in isolation, cannot show that NSAI's projections of future performance *as a whole* were overstated—let alone that Mr. Ward knew as much. *See Caprin v. Simon Transp. Servs.*, 112 F. Supp. 2d 1245, 1259 (D. Utah 2000) (finding no scienter because negative January report did "not mean that defendants knew that business would not improve in February and March").

Finally, any possible inference of scienter is negated by the fact that Defendants

---

[34] Statement 19 (emphasis added); *see also, e.g.*, Statement 26 ("An average horizontal well . . . produces 456 thousand barrels of oil equivalent."); Statement 2 ("[O]ur latest type curve from Netherland Sewell is 409 MBOE per well").

repeatedly disclosed a range of well results. SandRidge reported throughout 2010, 2011, and 2012 that it was observing production across the play in the range of "300,000 to 500,000 barrels per well." SUF 19. These disclosures "cut against" any finding that Mr. Ward knew investors would misinterpret the NSAI type curve—reflecting the expected production of a *typical* Mississippian well—as applying to each of SandRidge's wells individually. *Anderson*, 105 F. Supp. 3d at 1266.[35]

### 3. ***The Evidence Shows Mr. Ward Was Not Reckless in Describing SandRidge's Accurate Results or Geology***

Recklessness "is a particularly high standard" that "approximat[es] actual intent." *Dronsejko v. Thornton*, 632 F.3d 658, 668 (10th Cir. 2011). Plaintiffs contend "Defendants" acted recklessly when they commented on SandRidge's undeniably positive and accurate financial results and described the Mississippian's geology.[36] But their response to Mr. Ward's Interrogatory No. 9, which required Plaintiffs to set forth evidence of scienter for *each* statement and *each* Defendant, does not separately describe how Plaintiffs intend to prove that Mr. Ward was reckless. The best interpretation of their response is that Plaintiffs believe Mr. Ward was reckless because SandRidge's oil production varied well-to-well and by county. Plaintiffs thus must prove that each sub-level data point he allegedly omitted not only rendered his statements misleading, but was

[35] There is also no evidence Mr. Ward knew as of February 24, 2011 that SandRidge's 90% "expected" rate of return was false or misleading. *See* Statement 1. Weeks earlier, Mr. Ward was informed that the rate of return for horizontal Mississippian wells was 128%. Ex. 89 (Feb. 1, 2012 e-mail); *see also* Ex. 90 (Feb. 9, 2011 e-mail from Mr. Grubb noting "100% of our rigs currently drilling high ROR oil wells").

[36] App. A (Statements 7, 9, 13, 15, 22-25, 27-29, 30(a), & 31(a) & (b)).

"so obviously material that [he] must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001). Mere knowledge of underperformance by some wells is not enough to prove scienter—"it is the *danger of misleading [investors]* that must actually be known or so obvious that any reasonable man would be legally bound as knowing." *Id.* at 1260. Plaintiffs cannot sustain that heavy burden of proof.

First, there is absolutely no evidence that Mr. Ward knew his statements were misleading. Not a single witness says he did, and no internal documents show as much. On the contrary, the evidence shows Mr. Ward's public optimism about the Mississippian was matched by his private assessments. In internal correspondence in June 2011, for example, Mr. Ward commented that SandRidge was "continuing to hit very good wells." Ex. 92 (June 29, 2011 e-mail). He continued to comment positively on the company's overall results in early 2012, *e.g.*, Ex. 95 (Jan. 24, 2012 e-mail) (discussing a "[n]ice" January 2012 production report), and observed in his deposition that, for "the whole play together," SandRidge's "rates of return . . . continue[d] to be very high" through at least August 2012, Ex. 15 (Ward Dep. 158:14-160:15). And although he acknowledged internally that some wells (unsurprisingly) performed worse than others, *see* Ex. 94 (Sept. 27, 2011 e-mail describing one well as "another dog amongst decent wells," as "[s]eems to happen all over"), it was entirely ordinary to have a given well or "county performing better than the other"—the critical issue was "the overall production of all counties" together, Ex. 15 (Ward Dep. 160:5-6). Indeed, the evidence confirms that before the third quarter of 2012, average production across the Mississippian exceeded the type

curve and Mr. Ward did not become aware of any material and lasting change until sometime after September 2012 at the earliest. *See* SUF 21(d) (showing August 2012 production was 5% above target).

Plaintiffs' focus on Grant County—based on newly-manufactured assertions not pled in the Complaint, *see* Bennett & Grubb Br. § III—underscores the point. Plaintiffs identify internal reports by January 27, 2011 showing certain wells in Grant County underperforming and conclude that Defendants thus knew "all areas of the Mississippian were not the same," and should not have used a single type curve.[37] But the evidence shows Mr. Ward reasonably believed at the time of—and even after—his statements that Grant County *as a whole* was performing consistent with projections and in line with other parts of the play. In April 2011, for example, he was "encourage[d]" by initial results for "[t]he last three Grant Co wells." Ex. 91 (Apr. 4, 2011 e-mail). After reviewing a geological report for Grant County in September 2011, he remarked, "Looks as good as any to me!" Ex. 93 (Sept. 17, 2011 e-mail). And as late as February 2012, Mr. Ward suggested in an e-mail to employees that, "[s]ince early in the program our wells [in Grant County] have been consistently better even in the areas we were concerned about." Ex. 96 (Feb. 23, 2012 e-mail). As Mr. Ward testified, SandRidge "had good wells drilled in Grant County at this time and some, as in all counties, poorer wells and it wasn't a condemnation of the whole county." Ex. 15 (Ward Dep. 64:11-13). But he did not "believe[] that Grant County was performing worse than any other

[37] Ex. 113 (Pls.' Interrog. Resps., Ex. A, Statements 4, 7, & 11).

county." *Id.* at 56:18-20; *id.* at 66:12-14 ("I believe that our results . . . in Grant County as a whole were the . . . same as Woods and Alfalfa.").[38]

Second, Plaintiffs also cannot show that the risk of misleading investors by not disclosing subdivisions of production data was "so obvious" that Mr. Ward *must* have appreciated as much. The NSAI type curve represents an "average well," meaning there will always be some wells that out-perform and others that under-perform against the estimate. This is a basic concept in the industry, and Mr. Ward and others repeated early and often that "some wells [would] come on at a very high rate[] and some [would] come on at less." Ex. 17 (SD Nov. 2010 Call at 14); *see also* App. D (variance disclosures). Because investors already knew well results would vary, it cannot be "so obviously" misleading not to disclose that individual well results *in fact* varied. *Anderson*, 105 F. Supp. 3d at 1263 ("Disclosures such as these cut against a strong inference that Defendants were attempting to hide information or mislead the public."); *In re FX Energy, Inc. Sec. Litig.*, 2009 WL 1812828, at *9 (D. Utah June 25, 2009) (finding no scienter "given the amount of times FX Energy publicly made this type of statement"). Indeed, not a single one of the Lead Plaintiffs testified that they were misled by any statement about SandRidge's financial results or the geology of the Mississippian.

---

[38] Mr. Ward's view was not an anomaly. Others within SandRidge shared his belief that Grant County was meeting expectations. *See, e.g.*, Ex. 88 (Aug. 10, 2010 e-mail from Mr. Grubb describing a new Grant County well as "pretty strong"). And NSAI independently determined that Grant County's production was not sufficiently unique to justify a separate type-curve projection. *See* Ex. 11 (Miller Dep. 158:3-6).

### 4. *Mr. Ward Had No Motive to Commit Fraud*

Plaintiffs argue Mr. Ward was motivated to defraud investors for personal gain—"in order to enable SandRidge to continue monetizing its assets" so that he could "earn [an] extremely lucrative compensation package[]," and to enhance the value of property in the "vicinity" of SandRidge's Mississippian operations acquired by *other* entities in which Mr. Ward or his family held an interest. Ex. 113 (Pls.' Interrog. Resp. No. 13). But supposed motive evidence is not enough to establish scienter, *Fleming*, 264 F.3d at 1261, and the undisputed facts contradict Plaintiffs' tenuous theories.

First, Plaintiffs have no evidence to quantify the supposed financial benefit to Mr. Ward. On the contrary, the record shows he was *harmed by* his supposed scheme. Unlike in many securities fraud cases where defendants sell personal shares at allegedly inflated prices before the "truth" is revealed, Mr. Ward's SandRidge stock holdings *increased* by nearly 10% over the class period. *See* SUF 26. And he held those shares through—and acquired *even more* SandRidge stock after—the November 2012 disclosure and stock drop that led to this litigation. *See Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) ("[D]efendants' purchases of even more . . . stock during the relevant period signals only confidence in the future of their company[.]"). Indeed, Mr. Ward lost nearly *$15 million* when SandRidge's stock price declined. *Schuster v. Symmetricon, Inc.*, 2000 WL 33115909, at *7 (N.D. Cal. Aug. 1, 2000) ("[U]ndisputed evidence that defendants were actually *harmed* by their alleged fraud often negates an inference of scienter and supports entry of summary judgment for defendants."), *aff'd*, 35 F. App'x 705 (9th Cir. 2002).

Second, Plaintiffs' generic assertion that Mr. Ward—like every other corporate executive—"shared [a] general motive to make the company look good" is "unavailing." *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1122 (10th Cir. 2014); *see also Fleming*, 264 F.3d at 1269-70 ("motives shared by all company executives," including a "desire to maintain a high stock price in order to increase executive compensation," are not enough for scienter). There is no evidence Mr. Ward's salary was tied to SandRidge's investment in the Mississippian. In fact, most of his compensation package was in stock that lost substantial value when the alleged fraud was disclosed. That undisputed fact cuts against any finding of fraudulent intent. *See In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462-64 (S.D.N.Y. 2000) (granting summary judgment where "individual defendants had nothing to gain from making the[ir] alleged misrepresentations" and "held or increased their holdings" over the class period).

### C. Plaintiffs' "Control Person" Claim Fails As a Matter of Law

"The basic elements of a control person liability claim under § 20(a) are (i) a primary violation of the securities laws and (ii) 'control' over the primary violator by the alleged controlling person." *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1295 (N.D. Okla. 2007), *aff'd*, 558 F.3d 1130 (10th Cir. 2009). Because Plaintiffs cannot establish a primary violation of § 10(b) by any Defendant, "they cannot establish the first element of their § 20(a) claim" and "summary judgment is appropriate." *Id.*

## VI. CONCLUSION

For the reasons set forth above, Mr. Ward is entitled to summary judgment.

Dated: April 2, 2020

Respectfully submitted,

**LATHAM & WATKINS LLP**

*/s/ J. Christian Word*
J. Christian Word (*pro hac vice*)
Stephen P. Barry (*pro hac vice*)
David L. Johnson (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
christian.word@lw.com
stephen.barry@lw.com
david.johnson@lw.com
(202) 637-2200

Steven M. Bauer (*pro hac vice*)
505 Montgomery St., Suite 2000
San Francisco, CA 94111
steven.bauer@lw.com

**CORBYN LAW FIRM**

*/s/ George S. Corbyn, Jr.*
George S. Corbyn, Jr., OBA #1910
211 North Robinson, Suite 1910
One Leadership Square
Oklahoma City, OK 73102
gcorbyn@corbynlaw.com
kcaldwell@corbynlaw.com
(405) 239-7055

*Attorneys for Defendant Tom L. Ward*