# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

In re: SANDRIDGE ENERGY, )
INC. SECURITIES LITIGATION, )Case No. 5:12-cv-01341-G
____________________________)

VOLUME I

VIDEOTAPED DEPOSITION OF JAMES BENNETT

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON FEBRUARY 13, 2019

REPORTED BY: DAVID BUCK, CSR

97 a day. You may have one day that's at, let me look at the low here, 82 and one day that's at 99. My point on this, you want to be very careful quoting one day because those can change drastically from day to day.

Q. And who are the people you are telling 90 -- that SandRidge is doing 99 per day?

MR. GIMBEL: Objection to form.

THE WITNESS: I don't -- I don't know. I don't know who Kevin and I are talking about this. I don't know if it's internally. It could have been an internal meeting. I'm not sure.

Q. (By Mr. Horne) Could it be external?

A. It could be.

Q. Could it be --

MR. GIMBEL: Objection --

Q. (By Mr. Horne) -- a bank?

MR. GIMBEL: -- foundation.

THE WITNESS: I don't know. We'd have to see if Kevin remembered what we were talking about here. The point is we put out guidance and we reaffirmed that quarterly and we just tried to do it in an orderly fashion, we all communicate, you know, the same way, the same -- the same message.

Q. (By Mr. Horne) Okay. And if you read

Mr. White's e-mail, no kidding, had to counterbalance Tom.

Tom Ward. Right?

A. I'm assuming he means Tom Ward. I don't know for sure but that was the only Tom and --

Q. Okay.

A. -- likely.

Q. Today by reaffirming volume guidance while he is saying we are at October's plan today.

Do you see that?

A. Yes.

Q. Do you recall an issue with Mr. Ward overstating production?

A. No. No.

Q. Did this happen a lot?

A. No.

MR. GIMBEL: Objection to form.

THE WITNESS: Not to my memory, no.

Q. (By Mr. Horne) Okay.

A. Sometimes all of us would get -- sometimes we'd get numbers confused or transpose one or say we're going to do, you know, in a meeting ninety a day when we really meant 96 or 99. So no, it could have been a mistake.

Q. Okay. Could it have been something more

sinister?
MR. GIMBEL: Objection, foundation.
THE WITNESS: I -- I can't comment on that.
MR. HORNE: Thirty-five.
(Deposition Exhibit Number 35 marked for identification purposes and made part of the record.)
Q. (By Mr. Horne) Thirty-five is an e-mail Bates stamped SD-SECURITIES-0155327 and I'm only going to ask you about everything below the -- your 7:51 a.m. e-mail, so the bottom of the page onwards.
A. I'm sorry, from my e-mail on or the whole thing. Right?
Q. From your -- no, I'm sorry, from your -- your e-mail, the -- the last e-mail that you send in this is at 7:51. It's the bottom of the page.
Do you see that?
MR. KARAM: What exhibit number is this?
MR. GIMBEL: Thirty-five.
MR. HORNE: Thirty-five.
THE WITNESS: Thirty-five. 7:00 -- yes, I see, so okay.
Q. (By Mr. Horne) So I'm going to ask you about that e-mail and everything below that e-mail.
A. Below, okay.

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

In re: SANDRIDGE ENERGY, )
INC. SECURITIES LITIGATION, )Case No. 5:12-cv-01341-G
___________________________)

VOLUME II

CONTINUED VIDEOTAPED DEPOSITION OF JAMES BENNETT

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON FEBRUARY 14, 2019

REPORTED BY: DAVID BUCK, CSR

seriousness, Mr. Bennett, do you see on Page 34 that in bold italics it says, the company's estimated reserves are based on many assumptions that may turn out to be inaccurate? Do you see that?
A. Yes, I do.
Q. And then, in fact, there are several paragraphs of risk disclosures about potential inaccuracies with reserve estimates.
Do you see that?
A. Yes, I do.
Q. And one of those disclosures is that the process of estimating oil and natural gas reserves is complex and inherently imprecise.
Do you see that?
A. Yes.
Q. Is that a warning that SandRidge issued to investors in its stock?
A. Yes. This is a risk factor that would have been in 10-Ks and 10-Qs and in investor presentations as well.
Q. Okay. Do you recall being shown Exhibit 55? And I'm not going to ask you to fish for it but I will represent to you that it is the reserve estimate prepared by Netherland Sewell --
A. Yes.

Q. -- for SandRidge as of December 31, 2012. Do you recall that?

A. Yes, I recall that.

Q. Okay. Did SandRidge have the authority to dictate what Netherland Sewell put in that reserve estimate?

A. No.

Q. Who had final authority over that reserve estimate?

A. Netherland Sewell.

Q. Okay. Going back to the -- the 10-K that we looked at for the year 2012, were there sections of that 10-K that you were more responsible for than others in your role at the time?

A. Yes.

Q. Can you describe for the record what those were?

A. As CFO those would have been the financial statements, certainly the statement of profit and loss, the balance sheet and cash statement, the audit itself and the footnotes to the financial statements.

Q. Okay. Were there sections of the 10-K for which you did not have primary responsibility?

A. Yes.

Q. Can you give us a few examples of that for

A. Yes.
Q. Okay. Can you provide a little more context for that?
A. Sure. I don't remember if I said that in that exact instance, but if we're going to disclose something to the public, you know, we'd often think about is it going to have -- what effect will it have on the company's valuation of stock price. But most importantly you want to make sure what you're disclosing is -- is timely and it's accurate and well diligenced and well thought out. It may have a positive impact or a negative impact but you want to make sure you're getting the right information out that's been thoroughly vetted.
Q. Okay. Did you ever tell anyone not to lower the type curve to avoid having a negative impact on SandRidge's market capitalization?
A. No. In fact, we -- we did lower the type curve.
Q. Did you ever tell anyone to make a false or misleading disclosure because of the impact it would have on SandRidge's stock price?
A. No.
Q. Did you ever tell anyone to make a false or misleading disclosure because of the impact it would

have on the price of Mississippian trust units?
A. No.
Q. Are you aware of anyone at SandRidge making a false or misleading statement to inflate the price of SandRidge stock or Mississippian trust units?
A. No.
Q. Okay. During your tenure at SandRidge are you aware of anyone making a statement to investors about the performance of SandRidge or the trusts or its assets which you considered false or misleading?
A. No.
MR. GIMBEL: I have nothing further.
MR. KARAM: Just one followup on that, this conversation with Mr. Stark.

REDIRECT EXAMINATION

BY MR. KARAM:
Q. In sum and substance you're not denying that it happened. Right?
A. The conversation with Mr. Stark?
Q. That counsel just asked you about about the possibility of lowering the type curve affecting the market cap.
MR. BAUER: Objection to form of the question.
THE WITNESS: Can you say it one more time?
Q. (By Mr. Karam) Sure, sure.