# EXHIBIT 11

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

IN RE SANDRIDGE ENERGY, INC. ) No. 5:12-cv-01341-G
SECURITIES LITIGATION )

AND

IVAN NIBUR, LAWRENCE ROSS, )
JASE LUNA, MATTHEW )
WILLENBUCHER, and the DUANE )
& VIRGINIA LANIER TRUST, )
Individually and On Behalf )
of All Others Similarly )
Situated, )
)
VS. ) Civil Action No.
) 15-cv-00634-M
SANDRIDGE MISSISSIPPIAN )
TRUST I, SANDRIDGE )
MISSISSIPPIAN TRUST II, )
TOM L. WARD, JAMES D. )
BENNETT, MATTHEW K. GRUBB, )
RANDALL D. COOLEY, JIM J. )
BREWER, EVERETT R. DOBSON, )
WILLIAM A. GILLILAND, DANIEL )
W. JORDAN, ROY T. OLIVER, )
JR., JEFFREY S. SEROTA, D. )
DWIGHT SCOTT, RAYMOND )
JAMES & ASSOCIATES, INC., )
MORGAN STANLEY & CO. LLC )
(F/K/A MORGAN STANLEY & CO. )
INC.), MERRILL LYNCH, )
PIERCE, FENNER & SMITH, )
INC., CITIGROUP GLOBAL )
MARKETS, INC., and RBC )
CAPITAL MARKETS, LLC, )
Defendants. ) Job No. 10050010

*****************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
DAVID TODD MILLER
DECEMBER 12, 2018
VOLUME I
*****************************************************

**Q. What kind of business is that?**

A. We do energy advisory, reserve consulting, basically, helping people sell their oil and gas properties.

**Q. When did you start that?**

A. A year-and-a-half ago or -- July of '17. June or July of '17.

**Q. Before that, where were you employed?**

A. With Netherland Sewell for about 20 years.

**Q. So from -- from what year to what year were you employed at Netherland Sewell?**

A. '97 to '17.

**Q. So the court reporter is going to be taking down my questions and your answers. I would request that you just pause for half a second after my question so that we don't talk over one another.**

**Do you understand?**

A. Okay.

**Q. While you were at Netherland Sewell, did you have any professional relationship with SandRidge Energy?**

A. I was their reserve consultant at preparing reserve reports for them for the period 2007 to 2000 -- no, for about 10 years through year-end 2011.

**Q. When you say "year-end 2011," did you -- did you work on or prepare a reserve report for SandRidge for the year 2012?**

A. At -- yeah, I should say through year-end 2012. Sorry.

**Q. So can you describe for me the process by which you undertook to prepare a reserve report for SandRidge Energy, and if I don't specify a time period in my questions, I'm interested in the period from, let's say, January 2010 to the end of 2012.**

A. Well, the -- excuse me. The approach for SandRidge is kind of the typical approach that we did for all of our clients. It is, for a year-end report, you would typically start getting data in October, kind of collate and organize the data. And then start working -- working the information, doing some technical analysis, October, November, December, get into some commercial analysis, which is pricing models, operating expense models. And then usually, depending on the time frame or when the report was due, start issuing runs and reports in January, maybe as late as February. And then we kind of go quiet and then pick it up again in October again.

**Q. When you say "issuing runs or reports,"**

royalty Trust II. I don't know if we issued a signed report at year-end '12 or not for either of the trusts but, I know we issued an all-in SandRidge report.

**Q. Was that report attached to an SEC filing or was that internal to SandRidge?**

A. I believe a short-form version of the report -- we have -- we have a large report that we issue that goes to SandRidge that's a few hundred pages and then a short-form, a letter version of that report, is also issued and that is what SandRidge files with the SEC.

**Q. So for the year 2012, did you work with anyone in particular within SandRidge?**

A. Yes, well, for 2012, I -- I worked with Lance Galvin.

**Q. Okay.**

A. I believe that's his last name.

**Q. Can you tell me what your interaction was with him?**

A. Receiving data and discussing technical evaluations and the -- the actual report. There's -- we're talking about 2012.

**Q. Right.**

A. So in addition to Lance, we're also talking

with Rodney and...
**Q. Rodney Johnson?**
A. Yes. And their -- Danh -- Danh Nguyen, I believe. It was three main people we talked with, was Lance, Rodney and Danh Nguyen.
**Q. Do you know how to spell Mr. Nguyen's name?**
A. N-G-U-I-N, I think.
**Q. Sounds close.**
A. Yeah. And I think it's D-A -- there's an "H" in there.
**Q. D-A-H-N?**
A. Okay.
**Q. So can you describe what the process was -- well, let me just take a step back.**
**You mentioned that you got data from SandRidge. What data did you get?**
A. The data would kind of fall into two classes, commercial data, I'll say, and performance data. So the performance data would be by well, by month production data that would be, if we had done -- if this is like 2010 or '11, or '12, this would be new data since the last time we did the report and then we would also get daily data by well, by day.
**Q. Daily production data?**

A. Uh-huh (affirmative response). So daily and monthly.

**Q. Okay. So one of the other rules here is you can't say "uh-huh." You have to say "yes" or "no," because of the court reporter has to take down --**

A. It's a bad habit.

**Q. -- a word. We'll correct you. Don't worry.**

**So other than Mr. Galvin, Mr. Johnson, and Mr. Nguyen, did you work with anyone else in 2012 within SandRidge?**

A. I believe we did, but I can't -- I don't remember those names. There's other people that worked other properties that were specific to certain property that was maybe an engineer on the Permian or a geologist in the Gulf of Mexico but I can't remember their names.

**Q. In the Mississippian, did you -- do you recall working with someone named Lindsey Austin?**

A. Uh-huh (affirmative response), yes.

**Q. Tell me about your interactions with Lindsey Austin. What was her role?**

A. Lindsey -- well, Lindsey and Rodney and Lance were all engineers and Lindsey was an engineer

that first started working with -- on the Mississippian in 2010 and I believe we worked with her all the way through all three -- all three year-ends.

**Q. Anybody else?**

A. On the Mississippian?

**Q. Right.**

A. That I remember, it's basically, Lindsey and the other three.

**Q. What about Matt Powe, P-O-W-E? Did he work on the Mississippian?**

A. I don't remember him. I apologize if I --

**Q. That's all right. It's -- if you remember, say it, if you don't remember, don't say it.**

**So I think I interrupted you. Describe the process.**

A. Okay.

**Q. So you said it started in October.**

A. Yeah, it starts October.

**Q. What happened in October?**

A. It starts in October.

I'm sorry if I talked over you.

**Q. That's all right.**

A. But we received the by well, by month production data, the daily data. Our analysts would

BY MR. KARAM:
**Q. So this is an e-mail from you to Mr. Stevens and Mr. Rees, correct?**
A. Uh-huh (affirmative response). Yes.
**Q. So this is an internal NSAI e-mail, right?**
A. Yes.
**Q. Not to anybody at SandRidge?**
A. Correct.
**Q. So --**
A. We also have a couple of other engineers at Netherland Sewell copied.
**Q. But no -- no one from SandRidge is copied here, right?**
A. Right.
**Q. So can you explain -- well, what was the purpose of this?**
A. So this is in response to SandRidge's desire to have a more detailed gas projection model. You'll see that towards the bottom, SandRidge is advocating for an independent gas projection with -- Netherland Sewell calls this an N, the industry calls it a B, but the hyperbolic B factor or the N factor, you see there of 3, which is -- which is rather high.
And so my -- and I believe this is after a

meeting in Dallas, I believe, with Lance and Rodney there. And I got Scott and Eric involved to try to help out with this process to -- because we were in a very tight time frame at this point. You see this is January 20th we're trying to get to report. So my response to their perspective was to look at these 199 oldest wells and see if I could -- what I could learn about the GOR behavior of those. And when I did that, I broke it into three families. I think this is something I talked about earlier.

**Q. Right.**

A. That there are -- of these 199 wells, 143 are showing declining gas rates. 16 are showing increase in gas rates, and 40 are gas wells. And that my view was that these PDP wells should be forecast on that basis in these families for their gas.

**Q. Was there any geographic correlation to the -- the types of wells in terms of the three categories you just separated them into?**

A. I did not see one.

**Q. Okay. Now, so an N, or, as you say, also called B factor of 3.0?**

A. Uh-huh (affirmative response).

**Q. "Yes"?**

out what the right terminal decline is, and usually you can look at older, vintage wells to see what their terminal decline is.

**Q. And just to be clear, "DF," what does that mean?**

A. Final decline.

**Q. Okay.**

MR. BENESH: How much more are you planning to do before?

MR. KARAM: This will be my last one before lunch. My last document.

So this will be Miller 16 and it's 17.

MR. BENESH: 17.

MR. KARAM: Miller 17, SandRidge, Bates number 0542269.

(Exhibit No. 17 marked.)

MR. KARAM: And just to -- before we get started on No. 17.

BY MR. KARAM:

**Q. Did you -- so you were looking at the verticals to observe the final decline --**

A. Uh-huh (affirmative response).

**Q. -- data, right?**

A. Yes.

**Q. And you were doing that in 2012, right?**

A. '10, '11 and '12.

**Q. Okay. Was there any -- was there any change from 2010 to 2012 in your observation of the vertical well data?**

A. No.

**Q. So this is another e-mail between you and Mr. Galvin and Mr. Johnson, right?**

A. Yes.

**Q. So you say in the January 27th, 5:00, e-mail you say, "Here's a revised FM 5ACGSATC."**

**What is that?**

A. This is where -- not the Mississippian anymore, this is the Permian, Furman Mascow area.

MR. KARAM: Oh, okay. Well, then we're -- we're done for lunch.

THE VIDEOGRAPHER: We are off the record. The time is 12:40 p.m.

(Break taken, 12:40 p.m. to 1:40 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:40 p.m.

BY MR. KARAM:

**Q. Good afternoon, Mr. Miller.**

MR. KARAM: This will be Miller No. 18. It's SandRidge Securities-0005586.

(Exhibit No. 18 marked.)

here, was not a full representation of the data.

**Q. So you -- you agreed to adopt his outlook?**

A. Basically, I agreed that there's no subdivision to the areas within the Mississippian. That was the issue being discussed, not so much his analysis.

**Q. Now, we talked earlier about certain wells being excluded from the type curve because they were not like consistent with maybe SandRidge's future drilling plans.**

A. Yes.

**Q. Do you remember that?**

A. Uh-huh (affirmative response).

**Q. And was there any geographic pattern to the exclusion of the wells when you considered the type curve?**

A. Not from a -- like a systematic look at the geology kind of perspective, but it was from in this area, this localized area, we're not going to drill there anymore.

**Q. How -- how big of a circle would the localized area be?**

A. It varied.

**Q. A mile, two miles, 500 feet?**

A. I don't remember. It was various areas

A. Yes.
**Q. Can you tell me what that is?**
A. This is kind of the companion to my e-mail of October 14th, Miller 22.
**Q. Okay. This is a continuation of that?**
A. Kind of a continuation of the thought process and it just shows the well-by-well projections, or all the plots.
**Q. And this all is discussing a type curve, right, rather than PDPs?**
A. No these are all about PDPs.
**Q. Okay.**
A. Well-by-well PDPs. That's -- each one of these plots behind it is a PDP. I guess there's 145 PDPs -- PDP plots attached.
**Q. So going to -- well, let me just ask you, the first paragraph there, you say, "I've stuck with an N, which is the B factor of 1.5 for now. I'm still looking at 2.0."**
**Explain that, please.**
A. I -- I don't remember exactly, but I -- obviously, I think that Lance or Rodney has asked me to contemplate using a N or -- B or N of 2.0, instead of the 1.5 that we were using on the oil.
**Q. And that was -- would it be correct to say**

**that in your dealings with Lance and Mr. Galvin and Johnson, they consistently suggested that you use a 2.0 B factor?**
A. I think their perspective was a 2.0 was the correct B factor to use, whereas my consistent viewpoint for the oil was 1.5.
**Q. And so in this column here, there's a relative county-by-county breakdown, right?**
A. Uh-huh (affirmative response), yes.
**Q. Yes.**
**And then there were certain wells excluded, right?**
A. Yes.
**Q. And you said these are PDPs, right?**
A. Yes.
**Q. So what's the purpose of excluding the wells?**
A. That they're nonrepresentative or not in an area where they're going to be drilling.
**Q. And would -- were you going to -- was this data to be used to make a type curve or to calculate PUDs?**
A. No. At this point we're just simply -- I'm investigating do I -- is -- is subdividing the entire Mississippian into areas, just as a test case

**conclusion?**

A. I guess I -- the answer is simply that I didn't have good enough evidence to do -- to do the subdivision. There's always attention when you're looking at type curves between wanting to subdivide them and create groups that feel like they're more representative of a certain area, versus getting the population size down so small that it becomes nonrepresentative.

**Q. Okay. So can you be just a little more specific in that? What were you looking for that you found to be insufficient, if that's a correct characterization?**

A. I guess there was not a systematic reason to have the subdivisions and the -- the data did not warrant subdividing.

**Q. What kind of data were you looking for that would have maybe changed your opinion?**

A. A clear systemic difference in the -- in the -- in the completion or the rock being encountered or the fluids being encountered, but I did not see that at the end of the day.

**Q. So it was in part geology-based?**

A. The lack of being able to see a geology-based differentiation, either at a county

basis or the -- the other notional divisions I had made.

**Q. Okay. So and also earlier we discussed this idea that -- that some wells would be gassier and some would not.**

**Was that true in Woods County? Was that variation of gassy wells or pure oil wells?**

A. I think there was two discussions of that. One was like the year-end '12 discussion about subdividing the mature PDPs into GOR or gas projection families and the other one was the vertical wells and subdividing them by county. So which one are you --

**Q. The horizontals, I'm talking about.**

A. Okay. And so can you ask me again?

**Q. Sure.**

**In -- in Woods County, did you notice that same type of variability between gassy, very gassy wells or to pure oil wells?**

A. When I -- when I did that work, that was year-end '12, when we had 644 wells, and I did not see a geographic distribution to the -- to the GOR or gas family types, which led us -- which prevented us from being able to look at a location and say, you're this gas family type, and you're that family

type. So even though we were able to subdivide the PDPs, because we had the performance data to see that we were not able to subdivide the PUDs or the locations.

**Q. Okay. So I'm -- I'm just going to change the topic.**

**How -- did you, yourself, retain counsel or did someone retain counsel on your behalf?**

A. My guess is through Netherland Sewell and through SandRidge in that relationship.

**Q. Did -- did Netherland Sewell retain counsel who's representing you here today?**

A. I don't know how that works.

MR. BOECK: If you don't know, you don't know.

A. I don't know.

BY MR. KARAM:

**Q. Okay. Do you know who's paying for your counsel?**

A. Not me.

**Q. Do you know if it's -- do you know if it's --**

A. I believe it's either Netherland Sewell, who may be reimbursed by SandRidge, because there's -- the engagement letter provides for that,

**right, that's composed of both oil and gas, correct?**
A. The 5600 is the ratio of the gas to the oil.
**Q. Gas to oil.**
A. Yeah.
**Q. So -- so if the oil component stays the same, and you reduce the gas component, that means the oil is a higher percentage of the whole, correct?**
A. Well, I didn't reduce the gas component. I just did not permit it to grow.
**Q. In the small -- in the 5600, the oil is a higher percentage of that than the 7900, correct?**
A. That's the -- explicitly what GOR means, gas-oil ratio is -- 5600 is less than 7900.
**Q. So the answer to my question is "yes," that the oil percentage is higher when you use 5600?**
A. I don't know what you mean by "percentage." I understand GOR. GOR is lower.
**Q. Well, it's a ratio, right?**
A. Yes, the ratio of the gas to the oil.
**Q. And when there's a ratio, there -- in this particular case, there are -- there are two parts, right, the oil part and the gas part, right?**
A. Yes.

A. The ratio of the gas to the oil.

**Q. So you would agree that 203 is a larger part of 5600 than it is of 7900, right?**

MR. BOECK: Objection; form.

MR. PHILLIPS: Objection.

A. I'm sorry, but your question -- and it makes no sense to me.

BY MR. KARAM:

**Q. Well, if you divided 5600 by 203, right, you'll get a number?**

A. Divided 5600 by 203?

**Q. Right. To try to take apart the ratio. A ratio is a division of two numbers, right?**

A. The 5600 is the ratio of the gas reserves well-by-well, divided by the oil reserves well-by-well.

**Q. What? All right. Consultant tells me I'm going down the wrong -- I'm not doing well, so I'll change.**

A. I'm sorry.

**Q. Let me just stay nearby.**

**By being -- by choosing 5600 out of conservatism, you are choosing the GOR with less gas; is that correct?**

A. I'm choosing to have less gas in the

the -- strike that.

Why don't you read Mr. Ward's e-mail, dated December 8, 2010, 11:19 a.m.

A. Are we on another page?

Q. Oh, -431025.

MR. BENESH: Backside of the front page. Never mind.

MR. HORNE: Oh, and for the record, Miller 40 is SD-Securities-0431024.

A. (Reviews document.)

Okay.

BY MR. HORNE:

Q. Did you perceive SandRidge as pushing you to have a higher reserves report?

A. No.

Q. Okay. Let's turn to the first e-mail -- or last e-mail in time.

A. Okay.

Q. Do you recall -- and I'm going to read part of it into the record.

"Verbally, he agreed with our concept of booking some horizontal wells offsetting known vertical production."

The "he," Mr. Johnson is referring to, that's you; is that correct?