# EXHIBIT 14

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

In re: SANDRIDGE ENERGY, )
INC. SECURITIES LITIGATION,) Case No. 15-cv-00634-SLP
)

VIDEOTAPED DEPOSITION OF LINDSEY WALTON

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON JANUARY 31, 2019

REPORTED BY: DAVID BUCK, CSR

Miss Lime.
Q. And what is the Miss Lime?
A. The Miss Lime is the reservoir or zone in northern Oklahoma that SandRidge was drilling horizontally.
Q. Is that the Mississippian?
A. Yes.
Q. Okay. Do you know when your assignment to the Mississippian began?
A. I do not.
Q. Now, you said you worked with Netherland Sewell, the auditors. What was -- describe what you did in relation to Netherland Sewell as part of your job at SandRidge.
A. So, with Netherland & Sewell we would send them our well data. We would work closely with them for a period of time, mainly at year-end, to develop our corporate type curve and have a final reserve report for that year.
Q. What is a corporate type curve?
A. A type curve, a corporate type curve is an estimation or prediction of EUR oil reserves for a well set or a group of wells.
Q. Do you know if -- what the first year that SandRidge developed with Netherland Sewell a corporate

type curve for the Mississippian area?
A. I don't know the exact year.
Q. Do you know when SandRidge began drilling in the Mississippian?
A. I don't know the exact year but I would say 2010, 2011.
Q. Can you describe for me the process by which you worked with Netherland Sewell? What did you actually do?
A. So, the process would be that we have a database that has all of our wells or cases in them. We would forecast our wells. We would send the database and all of the data to Netherland & Sewell. They would look at the data and we would start kind of a back and forth process of, you know, Dave would or Netherland & Sewell would review our forecast and then he would -- we would go well by well and kind of compare forecasts or notes on EUR.
Q. So let's -- let's focus on 2011. You mentioned Dave. Is that David Miller?
A. That's David Miller.
Q. And he was the person at Netherland Sewell who dealt with SandRidge primarily?
A. Yes.
Q. Did SandRidge have an internal type curve

exclude a well because it was poor.

Q. (By Mr. Karam) But the result would be -- well, a mechanical well would be poorer performing. Right?

A. It could be.

Q. And a well drilled in the wrong zone would be poorer performing. Right?

MR. GIMBEL: Objection to form.

THE WITNESS: It could be.

Q. (By Mr. Karam) If you decided not to drill there anymore in that zone, that would be because the performance was poor. Right?

MR. GIMBEL: Objection, form.

THE WITNESS: I don't -- I don't think it has to be because the performance is poor. It may just not be economic.

Q. (By Mr. Karam) Do you remember wells in Grant County having a poorer performance than other areas in the Mississippian?

A. No, not during this time period.

Q. You don't remember or it was not a fact that Grant wells were poorer performing?

A. During this time period it was not a fact that Grant wells were poorer performers.

Q. So you can't give any reason why there were

initially designed pro forma curves.
Can you explain to me what that means?
A. No. I don't know what --
Q. You can't --
A. -- that means.
Q. You can't shed any light on that?
A. I don't know what pro forma curves it's referring to, but I -- I guess that well didn't have any production when we or SandRidge designed some pro forma curves.
MR. KARAM: This will be Number 6.
(Deposition Exhibit Number 6 marked for identification purposes and made part of the record.)
Q. (By Mr. Karam) And it is SandRidge Bates number 0456685.
(A brief pause.)
Do you recognize this?
A. From yesterday.
Q. And does this refresh your memory that SandRidge was urging Mr. Miller to use a 2.0 B factor?
MR. GIMBEL: Objection to form.
THE WITNESS: I don't believe SandRidge urged. We worked in conjunction with Dave to look at each individual well and develop a type curve and

ultimately Netherland & Sewell developed and agreed with their own type curve for SandRidge. We believed in some instances some wells' production profile needed an N of two, some others needed a different N, but I think that ultimately Dave made his own decision on that value.

Q. (By Mr. Karam) He, he believed an N of 1.5 was more appropriate. Isn't that right?

MR. GIMBEL: Objection to form.

MR. WORD: Objection to form.

THE WITNESS: It looks like he says on a type curve we get a better fit to the data using N 2.0.

Q. (By Mr. Karam) Do you know if he ultimately used 2.0?

A. I don't remember.

MR. KARAM: This will be Number 7.

(Deposition Exhibit Number 7 marked for identification purposes and made part of the record.)

Q. (By Mr. Karam) It's SandRidge Bates number 0426082. This is an e-mail from -- from Lindsey Austin to David Miller with a copy to Cristie Moss and Lance Galvin.

Do you recognize this, Ms. Walton?

A. No.

you unofficially or otherwise that -- that a higher type curve or higher numbers, higher judgments were preferred by management?

MR. GIMBEL: Objection to form.

THE WITNESS: I don't know that I remember anyone expressing that to me.

Q. (By Mr. Karam) Did SandRidge in its dealings with Mr. Miller have -- try to get him up to SandRidge's target EUR?

MR. GIMBEL: Objection to form.

THE WITNESS: Sand -- SandRidge had an internal type curve that we worked with Dave on to develop. Dave engineered his own type curve and the type curve that we ultimately adopted as year-end was Netherland & Sewell's approved type curve.

Q. (By Mr. Karam) Is it correct that in the e-mails we saw earlier, Dave's 1st pass, those were lower than SandRidge's numbers?

A. It may have been, but it was also first pass.

Q. And then eventually Netherland & Sewell's numbers moved up to what SandRidge's numbers were?

MR. GIMBEL: Objection to form.

THE WITNESS: They may have.

Q. (By Mr. Karam) Do you ever remember SandRidge

Q. Okay. And by this point, which is 2011, have you drilled enough wells in Grant County to reach that determination?
A. I don't know how many wells that we had drilled in Grant County as of this date.
Q. Well, if you look higher it says Grant, southeast Alfalfa and northern Garfield, 34 of 50 wells included.
So it looks like that area has 50 wells drilled. Is that correct?
MR. GIMBEL: Objection, form.
THE WITNESS: From this e-mail it appears so.
Q. (By Mr. Horne) And it also looks like Mr. Miller is telling you, Mr. Rodney Johnson, Mr. Galvin -- well, and Mr. Galvin that there do appear to be discrepancies between Grant wells and other wells?
A. David in his e-mail did bring that up.
Q. And do you recall discussing this issue with Mr. Miller?
A. I don't recall discussing it with Mr. Miller.
Q. Would it have reduced -- strike that.
If Grant County and other counties had very distinct production, would it have been appropriate to

have different type curves for the two areas?

MR. GIMBEL: Objection to form.

THE WITNESS: I think ultimately all data was supplied to David Miller and if he believed in his expertise it should have been separated then he would have developed more than one type curve.

Q. (By Mr. Horne) Okay. And my question is, if Grant County is different than -- is very different than other areas, would it have been appropriate to have different type curves for the areas?

MR. GIMBEL: Objection to form.

THE WITNESS: I can't say it wouldn't have been appropriate. Sorry. I don't know that it was appropriate in this instance. I think that Dave had the data and we presented him with the data and he developed type curves to the best that -- of his knowledge or expertise.

Q. (By Mr. Horne) And it looks like in this instance you provided him with the data and he's saying it looks like they're different. Is that correct?

A. Uh-huh. He is saying that.

Q. Okay. So it looks like you have provided him with the data and he has said they're different?

MR. WORD: Object to form.

Q. (By Mr. Horne) Yes.
A. I think that we were keeping the PUDs in those sections, 13, 14 and 16, because we had plans to drill those wells like the Olivia which we believed to have performed well.
Q. Okay. And there are wells within that section that did not -- PDPs within that section that did not perform well. Is that correct?
A. I don't know that they didn't perform well, but it appears here that they were excluded for a various reason from the type curve.
Q. Okay. And could it be, just could it be just simply luck of the draw that the Olivia did well while the other ones are excluded?
MR. GIMBEL: Objection.
Q. (By Mr. Horne) The other ones are more representative but the Olivia just happened to do well?
A. No, I would -- I would believe that if they were excluded that there was a reason other than just being a poor performer for them to be excluded.
Q. They would have --
A. So --
Q. I'm sorry.
A. I was -- we -- we provide -- these wells if

they are excluded from the type curve we provide that data to Netherland & Sewell and our reasoning why. Dave, Dave and Netherland & Sewell ultimately chooses whether they are in or out of the curve.

MR. HORNE: Walton 37.

(Deposition Exhibit Number 37 marked for identification purposes and made part of the record.)

Q. (By Mr. Horne) I'll keep the bad one, give the good ones.

For the record, Walton 37 is NSAI_SD_156078 and its attachment beginning 156122. I believe there may have been another attachment. And I'm going to ask you to go through this exhibit and point out all of the changes that SandRidge is requesting that would result in a lower EUR as opposed to a higher EUR.

(A brief pause.)

A. Well, there doesn't appear to be any.

Q. Okay. And about how many pages did you go through? Well, you know what, we can calculate it with the Bates stamps. NSAI_SD_156079 through NSAI_SD_156122 and there is one change per page. That's all I have on this one. Oh, actually, has -- did sand -- did SandRidge ever, to your knowledge did SandRidge ever request a change that would lower the

A. I'm sorry.
Q. Sorry, either by e-mail or orally concerning the type curve in which Matt Grubb was also involved?
A. Not that I remember, no.
Q. Okay. Do you recall James Bennett ever being involved in discussions with Netherland Sewell about SandRidge's type curve?
A. No, I don't recall.
Q. Do you recall Tom Ward ever being involved in discussions with Netherland Sewell about SandRidge's type curve?
A. No.
Q. I'm going to ask you to turn to Exhibit 25, which Mr. Horne showed you earlier today. Let me know when you have that.
(A brief pause.)
Do you have that in front of you now?
A. Yes, I do.
Q. And Exhibit 25 is an e-mail and an attachment. I'd like you to take a look at the attachment if you would. Do you have that --
A. Yes.
Q. -- in front of you?
A. Yes, I have it.
Q. Okay. And do you recall the attachment

the best place to try and make sense of analyses that were prepared over half a dozen years ago?

MR. HORNE: Objection to form.

Q. (By Mr. Gimbel) You can answer.

A. It's definitely hard.

Q. Okay.

MR. GIMBEL: I'll pass the witness.

FURTHER CROSS EXAMINATION

BY MR. WORD:

Q. Hi, Ms. Walton. My name is Christian Word. Can you hear me okay?

A. I can.

Q. Okay. We met before. I represent Tom Ward. I have just a few questions for you as well.

A. Sure.

Q. Did Mr. Ward ever instruct you to tell Netherland Sewell which wells they should include or exclude from its type curve analysis?

A. No.

Q. Did Mr. Ward ever tell you which B factor Netherland Sewell should use in constructing its type curve?

A. No.

Q. Did Mr. Ward tell you to push Netherland Sewell to a particular EUR target?

A. No.
Q. Did Mr. Ward tell you to withhold or misstate any data you were providing to Netherland Sewell?
A. No.
Q. Was Mr. Ward at all involved in creating the Netherland Sewell type curve for the Mississippian?
A. No.
Q. Was the information that you and SandRidge provided to Netherland Sewell accurate?
A. Yes.
Q. Do you believe that information was also complete?
A. Yes.
Q. Was there anything that Netherland Sewell asked you to provide that you didn't provide?
A. No.
Q. Did Netherland Sewell ever question the accuracy of any of the data you provided for them?
A. Not that I remember, no.
Q. Do you believe the Netherland Sewell type curves were a reasonable estimate of EUR at that time?
A. I do remember thinking that, yes.
Q. Do you believe that Netherland Sewell's type curves were the best estimate of the EUR based upon

all information that you had?

MR. HORNE: Objection to form.

THE WITNESS: I believed it was a good estimate.

Q. (By Mr. Word) Do you think there's ways in which the estimate could have been improved?

MR. HORNE: Objection, calls for speculation.

THE WITNESS: I mean, we just did it -- I mean, there were -- there were things that I didn't personally agree with, you know, Dave's suggestions, but in the end Dave was obviously a longer tenured engineer than I was and he did work for Netherland & Sewell, so I was happy to accept Dave's recommendation.

Q. (By Mr. Word) And ultimately these were Netherland Sewell's type curves. Correct?

A. Yes, ultimately, yes, they were.

Q. Did SandRidge misstate any of its actual financial results in its public SEC filings?

A. Not that I know of.

Q. Did SandRidge accurately disclose its gas to oil ratio of Mississippian wells in its SEC filings?

A. I don't -- I don't know. I -- I wasn't a part of the SEC filings and I don't know those numbers.

MR. WORD: Thank you. I'll pass the witness.