# EXHIBIT 15

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

DUANE & VIRGINIA LANIER TRUST, )
individually and on behalf of )
all others similarly situated,)
)
Plaintiffs, )
)
vs. ) Case No. CIV-15-634-G
)
SANDRIDGE MISSISSIPPIAN TRUST )
I, et al., )
)
Defendants. )
)
)
In re: SANDRIDGE ENERGY, ) Case No. CIV-12-1341-G
INC. SECURITIES LITIGATION, )
)
)
This Document Relates to: )
)
ALL ACTIONS )

VOLUME I

VIDEOTAPED DEPOSITION OF TOM WARD
TAKEN ON BEHALF OF THE PLAINTIFFS
IN OKLAHOMA CITY, OKLAHOMA
ON MARCH 28, 2019

REPORTED BY: DAVID BUCK, CSR

THE WITNESS: So would you repeat that, please?
(The record was read as directed.
"Q. Besides your recollection that you drilled additional wells in Grant County, do you have any other reason to disagree with Mr. Grubb's statement that the Grant -- the wells in Grant County have not performed to expectations to date?")
THE WITNESS: I -- I can't precisely say as of January 27th, 2011 how many wells were -- were drilled in Grant County, but my belief is and recollection is that we had good wells drilled in Grant County at this time and some, as in all counties, poorer wells and it wasn't a condemnation of the whole county.
MR. KAUFMAN: You don't have to mark that.
Q. (By Mr. Kaufman) You've been handed a document that's been previously marked as Grubb Exhibit 61. It's a two page document. The top is an e-mail from Tom Ward May 5th, 2011 Bates stamped SD-SECURITIES-0054410 through 4411. My question has to do with the top e-mail in which you wrote, you wrote very helpful. Matt, how many wells have we drilled in Grant County.
Actually no, let me -- let me start with just looking at the bottom, the bottom of Page 1, you see it's a -- it's an e-mail that was forwarded and

A. Netherland Sewell Associates I believe.
Q. Okay. Now, looking at the time period, around October 2011, is it your understanding that these e-mails have to do with Netherlands Sewell's year-end analysis for purposes of determining year-end reserves for 2011?
A. I think you could make the assumption it is. It seems early to me, but let's say yes.
Q. Okay. And was it pretty typical for you to communicate with Mr. Johnson about Netherland Sewell's work?
A. I wouldn't say it's typical.
Q. Did -- did Mr. Johnson typically keep you informed about the year-end reserve analysis progress?
A. Yes.
Q. In the second sentence of the line we were looking at it says, he's working on 2 b factor. Look to see if a raise is warranted. Tentative seems he believes it is. Right? Believes it is.
Do you see what I read to you?
A. Yes.
Q. Do you recall around this time that SandRidge wanted Netherland Sewell to use a 2 b factor for the Mississippian horizontal wells?
MR. PHILLIPS: Objection to form.

southeast Grant County, the top right graph, that shows that for the 37 wells that are -- that are being examined the normalized daily production of gross oil is underperforming the type curve. Right?

A. Yes, if you take all of those wells aggregated the -- the group of those wells is below the type curve of the horizontal Mississippian across the whole play.

Q. Okay. We're done with that document.

A. Thank you.

(Deposition Exhibit Number 28 marked for identification purposes and made part of the record.)

Q. (By Mr. Kaufman) You've been handed what's been marked as Exhibit 28. It's a SandRidge second quarter 2012 earnings conference call, August 3rd, 2012, SD-SECURITIES-0300269 through 297. And on the second page of the exhibit it lists Tom Ward as a corporate participant.

A. Yes.

Q. Now, directing your attention to -- well, before I ask that, so did you participate in this conference call?

A. Yes.

Q. Okay. Directing your attention to Page 3 of

the transcript, which is 0300271, you'll see it says Tom Ward at the top and then if you look at the fourth paragraph from the bottom in the middle you said, the value driver of the horizontal Mississippian play is the ability to consistently drill thousands of high rate of return oil wells over hundreds of miles.

Do you see what I read to you?

A. Okay, I'm looking here. Yes.

Q. Then the next paragraph you say, SandRidge has now drilled 382 producing wells across the original acreage we put together from 2007 to 2011 and we are seeing consistent results from Comanche County, Kansas through Grant County, Oklahoma.

Do you see what I read to you?

A. Yes.

Q. So during this conference call you didn't disclose that certain counties such as Comanche were underperforming the type curve. Right?

A. Comanche wasn't necessarily underperforming the type curve. I think it was at the type curve, but even in those 13 wells. But the scope of this is across the whole play is fairly consistent, you're going to drill good areas and poor areas but if you look at the whole play in general it's a -- it's generally very consistent. I think that's what I'm

trying to get to.

Q. Okay. But weren't some counties performing better than other counties?

A. Sure. By definition you have a count -- one county performing better than the other, but if you take the overall production of all counties and you put that into a rate of return it was very high and so that the -- the consistency across the play of being able to drill high rates of return wells even in Grant County as you -- as you bring out, there are very good areas to drill there. And if you just pick apart the southern or northern it might not be in a very localized area there or Comanche County or Alfalfa or Woods but if you take the whole play together the rates of return are -- continue to be very high.

Q. Right, but didn't we at the last exhibit we looked at different graphs that showed that certain counties were underperforming the type curve?

A. Oh, you just picked out certain general areas that had a small subset of wells and at the same time you can go into different townships within each of those areas and find very good wells. So whenever you drill a PUD location you would offset your better wells than your worse wells and you'd end up with a higher, projected higher rate of return.

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DUANE & VIRGINIA LANIER TRUST, individually and on behalf of all others similarly situated, Plaintiffs, vs. SANDRIDGE MISSISSIPPIAN TRUST I, et al., Defendants. | Case No. CIV-15-634-G |
| In re: SANDRIDGE ENERGY, INC. SECURITIES LITIGATION, | Case No. CIV-12-1341-G |
| This Document Relates to: ALL ACTIONS | |

VOLUME II

VIDEOTAPED DEPOSITION OF TOM WARD
TAKEN ON BEHALF OF THE PLAINTIFFS
IN OKLAHOMA CITY, OKLAHOMA
ON MARCH 29, 2019

REPORTED BY: DAVID BUCK, CSR

asked about what -- what we anticipated finding I was pretty clear that it was 300 to 500. I think we started out 200 to 400 then moved to 300 to 500 over time.

Q. But did you ever disclose to anyone that the -- that the type curve was substantially over the -- the EUR for the MBOE was substantially higher than what you were actually seeing from drilling?

MR. BAUER: Objection.

THE WITNESS: The -- the type curve was made by Netherland Sewell that we relied on for PUDs. The internal work that we did was always around a range of outcomes between 250 MBOE I believe it was in 2010 up to 400 to 500 in 2000 -- or maybe 300 to 500 in 2012. Internally our -- our reservoir department continued to look at -- at the outcomes as being against a 456 MBOE outcome and a 470 MBOE outcome even through 2012.

Q. (By Mr. Kaufman) Other than the -- the per range of three to 500 MBOE, did you represent that the oil EUR for the actual production was well under the oil EUR as set forth in the Netherland Sewell type curve?

A. We did.

Q. When?

A. In 2012 whenever we first noticed that our

oil cut went from 45 to 40.
Q. What do you mean by oil cut?
A. The percentage of oil in -- that was coming out of the -- the wellbore.
Q. Percent, percentage of oil relative to what?
A. In the percentage of oil relative to gas. I think we had -- we had anticipated our oil cut of being 45 percent and we moved that down to 40 percent in I believe late October or early November.
Q. Okay. And what did you disclose with respect to the -- the oil EUR for the typical horizontal Mississippian well?
A. We -- we disclosed the type curve given by Netherland Sewell, we disclosed that we had changed our internal numbers on oil and then we disclosed that Netherland Sewell had not reviewed our work and that would be done at year-end and then we -- we came up with a -- a new -- we increased our gas and at that time I believe we -- we thought that we change our B factor up from 1.5 to 1.8 internally. That was in November of 2012.
Q. Okay. Prior to that disclosure in November of 2012 did you disclose to investors that the oil EUR experienced from actual wells was much lower than the oil EUR as represented in the Netherland Sewell type

curve?
A. Well, it wasn't. The -- the oil EURs up until then wasn't ever -- we didn't anticipate them being a different than the Netherland Sewell PUD type curve. So, they -- these are two different things. As you look through the -- the operating group has historicals and then you're saying that the type curve which is in the future and also Netherland Sewell's is the same thing and they're -- they're not.
Q. Okay. So when did you disclose that the actual production from the PDPs was substantially lower than the Netherland Sewell EUR oil type curve?
MR. BAUER: Objection, form of the question.
Q. (By Mr. Kaufman) Your response was that they're different, that the -- the type curve is different than actual wells. So I'm asking you, when did you disclose that SandRidge knew throughout 2011 and -- and throughout 2012 up prior to November 2012 that the actual production from the -- from -- from PDPs was lower than the EUR for oil as represented by the Netherland Sewell type curve?
MR. BAUER: Objection, form of the question, assumes facts.
THE WITNESS: It wasn't. So, what we disclosed was that we have wells that were -- would make us a

Q. (By Mr. Kaufman) -- when did you disclose that prior to November 2012?")
THE WITNESS: Okay.
MR. BAUER: Same objections.
Go ahead.
THE WITNESS: Thank you.
So, the -- the sheets that you're showing are -- are given by the operations group. So the reservoir engineering group who does our reserves, corporate reserves had not changed the oil MBO on a -- to my knowledge on a -- in our quarterly reserves until the end of third quarter 2012.
Q. (By Mr. Kaufman) Okay. So I'm just going to break down because you actually said a couple things there.
A. Okay.
Q. First I'm going to start with the operations analysis. So, so if the operations group determined that the oil EUR was lower than the corporate group, why didn't you disclose that to investors?
MR. BAUER: Objection, assumes facts.
THE WITNESS: Because the -- the reserves of the company are given by our reserve engineers and reserve group. The operations group is -- is meant to operate the wells. They can risk any way they want to to move

forward on how to drill a well but the actual reserves are done by the reservoir group which was Rodney Johnson's group. And then they, Rodney Johnson's group at every year would have to go through with Netherland Sewell, the most respected or one of the two most respected firms in the industry, to come up with our actual reserves. So the actual reserves as I knew them and as our team knew them were the same as we -- as we disclosed until we chose to -- until it was given -- the reservoir group determined that there was less oil, oil cut. I don't know if you want me to use that -- that name or not, but that less oil was coming out than natural gas as natural gas was increasing.

Q. (By Mr. Kaufman) But didn't you think it was important to consider what the operations group was -- was determining as well as what just the corporate reservoir engineering group was determining?

MR. PHILLIPS: Objection, assumes facts not in evidence.

THE WITNESS: The -- the corporate reservoir group did our reservoir engineering. That's who I determined that I relied on for our reservoir.

Q. (By Mr. Kaufman) Did the corporate reservoir engineering group determine reserves for purposes of