# EXHIBIT 111

Southern International Incorporated

4200 Perimeter Center Drive, Suite 205
Oklahoma City, OK 73112-2391 USA
Telephone: (405) 943-5288 Telefax: (405) 947-4149

| | | | |
|---|---|---|---|
| OK | CA 1884PE | MT | CA 1577 |
| AR | CA 2158 | ND | COCP 1065PE |
| KS | E-1926 | OH | CA03996 |
| LA | EF 0004800 | TX | F-8348 |
| MS | E-2537 | WV | C04507-00 |
| WY | E-0571 | | |


**Report of Expert Witness**

**Terry L. Brittenham**

**April 4, 2019**

Re: In re SandRidge Energy, Inc. Securities Litigation
United States District Court for the Western District of Oklahoma
Case No. 12-cv-01341-G, Relating to All Securities Actions

and,

Re: Duane & Virginia Lanier Trust, individually and on behalf of all others similarly situated,
v.
SandRidge Mississippian Trust I, *et al.*
United States District Court for the Western District of Oklahoma
Case No. 15-cv-00634-G

The above captioned lawsuits include allegations by Plaintiffs, who are purchasers of securities of SandRidge Energy, Inc. ("SandRidge"), SandRidge Mississippian Trust I ("Trust I"), and/or SandRidge Mississippian Trust II ("Trust II"), between certain dates in 2011 through November 8, 2012 (the "Class Periods"), against SandRidge, Trust I, and several SandRidge officers (collectively, the "Defendants"), concerning SandRidge's crude oil and natural gas exploration and production activities within the Mississippian formation oil and gas leasehold (the "Mississippian," "Mississippian Play," or "Play") and related statements and alleged omissions by certain Defendants.

# I. ASSIGNMENT

1. I have been retained by Latham & Watkins, counsel for Defendant Tom L. Ward, to examine certain petroleum engineering issues involving the subject allegations and to address, at least, the following topics:

A. Relevant background on the technical, operational, and business aspects of oil and gas exploration, development, and production generally, and as they were known and applied in the Mississippian Play during the Class Periods.

B. The geology of the Mississippian and to what extent has the industry's understanding of that geology changed over time.

C. Whether the process SandRidge used to estimate and disclose its oil and gas reserves for its Mississippian interests was consistent with the industry norms and best practices in 2010, 2011, and 2012. Whether its retention of and interactions with Netherland Sewell & Associates, Inc. ("NSAI") were reasonable and appropriate.

D. The opinions of *Lanier*[1] Plaintiffs' expert witness Letha C. Lencioni regarding "[t]he predictability, or lack thereof, of well performance in the Mississippian formation;"[2] and "[t]he effect of ESPs used by SandRidge to increase production rates."[3]

E. The *Lanier* Plaintiffs' expert witness Jan J. Tomanek's "opinion that based on the information available at the time of each of the Trusts' IPOs, the geology of the Mississippian Lime was not well understood by SandRidge. Thus, the results of their drilling was not predictable or consistent."[4]

F. The opinion of *Glitz*[5] Plaintiffs' expert witness Steven D. Crane that SandRidge "convinced" NSAI to make inappropriate inclusions or exclusions of wells within NSAI's type curve calculations, as well as Crane's characterization that SandRidge overstated its average estimated ultimate recovery from existing and future undeveloped wells.[6]

---

1 "*Lanier*" refers to the case *Duane & Virginia Lanier Trust, et al., v. SandRidge Mississippian Trust I, et al.*, No. 15-cv-00634-G (W.D. Okla.).

2 Corrected Expert Report of Letha C. Lencioni § 1(1) (Mar. 21, 2019).

3 Lencioni Report § 1(4).

4 Expert Report of Jan J. Tomanek ("Tomanek Report") § 1.3 (Mar. 1, 2019).

5 "*Glitz*" refers to the case *In re SandRidge Energy, Inc., Sec. Litig.*, No. 12-cv-01341-G (W.D. Okla.).

6 Expert Report of Steven D. Crane (Mar. 1, 2019).

## II. QUALIFICATIONS

2. I am an Oklahoma professional petroleum engineer with education, training, and industry experience in the drilling, completion, and operation of oil and gas wells and the estimation of future oil and gas well production and crude oil and natural gas reserves.

3. I graduated with honors from the University of Wyoming, where I received a Bachelor of Science degree in Petroleum Engineering in 1975. I am a member of the Association of Energy Service Companies, the International Association of Drilling Contractors, the American Association of Drilling Engineers, both the Societies of Petroleum and Professional Engineers, the American Association of Petroleum Geologists, and the Rocky Mountain Association of Geologists. I have published peer-reviewed works regarding well operations, well equipment, and engineering. I have lectured extensively to the industry on these and other subjects. I am licensed to practice engineering in Oklahoma and most jurisdictions where oil and gas activities are performed in the United States of America. The most recent edition of my Resume is attached, which more fully discloses my education, professional and industry experience, publications, and professional affiliations.[7]

4. I am an employee of Southern International, Incorporated ("SII"). For my services in performing the investigation, preparing this Report, and subsequently providing testimony, SII is being compensated at a rate of $375/hour and any reimbursement for travel expenses and third party charges. In addition, SII is being compensated at rate of $280/hour for staff engineering assistance. This compensation was not contingent upon the substance or outcome of the opinions issued in this Report.

5. I founded SII in 1982 with one other individual. Since its founding, SII has been involved with Oklahoma oil and gas development, production, and management as consulting engineers, well operator, drilling contractor, well site consultants, and directional drillers on behalf of oil and gas well operators, service companies, and other stakeholders involved with development of oil and gas in Oklahoma, including the Mississippian Lime vertical play until about 2009, followed by the Mississippian Lime horizontal play, which continues today.

6. My work with SII in the Mississippian Play spans the breadth of reserves estimation, engineering design and forensic services, well site supervision, directional drilling, regulatory support, incident investigation and analysis, disputes between stakeholders, transaction support, produced water management, and litigation support. Each engagement provided me the opportunity for a first-hand look into the details of Mississippian Play development, including best practices, equipment application, process management, economics, and the business aspects of the Play.

7. I have worked with well operators of every size, oilfield drilling and completion service companies, equipment vendors, and mineral and land owners. Representative clients I have worked for include Newfield Exploration, Midstates Petroleum, White Star Petroleum,

---

7 *See* Appendix B.

Kirkpatrick Oil and Gas, Devon Energy, Tarka, Gulf Exploration, Eagle Road, Weatherford, Chaparral, SandRidge, Range Resources, Brown and Borelli, Chesapeake, Ward Production, Gungoll, Kaiser Francis, Unit, Marathon, Cheyenne Drilling, Apache, Samson Resources, Whitmar, Berexco, Crown, Payne, H&P, Cimarex, Grand, Marjo, New Dominion, Continental Resources, Okland Oil, Plymouth, and many others.

8. I have been retained as an expert witness in the oil and gas exploration and development industry approximately 650 times over the past 35 years. Approximately 250 of those engagements included testifying in depositions, arbitrations, or state and federal trials. My expert work in these litigation matters has included engagements by well operators, drilling contractors, oilfield services providers, non-operating working interest owners, and many others.

9. Additionally, I have provided sworn testimony in oilfield administrative matters before regulatory bodies, such as the Oklahoma Corporations Commission, approximately 300 times.

## III. OPINIONS

10. I herein state and disclose my opinions and their bases regarding my work and these issues. My opinions are expressed in this report to a reasonable degree of engineering and operational certainty and are based on my review and analysis of the information provided, the information I have otherwise secured, the engineering work I have performed, and my education, training, and more than forty years of experience as a petroleum engineer, well operator, and industry consultant, including considerable work involved with the vertical and horizontal development of the Mississippian Play. These opinions may be revised or supplemented if additional materials are reviewed, other evidence or facts are revealed, Plaintiffs' expert witnesses modify or add to their opinions, or additional work is necessarily performed.

### A. Relevant Background on Oil and Gas Exploration and the Mississippian Play

#### *§III(A)(1) The Nature and Occurrence of Crude Oil and Natural Gas*

11. Crude oil and natural gas are, respectively, liquid and gaseous forms of petroleum, a naturally occurring complex mixture of hydrocarbons (molecules containing hydrogen and carbon) which exist in the subsurface as liquids or gases depending upon their unique chemical composition and the pressure and temperature at which they are confined.

12. Most of the earth's crust where petroleum is found is comprised of layer upon layer of "sedimentary rock" formations deposited over hundreds of millions of years of geologic time by various earth processes. Younger rock formations are generally positioned on top of older rock formations. The oldest of these rock formations, where oil and gas are found in Oklahoma, were either deposited in or ultimately inundated by ancient saline seas, resulting in the filling of the porosity of these sedimentary formations by brine water, commonly referred to as "connate water," "interstitial water," or "formation water."

13. Petroleum is not found in underground lakes or rivers, but it exists within the void space ("pore space" or "porosity") of certain rocks. Most of the rock formations which comprise the earth's crust do not contain petroleum, and the determination of its whereabouts in commercial quantities is the basic objective of oil and gas exploration.

14. The mechanisms of the origin and accumulation of petroleum are not unique, but relevant to this work, petroleum is known to generate within a "source rock," such as an organically rich shale formation under the extremes of subsurface temperature and pressure to which the rock is exposed following its burial deep within the earth's crust. Subsequent to formation, petroleum may migrate from the source rock through and into adjacent rock formations having sufficient porosity and permeability to permit the petroleum to flow through and accumulate in the rock formation, expelling a portion of the connate water that previously occupied the porosity. While the term porosity is used to describe the extent of void space which occurs within a rock formation, the term "permeability" is used to define the extent to which those void spaces are interconnected and capable of flowing petroleum fluids (fluids are gasses and liquids) when a pressure differential is applied across the rock. Ultimately, the migrating petroleum will encounter a subsurface condition, known as a "trap" which restricts further movement such that it may accumulate in "oil and gas reservoirs."

15. Following the accumulation of petroleum in the reservoir trap, over the course of geologic time, gravitational forces separate the mixture of natural gas, crude oil (if both are present), and the remaining connate water into horizontal layers due to their density differences with natural gas rising to the attic of the trap, the connate water settling to the bottom, and the crude oil forming a layer between the gas and the water. Due to capillary forces, the surfaces of the pore spaces generally remain wetted with some amount of connate water that adheres to the rock. The relative amounts of oil, gas, and water within a given portion of the reservoir are denoted by the term "saturation." For example, a reservoir is 50 percent saturated with water if that liquid occupies 50 percent of the pore space.

16. Fluids contained within the porosity of subsurface rock formations are under increasing pressure with depth of occurrence, commonly referred to as "pore pressure" or "reservoir pressure." Relevant to the Mississippian portion of Oklahoma and Kansas, the reservoir pore pressure encountered typically is slightly less than the hydrostatic pressure which would be exerted by a column of brine water from the ground surface to the depth of the formation (for example, approximately 2,400 psi at a vertical depth of 5,000 feet). Similarly, formation temperature is also observed to increase with depth by approximately ten degrees Fahrenheit for each thousand feet of vertical depth from the ambient surface formation temperature of about 65 degrees Fahrenheit.

17. Natural gas is increasingly "soluble" (will dissolve) in crude oil with increased pressure and temperature. For example, at initial reservoir conditions of pressure and temperature, one barrel of medium-gravity crude oil such as that produced by the Mississippian reservoirs in Oklahoma and Kansas, may contain perhaps 1,000 standard cubic feet of natural gas per stock tank barrel of crude oil (scf/stbo). This term is referred to as the

"solution gas-oil ratio" (GOR). Standard surface conditions for gas and crude oil are stipulated to be 60 degrees Fahrenheit and 14.7 pounds per square inch.[8]

18. If more natural gas is present in the reservoir than can dissolve in the crude oil at reservoir conditions of pressure and temperature, that "excess" gas will remain in a gaseous phase in the reservoir and will either migrate into the gas cap or it may become trapped within the pore spaces of the rock also occupied by crude oil.

### *§III(A)(2) Production of Crude Oil and Associated Natural Gas*

19. With few exceptions, petroleum is produced from the subsurface through wellbores drilled to and completed within the oil and gas reservoir. Crude oil does not produce itself. It must be associated with an energy source in order to be transported though the reservoir, into the wellbore, and raised to the surface of the earth. The sources of natural energy, one or more of which are present in all commercially productive oil reservoirs include:

A. Expansion, as a result of reservoir pressure reduction, of gas which has come out of solution from the reservoir oil or of free gas initially present in the reservoir, commonly called "solution gas drive";

B. Formation water encroachment into the reservoir, also as a result of reduction of reservoir pressure, commonly called "water drive";

C. Expansion of the reservoir oil as pressure is released; and

D. Gravitational force.

20. In the early life of a well, the initial reservoir pressure may cause reservoir fluids to "flow naturally" up the wellbore and to the ground surface. However, with an initial reservoir pressure that is very close to the hydrostatic pressure exerted by a column of formation water or even crude oil, wells, such as those in the Mississippian Play, which produce primarily crude oil and water, will not flow naturally for a long period, if at all, and certainly not at the maximum efficient rate of production from the reservoir.

21. Therefore, very early in the life of an oil well, some form of artificial lift typically will be installed in the wellbore to lift the reservoir liquids to the surface and permit any associated natural gas to simultaneously flow to the surface. In order to efficiently lift several hundred barrels of oil and water daily, an electrical submersible pump ("ESP") is commonly used.[9] Alternatively, the well may be equipped with a gas or air-lift system. As the well declines in total liquid production rate, at some point a sucker-rod actuated insert pump, or "beam pumping" system will be installed and used for most of the life of the well. Finally, when the well produces only a few barrels of liquid per day, or less, a more efficient plunger lift system may be installed and used for the remaining life of the well.

---

[8] *See* Donald L. Katz, *Handbook of Natural Gas Engineering*, ch. 8 (McGraw-Hill 1959).

[9] For a depiction of an ESP, see **Figure 1**.

22. As the reservoir pressure depletes, the solution gas in the reservoir will expand increasing the saturation of gas in the reservoir at the expense of the crude oil and water. As a result, the "relative permeability" to gas in the reservoir will increase and gas will flow preferentially through the reservoir to the detriment of crude oil or water. This is one of the principles responsible for the common observation that wells that start out performing primarily as oil wells will end up performing more as gas wells as the reservoir pressure depletes.

23. The rate of oil and gas production from a well is directly related to the pressure remaining in the reservoir. In order to produce oil and gas from the well, reservoir energy in the form of pressure must be expended and depleted, thus the term "reservoir depletion." Because reservoirs have finite limits, as oil, gas, and water are produced from the reservoir, the rate of production from any well connected thereto will decline.

24. The computation of the original volume of oil and gas in place in a reservoir is a function of the total pore volume, the oil and gas saturation, and the properties of the fluids that are affected by changes in pressure and temperature. However, not all of the oil and gas originally in place in the reservoir is recoverable, either due to the efficiency of the reservoir drive mechanism or the economic validity of producing the well in consideration of the cost ("operating cost" or "lifting cost") when compared to the revenue generated by the sale of oil and gas produced from the well. The point of zero economic return is termed the "economic limit."

25. The volume of oil and gas that engineers predict will be economically recovered by a producing well during its lifetime is called its "oil and gas reserve."

### *§III(A)(3) Ownership, Development, and Sale of Produced Oil and Gas*

26. In the Mississippian Play, oil and gas mineral rights are generally owned by a private party (the lessor) who typically leases the right to develop the oil and gas to an oil and gas company in return for a royalty interest in the income derived from the sale of oil and gas, and often a bonus payment, and other considerations.

27. The leasehold interests of the parties having the right to drill an oil and gas well in a particular drilling and spacing unit are pooled by the state oil and gas regulatory authority (here, the Oklahoma Corporation Commission or the Kansas Oil and Gas Commission), and an Operator of the well is designated.

28. The costs of drilling, completing, and producing an oil and gas well are shared by the working interest owners. The royalty owners do not share in these costs.

29. Crude oil, natural gas, and produced water are transported from the wellhead of the producing well by a flowline into a tank battery facility where the oil and water are separated and stored in tanks and the natural gas is discharged into a gas sales pipeline owned by the gas purchaser. The crude oil is transported by the crude oil purchaser from the lease either by truck or by pipeline. The produced water is transported from the lease by truck or pipeline and is disposed into a nearby Class II disposal well.

30. The "First Purchaser" of the crude oil and natural gas sold from a well or lease has the responsibility to report to the state the volume of oil and gas produced and sold.

31. The First Purchaser or the well operator will disburse proceeds from the sale of oil and gas to the working and royalty interest owners, withholding the requisite production taxes levied by the state.

### *§III(A)(4) The Mississippian Play and Modern Horizontal Drilling and Completion Technology*

32. Since the advent of rotary drilling in Oklahoma nearly one hundred years ago, oil and gas wells have been drilled vertically into underground oil and gas formations that are generally horizontally postured. Hydraulic fracturing has been used to stimulate the production from Oklahoma wells for the last eighty of those years. However, petroleum engineering has long recognized that, if wells could be drilled horizontally, somewhat parallel to the over and underlying boundaries of the rock formations, the production of oil and gas from certain types of reservoirs could be enhanced. In particular, oil and gas formations having limited vertical thickness, low permeability, or vertical natural fractures in the rock are potential candidates for horizontal drilling. The Mississippian formation, although comparatively thick, was known to be naturally fractured and to have low matrix permeability and was considered a viable candidate for development by horizontal drilling and completion.

33. Modern horizontal drilling technology includes the equipment, services, and knowledge to drill a useable wellbore vertically from the surface of the ground, controlling its trajectory in order to land at a specific geologically advantageous point in the target oil and gas reservoir with a near horizontal attitude and at a pre-determined heading.[10] Subsequently, the horizontal portion of the wellbore (the "lateral") is extended several thousand feet in a particular trajectory dictated by geotechnical criteria through the objective geologic interval(s) or "pay zones" in the oil and gas reservoir, with the length of the lateral generally limited only by lease boundaries and regulatory considerations.

34. Modern horizontal completion technology includes the equipment, services and knowledge to accomplish a process termed "multistage hydraulic fracturing." The process involves installing steel casing and other specialized hardware into the horizontal lateral to permit the isolation and selective hydraulic fracture stimulation of short lengths of the lateral in succession beginning at the end or "toe" of the lateral. Subsequently, the expendable portions of the isolation hardware are drilled out of the inside of the production casing, and the completion effort continues to recover (flow and pump) the large volume (50,000 bbl, for example) of water-based stimulation fluids which were used in the fracturing process out of the oil and gas reservoir. These fluids must be disposed of properly at the conclusion of the fracturing process.

---

[10] See **Figure 2** for examples of horizontal and vertical wells. These images are examples only, and are not necessarily reflective of the geology or casing programs used in the Mississippian or in any particular well. *See also* **Figure 3**.

35. In its initial forms, the described horizontal well drilling and multistage hydraulic fracturing technology was generally available in Oklahoma and Kansas by approximately 2004; however, an increase in the price of crude oil was necessary to make the application to most of Mid-Continent candidate-reservoirs economically viable, and that did not occur until about 2008.

### B. Understanding the Geology and History of The Mississippian Horizontal Play in Oklahoma and Kansas

36. A "play" is a geographical trend of one or more geologically related prospects for the development of oil and gas resources. Such a geographical trend is typically not referred to as a "play" until explorationists seek to develop the prospect or prospects. The designation of a prospect as a "play" is not an indication that economic oil and gas production will necessarily result, as the business of oil and gas exploration remains highly risky even after a geographical trend of geologically related prospects is identified.

37. I understand from reviewing the Plaintiffs' allegations in these matters that the Trust I Registration Statement filed with the SEC on April 6, 2011 stated that the "Mississippian formation's geology" was then "well understood as a result of the thousands of vertical wells drilled and produced there since the 1940s."[11] I understand that the same section of the Trust I Registration Statement stated that "[b]eginning in 2007, the application of horizontal case-hole drilling and multi-stage hydraulic fracturing treatments have demonstrated the *potential* for extracting significant additional quantities of oil and natural gas from the formation." And another part of the Trust I Registration Statement noted that the "continuity of the formation across the AMI area was established by reviewing electric well logs, geologically mapping the analogous reservoir and reviewing extensive production data from more than 1,200 vertical and 40 horizontal wells."[12] Based on my experience working in the Mississippian, the geology of the Mississippian formation was reasonably well understood prior to the alleged Class Periods, as was the continuity of the formation across the areas where Trust wells were drilled.[13] It was reasonably certain that oil and gas was present in the formation, although the quantities and exact locations, of course, were not known.

38. Prior to 2007, horizontal drilling was virtually unexplored in the Mississippian within Oklahoma and Kansas. Vertical drilling in the area, however, was extensive and provided a wealth of information that could inform operators seeking to employ horizontal drilling technologies in the area.

39. Between 1920 and 2009, there were approximately 53,000 vertical wells drilled in the 22-township by 13-township rectangular area (10,296 square miles) surrounding the Trust I

---

11 *See, e.g.*, Third Consol. Am. Compl. ¶ 130, *In re SandRidge Energy, Inc., Sec. Litig.*, No. 12-cv-1341-G (W.D. Okla. Oct. 21, 2016) (Doc. No. 225).

12 *See, e.g.*, Consol. Am. Compl. ¶¶ 114, 192, *Duane & Virginia Lanier Trust v. SandRidge Mississippian Trust I*, No. 15-cv-00634-G (Nov. 11, 2016) (Doc. No. 78).

13 For an image of the Trust areas of mutual interest, see **Figures 4-5**.

and Trust II Areas of Mutual Interest ("AMIs").[14] A significant portion of these wells penetrated at least the top of the Mississippian, and over 11,000 penetrated the entire Mississippian sequence. And even those wells that did not still provided information regarding the geologic stratigraphy bounding the Mississippian. At least 13,500 of the vertical wells drilled prior to 2009 were production tested in the Mississippian.

40. A substantial amount of information about the Mississippian oil formation, including scout cards, well completion reports, open hole logs, well drilling and completion reports, drill stem tests, back pressure tests, shut-in pressure data, and oil and gas production and sales data, for example, was available in the public domain prior to 2009. This represented a significant database of information regarding the material petrophysical properties of the Mississippian, including information necessary to determine the regional extent of the geological formation, the presence of hydrocarbon saturation, the structural geology, the thickness of the formation, the presence of faults and fractures, the mineralogy, porosity and qualitative permeability of the formation, the fluid saturations in the formation, and the formation pore pressure and temperature. Production tests and completed wells provided information as to the gravity, composition and pressure-volume-temperature properties of the reservoir fluids, the response of the wells to stimulation, and historical well production performance information. The professional and academic library of studies performed on the Mississippian formation, especially regarding the potential for oil and gas production, were extensive.[15]

41. Volumetric studies, whether offered in support of applications for increased density development of the Mississippian or performed by engineers for well owners to justify a Mississippian completion, clearly demonstrated a vast accumulation of original oil in place and that the recoverable reserves yet remaining after vertical well development clearly supported substantial additional drilling and development, if the economics could be made to work. The application of horizontal drilling to take advantage of the significant near-vertical fracture swarms in the Mississippian, essentially inaccessible to vertical wells, appeared to be the key to materially increase oil and gas production and reserves at a lower finding cost than offered by a vertical well.

42. Most Mississippian vertical wells were designated by the Oklahoma Corporation Commission and the Kansas Corporation Commission as oil wells and generally spaced to permit the production of one well on each 80 acres.

43. The geologic model for the pore volume of oil accumulation and reservoir permeability was regionally well established many years before horizontal development was undertaken. Crude oil was generally believed to migrate from the underlying Woodford organic shale, ascending the paleo-structure northward through the Mississippian rocks and

---

14 *See* **Figures 6, 8**.

15 For an example of early literature on these topics, see Wallance Lee, *Relation of Thickness of Mississippian Limestones in Central and Eastern Kansas to Oil and Gas Deposits*, Bulletin of Univ. of Kansas (June 15, 1939), http://www.kgs.ku.edu/Publications/Bulletins/26/.

trapped stratigraphically due to the discontinuous nature of lateral fracture and joint permeability.

44. Regionally, the Mississippian Limestone represents a shallow, warm and quiet, marine-shelf carbonate mud accumulation building from north to south with periodic depositional hiatus due to fluctuations in sea level, during which impure carbonates and siltstones were deposited. The geologic unit thins southward toward the paleo-basin due to deposition and to the north due to Pennsylvanian erosion, which removed a portion of the Mississippian sediments (Chester facies). Through diagenesis, the main fabric of the lime mud was recrystallized to an overall anhedral mosaic of sparry carbonate.

45. The principle Mississippian facies units exist in belts trending east-northeast to west-southwest. The portion of the Mississippian Play developed by SandRidge was situated predominately in the siliceous facies with a much smaller portion in the siltstone facies.

46. Historically, the best vertical well production was generally observed to occur in the Mississippian rocks containing siliceous or cherty members, where the rock was the thickest and had the highest primary porosity. Existing secondary fractures and joint systems contributed to increased well production and ultimate reserves. The best matrix porosity is associated with the siliceous horizons located on the east-west paleo-structural trends. Thicker sections (biohermal mounds) of rock developed on the east-west structural trends and experienced siliceous replacement that developed increased matrix porosity.

47. As operators began to explore the possibility of horizontal drilling development, it was commonplace for them to rely upon vertical well data to inform their efforts. In some cases, operators even drilled new vertical wells to inform their horizontal well development efforts.[16] However, it should be noted that even having a good understanding of a formation's geology does not eliminate the inherent risk and uncertainty associated with oil and natural gas exploration.

48. Applying the vast amount of vertical data to the newer horizontal drilling approaches was not an exact science. This is something operators in the Mississippian publicized, and it was generally understood within the industry. Furthermore, it cannot be understated that reserves estimation and oil exploration is inherently a highly speculative business. That too was well understood by the industry and disclosed by Mississippian operators.

49. Nonetheless, armed with geological information derived from decades of vertical drilling, operators found very encouraging results from initial horizontal drilling efforts within the Mississippian. Chesapeake Energy is often credited as drilling the first modern horizontal well in the Mississippian in 2007. Chesapeake reported that well, the Howell 1-33H, as producing approximately 285 MBoe at a cost of only $2.7 million, which Chesapeake

---

[16] *See* Devon Energy Corp. Q2 2011 Earnings Call at 7, S&P Capital IQ Estimates (Aug. 3, 2011) ("This is a play originally established by vertical production years ago, but is now being pursued with horizontal drilling. We drilled our first vertical well to gather data in the second quarter, and we're currently drilling our first horizontal well. In total, we plan to drill or participate in 12 to 15 wells in 2011.").

promoted as being a "very, very successful first effort."[17] SandRidge Energy was a major investor in the Mississippian Play.

50. The modern Mississippian Play accelerated in 2009 as data continued to come in regarding significant horizontal well completions spanning a wide portion of the regionally hydrocarbon-saturated Mississippian limestone formation. The outlook among operators was also positive based on the refinement in the application of available drilling and completion technology, as well as further understanding of intrinsic reservoir properties.

51. The Mississippian horizontal play was dynamic and highly competitive, with a good number of large independent exploration and production companies taking part with reported high hopes and ambitions for great success.[18] There were several "key" wells completed during the early activities that drove some of the exuberance.[19] Results were positive, and with refinement in the application of available drilling and completion technology and operations, as well as identification of intrinsic reservoir properties, developers hoped to identify "sweet spots" both within the reservoir column and in certain areas.

52. Early efforts by developers in the Play concentrated on establishing production on existing leases to preserve their ownership beyond their respective primary terms. Since most horizontal Mississippian spacing units were 640 acres, generally only one well was drilled on each section of a leasehold. The drilling of additional wells in each section ("increased density drilling") generally did not commence until later in the Play.

53. Based upon early production results, coupled with historical knowledge of the Play, most reservoir engineers operated with the premise that the Mississippian was a regionally extensive, conventional, heavily fractured, oil-saturated, volumetric limestone reservoir exhibiting low permeability; otherwise a "tight oil" play, as the term is used in the industry. There was also an understanding that, because of the high water saturation observed in the fractured Mississippian, it may also respond to a "dewatering" effort, as had recently been observed in Hunton limestone reservoirs and thick Pennsylvanian sand reservoirs in Oklahoma, which, after pressure depletion by water removal, established increasing rates of oil and gas production and reserves.

54. Before any actual horizontal well performance was available, it was customary for petroleum engineers to estimate the performance of a horizontal well based upon a mathematically supported multiple of the performance of the vertical well. Examples of vertical wells which produced from only a low permeability matrix and other examples of vertical wells that had fortuitously penetrated some portion of a fracture swarm were both available to establish the basis for projection in the Mississippian. The estimate was further

---

[17] Chesapeake Energy Q2 2011 Earnings Call at 4, S&P Global Market Intelligence (July 29, 2011).

[18] For a map showing the presence of some operators in the Mississippian, see **Figure 12**.

[19] For maps showing the location of various operators' Mississippian horizontal wells, including some highly productive wells, see **Figures 10-11**.

refined by considering the performance of a horizontal well, which would be anticipated to intercept multiple swarms of naturally occurring vertical fractures.

55. The orientation of regional horizontal stress in the Mississippian formation was known to the industry and, as a result, most horizontal wells were drilled in a North-South trajectory, in approximately the direction of minimum horizontal stress in order to maximize the frequency of intercepting conductive, naturally-occurring, vertical fractures and to permit the fracture stimulation of the horizontal lateral with fractures created perpendicular to the axis of the lateral.[20]

56. As frequently observed during the early stages of a new play, there was a learning curve in the optimization of the process of well drilling, completion, and operation by operators in the Mississippian that served to establish the best practices that would be carried forward in the remaining development. Examples of efforts undertaken to increase production and reserves included:

A. Increasing the length of the horizontal lateral to expose more productive rock and more fracture swarms;

B. Using swellable packers as isolation tools attached to the production casing/liner to prevent plugging natural fractures with cement;

C. Shortening the length of each stage, increasing the volume of proppant injected into each fracture stimulation;

D. Tailoring the stage geometry and the fracture stimulation on each stage to the petrophysical properties of the rock in each stage observed during drilling;

E. Increasing the size of the tubulars in the vertical portion of the well to accommodate high volume lift equipment;

F. Use of high volume lift equipment (ESP, gas lift, air lift) to improve the rate and fraction of stimulation (load) water recovered, to reduce back pressure applied to the producing formation, and to expedite dewatering of the reservoir;

G. Installing surface infrastructure (electrical power, separation and storage facilities, produced water disposal, gas sales connection, compression, etc.) prior to stimulation to permit continuous production of the well as quickly as possible afterwards.

57. By 2011, the Play had experienced intense land-acquisition and exploration interest by oil and gas exploration companies. This had the effect of driving up lease prices in the Play.

---

[20] For a depiction of the directionality of the laterals drilled in the Mississippian between 2007 and 2012, see **Figures 10-11**.

58. By mid-2012, approximately 1,100 horizontal wells had been drilled in the Play, about forty percent by SandRidge and about thirty percent by Chesapeake.[21] The balance were drilled by developers such as Eagle, Calyx, Range, Plymouth, Shell, Territory Resources, Panther, Chaparral, Devon and others. This was yet very early in the development of the Play, with only about ten percent of these wells having over one year of production history. At that time, there was optimism that early projected estimated ultimate recoveries ("EURs") may have been conservative and that estimated reserves per well were improving. The use of open-hole packers to isolate frac stages was providing encouraging results. There were also indications that planning and design could improve performance and economics.

59. Optimism for horizontal drilling in the Play continued through the alleged class period with major operators continuing to invest in the area. As just one example, in October 2012, Midstates Petroleum Co., Inc. acquired the Mississippian assets of Eagle Energy.[22] During a November 8, 2012 earnings call, Midstates highlighted that "Eagle's last 30 wells had averaged over 600 Boes per day as an IP" and that Midstates thought it could "back up kind of 1.5 B factors pretty easily and maybe as much as 2 in some cases."[23]

60. In subsequent years, the development of the Mississippian Play was slowed considerably when oil and natural gas prices collapsed, consistent with the unpredictable nature of petroleum price cycles.

61. Based on the foregoing, it is my opinion that the geology of the Mississippian was generally understood prior to the beginning of the alleged Class Periods, as was the continuity of the Mississippian formation within the Trust AMIs. Part of that understanding was based on information obtained from vertical well data, which was informative of reservoir properties and customary to be used to forecast production within a drilling area being newly developed with horizontal drilling exploration. However, even where the geology of a reservoir is well understood, like the Mississippian, there are a substantial number of factors that cause variability of production results between wells and areas.

### C. SandRidge Energy's Process for Disclosing Reserves Estimates and the Central Role of Netherland Sewell & Associates

#### *§III(C)(1) Estimation of Crude Oil and Natural Gas Reserves*

62. The phrase "oil and gas reserves" (hereinafter "reserves") is defined as "those quantities of petroleum which are anticipated to be commercially recovered from known accumulations from a given date forward."[24]

---

21 *See* **Figures 10-11**.

22 Midstates Petroleum Co., Inc., Q3 2012 Earnings Call at 2, S&P Capital IQ (Nov. 8, 2012).

23 *Id.* at 17.

24 Society of Petroleum Engineers ("SPE"), "Petroleum Reserves Definitions," https://www.spe.org/industry/petroleum-reserves-definitions.php (last visited Apr. 4, 2019).