# EXHIBIT 10

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

Case No. 5:12-cv-01341-G

---

DEPOSITION OF: MAGGIE SILVERTOOTH - DECEMBER 20, 2018

---

IN RE SANDRIDGE ENERGY, INC.
SECURITIES LITIGATION,

---

THIS DOCUMENT RELATES TO: ALL ACTIONS.

---

PURSUANT TO NOTICE AND AGREEMENT, THE DEPOSITION OF MAGGIE SILVERTOOTH, was taken on behalf of the Defendant at 1600 Broadway, Suite 470, Denver, Colorado 80202, on December 20, 2018 at 9:01 a.m., before Barbara J. Davalos, Registered Merit Reporter, Certified Realtime Reporter and Notary Public within Colorado.

Page 42

what you were trying to do?
A. No. No.
Q. When you say -- or when the complaint here says, "By reviewing past production of wells in the same area," what do you mean by "the same area"?
A. The same section, township, county, you know, 160-acre tract of land. It depends on what area you're specifically looking at.
Q. But you're looking at a narrow area as opposed to looking at the entire geological formation?
A. Correct.
Q. How many other folks at SandRidge were working as geologists when you were there?
A. I do not know that number.
Q. Okay. Do you know how many were working on the Mississippian Lime formation?
A. In Kansas or Oklahoma?
Q. I was going to ask that next. Either place.
A. I don't know about Oklahoma. Kansas, there was maybe seven of us. I don't know the exact number.
Q. Was there anyone who was more junior to you at the time?
A. No.
Q. Okay. Let's go to the next time you are mentioned in the complaint, which I believe is

Page 43

Paragraph 98. Take a second and read that to yourself. I don't want to read it aloud.
A. Yes.
Q. Okay. Now, is the sum and substance of this something that you discussed with the plaintiffs' investigator?
A. I did tell her about this instance.
Q. Now, having reviewed this now, is everything in Paragraph 98 accurate?
A. No.
Q. What is not accurate?
A. So the first part that is not accurate is towards the end of the paragraph when it says, "This self-dealing upset Aaron Reyna, senior vice president operations, enough that he slammed his hands on the table and pulled Defendant Ward out of the meeting to ask him why the land was being leased." That is not correct.
Q. And what's inaccurate about that?
A. Mr. Ward was not in the follow-up meeting to the initial meeting. So . . .
Q. So he didn't get pulled out of a meeting by Mr. Reyna?
A. Correct. And --
Q. And he didn't see Mr. Reyna slam his hands

Page 44

down on a table?
A. And I don't think Aaron slammed his hands down on a table. Like that whole thing is not correct.
Q. What did you tell the investigator regarding that topic?
A. That it upset Aaron, and he said he would take care of it.
Q. Did you tell them anything more?
A. Well, I mean, I told her the first --
Q. No, no, on that topic.
A. Oh. Oh, okay.
Q. Let's stick --
A. Yeah, yeah. Okay.
Q. -- with that one sentence.
A. Okay. Sorry. No. I told her that Aaron was upset and that he said he would take care of it.
Q. Did you tell her that he slammed his hands down on a table?
A. No.
Q. Did you tell them -- tell her that he pulled Mr. Ward out of a meeting?
A. No.
Q. Do you have any idea where she got those ideas?
A. No.

Page 45

Q. Is there anything else in that paragraph that you would correct?
A. I don't remember Mr. Ward instructing Zach to -- how much to lease. That -- I don't recall that being correct.
Q. Okay. What do you recall?
A. Just that he told him to lease this area, but he didn't give him a dollar value.
Q. What did you tell the -- well, first let me ask you, what do you remember about Mr. Ward saying to lease an area? Can you give us any more detail?
A. I remember we were in a meeting and Zach Graham was the landman in this particular area. And I remember that Tom Ward got up and went to a map, and he said, "I would like to lease this area," hand-waving. And Zach said okay.
Q. Okay. So we're talking about one particular meeting --
A. Correct.
Q. -- with you and Mr. Ward and Zach Graham, right?
A. Uh-huh.
Q. Yes?
A. Correct.
MR. HABER: Objection.


MAGNA LEGAL SERVICES

Q. (BY MR. BAUER) Who else is in the meeting?
A. There would have been other geologists. There would have been landmen, reservoir engineers. There would have been our -- the VPs for the SandRidge -- for the Kansas Miss. Aaron Reyna would have been in there.
Q. Approximately how many people?
A. Those meetings generally had 15 to 30 people in them.
Q. Okay. And do you have any firmer memory of how many people were at this particular meeting?
A. No.
Q. Where was the meeting held?
A. In our large conference room on our floor.
Q. Which floor?
A. I think 26 -- 24?
Q. And was this a regular meeting?
A. Yes.
Q. What was the subject of the regular meeting?
A. These were our weekly -- just our weekly team meetings.
Q. And what team are we talking about?
A. The Kansas Mississippi meetings.
Q. So there was a different meeting for geologists and engineers regarding the Oklahoma Mississippi, right?



A. I don't know what Oklahoma does -- did.
Q. Okay. So all the meetings you attended were the Kansas Mississippian?
A. Correct.
Q. And did you attend those during your entire time at SandRidge?
A. Yes.
Q. Okay. How frequently?
A. I believe they were once a week.
Q. Do you remember what day?
A. No.
Q. Do you remember how long they would go?
A. I know they were long. I don't know how many hours, but I know they were long.
Q. Morning or afternoon?
A. Morning. I'm not entirely sure. They -- I don't know if they were at the same time every week.
Q. How frequently did Mr. Ward attend those meetings?
A. Not very frequently. I would say less than 25 percent of the time.
Q. How about Mr. Grubb? How frequently did he attend them?
A. I would say either the same amount or slightly less.



Q. Who ran the meeting?
A. It was mostly Aaron Reyna and Doug Johnson, unless one of them was out. Then it was just the other one.
Q. What was Aaron Reyna's title? Do you know?
A. I don't know his exact title. He was reservoir engineering, but I don't know his direct specific title.
Q. Okay. And what was his -- what did you know of his job duties?
A. He was just over reservoir engineering.
Q. And how about Doug -- Johnson you said?
A. Uh-huh.
Q. What was his job?
A. He was the VP of the Kansas Miss.
Q. So what was the purpose of these meetings?
A. We would -- geologists would come in and present -- if they had a prospect, they would present that prospect and present any data they had on it. It was kind of like a Show and Tell, Here's this area that I have found, I think it would be worth our time to go look there.
We would sit around and discuss it. And then we would also talk about just how things were going, operations in the area. If the reservoir engineers



were there, we would talk reservoir engineering. If a new prospect got approved or they were excited about it, we tried to figure out how to add it to the drill schedule. It was just kind of like your general -- like explorations, operations meeting.
Q. Were any decisions made about when or where to drill at these meetings?
A. Sometimes. Not all the time.
Q. Who had decision-making authority over that?
A. It was usually Dean, Aaron, Doug. The higher-ups. They would --
Q. Dean?
A. Dean Fratarcangeli.
Q. And sometimes the decision was made in the meeting?
A. Correct.
Q. Did you ever speak at these?
A. Yes.
Q. And you were one of the people that would present information about a site that you were interested in?
A. Yes.
Q. Is that fair to say?
A. Fair to say.
Q. About how many times did you speak at these