# EXHIBIT 11

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

In re: SANDRIDGE ENERGY, )
INC. SECURITIES LITIGATION,) Case No. 5:12-cv-01341-G
______________________________)

VOLUME I

VIDEOTAPED DEPOSITION OF PAUL STARK

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON JANUARY 18, 2019

REPORTED BY: DAVID BUCK, CSR

exact dates.
**Q. Okay. So it was only after Rodney Johnson left that you started receiving the type information that you wanted about the reserves calculated by corporate reserves?**
MR. GIMBEL: Objection, form, misstates testimony.
Go ahead.
THE WITNESS: No. I never got it from even during that time period.
**Q. (By Mr. Kaufman) Oh, you never got it. Okay.**
A. Yeah.
**Q. So what changed between when -- when Mr. Galvin took over?**
A. From my vantage point, not -- not very much.
**Q. Were you hired with -- by SandRidge with a specific mandate regarding reserves?**
A. No, no specific mandate or job description on the reserves piece.
**Q. What did you understand the primary function of your job to be when you first started in the first few months at SandRidge?**
A. Well, I was initially hired by -- or one of the initial contacts was David Lawler and he kind of described the job to me as this would be leading the



reservoir engineering group for the asset team or the operational team where they historically didn't have a presence. Most of the reserve -- reservoir engineers were contained within the centralized group, so this was going to be a reservoir engineering presence within the asset teams. I do believe they had an individual starting to be a reservoir engineering presence within the operational team a few months before me. But that was kind of the way it was described to me was just being in the reservoir engineering presence in the operational department.
**Q. In your prior answer you referenced an individual who was starting to be a reservoir engineer presence in the operational team a few months before you. Who was that person?**
A. It's been several years. I think his name was Kyle Corner. I don't recall exactly. He did leave. In fact, he left before I got to SandRidge, so I don't even think I ever spoke to him in person. He was there while I was interviewing and I forgot if he interviewed me or not, but I don't recall the individual's name.
**Q. Could it have been Kyle Koontz?**
A. Kyle Koo -- possibly.
**Q. So when you first started at SandRidge in**



**October of 2012. Is that correct?**
A. Yes.
**Q. How did you go about investigating and -- and learning about the -- the company's type curve?**
A. I mean, my -- my natural way of doing it is just starting to look at each well and doing -- providing individual forecasts on each of the wells. And I do recall a big -- one of my first big meetings so to speak was a look back on the 2012 program and I do remember this date specifically because my -- my wife was scheduled for a C section to deliver the twins on February 20th, 2013 and that was the day we ended up reviewing the 2012 look back, so our opinion of how the wells performed in 2012. And I do recall that the average forecast of the wells, I don't remember an exact average, but it was well under a hundred thousand barrels of oil per well on an EUR basis and I do recall that was different than, you know, some other numbers that were out there. And I -- I just remember thinking that I wonder how this meeting will go. But that was kind of my first big meeting I would say is 2012 look back.
**Q. When you say some other numbers that are out there -- there, specifically what -- what other numbers are you referring to?**



A. The corporately stated EUR type curve, type curve, yeah, the type curve's EUR.
**Q. Okay. And do you recall who was in attendance at the meeting you just described?**
A. I do not remember all the individuals. Truly I do not remember who all was in attendance.
**Q. Not necessarily all but do you remember any people that were in attendance?**
A. I -- I know for sure my boss was there, Craig Johnson. I -- I do believe or recall that I think Tom was there. I don't recall if -- if Matt Grubb or James Bennett were there or if Lance or Rodney were there, but it was -- I just don't remember very, very detailed. And then some of my team members, my team members were in there as well.
**Q. You mentioned a Tom. Is that Tom Ward?**
A. Yes.
**Q. And do you recall which of your team members were there?**
A. At the time it would have been Ross Giblet, Grayson Psenchik, Lindsey Walton, some of those individuals.
**Q. When you were analyzing when you first started -- let me rephrase that.**
**When you first started at SandRidge and you**

from the process just because of I just couldn't be not involved in the -- the year-end process and then just get pulled in on the back end.

**Q. Okay. And then the -- the last sentence of that paragraph states, the whistleblower later meant with a member of senior management to discuss the ethical concerns that the whistleblower had regarding this project.**

**Do you see that?**

A. Yes.

**Q. Who was the member of senior management referred to here?**

A. It was the head of people and culture at the time, Scott Griffin, Griffith. I told him because I knew I had responded to Lance, I was like, no, I'm not going to go, I'm sorry, no. And I don't think that -- he probably didn't like that. And so I just told Scott, I was like, look, any neg -- anything you hear about this, this was my decision to not include myself, my group should have no -- no responsibility of this. So it was just basically to say I didn't feel comfortable participating in the process and told him, you know, don't let that reflect badly on any -- anybody in my group.

**Q. And how did Scott respond?**



A. I mean, just kind of like, okay, thank you for telling me. I don't recall a very specific feedback. I mean, it was nothing too firm. Or it was a pretty just benign response.

**Q. And this, the ethical issue that you just described occurred on or around February 9th, 2015?**

MR. GIMBEL: Objection to form.

THE WITNESS: I mean, I -- I don't -- this has been several years ago.

**Q. (By Mr. Kaufman) Right.**

A. But I assume so, yes.

**Q. Okay.**

A. It was -- it was in 2015, it was early 2015.

**Q. And then the next paragraph, Paragraph 24, it talks about how in early to mid March 2015 the whistleblower again informed the company's senior management of concerns regarding the company's process in calculating oil and gas reserves.**

**Can you describe what that relates to?**

A. Yeah, I'm trying to remember by the March of 2015 time period. I think this was when once we had our new COO that came in, Steve Turk, and I think this was that -- that -- referring to this conversation. And he was kind of getting to know and learn the asset and so this was just kind of my initial kind of



running through some of my opinions and thoughts on -- on well performance and just kind of sharing with him I do see a disconnect between, you know, the per -- some of our reported numbers and kind of some of the numbers I'm showing you here. So I think this, if I recall correctly, this one referred to conversation with the new COO.

**Q. And what do you recall about that conversation?**

A. Basic -- we were kind of in the midst of -- I don't know why we were still doing business planning because it would have been in the first quarter, but it was putting together forecasts and I remember he was -- we were in a meeting and he basically just said we got to make this plan work and I was like, Steve, I need to show you some -- why this is going to be difficult. And so it was kind of just a followup from that conversation.

**Q. And going down to Paragraph 26, it starts off with, the company terminated the whistleblower on April 1st, 2015.**

**Do you recall whether you were terminated on April 1st --**

A. Yes.

**Q. -- 2015?**



**And you were terminated on that day?**

A. Yes.

**Q. And how were you -- how were you fired?**

A. Steve and Scott called me up to the office and they told me then.

**Q. And did they explain to you the reason?**

A. I don't recall exact wording, but they did refer to some of the, you know, the I was causing angst, you know, amongst various groups or whatever and just I don't remember the exact wording.

**Q. Was it your understanding that you were being fired because of the concerns that you repeatedly raised about how the company reported its -- its reserves to the public?**

A. Yes, I was under that impression.

**Q. And was it in this meeting that you received the form separation agreement that had some of the language that was similar to language we've discussed earlier?**

A. I don't remember if I was handed it that moment or if it came in the mail a day or so later, but -- so I don't recall exactly how I received the actual form.

**Q. You can put that document to the side, we're done with it.**

we'd have some discussions of, hey, we're still going out there with these big EUR numbers and our team as we've been kind of looking at are using less than a hundred thousand and I just said we have a disconnect here. Formally how did I -- I don't think I ever like drafted a memo or said thou shalt recommend to take it to a certain number, but it was just through conversations again stating that I see a large disconnect and we need to address it.

**Q. And who did you have conversations with about that?**

A. Certainly all through the audit process. I mean, that was kind of -- kind of the genesis of why I asked for the audit process. My boss, boss' boss. I most remember kind of of with my boss and then my boss' boss at the time, Dave Lawler.

**Q. Dave Lawler is your boss' boss?**

**Okay, now continuing with the -- with the letter, the next paragraph discusses that in response to your concerns about the reliability of the data being reported to -- to the market, you received various responses.**

**Do you see that?**

A. Yes.

**Q. Okay. With respect to the first bullet**



**point which states you received a response we can't reduce the type curve any further or it will destroy $1 billion of market cap.**

**Do you see that?**

A. I do.

**Q. Do you recall who said that to you?**

A. And again, I think I wrote this in -- in -- maybe not in this form, but these are my recollection of the quotes. They may not be word for word just to point that out. I do remember this one specifically from James. I remember we made a type -- I think the corporation made a type curve change in 2013 and, you know, later, 2014, 2015, I think the stock had a negative response at the last type curve adjustment and so I just remember kind of some of the concerns of the -- the impact of a subsequent type curve change.

**Q. You mentioned a James. James who?**

A. Bennett, James Bennett.

**Q. Did you have a lot of interaction with Mr. Bennett when you were employed with SandRidge?**

A. More than, well, those that departed in 2013. Certainly I had more interaction with James than those that had left in 2013. Not on a frequent basis but probably about once a month or so.

**Q. And how would you describe that -- the**



**purpose of the interaction?**

A. I mean, we were in various meetings together. I think he would sit in on some of the BPRs. We'd have general like business planning meetings. We would present to him our inventory or our POD. We would have some September managerial offsite meetings that we would just kind of talk strategy and what was next. So, just general meetings.

**Q. When -- when Mr. Bennett told you that, and I realize it's not -- it may not be an exact quote, but told you that, you know, you can't reduce the type curve any further or it will destroy $1 billion of market cap, did you respond?**

A. Probably not. I mean, I don't think I did directly at that moment. It's just kind of hearing kind of what the concerns were.

**Q. And do you recall what your reaction was internally to that statement?**

A. At this point it didn't surprise me. And I realize that was a legitimate concern because I think the last type curve did have a big impact. So, I mean, not surprised but just aware that, okay, that is going to be a uphill battle from here.

**Q. Do you think it's appropriate to consider**



**the impact of a company's stock price when determining the type curve?**

MR. BAUER: Objection.

THE WITNESS: It shouldn't be.

**Q. (By Mr. Kaufman) So why didn't it surprise you that Mr. Bennett would -- would say that it would be -- that you can't reduce the type curve any further or it would destroy $1 billion of market cap?**

A. I think it's mainly just awareness of what the impact would be. I mean, I think to your original question, I mean, it shouldn't be an impact -- playing into your decision making process.

**Q. Were you not surprised that Mr. Bennett would be focused on -- let me rephrase that.**

**Were you not surprised that -- that Mr. Bennett would reduce -- would -- would resist reducing the type curve because of potential negative impact on SandRidge's stock price?**

MR. GIMBEL: Object to form.

MR. BAUER: Objection, assumes facts.

THE WITNESS: I guess at this point nothing surprised me. I was kind of seeing the hesitance to -- to work with our group on what our forecasts were and reconciling with the CRG group.

MR. KAUFMAN: We need to go off the record for

**Q. Turn to the next page which is Stark 53, Bates number, the top paragraph. It says, at one** point (after SandRidge made a downward adjustment of the type-curve), a high ranking SandRidge executive gave Paul the following explanation as to why the type-curve was not going to be adjusted any lower (so as to be more in line with the projections of Paul's team). Then there's a quote, it's like landing a plane. You have to bring it down a little at a time, or you might crash, end quote.
Do you see what I read to you?
A. I do.
**Q. All right. Do you recall which high ranking SandRidge executive made that statement to you?**
A. That was Dave Lawler again.
**Q. Do you recall approximately when Mr. Lawler made that statement to you?**
A. I recall it being in that same time period. So, I don't remember exactly but probably second half of '14.
**Q. Do you recall whether it was the same meeting as the other statements or was it a different time?**
A. I think that was the same conversation.
**Q. So even though Mr. Lawler communicated to**



**you that asking questions could upset certain people at SandRidge, you continued to vocalize your objections. Correct?**
MR. GIMBEL: Objection to form, misstates testimony.
THE WITNESS: Well, this was still as that audit process was going on, so yes, I mean, through that forum there were still those ongoing conversations.
**Q. (By Mr. Kaufman) Now, you've referenced the audit process. Was the audit process conducted by the SandRidge audit department?**
A. Yes.
**Q. Okay. And who did you deal with in the audit department in connection with your concerns that SandRidge was overstating its reserves to the market?**
MR. GIMBEL: Objection to form.
THE WITNESS: Well, the original was with Joy LaBar who was leading that group at the time just saying, hey, can we have -- has this been looked at recently. And I don't remember the individual audit team members' names during that time period, but there -- that was when we started -- and again, my main, my main discussion was the lack of communication between the groups and, you know, and throughout the audit process I would, you know, kind of share some of



my concerns, but the fundamental being we just need to make sure this -- these are synced up or at least compared and discussed.
**Q. (By Mr. Kaufman) So you've brought up several times a lack of communications between the groups. Did you have access to Ares?**
A. I did, yes.
**Q. Okay. So if you had access to Ares why couldn't you just pull down the -- the reserves that were developed by the corporate group?**
A. Well, they're -- they're saved as individual databases, so I didn't have access to the -- that specific database. I had access to the tool and all that, you know, our databases and our forecasts, but you're able to lock certain databases within Ares. So I just didn't have access to that particular one.
**Q. So you were locked out of the corporate reserve group's database showing the analysis of the reserves in the Mississippian. Correct?**
A. Yes.
**Q. And you repeatedly asked to gain access to that database and that was refused. Correct?**
MR. BAUER: Objection.
THE WITNESS: Yeah, I mean, at least three or four times over -- over the years.



**Q. (By Mr. Kaufman) Do you know who had access to the corporate reserves database?**
A. I think mainly just the CRG group, so led by Lance Galvin at -- at that point.
**Q. Do you know whether Mr. Ward had access?**
A. I don't.
**Q. Do you know whether Mr. Bennett had access?**
A. I don't.
**Q. Do you know whether Mr. Grubb had access?**
A. I don't.
**Q. When Lindsey Walton came to work for you was she then locked out of access to the corporate group?**
A. That's a good question. I honestly don't know. I assume she was but I don't know.
**Q. Do you know if there was a formal policy in place that prevented people in the operations group from gaining access to the reserves developed by the corporate group?**
A. None that I was aware of.
**Q. Do you know who decided to prevent people in the operations group from gaining access to the reserves developed by the corporate group?**
A. I don't.
MR. GIMBEL: Objection to form.
**Q. (By Mr. Kaufman) Based on your experiences at**

**Q. And more specifically, switching Netherland Sewell for the -- for SandRidge's Mississippian assets. Right?**

A. I don't remember which auditors because I think we had -- there were a few different external auditors doing different parts of the business, so I just don't recall which auditors were working which assets at the time.

**Q. And you referred to hearing this information word of mouth. Who did you hear the information from?**

A. I actually heard this one from Lance. I mean, he mentioned that they had sent some results, like the same set of wells to a bunch of different auditors and so that's where I initially heard it from.

**Q. Did Mr. Galvin express to you any criteria that SandRidge used in order to evaluate the potential firms?**

A. No, he didn't.

**Q. Do you know whether SandRidge was looking to replace Netherland Sewell because its reserves for 2012 were too low?**

A. I honestly --

MR. GIMBEL: Objection.

THE WITNESS: -- don't know what went into the



decision process.

**Q. (By Mr. Kaufman) So you don't know any details about why SandRidge wanted to switch?**

A. I don't.

**Q. Okay. Now, turning to Page 2, which is Stark 25, the top several paragraphs describe three justifications you wrote that you heard frequently for why SandRidge booked reserves the way they did.**

**Do you see what I'm referring to?**

A. Yes.

**Q. Okay. The first one, Item 1 it says, our external auditors approved our reserves, so -- so we are okay. And then you provide several rebuttals to this argument.**

**Do you see that?**

A. I do.

**Q. Okay. The first rebuttal is, first and most importantly, it is the company's responsibility to book accurate reserves. To say we are okay "because the auditors approve it" is similar to approving inappropriate deductions on your taxes but justify the filing by saying that the IRS accepted it.**

**And second you wrote, external audit approval does not make the reserve estimates "right" as evidenced by our xxx% type curve reduction in**



**February 2013.**

**And then lastly you wrote, external audit firms review thousands of forecasts and will never understand our well performance as well as we do; therefore, it goes back to the point that we are the responsible party, not them.**

**Do you see what I read to you?**

A. I do.

**Q. Can you expand upon this a bit by explaining why it is not a valid argument that SandRidge is not responsible for inflated reserve figures because the figures were signed off on by Netherland Sewell?**

MR. BAUER: Objection.

THE WITNESS: Could you restate the question?

MR. KAUFMAN: Can you read back the question?

(The record was read as directed.

"Q. Can you expand upon this a bit by explaining why it is not a valid argument that SandRidge is not responsible for inflated reserve figures because the figures were signed off on by Netherland Sewell?")

THE WITNESS: I mean, my point is I think the company is responsible for it. Did you word the question to say why are they -- I mean, I believe the company is responsible for trying to relay the most accurate set of reserves they can.



**Q. (By Mr. Kaufman) Okay. Yeah, my question was a little -- I guess it may have been a little wordy. It was why is that argument not valid, like the argument they were making.**

A. Oh, okay.

MR. BAUER: Objection.

MR. GIMBEL: Objection.

THE WITNESS: This was just my own personal background with external auditors. I mean, they look at thousands and thousands of wells from tons, a bunch of different companies. They don't know the asset as well as well as the company does. It's ultimately the company's responsibility to put as accurate a forecast as you can. When you have auditors come back and if there's differences you compare and contrast at that time, but to me it's, again, it's just the company's responsibility. The auditors are doing their own thing, they don't know the asset as well as the company does. It's the company's responsibility.

**Q. (By Mr. Kaufman) Do you agree that if the company learns information that calls the auditor's type curve into question, that the company has a responsibility to update its public statements about its reserves?**

MR. BAUER: Objection. Is this an SEC expert

THE WITNESS: Again, the -- the corporate type curve at that time appeared too high once my team had come -- when I had jumped in and done some of the technical analysis.
**Q. (By Mr. Kaufman) Do you know whether Mr. Ward was aware that you believed that SandRidge's type curve for the Mississippian was overstated during 2012?**
MR. BAUER: Objection, foundation.
THE WITNESS: I have no personal knowledge of that. I never had that direct conversation.
**Q. (By Mr. Kaufman) Do you know whether Mr. Grubb or Bennett was aware?**
MR. BAUER: Same objection. It also misstates testimony.
THE WITNESS: Specifically 2012, is that what you're asking about?
**Q. (By Mr. Kaufman) Yes.**
A. No, I'm unaware.
**Q. What about 2013, do you know whether Mr. Ward, Grubb or Bennett were aware that you believed that SandRidge's type curve for the Mississippian was overstated?**
A. Very specific conversations did not occur in 20 -- in '13. I was starting to show the results from



those well look backs. So it was more -- it was not the direct this is overstated, it was just more of the results that we were reporting on a month to month basis were out of line.
**Q. Okay. So the results themselves showed that there was a discrepancy?**
A. In some of the presentations we presented, yes.
**Q. Okay. During the early part of 2013 did anyone else express that they believed that SandRidge overstated its reserves for the Mississippian to the investment community?**
A. No.
**Q. Did you have conversations with your team about your views that SandRidge overstated its reserves for the Mississippian?**
A. I -- I don't recall exact conversations but I probably did start asking them like are you guys seeing this same thing and just trying to have some of the conversation with them since our group or my group was responsible for doing the forecasts. So we probably started having those discussions in our -- within our workgroup.
**Q. Was the internal audit investigation like a confidential investigation or was it something that**



**was widely known?**
A. I'm not sure how widely known it was. I don't think it was confidential, but I -- I'm not sure how many people knew about it.
**Q. Did you discuss it with your team?**
A. I don't think I did. I don't think so.
**Q. You mentioned in a prior answer presentations that evidenced -- evidenced a discrepancy between the corporate reserves and the operation reserves. Do you remember that?**
A. Uh-huh, yes.
**Q. Are you aware of who saw the presentations?**
MR. BAUER: Objection, foundation.
THE WITNESS: It was a monthly process, BPRs, you would have some of the senior management team come in, they not all of them attended every meeting. Your standards were my boss, my workgroup. Again, the only one I remember very specifically was that February 13th date was the 2012 look back. And I don't remember all the parties but I do remember some of your senior leaders were in that meeting.
**Q. (By Mr. Kaufman) And you may have answered already, but just for the record, who do you remember being there?**
A. I remember Tom being there and I don't



recall if Matt was in there or James, but I do remember Tom in there.
**Q. Looking back at Section D(2) and the portion that we just went over, you know, the portion I read, did there come any time while you were employed at SandRidge that you did not agree with what is written there?**
A. D(2) is what you're referring to?
**Q. Yes.**
A. I was unaware of the third point while I was there, but everything else was true.
**Q. And what did you mean by exaggerating the results of its drilling program to the investment community?**
A. Again, I thought the actual results were less than some of the corporately stated type curves.
**Q. And how were those results communicated to the investment community?**
A. The type curve was the fundamental way that -- to indicate how does your average well perform. So it was just in your quarterly analyst presentations. They would sometimes have an annual meeting with the investment community, but it's investor relation type presentations.
**Q. Do you recall any, any statements like oral**