# EXHIBIT 12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

IN RE SANDRIDGE ENERGY, INC. )
SECURITIES LITIGATION )
______________________________)
)
) No. 5:12-cv-01341-G
This Document Relates To: )
)
)
ALL ACTIONS. )
______________________________)

VIDEOTAPED DEPOSITION OF BJORN I. STEINHOLT, CFA
Los Angeles, California
Wednesday, June 12, 2019

Stenographically Reported by:
AMANDA J. KALLAS
CSR No. 13901

Page 146

A No, I -- I'm not requiring -- I'm not saying that it requires an econometric analysis. It has to -- I have analyzed the inputs that would go into my model, which is very simple, what is the difference between what you give up and what you receive? So when I'm looking at the difference between the two, and I determine that it's positive, it is not necessary for me to -- to quantify it.
Q Okay.
A It doesn't even matter whether it's material or not.
Q What were --
A And that is different between the two -- two positions taken.
Q We'll get back to the Permian.
Let me turn, though, to the disclosure about increased well costs; all right? I think we've established that, on November 9th, SandRidge disclosed, in its earning call, that average well costs in the Mississippian had increased by almost 10 percent, from 3 million to 3.25 million; is that right? That's --
A Yes.
Q Okay. And am I correct that analysts reacted negatively to that development?

Page 147

A Yes, I mean, this -- this is -- if you have -- if the well cost goes up, that means that your expenses go up. And if the expenses go up, that means that earnings and future cashflows go down. So that would be a negative piece of information, yes.
Q Okay. And your analysis didn't attempt to disaggregate the impact of SandRidge's announcement that well costs had increased; right?
A Well, I wouldn't disaggregate the -- I would not disaggregate fraud-related information. Confounding factors, the way that you define it is as factors that's unrelated to the fraud, so you wouldn't take a fraud-related factor and disaggregate it. So that's why I didn't do that.
Q Did the plaintiffs allege anywhere in their complaint that the defendants made misrepresentations about well costs at any point during the class period?
A My understanding is that the plaintiff's allegations include the increases in average well costs. If it didn't, I would have looked at it to determine whether or not this particular piece, when included in the overall picture, would constitute a negative factor, and whether or not that was

Page 148

material, and whether or not it should be adjusted for.
Q So if the plaintiffs had not alleged any misrepresentation relating to well costs, you would need to adjust your damages estimate?
A There may be a need, and there may not be a need. It depends on the totality of the information, that totality of the confounding information.
Q Okay. Are you aware of any evidence, based on your review of the discovery record, that the defendants made any misrepresentation about well costs over the course of the class period?
A That's outside the scope of my work. That's not what I -- you know, I -- I'm -- I look at plaintiff's allegations, and I assume them to be true. I don't go through discovery documents to prove or disprove plaintiff's allegations, so I don't have -- I don't know one way or the other.
Q Okay. And your analysis is premised on your understanding that plaintiffs are alleging that defendants made misrepresentations about well costs; is that right?
A Yeah.
Q All right.

Page 149

A Well, it is premised on my understanding that this would be part of plaintiff's allegations and not a confounding factor.
Q We talked a little bit about the Permian, and you testified that you had not made an attempt to quantify the impact of the company's announcement that it was exploring a sale of its Permian assets.
And is that -- is that -- do I understand correctly that you didn't do that because you thought that, generally speaking, analysts responded positively to that development?
MR. KAUFMAN: Object to the form.
THE WITNESS: No, I think I lay out quite clearly what I did in this particular respect. I looked at the information, and I looked at it -- I analyzed the information myself, and -- to determine whether or not it would have a positive or negative cashflow impact.
And one of the things that I -- I did was to look at, well, what -- what did the company itself explain with respect to the potential sale of the Permian? And my -- just to paraphrase, my understanding of what the company said is that, you know, if you didn't get a premium value, if you didn't receive a value for the Permian that was

Page 150

sufficient, then they would simply not sell it.
So here, you have an option that, if the company get what they expect to get, which is the premium value for the company, then -- for the Permian, then they will sell it. And if -- of course, if they get a premium value for the company, and I think it's explained by -- by Defendant Ward, that, yes, some other entity can operate the Permian more efficiently than we can, consequently, they can make more money, so it's more valuable to them than to us. And that is, really, the reason for a transaction like that. If the Permian was more valuable to another firm, for them to operate, then sell it to that firm, and then, you know, that's a net benefit to the company.
BY MR. GIMBEL:
Q Okay. Let me direct you to Paragraph 72 of your initial report. Let me know when you have that in front of you.
A Yeah. I have that.
Q Okay. So in Paragraph 72, you discuss the decline of SandRidge's stock on November 9th, 2012.
You see that?
A Yes. I do see that.
Q Okay. And you talk about possible causes for

Page 151

that decline; right?
A That's correct.
Q Right.
And you rule out some possible causes, as I understand the paragraph; right?
A Yes.
Q Okay. And you rule out the Permian sale as a possible cause of that decline because, as you put it, the potential Permian sale was generally viewed by analysts as a positive?
A That's correct. Yes.
Q Okay. Am I correct that analysts had divergent views about the Permian sale?
A Yeah, of course, they did. I think that I have a paragraph in here where I have differences of opinions with respect to what the -- what they expected to receive for the Permian. And so of course, that -- if you think that they are going to receive a high price for the Permian, you would be more optimistic than if you did not. And different analysts would have different opinions.
Q Okay. How do you reconcile divergent views of analysts in determining whether a piece of information is greeted positively or negatively by the market?

Page 152

A You can come -- you can look at it in terms of coming up with a consensus, maybe a median or an average or something, something like that, in terms of what their expectations are. But moreover, if you -- if you have a majority -- majority of them looking at it in a positive light, and you know that the company itself has stated -- said, quote, (reading):
So there's nothing that makes us sell the Permian, end quote.
Which is in Paragraph 46, when I'm quoting Tom Ward. You understand that there isn't much negative, there isn't much of a negative tale to this particular proposition, but you have a substantial -- or you have an upside, if they get a premium price.
And the company talked to both, the fact that these type of assets were selling at a premium price, so the expectations would be that the price that they would receive would be similar to other similar assets sold at that point in time.
So if you have eliminated the negative tale of the probabilities, but you retain the positive, then the expectation is that this is going to be neutral, at worst, to -- to positive.

Page 153

Q Did you do any analysis to determine the median or average price at which analysts expected that SandRidge's Permian assets would be sold in a potential transaction?
A No. I've listed the numbers in Paragraph 47, I have not literally gone through it and figured out what the median -- median or the average price would be. But -- but whether or not they received that price -- and -- and quite frankly, they -- my understanding, if I recall correctly, is, they received, just as the company stated they would, a premium price that was at the very high end of the estimates of the analysts, including analysts who were positive to the sale.
So, you know, it's -- again, you have eliminated the negative tale, so what is the expected value of that? You can look at it, and in my view, it is positive. And I have looked at numbers, I have looked at what the analysts have said, I have explained methodology of -- of -- of -- of why an option, generally, is considered as positive, and that is the basis for my opinion. But there's nothing in terms of analysis or anything like that in the -- in Dr. Grenadier's report.
Q Okay. Have you done any analysis to