# EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

Case No. 5:12-cv-01341-G

_____

DEPOSITION OF:  MAGGIE SILVERTOOTH - DECEMBER 20, 2018

_____


IN RE SANDRIDGE ENERGY, INC.

SECURITIES LITIGATION,

_____

THIS DOCUMENT RELATES TO:  ALL ACTIONS.


_____


        PURSUANT TO NOTICE AND AGREEMENT, THE
DEPOSITION OF MAGGIE SILVERTOOTH, was taken on behalf
of the Defendant at 1600 Broadway, Suite 470, Denver,
Colorado 80202, on December 20, 2018 at 9:01 a.m.,
before Barbara J. Davalos, Registered Merit Reporter,
Certified Realtime Reporter and Notary Public within
Colorado.



```
 1                   A P P E A R A N C E S
 2    For the Plaintiffs:      MARK S. REICH, ESQ.
                               CHRISTOPHER GILROY, ESQ.
 3                             (Telephonic)
                               Robbins Geller Rudman & Dowd,
 4                             LLP
                               58 S. Service Road
 5                             Suite 200
                               Melville, New York 11747
 6                             (631) 367-7100
                               mreich@rgrdlaw.com
 7                             cgilroy@rgrdlaw.com
 8    For the Plaintiffs:      JOSH BAKER, ESQ.
      Case No. 15-cv-00634G    The Rosen Law Firm, PA
 9                             101 Greenwood Avenue
                               Suite 440
10                             Jenkintown, Pennsylvania 19046
                               (215) 600-2817
11                             jbaker@rosenlegal.com
12    For the Defendant:       STEVEN M. BAUER, ESQ.
      Tom Ward                 Latham & Watkins, LLP
13                             505 Montgomery Street
                               Suite 2000
14                             San Francisco, California 94111
                               (415) 391-0600
15                             steven.bauer@lw.com
16    For the Defendants:      MARK P. GIMBEL, ESQ.
      James Bennett, Matthew   Covington & Burling, LLP
17    Grubb and SandRidge      620 Eighth Avenue
      Energy, Inc.             The New York Times Building
18                             New York, New York 10018
                               (212) 841-1161
19                             mgimbel@cov.com
20    For the Defendant:       DAVID B. SPRINGER, ESQ.
      SandRidge Mississippian  Bracewell, LLP
21    Trust I                  111 Congress Avenue
                               Suite 2300
22                             Austin, Texas 78701
                               (512) 494-3617
23                             david.springer@bracewell.com
24
25
```



Page 3

1             A P P E A R A N C E S  (Continued)

2    For the Deponent:        JEFFREY M. HABER, ESQ.

                              Freiberger Haber, LLP

3                             708 3rd Avenue

                              5th Floor

4                             New York, New York 10017 (212)

                              209-1005

5                             jhaber@fhnylaw.com

6    Also Present:            Matt Thompson, Esq.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 19

1    reports?

2         A.    Yes.

3         Q.    Describe those for me, please.

4         A.    On a daily basis, we would take a screen shot

5    of the geo-steering -- so where we had been in hole --

6    just a snapshot of it.  And we would write up just a

7    little thing saying, This is how many feet we drilled,

8    you know, overnight, this is how fast we were drilling,

9    these are the shows that you -- that we've -- been

10   reported, that general information.

11              And then once a well TD'ed, you would write up

12   a TD report with, again, like a little screen shot of

13   the final -- a wellbore screen shot and just say, like,

14   At a thousand feet, measured depth we encountered this,

15   or, At 7,000 feet we encountered chert.  Just kind of

16   give a report on the well's activities.

17        Q.    Any other kinds of reports other than the ones

18   you just described?

19        A.    No.  Those are the . . .

20        Q.    So can you explain to us the difference

21   between your job as a geologist and a geological

22   engineer.

23        A.    I don't know what a geological engineer does.

24        Q.    Okay.  Would you use a different phrase than I

25   would use?  Who were the engineers that were working



Page 20

```
 1   with you?  What would you call -- give their title?
 2        A.   Drilling engineers?
 3        Q.   Drilling engineers.  Okay.
 4        A.   I'm not sure what job you're -- like job
 5   description you're referring to.  So there was drilling
 6   engineers.  There's reservoir engineers.  There's
 7   construction engineers.  None of us were referred to as
 8   geological engineers, if they were . . .
 9        Q.   What's the difference between your job and a
10   reservoir engineer's job?
11        A.   Reservoir engineers don't look at the geology
12   so much.  They look at the properties of the rock, and
13   they look at what could be down there.  And they --
14   reservoir engineers are often the ones to determine
15   what properties an area may have that may be conducive
16   to oil and gas.
17        Q.   And that was not part of your job?
18        A.   No.
19        Q.   Okay.  Have you ever met Tom Ward?
20        A.   In meetings, yes.
21        Q.   How many meetings have you been in with
22   Mr. Ward?
23        A.   I would say less than ten.
24        Q.   Did you ever have any discussions with him?
25        A.   Not one-on-one, no.
```



Page 21

1      Q.   In these meetings, did he ever ask you any

2   questions?

3      A.   No.

4      Q.   Did you ever speak to him in any of these

5   fewer than ten meetings?

6      A.   Not directly to him, no.

7      Q.   Meaning, you spoke at the meeting --

8      A.   I spoke at the meeting, but I wasn't saying,

9   Hey, Mr. Ward, this.

10     Q.   All right.  Have you ever had any discussions

11  with anyone from a firm called Netherland Sewell?

12     A.   No.

13     Q.   Do you even know who they are?

14     A.   No.

15     Q.   Okay.  Were you involved in any way, as far as

16  you know, with the Mississippian Trust?

17     A.   No.

18     Q.   All right.

19          MR. BAUER:  Let us mark the complaint in the

20  Glitz (phonetic) case as Exhibit 1, please.

21          (Exhibit Number 1 was marked.)

22          (Discussion off the record.)

23          MR. BAUER:  Okay.  So we've placed before the

24  witness the Third Consolidated Amended Complaint in the

25  SandRidge Energy Securities litigation case.



1        Q.   (BY MR. BAUER)   Ms. Silvertooth, have you ever

2    seen this before?

3        A.   Yes.

4        Q.   Okay.  When did you first see it?

5        A.   A few weeks ago.

6        Q.   And how did it come to be that you saw this

7    complaint a few weeks ago?

8        A.   It was sent to me via email.

9        Q.   And who sent it to you?

10       A.   Jeff, my counsel.  Is that -- counsel.

11       Q.   And that was the first time you'd seen it?

12       A.   Correct.

13       Q.   And did you read the whole thing?

14       A.   I did.

15       Q.   Had you ever discussed this complaint with

16   anyone before you received it from Mr. Haber?

17       A.   No.

18       Q.   Had you ever discussed any portions of the

19   complaint with anyone --

20       A.   No.

21       Q.   -- before you received it from Mr. Haber?

22       A.   No.

23       Q.   Okay.  Did you come to understand that you are

24   referred to in this complaint?

25       A.   I am aware.



Page 23

1        Q.    And when did you become aware of that?

2        A.    When I was subpoenaed.

3        Q.    Okay.  That's when you were subpoenaed by the

4   defense, right?

5        A.    Correct.

6        Q.    Did you know anything about this securities

7   litigation before you were subpoenaed by the defense?

8        A.    I did not know there was a -- I did not know

9   there was a class action lawsuit before I was

10   subpoena -- well, before I was subpoenaed.

11        Q.    Did you know that there was any kind of

12   lawsuit?

13        A.    I knew that the investors were -- I didn't

14   know if they were suing Mr. Ward and Matt Grubb, but I

15   knew there had been rumblings and I had seen things

16   that the investors were unhappy with them.

17        Q.    What are the things that you knew or saw?

18        A.    I had seen some news articles on Seeking Alpha

19   or just like those general energy publications.

20        Q.    But when you saw those -- the news articles on

21   Seeking Alpha and other publications, did you realize

22   that you had any involvement in that situation?

23        A.    No.  I probably didn't read them.  I think I

24   just saw them.

25        Q.    So was there a time that you were contacted by



Page 24

1      the plaintiffs' lawyers in this case?

2              MR. HABER:  Objection to form.

3      A.    Yes.

4              MR. HABER:  You can answer if you can.

5      A.    Oh.  Yes.  I'm assuming.

6              MR. HABER:  Well, the question is, you say

7      "lawyers."  Do you mean lawyers?  Agents of lawyers?

8      Be a little more specific so she can answer.

9      Q.    (BY MR. BAUER)  All right.  So there appears

10     to be a distinction between the lawyers and agents for

11     the lawyers.  So were you --

12     A.    Sure.

13     Q.    Do you know, were you contacted by lawyers for

14     the plaintiffs or agents for the lawyers for the

15     plaintiffs?

16             MR. REICH:  Objection.

17             MR. HABER:  Again, objection, to the extent

18     you know what an agent is or who an agent is.

19             MR. BAUER:  I'm trying to ask the question you

20     told me to ask.

21             MR. HABER:  Fair enough.  Fair enough.  Why

22     don't we just ask, was she contacted by either the

23     lawyers or an investigator working on behalf of a

24     lawyer.  That's what you want.  She can answer that.

25     Q.    (BY MR. BAUER)  So let me ask that question.


MAGNA
LEGAL SERVICES

Page 45

```
 1        Q.   Is there anything else in that paragraph that
 2   you would correct?
 3        A.   I don't remember Mr. Ward instructing Zach
 4   to -- how much to lease.  That -- I don't recall that
 5   being correct.
 6        Q.   Okay.  What do you recall?
 7        A.   Just that he told him to lease this area, but
 8   he didn't give him a dollar value.
 9        Q.   What did you tell the -- well, first let me
10   ask you, what do you remember about Mr. Ward saying to
11   lease an area?  Can you give us any more detail?
12        A.   I remember we were in a meeting and Zach
13   Graham was the landman in this particular area.  And I
14   remember that Tom Ward got up and went to a map, and he
15   said, "I would like to lease this area," hand-waving.
16   And Zach said okay.
17        Q.   Okay.  So we're talking about one particular
18   meeting --
19        A.   Correct.
20        Q.   -- with you and Mr. Ward and Zach Graham,
21   right?
22        A.   Uh-huh.
23        Q.   Yes?
24        A.   Correct.
25             MR. HABER:  Objection.
```



Page 46

1          Q.   (BY MR. BAUER)   Who else is in the meeting?

2          A.   There would have been other geologists.   There

3    would have been landmen, reservoir engineers.   There

4    would have been our -- the VPs for the SandRidge -- for

5    the Kansas Miss.   Aaron Reyna would have been in there.

6          Q.   Approximately how many people?

7          A.   Those meetings generally had 15 to 30 people

8    in them.

9          Q.   Okay.   And do you have any firmer memory of

10   how many people were at this particular meeting?

11         A.   No.

12         Q.   Where was the meeting held?

13         A.   In our large conference room on our floor.

14         Q.   Which floor?

15         A.   I think 26 -- 24?

16         Q.   And was this a regular meeting?

17         A.   Yes.

18         Q.   What was the subject of the regular meeting?

19         A.   These were our weekly -- just our weekly team

20   meetings.

21         Q.   And what team are we talking about?

22         A.   The Kansas Mississippi meetings.

23         Q.   So there was a different meeting for

24   geologists and engineers regarding the Oklahoma

25   Mississippi, right?



Page 47

```
 1          A.    I don't know what Oklahoma does -- did.
 2          Q.    Okay.  So all the meetings you attended were
 3     the Kansas Mississippian?
 4          A.    Correct.
 5          Q.    And did you attend those during your entire
 6     time at SandRidge?
 7          A.    Yes.
 8          Q.    Okay.  How frequently?
 9          A.    I believe they were once a week.
10          Q.    Do you remember what day?
11          A.    No.
12          Q.    Do you remember how long they would go?
13          A.    I know they were long.  I don't know how many
14     hours, but I know they were long.
15          Q.    Morning or afternoon?
16          A.    Morning.  I'm not entirely sure.  They -- I
17     don't know if they were at the same time every week.
18          Q.    How frequently did Mr. Ward attend those
19     meetings?
20          A.    Not very frequently.  I would say less than
21     25 percent of the time.
22          Q.    How about Mr. Grubb?  How frequently did he
23     attend them?
24          A.    I would say either the same amount or slightly
25     less.
```



Page 64

1    fund's allegations?

2         A.   No.

3         Q.   Did you ever know whether the hedge fund's

4    allegations were proven or disproven?

5         A.   No.

6         Q.   Do you know anything about the result of those

7    allegations for the company, SandRidge?

8         A.   No.

9         Q.   How about for Mr. Ward?

10        A.   No.

11        Q.   Do you know anything about Mr. Ward's

12   employment agreement with SandRidge?

13        A.   No.

14        Q.   What do you know about SandRidge's leasing

15   activity in Kansas?  Did -- was SandRidge actively

16   leasing properties in Kansas in the time that you were

17   working at SandRidge?

18             MR. REICH:  Objection.

19             MR. HABER:  Objection to form.

20        A.   I wasn't a landman, so I wasn't in charge of

21   leasing.  So I'm not sure what . . .

22        Q.   (BY MR. BAUER)  Do you know whether SandRidge

23   leased properties in Kansas during 2012?

24        A.   No, I don't.

25        Q.   Do you know whether SandRidge leased



Page 65

1   properties in Kansas in 2013?

2        A.   No, I don't.

3        Q.   All right.  Let's go to Paragraph 126, please.

4   And have you had a chance to read it?

5        A.   No.  I'm sorry.

6             Yeah.  I've read it.

7        Q.   Okay.  And is this what you told the

8   plaintiffs' investigator?

9        A.   I told her that the Mississippi was not

10  producing what was anticipated, and I did tell her that

11  I believed it was common knowledge that it was

12  underperforming.

13       Q.   Is there anything in Paragraph 126 that you

14  would correct?

15       A.   The "frustration within SandRidge," I feel

16  like that assumes I'm talking about all of SandRidge.

17  I don't know what the people at the gym thought.  I

18  know -- I would have just been speaking to my group.

19       Q.   So your -- the geologists were frustrated?

20       A.   Correct.

21       Q.   And what was frustrating to the geologists in

22  your group?

23       A.   Well, it's frustrating when you drill a dry

24  hole.  It's kind of a blow to the ego.

25       Q.   Let's go sentence by sentence here now.



Page 66

1    You're talking about, "Oil production in the

2    Mississippian play was lower than had been

3    anticipated." Can you give us any details about that

4    statement? For example, what, in your mind, had been

5    anticipated?

6              MR. REICH:  Objection.

7              MR. HABER:  Objection.

8      A.   Yeah, I don't know what they were expecting

9    number-wise, production wise. I can tell you I drilled

10   a well that produced one barrel of oil. So that's not

11   what anybody was expecting, so -- but I'm not sure like

12   what their type, volume, curve -- I don't know what

13   their anticipated volume was. I just know if you drill

14   a well with one barrel of oil, that's not what you're

15   anticipating.

16      Q.   (BY MR. BAUER)  Approximately when did your

17   well come up with just one barrel of oil?

18      A.   Towards the end of my time there.

19      Q.   In 2013?

20      A.   Correct.

21      Q.   Okay. Were there any other examples where you

22   were personally frustrated with the production from the

23   Mississippian?

24      A.   Not -- not specific times.

25      Q.   Was the -- if you know or if you can say, was



Page 67

1    the frustration constant during the entire time that

2    you were there?  Or was there fluctuations in the

3    frustration?

4              MR. REICH:  Objection.

5         A.   I'm not going to speak for other people.  I

6    don't know what other people were feeling on a daily

7    basis.

8         Q.   (BY MR. BAUER)  How about the -- comparing the

9    oil production to what was anticipated?  Did that

10   change at all over the course of your one-year tenure

11   at SandRidge.

12             MR. REICH:  Objection.

13             MR. HABER:  Objection.

14        A.   Yeah, I don't know the answer to that

15   question.

16        Q.   (BY MR. BAUER)  And one more question.  When

17   you say that the oil production was lower, do you have

18   any specific amount that it was lower by?

19        A.   No, I don't.

20        Q.   Okay.  So let me ask you, what is the basis

21   for the statement that you believed it was common

22   knowledge at SandRidge that the Mississippian was

23   underperforming?  Why did you say that?

24        A.   Well, when I'm asked why I left or when I'm

25   asked what the sentiment at the company was, it felt



Page 68

1    like if you're talking to your colleagues -- I mean,

2    it's kind of water cooler talk saying, I can't believe

3    you drilled a dry hole, Maggie, or frustration that the

4    wells are hard to drill, the Mississippi is hard to

5    drill.

6            It's just a tough play to understand, and

7    that's frustrating.  And it's frustrating to feel like

8    you don't understand how to do your job.

9        Q.   And when you say "common knowledge," this is

10   common knowledge within your group of geologists --

11       A.   Correct.

12       Q.   -- right?

13            Was there any -- do you think it was common

14   knowledge within the people that went to these weekly

15   meetings?

16            MR. HABER:  Objection to form.

17       A.   I don't know what those people thought.

18       Q.   (BY MR. BAUER)  Do you know of any effort to

19   hide from folks what the performance was of any wells

20   in the Mississippian?

21            MR. REICH:  Objection.

22            MR. HABER:  Objection.

23       A.   Yeah, I don't know what they were doing.

24       Q.   (BY MR. BAUER)  You don't know of any efforts?

25       A.   I don't know of any efforts, no.



Page 69

1          Q.    Okay.   I think you're next mentioned in

2    Paragraph 127.   Let's move on to that.   If you could

3    read that to yourself for a second, that would be

4    great.

5          A.    Okay.

6          Q.    Okay.   Is there anything in that paragraph

7    that you would correct?

8          A.    Ward and Grubb were not in every meeting.   I

9    feel like the way this is written says that it would be

10   common for them to be in it.   I don't know if that's

11   how everybody else read it.   But like I said before,

12   they would not have attended weekly.

13          The production at existing wells I feel like

14   is a complicated thing to -- like volumes wouldn't have

15   been discussed, like specific numbers.   And I feel like

16   that's a little ambiguous -- saying that production --

17   I mean, it probably would have just been a general

18   statement saying your Esplund Farms well --

19          THE REPORTER:   Your what?   I'm sorry?

20          MR. BAKER:   Esplund, E-s-p-l-u-n-d, Farms.

21          A.    That was the well that I drilled that was a

22   dry hole.   That obviously didn't produce very much,

23   why?   Those -- that would have been discussed but

24   not -- I feel like this talks about -- is referring to

25   like production volumes and numbers and . . .



Page 70

1         Q.    (BY MR. BAUER)  So there wasn't discussion at

2    these meetings of the overall production of the play?

3               MR. REICH:   Objection.

4         A.    Correct.

5         Q.    (BY MR. BAUER)  All right.  And so discussions

6    would be about particular wells, right?

7         A.    Yes.

8         Q.    And the discussion would not be about specific

9    amounts of production but just a general discussion?

10        A.    Correct.

11        Q.    And did you tell the investigator that last

12   sentence, "The poor performance of the Mississippian

13   was discussed during these meetings"?

14        A.    Yes.

15        Q.    So tell us what you recall about the poor

16   production -- poor performance of the Mississippian

17   being discussed.

18        A.    It was just discussed that -- I'm going to

19   keep using that well, the Esplund Farms well as an

20   example, saying, you know, Well, this was located on a

21   high, why don't you think that produced?

22              And, you know, we would look at examples and

23   figure out why was this area different than this area.

24   And it just felt like there was an overall sentiment

25   that it just wasn't living up to the expectations



Page 71

 1   thought.

 2        Q.   All right.  Let's go to -- I think you were in

 3   Paragraph 129 as well.

 4        A.   Correct.

 5        Q.   All right.  So I think you have to read the

 6   entire email -- the entire paragraph in order to see

 7   what is being attributed to you?

 8        A.   Yes.  I'm familiar with this paragraph.

 9        Q.   So is there anything that you would correct in

10   this paragraph?

11             MR. HABER:  Objection.

12        A.   I don't know --

13             MR. HABER:  I'm sorry.  Attributable to her?

14   To the witness?  What do you mean in general?

15             MR. BAUER:  I mean in general.

16        A.   In general, we did send daily emails that were

17   -- that the recipient's company -- I don't know.  I'm

18   not going to -- whatever -- I don't know who FE1 and

19   FE2 are.  But the -- I know it was sent to executives

20   and people within the company, higher up.  And then the

21   part that's attributed to me is correct, although I

22   don't know David's exact title.

23        Q.   (BY MR. BAUER)  Okay.  David Lawler, you don't

24   know if he's executive vice president of operations?

25        A.   Yeah, I don't know if that was his . . .

